UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS, INC.
Plaintiff

v.

DAVID W. ADAMS, TYRONE WILLIAMS, KEVIN BRITTO, RONALD E. MITCHELL, Individually and d/b/a MANSFIELD RUG COMPANY a/k/a MANSFIELD RUG DEPARTMENT and REMCO, MICHAEL E. BROWN, Individually and d/b/a DALTON PADDING and EMPIRE WEAVERS, JANE DZIEMIT, AGATHA ESPOSITO, DONALD SHOOP, CCC INTERNATIONAL, INC., JOHN D. SUN, DAVID D. SUN, and PAUL SUN,
Defendants

v.

LOWELL FIVE CENT SAVINGS BANK, WACHOVIA BANK, NATIONAL ASSOCIATION, f/k/a FIRST UNION BANK OF VIRGINIA, CITIZENS BANK, BANK OF AMERICA f/k/a BANK OF BOSTON, PEOPLE'S BANK, and FIRST UNION NATIONAL BANK,
Trustee Process Defendants

Civil Action No. 05-11654-NMG

**AFFIDAVIT OF WILLIAM GEMME IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIONS**

I, William Gemme, under oath, depose and state as follows:

1. I am over eighteen years of age, and I reside in the Commonwealth of Massachusetts. I submit the within affidavit in support of Plaintiff's Motion for Preliminary Injunctions. I incorporate herein by reference the factual averments made in

the Verified Complaint filed in this matter, which I signed in my capacity as an authorized agent of International Floor Crafts, Inc. (hereinafter, "IFC").

2. Since 1990, I have served as a Vice-President and Controller for Spags Supply, Inc., and, more recently, Spags 19, Inc. In that capacity, I have had the responsibility of managing the accounting and financial reporting systems.

3. In or around November, 2002, Building 19, Inc. and others purchased the assets of Spags Supply, Inc., which began operating as Spags 19, Inc.

4. In or around January, 2004, the corporate offices of Building 19, Inc. and Spags 19, Inc. began to merge for efficiency purposes. At that time, John Durant, Vice-President of Finance for Building 19, Inc., assumed control of the accounting function of Spags 19, Inc. At that time, I began to report to Durant.

5. In or around October, 2004, Building 19, Inc. placed its Accounts Payable Department under my control. The Building 19 Accounts Payable Department responsibilities include, without limitation, the payment of invoices for Building 19 and its affiliates, including, without limitation, IFC.

6. At the request of Durant, I actively participated in the investigation surrounding the events set forth in the Verified Complaint. I am, and, at all relevant times, have been, an authorized agent of IFC with regard to this matter.

7. From July 8, 1988 to November 15, 1997, and from September 28, 1998 to September 28, 2001, Defendant Kevin Britto served as a buyer of remnants, broadloom, padding, wood flooring and tile on behalf of IFC. From approximately October 1, 2001 to March 25, 2005, Defendant David Adams served as a buyer of remnants, broadloom, padding, wood flooring and tile on behalf of IFC. In that capacity,

Britto, and later Adams, purchased merchandise for distribution to various "Building 19" stores for retail sale.

8. On or about March 25, 2005, IFC terminated employee David Adams, who served as a buyer, for performance reasons which, at the time, we believed to be unrelated to the within matter. At or around that time, IFC re-assigned an individual named ~~Nicholas Adler~~ Nicolas Adler-Dorthe WA to serve as the buyer covering David Adams' departments. Shortly thereafter, Adler informed me that he was unable to confirm whether IFC had received certain merchandise in connection with two or three invoices, all of which had allegedly been purchased by Defendant Adams on behalf of IFC and all of which had allegedly been received by IFC.

9. One of the shipments at issue concerned merchandise allegedly received from a company known as Mansfield Rug. (I now believe that company to be fictitious.) In response, IFC requested documentation from Defendant Ronald Mitchell, an agent to Mansfield Rug, showing proof of delivery of the merchandise. On or about April 21, 2005, IFC received a faint copy of a bill of lading purportedly signed by Defendant Tyrone Williams, IFC's rug department manager. (See **Exhibit A**). According to the bill of lading, Mansfield Rug shipped the merchandise to IFC via a trucking company known as Regional Trucking.

10. Thereafter, Adler informed me that he had ~~visited~~ failed to inventory WA. the Building 19 retail stores and the warehouse, but that he was unable to locate any of the merchandise at issue, including, without limitation, the merchandise from Mansfield Rug.

11. Adler thereafter informed me that he had contacted Regional Trucking in order to inquire about a Mansfield Rug shipment. Adler told me that a representative of

Regional Trucking had told Adler that Regional Trucking had no record of the shipment at issue. Adler later received written confirmation that Regional Trucking had no such shipment. (See **Exhibit B**).

12. At or around that time, Adler informed me that he had concerns about an invoice from Defendant CCC International, Inc. (hereinafter, "CCC International") relating to merchandise allegedly purchased by Defendant Adams on behalf of IFC which IFC had purportedly received. According to Adler, Adler was unable to locate the wood flooring referred to in the invoice.

13. Adler informed me that he contacted Defendant Michael Brown, the representative to CCC International, in order to inquire about the type of wood flooring that CCC International had shipped to IFC. Adler informed me that Brown told Adler that Brown was unable to confirm the type of wood flooring contained in the shipment.

14. Throughout April, 2005, I had several conversations with my supervisor, Durant, regarding the status of Adler's efforts to confirm IFC's receipt of various shipments. In or around the middle or end of April, 2005, Durant instructed me to perform an investigation of invoices paid by IFC for shipments and to collect pertinent documentation.

15. I thereafter reviewed all of the invoices and all shipments that IFC had processed over a six month period from November 1, 2004 through April 30, 2005 from all companies, including, without limitation, Dalton Padding, Empire Weavers, REMCO, CCC International and Mansfield Rug (hereinafter, the "Five Companies"). Through my investigation, I learned that Defendant Mitchell served as Mansfield Rug Company's and

REMCO's representative to IFC, and that Defendant Brown served as Dalton Padding's, Empire Weavers' and CCC International's representative to IFC.

16. During the normal course of business, the buyer would prepare a purchase order for merchandise that IFC would buy from various suppliers. When a shipment is delivered to IFC, an IFC receiver prepares a "key rec," which is an internal accounting document which confirms receipt of the merchandise. The receiver also obtains bill of lading slips from trucking firms or from the vendor itself (if the vendor uses bill of ladings), and the receiver signs the bill of lading. The accounting department receives an invoice for the merchandise from the supplier. The accounting department matches all of the receiving information to the invoice and to the purchase order. No invoices are paid until such time as the buyer approves the invoice for payment. I was able to locate all but one or two bills of lading for several of the companies (not one of which included the Five Companies) from whom IFC purchased merchandise during the six month period. I found all of the key recs.

17. I thereafter telephoned all of the companies for which we required bill of ladings or other documentation concerning the six month period I was investigating. As to all of the companies for which we were missing only one or two bills of lading, the companies forwarded me the missing documentation within approximately twenty-four hours. On that basis, I determined that these shipments from the companies for which we were missing only one or two bills of lading were legitimate shipments. Those companies are not named in this Complaint.

18. During the course of my review of these materials, I determined that, for the six month period, I could locate "key recs," but no bill of ladings for the Five

Companies. During this six month period, Defendant Tyrone Williams served as a receiver on behalf of IFC at a location known as Warehouse 3, where all rug inventory, among other things, is kept when it is not in the stores. Despite being one of several receivers assigned to IFC, during the six month period, Defendant Williams prepared all of the key recs pertaining to alleged shipments received from any companies, including, without limitation, the Five Companies. During the six month period at issue, various receivers, including, without limitation, Kathy Whittaker and Carol Bonville, signed the bills of lading relating to shipments received. I was unable to locate a single bill of lading signed by any receiver pertaining to shipments received from the Five Companies.

19.    In or around April, 2005, I requested proof of delivery from the Five Companies. After waiting for a period ranging from four days to one week, I received a set of documents from CCC International, Dalton Padding and Empire Weaver purportedly signed by Defendant Williams in response to my request. The documents did not seem legitimate, as they appeared to have been prepared on a word processor. The documents contained the type of merchandise that was allegedly shipped, but they did not appear to me, based upon my experience, to be bill of ladings. None of these documents had shipper's signatures or dates, which is data commonly included on these documents in our business.

20.    On April 27, 2005, I telephoned Ronald Mitchell and requested two proof of deliveries pertaining to 2004 billings that fell within the six month period I studied. Mitchell told me that he was then in South Carolina, and that no one else at Mansfield Rug could pull the records I requested. He told me that he would return on May 3, 2005, and that he would pull the records for me at that time.

21. On May 2, 2005, I left a telephone message for Mitchell in which I provided him with the invoice numbers, dates, and amounts of the invoices for which I needed proof of delivery. On or about May 3, 2005, Mitchell telephoned me and told me that an individual named Diane, who apparently worked for him, had cleaned up while he was away and she shred his 2004 records. He told me that Diane should not have destroyed the documents, but that, as a result, he would not be able to provide copies of the bill of ladings which I sought.

22. In May, 2005, I made a review of all 2004 invoices from the Five Companies and found that, during 2004, IFC paid more than $2.3 million dollars to four of the Five Companies. IFC did not make any payments to Dalton Padding during 2004. I determined that IFC had simply paid upon matching the key recs submitted by Defendant Williams to the invoices, without having any bill of ladings attached.

23. At that time, I determined that I needed to determine whether all of these shipments were fraudulent or, alternatively, whether IFC was receiving some merchandise and paying the invoices based solely on the key recs (in which case we would not be able to determine which shipments were legitimate). At that time, I used the inventory records prepared by RGIS for 2003, as well as for the end of January, 2005, for all of the Building 19 stores.

24. At that time, I took the 13 month period where I knew we had fairly good inventory counts in the Building 19 stores. During that period at the warehouses we paid extra attention to how well we did the inventory on our own at our warehouses. I determined the total value of the inventory at the beginning of this 13 month period, and the total value of the inventory at the end of the 13 month period. RGIS takes our store

inventory at retail value and when we take our inventory in the warehouses, we take that inventory at cost. I converted the warehouse inventory cost to a retail value of the warehouse inventory, and then added it to the retail value of the inventory we had from RGIS in the stores. At that point, I was able to take the beginning inventory as of the end of December 2003, and add to it at retail value, all our purchases for 2004 for the 13-month period that ended January of 2005. I then subtracted all the sales for that same 13-month period in order to arrive at an estimated retail value of inventory by department for IFC for that period of time. I then compared that estimated inventory value to the actual inventory value that we had at that time. I found a shortfall of more than $5.2 million at retail value.

25. At that time I compiled the total purchases which IFC purportedly made from CCC International, Empire Weavers, Remco and Mansfield Rug during the 13 month period. (IFC did not purchase from Dalton Padding during that 13 month period.) I determined that the total retail dollar value of all the purchases from those four companies during that period was more than $4,555,000. I also concluded that IFC had not received any merchandise from CCC International, Empire Weavers, Remco or Mansfield Rug during that thirteen month period.

26. I also reviewed the inventory that we had on hand at Warehouse 3, which is where the Five Companies allegedly shipped all of the shipments which we now believe to be fraudulent. As of the end of January, 2005, IFC only had rugs from Georgia Rug and Natco in its inventory. IFC had no rugs in its inventory from CCC International or Empire Weavers, even though a review of purchases in December of 2004 and January of 2005 showed that IFC had purchased at retail, and had received, approximately

$313,000 worth of rugs from CCC International, approximately $205,000 worth of rugs from Empire Weavers, approximately $32,000 worth of rugs at retail from Georgia Rug and approximately $17,000 from Natco.

27. In or around May, 2005, I reviewed records from 1999 to 2005 for IFC. During part of this time, Defendant Britto served as the buyer for IFC. During that period, I found no bill of ladings from Mansfield Rug, Remco, Dalton Padding or Empire Weavers in connection with any alleged shipments. I could locate only five bills of lading for CCC International for that six year period, none of which involved purchases made by David Adams or Kevin Britto. During that same six year period, IFC purportedly purchased more than $7 million of merchandise from these companies at cost – with a retail value in excess of approximately $13 million or $14 million.

28. As a part of the investigation, I also caused copies to be made of the front and back of all checks concerning the Five Companies from 1999 to present. From my review of the checks, I noted that even though CCC International is located in Virginia, Empire Weavers is in Maryland, Dalton Padding is in Georgia, all three of the companies deposited at least some checks from IFC into the same account number with the same bank in Virginia. At least one Remco mailing was sent from IFC via overnight mail to Defendant Jane Dziemit, who was apparently an officer, agent, servant or employee of Defendant Mitchell. It appears that Dziemit endorsed several checks and caused them to be deposited into Remco or other accounts.

29. As a part of my investigation, I also noted that, from 1999 to 2005, all of the Five Companies supposedly delivered their shipments in their own trucks. In fact, the apparently fictitious proof of deliveries from CCC International, Empire Weaver, and

Dalton Padding that I received at my request (see Paragraph 19, *supra*) indicate that the deliveries were to be made by the particular company's own truck. Although Remco's invoices represented that they delivered all their shipments by their own trucks, the only bill of lading provided by Remco to IFC listed Regional Express as the trucking company that performed the delivery. On that bill of lading, the items were supposedly shipped from 5 Mansfield Grove Road, East Haven, Connecticut.

30. In or around late April or early May, 2005, I drove to 5 Mansfield Grove Road in East Haven, Connnecticut, the address from which the merchandise was supposedly shipped. The address is located in a gated apartment complex on the water – certainly not an area where one would find 18 wheelers loading or unloading merchandise.

31. As a result of my investigation, I have concluded that Defendants Britto, Adams, Williams, Dziemit, Brown, John Sun, Paul Sun and David Sun and CCC International have all participated in a scheme to defraud IFC of at least $5 million dating back to at least 1999. As a result of my investigation, I also believe that the following entities, to which IFC made significant payments, are fictitious and have never shipped any merchandise to IFC: Dalton Padding, Mansfield Rug, REMCO and Empire Weavers. Defendant Britto, and later Defendant Adams, placed fictitious orders for items from the Five Companies. Defendant Williams would prepare false documentation showing that IFC had received the non-existent merchandise. IFC would send payment for the non-existent merchandise to the appropriate company. IFC's investigation of the extent of the fraud is ongoing. As a result of my investigation, I also believe that the following entities, to which IFC made significant payments, are fictitious and have never

shipped any merchandise to IFC: Dalton Padding, Mansfield Rug, REMCO and Empire Weavers.

Signed under the pains and penalties of perjury this 19 day of September, 2005.

William Gemme

William Gemme

**CERTIFICATE OF SERVICE**

I, Paul J. Klehm, hereby certify that, on September 19, 2005, the following counsel and *pro se* parties were served either by ECF or by me by facsimile (to counsel only) and first class mail, postage prepaid, where they were not ECF filers:

Isaac Peres, Esq. Counsel to David Adams
50 Congress Street
Boston, MA 02109

Peter Krupp, Esq. Counsel to Paul Sun, David Sun and CCC International
Lurie and Krupp, LLP
One McKinley Square
Boston, MA 02109

William A. Brown, Esq. Counsel to Agatha Esposito
31 Milk Street, Suite 501
Boston, MA 02109

Paul V. Kelly, Esq. Counsel to Michael Brown
Kelly, Libby & Hoopes, P.C.
175 Federal Street
Boston, MA 02110

Frederic D. Grant, Jr., Esq. Counsel to Ronald Mitchell
727 Atlantic Avenue, Second Floor
Boston, MA 02111

Robert M. Xifaras, P.C. Counsel to Tyrone Williams
5 Dover Street, Suite 101
New Bedford, MA 02740

Andrew Good, Esq. Counsel to John Sun
Good & Cormier
83 Atlantic Avenue
Boston, MA 02110

Ms. Jane Dziemit
48551 Shady View Drive
Palm Desert, CA 92260

Mr. Kevin Britto
300 W 21st Street, Apt. 25
New York, NY 10011

/s/ Paul J. Klehm

STRAIGHT BILL OF LADING - NOT NEGOTIABLE

Regional Trucking
5 Hart St
West Haven, CT 0651

DATE 3/25/05

FROM SHIPPER: [illegible]
STREET: 5 [illegible]
CITY, STATE, ZIP: East Haven, CT [illegible]

CUSTOMER P.O. NO. SS[illegible]

TO CONSIGNEE: [illegible] #19 [illegible]
STREET: [illegible]
CITY, STATE, ZIP: [illegible] [illegible]

BILL TO NAME
ADDRESS
CITY, STATE, ZIP

| | | |
|---|---|---|
| 2,459 | | Light weight [illegible] Rugs |
| 2,502 | | Heavy weight [illegible] Rugs |

Tyrone Williams 3/25/05

TOTAL PCS 4,961 — MARK "X" IN COLUMN FOR HAZARDOUS MATERIALS — 24 HR EMERGENCY RESPONSE HAZ MAT PH — TOTAL WT

FREIGHT CHARGES: PREPAID UNLESS BOX IS CHECKED. COLLECT IF BOX CHECKED ☐

C.O.D. AMT. $
CUSTOMER'S CHECK ACCEPTABLE FOR C.O.D.? YES ☐ NO ☐
C.O.D. FEE IS COLLECT UNLESS MARKED PREPAID ☐ C.O.D. FEE PREPAID
REMIT C.O.D. TO: NAME / ADDRESS / CITY, STATE, ZIP

DECLARED VALUE [illegible]

[illegible]

SHIPPER / PER — CARRIER / DRIVER / PCS / DATE
COLLECTED AT PICKUP $ ☐ CASH ☐ CHECK ☐ CARD TYPE

Nick,
Regional Express did not pick up this shipment.

Carol

STRAIGHT BILL OF LADING - NOT NEGOTIABLE

Regional Trucking
5 HART ST
WEST HAVEN, CT. 0651

DATE 3/25/05

FROM SHIPPER: [illegible]
STREET: 5 [illegible]
CITY, STATE, ZIP: EAST HAVEN, CT. [illegible]

CONSIGNEE: [illegible] #19
STREET: [illegible]
CITY, STATE, ZIP: [illegible], NH [illegible]

CUSTOMER P.O. NO. SS[illegible]

| | | |
|---|---|---|
| 2,459 | | Light Weight New Skid Rugs |
| 2,502 | | Heavy Weight New Skid Rugs |

Tyrone Williams 3/25/05

TOTAL PCS 4,961

FREIGHT CHARGES
PREPAID UNLESS BOX IS CHECKED
COLLECT IF BOX IS CHECKED

Nick,

Regional Express did not pick up this shipment.

Carol