UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

———————————————————————
                                                    )
INTERNATIONAL FLOOR CRAFTS, INC.                    )
                    Plaintiff,                      )
                                                    )  Civil Action No. 05-11654-NMG
v.                                                  )
                                                    )
DAVID W. ADAMS, *et al*,                            )
                    Defendants.                     )
———————————————————————)

**PLAINTIFF INTERNATIONAL FLOOR CRAFTS, INC.'S MEMORANDUM IN
OPPOSITION TO PARTIAL MOTION OF DEFENDANT RONALD E. MITCHELL TO
DISMISS COUNTS I AND II (CIVIL RICO) AND COUNT V (FRAUD) OF THE
PLAINTIFF'S AMENDED COMPLAINT**

Plaintiff International Floor Crafts, Inc. ("IFC") hereby opposes the partial motion to

dismiss of Defendant Ronald E. Mitchell ("Mitchell") on Counts I and II (Civil RICO) and

Count V (Fraud) of Plaintiff's Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), where

IFC's Amended Complaint satisfies the requirements for claims brought pursuant to the

Racketeer-Influenced and Corrupt Organizations Act ("RICO") and for fraud claims.  Defendant

Mitchell does not move to dismiss Counts III (Conversion), IV (Unfair and Deceptive Business

Practices) and VIII (Injunctive Relief), all of which state claims against him.

## FACTS

IFC is engaged in the business of selling discounted merchandise to the public through

fifteen retail stores located in Massachusetts, Rhode Island and New Hampshire.  (Amended

Complaint, ("AC"), ¶24).  In a nearly twenty page fact pattern, the Amended Complaint recites,

with specificity, the details of a criminal enterprise in which the organization, which included,

without limitation, Defendant Mitchell, bilked IFC out of millions of dollars over a period of

approximately eight years by means of falsified documents, illusory companies and non-existent merchandise. (*See* AC, ¶¶ 1 – 64). The Defendants in this action, include, without limitation, various present and former IFC employees and manufacturers' representatives (like Defendant Mitchell) to mainly non-existent companies who conspired to defraud IFC. (AC, ¶1).

In the normal course of business, IFC employs various buyers who work with manufacturer representatives of various supplying companies, such as Mitchell, in order to locate and to purchase merchandise, and then the buyer places an order with the supplying company. (*See* AC, ¶25). The supplying company then ships the merchandise to IFC. (*See* AC, ¶25). A warehouse receiver, employed by IFC, then verifies that the merchandise received by IFC meets the order. (*See* AC, ¶25). The manufacturer representative then forwards an invoice from the supplying company to buyer. (*See* AC, ¶25). The buyer then verifies that the invoice meets the request for merchandise, and, if so, the buyer approves the invoice and forwards it to the Accounts Payable Department at IFC. (*See* AC, ¶25). At or around the same time, the warehouse receiver prepares and forwards the receiving documents (also known as "Key Reqs") to the Accounts Payable Department. (*See* AC, ¶25). The Accounts Payable Department matches the invoice to the receiving documents and then pays the invoice. (*See* AC, ¶25).

The Amended Complaint paints a detailed picture of an ongoing criminal enterprise organized. Defendants Williams, Adams, and Britto individually and as a group, operated within IFC. (*See* AC, ¶ 40). At all times relevant, Defendant Williams served as a receiver on behalf of IFC for the fictitious shipments at issue. (A.C., ¶37). At different times, Defendants Adams and Britto served as buyers at IFC. (*See* AC, ¶40). Defendants Brown, Mitchell, the Suns, and Dziemit, in turn, also played roles in the enterprise. (*See* AC, ¶ 40). Defendant Mitchell served as the manufacturer's representative for non-existent companies Mansfield Rug and Remco.

(AC, ¶9). With regard to the fictitious Empire Weavers and Dalton Padding, Defendant Brown

served as the manufacturer's representative – the same role that Defendant Mitchell played. (See

A.C. ¶¶50, 54). With regard to CCC International, Defendants David Sun and Paul Sun, at all

times relevant, served as officers, agents, servants or employees of CCC International and they

engaged in the fraudulent transactions with IFC on behalf of CCC International. (See, A.C.,

¶¶16-17).

> The enterprise operated as follows:
>
> [O]ver the past eight to ten years, Buyers Britto and Adams colluded with
> manufacturer representatives Brown, Mitchell and the Suns to create a criminal
> enterprise in which Brown, Mitchell and the Suns created false invoices for non-
> existent shipments of merchandise from one of the fictitious companies and/or
> CCC International[1] to IFC. Under the criminal enterprise, Defendants Britto or
> Adams would create purchase orders. Defendant Williams or Defendant Britto
> would then generate fabricated Key Reqs [shipping documents] in which he
> falsely confirmed that IFC had received the non-existent merchandise, and he
> would then forward the Key Reqs to Accounts Payable for payment. Accounts
> Payable would then make payments to various individuals and/or entities,
> including, without limitation, Mansfield Rug, CCC International, Remco, Empire
> Weavers, and Accounts Payable would forward these payments to various
> addresses, including, without limitation, addresses for the following individuals,
> Jane Dziemit (for Remco) …

(AC, ¶ 40).

In the Amended Complaint, IFC alleges that it paid approximately 4.47 million dollars to

cover invoices for non-existent merchandise "purchased" from the four non-existent companies,

including, without limitation, Mansfield Rug and Remco. (AC, ¶62). IFC received invoices

from Mansfield Rug from 1999 through 2005 in the amount of approximately $980,000.00, and

it received invoices totaling approximately $2.3 million from 1999 to 2005 from Remco, which,

again, does not exist. (AC, ¶62). IFC also alleges that it made payments to CCC International in

---

[1] Chinese Carpet Center, Inc. d/b/a CCC International (hereinafter, "CCC International").

the amount of $5.289 million, an indeterminate amount of which is based upon fraudulent invoices.  (AC, ¶63).

In an effort to elucidate the criminal enterprise, IFC included a representative sample of the course of the Defendants' fraudulent conduct covering each of the fictitious companies (including, without limitation, Remco and Mansfield Rug) and CCC International.  (AC, ¶¶41-61).

### Remco

On or about October, 2002, IFC, through Defendant Adams, sent a $38,500 purchase order to Remco through its manufacturer's representative, Defendant Mitchell.  (*See* AC, ¶ 42). Remco, in turn, issued an invoice referencing that purchase order for $38,500.  (*See* AC, ¶43). Defendant Williams then signed a receiving document ("Key-Req") falsely indicating that IFC received the merchandise.  (*See* AC, ¶ 44).  About two weeks after IFC sent out the initial purchase order to Remco, IFC issued a check in the amount of $38,500.00 paid to the order of Remco, which was subsequently deposited.  (*See* AC, ¶ 45).

### Mansfield Rug

On another occasion, IFC, through Adams, sent a $43,050 purchase order to Mansfield Rug Co., through its manufacturer's representative, Mitchell.  (*See* AC, ¶ 46).  Mansfield Rug, in turn, issued an invoice referencing that purchase order for $43,050.  (*See* AC, ¶48).  Williams had previously signed a Key-Req falsely indicating that IFC received the merchandise.  (*See* AC, ¶ 47).  About two weeks after IFC sent out the initial purchase order to Remco, IFC issued a check paid to the order of Mansfield Rug Co., which was subsequently deposited.  (*See* AC, ¶ 49).

The Amended Complaint also includes representative fraudulent transactions involving Empire Weavers, Dalton Padding and CCC International.  (See AC, ¶¶50-61).

The Amended Complaint further alleges that, for the past several years, Defendant Williams has maintained almost daily contact with Defendant Adams and Defendant Britto from both inside and outside of IFC, by telephone and facsimile.  (A.C., ¶38).

> Upon information and belief, at all times relevant, all of the Defendants have maintained a common communication network for sharing information on a regular basis. Where necessary, upon information and belief, one or more of the Defendants have held meetings, in person and/or by telephone, to discuss their criminal enterprise.  Upon information and belief, the Defendants have (a) knowingly placed in or caused to be placed in the U.S. mail various letters to accomplish the embezzlement of IFC funds and, directly or indirectly, and through agents or employees, received various letters from other members of the criminal enterprise (b) knowingly sent or caused to be sent various emails and/or facsimiles to accomplish the embezzlement of IFC funds and, directly or indirectly, and through agents or employees, received various emails and/or facsimiles, from other members of the criminal enterprise, and (c) knowingly made or caused to be made various telephone calls to accomplish the embezzlement of IFC funds and, directly or indirectly, and through agents or employees, received telephone calls from other members of the criminal enterprise, all in furtherance of the criminal enterprise.

(A.C., ¶38).

In or around April, 2005, IFC discovered this pattern of fraud when a new buyer at IFC, Adams' replacement, reported that he could not locate certain inventory.  (See AC, ¶ 27). Among other invoices, the new buyer was unable to confirm receipt of merchandise allegedly purchased by IFC from Mansfield Rug dated March 25, 2005 in the amount of $25,054.77, and, at that time, IFC requested proof of delivery (a bill of lading) from Defendant Mitchell, the manufacturer's representative for Mansfield Rug.  (See AC, ¶ 28).  On April 20, 2005, Mitchell forwarded to IFC a light copy of bill of lading signed by Defendant Williams listing Regional Trucking as the trucking company which had purportedly delivered the merchandise to IFC. (See AC, ¶ 29).  On or about April 20, 2005, the new buyer contacted Regional Express LLC

d/b/a Regional Trucking regarding the Bill of Lading.  (*See* AC, ¶ 29).  On April 27, 2005, a

representative of Regional Trucking informed the new buyer that Regional Trucking did not pick

up the merchandise referred to in the March 25, 2005 invoice.  (*See* AC, ¶ 29).

At that point, IFC launched an internal investigation into merchandise which Defendant

Adams had ordered for IFC, and IFC asked Defendant Mitchell to provide bills of lading

showing the shipment of merchandise from Mansfield Rug and Remco to IFC.  (*See* AC, ¶ 31 –

32).  Despite having arranged for hundreds of shipments to IFC, Mitchell was only able to

produce a single bill of lading – the one referred to above which was found to be fabricated.  (*See*

AC, ¶ 32).  Defendant Mitchell later told IFC that the bills of lading for Mansfield Rug and

Remco had been inadvertently shredded a week before IFC made the request for the bills of

lading.  (*See* AC, ¶ 32).

In January, 2005, during the course of the investigation, IFC examined its warehouse

inventory.  (A.C., ¶35).  According to paperwork prepared by Defendants Williams and Adams,

the IFC warehouse in New Bedford had supposedly received a total of approximately

$500,000.00 worth of carpet and rugs from CCC International and Empire Weavers during

December, 2004 and January, 2005.  (A.C., ¶35).  Upon information and belief, Defendant

Adams directed all of the fictitious shipments from all of the fictitious companies and from CCC

International during January, 2005 to the New Bedford warehouse.  (A.C., ¶35).  Nonetheless,

the January, 2005 inventory, revealed that there were no carpet or rugs at that New Bedford

Warehouse from any of the fictitious companies or from CCC International.  (A.C., ¶35).

Over the past eight to ten years, the dollar amount of the individual fraudulent invoices

from the enterprise increased into the tens of thousands of dollars.  (A.C., ¶64).  While IFC

continues its investigation, the estimated total payments made by IFC to the fictitious companies

and to CCC International for fraudulent invoices stands at between four and six million dollars. (A.C., ¶64).

## ARGUMENT

### I.    THE STANDARD OF REVIEW

When examining a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), this Court must accept all of the allegations of the Complaint as true and must draw all reasonable inferences in favor of the plaintiff -- here, IFC. *Albright v. Morton*, 2004 WL 1240900, at *2 (D.Mass. 2004) citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1st Cir.1994). The Court may only dismiss a Complaint if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Albright*, 2004 WL 1240900 at *2, quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229 (1984).

### II.    COUNT I (RICO) MUST NOT BE DISMISSED BECAUSE PLAINTIFF HAS SUFFICIENTLY PLEADED THE EXISTENCE OF AN "ASSOCIATION IN FACT" (OR ASSOCIATIONS-IN-FACT) CONSTITUTING A RICO ENTERPRISE.

In Count I of the Amended Complaint, IFC alleges violations of the Racketeer-Influenced and Corrupt Organizations Act against all Defendants. (*See* AC, ¶¶ 65 – 69). IFC alleges that, at all times relevant, the Defendants, a union and/or a group of individuals associated in fact, although not a legal entity, for the common purpose of systematically and surreptiously embezzling substantial sums of money from, and otherwise defrauding, IFC from at least 1997 to and including 2005, constitute an enterprise within the meaning of 18 U.S.C. §1961(4). (AC, ¶ 66). The activities of the enterprise affect interstate and foreign commerce. (AC, ¶ 66).

Upon information and belief, in furtherance of the criminal enterprise, the Defendants knowingly and purposely used interstate wire in violation of 18 U.S.C. §1343 and interstate mail in violation of 18 U.S.C. §1341, both of which constitute racketeering activity in violation of 18

U.S.C. §1962(a, b, and c).  (AC, ¶ 67). The Defendants have engaged in more than two acts of racketeering and therefore engaged in a pattern of racketeering activity as defined in 18 U.S.C. §1961.  (AC, ¶ 68).  Moreover, the Defendants conducted or participated in, directly or indirectly, the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5).  (AC, ¶ 68).  IFC has been, and continues to be, injured in their business, including, without limitation, the loss of millions of dollars, by reason of the violation of 18 U.S.C. §1962(c) by Defendants.  (AC, ¶ 69).

Despite the detailed facts summarized above and the equally detailed Count I of the Complaint, alleging a RICO violation, Defendant Mitchell claims that IFC has failed to state a claim for a RICO violation against him.  Specifically, Defendant Mitchell argues that IFC has not alleged specific facts to demonstrate an "association in fact" RICO enterprise.  Contrary to Defendant Mitchell's assertion, though, IFC has, indeed, met the requirements for a RICO claim.

To state a RICO claim under 18 U.S.C. §1962(c), "a plaintiff must allege each of the four elements required by the statute:  1) conduct;  2) of an enterprise;  3) through a pattern;  4) of racketeering activity."  *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995)(Court finds sufficient evidence of "enterprise" as to some Defendants).  The statutory definition of a RICO "enterprise" includes "any union or group of individuals associated in fact."  *United States v. Turkette*, 452 U.S. 576, 580 (1981).  The association must be "a group of persons associated together for a common purpose of engaging in a course of conduct."  *Id.*, at 583.  While the association must constitute a unit demonstrated by "systemic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination," *Libertad*, 53 F.3d at 442 – 443.  "[A] RICO conspiracy [under §1962(d)] does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with

all other defendants." *Id.*, at 445, quoting *United States v. Boylan, et al.*, 898 F.2d 230, 242 (1st Cir.), *cert. denied*, 498 U.S. 849 (1990).

IFC must simply show that "the existence of the enterprise, *of which* the [Defendants] were a part." *Libertad*, 53 F.3d at 442 (emphasis in original). The First Circuit, considering whether an RICO association-in-fact enterprise has been asserted properly, has considered the following factors:

> (1) whether the associates have a common purpose, *see id.* at 442-443; (2) whether there is "systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination," *id.* at 443; (3) whether there is a common communication network for sharing information on a regular basis, see *id.* at 444; (4) whether the associates hold meetings and sessions where important discussions take place, *see* [*United States v.*] *Patrick*, 248 F.3d [11] at 19 [1st Cir. 2001]; (5) whether the associates wear common colors, signs or insignia to make the group identifiable, *see id.*; and (6) whether the group conducted common training and instruction, *see id.* None of these factors is dispositive.

*In re Pharmaceutical Industry Average Wholesale Price Litigation ("Pharm I")*, 263 F. Supp. 2d 172, 182 (D. Mass. 2003), citing *Libertad*, 53 F.3d at 442 – 444.

### A.    The *Libertad* factors:  Common purpose / Systematic linkage

In the case at bar, Defendants Adams, Britto and Williams oversaw fraudulent transactions involving Defendant Brown (Empire Weavers and Dalton Padding), Defendant Mitchell (Mansfield Rug and Remco) and Defendants David Sun and Paul Sun (Defendant CCC International). The mechanism of the fraud is the same in each instance; the fictitious merchandise supplier merely changes. Defendant Mitchell was a part of, and important to, an ongoing association, instead of a mere series of criminal acts. *U.S. v. Doherty*, 867 F.2d 47, 68 (1st Cir. 1989)(First Circuit upheld guilty verdicts on RICO counts for most defendants).

There are other factors which tend to show an association-in-fact as well. In *Doherty*, the Court found:

> The number of acts, their relationship, their having taken place over several years,
> and the consistent participation of the central figures in the scheme show a "group
> of persons associated together for a common purpose of engaging in a [criminal]
> course of conduct."

quoting *Turkette*, 552 U.S. at 583.  This scheme took place over an eight-year period, and

involved the same people and entities over that time.

In *Turkette*, the Court found that the "[t]he common thread to all counts was respondent's

alleged leadership of this criminal organization through which he orchestrated and participated in

the commission of the various crimes delineated in the RICO count …" *Turkette*, 452 U.S. at

579.  Like *Turkette*, Adams, Britto and Williams in the case at bar played the central role as

"insiders" under IFC's roof for approximately eight years.  (*See* Defendant Mitchell's

Memorandum, at p.2.)  Nonetheless, the enterprise would be unable to function without

remaining Defendants.  (*See* AC, ¶ 40).  While the role of Defendants Adams, Britto and

Williams provided the common thread of leadership, Defendants Mitchell, Brown, Dziemit,

CCC International and the Suns played their *designated roles*, serving as manufacturer's

representatives to fictitious corporations (except for CCC International), setting up transactions

involving non-existent merchandise, preparing false documentation and receiving and

negotiating the checks for fictitious shipments of merchandise.  (*See* AC, ¶¶ 40, 43, 45).  *See*

*United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003) (finding a discernable structure to the

enterprise where the members played "designated roles in keeping the enterprise functioning as a

viable unit").  As in *Connolly*, the roles of Mitchell, Brown, Dziemit, CCC International and the

Suns were necessary to keep the enterprise functioning as a viable unit:  the fictitious companies

and CCC International not only provided the invoices necessary to defraud IFC, but they also

received and channeled all of the illicit funds.  (*See* AC, ¶ 40, 42 – 64).  The commonalities of

conduct among the Defendants, in an intricate scheme to defraud IFC, as well as the large

10

amount of cash sent to the Defendants (approximately $ 4.8 million to the four fictitious

companies alone over a period of several years (*See* AC, ¶ 62)), demonstrate not only the

common purpose of the enterprise but also a systematic linkage.  *See Libertad*, 53 F.3d at 442

(crediting evidence of substantial planning and coordination).

In *In re Pharmaceutical Industry Average Wholesale Price Litigation ("Pharm II")*[2], 307

F.Supp.2d 196, 204 (D.Mass. 2004)(Saris, J.), certain employee health plans asserted RICO

counts against several pharmaceutical companies, alleging that they fraudulently overstated the

price of prescription drugs, resulting in larger payments by consumers and others.  Plaintiffs

alleged various associations-in-fact, each consisting of pharmacy benefit managers (PBMs) who

served as middlemen between drug manufacturers and end-payors, and a defendant drug

manufacturer.  *Id.* at 205.  The Complaint alleged that PBMs engaged in certain hidden profit-

making schemes. *Id*. at 206.  Under the schemes, PBMs would benefit from certain "spreads"

associated with certain pharmaceutical transactions, and the drug manufacturer would benefit

because the "spreads" encourage the PBMs to sell that drug manufacturer's drugs.  *Id*.  The

Court concluded that there was a common fraudulent purpose, along with "systematic linkages,

common communication networks, and regular meetings among associates.  *Pharm II*, 307

F.Supp.2d at 206.  Following the reasoning of *Pharm II*, the case at bar also presents a common

fraudulent purpose.  The Defendants worked together, as a single association-in-fact or even

three separate associations-in-fact (one involving Defendant Brown, one involving Defendant

Mitchell, and one involving CCC International) for the purpose of defrauding IFC under the

same scheme and of making profits for themselves.

---

[2]     After the Court partially dismissed the original complaint in *Pharm I*, Plaintiffs filed an Amended Complaint.
The Defendants filed a motion to dismiss the amended complaint, which led to *Pharm II.*

The within case is distinguishable from *In re Lupron Marketing and Sales Practices Litigation*, 295 F. Supp. 2d 148, 173-174 (D. Mass. 2003), where the Court found that there was no allegation that the defendants "were associated in any meaningful sense, or were even aware of one another's existence as participants in a scheme to defraud." There are several indicators in this case of a scheme to defraud.  The Defendants needed to coordinate documentation in order to induce IFC to pay on fraudulent invoices.  In response to purchase orders sent by Defendants Adams, not only would these manufacturer's representatives (Mitchell and Brown) send invoices to IFC for fictitious shipments of goods, but they would receive and negotiate checks written by IFC to pay for those goods which were never delivered.  (*See* AC, ¶¶ 43, 45, 48, 49, 52, 53, 55, 57, 59, 61).  Defendant Mitchell served as the manufacturer's representative to *two* of the four fictitious companies:  Remco *and* Mansfield Rug (*See* AC, ¶¶42, 46).  Likewise, Defendant Brown served as the manufacturer's representative to the other two fictitious companies: Dalton Padding and Mansfield Rug.  (*See* AC, ¶¶50, 54).  Defendant Adams, who had ordered merchandise from the fictitious companies, Dalton Padding, Mansfield Rug, Remco and Empire Weavers, directed all of the fictitious shipments from those fictitious companies as well as fraudulent shipments from CCC International during January, 2005.  (*See* AC, ¶¶ 31, 35 – 36). Like in *Doherty*, systematic linkages can be inferred from the large number of acts by each Defendant over a period of years (See AC, ¶¶ 62 – 63), as well as the consistent participation of the central figures in the scheme.  *See Doherty*, 867 F.2d at 68.  This is not a case where IFC simply filed a "RICO claim, chant[ed] the statutory mantra, and [left] the identification of predicate acts to the time of trial," which would be insufficient for a RICO claim.  *Feinstein v*.

*Resolution Trust Corp.*, 942 F.2d 34 (1ˢᵗ Cir. 1991).  Instead, this case presents an association-in-fact (or multiple associations-in-fact) giving rise to an enterprise for purposes of RICO[3].

  **B.  Common communication network / meetings.**

  Defendant Mitchell argues that "no <u>facts</u> have ever been alleged to show that [a common] 'communication network' is anything other than fantasy …" (emphasis in original).  Defendant Mitchell's Memorandum, at p.13).  In the case at bar, the Amended Complaint alleges an extensive communications network.  The Amended Complaint presents detailed samples of the mechanics of the scheme with regard to each of the four fictitious entities and CCC International. (AC, ¶41-61).  Additionally, the Amended Complaint specifically alleges:

> Where necessary, upon information and belief, one or more of the Defendants
> have held meetings, in person and/or by telephone, to discuss their criminal
> enterprise.  Upon information and belief, the Defendants have (a) knowingly
> placed in or caused to be placed in the U.S. mail various letters to accomplish the
> embezzlement of IFC funds and, directly or indirectly, and through agents or
> employees, received various letters from other members of the criminal enterprise
> (b) knowingly sent or caused to be sent various emails and/or facsimiles, from
> other members of the criminal enterprise and (c) knowingly made or caused to be
> made various telephone calls to accomplish the embezzlement of IFC funds and,
> directly or indirectly, and through agents or employees, received telephone calls
> from other members of the criminal enterprise, all in furtherance of the criminal
> enterprise.

(*See* AC, ¶ 38).  While this language does not necessarily point to specific names or dates, the specifically pleaded communications detailed in paragraphs 42 through 61 of the Amended Complaint combined with the more generally pleaded communications of paragraph 38 suffice to show a sophisticated communications network.  Moreover, "courts have recognized that relaxation of pleading requirements is permitted where information is in a defendant's sole possession."  *Pharm II*, 307 F.Supp.2d at 206 (Court found enterprise even though Plaintiffs failed to allege specific communications for each enterprise), citing *Efron v. Embassy Suites*

---

[3] The remaining two *Libertad* factors appear not to be relevant to the factual situation presented by this case.

*(P.R.) Inc.,* 223 F.3d 12, 16 (1st Cir. 2000).  At this stage of the proceedings, IFC is unable to be more detailed about the communication network.  Taken as a whole, however, especially when the allegations of the Complaint are accepted as true, IFC has met its minimal burden to defeat a motion to dismiss as to Count I of the Amended Complaint where IFC has properly alleged an association-in-fact which constitutes an enterprise for RICO purposes.  To the extent necessary, IFC seeks leave to amend its Complaint to make further allegations pertaining to the functioning of the communication network and/or meetings as discovery progresses.

### III.    COUNT I (RICO) MUST NOT BE DISMISSED BECAUSE PLAINTIFF HAS SUFFICIENTLY PLEADED DEFENDANT MITCHELL'S PARTICIPATION IN THE CONDUCT OF THE ASSOCIATION PURSUANT TO 18 U.S.C. §1962(c).

On page 14 of his memorandum, Defendant Mitchell claims that Count I must be dismissed because IFC has failed to allege that Defendant Mitchell participated in the operation or management of an enterprise. Pursuant to 18 U.S.C. §1962(c),

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"[R]ICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required."  *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 1170 (1993)(footnote omitted, emphasis in original).  "An enterprise is 'operated' not just by upper management by also by lower-rung participants in the enterprise who are under the direction of upper management."  *Pharm II,* 307 F.Supp.2d at 206 (Held that certain defendants were participating in enterprise).  As discussed above, the Amended Complaint properly alleges an enterprise under the RICO statute.  Defendant Mitchell played an active role in the scheme, helping to defraud IFC

out of millions of dollars.  *United States v. Shifman*, 124 F.3d 31, 36 (1ˢᵗ Cir.

1997)(Debtor who referred persons to loan shark in exchange for benefits participated in

loan sharking enterprise).  Mitchell was responsible for, among other things, preparing

false documents and processing the ill-gotten gains.  For instance, in *Aetna Cas. Sur. Co.*

*v. P & B Autobody, 43 F.3d 1546* (1ˢᵗ Cir. 1994), the First Circuit found that defendants

who, with others, processed fraudulent insurance claims, exerted the requisite control.

> [Defendants] caused the Aetna appraisers to approve false claims and conduct
> their appraisals in a manner contrary to Aetna's business practices and caused
> Aetna to pay out large sums of money on false claims.  The evidence was
> sufficient to support a finding that [defendants] exerted control over the
> enterprise, if not by bribery .. then at least by other methods of inducement.

*Pharm I*, 263 F.Supp.2d at 186, quoting *Aetna*, 43 F.3d at 1560.

In short, contrary to Defendant Mitchell's assertions, his acts constitute

participation in the enterprise for purposes of the RICO statute.  As a result, IFC

respectfully requests that this Court deny Defendant Mitchell's partial motion to dismiss

as to Count I of the Amended Complaint.

## IV.    PLAINTIFF HAS SUFFICIENTLY PLEADED A CIVIL RICO CONSPIRACY CLAIM (COUNT II).

Defendant Mitchell makes a limited argument as to why he contends Count II (Civil

RICO Conspiracy) must be dismissed.  He argues *only* that, since IFC has failed to establish a

RICO enterprise, the conspiracy claim must fail.  (See Defendant Mitchell's Memorandum, at p.

15).  Contrary to Defendant Mitchell's argument, however, IFC has demonstrated, both in its

Amended Complaint and in the within memorandum, that there is an actionable enterprise.  For

this reason alone, the motion to dismiss as to Count II should be denied.

Under 18 U.S.C. §1962(d), it is unlawful for an individual to conspire with another to violate §§1962(a), (b), or (c).  IFC need only provide that the defendant agreed with one or more individuals to commit at least two offenses which violate those provisions.  *Aetna*, 43 F.3d at 1562 (1st Cir. 1994), citing *Boylan*, 898 F.2d at 252.   There can be a conspiracy "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Financial Advisors & Consultants, Inc*. *v*. *Cooperativa de Seguros de Vida*, 106 F.Supp.2d 244, 260 (D.P.R. 2000)(quoting *Salinas v*. *United States*, 522 U.S. 52, 63 (1997));  *See Federal Civil Litigation in the First Circuit*, Vol I of II, §13.2 (2004).

In order to state a claim under §1962(d) in the First Circuit, a plaintiff must show:  1) an enterprise affecting interstate commerce;  2) the defendant knowingly joined the conspiracy to participate in the enterprise;  3) the defendant participated in the enterprise;  and 4) the defendant did so through a pattern of racketeering activity by agreeing to commit, or by committing, two or more predicate offenses.  *Id*.;  *Aetna*, 43 F.3d at 1561.  Each defendant does not need to know all of the details of the conspiracy.  *Id*. at 1562.

In Count II, IFC alleges that, upon information and belief, the Defendants entered into an agreement to violate 18 U.S.C. §1961.  (AC, ¶ 71).  By their acts, conduct and communications, the Defendants conspired to violate 18 U.S.C. §1962(c).  (AC, ¶ 72).  IFC has been, and continues to be, injured in its business, including, without limitation, the loss of millions of dollars, by reason of the violation of 18 U.S.C. §1962(c) by Defendants.  (AC, ¶ 73).  The Count also incorporates by reference all of the preceding paragraphs of the Amended Complaint, in which IFC recites the mechanics of the enterprise in more detail.  Defendant Mitchell knowingly joined a conspiracy to participate in a criminal enterprise aimed at defrauding IFC of millions of dollars by means of, among other things, fictitious companies.  He performed at least two

predicate offenses, including, without limitation: 1) fabricating a bill of lading; and 2) misrepresenting that he had destroyed bills of lading which, upon information and belief, never existed.  IFC has met its burden.

IFC respectfully requests that this Court deny Defendant Mitchell's partial motion to dismiss as to Count II of the Amended Complaint.

### V.     PLAINTIFF HAS SUFFICIENTLY PLEADED A FRAUD CLAIM (COUNT V).

On Page 16 of his memorandum, Defendant Mitchell argues that IFC's fraud claim should be dismissed because the pleading lacks specificity with regard to the "association in fact" enterprise.  As Defendant Mitchell writes, fraud must be plead with particularity. Fed.R.Civ.P. 9(b).

In Count V of the Amended Complaint, IFC alleges that the Defendants engaged in various acts of fraud, including, without limitation, (1) converting funds belonging to IFC to their own use, (2) stealing funds from IFC, (3) creating false documentation in order to obtain stolen funds from IFC, (4) providing false representations in documents by alleging shipments of merchandise were made and received when in fact no such shipment occurred, (5) taking steps to conceal the fraudulent and criminal activity, (6) providing IFC with fabricated documents in order to conceal the wrongful criminal enterprise, (7) creating false and non-existent companies in order to further their criminal enterprise, (8) using office property, including, without limitation, facsimiles, telephones and mailing items, in order to effectuate the fraud, (9) defrauding IFC of millions of dollars, (10) causing funds to be transferred outside of the Commonwealth of Massachusetts in order to render recapture of the funds more difficult, and (11) forging documents, all with the intention of deceiving and defrauding IFC.  (AC, ¶ 82).

Throughout the Amended Complaint, in paragraphs which are incorporated therein by reference, IFC sets forth in detail the wrongful conduct which is specific to Defendant Mitchell. Among other things, Defendant Mitchell served as a manufacturer's representative to two fictitious companies (one of which (Remco) appears to be an acronym based upon Defendant Ronald E. Mitchell's name), and he received funds for false shipments.  He provided a fabricated bill of lading when IFC sought some backup documentation.  He told IFC that all of his billing documents had been shredded recently, when IFC asked for more documentation.  He benefited from the fraud.

Finally, in paragraphs 42 through 49 of the Amended Complaint, IFC sets forth in detail two representative fraudulent transactions in which Defendant Mitchell participated.

In short, the Amended Complaint, taken as a whole, details the wrongful conduct of Mitchell.  Where IFC has met the requirements of Fed.R.Civ.P. 9(b), IFC respectfully requests that this Court deny Defendant Mitchell's partial motion to dismiss Count V of the Amended Complaint.

## **CONCLUSION**

Defendant Mitchell's partial motion to dismiss should be denied as to Counts I and II of the Amended Complaint where the Amended Complaint details systematic linkages between and among the Defendants, clearly establishing an "association in fact" RICO enterprise, and clearly establishing extensive participation in that enterprise on the part of Defendant Mitchell.

Moreover, in Count V, IFC has sufficiently pleaded fraud with specificity, and so

Defendant Mitchell's motion to dismiss as to that Count should also be denied.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,


/s/ Paul J. Klehm
James B. Krasnoo
*james@krasnoolaw.com*
Paul J. Klehm
*pklehm@krasnoolaw.com*
Law Offices James B. Krasnoo
23 Main Street
Andover, MA  01810
(978) 475-9955

Dated:  December 5, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid, on December 5, 2005.  On December 5, 2005, I have also forwarded a copy of the within opposition via first class mail, postage pre-paid, to Kevin Britto, 300 W. 21st Street, Apartment #25, New York, NY.

/s/ Paul J. Klehm
Paul J. Klehm