UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC.,<br><br>Plaintiff<br><br>v.<br><br>DAVID W. ADAMS, TYRONE WILLIAMS, KEVIN BRITTO, RONALD MITCHELL, Individually and d/b/a MANSFIELD RUG DEPARTMENT and REMCO, MICHAEL E. BROWN, Individually and d/b/a DALTON PADDING and EMPIRE WEAVERS, JANE DZIEMIT, CHINESE CARPET CENTER, INC. DAVID D. SUN, and PAUL SUN,<br><br>Defendants<br><br>and<br><br>LOWELL FIVE CENT SAVINGS BANK, WACHOVIA BANK, NATIONAL ASSOCIATION, f/k/a FIRST UNION BANK OF VIRGINIA, CITIZENS BANK, BANK OF AMERICA f/k/a BANK OF BOSTON, PEOPLE'S BANK, and FIRST UNION NATIONAL BANK,<br><br>Trustee Process Defendants. | Civil Action No. 05-11654-NMG |

## AFFIDAVIT OF JANE DZIEMIT

Jane Dziemit, being duly sworn, does herby depose and say as follows:

1. I am a 48-year-old homemaker and mother of two children. I live in California with my two children who are 12 and 9 years old and their father.

2. I grew up in Branford, Connecticut. When I graduated high school in 1974, I

went to school in Massachusetts for two years. I then got a job at IBM on Boylston Street, Boston. In 1978, I moved to New York, where I spent approximately 12 years working in various jobs as a secretary. In 1990, I returned to Connecticut to be close to my godmother and cousins after the break-up of my marriage. I moved to California in July 2004.

    3.    I make this affidavit in opposition to the plaintiff's motion for a preliminary injunction. I understand from reading the amended complaint that the plaintiff (IFC or Building 19) says that I defrauded it somehow in a scheme by insiders at Building 19 to generate false purchase orders. This is false. Rather, as someone who advanced money on purchase orders *from* IFC, I believe that if IFC was defrauded, then I was defrauded too because I relied on those purchase orders to make the advances I did. The purchase orders on which I relied in making these advances were generated and signed by employees (typically *two* employees) of Building 19. For example, attached at Exhibit A are copies of purchase orders from Building 19 as well as invoices from a carpet supplier, CCC. The advances I made were in connection with, and referenced, such types of purchase orders and invoices.

<u>Mitchell</u>

    4.    I first met Ronald Mitchell in 1990 in Connecticut. He is and was a friend of a friend who then became a family friend. When I met Ron Mitchell, he told me he worked as a sales manager for a manufacturer of padding and/or rugs called CrestFoam. He also said he worked in the floor covering industry all of his life. From time to time, he would talk to me in passing about the work he did for CrestFoam. Later on, he told me that he was no longer an employee, and he became an independent rep or broker, working out of his house, selling padding and rugs. He told me that when he acted as a broker he operated under the trade name Remco. I understood this to be a "d/b/a."

5.      In the meantime, before and after having my children, I had a number of secretarial jobs.  Gradually, however, in the mid and later 1990's I did a little real estate investing and I started making a small number of mortgage loans.  As a mother, I did not want a full-time job (I had my daughter when I was 35) but I did want and needed to earn some monies.  My mother died when I was 4, and my father died when I was 12, and since I waited so long to have my own children, it was very important -- and still is -- to me to always be there for my children.  Therefore, I discovered that I could make some money, part-time, working out of my home, by making real estate loans.  Mitchell learned of this.

Advances to Mitchell and REMCO

6.      In or about 1999, Mitchell approached me and requested that I loan him money to finance some of his brokering transactions.  Mitchell told me at that time that he was going to purchase carpets, rugs, and related goods and then resell them at a profit to a chain of stores called Building 19 in Rhode Island and Massachusetts.  He explained that Building 19 was much like Railroad Salvage in Connecticut, where it would buy truckloads of goods, closeouts, bankruptcy goods, seconds, etc. and then sell these items to the public.  He wanted approximately $14,400.00, as I recall, to make his first purchase.  Because I typically did not, and do not, make non-real estate loans, I was reluctant to loan Mitchell the money.  Eventually, however, because he had been a family friend for almost ten years whom I trusted, I agreed to do so.

7.      With the first loan, I had him sign a promissory note.  My recollection is that I forwarded the money Mitchell borrowed directly to his supplier, who I recall was something like "CCC."  Within a short while of making the loan to buy the goods from the supplier, I was told that the rugs had been delivered to Building 19, Building 19 had issued a purchase order which

was invoiced, Building 19 issued a check for payment, and I was paid back. I gave Mitchell the promissory note back after I was paid. Because this transaction occurred so many years ago (and I have moved two times since then) and because when it was repaid I returned the note to Mitchell, I have not been able to find a copy of that promissory note.

8. After this initial transaction, and maybe a second one like it, Mitchell said that he wanted to borrow similar amounts on an ongoing basis. I was reluctant to do it because I still focused my attention on real estate mortgage loans. It did not make sense to me to generate a whole series of promissory notes on a series of small, individual loans. I asked my accountant how I should protect myself. It was suggested that, among other things: (1) I should loan based upon the Building 19 purchase orders or similar documents, and (2) when Building 19 made payment, I should arrange to be reimbursed for the monies I had advanced, plus a charge/profit for the loan. Mitchell would disburse the balance. To make this arrangement work, I was given authority by Mitchell to endorse checks, if necessary, payable to Remco.

9. I advanced monies to Mitchell/Remco (or, at his direction, to suppliers) based upon my receipt of Building 19 purchase orders as proof that there would be a source of repayment for the loan I made. These purchase orders were generated and signed by employees of IFC/Building 19 (often two separate employees). The Remco invoice for that purchase order specified that payment was to be made to a post office box from which I could obtain the payment. When the check or payment was received, my prior advance was paid along with my charges and interest. In general, Mitchell disbursed the balance. The transactions were typically in the range of $20,000-$50,000. Typically, the amount owed to me from Mitchell/Remco, at any one time, was $75,000 or less.

10. I was, however, a reluctant lender. I was simply less comfortable lending on

4

"paper" (i.e. purchase orders and invoices) than on real estate which is fully secured. Not being in the business of selling rugs, let alone any other products, I did not know what documentation typically accompanied such a sale. Also these small advances required that I review things and follow-up, whereas a secured real estate loan rarely needed that much ongoing attention. Many times, I told Mitchell that I did not want to make any more advances on purchase orders and invoices. I only wanted to help him get started so he could finance the transactions himself. When I raised this issue, he would tell me that he just needed me to continue loaning for a little longer.

11.     During 2001, I told Mitchell that I did not want to finance his carpet transactions any longer, and I wanted my money returned as soon as possible. I did not want to have to run what was effectively a purchase order factoring arrangement for him (those are not the words I used, but I now understand this is what I was doing).

12.     After 2001, I continued to make some small occasional advances to or for Mitchell and Remco. Ron Mitchell would reimburse me himself for these small loans, and Building 19/IFC sent payments directly to Mitchell/Remco. (Attached as Exhibit B are copies of several repayments from Mitchell/Remco.) I understood that Mitchell had lined up or was lining up other financing. In 2003, my loans slowed to a trickle and stopped completely by the end of 2003. I was finally paid for the last loan principal in 2004, and I wrote off some unpaid interest. I learned from reading the amended complaint, at some point in time, in addition to Remco, Mitchell started operating as "Mansfield Rug." I did not do business with Mansfield Rug.

13.     IFC has alleged that, in 2003, I received a delivery from Building 19/IFC on behalf of Remco. (Gemme Aff. at ¶ 28.) The incident to which IFC refers was a situation where Building 19/IFC sent its payment on an invoice to my address via Federal Express overnight

5

mail at Mitchell's request, because IFC had failed to make timely payment to Remco/Mitchell and because Mitchell was out of town at the time. Ron Mitchell called me to tell me a package would be delivered to my house from Building 19 – he did not call to ask first. At the time, I was at home during the day taking care of my children. As a friend, I did so. I note that the FedEx package was originally delivered to an incorrect address and that I had to track it down.

14.   The amended complaint and the papers on the motion for a preliminary injunction make it sound as though I had some involvement with a plan to defraud Building 19/IFC. Nothing could be further from the truth. I am a homemaker, a mother, and primarily a small time real estate lender. In making these advances, over several years, other than receiving back the principal I had loaned, I received only a very modest amount of interest, charges, and profit.

15.   I note that the Amended Complaint does not include any specific allegations concerning my role in the purported fraud scheme. I am only mentioned by name in only *two* places in the substantive allegations of the Amended Complaint: (a) paragraph 40 in which it is alleged only that I endorsed and deposited IFC checks and (b) paragraph 66 in which I am very generally alleged to have somehow conspired with other defendants, who generally are people I never met. Yet, IFC does not explain how I was supposedly involved in a scheme to defraud it.

16.   At no time prior to the filing of the complaint in this lawsuit did I ever discover that Mitchell or Remco was involved in any plan to defraud IFC/Building 19, or any other entity, by collecting money for rugs or other goods that Mitchell or Remco did not actually purchase and deliver. To the contrary, I was told by Mitchell that IFC/Building 19 was very happy with the quality of the rugs on which I had advanced money. Indeed, I was told that Nick Adler, who Mitchell explained was a buyer, had called Mitchell to say how pleased he was with the carpet and that he wanted more of the same.

6

17.    I note that even the employee at Building 19 that supposedly discovered the purported scheme, Nick Adler, IFC's purchaser of "machine-made oriental rugs," had dealings with Mitchell and Remco and, in fact, had been ordering rugs from Remco since at least 2001. (See Building 19 purchase order at Exhibit A.) Yet, Adler says he did not "discover" the purported scheme until some years later. Additionally, since at least 2002, Marjorie Langan, IFC's purchaser of handmade oriental rugs, had been purchasing rugs from Remco. (Id.) If Adler and Building 19 were unable to detect the purported scheme, I, as an outsider who merely advanced money based on Building 19 purchase orders, was certainly in a much worse position to do so. Building 19 was the party that was supposed to receive the rugs -- not me. Surely Building 19 was in a better position to determine whether it actually received the ordered rugs, compared to me. It is odd that Building 19, if it performed any reasonable diligence, would miss large items (in such large quantities) such as rugs. To this day, I have no knowledge of whether rugs were or were not actually delivered.

18.    If what IFC alleges is true, then it is unusual that it would not have noticed that hundreds of items worth millions of dollars were not delivered. If what IFC alleges is true, then it is unusual that those persons who discovered the purported "scheme" in 2005 did not do so years earlier despite their direct involvement in purchasing rugs. It was IFC's own senior employees, rug purchasers Nick Adler and Marjorie Langan, that noted on purchase orders to Remco that Tyrone Williams, one of the insiders charged with orchestrating and carrying out the purported scheme, should be contacted so that deliveries could be set up – deliveries that are alleged not to have taken place.

SIGNED UNDER THE PENALTIES OF PERJURY THIS ___ DAY OF DECEMBER 2005.

_____
Jane Dziemit

SIGNED UNDER THE PENALTIES OF PERJURY THIS ___ DAY OF DECEMBER 2005.

*Jane Dziemit*
Jane Dziemit

16,580
3085.16
15,063

To: Ron Mitchell -
From: Nick Radler
Date: 3-21-03

Please call Tyrone Williams to set up a delivery appointment 508 991 7769.

CC: Tyrone.

| PURCHASE ORDER | 6721 | | | BILL TO: INTERNATIONAL FLOOR CRAFT, INC. 319 LINCOLN STREET · RTE. 3A HINGHAM, MA 02043 (781) 749-8800 | |
|---|---|---|---|---|---|
| VENDOR: Remco | | | | | |
| SHIP TO: Building 19 Whse 3 - 1 King St New Bedford MA 02745 | | | DATE OF ORDER: 3-17-03 SHIP ON: CANCELLATION DATE: ORDER TAKEN BY: Nick Adler TERMS: 2% DISCOUNT 15 DAYS NET 30 DAYS OTHER: | | |
| SHIPPING INSTRUCTIONS: Tyrone 508 991 7769 | | PLEASE DO NOT SHIP BACK ORDERS OR PARTIAL SHIPMENTS WHERE ADDITIONAL FREIGHT CHARGES WILL RESULT | | | |
| MANUFACTURERS NUMBER | DESCRIPTION | PACK | QUANTITY | BUYING UNIT | COST PRICE |
| 2×8 | Cairo Collection - | | 31 | | 11 - |
| 5×8 | 1st Quality Overstock | | 27 | | 28 - |
| 8×11 | | | 27 | | 58 - |
| 2×4 | Antique Treasures coll. | | 72 | | 5 - |
| 2×8 | 1st Quality Overstock | | 111 | | 10 - |
| 5×8 | | | 147 | | 30 - |
| 8×11 | | | 31 | | 55 - |
| 2×8 | BCF Poly Rugs | | 122 | | 6 - |
| 6×8 | 1st Quality Overstock | | 48 | | 14 - |
| 8×11 | | | 97 | | 27 - |
| 8×11 | Heat-Set Rugs, 1st Quality Overstock | | 83 | | 48 - |

SIGNATURE: JMS

CCC INTERNATIONAL

7903-A KINCANNON PLACE    LORTON, VA. 22079    U.S.A.

## INVOICE

**TOTAL DUE    20,746.18**

| | | Salesperson | HOUSE |
|---|---|---|---|
| | | Invoice number | 0146 |
| | | Invoice date | 1/4/01 |
| | | Customer ID | 019 |
| | | Terms | NET |
| | | Date shipped | January 20, 2001 |
| | | Shipped via | OT |
| | | FOB | LORTON |
| | | Prepaid / Collect | PREPAID |
| | | Tax exempt | |
| | | Reason | |
| | | Exemption no. | |

**SOLD TO**

REMCO

E.HAVEN CT

**SHIPPED TO**

BUILDING #19
WAREHOUSE # 3
1 KING STREET
NEWBEDFORD, MA
1-508-991-7769

Please make checks payable to:

CCC INTERNATIONAL

| REF NO. | QTY | DESCRIPTION | PRICE EACH | TOTAL |
|---|---|---|---|---|
| | 1130 | NON SKID 2X4L | 0.43 | 485.90 |
| | 875 | NON SKID 2X6L | 0.55 | 577.50 |
| | 930 | NON SKID 4X6L | 1.25 | 1,162.50 |
| | 1032 | NON SKID 6X9L | 3.00 | 3,096.00 |
| | 572 | NON SKID 9X12L | 6.00 | 3,432.00 |
| | 772 | NON SKID 2X4H | 0.86 | 663.92 |
| | 1123 | NON SKID 2X6H | 1.32 | 1,482.36 |
| | 980 | NON SKID 4X6H | 2.50 | 2,450.00 |
| | 970 | NON SKID 6X9H | 6.00 | 5,820.00 |
| | 210 | NON SKID 9X12H | 7.50 | 1,575.00 |

| | |
|---|---|
| SUBTOTAL | 20,746.18 |
| Sales tax % | |
| SHIPPING & HANDLING | 0.00 |
| PAYMENTS | |
| PLEASE PAY THIS AMOUNT | 20,746.18 |
| TERMS: NET | |

ATT: RON MITCHELL
FROM: NICK ADLER
DATE 9-21-01
DELIVER GOOD ON 10-4-01

**PURCHASE ORDER** 6073

**BILL TO:** INTERNATIONAL FLOOR CRAFT, INC.
319 LINCOLN STREET - RTE. 3A
HINGHAM, MA 02043
(781) 749-8800

VENDOR: REMCO

SHIP TO: BUILDING 19 WHSE 3
1 KING ST
NEW BEDFORD MA 02745

2% DISCOUNT 15 DAYS
NET 30 DAYS

| MFR # | DESCRIPTION | PACK | QUANTITY | UNIT | COST | TOTAL |
|---|---|---|---|---|---|---|
| 6x9 | POLYPROPYLENE RUGS | | 297 | | 15 — | 4455 |
| 9x12 | FROM BEAULIEU | | 241 | | 30 — | 7830 |
| 6x9 | HEAT SET RUGS FROM | | 172 | | 22 25 | 3827 |
| 9x12 | BEAULIEU | | 178 | | 46 50 | 5952 |
| 2x8 | ALEXANDRIA COLLECTION | | 482 | | 13 — | 6266 |
| 4x6 | ASSORTED PATTERNS | | 291 | | 19 — | 5529 |
| 6x9 | + PATTERNS | | 138 | | 35 — | 4830 |
| 9x12 | | | 52 | | 70 — | 3640 |
| 6x9 | CAIRO COLLECTION | | 111 | | 30 — | 3330 |
| 9x12 | ASSORTED PATTERNS | | 137 | | 60 — | 8220 |

53,879

JMS

**PURCHASE ORDER** 6340

BILL TO:

218 LINCOLN STREET • RTE. 3A
HINGHAM, MA 02043
(781) 749-8880

VENDOR: Remco

SHIP TO: Branford CT
Building #19 W3
1 King St
New Bedford MA 02745

REF: Delivered

TERMS: NET 30 DAYS

| MANUF. NUMBER | DESCRIPTION | PKG | QUANTITY | BUYING UNIT | UNIT PRICE | |
|---|---|---|---|---|---|---|
| 5x8 | Lightweight Non-skid | | 110 | ea | 3.11 | 342.10 |
| 6x9 | paddins | | 142 | ↓ | 4.20 | 596.40 |
| 9x12 | ↓ | | 153 | ↓ | 8.40 | 1285.20 |
| 5x9 | Heavyweight Non-skid | | 161 | ea | 7.80 | 1255.80 |
| 9x12 | paddins | | 152 | ↓ | 15.60 | 2371.20 |
| | | | | | | 5,850.70 |

Marjorie Langan

JMS

Building #19
W3

Please contact Tyrone Williams at
508 991-7769 for delivery
appointment.

Thank you,
Marjorie Langan

TO: RON MITCHELL
FROM: NICK ADLER
DELIVER THE RUGS ON 6-27-02 OR 6-28-02 —
PLEASE CALL TYRONE WILLIAMS AT 508-991-7769 TO SET UP DELIVERY DATE.

PURCHASE ORDER 6267

BILL TO:
INTERNATIONAL FLOOR CRAFT, INC.
219 LINCOLN STREET • RTE. 3A
HINGHAM, MA 02043
(781) 749-6060

REMCO

BUILDING 19 WHSE 3
1 KING ST
NEW BEDFORD MA 02745

Date of Order: 6-10-02   PO# 27

Purchaser: Nick Adler

Terms: 2% DISCOUNT 30 DAYS
NET _____ DAYS
OTHER _____

TYRONE 508-991-7769

| SIZE | DESCRIPTION | PACK | QUANTITY | SUPER UNIT | UNIT PRICE |
|---|---|---|---|---|---|
| 3x5 | CAIRO COLLECTION FROM | | 250 | | 9 — |
| 2x6 | ORIENTAL WEAVERS | | 210 | | 8 — |
| 2x8 | 1ST QUALITY OVERSTOCK | | 152 | | 11 — |
| 4x6 | ASSORTED | | 119 | | 15 — |
| 5x8 | | | 189 | | 30 — |
| 8x11 | | | 81 | | 60 — |
| 4x6 | BCF PLUS 1ST QUALITY | | 83 | | 6 — |
| 6x8 | OVERSTOCK ASSORTED | | 91 | | 14 — |
| 8x11 | | | 97 | | 30 — |
| 9x11 | IMPERIAL COLLECTION FROM OW | | 41 | | 70 — |
| 2x8 | ALEXANDRIA COLLECTION | | 137 | | 13 — |
| 5x8 | CASHMERE COLLECTION | | 153 | | 40 — |

CONDITIONS OF THIS ORDER
ALL COLLECT SHIPMENTS MUST BE ROUTED BY TRAFFIC DEPARTMENT AT ... FAILURE TO COMPLY WILL RESULT IN CHARGEBACK OF EXCESSIVE FREIGHT CHARGES INCURRED. ALL BACK ORDERS MUST BE SHIPPED PRE-PAID.
THIS ORDER MUST NOT BE FILLED AT HIGHER PRICES THAN SPECIFIED WITHOUT OUR WRITTEN PERMISSION.
THE RIGHT IS RESERVED TO CANCEL IF NOT FILLED IN ACCORDANCE WITH OUR DELIVERY SCHEDULE.
THE RIGHT IS RESERVED TO RETURN EXCESS OR DEFECTIVE MERCHANDISE AT SHIPPER'S EXPENSE.

SIGNATURE

**Check 103**
RONALD E MITCHELL
D/B/A REMCO
5 MANSFIELD GROVE RD. UNIT 146
EAST HAVEN, CT. 06512
Date: 7/29/02
Pay to the Order of: Jane Dziemit
$ 8300.00
Eight Thousand Three Hundred and 00/100 Dollars
CITIZENS BANK
Connecticut
For: Loan Payment
Signed: Ron Mitchell

**Check 112**
RONALD E MITCHELL
D/B/A REMCO
5 MANSFIELD GROVE RD. UNIT 146
EAST HAVEN, CT. 06512
Date: 8/26/02
Pay to the Order of: Jane Dziemit
$ 5300.00
Five Thousand Three Hundred and 00/100 Dollars
CITIZENS BANK
Connecticut
For: Loan Payment
Signed: Ron Mitchell

**Check 116**
RONALD E MITCHELL
D/B/A REMCO
5 MANSFIELD GROVE RD. UNIT 146
EAST HAVEN, CT. 06512
Date: 9/11/02
Pay to the Order of: Jane Dziemit
$ 2,000.00
Two Thousand and 00/100 Dollars
CITIZENS BANK
Connecticut
For: Loan
Signed: Ron Mitchell

```
RONALD E. MITCHELL
D/B/A REMCO                                            134
5 MANSFIELD GROVE RD. UNIT 146
EAST HAVEN, CT. 06512                Date_____        51-7011/2111
                                                              270

Pay to the
Order of   Jane Diesmer                        $ 18,000.00

  eighteen thousand + 00/100                   Dollars

  CITIZENS BANK
     Connecticut

For  return of principal          ___Mitchell___

⑆211170114⑆  2202665727⑈   0134 ,000 18000000⁕
```

