UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID W. ADAMS, *et al*, | ) | CIVIL ACTION NO. |
| Defendants. | ) | 05CA11654-NMG |
| | ) | |

**PLAINTIFF'S MOTION, PURSUANT TO FED. R. CIV. P. 37(b)(2)(C) AND L.R. 37.1(A), FOR ORDER OF CONTEMPT AGAINST DEFENDANT KEVIN BRITTO FOR FAILURE TO COMPLY WITH THIS COURT'S FEBRUARY 13, 2006 ORDER**

Plaintiff International Floor Crafts, Inc. (hereinafter, "IFC") hereby moves this Court, pursuant to Fed. R. Civ. P. 37(b)(2)(C), to issue an order of contempt and other appropriate relief against Defendant Kevin Britto, who is *pro se*, for failure to comply with this Court's order dated February 13, 2006.  IFC relies upon the reasons set forth below:

1.      On January 24, 2006, IFC moved for leave to take the immediate videotaped deposition of Kevin Britto and for an order compelling Kevin Britto to appear at such a videotaped deposition because of his allegedly failing health.[1]  As an accommodation to Defendant Britto's alleged poor state of health, IFC asked that the deposition be held in New York City, where Defendant Britto resides.

2.      Paragraph 6 of IFC's January 24, 2006 Motion provides:

IFC therefore respectfully requests that this Court … (2) issue an order compelling Defendant Britto to appear at such a videotaped deposition, at a time and location in New York City agreed upon by the parties …

---

[1] *See* Docket Entry No. 128.

3.      On February 13, 2006, the Court (Gorton, J.) issued an order allowing IFC's January 24, 2006 Motion.

4.      Pursuant to this Court's February 13, 2006 order and pursuant to the agreement of the parties, IFC served a notice of deposition of Defendant Britto upon all parties, including, but not limited to, Defendant Britto.  The notice provided for Britto's deposition to take place at 1:00 p.m. on Tuesday, March 7, 2006 and, if necessary, at 1:00 p.m. on Friday, March 10, 2006.  The parties scheduled each deposition to be held from 1:00 p.m. to 4:00 p.m. in order to accommodate Defendant Britto because he had informed Plaintiff's attorneys that he "felt better" in the afternoon.

5.      On Tuesday, March 7, 2006, three IFC officials and counsel to almost all parties traveled to New York City for the first day of the Britto deposition.  Defendant Britto testified from 1:30 p.m. until 4:22 p.m. that day.  During his testimony, Defendant Britto admitted to participating with certain other named defendants in a scheme to defraud IFC of a significant amount of funds dating back to 1993, thereby waiving his Fifth Amendment privilege against self-incrimination.  (See p. 8, ln. 11 through p. 9, ln. 14;  p. 10 ln. 15-23;  p. 11, ln. 15-18; p. 12 ln. 15 through p. 13 ln. 13;  p. 68 ln. 22 through p. 71, ln. 20, and citations set forth *supra*,  of the Deposition of Kevin Britto (March 7, 2006), excerpted portions of which are attached hereto as **Exhibit A**).   In essence, Britto testified that he, Defendant David Adams and Defendant Tyrone Williams would create false documents and/or cause others to create false documents unknowingly showing that IFC had received certain goods so that IFC would make payment on the false invoices.  (See **Exhibit A**, p. 10 ln. 15-23, p. 68 ln. 22 through p. 71, ln. 20).  As a part of the scheme, Defendant Britto would then receive checks.  (See **Exhibit A**, p. 14, ln. 25 through 15 ln. 8).  Depending upon what IFC had in stock, Britto, Adams and Williams at times

arranged for half-shipments of goods to IFC, and, at other times, IFC would receive no goods at all.  (See **Exhibit A**, p. 28, ln. 17 through p. 31, ln. 4).  Britto directed Williams during the course of the scheme.  (See **Exhibit A**, p. 18, ln. 11 through p. 20, ln. 10). Britto testified that he had contact with Defendants Paul Sun of David Sun of Defendant CCC and with Michael Brown about the scheme.  (See **Exhibit A**, p. 8, ln. 23-24, p. 15 ln. 9 through p. 16 ln. 13).

6.       According to Britto, Defendant Adams gambled away over a million dollars (presumably from the scheme).  (See **Exhibit A**, p. 23, ln. 19-20).  Britto admitted to stealing more than one hundred thousand dollars from IFC.  (See **Exhibit A**, p. 13, ln. 24 through 14 ln. 14).  He even admitted to receiving a "bunch" of checks after he left IFC, because, according to Britto, he continued to control IFC's warehouse.  (See **Exhibit A**, p. 16, ln. 19-21, p. 18, ln. 6-10).  According to Defendant Britto, Defendant Brown received probably $6,000 or $7,000 from the scheme.  (See **Exhibit A**, p. 53, ln. 21-23).  Defendant Williams received approximately $1,500 per fraudulent transaction, approximately once per month.  (See **Exhibit A**, p. 107, ln 5-17).

7.       Britto testified that Defendants Mitchell and Dziemit were not involved in the scheme.  (See **Exhibit A**, p. 63, ln. 23 through p. 64 ln. 8).  Nonetheless, according to Britto, Defendant Mitchell loaned money in advance to Defendant Adams so that purportedly Britto and Adams could convert the goods and resell them to IFC and then be paid. (See **Exhibit A**, p. 41, ln. 15 through p. 42, ln. 16;  p. 62 ln. 2-6).  Upon information and belief, Defendant Dziemit served as the source of the "loan" money.  According to Britto, Defendant Adams spoke with Mitchell or Dziemit and another about this fabricated notion of conversion of goods in order to induce them to loan money to Defendant Adams.  (See **Exhibit A**, p. 38, ln. 13-20).  According to Britto, Mitchell would receive a percentage of the loan.  (See **Exhibit A**, p. 42, ln. 3-13).

That way, Adams could receive the stolen funds (and gamble with the money) without having to wait for IFC to pay the invoice for the fictitious shipments.    (See **Exhibit A**, p. 42, ln. 19-23). Mitchell was Adams' and Britto's link to a company called REMCO which participated in the scheme – a company which IFC alleges is fictitious[2].  (See **Exhibit A**, p. 62, ln. 13-23). REMCO, through Mitchell, presented bills to IFC for goods that were never shipped to IFC. (See **Exhibit A**, p. 62, ln 8-12). The only time that Britto would know of a purported "loan" would be when Adams informed Britto that certain monies had been received from REMCO, Mitchell or Dziemit.  (See **Exhibit A**, p. 66, ln. 1-5).

8.    At one point, Defendant Britto determined that Defendant Adams was not paying Britto his share of the stolen funds.  (See **Exhibit A**, p.  97, ln. 9 through p. 99 ln. 18).  At that point, Defendant Britto contacted Defendant Mitchell and told Defendant Mitchell to direct all of the "loan" money to Britto, and not to Adams, at a time when Britto was not an employee of IFC. (See **Exhibit A**, p. 99 ln. 21-25;  p. 134, ln. 21-24).  Mitchell did not ask Britto to sign any documents reflecting the purported loans.  (See **Exhibit A**, p. 130, ln. 16-20).  Despite the fact that Britto's phone call represented the first time that Britto had informed Mitchell that Britto was working with IFC, Mitchell complied and unquestioningly sent money directly to Britto. (See **Exhibit A**, p. 99, ln. 24-25).   Britto told Mitchell that if Mitchell did not continue to send money, then the deal would end.  (See **Exhibit A**, p. 100, ln. 2-8).

9.    IFC was unable to complete the deposition of Defendant Britto in one afternoon, and the company needs to cover additional ground regarding the involvement of the Defendants in the scheme.  On March 10, 2006, the three IFC officials and counsel to almost all parties traveled to New York City once again.  Defendant Britto physically appeared at his deposition.

---

[2]  When asked whether REMCO ever sent goods to IFC while Britto was employed there, Britto replied, "They thought they did."  (See **Exhibit A**, p. 61, ln. 12-15).

At the beginning of the deposition, Defendant Britto stated that, unless IFC immediately dismissed two defendants, Britto would refuse to testify.  He next stated that he was leaving the deposition for twenty minutes, and, upon the conclusion of the twenty minutes, he would return. After approximately twenty minutes passed, IFC, through counsel, told Defendant Britto on the record that IFC would not dismiss the two defendants.  Defendant Britto thereafter stated his refusal to testify, whereupon IFC's counsel stated that he would ask the Court to compel Defendant Britto to complete his deposition.  Defendant Britto thereafter left the deposition. (See copy of Deposition of Kevin Britto (March 10, 2006) attached hereto as **Exhibit B**).

10.     Rule 37 sanctions are appropriate given Defendant Britto's deliberate and wrongful defiance of this Court's February 13, 2006 order.  *See Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 671 (7th Cir. 1996) (sanctions proper "upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant").

11.     Moreover, the parties have incurred substantial costs and attorneys' fees as a result of Defendant Britto's failure to testify at his own deposition.  *See* Fed. R. Civ. P. 37(d). Each counsel had to travel to New York City from the Boston area for the two days of deposition.  Moreover, the videographer and deposition costs for the two days, according to Fink & Carney, the New York City court reporting company, were roughly $2,500.00.

12.     In light of the violation of the order, IFC respectfully requests that this Court issue an order of contempt against Defendant Britto and:

a.     Issue a ruling that Defendant Britto has waived his Fifth Amendment privilege against self-incrimination for all purposes in connection with his deposition as to the subject matter of his deposition set forth in paragraphs 5 through 8, *supra*;

b.     Order that he be remanded into the custody of the United States Marshals Office immediately and that he remain in custody until such time as he complies with this Court's February 13, 2006 order;

c.      Order that Defendant Kevin Britto appear for his deposition at the United States District Court for the Eastern District of Massachusetts, One Courthouse Way, Boston, MA, at a date and time convenient to the parties;

d.      Order that Defendant Britto pay his own travel expenses in connection with paragraph c., *supra*;

e.      Order the parties to submit affidavits setting forth the attorney's fees, costs and expenses they incurred in preparation for, and in connection with attendance at, the deposition of Kevin Britto on March 7, 2006 and March 10, 2006 within ten days;  and

f.      Order Defendant Kevin Britto to pay any and all reasonable attorneys' fees, costs and expenses incurred by the parties, per paragraph e., *supra*, as determined by the Court, within twenty days.

**WHEREFORE**, for the above reasons, International Floor Crafts, Inc. respectfully requests that this Court GRANT the within motion and issue an order of contempt against Defendant Kevin Britto and:

a.      Issue a ruling that Defendant Britto has waived his Fifth Amendment privilege against self-incrimination for all purposes in connection with his deposition as to the subject matter of his deposition set forth in paragraphs 5 through 8, *supra*;

b.      Order that he be remanded into the custody of the United States Marshals Office immediately and that he remain in custody until such time as he complies with this Court's February 13, 2006 order;

c.      Order that Defendant Kevin Britto appear for his deposition at the United States District Court for the Eastern District of Massachusetts, One Courthouse Way, Boston, MA, at a date and time convenient to the parties;

d.      Order that Defendant Britto pay his own travel expenses in connection with paragraph c., *supra*;

e.      Order the parties to submits affidavits setting forth the attorney's fees, costs and expenses they incurred in preparation for, and in connection with attendance at, the deposition of Kevin Britto on March 7, 2006 and March 10, 2006 within ten days;  and

f.      Order Defendant Kevin Britto to pay any and all reasonable attorneys' fees, costs and expenses incurred by the parties, per paragraph e., *supra*, as determined by the Court, within twenty days.

> The Plaintiff
> International Floor Crafts, Inc.
> By Its Attorneys,
>
>
> /s/ Paul J. Klehm
> James B. Krasnoo (BBO#279300)
> *jkrasnoo@krasnooklehm.com*
> Paul J. Klehm (BBO#561605)
> *pklehm@krasnooklehm.com*
> Krasnoo/Klehm LLP
> 23 Main Street, Suite One
> Andover, MA  01810

Dated:  March 16, 2006                              (978) 475-9955

## LOCAL RULE 7.1(A)(2) AND L.R. 37.1(A) STATEMENT

On March 15, 2006 from approximately 6:22 p.m. to 6:33 p.m., Attorneys Paul J. Klehm and James B. Krasnoo spoke by telephone with Defendant Kevin Britto in connection with the within motion.  Attorney Klehm read the title of the motion for Defendant Britto, and then Attorney Klehm discussed the relief sought by IFC.  Defendant Britto stated, among other things, that he had left a telephone message for IFC's President offering to proceed with the deposition. Attorney Krasnoo stated, among other things, that IFC needed to pursue the within motion because of the costs involved in the event that Defendant Britto failed to testify again and because of the need to obtain a court order to insure that Defendant Britto appeared and testified at the deposition.  Defendant Britto stated that he may need to get an attorney.  Despite further discussion, the parties were not able to reach agreement on the motion.

> /s/ Paul J. Klehm
> Paul J. Klehm

## <u>CERTIFICATE OF SERVICE</u>

 I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within document

upon all counsel of record not served via ECF and upon all parties not represented by counsel by

first class mail, postage pre-paid, on March 16, 2006.

       <u>/s/ Paul J. Klehm      </u>
       Paul J. Klehm

EXHIBIT A

1

1          UNITED STATES DISTRICT COURT FOR THE

2

3          EASTERN DISTRICT OF MASSACHUSETTS

4   - - - - - - - - -- - - - - - - - x

5   INTERNATIONAL FLOOR CRAFTS, INC., :

6          Plaintiff,        :

7          -against-        :  CIVIL ACTION NO.
                           :  05CA11654-NMG

8   DAVID W. ADAMS, et al.,     :

9          Defendants.      :

10  - - - - - - - - - - - - - - - x

11

12         VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by

13  Plaintiff at the offices of Fink & Carney Reporting

14  and Video Services, 39 West 37th Street, 6th Floor,

15  New York, New York 10018, on Tuesday, March 7, 2006

16  commencing at 1:30 p.m., before Debra DiBenedetto, a

17  Shorthand (Stenotype) Reporter and Notary Public

18  within and for the State of New York.

19

20

21

22

23

24

25

8

                          Britto

1

2          and testified as follows:

3                    THE WITNESS:  I don't believe

4              in God.  There isn't a God.  If there

5              is, he's a deadbeat dad.

6    DIRECT EXAMINATION

7    BY MR. KRASNOO:

8          Q      Mr. Britto, at some point you began

9    employment with International Floor Crafts?

10         A      1988, July 18th.

11         Q      Okay. And at some point you did

12   something while you were working for International

13   Floor Crafts that you've earlier, off the record,

14   just apologized to Mr. Elovitz for, is that

15   correct?

16         A      Yes.

17         Q      Okay. What was it that you did when

18   you worked for International Floor Crafts for

19   which you've just offered an apology?

20         A      Stole money.

21         Q      Now, do you recall how it came about

22   on the first occasion that you stole money?

23         A      Dave actually coerced myself into

24   it, and the Suns and Mike Brown.  And there was a

25   shipment one time that, was short.  And I was the

9

1                              Britto

2    buyer, I became the buyer, June 1993 when Bill

3    became the president.  And, there was a short

4    shipment and at the time I wasn't close to Bill.

5    He did something that pissed me off, I can't

6    recall what it was, and Dave egged me on, so I was

7    pissed off.  The shipment came in short, I called

8    him up, what's going on, Dave.  He said, oh, let

9    me call you back, I'll fix it.  He knew I was mad.

10   And then he called me back, and said, Well, we can

11   make some money off this.  I'm like, what are you

12   talking about.  So when he did, I thought about

13   it, I called him back and I said, okay, let's do

14   it.

15           Q     Now, let me ask you some questions

16   about that first --

17           A     Okay.

18           Q     You mentioned Dave.  What's Dave's

19   last name?

20           A     Adams.

21           Q     Okay. Secondly, you mentioned that

22   there was a short shipment.  Do you know who the

23   supplier of the short shipment was?

24           A     DGM.

25           Q     Okay. And --

10

1                           Britto

2         A     Which the owner is now dead, so.

3         Q     Now, you also mentioned that you had

4    some type of conversation with Dave Adams where he

5    said, in substance, let's make some money out of

6    this?

7         A     Yep.

8         Q     Okay. Did he describe to you in that

9    conversation how you and he were going to make

10   money and how the scheme or plan would be

11   implemented?

12        A     There was supposed to be like 600

13   rugs.  300 came in.  We made the money off the 300

14   rugs.

15        Q     Now, how did you -- was there

16   certain paperwork you had to fill out to indicate

17   that 600 rugs had come in when, in fact, only 300

18   had?

19        A     See, this is where it gets

20   complicated.  I like to cover my tracks.  So I

21   used to have all kind of people do the paperwork

22   just so it's not one person, you know what I mean.

23   And, so I don't know who did it at the time.

24        Q     Okay.  Now, did Mr. Williams, Tyrone

25   Williams, become known to you at some point?

11

1                      Britto

2        A     Yeah.

3        Q     And did Mr. Williams at any time

4    participate in any portion of this scheme?

5        A     Yes.

6        Q     Okay. Now --

7        A     Let me say something on that.  I was

8    his boss.  I don't know if I intimidated him,

9    plus, I do have a reputation -- well, I used to

10   have a reputation of kicking people's ass, so I

11   don't know if I intimidated him over that and

12   that's why he did it.  Of course, he's a man, he

13   wanted the money, you know, but I don't know if I

14   forced him into it.

15       Q     Well, first you stated you began

16   with this scheme, it first started in 1993?

17       A     Well, that's when I became the

18   buyer.

19       Q     Okay. When, roughly, from 1993

20   until how long did you work for International

21   Crafts?

22       A     I left in 1998, September.  I came

23   back September -- it's funny because the day I

24   left is the same date I came back a year later.

25       Q     So you came back September 1999?

12

Britto

1

2      A    No, I think that's wrong, I came

3    back ten months later.  I left in November of '97,

4    came back September 28th of 1998, and then I left

5    again September 28th, 2001.

6      Q    Now, did the scheme to defraud first

7    happen in your first employment with IFC as well

8    as your second or only in your second or only in

9    your first?

10      A    Both.

11      Q    Okay. And, when did Tyrone Williams

12    start participating with you in this?

13      A    Oh, I came back in '98, I hired him,

14    so he probably started in '99.

15      Q    And when he started with you, can

16    you estimate for us when the shipment -- strike

17    that -- when the stealing actually started, by

18    that I mean reporting that X number of rugs came

19    in when only one came in, which was less?

20      A    I understand, it was after Dave

21    Rooney left, which I'm pretty sure IFC has that on

22    record.

23      Q    Now, are you able estimate for us

24    how many shipments of rugs this involved?

25      A    Oh, I don't know.

13

Britto

```
1                      Britto
2          Q     Is it more than 50?
3          A     It's, it's a high number, I don't
4     know.  It's around 50 at least anyways.
5          Q     And, when the stealing began, how
6     did the parties get the money from it that they
7     split up, what was the method by which the money
8     was placed in your pocket?
9          A     Went through Dave.
10         Q     And did you know how much the theft
11    represented each time?
12         A     No.  Actually Dave stole from IFC
13    and myself.
14         Q     Okay.  So, did you ever question
15    Dave Adams --
16         A     Oh, yeah, we went at it.
17         Q     Okay. So, when you went at it, what
18    kinds of conversations did you have with Mr. Adams
19    about the money?
20         A     Well, he said Building 19 is not
21    paying their bills, which they were, and that's
22    why there's no money there, because he was
23    gambling the shit away.
24         Q     Did you -- can you tell us how much
25    money you made out of the scheme as an estimate?
```

14

1                         Britto

2    Is it more than a thousand dollars?

3         A     Oh, of course.

4         Q     Okay.  Is it more than 50,000?

5         A     I'm not going to give you any

6    numbers.

7         Q     Is it because you don't have a

8    memory?

9         A     Yeah, I don't know how much, I'm not

10   gonna give you a number if I don't know -- I'm

11   under oath so I'm not going to.

12        Q     Did --

13        A     I can tell you one thing, it's over

14   a hundred thousand, that's for sure.

15        Q     Okay.

16        A     And, well, he will get every penny

17   back that I took from him.

18        Q     When you say a hundred thousand, is

19   that money that came just to you?

20        A     Oh, yeah.

21        Q     Now, over what period of time did

22   you receive these monies?

23        A     That was after Dave really left, I

24   don't know.

25        Q     Did you continue to receive any

15

1                         Britto

2   money at all after you left IFC for good?

3           A     Yes.

4           Q     Okay. And how did you get that

5   money?

6           A     Checks.

7           Q     And who did the checks come from?

8           A     CCC.

9           Q     Okay. And, had you ever had any

10  direct contact with any member of CCC --

11          A     Yes.

12          Q     -- about any aspect of this scheme?

13          A     Yes.

14          Q     Okay. With whom did you have

15  contact?

16          A     Paul and David.

17          Q     Okay. Did you ever have any contact

18  with another member of CCC named John Sun --

19          A     Oh, Mike Brown.

20          Q     Well, John Sun?

21          A     No, I don't know who that is.

22          Q     Okay. Now, when you left and you

23  received checks, did you have communication with

24  either David Sun or Paul Sun about those specific

25  checks that came to you after you left

16

Britto

1

2   International Floor Craft?

3          A    Yes.

4          Q    Which one or both if it was both?

5          A    Both.

6          Q    Can you remember, in substance, the

7   conversations that you had with either one or both

8   of them?

9          A    Give me an example.

10          Q    Well, did you ever discuss with

11   them, for example, the size of the check and how

12   much it should be?

13          A    Yes.

14          Q    Okay. And did you ever discuss with

15   them that you thought you were being shortchanged,

16   for want of a better word, about the size of the

17   check?

18          A    No.  That would be Dave.

19          Q    How many checks did you receive

20   after you left?

21          A    A bunch.

22          Q    Okay. And do you know how much money

23   that represented?

24          A    (Indicating.)

25          Q    When did you first -- Oh, yeah, you

17

Britto

 1   need --

 3          A      No.

 4          Q      And if you could give us a verbal,

 5   because she can't, the court reporter can't record

 6   whether it means a yes or no with your gesture.

 7          A      Okay.

 8          Q      Now, after you left International

 9   Floor Crafts, what was the purpose of your getting

10   money from CCC at that point?

11          A      There's a whole bunch, actually.

12          Q      Okay.  What were they, or the

13   purposes?

14          A      Alcoholic, pills, wanting to live in

15   a gay lifestyle out here in New York.  And then my

16   when mother died, some of that money went to pay

17   for her funeral, tombstone.

18          Q      So those are the purposes for which

19   you used it?

20          A      I paid -- I grew up on welfare in

21   the projects so all the people I'm close to are

22   poor.  So when I wasn't using the money for the

23   drugs, the addictions, I was helping people pay

24   their electric bills, their rent, phone bills,

25   whatever.

18

1                        Britto

2         Q     What were the purposes, if you know,

3   that you got the money from CCC after you left

4   International Floor Crafts?

5         A     That was the addiction.

6         Q     Yes, but I mean what was it that

7   caused them to give you the money to support your

8   addiction after you had left?

9         A     Because I had control of the

10  warehouse.

11        Q     So did you continue to have control

12  of the warehouse even though you physically left

13  IFC?

14        A     Yes.

15        Q     And how did you have physical

16  control over the warehouse?

17        A     Because Tyrone was my friend.

18        Q     So, would you be in communication

19  with Tyrone Williams after you left IFC?

20        A     Yes.

21        Q     And what would be the conversations

22  that you would have with Tyrone Williams?

23        A     I would just give him advice how to

24  do some shit.

25        Q     And when you gave him advice on how

Britto

19

1

2    to do shit, what kind of shit are we talking

3    about?

4          A      Legal shit.

5          Q      So, would he initiate the phone

6    calls with you or you with him?

7          A      I probably had to because he's not

8    too good at communication.

9          Q      And when you initiated the phone

10   calls with him or spoke with him, what were some

11   of the subject matters or all of the subject

12   matters as you can remember, that you engaged in

13   between him and Tyrone Williams and yourself?

14         A      I would tell him what came in, when

15   to bill it, I mean when to do the key rec.  Give

16   him answers to tell the buyers.

17         Q      When you would talk to him about

18   what came in, do you mean by that --

19         A      I would tell him, look, there's 350

20   9-by-10 wells, 350 8-by-10 wells.

21         Q      So, are you giving him information

22   that he should be putting down on what you call

23   the key rec?

24         A      Yes.

25         Q      Even though those numbers of rugs in

20

Britto

1
2      that quantity actually did not come in?

3              A      Yes.

4              Q      So you would be giving him on that

5      phone call the numbers that he should be placing

6      in --

7              A      I was directing him --

8              Q      That represented phony but not

9      actual shipments?

10             A      Yes, I was directing him.

11             Q      Okay. And when you gave that

12     quantity, would you first, before you discussed it

13     with Tyrone Williams, discuss it with anyone at

14     CCC as to what the quantities should be?

15             A      Sometimes.  Dave, mostly.

16             Q      Okay. How would CCC know the

17     quantities of nonexisting rugs to bill IFC for if

18     they did not discuss it with you?

19             A      Dave would tell them or I would tell

20     them.

21             Q      Would Dave also have -- Dave Sun,

22     you're talking about?

23             A      No, Dave Adams.

24             Q      Okay. And would -- did David Sun

25     ever have direct communication with you while you

23

                              Britto

1

2          A      I'm not going to incriminate myself,

3     it was nasty.

4          Q      Okay. By nasty, do you mean a lot of

5     blasphemy being used or swear words?

6          A      Threatening.

7          Q      Were you doing the threatening of

8     him --

9          A      Yes.

10         Q      Okay.  And did your threats to him

11    involve no longer continuing in this scheme?

12         A      Yes.

13         Q      Did the scheme nevertheless continue

14    after you made the threats to David Adams?

15         A      Yes.

16         Q      Do you have any idea at all how much

17    money from anything David Adams told you or what

18    you personally observed David Adams gambled away?

19         A      It's got to be over a million

20    dollars.

21         Q      Did you ever accompany Dave Adams to

22    any place of gambling such as the track or a

23    gambling club or --

24         A      I did one time, actually.

25         Q      Where did you go on that occasion?

28

1                              Britto

2          Q      There are no shipping papers?

3          A      Yes.

4          Q      Those goods come in and then what

5     happens to them if a person is a scumbag and wants

6     to, in some way, get some cash or profit or, or

7     acquisition because of this?

8          A      Let me make this clear, Steve is not

9     involved in this.

10         Q      Right, I understand that.

11         A      Okay.

12         Q      But what happens to those goods when

13    they come out and there is no paperwork

14    accompanying them?

15         A      We tell them to go off the truck, we

16    ship them right out.

17         Q      And when you ship -- so they're

18    actual goods that come in, is that correct?

19         A      Sometimes, sometimes not.   '

20         Q      Okay. Sometimes they're just

21    fictional goods?

22         A      Yes.

23         Q      Goods don't come in?

24         A      Yes.

25         Q      Are there also times when goods

29

1                          Britto

2     would come in --

3              A      Half shipments --

4              Q      But then you would add to the goods?

5              A      Yes.

6              Q      That portion would be fiction?

7              A      Yep.

8              Q      Okay. And as a result you would

9     claim, for example, 600 rugs came in but only 300

10    came in?

11             A      Yes.

12             Q      Okay. Then there were times when you

13    would claim 600 rugs came in but absolutely no

14    rugs came in?

15             A      Yes.

16             Q      And then there would be times when

17    600 rugs came in and 600 rugs actually did come

18    in?

19             A      Yes.

20             Q      And you would claim that 600 rugs

21    came in?

22             A      Yes.

23             Q      Okay. Now, in all three instances

24    you say that when they would come in but there

25    would be no paper work with them, you would ship

30

1                        Britto
2   them immediately out.  In the instance where
3   you're shipping them out but actually no rugs came
4   in at all, are you creating a document that
5   suggests these nonexistent 600 rugs actually were
6   sent out somewhere?
7           A     We could ship them from another
8   company.
9           Q     Okay.
10          A     So the rugs did go on the trailer,
11  but it wasn't from the ones.
12          Q     So, in other words if company A --
13          A     They didn't ship anything, company B
14  did.
15          Q     And you would use company B's rugs
16  claiming they were company A's --
17          A     Correct.
18          Q     And send those out?
19          A     Correct.
20          Q     So that it would look like the
21  receiving Building 19 outlets got 600 rugs but
22  those 600 rugs that came actually from company B
23  had already been paid for to company B?
24          A     Correct.
25          Q     How did you determine whether to do

31

1                              Britto

2      a real shipment, a legitimate shipment, as opposed

3      to treat a shipment as if it were fiction?

4              A      Depends what we had in stock.

5              Q      Okay. So if you actually had 600

6      rugs, this was a good time to let CCC or another

7      company know that they should create a fake bill

8      for 600 rugs because you were going to ship them

9      out as if they were that company's rugs when they

10     really weren't?

11             A      Correct.

12             Q      Okay. Did --

13             A      And also, Bill might want to write

14     this down.  The tags shouldn't be universal,

15     because that's another thing.

16             Q      So when you say the tags now, you

17     mean that there are tags that are attached with

18     wires to the rugs, is that correct?

19             A      No, our tags -- well, I say ours.

20             Q      Okay.

21             A      The Building 19 tags, there should

22     be different tags on each vendor, because if you

23     use a universal tag you could say it's this

24     person's goods, that person's goods or whatever.

25             Q      So what you're basically telling

38

1                          Britto

2          A     That's one thing I don't know.

3          Q     Okay.

4          A     I wasn't involved in that.

5          Q     Did David Adams ever tell you in

6    passing in any conversation with you, any of the

7    steps he took to get it going?

8          A     Yeah, he said he talked to Mike

9    Brown.

10         Q     Okay. Now, when you --

11         A     -- and he told me --

12         Q     Go on.

13         A     Like with Ron Mitchell and Jane, who

14   are innocent, by the way, again.  He met with Ron

15   and Tony, or Jane, and, Dave's a good bullshit

16   artist, he told me we're converting goods and Bill

17   contested this, he always wants the buyer to get

18   new vendors, so that's what Dave told them, I need

19   new vendors, I want to convert goods, so I can get

20   Bill off my back, and that's what happened.

21         Q     Now, you mentioned the name Tony,

22   for the first time in your testimony.  Who is

23   Tony?

24         A     I think it's Jane's boyfriend or

25   some shit.

41

Britto

1

2  that conversation at all as to why you were

3  calling him to find out that information?

4           A     No.

5           Q     Okay. Did you and Mr. Mitchell have

6  any discussion with one another about Mr. Adams in

7  that conversation?

8           A     Oh, definitely.

9           Q     What was the conversation that you

10  had with Mr. Mitchell about it?

11           A     There's a few of them.

12           Q     Okay.  Could you tell us as best as

13  you can recall what you said to him and what he

14  said to you?

15           A     I don't believe Dave.  I said, are

16  you getting paid?  He said, oh, yeah, I'm getting

17  paid.  And because Dave kept saying Building 19's

18  not paying their bills, not, so I'm not getting my

19  money, I'm getting pissed off.  Now, Ron, in the

20  meantime, I mean he's naive, he doesn't know what

21  the hell's going on.  But he told me, yeah, I got

22  paid, I gave the money to Dave because -- this is

23  how it was set up.  They were, I guess, call it a

24  broker, put the money up in advance so we can

25  convert the goods, buy the rugs, resell them to

42

1                          Britto

2     IFC and then they get paid.

3            Q       Now, can you tell us or explain to

4     us why it was that Mr. Mitchell would put up the

5     money so that you could convert the goods?

6            A       Because he made a percentage off it.

7            Q       And, made a percentage off the

8     money?

9            A       Yeah, for loaning it.

10           Q       So was he financing Dave Adams'

11    attempt to convert the goods, is that what you

12    mean by what you just said?

13           A       Yes.

14           Q       Okay. Now, what did the conversion

15    of the goods involve?

16           A       Buying the goods, paying people to

17    cut them up, bind them, ship them, cost of

18    delivery.

19           Q       What was the purpose of converting

20    the goods, how would that benefit Mr. Adams so as

21    to cause the scheme to succeed?

22           A       Because he wanted money up front so

23    he can go gamble it.

24           Q       Okay. So by being paid in advance --

25           A       He had the money right away.

53

1                           Britto

2           Q      Okay. Did you discuss money in that

3     conversation?

4           A      No.

5           Q      Did Michael Brown discuss with you

6     whether or not he was getting paid with David

7     Adams?

8           A      No.

9           Q      Was Michael Brown to get paid by

10    David Adams directly?

11          A      He was at first, and Dave wasn't

12    paying him.  So then, Dave was telling him that I

13    was supposed to pay him when Dave was supposed to,

14    because Dave's, he's --

15          Q      So did you wind up paying Michael

16    Brown any money?

17          A      Yes, but he didn't get too much.

18          Q      Over what period of time did you pay

19    Michael Brown?

20          A      Maybe a year.

21          Q      Do you recall roughly how much

22    Mr. Brown got?

23          A      Probably got like six, 7,000.

24          Q      And what was Michael Brown's role?

25          A      Well, he helped set it up with Dave.

62

1                                    Britto

2          A      No, he wasn't.

3          Q      Okay. And you would take then

4    shipments of actual product and display them to

5    Nick Adler, telling him that those were the

6    product that allegedly were shipped in by Remco?

7          A      Correct.

8          Q      Okay. Does that mean, therefore,

9    that Remco presented bills or invoices to show

10   product was shipped into IFC when, in fact, no

11   product was shipped in?

12         A      Without their knowledge, correct.

13         Q      Okay. Now, could you explain to us

14   how Remco could create an invoice suggesting that

15   product was sent in to IFC without its knowledge

16   their product was never sent in to IFC?

17         A      Yes.  Because we told them, bullshit

18   them actually, that we didn't want them getting

19   involved, because we didn't want them to get

20   involved with the people we were buying the goods

21   from, so they couldn't steal our business.

22         Q      So you were telling that to --

23         A      Ron Mitchell.

24         Q      Did you ever tell that to Jane

25   Dziemit?

63

1                          Britto

2        A      I never talked on her.

3        Q      Did you ever tell that to Tony?

4        A      Maybe, I'm not sure.

5        Q      And Tony's last name, Marasca?

6        A      Yep.

7        Q      Does that refresh your recollection?

8        A      Yep.

9        Q      Now, you just stated a moment ago

10   that you had never talked to Jane Dziemit.  How

11   did you come to know her name and her involvement

12   with Remco, if at all?

13       A      Paperwork.

14       Q      So that was the first time you

15   became aware of the --

16       A      Her at all.

17       Q      -- of the existence of Jane Dziemit?

18       A      Yeah.

19       Q      Did you ever have any discussion

20   with Ron Mitchell following receipt about

21   paperwork down to today about Jane Dziemit?

22       A      Yes.

23       Q      Would you tell us as best you can

24   recall, what you said to Ron Mitchell and what Ron

25   Mitchell said to you about Jane Dziemit.

64

1                          Britto

2          A     No, I just said Ron and Jane are

3    innocent.

4          Q     You said that to Ron?

5          A     Yes.

6          Q     Okay.

7          A     Because they are.  I'm trying to

8    make the wrongs right.

9          Q     What did Ron, if anything, say in

10   response to your statement?

11         A     I can't remember.

12         Q     Did -- do you know from any

13   conversation at any time with Mr. Mitchell how

14   much money Remco fronted -- if I can put it that

15   way -- paid up front to David Adams?

16         A     (Witness nods).

17         Q     How much money?

18         A     Well, if there was a $40,000

19   invoice, I guess it would have been like 22,

20   25,000.

21         Q     So, so Mr. Mitchell then was to

22   receive a percentage of the total amount of the

23   invoice?

24         A     Um-hum.

25         Q     As payment for having produced an

66

1                          Britto

2          Q       So the only time you would know of

3    it was when Mr. Adams passed some money to you and

4    made the statement that this was money that came

5    either from Remco or Mr. Mitchell or Ms. Dziemit?

6          A       Correct.

7          Q       Did you ever try to find any ways to

8    determine that you were getting your fair share of

9    the monies that either Mr. Mitchell or Ms. Dziemit

10   or Remco had paid to Mr. Adams up front?

11         A       Definitely.

12         Q       What steps did you take to get that

13   information?

14         A       Well, when Dave was giving me this

15   bullshit act, I called up Ron.

16         Q       Would you do this periodically while

17   you were still employed at IFC?

18         A       No, this was afterwards.

19         Q       Okay. Before that did Mr. Adams

20   indicate to you that Remco was fronting him some

21   monies for shipments that were later going to be

22   fictional?

23         A       I can't remember that.

24         Q       When you first -- when did you first

25   become aware of the existence of Ron Mitchell?

68

Britto

2    connections.

3         Q     But I mean how would you find out --

4         A     He made my job easier.

5         Q     That he bought the foam from North

6    Carolina Foam as opposed to from another

7    connection?

8         A     The bill.

9         Q     Okay.  So you would actually get to

10   see the bill?

11        A     Yes.

12        Q     Okay.

13        A     I had to sign off on everything,

14   every bill that came in, when I was the buyer.

15        Q     So that would involve bills for

16   genuine shipments?

17        A     Yes.

18        Q     And bills for fictional shipments?

19        A     No.

20        Q     Never?

21        A     Never.

22        Q     Okay. All right.  When a bill came

23   in for a fictional shipment how -- let's do it

24   another way.  Would you take us through the steps

25   that would be accomplished, identifying the

69

Britto

1

2  paperwork, for a legitimate shipment first and

3  then I'll ask you to do the same thing for us for

4  a fictional shipment so we all can appreciate the

5  difference in steps.

6          A       Okay.

7          Q       So first, for a legitimate shipment.

8          A       Trailer comes in, count the goods,

9  this is what they're supposed to do.  Count the

10  goods off the trailer, put it upstairs, count.

11  Now, the people upstairs who are unloading it

12  upstairs count the goods in.  They got a master

13  paperwork, turn it in to the supervisor, looks at

14  the bill of lading, compares the two, if it's a

15  piece or two off, you know, it could be a wrong

16  count, do the key rec, sign it, send it in.

17          Q       Now, tell us --

18          A       Now, with the fake ones, you mix it

19  in with the real ones.

20          Q       Okay.

21          A       Because people are not good at doing

22  paperwork.  So you just give them a whole stack of

23  shit.

24          Q       So you give them genuine pieces of

25  paper representing genuine shipments, but you mix

70

1                                  Britto

2          it in with pieces of paper about nonexistent --

3                  A      Yes --

4                  Q      Shipments at the same time?

5                  A      Yes.

6                  Q      Now, is the key rec created for the

7          fictional shipments as well?

8                  A      Yes.

9                  Q      Okay.  And is the supervisor still

10         required to sign off on the fictional shipments?

11                 A      Yeah.

12                 Q      Okay. Now, who do you give this

13         paperwork to where the fictional shipment

14         paperwork is mixed in with the genuine shipment

15         paperwork?

16                 A      To the supervisor.

17                 Q      Okay. Now --

18                 A      I'll give you an example.  When I

19         was the buyer, we went through a lot of

20         supervisors.  I used to send them off on shopping

21         reports, to go a store, do this.  While they're

22         gone, this trailer just happened to come in and we

23         shipped it out.  I'm their boss.  They're not

24         gonna question me.  There's the key rec.

25                 Q      So you would prepare a key rec for

71

Britto

1

2     some of the fictional shipments?

3          A     No, I wouldn't -- well, I did some

4     key recs, but --

5          Q     Who would prepare the key rec for a

6     fictional shipment?

7          A     The supervisor would, but he didn't

8     know or she didn't know.

9          Q     That it was fictional shipment?

10          A     Yes.

11          Q     So they would come back from their

12     shopping merchandise that you sent them on?

13          A     And do the paperwork.

14          Q     They would see the paperwork there,

15     they would know they had to fill out a key rec?

16          A     Yes.

17          Q     They would fill it out, they would

18     sign off on it on the basis of the paperwork they

19     received?

20          A     Correct.

21          Q     Okay. And especially they would be

22     in part relying upon your statement as a boss that

23     the shipment came in while you were out?

24          A     Correct.

25          Q     Here's all the paperwork on it?

97

Britto

```
1                           Britto
2          A     I have no idea.
3          Q     But was that something that was
4   discussed?
5          A     Yes.
6          Q     Okay. Did you ever --
7          A     I was probably drunk at the time,
8   so --
9          Q     How did you obtain the information
10  that caused you to conclude that David Adams was
11  robbing you, as you've just put it?
12         A     Because the money wasn't coming in.
13         Q     And you knew that money should be
14  coming in because you were aware of the shipments
15  that came in that were really fictional?
16         A     Correct.
17         Q     Okay. Did you confront David Adams
18  about the fact that no money was coming in even
19  though shipments were?
20         A     Over the phone, yes.
21         Q     Now --
22         A     Several times.
23         Q     Okay.  And you would do it over the
24  phone because David Adams wasn't always in on a
25  daily basis at IFC, is that correct?
```

98

Britto

1

2      A      Well, I was in New York.

3      Q      Okay.

4      A      He was in Massachusetts.

5      Q      So this occurred after you had

6  already left IFC?

7      A      Correct.

8      Q      Okay. What was David Adams'

9  explanation for --

10     A      Building 19's not paying their

11 bills.

12     Q      Okay.

13     A      Which they were.

14     Q      Okay. Now -- and the way you found

15 that out was by calling David Sun?

16     A      Paul Sun and Ron Mitchell.

17     Q      Okay. When you called and you spoke

18 to Paul Sun and found out that IFC or Building 19

19 was, in fact, paying their bills, did you ever

20 reconfront David Adams?

21     A      Ho, ho, ho, ho.

22     Q      And what basically did you say to

23 Adams and Adams say to you --

24     A      I'm not gonna say what I said.

25     Q      Okay, is that because it's harsh

99

1                          Britto

2    language?

3          A     Yes.

4          Q     Okay, taking away the colorful

5    language for the moment, in essence, what did you

6    say to Dave Adams about the fact that you've now

7    learned that IFC had, in fact, paid bills that

8    Dave Adams had claimed IFC had not paid?

9          A     It was all colorful language.

10         Q     And what did Adams say upon your

11   acquainting him with your discovery that he had

12   lied to you?

13         A     He hung up.

14         Q     At that point what did you do?

15         A     Called him back and he didn't

16   answer.

17         Q     So you're still without the money?

18         A     Yup.

19         Q     What steps if any do you take to get

20   the money?

21         A     Then I called up Ron and the Suns

22   and said, look, this is what's gonna happen, you

23   don't give Dave the money anymore, it comes to me.

24         Q     And did Ron Mitchell send you money?

25         A     Yes.

100

1                          Britto

2          Q     Did Ron Mitchell ask you why the

3    change in circumstances that he no longer sent to

4    it to Dave?

5          A     Yes.  And I told him because if he

6    doesn't send it to me, the business stops -- I

7    controlled the warehouse, I could have stopped at

8    any point and that's what Dave knew.

9          Q     Okay. So you indicated therefore, to

10   Ron, that the business would stop if you didn't

11   get paid.  Did Ron understand from the

12   circumstances in your phone call that the business

13   that would stop would be the representation that a

14   shipment came in when, in fact, it was fictional?

15         A     No.

16         Q     What was it that Ron thought was

17   going to stop?

18         A     My commission.

19         Q     For actual shipments of rugs?

20         A     Yes.

21         Q     Okay. Had you had direct

22   communication with Ron before this time when you

23   called him?

24         A     No.

25         Q     Okay. How did you know that when you

107

1                              Britto

2      monies from CCC with, that you received from them

3      with Michael Brown?

4              A      Yes.

5              Q      Okay. Now, how would you determine

6      how much of the monies that came to you from CCC

7      should go to Tyrone Williams?

8              A      He would get so much on a key rec.

9              Q      Was that a flat sum?

10             A      Yeah.

11             Q      How much money was that?

12             A      1500.

13             Q      Per key rec?

14             A      Yes.

15             Q      And would that be on average of once

16     a month?

17             A      Yes.

18             Q      Okay. Would it be more often than

19     once a month?

20             A      Sometimes.

21             Q      And --

22             A      Sometimes it wouldn't -- sometimes

23     they were dry, there wouldn't be anything.  Back

24     to school, there was obviously more, that's our

25     busy season.

130

Britto

1

2  borrowed money that he was unlikely to repay, is

3  that correct?

4         A     Yes.

5         Q     And you had that conversation with

6  Mr. Mitchell at a time when Mr. Mitchell was

7  commenting to --

8         A     It was 2002.

9         Q     -- commented to you that he hadn't

10 been paid monies that he was owed by Dave Adams?

11        A     Correct.

12        Q     Just as you told Mr. Mitchell you

13 weren't getting paid by Dave Adams what you were

14 supposed to be getting paid?

15        A     Correct.

16        Q     Okay. Now, when he, Mr. Mitchell,

17 started sending you wire transfers, did he ask you

18 to sign any documents at all indicating that you

19 were getting paid monies?

20        A     No.

21        Q     Okay. Do you know from any

22 conversation you ever had with either Mr. Mitchell

23 or Mr. Adams that Mr. Mitchell told Mr. Adams that

24 he was now sending monies he otherwise would have

25 been sending to Mr. Adams to Mr. Britto, to you?

134

Britto

1

2       told Ron Mitchell to send you the money instead of

3       Adams that, Mr. Mitchell, who up to this point

4       thought that all the moneys that he was laying out

5       were legitimate, would suddenly think that it was

6       not legitimate?

7             A       No. I mean, I bullshitted him, I'll

8       admit it.

9             Q       Did Mr. Mitchell ever indicate to

10      you in this conversation that he thought this was

11      unusual or strange?

12            A       Yes.

13            Q       Okay. And --

14            A       And that's when the bullshit came

15      in.

16            Q       Well, can you explain to us what it

17      was that you said that eased his suspicions

18      sufficiently to have Mr. Mitchell send by wire

19      transfer, monies directly to you?

20            A       I said it earlier.

21            Q       Okay.  Now, at this time, did

22      Mr. Mitchell know that you were no longer

23      associated with IFC?

24            A       Yes.

25            Q       Okay.  Did Mr. Mitchell -- sorry.

150

1

2              UNITED STATES DISTRICT COURT FOR THE

3                EASTERN DISTRICT OF MASSACHUSETTS

4    - - - - - - - - - - - - - - - - x
     INTERNATIONAL FLOOR CRAFTS, INC., :
5                                      :
                   Plaintiff,          :
6                                      :
                                       :
7            -against-                 : CIVIL ACTION NO.
                                       : 05CA11654-NMG
8    DAVID W. ADAMS, et al.,           :
                                       :
9                  Defendants.         :
                                       :
10   - - - - - - - - - - - - - - - - x

11

12          CONTINUED VIDEOTAPED PROCEEDINGS in the

13   above-captioned matter, held at the offices of Fink &

14   Carney Reporting and Video Services, 39 West 37th

15   Street, 6th Floor, New York, New York 10018, on

16   Friday, March 10, 2006 commencing at 12:20 p.m.,

17   before Debra DiBenedetto, a Shorthand (Stenotype)

18   Reporter and Notary Public within and for the State of

19   New York.

20

21

22

23

24

25

151

1

2    A P P E A R A N C E S:

3            KRASNOO KLEHM LLP
                     Attorneys for Plaintiff
4                    Terrace Level Suite One
                     Andover, Massachusetts  01810-3730
5
         BY:  JAMES B. KRASNOO, Esq., of Counsel
6              PAUL J. KLEHM, Esq., of Counsel

7

8
         LAW FIRM OF ISAAC H. PERES
9                    Attorneys for Defendant Adams
                     50 Congress Street, Suite 225
10                   Boston, Massachusetts  02109

11       BY:  ISAAC H. PERES, Esq., of Counsel

12

13

14       YURKO, SALVESEN & REMZ, P.C.
                     Attorneys for Defendant Dziemit
15                   One Washington Mall, 11th Floor
                     Boston, Massachusetts  02108-2603
16
         BY:  RICHARD J. YURKO, Esq., of Counsel
17

18

```
19           LAW OFFICES OF FREDERICK D. GRANT, JR.
                 Attorneys for Defendant Mitchell
20               727 Atlantic avenue, Second Floor
                 Boston, Massachusetts  02111
21
         BY:  ROBERT A. FALK, Esq., of Counsel
22

23

24

25
```

```
                                        152
 1

 2    A P P E A R A N C E S(Cont'd):

 3

 4           TROUT CACHERIS, PLLC
                 Attorneys for Defendants David and
 5               Paul Sun
                 1350 Connecticut Avenue, Northwest,
 6               Suite 300
                 Washington, D.C.  20036
 7
         BY:  JOHN THORPE RICHARDS, Esq., of  Counsel
 8

 9

10
     ALSO PRESENT:  John Durant
11                   William Gemme
                     Ronald Mitchell
12                   William Elovitz

13

14

15
```

16

17

18

19

20

21

22

23

24

25

153

1

2                    THE VIDEOGRAPHER:  We're now

3           going on the record.  The time is

4           12:20 p.m. on March 10th, 2006.  This

5           is the videotape deposition of Kevin

6           Britto, in the matter of International

7           Floor Crafts, Inc. versus David W.

8           Adams, et al., under the jurisdiction

9           of the United States District Court

10          for the Eastern District of

11          Massachusetts.

12          This deposition is being held

13          at 39 West 37th Street, New York, New

14          York.  My name is Jose Santos and I am

15          the video specialist.  The court

16          reporter is Debra DiBenedetto and we

17          both represent Fink & Carney Reporting

18          with offices located at 39 West 37th

19          Street, New York, New York.

20          May I have an introduction

21          from counsel.

22          MR. KRASNOO:  My name is James

23          Krasnoo.  With me is my associate,

24          Paul Klehm.  We both represent the

25          plaintiff in this matter,

                                                    154

1

2           International Floor Craft, Inc.

3           MR. FALK:  My name is Robert

4           Falk.  I'm here with the witness, Ron

5           Mitchell, substituting for Frederic

6           Grant, Law Office of Frederic Grant.

7           MR. PERES:  Isaac Peres,

8           representing the defendant, David

```
9              Adams.

10                  MR. YURKO:  Richard Yurko,

11             representing the defendant, Jane

12             Dziemit.

13                  MR. RICHARDS:  John Richards,

14             representing CCC International and

15             Paul and David Sun.

16                  THE VIDEOGRAPHER:  Will the

17             reporter please swear in the witness.

18  K E V I N   B R I T T O, called as a witness,

19             having been first duly affirmed by Debra

20             DiBenedetto, a Notary Public within and for

21             the State of New York, was examined and

22             testified as follows:

23                  MR. KRASNOO:  Mr. Britto, you

24             indicated shortly before this second

25             day of your deposition was to begin
```

                                                            155
```
1

2              that you wished to make a statement,

3              thereafter leave the building for

4              about 20 minutes, is that correct?
```

5                    THE WITNESS:  Correct.

6                    MR. KRASNOO:  Why don't you

7          tell us what statement you wanted to

8          make, go ahead and make it.

9                    THE WITNESS:  One, I want to

10         say, you indicated last time that

11         there was a problem because I had a

12         few drinks beforehand, and my

13         medication, as I showed you the

14         paperwork can make me confused.

15         Haven't had anything to drink, haven't

16         taking taken my medication, which I'm

17         sure is not a good thing but my system

18         is clean.  I haven't been coerced,

19         paid off, bribed or threatened by

20         anyone on IFCs behalf including the

21         attorneys.  I want to make that clear.

22         I'm doing this of my own free will.

23         Enough people have been victimized

24         over what I did.  I'm guilty, I can

25         admit it.  I stand up for what I did.

156

1

```
2               But it seems like there are more

3               people getting victimized now because

4               of me.  Jane, Ron and the last time

5               you brought up Peter Burnham, Debbie

6               Meyers, Sinai Wholesale and Rick

7               Finley.  They are all innocent. I

8               can't have any more people getting

9               victimized over what I did.  It's just

10              not right.  I'll stand up for what I

11              did, but it's not fair to them.

12                    I've been victimized, as I

13              said the first time I got here on

14              Tuesday, March the 7th, 2006.  Today

15              is Friday, March the 10, 2006.  Bill's

16              birthday is February 28th.  His

17              father's birthday's September 11th.

18              My birthday is October 2nd.  My mother

19              and father were born, my mother was

20              born on June 4th, 1943, my father was

21              born July 6, 1937.  My grandmother on

22              my mother's side was born April 2nd,

23              1912, right around the time that the

24              Titanic went down which was the

25              14th into the 15th which is the
```

157

1

2          15th we all know is tax day.  I'm

3          saying that just so everybody knows I

4          know what's going on.  I'm coherent.

5                  I gotta right the wrongs.  If

6          I can't right them all, then I'm not

7          going to right anything.

8                  The names I just previously

9          mentioned need to be released,

10         dismissed from this case or this

11         deposition is over today, right now.

12         Bill, Durant, and your counsel have 20

13         minutes to make a decision and I'll be

14         back.  It's not right.  There's enough

15         victims in this case already.

16                 MR. YURKO:  Off the record.

17                 THE VIDEOGRAPHER:  Time is now

18         12:25, off the record.

19                 (Brief recess.)

20                 THE VIDEOGRAPHER:  Time is now

21         12:52, on the record.

22          MR. KRASNOO:  Okay,

23      Mr. Britto, I've heard your statement,

24      as have some of the others.  Now you

25      can hear mine.  First, a person who is

                                                    158

1

2       noticed to have a deposition taken is

3       to appear at the deposition and to

4       answer questions put to him.

5           THE WITNESS:  I already have

6       done that.

7           MR. KRASNOO:  You have not

8       completed your deposition, sir, either

9       with questions of me or questions from

10      any of the other people in the room

11      who choose to avail themselves of

12      their right under the case law and

13      under the federal rules to ask you any

14      questions at all.

15          THE WITNESS:  First of all, I

16      volunteered for this.

17          MR. KRASNOO:  If you see your

18      job --

19                    THE WITNESS:  Do you have

20           anything with my signature on it

21           saying --

22                    MR. KRASNOO:  Are you going to

23           let me finish and give me the

24           politeness you told me --

25                    THE WITNESS:  Yes, yes.


                                                    159

1

2                    MR. KRASNOO:  That I was to

3           treat to you --

4                    THE WITNESS:  Yes.

5                    MR. KRASNOO:  With politeness?

6                    As I say, you're a party to

7           the proceedings, you were a party

8           named in the complaint.  Parties can

9           be noticed by way of taking

10           deposition, they need sign nothing,

11           but they must appear at a deposition,

12           if the deposition is ordered.  The

13           deposition was ordered, you have

14           appeared at day one.  Your deposition

15          is not complete.  Under Rule 30 of the

16          Federal Rules of Civil Procedure, not

17          only are we entitled to ask questions

18          that we feel are necessary and germane

19          to our case even if you disagree with

20          their necessity, but the attorneys who

21          represent all other parties are to be

22          afforded the opportunity to ask

23          questions upon the completion of our

24          asking the initial round of questions.

25          After they ask their questions, we're

160

1

2          entitled to ask further questions

3          based on anything that they illuminate

4          or bring out, and they, thereafter,

5          are entitled to ask questions based on

6          what we ask.  At some point, of

7          course, the deposition is concluded.

8                   You have said last time and

9          this time that Ron and Jane are

10          innocent.  That may be true, but that

11          does not mean that you are entitled to

12          determine that solely because you know

13          what you know, because you can't

14          possibly know necessarily all that

15          other people know and may be able to

16          contribute to this, so your request is

17          at best, premature, perhaps a request

18          that cannot be honored, perhaps a

19          request that can be honored.  With

20          your testimony all of us may be able

21          to dig better and obtain the truth.

22          Without your testimony all of us will

23          nevertheless still attempt to dig

24          better to get the truth.

25

161

1

2                If your testimony abrogates

3          now, the following things have to

4          happen. We will go back to Judge

5          Gordon, who's the judge in these

6          proceedings and seek to have a court

7          order compelling you to complete your

8              deposition.  If your deposition is not

9              complete, it leaves up in the air

10             whether or not any of your testimony

11             can be used in this case at all.

12             There are people who may say that they

13             did not have the opportunity to

14             examine you and therefore, your

15             testimony cannot be used.  If your

16             testimony cannot be used, it's not

17             that your testimony can be split into

18             what is useful for one side or the

19             other, it means all of your testimony

20             cannot be used.  So any of your

21             statements that you feel aid one party

22             or the other, aren't going to be able

23             to be used.  On the other hand, the

24             court may allow, may allow -- and the

25             stress is may, because I don't know

162

1

2              the answer to this yet -- all of your

3              deposition to be used, none of your

4              deposition to be used.  I can't

5          picture him, but I can't tell you what

6          a judge necessarily will do.  I think

7          it would be highly unlikely that he

8          would allow some of your deposition to

9          be used but not others.  So that

10         that's where we're at.

11              If you choose not to answer

12         questions today, I have no choice but

13         to go back to Judge Gordon and ask

14         that your deposition be completed.

15              Do I have the authority to do

16         as you wish, to dismiss people where

17         the evidence is not all in, to find

18         any determination as to their guilt or

19         innocence as you put it -- and those

20         are the wrong terms, it's whether or

21         not they're civilly liable or

22         responsible or not -- the answer is

23         no.  So that's my response to your

24         statement.

25

1

2          THE WITNESS:  My response is

3    go back to Judge Gordon.

4          MR. KRASNOO:  Okay.

5          THE WITNESS:  I'm tired of

6    getting up in the morning, throwing up

7    bleeding ulcers over this shit.  I'll

8    take --

9          MR. KRASNOO:  Let me ask

10    you --

11          THE WITNESS:  What I did and

12    other people as well as Bill, victims,

13    it's not right.

14          MR. KRASNOO:  It's --

15          THE WITNESS:  Trying to make

16    things right.

17          MR. KRASNOO:  It's up to you,

18    not me; but as long as the other

19    people are here, since you're not

20    going to answer any of my questions,

21    the question is whether or not you're

22    going to answer any of theirs at the

23    present time?

24          THE WITNESS:  I'm not

25          answering anybody's questions.

164

1

2                    MR. KRASNOO:  Okay.

3                    THE WITNESS:  I guess this is

4          going to turn ugly.  I'm sorry, Bill,

5          I didn't want this to happen, but I'm

6          not getting any cooperation here.

7                    MR. YURKO:  I suggest we go

8          off the record, I'm not -- there's no

9          deponent, there's no reason to have a

10         record.

11                   MR. KRASNOO:  Okay.

12                   THE VIDEOGRAPHER:  Time is now

13         12:58, off the record.

14                   (Time noted: 12:58 o'clock

15         p.m.)

16

17

18

19

20

21

22

23

24

25


165

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK  )

4                      ) ss.

5    COUNTY OF NEW YORK )

6                    I, DEBRA DIBENEDETTO, a

7              Shorthand (Stenotype) Reporter and

8              Notary Public of the State of New

9              York, do hereby certify that the

10             foregoing Proceedings, taken at the

11             time and place aforesaid, is a true

12             and correct transcription of my

13             shorthand notes.

14                    I further certify that I am

15             neither counsel for nor related to any

16             party to said action, nor in any wise

17             interested in the result or outcome

```
18          thereof.

19                IN WITNESS WHEREOF, I have

20          hereunto set my hand this 15th day of

21          March, 2006.

22

23          _____

24                    DEBRA DIBENEDETTO

25
```