wanted to let you know that I am
truly sorry and to let you know all
this happened before you and I got close,
and then I was hooked on booze + pills.
Its no excuse but I wanted to let you
know it was never meant to hurt you.
An addiction is a bitch, let alone two!
I hurt you and destroyed my liver. Both
scenarios suck! I betrayed your trust
which was important to me, and I know
you don't give it out freely! (I see why)
Everyone is guilty except Ron + Jane. They
thought they were putting money up to convert
goods with Dave, and then Bill it when
Dave told them the goods came in. I wanted
you to have this as evidence just in case
my liver gives out before the trial as I
only have about 5/6 left, IF I do make
it I will tell the judge everything!

I know it doesn't fix what I did
but maybe this will help. There
isn't a day that goes by that I
don't feel like shit!!!

...now

and

always

sorry again
(signed)
The Loser  1/14/06
Regina Batts

**Matthew C. Welnicki**

| | |
|---|---|
| **From:** | Richard J. Yurko |
| **Sent:** | Thursday, February 16, 2006 4:15 PM |
| **To:** | 'Paul Klehm'; Robert Xifaras; Peter Krupp; Matthew C. Welnicki; Fred Grant Jr.; Paul Kelly; Isaac Peres |
| **Cc:** | James krasnoo |
| **Subject:** | RE: Deposition of Kevin Britto |

Paul,

Thank you for your email and for seeking to coordinate a suitable time for the deposition of Mr. Britto.  Pursuant to your request:

1. We intend to participate in the deposition on behalf of Ms. Dziemit.

2. I am not sure what you mean by the request that we "waive all objections until the time of trial."  What I assume you mean is that the parties agree to hold, and not make at the deposition, all objections, including as to form, foundation, evidence, relevance, etc. (except for issues of privilege) and that nonetheless any such potential objection would be preserved and could be asserted for the first time at the time of trial if any party seeks to offer the videotaped deposition in evidence. If all other parties agree to this procedure, we have no objection to joining in as well.

3. I cannot do Feb. 23 or 24 any more.  As to the other dates, we are willing to move things around to accommodate the witness.  We also strongly prefer that this deposition be scheduled earlier than later.  However, I would also strongly suggest that you choose two days in a row because that makes logistical sense for counsel who have to travel to New York.

4. We will be participating in person.  I have no objection if any other counsel appears via telephone as long as such counsel can be heard and can adequately hear the proceedings.

Let me know what you decided to do and what arrangements you make.  Thanks again.

Rich Yurko

-----Original Message-----
From: Paul Klehm [mailto:pklehm@krasnooklehm.com]
Sent: Monday, February 13, 2006 4:02 PM
To: Robert Xifaras; Peter Krupp; Matthew C. Welnicki; Richard J. Yurko; Fred Grant Jr.; Paul Kelly; Isaac Peres
Cc: James krasnoo
Subject: Deposition of Kevin Britto

Gentlemen:

As you probably are aware, the Court allowed Plaintiff's Motion for Leave to Take the Videotaped Deposition of Kevin Britto.  As a result, I am writing to set up the dates for Mr. Britto's deposition.  Please remember that this deposition shall be held in New York City.

According to Mr. Britto, as a result of his health condition, he is better able to handle a videotaped deposition in the afternoon (1 p.m. to 4 p.m.), and we intend to honor that request.  IFC therefore will need to schedule the deposition to be held over at least two afternoons.  Given the number of counsel involved, we may need to schedule the deposition over a series of days, so that each counsel may have the opportunity to attend at least one day and ask questions.  IFC IS WILLING TO SET UP THE DEPOSITION SO THAT ONE OR MORE COUNSEL MAY PARTICIPATE BY TELEPHONE, ALTHOUGH EACH PARTY WILL BE REQUIRED TO PAY ITS OWN COSTS ASSOCIATED WITH PARTICIPATING BY TELEPHONE.

In an effort to resolve any difficulties regarding the inability of counsel to attend all days of the deposition and in light of the fact that IFC is taking the deposition now in

order to preserve Mr. Britto's testimony, IFC is willing to agree to waive all objections until the time of trial.  When you respond to this email, please let me know whether your client(s) will also agree to waive all objections until the time of trial.

If you do intend to attend, please note that we are available on the following dates (keeping in mind that the videotaped deposition will be held from 1 p.m. to 4 p.m. on each date):

February 23, 2006
February 24, 2006
February 28, 2006
March 6, 2006
March 7, 2006
March 10, 2006
March 15, 2006
March 17, 2006
March 23, 2006
March 24, 2006
March 27, 2006
March 28, 2006
March 29, 2006

Please let me know the following:
1.  Whether you intend to participate in the deposition, 2.  Whether your client(s) agree to waive all objections until the time of trial, 3.  Which date(s)  you would be available for the deposition, and 4.  Whether you intend to attend the deposition in person or by telephone.

In light of the exigencies of this matter, please get back to me with the information requested above by Friday, February 17, 2006; otherwise, we shall assume that you do not wish to participate in the deposition.

In the meantime, we shall attempt to contact Mr. Britto regarding his availability.

Thanks.

Very truly yours,

Paul J. Klehm, Esq.
Krasnoo/Klehm LLP
23 Main Street, Suite One
Terrace Level
Andover, MA  01810
(978) 475-9955
facsimile (978) 474-9005

## Matthew C. Welnicki

| | |
|---|---|
| **From:** | Richard J. Yurko |
| **Sent:** | Monday, February 13, 2006 4:09 PM |
| **To:** | 'Paul Klehm'; Robert Xifaras; Peter Krupp; Matthew C. Welnicki; Fred Grant Jr.; Paul Kelly; Isaac Peres |
| **Cc:** | James krasnoo |
| **Subject:** | RE: Deposition of Kevin Britto |

Paul,

Thanks for your email. Just for curiosity's sake, have you asked Mr. Britto whether he is willing to come to Boston? Having one person travel is certainly going to be more cost effective than half a dozen lawyers traveling to depose him and stay overnight, etc. I do not know whether he can travel, but if he can, perhaps you should raise it with him. Thanks.

Rich Yurko

-----Original Message-----
From: Paul Klehm [mailto:pklehm@krasnooklehm.com]
Sent: Monday, February 13, 2006 4:02 PM
To: Robert Xifaras; Peter Krupp; Matthew C. Welnicki; Richard J. Yurko; Fred Grant Jr.; Paul Kelly; Isaac Peres
Cc: James krasnoo
Subject: Deposition of Kevin Britto

Gentlemen:

As you probably are aware, the Court allowed Plaintiff's Motion for Leave to Take the Videotaped Deposition of Kevin Britto. As a result, I am writing to set up the dates for Mr. Britto's deposition. Please remember that this deposition shall be held in New York City.

According to Mr. Britto, as a result of his health condition, he is better able to handle a videotaped deposition in the afternoon (1 p.m. to 4 p.m.), and we intend to honor that request. IFC therefore will need to schedule the deposition to be held over at least two afternoons. Given the number of counsel involved, we may need to schedule the deposition over a series of days, so that each counsel may have the opportunity to attend at least one day and ask questions. IFC IS WILLING TO SET UP THE DEPOSITION SO THAT ONE OR MORE COUNSEL MAY PARTICIPATE BY TELEPHONE, ALTHOUGH EACH PARTY WILL BE REQUIRED TO PAY ITS OWN COSTS ASSOCIATED WITH PARTICIPATING BY TELEPHONE.

In an effort to resolve any difficulties regarding the inability of counsel to attend all days of the deposition and in light of the fact that IFC is taking the deposition now in order to preserve Mr. Britto's testimony, IFC is willing to agree to waive all objections until the time of trial. When you respond to this email, please let me know whether your client(s) will also agree to waive all objections until the time of trial.

If you do intend to attend, please note that we are available on the following dates (keeping in mind that the videotaped deposition will be held from 1 p.m. to 4 p.m. on each date):

February 23, 2006
February 24, 2006
February 28, 2006
March 6, 2006
March 7, 2006
March 10, 2006
March 15, 2006
March 17, 2006
March 23, 2006
March 24, 2006
March 27, 2006

March 28, 2006
March 29, 2006

Please let me know the following:
1.  Whether you intend to participate in the deposition, 2.  Whether your client(s) agree
to waive all objections until the time of trial, 3.  Which date(s)  you would be available
for the deposition, and 4.  Whether you intend to attend the deposition in person or by
telephone.

In light of the exigencies of this matter, please get back to me with the information
requested above by Friday, February 17, 2006; otherwise, we shall assume that you do not
wish to participate in the deposition.

In the meantime, we shall attempt to contact Mr. Britto regarding his availability.

Thanks.

Very truly yours,

Paul J. Klehm, Esq.
Krasnoo/Klehm LLP
23 Main Street, Suite One
Terrace Level
Andover, MA  01810
(978) 475-9955
facsimile (978) 474-9005

# YURKO, SALVESEN & REMZ, P.C.
## Attorneys at Law

Richard J. Yurko
Douglas W. Salvesen
Sanford F. Remz*
Kevin S. Murphy†'

Michael S. Bonner‡
Matthew C. Welnicki†

† Also admitted in CT
‡ Also admitted in NH
' Also admitted in NY

March 13, 2006

**<u>By Facsimile</u>**

James B. Krasnoo, Esq.
Paul J. Klehm, Esq.
Krasnoo Klehm, LLP
23 Main Street
Andover, MA 01810

Re:     **International Floor Crafts, Inc. v. Adams, et al., U.S. District Court,
Civil Action No. 05-cv-11654-NMG**

Gentlemen:

I am writing to put in writing the several comments that I made to you on Friday following the suspension of the Britto deposition.

As I have previously advised you, I believe that your firm and your client had no good faith basis, consistent with Rules 9(b) and 11, to name Jane Dziemit as a defendant in this matter. If you had a proper basis prior to filing either the initial complaint or the amended complaint, that basis was undermined when, on behalf of Ms. Dziemit, you were advised by counsel that she acted as a lender. Most importantly, now that the central figure in the alleged conspiracy against IFC has testified, and given testimony upon which I presume you intend to rely, that Ms. Dziemit had no knowledge of the conspiracy, it has become manifestly apparent that the complaint against my client has no good faith basis. I must insist that you dismiss Ms. Dziemit with prejudice forthwith.

I was surprised and disappointed that Mr. Britto chose not to proceed with his deposition further on Friday. Given that Mr. Britto has already defaulted in this case, I was further disappointed that you had not obtained a subpoena from the federal court in New York to compel his attendance. I will review this matter further, but as I mentioned to you on Friday, I think that it is likely that Ms. Dziemit and the other defendants have a right to seek costs from your client for a wasted trip to New York City for the continuation of Mr. Britto's deposition. Finally, please advise me whether, in your office's prior communications with Mr. Britto, he ever made a threat not to proceed with his deposition. If he did so and if you nonetheless failed to subpoena him to compel his

One Washington Mall • 11th Floor • Boston, Massachusetts 02108-2603
Tel: 617.723.6900 • Fax: 617.723.6905 • www.bizlit.com



## YURKO, SALVESEN & REMZ, P.C.

James B. Krasnoo, Esq.
Paul J. Klehm, Esq.
March 13, 2006
Page 2 of 2

attendance, I believe that such would further support a request by defendants for their fees for Friday.

Thank you for your attention to these matters. I look forward to hearing from you.

Very truly yours,

Richard J. Yurko

cc:    All counsel
       Matthew C. Welnicki, Esq.



# YURKO, SALVESEN & REMZ, P.C.
## Attorneys at Law

Richard J. Yurko
Douglas W. Salvesen
Sanford F. Remz*
Kevin S. Murphy †

Michael S. Bonner‡
Matthew C. Welnicki†

◊ Also admitted in CT
‡ Also admitted in NH
* Also admitted in NY

March 14, 2006

**By Facsimile**

James B. Krasnoo, Esq.
Paul J. Klehm, Esq.
Krasnoo Klehm, LLP
23 Main Street
Andover, MA 01810

> Re: **International Floor Crafts, Inc. v. Adams, et al., U.S. District Court, Civil Action No. 05-cv-11654-NMG**

Gentlemen:

Please treat this letter as an invitation to confer to resolve this discovery issue pursuant to Local Rule 7.1(A)(2).

As you know, the deposition of Kevin Britto was suspended on Friday, March 10 after Mr. Britto declined to testify further. I was surprised and disappointed that Mr. Britto chose not to proceed with his deposition on Friday. Given that Mr. Britto has already defaulted in this case, I was further disappointed that you had not obtained a subpoena from the federal court in New York to compel his attendance. Such a subpoena, issued by a court with jurisdiction over his person, could have been used to ensure that the deposition continued uninterrupted.

On Friday, you took the position that IFC had taken sufficient steps to ensure Mr. Britto's attendance by seeking permission to take the deposition from the Massachusetts district court.[1] I invited you to provide me with authority for your position. My understanding is that your position is incorrect. Although a notice of deposition and the sanctions of Rule 37 are typically sufficient to ensure the attendance of a party-witness, in <u>Diebold, Inc. v. Record Files, Inc.</u>, 11 F.R.D. 543 (N.D. Ohio 1951), a patent infringement action, the Court held that a subpoena had to issue by a court with

---

[1] Although in your motion you asked for two things, both permission to take Mr. Britto's videotaped deposition and an order compelling his attendance. The electronic docket appears to reflect that the Court allowed leave to take the deposition but did not compel attendance: "Electronic ORDER entered granting 128 Motion for leave to take video taped deposition." <u>See</u> Exhibit A enclosed. As otherwise noted in this letter, even an order compelling Mr. Britto's appearance at the deposition issued by the Massachusetts court would have been ineffective to get Mr. Britto to the deposition.

One Washington Mall • 11th Floor • Boston, Massachusetts 02108-2603
Tel: 617.723.6900 • Fax: 617.723.6905 • www.bizlit.com



# YURKO, SALVESEN & REMZ, P.C.

James B. Krasnoo, Esq.
Paul J. Klehm, Esq.
March 14, 2006
Page 2 of 2

jurisdiction over the person of an "involuntary plaintiff." In that case, decided more than 50 years ago, the Court's reasoning is quite sound:

> Ordinary parties need not be subpoenaed when their deposition is sought because the court already has jurisdiction over them, and adequate sanctions are provided in Rule 37 in the event they fail to respond to notice. However, if the sanctions of Rule 37 were to be applied to this involuntary plaintiff, it would work an injustice upon plaintiff, Diebold, Incorporated, and defeat its action.

11 F.R.D. at 544. Here, the same principle applies. Mr. Britto has already defaulted; moreover, he has written and testified that he is dying. As a result, the potential sanctions of Rule 37 are meaningless. The most serious sanction, default, has no legal or practical meaning since default has already been entered and the witness believes he is dying. Only an order from a court which has physical jurisdiction over him can actually require him to do anything.

Given that you did not subpoena Mr. Britto at all and certainly did not subpoena him from a court with jurisdiction over his person, his decision not to proceed with his deposition is the equivalent of his failure to attend on Friday, entitling Ms. Dziemit and all other parties whose counsel attended the deposition in New York (at considerable cost) to the payment of their costs, including reasonable attorney's fees. Fed. R. Civ. P. 30 (g)(2). Please advise me whether IFC is willing to agree to pay Ms. Dziemit's costs, including reasonable attorney's fees, from the wasted deposition day Friday. See, e.g., Mercer v. Gerry Baby Products Co., 160 F.R.D. 576 (S.D. IA 1995)(wasted deposition time compensable).

I have not heard back from you with respect to my letter yesterday regarding whether you had any advance indication from the witness that he might take the position he did on Friday. As I noted yesterday, if the witness gave you any indication he might do so and if you nonetheless failed to subpoena him to compel his attendance, I believe that such would further support a request by defendants for their fees for Friday.

Thank you for your attention to these matters. I look forward to hearing from you.

Very truly yours,

Richard J. Yurko

cc:     All counsel
        Matthew C. Welnicki, Esq.



# KRASNOO | KLEHM LLP

*attorneys at law*

Twenty-Three Main Street, Terrace Level, Suite One, Andover, MA 01810-3730
978.475.9955 (phone) • 978.474.9005 (facsimile) • www.krasnooklehm.com
James B. Krasnoo, admitted in MA & CA • Paul J. Klehm, admitted in MA & NH

March 27, 2006

**VIA FACSIMILE ONLY**

Richard J. Yurko, Esq.
Yurko, Salvesen & Remz, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108-2603

> **Re:** *International Floor Crafts, Inc. v. David W. Adams et al*
> **Civil Action No. 05-11654-NMG**

Dear Mr. Yurko:

Please be advised I have carefully reviewed your letters of March 13, 2006 and March 14, 2006 with reference to the above-entitled matter. I have read your comments accusing me and my client of having no good faith basis to name your client as a defendant in this matter. I take your allegations very seriously, especially since you are accusing me of unethical conduct.

As you know, or should know from a reading of any developed case law under Rule 11, the test of the good faith basis is to see whether or not, at the time of filing a complaint, the parties have a reasonable basis to name an individual or entity as a defendant. In this case, there is much documentary material to demonstrate that Ms. Dziemit cashed several checks on behalf of Remco, which appears to be a fictitious company. There are several facts to indicate that Remco, through Ms. Dzmiet's friend or associate Mitchell, furnished false invoices and received checks for unshipped goods. Developed facts since the time of the filing of the complaint furthermore confirm the degree of involvement of Ms. Dziemit as well as the other defendants.

Under the law of conspiracy, individuals may be involved in one conspiracy even if they do not know the identity of, and the involvement of, other co-conspirators. Thus, even though Defendant Britto claimed that Ms. Dziemit had no knowledge of the conspiracy, that contention, without more, is not persuasive to eliminate Ms. Dziemit presently, if ever, as a defendant in this case.



03/27/2006 15:08 FAX 978 474 9005     KRASNOO|KLEHM LLP     ☒003

# KRASNOO | KLEHM LLP

*attorneys at law*

Richard J. Yurko, Esq.
March 27, 2006
Page Two

Mr. Britto, presumably the unnamed person you describe in your letter as the central figure in the alleged conspiracy, is not necessarily the sole central figure. I know of several central figures, each of whom performed a distinct role in furtherance of the conspiracy. Your client has had communications with some of those central figures, and she has taken acts in furtherance of the scheme. I welcome receiving all information your client has to suggest that Mr. Britto is the sole central figure.

You mention, without citing facts to back up your conclusory statements, that it has become manifestly apparent that the claims against your client have no good faith basis. I sincerely hope that you have not lodged your baseless Rule 11 allegations against my client and me simply in an effort to gain an unfair civil advantage in this case.

This letter will not address your claimed surprise and disappointment regarding Mr. Britto's failure to complete his deposition. I have researched the law and I have determined that neither my client, nor I, have done anything wrong either under the Federal Rules of Civil Procedure or under any ethical strictures whatsoever. My office has previously sent you a letter supplying you with the authority for our position that we did all we needed to do to require Mr. Britto's attendance at his deposition. I have no intention of informing you as to my office's prior communications with Mr. Britto, just as I would not ask you to relate your communications with him. I further suggest that you are without right to demand such information unless you can prove that it is evidence that is relevant and material to the case.

Very truly yours,

James B. Krasnoo

JBK:eka



03/27/2006 13:06 FAX 978 474 9005    KRASNOO|KLEHM LLP                    001

# KRASNOO | KLEHM LLP
23 MAIN STREET
TERRACE LEVEL
ANDOVER, MA  01810
(978) 475-9955
Facsimile (978) 474-9005

# facsimile transmittal

| | | | |
|---|---|---|---|
| **To:** | Richard Yurko, Esq. | **Fax:** | (617) 723-6905 |
| **From:** | Paul J. Klehm, Esq. | **Date:** | March 27, 2006 |
| **Re:** | International Floor Crafts, Inc. | **Pages:** | 3 (including cover) |

⊗ Urgent    ⊗ For Review    ⊗ Please Comment    ⊗ Please Reply    ⊗ Please Recyle

**Notes:**



UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

```
_____
                                       )
INTERNATIONAL FLOOR CRAFTS, INC.,      )
        Plaintiff,                     )
                                       )
v.                                     )
                                       )
DAVID W. ADAMS, et al,                 )        CIVIL ACTION NO.
        Defendants.                    )        05CA11654-NMG
_____ )
```

**PLAINTIFF'S MOTION, PURSUANT TO FED. R. CIV. P. 37(b)(2)(C) AND L.R. 37.1(A),
FOR ORDER OF CONTEMPT AGAINST DEFENDANT KEVIN BRITTO FOR
FAILURE TO COMPLY WITH THIS COURT'S FEBRUARY 13, 2006 ORDER**

Plaintiff International Floor Crafts, Inc. (hereinafter, "IFC") hereby moves this Court,

pursuant to Fed. R. Civ. P. 37(b)(2)(C), to issue an order of contempt and other appropriate relief

against Defendant Kevin Britto, who is *pro se*, for failure to comply with this Court's order dated

February 13, 2006.  IFC relies upon the reasons set forth below:

1.      On January 24, 2006, IFC moved for leave to take the immediate videotaped

deposition of Kevin Britto and for an order compelling Kevin Britto to appear at such a

videotaped deposition because of his allegedly failing health.[1]  As an accommodation to

Defendant Britto's alleged poor state of health, IFC asked that the deposition be held in New

York City, where Defendant Britto resides.

2.      Paragraph 6 of IFC's January 24, 2006 Motion provides:

IFC therefore respectfully requests that this Court … (2) issue an order
compelling Defendant Britto to appear at such a videotaped deposition, at a time
and location in New York City agreed upon by the parties …

---

[1] *See* Docket Entry No. 128.

3.      On February 13, 2006, the Court (Gorton, J.) issued an order allowing IFC's
January 24, 2006 Motion.

4.      Pursuant to this Court's February 13, 2006 order and pursuant to the agreement of
the parties, IFC served a notice of deposition of Defendant Britto upon all parties, including, but
not limited to, Defendant Britto.  The notice provided for Britto's deposition to take place at 1:00
p.m. on Tuesday, March 7, 2006 and, if necessary, at 1:00 p.m. on Friday, March 10, 2006.  The
parties scheduled each deposition to be held from 1:00 p.m. to 4:00 p.m. in order to
accommodate Defendant Britto because he had informed Plaintiff's attorneys that he "felt better"
in the afternoon.

5.      On Tuesday, March 7, 2006, three IFC officials and counsel to almost all parties
traveled to New York City for the first day of the Britto deposition.  Defendant Britto testified
from 1:30 p.m. until 4:22 p.m. that day.  During his testimony, Defendant Britto admitted to
participating with certain other named defendants in a scheme to defraud IFC of a significant
amount of funds dating back to 1993, thereby waiving his Fifth Amendment privilege against
self-incrimination.  (See p. 8, ln. 11 through p. 9, ln. 14;  p. 10 ln. 15-23;  p. 11, ln. 15-18; p. 12
ln. 15 through p. 13 ln. 13;  p. 68 ln. 22 through p. 71, ln. 20, and citations set forth *supra*,  of the
Deposition of Kevin Britto (March 7, 2006), excerpted portions of which are attached hereto as
**Exhibit A**).   In essence, Britto testified that he, Defendant David Adams and Defendant Tyrone
Williams would create false documents and/or cause others to create false documents
unknowingly showing that IFC had received certain goods so that IFC would make payment on
the false invoices.  (See **Exhibit A**, p. 10 ln. 15-23, p. 68 ln. 22 through p. 71, ln. 20).  As a part
of the scheme, Defendant Britto would then receive checks.  (See **Exhibit A**, p. 14, ln. 25
through 15 ln. 8).  Depending upon what IFC had in stock, Britto, Adams and Williams at times

arranged for half-shipments of goods to IFC, and, at other times, IFC would receive no goods at all.  (See **Exhibit A**, p. 28, ln. 17 through p. 31, ln. 4).  Britto directed Williams during the course of the scheme.  (See **Exhibit A**, p. 18, ln. 11 through p. 20, ln. 10). Britto testified that he had contact with Defendants Paul Sun of David Sun of Defendant CCC and with Michael Brown about the scheme.  (See **Exhibit A**, p. 8, ln. 23-24, p. 15 ln. 9 through p. 16 ln. 13).

      6.     According to Britto, Defendant Adams gambled away over a million dollars (presumably from the scheme).  (See **Exhibit A**, p. 23, ln. 19-20).  Britto admitted to stealing more than one hundred thousand dollars from IFC.  (See **Exhibit A**, p. 13, ln. 24 through 14 ln. 14).  He even admitted to receiving a "bunch" of checks after he left IFC, because, according to Britto, he continued to control IFC's warehouse.  (See **Exhibit A**, p. 16, ln. 19-21, p. 18, ln. 6-10).  According to Defendant Britto, Defendant Brown received probably $6,000 or $7,000 from the scheme.  (See **Exhibit A**, p. 53, ln. 21-23).  Defendant Williams received approximately $1,500 per fraudulent transaction, approximately once per month.  (See **Exhibit A**, p. 107, ln 5-17).

      7.     Britto testified that Defendants Mitchell and Dziemit were not involved in the scheme.  (See **Exhibit A**, p. 63, ln. 23 through p. 64 ln. 8).  Nonetheless, according to Britto, Defendant Mitchell loaned money in advance to Defendant Adams so that purportedly Britto and Adams could convert the goods and resell them to IFC and then be paid. (See **Exhibit A**, p. 41, ln. 15 through p. 42, ln. 16;  p. 62 ln. 2-6).  Upon information and belief, Defendant Dziemit served as the source of the "loan" money.  According to Britto, Defendant Adams spoke with Mitchell or Dziemit and another about this fabricated notion of conversion of goods in order to induce them to loan money to Defendant Adams.  (See **Exhibit A**, p. 38, ln. 13-20).  According to Britto, Mitchell would receive a percentage of the loan.  (See **Exhibit A**, p. 42, ln. 3-13).

That way, Adams could receive the stolen funds (and gamble with the money) without having to wait for IFC to pay the invoice for the fictitious shipments.   (See **Exhibit A**, p. 42, ln. 19-23). Mitchell was Adams' and Britto's link to a company called REMCO which participated in the scheme – a company which IFC alleges is fictitious[2].  (See **Exhibit A**, p. 62, ln. 13-23). REMCO, through Mitchell, presented bills to IFC for goods that were never shipped to IFC. (See **Exhibit A**, p. 62, ln 8-12). The only time that Britto would know of a purported "loan" would be when Adams informed Britto that certain monies had been received from REMCO, Mitchell or Dziemit.  (See **Exhibit A**, p. 66, ln. 1-5).

8.      At one point, Defendant Britto determined that Defendant Adams was not paying Britto his share of the stolen funds.  (See **Exhibit A**, p.  97, ln. 9 through p. 99 ln. 18).  At that point, Defendant Britto contacted Defendant Mitchell and told Defendant Mitchell to direct all of the "loan" money to Britto, and not to Adams, at a time when Britto was not an employee of IFC. (See **Exhibit A**, p. 99 ln. 21-25;  p. 134, ln. 21-24).  Mitchell did not ask Britto to sign any documents reflecting the purported loans.  (See **Exhibit A**, p. 130, ln. 16-20).  Despite the fact that Britto's phone call represented the first time that Britto had informed Mitchell that Britto was working with IFC, Mitchell complied and unquestioningly sent money directly to Britto. (See **Exhibit A**, p. 99, ln. 24-25).   Britto told Mitchell that if Mitchell did not continue to send money, then the deal would end.  (See **Exhibit A**, p. 100, ln. 2-8).

9.      IFC was unable to complete the deposition of Defendant Britto in one afternoon, and the company needs to cover additional ground regarding the involvement of the Defendants in the scheme.  On March 10, 2006, the three IFC officials and counsel to almost all parties traveled to New York City once again.  Defendant Britto physically appeared at his deposition.

---

[2]  When asked whether REMCO ever sent goods to IFC while Britto was employed there, Britto replied, "They thought they did."  (See **Exhibit A**, p. 61, ln. 12-15).

At the beginning of the deposition, Defendant Britto stated that, unless IFC immediately

dismissed two defendants, Britto would refuse to testify.  He next stated that he was leaving the

deposition for twenty minutes, and, upon the conclusion of the twenty minutes, he would return.

After approximately twenty minutes passed, IFC, through counsel, told Defendant Britto on the

record that IFC would not dismiss the two defendants.  Defendant Britto thereafter stated his

refusal to testify, whereupon IFC's counsel stated that he would ask the Court to compel

Defendant Britto to complete his deposition.  Defendant Britto thereafter left the deposition.

(See copy of Deposition of Kevin Britto (March 10, 2006) attached hereto as **Exhibit B**).

10.     Rule 37 sanctions are appropriate given Defendant Britto's deliberate and

wrongful defiance of this Court's February 13, 2006 order.  *See Melendez v. Illinois Bell

Telephone Co.*, 79 F.3d 661, 671 (7th Cir. 1996) (sanctions proper "upon a finding of

willfulness, bad faith, or fault on the part of the noncomplying litigant").

11.     Moreover, the parties have incurred substantial costs and attorneys' fees as a

result of Defendant Britto's failure to testify at his own deposition.  *See* Fed. R. Civ. P. 37(d).

Each counsel had to travel to New York City from the Boston area for the two days of

deposition.  Moreover, the videographer and deposition costs for the two days, according to Fink

& Carney, the New York City court reporting company, were roughly $2,500.00.

12.     In light of the violation of the order, IFC respectfully requests that this Court issue

an order of contempt against Defendant Britto and:

     a.     Issue a ruling that Defendant Britto has waived his Fifth Amendment
privilege against self-incrimination for all purposes in connection with his
deposition as to the subject matter of his deposition set forth in paragraphs 5
through 8, *supra*;

     b.     Order that he be remanded into the custody of the United States Marshals
Office immediately and that he remain in custody until such time as he complies
with this Court's February 13, 2006 order;

c.    Order that Defendant Kevin Britto appear for his deposition at the United States District Court for the Eastern District of Massachusetts, One Courthouse Way, Boston, MA, at a date and time convenient to the parties;

d.    Order that Defendant Britto pay his own travel expenses in connection with paragraph c., *supra*;

e.    Order the parties to submit affidavits setting forth the attorney's fees, costs and expenses they incurred in preparation for, and in connection with attendance at, the deposition of Kevin Britto on March 7, 2006 and March 10, 2006 within ten days;  and

f.    Order Defendant Kevin Britto to pay any and all reasonable attorneys' fees, costs and expenses incurred by the parties, per paragraph e., *supra*, as determined by the Court, within twenty days.

**WHEREFORE**, for the above reasons, International Floor Crafts, Inc. respectfully

requests that this Court GRANT the within motion and issue an order of contempt against

Defendant Kevin Britto and:

a.    Issue a ruling that Defendant Britto has waived his Fifth Amendment privilege against self-incrimination for all purposes in connection with his deposition as to the subject matter of his deposition set forth in paragraphs 5 through 8, *supra*;

b.    Order that he be remanded into the custody of the United States Marshals Office immediately and that he remain in custody until such time as he complies with this Court's February 13, 2006 order;

c.    Order that Defendant Kevin Britto appear for his deposition at the United States District Court for the Eastern District of Massachusetts, One Courthouse Way, Boston, MA, at a date and time convenient to the parties;

d.    Order that Defendant Britto pay his own travel expenses in connection with paragraph c., *supra*;

e.    Order the parties to submits affidavits setting forth the attorney's fees, costs and expenses they incurred in preparation for, and in connection with attendance at, the deposition of Kevin Britto on March 7, 2006 and March 10, 2006 within ten days;  and

6

f.      Order Defendant Kevin Britto to pay any and all reasonable attorneys' fees, costs and expenses incurred by the parties, per paragraph e., *supra*, as determined by the Court, within twenty days.

The Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,


/s/ Paul J. Klehm_____
James B. Krasnoo (BBO#279300)
*jkrasnoo@krasnooklehm.com*
Paul J. Klehm (BBO#561605)
*pklehm@krasnooklehm.com*
Krasnoo/Klehm LLP
23 Main Street, Suite One
Andover, MA  01810
Dated:  March 16, 2006                       (978) 475-9955

## LOCAL RULE 7.1(A)(2) AND L.R. 37.1(A) STATEMENT

On March 15, 2006 from approximately 6:22 p.m. to 6:33 p.m., Attorneys Paul J. Klehm and James B. Krasnoo spoke by telephone with Defendant Kevin Britto in connection with the within motion.  Attorney Klehm read the title of the motion for Defendant Britto, and then Attorney Klehm discussed the relief sought by IFC.  Defendant Britto stated, among other things, that he had left a telephone message for IFC's President offering to proceed with the deposition. Attorney Krasnoo stated, among other things, that IFC needed to pursue the within motion because of the costs involved in the event that Defendant Britto failed to testify again and because of the need to obtain a court order to insure that Defendant Britto appeared and testified at the deposition.  Defendant Britto stated that he may need to get an attorney.  Despite further discussion, the parties were not able to reach agreement on the motion.

/s/ Paul J. Klehm_____
Paul J. Klehm

7

**<u>CERTIFICATE OF SERVICE</u>**

I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within document upon all counsel of record not served via ECF and upon all parties not represented by counsel by first class mail, postage pre-paid, on March 16, 2006.

<u>/s/ Paul J. Klehm</u>
Paul J. Klehm

1

1

2          UNITED STATES DISTRICT COURT FOR THE

3            EASTERN DISTRICT OF MASSACHUSETTS

4    - - - - - - - - - - - - - - - - x
     INTERNATIONAL FLOOR CRAFTS, INC., :
5                                     :
                 Plaintiff,           :
6                                     :
                                      :
7          -against-                  :   CIVIL ACTION NO.
                                      :   05CA11654-NMG
8    DAVID W. ADAMS, et al.,          :
                                      :
9                Defendants.          :
                                      :
10   - - - - - - - - - - - - - - - - x

11

12          VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by

13   Plaintiff at the offices of Fink & Carney Reporting

14   and Video Services, 39 West 37th Street, 6th Floor,

15   New York, New York 10018, on Tuesday, March 7, 2006

16   commencing at 1:30 p.m., before Debra DiBenedetto, a

17   Shorthand (Stenotype) Reporter and Notary Public

18   within and for the State of New York.

19

20

21

22

23

24

25

```
                                                              2
 1

 2     A P P E A R A N C E S:

 3          KRASNOO KLEHM LLP
                 Attorneys for Plaintiff
 4               Terrace Level Suite One
                 Andover, Massachusetts  01810-3730
 5
            BY:  JAMES B. KRASNOO, Esq., of Counsel
 6               PAUL J. KLEHM, Esq., of Counsel

 7

            LAW FIRM OF ISAAC H. PERES
 8               Attorneys for Defendant Adams
                 50 Congress Street, Suite 225
 9               Boston, Massachusetts  02109

10          BY:  ISAAC H. PERES, Esq., of Counsel

11

            YURKO, SALVESEN & REMZ, P.C.
12               Attorneys for Defendant Dziemit
                 One Washington Mall, 11th Floor
13               Boston, Massachusetts  02108-2603

14          BY:  RICHARD J. YURKO, Esq., of Counsel

15

            LAW OFFICES OF FREDERICK D. GRANT, JR.
16               Attorneys for Defendant Mitchell
                 727 Atlantic avenue, Second Floor
17               Boston, Massachusetts  02111

18          BY:  FREDERIC D. GRANT, JR., Esq.,
                 of Counsel
19

20          TROUT CACHERIS, PLLC
                 Attorneys for Defendants David and
21               Paul Sun
                 1350 Connecticut Avenue, Northwest,
22               Suite 300
                 Washington, D.C.  20036
23
            BY:  JOHN THORPE RICHARDS, Esq., of Counsel
24

25
```

```
                                                              3
 1

 2    A P P E A R A N C E S: (Cont'd)

 3

 4            KELLY, LIBBY, HOOPES
                   Attorneys for Defendant Brown
 5                 175 Federal Street
                   Boston, Massachusetts  02110
 6
              BY:  SHARON LAHEY, Esq., of Counsel
 7

 8

 9    ALSO PRESENT:  John Durant
                     William Gemme
10                   Ronald Mitchell
                     William Elovitz
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1

2                    IT IS HEREBY STIPULATED AND

3            AGREED that the Parties agree to

4            hold, and not make at the deposition,

5            all objections, including as to form,

6            foundation, evidence, relevance, etc.

7            (except for issues of privilege) and

8            that nonetheless any such potential

9            objections would be preserved and

10           could be asserted for the first time

11           at the time of trial if any party

12           seeks to offer the videotaped

13           deposition in evidence.

14

15

16

17

18

19

20

21

22

23

24

25

5

```
1                    Britto
2              THE VIDEOGRAPHER:  We're now
3         going on the record.  The time is
4         1:30 p.m. on March 7, 2006.  This is
5         the videotaped deposition of Kevin
6         Britto, in the matter of International
7         Floor Crafts, Inc. versus David W.
8         Adams, et al. under the jurisdiction
9         of the United States District Court
10        for the Eastern District of
11        Massachusetts.
12              This deposition is being held
13        at 39 West 37th Street, New York, New
14        York.  My name is Jose Santos and I am
15        the video specialist.  The court
16        reporter is Debra DiBenedetto and we
17        both represent Fink & Carney Reporting
18        with offices located at 39 West 37th
19        Street New York, New York.
20              May I have an introduction
21        from counsel.
22              MR. KRASNOO:  Good morning, my
23        name is James Krasnoo, and with
24        co-counsel Paul Klehm, we both
25        represent International Floor Crafts,
```

6

```
 1                    Britto

 2           Inc., the plaintiff in this action.

 3                MR. GRANT:  My name is Fred

 4           Grant, I represent Ron Mitchell, a

 5           defendant in this action.

 6                MR. PERES:  Isaac Peres,

 7           representing the defendant, David

 8           Adams.

 9                MR. RICHARDS:  My name is John

10           Richards and I represent Paul and

11           David Sun and CCC, Inc.

12                MR. YURKO:  Richard Yurko I'm

13           representing Jane Dziemit.

14                MS. LAHEY:  Sharon Lahey,

15           representing Michael Brown.

16                MR. KRASNOO:  Does anyone wish

17           to discuss the stipulations at all in

18           this matter?

19                MR. YURKO:  We're proceeding

20           on the stipulation that was E-mailed

21           back and forth.

22                MR. KRASNOO:  Okay.

23                MR. KLEHM:  That's fine by me.

24                THE WITNESS:  Well, I would

25           like to start off, Jane and Ron are
```

7

```
1                    Britto

2            innocent.  The other parties were all

3            guilty.  I have facts to back it up

4            and I'm trying to make this wrong

5            right.  You know, Bill, Ron, and Jane

6            are victims.

7                    As I told Paul yesterday, as a

8            child I got raped, I was a victim.  I

9            shouldn't be victimizing these people.

10           And the three of them are going

11           through shit because of me, and it's

12           not fair.

13                   THE VIDEOGRAPHER:  Excuse me,

14           will the court reporter please swear

15           in the witness.

16                   REPORTER:  Yes, sir I'm just

17           going to swear you in.

18                   THE WITNESS:  I won't put my

19           hand on a Bible.

20                   REPORTER:  No. Would you like

21           to affirm.

22   K E V I N   B R I T T O, called as a witness,

23           having been first duly affirmed before

24           Debra DiBenedetto, a Notary Public within

25           and for the State of New York, was examined
```

```
 1                      Britto

 2        and testified as follows:

 3                    THE WITNESS:  I don't believe

 4             in God.  There isn't a God.  If there

 5             is, he's a deadbeat dad.

 6   DIRECT EXAMINATION

 7   BY MR. KRASNOO:

 8        Q    Mr. Britto, at some point you began

 9   employment with International Floor Crafts?

10        A    1988, July 18th.

11        Q    Okay. And at some point you did

12   something while you were working for International

13   Floor Crafts that you've earlier, off the record,

14   just apologized to Mr. Elovitz for, is that

15   correct?

16        A    Yes.

17        Q    Okay. What was it that you did when

18   you worked for International Floor Crafts for

19   which you've just offered an apology?

20        A    Stole money.

21        Q    Now, do you recall how it came about

22   on the first occasion that you stole money?

23        A    Dave actually coerced myself into

24   it, and the Suns and Mike Brown.  And there was a

25   shipment one time that, was short.  And I was the
```

9

```
 1                     Britto

 2    buyer, I became the buyer, June 1993 when Bill

 3    became the president.  And, there was a short

 4    shipment and at the time I wasn't close to Bill.

 5    He did something that pissed me off, I can't

 6    recall what it was, and Dave egged me on, so I was

 7    pissed off.  The shipment came in short, I called

 8    him up, what's going on, Dave.  He said, oh, let

 9    me call you back, I'll fix it.  He knew I was mad.

10    And then he called me back, and said, Well, we can

11    make some money off this.  I'm like, what are you

12    talking about.  So when he did, I thought about

13    it, I called him back and I said, okay, let's do

14    it.

15             Q      Now, let me ask you some questions

16    about that first --

17             A      Okay.

18             Q      You mentioned Dave.  What's Dave's

19    last name?

20             A      Adams.

21             Q      Okay. Secondly, you mentioned that

22    there was a short shipment.  Do you know who the

23    supplier of the short shipment was?

24             A      DGM.

25             Q      Okay. And --
```

10

1                          Britto

2          A     Which the owner is now dead, so.

3          Q     Now, you also mentioned that you had

4    some type of conversation with Dave Adams where he

5    said, in substance, let's make some money out of

6    this?

7          A     Yep.

8          Q     Okay. Did he describe to you in that

9    conversation how you and he were going to make

10   money and how the scheme or plan would be

11   implemented?

12         A     There was supposed to be like 600

13   rugs.  300 came in.  We made the money off the 300

14   rugs.

15         Q     Now, how did you -- was there

16   certain paperwork you had to fill out to indicate

17   that 600 rugs had come in when, in fact, only 300

18   had?

19         A     See, this is where it gets

20   complicated.  I like to cover my tracks.  So I

21   used to have all kind of people do the paperwork

22   just so it's not one person, you know what I mean.

23   And, so I don't know who did it at the time.

24         Q     Okay.  Now, did Mr. Williams, Tyrone

25   Williams, become known to you at some point?

```
                                             11
 1                       Britto

 2          A      Yeah.

 3          Q      And did Mr. Williams at any time

 4   participate in any portion of this scheme?

 5          A      Yes.

 6          Q      Okay. Now --

 7          A      Let me say something on that.  I was

 8   his boss.  I don't know if I intimidated him,

 9   plus, I do have a reputation -- well, I used to

10   have a reputation of kicking people's ass, so I

11   don't know if I intimidated him over that and

12   that's why he did it.  Of course, he's a man, he

13   wanted the money, you know, but I don't know if I

14   forced him into it.

15          Q      Well, first you stated you began

16   with this scheme, it first started in 1993?

17          A      Well, that's when I became the

18   buyer.

19          Q      Okay. When, roughly, from 1993

20   until how long did you work for International

21   Crafts?

22          A      I left in 1998, September.  I came

23   back September -- it's funny because the day I

24   left is the same date I came back a year later.

25          Q      So you came back September 1999?
```

12

                              Britto

1

2          A     No, I think that's wrong, I came

3    back ten months later.  I left in November of '97,

4    came back September 28th of 1998, and then I left

5    again September 28th, 2001.

6          Q     Now, did the scheme to defraud first

7    happen in your first employment with IFC as well

8    as your second or only in your second or only in

9    your first?

10         A     Both.

11         Q     Okay. And, when did Tyrone Williams

12   start participating with you in this?

13         A     Oh, I came back in '98, I hired him,

14   so he probably started in '99.

15         Q     And when he started with you, can

16   you estimate for us when the shipment -- strike

17   that -- when the stealing actually started, by

18   that I mean reporting that X number of rugs came

19   in when only one came in, which was less?

20         A     I understand, it was after Dave

21   Rooney left, which I'm pretty sure IFC has that on

22   record.

23         Q     Now, are you able estimate for us

24   how many shipments of rugs this involved?

25         A     Oh, I don't know.

13

1                         Britto

2          Q     Is it more than 50?

3          A     It's, it's a high number, I don't

4     know.  It's around 50 at least anyways.

5          Q     And, when the stealing began, how

6     did the parties get the money from it that they

7     split up, what was the method by which the money

8     was placed in your pocket?

9          A     Went through Dave.

10         Q     And did you know how much the theft

11    represented each time?

12         A     No.  Actually Dave stole from IFC

13    and myself.

14         Q     Okay.  So, did you ever question

15    Dave Adams --

16         A     Oh, yeah, we went at it.

17         Q     Okay. So, when you went at it, what

18    kinds of conversations did you have with Mr. Adams

19    about the money?

20         A     Well, he said Building 19 is not

21    paying their bills, which they were, and that's

22    why there's no money there, because he was

23    gambling the shit away.

24         Q     Did you -- can you tell us how much

25    money you made out of the scheme as an estimate?

14

```
 1                     Britto
 2   Is it more than a thousand dollars?
 3           A     Oh, of course.
 4           Q     Okay.  Is it more than 50,000?
 5           A     I'm not going to give you any
 6   numbers.
 7           Q     Is it because you don't have a
 8   memory?
 9           A     Yeah, I don't know how much, I'm not
10   gonna give you a number if I don't know -- I'm
11   under oath so I'm not going to.
12           Q     Did --
13           A     I can tell you one thing, it's over
14   a hundred thousand, that's for sure.
15           Q     Okay.
16           A     And, well, he will get every penny
17   back that I took from him.
18           Q     When you say a hundred thousand, is
19   that money that came just to you?
20           A     Oh, yeah.
21           Q     Now, over what period of time did
22   you receive these monies?
23           A     That was after Dave really left, I
24   don't know.
25           Q     Did you continue to receive any
```

15

```
 1                    Britto
 2   money at all after you left IFC for good?
 3        A     Yes.
 4        Q     Okay. And how did you get that
 5   money?
 6        A     Checks.
 7        Q     And who did the checks come from?
 8        A     CCC.
 9        Q     Okay. And, had you ever had any
10   direct contact with any member of CCC --
11        A     Yes.
12        Q     -- about any aspect of this scheme?
13        A     Yes.
14        Q     Okay. With whom did you have
15   contact?
16        A     Paul and David.
17        Q     Okay. Did you ever have any contact
18   with another member of CCC named John Sun --
19        A     Oh, Mike Brown.
20        Q     Well, John Sun?
21        A     No, I don't know who that is.
22        Q     Okay. Now, when you left and you
23   received checks, did you have communication with
24   either David Sun or Paul Sun about those specific
25   checks that came to you after you left
```

16

```
 1                        Britto

 2    International Floor Craft?

 3          A      Yes.

 4          Q      Which one or both if it was both?

 5          A      Both.

 6          Q      Can you remember, in substance, the

 7    conversations that you had with either one or both

 8    of them?

 9          A      Give me an example.

10          Q      Well, did you ever discuss with

11    them, for example, the size of the check and how

12    much it should be?

13          A      Yes.

14          Q      Okay. And did you ever discuss with

15    them that you thought you were being shortchanged,

16    for want of a better word, about the size of the

17    check?

18          A      No.  That would be Dave.

19          Q      How many checks did you receive

20    after you left?

21          A      A bunch.

22          Q      Okay. And do you know how much money

23    that represented?

24          A      (Indicating.)

25          Q      When did you first -- Oh, yeah, you
```

17

```
 1                        Britto

 2   need --

 3          A     No.

 4          Q     And if you could give us a verbal,

 5   because she can't, the court reporter can't record

 6   whether it means a yes or no with your gesture.

 7          A     Okay.

 8          Q     Now, after you left International

 9   Floor Crafts, what was the purpose of your getting

10   money from CCC at that point?

11          A     There's a whole bunch, actually.

12          Q     Okay.  What were they, or the

13   purposes?

14          A     Alcoholic, pills, wanting to live in

15   a gay lifestyle out here in New York.  And then my

16   when mother died, some of that money went to pay

17   for her funeral, tombstone.

18          Q     So those are the purposes for which

19   you used it?

20          A     I paid -- I grew up on welfare in

21   the projects so all the people I'm close to are

22   poor.  So when I wasn't using the money for the

23   drugs, the addictions, I was helping people pay

24   their electric bills, their rent, phone bills,

25   whatever.
```

18

Britto

1

2      Q    What were the purposes, if you know,

3   that you got the money from CCC after you left

4   International Floor Crafts?

5      A    That was the addiction.

6      Q    Yes, but I mean what was it that

7   caused them to give you the money to support your

8   addiction after you had left?

9      A    Because I had control of the

10  warehouse.

11     Q    So did you continue to have control

12  of the warehouse even though you physically left

13  IFC?

14     A    Yes.

15     Q    And how did you have physical

16  control over the warehouse?

17     A    Because Tyrone was my friend.

18     Q    So, would you be in communication

19  with Tyrone Williams after you left IFC?

20     A    Yes.

21     Q    And what would be the conversations

22  that you would have with Tyrone Williams?

23     A    I would just give him advice how to

24  do some shit.

25     Q    And when you gave him advice on how

19

1                              Britto

2       to do shit, what kind of shit are we talking

3       about?

4              A      Legal shit.

5              Q      So, would he initiate the phone

6       calls with you or you with him?

7              A      I probably had to because he's not

8       too good at communication.

9              Q      And when you initiated the phone

10      calls with him or spoke with him, what were some

11      of the subject matters or all of the subject

12      matters as you can remember, that you engaged in

13      between him and Tyrone Williams and yourself?

14             A      I would tell him what came in, when

15      to bill it, I mean when to do the key rec.  Give

16      him answers to tell the buyers.

17             Q      When you would talk to him about

18      what came in, do you mean by that --

19             A      I would tell him, look, there's 350

20      9-by-10 wells, 350 8-by-10 wells.

21             Q      So, are you giving him information

22      that he should be putting down on what you call

23      the key rec?

24             A      Yes.

25             Q      Even though those numbers of rugs in

20

                            Britto

1    that quantity actually did not come in?

2         A    Yes.

3         Q    So you would be giving him on that

4    phone call the numbers that he should be placing

5    in --

6         A    I was directing him --

7         Q    That represented phony but not

8    actual shipments?

9         A    Yes, I was directing him.

10        Q    Okay. And when you gave that

11   quantity, would you first, before you discussed it

12   with Tyrone Williams, discuss it with anyone at

13   CCC as to what the quantities should be?

14        A    Sometimes.  Dave, mostly.

15        Q    Okay. How would CCC know the

16   quantities of nonexisting rugs to bill IFC for if

17   they did not discuss it with you?

18        A    Dave would tell them or I would tell

19   them.

20        Q    Would Dave also have -- Dave Sun,

21   you're talking about?

22        A    No, Dave Adams.

23        Q    Okay. And would -- did David Sun

24   ever have direct communication with you while you

21

```
 1                        Britto

 2   were at IFC?

 3         A     No.

 4         Q     Okay. Did Paul Sun ever have direct

 5   communication with you while you were at IFC?

 6         A     No.

 7         Q     Did either one of them ever have any

 8   telephone communication with you while you were at

 9   IFC?

10         A     No, it went through Dave Adams.

11         Q     Always went through Dave Adams?

12         A     Yeah.

13         Q     Now --

14         A     Or Mike Brown.

15         Q     After, from the time David Adams

16   first had the conversation with you where, would

17   you like to make some money on this or we could

18   make some money on this, until you left, did David

19   Adams and you ever discuss whether or not David

20   Adams had ever implemented this kind of a plan

21   before he asked you to join him in that endeavor?

22         A     No.

23         Q     Okay. When you had this first

24   conversation with David Adams about, in essence,

25   we can make some money this way, did you ever
```

22

```
 1                      Britto

 2    discuss with him whether or not it was a wrong

 3    thing to do?

 4         A     Nope.  I told you at the time I was

 5    mad at Bill.

 6         Q     Right.  Now, at some time you became

 7    friendly with Bill again, is that correct?

 8         A     Oh, well, that was before I became

 9    close to Bill.

10         Q     And when you became close to Bill,

11    did you continue to participate in the scheme to

12    steal from IFC?

13         A     Yeah, because that's when I was

14    addicted.  And you can ask Bill, I mean, I used to

15    have meetings with him, I used to cancel them, I

16    left because I couldn't face him, I felt like

17    shit.

18         Q     Did you ever discuss with Dave Adams

19    at any point after you became well disposed to

20    Bill Elovitz, that you had some reluctance to

21    continue with the scheme?

22         A     Yes, a few times.

23         Q     And in the few times can you give us

24    the substance of any one conversation that you can

25    remember?
```

```
 1                        Britto
 2          A     I'm not going to incriminate myself,
 3     it was nasty.
 4          Q     Okay. By nasty, do you mean a lot of
 5     blasphemy being used or swear words?
 6          A     Threatening.
 7          Q     Were you doing the threatening of
 8     him --
 9          A     Yes.
10          Q     Okay.  And did your threats to him
11     involve no longer continuing in this scheme?
12          A     Yes.
13          Q     Did the scheme nevertheless continue
14     after you made the threats to David Adams?
15          A     Yes.
16          Q     Do you have any idea at all how much
17     money from anything David Adams told you or what
18     you personally observed David Adams gambled away?
19          A     It's got to be over a million
20     dollars.
21          Q     Did you ever accompany Dave Adams to
22     any place of gambling such as the track or a
23     gambling club or --
24          A     I did one time, actually.
25          Q     Where did you go on that occasion?
```

24

1                        Britto

2          A     It was a dog racetrack I think in

3    Randolph, I'm not sure, I think it's Randolph,

4    but.

5          Q     Would that be perhaps Raynham?

6          A     Raynham, maybe that's it.

7          Q     And do you recall how much money on

8    that occasion Mr. Adams placed down on bets?

9          A     I have no idea.

10          Q     Okay. We've discussed --

11          A     I could say one thing, too. One

12    time -- and I do have the receipt -- I had to give

13    him a bank check, because his bookie was gonna

14    come after him.

15          Q     Okay.  Do you remember how much that

16    was for?

17          A     $18,000.

18          Q     Now, you've told us so far about

19    Mr. Adams.  Was Mr. Adams at some of the time an

20    IFC employee during the scheme or was he an

21    independent contractor, if you know?

22          A     No, he was an IFC employee at the

23    end.

24          Q     And Tyrone Williams was an IFC

25    employee?

25

```
 1                        Britto

 2          A      Yes.

 3          Q      Okay. And were there any other

 4   persons during the entire period of time that the

 5   scheme existed, that were employees of IFC

 6   participating in it other than Mr. Adams,

 7   Mr. Williams and yourself?

 8          A      Just by -- well, no, but doing

 9   paperwork that they didn't know that they were

10   doing.

11          Q      So were there any employees who knew

12   what they were doing or knowingly participated in

13   the scheme --

14          A      No.

15          Q      -- other than Mr. Adams,

16   Mr. Williams and yourself?

17          A      No.

18          Q      Now, when -- you mentioned earlier a

19   document called the key rec.  Could you --

20          A      That's a receiving bill.

21          Q      Okay. Could you take us through a

22   legitimate transaction on the purchase of rugs by

23   IFC while you were there from start to finish,

24   identifying for us what documents would be made,

25   who would be handling the document and what they
```

1                          Britto

2     would be placing in those documents by way of

3     information?

4          A     Yes.  And one, Bill needs to know

5     this so it doesn't happen again.  One, don't have

6     stuff delivered free of charge, because it doesn't

7     go through the company.  That's the main thing.

8     Because it doesn't -- I don't know if Steve still

9     works there, but if it doesn't go through the

10    traffic manager there's no trace.  That's how we

11    get away with it.

12         Q     You mentioned a name just before and

13    she doesn't didn't get the full name. Steve?

14         A     Burroughs.

15         Q     And do you know how to spell

16    Burroughs?

17         A     B-U-R-R-O-U-G-H-S.

18         Q     Now, who was Steve Burroughs?

19         A     He's the traffic manager.

20         Q     What does the traffic manager do at

21    IFC?

22         A     He sets up all the deliveries, for

23    the whole company, not just IFC.

24         Q     Okay. And the whole company, by that

25    you mean Building 19 as well?

27

1                          Britto

2          A     Yeah, but if there's no paper trail,

3     you can get away with it.

4          Q     So when free goods come in, there's

5     no paper trail?

6          A     Nope.

7          Q     And what would happen then with the

8     free goods if there were no paper trail?

9                     MR. YURKO:  By that do you

10               mean free delivery?

11         Q     Free of charge delivery is what you

12    mean?

13         A     Yeah.

14         Q     Okay, so --

15         A     The paperwork comes from the

16    company.

17         Q     Okay.

18         A     So if you have somebody receiving

19    the goods who's a scumbag.

20         Q     So by that you mean, that if

21    somebody's a traffic manager and knows that a

22    shipment of goods is coming for the company but

23    because they're being delivered without a delivery

24    charge --

25         A     He doesn't know about it.

28

1                              Britto

2        Q     There are no shipping papers?

3        A     Yes.

4        Q     Those goods come in and then what

5   happens to them if a person is a scumbag and wants

6   to, in some way, get some cash or profit or, or

7   acquisition because of this?

8        A     Let me make this clear, Steve is not

9   involved in this.

10       Q     Right, I understand that.

11       A     Okay.

12       Q     But what happens to those goods when

13  they come out and there is no paperwork

14  accompanying them?

15       A     We tell them to go off the truck, we

16  ship them right out.

17       Q     And when you ship -- so they're

18  actual goods that come in, is that correct?

19       A     Sometimes, sometimes not.

20       Q     Okay. Sometimes they're just

21  fictional goods?

22       A     Yes.

23       Q     Goods don't come in?

24       A     Yes.

25       Q     Are there also times when goods

29

```
 1                      Britto

 2   would come in --

 3          A      Half shipments --

 4          Q      But then you would add to the goods?

 5          A      Yes.

 6          Q      That portion would be fiction?

 7          A      Yep.

 8          Q      Okay. And as a result you would

 9   claim, for example, 600 rugs came in but only 300

10   came in?

11          A      Yes.

12          Q      Okay. Then there were times when you

13   would claim 600 rugs came in but absolutely no

14   rugs came in?

15          A      Yes.

16          Q      And then there would be times when

17   600 rugs came in and 600 rugs actually did come

18   in?

19          A      Yes.

20          Q      And you would claim that 600 rugs

21   came in?

22          A      Yes.

23          Q      Okay. Now, in all three instances

24   you say that when they would come in but there

25   would be no paper work with them, you would ship
```

30

1                          Britto

2    them immediately out.  In the instance where

3    you're shipping them out but actually no rugs came

4    in at all, are you creating a document that

5    suggests these nonexistent 600 rugs actually were

6    sent out somewhere?

7           A     We could ship them from another

8    company.

9           Q     Okay.

10          A     So the rugs did go on the trailer,

11   but it wasn't from the ones.

12          Q     So, in other words if company A --

13          A     They didn't ship anything, company B

14   did.

15          Q     And you would use company B's rugs

16   claiming they were company A's --

17          A     Correct.

18          Q     And send those out?

19          A     Correct.

20          Q     So that it would look like the

21   receiving Building 19 outlets got 600 rugs but

22   those 600 rugs that came actually from company B

23   had already been paid for to company B?

24          A     Correct.

25          Q     How did you determine whether to do

31

```
 1                        Britto
 2      a real shipment, a legitimate shipment, as opposed
 3      to treat a shipment as if it were fiction?
 4            A      Depends what we had in stock.
 5            Q      Okay. So if you actually had 600
 6      rugs, this was a good time to let CCC or another
 7      company know that they should create a fake bill
 8      for 600 rugs because you were going to ship them
 9      out as if they were that company's rugs when they
10      really weren't?
11            A      Correct.
12            Q      Okay. Did --
13            A      And also, Bill might want to write
14      this down.  The tags shouldn't be universal,
15      because that's another thing.
16            Q      So when you say the tags now, you
17      mean that there are tags that are attached with
18      wires to the rugs, is that correct?
19            A      No, our tags -- well, I say ours.
20            Q      Okay.
21            A      The Building 19 tags, there should
22      be different tags on each vendor, because if you
23      use a universal tag you could say it's this
24      person's goods, that person's goods or whatever.
25            Q      So what you're basically telling
```

32

1                        Britto

2    Mr. Elovitz by your testimony today is that he

3    should be able to track the shipments that go out

4    to the outlets and in order to do that there

5    should be an individualized tag --

6             A     For each company.

7             Q     That some code identifies the

8    actually rug shipper or manufacturer?

9             A     For each company.  Now, I'm not

10   talking about a number because you can reuse the

11   tags, use different colors or something, I mean.

12            Q     Okay.  When you would determine

13   because there were rugs on hand, that a shipment

14   of 600 rugs came in and there were, in fact, 600

15   rugs there, no matter what company it came from,

16   what paperwork would be created to cause those

17   rugs to first be accepted at the receiving and

18   then sent out to the various Building 19 outlets,

19   what paperwork would be created for an entirely

20   legitimate shipment?

21            A     Just a bill of lading.

22            Q     Okay. Now, would the bill of lading

23   be created by IFC?

24            A     No.

25            Q     This would be a bill of lading that

33
1                          Britto

2    came and accompanied the rugs?

3         A      Yes.

4         Q      Because the rugs would be shipped in

5    by a carrier?

6         A      No, it would be by the company.

7         Q      By the company itself.

8         A      (Witness nods).

9         Q      Now, when the bill of lading comes

10   with those rugs, to the warehouse --

11        A      Um-hum.

12        Q      -- what's the next step, they're

13   taken off of the trucks and put on a platform at

14   the warehouse.  What paperwork is created, if any,

15   by an IFC employee to show that they actually were

16   received?

17        A      Because we have -- I keep saying

18   we -- lousy employees.  They don't count.  They

19   just go by the paperwork, they just want to punch

20   in, punch out and go home.

21        Q      So nobody, first you're saying

22   nobody checks the number of rugs to see what

23   actually came in?

24        A      Exactly.

25        Q      Okay. Secondly, though, do they do

34

1                              Britto

2      anything, the warehouseman who's standing on the

3      dock watching the rugs being unloaded, is he or

4      she the person who receives the bill of lading?

5           A     Yes, but then it goes to the

6      supervisor.

7           Q     Okay.  Now, does the warehouseman

8      who first receives the bill of lading write

9      anything on it, or make any notations on the bill

10     of lading itself --

11          A     No.

12          Q     To indicate that the rugs were

13     received?

14          A     No.

15          Q     Does the supervisor who receives

16     this bill of lading do anything with it?

17          A     Yeah, he's got to sign it, date it

18     and send it in.  But if he's a scumbag --

19          Q     He doesn't send it in?

20          A     No, he sends it in, but he fakes it.

21          Q     You mean he fakes the shipment that

22     comes in?

23          A     Yeah.

24          Q     Okay. What happens with a legitimate

25     shipment, though?  Did Tyrone Williams ever sign

35

Britto

1

2   bills of lading to indicate that he actually

3   received shipments that he did actually receive?

4           A       Oh, definitely, yeah.

5           Q       Okay. And did Tyrone Williams also

6   sign bills of ladings that faked some or all of

7   the shipment?

8           A       Yes.

9           Q       Is there a way, from looking at the

10  bill of ladings to determine now, with hindsight,

11  which ones were faked and which ones were genuine?

12          A       Yeah, there is actually.

13          Q       Okay.

14          A       The remnant ones were fake.

15          Q       R-E-M-N-A-N-T?

16          A       Yeah.

17          Q       Okay.

18          A       Machine mades weren't.  Machine

19  mades were like half faked.

20          Q       And by half faked, do you mean that

21  if 300 of those rugs came in it was earmarked as

22  600 coming in?

23          A       Yeah, something like that.  And

24  Sometimes it was a full shipment, too.

25          Q       That would be faked?

36

1                          Britto

2          A      No, it was a full shipment that did

3    come in actually.

4          Q      Okay.  Now --

5          A      Let me just get to my point.  We

6    would have a full shipment come in and then have a

7    backup one come in that was half, so we had stock.

8          Q      So you had rugs on hand --

9          A      On hand.

10         Q      To suggest that the half that was

11   coming in --

12         A      Was added to it, yes.

13         Q      Was really more?

14         A      Yes.

15         Q      Now, after the supervisor passes in

16   that paperwork to billing, is there a separate

17   bill that comes from either the rug manufacturer

18   or supplier?

19         A      A bill-bill, yeah.

20         Q      So,  you were participating in the

21   scheme, would you get word from anyone that the

22   defrauding company, the company that knew a

23   shipment of 300 was being sent in, but it was

24   going to be billed out at 600, would you get any

25   word at all that that 600 rug bill was on its way

37

1                        Britto

2     to IFC?

3            A      I would tell them.

4            Q      You would tell them when to send it?

5            A      When to bill it.

6            Q      Okay. And was one of the reasons for

7     waiting that the, you wanted to make sure that

8     most of those rugs now were out to the various

9     outlets so that they really couldn't be traced and

10    counted?

11           A      Always depended on what was in

12    stock.  That's how it worked.

13           Q      Now, what role, if any, did Adams

14    play in causing the scheme to succeed?

15           A      He set it up.

16           Q      And so he told you that your duties

17    in this scheme would be as follows and then he

18    outlined them?

19           A      He set it up.  Nobody tells me what

20    to do.

21           Q      Okay. So tell me what you mean by

22    the words "set it up."  What did David Adams do?

23           A      He got it going.

24           Q      And do you know what steps he took

25    to get it going?

38

1                        Britto

2         A     That's one thing I don't know.

3         Q     Okay.

4         A     I wasn't involved in that.

5         Q     Did David Adams ever tell you in

6    passing in any conversation with you, any of the

7    steps he took to get it going?

8         A     Yeah, he said he talked to Mike

9    Brown.

10        Q     Okay. Now, when you --

11        A     -- and he told me --

12        Q     Go on.

13        A     Like with Ron Mitchell and Jane, who

14   are innocent, by the way, again.  He met with Ron

15   and Tony, or Jane, and, Dave's a good bullshit

16   artist, he told me we're converting goods and Bill

17   contested this, he always wants the buyer to get

18   new vendors, so that's what Dave told them, I need

19   new vendors, I want to convert goods, so I can get

20   Bill off my back, and that's what happened.

21        Q     Now, you mentioned the name Tony,

22   for the first time in your testimony.  Who is

23   Tony?

24        A     I think it's Jane's boyfriend or

25   some shit.

39

1                          Britto

2        Q      Okay. Do you know his last name?

3        A      No, I have no idea.

4        Q      And when did you find out that

5   Mr. Adams had had this conversation with either

6   Ron Mitchell or Jane Dziemit or Tony, whose last

7   name is unknown?

8        A      Probably a year afterwards.

9        Q      And how did you find it out?

10        A      Because I was pissed off he was --

11   Dave was actually stealing from both of us.

12        Q      Dave Adams?

13        A      At IFC -- Dave Adams, and myself.

14   And so I called up Ron and said look, what the F

15   is going on, you know.

16        Q      Now, when you say that Dave Adams

17   was stealing from both of us, you indicated in

18   your testimony that one of the persons who he was

19   stealing from was you.

20        A      Yes.

21        Q      Who was the other person?

22        A      IFC.

23        Q      IFC, okay.  Now, when you called,

24   when you called Ron Mitchell on that occasion, and

25   said what the F is going on, what conversation did

40

```
 1                        Britto
 2    you have with Mr. Mitchell?
 3         A    Well, he didn't know I was a big
 4    part of the shit that was going on, okay.  I mean
 5    he doesn't know -- well, he's finding out now,
 6    but, he didn't know I was a big player in the
 7    conversion company, which means converting carpet,
 8    which means you cut it down, you bind it, mix a
 9    remnant.
10         Q    Did Mr. Mitchell know that
11    Mr. Adams, based on the conversation with you, did
12    he indicate that he knew that Mr. Adams was
13    causing conversions of the carpets?
14         A    Can you rephrase that a little bit.
15         Q    When you called Mr. Mitchell --
16         A    Yes.
17         Q    -- what was your purpose in calling
18    him at the time that you did?
19         A    Because Dave told me Building 19
20    wasn't paying the bills, so I called Ron up to see
21    if they were paying them.
22         Q    And did Mr. Mitchell indicate to you
23    one way or the other whether --
24         A    He said yes, they were paying them.
25         Q    Did Mr. Mitchell inquire of you in
```

41

```
 1                        Britto

 2    that conversation at all as to why you were

 3    calling him to find out that information?

 4         A     No.

 5         Q     Okay. Did you and Mr. Mitchell have

 6    any discussion with one another about Mr. Adams in

 7    that conversation?

 8         A     Oh, definitely.

 9         Q     What was the conversation that you

10    had with Mr. Mitchell about it?

11         A     There's a few of them.

12         Q     Okay.  Could you tell us as best as

13    you can recall what you said to him and what he

14    said to you?

15         A     I don't believe Dave.  I said, are

16    you getting paid?  He said, oh, yeah, I'm getting

17    paid.  And because Dave kept saying Building 19's

18    not paying their bills, not, so I'm not getting my

19    money, I'm getting pissed off.  Now, Ron, in the

20    meantime, I mean he's naive, he doesn't know what

21    the hell's going on.  But he told me, yeah, I got

22    paid, I gave the money to Dave because -- this is

23    how it was set up.  They were, I guess, call it a

24    broker, put the money up in advance so we can

25    convert the goods, buy the rugs, resell them to
```

42

1                        Britto

2    IFC and then they get paid.

3         Q      Now, can you tell us or explain to

4    us why it was that Mr. Mitchell would put up the

5    money so that you could convert the goods?

6         A      Because he made a percentage off it.

7         Q      And, made a percentage off the

8    money?

9         A      Yeah, for loaning it.

10         Q      So was he financing Dave Adams'

11   attempt to convert the goods, is that what you

12   mean by what you just said?

13         A      Yes.

14         Q      Okay. Now, what did the conversion

15   of the goods involve?

16         A      Buying the goods, paying people to

17   cut them up, bind them, ship them, cost of

18   delivery.

19         Q      What was the purpose of converting

20   the goods, how would that benefit Mr. Adams so as

21   to cause the scheme to succeed?

22         A      Because he wanted money up front so

23   he can go gamble it.

24         Q      Okay. So by being paid in advance --

25         A      He had the money right away.

43

1                           Britto

2          Q      By Mr. Mitchell, is that correct?

3          A      Or CCC, or --

4          Q      Okay.  And by being paid in advance,

5   he was supposed to share some of that money with

6   you, is that correct?

7          A      Correct.

8          Q      Now, was there ever any agreement,

9   oral, between you and Mr. Adams as to what

10  percentage of the monies received by Mr. Adams you

11  would receive?

12         A      50/50.

13         Q      And --

14         A      And did not happen.

15         Q      Did you give any monies from the 50

16  that you received to anyone else?

17         A      Yes.

18         Q      To whom?

19         A      Tyrone.

20         Q      Okay. And was there a percentage

21  agreed between --

22         A      Mike Brown, only got a little bit,

23  but.

24         Q      Was there a percentage between you

25  and Tyrone that had ever been discussed?

44

1                         Britto

2          A     No.

3          Q     Okay.  And was there a percentage

4     between you and Mike Brown that had ever been

5     discussed?

6          A     No.

7          Q     When did --

8          A     Well, for the longest time Dave was

9     supposed to be paying Mike.

10         Q     Dave Adams was supposed to be paying

11    Michael --

12         A     And he didn't.

13         Q     How do you know that?

14         A     Because Mike told me.

15         Q     Okay, and --

16         A     Can I just grab another water --

17               (Brief pause.)

18         Q     Do you know how much money Tyrone

19    Williams made from being paid by you?

20         A     No idea.

21         Q     Okay, is it more than $10,000?

22         A     Oh, yeah.

23         Q     Is it more than $50,000?

24         A     I'm not sure about that.

25         Q     And, were there multiple payments or

45

                              Britto

1    just a single payment to Tyrone Williams?

2         A     Multiple, yeah.

3         Q     Did you ever have any discussions

4    with Tyrone Williams about what his job was to be

5    in order to keep on getting this money on the

6    side?

7         A     Probably.

8         Q     Do you remember those conversations

9    at all?

10        A     No.

11        Q     Did Tyrone Williams ever, once he

12   came aboard in the scheme, discuss with you any

13   shipments that created problems for him?

14        A     Yes.

15        Q     Okay. Do you have any memory of any

16   particular shipment?

17        A     Actually, it was the ones that got

18   us caught, that wood flooring and nonskid.

19        Q     And tell us about that shipment and

20   if you could, take us through that shipment from

21   the start of all you know about it all the way

22   down to the end of it.

23        A     Well, Dave --

24        Q     Dave Adams?

46
```
 1                        Britto

 2          A     Yes, Dave Adams, I keep saying that.

 3          Q     The only reason I constantly add the

 4     last name is because --

 5          A     No, I know, I understand.

 6          Q     We also have a David Sun --

 7          A     Yeah, I understand that --

 8          Q     And I don't want --

 9          A     I understand that --

10          Q     Any unfairness to result.

11          A     I understand that.

12                Dave Adams got dismissed from IFC.

13     So at the end he wanted to put a couple of orders

14     in to get more money before he left.  And there

15     was a nonskid, and the wood flooring, which there

16     was no stock, and that's what happened.

17          Q     So, who put in those orders for him?

18          A     No, he did, he just, it was a

19     purchase order that was already written.

20          Q     And did he alert you that those

21     orders were put in?

22          A     I talked to him about it.  He said

23     there was stock but there wasn't.

24          Q     And at some point did it appear from

25     paperwork that the nonskid -- nonskid rugs I
```

47
1                    Britto

2    assume they are, is that correct?

3         A    No, it's under the.

4         Q    Nonskid material that goes under the

5    bottom of the rug?

6         A    So it don't slide, yes.

7         Q    And was there paperwork that came in

8    with regard to the nonskid material and to the

9    wood tiles?

10        A    See, that I wouldn't know because I

11   wasn't there.

12        Q    All right. So this happened while

13   you were -- already had left?

14        A    Oh, yeah.

15        Q    Did you at some point then, with

16   regard to these two transactions, have any

17   conversation with Williams about it?

18        A    Oh, yeah.

19        Q    Can you tell us as best as you can

20   recall what you said to Tyrone Williams and what

21   Tyrone Williams said to you?

22        A    No, I can't.

23        Q    Okay. Did you ever find out whether

24   or not, what it was that caused the scheme to be

25   discovered at this precise point?

48

1                          Britto

2          A      Those two last orders.

3          Q      Okay. So how do you know that it was

4    discovered that there was a fraud involved with

5    it?

6          A      There was a new buyer that took over

7    and he had to do inventory and there was nothing

8    there.

9          Q      And who reported this to you,

10   because you had left the company by this point,

11   isn't that right?

12         A      Yes.

13         Q      Okay. So who reported to you that

14   the new buyer did the inventory and discovered it

15   wasn't there?

16         A      I think it was you guys.

17         Q      Okay. So you found you that out --

18         A      -- or the State Police, either one,

19   yes.  Actually, it was the State Police, yeah.

20         Q      So the State Police came to see you

21   in New York?

22         A      Yeah, a week after I got out of the

23   hospital.

24         Q      And do you recall when that was?

25         A      I left the hospital on August 2nd,

49

1                          Britto

2    so a week later.

3            Q      Okay. And this is of '05?

4            A      Yes.

5            Q      Okay. Now --

6            A      Actually, so you don't think I'm

7    lying --

8            Q      And you have shown me, and I'll pass

9    it to other counsel, a Mount Sinai Hospital, New

10   York, New York patient discharge plan and referral

11   form, is that correct?

12           A      Yes.

13           Q      And it shows a discharge date of

14   August 1, 2005.

15           A      And they came a week later, so.

16           Q      Okay. And I will pass this, so that

17   all persons can see it.

18                      MR. YURKO:  Will you be

19               marking that as an exhibit?

20           Q      Do you want that piece of paper

21   back?

22           A      Yes.

23           Q      Okay. So, is it all right if we make

24   a copy of it?

25           A      That's fine.

50

1                          Britto

2                          MR. KRASNOO:  And is it all

3                  right with counsel if we mark the copy

4                  as an exhibit?

5                          MR. YURKO:  Fine with me.

6          Q     Did you arrange with Mr. Adams that

7   with regard to this last shipment that actually

8   got discovered, that you were to get some money

9   out of it?

10         A     Yes.

11         Q     Okay. Did you get any money out of

12  it?

13         A     No.

14         Q     Okay. Now, was this a shipment where

15  Mr. Adams got his money up front, as you said he

16  liked to get his money up front?

17         A     I believe so.

18         Q     Okay. Now, do you know who this

19  shipment came from?

20         A     CCC.  And the nonskid was Dalton

21  Padding. I think it was Dalton.

22         Q     D-A-L-T-O-N?

23         A     Yeah, I think.

24         Q     Do you know whether Dalton Padding

25  was an actual or a fictitious company?

51

1                          Britto

2         A     I think it was actual, at one time.

3         Q     Okay. Was it at the time that it

4    sent in this padding?

5         A     I'm not, I'm not sure.

6         Q     Okay.  Did you ever have any

7    discussion with Michael Brown about Dalton

8    Padding?

9         A     Yes.

10        Q     Okay. And do you recall how long ago

11   that was, or an approximate time?

12        A     Four months ago, maybe, five months.

13        Q     Okay. And when you had this

14   discussion with Michael Brown about four months

15   ago, would make it December of '05 -- November or

16   December of '05?

17        A     Maybe earlier than that, like

18   September maybe.

19        Q     Would it be shortly after you spoke

20   with the State Police?

21        A     No.

22        Q     Okay. Would it be before you spoke

23   to the State Police?

24        A     No, it was after, because --

25        Q     And what was your conversation with

52

```
 1                        Britto

 2    Mike Brown about, what did you say to him and what

 3    did he say to you?

 4            A     In reference to what?

 5            Q     Well, you had a conversation with

 6    him you just told us?

 7            A     Yes.

 8            Q     Where you also discussed Dalton

 9    Padding as one of the subject matters --

10            A     No, are you talking about the

11    inventory or the State Police?

12            Q     Well, did you discuss both with Mike

13    Brown?

14            A     After the State police came I called

15    him.

16            Q     Okay.  So first, are there two

17    separate conversations with --

18            A     Yes.

19            Q     All right. Which one occurred

20    earlier in time, the one about Dalton Padding?

21            A     Dalton Padding, yes.

22            Q     Would you tell us as best as you can

23    recall the conversation you had with Mike Brown

24    about the Dalton Padding.

25            A     I have no idea.
```

                                                                    53
    1                          Britto

    2         Q     Okay. Did you discuss money in that

    3   conversation?

    4         A     No.

    5         Q     Did Michael Brown discuss with you

    6   whether or not he was getting paid with David

    7   Adams?

    8         A     No.

    9         Q     Was Michael Brown to get paid by

   10   David Adams directly?

   11         A     He was at first, and Dave wasn't

   12   paying him.  So then, Dave was telling him that I

   13   was supposed to pay him when Dave was supposed to,

   14   because Dave's, he's --

   15         Q     So did you wind up paying Michael

   16   Brown any money?

   17         A     Yes, but he didn't get too much.

   18         Q     Over what period of time did you pay

   19   Michael Brown?

   20         A     Maybe a year.

   21         Q     Do you recall roughly how much

   22   Mr. Brown got?

   23         A     Probably got like six, 7,000.

   24         Q     And what was Michael Brown's role?

   25         A     Well, he helped set it up with Dave.

54

```
 1                        Britto

 2          Q    And did he ever discuss with you the

 3    steps he had taken to set it up with Dave Adams?

 4          A    No.

 5          Q    Okay. How did you find out the

 6    information that Michael Brown was also one of the

 7    people that set up the scheme with Dave Adams?

 8          A    Because me and Dave discussed it

 9    beforehand.

10          Q    Okay, what was your discussion with

11    Dave Adams --

12          A    Dave Adams.

13          Q    -- about Michael Brown's role in

14    this matter?

15          A    Because Michael Brown worked for

16    CCC, and he was like, I guess the best salesman or

17    whatever, so he was close to him.  So Dave worked

18    through Michael Brown to get them to do what they

19    did.

20                    MR. KRASNOO:  Okay. Off the

21             record a minute.

22                    THE VIDEOGRAPHER:  The time is

23             now 2:23.  Off the record.

24                    (Brief recess.)

25                    THE VIDEOGRAPHER:  Time is now
```

55

1                          Britto

2              2:41.  On the record.

3     BY MR. KRASNOO:

4          Q     Mr. Britto, earlier in your

5     deposition --

6          A     Call me Kevin, please.

7          Q     Well, it's hard to do it in a

8     deposition.

9          A     Oh, okay.  Make me feel old.

10         Q     I don't try to do that, please

11    believe me, I know what age is.

12               You had mentioned that there were

13    four ways to prevent theft earlier in your

14    deposition today.

15         A     Um-hum.

16         Q     And you mentioned one of the ways

17    was don't use prepaid freight?

18         A     Yes.

19         Q     A second way was use different tags

20    for different vendors?

21         A     Yes.

22         Q     What are the other two ways?

23         A     Freight, tags, can't have a

24    supervisor that's not, scumbag, and the fourth one

25    I forget.

56

1                              Britto

2          Q     Okay, now, when Mr. Adams brought

3     you aboard in this scheme and discussed it with

4     you --

5          A     Before we get into it, have a buyer

6     that's honest.

7          Q     Okay.

8          A     So that's five, I don't know.

9          Q     Okay. When Mr. Adams brought you

10    aboard in this scheme and gave you the outlines of

11    it, what was it, if anything, about Tyrone

12    Williams that caused you to connect to Tyrone and

13    make him a participant in this scheme?

14         A     Well, his girlfriend was a friend of

15    mine.

16         Q     Now --

17         A     At the time.  He's got two or three

18    since then, but.

19         Q     And at that time were you friendly

20    with Tyrone Williams as a result of knowing his

21    girlfriend?

22         A     Yes.

23         Q     Are there other companies other than

24    CCC and Dalton Padding that were connected to the

25    scheme of which you're aware?

57

Britto

 1

 2          A     DGM used to do it, which, the guy

 3     died, so it's not happening anymore.

 4          Q     Did you ever have any direct

 5     contacts with DGM?

 6          A     Through Dave Adams.

 7          Q     Now, you mentioned that the guy

 8     died.  Do you mean the company --

 9          A     Lou Levine died.

10          Q     And that was a person.  Did you have

11     direct communication with Lou Levine before he

12     died about any aspects of this fraud?

13          A     Yes.

14          Q     Okay.  And what were your

15     conversations with this person about the fraud?

16          A     Had lunch.

17          Q     When you had lunch did you discuss

18     fake shipments?

19          A     No, always went through Dave Adams.

20          Q     Did you discuss any money matters

21     relating to fake shipments?

22          A     Always went through Dave Adams.

23          Q     Was Dave present at the lunch?

24          A     Yes.

25          Q     Do you recall where the lunch was?

                                                      58
 1                          Britto

 2           A      It was in Worcester, I don't know

 3     the restaurant.

 4           Q      And do you recall approximately what

 5     year?

 6           A      The year after Dave Rooney left, I

 7     don't know what year he left.

 8           Q      Now, you mentioned Dave Rooney

 9     earlier in your depo and just now.  Can you tell

10     us, did Dave Rooney, acting in his capacity as

11     warehouseman or receiver --

12           A      No, Dave Rooney was the buyer.

13           Q      Okay.

14           A      I took over his position when he

15     left.

16           Q      Was Dave Rooney an honest buyer?

17           A      Yes, definitely.

18           Q      Did Dave Rooney ever discuss with

19     you ways to cheat the company if he wanted to?

20           A      Never, no, Dave, honest man.

21           Q      Now, have you ever heard of a

22     company called Empire Weavers?

23           A      Yes.

24           Q      Were they a company that in any way

25     participated in this fraud?

59

1                           Britto

2         A    Yes.

3         Q    Okay. How did they participate in

4    the fraud?

5         A    CCC had CCC, Empire Weavers, Dalton

6    Padding.

7         Q    So, this was, for some purposes, an

8    alter ego of CCC?

9         A    Yes.

10        Q    Do you know whether or not it was an

11   actual ongoing company that sold product or was it

12   a fictitious entity that was used to pretend to

13   sell product?

14        A    It was fictitious for us, I don't

15   know if it was all around.

16        Q    As far as you know then, was there

17   ever a legitimate shipment where the shipper was

18   Empire Weavers in your association with IFC?

19        A    No.

20        Q    Okay. Now, with regard to Dalton

21   Padding was there any genuine shipments to your

22   knowledge, from Dalton Padding to IFC while you

23   were there?

24        A    I don't believe so.

25        Q    Now, have you ever heard of a

60

```
 1                        Britto

 2      company named Mansfield Rug?

 3            A      Yes.

 4            Q      Okay. Is Mansfield Rug an actual

 5      company to your knowledge?

 6            A      To my knowledge, yeah.

 7            Q      Okay. Did IFC receive any shipments

 8      from Mansfield Rug while you were there?

 9            A      No.

10            Q      Did IFC ever receive any paperwork

11      to indicate that Mansfield Rug had shipped in

12      items to IFC while you were there?

13            A      Yes.

14            Q      So, is it fair to state or unfair to

15      state that Mansfield Rug, if one were to find any

16      paperwork indicating shipments had come in, that

17      all of those shipments to your knowledge would be

18      fictional, nonexisting shipments -- I'm sorry,

19      shipments of nonexisting rugs?

20            A      Yes.

21            Q      And fake shipments?

22            A      Yes.

23            Q      Now, have you ever heard of a

24      company named International Floor, Incs. -- Inc.,

25      sorry?
```

61

```
 1                        Britto

 2          A     No.

 3          Q     And you don't know it to be

 4   connected to the scheme one way or another, is

 5   that correct?

 6          A     Yeah, I never even heard of that.

 7          Q     Have you ever heard of a company

 8   called Remco?

 9          A     Yes.

10          Q     Is Remco an actual company?

11          A     Supposedly.

12          Q     Did Remco ever send in shipments of

13   actual rugs or merchandise to IFC while you were

14   employed there?

15          A     They thought they did.

16          Q     Okay.

17          A     And I'll tell you how.  Like with

18   machine made rugs we would take them and hide them

19   because Nick was the buyer, or he still is the

20   buyer, so when he came in, here's the goods.

21          Q     Now you -- Nick is, what's Nick's

22   last name, do you know?

23          A     Adler.

24          Q     To your knowledge, is Nick Adler

25   someone who was not involved in the fraud?
```

62

1                          Britto

2          A      No, he wasn't.

3          Q      Okay. And you would take then

4    shipments of actual product and display them to

5    Nick Adler, telling him that those were the

6    product that allegedly were shipped in by Remco?

7          A      Correct.

8          Q      Okay. Does that mean, therefore,

9    that Remco presented bills or invoices to show

10   product was shipped into IFC when, in fact, no

11   product was shipped in?

12         A      Without their knowledge, correct.

13         Q      Okay. Now, could you explain to us

14   how Remco could create an invoice suggesting that

15   product was sent in to IFC without its knowledge

16   their product was never sent in to IFC?

17         A      Yes.  Because we told them, bullshit

18   them actually, that we didn't want them getting

19   involved, because we didn't want them to get

20   involved with the people we were buying the goods

21   from, so they couldn't steal our business.

22         Q      So you were telling that to --

23         A      Ron Mitchell.

24         Q      Did you ever tell that to Jane

25   Dziemit?

63

1                        Britto

2          A     I never talked on her.

3          Q     Did you ever tell that to Tony?

4          A     Maybe, I'm not sure.

5          Q     And Tony's last name, Marasca?

6          A     Yep.

7          Q     Does that refresh your recollection?

8          A     Yep.

9          Q     Now, you just stated a moment ago

10    that you had never talked to Jane Dziemit.  How

11    did you come to know her name and her involvement

12    with Remco, if at all?

13         A     Paperwork.

14         Q     So that was the first time you

15    became aware of the --

16         A     Her at all.

17         Q     -- of the existence of Jane Dziemit?

18         A     Yeah.

19         Q     Did you ever have any discussion

20    with Ron Mitchell following receipt about

21    paperwork down to today about Jane Dziemit?

22         A     Yes.

23         Q     Would you tell us as best you can

24    recall, what you said to Ron Mitchell and what Ron

25    Mitchell said to you about Jane Dziemit.

64

```
 1                      Britto
 2         A     No, I just said Ron and Jane are
 3    innocent.
 4         Q     You said that to Ron?
 5         A     Yes.
 6         Q     Okay.
 7         A     Because they are.  I'm trying to
 8    make the wrongs right.
 9         Q     What did Ron, if anything, say in
10    response to your statement?
11         A     I can't remember.
12         Q     Did -- do you know from any
13    conversation at any time with Mr. Mitchell how
14    much money Remco fronted -- if I can put it that
15    way -- paid up front to David Adams?
16         A     (Witness nods).
17         Q     How much money?
18         A     Well, if there was a $40,000
19    invoice, I guess it would have been like 22,
20    25,000.
21         Q     So, so Mr. Mitchell then was to
22    receive a percentage of the total amount of the
23    invoice?
24         A     Um-hum.
25         Q     As payment for having produced an
```

65

                         Britto

1

2    invoice?

3         A    Loaned the money.

4         Q    Okay. Did you ever see any checks or

5    monies that were purportedly loaned by

6    Mr. Mitchell to Mr. Adams?

7         A    I don't believe so.

8         Q    How did you know, in a Remco

9    transaction, that Mr. Mitchell actually paid

10   Mr. Adams any money up front?

11        A    I don't know.

12        Q    Okay.  Was it something that

13   Mr. Adams ever told you, that I just received

14   money from Mr. Mitchell?

15        A    Yes.

16        Q    Did you ever see any checks

17   representing payments from either Remco or

18   Mr. Mitchell or Ms. Dziemit to Dave Adams?

19        A    No.

20        Q    Did you ever see any monies that

21   Dave Adams showed you wherein, through

22   conversation, Mr. Adams indicated that this

23   represented money flowing from either Remco or

24   Mr. Mitchell or Ms. Dziemit to him?

25        A    No.  To me, yes.

66

Britto

1      Q     So the only time you would know of

3   it was when Mr. Adams passed some money to you and

4   made the statement that this was money that came

5   either from Remco or Mr. Mitchell or Ms. Dziemit?

6      A     Correct.

7      Q     Did you ever try to find any ways to

8   determine that you were getting your fair share of

9   the monies that either Mr. Mitchell or Ms. Dziemit

10  or Remco had paid to Mr. Adams up front?

11     A     Definitely.

12     Q     What steps did you take to get that

13  information?

14     A     Well, when Dave was giving me this

15  bullshit act, I called up Ron.

16     Q     Would you do this periodically while

17  you were still employed at IFC?

18     A     No, this was afterwards.

19     Q     Okay. Before that did Mr. Adams

20  indicate to you that Remco was fronting him some

21  monies for shipments that were later going to be

22  fictitional?

23     A     I can't remember that.

24     Q     When you first -- when did you first

25  become aware of the existence of Ron Mitchell?

67

```
 1                        Britto

 2        Q      Was it a name first basis?

 3        A      I don't know.

 4        Q      Okay. Do you know how you first

 5   learned of his name?

 6        A      Yeah, because I did buy padding from

 7   him when I was a buyer.

 8        Q      When you bought padding from him

 9   when you were a buyer, was that padding that was

10   shipped out under Remco's name or another name?

11        A      North Carolina Foam.

12        Q      Okay. And as far as you know what

13   was Mr. Mitchell's connection, if any, to North

14   Carolina Foam?

15        A      Salesman.

16        Q      Did you find out -- did you have

17   direct conversations with Mr. Mitchell about any

18   purchases made from North Carolina Foam?

19        A      Actually, I used to go through Dave.

20        Q      So you would tell Mr. Adams that you

21   needed to buy some foam, is that correct?

22        A      Yes.

23        Q      And Mr. -- how did you find out that

24   Mr. Adams would buy it from North Carolina Foam?

25        A      Because he had all kind of
```

68

```
 1                      Britto

 2     connections.

 3          Q     But I mean how would you find out --

 4          A     He made my job easier.

 5          Q     That he bought the foam from North

 6     Carolina Foam as opposed to from another

 7     connection?

 8          A     The bill.

 9          Q     Okay.  So you would actually get to

10     see the bill?

11          A     Yes.

12          Q     Okay.

13          A     I had to sign off on everything,

14     every bill that came in, when I was the buyer.

15          Q     So that would involve bills for

16     genuine shipments?

17          A     Yes.

18          Q     And bills for fictional shipments?

19          A     No.

20          Q     Never?

21          A     Never.

22          Q     Okay. All right.  When a bill came

23     in for a fictional shipment how -- let's do it

24     another way.  Would you take us through the steps

25     that would be accomplished, identifying the
```

69

1                           Britto

2      paperwork, for a legitimate shipment first and

3      then I'll ask you to do the same thing for us for

4      a fictional shipment so we all can appreciate the

5      difference in steps.

6              A      Okay.

7              Q      So first, for a legitimate shipment.

8              A      Trailer comes in, count the goods,

9      this is what they're supposed to do.  Count the

10     goods off the trailer, put it upstairs, count.

11     Now, the people upstairs who are unloading it

12     upstairs count the goods in.  They got a master

13     paperwork, turn it in to the supervisor, looks at

14     the bill of lading, compares the two, if it's a

15     piece or two off, you know, it could be a wrong

16     count, do the key rec, sign it, send it in.

17             Q      Now, tell us --

18             A      Now, with the fake ones, you mix it

19     in with the real ones.

20             Q      Okay.

21             A      Because people are not good at doing

22     paperwork.  So you just give them a whole stack of

23     shit.

24             Q      So you give them genuine pieces of

25     paper representing genuine shipments, but you mix

70

```
 1                        Britto

 2   it in with pieces of paper about nonexistent --

 3        A     Yes --

 4        Q     Shipments at the same time?

 5        A     Yes.

 6        Q     Now, is the key rec created for the

 7   fictional shipments as well?

 8        A     Yes.

 9        Q     Okay.  And is the supervisor still

10   required to sign off on the fictional shipments?

11        A     Yeah.

12        Q     Okay. Now, who do you give this

13   paperwork to where the fictional shipment

14   paperwork is mixed in with the genuine shipment

15   paperwork?

16        A     To the supervisor.

17        Q     Okay. Now --

18        A     I'll give you an example.  When I

19   was the buyer, we went through a lot of

20   supervisors.  I used to send them off on shopping

21   reports, to go a store, do this.  While they're

22   gone, this trailer just happened to come in and we

23   shipped it out.  I'm their boss.  They're not

24   gonna question me.  There's the key rec.

25        Q     So you would prepare a key rec for
```

71

1                          Britto

2     some of the fictional shipments?

3          A     No, I wouldn't -- well, I did some

4     key recs, but --

5          Q     Who would prepare the key rec for a

6     fictional shipment?

7          A     The supervisor would, but he didn't

8     know or she didn't know.

9          Q     That it was fictional shipment?

10         A     Yes.

11         Q     So they would come back from their

12    shopping merchandise that you sent them on?

13         A     And do the paperwork.

14         Q     They would see the paperwork there,

15    they would know they had to fill out a key rec?

16         A     Yes.

17         Q     They would fill it out, they would

18    sign off on it on the basis of the paperwork they

19    received?

20         A     Correct.

21         Q     Okay. And especially they would be

22    in part relying upon your statement as a boss that

23    the shipment came in while you were out?

24         A     Correct.

25         Q     Here's all the paperwork on it?

72

1                         Britto

2          A     Do what the fuck you're told.

3          Q     Okay. Can you tell us the names of

4    any of the supervisors that were involved?

5          A     Involved in what?

6          Q     Just where you would present these

7    pieces of paper and they would fill out the key

8    rec?

9          A     Oh, yeah, yeah, Chris Nolan, Wendy,

10   I don't know her last name, Mark something, I had

11   Tito do key recs, Moxume do key recs.  I mean, I

12   had all kinds of people do the key recs.  The more

13   people that did the key recs, the less chance of

14   getting caught.

15         Q     With the regard to the people that

16   you've mentioned, is it your testimony that none

17   of them were participants in the scheme, no one?

18         A     Oh, zero.

19         Q     Okay. Now, could you tell us what

20   information is contained in a key rec, whether

21   it's for a fictional shipment or a real shipment

22   or a half real, half --

23         A     They're both the same.

24         Q     Okay. And what information is

25   contained in it?  A key rec apparently is a

73

                              Britto

1

2    document used by IFC to track receipts of

3    shipment, is that correct?

4           A     Yes.

5           Q     Okay. So what kind of information is

6    entered onto the key rec by whoever makes it out?

7           A     The date it came in, who unloaded

8    it, the shipper, quantities, the supervisor has to

9    sign it or, whoever signs it, and the date.

10          Q     Now, occasionally in some documents

11   that are key recs there would be handwritten

12   notation on it such as I muffed the inventory, it

13   was really four by six rugs as opposed to eight by

14   tens, or I put down the wrong quantity for the

15   four by six rugs.  What situations, would those

16   always be genuine shipments?

17          A     Yeah, I don't have any knowledge of

18   that.

19          Q     Okay. Did you ever write that kind

20   of information on any key rec that you filled out?

21          A     Maybe.  I don't know.

22          Q     How soon after -- strike that.

23                When the scheme first started,

24   Mr. Adams was not receiving the money up front

25   from these companies, was he?

74

1                          Britto

2          A     No.

3          Q     When did that change in the scheme.

4   You don't know?

5          A     I can't tell you.

6          Q     Was there any conversation with

7   Mr. Adams and yourself to indicate when it was

8   going to change and/or why it was going to change?

9          A     With him getting the money up front?

10         Q     Yes.

11         A     No.

12         Q     Before the money came in up front,

13  how would -- would Mr. Adams wait until the

14  company that shipped the fictional shipment

15  received payment --

16         A     Yes.

17         Q     From IFC?

18         A     Yes.

19         Q     Okay. How soon, roughly, after the

20  company received shipment from IFC would Mr. Adams

21  receive his money?

22         A     Probably a week.

23         Q     Now, would Mr. Adams get it in check

24  form?

25         A     Well, he, he had an ATM card, got

75

```
 1                      Britto
 2   cash, I mean.
 3          Q     So there were different ways in
 4   which he would get paid?
 5          A     Yeah.
 6          Q     Did you ever see a check made out
 7   from a shipper of fictional merchandise addressed
 8   to Mr. Adams?
 9          A     I don't think he ever did that.
10          Q     Okay. When he paid you, was it in
11   cash or in any other form?
12          A     Cash at first.  Then I got checks
13   from the company.
14          Q     Did the checks commence only after
15   you left the company or was it while you were also
16   still employed there?
17          A     I'm not sure.  I'm not going to
18   answer that.  I'm not going to give a wrong
19   answer.
20          Q     And when you got the cash would you
21   ever deposit it in a bank account?
22          A     Sometimes.
23          Q     Okay. Now, while you were a buyer --
24   strike that.
25                Were you a buyer at, overlapping the
```

76

1                        Britto

2    same time that Dave Adams was a buyer for the

3    company?

4            A     Yes.

5            Q     Okay.  And when you were both

6    buyers, did you also have some kind of either

7    written or oral agreement with IFC through any of

8    its managers or its president with regard to

9    reimbursements for disbursements that you would

10   have made?

11           A     Oh, no.

12           Q     Okay.  Well, did you ever get

13   reimbursement checks for expenses?

14           A     What do you mean by that?

15           Q     If you took people out to eat would

16   you do that in your role as buyer, take them --

17           A     Yeah, I had a company credit card.

18           Q     Would you ever put in for gas

19   reimbursement, for driving to various locations,

20   or things of that nature?

21           A     Yeah, that was, everybody does that.

22           Q     Okay. With regard to any of those

23   checks that you received from the company,

24   reimbursing you for gas and mileage and things of

25   that nature, would all those checks be legitimate

77

```
 1                        Britto

 2   checks or would those also be fictional expenses

 3   created to be representative of the fictional

 4   shipments of rugs?

 5          A     Never.

 6          Q     So they were always legitimate?

 7          A     Yes.

 8          Q     Okay. Do you know whether or not, of

 9   your own personal knowledge, Dave Adams' were ever

10   fake reimbursement expenses?

11          A     I think so.  Like when he took over

12   as buyer, Georgia Rug Mills was paying for half of

13   his Escalade or whatever, Navigator, and he was

14   claiming, he was getting money from IFC for that.

15          Q     Have you ever heard the name of

16   Peter Burnham?

17          A     Yes.

18          Q     Who is or was Peter Burnham?

19          A     Dave used to work for him.  Adams,

20   used to work for him.

21          Q     When David Adams worked for him, do

22   you know in what capacity David Adams worked for

23   him?

24          A     I guess he was his assistant, I

25   guess, I'm not sure.
```

78

1                          Britto

2          Q      David Adams was the assistant to

3     Peter Burnham?

4          A      Yes.

5          Q      What kind of work that did Burnham

6     do at the time David Adams worked for him?

7          A      They used to go to the store, do

8     inventories, decide what we needed in stock,

9     something like that.

10          Q      Was Peter Burnham then an employee

11    of IFC?

12          A      Never was.

13          Q      Okay.

14          A      To my knowledge, anyways.

15          Q      Okay. Do you know whether Peter

16    Burnham ever was involved or knowledgeable about

17    this particular scheme that you've described for

18    us today?

19          A      I don't think so.

20          Q      Okay. Now --

21          A      But, however, Peter Burnham was

22    working with Dave after Dave left IFC to try to

23    get business.

24          Q      Was Peter Burnham trying to get

25    business for David or was David trying to get

79

```
 1                      Britto
 2   business for Peter Burnham?
 3        A     They were trying to work together to
 4   try to get business together for IFC.
 5        Q     Okay. And that was after David Adams
 6   left?
 7        A     Yes.
 8        Q     How did you know that?
 9        A     Dave told me.
10        Q     Were you in constant communication
11   with David Adams once you had left the company?
12        A     Yes.
13        Q     Okay. A once a week phone call,
14   twice a week, daily?
15        A     Well, sometimes it was a month that
16   went by.  If he knew I was pissed off he wouldn't
17   call me.
18        Q     Okay. And was what would piss you
19   off being that you weren't receiving payment you
20   thought you were entitled to?
21        A     Correct.
22        Q     Now, when you left IFC, did you
23   locate to New York?
24        A     The first time, no.
25        Q     Okay.
```

80

1                              Britto

2          A     The second time, yes.

3          Q     What did you do -- when you left IFC

4     the first time and before the second time, what

5     kind of work did you do?

6          A     I was trying to take care of my

7     addiction.

8          Q     Okay, so --

9          A     And I tried to become a state

10    trooper, actually.

11         Q     Is this an alcoholic addiction or a

12    drug addiction?

13         A     Alcoholic and oxycontins.

14         Q     Okay. And, did you go in for some

15    treatment to any hospital?

16         A     Yes.

17         Q     Okay. How long a period of time was

18    that period between the first time employment

19    ended with IFC --

20         A     Ten months.

21         Q     And the second time it began?  Ten

22    months?

23         A     Ten months.

24         Q     And where were you located at the

25    time, was it Massachusetts or --

81

1                          Britto

2          A     Yes.

3          Q     Okay.  Now, when you left IFC the

4     second time, did you come to New York?

5          A     Yes.

6          Q     And when was that roughly?

7          A     2001.

8          Q     Okay.

9          A     September 28th.

10         Q     You had told Mr. Elovitz, had you

11    not, on some occasion, that you had an uncle in

12    New York that was lending you an apartment?

13         A     Yes.

14         Q     Was that correct?

15         A     No.

16         Q     Was that a fake statement?

17         A     Yes.

18         Q     Okay. Why, at that point when you

19    left, did you maintain that fake story to

20    Mr. Elovitz?

21         A     Well, New York's expensive.  I

22    didn't want him, let him know what was going on,

23    you know what I mean.

24         Q     So, you actually were --

25         A     Lying.

82

1                        Britto

2         Q     Lying to obtain money still from --

3         A     Correct.

4         Q     Mr. Elovitz.

5               Now, was this money because of work

6     you had done or was this like personal loans from

7     Mr. Elovitz?

8         A     It was stolen.

9         Q     Okay. So you told him that you were

10    living in New York now while you were still trying

11    to do work for IFC?

12        A     No.

13        Q     Okay.  I'm confused.  When you say

14    you stole the money, was that money that you stole

15    from IFC or directly from Mr. Elovitz?

16        A     IFC.

17        Q     Okay. And how was it that you were

18    stealing that money at that point, was it still

19    the --

20        A     The fake orders.

21        Q     Okay.  So you were participating

22    then in fake orders after you left, and you used

23    as a cover-up to Mr. Elovitz that you had an uncle

24    in New York that was lending you an apartment as

25    part of your covering up the scheme?

83

```
1                        Britto

2         A     I do have a uncle in New York.

3         Q     Okay. But not one who had loaned you

4    an apartment?

5         A     Correct.

6         Q     Now, what was the advantage in lying

7    to Mr. Elovitz about that aspect that aided you in

8    still getting money from IFC?

9         A     What do you think?

10        Q     I don't know, that's why I'm asking.

11        A     A cover-up.

12        Q     What was it covering up?

13        A     Just in case he got a hint of it.

14        Q     So in case --

15        A     Could I have a bottle of water,

16   please.

17        Q     In other words, part of what you

18   were worried about was that --

19        A     My tracks.

20        Q     He might discover your lifestyle?

21        A     Cover my tracks.  Thank you.

22              Let's not do a play on words, let's

23   be direct.  I'm direct, you be direct.

24        Q     How often did you do fake or short

25   shipments, would it average out to once a week,
```

84

1                           Britto

2     once a month?

3          A      Probably once a month.

4          Q      Okay.  And is there an average

5     amount of money that would represent each of the

6     fake shipments?

7          A      When there's remnants, probably like

8     40,000.  Nonskid, 20-something thousand, I mean.

9     Machine mades, 15,000, with half shipments.

10         Q      Now, did you ever socialize with

11    David Adams?

12         A      No, never.  Well, one time I went to

13    the dog races.  That was it.

14         Q      Did you ever have any discussion

15    with David Adams about any knee injury that

16    occurred to him?

17         A      Foot, when he said he jumped in the

18    pool and broke his foot which was like, I think it

19    was bullshit, I think the bookie did that to him.

20         Q      Did you ever see him displaying any

21    kind of knee or leg injury?

22         A      A foot injury.

23         Q      Okay. And when he had the foot

24    injury how did you see that, what was it, was he

25    limping or was it in a cast or was it in a brace?

85

                              Britto

1

2        A      Yeah, it was in a cast and he had

3   crutches.

4        Q      Okay. Now, would you -- you've

5   indicated before that when a fictional shipment

6   was being created you would see what was in

7   inventory first.

8        A      Correct.

9        Q      Would that be your visual inspection

10  --

11       A      That would be the guideline.

12       Q      Or would you be relying upon

13  previous paperwork to suggest what was in

14  inventory?

15       A      No.

16       Q      You'd actually go look at the rugs

17  that were there?

18       A      That would be the guideline, yeah.

19       Q      Now, after the State Police came to

20  interview you, who, if anyone, named in the civil

21  complaint did you have contact with?

22       A      Ron Mitchell, Tyrone Williams, Mike

23  Brown.

24       Q      Okay. Did you ever have any contact

25  directly with any member of CCC?

86

1                          Britto

2          A     No.

3          Q     Okay. When you had contact with

4    Tyrone Williams, what did you say to him and what

5    did he say to you?

6          A     Well, when the State Police were

7    there, I said tell them the truth, because he was,

8    listen, don't say nothing, I'll take care of it.

9    But I told him, just tell them the truth.  And he

10   did.

11         Q     What is it your understanding that

12   Mr.  Williams said?

13         A     I have no idea.

14         Q     Okay.

15         A     I wasn't there.

16         Q     So, how do you, therefore, form the

17   conclusion that he did tell the State Police the

18   truth?

19         A     Well, one, the State Police were

20   pissed off.  Two, when they went back after I told

21   him, they seemed like they were happy.  Like he

22   was, what I told them, he was telling them, so --

23         Q     But has anybody ever told you

24   explicitly what Tyrone Williams said to the State

25   Police?

87

```
 1                       Britto

 2          A      No.

 3          Q      Okay. That's neither Tyrone Williams

 4    nor the State Police?

 5          A      No.

 6          Q      Okay. And has anyone ever told you

 7    that what Tyrone Williams said to the State Police

 8    was or was not true?

 9          A      No.

10          Q      Okay.

11          A      The State Police did tell me though,

12    he was cooperative the second time.  And I

13    actually called him in front of one of the state

14    troopers.

15          Q      Okay. And was that when you told him

16    to go ahead and tell the truth?

17          A      (Witness nods).  Because he wasn't

18    talking at all.

19          Q      Okay. Why don't we stop now, because

20    it's my understanding that the tape is about to

21    run out.

22                     THE VIDEOGRAPHER:  Time is now

23                  3:16.  This marks the ending of tape

24                  number one.  Off the record.

25                     (Brief recess.)
```

88

```
 1                      Britto

 2                      THE VIDEOGRAPHER:  3:20 p.m.,

 3             this marks the beginning of tape

 4             number two.  On the record.

 5  BY MR. KRASNOO:

 6       Q      Now, you indicated that when the

 7  State Police came you spoke to Tyrone Williams.

 8  Can you tell us, did you have any control over

 9  Tyrone Williams?

10       A      Definitely.

11       Q      Okay. And what was the nature of the

12  control?

13       A      Well, first, I was his boss.

14       Q      Okay.

15       A      Secondly, he knew that -- how can I

16  put it.  It's better to be in my hands than his.

17       Q      Did he in any way rely upon you to

18  make decisions that affected him in his job?

19       A      Yes.

20       Q      Was that true for legitimate acts he

21  did on behalf of the employer?

22       A      Yes.

23       Q      Was that also true for --

24       A      Previous employees, too.

25       Q      Okay. Was that also true for
```

89
```
 1                    Britto

 2   fraudulent acts that he did on behalf of the

 3   employer?

 4          A     Um-hum.

 5          Q     The answer is --

 6          A     Yes.

 7          Q     Okay. Now --

 8          A     For him, I mean, not the ones I'm...

 9          Q     What did you mean when you said a

10   moment ago that it's better to be in my hands than

11   his?

12          A     Because I'm smarter than he is.

13          Q     So, did you mean by that that he

14   should leave decision-making to you --

15          A     Correct.

16          Q     Because you would make wiser

17   decisions --

18          A     Correct --

19          Q     Than he would?

20          A     Correct.

21          Q     Okay. Is that a fair interpretation

22   of what that --

23          A     That's correct.  And if Dave would

24   have done it then I wouldn't be sitting here right

25   now, which I'm glad, because I'm actually glad
```

90

1                          Britto

2    this happened, because this has been eatin' me up

3    for years, so --

4          Q     Did you talk to Dave Adams at all

5    after the State Police came to see you?

6          A     No.  I tried calling him, but he

7    wouldn't pick up the phone.

8          Q     Did you -- you talked to Ron

9    Mitchell after the State Police came?

10         A     Yes.

11         Q     And you've told us about that?

12         A     Yes.

13         Q     Okay. Now, you spoke to Mike Brown

14   after the State Police?

15         A     Yes.

16         Q     What was it that you said to Mike

17   Brown and what was it that he said to you?

18         A     Well, Mike Brown told me that he's

19   not working for CCC anymore --

20         Q     Okay.

21         A     Because they're downsizing, which I

22   told Paul.  I don't know if they're trying to

23   hide, I asked, the Chinese tried to skip the

24   country.

25         Q     When you said you told Paul, do you

91

<pre>
  1                         Britto

  2    mean Mr. Klehm?

  3         A     Yes.

  4         Q     Okay. Did you ask Mr. Brown, in the

  5    conversation wherein he reported that he was no

  6    longer employed by CCC, how the circumstances of

  7    his termination of employment occurred?

  8         A     Yeah, I said they're downsizing.

  9         Q     Okay. Did Mr. Brown at all discuss

 10    whether or not he had had any communications with

 11    the State Police?

 12         A     Yes.

 13         Q     Okay. What did he say about that?

 14         A     He didn't say anything, he just said

 15    they came and seen him, that's it.

 16         Q     Okay.

 17         A     Because his lawyer advised him not

 18    to talk to me.

 19         Q     When you spoke to these three

 20    persons, Ron Mitchell, Mr. Brown and Mr. Williams,

 21    was it to inform them that the State Police had

 22    come to see you?

 23         A     Yes.

 24         Q     Okay. Was it to find out whether or

 25    not the State Police had come to see them?
</pre>

92

 1                          Britto

 2          A     Yes.

 3          Q     At the time that you spoke to

 4   Mr. Mitchell, had any State Police come to see

 5   him?

 6          A     No.

 7          Q     Okay. Did he specifically tell you

 8   that no State Police had come to see him yet --

 9          A     Yes.

10          Q     If at all?

11          A     Yes.

12          Q     And with regard to Mr. Williams you

13   already knew, at least at the time when you called

14   with the State Police in your presence --

15          A     They were there when the State --

16          Q     That the State Police had come to

17   see him?

18          A     Yeah.

19          Q     Do you know what, if anything,

20   Mr. Williams did with the money that you gave to

21   him that represents the fraud, his share of the

22   fraudulent shipments?

23          A     That's his own personal business.

24          Q     Okay. Did he own a house at the time

25   this fraudulent shipment scheme began?

93
```
 1                        Britto
 2        A     No.  He does now.
 3        Q     Did he own a house after?
 4        A     Yes.
 5        Q     Okay. Did you ever find out whether
 6   or not he used any of the monies to acquire that
 7   house?
 8        A     Oh, probably.
 9        Q     But you didn't explicitly discuss it
10   with him?
11        A     No.
12        Q     Did Mr. Williams work at any job
13   other than working for IFC?
14        A     Yeah, he has a band, excuse me,
15   drummer in a band.
16        Q     Did you ever hear him play?
17        A     Oh, yeah.
18        Q     Did Mr. Adams ever work at any jobs
19   other than as a buyer for IFC?
20        A     Yeah, DGM.  Burton Carpet, I think
21   NATCO, too.
22        Q     NATCO?
23        A     I think so.
24        Q     What is NATCO?
25        A     That's who Peter Burnham worked for.
```

94

<pre>
 1                        Britto

 2         Q     Okay, and is that N-A-C-O?

 3         A     N-A-T-C-O and oriental, something.

 4   Bill can tell you.

 5         Q     Do you know whether or not he ever

 6   implemented a similar scheme at any of those

 7   enterprises?

 8         A     No.

 9         Q     Did you -- have you ever heard of

10   the following names:  Diane Spignosi,

11   S-P-I-G-N-O-S-I?

12         A     Nope.

13         Q     Okay. Rick Finley.

14         A     Yes.

15         Q     Who is Rick Finley?

16         A     He's a salesman for Liberty Carpet.

17         Q     Was Liberty Carpet ever one of those

18   companies that --

19         A     No.

20         Q     -- created a fraudulent shipment?

21         A     No.

22         Q     Okay.  Do you know Rick Finley in

23   any way to be a participant in the scheme that

24   you've described today?

25         A     No.
</pre>

95

                              Britto

1

2        Q     Do you know a -- was he asked to be

3    involved?

4        A     Not on my behalf, I mean.

5        Q     Okay. Did Mr. Adams ever indicate

6    that he was going to ask Mr. Finley to be

7    involved?

8        A     Not to my knowledge.

9        Q     Okay.  Have you ever heard of a

10   company called Sinai Wholesalers?

11       A     Yes.

12       Q     Are they involved in any way?

13       A     No.

14       Q     Okay. Are they a real company?

15       A     Yes.

16       Q     Did IFC do business with them?

17       A     Yes.

18       Q     Okay. As far as you know, every

19   shipment that came in from Sinai Wholesalers was a

20   real shipment?

21       A     Yes.  Even Nick Adler bought from

22   them, so.

23       Q     Did you ever find out any

24   information from any participant in the scheme to

25   indicate whether or not the Suns knowingly

96

1                           Britto

2     participated in creating fraudulent documents

3     suggesting merchandise had been sent from CCC?

4              A     Yes.

5              Q     To IFC?

6              A     Yes.

7              Q     Okay. Who gave you the substance of

8     that information first?

9              A     David Sun.

10             Q     David Sun.  What was the occasion of

11    your talking directly to David Sun where your

12    previous dealings had been either with Mike Brown

13    or through Dave Adams to Mike Brown?

14             A     Because Dave Adams was robbing.

15             Q     He was robbing you?

16             A     Yes.

17             Q     So when he was robbing you, you took

18    it into your own hands to contact David Sun?

19             A     Yes, because I controlled the

20    warehouse, which was the most important part.

21             Q     When you contacted David Sun what

22    was it in your conversation or conversations with

23    David Sun, to indicate to you that they were aware

24    that they were knowingly creating documents to

25    represent fictional shipments?

97

1                         Britto

2           A      I have no idea.

3           Q      But was that something that was

4     discussed?

5           A      Yes.

6           Q      Okay. Did you ever --

7           A      I was probably drunk at the time,

8     so --

9           Q      How did you obtain the information

10    that caused you to conclude that David Adams was

11    robbing you, as you've just put it?

12          A      Because the money wasn't coming in.

13          Q      And you knew that money should be

14    coming in because you were aware of the shipments

15    that came in that were really fictional?

16          A      Correct.

17          Q      Okay. Did you confront David Adams

18    about the fact that no money was coming in even

19    though shipments were?

20          A      Over the phone, yes.

21          Q      Now --

22          A      Several times.

23          Q      Okay.  And you would do it over the

24    phone because David Adams wasn't always in on a

25    daily basis at IFC, is that correct?

98

1                          Britto

2          A      Well, I was in New York.

3          Q      Okay.

4          A      He was in Massachusetts.

5          Q      So this occurred after you had

6    already left IFC?

7          A      Correct.

8          Q      Okay. What was David Adams'

9    explanation for --

10         A      Building 19's not paying their

11   bills.

12         Q      Okay.

13         A      Which they were.

14         Q      Okay. Now -- and the way you found

15   that out was by calling David Sun?

16         A      Paul Sun and Ron Mitchell.

17         Q      Okay. When you called and you spoke

18   to Paul Sun and found out that IFC or Building 19

19   was, in fact, paying their bills, did you ever

20   reconfront David Adams?

21         A      Ho, ho, ho, ho.

22         Q      And what basically did you say to

23   Adams and Adams say to you --

24         A      I'm not gonna say what I said.

25         Q      Okay, is that because it's harsh

99

```
 1                        Britto

 2   language?

 3        A     Yes.

 4        Q     Okay, taking away the colorful

 5   language for the moment, in essence, what did you

 6   say to Dave Adams about the fact that you've now

 7   learned that IFC had, in fact, paid bills that

 8   Dave Adams had claimed IFC had not paid?

 9        A     It was all colorful language.

10        Q     And what did Adams say upon your

11   acquainting him with your discovery that he had

12   lied to you?

13        A     He hung up.

14        Q     At that point what did you do?

15        A     Called him back and he didn't

16   answer.

17        Q     So you're still without the money?

18        A     Yup.

19        Q     What steps if any do you take to get

20   the money?

21        A     Then I called up Ron and the Suns

22   and said, look, this is what's gonna happen, you

23   don't give Dave the money anymore, it comes to me.

24        Q     And did Ron Mitchell send you money?

25        A     Yes.
```

100
1                    Britto

2        Q    Did Ron Mitchell ask you why the

3   change in circumstances that he no longer sent to

4   it to Dave?

5        A    Yes.  And I told him because if he

6   doesn't send it to me, the business stops -- I

7   controlled the warehouse, I could have stopped at

8   any point and that's what Dave knew.

9        Q    Okay. So you indicated therefore, to

10  Ron, that the business would stop if you didn't

11  get paid.  Did Ron understand from the

12  circumstances in your phone call that the business

13  that would stop would be the representation that a

14  shipment came in when, in fact, it was fictional?

15       A    No.

16       Q    What was it that Ron thought was

17  going to stop?

18       A    My commission.

19       Q    For actual shipments of rugs?

20       A    Yes.

21       Q    Okay. Had you had direct

22  communication with Ron before this time when you

23  called him?

24       A    No.

25       Q    Okay. How did you know that when you

1                          Britto

2      called Ron, Ron would know that you participated

3      in working for IFC in this regard in some way?

4          A      He didn't until I called.

5          Q      Okay.

6          A      I got the phone number from Tyrone,

7      because he had it in my Rolodex from my old

8      office.

9          Q      Okay. When you spoke to Ron about

10     this, did you receive any shipments from Ron

11     Mitchell, of money, after you spoke to him and

12     said, hey, you got to send me the money, not Dave

13     Adams, because I'm not getting paid and it's just

14     gonna stop?

15         A      Yes.  And let me go a little deeper.

16     I told him because he's screwing over the vendors.

17         Q      Who's the he?

18         A      Dave Adams.  He's screwing over the

19     vendors, I said now they're gonna to stop doing

20     business with us.  I basically bullshitted the

21     guy.

22         Q      So you lied to Ron Mitchell --

23         A      Yes.

24         Q      When you told him that Dave Adams

25     was basically screwing over the vendors?

102

1                        Britto

2          A     Yes.

3          Q     You had no information to indicate

4     that Dave Adams was, in fact, screwing over the

5     vendors?

6          A     There wasn't any vendors.

7          Q     Okay. So you knew, in fact, that

8     what you were saying was a lie?

9          A     Correct.

10          Q     Okay. And that lie was designed to

11     make Mr. Mitchell send you some money --

12          A     Believe what I was saying.

13          Q     Okay.  Now, you also called either

14     David or Paul Sun directly with pretty much the

15     same complaint, is that so?

16          A     Paul, I talked to Paul.

17          Q     Had you ever spoken to Paul Sun

18     before this moment?

19          A     I seen him one time in a Vegas show.

20          Q     When you saw him in the Vegas show,

21     did you ever discuss with him anything that made

22     Paul Sun aware that you were participating with

23     David Adams in a fraud in which CCC was also --

24          A     We weren't doing it then.

25          Q     Okay. So, how was it -- did you

103

1                              Britto

2    receive monies from CCC after calling Paul Sun?

3         A     Yes.

4         Q     Okay.  And would you receive checks

5    from CCC?

6         A     Yes.

7         Q     Did you also receive checks from Ron

8    Mitchell after you called to tell him that Dave

9    Adams was screwing over the vendors?

10        A     No, it was, actually got wired.

11        Q     Now -- You mean like trick money was

12   transferred in a wire transfer?

13        A     Um-hum.

14        Q     Okay. How would Ron Mitchell know

15   how much to send you after your conversation with

16   him?

17        A     I would tell him.

18        Q     So you would call him again and say

19   you got to send me X-amount of money?

20        A     Let me give you an example.

21              Because, now the number's not gonna

22   be correct, but I'm going to give you an example.

23   Let's say it's a 30,000-dollar shipment, cost

24   25,000 to convert the goods and buy them, the

25   other 5,000 is commission for me and Dave or Dave

104

```
 1                      Britto

 2   and myself, and the money they loaned, they get

 3   their interest.

 4          Q     Now, so, when that would happen, did

 5   Mr. Mitchell -- using the hypothetical for the

 6   moment, I'm not saying those are the real

 7   figures -- he would then receive a phone call from

 8   you that you're to send me a check for $5,000 less

 9   the commission?

10          A     Wire the money, right.

11          Q     Am I right that it would be less the

12   commission?

13          A     Yes.

14          Q     So let's assume the commission was

15   about a fifth of the total amount, you would then

16   get a wire transfer of $4,000, is that correct?

17   Yes?

18          A     No.

19          Q     On the hypothetical?

20          A     Once they paid the bill, then I

21   would get my commission.

22          Q     You mean once Building 19 would pay

23   the bill?

24          A     Correct.

25          Q     So what happened with regard to the
```

1                          Britto

2    commissions that you were supposed to get, the

3    monies you were supposed to get, that Dave Adams

4    had stiffed you on, that you didn't get?

5          A    Never got it.

6          Q    Okay. So those were lost until you

7    picked up the phone and arranged now that you were

8    to get payment instead of Dave Adams?

9          A    Yes.

10         Q    And when that happened did you ever

11   share any of those monies you received with Dave

12   Adams?

13         A    One time I did.

14         Q    But other than that you would keep

15   it and would you share any of those monies with

16   Tyrone Williams?

17         A    Yes.

18         Q    Okay. Now, did you ever share any of

19   those monies with Mike Brown?

20         A    A little bit.

21         Q    Okay. You would receive the check

22   from CCC, is that correct, after your conversation

23   with Paul Sun?

24         A    Um-hum.

25         Q    How would --

106

```
 1                       Britto
 2                 MR. KLEHM:  Is that a yes?
 3         Q     That's a yes?
 4         A     Yes.
 5         Q     Okay. How would Paul Sun know how
 6   much money he was to send you?
 7         A     Percentage breakdown.
 8         Q     So that would be on his own invoices
 9   that he sent out?
10         A     Um-hum.  Yes.
11         Q     Okay. How would you know that the
12   amount of money Paul Sun was sending you after you
13   had called to complain that Dave Adams was
14   stiffing you was an accurate amount, that you
15   weren't being gypped by CCC?
16         A     I trusted them.
17         Q     Did you ever share any of the monies
18   you received from CCC with Dave Adams?
19         A     I don't think so.
20         Q     Did you ever share any of the monies
21   that you received with Tyrone Williams?
22         A     Yes.
23         Q     From CCC?
24         A     Yes.
25         Q     And did you ever share any of those
```

107

1                         Britto

2    monies from CCC with, that you received from them

3    with Michael Brown?

4          A     Yes.

5          Q     Okay. Now, how would you determine

6    how much of the monies that came to you from CCC

7    should go to Tyrone Williams?

8          A     He would get so much on a key rec.

9          Q     Was that a flat sum?

10         A     Yeah.

11         Q     How much money was that?

12         A     1500.

13         Q     Per key rec?

14         A     Yes.

15         Q     And would that be on average of once

16   a month?

17         A     Yes.

18         Q     Okay. Would it be more often than

19   once a month?

20         A     Sometimes.

21         Q     And --

22         A     Sometimes it wouldn't -- sometimes

23   they were dry, there wouldn't be anything.  Back

24   to school, there was obviously more, that's our

25   busy season.

108

                             Britto

1

2        Q     How would you determine what amount

3   of the money you received from CCC should go to

4   Michael brown?

5        A     Whatever I felt like giving him.

6   For the longest time Dave was supposed to be

7   paying him, but he stiffed him.

8        Q     Okay.

9        A     So when I found that out I started

10  giving it, you know.

11       Q     So you found out that David Adams

12  was not only stiffing you, but he was stiffing

13  Michael Brown?

14       A     Correct.

15       Q     Do you have any knowledge as to

16  whether or not the period of time that Michael

17  Brown was being stiffed overlapped or was similar

18  to the period of time you were being stiffed?

19       A     No.

20       Q     Okay. Now, what percentage were you

21  getting from CCC?

22       A     22 percent, I believe it is.

23       Q     And that was for every shipment that

24  was fraudulent?

25       A     And the real ones.

109

1                          Britto

2          Q    Okay. 22 percent of what?

3          A    The total invoice.

4          Q    Okay.

5          A    On the real ones there wasn't much

6     to get, but.

7          Q    Okay. Now, with regard to the other

8     companies that caused fictional paperwork to come

9     into IFC on which they paid, was that also the

10    amount, 22 percent?

11         A    Yeah all three of them were CCC, I

12    mean.

13         Q    Did you ever discuss with David

14    Adams how he selected CCC to be the company that

15    should be sending in the bulk of the fictional

16    shipments?

17         A    No.

18         Q    Okay. Did -- were you ever at Dave

19    Adams' home?

20         A    One time.

21         Q    Okay. What were the circumstances

22    over that?--

23         A    I just happened to be into Building

24    store, I went by there.

25         Q    At the time that you complained to

110

1                       Britto

2   David Adams that you were being stiffed by him --

3          A      There was a lot of times.

4          Q      Well, on the various occasions that

5   you were complaining about it, did you live,

6   during that period of time, solely in New York?

7          A      No, Massachusetts.

8          Q      In Massachusetts was there ever a

9   time when you were angry enough with the way you

10  were being treated that you went over to his

11  house?

12         A      Oh, no, never.

13         Q      Never confronted him, okay.

14                Do you know whether or not in any

15  completely fraudulent shipment that CCC sent in,

16  when you or David Adams allegedly got 22 percent

17  of that, did CCC keep the other 78 percent?

18         A      Not to my knowledge.

19         Q      What -- do you know what happened to

20  the 78 percent, some or all of it?

21         A      I have no idea.  I know he stiffed

22  them, too, Dave Adams.

23         Q      And in what way did he stiff them?

24         A      He owed them like 35,000 or some

25  shit.

                                                            111
1                          Britto

2           Q     Okay. So, that was during a period

3     where CCC would pay David Adams up front, is that

4     correct?

5           A     I'm not sure what happened -- I

6     think he borrowed the money, actually.

7           Q     He borrowed money from CCC?

8           A     Yeah.

9           Q     And never paid it back?

10          A     Correct.

11          Q     Okay. Do you know the circumstances

12    of their borrowing, how it occurred?

13          A     Yeah, it was probably his gambling

14    problem.

15          Q     Do you know roughly when that

16    occurred?

17          A     2000 -- 2000.  Or 2001, one of those

18    two years.

19          Q     Have you ever had any conversation

20    with Michael Brown as to why he went along with

21    the scheme?

22          A     Not really.

23          Q     Have you ever had any conversation

24    with Tyrone Williams as to why he went along with

25    the scheme?

112

1                        Britto

2          A      Yeah, I probably forced him into it.

3          Q      Okay.

4          A      I mean, he's a man, he makes his own

5    decisions, but, I persuaded him.

6          Q      When, when did you first learn that

7    Mr. David Adams had a gambling problem?

8          A      Oh, I have no idea.

9          Q      Was it before he talked about this

10   scheme in which you and he could make some money?

11         A      I have no idea.

12         Q      But at some point you did learn that

13   he had that problem?

14         A      Yeah.

15         Q      Can you explain to us, if you know,

16   why after your phone call, Ronald Mitchell would

17   start sending money directly to you?

18         A      Cause I told him the business would

19   stop.

20         Q      But in the business that would stop,

21   he was putting up-front money, is that correct?

22         A      Correct.

23         Q      Do you know how much in actual

24   dollars the stoppage of business meant to

25   Mr. Mitchell?

113
```
 1                         Britto

 2          A       No idea.

 3          Q       How much money did Mr. Mitchell send

 4     you after you had this communication with him?

 5          A       No idea.

 6          Q       Are we talking about thousands?

 7          A       Yeah, definitely.

 8          Q       Okay. Are we talking about more than

 9     50,000?

10          A       Probably.

11          Q       Do you think we're talking about

12     more than a hundred thousand?

13          A       Maybe.

14          Q       And what percentage interest was

15     Mr. Mitchell getting for having loaned the money

16     up front to Mr. Adams?

17          A       That's between him and Dave, I have

18     no idea -- Dave Adams.

19          Q       Did you ever -- another water?

20          A       Thank you.  Should have put a mini

21     bar up in here.

22          Q       Did you ever, while you were working

23     for IFC, accompany David Adams on any buying trip?

24          A       One time, yes.

25          Q       Where did you go with David Adams?
```

114

1                        Britto

2          A     Georgia.

3          Q     And what company or companies did

4     you visit?

5          A     Burton, Georgia Rug Mills.  That was

6     it, actually.

7          Q     Were those legitimate transactions?

8          A     Yes.

9          Q     Let me ask you, in terms of your

10    background, how far did you go in education?

11         A     High school.

12         Q     Okay.  And what high school was

13    that?

14         A     New Bedford High School.

15         Q     Okay. Have you ever been a member of

16    the military?

17         A     No.

18         Q     Okay. And after New Bedford High

19    School did you get out when you were around 18,

20    19?

21         A     18.

22         Q     And what kind of experience did you

23    have in the rug buying business before you joined

24    IFC?

25         A     Nothing.

115

1                          Britto

2          Q      Okay. How did you obtain the job at

3    IFC?

4          A      Part time kid in school.

5          Q      So you worked for them in New

6    Bedford while you were going to school?

7          A      Yes.

8          Q      Okay.  And when you first came

9    aboard IFC in what capacity were you employed by

10   them?  Meaning what kind of work did you do when

11   you first came aboard?

12         A      Unloading trailers, you know,

13   tagging rugs.

14         Q      When you graduated did you continue

15   to work for IFC at that point?

16         A      Yes.

17         Q      Okay.  And when you continued to

18   work for them how long was it before you became a

19   buyer for IFC?

20         A      June of 1993 when Bill became the

21   president.

22         Q      So, by that point you'd been working

23   for them about how long?

24         A      Five years.

25         Q      During the five years what other

116

```
  1                        Britto
  2    positions did you have from unloading?
  3         A     Supervisor of the warehouse --
  4         Q     Okay.
  5         A     When I graduated.
  6         Q     Okay.  Now, did anyone teach you how
  7    to evaluate the rugs that you were buying when you
  8    first became a buyer?
  9         A     No.
 10         Q     Okay. Did you simply go out on your
 11    own to buy rugs?
 12         A     Well, Bill showed me a little bit,
 13    but I kind of got thrown out there.
 14         Q     Okay. And when Bill showed you a
 15    little bit, did he ever take you around to
 16    purchase rugs?
 17         A     Excuse me, I didn't --
 18         Q     When Bill showed you a little bit,
 19    did he ever take you around to purchase rugs?
 20         A     Never.
 21         Q     Okay. Did he simply sit down with
 22    you and point out the pluses and the minuses of
 23    buying rugs and --
 24         A     Yes.
 25         Q     -- how you should conduct yourself
```

117

```
 1                        Britto

 2    in that business?

 3         A     Yes.

 4         Q     And did he supervise your buying

 5    techniques and acquisitions when you first went

 6    out and did those?

 7         A     Yes.

 8         Q     How long did it take you before you

 9    felt you were proficient at acquiring rugs for

10    IFC?

11         A     I was proficient before I got the

12    buying job.

13         Q     And is that partially because you

14    were able to evaluate the worth of what was being

15    unloaded from the trucks?

16         A     Correct.

17         Q     Did you ever have discussions with

18    Mr. Elovitz or anyone else at IFC about whether

19    they were good merchandise they were getting in or

20    bad merchandise they were getting in?

21         A     Yes.

22         Q     Did you ever have any conversations

23    with Mr. Elovitz about merchandise being bad

24    enough that you didn't think it was sellable or

25    salable by any Building 19 outlet or IFC?
```

                                                                          118
 1                          Britto

 2          A     I'm not sure.

 3          Q     Okay. In any event, did you continue

 4    to get raises?

 5          A     Yes.

 6          Q     And when you left, at the conclusion

 7    of your first stay with IFC, did you make it known

 8    to Mr. Elovitz that one of the reasons you were

 9    leaving was to try to get rid of your addictions?

10          A     No, I let him know afterwards.

11          Q     How bad was your addiction at the

12    time you left to try to get rid of it?

13          A     Bad enough to leave a job that I

14    loved.

15          Q     And were there two different forms

16    of addiction, both Oxycontins and --

17          A     No, back then it was Percocets and

18    blues.

19          Q     Now, what is the state of your

20    health today with regard to the addiction that you

21    have and the alcohol problem that you have?

22          A     Well, the pills are gone.  I'm still

23    trying to get myself off the alcohol but, I get

24    anxiety, and I can't take anxiety pills because it

25    messes with the liver.  So I, drinking is the same

119

```
 1                      Britto
 2    thing, but, I'm still drinking, so.
 3           Q     Now, are you addicted to alcohol?
 4           A     Yes.
 5           Q     Has your addiction to alcohol,
 6    Percocets or Oxycontins affected your ability to
 7    think?
 8           A     Most likely.
 9           Q     Are you fully able to understand
10    what's going on here today?
11           A     Yes.
12           Q     Okay. Has it, any of those
13    addictions affected your ability to tell the truth
14    here today?
15           A     No.
16           Q     Have you had any alcohol in your
17    system today before you came here today?
18           A     Yes.
19           Q     Okay. And do you feel that
20    throughout your deposition at any time there was a
21    time when you were not fully sober for purposes of
22    taking the deposition?
23           A     Oh, I'm sober right now.
24           Q     Okay. How much alcohol did you have
25    today before you came to the deposition?
```

120

1                          Britto

2          A      Two drinks.

3          Q      And what is the nature of what you

4    drink, is it beer or wine or --

5          A      Whiskey.

6          Q      Whiskey. And when you say two

7    drinks, are we talking about a normal size drink

8    in a restaurant?

9          A      Yeah, like a (indicating).

10         Q      Okay. Have you had -- when did you

11   cease any ingestion of drugs for the purposes of

12   an addiction to drugs?

13         A      When I went to the hospital back in

14   July.

15         Q      So you haven't had any drugs since?

16         A      None, nope.

17         Q      Are you on any medications,

18   prescriptive medications?

19         A      Oh, a whole bunch.

20         Q      Okay. Do any of them affect your

21   ability to think?

22         A      Yes.

23         Q      Okay.  Can you tell us which

24   medicines you're on --

25         A      No.

121

1                          Britto

2          Q      -- that affect your ability to

3    think?

4          A      I...

5          Q      Okay.  Are any of them

6    antidepressant pills like Prozac or Celexa or

7    things of that nature?

8          A      Well, I used to take Ativan.

9          Q      And do any of those, to your

10   knowledge, impair your memory?

11         A      I think so.  I'm not sure.

12         Q      Have you ever discussed it with your

13   doctor?  Just yes or no to that.

14         A      No.

15         Q      Okay. Now, were there any writings

16   between David Adams and yourself at all that

17   relate to the fraudulent scheme that you've

18   described today?

19         A      Most likely.

20         Q      Do you still have any of those

21   writings in your possession?

22         A      Hell, no.

23         Q      Okay. What were the occasions, if

24   you could remember, under which the writings were

25   produced?

122

1                          Britto

2          A     Well, we would go over orders that

3     had to be placed.

4          Q     Okay.  And would you keep copies of

5     the ones that had to be placed?

6          A     Until it got shipped, correct.

7          Q     And where did you maintain those

8     when you kept them, was it at your home, or --

9          A     Yes.

10         Q     Okay. Did Mr. Adams also keep copies

11    of those?

12         A     I don't think so.

13         Q     Okay.  And at some time did you

14    cause those to be destroyed or?

15         A     Oh, definitely.  Get rid of the

16    evidence.

17         Q     And how would you get rid of them?

18         A     Garbage.

19         Q     Just rip them up and throw them

20    away?

21         A     When I had my house, I would put

22    them in the fireplace.

23         Q     Okay. Now, once the shipments would

24    be accomplished, meaning that IFC would have

25    okayed them or paid for them, why, at that point,

123
1                              Britto

2     would you destroy them?

3              A      There's no need for it.

4              Q      Did you find at a certain point that

5     you needed them to keep track of what Dave Adams

6     should be paying you?

7              A      No.

8              Q      Did -- when Ron Mitchell sent you

9     the monies, did he wire it to a particular bank

10    account?

11             A      Citizens.

12             Q      So did you give Mr. Mitchell a

13    specific bank number?

14             A      Well, obviously, if he --

15             Q      An account number?

16             A      Obviously, if he wired it, he needed

17    an account number.

18             Q      Was that account number in your

19    name, Kevin Britto?

20             A      Yes.

21             Q      Do you know how many wire transfers

22    were made?

23             A      I have no idea.

24             Q      Do you know the period of time over

25    which it was made?

124

```
 1                       Britto

 2          A     No idea.

 3          Q     Do you still have any bank records

 4   showing the deposits of those sums of money into

 5   your bank account?

 6          A     No, I don't.

 7          Q     Okay. Do you still have the bank

 8   account at Citizens Bank?

 9          A     No, I just closed it.

10          Q     Would you be willing to give us

11   permission, on appropriate documents, to secure

12   copies of the bank statements showing those

13   deposits in?

14          A     Yes.

15          Q     Okay.  Would you also be willing to

16   identify for us, if we sat down with those

17   documents, which ones you believed to have been

18   deposits made through wire transfers from

19   Mr. Mitchell?

20          A     Yes.

21          Q     Okay. Now, did you have or ever see

22   any documents concerning any loans from REM,

23   Remco, or Ron Mitchell or Jane Dziemit, to David

24   Adams?

25          A     I haven't seen anything, no.
```

                                                              125
1                              Britto

2          Q     Okay. Did Mr. Mitchell --

3          A     I'm aware of --

4          Q     You're aware of what?

5          A     -- a loan.

6          Q     Okay.  Through a writing?

7          A     I haven't seen it, but just.

8          Q     So somebody told you?

9          A     Yes.

10         Q     Okay.  Who told you of that loan?

11         A     Ron Mitchell.

12         Q     And when did he tell you of it?

13         A     I don't know.

14         Q     Was it before or after the State

15   Police came to visit you?

16         A     Before.

17         Q     Okay.

18         A     Way before.

19         Q     Was it before or after you called

20   Mr. Mitchell complaining that --

21         A     Before.

22         Q     -- Dave Adams stiffed you?

23         A     Before.

24         Q     Okay. What was it that occasioned

25   your having contact with Mr. Mitchell about a loan

126

1                          Britto

2    before you called to complain that Dave Adams was

3    stiffing you?

4            A     Because he needed money for a

5    bookie.

6            Q     Because Dave Adams needed money for

7    a bookie?

8            A     Yes, Dave Adams needed money for a

9    bookie.

10           Q     How did you know that Dave Adams

11   secured the money loan to pay off the gambling

12   debt from Mr. Mitchell as opposed to from someone

13   else?

14           A     Through fraudulent receivings.

15           Q     Well, you indicated that

16   Mr. Mitchell and you had discussed this, is that

17   correct, in a phone call before the State Police

18   ever called and before -- contacted you, and

19   before you called Mr. Mitchell to complain that

20   Dave Adams was stiffing you?

21           A     About the loan.

22           Q     Yes.

23           A     Yes.

24           Q     Okay. Can you tell us, as best as

25   you can recall, what the conversation was that you

127
Britto

1
2       had with Mr. Mitchell, what he said to you and

3       what you said to him about that loan?

4             A     I called him up, telling him about

5       Dave's stiffing, blah, blah, blah, you know,

6       vendors are calling up because he's not paying

7       'em, and then he said, yeah, Dave called up New

8       Year's Eve or January something, and he was

9       gamblin' and he asked for a loan, and I said yeah,

10      well, you're not gonna get that money back.

11            Q     When you say January, are we talking

12      about '05?

13            A     2000 or 2001.

14            Q     2000 to 2001, okay.

15            A     I believe, I'm not sure, but.

16            Q     Did you, in that conversation, make

17      Mr. Mitchell aware of the purpose of his loan,

18      namely to help David Adams defray his gambling

19      debt?

20            A     No.

21            Q     Okay. What was it that caused you

22      and Mr. Mitchell to discuss that Mr. Mitchell had

23      loaned money to David Adams?

24            A     Because I was pissed off at Dave and

25      he was too, cause he wasn't getting his money

128
1                        Britto

2     back.

3          Q     Okay. You wrote a letter to Bill

4     Elovitz about a couple of months ago, is that

5     correct?

6          A     Correct.

7          Q     And in that letter you indicated

8     that your liver was functioning approximately five

9     percent of capacity, is that correct?

10         A     Correct.

11         Q     Can you tell us what the state of

12    your health is today?

13         A     Well, once I get this over with, I'm

14    going to doctor, I'll find out even better then.

15         Q     Has any doctor and you -- just yes

16    or no to this -- discussed any prognosis for you

17    as to whether or not you can be restored to

18    completely good health?

19         A     Yes, a whole bunch of doctors.

20         Q     Okay. Has any doctor indicated to

21    you how long you've got to live or estimated your

22    life span?

23         A     No, but they want me to get a

24    transplant which is going to take six months, and

25    I don't have $100,000 to get a liver, so.  Plus, I

129

1                       Britto

2    don't want to put myself through that anyways.

3         Q     So have they indicated that if you

4    do not have a liver transplant you would be

5    shortening your own life?

6         A     Yes.

7         Q     Have they indicated how long without

8    a liver transplant?

9         A     Well, they said if I had one more

10   drink I'd be dead.  I've had plenty after that.

11        Q     Okay. So, in short, you've learned

12   that doctors are not always accurate?

13        A     Yes, just like lawyers aren't

14   either.

15        Q     Do you know whether or -- did Ron

16   Mitchell ever discuss with you that he thought

17   that all of the money that he'd sent to Dave Adams

18   was legitimate?

19        A     Yes.

20        Q     Did that include the loan that he

21   made on or about New Year's Eve?

22        A     That I have no idea.

23        Q     But in any event, from 2000, on,

24   based on your conversation with him, Mr. Mitchell

25   would have known that Mr. Adams was a gambler who

130

1                        Britto

2    borrowed money that he was unlikely to repay, is

3    that correct?

4          A     Yes.

5          Q     And you had that conversation with

6    Mr. Mitchell at a time when Mr. Mitchell was

7    commenting to --

8          A     It was 2002.

9          Q     -- commented to you that he hadn't

10   been paid monies that he was owed by Dave Adams?

11         A     Correct.

12         Q     Just as you told Mr. Mitchell you

13   weren't getting paid by Dave Adams what you were

14   supposed to be getting paid?

15         A     Correct.

16         Q     Okay. Now, when he, Mr. Mitchell,

17   started sending you wire transfers, did he ask you

18   to sign any documents at all indicating that you

19   were getting paid monies?

20         A     No.

21         Q     Okay. Do you know from any

22   conversation you ever had with either Mr. Mitchell

23   or Mr. Adams that Mr. Mitchell told Mr. Adams that

24   he was now sending monies he otherwise would have

25   been sending to Mr. Adams to Mr. Britto, to you?

131

```
 1                        Britto
 2        A    Yes, I believe.
 3        Q    Okay.  Did Mr. Mitchell tell you
 4   that he had this conversation with Mr. Adams?
 5        A    Yes, I believe.
 6        Q    Okay.  How long after you spoke to
 7   Mr. Mitchell and complained that Dave Adams was
 8   stiffing you, had learned that Dave Adams was not
 9   paying back Mr. Mitchell, how long after that was
10   it when you had the conversation with Mr. Mitchell
11   where he informed you that he had told Adams that
12   he was now sending the money to you, not to
13   Mr. Adams?
14        A    I'm not sure.  Probably within 30
15   days.
16        Q    Did you ever have any conversations
17   with Dave Adams following that period of time that
18   you learned from Mr. Mitchell that Mitchell told
19   Adams, hey, I'm sending the money to Kevin Britto
20   now, I'm no longer giving it to you?
21        A    Say that again?
22        Q    Did you ever have any conversation
23   with David Adams after --
24        A    Yes.
25        Q    -- Mr. Mitchell told you that
```

132

                              Britto

1                             Britto

2    Mitchell said to Adams, hey, I'm sending the money

3    to Kevin Britto, I'm no longer sending it to you,

4    David Adams?

5         A    Yes.

6         Q    Okay. When you had that conversation

7    with David Adams, what was that conversation?

8         A    I'm not gonna say it on tape.

9         Q    Okay.  So, are we back to terrible

10   language again?

11        A    Yep.

12        Q    Okay. Did Mr. Adams --

13        A    I feel like I'm taking a fuckin'

14   test here.  Pardon my language, ladies.

15        Q    Is that what was said?

16        A    No, I'm saying this now, with all

17   these questions.

18        Q    Okay.  Did David Adams swear at you?

19        A    Well, probably.

20        Q    Okay. Did he indicate that he wanted

21   his share?

22        A    Yes.

23        Q    Okay. What did he say about that?

24        A    Oh, I cant'.

25        Q    You don't remember?

133

```
 1                        Britto

 2         A      No.

 3         Q      Did you send him any?

 4         A      Yeah.

 5         Q      Were you at all worried in your

 6   relationship with David Adams at this point that

 7   he might spill the beans and get you in trouble?

 8         A      Never.

 9         Q      Did David Adams ever express any

10   worry that when he was stiffing you, as you

11   accused him of, that you would go whistle to the

12   cops?

13         A      Yes.

14         Q      Okay.  Was that something you said

15   to him?

16         A      Yes.

17         Q      Okay.  And what did he say in

18   response?  Did he threaten you or try to talk you

19   out of it?

20         A      Oh, he's not gonna threaten me, but,

21   what exactly did he say.  Oh, if I go down, you're

22   going down.  I said, pardon my language, I don't

23   give a fuck.  Alls it may seem, my loyalty's to

24   Bill, not these other, people.

25         Q      Were you at all worried when you
```

134

1                          Britto

2      told Ron Mitchell to send you the money instead of

3      Adams that, Mr. Mitchell, who up to this point

4      thought that all the moneys that he was laying out

5      were legitimate, would suddenly think that it was

6      not legitimate?

7            A     No. I mean, I bullshitted him, I'll

8      admit it.

9            Q     Did Mr. Mitchell ever indicate to

10     you in this conversation that he thought this was

11     unusual or strange?

12           A     Yes.

13           Q     Okay. And --

14           A     And that's when the bullshit came

15     in.

16           Q     Well, can you explain to us what it

17     was that you said that eased his suspicions

18     sufficiently to have Mr. Mitchell send by wire

19     transfer, monies directly to you?

20           A     I said it earlier.

21           Q     Okay.  Now, at this time, did

22     Mr. Mitchell know that you were no longer

23     associated with IFC?

24           A     Yes.

25           Q     Okay.  Did Mr. Mitchell -- sorry.

135

1                          Britto

2    Did Mr. Adams ever indicate to you that he was

3    aware that you had spoken with Mr. Mitchell about

4    being stiffed by Dave Adams?

5          A     Yes.

6          Q     Okay. And was that one of the

7    unpleasant conversations that you mentioned

8    earlier?

9          A     Oh, yeah, there was plenty of 'em.

10         Q     Now, how soon after you had this

11   conversation with Mr. Mitchell whereby you tried

12   to persuade him that it was okay to send you a

13   wire transfer, did you receive your first wire

14   transfer?

15         A     No idea.

16         Q     Okay, and when you received it, did

17   you call to let Mr. Mitchell know that you

18   received it?

19         A     I believe so.

20         Q     Now, you indicated in earlier

21   conversation using a hypothetical, that it would

22   be roughly out of a 5,000-dollar transaction for

23   the shipment, it would be about $4,000, is that

24   correct, because he would be taking his commission

25   or interest?

136
```
 1                        Britto

 2          A      Oh, okay, yeah.

 3          Q      Is that right?

 4          A      Yes.

 5          Q      Now, do you have any memory of the

 6   first -- of the actual sum of money you received

 7   from Mr. Mitchell for wire transfer to you?

 8          A      No, I don't.

 9          Q      Okay. Did Mr. Mitchell ever call you

10   to find out whether you received it?

11          A      Yes.

12          Q      Okay. And had you, by the time he

13   called you, received it?

14          A      Sometimes yes, sometimes no.

15          Q      Did he ask you whether or not you

16   were going to be paying Dave Adams any money out

17   of it?

18          A      Maybe, I'm not sure.

19          Q      Did you pay Ron Mitchell back any

20   money for any of the loans?

21          A      No.

22          Q      So as far as you knew, Mr. Mitchell

23   suffered the loss of repayment when David Adams

24   didn't repay him, is that correct?

25          A      Correct, yes.
```

137

```
 1                          Britto

 2          Q     Okay. Did you ever discuss with Dave

 3    Adams whether or not Mr. Mitchell was going to get

 4    paid after he told you that he had, like you, been

 5    stiffed by Dave Adams?

 6          A     Yes.

 7          Q     And what did Adams say about that?

 8          A     He'll get paid.

 9          Q     Did you ask Adams how?

10          A     No.

11          Q     Okay. Did Mr. Mitchell ever contact

12    you seeking repayment of the loans?

13          A     I don't believe so.

14          Q     Did he ever in any conversation with

15    you ask you whether or not you could try to

16    prevail upon Dave Adams to repay it?

17          A     Probably, yes.

18          Q     Do you have a memory of that?  You

19    say probably, but it's important to know whether

20    you have some memory of it or no memory of it.

21          A     Most likely, because I'm an

22    aggressive person, so.

23          Q     Okay. Do you know a person by the

24    name of Debbie Meyers?

25          A     Accounts payable, right?
```

138
1                          Britto

2          Q     Yes.  Did you have any contact with

3    her about any of the fraudulent shipments?

4          A     No.

5          Q     Okay. Do you know whether or not she

6    ever had any suspicions that something was wrong?

7          A     I have no idea.

8          Q     Did she ever discuss with you or

9    hint with you that there were suspicions?

10         A     No.

11         Q     Did you ever have direct

12   conversation or communication with Debbie Meyers

13   in, within your job employment?

14         A     Yes.

15         Q     Okay. And what would be the nature

16   of the communications that you would have with

17   her?

18         A     Well, when I had to sign the

19   invoices, or if there was a key rec late, she

20   would call.

21         Q     So, under what --

22         A     Or if she needed a purchase order,

23   stuff like that.

24         Q     Now, on some of the slips that we

25   have seen there is language written to indicate

139
1                          Britto

2       that in order for her to take advantage of certain

3       discounts in a timely fashion, she needs the buyer

4       to sign off on the document.

5            A     Yes.

6            Q     Do you recall any such transactions

7       where she asked you to you sign off on such

8       documents?

9            A     Yes.

10           Q     Okay.  And did you do so?

11           A     Sometimes.

12           Q     Okay. Were there times when you did

13      not?

14           A     Yeah, because I didn't feel like

15      going to the main office.

16           Q     Okay. So in order to do that you

17      would have to come into the main office to sign?

18           A     Yes.

19           Q     How frequently would you have

20      contact with Debbie Meyers?

21           A     Only when there was a problem or I

22      had to go sign.  When I did advertising I used to

23      go home and sign all my paperwork.

24           Q     Did you have any discounts that were

25      added on to the paperwork relating to fraudulent

                                                              140
1                          Britto

2    shipments?

3          A     Yes.

4          Q     Okay. So, in order to make a

5    fraudulent shipment look like a legitimate

6    shipment you would sometimes tell the shipping

7    company to add in onto their paperwork 2 percent

8    discount if paid within ten days or something like

9    that?

10         A     Because it gets paid faster.

11         Q     Okay.

12                    MR. KRASNOO:  I notice it's

13               about --

14                    MR. PERES:  Yeah, it's 4:15

15               right now.

16                    MR. KRASNOO:  So why don't we

17               go off for a minute.

18                    THE VIDEOGRAPHER:  Time is now

19               4:17.  Off the record.

20                    (Brief recess.)

21                    THE VIDEOGRAPHER:  Time is now

22               4:19.  On the record.

23                    MR. KRASNOO:  Mr. Britto, you

24               have a right to review and sign your

25               deposition.  You have a right to give

141

1                          Britto

2              up that right to review and sign your

3              deposition.  Those rights entirely

4              belong to you.  They don't belong to

5              anyone else in this room.  If you do

6              agree to review and sign your

7              deposition, the following procedure

8              happens.  You're sent a copy of the

9              deposition by us, you would also have

10             what's called an errata page, an error

11             page.

12                  THE WITNESS:  Um-hum.

13                  MR. KRASNOO:  And that has

14             usually four columns on it.  It would

15             list the page of the deposition in

16             which the error occurs, the line in

17             the deposition in which the error

18             occurs, what the error is and how the

19             error should be corrected.  And that's

20             the information you would fill out as

21             you go through the deposition and

22             write it on the sheet of paper.

23                  THE WITNESS:  Okay.

24                  MR. KRASNOO:  You would then

25             sign that sheet of paper at the end

                                                      142
1                    Britto

2              which would indicate as well that you

3              have read and reviewed the entire

4              deposition and that these are the

5              changes that you feel are necessary to

6              make it more accurate.

7                    THE WITNESS:  Okay.

8                    MR. KRASNOO:  You can give up

9              that right to review and sign this

10             and, but you can also go through this

11             procedure.  If you do it, the normal

12             amount of time to get that

13             accomplished is sending it to you, you

14             would have 30 days from the date you

15             receive it to review it, to prepare

16             this errata sheet and to send this

17             errata sheet back to us along with

18             your signature on it.  We would not

19             need the copy of the deposition that

20             we've provided to you, we would send

21             that to you, because obviously it's

22             New York as opposed to Boston, or

23             Andover, where we are, and you're not

24             coming all the way over to Andover to

25             review and sign it.  So we can do

143

1                    Britto

2              that.  In the normal case, it can be

3              signed in the presence of a notary,

4              but if everyone here agrees, it can be

5              signed under the pains and penalties

6              of perjury so you don't have to go out

7              and seek a notary for the errata

8              sheet, you can merely sign it with

9              that on it, signed under the pains and

10             penalties of perjury, this blank day

11             of, let's say you got it in March,

12             March 2006, and then a signature line

13             for you.

14                    THE WITNESS:  Okay.

15                    MR. KRASNOO:  So I'd ask you

16             just to think about the way you want

17             to do it, let us know on Friday and I

18             would ask these gentlemen here as well

19             to think about whether or not signing

20             under the pains and penalties of

21             perjury is satisfactory to them or

22             whether or not they would insist upon

23             your signing before a notary, as they

24             can.  That's their right as well.

25                    THE WITNESS:  Um-hum.  I

144

```
 1                    Britto
 2          understand.
 3                    MR. KRASNOO:  Okay, with that
 4          I think the deposition is concluded
 5          for today, unless anyone wants to
 6          amend what I've said by way of the
 7          explanation on the errata sheet and
 8          signing.
 9                    Hearing no one who wants to,
10          this deposition is suspended for today
11          to be resumed on Friday, March 10th,
12          at 12 noon.
13                    THE VIDEOGRAPHER:  Time is now
14          4:22.  This marks the ending of tape
15          number two.  Off the record.
16                    (Whereupon, at 4:22 o'clock
17          p.m., the deposition was suspended.)
18                    (Mt. Sinai Discharge Plan and
19          Referral Form was marked as Deposition
20          Exhibit No. 1 for identification, as
21          of this date.)
22
23
24
25
```

145

1

2                          C A P T I O N

3

4     The Deposition of KEVIN BRITTO, taken in the

5     matter, on the date, and at the time and place set

6     out on the title page hereof.

7

8

9     It was requested that the deposition be taken by

10    the reporter and that same be reduced to

11    typewritten form.

12

13

14    It was agreed by and between counsel and the

15    parties that the Deponent will read and sign the

16    transcript of said deposition.

17

18

19

20

21

22

23

24

25

146

1

2                          C E R T I F I C A T E

3

4    STATE OF_____:

5    COUNTY/CITY OF_____:

6

7    Before me, this day, personally appeared

8    KEVIN BRITTO, who, being duly sworn, states

9    that the foregoing transcript of his/her

10   Deposition, taken in the matter, on the date, and

11   at the time and place set out on the title page

12   hereof, constitutes a true and accurate transcript

13   of said deposition.

14

15

16                    _____

                              KEVIN BRITTO
17

18

19   SUBSCRIBED and SWORN to before me this_____

20   day of _____, 2006, in the

21   jurisdiction aforesaid.

22

23

24   _____      _____

25   My Commission Expires            Notary Public

147

1

2                    DEPOSITION ERRATA SHEET

3    RE:
     FILE NO.
4    CASE CAPTION:    IFC   vs.   ADAMS, et al.

5    DEPONENT:  KEVIN BRITTO
     DEPOSITION DATE: 03/07/06
6
     To the Reporter:
7    I have read the entire transcript of my Deposition
     taken in the captioned matter or the same has been
8    read to me.  I request for the following changes
     be entered upon the record for the reasons
9    indicated.
     I have signed my name to the Errata Sheet and the
10   appropriate Certificate and authorize you to
     attach both to the original transcript.
11   _____
     _____
12   _____
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
     _____
22   _____
     _____
23   _____
     _____
24   SIGNATURE:_____ DATE:_____

25        KEVIN BRITTO

148

1

2                              I N D E X

3    Witness:        Direct

4    Kevin Britto   8

5

6

7                           E X H I B I T S

8
     Britto                  Description                 Page
9    For Ident.

10   1      Mt. Sinai Discharge Plan and Referral 140
            Form
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

149

1

2                         C E R T I F I C A T E

3    STATE OF NEW YORK  )

4                          ) ss.

5    COUNTY OF NEW YORK )

6                    I, Debra DiBenedetto, a

7                    Shorthand (Stenotype) Reporter and

8                    Notary Public of the State of New

9                    York, do hereby certify that the

10                   foregoing Deposition, of the witness,

11                   KEVIN BRITTO, taken at the time and

12                   place aforesaid, is a true and correct

13                   transcription of my shorthand notes.

14                    I further certify that I am

15                   neither counsel for nor related to any

16                   party to said action, nor in any wise

17                   interested in the result or outcome

18                   thereof.

19                    IN WITNESS WHEREOF, I have

20                   hereunto set my hand this 14th day of

21                   March, 2006.

22

23                   _____

24                        Debra DiBenedetto

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) ) ) | |
| Plaintiff | ) ) | Civil Action No. 05-11654-NMG |
| v. | ) ) ) | |
| DAVID W. ADAMS, TYRONE WILLIAMS, KEVIN BRITTO, RONALD MITCHELL, Individually and d/b/a MANSFIELD RUG DEPARTMENT and REMCO, MICHAEL E. BROWN, Individually and d/b/a DALTON PADDING and EMPIRE WEAVERS, JANE DZIEMIT, CHINESE CARPET CENTER, INC. DAVID D. SUN, and PAUL SUN, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) ) | |

**JANE DZIEMIT'S OPPOSITION TO PLAINTIFF'S MOTION
ON THE BRITTO DEPOSITION AND HER
REQUEST FOR COSTS AND ATTORNEY'S FEES**

Perhaps attempting to adhere to the old sports adage that the "best defense is a good offense," plaintiff International Floor Crafts, Inc. ("IFC" or "Building 19") has moved for an order of contempt and other so-called "appropriate relief" against deponent Kevin Britto for walking out of his deposition on March 10, 2006.  Among the relief that IFC seeks are (a) an order from this Massachusetts court to the United States Marshal Service that the marshals arrest Mr. Britto in New York, where he lives, and compel him to come to Boston for his continued deposition, and (b) an order compelling the impoverished Britto to pay everyone connected with

the deposition their travel expenses, attorney's fees, and costs. The plaintiff's motion seeks

relief as impractical as plaintiff's own actions here are inexplicable.

Not for a moment does Defendant Jane Dziemit condone the actions of Kevin Britto on

March 10, 2006. But Ms. Dziemit also cannot condone the actions of IFC, whose own failure to

take simple steps caused each client in this matter to spend thousands of dollars at a deposition

which is now in legal limbo. The true "fault" here lies not only with the dying, high school-

educated Mr. Britto, but rather also with plaintiff which failed to spend the <u>de minimus</u> amount

needed to subpoena Mr. Britto <u>in</u> New York <u>by</u> a New York court which would have then had

immediate physical jurisdiction over Mr. Britto. Because IFC failed to spend a very few dollars

to have a New York subpoena issued and served for Mr. Britto's deposition, well over ten

thousand dollars has been spent by the various parties and counsel in attendance at the Britto

deposition. <u>See</u> Fed. R. Civ. P. 30(g)(2).

Background Facts

The following facts are relevant to the instant motion:

1. Kevin Britto is a former employee of IFC. He stands accused by IFC of being a

central figure, if not <u>the</u> central figure, in an alleged conspiracy to bilk Building 19 out of

unspecified millions of dollars.

2. Although Britto was named as a defendant in this action, he made no appearance or

defense, and he was defaulted by the Court on or about November 18, 2005. Nonetheless, he has

freely talked with plaintiff's counsel on several occasions.[1] In January, the reason why Mr.

Britto has made no appearance or defense in this matter became apparent. He wrote to Bill

---

[1] Both plaintiff's counsel (in various papers filed with the Court) and the witness, at his deposition, noted that they had spoken on several occasions.

Elovitz, the president of IFC, to tell Mr. Elovitz that he had no money, was dying, and was sorry for what he had done.  See Attachment A.

3.  Because discovery has not yet begun in this case and Mr. Britto said he was dying, on January 24, 2006, plaintiff IFC sought permission to take Mr. Britto's deposition before the formal start of discovery.  The Court allowed the motion in an electronic order, without a written order saying precisely what the Court was allowing ("Electronic ORDER entered granting 128 Motion for leave to take videotaped deposition").  It is unclear whether this order was ever served on the defaulted Mr. Britto and, if so, whether he understood it.

4.  Rather than having Mr. Britto come to Boston, IFC chose to take the deposition in New York City, necessitating that all counsel (none of whom is from New York) travel to New York.  Rather than schedule the deposition for full days, plaintiff scheduled it for half days.  Rather than schedule the deposition for consecutive days, plaintiff scheduled it for a Tuesday afternoon and then a Friday afternoon, thereby requiring that, at a minimum, each counsel would have to make at least two complete roundtrips to New York (each round trip requiring at least seven hours of just travel time by train).  As to scheduling, IFC rejected Dziemit's counsel's suggestions that the deposition be in Boston and that it be scheduled for consecutive days.  See Attachment B.  IFC said that these decisions were made based upon their conversations with Mr. Britto.  At the deposition itself, Mr. Britto indicated that he had discussed the case both procedurally and substantively with IFC's counsel prior to the deposition.  It is unclear whether Mr. Britto had previously threatened not to appear at his deposition.[2]  If so, then IFC plainly had no conceivable excuse for failing to serve him with a local subpoena.

---

[2] By letters on March 13 and March 14, Ms. Dziemit's counsel asked IFC's counsel whether Mr. Britto had, at any time prior to his deposition, threatened not to appear.  See Attachments C(1) and C(2).  IFC has refused to respond to these questions, see Attachment C(3), leading defendants to believe that IFC's counsel was aware that there might be an issue at the deposition.

5.  Mr. Britto began the first day of his deposition by apologizing to three people, Mr. Elovitz, Mr. Mitchell, and Ms. Dziemit, each of whom he said he had deceived in the alleged conspiracy.  As to Mr. Elovitz, Mr. Britto admitted that he and several other trusted inside employees of IFC had perpetrated a conspiracy to issue false purchase orders and false delivery receipts for merchandise, which either was not delivered at all, or delivered in only lesser quantities.  As to Mr. Mitchell and Ms. Dziemit, Mr. Britto testified that he and his cohorts had similarly presented false purchase orders to Mr. Mitchell d/b/a REMCO.[3]  He and his co-conspirators told Mr. Mitchell, who acted as the broker for their sources, that they needed monies to buy the remnant carpets and convert[4] that carpet into area rugs for sale then by REMCO, as broker, to IFC.  Ms. Dziemit lent money to Mr. Mitchell, money that was supposed to be used to buy the remnant carpets.

6.  Despite sometimes confusing questions and misconstruction of his answers by IFC, Mr. Britto testified consistent with his apology.  He stated, unequivocally and on several occasions, that Ron Mitchell was told that Mr. Britto's sources were converting real carpet into real area rugs which IFC then ordered and which IFC then paid for when these supposedly real area rugs were delivered.  See, e.g., Britto Dep. Day 1, p. 100, 1.16-20.  In the colorful language of Mr. Britto, "I basically bullshitted the guy [Ron Mitchell]" and lied to him.  Britto Dep. Day 1, p.101, 1.9-23.  Repeatedly, Mr. Britto testified he had lied to Mr. Mitchell just as he had lied

---

[3] During Mr. Britto's deposition, IFC's counsel frequently misunderstood or confused Mr. Britto's answers. Nonetheless, a fair reading of the deposition testimony is as set forth herein.  Mr. Mitchell thought he was serving as a broker for suppliers that Adams and Britto had supposedly lined up.  Mr. Mitchell d/b/a Remco was to buy the goods that were converted (an industry term of art, not legal "conversion").   Mr. Mitchell borrowed from Dziemit to buy the goods and when IFC paid for the goods, Dziemit's loan was repaid and each of Mitchell, Adams and Britto were to receive small commissions.  Unbeknownst to Mr. Mitchell, there were no goods and Adams and Britto were simply pocketing the advance payments on the goods.

[4] Conversion is the cutting down of broadloom carpet, binding of it and creation of a bound remnant rug.  Britto Dep. Day 1, p. 40, 1.7-9.

to IFC and Mr. Elovitz. He testified he had never even talked with Jane Dziemit. As to other defendants, those who actually played a knowing role in the insiders' conspiracy, he testified bluntly regarding their respective roles.[5] Plaintiff submitted excerpts of the Britto deposition attached to its motion. Rather than pick and choose, Ms. Dziemit supplies the Court with the entire day one transcript at Attachment E. Ms. Dziemit has not yet been given the opportunity to cross-examine Mr. Britto and expressly reserves her right to do so.

7.     As is reflected in Ms. Dziemit's pending motion to dismiss and pending opposition to plaintiff's motion for a preliminary injunction, IFC had no proper basis on which to name Jane Dziemit in its complaint. When, in January, Mr. Britto wrote his apology letter to Mr. Elovitz, any good faith basis for continuing to include Ms. Dziemit in the sweep of this complaint disappeared because he exonerated her. See Attachment A. When Mr. Britto then testified regarding the details of his conspiracy - - testimony that IFC will undoubtedly rely upon to implicate the other defendants - - his testimony confirmed that there was no longer any good faith basis for including Ms. Dziemit in this complaint. See Attachment C.

8.     Obviously, Mr. Britto got increasingly frustrated during his deposition as he saw counsel for the plaintiff accept his testimony that damned certain defendants but misconstrue and misunderstand testimony that exonerated Mr. Mitchell or Ms. Dziemit or both. From his simple perspective, Mr. Britto was testifying to "right the wrongs" that he had committed while addicted to drugs and alcohol. To defense counsel's surprise,[6] on Friday, March 10, Mr. Britto said that

---

[5] Undoubtedly, IFC will be relying on this testimony as against almost all other defendants. Of course, these defendants have not yet had the opportunity to cross-examine Mr. Britto so his deposition cannot yet be used against them.

[6] It does not appear that IFC was surprised. See note 2 above.

he would not testify further unless IFC dismissed Defendants Mitchell and Dziemit from the litigation.  He walked out of the deposition when IFC refused to act.

9.      It bears repeating that Mr. Britto did not act at the behest of Ms. Dziemit.  He has never spoken to Jane Dziemit. Britto Dep. Day 1, pp. 62-63, 1.24-1.1, 1.9-1.18.   Unlike plaintiff's counsel, counsel for Ms. Dziemit has neither spoken to, nor communicated with, Mr. Britto except for such interaction that has occurred in the deposition room itself.  Ms. Dziemit does not condone Mr. Britto's actions, but her counsel certainly understands Mr. Britto's frustration at the pendency of a groundless claim against Ms. Dziemit, which plaintiff IFC should have dismissed voluntarily months ago.  See Attachments C(1) and C(2).

10.      For the purposes of this motion, however, what matters is that Mr. Britto was able to walk out of the deposition because IFC and its counsel did not take the inexpensive and rudimentary steps necessary to require him to testify.

11.      Surprisingly, and very troubling, IFC refused to take up Mr. Britto on his offer to complete his deposition.  See Attachment D at Rule 7.1 Certification ("Britto stated, among other things, that he had left a telephone message for IFC's president offering to proceed with the deposition").  Rather than come to some agreement with Mr. Britto about completing his deposition to preserve his testimony, IFC resorts to avoidable motion practice.

<u>Argument</u>

**Because IFC failed to subpoena Mr. Britto for his deposition,
IFC, rather than the impoverished Mr. Britto, owes each other
party its costs, fees, and expenses for the second day of his deposition.**

Rule 45 provides an easy mechanism for commanding any "person" to attend and give testimony (and/or produce documents).  Fed. R. Civ. P. 45 (a)(1)(C) and 45(a)(2)(B).  For a deposition, the subpoena is to issue from the district court "for the district where the deposition is

to be taken." Fed. R. Civ. P. 45(a)(2)(B). If a witness fails to attend (or walks out of a deposition) because he has not been subpoenaed, then the party noticing the deposition may be ordered to pay the costs, attorney's fees and expenses of those parties who attended the deposition. Fed. R. Civ. P. 30(g)(2).

Rule 45 does <u>not</u> make any distinction in its text between depositions of parties and non-parties. Either may be commanded by subpoena. Fed. R. Civ. P. 45(a)(1)(C). Typically, one does not <u>need</u> to subpoena an actual party to attend his own deposition because the potential sanctions of Rule 37, typically, are sufficient to ensure that a party will, in fact, attend his own deposition. <u>See</u>, <u>e.g.</u>, <u>Diebold v. Record Files, Inc.</u>, 11 F.R.D. 543 (N.D. Ohio 1951). There do arise, however, situations in which a party's deposition should be initiated by subpoena rather than simply by a notice. This case is one of those situations.

It is only logical that the deposition of a party must be initiated by subpoena when the potential sanctions of Rule 37 have no real force. <u>Id.</u> That is the case here. The most serious sanction available against a defendant under Rule 37 is the entry of a default judgment against that defendant. <u>E.g.</u> Fed. R. Civ. P. 37(b)(2)(c). Here, the impoverished Mr. Britto has <u>already</u> had default entered against him. Perforce, the entry of a default judgment or the award of a monetary sanction <u>against an impoverished, non-appearing party who is dying</u> will do little to compel him to attend his deposition. Indeed, in this case, it is not even apparent whether this Court merely <u>permitted</u> Mr. Britto's deposition or whether this Court intended to <u>compel</u> his deposition. Nor is it apparent whether Mr. Britto received the Court's electronic order or could have understood it. Mr. Britto clearly acted as though he was appearing voluntarily.

By contrast, if IFC had served a subpoena issued from the district court in New York City, as was freely available under Fed. R. Civ. P. 45(a)(3)(b), then all counsels' trips to New

7

York would not have been in vain.  Mr. Britto would have been under unequivocal command to appear and testify by a New York federal court which had undeniable personal jurisdiction over him and could have employed all the powers of the contempt sanction against someone physically located in its district.  Fed. R. Civ. P. 45(e).

Indeed, the issuance of a subpoena from the district court in New York <u>remains</u> a current option open to IFC.  Rather than filing <u>this</u> motion, for the cost of a blank subpoena from the New York federal court and the fees of a process server, IFC could have already served Mr. Britto with the previously omitted subpoena and saved all parties the time and trouble of this motion.  (Indeed, given that Ms. Dziemit's request for her attorney's fees was made on March 14, 2006, <u>see</u> Attachment C, it seems that IFC's motion on March 16 is, in part, an attempt to deflect the Court's attention from IFC's own failure to act.)

In this situation, rather than the extraordinary and utterly impractical relief IFC seeks, this Court ought to order (1) IFC to proceed by subpoena issued by the New York federal district court, and (2) IFC to pay each attending party's deposition costs, attorney's fees and expenses for the aborted March 10 deposition of Mr. Britto for failure to previously subpoena Mr. Britto.[7]

---

[7] Given the options available to IFC, including Mr. Britto's offer to complete his deposition, it is baffling that IFC has chosen this current route.  The message that IFC sends is that it recognizes its own errors and is looking quickly to shift the blame (and payment of costs and fees) to another.  By asking this Court to hold Mr. Britto (an already defaulted party) in contempt, IFC hopes to create a distraction from the question of whether the other parties are entitled to their costs and fees <u>from IFC</u>.

Respectfully submitted,

JANE DZIEMIT
By her attorneys,

s/Richard J. Yurko/

Richard J. Yurko (BBO#538300)
YURKO, SALVESEN & REMZ, P.C.
One Washington Mall, 11th Floor
Boston, MA 02108
(617) 723-6900

Dated:  March 30, 2006

## <u>Certificate of Service</u>

The undersigned counsel hereby certifies that he has caused a copy of the above Notice to be served on each counsel of record via this Court's ECF filing system and by mail on counsel not registered with the ECF system.

s/Matthew C. Welnicki/
s/Richard J. Yurko/
_____