UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR　　　　　)
CRAFTS, INC.,　　　　　　　　　)
　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　) CIVIL ACTION NO. 05CA11654-NMG
　　　　　　　　　　　　　　　)
DAVID W. ADAMS, *et al.,*　　　　)
　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.　　　This an action which stems from a long-term scheme involving three (3) IFC former employees/agents, defendants David Adams, Tyrone Williams and Kevin Britto to defraud and steal money from plaintiff IFC.  Amended Complaint, ¶¶ 38, 40 and 66.[1]

2.　　　This long-term scheme involving the insiders and manufacturers' representatives to mainly non-existent companies who conspired to defraud IFC by preparing fabricated purchase orders and fictitious shipping documents in order to cause IFC to make thousands of dollars of payments at a time to illusory companies for non-existent merchandize spanned a period of at least eight years. Amended Complaint ¶1.

3.　　　Defendant Jane Dziemit is a 50 year-old homemaker and mother of two children, ages 15 and 11, who lives in California with the children's father,

---

[1] During this litigation Defendant Adams has taken the 5th Amendment concerning answering questions under oath.  Defendant Williams has failed to defend the action.  Defendant Britto is deceased, but admitted to his part in the scheme during deposition testimony preceding his death.  Additionally, the Original Complaint in this action was verified by IFC controller William Gemme and those allegations remained unchanged in the Amended Complaint.

Tony Maresca.  Affidavit of Jane Dziemit, attached hereto as Exhibit 1 and incorporated herein by reference. Exhibit 1, ¶1.

4.      In or about 1999, Dziemit was approached by family friend and co-defendant Ronald Mitchell for a loan to help him expand his carpet and floor covering business.  Exhibit 1, ¶5.

5.      Mitchell had been in the carpet cushion business for more than thirty (30) years.  Affidavit of Ronald Mitchell, attached hereto as Exhibit 2 and incorporated herein by reference. Exhibit 2, ¶3.

6.      Previous to Mitchell approaching Dziemit, Dziemit had been involved in the at home business of making real estate loans, which allowed her to earn money at home while raising her children.  Exhibit 1, ¶6.

7.      Mitchell, who previously worked for a company called Crest Foam, became an independent sales agent of padding when Crest Foam was purchased. Mitchell began using the name "Remco" as the name of his sales agency and was working with as many as ten sales representatives.  Exhibit 2, ¶4.

8.      In approximately late 1998 one of Mitchell's customers suggested he contact David Adams, who worked as an independent representative for a company called Building 19, which was later determined to be plaintiff, IFC.

9.      Sometime later Mitchell spoke to Adams who confirmed he was an independent sales representative for IFC.  Adams explained that he would find "good deals" on rugs from various suppliers, sell them to IFC and receive commission from the supplier providing the material.  Adams also stated that

even though he was not an employee for IFC, he could write purchase orders himself. Exhibit 2, ¶5.

10.   Shortly thereafter, Adams agreed to purchase padding from Mitchell through his supplier, North Carolina Foam, who shipped and billed the material and paid Mitchell the commission, for which he gave a portion to Adams.  Exhibit 2, ¶6.

11.   After several months of this relationship, Adams approached Mitchell and asked if he was interested in expanding his business.  Adams told Mitchell that he needed capital to pay suppliers in advance, for merchandise at lower prices, which he could then resell to IFC.  Adams stated that if Mitchell was interested, advance funds would be sent to the suppliers, and Mitchell could then bill IFC through his company.  Once IFC paid Mitchell on the invoice, the profits could be split. Exhibit 2, ¶7.

12.   Since Mitchell did not have the capital himself he approached friends of his Dziemit and Maresca.  Mitchell knew Dziemit was in the mortgage lending business.  Mitchell explained the concept to Dziemit and Maresca, and Dziemit agreed to finance the project with a percentage of the profits going to her.  Exhibit 2, ¶8.

13.   Previous to beginning the relationship, Adams met Dziemit, Mitchell and Maresca at a Building 19 outlet in Rhode Island.   The purpose of the meeting was to show Dziemit the type of rugs for which she was lending money.  At no time during this meeting were there any conversations, agreements or

agreements to conspire to defraud IFC amongst the participants.  Exhibit 2, ¶9.

14. The first several orders were purchased through CCC International of Lorton, Virginia.  Remco checks were forwarded to that company in advance as per IFC purchase orders, Remco then billed IFC and IFC forwarded payments to Remco.  Exhibit 2, ¶10.

15. In early 2000, Adams approached Mitchell and told him he was using some new suppliers and that instead of advancing funds to the suppliers, Mitchell could send the money directly to Adams.  Adams told Mitchell that he did not want Mitchell to know who the new suppliers were, because then Mitchell would not need Adams. Exhibit 2, ¶11.

16. Dziemit continue to advance funds to Mitchell for approximately two years, but then informed him she did not want to do it anymore.  Dziemit made a few more loans in 2002 and 2003, but by the end of 2003, Dziemit stopped advancing funds to Mitchell/Remco.  Exhibit 1, ¶12 and Exhibit 2, ¶12.

17. At no time between 1999 and 2004 did Mitchell have any agreement with Dziemit or any other person or entity to defraud or conspire to defraud IFC. Between 1999 and 2003 neither Mitchell nor Dziemit had any knowledge of any scheme or plan to defraud IFC in any way.  Exhibit 2, ¶14.

18. Dziemit only met Adams one other time in order to loan him money which was secured by Adams' property.   In both meetings with Adams there were absolutely no conversations or agreements amongst the persons present to agree or conspire to defraud IFC.  Exhibit 1, ¶14.

19.    Dziemit has never met, nor ever spoken to co-defendant and IFC employee

Tyrone Williams, so she could not have agreed or conspired with him to

defraud IFC.  Exhibit 1, ¶15.

20.    Dziemit has never met, nor ever spoken to co-defendant and IFC employee

Kevin Britto, so she could not have agreed or conspired with him to defraud

IFC. Exhibit 1, ¶16.

21.    Kevin Britto never spoke to Dziemit, and he only knew her through

paperwork.  All fraudulent acts were done without Remco's knowledge.

Deposition of Kevin Britto, attached hereto as Exhibit 3 and incorporated by

reference.  Exhibit 3, pp. 62, l. 17- p.64, l. 11.

22.    Until the lawsuit was initiated, Dziemit was unaware that co-defendant

Ronald Mitchell ever operated another business known as Mansfield Rug, so

she could not have conspired with that company to defraud IFC. Exhibit 1,

¶17.

23.    Dziemit has never met nor ever spoken to co-defendant Michael Brown, nor

did Dziemit ever have any contact with Dalton Padding or Empire Weavers at

any time, so she could not have agreed or conspired with Brown or either of

those companies to defraud IFC. Exhibit 1, ¶18.

24.    Dziemit has never met or had any conversations with co-defendants John,

David or Paul Sun nor did I have any direct contact with CCC International,

Inc., except Dziemit did see five or six invoices from CCC, International.

Dziemit also forwarded approximately four checks to CCC per Mitchell's

instructions.   Hence, Dziemit could not have agreed or conspired with the Suns or CCC to defraud IFC. Exhibit 1, ¶19.

25.     Dziemit has never signed or generated any purchase orders from IFC for the purpose of buying goods.  Dziemit has never signed or generated a document called a "key req" which IFC's warehouse people, of which Williams was one, sign to inform accounts payable that the merchandise was received. Exhibit 1, ¶21.  Deposition of William Gemme which is attached as Exhibit 4 and incorporated herein by reference. Exhibit 4, p. 16, l.7-10 and p. 18, l. 6- p. 19, l. 14.

26.     Dziemit had no knowledge that the purchase orders generated by IFC were fraudulent or fake. Exhibit 4, p. 77, l. 23-p.78, l. 3.

27.     The scheme to defraud IFC began as early as 1995 and went undetected by the company for almost ten (10) years. Deposition of William Elovitz which is attached hereto as Exhibit 5 and incorporated herein by reference. Exhibit 5, p. 52, l.1-7.

28.     Dziemit did not make the first loan on behalf of Remco until 1999.  Exhibit 1, ¶ 23.

29.     Dziemit had previously maintained a P.O. Box which she used to received checks from IFC payable to Remco. Exhibit 1, ¶24.

30.     Dziemit's and/or Maresca's name and/or number appeared on some purchase orders for Remco. Exhibit 1, ¶24 and Exhibit 4, p. 75, l.14- p. 76, l. 12.

31. Dziemit had the authority to endorse checks payable to Remco in order to secure quicker repayment of advances she made on behalf of Remco. Exhibit 1, ¶10.

32. Dziemit received a check from IFC via Federal Express when Mitchell was out of town. Mitchell arranged for IFC to send the check to Dziemit. Exhibit 1, ¶26.

33. Dziemit had the authority to sign checks on behalf of Remco and did sign some checks from the Remco account payable to Mitchell. Exhibit 1, ¶27.

34. Dziemit had no agreements or conversations with Mitchell wherein they agreed or conspired to defraud IFC. Dziemit thought that because all of the purchase orders were generated by long-term employees of IFC that the transactions were legitimate. Exhibit 1, ¶28.

35. For each and every check that Dziemit received from IFC, she believed the check to be legitimate, generated as a result of legitimate IFC internal documents and for legitimate transactions. Dzimeit deposited those checks in good faith and in reliance upon IFC employees that the transactions were, in fact, legitimate. Exhibit 1, ¶29.

36. Dziemit never generated, created or signed any IFC purchase orders, invoices, bills of lading or key reqs. The only funds that Dziemit ever received were checks IFC issued to Remco which was used to repay Dziemit's loans and pay her charges, interest and profit. Exhibit 1, ¶ 30.

37. Dziemit has never been in possession at any time of any telephones, facsimile machines, or other equipment that IFC owned.

38. IFC has been aware since as early as March 7, 2006 that Dziemit had no knowledge of the underlying scheme to defraud IFC and steal funds. Exhibit 3, p. 38, l. 13-20.

39. IFC never sued Diane Spignozzi, Mitchell's girlfriend, who was listed as a contact person on purchase orders for Mansfield Rug. Exhibit 4, p. 124, l. 13- p. 126, l. 24 and p. 130, l. 7.

40. Between 1999 and 2004, no one at IFC ever questioned Mitchell or Dziemit about a single shipment for rugs. Exhibit 4, p. 148, l. 10- p.149, l. 11.

41. Between 1999 and 2004, IFC never required bills of lading from trucking companies to be attached or affixed to IFC receiving documents (key reqs) in order to independently verify that merchandize was received. Deposition of John Durant, attached hereto as Exhibit 6 and incorporated by reference. Exhibit 6, p. 18, l. 16-23.

42. Previous to 2005 IFC had no policy that bills of lading were necessary in order to pay a suppliers invoice. Exhibit 6, pg. 21, l. 5-12.

43. IFC President, William Elovitz, does not know or cannot remember a single fact that supports an allegation that Dziemit had an agreement with any co-defendant to steal money from IFC. Exhibit 5, p. 90, l.1-p. 93, l. 24.

44. IFC President, William Elovitz, is unaware of any facts that support and allegation that Dziemit was involved in the portion of Remco's business where she would receive invoices from suppliers. Exhibit 5, p. 87, l. 10- p. 89, l. 15.

Respectfully submitted
Defendant, Jane Dziemit

By her Attorney,


/s/ Neil S. Cohen
Neil S. Cohen, Esq. (BBO#561173)
neilcohenlaw@yahoo.com
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108
(617) 367-0070


## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 14th day of March, 2008, the above document filed through the ECT system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and a paper copy will be sent this day to those indicated as non-registered participants by first class mail, postage prepaid.

/s/ Neil S. Cohen
Neil S. Cohen

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS


INTERNATIONAL FLOOR CRAFTS, INC. )
      Plaintiffs                 )
                                    )
v.                             ) CIVIL ACTION NO. 05CA11654-NMG
                                    )
DAVID W. ADAMS, *et al*        )
      Defendants             )


## **LIST OF EXHIBITS ATTACHED TO DEFENDANT, JANE DZIEMIT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**


**EXHIBIT 1** – Affidavit of Jane Dziemit

**EXHIBIT 2 –** Affidavit of Ronald Mitchell

**EXHIBIT 3 –** Relevant Excerpts from the Deposition of Kevin Britto

**EXHIBIT 4** - Relevant Excerpts from the Deposition of William Gemme

**EXHIBIT 5** - Relevant Excerpts from the Deposition of William Elovitz

**EXHIBIT 6** - Relevant Excerpts from the Deposition of John Durant


                     Respectfully submitted
                     Defendant, Jane Dziemit
                     By her Attorney,


                     /s/ Neil S. Cohen
                     Neil S. Cohen, Esq. (BBO#561173)
                     neilcohenlaw@yahoo.com
                     **NEIL S. COHEN, P.C.**
                     Eleven Beacon Street, Suite 625
                     Boston, MA 02108
                     (617) 367-0070

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | CIVIL ACTION NO. 05CA11654-NMG |
| DAVID W. ADAMS, *et al.,* | ) ) ) | |
| Defendants. | ) | |

**AFFIDAVIT OF JANE DZIEMIT IN SUPPORT OF HER
MOTION FOR SUMMARY JUDGMENT**

Defendant/Plaintiff in counterclaim, Jane Dziemit, does hereby state and depose

of her own personal knowledge the following:

1. I am a 50-year-old homemaker and mother of two children, ages 15 and 11,

living in California.

2. I grew up in Branford, Connecticut.  When I graduated high school in 1974, I

went to school in Massachusetts for two years.  I then obtained a position at IBM

on Boylston Street in Boston in 1978.  After that I moved to New York, where I

spent approximately 12 years working at various jobs and went to college.  I

graduated college and have a BBA in Marketing from Bernard Baruch College.

In 1990, I returned to Connecticut to be close to my godmother and cousins after

my marriage ended.  I moved to California in 2004.

3. I am executing this affidavit in support of my Motion for Summary Judgment

in the lawsuit IFC has filed against me for civil RICO (Racketeered-Influenced

and Corrupt Organizations Act), conspiracy to violate RICO, Conversion, Unfair and Deceptive Business Practices and Fraud.

4. Since the beginning of this lawsuit, I have maintained my innocence of the underlying scheme involving several IFC insiders and co-defendants, seeking to defraud IFC, namely David Adams, Kevin Britto and Tyrone Williams. Indeed, I have, to the best of my ability, tried to cooperate with IFC/Building 19 to get to the bottom of the underlying problem and explain my position.

5. In or about 1999 I was approached by family friend and co-defendant Ronald Mitchell for a loan to help him expand his carpet business. When I originally met Mr. Mitchell, he told me that he worked as the Sales Manager for a prominent manufacturer of padding and/or rugs called CrestFoam in New Jersey. He also stated that he had worked in the floor covering industry all his life. Sometime later, Mr. Mitchell told me that he was no longer an employee, and that he had become an independent representative or broker selling padding and rugs. He told me that when he acted as a broker, he operated under the trade name Remco, which I understood was a "d/b/a". Mr. Mitchell was a close, well respected, long time friend. I felt he was always straight forward and honest with me and my friends.

6. At that time, I processed real estate loans from my house, which allowed me to earn money at home to raise my children.

7. When Mr. Mitchell approached me for a loan, he told me that he was going to purchase carpets, rugs and related goods and then resell them at a profit to a chain of stores called Building 19 in Rhode Island and Massachusetts. By paying for

the carpet before delivery, he would be getting a better price for the carpet (discount). Previous to speaking with Mr. Mitchell, I had never heard of Building 19. I recall that Mr. Mitchell requested a loan of approximately $14,400.00 to buy rugs (his first purchase), which I paid to the supplier. At first, I was hesitant to loan money on a non-real estate transaction, but because Mr. Mitchell was a family friend for almost ten years, I agreed to make the loan.

8. Previous to making the initial loan in 1999, Mr. Mitchell, my boyfriend Tony Maresca and I met co-defendant David Adams at a Building 19 store, I believe in Rhode Island. Mr. Adams was introduced as an independent contractor who purchased carpet for IFC/Building 19. The meeting was brief, but Mr. Adams showed Mr. Mitchell and me rugs that would be purchased, so that I had an understanding of what kinds of goods I was lending money to buy.

9. When I made the first loan, I had Mr. Mitchell sign a promissory note. My memory is that I forwarded the money that I was lending directly to the supplier, which had a name of "CCC". Within a short time of making this initial loan I was told that the rugs had been delivered to IFC (Building 19). IFC was sent an invoice, which it paid, and my loan was paid back to me along with a charge and/or interest, and I returned the promissory note to Mr. Mitchell. Despite my best efforts I have been unable to locate a copy of this original promissory note.

10. Thereafter, Mr. Mitchell approached me to ask if I would lend him money on an ongoing basis to make other purchases for carpet, rugs, etc. Rather than asking for a series of promissory notes for these individual loans, my accountant advised me that I should make a loan based upon IFC Purchase Orders or similar

documents; he also suggested that when IFC forwarded checks to pay invoices sent from Mr. Mitchell, I should arrange to be reimbursed for the money I advanced, plus charge and/or profit for the loan. Mr. Mitchell would then disburse the balance. In order to simplify this arrangement, Mr. Mitchell gave me the authority to endorse checks, if necessary, payable to Remco. (Since Mr. Mitchell has had a series of heart problems, I wanted and needed to be protected.) I agreed to help Mr. Mitchell for a short term basis so he could get started in the business. I used my home equity line on my house to lend Mr. Mitchell money for carpet.

11. I advanced money to Mitchell/Remco based upon my receipt of IFC/Building 19 Purchase Orders generated and signed by IFC/Building 19 employees (often two separate employees). The Remco invoice for that purchase order specified that payment was to be sent to a post office box from which I could obtain the payment, if necessary. When the check or payment was received, my prior advance was paid along with my charges, profit and interest. For this reason, occasionally checks from IFC were paid directly into my personal account. The transactions were typically in the range of $20,000.00-$50,000.00. Typically, the amount Mitchell/Remco owed to me at any one time was $75,000.00 or less. There were also times when Mr. Mitchell asked to borrow money for carpet, and I refused. My intention was only to get Mr. Mitchell started in the business, and I preferred that orders were filled and my existing loans were reimbursed before I lent out additional funds.

12. The loans I made to Mitchell/Remco continued from approximately 1999 through 2001.  After 2001, I continued to make some occasional loans to Mr. Mitchell.  Mr. Mitchell would reimburse me himself for these small loans. IFC/Building 19 sent payments directly to Mr. Mitchell.  I understood that Mr. Mitchell lined up or was lining up other financing or using his own funds to buy carpet.  In 2003, my loans slowed to a trickle and stopped completely by the end of 2003.

13. Other than the one meeting I had with David Adams, described above, I had only met him one other time when Ron Mitchell borrowed money for carpet and the loan was secured with Mr. Adams' property.

14. In both meetings with David Adams there were absolutely no conversations or agreements amongst the persons present to agree or conspire to defraud IFC.

15. I have never met, nor ever spoke to co-defendant and IFC employee Tyrone Williams, so I could not have agreed or conspired with him to defraud IFC.

16. I have never met, nor ever spoke to co-defendant and IFC employee/consultant Kevin Britto so I could not have agreed or conspired with him to defraud IFC.

17. Until the lawsuit, I was unaware that co-defendant Ronald Mitchell ever operated another business known as Mansfield Rug, so I could not have agreed or conspired with that company to defraud IFC.

18. I never met or ever spoke to co-defendant Michael Brown, nor did I ever have

any contact with Dalton Padding or Empire Weavers at any time, so I could not have agreed or conspired with Mr. Brown or either of those companies to defraud IFC.

19. I never met or had any conversations with John, David or Paul Sun, nor did I have any direct contact with CCC International, Inc. except I did see five or six invoices from CCC which I may have paid directly when I first began lending money to Mr. Mitchell/Remco. Hence, I could not have agreed or conspired with the Suns or CCC to defraud IFC.

20. I have read the deposition of Kevin Britto taken shortly before he died and understand that he testified under oath that neither Mr. Mitchell nor I had any knowledge of any plan or scheme to conspire to defraud IFC. I am further aware that Mr. Britto originally refused to provide further testimony until Court Order until IFC dismissed Mr. Mitchell and me from this lawsuit. I understand that the President of IFC, testified that he could not confirm that Mr. Britto is deceased and I have attached a copy of the Notice of Apparent Death generated by Plaintiff's attorney and obituary as Exhibit A to confirm this fact.

21. I have never signed or generated any purchase orders from IFC for the purpose of buying goods. I have never signed or generated a document called a "key req" which IFC's warehouse people, of which Mr. Williams was one, sign to inform accounts payable that the merchandize was received.

22. I was present at the deposition of William Gemme, the IFC controller/real estate manager who was the investigator and individual who signed the Complaint for IFC against the defendants. During his deposition Mr. Gemme testified under

oath that the basis for IFC's Complaint against me were: that I signed checks for Remco, that I maintained a P.O. Box to receive Remco checks, that there were Purchase Orders which had my name or Tony Maresca's name as a contact person on them, that I deposited checks into various accounts, including my personal account, that I received one check via Federal Express to my personal address and that I signed Remco checks payable to Mr. Mitchell.

23. Mr. Gemme also testified under oath that his investigation revealed that the scheme to defraud IFC began as early as 1995, and yet went undetected by the company for almost ten (10) years, long before I ever heard of Building 19.

24. In addition to what I stated above, I already maintained a P.O. Box and thought it would be easier and more secure to have the payments from IFC to Remco sent to that box, so I could ensure that they would be deposited in a timely fashion and that I would be reimbursed for my advances.

25.  With regard to the purchase orders with either my or Tony's name on them, as I previously stated, we met with co-defendant and IFC buyer David Adams and he knew I was advancing money to Mr. Mitchell/Remco for the purpose of purchasing rugs and he, Kevin Britto or other IFC/Building 19 employees generated and signed almost all the purchase orders.  The other IFC employees (who we believe still work for IFC/Building 19) who also signed purchase orders have apparently been cleared of any wrongdoing. Furthermore, Mr. Gemme testified that even though Diane Spignosi, Mr. Mitchell's girlfriend, was listed on many purchase orders as contact person, she was never sued.

26. As I stated in my previous affidavit in support of my Motion to Dismiss, I received a check from IFC via Federal Express to my home at Mr. Mitchell's request because IFC had failed to make a timely payment and Mr. Mitchell was out of town.  He did not call me first to make sure it was okay to have the check delivered, but simply told me after-the-fact that it was coming.

27. With regard to checks drawn from Remco that I signed and paid to Mr. Mitchell, as I stated previously, I had the authority to endorse checks for Remco, so I could be repaid more quickly.  On those occasions, it is my recollection that after depositing a check from IFC, I would have signed checks from Remco to the others, including to Mr. Mitchell and perhaps myself.

28. Mr. Mitchell and I never had any agreement or conversations wherein we agreed or conspired to defraud IFC.  I thought, because all of the purchase orders were generated by long-term employees of IFC, that these transactions were legitimate.  I was told by Mr. Mitchell that IFC/Building 19 was very happy with the quality of rugs on which I had advanced money.  Indeed, I was told that Nick Adler, a buyer from IFC/Building 19 had called Mr. Mitchell to say how pleased he was with the carpet and that he wanted more of the same.

29. For each and every check I received from IFC, I believed the check to be legitimate, generated as a result of appropriate IFC internal documents, and for legitimate transactions.  When I deposited those IFC checks, I did so in good faith and relied upon IFC's employees that these transactions were, in fact, legitimate.

30. I never created or signed any purchase orders, invoices, bills of lading or key reqs owned by IFC.  The only funds that I ever received were checks IFC issued

to Remco that were used to repay loans I had made, plus my interest, charges and profit.

31. I have never been in possession of any telephones, facsimile machines or other equipment IFC owned at any time.

**SIGNED UNER THE PAINS AND PENALTIES OF PERWRY THIS <u>13th</u> DAY OF MARCH, 2008.**

**Jane Dziemit**

**Exhibit A**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS, INC. )
Plaintiff ))
v. ) CIVIL ACTION NO. 05CA11654-NMG
)
DAVID W. ADAMS, *et al* )
Defendants )

**SUGGESTION OF APPARENT DEATH**

Plaintiff hereby gives notice that it has obtained a copy of an obituary which, upon

information and belief, pertains to Defendant Kevin Britto. (*See* **Exhibit A**). Since Mr. Britto

acted *pro se* in the within matter, Plaintiff gives notice to the Court of Mr. Britto's apparent

death.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,

*/s/ Benjamin L. Falkner*
Paul J. Klehm (BBO#561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO#279300)
jkrasnoo@krasnooklehm.com
Benjamin L. Falkner (BBO#667951)
bfalkner@krasnooklehm.com
Krasnoo | Klehm LLP
23 Main Street, Suite Six
Andover, MA 01810
(978) 475-9955

**CERTIFICATE OF SERVICE**

I, Benjamin L. Falkner, Esq., hereby certify that I have served a copy of the within document upon all counsel of record and upon all parties not represented by counsel by first class

mail, postage pre-paid, on March 1, 2007. On March 1, 2007, I have also forwarded a copy of

the within document via first class mail, postage pre-paid, to Kevin Britto, 300 W. 21st Street,

Apartment #25, New York, NY.

*/s/ Benjamin L. Falkner*
Benjamin L. Falkner

Case 1:05-cv-11654-NMG Document 192 Filed 03/01/2007 Page 1 of 1

**Exhibit 2**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05CA11654-NMG |
| DAVID W. ADAMS, *et al.*, | ) ) | |
| Defendants. | ) | |

## <u>AFFIDAVIT OF RONALD MITCHELL</u>

Ronald Mitchell, having been duly sworn, does hereby state and depose of his own personal knowledge the following:

1. I am sixty-two years old.

2. I currently reside at 5 Mansfield Grove, #146, East Haven, Connecticut.

3. For more than thirty (30) years, I have been in the carpet cushion business. I was previously a self-employed sales representative for a company called North Carolina Foam for approximately fifteen (15) years. Previous to that, I was employed first as a sales representative and then as a sales manager for fifteen (15) years with a New Jersey Company called Crest Foam.

4. Crest Foam was ultimately purchased by a larger company and plants were consolidated and I was informed that I was no longer needed. Fortunately, it was an easy transition as I had a large following of customers. Ultimately, I had as many as ten sales representatives working through me. At that time I started using the name "Remco" as the name of my sales agency. I still use the name to this day.

2

5. In approximately late 1998, one of my customers told me that I should talk to a friend of his named David Adams, who worked as an independent representative for a company called "Building 19" (I later found out that the actual company name was International Floor Crafts, Inc. ["IFC"]). Sometime later, I spoke with Mr. Adams who confirmed he was an independent sales representative for IFC. He further explained that he would find "good deals" on rugs from various suppliers, sell them to IFC, and receive a commission from the supplier providing the material. He also stated that even though he was not an employee for IFC, he could write purchase orders himself.

6. Shortly thereafter, Mr. Adams agreed to purchase padding from me through my supplier, North Carolina Foam, who shipped and billed the material and paid me the commission. I paid Mr. Adams part of that commission.

7. After several months of this relationship, Mr. Adams approached me and asked if I was interested in expanding my business. He stated that he could buy carpet in advance from various suppliers at a much lower price and then resell the carpet to IFC. Previous to this suggestion, I had not billed customers as the suppliers had handled that end of the business. Mr. Adams explained that he did not have the capital and asked if I was interested in investing in this type of venture and then billing IFC from my company. My experience in the carpet business was that I knew carpet suppliers like to sell carpet by being paid before the carpet was shipped. I believed this scenario to be a win-win situation as the suppliers would be paid in advance, IFC was

3

getting the same price for better quality rugs, and Mr. Adams and I would be making a profit.

8.  Since I did not having the working capital myself, I contacted friends of mine named Tony Maresca and Jane Dziemit.  Ms. Dziemit was and I believe still is a mortgage broker.  After I explained the concept to them, Ms. Dziemit agreed to finance the project with a percentage of the profits going to her.  I signed a promissory note to guarantee any losses on her part.

9.  As I recall, Mr. Adams, Mr. Maresca, Ms. Dziemit and I met at Building 19 outlet in Rhode Island in approximately 1999.  The purpose of the meeting was to show Ms. Dziemit the types of rugs for which she was going to be lending money.  At no time during this meeting was there any conversation, agreement or agreement to conspire to defraud IFC amongst the participants.

10. The first order was for IFC purchase order number 4499, for which we sent a check to CCC International of Lorton, Virginia in the amount of $14,400.00, for 1000 grass carpet rugs.  We then billed IFC for $16,000 on Remco Invoice No. 25399.  We filled a second order similar to the first and sent a bank check to CCC International in the amount of $20,025 and billed IFC in the amount of $22,250.00 for 1600 grass carpet rugs.  The next few orders were similar, but larger amounts.  I believe all advance funds were sent to CCC International.

11. In early 2000, Mr. Adams approached me and told me that he was going to be using some new suppliers and that instead of advancing funds to the suppliers, I would send him the money and he would pay the suppliers directly.  I

*+h*

SIGNED LINER THE PAINS AND PENALTIES OF PERJURY THIS 6 DAY

thought this was odd since he would still have to send me a purchase order, but Mr. Adams explained that if he told me who the suppliers were I would not need him, so I agreed, having no reason to distrust him.

12. The arrangement worked well for about two years, at which time Ms. Dziemit informed me she did not wish to loan money anymore. I believe she made a few more loans during 2002 and 2003, but by the end of 2003, she made no more loans.

13. I believe I paid her back the last loan sometime in 2004.

14. At no time between 1999 and 2004, did I have any agreement with Ms. Dziemit or any other person or entity to defraud or conspire to defraud IFC. Between 1999 and 2003 neither I nor Ms. Dziemit had any knowledge of any scheme or plan to defraud IFC in any way.

15. Previous to Ms. Dziemit ending her loans to Remco or me, I had given her the authority to endorse on behalf of Remco to expedite and simplify repayment of her loans. Ms. Dziemit had a P.O. Box which she generously used to receive IFC checks during the period of time she was loaning money.

16. Between 1999 and 2003, I had no reason to distrust David Adams or his representations and had absolutely no reason to ever call a trucking company to confirm the delivery of merchandize since I never received a complaint from IFC concerning the goods. To the contrary, I received a number of praises concerning the quality of the rugs that were being delivered.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 6TH DAY

OF MARCH, 2008.

_____

Ronald Mitchell

"Subscri ed and swona to before me this      day of

_____ x8"

Notary Public

Date Commission Expires: _____

**M**y **Commission Expires
November 30, 2012**

1

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF MASSACHUSETTS

                                        x

INTERNATIONAL FLOOR CRAFTS, INC.,


            Plaintiff,

                                    CIVIL ACTION NO.

            -against-               05CA11654-NMG

DAVID W. ADAMS, et al.,

            Defendants.

                                        x



        VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by

Plaintiff at the offices of Fink & Carney Reporting and

Video Services, 39 West 37th Street, 6th Floor, New York,

New York 10018, on Tuesday, March 7, 2006 commencing at

1:30 p.m., before Debra DiBenedetto, a Shorthand

(Stenotype) Reporter and Notary Public within and for the

State of New York.

A P P E A R A N C E S :

KRASNOO KLEHM LLP
Attorneys for Plaintiff Terrace Level Suite One
Andover, Massachusetts 01810-3730

BY: JAMES B. KRASNOO, Esq., of Counsel PAUL J.
KLEHM, Esq., of Counsel

LAW FIRM OF ISAAC H. PERES Attorneys for Defendant
Adams 50 Congress Street, Suite 225 Boston,
Massachusetts 02109

BY: ISAAC H. PERES, Esq., of Counsel

YURKO, SALVESEN & REMZ, P.C.
Attorneys for Defendant Dziemit One Washington
Mall, 11th Floor Boston, Massachusetts 02108-2603

BY: RICHARD J. YURKO, Esq., of Counsel

LAW OFFICES OF FREDERICK D. GRANT, JR. Attorneys
for Defendant Mitchell 727 Atlantic avenue, Second
Floor Boston, Massachusetts 02111

BY: FREDERIC D. GRANT, JR., Esq., of Counsel

TROUT CACHERIS, PLLC
Attorneys for Defendants David and Paul Sun
1350 Connecticut Avenue, Northwest, Suite 300
Washington, D.C. 20036

BY: JOHN THORPE RICHARDS, Esq., of Counsel

A P P E A R A N C E S: (Cont'd)


            KELLY, LIBBY, HOOPES
                    Attorneys for Defendant Brown
                    175 Federal Street Boston,
                    Massachusetts 02110

            BY: SHARON LAHEY, Esq., of Counsel



ALSO PRESENT: John Durant William Gemme Ronald
                    Mitchell William Elovitz

Britto

A          That's one thing I don't know.

•          Okay.

A          I wasn't involved in that.

•          Did David Adams ever tell you in
passing in any conversation with you, any of the
steps he took to get it going?

A          Yeah, he said he talked to Mike
Brown.

•          Okay. Now, when you --

A          -- and he told me --

•          Go on.

A          Like with Ron Mitchell and Jane, who
are innocent, by the way, again. He met with Ron
and Tony, or Jane, and, Dave's a good bullshit
artist, he told me we're converting goods and Bill
contested this, he always wants the buyer to get new
vendors, so that's what Dave told them, I need new
vendors, I want to convert goods, so I can get Bill
off my back, and that's what happened.

•          Now, you mentioned the name Tony, for
the first time in your testimony. Who is Tony?

A          I think it's Jane's boyfriend or some
shit.

Britto                                          62

A       No, he wasn't.

•       Okay. And you would take then
shipments of. actual product and display them to Nick
Adler, telling him that those were the

product that allegedly were
            A       Correct.


•       Okay. Does that mean, therefore,
that  Remco  presented  bills  or  invoices  to  show
product  was  shipped  into  IFC  when,  in  fact,  no
product was shipped in?

            A       Without their knowledge, correct.

•       Okay. Now, could you explain to us
how Remco could create an invoice suggesting that
product was sent in to IFC without its knowledge
their product was never sent in to IFC?

            A       Yes. Because we told them, bullshit
them actually, that we didn't want them getting
involved, because we didn't want them to get involved
with the people we were buying the goods from, so they
couldn't steal our business.

•       So you were telling that to --

A       Ron Mitchell.

•  Did you ever tell that to Jane Dziemit?

A       I never talked on her.

•       Did you ever tell that to Tony?

A       Maybe, I'm not sure.

•       And Tony's last name, Marasca? A
Yep.

•       Does that refresh your recollection? A
Yep.

•       Now, you just stated a moment ago
that you had never talked to Jane Dziemit. How did
you come to know her name and her involvement with
Remco, if at all?

A       Paperwork.

•       So that was the first time you became
aware of the --

A       Her at all.

•       -- of the existence of Jane Dziemit? A
Yeah.

•       Did you ever have any discussion with
Ron Mitchell following receipt about paperwork down
to today about Jane Dziemit?

A       Yes.

•       Would you tell us as best you can
recall, what you said to Ron Mitchell and what Ron
Mitchell said to you about Jane Dziemit.

Britto

64

A      No, I just said Ron and Jane are innocent.

•      You said that to Ron?

A      Yes.

•      Okay.

A      Because they are. I'm trying to make the wrongs right.

•      What did Ron, if anything, say in response to your statement?

A      I can't remember.

•      Did -- do you know from any conversation at any time with Mr. Mitchell how much money Remco fronted -- if I can put it that way -- paid up front to David Adams?

A      (Witness nods).

•      How much money?

A      Well, if there was a $40,000 invoice, I guess it would have been like 22, 25,000.

•      So, so Mr. Mitchell then was to receive a percentage of the total amount of the invoice?

A      Um-hum.

•      As payment for having produced an

**Exhibit 4**

1

Volume I
Pages 1 to 244
Exhibits 1 - 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
INTERNATIONAL FLOOR CRAFTS,     :
INC.,                           :
              Plaintiff,        :
                                :  Civil Action
         vs.                    :  No. 05-11654-NMG
                                :
DAVID W. ADAMS, TYRONE          :
WILLIAMS, KEVIN BRITTO,         :
RONALD MITCHELL, Individually   :
and d/b/a MANSFIELD RUG         :
COMPANY a/k/a MANSFIELD RUG     :
DEPARTMENT and REMCO, MICHAEL   :
E. BROWN, Individually and      :
d/b/a DALTON PADDING and        :
EMPIRE WEAVERS, JANE DZIEMIT,   :
AGATHA ESPOSITO, DONALD         :
SHOOP, CCC INTERNATIONAL,       :
INC., JOHN D. SUN, DAVID D.     :
SUN and PAUL SUN,               :
              Defendants,       :
                                :
         - and -                :
                                :
LOWELL FIVE CENT SAVINGS        :
BANK, WACHOVIA BANK, NATIONAL   :
ASSOCIATION, f/k/a FIRST        :
UNION BANK OF VIRGINIA,         :
CITIZENS BANK, BANK OF          :
AMERICA f/k/a BANK OF BOSTON,   :
PEOPLE'S BANK and FIRST UNION   :
NATIONAL BANK,                  :
              Trustee Process   :
              Defendants.       :

- - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

DEPOSITION OF WILLIAM J. GEMME, a witness
called on behalf of the Defendant Jane Dziemit,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street, Suite
625, Boston, Massachusetts, on Monday, February 11,
2008, commencing at 11:08 a.m.

PRESENT:

    Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
        23 Main Street, Terrace Level, Suite One,
        Andover, MA  01810-3730, for the Plaintiff.

    Isaac H. Peres, Esq.
        92 State Street, Eighth Floor, Boston, MA
        02109, for the Defendant David W. Adams.

    Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
        Eleven Beacon Street, Suite 625, Boston, MA
        02108, for the Defendant Jane Dziemit.

    Also Present:  Jane Dziemit
                William Elovitz

16

1        Q.    We were talking about matching up paper

2    originally, and you started with the purchase order.

3    You match the purchase order, which is a document

4    issued by, we'll talk about, IFC when they make a

5    commitment to buy some merchandise, correct?

6        A.    I'm not sure I understood the question.

7        Q.    We started off talking about a purchase

8    order, which is a document that is generated by IFC,

9    correct?

10        A.    Yes.

11        Q.    And I believe what you testified to, and

12    you can correct me if I'm misstating, that document

13    is generated at the moment in time that IFC makes a

14    commitment to buy some merchandise?

15        A.    Usually it is, yes.

16        Q.    What other paperwork is involved other than

17    these purchase orders, sir?  I saw something about

18    key reqs.  Is that part of the paperwork we're

19    talking about?

20        A.    Paperwork in accounts payable?  Yes.

21        Q.    What are key reqs?  What are those?

22        A.    Key reqs are the document that the points

23    of receiving fill out showing when the merchandise

24    came in, what merchandise was received.

18

1      A.    And possibly if it's delivered at a

2  warehouse as well.

3      Q.    Okay.

4      A.    If there isn't an IFC employee filling out

5  a key req, it could be a Building 19 employee.

6      Q.    In this particular case, sir, with regard

7  to this lawsuit, were there any key reqs filled out

8  by people other than -- the allegations that are

9  made in this complaint that was filed, are you aware

10 of any people other than an IFC employee that filled

11 out a key req?

12     A.    Not pertaining to any of those shipments,

13 no.

14     Q.    That's what I'm talking about, sir.  And I

15 think I saw -- Tyrone Williams is one of the

16 Defendants in this case.  Was he the one who filled

17 out most of the key reqs?

18     A.    Yes.

19     Q.    Who else filled out key reqs other than Mr.

20 Williams?

21     A.    I believe Kevin Britto also filled out key

22 reqs.

23     Q.    Anyone else?

24     A.    Not in any of the key reqs that you're

19

1    referring to in the case.

2        Q.    I'm only referring, sir, right now -- I'm

3    not talking generally -- to this specific lawsuit.

4    There are allegations in this complaint -- in this

5    lawsuit that IFC purchased rugs and/or flooring that

6    were never delivered, correct?

7        A.    Correct.

8        Q.    And the key reqs signed off on those

9    particular orders that IFC claims it never got were

10   signed off on by either Mr. Williams or Mr. Britto,

11   correct?

12       A.    Correct.

13       Q.    No one else?

14       A.    Not to my knowledge.

15       Q.    You were involved in the investigation,

16   sir, were you not?

17       A.    Yes.

18       Q.    And you in fact verified this complaint

19   when it was filed, correct?

20       A.    Yes.

21       Q.    And you know what verification of a

22   complaint means, correct?

23       A.    You could explain.  I'm not completely sure

24   what you mean.

77

 1    that that person would have some knowledge of what

 2    was going on with those purchase orders.

 3        Q.   Why is that -- that's a presumption you're

 4    making, sir, is it not?  You presume that?

 5        A.   I am presuming that, because otherwise, why

 6    not have Ron Mitchell's phone number, which was on

 7    there for a period of time, or somebody who was at

 8    least aware of, if there is a phone call, and there

 9    are questions raised, that would have the

10    appropriate answers to those questions.

11        Q.   All right.  The problem I still have, sir,

12    is that these purchase orders that have this contact

13    information on them are generated by IFC, correct?

14        A.   Correct.

15        Q.   Mrs. Dziemit doesn't generate these

16    purchase orders, does she?

17        A.   No, she does not.

18        Q.   In fact, the information that would have

19    been filled out, okay, for the information part of

20    these purchase orders would have been done by IFC

21    employees, Britto, Adams, correct?

22        A.   Correct.

23        Q.   So you have no facts, sir, in that case

24    that support an allegation that Ms. Dziemit knew

78

1    that these purchase orders were fraudulent or fake,

2    do you?

3        A.   I have no fact that she knew, no.

4        Q.   And the reason that you have no fact to

5    support that is because these documents, the

6    purchase orders, as well as the key reqs, were

7    generated by IFC people, not Ms. Dziemit, correct?

8        A.   When you say that's the reason that I have

9    no facts, I mean -- I'm not sure that I understand

10   the question.

11       Q.   Okay.  I'll try to rephrase it, sir.

12            The reason that you say that you have no

13   facts to support the allegation that Ms. Dziemit

14   knew that this criminal enterprise was occurring was

15   because the purchase orders, which have this

16   information in them about who to contact, are not

17   generated by her, correct?

18            MR. KLEHM:  Objection.

19       A.   They are not generated by her, correct.

20       Q.   Her handwriting doesn't appear on the

21   purchase orders, does it?

22       A.   To the best of my knowledge, no.

23       Q.   Her handwriting or signature does not

24   appear on the key reqs, does it?

75

1   conclusion.  There are no documents that tell me

2   from a specific document that she knew, correct.

3      Q.   And I presume the documents to which you're

4   referring that lead you to conclude that she knew

5   about this criminal enterprise that was ongoing,

6   involving a number of IFC insiders, were these

7   checks that she signed on behalf of REMCO, correct?

8      A.   That's one of the documents, yes.

9      Q.   Well, there were several checks, correct?

10      A.   There were several checks, there were many

11   checks, yes.

12      Q.   That she signed on behalf REMCO?

13      A.   Correct.

14      Q.   What other documents are you -- I'm not

15   talking about the bill of lading that you referred

16   to in 2005.  I'm talking about between 1999 and

17   2004, what other documents, other than checks that

18   Ms. Dziemit signed on behalf REMCO, lead you to the

19   conclude that she knew there was a criminal

20   enterprise under way involving the insiders?

21      A.   One of the things that leads me to that is,

22   if you look at our purchase orders during that time,

23   purchase orders, generally there's an information

24   section of the purchase order that would give

76

1    information; contact information is one of the

2    things we asked our merchants to provide there.

3         During that time, 1999, 2000, probably

4    about halfway through 2000 and for all of 2001, the

5    name given -- well, even going back to '99, the name

6    given as a contact on the purchase order was Tony

7    Maresca.  The phone number beginning some point in

8    2000 and for all of 2001, which is when REMCO had

9    the greatest amount of volume that it was billing

10   for, the phone number given at that time for a

11   contact phone number was the phone number for Tony

12   Maresca and Jane Dziemit.

13        Now, those purchase orders are seen by the

14   merchandise manager, they're seen by Bill Elovitz,

15   they're seen by Jerry Ellis, who is treasurer of the

16   company.  One of the reasons they ask for

17   information on there is so that if a buyer wasn't

18   around or if there was a problem, they can go back

19   and they can at least have a contact person,

20   somebody they can call.

21        By having a phone number of your client on

22   there, that's one of the things that also leads me

23   to believe that if a phone call was made from the

24   president of the company or the merchandise manager,

124

```
 1                    AFTERNOON SESSION

 2    BY MR. COHEN:

 3       Q.   Sir, do you know who Diane Spinagassi is?

 4       A.   When I look at her name, I'm not sure of

 5    the pronunciation.  I thought it was Diane

 6    Spignozzi.

 7       Q.   Spignozzi.  So you are familiar with that

 8    name?

 9       A.   I'm familiar with the name, yes.

10            MR. COHEN:  Mark this.

11               (Document marked as Gemme

12                Exhibit 2 for identification)

13       Q.   Take a look at the document that we've

14    marked as Exhibit 2.  It is probably produced by

15    your counsel.

16            MR. KLEHM:  Do you have copies of the

17    exhibits?

18            MR. COHEN:  We can make them.

19       Q.   Have you had a chance to review Exhibit No.

20    2?

21       A.   Yes.

22       Q.   And that's a purchase order, isn't it?

23       A.   That's a copy of a purchase order, and it

24    looks like a little bit has been cut off, but, yes,
```

126

1     A.    "Order given by DA," it says, which at that

2  time would have been David Adams.

3     Q.    And this is a REMCO order, is it not?

4     A.    No.  This one is Mansfield Rug.

5     Q.    I'm sorry, Mansfield Rug.  And we've

6  already established that you're not aware of any

7  facts that support an allegation that Ms. Dziemit

8  had anything to do with Mansfield Rug, correct?

9     A.    Yes, as far as I know.

10    Q.    But Mansfield Rug was one of the fictitious

11 entities, was it not, that you claim defrauded IFC?

12    A.    Correct.

13    Q.    The contact person up there is listed as

14 who, sir?

15    A.    It says "Diane Spignozzi."

16    Q.    And what is the number associated with

17 Diane Spignozzi, the telephone number, sir?

18    A.    203-468-9544.

19    Q.    Did you ever call that number, sir, to

20 verify what number that was for?

21    A.    Yes.

22    Q.    And what number it was for?

23    A.    Ron Mitchell was the one that answered the

24 phone when I called that number.

130

```
 1   to sue her, did you?

 2       A.   If you're asking me whether I thought she

 3   was involved in the case?

 4       Q.   Yes.

 5       A.   I didn't have as much evidence on her being

 6   specifically involved other than some conversations

 7   with Mr. Mitchell and so forth, but...

 8       Q.   Well, remember back earlier in the

 9   deposition, you gave me five reasons that you felt

10   that Ms. Dziemit was involved in this scheme, right?

11       A.   Correct.

12       Q.   One of them is that she was listed as a

13   contact person on a purchase order; am I correct?

14       A.   Not that she was listed.  I don't believe

15   her name was listed as a contact person.

16       Q.   That's what you said, sir.  You said that

17   Ms. Dziemit was listed as a contact person on a

18   purchase order.

19            MR. KLEHM:  Objection.

20       A.   If that's what I said, then I'm not

21   correct.

22       Q.   Well, who was listed, then, sir?

23       A.   Tony Maresca was listed as a contact

24   person.  The phone number on there we believe to be
```

148

1    would think that he knew because when we requested,

2    IFC requested proof of deliveries, he didn't just

3    get the proper proof of deliveries, he made up

4    fraudulent proof of deliveries, which suggests to me

5    that he knew there was no proper proof of delivery.

6        Q.    At least in 2005, right?  At least in 2005?

7        A.    At least in 2005 and 2004, because he was

8    asked on 2004 as well.

9        Q.    When in 2004 was he asked?

10       A.    He wasn't asked in 2004.  In 2005 he was

11   asked to provide proof of delivery on some 2004

12   shipments.

13       Q.    So, in other words, he was not questioned

14   about any of his shipments between 1999 and 2004; am

15   I correct?  No one at IFC ever questioned him about

16   the shipments?

17       A.    Not that I'm aware of.

18       Q.    And obviously, if no one from IFC

19   questioned Mr. Mitchell about the shipments between

20   1999 and 2004, they certainly couldn't have

21   questioned Ms. Dziemit about any shipments between

22   1999 and 2004?

23          MR. KLEHM:  Hold on.  What's your question?

24   That's a statement.  Where is the question?

149

1    Q.    Did you understand my question, sir?

2          MR. KLEHM:  I'm going to object.

3    A.    I'm not sure what you're looking for for an

4    answer.

5    Q.    Okay.  Fine.  If no one questioned Mr.

6    Mitchell's shipments between 1999 and 2004 from IFC,

7    would it be fair to say that no one questioned Ms.

8    Dziemit about any shipments between 1999 and 2004?

9          MR. KLEHM:  Objection.  You can answer.

10   A.    To the best of my knowledge, nobody

11   questioned Ms. Dziemit during that period of time.

12   Q.    Sir, what facts are you aware of that there

13   was a specific agreement between Ms. Dziemit and Mr.

14   Britto to defraud IFC?

15   A.    The facts that I'm aware that there was an

16   agreement is the question?

17   Q.    Yes, sir.

18   A.    I think it's similar to the question that

19   you had on -- between Mr. Adams and Ms. Dziemit.

20   Q.    It would be the exact same question, in

21   fact.

22   A.    For this to work, there has to be collusion

23   between parties at IFC's warehouse, parties in IFC's

24   buyer's office, and outside parties that do billing

**Exhibit 5**

1

Volume I
Pages 1 to 121
Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
INTERNATIONAL FLOOR CRAFTS,     :
INC.,                           :
            Plaintiff,          :
                                :  Civil Action
        vs.                     :  No. 05-11654-NMG
                                :
DAVID W. ADAMS, TYRONE          :
WILLIAMS, KEVIN BRITTO,         :
RONALD MITCHELL, Individually   :
and d/b/a MANSFIELD RUG         :
COMPANY a/k/a MANSFIELD RUG     :
DEPARTMENT and REMCO, MICHAEL   :
E. BROWN, Individually and      :
d/b/a DALTON PADDING and        :
EMPIRE WEAVERS, JANE DZIEMIT,   :
AGATHA ESPOSITO, DONALD         :
SHOOP, CCC INTERNATIONAL,       :
INC., JOHN D. SUN, DAVID D.     :
SUN and PAUL SUN,               :
            Defendants,         :
                                :
        - and -                 :
                                :
LOWELL FIVE CENT SAVINGS        :
BANK, WACHOVIA BANK, NATIONAL   :
ASSOCIATION, f/k/a FIRST        :
UNION BANK OF VIRGINIA,         :
CITIZENS BANK, BANK OF          :
AMERICA f/k/a BANK OF BOSTON,   :
PEOPLE'S BANK and FIRST UNION   :
NATIONAL BANK,                  :
            Trustee Process     :
            Defendants.         :
                                :
- - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

           DEPOSITION OF WILLIAM D. ELOVITZ, a witness
called on behalf of the Defendant Jane Dziemit,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street, Suite
625, Boston, Massachusetts, on Wednesday, February
20, 2008, commencing at 2:07 p.m.

PRESENT:

     Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
          23 Main Street, Terrace Level, Suite One,
          Andover, MA  01810-3730, for the Plaintiff.

     Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
          Eleven Beacon Street, Suite 625, Boston, MA
          02108, for the Defendant Jane Dziemit.

52

1    Q.   As you understand, sir, as you sit here
2    today, are you aware of how long this scheme had
3    been occurring prior to August of 2005?
4    A.   I can only estimate, based upon that
5    original phone call that tipped me off, which I
6    think was about ten years ago, that it had been
7    going on for a long time.  Ten years.
8         MR. COHEN:  Let's take a break.
9         (Recess)
10   BY MR. COHEN:
11   Q.   I think where I left off, sir, I was trying
12   to figure out how this scheme was going on for so
13   many years without, you know, you or anyone else in
14   the company finding out about it.  How is that
15   possible?
16   A.   Because they were only stealing a little
17   bit at a time, and turning it up gradually, like
18   boiling a frog.
19   Q.   Did either Mr. Gemme or any one of the
20   other people ever do an analysis as to how much they
21   were stealing, say, back in '98 and then how much
22   they were stealing back in 2004?  Did you ever do
23   any kind of comparison?
24   A.   I don't know.

90

1     A.    No.

2     Q.    Did you ever review the spreadsheet that I

3  think Ms. Dziemit produced to counsel relative to

4  purchase orders and invoices that were sent to your

5  company, sir, and then checks that were then

6  generated as a result of those invoices?

7     A.    No.

8     Q.    Was that under Mr. Gemme's purview in terms

9  of his investigation?

10     A.    I don't know, but I think so.

11     Q.    Sir, are you aware of any facts that

12  support an allegation that Ms. Dziemit had an

13  agreement, either oral or written, with Mr. Dave

14  Adams to steal money from IFC?

15     A.    Am I aware of any facts?

16     Q.    Yes, sir.

17     A.    No.

18     Q.    Are you aware of any facts that support an

19  allegation that Ms. Dziemit had an agreement with

20  Mr. Britto to steal -- either oral or written

21  agreement with Mr. Britto to steal money from IFC?

22     A.    No, I'm not aware of that.

23     Q.    Are you aware of any facts that support an

24  allegation that Ms. Dziemit had an agreement, oral

91

1   or written, with Mr. Williams to steal money from

2   IFC?

3        A.   No, I'm not aware of those facts.

4        Q.   Do you know, sir, whether or not Ms.

5   Dziemit ever met Kevin Britto?

6        A.   No, I don't know.

7        Q.   Do you know whether or not Ms. Dziemit ever

8   met Mr. David Adams?

9        A.   No, I don't know.

10       Q.   Do you know whether or not Ms. Dziemit ever

11   met Tyrone Williams?

12       A.   No, I do not know that.

13       Q.   Do you know whether or not Ms. Dziemit had

14   any agreement with co-Defendant Michael Brown to

15   steal money from IFC?

16       A.   No, I don't know.

17       Q.   Are you aware of any facts that support

18   that she had an agreement with Mr. Michael Brown of

19   Dalton Padding to steal money from IFC?

20       A.   No, I'm not aware of that.

21       Q.   Do you know whether or not Ms. Dziemit --

22   are you aware of any facts that support an

23   allegation that Ms. Dziemit had an agreement, oral

24   or written, with -- let's go off the record for a

1  second.

2         (Discussion off the record)

3     Q.   Sir, are you aware of any agreements that

4  Ms. Dziemit had, oral or written, with either David

5  or Paul Sun to steal money from IFC?

6     A.   No, I am not.

7     Q.   And the same question with regard to CCC

8  International, Inc.  Are you aware whether or not

9  there are any facts that support that Ms. Dziemit

10 had an agreement, oral or otherwise, with CCC to

11 steal money from IFC?

12    A.   No, I am not.

13    Q.   Sir, does anyone in your company that works

14 underneath you that you've relied upon, to your

15 knowledge, have any facts that support allegations

16 that Ms. Dziemit had any kind of agreements with any

17 of the individuals or companies I just mentioned to

18 steal money from IFC?

19    A.   I believe they have facts.

20    Q.   Okay, but you haven't had a discussion with

21 them as to what facts they have?

22    A.   No, they have advised me that she is part

23 of the scheme, and I've relied upon that.

24    Q.   But they didn't tell you specifically what

93

1    facts they had to support their contention -- I'm

2    talking about the people that work underneath you

3    that you've been relying on --

4        A.   I don't remember what they've told me.

5        Q.   Sir, have you reviewed the deposition of

6    Kevin Britto?

7        A.   No, I have not.

8        Q.   If Mr. Britto testified in his deposition

9    that he became a buyer when you became the president

10   in 1993, is that inaccurate?

11       A.   I suppose that's true.

12       Q.   If Mr. Britto indicated that he first left

13   IFC in November, approximately November of 1997, do

14   you have any reason to doubt that?

15       A.   No.

16       Q.   If Mr. Britto testified that he was rehired

17   less than a year later, in September of 1998, would

18   you have any reason to quarrel with that?

19       A.   No.

20       Q.   And if Mr. Britto testified that he then

21   left again for the last time in 2001, would you have

22   any reason to quarrel with that, if he testified to

23   that?

24       A.   No.

1      A.    Yes.

2      Q.    I may have asked this, and if I did, I

3   apologize.  Sir, what facts are you aware of that

4   support an allegation against Ms. Dziemit that she

5   knew there were no invoices being sent from

6   suppliers to REMCO?

7      A.    I don't know what she knew.  I don't think

8   I've answered that question.  I don't know what she

9   knew.  I know that --

10     Q.    All I'm asking for is what facts you're

11  aware of, if any, that Ms. Dziemit knew that -- was

12  aware that there were no invoices coming from

13  suppliers to REMCO.

14     A.    We have asked for the documents to be

15  supplied to us, and they haven't been.  So I'm

16  taking that as a fact, that she knew there were no

17  documents.

18     Q.    Sir, what facts are you aware of that

19  support your belief that Ms. Dziemit would have

20  received any document -- any invoices from suppliers

21  herself?

22     A.    I haven't said that she would receive

23  invoices herself.

24     Q.    Sir, is the answer that you don't know of

88

```
1    any facts that Ms. Dziemit ever received any

2    invoices --

3         A.    Yes.

4         Q.    -- from suppliers?

5         A.    The answer is I don't know whether she

6    received any -- I don't have any facts that she

7    received any invoices from suppliers.

8         Q.    And isn't it true, sir, that there are no

9    facts that you're aware of that support a contention

10   that Ms. Dziemit handled that end of REMCO's

11   business, which was to receive invoices from

12   suppliers?

13        A.    Correct.

14     * Q.    And by that, sir, would you also agree with

15   me that you have no facts to support that Ms.

16   Dziemit ever had possession or control of any

17   invoices that would have been sent from suppliers to

18   REMCO?

19        A.    I'm sorry, would you repeat that.

20        Q.    I can't.

21              (* Question read)

22        A.    If there were no invoices, there would be

23   no facts that she had those.  I think that's a

24   negative --
```

89

```
 1      Q.    I think the question may be a little messed
 2   up.  Let me see if I can fix it.
 3           If you don't have any facts to support that
 4   she knew there should have been invoices, would it
 5   be logical, sir, that she wouldn't be in possession
 6   of any invoices that REMCO would have received from
 7   its suppliers?
 8      A.    Sorry, I got lost on that one.  Maybe --
 9      Q.    I think I can simplify it.
10      A.    Sorry.
11      Q.    It's okay.  I'm getting tired.
12           You have no facts, sir, that Ms. Dziemit
13   was ever in possession of any invoices from
14   suppliers to REMCO; is that fair to say?
15      A.    Correct.  Yes.
16      Q.    And you have no facts, sir, that Ms.
17   Dziemit has ever seen any invoices from suppliers to
18   REMCO?
19      A.    Correct.  From what we've asked, there are
20   no invoices from suppliers to REMCO.
21      Q.    I understand that's your position, sir.
22   That's fine.  You have answered the question.
23           Have you reviewed Ms. Dziemit's tax
24   returns?
```

**Exhibit 6**

1

Volume I
Pages 1 to 60
Exhibits 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
INTERNATIONAL FLOOR CRAFTS,      :
INC.,                            :
            Plaintiff,           :
                                 :  Civil Action
        vs.                      :  No. 05-11654-NMG
                                 :
DAVID W. ADAMS, TYRONE           :
WILLIAMS, KEVIN BRITTO,          :
RONALD MITCHELL, Individually    :
and d/b/a MANSFIELD RUG          :
COMPANY a/k/a MANSFIELD RUG      :
DEPARTMENT and REMCO,            :
MICHAEL E. BROWN,                :
Individually and d/b/a DALTON    :
PADDING and EMPIRE WEAVERS,      :
JANE DZIEMIT, AGATHA             :
ESPOSITO, DONALD SHOOP, CCC      :
INTERNATIONAL, INC., JOHN D.     :
SUN, DAVID D. SUN and PAUL       :
SUN,                             :
            Defendants,          :
                                 :
        - and -                  :
                                 :
LOWELL FIVE CENT SAVINGS         :
BANK, WACHOVIA BANK, NATIONAL    :
ASSOCIATION, f/k/a FIRST         :
UNION BANK OF VIRGINIA,          :
CITIZENS BANK, BANK OF           :
AMERICA f/k/a BANK OF BOSTON,    :
PEOPLE'S BANK and FIRST UNION    :
NATIONAL BANK,                   :
            Trustee Process      :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

        DEPOSITION OF JOHN L. DURANT, JR., a
witness called on behalf of the Defendant Jane
Dziemit, taken pursuant to the Federal Rules of
Civil Procedure before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street,
Suite 625, Boston, Massachusetts, on Friday,
March 7, 2008, commencing at 2:04 p.m.

PRESENT:

    Krasnoo/Klehm LLP
        (by Paul J. Klehm, Esq.)
        23 Main Street, Terrace Level, Suite One,
        Andover, MA 01810-3730, for the Plaintiff.


    Neil S. Cohen, P.C.
        (by Neil S. Cohen, Esq.)
        Eleven Beacon Street, Suite 625,
        Boston, MA 02108,
        for the Defendant Jane Dziemit.


                * * * *

18

1   req -- does the merchant also sign the key req, by

2   the way?

3       A.   No.  The receiver does.

4       Q.   And in this case or under these

5   circumstances, it was Mr. Williams?

6       A.   Correct.

7       Q.   Once the merchant sees the invoice from the

8   supplier and notes that it's the same as what was on

9   the purchase order --

10      A.   And sees the key req.  If he's doing

11  everything correctly, he should see the key req.

12      Q.   He would sign off on the invoice saying

13  that it's okay for accounts payable to now pay that

14  supplier?

15      A.   Correct.

16      Q.   Was there any requirement between, say,

17  1999 and 2005, when you discovered the

18  irregularities, that a bill of lading be attached to

19  a key req?  Was there any requirement for that?

20      A.   No.

21      Q.   So I'll go back to the question:  Why not?

22      A.   I think it goes back farther than 1999.  I

23  thing it goes back to '94.

24      Q.   What goes back to 1994?

1          So we had a complete list of all the

2    shipments during that period with bills of ladings,

3    and the five companies that remained didn't have

4    bills of lading.

5      Q.   Correct me if I'm wrong, sir.  Accounts

6    payable had no instructions previous to the change

7    in policy to not pay invoices from suppliers if

8    there was no bill of lading attached to a key req,

9    correct?

10      A.   That's correct, as long as the key req was

11    signed and then the invoice was okayed by the

12    merchant.

13      Q.   Sir, when you began your discussions with

14    Mr. Gemme concerning the investigation that you both

15    were doing previous to the attorneys coming on

16    board, did you have a theory of liability against

17    each and every person connected with the five

18    companies?

19          MR. KLEHM:  Objection.  You can answer.

20          MR. COHEN:  I'll strike it.  I think I know

21    the problem.  It calls for a legal conclusion.

22      Q.   Did you have a theory as to how each of the

23    individual -- how the companies or the individuals

24    connected with those companies were involved in this