UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC. ) | |
|     Plaintiffs              ) | |
|                         ) | |
| v.                      ) CIVIL ACTION NO. 05CA11654-NMG | |
|                         ) | |
| DAVID W. ADAMS, *et al*      ) | |
|     Defendants          ) | |

## <u>DEFENDANT, JANE DZIEMIT'S, MEMORANDUM IN SUPORT OF HER MOTION FOR SUMMARY JUDGEMENT PURSUANT TO RULE 56.</u>

NOW COMES Defendant, Jane Dziemit, who submits this memorandum of law in support of her Motion for Summary Judgment pursuant to <u>Fed. R. Civ. P. 56</u>, on all counts brought against her.  After several years, copious amounts of discovery, and thousands of dollars in legal expenses, Plaintiff International Floor Crafts, Inc., has yet to produce a shred of evidence or a single material fact that tends to support their vexatious suit against Dziemit.  The defendant continues their unwarranted crusade to place blame on the defendant even after a lead witness, and co-mastermind of the alleged scheme, repeatedly gave exculpating testimony and went so far as to terminate his voluntary testimony until the defendant was exonerated. ***Deposition of Kevin Britto, Exhibit 3, p. 64, l. 2-3, and pp. 156, l.4-p. 157, l.15.***

### <u>Standard of Review</u>

The role of Summary Judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir Mass.1991)</u>(quoting <u>Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir Mass.1990)</u>). The burden is upon the moving party to show, based upon the

pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir Mass.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.[1]

### Statement of Case and Material Facts

The present action stems from a long-term scheme involving three (3) IFC employees/agents, defendants David Adams, Kevin Britto and Tyrone Williams. These IFC insiders used mainly fictitious companies to defraud IFC. The insiders would

---

[1] This statement of the Summary Judgment standard of review was taken in its entirety from Fiumara v. President and Fellows of Harvard College, 526 F.Supp.2d 150, D.Mass.,(2007).

fabricate purchase orders and key reqs. These documents are filled out and signed when goods are delivered to IFC, to give the appearance that IFC was receiving far more inventory than it actually was.  In turn, these men would forward invoices for the non-existent inventory through both genuine and non-existent companies.  This scheme spanned at least eight (8) years and generated thousands of dollars.  In or about 1999, long after the insiders began their scheme, co-defendant Ronald Mitchell approached defendant Jane Dziemit for a loan to help him expand his floor covering business. Mitchell was on the verge of entering into a business arrangement with co-defendant and long-time IFC consultant/merchant David Adams to provide capital for what Mitchell thought were legitimate carpet purchases.  Adams told Mitchell that as a merchant for IFC he could write purchase orders for goods being sold to IFC. Adams represented to Mitchell that he could purchase carpet by sending money, in advance, to certain suppliers at lower prices and reselling them to plaintiff IFC.  In return for providing capital, Mitchell would be paid a commission for the alleged carpet purchases.  Mitchell had been operating as a sales representative under the trade name "Remco" for several years before he was approached by Adams.  Up to that point, Dziemit was exclusively in the business of making real estate loans, and was familiar with the processes and subtleties of loaning money.  Because Mitchell did not have the funds to send to Adams, he turned to his friend, Dziemit, whom he knew was in the business of making loans.  Dziemit hesitantly agreed to make the loans and was promised a percentage of Mitchell's profits.  Prior to this agreement, Dziemit maintained a P.O. Box.  This P.O. Box was then used to receive payment from IFC payable to Remco.

Prior to Dziemit's first loan, Adams brought Mitchell, Dziemit and Tony Maresca, Dziemit's boyfriend, to a Building 19 outlet in Rhode Island to inspect the type of goods Adams would purchase with her funds. During this meeting and throughout her involvement with Mitchell and Adams, Dziemit believed that Adams was actually using her funds to purchase carpets, rugs, padding, and other related goods. In the first few transactions with Adams, Mitchell, under his company name Remco, would forward funds to the company supplying the rugs to IFC and in turn bill IFC. IFC, in response to these bills would pay Remco. Dziemit had the authority to, and on some occasions did endorse checks on behalf Remco to secure quicker payments on the loans she made on behalf of Remco. Dziemit also received a check from IFC via federal express on behalf of Remco when Mitchell was out of town (Mitchell arranged for IFC to send this check to Dziemit, whom never knew about it until the check arrived). In early 2000, Adams represented to Mitchell that he was changing rug suppliers and that Mitchell should send the advance payments directly to Adams. Adams represented that he did not want Mitchell to know who the suppliers were so that Mitchell could not cut Adams out of the deal. This business arrangement continued for approximately two (2) years, at which point Dziemit informed Mitchell she no longer wished to participate in the arrangement. Dziemit's ceased loaning money to Mitchell in 2003. At no point during the business arrangement were either Mitchell or Dziemit aware of the purported criminal enterprise in which Adams, along with Britto and Williams were partaking.

**Argument**

**A.    COUNT I – RACKETEERING-INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

I.    **Plaintiff has offered no genuine issue of material fact tending to subject the Defendant to liability under the RICO Act.**

To state a RICO act claim, Plaintiff must show: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." Kenda Corp. v. Pot O' Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir Mass. 2003), quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  In addition, there must be a causal link between violations of the RICO act and any harm alleged by the plaintiff.  Miranda v. Ponce Federal Park, 948 F.2d 41, 48-49 (1st Cir Mass. 1991)  Additionally, to prove a "pattern of racketeering activity," a party must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J Inc. v. Northwestern Bell Tel. Co.,  492 U.S. 229, 239 (1989).  Moreover, this court district requires that each specific defendant "participate in the operation or management of the enterprise itself." Bowdoin Construction Corp. v. Rhode Island Hospital Trust National Bank, N.A., 869 F.Supp. 1004, 1009 (D. Mass. 1994).  In this context, participation requires "some part in directing the enterprise's affairs." Id.

Further, there are no grounds for a RICO Act claim even where a lender has knowledge of the fraud, or even the ability to induce those controlling the fraud to take certain steps. Id. (RICO Act claims against two defendants that loaned money to those who allegedly engaged in the fraud must fail, even if those defendants knew of the fraud, because they did not control the fraud).  See also, McNew v. People's Bank of Ewing, 999 F.2d 540, 1993 WL 243772 (6th Cir. July 6, 1993)(even where defendant lender had knowledge of a purported scheme, it was insufficient for RICO claims to allege only that defendant dealt with others through financial loan transactions and not participation in

fraud scheme; lender does not violate RICO act by having a particular customer); <u>Reves v. Ernst & Young</u>, 507 U.S. 170 (1993)(outside accountants and other professionals not directing an enterprises affair's are not liable under RICO Act).

Further, to state a RICO Act claim, the plaintiff must prove the existence of a specific "enterprise"; in other words, a group of individuals associated in fact. <u>United States v. Turkette</u>, 452 U.S. 576, 580 (1981). The RICO Act "enterprise," must be a "group of persons associated together for a common purpose of engaging in a course of conduct." <u>Id.</u> Moreover, these "enterprise" associates must function as a continuing unit. <u>Id.</u>

In the case at bar, the plaintiff has failed to produce any facts that tend to show that Dziemit's conduct satisfied any elements of a RICO act claim. There are simply no facts or evidence to show the Dziemit had any knowledge of a purported criminal enterprise to defraud IFC, let alone that she actively participated in such a scheme.[2] Dzimeit, for her part, has always cooperated with plaintiff's investigation, produced documents and appeared for a deposition. She never has taken the 5th Amendment and has always maintained her innocence.

Dziemit's only connection to the purported criminal enterprise masterminded by David Adams and Kevin Britto, were her loans to Mitchell, which Dziemit believed were for the purpose of legitimately purchasing rugs for re-sale, and, in turn, accepting repayment on these loans directly from IFC or Mitchell. ***Exhibit 1, ¶¶10, 24, 27 and 28.*** It is well founded that Dziemit was "involved in the at home business of making real estate loans." ***Exhibit 1, ¶6 and Exhibit 2, ¶8.*** . Moreover, Mitchell was a friend of

---

[2] IFC President William Elovitz admitted as much in his deposition testimony "***Exhibit 5, p. 90, l.1 –p.93, l.24***

6

Dziemit and Maresca whom, one can infer, had gained their trust over their years of friendship. Thus, when Mitchell approached Dziemit to secure capital, for what both Mitchell and Dziemit believed was a legitimate business opportunity, it is not difficult to understand why she consented. There was simply no criminal enterprise between Mitchell and Dziemit, instead there existed a business agreement by parties operating in their respective fields of expertise (carpet for Mitchell, money lending for Dziemit.) As a lender, Dziemit's object was to advance monies to Mitchell for the purchase of real goods and to be repaid when those goods were sold. Moreover, Dziemit's loans did not directly reach the members of the purported criminal enterprise, rather, Dziemit's funds traveled through Mitchell, as an intermediary, further distancing Dziemit from the purported criminal enterprise. Dziemit (and most likely Mitchell as well) was completely unaware of any purported criminal enterprise. Moreover, her actions certainly did not rise to the level of participation and management required in this court district. Bowdoin 869 F.Supp at 1009.

To further bolster the evidence of Dziemit's innocence, it is undisputed that before making any loans, Dziemit, along with Mitchell and Adams, traveled to a Building 19 store to inspect the type of goods her loans would allegedly be securing. Adams undoubtedly took this action in order to convince Mitchell and Dziemit that they were purchasing top quality goods, when in fact Adams was secretly using their money as advances on the money he would eventually steal from IFC. Adams would then use this money to pay down gambling debts. ***Exhibit 3, p. 126, l. 4-9.*** These facts, and the testimony supporting them, unequivocally refute IFC's claims that Dziemit actively participated in a criminal enterprise.

IFC outlines a scheme against it in which a small number of insiders create fraudulent purchase orders, fill out and sign phony receiving documents for goods it claims it never received.  This type of a scheme outlined by IFC does not require any capital, because no real products are being purchased.  The nature and beauty of the scheme masterminded by Adams and/or Britto is that the insiders collect money for nothing.  It defies logic that Dziemit would contribute capital, through a third party no less, for a criminal enterprise that requires no capital.  Only real purchases require a lender and according to IFC, neither Adams nor IFC made any real purchases.  Adams and/or Britto used Dziemit as an unknowing pawn in order to (1) distort the fact that they and a small number of IFC insiders and a few outsiders "in the know" were the only members of the criminal enterprise and (2) to secure funds to pay down Adams' gambling debts.  Dziemit was unaware of any criminal enterprise and thus was not a part of any common goal or continuing unit acting to defraud IFC.  <u>Turkette</u> 452 U.S at 580. Furthermore, there is not a shred of credible evidence that Dziemit participated or engaged in the management or the enterprise.  <u>Bowdoin</u> 869 F.Supp at 1009.

Even if this Court finds that Dziemit had knowledge of the criminal scheme, and Dziemit believes the Court should not, lending funds alone do not rise to the requisite level of participation or control over an enterprise.  <u>Bowdoin</u> 869 F.Supp at 1009; <u>McNew v. People's Bank of Ewing</u>, *Supra.*  Further, if the Court should find that Dziemit actively participate in a criminal enterprise, even though she did not, there is no connection between her acts and the damage IFC claims to have suffered.  A causal link between violations of the RICO act and the alleged harm is a requisite for recovery. <u>Miranda</u> 948 F.2d 41 at 48-49.  In the present case, IFC only accuses Dziemit of the use

of their funds after their theft. The only allegations against her concern her accepting and depositing supposedly ill-gotten funds into her account. Even assuming this to be true, Dziemit's acts did not cause the harm to IFC. The cause of IFC's alleged harm is the actual theft of its funds, Dziemit's acceptance of a portion of those funds, in good faith, after the harm, do not provide a causal connection required in a RICO claim. <u>See generally</u> 18 U.S.C § 1962(a) (defendant can only be liable for money laundering if the plaintiff alleges it was actually injured by reason of the defendant's investment of the proceeds of racketeering activity); <u>Miranda</u> 948 F.2d at 48-49 (even where there is an allegation of money laundering, nothing would be gained by the plaintiff unless it could be established that its harm was a direct result of the money laundering).

While there are no facts or evidence to show that Dziemit was guilty of a RICO Act violation, multiple pieces of deposition testimony tend to exculpate Dziemit. For instance, Britto repeatedly testified that both Dziemit and Mitchell were naïve to the facts of the scheme and actively misled by both himself and Adams. ***Exhibit 3, p.64, l.2-3, p. 156, l.4-11.*** Further, Britto went so far as to refuse to voluntarily continue his testimony unless the two were exonerated. ***Exhibit 3, p. 157, l. 8-15.*** IFC President Elovitz declared in his deposition that he was aware of no facts or could not remember a single fact which tended to show that Dziemit knew of or actively participated in the criminal enterprise to defraud IFC. ***Exhibit 5, p. 90, l.1- p.93 l. 24.*** This testimony is particularly poignant in light of the fact that Elovitz also acknowledges that Britto was a good liar, believable and conned Elovitz for years. ***Exhibit 5, p. 106, l.7-18.*** Moreover, William Gemme, IFC controller and one of the lead persons in the investigation, testified that he had no facts to support an allegation that Dziemit knew the purchase orders were

fraudulent or fake. ***Exhibit 4, p. 77, l. 23- p.78, l. 3.*** Amazingly, Gemme also testified

that for the years 1999-2004, he had no personal knowledge that Mitchell knew he was

filling orders based upon purchase orders generated by IFC for rugs that didn't exist.

***Exhibit 4, p. 70, l. 18- p. 71, l. 3.*** Obviously, if Mitchell did not know between 1999-

2004, according to IFC, then Dziemit could not have known as she was even less

involved than Mitchell.

## II.     Plaintiff has failed to plead their RICO claim against the Defendant with the requisite level of particularity.[3]

RICO Act claims require the Plaintiff to plead with level of particularity. See New

England Data Services, Inc. v. Becher, 829 F.2d 286, 288-290 (1st Cir Mass. 1987);

Feinstien v. Resolution Trust Corp,. 942 F.2d 34, 44 (1st Cir Mass. 1991); Miranda 948

F.2d at 44.  "[T]he Plaintiff may not delay setting out facts to support his claim pending

discovery, but must detail them in the complaint." Alton v. Prudential-Bache Securities ,

Inc., 753 F. Supp. 39, 42 (D. Mass. 1990)(quoting Shamsi v. Dean Witter Reynolds, Inc.,

743 F. Supp. 87, 90 (D. Mass. 1989).  The First Circuit has been "especially rigorous" in

demanding such detailed pleadings.  Greebel v. FTP Software, Inc., 194 F.3d 185, 193-94

(1st Cir Mass. 1999)

The purpose of the particularity requirement "is to (1) place the defendant on

notice and enable him or her 'to prepare a meaningful defense to fraud; (2) to prevent the

use of conclusory allegations of fraud as a basis to strike suits and fishing expeditions;

and (3) to prevent defendants from groundless charges which tend to damage their

reputations.'" Alton 753 F. Supp. at 42 (quoting Shamsi 743 F. Supp. at 90).  This

requirement of particularized pleadings extends to each individual defendant in multiple

---

[3] *See also* Argument E(II), *Ante.*

defendant suits.  See Loan v. Federal Deposit Ins. Corp., 717 F. Supp. 964, 968 (D. Mass.

1989); Margret Hall Found., Inc., v. Atlantic Financial Management, Inc., 572 F. Supp.

1475. 1481 (D. Mass. 1983); Konstantinakos v. FDIC, 719 F. Supp. 35, 38 (D. Mass.

1989).

 The need for particularized pleadings is "particularly important in civil RICO

pleadings in which the predicate racketeering acts are critical to the sufficiency of the

RICO claim."  Kates v. Mzzcone, 1995 WL 44531 (E.D. Pa. 1995), citing Alfaro v. E.F.

Hutton & Co., 606 F. Supp. 1100, 1118 (E.D. Ps. 1985) and O'Brien v. National Property

Analysts Partners, 719 F. Supp. 222, 230 (S.D.N.Y. 1989)("all of the concerns that

dictate that fraud be pleaded with particularity exist with even greater urgency in civil

RICO actions").

> [In] cases alleging civil RICO violations, particular care is required to balance the
> liberality of the Civil Rules with the necessity of preventing abusive or vexatious
> treatment of defendants.  Civil RICO is an unusually potent weapon – the litigation
> equivalent of a thermonuclear device.  The very pendancy of a RICO suit can be
> stigmatizing and its consummation can be costly; a prevailing plaintiff, for example,
> stands to receive treble damages and attorney's fees. For these reasons, it would be unjust
> if a RICO plaintiff could … simply [assert] an inequity attributable to a defendant's
> conduct and [tack] on the self-serving conclusion that the conduct amounted to
> racketeering.

Miranda, 948 F.2d at 44.

 In the present case, IFC has failed to plead its RICO Act claim with particularity.[4]

The want for particularity in IFC's Amended Complaint put Dziemit at a disadvantage in

mounting a defense against the count.  Alton 753 F. Supp at 42.  Now, with discovery

complete and IFC's continuing failure to produce a single material fact or shred of

evidence to prove that Dziemit was a member or knowing participant in the purported

---

[4] In fact, Dziemit's name appears individually only five times in a thirty three (33) page  Amended
Complaint.

criminal enterprise alleged in its Amended Complaint, Dziemit is in threat of serious damage to her reputation.  Id.; Miranda 948 F.2d at 44.

IFC made only broad and unsubstantiated claims in their Amended Complaint. These claims did not provide in any detail or particularity her alleged level of participation in the purported criminal enterprise, nor did it state any detail of her alleged connection to the enterprise's participants or the enterprise itself.  Instead, IFC's Amended Complaint made only generic statements concerning the endorsing and depositing of a few checks.

These broad-brush claims may have been sufficient to move the parties to discovery, however, now with discovery complete it is apparent that the reason for the lack of particularity in the plaintiff's Amended Complaint was that there are absolutely no facts, evidence or witnesses that can point to even the most limited level of participation in the purported criminal enterprise on the part of Dziemit.  Now, based on the lack of evidence against Dziemit, the Court should again examine the particularity with which the plaintiff pled its claims, and dispose of the claim before this "thermonuclear device" of civil litigation further damages Dziemit's reputation. Id. Because IFC is unable to assert any material facts that Dziemit or for that matter even Mitchell had any knowledge of the criminal scheme between 1999 and the end of 2003, Dziemit is entitled to Summary Judgment on this Count.


### B.   COUNT II – COMMON LAW CONSPIRACY TO VIOLATE RACKETEERING-INFLUENCED AND CORRUPT ORGANIZATIONS ACT[5]

---

[5] A count of Common Law Conspiracy, like RICO requires a pleading of particularity. Doyle v. Hasbro, Inc. 103 F.3d 186, 194 Defendant now recites and incorporates Argument A(II), *Supra*.

I.    **Plaintiff has Failed to Provide Any Material Facts that Defendant agreed or Knowingly Joined a Conspiracy to Defraud it**

Liability in a RICO conspiracy case "is proved against a defendant by showing (1) the existence of enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1562(1st Cir  Mass.1994) See also U.S. v. Boylan, 898 F.2d 230, 241(1st Cir. Mass.1990). "Factors to be considered in deciding whether one, or many, conspiracies were demonstrated include the nature, design, implementation, and logistics of the illegal activity; the participants' modus operandi; the relevant geography; and the scope of coconspirator involvement." Boylan 898 F.2d at 241.  These factors must be linked together so as to afford a plausible basis for the inference that an agreement existed.  Id.

It is not enough, in a RICO conspiracy case, to show that a party took part in a RICO violation, but rather a plaintiff must prove that the defendant participated in the RICO activity knowingly.  Aetna 43 F.3d at 1562.  Further, "plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury;" rather "plaintiff must be harmed by an act that is independently wrongful under RICO." Beck v. Prupis, 529 U.S. 494, 505-06(2000).

It has already been sufficiently established that Dziemit did not manage or participate in any criminal enterprise to defraud IFC.[6]  A common law conspiracy claim, connected to an alleged RICO violation, requires the plaintiff to carry an even heavier burden than that in a civil RICO claim.  Namely, the plaintiff must prove that the defendant "agreed to commit RICO violations," and that the defendant "knowingly joined the conspiracy."  Aetna 43 F.3d at 1562.

The record is absolutely void of evidence, documents or testimony that Dziemit, ever participated in conversations concerning a purported criminal enterprise or that she was ever told of a conspiracy or plan to violate RICO.  In her Affidavit, as well as the Affidavit of Ronald Mitchell, it is specifically stated that Dziemit never had any conversations or agreements with Adams, Britto, Williams or any other co-defendant concerning the alleged scheme to defraud IFC. ***Exhibit 1, ¶¶ 14-19; Exhibit 2, ¶ 14; Exhibit 4, p. 138, l. 14-p. 139, l. 10; p. 152, l. 20- p. 153, l.14; Exhibit 5, p. 90, l. 1- p. 93, l. 24.***  Moreover, in the deposition testimony to date concerning the RICO Act violations, clearly demonstrate that plaintiff is unable to identify any conversation or agreement to engage in a criminal enterprise. ***See Exhibits 1, 4 & 5, supra.***  The evidence in the record clearly shows that Dziemit did not agree to engage in a criminal enterprise.  More importantly, all of the testimony given to this date, tends to show that Dziemit was not even aware that any enterprise existed.  In fact, the deposition testimony of Britto makes it abundantly clear then neither Dziemit, nor her intermediary Mitchell, participated in the alleged enterprise or even knew of its existence. ***Exhibit 3, supra.***

---

[6] Argument A(I) firmly establishes several sets of facts and volumes of evidence that Dziemit did not participate in the affairs of any RICO violation, if any existed.

According to Britto, the two were completely innocent of RICO violations and were in reality completely naïve of its very existence. ***Exhibit 3, supra.***

In addition, when the Court examines the factors to be considered in a civil conspiracy action, it is apparent that very nature of the alleged RICO enterprise hinged upon Dziemit's and Mitchell's naivety.  <u>Boylan</u><u>,</u> 898 F.2d at 241.  The very "nature, design, implementation, and logistics of the illegal activity" was contingent upon Mitchell unknowingly funneling capital into an alleged criminal enterprise. <u>Id.</u>  The masterminds of this alleged criminal enterprise designed a plot that in its very nature could run without any capital, and these men began implementing it perfectly even before Mitchell and Dziemit allegedly became involved.  ***Exhibit 5, p. 52, l. 1-7.***  Once Adams gambling debts mounted, his need for larger advances to steal funds, however, dragged Mitchell and Dziemit, unknowingly, into an alleged criminal scheme. ***Exhibit 3, p. 126, l.4- l. 14.*** To make the operation seem legitimate, and to keep Mitchell and Dziemit in the dark with regards to the purported illegality of his business, Adams went so far as to invite Dziemit to Rhode Island to view the goods her money would be "purchasing." ***Exhibit 1, ¶ 8 and Exhibit 2, ¶9.***  This showcasing of real goods was Adams way of keeping Dziemit and Mitchell at arms length of his alleged criminal plot.

Further, Adams' and Britto's for that matter, "modus operandi" were that of a liars and confidence men. <u>Boylan</u><u>,</u> 898 F.2d at 241; ***Exhibit 5, p. 106, l. 13-18 and p. 107, l. 2-6.***  Based on evidence in the record, and Britto's testimony, it is easy to believe that Adams would keep the true characteristics of his business dealings away from Mitchell and Dziemit through a maze of misinformation and misrepresentations.  Based on Adams' and Britto's modus operandi and their misrepresentations to both Mitchell and

Dziemit, it is impossible to believe that they knew of any conspiracy or criminal enterprise, let alone that they had in some way agreed to or actually participated in it. Afterall, the crafty Adams and Britto hoodwinked Elovitz and other management personnel at IFC for a much longer period of time.

Moreover, Dziemit's alleged level of involvement in this purported criminal enterprise is nominal at best. Not only has a lead witness testified that Dziemit is completely innocent and unknowing, the plaintiff's own thirty-three (33) page Amended Complaint only references her five (5) times, and merely alleges that she received and endorsed checks, a common practice for a party loaning capital.

With all of the relevant factors considered and in the light most favorable to plaintiff, there is simply no evidence and no set of facts that a fact-finder could infer that Dziemit had any knowledge of the scheme or agreed to partake in the already existing scheme. Boylan, 898 F.2d at 241

Finally, even should the Court determine that Dziemit was involved in a conspiracy to violate RICO, which she was not, her actions as a money lending party, are not independently wrongful under RICO and therefore they do not warrant recovery by the plaintiff in a Common Law Conspiracy to Violate RICO claim.[7] Aetna 43 F.3d at 1562.

## C. COUNT III – CONVERSION

**I.      Defendant converted no IFC Property and Plaintiff Cannot Maintain a Claim for Conversion of Funds as an Issuer of a check**

---

[7] Lending funds alone do not rise to the requisite level of participation or control over an enterprise. See Argument A(I) of this memorandum at Pg. 8; Bowdoin 869 F.Supp at 1009; McNew v. People's Bank of Ewing, *Supra*

An action for conversion requires "an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession." Kelley v. LaForce, 288 F.3d 1, 11, (1st Cir. Mass. 2002). A conversion action must fail if a plaintiff cannot prove that "'the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property.' " Kelley 288 F.3d at 12, quoting Grande v. PFL Life Ins. Co., No. 9663, 2000 WL 1476676, at *4 (Mass.App.Div. Sept.27, 2000) and Spooner v. Manchester, 133 Mass. 270, 273 (1882), See also Gouin v. Gouin, 249 F.Supp.2d 62 D.Mass.(2003).

Under the Massachusetts adopted version of the Uniform Commercial Code, M.G.L. c. 106 §3-420(a), an issuer of check cannot maintain an action for conversion.

In the case at bar, plaintiff alleges that Dziemit and others converted property including purchase orders, invoices bills of lading, key reqs, telephones, facsimile machines and funds to their own use and benefit.

When Mitchell came to Dziemit for a loan initially, she required a promissory note from Mitchell upon making that first loan. *Exhibit 1, ¶9.* When Mitchell came to Dziemit for additional loans, instead of executing a series of promissory notes, Mitchell gave Dziemit the authority to endorse checks payable to Remco from IFC for goods being sold to IFC. *Exhibit 1, ¶10 and Exhibit 2, ¶15..* Dziemit was previously advised by her accountant that to ensure repayment of the loans, she should base her loans on IFC Purchase Orders and/or similar documents. It has been well-established in the record of this case that Dziemit never generated or signed a purchase order. *Exhibit 4, p. 77, l. 11-22.* Dziemit did not create or sign any receiving documents (key reqs) either. *Exhibit 4,*

***p. 78, l. 23- p. 79, l. 2.*** Furthermore, there are no facts that Dziemit knew that the purchase orders from IFC, on which she was basing her loans to Mitchell/Remco, were fake or fraudulent. ***Exhibit 4, p. 77, l. 23-p. 78, l. 3.*** The only evidence that exists on the record of this case is that Dziemit, on authority from Mitchell, endorsed checks payable to Remco. ***Exhibit 1, ¶10 and Exhibit 2, ¶15.*** There is absolutely no evidence that Dziemit somehow converted IFC invoices, bills of lading, key reqs, telephone, or facsimile machines. ***Exhibit 1, ¶30.*** Presumably, with reference to the documents, IFC maintained copies to the extent they existed. Dziemit vehemently denies she ever had possession of any IFC telephones or facsimile machines. ***Exhibit 1, ¶31.***

With regard to the "funds" IFC alleges Dziemit converted, it is well-settled that the issuer of a check (a negotiable instrument) cannot maintain an action of conversion. M.G.L. c. 106 §3-420(a), The Uniform Commercial Code provides in pertinent part: An action for conversion of an instrument may **not** be brought by (i) the issuer or acceptor of the instrument or (ii) a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a co-payee. (*Emphasis supplied*). It is undisputed that IFC *issued* checks to Remco based upon goods it believed it was receiving pursuant to purchase orders generated by its employees/agents and key reqs signed by its own employees/agents. Hence, as the *issuer* of the checks it is foreclosed from bringing a claim against Dziemit for conversion of its funds through check received by Remco from IFC. Consequently, Dziemit is entitled to summary judgment on Count III of the Amended Complaint.

**D.   COUNT IV - UNFAIR AND DECEPTIVE BUSINESS PRACTICES**

**I. Defendant's Conduct was not Immoral, Unscrupulous, Unfair or Deceptive and her actions took place outside the Commonwealth.**

Under M.G.L 93A §2, it is unlawful to partake in "unfair methods of competition and unfair or deceptive acts or practices."  "Unfair and deceptive acts" are not specifically defined in the statute; instead they are "best discerned from the circumstances of each case." <u>States Resources Corp. v. The Architectural Team, Inc.</u>, 433 F.3d 73, 84, (1st Cir. Mass. 2005), <u>quoting</u> <u>Kattar v. Demoulas</u>, 433 Mass. 1, 14 (2000).  To raise a cause of action the plaintiff must allege some form of deceptive or unfair conduct that took place in the Commonwealth. <u>States</u> 433 F.3d at 84, and <u>Kuwaiti Danish Computer Co. v. Digital Equipment Corporation</u>, 438 Mass 459, 475 (2003).

"[T]he law requires more than a mistake" when assessing liability under M.G.L. 93A, "[s]ome level of bad faith must be present." <u>Ecological Fibers, Inc. v. Kappa Graphic Bd., B.V.</u>, 345 F.Supp.2d 13, D.Mass.,2004. <u>See</u> <u>also</u> <u>Duclersaint v. Federal National Mortgage Association</u>, 427 Mass. 809, 814, (1998); <u>Anthony's Pier Four, Inc. v. HBC Associates</u>, 411 Mass. 451, 474-75(1991). " 'A practice or act will be unfair under [ch. 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.' " <u>States</u> 433 F.3d at 85, <u>quoting</u> <u>Morrison v. Toys 'R' Us, Inc.</u>, 441 Mass. 451, 457 (2004).  "   The plaintiff's presence in the Commonwealth alone, does not warrant a claim under M.G.L. 93A. <u>American Management Services, Inc. v. George S. May Intern. Co.</u>,933 F.Supp. 64, 68, D.Mass. (1996). Moreover, under M.G.L 93A §9 a plaintiff is required to show a causal link between the deceptive act and any loss.  This causal link "is an essential predicate for

recovery under [the] consumer protection statute." Hershenow v. Enterprise Rent-A-Car Company Of Boston, Inc., 445 Mass. 790, 791 (2006).

In other words, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Damon v. Sun Co., Inc., 87 F.3d 1467, 1483 (1st Cir. Mass. 1996.) *quoting* Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir Mass.1989).

A claim under M.G.L.93A is certainly not applicable under the present facts. Dziemit's business dealings display not a trace of objectionable conduct. In fact, Dziemit's actions were wholly consistent with the ordinary practices of a moneylender. In the "rough and tumble… world of commerce," it is not uncommon for a lender to make loans and accept payment directly out of the debtor's proceeds. Damon, 87 F.3d at 1483. This is, in essence, the crux of Dziemit's business dealings.

Dziemit was unaware of any insidious scheme to defraud IFC when she made loans to a trusted friend. *Exhibit 1, ¶ 7, 9, 10; Exhibit 2, ¶ 8,9,10.* To the best of her knowledge, her business arrangement was a run of the mill lending agreement. She lent Mitchell money in hopes that she would eventually see a return on her investment. *Exhibit 1, ¶ 11-14.* While third parties may have ultimately used the funds for their own unseemly goals, Dziemit was certainly not privy to any such machinations. Dziemit made her loans in good faith. She was unaware of the purported criminal enterprise in which her funds would eventually become entangled, and therefore, does not display the level of bad faith a 93A claim requires. Ecological Fibers, Inc 345 F.Supp.2d at 15. Dziemit was merely an unwitting and innocent businesswomen, whose business transactions can hardly be characterized as unfair or deceptive. While IFC has

characterized Dziemit as an individual who should have been aware of the underlying

scheme, not having done due diligence an obtain invoices from suppliers, such an

omission on her part does not demonstrate that she acted immorally, unethically or

unscrupulously. ***Exhibit 5, p. 112, l. 2-13.*** It seems rather obvious that even if Dziemit

had requested invoices from Adams' and Britto's web of fictitious suppliers, she would

have been sent phony invoices in any event. When juxtaposed with IFC's admission that

it has no facts that Dzimeit knew the IFC purchase orders were fake or fraudulent, the

unfair and deceptive business practices Count must be dismissed. ***Exhibit 4, p. 77, l. 23-***
***p.78, l. 3.***

Additionally, to find this common lending transaction an "immoral" or

"unethical" practice warranting protection under section 93A, simply because a

unscrupulous third party used the funds in a purported criminal enterprise without the

lender's consent or knowledge, would turn the commercial lending business on its ear.

States 433 F.3d at 85. Applying 93A in these types of situations would force lenders to

earmark every dollar lent, and set draconian approval guidelines to ensure the good

intentions of every borrower, virtually encumbering the money lending business to the

point of futility.

Moreover, a point which plaintiff has forgotten, Dziemit's business transaction

occurred outside the Commonwealth. The purpose of 93A is to protect consumers from

unfair and deceptive practices in the Commonwealth. Dziemit's only business

transactions, with regards to the plaintiff's complaint were her loans to Mitchell, which

took place outside the Commonwealth, her maintenance of a Post Office Box outside the

Commonwealth and her endorsement of checks, which were directed to a d/b/a outside

the Commonwealth.  The only connection between the Commonwealth and the plaintiff's claim is the plaintiff's presence in the Commonwealth. This Court has explicitly stated that a plaintiff's presence in the Commonwealth alone does not warrant a 93A claim. <u>American Management Services, Inc,</u> 933 F.Supp. at 68.  Thus, because none of the business transactions relied on by the plaintiff, concerning Dziemit, occurred in the Commonwealth, the plaintiff's claim pursuant to 93A against Dziemit must fail.

Finally, even should the Court find that Dziemit falls under and did indeed violate 93A, which defendant vehemently denies, there is no connection between her actions and the harm to the IFC.  Dziemit's business transactions are so far removed from the plaintiff's harm that it is quite difficult to see any connection between the two. Dziemit loaned money to a friend, Mitchell, who, in turn, loaned money to a man who, unbeknownst to both parties, supposedly intended to use the money for a purported criminal enterprise.  This transaction clearly does not sufficiently connect Dziemit's actions to the plaintiff's loss.  In addition, the purported scheme, which Dziemit supposedly lent capital to, in fact needed no capital to operate.[8]  Thus, if the plaintiff's claim arose out of a scheme which needed no capital to operate, then Dziemit's contribution of capital to the scheme doesn't cause the plaintiff any more or less harm. Not only is there not a sufficient connection between Dziemit's business transactions and the plaintiff's loss, in actuality the connection is nonexistent.

### E.   COUNT V – FRAUD

**I.      Plaintiff has offered no genuine issue of material fact tending to subject the Defendant to fraud liability.**

---

[8] For a more in depth explanation of this point see Argument A(I) at Pg. 8.

"To prevail on a claim of fraudulent misrepresentation under Massachusetts law, the plaintiff must show that the defendant 'made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.' Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F.3d 62 (1st Cir Mass. 2005.) (quoting Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458 (2002)).

An action for fraud "requires [a] showing that the defendant made [a] false representation of material fact with knowledge of its falsity." Davis v. Dawson, Inc., 15 F.Supp.2d 64, 137, D.Mass.(1998); See also Town & Country Fine Jewelry Group, Inc. v. Hirsch, 875 F.Supp. 872, 876 (D.Mass.1994); Bolen v. Paragon Plastics, Inc., 754 F.Supp. 221, 226 (D.Mass.1990). Further, the plaintiff is required to show that their damages flow directly from the misrepresentation. Davis 15 F.Supp.2d at 137. See also Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir Mass.1986)

The elements to prove fraud are simply not present with respect to Dziemit. Dziemit's made representations only to Ronald Mitchell. Further, Dziemit's representations were not false. Dziemit engaged in an ordinary lending agreement with Mitchell, and acted with the utmost honesty pursuant to that agreement. Dziemit honored her agreement, and Dziemit acted in good faith when invoicing IFC. The invoices sent by Dziemit were for payments Remco genuinely believed IFC owed it. Dziemit did not send these invoices in furtherance of an alleged scheme. To the contrary, Dziemit forwarded invoices to IFC at the direction of Mitchell, who was, in turn, instructed by Adams to forward the invoices when he told Mitchell the goods had been delivered.

***Exhibit 2, ¶¶ 11-14.***  With respect to the alleged scheme to defraud IFC, Dzimeit was a victim of fraud and deception in her own right.

Additionally, Dziemit personally made no representations to IFC, and IFC did not rely on any of her actions.  Dziemit had no direct dealings with IFC.  John L. Durant, the vice president of finance for Building 19, who was involved in the investigation, himself admitted that Dziemit had no connection with the plaintiff.  ***Exhibit 6, p. 57, l. 22- p. 58, l. 9.***  Her only affirmative actions involved business transactions with Mitchell, an intermediary.  It is impossible to believe, and for the plaintiff to prove, that they did or could have relied on Dziemit's business transactions to their detriment.  Thus, Dziemit's actions certainly do not rise to the level of reliable representations, let alone false ones.

In addition, the plaintiff's claim that they detrimentally relied on Dziemit's misrepresentation when they were not even aware of her existence seems quite far-fetched. IFC did not know of Dziemit's existence until long after she had ceased her involvement with Remco.  ***Exhibit 1, ¶¶ 11-12, Exhibit 2, ¶¶ 12-14.***  In order to rely on the representations of another, a party must be aware of those representations.  Because IFC was unaware of not only Dziemit's dealings with Mitchell, but also of her mere existence, it follows that their reliance on her actions would be impossible.

Further, in an action for fraud, a defendant must make false representations with knowledge of their falsity.  Even should the Court somehow find that Dziemit's actions in sending out invoices for merchandise, rose to the level of false representations, and that IFC indeed relied on those representations, plaintiff must still prove that  Dziemit knew her representations were false.  Any false representations allegedly made by Dziemit, of which there were none, could not have possibly been made knowingly.

Dziemit was not aware of any scheme to defraud IFC when she entered into her arrangement with Mitchell or when she became involved Remco. ***Exhibit 1, ¶¶ 4, 9, 11, 12 and Exhibit 2, ¶¶ 10-14.*** Though Dziemit may have caused invoices to be sent to IFC, she sent those invoices, in good faith for what she believed was the purchase of real goods. It is simply not enough for plaintiff to contend that Dziemit did not conduct due diligence in her business dealings with a trusted friend. ***See Exhibit 5, p. 112, l. 2-13.*** Even had these actions and representations been false, which they were not, Dziemit did not know them to be false and thus she is not liable to plaintiff for fraud.

Finally, the plaintiffs cannot attribute any of its losses to the alleged false representations on the part of Dziemit. The actions of David Adams, Kevin Britto and Tyrone Williams and defendants other than Dziemit were responsible for the plaintiff's harm. Dziemit's business transactions with Mr. Mitchell and Remco, did not directly harm IFC. The three criminal masterminds and their accomplices, excluding Dziemit harmed IFC when they did not use Remco's money to purchase or deliver goods.

II.    **Plaintiff has failed to plead their fraud claim against the Defendant with the requisite level of particularity.**

Much like a RICO act claim, the circumstances underlying allegations of fraud must be pled with particularity, including the specification of the time place and content of any alleged false representation. Fed. R. Civ. P. 9(b); <u>Hayduk v. Lanna</u>, 775 F.2d 441, 444 (1st Cir Mass. 1985); <u>Friedman v. Jablonski</u>, 371 Mass. 482, 488-89 (1976); <u>Schinkel v. Maxi-Holding, Inc.,</u> 30 Mass. App. Ct. 41, 48 (1991)[9] "[I]t is a serious matter to

---

[9] The reasons for this particularity requirement have already been stated in the defendant's argument for summary judgment with regards to the plaintiff's RICO claim. <u>See,</u> Argument A(II), *Supra.* Rather than restate these reasons the defendant here reincorporates them.

charge a person with fraud and, hence, no one is permitted to do so unless he is in a position and is willing to put himself on record as to what the alleged fraud consist specifically." <u>Decker v. Massey-Ferguson, Ltd.</u>, 681 F.2d 111, 115 (2nd Cir.)(1982). "In other words, '[i]n cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action.'" <u>Hayduk</u>, 775 F.2d at 443 (quoting <u>Lopez v. Bulova Watch Co. Inc.</u>, 582 F.Supp. 755, 766 (D.R.I. 1984)). An "oblique remark" suggesting fraud is simply not sufficient. <u>Charbonnier v. Amico</u>, 367 Mass. 146, 152 (1975). Moreover, "mere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusive to satisfy the particularity requirement, no matter how many times such accusations are repeated." <u>Doyle v. Hasbro, Inc.</u> 103 F.3d 186, 194(1st Cir Mass. 1996)(quoting <u>Hayduk</u> at 444).

This principle extends to each party who must defend a charge of misrepresentation or fraud. "Where multiple defendants are involved, each person's in the alleged fraud must be particularized." <u>Loan v. Federal Deposit Ins. Corp.</u>, 717 F.Supp. 964, 968 (D. Mass. 1989). <u>See</u> <u>also</u> <u>Margret Hall Found., Inc. v. Atlantic Financial Management, Inc.</u>, 572 F. Supp. 1475, 1481 (D. Mass. 1983). Plaintiff must "inform each individual defendant of what role [it] is alleged to have played in the fraud." <u>Konstantinakos</u> 719 F. Supp at 38.

A claim for fraud requires a plaintiff to plead with particularity, specific to each defendant. In the plaintiff's Complaint, however, there are not claims of fraud particular to Dziemit. The plaintiff simply lumps all of the defendants together forming a Gordian knot of claims and accusations. This type of pleading is impermissible in a fraud action.

Unfortunately, for IFC, it has been unable, through discovery, to connect the dots concerning Dziemit's alleged fraud.

While the plaintiff does state facts which it claims amounts to a fraud, it does not do so specifically with regards to each defendant.  The plaintiff relies on pleading all the facts surrounding an alleged criminal enterprise, however, this Court considers this type of pleading "too conclusional to satisfy particularity requirements." Doyle 103 F.3d at 194.  Moreover, the plaintiff's fraud count does not describe in the least what role Dziemit played in the fraud, another requirement in fraud pleading. Konstantinakos 719 F. Supp at 38.

The want for particularity in IFC's Amended Complaint put Dziemit at a disadvantage in mounting a defense against the Fraud Count, and have risked serious damage to her reputation.  Alton 753 F. Supp at 42.  Now, with discovery complete and the failure of the plaintiff to produce a single material fact or shred of evidence to prove that Dziemit was involved in a fraud, it is clear that the plaintiff employed its non-particularized Complaint, simply to fish for a suit, a suit they have yet to find. Hayduk, 775 F.2d at 443.

The unsubstantiated claims made by the plaintiff may have been sufficient to move the parties to discovery, however, now with discovery complete it is apparent that the reason for the lack of particularity in the plaintiff's Amended Complaint was that there are absolutely no facts, evidence or witnesses that can point to even the most limited level of participation in the purported criminal enterprise on the part of Dziemit. Now, without a single relevant material fact to support their claim, the Court should again

take under advisement the level of particularity with which IFC plead its Amended Complaint and offer Dziemit the relief by way of a Summary Judgment.

## CONCLUSION

Dziemit is entitled to Summary Judgment in her favor dismissing International Floor Crafts, Inc.'s Amended Complaint.  Based on the lack of evidence procured by IFC during discover, the favorable deposition testimony of several key witnesses, the affidavits of Jane Dziemit and Ronald Mitchell, and all papers previously filed with this Court, it is clear that plaintiff, IFC, cannot show any genuine issue of material fact on any of their counts against Dziemit.

IFC pled their counts for fraud, conspiracy and RICO with insufficient particularity, sparking a fishing expedition, in which IFC failed to produce a single piece of evidence or testimony to show that Dziemit was involved in the alleged criminal enterprise perpetrated against it.  Dziemit entered into an ordinary lending agreement with a trusted friend.  This agreement, as far a Dziemit knew, was in furtherance of Mitchell's business as a carpet broker, and was in no way unscrupulous, immoral or deceptive.  Dziemit never participated in, managed, agreed to participate in or even knew of a criminal enterprise to defraud IFC.

Her lack of participation and/or management of the alleged scheme absolves her from liability under civil RICO, as does her role as a moneylender, a station which does not warrant RICO liability.  Further, her lack of knowledge, and the lack of any conversations and/or agreements pertaining to such a scheme disqualify her from liability under Common Law Conspiracy to Violate RICO.  Moreover, her good faith business

transactions with Mitchell outside the Commonwealth, do not rise to the requisite level of rascality to required to prove a M.G. L. c. 93A violation.

IFC's claim of conversion is without merit and clearly outside the bounds of Massachusetts statutory law. IFC lists a laundry list of property it alleges were converted, almost all of which, high ranking employees of IFC themselves admit Dziemit had no contact. Further, IFC's grounds for the conversion of its funds hinges on Dziemit's actions as an endorsee on behalf of Remco. Massachusetts' adoption of Article 3 of the Uniform Commercial Code, however, specifically bars an action for conversion in the present circumstance for an issuer of check.

Finally, Dziemit made no personal representations to IFC, let alone false ones. Moreover, even if she did make false representations, with respect to her role in Remco, she had not knowledge that those representations were false. At all times during her involvement with Mitchell, Dziemit believed that she was engaged in loaning funds in furtherance of the legitimate purchase and sale of carpets. Thus, Dziemit is not liable for fraud.

It is clear from all of material facts and evidence presented that there are no grounds on which Jane Dziemit can be found liable for any counts alleged, and therefore, she should be afforded Summary Judgment.

**WHEREFORE,** Defendant Jane Dziemit requests that this Court grant her Motion for Summary Judgment on all counts and award her costs associated with bringing this Motion. Plaintiff in it verified Complaint has never and is not now able to assert any facts that would attach liability to this defendant and despite having this knowledge for two years, failed to Dismiss Dzimeit.

Respectfully Submitted,
Counsel for the Defendant,

/s/ Neil S. Cohen, Esq.
neilcohenlaw@yahoo.com
Neil S. Cohen, Esquire (BBO# 561173)
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108
(617) 367-0070

## Certificate of Conference – Rule 7.1(A)(2) Statement

The undersigned hereby certifies that on or about March 13, 2008, counsel for the

Defendant/Plaintiff in counterclaim conferred with counsel for Plaintiff concerning this

motion.  No agreement as to the Disposition of the case could be reached.

/S/ Neil S. Cohen
Neil S. Cohen, Esq.
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108

## Certificate of Service

The undersigned hereby certifies that a copy of the above motion was caused to
be served on all counsel of record via the ECF filing system and on all parties not
represented by counsel by first class mail on March 14, 2008.

/S/ Neil S. Cohen
Neil S. Cohen, Esq.
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS


INTERNATIONAL FLOOR CRAFTS, INC. )
      Plaintiffs                  )
                              )
v.                               ) CIVIL ACTION NO. 05CA11654-NMG
                              )
DAVID W. ADAMS, *et al*        )
      Defendants           )

**<u>LIST OF EXHIBITS ATTACHED TO DEFENDANT, JANE DZIEMIT'S
MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR SUMMARY
JUDGMENT</u>**


**EXHIBIT 1** – Affidavit of Jane Dziemit

**EXHIBIT 2** – Affidavit of Ronald Mitchell

**EXHIBIT 3 –** Relevant Excerpts from the Deposition of Kevin Britto

**EXHIBIT 4** - Relevant Excerpts from the Deposition of William Gemme

**EXHIBIT 5** - Relevant Excerpts from the Deposition of William Elovitz

**EXHIBIT 6** - Relevant Excerpts from the Deposition of John Durant


                              Respectfully submitted
                              Defendant, Jane Dziemit
                              By her Attorney,


                              /s/ Neil S. Cohen
                              Neil S. Cohen, Esq. (BBO#561173)
                              neilcohenlaw@yahoo.com
                              **NEIL S. COHEN, P.C.**
                              Eleven Beacon Street, Suite 625
                              Boston, MA 02108
                              (617) 367-0070

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR )
CRAFTS, INC., )
                                                  )
        Plaintiff, )
                                                  )
v.                                                ) CIVIL ACTION NO. 05CA11654-NMG
                                                  )
DAVID W. ADAMS, *et al.,* )
                                                  )
        Defendants. )

## AFFIDAVIT OF JANE DZIEMIT IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

Defendant/Plaintiff in counterclaim, Jane Dziemit, does hereby state and depose of her own personal knowledge the following:

1. I am a 50-year-old homemaker and mother of two children, ages 15 and 11, living in California.

2. I grew up in Branford, Connecticut.  When I graduated high school in 1974, I went to school in Massachusetts for two years.  I then obtained a position at IBM on Boylston Street in Boston in 1978.  After that I moved to New York, where I spent approximately 12 years working at various jobs and went to college.  I graduated college and have a BBA in Marketing from Bernard Baruch College. In 1990, I returned to Connecticut to be close to my godmother and cousins after my marriage ended.  I moved to California in 2004.

3. I am executing this affidavit in support of my Motion for Summary Judgment in the lawsuit IFC has filed against me for civil RICO (Racketeered-Influenced

and Corrupt Organizations Act), conspiracy to violate RICO, Conversion, Unfair and Deceptive Business Practices and Fraud.

4. Since the beginning of this lawsuit, I have maintained my innocence of the underlying scheme involving several IFC insiders and co-defendants, seeking to defraud IFC, namely David Adams, Kevin Britto and Tyrone Williams. Indeed, I have, to the best of my ability, tried to cooperate with IFC/Building 19 to get to the bottom of the underlying problem and explain my position.

5. In or about 1999 I was approached by family friend and co-defendant Ronald Mitchell for a loan to help him expand his carpet business. When I originally met Mr. Mitchell, he told me that he worked as the Sales Manager for a prominent manufacturer of padding and/or rugs called CrestFoam in New Jersey. He also stated that he had worked in the floor covering industry all his life. Sometime later, Mr. Mitchell told me that he was no longer an employee, and that he had become an independent representative or broker selling padding and rugs. He told me that when he acted as a broker, he operated under the trade name Remco, which I understood was a "d/b/a". Mr. Mitchell was a close, well respected, long time friend. I felt he was always straight forward and honest with me and my friends.

6. At that time, I processed real estate loans from my house, which allowed me to earn money at home to raise my children.

7. When Mr. Mitchell approached me for a loan, he told me that he was going to purchase carpets, rugs and related goods and then resell them at a profit to a chain of stores called Building 19 in Rhode Island and Massachusetts. By paying for

the carpet before delivery, he would be getting a better price for the carpet

(discount).  Previous to speaking with Mr. Mitchell, I had never heard of

Building 19.  I recall that Mr. Mitchell requested a loan of approximately

$14,400.00 to buy rugs (his first purchase), which I paid to the supplier.  At first, I

was hesitant to loan money on a non-real estate transaction, but because Mr.

Mitchell was a family friend for almost ten years, I agreed to make the loan.

8. Previous to making the initial loan in 1999, Mr. Mitchell, my boyfriend Tony

Maresca and I met co-defendant David Adams at a Building 19 store, I believe in

Rhode Island.  Mr. Adams was introduced as an independent contractor who

purchased carpet for IFC/Building 19.  The meeting was brief, but Mr. Adams

showed Mr. Mitchell and me rugs that would be purchased, so that I had an

understanding of what kinds of goods I was lending money to buy.

9. When I made the first loan, I had Mr. Mitchell sign a promissory note.  My

memory is that I forwarded the money that I was lending directly to the supplier,

which had a name of "CCC".  Within a short time of making this initial loan I was

told that the rugs had been delivered to IFC (Building 19).  IFC was sent an

invoice, which it paid, and my loan was paid back to me along with a charge

and/or interest, and I returned the promissory note to Mr. Mitchell.  Despite my

best efforts I have been unable to locate a copy of this original promissory note.

10. Thereafter, Mr. Mitchell approached me to ask if I would lend him money on

an ongoing basis to make other purchases for carpet, rugs, etc.  Rather than asking

for a series of promissory notes for these individual loans, my accountant advised

me that I should make a loan based upon IFC Purchase Orders or similar

documents; he also suggested that when IFC forwarded checks to pay invoices sent from Mr. Mitchell, I should arrange to be reimbursed for the money I advanced, plus charge and/or profit for the loan.  Mr. Mitchell would then disburse the balance.  In order to simplify this arrangement, Mr. Mitchell gave me the authority to endorse checks, if necessary, payable to Remco.  (Since Mr. Mitchell has had a series of heart problems, I wanted and needed to be protected.) I agreed to help Mr. Mitchell for a short term basis so he could get started in the business.  I used my home equity line on my house to lend Mr. Mitchell money for carpet.

11. I advanced money to Mitchell/Remco based upon my receipt of  IFC/Building 19 Purchase Orders generated and signed by IFC/Building 19 employees (often two separate employees).  The Remco invoice for that purchase order specified that payment was to be sent to a post office box from which I could obtain the payment, if necessary.  When the check or payment was received, my prior advance was paid along with my charges, profit and interest.  For this reason, occasionally checks from IFC were paid directly into my personal account.  The transactions were typically in the range of $20,000.00-$50,000.00.  Typically, the amount Mitchell/Remco owed to me at any one time was $75,000.00 or less. There were also times when Mr. Mitchell asked to borrow money for carpet, and I refused.  My intention was only to get Mr. Mitchell started in the business, and I preferred that orders were filled and my existing loans were reimbursed before I lent out additional funds.

12. The loans I made to Mitchell/Remco continued from approximately 1999 through 2001. After 2001, I continued to make some occasional loans to Mr. Mitchell. Mr. Mitchell would reimburse me himself for these small loans. IFC/Building 19 sent payments directly to Mr. Mitchell. I understood that Mr. Mitchell lined up or was lining up other financing or using his own funds to buy carpet. In 2003, my loans slowed to a trickle and stopped completely by the end of 2003.

13. Other than the one meeting I had with David Adams, described above, I had only met him one other time when Ron Mitchell borrowed money for carpet and the loan was secured with Mr. Adams' property.

14. In both meetings with David Adams there were absolutely no conversations or agreements amongst the persons present to agree or conspire to defraud IFC.

15. I have never met, nor ever spoke to co-defendant and IFC employee Tyrone Williams, so I could not have agreed or conspired with him to defraud IFC.

16. I have never met, nor ever spoke to co-defendant and IFC employee/consultant Kevin Britto so I could not have agreed or conspired with him to defraud IFC.

17. Until the lawsuit, I was unaware that co-defendant Ronald Mitchell ever operated another business known as Mansfield Rug, so I could not have agreed or conspired with that company to defraud IFC.

18. I never met or ever spoke to co-defendant Michael Brown, nor did I ever have

any contact with Dalton Padding or Empire Weavers at any time, so I could not have agreed or conspired with Mr. Brown or either of those companies to defraud IFC.

19. I never met or had any conversations with John, David or Paul Sun, nor did I have any direct contact with CCC International, Inc. except I did see five or six invoices from CCC which I may have paid directly when I first began lending money to Mr. Mitchell/Remco. Hence, I could not have agreed or conspired with the Suns or CCC to defraud IFC.

20. I have read the deposition of Kevin Britto taken shortly before he died and understand that he testified under oath that neither Mr. Mitchell nor I had any knowledge of any plan or scheme to conspire to defraud IFC. I am further aware that Mr. Britto originally refused to provide further testimony until Court Order until IFC dismissed Mr. Mitchell and me from this lawsuit. I understand that the President of IFC, testified that he could not confirm that Mr. Britto is deceased and I have attached a copy of the Notice of Apparent Death generated by Plaintiff's attorney and obituary as Exhibit A to confirm this fact.

21. I have never signed or generated any purchase orders from IFC for the purpose of buying goods. I have never signed or generated a document called a "key req" which IFC's warehouse people, of which Mr. Williams was one, sign to inform accounts payable that the merchandize was received.

22. I was present at the deposition of William Gemme, the IFC controller/real estate manager who was the investigator and individual who signed the Complaint for IFC against the defendants. During his deposition Mr. Gemme testified under

oath that the basis for IFC's Complaint against me were: that I signed checks for

Remco, that I maintained a P.O. Box to receive Remco checks, that there were

Purchase Orders which had my name or Tony Maresca's name as a contact person

on them, that I deposited checks into various accounts, including my personal

account, that I received one check via Federal Express to my personal address and

that I signed Remco checks payable to Mr. Mitchell.

23. Mr. Gemme also testified under oath that his investigation revealed that the

scheme to defraud IFC began as early as 1995, and yet went undetected by the

company for almost ten (10) years, long before I ever heard of Building 19.

24. In addition to what I stated above, I already maintained a P.O. Box and

thought it would be easier and more secure to have the payments from IFC to

Remco sent to that box, so I could ensure that they would be deposited in a timely

fashion and that I would be reimbursed for my advances.

25.  With regard to the purchase orders with either my or Tony's name on them,

as I previously stated, we met with co-defendant and IFC buyer David Adams and

he knew I was advancing money to Mr. Mitchell/Remco for the purpose of

purchasing rugs and he, Kevin Britto or other IFC/Building 19 employees

generated and signed almost all the purchase orders.  The other IFC employees

(who we believe still work for IFC/Building 19) who also signed purchase orders

have apparently been cleared of any wrongdoing. Furthermore, Mr. Gemme

testified that even though Diane Spignosi, Mr. Mitchell's girlfriend, was listed on

many purchase orders as contact person, she was never sued.

26. As I stated in my previous affidavit in support of my Motion to Dismiss, I received a check from IFC via Federal Express to my home at Mr. Mitchell's request because IFC had failed to make a timely payment and Mr. Mitchell was out of town.  He did not call me first to make sure it was okay to have the check delivered, but simply told me after-the-fact that it was coming.

27. With regard to checks drawn from Remco that I signed and paid to Mr. Mitchell, as I stated previously, I had the authority to endorse checks for Remco, so I could be repaid more quickly.  On those occasions, it is my recollection that after depositing a check from IFC, I would have signed checks from Remco to the others, including to Mr. Mitchell and perhaps myself.

28. Mr. Mitchell and I never had any agreement or conversations wherein we agreed or conspired to defraud IFC.  I thought, because all of the purchase orders were generated by long-term employees of IFC, that these transactions were legitimate.  I was told by Mr. Mitchell that IFC/Building 19 was very happy with the quality of rugs on which I had advanced money.  Indeed, I was told that Nick Adler, a buyer from IFC/Building 19 had called Mr. Mitchell to say how pleased he was with the carpet and that he wanted more of the same.

29. For each and every check I received from IFC, I believed the check to be legitimate, generated as a result of appropriate IFC internal documents, and for legitimate transactions.  When I deposited those IFC checks, I did so in good faith and relied upon IFC's employees that these transactions were, in fact, legitimate.

30. I never created or signed any purchase orders, invoices, bills of lading or key reqs owned by IFC.  The only funds that I ever received were checks IFC issued

to Remco that were used to repay loans I had made, plus my interest, charges and

profit.

31. I have never been in possession of any telephones, facsimile machines or

other equipment IFC owned at any time.


**SIGNED UNER THE PAINS AND PENALTIES OF PERWRY THIS <u>13th</u> DAY**

**OF MARCH, 2008.**


**Jane Dziemit**

**Exhibit A**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS, INC. )
Plaintiff ))
v. ) CIVIL ACTION NO. 05CA11654-NMG
)
DAVID W. ADAMS, *et al* )
Defendants )

**SUGGESTION OF APPARENT DEATH**

Plaintiff hereby gives notice that it has obtained a copy of an obituary which, upon
information and belief, pertains to Defendant Kevin Britto. (*See* **Exhibit A**). Since Mr. Britto
acted *pro se* in the within matter, Plaintiff gives notice to the Court of Mr. Britto's apparent
death.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,
*/s/ Benjamin L. Falkner*
Paul J. Klehm (BBO#561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO#279300)
jkrasnoo@krasnooklehm.com
Benjamin L. Falkner (BBO#667951)
bfalkner@krasnooklehm.com
Krasnoo | Klehm LLP
23 Main Street, Suite Six
Andover, MA 01810
(978) 475-9955

**CERTIFICATE OF SERVICE**

I, Benjamin L. Falkner, Esq., hereby certify that I have served a copy of the within
document upon all counsel of record and upon all parties not represented by counsel by first class
mail, postage pre-paid, on March 1, 2007. On March 1, 2007, I have also forwarded a copy of
the within document via first class mail, postage pre-paid, to Kevin Britto, 300 W. 21st Street,
Apartment #25, New York, NY.
*/s/ Benjamin L. Falkner*
Benjamin L. Falkner

Case 1:05-cv-11654-NMG Document 192 Filed 03/01/2007 Page 1 of 1

**Exhibit 2**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 05CA11654-NMG |
| | ) |
| DAVID W. ADAMS, *et al.,* | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF RONALD MITCHELL

Ronald Mitchell, having been duly sworn, does hereby state and depose of his own personal knowledge the following:

1. I am sixty-two years old.

2. I currently reside at 5 Mansfield Grove, #146, East Haven, Connecticut.

3. For more than thirty (30) years, I have been in the carpet cushion business. I was previously a self-employed sales representative for a company called North Carolina Foam for approximately fifteen (15) years. Previous to that, I was employed first as a sales representative and then as a sales manager for fifteen (15) years with a New Jersey Company called Crest Foam.

4. Crest Foam was ultimately purchased by a larger company and plants were consolidated and I was informed that I was no longer needed. Fortunately, it was an easy transition as I had a large following of customers. Ultimately, I had as many as ten sales representatives working through me. At that time I started using the name "Remco" as the name of my sales agency. I still use the name to this day.

2

5.  In approximately late 1998, one of my customers told me that I should talk to a friend of his named David Adams, who worked as an independent representative for a company called "Building 19" (I later found out that the actual company name was International Floor Crafts, Inc. ["IFC"]). Sometime later, I spoke with Mr. Adams who confirmed he was an independent sales representative for IFC.  He further explained that he would find "good deals" on rugs from various suppliers, sell them to IFC, and receive a commission from the supplier providing the material.  He also stated that even though he was not an employee for IFC, he could write purchase orders himself.

6.  Shortly thereafter, Mr. Adams agreed to purchase padding from me through my supplier, North Carolina Foam, who shipped and billed the material and paid me the commission.  I paid Mr. Adams part of that commission.

7.  After several months of this relationship, Mr. Adams approached me and asked if I was interested in expanding my business.  He stated that he could buy carpet in advance from various suppliers at a much lower price and then resell the carpet to IFC.  Previous to this suggestion, I had not billed customers as the suppliers had handled that end of the business.  Mr. Adams explained that he did not have the capital and asked if I was interested in investing in this type of venture and then billing IFC from my company.  My experience in the carpet business was that I knew carpet suppliers like to sell carpet by being paid before the carpet was shipped.  I believed this scenario to be a win-win situation as the suppliers would be paid in advance, IFC was

3

getting the same price for better quality rugs, and Mr. Adams and I would be making a profit.

8. Since I did not having the working capital myself, I contacted friends of mine named Tony Maresca and Jane Dziemit. Ms. Dziemit was and I believe still is a mortgage broker. After I explained the concept to them, Ms. Dziemit agreed to finance the project with a percentage of the profits going to her. I signed a promissory note to guarantee any losses on her part.

9. As I recall, Mr. Adams, Mr. Maresca, Ms. Dziemit and I met at Building 19 outlet in Rhode Island in approximately 1999. The purpose of the meeting was to show Ms. Dziemit the types of rugs for which she was going to be lending money. At no time during this meeting was there any conversation, agreement or agreement to conspire to defraud IFC amongst the participants.

10. The first order was for IFC purchase order number 4499, for which we sent a check to CCC International of Lorton, Virginia in the amount of $14,400.00, for 1000 grass carpet rugs. We then billed IFC for $16,000 on Remco Invoice No. 25399. We filled a second order similar to the first and sent a bank check to CCC International in the amount of $20,025 and billed IFC in the amount of $22,250.00 for 1600 grass carpet rugs. The next few orders were similar, but larger amounts. I believe all advance funds were sent to CCC International.

11. In early 2000, Mr. Adams approached me and told me that he was going to be using some new suppliers and that instead of advancing funds to the suppliers, I would send him the money and he would pay the suppliers directly. I

*+h*

SIGNED LINER THE PAINS AND PENALTIES OF PERJURY THIS 6 DAY

thought this was odd since he would still have to send me a purchase order, but Mr. Adams explained that if he told me who the suppliers were I would not need him, so I agreed, having no reason to distrust him.

12. The arrangement worked well for about two years, at which time Ms. Dziemit informed me she did not wish to loan money anymore. I believe she made a few more loans during 2002 and 2003, but by the end of 2003, she made no more loans.

13. I believe I paid her back the last loan sometime in 2004.

14. At no time between 1999 and 2004, did I have any agreement with Ms. Dziemit or any other person or entity to defraud or conspire to defraud IFC. Between 1999 and 2003 neither I nor Ms. Dziemit had any knowledge of any scheme or plan to defraud IFC in any way.

15. Previous to Ms. Dziemit ending her loans to Remco or me, I had given her the authority to endorse on behalf of Remco to expedite and simplify repayment of her loans. Ms. Dziemit had a P.O. Box which she generously used to receive IFC checks during the period of time she was loaning money.

16. Between 1999 and 2003, I had no reason to distrust David Adams or his representations and had absolutely no reason to ever call a trucking company to confirm the delivery of merchandize since I never received a complaint from IFC concerning the goods. To the contrary, I received a number of praises concerning the quality of the rugs that were being delivered.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 6TH DAY

OF MARCH, 2008.

Ronald Mitchell

"Subscri ed and swona to before me this     day of

x8"

Notary Public

Date Commission Expires: _____

**M**y **Commission Expires**
**November 30, 2012**

**Exhibit 3**

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF MASSACHUSETTS

x

INTERNATIONAL FLOOR CRAFTS, INC.,


        Plaintiff,


        -against-                    CIVIL ACTION NO.
                                     05CA11654-NMG
DAVID W. ADAMS, et al.,

        Defendants.




                                    x


        VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by

Plaintiff at the offices of Fink & Carney Reporting and

Video Services, 39 West 37th Street, 6th Floor, New York,

New York 10018, on Tuesday, March 7, 2006 commencing at

1:30 p.m., before Debra DiBenedetto, a Shorthand

(Stenotype) Reporter and Notary Public within and for the

State of New York.

A P P E A R A N C E S:

KRASNOO KLEHM LLP
      Attorneys for Plaintiff Terrace Level Suite One
      Andover, Massachusetts 01810-3730

BY: JAMES B. KRASNOO, Esq., of Counsel PAUL J.
      KLEHM, Esq., of Counsel


LAW FIRM OF ISAAC H. PERES Attorneys for Defendant
      Adams 50 Congress Street, Suite 225 Boston,
      Massachusetts 02109

BY: ISAAC H. PERES, Esq., of Counsel


YURKO, SALVESEN & REMZ, P.C.
      Attorneys for Defendant Dziemit One Washington
      Mall, 11th Floor Boston, Massachusetts 02108-2603

BY: RICHARD J. YURKO, Esq., of Counsel


LAW OFFICES OF FREDERICK D. GRANT, JR. Attorneys
      for Defendant Mitchell 727 Atlantic avenue, Second
      Floor Boston, Massachusetts 02111

BY: FREDERIC D. GRANT, JR., Esq., of Counsel

TROUT CACHERIS, PLLC
Attorneys for Defendants David and Paul Sun
1350 Connecticut Avenue, Northwest, Suite 300
Washington, D.C. 20036

BY: JOHN THORPE RICHARDS, Esq., of Counsel

A P P E A R A N C E S: (Cont'd)


          KELLY, LIBBY, HOOPES
                Attorneys for Defendant Brown 175 Federal
                Street Boston, Massachusetts 02110

          BY: SHARON LAHEY, Esq., of Counsel



ALSO PRESENT: John Durant William Gemme Ronald Mitchell
              William Elovitz

Britto

64

A      No, I just said Ron and Jane are innocent.

•      You said that to Ron?

A      Yes.

•       Okay.

A      Because they are. I'm trying to make the wrongs right.

•       What did Ron, if anything, say in response to your statement?

A      I can't remember.

•       Did -- do you know from any conversation at any time with Mr. Mitchell how much money Remco fronted -- if I can put it that way -- paid up front to David Adams?

A      (Witness nods).

•       How much money?

A      Well, if there was a $40,000 invoice, I guess it would have been like 22, 25,000.

•    So, so Mr. Mitchell then was to receive a percentage of the total amount of the invoice?

A      Um-hum.

•       As payment for having produced an

Britto

before you called to complain that Dave Adams was stiffing you?

    A    Because he needed money for a bookie.

    •    Because Dave Adams needed money for a bookie?

    A    Yes, Dave Adams needed money for a bookie.

    •    How did you know that Dave Adams secured the money loan to pay off the gambling debt from Mr. Mitchell as opposed to from someone else?

    A    Through fraudulent receivings.

    •    Well, you indicated that Mr. Mitchell and you had discussed this, is that correct, in a phone call before the State Police ever called and before -- contacted you, and before you called Mr. Mitchell to complain that Dave Adams was stiffing you?

    A    About the loan.

    •    Yes.

    A    Yes.

    •    Okay. Can you tell us, as best as you can recall, what the conversation was that you

156

But it seems like there are more people getting victimized now because of me. Jane, Ron and the last time you brought up Peter Burnham, Debbie Meyers, Sinai Wholesale and Rick Finley. They are all innocent. I can't have any more people getting victimized over what I did. It's just not right. I'll stand up for what I did, but it's not fair to them.

I've been victimized, as I said the first time I got here on Tuesday, March the 7th, 2006. Today is Friday, March the 10, 2006. Bill's birthday is February 28th. His father's birthday's September 11th. My birthday is October 2nd. My mother and father were born, my mother was born on June 4th, 1943, my father was born July 6, 1937.  My grandmother on

my mother's side was born April 2nd, 1912, right around the time that the Titanic went down which was the 14th into the 15th which is the

15th we all know is tax day. I'm saying that just so
everybody knows I know what's going on. I'm
coherent.

I gotta right the wrongs. If I can't right
them all, then I'm not going to right anything.

The names I just previously mentioned need
to be released, dismissed from this case or this
deposition is over today, right now. Bill, Durant,
and your counsel have 20 minutes to make a decision
and I'll be back.  It's not right.  There's enough
victims in this case already.

MR. YURKO:    Off the record.


THE VIDEOGRAPHER: Time is now 12:25,
off the record.

(Brief recess.)
THE VIDEOGRAPHER: Time is now
12:52, on the record.

MR. KRASNOO: Okay,
Mr. Britto, I've heard your statement,
as have some of the others. Now you can
hear mine. First, a person who is

**Exhibit 4**

1

Volume I
Pages 1 to 244
Exhibits 1 - 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                               :
INTERNATIONAL FLOOR CRAFTS,    :
INC.,                          :
            Plaintiff,         :
                               :  Civil Action
        vs.                    :  No. 05-11654-NMG
                               :
DAVID W. ADAMS, TYRONE         :
WILLIAMS, KEVIN BRITTO,        :
RONALD MITCHELL, Individually  :
and d/b/a MANSFIELD RUG        :
COMPANY a/k/a MANSFIELD RUG    :
DEPARTMENT and REMCO, MICHAEL  :
E. BROWN, Individually and     :
d/b/a DALTON PADDING and       :
EMPIRE WEAVERS, JANE DZIEMIT,  :
AGATHA ESPOSITO, DONALD        :
SHOOP, CCC INTERNATIONAL,      :
INC., JOHN D. SUN, DAVID D.    :
SUN and PAUL SUN,              :
            Defendants,        :
                               :
        - and -                :
                               :
LOWELL FIVE CENT SAVINGS       :
BANK, WACHOVIA BANK, NATIONAL  :
ASSOCIATION, f/k/a FIRST       :
UNION BANK OF VIRGINIA,        :
CITIZENS BANK, BANK OF         :
AMERICA f/k/a BANK OF BOSTON,  :
PEOPLE'S BANK and FIRST UNION  :
NATIONAL BANK,                 :
            Trustee Process    :
            Defendants.        :

- - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

DEPOSITION OF WILLIAM J. GEMME, a witness
called on behalf of the Defendant Jane Dziemit,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street, Suite
625, Boston, Massachusetts, on Monday, February 11,
2008, commencing at 11:08 a.m.

PRESENT:

    Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
        23 Main Street, Terrace Level, Suite One,
        Andover, MA  01810-3730, for the Plaintiff.

    Isaac H. Peres, Esq.
        92 State Street, Eighth Floor, Boston, MA
        02109, for the Defendant David W. Adams.

    Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
        Eleven Beacon Street, Suite 625, Boston, MA
        02108, for the Defendant Jane Dziemit.

    Also Present:  Jane Dziemit
               William Elovitz

* * * *

1    that that person would have some knowledge of what

2    was going on with those purchase orders.

3        Q.    Why is that -- that's a presumption you're

4    making, sir, is it not?  You presume that?

5        A.    I am presuming that, because otherwise, why

6    not have Ron Mitchell's phone number, which was on

7    there for a period of time, or somebody who was at

8    least aware of, if there is a phone call, and there

9    are questions raised, that would have the

10   appropriate answers to those questions.

11       Q.    All right.  The problem I still have, sir,

12   is that these purchase orders that have this contact

13   information on them are generated by IFC, correct?

14       A.    Correct.

15       Q.    Mrs. Dziemit doesn't generate these

16   purchase orders, does she?

17       A.    No, she does not.

18       Q.    In fact, the information that would have

19   been filled out, okay, for the information part of

20   these purchase orders would have been done by IFC

21   employees, Britto, Adams, correct?

22       A.    Correct.

23       Q.    So you have no facts, sir, in that case

24   that support an allegation that Ms. Dziemit knew

78

1    that these purchase orders were fraudulent or fake,

2    do you?

3        A.    I have no fact that she knew, no.

4        Q.    And the reason that you have no fact to

5    support that is because these documents, the

6    purchase orders, as well as the key reqs, were

7    generated by IFC people, not Ms. Dziemit, correct?

8        A.    When you say that's the reason that I have

9    no facts, I mean -- I'm not sure that I understand

10   the question.

11       Q.    Okay.  I'll try to rephrase it, sir.

12             The reason that you say that you have no

13   facts to support the allegation that Ms. Dziemit

14   knew that this criminal enterprise was occurring was

15   because the purchase orders, which have this

16   information in them about who to contact, are not

17   generated by her, correct?

18             MR. KLEHM:  Objection.

19       A.    They are not generated by her, correct.

20       Q.    Her handwriting doesn't appear on the

21   purchase orders, does it?

22       A.    To the best of my knowledge, no.

23       Q.    Her handwriting or signature does not

24   appear on the key reqs, does it?

1     Q.   That is my question, sir.

2     A.   I can't tell you whether he knew about it

3     in 1999 or it was 2000 that he knew about it.  But I

4     know at some point he knew about it, because he

5     provided false documentation to us.

6     Q.   In 2005, sir, correct?

7     A.   In 2005, yes.

8     Q.   But would it be fair to say, sir, that you

9     can't identify, as you sit here today, whether Mr.

10    Mitchel knew in 1999, 2000, 2001, 2002, 2003 or 2004

11    that he was filling orders for rugs that didn't

12    exist?  Isn't that fair to say?  You don't have any

13    facts that support the allegation that he knew?

14    A.   Well, I know --

15         MR. KLEHM:  Objection.

16    A.   I know he was billing for rugs that didn't

17    exist.

18    Q.   Understood, sir, but that's not answering

19    my question.  I'm going to object to the response as

20    being nonresponsive.

21         You're not aware of any facts for those

22    years -- I just said '99, 2000, 2001, 2002, 2003,

23    2004 -- you have no facts, okay, that support an

24    allegation that Mr. Mitchell knew that he was

1   filling orders, based on purchase orders generated

2   by IFC, for rugs that didn't exist; am I correct?

3       A.   I have no personal knowledge that he knew.

4       Q.   You don't have any facts, sir, to support

5   it, do you?

6       A.   Well, like I said, the facts --

7       Q.   Other than the --

8            MR. KLEHM:  Let him answer your question.

9       A.   The facts that I have is that he did

10  billing.  So he did billing.  Now, if you do billing

11  as a company, you know what you're paying for for

12  inventory, you know what you're shipping out in

13  inventory, you know what you're billing for.

14      Q.   But if you're just a middleman, sir, okay,

15  if you're just a middleman, and rugs are coming from

16  some other supplier that a couple of IFC people told

17  you are out there and you can get them cheaper, and

18  you've dealt with them for years and they've been

19  part of IFC for years, why would you think there was

20  anything wrong with that?

21           MR. KLEHM:  Objection.

22      Q.   What would you think would be bizarre about

23  that?

24           MR. KLEHM:  Objection.

138

```
 1      Q.   Sir, what facts do you have that support

 2   your allegation that there was a specific agreement

 3   between David Adams and Jane Dziemit to defraud IFC?

 4      A.   Facts that there was a specific agreement?

 5      Q.   Yes, that there were specific agreements

 6   between Mr. Adams and Ms. Dziemit to defraud IFC,

 7   what facts do you have to support there was such an

 8   agreement?

 9      A.   What I know is that Mr. Adams needed

10   somebody to do billing and to cooperate with him so

11   that this could take place.  Now, if you're asking

12   me, do I have a piece of paper that shows that there

13   was an agreement, no, I don't.

14      Q.   I'm asking for facts, sir.  What facts,

15   whether there's -- I'll get to the papers in a

16   minute.  What facts, other than your bold, bold

17   speculation that there had to be an agreement, okay,

18   what facts, specific facts, do you have, what facts

19   do you possess, sir, that support an allegation that

20   there was an agreement between Ms. Dziemit and Mr.

21   Adams to defraud IFC?

22           MR. KLEHM:  Objection.

23      Q.   What facts?

24      A.   I know REMCO was involved in it, and I
```

139

1  know --

2      Q.   REMCO --

3           MR. KLEHM:  You have to let him finish the

4  answer.

5           MR. COHEN:  Okay, fine.

6      A.   And I know that Ms. Dziemit was involved in

7  REMCO to the degree it appears she should have

8  known.  Whether there was a specific agreement

9  between Dave Adams and Ms. Dziemit, I don't know

10  that there was a specific agreement.

11      Q.   That's what you have alleged, sir.  So I'm

12  wondering what facts you have to support that there

13  was a specific agreement between Mr. Adams and Ms.

14  Dziemit to defraud IFC.

15      A.   What I know is there had to be collusion

16  between Mr. Adams and REMCO to defraud the company

17  for the billings to take place, for no shipments to

18  take place, and I know that Ms. Dziemit, in my view

19  in looking at this, was, for all intent, REMCO.

20      Q.   What facts do you have to support this

21  collusion?  What facts?

22      A.   The facts that I have to support the

23  collusion, I have that there is a purchase order

24  filled out for merchandise which was not going to be

152

1    doing with the checks, that that in fact put her in

2    charge of the billing for REMCO, that she was doing

3    the billing for REMCO?  Did you ever see her name on

4    any bill or invoice sent from REMCO to IFC, ever?

5        MR. KLEHM:  Objection.  You want him to

6    answer the last of those questions?  Because that

7    was several questions.

8        Q.    Are there any bills from REMCO to IFC

9    signed by Ms. Dziemit?

10       A.    Not that I know of, no.

11       Q.    There are no bills that Ms. Dziemit

12   generated from REMCO that were sent to IFC?

13       A.    I don't know that.

14       Q.    What facts do you have to support an

15   allegation that there were in fact bills that Ms.

16   Dziemit generated on behalf of REMCO that were then

17   sent to IFC for payment?

18       A.    I'm unable to tell who generated the bills

19   from REMCO.  I just know who was REMCO.

20       Q.    Sir, what facts do you possess that support

21   an allegation that there was some kind of specific

22   agreements between Mr. Williams and Ms. Dziemit to

23   defraud IFC?

24       A.    I don't know if there was any specific

153

1  agreement between Mr. Williams and Ms. Dziemit.  I

2  know Mr. Williams was involved in the scheme and he

3  was an integral part of having that scheme work.

4      Q.   Right, because he is the guy who signs the

5  key reqs and says they got the delivery when they

6  did, right?

7      A.   Correct.

8      Q.   Are you aware whether or not Ms. Dziemit

9  ever actually even spoke to or met with Kevin

10 Britto?

11     A.   No, I'm not aware that they ever met.

12     Q.   Would it surprise you to know that they've

13 never had any contact whatsoever?

14     A.   I can't say that it would surprise me, no.

15     Q.   What about with Mr. Williams?  Are you

16 aware whether or not Ms. Dziemit has ever spoken to

17 or had any contact with or ever met Mr. Williams?

18     A.   I've never known.  I thought that was the

19 question you just asked me.  I've never known --

20     Q.   That was with Britto the first time, sir.

21 This was with Williams.

22          MR. KLEHM:  He's right.

23     A.   I'm sorry, I may have answered the question

24 wrong.

1    A.    No, it does not, to the best of my

2    knowledge.

3    Q.    The only thing that you have -- the only

4    information that you have that supports your

5    conclusion that she knew about this criminal

6    enterprise is that she signed some checks, correct?

7    A.    That's not the only information that I

8    have, no.

9    Q.    Well, what other information do you have,

10    other than her signing some checks on behalf of

11    REMCO, that supports your allegation that she knew,

12    okay, or had a reason to know that there was this

13    criminal enterprise involving fake purchase orders

14    and fake delivery of rugs?

15    A.    The reason that I feel that way, from my

16    investigation, is that a phone number was given that

17    could have called your client at any time, that a PO

18    box that was -- that the money was sent to was in

19    the name of your client.

20        I also know that your client had control of

21    that account, that REMCO account where the money was

22    being sent, and was able to move that money into

23    even personal accounts and other accounts.

24        To me, that tells me that, financially, she

**Exhibit 5**

1

Volume I
Pages 1 to 121
Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
INTERNATIONAL FLOOR CRAFTS,     :
INC.,                           :
            Plaintiff,          :
                                :  Civil Action
        vs.                     :  No. 05-11654-NMG
                                :
DAVID W. ADAMS, TYRONE          :
WILLIAMS, KEVIN BRITTO,         :
RONALD MITCHELL, Individually   :
and d/b/a MANSFIELD RUG         :
COMPANY a/k/a MANSFIELD RUG     :
DEPARTMENT and REMCO, MICHAEL   :
E. BROWN, Individually and      :
d/b/a DALTON PADDING and        :
EMPIRE WEAVERS, JANE DZIEMIT,   :
AGATHA ESPOSITO, DONALD         :
SHOOP, CCC INTERNATIONAL,       :
INC., JOHN D. SUN, DAVID D.     :
SUN and PAUL SUN,               :
            Defendants,         :
                                :
        - and -                 :
                                :
LOWELL FIVE CENT SAVINGS        :
BANK, WACHOVIA BANK, NATIONAL   :
ASSOCIATION, f/k/a FIRST        :
UNION BANK OF VIRGINIA,         :
CITIZENS BANK, BANK OF          :
AMERICA f/k/a BANK OF BOSTON,   :
PEOPLE'S BANK and FIRST UNION   :
NATIONAL BANK,                  :
            Trustee Process     :
            Defendants.         :
                                :
- - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

DEPOSITION OF WILLIAM D. ELOVITZ, a witness
called on behalf of the Defendant Jane Dziemit,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street, Suite
625, Boston, Massachusetts, on Wednesday, February
20, 2008, commencing at 2:07 p.m.

PRESENT:

Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
      23 Main Street, Terrace Level, Suite One,
      Andover, MA  01810-3730, for the Plaintiff.

Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
      Eleven Beacon Street, Suite 625, Boston, MA
      02108, for the Defendant Jane Dziemit.

                    * * * *

90

1    A.    No.

2    Q.    Did you ever review the spreadsheet that I

3    think Ms. Dziemit produced to counsel relative to

4    purchase orders and invoices that were sent to your

5    company, sir, and then checks that were then

6    generated as a result of those invoices?

7    A.    No.

8    Q.    Was that under Mr. Gemme's purview in terms

9    of his investigation?

10    A.    I don't know, but I think so.

11    Q.    Sir, are you aware of any facts that

12    support an allegation that Ms. Dziemit had an

13    agreement, either oral or written, with Mr. Dave

14    Adams to steal money from IFC?

15    A.    Am I aware of any facts?

16    Q.    Yes, sir.

17    A.    No.

18    Q.    Are you aware of any facts that support an

19    allegation that Ms. Dziemit had an agreement with

20    Mr. Britto to steal -- either oral or written

21    agreement with Mr. Britto to steal money from IFC?

22    A.    No, I'm not aware of that.

23    Q.    Are you aware of any facts that support an

24    allegation that Ms. Dziemit had an agreement, oral

91

1   or written, with Mr. Williams to steal money from

2   IFC?

3        A.   No, I'm not aware of those facts.

4        Q.   Do you know, sir, whether or not Ms.

5   Dziemit ever met Kevin Britto?

6        A.   No, I don't know.

7        Q.   Do you know whether or not Ms. Dziemit ever

8   met Mr. David Adams?

9        A.   No, I don't know.

10       Q.   Do you know whether or not Ms. Dziemit ever

11  met Tyrone Williams?

12       A.   No, I do not know that.

13       Q.   Do you know whether or not Ms. Dziemit had

14  any agreement with co-Defendant Michael Brown to

15  steal money from IFC?

16       A.   No, I don't know.

17       Q.   Are you aware of any facts that support

18  that she had an agreement with Mr. Michael Brown of

19  Dalton Padding to steal money from IFC?

20       A.   No, I'm not aware of that.

21       Q.   Do you know whether or not Ms. Dziemit --

22  are you aware of any facts that support an

23  allegation that Ms. Dziemit had an agreement, oral

24  or written, with -- let's go off the record for a

92

1    second.

2            (Discussion off the record)

3        Q.    Sir, are you aware of any agreements that

4    Ms. Dziemit had, oral or written, with either David

5    or Paul Sun to steal money from IFC?

6        A.    No, I am not.

7        Q.    And the same question with regard to CCC

8    International, Inc.  Are you aware whether or not

9    there are any facts that support that Ms. Dziemit

10   had an agreement, oral or otherwise, with CCC to

11   steal money from IFC?

12       A.    No, I am not.

13       Q.    Sir, does anyone in your company that works

14   underneath you that you've relied upon, to your

15   knowledge, have any facts that support allegations

16   that Ms. Dziemit had any kind of agreements with any

17   of the individuals or companies I just mentioned to

18   steal money from IFC?

19       A.    I believe they have facts.

20       Q.    Okay, but you haven't had a discussion with

21   them as to what facts they have?

22       A.    No, they have advised me that she is part

23   of the scheme, and I've relied upon that.

24       Q.    But they didn't tell you specifically what

93

1   facts they had to support their contention -- I'm

2   talking about the people that work underneath you

3   that you've been relying on --

4       A.   I don't remember what they've told me.

5       Q.   Sir, have you reviewed the deposition of

6   Kevin Britto?

7       A.   No, I have not.

8       Q.   If Mr. Britto testified in his deposition

9   that he became a buyer when you became the president

10  in 1993, is that inaccurate?

11      A.   I suppose that's true.

12      Q.   If Mr. Britto indicated that he first left

13  IFC in November, approximately November of 1997, do

14  you have any reason to doubt that?

15      A.   No.

16      Q.   If Mr. Britto testified that he was rehired

17  less than a year later, in September of 1998, would

18  you have any reason to quarrel with that?

19      A.   No.

20      Q.   And if Mr. Britto testified that he then

21  left again for the last time in 2001, would you have

22  any reason to quarrel with that, if he testified to

23  that?

24      A.   No.

106

1    Maybe it was just a little water in the pool.

2         But that combined with the ratios being out

3    of whack, I just -- it never occurred to me that he

4    was stealing, but I knew that he was under a great

5    deal of financial pressure, or I believed he was

6    under a great deal of financial pressure.

7    Q.    If you assume for the purpose of this

8    question that Mr. Britto testified at his deposition

9    that if any questions were raised by Mr. Mitchell,

10   he would simply tell them a lie, and Mr. Mitchell

11   would believe it, do you find that hard to believe?

12   A.    Who was telling the lie?

13   Q.    Mr. Britto was lying to Mr. Mitchell if he

14   had a question about anything.

15   A.    I have no facts, but I believe that Kevin

16   is a good liar and that he would be believable.

17   Q.    He conned you for years, sir, did he not?

18   A.    He conned me for years, yes.

19   Q.    And --

20   A.    And still --

21   Q.    And Mr. Adams conned you for years?  Maybe

22   not as many years, but for some years?

23   A.    Mr. Adams stole from me.  He never conned

24   me.  He never gained my love and respect.  He just

52

1    Q.    As you understand, sir, as you sit here

2    today, are you aware of how long this scheme had

3    been occurring prior to August of 2005?

4    A.    I can only estimate, based upon that

5    original phone call that tipped me off, which I

6    think was about ten years ago, that it had been

7    going on for a long time.  Ten years.

8        MR. COHEN:  Let's take a break.

9        (Recess)

10    BY MR. COHEN:

11    Q.    I think where I left off, sir, I was trying

12    to figure out how this scheme was going on for so

13    many years without, you know, you or anyone else in

14    the company finding out about it.  How is that

15    possible?

16    A.    Because they were only stealing a little

17    bit at a time, and turning it up gradually, like

18    boiling a frog.

19    Q.    Did either Mr. Gemme or any one of the

20    other people ever do an analysis as to how much they

21    were stealing, say, back in '98 and then how much

22    they were stealing back in 2004?  Did you ever do

23    any kind of comparison?

24    A.    I don't know.

1    stole.

2        Q.    But, sir, would you agree with me that,

3    until you found out what he was involved with, that

4    you thought he was an honest person?

5        A.    Until I heard about the gambling problems

6    and the broken knees, I believed him.

7        Q.    He at least seemed to you, and you worked

8    with him for many years --

9        A.    He always seemed to be a hard worker, knew

10   his business well, put in long hours, and seemed to

11   be devoted to it.

12       Q.    And you trusted what he told you?

13       A.    Yes.  But nowhere near like with Kevin.

14       Q.    But Kevin, you really trusted what he told

15   you; is that fair to say?

16       A.    Kevin I had an emotional bond with.

17       Q.    How come?

18       A.    Because he buttered me up so well, or maybe

19   we really liked each other, I don't know.  I don't

20   know if there was anything there or not.  But he

21   sure had me going.  And I to this day still believe

22   there was some truth there, and I don't know.  I

23   don't know.

24            I even -- when his mother was sick, I went

1    invoices against which she was lending money.

2         Q.    So, in other words, your factual basis that

3    you believe in and of itself supports allegations

4    that Ms. Dziemit knew there was a scheme going on

5    was the fact that she never asked for invoices from

6    the suppliers from Mr. Mitchell?

7              MR. KLEHM:  Objection.  Go ahead.

8         A.    That she never did any due diligence at all

9    to see what she was lending money for, and it was

10   significant amounts of money.  It wasn't a hundred

11   dollars here; it was tens of thousands of dollars.

12   And for that kind of -- she must be a sophisticated

13   lender of money to be doing that.

14        Q.    Where did you -- where do you come to that

15   conclusion, sir, that she was a sophisticated --

16        A.    She had enough money to be lending large

17   sums of money.

18        Q.    Sir, you were led astray by Mr. Britto for

19   ten years.  Assume that Ms. Dziemit knew Mr.

20   Mitchell for ten years.  What is so incredible or

21   not credible about someone coming to her, asking her

22   to lend money for a start-up business, and for her

23   to see purchase orders, key reqs, and not ask Mr.

24   Mitchell what invoices he got?  Why is that so

**Exhibit 6**

1

Volume I
Pages 1 to 60
Exhibits 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                 :
INTERNATIONAL FLOOR CRAFTS,      :
INC.,                            :
            Plaintiff,           :
                                 :  Civil Action
        vs.                      :  No. 05-11654-NMG
                                 :
DAVID W. ADAMS, TYRONE           :
WILLIAMS, KEVIN BRITTO,          :
RONALD MITCHELL, Individually    :
and d/b/a MANSFIELD RUG          :
COMPANY a/k/a MANSFIELD RUG      :
DEPARTMENT and REMCO,            :
MICHAEL E. BROWN,                :
Individually and d/b/a DALTON    :
PADDING and EMPIRE WEAVERS,      :
JANE DZIEMIT, AGATHA             :
ESPOSITO, DONALD SHOOP, CCC      :
INTERNATIONAL, INC., JOHN D.     :
SUN, DAVID D. SUN and PAUL       :
SUN,                             :
            Defendants,          :
                                 :
        - and -                  :
                                 :
LOWELL FIVE CENT SAVINGS         :
BANK, WACHOVIA BANK, NATIONAL    :
ASSOCIATION, f/k/a FIRST         :
UNION BANK OF VIRGINIA,          :
CITIZENS BANK, BANK OF           :
AMERICA f/k/a BANK OF BOSTON,    :
PEOPLE'S BANK and FIRST UNION    :
NATIONAL BANK,                   :
            Trustee Process      :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

              DEPOSITION OF JOHN L. DURANT, JR., a
witness called on behalf of the Defendant Jane
Dziemit, taken pursuant to the Federal Rules of
Civil Procedure before Ken A. DiFraia, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Neil S. Cohen, P.C., Eleven Beacon Street,
Suite 625, Boston, Massachusetts, on Friday,
March 7, 2008, commencing at 2:04 p.m.

PRESENT:

     Krasnoo/Klehm LLP
          (by Paul J. Klehm, Esq.)
          23 Main Street, Terrace Level, Suite One,
          Andover, MA 01810-3730, for the Plaintiff.


     Neil S. Cohen, P.C.
          (by Neil S. Cohen, Esq.)
          Eleven Beacon Street, Suite 625,
          Boston, MA 02108,
          for the Defendant Jane Dziemit.

57

```
 1      Q.    Sir, if this scheme or scam flew under the

 2   radar of your company for ten years, why do you

 3   believe or why does the company believe that

 4   Ms. Dziemit should have been looking for some more

 5   documentation to be a savvy business person when she

 6   was loaning the money to REMCO and Mitchell?

 7          MR. KLEHM:  Objection.  You can answer.

 8      A.    There's a lot of association here that

 9   happens.  Dziemit knows Mitchell, loaning money, no

10   documentation.  There's Tony Maresca, employed by

11   REMCO, not employed by REMCO.  No one knows what he

12   really...  But, again, involved with Ms. Dziemit.

13          There just seems to be a lot of involvement

14   with people that could have been part of what did us

15   wrong.

16      Q.    But your company has to prove not what

17   could have happened but what in fact is more likely

18   to have happened.

19          MR. KLEHM:  Wait for a question.

20      Q.    Would you agree with that?

21      A.    Yes, sir.

22      Q.    Would you agree with me, sir, that IFC, the

23   company, it is aware that there was a relationship

24   between Mitchell and Dziemit and Maresca, but
```

58

1   there's really no relationship between Dziemit and

2   anyone else involved in this lawsuit that's been

3   sued?  Would you agree with that, that there's

4   absolutely no connection?

5       A.    None that I know of right now.

6       Q.    And Mr. Gemme hasn't told you of any

7   connection that Ms. Dziemit has with anyone else

8   involved in this lawsuit other than Mr. Mitchell?

9       A.    Correct.

10          MR. COHEN:  I believe that's all the

11  questions I have.

12                (Whereupon the deposition

13                 was concluded at 3:25 p.m.)

14