UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| INTERNATIONAL FLOOR CRAFTS, INC. ) | |
|      Plaintiff       ) | |
|           ) | |
| v.         ) | |
|          ) | |
| DAVID W. ADAMS, *et al*   ) | CIVIL ACTION NO. 05CA11654-NMG |
|      Defendants   ) | |
| _____) | |

**PLAINTIFF'S MOTION (1) FOR LEAVE TO CONTINUE DEPOSITION OF
DEFENDANT RONALD MITCHELL WHERE HIS RECENT AFFIDAVIT WAIVED
HIS PRIVILEGE AGAINST SELF-INCRIMINATION WHICH HE INVOKED AT
HIS DEPOSITION, AND (2) TO EXTEND TIME FOR IFC TO SUBMIT
OPPOSITION TO DZIEMIT'S SUMMARY JUDGMENT MOTION**

Plaintiff International Floor Crafts, Inc. ("IFC") hereby moves this Court pursuant to

Fed.R.Civ.P. 56(f) for leave to continue the deposition of Defendant Mitchell, with a

declaration by this Court that Mitchell has waived his privilege against self-incrimination,

where, although Mitchell claimed such a privilege at his discovery deposition in the within

matter on June 23, 2006 as to all questions posed to him except for his name, he recently

signed an Affidavit of Ronald Mitchell (Doc. Nos. 212-4 and 213-4) directly addressing the

allegations of IFC's Amended Complaint – an affidavit which Defendant Jane Dziemit filed

in support of her motion for summary judgment (Doc. No. 211) on March 14, 2008.   IFC has

suffered severe prejudice from Mitchell's late, and previously unannounced, change of heart,

thus leaving IFC without an opportunity to question Mitchell under oath about the facts

surrounding the within matter.   Under the circumstances, IFC further moves to extend the

time within which IFC must file its opposition to Defendant Dziemit's summary judgment

materials, and supporting documents, from March 28, 2008 to and including May 1, 2008 so

as to afford IFC time to take the deposition of Defendant Mitchell and to prepare a response to Defendant Dziemit's thirty page memorandum of law (Doc. No. 212).

In the alternative, IFC respectfully requests that this Court strike the Affidavit of Ronald Mitchell and strike Paragraphs 5 and 7 through 17 of Defendant Dziemit's Statement of Undisputed Material Facts (Doc. No. 212), which rely exclusively (with the exceptions of ¶¶ 8 and 16[1]) upon said affidavit.

Plaintiff IFC relies upon the Affidavit of Paul J. Klehm Pursuant to Fed.R.Civ.P. 56(f) and the reasons set forth below:

1.      In the within R.I.C.O. action, IFC claims, in essence, that Defendants stole millions of dollars from IFC as a part of a scheme in which Defendants wrongfully obtained payments from IFC for non-existent or partial shipments of rugs from fictitious and/or actual companies over a period of several years.  Upon information and belief, criminal charges are pending against two former employees (Defendants David Adams and Tyrone Williams) arising out of the scheme.  Under the scheme, in essence, Adams (a buyer) would arrange for the "purchase" of certain rugs (which were not delivered, or which were only partially delivered) and Williams (the warehouse receiver) would sign documents falsely acknowledging the receipt of the rugs.   IFC would then pay for the alleged shipment of rugs.

---

[1] Paragraph 8 of the Statement of Undisputed Facts includes no citation (which, in and of itself, should require that the paragraph be stricken.  Nonetheless, the language appears to be drawn from Paragraph 5 of Mitchell's affidavit.  As to Paragraph 16 of the Statement of Undisputed Facts, Dziemit cites to not only Mitchell's affidavit, but also to her own affidavit.

2.     During discovery in this matter, Defendants Adams, Williams and Mitchell exercised their privilege against self-incrimination as to virtually all questions[2]. (*See* copy of Deposition of Ronald Mitchell attached hereto as **Exhibits A-1 and A-2).**

3.     On March 14, 2008, Defendant Jane Dziemit filed a motion for summary judgment, along with supporting materials.  She included a five-page affidavit of Ronald Mitchell.  (Doc. Nos.  212-4 and 213-4[3]).

4.     In that affidavit, Defendant Mitchell details his involvement with Defendant Adams and Defendant Dziemit concerning the sale of rugs to IFC:

> a.     Mitchell wrote about an arrangement under which Adams claimed that Adams would buy carpet from suppliers in advance and resell them to IFC.  (*See* ¶ 7).  Adams wanted to know whether Mitchell was interested in joining this type of venture and then billing IFC from Mitchell's company, presumably REMCO.  (*See* ¶ 7).

> b.     Mitchell wrote that Dziemit agreed to finance the project "with a percentage of the profits going to her."  (*See* ¶ 8).  IFC finds this assertion surprising, since one would think that a lender, as Dziemit professes to be, would obtain interest, and not profits, from loans.  This confusion is compounded when, in her own affidavit, Dziemit writes, "[t] he only funds that I ever received were checks IFC issued to Remco that were to repay loans I had made, plus my interest, charges and profit."  (*See* Affidavit of Jane Dziemit, Doc. No. 212-3, ¶ 30).  Thus, it appears that Dziemit was earning more than mere interest on the purported loans, and that Mitchell was aware of same.  IFC seeks to explore this issue with Mitchell under oath at a continued deposition, as the testimony may lead to the discovery of admissible evidence.

> c.     Mitchell described a meeting with Mr. Adams, Ms. Dziemit and another to discuss rugs for which Dziemit would allegedly lend money. (*See* ¶ 9).

> d.     Mitchell wrote that Adams changed the deal in 2000.  (*See* ¶ 11).  Under the new deal, Adams wanted to receive the money directly from

---

[2]  The deposition of Defendant Adams was not held because Adams' counsel represented that Adams would exercise the privilege against self-incrimination.  Defendant Williams was deposed, but he took the privilege as to almost all questions posed to him.
[3]  Doc. Nos. 212-4 and 213-4 appear to be identical.

Mitchell so that Adams could pay the suppliers directly.  (*See* ¶ 11).
Mitchell admits in his affidavit that he found that arrangement "odd" since
Adams "would still have to send me a purchase order…."  *Id.*

e.       Mitchell wrote that Dziemit made loans during 2000 and 2001, and he
believed that she made a few more loans during 2002 and 2003.  (*See* ¶ 12).

f.       Mitchell further writes that Dziemit had the authority to sign on behalf
of REMCO, and that she received checks on behalf of REMCO at her P.O.
Box.  (*See* ¶ 15).

5.       IFC seeks to reopen the deposition of Mitchell in order to pose questions to

him under oath regarding, among other things, the topics listed above.

6.       "…[A]n individual is not compelled to produce evidence which may later be

used against him as an accused in a criminal action."  *Maness v. Meyers*, 419 U.S. 449, 461

(1975).  A party may waive a privilege by explicit act or by inference.  *Krane v. City of*

*Lowell*, 622 F.Supp. 262, 264 (D.Mass. 1985).

> [If] the witness himself elects to waive his privilege, as he may doubtless
> do, since that privilege is for his protection and not for that of other parties,
> and discloses his criminal connections, he is not permitted to stop, but must
> go on and make a full disclosure.

*Id*. quoting *Brown v. Walker*, 161 U.S. 591, 597 (1896).

7.       In the case at bar, by executing the affidavit, Mitchell has waived his privilege

against self-incrimination.  By doing so at this late juncture – discovery ended on March 14,

2008 – Mitchell has caused undue prejudice to IFC.  Mitchell refused to provide any oral

testimony (other than his name and other minor details) to IFC at his deposition. IFC is

severely prejudiced if it does not have the opportunity to question Mitchell under oath

regarding the issues raised in the case at bar.

8.       IFC's counsel was surprised, to say the least, to find Mitchell's affidavit

among Defendant Dziemit's summary judgment materials.  In the interest of fairness,

pursuant to Fed.R.Civ.P. 56(f), IFC respectfully requests that this Court permit IFC leave to continue the deposition of Defendant Mitchell, at which Defendant Mitchell will be deemed to have waived any privilege against self-incrimination.  (*See* Affidavit of Paul J. Klehm, Esq. Pursuant to Fed.R.Civ.P. 56(f), attached hereto as **Exhibit B**).  Under the circumstances, IFC also respectfully requests that this Court extend the time within which IFC may file its opposition to Defendant Dziemit's summary judgment materials, and supporting documents, to and including May 1, 2008.  The requested extension will permit IFC time to take Defendant Mitchell's deposition and to respond to Defendant Dziemit's thirty-page memorandum of law.

9.      In the alternative, IFC respectfully requests that this Court strike Mitchell's affidavit, and that this Court strike Paragraphs 5 and 7 through 17 of Defendant Dziemit's Statement of Undisputed Facts, which rely upon, and cite to, Mitchell's affidavit.

**WHEREFORE**, for the above reasons, Plaintiff International Floor Crafts, Inc. respectfully requests that this Court GRANT the within motion and

(a)    permit IFC leave to continue the deposition of Defendant Mitchell, at which Defendant Mitchell will be deemed to have waived any privilege against self-incrimination, and

(b)    extend the time within which IFC must respond to Defendant Dziemit's summary judgment materials from March 28, 2008 to and including May 1, 2008.

In the alternative, IFC respectfully requests that this Court

(a)    strike the Affidavit of Defendant Ronald Mitchell (Doc. Nos. 212-4 and 213-4), and

(b)    strike Paragraphs 5 and 7 through 17 of Defendant Dziemit's Statement of Undisputed Material Facts (Doc. No. 212).

The Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,

*/s/ Paul J. Klehm*_____
James B. Krasnoo (BBO# 279300)
*jkrasnoo@krasnooklehm.com*
Paul J. Klehm (BBO# 561605)
*pklehm@krasnooklehm.com*
Benjamin Falkner (BBO# 667951)
*bfalkner@krasnooklehm.com*
Krasnoo|Klehm, LLP
23 Main Street, Suite 6
Andover, MA 01810
Dated:  March 17, 2008                    (978) 475-9955

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

I, Paul J. Klehm, counsel to Plaintiff hereby certify that, on March 17, 2008, I left

voicemail messages for Attorney Frederic Grant, Jr., counsel to Defendant Mitchell, Isaac

Peres, counsel to Defendant Adams, and Neil Cohen, counsel to Defendant Dziemit.  I

attempted to reach Robert Xifaras, counsel to Defendant Williams, but his telephone has

been temporarily disconnected.  I spoke with Attorney Grant and Attorney Cohen in separate

telephone calls on March 17, 2008.  Attorney Grant stated that, since he had no

communication and no direction from his client (Defendant Mitchell), Grant could not take

any position on the motion.  Attorney Cohen stated that he would oppose the motion;  he also

stated that the portions of the statement of undisputed material facts which the within motion

seeks to strike are supported by the Affidavit of Jane Dziemit.  From a comparison of the

paragraphs of the Statement of Undisputed Facts which IFC seeks to strike with the contents

of Affidavit of Jane Dziemit, IFC's counsel has found that Paragraphs 5, 7 through 12, and

14 through 15 of the Statement of Undisputed Facts are not supported by the Affidavit of

Jane Dziemit.  Paragraphs 13 and 16 of the Statement of Undisputed Facts are similar to

Paragraphs 8 and 12 of the Affidavit of Jane Dziemit.  As to Paragraph 13 of the Statement

of Undisputed Facts, Defendant Dziemit does not cite to her own affidavit.

*/s/ Paul J. Klehm*
Paul J. Klehm

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the
attorney(s) of record or upon each party not represented by an attorney via ECF or via first
class mail, postage pre-paid, on March 17, 2008.

*/s/ Paul J Klehm*
Paul J. Klehm

*EXHIBIT A-1*

VOLUME I
PAGES 1 TO 221
EXHIBITS 1 TO 36

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MASSACHUSETTS

C.A. NO. 05CA11654-NMG

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) |
| DAVID W. ADAMS, ET AL., | ) |
| Defendants. | ) |

DEPOSITION OF RONALD EDWARD
MITCHELL, a witness called on behalf of the
Plaintiff, pursuant to the Massachusetts
Rules of Civil Procedure before Lisa Abdo,
Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the offices of Krasnoo
Klehm LLP, 23 Main Street, Terrace Level,
Suite One, Andover, Massachusetts, on Friday,
June 23, 2006, commencing at 10:30 a.m.

## Page 2

1  APPEARANCES:

2

3  Krasnoo Klehm LLP

4  (by Paul J. Klehm, Esq.

5  and James B. Krasnoo, Esq.)

6  23 Main Street

7  Terrace Level, Suite One

8  Andover, Massachusetts  01810-3730

9  978.475.9955

10  pklehm@krasnooklehm.com,

11  for the Plaintiff.

12

13  Frederic D. Grant, Jr., Esq.

14  727 Atlantic Avenue

15  Boston, Massachusetts  02111

16  617.357.6555

17  for the Deponent.

18

19  ALSO PRESENT:  Andrew Stricos and Matt Fram

20

21

22

23

24

## Page 3

1        INDEX
2  DEPONENT:        DIRECT
3  Ronald Edward Mitchell
4
   (by Mr. Klehm)    6
5
6
7
8
        EXHIBITS
9
   NO.              PAGE
10
   1  Mansfield Rug PO 7371      4
11
   2  PO #5881             4
12
   3  Document headed "General
13    Instructions"        4
14  4  Packet of documents relating to
      REMCO and IFC         4
15
   5  Packet of documents relating to
16    REMCO, IFC and CCC International  4
17  6  Documents Bates-stamped 000017 to
      000036          4
18
   7  FedEx receipt        4
19
   8  Check No. 003681        4
20
   9  Packet of documents relating to
21    IFC and Mansfield Rug Co.    4
22  10  Packet of checks      4
23  11  Packet of checks      4
24

## Page 4

1        EXHIBITS
2  NO.              PAGE
3  12  Documents relating to REMCO, IFC
      and CCC International      4
4
   13  Packet of documents      4
5
   14  Agreement for Sale of Goods    4
6
   15  Packet of documents      4
7
   16  Packet of documents      4
8
   17  Packet of documents      4
9
   18  Documents Bates-stamped 000074 to
10    000075          4
11  19  Documents Bates-stamped 000078 to
      000079          4
12
   20  Documents Bates-stamped 000003 to
13    000013          4
14
   21  Documents Bates-stamped 000134 to
15    000135 and 000052      4
16  22  Documents Bates-stamped 000136
      and 000053         4
17
   23  Documents Bates-stamped 000309 to
18    000312          4
19  24  Packet of documents      4
20  25  Documents Bates-stamped 000199 to
      000200 and 1722        4
21
22  26  Bill of Lading        4
   27  Mansfield Rug PO 6995      4
23
   28  Document Bates-stamped 001270    4
24

## Page 5

1        EXHIBITS
2  NO.              PAGE
3  30  Document Bates-stamped 001286    4
4  31  Document Bates-stamped 001287    4
5  32  Document Bates-stamped 001288    4
6  33  Document Bates-stamped 001329    4
7  34  Document Bates-stamped 001334    4
8  35  Documents Bates-stamped 001694 to
      001699          4
9
   36  Document Bates-stamped 000573    4
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2  (Pages 2 to 5)

Page 6

```
 1          P R O C E E D I N G S
 2     (Documents marked as Mitchell
 3     Exhibits 1 to 36 for identification)
 4          MR. GRANT: Ronald Mitchell is my
 5     client and is personally well-known to me to
 6     be Ron Mitchell.
 7          MR. KLEHM: The parties present have
 8     agreed that they'll reserve all objections
 9     and motions to strike until the time of
10     trial. Mr. Mitchell will read and sign
11     within 30 days. We will waive notary and
12     waive filing.
13          RONALD EDWARD MITCHELL
14     a witness called for examination by counsel
15     for the Plaintiff, being first duly sworn,
16     was examined and testified as follows:
17          DIRECT EXAMINATION
18     BY MR. KLEHM:
19  Q. Would you please state your name.
20  A. Ronald Edward Mitchell.
21  Q. Where do you live?
22  A. On advice of counsel -- and I stress on
23     advice of counsel -- and with no intention to
24     impede the progress of discovery in this
```

Page 7

```
 1     action, I respectfully decline to answer on
 2     the grounds that the noticing of my
 3     deposition and my answer to the present
 4     questions will violate my privileges under
 5     the Bill of Rights to the Constitution of the
 6     United States.
 7          Without waiving other grounds, I
 8     wish to give the following specific reasons:
 9          (1) The first amendment right to
10     freedom of speech, association and religion;
11     (2) The fourth amendment right to be free of
12     unreasonable searches and seizures and not be
13     a subject of illegal electronic surveillance;
14     (3) The fifth amendment privilege against
15     self-incrimination; (4) The fifth amendment
16     right to due process of law; (5) The sixth
17     amendment right to counsel; (6) The ninth
18     amendment right to privacy and to be let
19     alone; and (7) The fourteenth amendment to
20     the Constitution of the United States.
21  Q. Is it your contention, Mr. Mitchell, that my
22     question as to your address may form a link
23     in the chain of evidence needed for a
24     prosecution against you?
```

Page 8

```
 1          MR. GRANT: Objection. That
 2     question necessarily gets into the advice of
 3     counsel. And he has -- we've discussed this
 4     with him, and he has taken -- made this
 5     assertion on the advice of counsel.
 6          MR. KLEHM: Okay. I just wanted to
 7     make sure that that was on the record.
 8     BY MR. KLEHM:
 9  Q. Have you ever been known by any other name
10     other than Ronald Mitchell?
11  A. I refer to...
12          MR. GRANT: Same answer.
13  A. Same answer.
14          MR. KLEHM: Am I correct -- I'm
15     addressing this to your counsel. Am I
16     correct that Mr. Mitchell will be giving the
17     answer "same answer" to mean an assertion of
18     his fifth amendment privilege as he did in
19     response to my question about his address?
20          MR. GRANT: What we had talked about
21     earlier -- and I suppose this is what -- I'd
22     like to come up with a protocol here which is
23     agreeable to you to spare everybody the time
24     of his having to repeat it. But his use of
```

Page 9

```
 1     the phrase "same answer" is meant to repeat
 2     in its entirety the answer he gave in
 3     response to the question about his address.
 4          MR. KLEHM: Okay. Also, while I
 5     intend to proceed with asking questions of
 6     your client, it is my understanding that your
 7     client intends to assert the fifth amendment
 8     privilege as to all questions today. Is that
 9     true?
10          MR. GRANT: That is correct.
11     BY MR. KLEHM:
12  Q. What is your middle name?
13          MR. GRANT: Objection. Asked and
14     answered.
15          MR. KLEHM: Let's go off the record
16     for a second.
17          (Discussion off the record)
18          MR. KLEHM: Let's go back on. I
19     withdraw the previous question.
20  Q. What other names, if any, have you used other
21     than Ronald Edward Mitchell?
22  A. Same answer.
23  Q. Are you married?
24  A. Same answer.
```

3  (Pages 6 to 9)

Page 10

1   Q. Have you ever been married?
2   A. Same answer.
3   Q. What is the name of your current suppose, if
4       any?
5   A. Same answer.
6   Q. What is the name of any spouse that you have
7       had during your lifetime?
8   A. Same answer.
9   Q. Who lives with you at your current address?
10  A. Same answer.
11  Q. How long have he or she -- sorry. How long
12      has or have he or she lived with you at that
13      address?
14  A. Same answer.
15  Q. What is the relationship between you and
16      anyone who lives with you at your current
17      address?
18  A. Same answer.
19  Q. Where did you live before you lived -- strike
20      that.
21          Where did you live before you
22      resided at your current address?
23  A. Same answer.
24  Q. Please tell me all of the residences that you

Page 11

1       have lived at since 1980.
2   A. Same answer.
3   Q. Do you have any children?
4   A. Same answer.
5   Q. What are the names of your children?
6   A. Same answer.
7   Q. Are your children alive today?
8   A. Same answer.
9   Q. What do your children do for a living?
10  A. Same answer.
11  Q. Where do your children reside?
12  A. Same answer.
13  Q. Do you own or rent your current residence?
14  A. Same answer.
15  Q. Do you own any property other than
16      potentially the place where you reside?
17  A. Same answer.
18  Q. Have you ever lived in Florida?
19  A. Same answer.
20  Q. Have you ever owned property in Florida?
21  A. Same answer.
22  Q. Have you ever lived in New York?
23  A. Same answer.
24  Q. Have you ever owned property in New York?

Page 12

1   A. Same answer.
2   Q. To the extent that you since -- from 1980 to
3       the present, to the extent that you rented
4       any place at which you resided, what is the
5       name and address of your landlord or
6       landlords?
7   A. Same answer.
8   Q. What is your Social Security number?
9   A. Same answer.
10  Q. Have you ever used any Social Security number
11      other than that one?
12  A. Same answer.
13  Q. For what purpose have you used your Social
14      Security numbers other than for purposes
15      connected with taxes and/or the Social
16      Security Administration?
17  A. Same answer.
18  Q. Have you ever used any Social Security number
19      in connection with obtaining any loans,
20      mortgages or other funds?
21  A. Same answer.
22  Q. If so, on what occasions have you done so?
23  A. Same answer.
24  Q. With what organizations have you sought to

Page 13

1       obtain funds using Social Security numbers?
2   A. Same answer.
3   Q. Have you ever gone through any divorce
4       proceedings?
5   A. Same answer.
6   Q. To the extent that you have gone through any
7       divorce proceedings, in what court did the
8       proceeding take place?
9   A. Same answer.
10  Q. What was the docket number of the case?
11  A. Same answer.
12  Q. In what town or city was the court located in
13      which the proceedings took place?
14  A. Same answer.
15  Q. What was the disposition of the divorce
16      proceedings?
17  A. Same answer.
18  Q. I may have asked this, but what is the
19      current address of any prior spouses that you
20      may have had?
21  A. Same answer.
22  Q. Do you currently have a girlfriend?
23  A. Same answer.
24  Q. What is the name and address of that

4 (Pages 10 to 13)

Page 14

```
 1      girlfriend?
 2   A. Same answer.
 3   Q. Have you discussed this case with that
 4      girlfriend?
 5   A. Same answer.
 6   Q. To the extent that you have discussed this
 7      case with that girlfriend, what did you say
 8      to her and what did she say to you?
 9   A. Same answer.
10   Q. On how many occasions did you speak about
11      this case with that girlfriend?
12   A. Same answer.
13   Q. Have you had other girlfriends from 1990 to
14      the present?
15   A. Same answer.
16   Q. What is the last known addresses of each of
17      those girlfriends?
18   A. Same answer.
19   Q. What is the name of each of those
20      girlfriends?
21   A. Same answer.
22   Q. Have you discussed this case with any of
23      those -- I should have called them
24      ex-girlfriends?
```

Page 15

```
 1   A. Same answer.
 2   Q. If so, what did you say to them and what did
 3      they say to you?  And on how many occasions
 4      did you discuss this with them?
 5   A. Same answer.
 6        MR. KLEHM:  Off the record for a
 7      second.
 8        (Discussion off the record.)
 9   Q. Sir, have you ever served in any military?
10   A. Same answer.
11   Q. When and where did you serve?
12   A. Same answer.
13   Q. What was your rank upon discharge?
14   A. Same answer.
15   Q. Do you have a copy of your DD214?
16   A. Same answer.
17   Q. What was your military occupation?
18   A. Same answer.
19   Q. What was your military serial number, ID
20      number?
21   A. Same answer.
22   Q. What was the type of discharge?
23   A. Same answer.
24   Q. To the extent that the discharge was anything
```

Page 16

```
 1      other than honorable, what were the
 2      circumstances surrounding the discharge?
 3   A. Same answer.
 4   Q. At what base or bases did you serve during
 5      your military service?
 6   A. Same answer.
 7   Q. What is your date of birth?
 8   A. Same answer.
 9   Q. Have you ever used any other date of birth
10      other than the date of birth you just stated?
11   A. Same answer.
12   Q. Have you ever been a party to any lawsuit?
13   A. Same answer.
14   Q. To the extent that you have, please state the
15      name of the case, the name of the courthouse,
16      the docket number of the case, and the
17      disposition of the case.
18   A. Same answer.
19        MR. KLEHM:  I'm trying to group
20      these together a little more now to move it
21      along.
22   Q. Please state your educational background
23      beginning with high school.
24   A. Same answer.
```

Page 17

```
 1   Q. To the extent that you graduated from high
 2      school, in what year did you graduate from
 3      high school?
 4   A. Same answer.
 5   Q. Did you pursue any further education after
 6      high school?
 7   A. Same answer.
 8   Q. If so, where did you go?  What degrees did
 9      you receive?  From what schools and in what
10      years?
11   A. Same answer.
12   Q. Did you pursue any further formal education
13      other than what you've just stated?
14   A. Same answer.
15   Q. To the extent that you have, where did you
16      go?  Did you receive any degrees or
17      certificates or other recognitions of the
18      class or studies that you took?  From where,
19      and what years?
20   A. Same answer.
21   Q. From the time that you completed high school
22      up to the present, please state your complete
23      employment history.
24   A. Same answer.
```

5 (Pages 14 to 17)

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  Q. Please state where you worked, the dates on
2     which you worked there, what your job title
3     was, what your job duties were, what the name
4     of your supervisor was, the address of the
5     place where you worked, and the name of the
6     owner of the company.
7  A. Same answer.
8  Q. Have you ever served as a trustee of any
9     trusts?
10  A. Same answer.
11  Q. If so, what trust did you serve as a trustee
12     of? Where is the trust located? What funds
13     or property did the trust hold? What was the
14     purpose of the trust? What were the names of
15     the beneficiaries?
16  A. Same answer.
17  Q. Have you ever served as an officer of any
18     business entity of any kind?
19  A. Same answer.
20  Q. If so, what business entity did you serve as
21     an officer of? When did you serve in that
22     capacity? What were your duties and
23     responsibilities in that capacity? And what
24     was your salary, wages or other income from

**Page 19**

1     that position?
2  A. Same answer.
3  Q. Are you currently employed?
4  A. Same answer.
5  Q. Where are you employed? What is your job
6     title? What are your duties and
7     responsibilities? What's the name of the
8     entity for whom you are employed? What's
9     your current salary? What other income do
10     you receive from that business, if any? And
11     do you have any ownership stake in the
12     company? And if so, what is your ownership
13     stake?
14  A. Same answer.
15  Q. From 1990 up to the present, list all sources
16     of income that you have.
17  A. Same answer.
18  Q. What is the amount of income that you
19     received each year from those sources of
20     income?
21  A. Same answer.
22  Q. Describe the source of the income as to each
23     such type of income that you received.
24  A. Same answer.

**Page 20**

1  Q. From 1990 to the present, list the names of
2     all entities for whom you were employed or
3     otherwise performed services for.
4  A. Same answer.
5  Q. And also list the addresses of those
6     companies.
7  A. Same answer.
8  Q. List the -- strike that.
9         Describe the manner in which you
10     were paid by those entities, if at all, for
11     your work.
12  A. Same answer.
13  Q. List any commissions that you received from
14     any of those companies.
15  A. Same answer.
16  Q. State whether or not you have ever been the
17     subject of an IRS audit.
18  A. Same answer.
19  Q. If so, state the date of the audit and the
20     disposition of the audit.
21  A. Same answer.
22  Q. State whether you've ever been the subject of
23     a State of Connecticut or other state audit.
24  A. Same answer.

**Page 21**

1  Q. State the disposition of that audit and the
2     date on which it took place.
3  A. Same answer.
4  Q. From 1990 to the present, list the addresses
5     of every place where you have worked.
6  A. Same answer.
7  Q. Are you familiar with an entity known as
8     International Floor Crafts, Inc.?
9  A. Same answer.
10  Q. Have you ever performed any services for or
11     on behalf of International Floor Crafts,
12     Inc.?
13  A. Same answer.
14  Q. Have you ever heard of an entity known as
15     Building 19?
16  A. Same answer.
17  Q. Have you ever heard of an entity known as
18     Building 19, Inc.?
19  A. Same answer.
20  Q. Have you ever performed services for either
21     Building 19 or Building 19, Inc.?
22  A. Same answer.
23  Q. To the extent that you have performed
24     services for International Floor Crafts,

Page 22

```
 1    Building 19, Inc., and/or Building 19,
 2    describe what work you did, when you did it,
 3    where you did it, who you did it for, and
 4    why.
 5  A. Same answer.
 6  Q. Describe any and all income that you received
 7    as a result of performing any such work.
 8  A. Same answer.
 9  Q. Please state when you -- strike that.
10        Please state all the experience that
11    you have selling remnants, padding,
12    broadloom, wood flooring and tile.
13  A. Same answer.
14  Q. Please list all the companies for whom you
15    have sold remnants, padding, broadloom, wood
16    flooring and/or tile.
17  A. Same answer.
18  Q. Name all of the companies for whom you worked
19    selling remnants, padding, broadloom, wood
20    flooring and/or tile along with their
21    addresses.
22  A. Same answer.
23  Q. When did you first get involved in the carpet
24    business?
```

Page 23

```
 1  A. Same answer.
 2  Q. How did you get involved in the carpet
 3    business?
 4  A. Same answer.
 5  Q. When did you first begin working with
 6    International Floor Crafts, Inc., and/or
 7    Building 19?
 8  A. Same answer.
 9  Q. What did you do for them?
10  A. Same answer.
11  Q. Have you ever been convicted -- strike that.
12        Have you been convicted of a felony
13    within the past ten years and/or a
14    misdemeanor within the past five years?
15  A. Same answer.
16  Q. If so, please state the charge of which you
17    were convicted or charges of which you were
18    convicted, the date of the conviction, the
19    court in which the matter was litigated and
20    the name of the attorney who represented you
21    in each such action.
22  A. Same answer.
23  Q. What did you do in preparation for your
24    deposition here today?
```

Page 24

```
 1  A. Same answer.
 2  Q. With whom did you speak?
 3  A. Same answer.
 4  Q. Other than conversations with your attorneys,
 5    please state every conversation that you had
 6    with anyone in preparation for your
 7    deposition here today.
 8  A. Same answer.
 9  Q. What documents did you review in preparation
10    for your deposition today?
11  A. Same answer.
12  Q. To the extent that you reviewed any documents
13    in preparation for your deposition here
14    today, did any of those documents refresh
15    your memory as to any facts? If so, which
16    documents and what facts?
17  A. Same answer.
18  Q. Do you currently intend to leave your current
19    residential address? If so, to where do you
20    intend to go?
21  A. Same answer.
22  Q. Have you ever heard of an entity known as
23    REMCO? R-E-M-C-O, all caps.
24  A. Same answer.
```

Page 25

```
 1  Q. What is REMCO? When was it formed? Who was
 2    it formed by? Is it incorporated? I'll stop
 3    there.
 4  A. Same answer.
 5  Q. To the extent that REMCO is not incorporated,
 6    is it a d/b/a? Is it a situation where it is
 7    Ronald E. Mitchell d/b/a, doing business as,
 8    REMCO?
 9  A. Same answer.
10  Q. Is it a situation where the entity known as
11    REMCO was at one time a d/b/a and at another
12    time was incorporated? If so, please state
13    when it was incorporated and when it was not
14    incorporated, the dates that that happened.
15  A. Same answer.
16  Q. What does REMCO do?
17  A. Same answer.
18  Q. Does REMCO have any employees? To the extent
19    that it has employees -- strike that. Sorry.
20        Has REMCO ever had any employees?
21    To the extent that it has ever had any
22    employees, what are their names? What are
23    the dates on which they worked for REMCO?
24    What were their salaries? What were their
```

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 26

1    job duties? What were their job titles? Who
2    supervised these workers? And do they
3    currently work for REMCO?
4    A. Same answer.
5    Q. Is there an entity known as REMCO that exists
6    today?
7    A. Same answer.
8    Q. Have you used the name "REMCO" as a part of
9    an e-mail address at any time?
10   A. Same answer.
11   Q. If so, what e-mail addresses have you used
12   under the name "REMCO"?
13   A. Same answer.
14   Q. From 1990 to the present, list the names of
15   all of your ISP providers, computer
16   providers, e-mail providers that you have
17   used individually or in connection with any
18   business.
19   A. Same answer.
20   Q. Have you ever used any e-mail address for any
21   REMCO business? If you have, list the names
22   or name of all such e-mail addresses.
23   A. Same answer.
24   Q. Does REMCO have an office? If so, please

Page 27

1    state the name -- if so, please state the
2    address of the office.
3    A. Same answer.
4    Q. Has REMCO ever had any other offices? If so,
5    please the state the address of all such
6    other offices.
7    A. Same answer.
8    Q. Does REMCO actually exist?
9    A. Same answer.
10   Q. Is it true that REMCO is a fictitious entity
11   created solely for the purpose of defrauding
12   International Floor Crafts, Inc.?
13   A. Same answer.
14   Q. If it was, when was REMCO first used for that
15   purpose? Who arranged for it to be set up
16   for that purpose? And what discussions were
17   had leading up to that circumstance?
18   A. Same answer.
19   Q. At any time from 1990 to the present, has
20   REMCO ever possessed or owned or had control
21   over any carpet, remnants, padding,
22   broadloom, wood flooring and/or tile?
23   A. Same answer.
24   Q. Has REMCO ever had a warehouse?

Page 28

1    A. Same answer.
2    Q. If so, where is the warehouse? And during
3    what dates was that warehouse a REMCO
4    warehouse?
5    A. Same answer.
6    Q. At any time has REMCO ever rented any
7    warehouse space from any other entity or
8    individual? If so, when did REMCO rent the
9    space? From whom? And what, if anything,
10   did REMCO store at that space?
11   A. Same answer.
12   Q. Did REMCO ever sell remnants, padding,
13   carpet, broadloom, wood flooring and/or tile?
14   A. Same answer.
15   Q. If so, who were its customers? I'll stop
16   there.
17   A. Same answer.
18   Q. What are the addresses of each customer of
19   REMCO? What, if anything, did each such
20   customer purchase from REMCO? When did each
21   such customer purchase items from REMCO? How
22   were they shipped to the customer? From
23   where were the items shipped to the customer?
24   What paperwork was created by REMCO regarding

Page 29

1    the transactions? How much did each customer
2    pay for the shipment of the items? Were
3    items actually shipped to the customer? And
4    what is the name and the address of any
5    shipping or transport company that shipped
6    the items?
7    A. Same answer.
8    Q. Did Diane Spignosi ever work for REMCO?
9    A. Same answer.
10   Q. Did a Tony Marasco, M-a-r-a-s-c-o, or anyone
11   with a last name similar to Marasco ever work
12   or provide services for REMCO?
13   A. Same answer.
14   Q. Did REMCO ever pay any money to Anthony
15   Marasco?
16   A. Same answer.
17   Q. Did REMCO ever borrow any money from Anthony
18   Marasco?
19   A. Same answer.
20   Q. Have you ever spoken with Anthony Marasco?
21   A. Same answer.
22   Q. When did you first meet Anthony Marasco?
23   What were the circumstance under which you
24   met Anthony Marasco? I'll stop there.

8  (Pages 26 to 29)

1    A.  Same answer.
2    Q.  Have you ever discussed the sale of remnants,
3        padding, broadloom, carpeting, wood flooring
4        and/or tile with Anthony Marasco?
5    A.  Same answer.
6    Q.  Has REMCO ever done any business with Anthony
7        Marasco?  And if so, what business has it
8        done?
9    A.  Same answer.
10   Q.  And if so, when was that business done with
11       him?
12   A.  Same answer.
13   Q.  And if so, what was the nature of the
14       transaction and the amount or amounts of
15       funds that was exchanged between REMCO and
16       Anthony Marasco?
17   A.  Same answer.
18   Q.  Do you hold any title with REMCO, or have you
19       ever held any title with REMCO?
20   A.  Same answer.
21   Q.  If so, what title or titles have you held?
22       And during what date or dates did you hold
23       those titles?
24   A.  Same answer.

1    Q.  Do you hold any licenses other than a license
2        to operate a motor vehicle?  And if so, what
3        licenses do you hold?  And have they ever
4        been suspended or revoked?
5    A.  Same answer.
6    Q.  At any point did REMCO cease to operate?  If
7        so, when and why?
8    A.  Same answer.
9    Q.  Do you consider yourself a broker?  If so,
10       why?
11   A.  Same answer.
12   Q.  Has REMCO ever engaged in any fraudulent
13       activities?
14   A.  Same answer.
15   Q.  If so, what activities has it engaged in?
16   A.  Same answer.
17   Q.  It is my understanding that you contend that
18       you have done nothing of an illegal nature in
19       this matter.  If so, if I am correct on that,
20       then please state all of the reasons why you
21       are not -- strike that -- why you did not
22       engage in any -- let me start that again.
23       I'm sorry.
24           If so, please state every fact that

1        you have that demonstrates that you have not
2        committed any wrongful conduct in this
3        matter.
4    A.  Same answer.
5    Q.  Please list each and every person who has
6        knowledge to suggest that you have not
7        engaged in any wrongful conduct in this
8        matter.
9    A.  Same answer.
10   Q.  Please state what information you believe
11       each of the people that you have listed would
12       know to suggest that you have not engaged in
13       any wrongdoing in this matter.
14   A.  Same answer.
15   Q.  Please describe how -- strike that.
16           Please describe what your typical
17       role is in a transaction involving the sale
18       of remnants, padding, broadloom, wood
19       flooring, carpet and/or tile.
20   A.  Same answer.
21   Q.  Has your role changed at any point over the
22       past 20 years?  And if so, how has it
23       changed?
24   A.  Same answer.

1    Q.  Do you use the Internet as a part of your
2        work?  And if so, for what do you use the
3        Internet?
4    A.  Same answer.
5    Q.  Do you maintain either individually or on
6        behalf of any entity, including REMCO or
7        Mansfield Rug or any other entity, any Web
8        sites promoting the sale of remnants,
9        padding, broadloom, carpeting, wood flooring
10       and/or tile?
11   A.  Same answer.
12   Q.  If so, what Web sites do you use?
13   A.  Same answer.
14   Q.  If so, what company or companies created the
15       Web sites for you?
16   A.  Same answer.
17   Q.  Have you at any time created any fake bills
18       of lading or other proof of delivery for
19       International Floor Crafts?
20   A.  Same answer.
21   Q.  If so, for what purpose did you create fake
22       bills of lading or one bill of lading --
23       sorry.
24           If so, for what purpose did you

9 (Pages 30 to 33)

Page 34

1    create the fake bills of lading?
2    A.  Same answer.
3    Q.  If there was only one bill of lading, for
4       what purpose did you create the one bill of
5       lading that was fake?
6    A.  Same answer.
7    Q.  Describe any and all training that you have
8       received in the sale of remnants, padding,
9       broadloom, wood flooring, carpeting and/or
10      tile.
11   A.  Same answer.
12   Q.  Have you ever heard of an individual named
13      David Adams?
14   A.  Same answer.
15   Q.  Who is David Adams?
16   A.  Same answer.
17   Q.  When did you first come in contact with David
18      Adams?
19   A.  Same answer.
20   Q.  Have you ever understood David Adams to have
21      a gambling problem?  And if so, describe what
22      your understanding is of his gambling
23      problem.
24   A.  Same answer.

Page 35

1    Q.  Have you ever lent any money to David Adams?
2    A.  Same answer.
3    Q.  Has David Adams ever lent any money to you?
4    A.  Same answer.
5    Q.  Has David Adams ever lent any money to REMCO
6       or Mansfield Rug?
7    A.  Same answer.
8    Q.  Has REMCO or Mansfield Rug ever loaned any
9       money to David Adams?
10   A.  Same answer.
11   Q.  Are you or have you ever been involved in an
12      entity known as Mansfield Rug?
13   A.  Same answer.
14   Q.  Have you ever represented to anyone that
15      merchandise was ever shipped on behalf of
16      Mansfield Rug from an address of 5 Mansfield
17      Grove, East Haven, Connecticut?
18   A.  Same answer.
19   Q.  Do you have any association or affiliation or
20      have you ever had any association or
21      affiliation with an address known as 5
22      Mansfield Grove, East Haven, Connecticut?
23   A.  Same answer.
24   Q.  What is located at the address of 5 Mansfield

Page 36

1    Grove, East Haven, Connecticut?
2    A.  Same answer.
3    Q.  Have you ever represented to anyone, whether
4       a part of International Floor Crafts or not,
5       that items were or merchandise were stored at
6       5 Mansfield Grove, East Haven, Connecticut?
7    A.  Same answer.
8    Q.  Have you ever used an organization known as
9       Regional Express for any purpose?
10   A.  Same answer.
11   Q.  Have you ever used an organization known as
12      Regional Express to ship items as part of
13      your work?
14   A.  Same answer.
15   Q.  Have you ever used an organization known as
16      Regional Express to ship items to
17      International Floor Crafts?
18   A.  Same answer.
19   Q.  Have you ever represented to anyone or caused
20      another to represent -- sorry.
21          Have you ever represented to
22      International Floor Crafts or caused another
23      to represent to International Floor Crafts
24      that Regional Express had shipped items to

Page 37

1    International Floor Crafts?
2    A.  Same answer.
3    Q.  To the extent that you have made that
4       representation or that you have caused
5       another to make that representation, what was
6       the representation you made?  When did you
7       make it?  Why did you make it?  And -- that's
8       it.  Why did you make it?
9    A.  Same answer.
10   Q.  Have you ever known David Adams to be
11      involved in any fraudulent conduct whatsoever
12      including fraudulent conduct involving
13      International Floor Crafts, Building 19,
14      Inc., and/or Building 19?
15   A.  Same answer.
16   Q.  To the extent that you have any such
17      knowledge, what is that knowledge and when
18      did this act or these acts take place?
19   A.  Same answer.
20   Q.  Did you at any time try to stop David Adams
21      from committing any fraud against
22      International Floor Crafts?
23   A.  Same answer.
24   Q.  Did you at any time try to stop David Adams

10 (Pages 34 to 37)

Page 38

1    from committing any acts of fraud against
2    Building 19 and/or Building 19, Inc.?
3    A.  Same answer.
4    Q.  To the extent that you did take any such
5    acts, what acts did you take?  When did you
6    take them?  And -- I'll leave it at that.
7    A.  Same answer.
8    Q.  Did David Adams at any time give you any
9    funds that you were not entitled to?
10   A.  Same answer.
11   Q.  To the extent that he gave you any funds that
12   you were not entitled to, when did he give
13   them to you?  How much did he give you?  Why
14   did he give it to you?  What did you do with
15   the money?  And where is it now?
16   A.  Same answer.
17   Q.  Where are the fruits of the fraud that was
18   committed against International Floor Crafts,
19   Building 19, and Building 19, Incorporated?
20   A.  Same answer.
21   Q.  Do you have an understanding that the amount
22   of funds stolen from Building 19,
23   International Floor Crafts, and/or
24   Building 19, Incorporated, exceed $5 million?

Page 39

1    A.  Same answer.
2    Q.  Do you know whether they exceed $10 million?
3    A.  Same answer.
4    Q.  Do you know where any of those funds that
5    were stolen from Building 19, International
6    Floor Crafts, Inc., and/or Building 19, Inc.,
7    are today?
8    A.  Same answer.
9    Q.  To the extent that you do know where they
10   are, where are those funds today?
11   A.  Same answer.
12   Q.  Who has possession of the funds?
13   A.  Same answer.
14   Q.  And how did they end up in the hands of the
15   person or persons with whom those funds are
16   today?
17   A.  Same answer.
18   Q.  Did you serve as a broker assisting
19   Building 19, International Floor Crafts with
20   obtaining rugs and remnants, padding,
21   broadloom, wood flooring, carpeting and tile?
22   A.  Same answer.
23   Q.  When did you first start doing that?
24   A.  Same answer.

Page 40

1    Q.  With whom at Building 19 did you interact
2    when you were brokering the sale of these
3    items?
4    A.  Same answer.
5    Q.  How would you go about determining the price
6    of the items to be sold to Building 19?
7    A.  Same answer.
8    Q.  What were the names of all of the suppliers
9    and addresses of all of the suppliers of
10   items to Building 19?
11   A.  Same answer.
12       MR. KLEHM:  Let's go off the record
13   for a second.
14       (Mr. Fram joins deposition)
15       MR. KLEHM:  Can you read that back.
16       (Question and answer read)
17   Q.  At what point did David Adams -- strike that.
18       At any point did the nature of your
19   dealings with International Floor Crafts
20   change?  And if so, how did they change?
21   When did they change?
22   A.  Same answer.
23   Q.  Have you ever been associated with an entity
24   known as Mansfield Rug?

Page 41

1    A.  Same answer.
2    Q.  What was your association with Mansfield Rug?
3    Where was Mansfield Rug located?  Is
4    Mansfield Rug still in business today?
5    During what dates was Mansfield Rug in
6    business?  And what did Mansfield Rug do?
7    A.  Same answer.
8    Q.  Did Mansfield Rug ever have any employees?
9    A.  Same answer.
10   Q.  If so, what are the names of all of the
11   employees of Mansfield Rug?  What are their
12   addresses, last known addresses?  What role
13   or roles or job duties did each of those
14   people perform?  And what was your title at
15   Mansfield Rug?
16   A.  Same answer.
17   Q.  Did Mansfield Rug have a warehouse?  And if
18   so, where was the warehouse located?  Did it
19   have more than one warehouse?  If so, where
20   were they located?
21   A.  Same answer.
22   Q.  Did Mansfield Rug ever rent or lease any
23   warehouse space?  If so, from whom did
24   Mansfield Rug rent or lease the warehouse

11 (Pages 38 to 41)

Page 42

1    space? And where was the leased space
2    located?
3    A. Same answer.
4    Q. Did Mansfield Rug ever keep any items in any
5       warehouses?
6    A. Same answer.
7    Q. If so, what items did it keep in the
8       warehouses?
9    A. Same answer.
10   Q. Is Mansfield Rug a fictitious company set up
11      to defraud International Floor Crafts?
12   A. Same answer.
13   Q. Did you participate in the creation of
14      Mansfield Rug for the purpose of defrauding
15      International Floor Crafts?
16   A. Same answer.
17   Q. Why was Mansfield Rug created?
18   A. Same answer.
19   Q. Did you ever have any conversations with a
20      David Adams, a Kevin Britto, or anyone else
21      with regard to the creation of REMCO and/or
22      Mansfield Rug?
23   A. Same answer.
24   Q. To the extent that you had any such

Page 43

1    conversations, with whom did you have the
2    conversations? Were they in writing or oral?
3    Who was present at the conversations? What
4    were the substance of the conversations? And
5    where did the conversations take place?
6    A. Same answer.
7    Q. Did Mansfield Rug ever ship anything to
8       anyone?
9    A. Same answer.
10   Q. Did Mansfield Rug ever ship anything to
11      Building 19, International Floor Crafts,
12      Inc., or Building 19, Inc.?
13   A. Same answer.
14   Q. To the extent that Mansfield Rug shipped
15      anything to Building 19, International Floor
16      Crafts, Inc., and/or Building 19, Inc., what
17      did it ship? When did it ship them? What
18      was the price that it was shipped at? And
19      with whom did Mansfield Rug deal at Building
20      19 regarding the shipments?
21   A. Same answer.
22   Q. Is Mansfield Rug incorporated?
23   A. Same answer.
24   Q. Is Mansfield Rug -- strike that.

Page 44

1        Was Mansfield Rug ever incorporated?
2    A. Same answer.
3    Q. If it was incorporated, when was it
4       incorporated? Who incorporated it? What was
5       the name, if any, of the attorney who
6       performed the incorporation?
7    A. Same answer.
8    Q. At any time was Mansfield Rug a d/b/a, a
9       doing business as, under your name? And if
10      so, when was Mansfield Rug first set up as a
11      d/b/a under your name?
12   A. Same answer.
13      MR. KLEHM: Could we go off for a
14      second.
15      (Recess taken)
16   BY MR. KLEHM:
17   Q. Do you know an individual named Kevin Britto?
18   A. Same answer.
19   Q. When did you first meet Kevin Britto, and
20      what were the circumstances under which you
21      met Kevin Britto?
22   A. Same answer.
23   Q. When did you last speak with Kevin Britto?
24   A. Same answer.

Page 45

1    Q. Please recite all of the conversations that
2       you have had with Kevin Britto from April of
3       2005 to the present, including in your answer
4       whether the conversation was oral or in
5       writing, who was present, when the
6       conversation took place, and as best you can
7       recall, what you said to him and what he said
8       to you.
9    A. Same answer.
10   Q. At any point did Kevin Britto apologize for
11      getting you involved in this particular case?
12   A. Same answer.
13   Q. At any point did Kevin Britto -- strike that.
14      Please recite all of the
15      conversations that you have had with David
16      Adams from April of 2005 to the present,
17      including in your answer the number of
18      conversations, when each such conversation
19      took place, the names of all persons present
20      at the conversation, whether the conversation
21      was oral or in writing, and as best you can
22      recall, what you said to him and what he said
23      to you.
24   A. Same answer.

12 (Pages 42 to 45)

Page 46

1   Q.  What was your involvement, if any, with
2       International Floor Crafts, Building 19
3       and/or Building 19, Inc., from 1990 to the
4       present?
5   A.  Same answer.
6   Q.  At any time were you approached by David
7       Adams or Kevin Britto regarding the need for
8       them to buy product from new business
9       sources?
10  A.  Same answer.
11  Q.  If so, state all of the conversations that
12      you had with David Adams and/or Kevin Britto
13      on that subject matter.
14  A.  Same answer.
15  Q.  When did those conversations take place?
16  A.  Same answer.
17  Q.  Did you set up REMCO and/or Mansfield Rug as
18      a result of a request from Adams and/or
19      Britto?
20  A.  Same answer.
21  Q.  Why did you set up REMCO and/or Mansfield
22      Rug?
23  A.  Same answer.
24  Q.  At any point did you either individually or

Page 47

1       through any entity begin to loan money to
2       Britto or Adams?
3   A.  Same answer.
4   Q.  If so, when and why?
5   A.  Same answer.
6   Q.  Is it correct that you served as a broker for
7       carpet, broadloom, padding, remnants, wood
8       flooring and tile sold to International Floor
9       Crafts?
10  A.  Same answer.
11  Q.  Did REMCO or Mansfield Rug ever store any
12      property at International Floor Crafts?  And
13      if so, when did that happen?  What property
14      did it store there?
15  A.  Same answer.
16  Q.  What income did you receive as a result of
17      your work -- what income did you, REMCO
18      and/or Mansfield Rug receive as a result of
19      any transactions involving International
20      Floor Crafts?
21  A.  Same answer.
22  Q.  Is it true that David Adams would contact you
23      and let you know when to bill or send an
24      invoice to International Floor Crafts?

Page 48

1   A.  Same answer.
2   Q.  Explain any and all arrangements that you had
3       with Kevin Britto and/or David Adams with
4       regard to the sale of remnants, padding,
5       broadloom, wood flooring, carpet and/or tile
6       to International Floor Crafts.
7   A.  Same answer.
8   Q.  Did that arrangement change at all at any
9       time from 1995 to the present?  And if so,
10      how did it change?  When did it change?  Who
11      caused the change?  And what conversations
12      did you have with anybody about the change?
13  A.  Same answer.
14  Q.  Did you ever see any of the product that you,
15      REMCO and Mansfield Rug sold to Building 19?
16  A.  Same answer.
17  Q.  What product did you see?
18  A.  Same answer.
19  Q.  To the extent that there was any product that
20      you did not see, why is it that you did not
21      see it?
22  A.  Same answer.
23  Q.  To the extent that there was product that you
24      did not see, is the reason why you did not

Page 49

1       see the product was because there was no
2       product?
3   A.  Same answer.
4   Q.  Did you create and/or send invoices to
5       International Floor Crafts?
6   A.  Same answer.
7   Q.  To the extent that you did, when did you
8       create them?  What information did you use to
9       create them?  To whom did you send them?
10      Were they fictitious in any way?  And if so,
11      how?
12  A.  Same answer.
13  Q.  Did you ever have any partners at REMCO?
14  A.  Same answer.
15  Q.  If so, who were your partners?  What is their
16      current or last known address?  When did they
17      become partners?  And what was their
18      partnership share?
19  A.  Same answer.
20  Q.  Was Jane Dziemit a partner in REMCO?
21  A.  Same answer.
22  Q.  Was Jane Dziemit a partner in Mansfield Rug?
23  A.  Same answer.
24  Q.  To the extent that she was a partner in

13  (Pages 46 to 49)

Page 50

1    either of those two companies, what
2    percentage partnership interests did she
3    have? What percentage partnership interests
4    did you have? Did that change at all? And
5    if so, when and why?
6  A. Same answer.
7  Q. Did Jane Dziemit ever receive any profits
8    from REMCO, from Mansfield Rug or any other
9    dealings that you had with David Adams, Kevin
10   Britto and/or International Floor Crafts?
11  A. Same answer.
12  Q. If so, what profits did she receive? List
13   each profit that she -- each instance in
14   which she received profit and why she
15   received profit from it.
16  A. Same answer.
17  Q. Have you ever signed any documents stating
18   that Jane Dziemit was a partner at IFC, or
19   have you ever seen -- well, I'll stop there.
20  A. Same answer.
21  Q. Have you ever seen any documents in which
22   Jane Dziemit was listed as a partner in IFC?
23   And if so, what documents have you seen?
24  A. Same answer.

Page 51

1  Q. Is it a practice or procedure of you as a
2   broker to not have the items that you are
3   brokering the sale of in your immediate
4   possession? And if so, can you explain how
5   that works.
6  A. Same answer.
7  Q. Is it your practice or procedure or has it
8   ever been your practice or procedure as a
9   part of REMCO and/or Mansfield Rug to not
10   have the actual product that you're selling
11   to International Floor Crafts in your
12   possession? And if so, why?
13  A. Same answer.
14  Q. Have you ever heard of an entity known as
15   Equity Mortgage?
16  A. Same answer.
17  Q. Where is Equity Mortgage located?
18  A. Same answer.
19  Q. Did you, REMCO, Mansfield Rug or Jane Dziemit
20   have any affiliation with Equity Mortgage?
21  A. Same answer.
22  Q. Did Tony Marasco have any affiliation with
23   Equity Mortgage?
24  A. Same answer.

Page 52

1  Q. Did you, Tony Marasco, Jane Dziemit, REMCO or
2   Mansfield Rug ever take out any loans with
3   Equity Mortgage?
4  A. Same answer.
5  Q. Have you included income -- strike that.
6     Have you included all income that
7   you received from REMCO and Mansfield Rug on
8   your state and federal income tax returns at
9   any time from 1990 to the present?
10  A. Same answer.
11  Q. Have you ever failed to include any income --
12   (Mr. Krasnoo joins deposition)
13  A. Same answer.
14  Q. I didn't finish the question. I'm sorry.
15   (Discussion off the record)
16  Q. Have you ever failed to include any income
17   that you have received from REMCO and/or
18   Mansfield Rug on any of your state or federal
19   income tax returns at any time from 1990 to
20   the present?
21  A. Same answer.
22  Q. To the extent that you have not included any
23   such income on your returns, how much income
24   have you failed to report? Why did you fail

Page 53

1   to report it? And what have you done with
2   those funds?
3  A. Same answer.
4  Q. Has REMCO ever prepared any state or federal
5   income tax returns?
6  A. Same answer.
7  Q. Has Mansfield Rug ever prepared any state or
8   federal income tax returns?
9  A. Same answer.
10  Q. To the extent that REMCO and/or Mansfield Rug
11   have prepared state or federal income tax
12   returns, do you have copies of any such
13   returns in your possession?
14  A. Same answer.
15  Q. Do you have copies of your state or federal
16   income tax returns from 1990 to the present?
17  A. Same answer.
18  Q. Who is your -- strike that. Sorry.
19     At any time from 1990 to the
20   present, have you, REMCO or Mansfield Rug had
21   any accountant?
22  A. Same answer.
23  Q. To the extent that you have had any
24   accountant or accountants with an "S," what

14 (Pages 50 to 53)

1    are their names and addresses?

2    A. Same answer.

3    Q. To the extent that you had any accountant or

4       accountants, during what period of time or

5       periods of time have each such accountant

6       performed work for or on behalf of

7       Mitchell -- sorry -- of you, REMCO and/or

8       Mansfield Rug?

9    A. Same answer.

10   Q. To the extent that REMCO or Mansfield Rug

11      have prepared any state or federal income tax

12      returns, has Jane Dziemit ever signed any

13      such returns?

14   A. Same answer.

15   Q. To the extent that she has signed any such

16      returns, how many returns has she signed and

17      on behalf of which of the two organizations

18      did she sign it?

19   A. Same answer.

20   Q. Have you, yourself, signed any returns on

21      behalf of REMCO and/or Mansfield Rug?  And to

22      the extent that you have, how many have you

23      signed?

24   A. Same answer.

1    Q. Has REMCO and/or Mansfield Rug paid any sales

2       tax on any sales at any time from 1990 to the

3       present?

4    A. Same answer.

5    Q. Has REMCO and/or Mansfield Rug prepared any

6       tax documents regarding sales tax for any

7       state or federal entity at any time from 1990

8       to the present?

9    A. Same answer.

10   Q. To the extent that such documents were

11      prepared, who prepared them?

12   A. Same answer.

13   Q. Do you have copies of any of those documents

14      as they relate to REMCO and/or Mansfield Rug?

15   A. Same answer.

16   Q. If so, where are they kept?

17   A. Same answer.

18   Q. Who was the actual preparer of any of the

19      state or federal income tax returns on behalf

20      of REMCO and/or Mansfield Rug and yourself at

21      any time?

22   A. Same answer.

23   Q. Did the actual preparer of the tax return or

24      the sales tax documents sign the return?

1    A. Same answer.

2    Q. Did Jane Dziemit prepare any documents for or

3       on behalf of REMCO or Mansfield Rug?

4    A. Same answer.

5    Q. To the extent that she prepared any

6       documents, what documents did she prepare and

7       how -- what are the circumstances under which

8       she prepared the documents?

9    A. Same answer.

10   Q. Where are those documents, if any, that she

11      prepared kept?

12   A. Same answer.

13   Q. Who is the keeper of the records for

14      Mansfield Rug, and who is the keeper of

15      records for REMCO?

16   A. Same answer.

17   Q. Where do you keep all of your business

18      records?

19   A. Same answer.

20   Q. Have you destroyed at any time any records

21      for yourself, for REMCO and/or for Mansfield

22      Rug?

23   A. Same answer.

24   Q. To the extent that you have destroyed any

1       documents, when did you destroy them?  For

2       what purpose did you destroy them, and what

3       documents did you destroy?

4    A. Same answer.

5    Q. Have you caused any electronic information,

6       whether it be an e-mail or a word processing

7       document or any other similar document

8       including instant messaging, to be destroyed

9       or altered or obliterated at any time from

10      1995 to the present?

11   A. Same answer.

12   Q. To the extent that you have, what documents

13      did you cause to be destroyed or altered or

14      obliterated?  For what purpose did you do

15      that?  And what was the actual portion that

16      was destroyed or obliterated or altered?

17   A. Same answer.

18   Q. Has anyone ever asked you to destroy,

19      obliterate or alter any documentation that

20      relates to you, to REMCO and/or to Mansfield

21      Rug at any time from 1995 to the present?

22   A. Same answer.

23   Q. If so, who asked you to destroy, alter or

24      obliterate documents?  What documents did

15  (Pages 54 to 57)

Page 58

1    they ask you to destroy, alter or obliterate?
2    Did you destroy, alter or obliterate the
3    documents? And if so, when?
4    A. Same answer.
5    Q. Has anyone ever suggested that you destroy,
6    alter or obliterate the documents?
7    A. Same answer.
8    Q. And to the extent -- well, I'll just say it
9    again. To the extent that anyone did ask --
10   did suggest that you destroy, alter or
11   obliterate documents, who asked you to do
12   that? When did he or she ask you to do that?
13   Did you, in fact, go ahead and do it? And
14   what documents, if any, did you destroy,
15   alter or obliterate?
16   A. Same answer.
17   Q. Did Kevin Britto or David Adams ever tell you
18   that Kevin Britto and David Adams were
19   partners in any particular venture?
20   A. Same answer.
21   Q. To the extent that they did, who said it to
22   you? When did they say it? Was it orally or
23   in writing? Who else was present, if anyone?
24   And what was the substance of that

Page 59

1    communication?
2    A. Same answer.
3    Q. Did Tony Marasco ever loan money to David
4    Adams?
5    A. Same answer.
6    Q. Did you ever become aware that David Adams
7    owed money to Tony Marasco?
8    A. Same answer.
9    Q. Were you ever contacted by Kevin Britto and
10   told in words or substance that certain
11   vendors were calling him and not getting paid
12   because Adams was taking away some money or
13   words to that effect?
14   A. Same answer.
15   Q. To the extent that -- strike that.
16        If so, please state as best you can
17   recall what was said to you and what you said
18   to Kevin Britto regarding that subject
19   matter, including the date on which the
20   conversation took place.
21   A. Same answer.
22   Q. Have you ever heard Tony Marasco referred to
23   as a quote/unquote leg breaker or words to
24   that effect?

Page 60

1    A. Same answer.
2    Q. Have you ever heard of Tony Marasco referred
3    to as a loan shark or words to that effect?
4    A. Same answer.
5    Q. Have you ever socialized with Tony Marasco
6    and/or Jane Dziemit?
7    A. Same answer.
8    Q. When did you first meet Jane Dziemit, and
9    what were the circumstances under which you
10   met her?
11   A. Same answer.
12   Q. Have you ever dated Jane Dziemit?
13   A. Same answer.
14   Q. If you did date her, during what period of
15   time did you date her?
16   A. Same answer.
17   Q. To the extent that you have socialized with
18   Jane Dziemit and/or Tony Marasco, how many
19   times have you socialized? What sorts of
20   things did you do when you were socializing?
21   And was Kevin Britto and/or David Adams ever
22   present when you did socialize?
23   A. Same answer.
24   Q. Have you read the deposition transcripts of

Page 61

1    the deposition of Kevin Britto?
2    A. Same answer.
3    Q. To the extent that you have read the
4    transcript of the deposition of Kevin Britto,
5    do you disagree with any portion or portions
6    of that deposition transcript?
7    A. Same answer.
8    Q. If so, with what portion or portions do you
9    disagree and why?
10   A. Same answer.
11   Q. At any point did -- strike that.
12        During the period from approximately
13   2000 to 2002, were you sending checks to
14   David Adams?
15   A. Same answer.
16   Q. During the period of roughly 2000 to 2002,
17   what was your role with regard to any
18   arrangements that you had with David Adams
19   and/or Kevin Britto?
20   A. Same answer.
21   Q. Did that role include your sending checks to
22   David Adams and/or to others?
23   A. Same answer.
24   Q. To the extent that your role involved sending

16 (Pages 58 to 61)

## Page 62

1    checks to anyone, what would cause you to
2    send a check? How would you determine how
3    much of a check to send? Where would you
4    send the checks to? And from what account
5    would you send the checks?
6  A. Same answer.
7  Q. Where would you receive the funds from which
8    to make the payments?
9  A. Same answer.
10 Q. Has REMCO ever had any bank accounts?
11 A. Same answer.
12 Q. Let me ask you in a broad sense. From 1990
13   to the present, have you, REMCO and/or
14   Mansfield Rug ever had any bank accounts
15   either individually or jointly held with
16   others?
17 A. Same answer.
18 Q. To the extent that you've had any bank
19   accounts, with what banks have you had the
20   accounts?
21 A. Same answer.
22 Q. How much is currently in those accounts?
23 A. Same answer.
24 Q. Have you ever commingled your personal funds

## Page 63

1    with funds that belonged to REMCO and/or
2    Mansfield Rug?
3  A. Same answer.
4  Q. Are you involved as an owner and/or officer
5    and/or employee of any other company which
6    requires you to hold funds?
7  A. Same answer.
8  Q. To the extent that you do, with what bank do
9    you hold those funds, and for what purpose
10   are you holding the funds?
11 A. Same answer.
12 Q. Do you know an individual named Bill Elovitz?
13 A. Same answer.
14 Q. How do you know Bill Elovitz?
15 A. Same answer.
16 Q. Have you ever spoken with Bill Elovitz?
17 A. Same answer.
18 Q. On how many occasions have you spoken with
19   Bill Elovitz? And as to each such
20   conversation, could you state where the
21   conversation took place. Was it orally or in
22   writing? What was the substance of the
23   conversation, and who else was present?
24 A. Same answer.

## Page 64

1  Q. Do you know an individual named John Durante?
2  A. Same answer.
3  Q. Have you ever spoken to John Durante? And if
4    so, was it orally or in writing? Was anyone
5    else present? As best you can recall, what
6    did you say to him and what did he say to
7    you? And how many times have you spoken with
8    him?
9  A. Same answer.
10 Q. Same set of questions for a William Gemme,
11   also known as Bill Gemme, G-e-m-m-e?
12 A. Same answer.
13 Q. Same set of questions regarding a Nicholas
14   Adler-Duthe, A-d-l-e-r hyphen capital
15   D-u-t-h-e?
16 A. Same answer.
17 Q. Do you know an individual named Tyrone
18   Williams?
19 A. Same answer.
20 Q. Who is Tyrone Williams?
21 A. Same answer.
22 Q. On how many occasions have you spoken with
23   Tyrone Williams?
24 A. Same answer.

## Page 65

1  Q. During the occasions that you did speak with
2    him -- first of all, how many occasions were
3    there? Was it orally or in writing? Who was
4    present? And as best you can recall, what
5    did you say to him, and what did he say to
6    you?
7  A. Same answer.
8  Q. Do you know an individual named Michael E.
9    Brown?
10 A. Same answer.
11 Q. Have you ever spoken with a Michael E. Brown?
12 A. Same answer.
13 Q. To the extent that you have spoken with a
14   Michael E. Brown, can you set forth each time
15   you've spoken with him -- set forth as to
16   each time you've spoken with him, whether it
17   was orally or in writing, who was present,
18   and as best you can recall, what you said to
19   him and what he said to you.
20 A. Same answer.
21 Q. Who is Agatha Esposito?
22 A. Same answer.
23 Q. Have you ever discussed this case with Agatha
24   Esposito?

17  (Pages 62 to 65)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 66

1  A.  Same answer.
2  Q.  Have you ever discussed the facts alleged in
3     this case with Agatha Esposito?
4  A.  Same answer.
5  Q.  To the extent that you have discussed either
6     of these things with Agatha Esposito, was it
7     orally or in writing?  Who was present?  And
8     as best you can recall, what did you say to
9     her, and what did she say to you?
10 A.  Same answer.
11 Q.  Has Agatha Esposito ever received any funds
12    from REMCO or from Mansfield Rug or from you
13    representing proceeds of any sale involving
14    International Floor Crafts?
15 A.  Same answer.
16 Q.  To the extent that she has received any such
17    funds, when did she receive them?  How much
18    did she receive?  And to the extent that you
19    know, what did she do with the funds?
20 A.  Same answer.
21 Q.  Do you know an individual named David Sun?
22 A.  Same answer.
23 Q.  Who is David sun?
24 A.  Same answer.

Page 67

1  Q.  To the extent -- sorry.  Have you ever spoken
2     with David Sun?
3  A.  Same answer.
4  Q.  To the extent that you have spoken with David
5     Sun, as to each such conversation, can you
6     tell me whether it was oral or in writing,
7     who was present, and as best you can recall,
8     what you said to him and what he said to you.
9  A.  Same answer.
10 Q.  Do you know an individual named John Sun?
11 A.  Same answer.
12 Q.  Who is John Sun?
13 A.  Same answer.
14 Q.  Have you ever spoken with John Sun?
15 A.  Same answer.
16 Q.  To the extent that you have spoken with John
17    Sun, as to each such conversation, was it
18    oral or in writing?  Who was present?  Where
19    did the conversation take place?  And as best
20    you can recall, what did you say to him, and
21    what did he say to you?
22 A.  Same answer.
23 Q.  Do you know an individual named Paul Sun?
24 A.  Same answer.

Page 68

1  Q.  Who is Paul Sun?
2  A.  Same answer.
3  Q.  Have you ever spoken with Paul Sun?
4  A.  Same answer.
5  Q.  As best you can recall, as to each such
6     conversation, please state whether it was
7     oral or in writing, who was present, where
8     the conversation took place, and the
9     substance of the conversation.
10 A.  Same answer.
11 Q.  Do you know an individual named Rick Finley?
12 A.  Same answer.
13 Q.  Who is Rick Finley?
14 A.  Same answer.
15 Q.  As best you can recall, as to each -- sorry.
16    Have you ever spoken with Rick Finley?
17 A.  Same answer.
18 Q.  As best you can recall, as to each such
19    conversation, was it oral or in writing?  Who
20    was present?  And where did the conversation
21    take place, and what was the substance of
22    your conversation?
23 A.  Same answer.
24 Q.  Did Rick Finley ever approach you regarding

Page 69

1     any scheme or wrongful conduct involving
2     International Floor Crafts?
3  A.  Same answer.
4  Q.  If so, describe the scheme that he -- sorry.
5        If so, did you ever agree to
6     participate in the scheme or wrongful
7     conduct?
8  A.  Same answer.
9  Q.  Has REMCO ever used the home address of
10    Agatha Esposito as a business address for
11    REMCO?
12 A.  Same answer.
13 Q.  If so, when, why, and how often?
14 A.  Same answer.
15 Q.  To the extent that REMCO used an address of
16    Agatha Esposito as a business address for
17    REMCO, did REMCO only use that address for
18    shipments to International Floor Crafts?
19 A.  Same answer.
20 Q.  If so, why?
21 A.  Same answer.
22 Q.  Did REMCO ever ship to anyone other than
23    International Floor Crafts?
24 A.  Same answer.

18 (Pages 66 to 69)

Page 70

```
 1   Q.  If so, to whom?
 2   A.  Same answer.
 3   Q.  Did Mansfield Rug ever ship to anyone other
 4       than International Floor Crafts?
 5   A.  Same answer.
 6   Q.  And if so, to whom?
 7   A.  Same answer.
 8   Q.  Do you know an individual named James Clark?
 9   A.  Same answer.
10   Q.  Who is James Clark?
11   A.  Same answer.
12   Q.  Have you ever spoken with James Clark?
13   A.  Same answer.
14   Q.  To the extent that you have spoken with him,
15       please state whether it was oral or in
16       writing, who was present, where the
17       conversation took place, and the substance of
18       the conversation.
19   A.  Same answer.
20   Q.  Did REMCO or Mansfield Rug ever use an
21       address of Jane Dziemit as a business
22       address?
23   A.  Same answer.
24   Q.  If so, when, why, and how often?
```

Page 71

```
 1   A.  Same answer.
 2   Q.  To the extent that REMCO did use an address
 3       of Jane Dziemit as a business address, did
 4       REMCO only use that address for shipments to
 5       IFC?
 6   A.  Same answer.
 7   Q.  If so, why?
 8   A.  Same answer.
 9   Q.  Do you know an individual named Deborah
10       Meyers?
11   A.  Same answer.
12   Q.  Who is Deborah Meyers?
13   A.  Same answer.
14   Q.  Have you ever spoken with Deborah Meyers?
15   A.  Same answer.
16   Q.  To the extent that you have spoken with
17       Deborah Meyers, as to each such conversation,
18       was it oral or in writing?  Who was present?
19       Where did it take place?  And what was the
20       substance of the conversation?
21   A.  Same answer.
22   Q.  Do you know an individual named Linda Adams?
23   A.  Same answer.
24   Q.  Who is Linda Adams?
```

Page 72

```
 1   A.  Same answer.
 2   Q.  Have you ever spoken with Linda Adams?
 3   A.  Same answer.
 4   Q.  To the extent that you have spoken with Linda
 5       Adams, as best you can recall, as to each
 6       such conversation, who was present?  Was it
 7       oral or in writing?  Where did it take place?
 8       And what was the substance of the
 9       conversation?
10   A.  Same answer.
11   Q.  Are you related to Jane Dziemit in any way?
12   A.  Same answer.
13   Q.  Are you related to Tony Marasco in any way?
14   A.  Same answer.
15   Q.  Have you ever borrowed money from either Jane
16       Dziemit or Tony Marasco?
17   A.  Same answer.
18   Q.  To the extent that you have borrowed any
19       money from Jane Dziemit or Tony Marasco, how
20       much have you borrowed?  When did you borrow
21       it?  When did you pay it back?  And with what
22       funds did you use to pay it back with?
23   A.  Same answer.
24   Q.  Also, what was the purpose of the loan as to
```

Page 73

```
 1       each such loan that you made -- I'm sorry --
 2       as to each such loan that you requested from
 3       Jane Dziemit or Tony Marasco?
 4   A.  Same answer.
 5   Q.  Do you know an individual named Diane
 6       Spignosi, S-p-i-g-n-o-s-i?
 7   A.  Same answer.
 8   Q.  Who is Diane Spignosi?
 9   A.  Same answer.
10   Q.  Have you ever spoken with Diane Spignosi?
11   A.  Same answer.
12   Q.  To the extent that you have spoken with Diane
13       Spignosi, as to each such conversation, was
14       it oral or in writing?  Who was present?
15       Where did the conversation took place?  And
16       what was the substance of the conversation?
17   A.  Same answer.
18   Q.  And for Diane Spignosi, I want to narrow it a
19       little bit more.  Have you ever spoken with
20       Diane Spignosi about either this lawsuit or
21       the facts underlying this lawsuit?
22   A.  Same answer.
23   Q.  To the extent that you have spoken with her
24       about this lawsuit or the facts underlying
```

19 (Pages 70 to 73)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

**Page 74**

1 this lawsuit, as to each such conversation,
2 was it oral or in writing? Who was present?
3 Where did the conversation take place? And
4 as best you can recall, what did you say to
5 her and what did she say to you?
6 A. Same answer.
7 Q. Are you or have you ever been related to
8 Diane Spignosi?
9 A. Same answer.
10 Q. Do you know an individual named Tony Marasco?
11 A. Same answer.
12 Q. To the extent that you have spoken with him,
13 as best you can recall, who was present? Was
14 it oral or in writing? Where did it take
15 place? And what was the substance of the
16 communication?
17 A. Same answer.
18 Q. Is Spignosi related to Tony Marasco or Jane
19 Dziemit?
20 A. Same answer.
21 Q. If so, how are they related?
22 A. Same answer.
23 Q. Are you familiar with any of the following
24 entities: Bentley Mortgage Company; Wyvern

**Page 75**

1 Group, W-y-v-e-r-n Group LLC; Equity
2 Mortgage; 2575 State Street LLC; Dimetri
3 Properties LLC; Lia's Choice, L-i-a
4 apostrophe s; Fifteen Homes Properties LLC;
5 283 Forbes Properties LLC?
6 A. Same answer.
7 Q. To the extent that you're familiar with any
8 of those, what is your familiarity with those
9 entities?
10 A. Same answer.
11 Q. Have you ever received funds from any of
12 those entities?
13 A. Same answer.
14 Q. If so, what funds have you received and why
15 and when?
16 A. Same answer.
17 Q. Have you ever been employed by or performed
18 services on behalf of any of those entities?
19 And if so, what was the nature of your
20 employment and what services -- and/or what
21 services did you perform?
22 A. Same answer.
23 Q. Have you ever received any funds from any of
24 those organizations for any reason

**Page 76**

1 whatsoever? And if so, what funds have you
2 received, when and why?
3 A. Same answer.
4 Q. Have you ever had any ownership interests in
5 any of those organizations? And if so, what
6 ownership interests have you had and why?
7 A. Same answer.
8 Q. Have any funds from International Floor
9 Crafts, Building 19, or Building 19, Inc.,
10 ever gone to any of those organizations? If
11 so, how much, when and why?
12 A. Same answer.
13 Q. Have any funds from any of those
14 organizations been paid to David Adams, Kevin
15 Britto or to yourself? If so, how much, when
16 and why?
17 A. Same answer.
18 Q. Do you know an individual named Ken Machado,
19 M-a-c-h-a-d-o?
20 A. Same answer.
21 Q. Who is Ken Machado?
22 A. Same answer.
23 Q. Have you ever spoken with him?
24 A. Same answer.

**Page 77**

1 Q. To the extent that you have spoken with him,
2 as to each such conversation, was it oral or
3 in writing? Who was present? Where did it
4 take place, and what was the substance of the
5 communication?
6 A. Same answer.
7 Q. Have you ever spoken to Jane Dziemit
8 regarding this lawsuit and/or the facts
9 surrounding this lawsuit?
10 A. Same answer.
11 Q. To the extent that you have, as to each such
12 conversation, was it oral or in writing? Who
13 was present? Where did it take place? Was
14 anybody else present -- sorry -- who was
15 present? Where did it take place? And as
16 best you can recall, what did you say to her,
17 and what did she say to you?
18 A. Same answer.
19 Q. Has Jane Dziemit ever suggested that you take
20 any action with regard to this particular
21 lawsuit? And if so, when did she make the
22 suggestion and what suggestion did she make?
23 A. Same answer.
24 Q. Have you ever discussed the facts underlying

Page 78

1   this lawsuit with either David Adams, Kevin
2   Britto or Tyrone Williams?
3   A. Same answer.
4   Q. If so, as to each such conversation, please
5   state whether it was oral or in writing, who
6   was present, where it took place, and as best
7   you can recall, what they said to them and
8   what they said to you.
9   A. Same answer.
10  Q. Has REMCO or Mansfield Rug or you ever made
11  any payments directly or indirectly to Tyrone
12  Williams?
13  A. Same answer.
14  Q. If so, what payments were made? When were
15  they made? Why were they made, and how were
16  they made?
17  A. Same answer.
18  Q. Have you ever had any conversations with
19  anyone at CCC International other than David
20  Sun, Paul Sun and John Sun?
21  A. Same answer.
22  Q. To the extent that you have, as best you can
23  recall, was it oral or in writing? Who was
24  present? Where did it take place? And what

Page 79

1   was the substance of the communication?
2   A. Same answer.
3   Q. Mr. Mitchell, at this point I want to go
4   through a number of documents with you. And
5   we'll just go through them one by one.
6       MR. GRANT: I just would like to be
7   sure as we go through the documents that I am
8   putting correct exhibit numbers on the
9   correct document.
10  Q. Mr. Mitchell, I'm showing you Mansfield Rug
11  PO 7371. It consists of two pages. I'm
12  going to ask you if you recognize it?
13  A. Same answer.
14  Q. What do you recognize it to be?
15  A. Same answer.
16  Q. Who prepared this document?
17  A. Same answer.
18  Q. And when was it prepared?
19  A. Same answer.
20  Q. What is the purpose of this particular
21  document?
22  A. Same answer.
23  Q. Is this document prepared by Mansfield Rug?
24  A. Same answer.

Page 80

1   Q. Is this document prepared in the normal
2   course of business of Mansfield Rug?
3   A. Same answer.
4   Q. Have you ever resided at 5 Mansfield Grove
5   Road, Suite 146, East Haven, Connecticut?
6   A. Same answer.
7   Q. If so, when?
8   A. Same answer.
9   Q. What document or documents were used in the
10  preparation of this two-page document?
11  A. Same answer.
12  Q. And to whom, if anyone, was this document
13  sent?
14  A. Same answer.
15  Q. How was it sent?
16  A. Same answer.
17  Q. At the top -- at the left side of the page,
18  using it as a landscape for a moment, there
19  is a fax line, if you will, that reads, it
20  appears, "August 6, 2004." Normally, I would
21  say, "Do you see that?" But that's not going
22  to get me anywhere today. That fax line, do
23  you know what fax machine that document was
24  sent from? And do you know where that was

Page 81

1   sent to?
2   A. Same answer.
3   Q. If so, where was it sent from and where was
4   it sent to?
5   A. Same answer.
6   Q. The items represented on the two pages of
7   Exhibit 1, were those items ever sent to
8   Building 19?
9   A. Same answer.
10  Q. Were the items already at Building 19 as of
11  the time Building 19 purchased these items?
12  A. Same answer.
13  Q. In other words, did Building 19 buy items
14  that were already -- that it already had?
15  A. Same answer.
16  Q. Do you know whether or not the documentation
17  represented here as Exhibit 1 is for an
18  actual sale of actual goods to Building 19?
19  A. Same answer.
20  Q. If so, was it an actual sale?
21  A. Same answer.
22  Q. In the lower right-hand corner of the page,
23  if you held it in a landscape fashion, there
24  is a date. How was that date added and by

21 (Pages 78 to 81)

Page 82

1    whom?
2  A. Same answer.
3  Q. Did you, Mansfield Rug and/or REMCO have any
4    computers?
5  A. Same answer.
6  Q. What computers did you have at any time from
7    1990 to the present?
8  A. Same answer.
9  Q. Where were they kept?
10  A. Same answer.
11  Q. Where are they now?
12  A. Same answer.
13  Q. Has any data been deleted from those
14    computers that relates to REMCO or Mansfield
15    Rug for the sale of carpet, broadloom or
16    padding?
17  A. Same answer.
18  Q. If so, when was it deleted?
19  A. Same answer.
20  Q. And why was it deleted?
21  A. Same answer.
22  Q. All right. Let's move on to No. 2, sir. I'm
23    showing you what's been marked as Exhibit
24    No. 2. It says, it appears, "PO" and then a

Page 83

1    number sign, "5881." I'm going to ask you if
2    you recognize it?
3  A. Same answer.
4  Q. What do you recognize it to be?
5  A. Same answer.
6  Q. Does this document which purports to be a
7    purchase order of some sort or a reference to
8    a purchase order represent the actual
9    shipment of goods by Mansfield Rug to
10    Building 19?
11  A. Same answer.
12  Q. What document or documents were used in the
13    preparation of this particular document?
14  A. Same answer.
15  Q. At the bottom of the document, there is a
16    facsimile telephone number. Can you tell by
17    looking at this document from whom the
18    document was faxed and to whom it was faxed?
19  A. Same answer.
20  Q. If so, from whom was it faxed and to whom was
21    it faxed?
22  A. Same answer.
23  Q. There is handwriting on this page. Could you
24    tell me as to all of the handwriting on the

Page 84

1    page whose handwriting it is?
2  A. Same answer.
3  Q. There is what appears to be a pre-formed
4    stamp at the top of the page. Who affixed
5    that stamp on the page?
6  A. Same answer.
7  Q. I'm going to go on to No. 3. Mr. Mitchell,
8    I'm showing you what's been marked as
9    Mitchell Exhibit 3. I'm going to ask you if
10    you recognize it?
11  A. Same answer.
12  Q. What do you recognize it to be?
13  A. Same answer.
14  Q. There is handwriting on both pages of this
15    two-page document which for the record is a
16    document which at the very top says "General
17    Instructions." And on the right-hand side,
18    it says "September 30, 1999, QTR." And
19    underneath that is a Connecticut Tax
20    Registration Number of 9710674 000. Whose
21    handwriting is on this document?
22  A. Same answer.
23  Q. Who arranged, if anyone, to obtain a
24    Connecticut Tax Registration Number?

Page 85

1  A. Same answer.
2  Q. When was that obtained and how?
3  A. Same answer.
4  Q. For what purpose was this particular document
5    prepared?
6  A. Same answer.
7  Q. Who prepared it?
8  A. Same answer.
9  Q. Have you ever seen a copy or an original of
10    this particular document which includes a
11    signature other than the signature that
12    appears at the bottom left-hand corner?
13  A. Same answer.
14  Q. Do you recognize the signature of Jane
15    Dziemit?
16  A. Same answer.
17  Q. Is the signature that appears in the bottom
18    left-hand corner of this particular document
19    the signature of Jane Dziemit?
20  A. Same answer.
21  Q. Was Jane Dziemit ever a partner of yours in
22    REMCO?
23  A. Same answer.
24  Q. Was Jane Dziemit a partner of yours in REMCO

22 (Pages 82 to 85)

Page 86

1    as of October 25, 1999?
2    A. Same answer.
3    Q. Was there a written partnership agreement in
4      place at any time between you and Jane
5      Dziemit regarding REMCO?
6    A. Same answer.
7    Q. If there was, where is a copy of that
8      partnership agreement kept?
9    A. Same answer.
10   Q. Was there an attorney who prepared any
11     partnership agreement between you and Jane
12     Dziemit? And if so, what's the name and
13     address of the attorney?
14   A. Same answer.
15   Q. Have you ever seen any other documents which
16     state that Jane Dziemit is a partner in
17     REMCO? And if so, what documents have you
18     seen? When did you last see them? And do
19     you have copies of them in your possession?
20   A. Same answer.
21   Q. Did you or Jane Dziemit or anyone else ever
22     submit this document to anyone? And if so,
23     to whom?
24   A. Same answer.

Page 87

1    Q. Has Jane Dziemit ever represented herself to
2      anyone that she was a partner in REMCO that
3      you're aware of?
4    A. Same answer.
5    Q. Have you or has anyone else ever filed a
6      document such as the one that is Exhibit 3 in
7      any previous years or quarters?
8    A. Same answer.
9    Q. Let me try that again. Have you or anyone
10     else ever filed a document similar to
11     Exhibit 33 which includes a reference to Jane
12     Dziemit as a partner in any previous quarters
13     or any later quarters?
14   A. Same answer.
15   Q. What's the purpose of this particular
16     document?
17   A. Same answer.
18   Q. To the extent that you filed a document
19     similar to Exhibit 3 either before or after
20     the one that's Exhibit 3, how many such
21     documents did you file? When were they
22     filed? Who filed them? And where are they
23     kept presently?
24   A. Same answer.

Page 88

1    Q. To the extent that you are not certain as to
2      what the purpose of this particular document
3      is, what do you believe the purpose of the
4      document to be?
5    A. Same answer.
6    Q. What documents were used in the preparation
7      of Exhibit 3?
8    A. Same answer.
9    Q. Was P.O. Box 2274, Branford, Connecticut,
10     ever a business address for REMCO?
11   A. Same answer.
12   Q. Did REMCO pay sales taxes at any time to the
13     state of Connecticut? And if so, how much?
14   A. Same answer.
15   Q. Mr. Mitchell, I'm now going to show you
16     what's been marked as Exhibit 4. It consists
17     of 13 pages. My first question is, do you
18     recognize it?
19   A. Same answer.
20   Q. What do you recognize it to be?
21   A. Same answer.
22   Q. Please go through for me the purpose of each
23     of the documents contained in Exhibit 4.
24   A. Same answer.

Page 89

1    Q. Of the documents contained in Exhibit 4,
2      which, if any, are prepared by you, REMCO
3      and/or Mansfield Rug?
4    A. Same answer.
5    Q. The second page of the document is a loading
6      ticket. What is a loading ticket, and what
7      is the purpose of a loading ticket?
8    A. Same answer.
9    Q. Do the documents contained in Exhibit 4
10     represent a legitimate shipment from REMCO of
11     product to International Floor Crafts, Inc.?
12   A. Same answer.
13   Q. Can you determine by looking at these
14     documents whether or not they represent a
15     legitimate shipment of product from REMCO to
16     Building 19? And if so, how can you make
17     that determination?
18   A. Same answer.
19   Q. Do the documents that are stapled together as
20     Exhibit 4 all represent one shipment of
21     product from REMCO to Building 19?
22   A. Same answer.
23   Q. The purchase orders contained in Exhibit 4
24     include reference to a Tony Marasco, Tony

23  (Pages 86 to 89)

Page 90

1    Marasca. Is that the Tony Marasco who is the
2    boyfriend and/or -- boyfriend or husband of
3    Jane Dziemit?
4  A. Same answer.
5  Q. Did he ever work for REMCO?
6  A. Same answer.
7  Q. Did you ever authorize him to be the contact
8    person for REMCO?
9  A. Same answer.
10 Q. Whose telephone number is or was
11    203.466.1191?
12 A. Same answer.
13 Q. How did you and/or Kevin Britto and/or David
14    Adams go about determining what product to
15    include in the purchase order and/or in your
16    invoices?
17 A. Same answer.
18 Q. At any time has REMCO or Mansfield Rug or you
19    ever owned any paper shredder?
20 A. Same answer.
21 Q. To the extent that you've ever owned one,
22    when did you, REMCO and Mansfield Rug own it?
23 A. Same answer.
24 Q. What brand shredder did you own?

Page 91

1  A. Same answer.
2  Q. Was it ever used for the purposes of REMCO,
3    Mansfield Rug or for yourself?
4  A. Same answer.
5  Q. Do you know whether or not Jane Dziemit has
6    ever owned a paper shredder?
7  A. Same answer.
8  Q. If so, when did she own it?
9  A. Same answer.
10 Q. Has she ever used it to destroy any documents
11    relating to you, Mansfield Rug and/or REMCO?
12 A. Same answer.
13 Q. And if she did, what documents did she
14    destroy with it?
15 A. Same answer.
16 Q. Did you ever use your shredder or shredders
17    to destroy any documents relating to you,
18    REMCO and/or Mansfield Rug?
19 A. Same answer.
20 Q. To the extent that you did, what documents
21    did you shred and why?
22 A. Same answer.
23 Q. Assuming that the shipments or shipment of
24    product set forth in Exhibit 4 are

Page 92

1    legitimate, how was the product shipped from
2    REMCO to Building 19?
3  A. Same answer.
4  Q. Was the product ever at any REMCO warehouse
5    before it was shipped to Building 19?
6  A. Same answer.
7  Q. Was the product always at Building 19, but
8    you believed that the ownership of the
9    product had been transferred to you for a
10    period of time -- or to you, to REMCO or to
11    Mansfield Rug for a period of time?
12 A. Same answer.
13 Q. If so, on what basis do you make that
14    determination?
15 A. Same answer.
16 Q. I may have asked you this earlier today. I
17    think I did. What shippers or transfer
18    companies did REMCO, Mansfield or you use at
19    any time from 1990 to the present?
20 A. Same answer.
21    MR. KLEHM: Let's go off for a
22    second.
23    (Luncheon recess taken from
24    12:28 p.m. to 1:06 p.m.)

Page 93

1    AFTERNOON SESSION
2    RONALD EDWARD MITCHELL, RESUMED
3    DIRECT EXAMINATION, CONTINUED
4  BY MR. KLEHM:
5  Q. Mr. Mitchell, when we left off before the
6    break, we were talking about deposition
7    Exhibit No. 4. In general, did you ever see
8    any product before it was shipped to
9    Building 19?
10 A. Same answer.
11 Q. And if so, where did you see it? When did
12    you see it? That's it.
13 A. Same answer.
14 Q. Were any of the shipments that you did see
15    Building 19 shipments?
16 A. Same answer.
17 Q. Did you see some of the shipments before you
18    started REMCO and Mansfield Rug?
19 A. Same answer.
20 Q. Were some of those shipments IFC shipments?
21 A. Same answer.
22 Q. How many?
23 A. Same answer.
24 Q. And where did you see them?

24 (Pages 90 to 93)

Page 94

1   A.  Same answer.
2   Q.  When you were involved in a legitimate
3       shipment of product, explain for me how the
4       transaction would work from beginning to end.
5   A.  Same answer.
6   Q.  Who would be the shipper for those products?
7   A.  Same answer.
8   Q.  Who prepared the invoices that are contained
9       in Exhibit 4?
10  A.  Same answer.
11  Q.  How would you learn what documents were being
12      shipped -- what product was to be shipped and
13      to be added to your invoices?
14  A.  Same answer.
15  Q.  Did you at any time ever refuse to make out
16      an invoice for a REMCO shipment?
17  A.  Same answer.
18  Q.  Did you at any time ever refuse to make out
19      any invoice that was requested of you from
20      Adams or Britto?
21  A.  Same answer.
22  Q.  How many times did you make these refusals?
23      Why did you refuse and when?
24  A.  Same answer.

Page 95

1   Q.  Mr. Mitchell, I'm going to show you what's
2       been marked as Exhibit 5.  I'm going to ask
3       you if you recognize it?
4   A.  What do you recognize it to be?
5   Q.  What do you recognize it to be?
6   A.  Same answer.
7           MR. GRANT:  For the record, how many
8       pages is Exhibit 5?
9           MR. KLEHM:  I count 24.
10          MR. GRANT:  I count 25.
11          MR. KLEHM:  You're right.
12          What was the last question?
13          (Question read)
14  Q.  The fifth page of this particular exhibit,
15      Exhibit 5 is entitled "Invoice."  What is
16      this document?
17  A.  Same answer.
18  Q.  For what purpose was it prepared?
19  A.  Same answer.
20  Q.  Is anything crossed out or obliterated from
21      this document?
22  A.  Same answer.
23  Q.  If so, why?
24  A.  Same answer.

Page 96

1   Q.  Is this a document prepared by -- strike
2       that.
3           Who prepared this particular
4       document and for what purpose?
5   A.  Same answer.
6   Q.  Tell me all of the people at Building 19 that
7       you dealt with in the course of your work
8       with Building 19.
9   A.  Same answer.
10  Q.  Of those people, how many people knew that
11      the transactions were fraudulent?
12  A.  Same answer.
13  Q.  Did anyone force you to take the fifth
14      amendment privilege to that?
15  A.  Same answer.
16  Q.  The document that is the sixth page in, can
17      you tell me whose handwriting is on this
18      document?
19  A.  Same answer.
20  Q.  Whose handwriting is on it?
21  A.  Same answer.
22  Q.  Whose telephone number is 203.468.9544?
23  A.  Same answer.
24  Q.  Why is Diane Spignosi's name on this

Page 97

1       particular document?
2   A.  Same answer.
3   Q.  Did she ever work for Mansfield Rug?
4   A.  Same answer.
5   Q.  Did you ever provide any information to
6       anyone to suggest that Diane Spignosi worked
7       for Mansfield Rug?
8   A.  Same answer.
9   Q.  There's a fax line at the top of this page
10      which is Bates-stamped 43 that says, "Dave
11      Adams."  To whom did this document get faxed
12      and from whom?
13  A.  Same answer.
14  Q.  What documents are associated with a typical
15      transaction in which you were involved with
16      regarding International Floor Crafts?
17  A.  Same answer.
18  Q.  Of those documents, which ones would you,
19      REMCO or Mansfield Rug prepare?
20  A.  Same answer.
21  Q.  What dealings, if any, did you have with CCC
22      International from 1995 to the present?
23  A.  Same answer.
24  Q.  Did any of those dealings involve fictitious

25 (Pages 94 to 97)

Page 98

1    shipments of goods?
2    A.  Same answer.
3    Q.  How many of them did, and how much money was
4        each shipment?
5    A.  Same answer.
6    Q.  Did you receive checks from International
7        Floor Crafts at any time?
8    A.  Same answer.
9    Q.  For what did you receive the checks, and what
10       did you do with them?
11   A.  Same answer.
12   Q.  Did you make disbursements of any of the
13       proceeds of any checks from International
14       Floor Crafts?  And to whom did you make the
15       proceeds and why?
16   A.  Same answer.
17   Q.  Did you have any written agreements with
18       International Floor Crafts, Kevin Britto,
19       David Adams, REMCO or Mansfield Rug at any
20       time?
21   A.  Same answer.
22   Q.  When did you first become suspicious that the
23       transactions may be -- strike that.
24           When did you first become suspicious

Page 99

1        that the transactions involving REMCO,
2        Mansfield Rug and International Floor Crafts
3        were fraudulent?
4    A.  Same answer.
5    Q.  What did you do -- how did you become aware
6        of that knowledge, and what did you do in
7        response to learning that information?
8    A.  Same answer.
9    Q.  Did you continue to participate in
10       transactions involving International Floor
11       Crafts after your suspicions were aroused?
12   A.  Same answer.
13   Q.  Why?
14   A.  Same answer.
15   Q.  With regard to the first -- sorry.  With
16       regard to the first two pages of Exhibit 5,
17       which of the two documents would be prepared
18       earlier, first in time?
19   A.  Same answer.
20   Q.  Did you ever authorize Jane Dziemit to
21       endorse checks made payable to REMCO or
22       Mansfield Rug?
23   A.  Same answer.
24   Q.  When did you first do that?

Page 100

1    A.  Same answer.
2    Q.  Why did you do that?
3    A.  Same answer.
4    Q.  Did you ever have any written agreements with
5        Jane Dziemit of any kind?
6    A.  Same answer.
7    Q.  What written agreements did you have, for
8        what purpose, and where are they kept?
9    A.  Same answer.
10   Q.  Did you ever have any discussions whatsoever
11       with Jane Dziemit in which either one of you
12       raised the prospect that the shipments from
13       REMCO or Mansfield Rug to International Floor
14       Crafts was fraudulent?
15   A.  Same answer.
16   Q.  Mr. Mitchell, I'm going to show you now
17       what's been marked as deposition Exhibit
18       No. 6, and it consists of 20 pages.
19           Sir, do you recognize any or all of
20       the documents that are contained in
21       Exhibit 6?
22   A.  Same answer.
23   Q.  What do you recognize them to be?
24   A.  Same answer.

Page 101

1    Q.  Okay.  At the top of each of the agreement
2        for sale of goods that are included in this
3        set of documents, there are what appear to be
4        three lines of fax lines, I'll call them.
5        Can you tell me the circumstances under which
6        those were created?
7    A.  Same answer.
8    Q.  Can you tell me whether or not those fax
9        lines represent the shipment -- the faxing of
10       certain documents on the dates that are
11       listed?
12   A.  Same answer.
13   Q.  Can you tell me why each of the agreements
14       for sale of goods has the exactly same three
15       fax lines at the top, each of which reads
16       "page 1"?
17   A.  Same answer.
18   Q.  Can you tell me why each of them also has the
19       exact same time and date on them?
20   A.  Same answer.
21   Q.  Can you tell me why the signature of David
22       Adams that appears on each of these agreement
23       for sale of goods appears to be in the
24       identical place and the identical signature?

26 (Pages 98 to 101)

Page 102

1    A.  Same answer.
2    Q.  Were these agreements for sale of goods
3        presented to you in a format where David
4        Adams' name was already on it when you saw
5        it?
6    A.  Same answer.
7    Q.  Were these agreements for sale of goods
8        prepared by you?
9    A.  Same answer.
10   Q.  Who prepared these agreements for sale of
11       goods?
12   A.  Same answer.
13   Q.  Can you explain to me why these agreements
14       for sale of goods are all dated before the
15       dates listed on the fax which appear to be
16       August of 2000?
17   A.  Same answer.
18   Q.  Were these documents created all at the same
19       time?
20   A.  Same answer.
21   Q.  Were these documents created in order to
22       explain certain transactions?
23   A.  Same answer.
24   Q.  For what purpose were these documents

Page 103

1        created?
2    A.  Same answer.
3    Q.  Did you sign these documents?
4    A.  Same answer.
5    Q.  Is this actually a stamp with your signature
6        on it and not your actual signature?
7    A.  Same answer.
8    Q.  Did you have a stamp with your actual
9        signature on it that you used in the course
10       of business as either individually or REMCO
11       or Mansfield Rug?
12   A.  Same answer.
13   Q.  Do you know whether or not anyone else had a
14       stamp with your signature on it?
15   A.  Same answer.
16   Q.  Were you the person that added this stamped
17       signature onto each of these agreements for
18       sale of goods?
19   A.  Same answer.
20   Q.  When were each of these agreements for sale
21       of goods contained in Exhibit 6 created?
22   A.  Same answer.
23   Q.  I'm going to ask you to look at the fourth
24       page and the fifth page in. The fourth page

Page 104

1        includes a price, whereas the fifth page does
2        not. And the fourth page does not include
3        your signature, whereas the fifth page does.
4        Why is that?
5    A.  Same answer.
6    Q.  Which of these two documents was prepared
7        first in time?
8    A.  Same answer.
9    Q.  Who prepared these documents?
10   A.  Same answer.
11   Q.  Why were they prepared?
12   A.  Same answer.
13   Q.  Did you provide David Adams with any funds as
14       a result of the signing of these particular
15       documents, these agreements for sale of
16       goods?
17   A.  Same answer.
18   Q.  Explain for me what documents were involved
19       in these agreements for sale of goods?
20   A.  Same answer.
21   Q.  Explain for me when -- in terms of any
22       particular transaction with David Adams, when
23       the agreement for sale of goods would be
24       signed?

Page 105

1    A.  Same answer.
2    Q.  Are these agreements for sale of goods that
3        are contained in Exhibit 6 legitimate?
4    A.  Same answer.
5    Q.  Who caused the creation of these agreements
6        for sale of goods?
7    A.  Same answer.
8    Q.  Had you given Adams money -- strike that.
9            With regard to the first page of
10       Exhibit 6, did you give Adams money before or
11       after the agreement for sale of goods was
12       prepared?
13   A.  Same answer.
14   Q.  When in relation to the execution of the
15       agreement for sale of goods by both of you
16       did you give funds to Adams?
17   A.  Same answer.
18   Q.  How would you provide Adams with the funds?
19   A.  Same answer.
20   Q.  Why is it that each and every one of these
21       agreement for sale of goods says that the
22       total purchase price is $25,000?
23   A.  Same answer.
24   Q.  Was the total purchase price for every

27 (Pages 102 to 105)

Page 106

1    transaction that you had with David Adams
2    $25,000?
3    A.  Same answer.
4    Q.  During the time that you had the transactions
5        that were a part of the agreement for sale of
6        goods, was David Adams working for
7        Building 19?
8    A.  Same answer.
9    Q.  During the time that you were interacting
10       with David Adams in connection with these
11       agreements for sale of goods, was David Adams
12       acting as an agent of Building 19, to your
13       knowledge?
14   A.  Same answer.
15   Q.  At the time that you executed each of these
16       agreement for sale of goods, where were the
17       goods located?
18   A.  Same answer.
19   Q.  Is it true that with regard to the agreement
20       for sale of goods that are contained in
21       Exhibit 6, that these goods were already
22       located at Building 19 at the time this was
23       -- these agreements were signed?
24   A.  Same answer.

Page 107

1    Q.  Did you ever see a segregated out set of
2        goods that were represented to you as being
3        the goods that you would be purchasing as a
4        part of these agreement for sale of goods?
5    A.  Same answer.
6    Q.  Did you ever prepare any UCC documents or
7        other documents showing your ownership or
8        having an ownership interest in any of these
9        goods represented by Exhibit 6?
10   A.  Same answer.
11   Q.  Did you ever see any videos, pictures,
12       photographs or other depictions of the goods?
13   A.  Same answer.
14   Q.  Did you ever ask to see any videos, pictures,
15       depictions or other photographs of the goods?
16   A.  Same answer.
17   Q.  What steps did you take to confirm that you
18       had received goods from David Adams?
19   A.  Same answer.
20   Q.  Did you ever ask David Adams for confirmation
21       that he had an ownership interest in any of
22       the goods that he sold to you?
23   A.  Same answer.
24   Q.  What documentation or other information did

Page 108

1    David Adams provide to you to demonstrate to
2    you that he did have an ownership interest in
3    any of the goods that he sold to you?
4    A.  Same answer.
5    Q.  Were these agreements for sale of goods
6        prepared on the date that's listed at the --
7        that says this agreement was made this blank
8        day -- "this 22nd day of June 2000," for
9        instance, as to the first one?  Was each
10       prepared on the date that's listed?
11   A.  Same answer.
12   Q.  If not, on what dates were they prepared?
13       And why weren't they prepared on the date
14       that's listed?
15   A.  Same answer.
16   Q.  How would you or REMCO or Mansfield Rug
17       confirm that you had actually purchased any
18       goods?
19   A.  Same answer.
20   Q.  Who drafted the original agreement for sale
21       of goods?
22   A.  Same answer.
23   Q.  Did you ever have any agreement for sale of
24       goods with Kevin Britto?

Page 109

1    A.  Same answer.
2    Q.  If so, how many and for what product?
3    A.  Same answer.
4    Q.  Did you and David Adams use a blank form for
5        each of these transactions that are
6        represented by the agreement for sale of
7        goods?
8    A.  Same answer.
9    Q.  Did you insist upon an agreement for sale of
10       goods for tax purposes or for any other
11       purpose?
12   A.  Same answer.
13   Q.  If you did insist upon an agreement for sale
14       of goods, for what purpose did you insist
15       upon it?
16   A.  Same answer.
17   Q.  At the time that the agreement for sale of
18       goods was prepared, were there any other
19       documents that had already been prepared as
20       to the transaction involving those particular
21       goods?  And if so, what documents were they?
22   A.  Same answer.
23   Q.  What communications, if any, did you have
24       with David Adams and/or Kevin Britto

28  (Pages 106 to 109)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 110

1    regarding having each transaction or having
2    some transactions reduced to writing?
3    A. Same answer.
4    Q. And if so, when did you have those
5    conversations and who was present? Were they
6    oral or in writing? Where did they take
7    place? And as best you can recall, what did
8    you say to him or them, and what did he or
9    they say to you?
10   A. Same answer.
11   Q. At the time that you entered into these
12   agreements for the sale of goods, would Adams
13   already be in possession of the goods?
14   A. Same answer.
15   Q. Or would Adams go out and take the $25,000
16   that you gave him and purchase the goods?
17   A. Same answer.
18   Q. How would you know that the money that you
19   advanced to Adams was used to purchase the
20   goods?
21   A. Same answer.
22   Q. The goods that are represented by the
23   agreement for sale of goods, is that handmade
24   carpets, machine-made carpets or both? And

Page 111

1    did it also include padding?
2    A. Same answer.
3    Q. Did you ever receive any writings at all from
4    Kevin Britto regarding any of the goods
5    that's sold by REMCO or Mansfield?
6    A. Same answer.
7    Q. Did you ever -- if so, how many did you
8    receive?
9    A. Same answer.
10   Q. Did you ever receive purchase orders from
11   Kevin Britto with regard to any of these
12   transactions?
13   A. Same answer.
14   Q. How many did you receive?
15   A. Same answer.
16   Q. How much profit did you make from this
17   particular scheme over the time that it was
18   in place?
19   A. Same answer.
20   Q. How would you find out that the goods were
21   available to be sold during the course of
22   this transaction?
23   A. Same answer.
24   Q. At any time did Kevin Britto tell you that

Page 112

1    the bills of lading with regard to each
2    transaction had to come from REMCO because
3    you were the broker of that deal?
4    A. Same answer.
5    Q. Did you have any understanding as to each
6    such shipment that there were two bills of
7    lading prepared, one of which went to David
8    Adams?
9    A. Same answer.
10   Q. If that's correct, how would that come about?
11   A. Same answer.
12   Q. Did you ever ask either David Adams or Kevin
13   Britto to see bills of lading?
14   A. Same answer.
15   Q. To the extent that you did, what did they
16   tell you in response?
17   A. Same answer.
18   Q. At any time did David Adams say that he had
19   gotten rid of the bills of lading?
20   A. Same answer.
21   Q. Did you ever talk about the tax consequences
22   of your transactions with either David Adams
23   or Kevin Britto or Tony Marasco?
24   A. Same answer.

Page 113

1    Q. If so, what were those discussions?
2    A. Same answer.
3    Q. Do you have copies of the checks that you
4    provided to Adams or to Britto?
5    A. Same answer.
6    Q. If so, where are they? And if not, who has
7    them? Who is the keeper of the records for
8    those documents?
9    A. Same answer.
10   Q. Did anyone ever contact you to say that they
11   were the seller of the goods to you?
12   A. Same answer.
13   Q. If so, who did, when, and what did they tell
14   you?
15   A. Same answer.
16   Q. And what is the address of those people?
17   A. Same answer.
18   Q. And what company do they work for?
19   A. Same answer.
20   Q. Did you ever tell Kevin Britto that if David
21   Adams' lips are moving, he's lying or words
22   to that effect?
23   A. Same answer.
24   Q. I'm going to move on now to Exhibit 7, which

29  (Pages 110 to 113)

| Page 114 | Page 116 |
|---|---|
| 1    is the FedEx receipts. Mr. Mitchell, I'm | 1    Mitchell -- sorry -- well, for you, for David |
| 2    showing you what's been marked as deposition | 2    Adams or for Kevin Britto? |
| 3    Exhibit No. 7 and ask if you recognize it? | 3    A. Same answer. |
| 4    A. Same answer. | 4    Q. Did REMCO or Mansfield ever propose any |
| 5    Q. What do you recognize it to be? | 5    documentation whatsoever which would show the |
| 6    A. Same answer. | 6    receipt of any funds by David Adams and/or |
| 7    Q. Were you aware at any time that any funds | 7    Kevin Britto? |
| 8    were being sent by Building 19 directly to | 8    A. Same answer. |
| 9    Jane Dziemit? | 9    Q. What documents? |
| 10    A. Same answer. | 10    A. Same answer. |
| 11    Q. If so, when did you become aware of it and | 11    Q. I'm now going to show you Exhibit 8. Exhibit |
| 12    how did you become aware of it? | 12    8 is what appears to be a check, No. 003681. |
| 13    A. Same answer. | 13    Have you seen this before? |
| 14    Q. Did you ever authorize Jane Dziemit to | 14    A. Same answer. |
| 15    receive funds on behalf of REMCO and/or | 15    Q. What do you recognize it to be? |
| 16    Mansfield Rug and/or you? | 16    A. Same answer. |
| 17    A. Same answer. | 17    Q. On the second page, there is some |
| 18    Q. If so, when did you so authorize? How did | 18    handwriting. Do you recognize the |
| 19    you so authorize? And did you communicate | 19    handwriting? And if so, whose is it? |
| 20    that authorization to anyone other than Jane | 20    A. Same answer. |
| 21    Dziemit? | 21    Q. What is BMC as reflected on the second page? |
| 22    A. Same answer. | 22    A. Same answer. |
| 23    Q. And if so, to whom did you communicate it to? | 23    Q. Does BMC stand for Bentley Mortgage |
| 24    A. Same answer. | 24    Corporation? |

| Page 115 | Page 117 |
|---|---|
| 1    Q. What are the circumstances under which Jane | 1    A. Same answer. |
| 2    Dziemit received a package that is set forth | 2    Q. Did you authorize Jane Dziemit to sign this |
| 3    in Exhibit 7? | 3    check made payable to REMCO? |
| 4    A. Same answer. | 4    A. Same answer. |
| 5    Q. When she received the package that's set | 5    Q. If so, when did you authorize her to do so |
| 6    forth in Exhibit 7, was that on behalf of you | 6    and how? |
| 7    or REMCO or Mansfield Rug? | 7    A. Same answer. |
| 8    A. Same answer. | 8    Q. Did you ever have any written loan agreements |
| 9    Q. And if so, what were the circumstances? | 9    between you and Jane Dziemit or any of her |
| 10    A. Same answer. | 10    entities? |
| 11    Q. Did Kevin Britto ever tell you that he had | 11    A. Same answer. |
| 12    paid taxes on funds that he had received | 12    Q. If so, how many did you have? Where are they |
| 13    illegally from International Floor Crafts? | 13    kept? |
| 14    A. Same answer. | 14    A. Same answer. |
| 15    Q. If so, when did he tell you that? Who else | 15    Q. What happened to the proceeds of this check |
| 16    was present? Was it orally or in writing? | 16    that's marked as Exhibit 8? |
| 17    Where was he when he told you? And what's | 17    A. Same answer. |
| 18    the full substance of that conversation? | 18    Q. Sir, I'm going to show you what's been marked |
| 19    A. Same answer. | 19    Deposition Exhibit 9. It's purchase order -- |
| 20    Q. Did REMCO and/or Mansfield prepare 1099s and | 20    it starts with Purchase Order 6590. It |
| 21    W-2s and other tax documents? | 21    consists of five pages. Do you recognize |
| 22    A. Same answer. | 22    that? |
| 23    Q. Did REMCO and/or Mansfield prepare tax | 23    A. Same answer. |
| 24    documents such as 1099s or W-2s for | 24    Q. What do you recognize it to be? |

30 (Pages 114 to 117)

Page 118

1  A.  Same answer.
2  Q.  Did you prepare any of the documentation
3     contained in Exhibit 9?  And if so, which
4     documents?
5  A.  Same answer.
6  Q.  To the extent that you prepared any of the
7     documents in this Exhibit 9, what documents
8     did you refer to, if any, in preparing the
9     documents?
10  A.  Same answer.
11  Q.  Do you know who endorsed the check which is
12     attached as the last two pages of Exhibit 9?
13     And if so, who did and where were the funds
14     deposited?
15  A.  Same answer.
16  Q.  Did you authorize anyone other than yourself
17     to endorse checks on behalf of Mansfield Rug?
18     And if so, who, when and how?
19  A.  Same answer.
20  Q.  What happened to the proceeds of the check
21     that's attached to Exhibit 9?
22  A.  Same answer.
23  Q.  What goods, if any, were shipped to anyone as
24     a result of the documentation that's set

Page 119

1     forth in Exhibit 9?
2  A.  Same answer.
3  Q.  Does Exhibit 9 memorialize a fraudulent
4     shipment?
5  A.  Same answer.
6  Q.  Mr. Mitchell, I am now showing you what's
7     been marked as Exhibit 10.  I'm going to ask
8     you, do you recognize it?
9  A.  Same answer.
10  Q.  I'll note for the record it consists of 16
11     pages.  What do you recognize this to be?
12  A.  Same answer.
13  Q.  Exhibit 10 appears to contain a number of
14     checks, all of which are signed REMCO by
15     Dziemit.  Do you recognize the signatures on
16     any of these particular documents?  And if
17     so, which ones and whose signatures are they?
18  A.  Same answer.
19  Q.  What is the purpose of the checks that are
20     included in Exhibit 10?
21  A.  Same answer.
22  Q.  Have you in the course of your business,
23     either individually or as REMCO or Mansfield
24     Rug, ever advanced funds to any buyer other

Page 120

1     than David Adams?
2  A.  Same answer.
3  Q.  Have you ever advanced such funds to any
4     buyer other than David Adams so that the
5     buyer could buy goods which you would then
6     claim to sell to others?
7  A.  Same answer.
8  Q.  Did you authorize Jane Dziemit to endorse any
9     or all of the checks contained in Exhibit 10?
10  A.  Same answer.
11  Q.  If so, which checks did you authorize her to
12     sign?
13  A.  Same answer.
14  Q.  Where were these checks deposited?
15  A.  Same answer.
16  Q.  What happened to the proceeds of these
17     checks?
18  A.  Same answer.
19  Q.  Do each of these checks represent fraudulent
20     transactions in which no product was shipped
21     at all to International Floor Crafts?
22  A.  Same answer.
23  Q.  Mr. Mitchell, I'm now showing you what's been
24     marked as Exhibit 11 and ask if you recognize

Page 121

1     those documents?
2  A.  Oh, same answer.  I'm sorry.
3  Q.  Exhibit 11, which consists of 14 documents,
4     appears to be another set of checks.  Do you
5     know the purpose of any of these checks?
6  A.  Same answer.
7  Q.  Some of these checks, including the first
8     page of the checks and some of the others,
9     are made directly to Ron Mitchell.  Why are
10     the checks made directly to Ron Mitchell from
11     Jane Dziemit?  Or from --
12  A.  Same answer.
13  Q.  Why were the checks made directly to Ron
14     Mitchell from Jane Dziemit and/or from
15     Bentley Mortgage Corp.?
16  A.  Same answer.
17  Q.  Did you have separate bank accounts for
18     REMCO, Mansfield Rug, and for your personal
19     accounts?
20  A.  Same answer.
21  Q.  On the second page, there is a check made
22     payable to cash -- or it appears to be to
23     cash.  What's the circumstance under which
24     that was issued?

31  (Pages 118 to 121)

Page 122

1   A. Same answer.
2   Q. Would the advance of certain funds to a buyer
3      be the normal and ordinary way in which you
4      conducted your business either individually
5      as REMCO or as Mansfield?
6   A. Same answer.
7   Q. If so, who else did you conduct business in
8      this way with?
9   A. Same answer.
10  Q. If not, why did you do business this way only
11     with Adams and/or Britto?
12  A. Same answer.
13  Q. What happened to the funds represented in
14     Exhibit 11?
15  A. Same answer.
16  Q. Mr. Mitchell, I'm now showing you what's been
17     marked as Exhibit 12 which consists of six
18     pages. Do you recognize it?
19  A. Same answer.
20  Q. What do you recognize it to be?
21  A. Same answer.
22  Q. I'll just note for the record it appears that
23     the first two pages are identical.
24  A. Yes.

Page 123

1   Q. Did you participate in the preparation of any
2      of the documents contained in Exhibit 12?
3   A. Same answer.
4   Q. Were any of the items referenced in
5      Exhibit 12 ever sold by REMCO to Building 19?
6      And if so, which ones?
7   A. Same answer.
8   Q. On the top of page 1 of actually the first
9      page and obviously the second is the word
10     "paid." Do you know who wrote that? And if
11     so, who?
12  A. Same answer.
13  Q. Just quickly on Exhibit 13 -- we won't spend
14     long on this. But do you recognize this?
15     And if so, what do you recognize it to be?
16  A. Same answer.
17  Q. The first two pages of Exhibit 13 appear to
18     be similar but for the addition of the price
19     on the first page and the addition of the
20     signature of Ron Mitchell on the second page.
21     Do you know how that came to be?
22  A. Same answer.
23  Q. Do you know when these documents were
24     prepared?

Page 124

1   A. Same answer.
2   Q. Who prepared them?
3   A. Same answer.
4   Q. Because I worded the question wrong earlier,
5      when were they prepared?
6   A. Same answer.
7   Q. When in relation to the preparation of the
8      agreement for sale of goods was the loading
9      ticket prepared?
10  A. Same answer.
11  Q. Who prepared it?
12  A. Same answer.
13  Q. The last page is a check for approximately
14     $40,000. What happened to the proceeds of
15     that check?
16  A. Same answer.
17  Q. This is Exhibit 14, which consists of one
18     page. Sir, the signature -- well, let me --
19     do you recognize this document? And if so,
20     what do you recognize it to be?
21  A. Same answer.
22  Q. The signature that appears at the bottom of
23     this document for Ron Mitchell, is that your
24     signature?

Page 125

1   A. Same answer.
2   Q. The signature that appears at the bottom of
3      this document that says "Ron Mitchell" is
4      different than the signature on all of the
5      other agreement for sale of goods produced in
6      this case. Why is that?
7   A. Same answer.
8   Q. When in relation to December 1st of 1999 was
9      that signature added to this document?
10  A. Same answer.
11  Q. Who wrote it?
12  A. Same answer.
13  Q. Are the goods referenced in Exhibit 14 goods
14     that were ever sold by REMCO or Building --
15     sorry -- REMCO or Mansfield Rug to
16     Building 19?
17  A. Same answer.
18  Q. Sir, I'm showing you what's been marked as
19     Exhibit 15 which consists of six pages. I'm
20     going to ask you if you recognize it? And if
21     so, what do you recognize it to be?
22  A. Same answer.
23  Q. Just briefly going back to Exhibits 13 and
24     14, is that the signature of David Adams on

32 (Pages 122 to 125)

**Page 126**

1  those two documents?
2  A. Same answer.
3  Q. If it's not, who wrote it?
4  A. Same answer.
5  Q. If it is, when was it written?
6  A. Same answer.
7  Q. With regard to Exhibit 15, I note that
8    there's a price on the first page and the
9    signature of you -- of Ron Mitchell on the
10    second page, but the documents appear to be
11    otherwise identical. Can you tell me why
12    that is?
13  A. Same answer.
14  Q. Which of these two documents, the first and
15    the second page of Exhibit 15, were prepared
16    first in time?
17  A. Same answer.
18  Q. Were these documents prepared on April 14,
19    2000?
20  A. Same answer.
21  Q. Were any goods shipped as a result of this
22    particular document -- well --
23  A. Same answer.
24  Q. I'm going to withdraw it.

**Page 127**

1    Were any goods shipped as a result
2    of the documentation contained in Exhibit 15?
3  A. Same answer.
4  Q. The second-to-last page of the exhibit is an
5    invoice or appears to be an invoice. Do you
6    see that?
7  A. Same answer.
8  Q. The section that says "Remit To" then lists
9    Mansfield Rug with an address, do you know
10    who caused that address to be placed in that
11    place on that invoice?
12  A. Same answer.
13  Q. Okay. Who did?
14  A. Same answer.
15  Q. Who prepared the invoice?
16  A. Same answer.
17  Q. For what purpose was the invoice prepared?
18  A. Same answer.
19  Q. When was the invoice prepared?
20  A. Same answer.
21  Q. What documentation was available at the time
22    of the preparation of the invoice?
23  A. Same answer.
24  Q. Would you agree with me that the signature of

**Page 128**

1    David Adams on all of the agreements for sale
2    of goods that you've been shown today are
3    identical and exactly the same?
4  A. Same answer.
5  Q. Would you agree with me that all of the
6    signatures of Ronald Mitchell but for the one
7    on Exhibit 14 contained on all of the
8    agreements for sale of goods are identical
9    and exactly the same?
10  A. Same answer.
11  Q. Why is it that the signatures of David Adams
12    and yours but for the one on Exhibit 14 are
13    all identical and exactly the same?
14  A. Same answer.
15  Q. Do you know whether or not multiple
16    photocopies were made of the agreement for
17    sale of goods?
18  A. Same answer.
19  Q. Is the documentation that is included in
20    Exhibit 15 -- are the documents that are
21    included in Exhibit 15 all of the documents
22    that are produced in the shipment that's
23    referenced in Exhibit 15?
24  A. Same answer.

**Page 129**

1  Q. Were the goods referenced in Exhibit 15 ever
2    shipped to you as the buyer?
3  A. Same answer.
4  Q. Were those goods ever then shipped to
5    International Floor Crafts?
6  A. Same answer.
7  Q. Mr. Mitchell, I'm now showing you what's been
8    marked as Exhibit 16. It consists of three
9    pages. Do you recognize this document? And
10    if so, what do you recognize it to be?
11  A. Same answer.
12  Q. Do the documents included in Exhibit 16 all
13    relate to the same shipment of goods?
14  A. Same answer.
15  Q. At the top of the first page of Exhibit 16,
16    there's a note that says, "Please note
17    address change." And then there's an address
18    for REMCO. Why did REMCO change its address?
19  A. Same answer.
20  Q. When did REMCO change its address?
21  A. Same answer.
22  Q. At the very top of the first page of
23    Exhibit 16, there's a fax line. To whom was
24    the document faxed, and from whom was it

33 (Pages 126 to 129)

Page 130

1    faxed?
2    A. Same answer.
3    Q. For what purpose was the document faxed?
4    A. Same answer.
5    Q. Do you the documents contained in Exhibit 16
6      refer to a legitimate shipment of goods from
7      REMCO to International Floor Crafts?
8    A. Same answer.
9    Q. Did you authorize Jane Dziemit to sign the
10     check in the last page of Exhibit 16?
11   A. Same answer.
12   Q. What happened to the proceeds of that check?
13   A. Same answer.
14   Q. Mr. Mitchell, I'm now showing you Exhibit
15     No. 17. Do you recognize it? And if so,
16     what do you recognize it to be?
17       MR. GRANT: Exhibit 17 is what page,
18     please? I'm having trouble again.
19       MR. KLEHM: Exhibit 17 is seven
20     pages.
21       MR. GRANT: And it's --
22       MR. KLEHM: July 13th.
23       (Discussion off the record)
24   Q. Sir, do you recognize it? And if so, what do

Page 131

1      you recognize it to be?
2    A. Same answer.
3    Q. Do the documents contained in Exhibit 17 all
4      relate to the same transaction?
5    A. Same answer.
6    Q. The first two pages of Exhibit 17 appear
7      identical except for the price that's
8      contained in the first page and a purported
9      signature of Ron Mitchell on the second page.
10     Why is it that that circumstance would exist?
11   A. Same answer.
12   Q. What role, if any, did you play in the
13     preparation of the exhibits contained in --
14     the documents contained in Exhibit 17?
15   A. Same answer.
16   Q. Did Building 19 make any payments to REMCO
17     for the shipment referenced in Exhibit 17?
18   A. Same answer.
19   Q. Have you ever been to Warehouse No. 3 at One
20     King Street, New Bedford, Mass.?
21   A. Same answer.
22   Q. If so, when did you go there? Why did you go
23     there? For what purpose did you go there?
24     And who did you talk to when you were there,

Page 132

1      and what did you talk about?
2    A. Same answer.
3        MR. KLEHM: That's it for 17.
4    Q. Mr. Mitchell, I'm showing you Exhibit 18.
5      I'm going to ask you if you recognize it; and
6      if so, what do you recognize it to be?
7    A. Same answer.
8    Q. Who prepared the documents contained in
9      Exhibit 18?
10   A. Same answer.
11   Q. Does Exhibit 18 refer to a legitimate
12     shipment of goods from REMCO to International
13     Floor Crafts?
14   A. Same answer.
15   Q. If so, how do you know it was a legitimate
16     shipment?
17   A. Same answer.
18   Q. Did you ever discuss the shipment referenced
19     in Exhibit 18 with Tony Marasco?
20   A. Same answer.
21   Q. Did Tony Marasco serve as the contact person
22     for REMCO on the transaction that's
23     referenced in Exhibit 18?
24   A. Same answer.

Page 133

1    Q. Did REMCO ever receive any funds from
2      International Floor Crafts for Exhibit 18?
3      And if so, how much?
4    A. Same answer.
5    Q. And what happened to the funds?
6    A. Same answer.
7    Q. Exhibit 16 just for a second. At the time
8      that documents were faxed to Jane Dziemit as
9      referenced at the top of Exhibit 16, what was
10     faxed to her? How many pages were faxed to
11     her, and for what purpose?
12   A. Same answer.
13   Q. And at that time, what documents, if any,
14     were faxed to you or to REMCO or to Mansfield
15     Rug from Jane Dziemit?
16   A. Same answer.
17   Q. So now we're on to Exhibit 19.
18       MR. GRANT: And what does Exhibit 19
19     look like?
20       (Discussion off the record)
21   Q. Mr. Mitchell, I'm showing you Exhibit 19. Do
22     you recognize it? And if so, what do you
23     recognize it to be?
24   A. Same answer.

34 (Pages 130 to 133)

1  Q. Did you have any discussions with Kevin
2     Britto and/or David Adams with regard to the
3     transaction referred to in Exhibit 19?
4  A. Same answer.
5  Q. And if so, what were those discussions?
6  A. Same answer.
7  Q. Now, did Tony Marasco serve as the contact
8     person for REMCO with regard to the
9     transaction referenced in Exhibit 19?
10 A. Same answer.
11 Q. Is the transaction referred to in Exhibit 19
12    a legitimate transaction?
13 A. Same answer.
14 Q. Did REMCO ship any goods to Building 19 as a
15    result of Exhibit 19?
16 A. Same answer.
17    MR. KLEHM:  That's it for that one.
18    (Discussion off the record)
19 Q. Sir, I'm showing you what's been marked
20    Exhibit 20.  It consists of 11 pages, and
21    it's clipped with a black clip in the top
22    left-hand corner.  Do you recognize these
23    documents?  And if so, what do you recognize
24    them to be?

1  A. Same answer.
2  Q. For simplicity, just for the record, they are
3     Bates-stamped 000003 through 000013.  Before
4     we get too far on this, I just want to go
5     back to 19 for one second, the second page of
6     19.  In the center, there's a reference to a
7     Kevin.  Who is that?
8  A. Same answer.
9  Q. Just after that, there's a telephone number.
10    Whose telephone number is that?
11 A. Same answer.
12 Q. And the -- that's it.  Okay.  Back to 20.
13    Sir, what are these "To Whom It May Concern"
14    documents referred to in Exhibit 20?
15 A. Same answer.
16 Q. On some of the documents, there are
17    references in the top right-hand corner to
18    certain -- what appear to be invoice numbers.
19    Is that what those references are to?
20 A. Same answer.
21 Q. Let me ask it differently.  I didn't ask it
22    well.  What is the significance of the
23    handwritten numbers and letters in the top
24    right-hand corner of most, but not all, of

1     the documents included in Exhibit 20?
2  A. Same answer.
3  Q. Who prepared the original typed document "To
4     Whom It May Concern"?
5  A. Same answer.
6  Q. When were they prepared?
7  A. Same answer.
8  Q. Whose signature appears at the bottom of each
9     of those pages?
10 A. Same answer.
11 Q. Will you agree with me that the signatures
12    are different -- appear to be different than
13    the signatures included in the agreement for
14    sale of goods that we looked at earlier?
15 A. Same answer.
16 Q. Do you know why the signature -- do you know
17    why the Social Security number of David Adams
18    is included on those "To Whom It May Concern"
19    documents?
20 A. Same answer.
21 Q. For what purpose are these "To Whom It May
22    Concern" documents produced?
23 A. Same answer.
24 Q. Who requested -- strike that.

1     What were the circumstances under
2     which these "To Whom It May Concern"
3     documents were prepared?
4  A. Same answer.
5  Q. Were these documents prepared for tax
6     purposes?
7  A. Same answer.
8  Q. Are the signatures contained at the bottom of
9     each of these pages on Exhibit 20 actual
10    signatures of David Adams?
11 A. Same answer.
12 Q. To the extent that any of them are not the
13    signatures of David Adams, which ones are not
14    his signature?
15 A. Same answer.
16 Q. Did you sign any of these forms?
17 A. Same answer.
18 Q. Were these documents, the "To Whom It May
19    Concern" documents, prepared before or after
20    or simultaneously with the agreements for
21    sale of goods?
22 A. Same answer.
23 Q. Whose handwriting is contained in the date
24    and monetary portion of each of these "To

Page 138

1    Whom It May Concern" documents?
2  A.  Same answer.
3  Q.  Whose handwriting is in the top right-hand
4    corner of most of the documents which is a
5    series of numbers and letters?
6  A.  Same answer.
7  Q.  For what purpose was the series of numbers
8    and letters put in the right-hand corner --
9    top right-hand corner of these documents?
10  A.  Same answer.
11  Q.  At the time that David Adams executed these
12    documents -- strike that.
13         At the time a signature was placed
14    on these documents included in Exhibit 20,
15    had David Adams received $20,000 from REMCO?
16  A.  Same answer.
17  Q.  In what format had David Adams received the
18    $20,000 from REMCO?
19  A.  Same answer.
20  Q.  What sources did David Adams receive the
21    carpet and rugs for that are referenced in
22    the "To Whom It May Concern" in Exhibit 20?
23  A.  Same answer.
24  Q.  How did it come about that REMCO was to bill

Page 139

1    International Floor Crafts for goods
2    purchased by David Adams as referenced on
3    Exhibit 20?
4  A.  Same answer.
5  Q.  Have you ever seen the originals of any of
6    these documents included in Exhibit 20?
7  A.  Same answer.
8  Q.  Where are the originals?
9  A.  Same answer.
10  Q.  Where are the originals of the agreements for
11    purchase in the documents we looked at
12    earlier today?
13  A.  Same answer.
14  Q.  Do the transactions referred to in Exhibit
15    20 -- sorry.  Were the transactions referred
16    to in Exhibit 20 legitimate transactions in
17    which actual goods were transferred?
18  A.  Same answer.
19  Q.  What happened to the proceeds of the $20,000
20    and in some cases the $25,000 referred to in
21    Exhibit 20?
22  A.  Same answer.
23  Q.  At any time did Jane Dziemit request copies
24    or the originals of the "To Whom It May

Page 140

1    Concern" documents?
2  A.  Same answer.
3  Q.  At any time did you provide copies and/or the
4    originals of any of these "To Whom It May
5    Concern" documents to Jane Dziemit?
6  A.  Same answer.
7  Q.  At any time did Jane Dziemit receive any of
8    the "To Whom It May Concern" documents?
9  A.  Same answer.
10  Q.  To the extent that she received any such
11    documents or requested such documents, when
12    did she receive or request them?
13  A.  Same answer.
14  Q.  Why did she request or receive the documents
15    called "To Whom It May Concern"?
16  A.  Same answer.
17  Q.  In what manner were the documents provided to
18    Jane Dziemit?
19  A.  Same answer.
20  Q.  Were any of the agreements for purchase of
21    goods or the "To Whom It May Concern"
22    documents ever provided to International
23    Floor Crafts, Building 19 or Building 19,
24    Inc.?

Page 141

1  A.  Same answer.
2  Q.  To the extent that they were provided, how
3    were they provided?  When were they provided,
4    and why were they provided?
5  A.  Same answer.
6         MR. KLEHM:  Let's go off the record
7    for a second.
8         (Recess taken)
9    BY MR. KLEHM:
10  Q.  Mr. Mitchell, I'm now showing you what's been
11    marked as Exhibit 21 which consists of three
12    pages.  I'm going to ask you if you recognize
13    it.  And if so, what do you recognize it to
14    be?
15  A.  Same answer.
16  Q.  At the very top of Exhibit 21 on the first
17    page there is a -- what appears to be a fax
18    line.  Can you tell me to whom it was faxed
19    and from whom it was faxed?
20  A.  Same answer.
21  Q.  Can you tell me what was faxed?
22  A.  Same answer.
23  Q.  What was the discussion, if at all, that led
24    to this particular fax?

36 (Pages 138 to 141)

Page 142

1   A. Same answer.
2   Q. Do the documents contained in Exhibit 21
3       relate to the same transaction?
4   A. Same answer.
5   Q. Who prepared the documents contained in
6       Exhibit 21?
7   A. Same answer.
8   Q. The last page appears to be a check. Did you
9       authorize Jane Dziemit to endorse this
10      particular check?
11  A. Same answer.
12  Q. Now, this particular check doesn't appear to
13      have Jane Dziemit's signature on it. Do you
14      recognize the handwriting as being Jane
15      Dziemit's handwriting?
16  A. Same answer.
17  Q. Does BMC refer to Bentley Mortgage
18      Corporation?
19  A. Same answer.
20  Q. Is there any reason why funds from
21      International Floor Crafts would be paid to
22      Bentley Mortgage Corporation?
23  A. Same answer.
24  Q. What happened to the proceeds of this

Page 143

1       particular check?
2   A. Same answer.
3   Q. On the second page, there's a mention of a --
4       MR. GRANT: Off the record.
5       (Discussion off the record)
6   Q. On the second page of Exhibit 21, there is a
7       mention of a Kevin. Who is that?
8   A. Same answer.
9   Q. The second page also has a fax line. From
10      whom was it faxed and to whom was it faxed?
11  A. Same answer.
12  Q. Were there any other documents included in
13      the fax? If so, what documents?
14  A. Same answer.
15  Q. Why was it faxed?
16  A. Same answer.
17  Q. I don't remember if I asked this. But do the
18      documents included in Exhibit 21 constitute a
19      legitimate shipment of goods from REMCO to
20      International Floor Crafts?
21  A. Same answer.
22  Q. If you needed to confirm as to whether or not
23      actual goods were shipped by REMCO to
24      International Floor Crafts, what documents

Page 144

1       would you look at?
2   A. Same answer.
3       MR. KLEHM: Fred, this is 136.
4       MR. GRANT: And this is Exhibit 22?
5       MR. KLEHM: Yes. Let's go back to
6   21 for a second.
7       MR. GRANT: Off the record.
8       (Discussion off the record)
9   Q. Are you familiar with an entity or an
10      organization known as Oriental Weavers?
11  A. Same answer.
12  Q. Who is Oriental Weavers? Where are they
13      located?
14  A. Same answer.
15  Q. Have you ever had any transactions involving
16      Oriental Weavers other than in connection
17      with International Floor Crafts?
18  A. Same answer.
19  Q. Does the second page of Exhibit 21 refer to a
20      legitimate shipment of goods from Oriental
21      Weavers to International Floor Crafts either
22      directly or indirectly?
23  A. Same answer.
24  Q. What is a cashmere collection?

Page 145

1   A. Same answer.
2   Q. Where would one purchase a cashmere
3       collection?
4   A. Same answer.
5   Q. What is a Cairo collection?
6   A. Same answer.
7   Q. Where would one purchase a Cairo collection?
8   A. Same answer.
9   Q. Did you have any communications with anyone
10      with regard to this particular transaction
11      before Purchase Order 5883 was prepared?
12  A. Same answer.
13  Q. If so, with whom did you speak, and what was
14      the substance of the conversation?
15  A. Same answer.
16  Q. Have you had any conversations with Nick
17      Adler with regard to the transaction
18      represented in Exhibit No. 21?
19  A. Same answer.
20  Q. If so, when was the transaction? Where was
21      the -- if so, when was the conversation?
22      Where was the conversation? Was it oral or
23      in writing, and what was said?
24  A. Same answer.

37 (Pages 142 to 145)

Page 146

1  Q. Okay. Now we can go to 22. With regard to
2     Exhibit No. 22 which consists of two pages,
3     do you recognize it? And if so, what do you
4     recognize it to be?
5  A. Same answer.
6  Q. The top of the first page says, "Order
7     Number, Kevin." What does that mean?
8  A. Same answer.
9  Q. Does the Kevin refer to Kevin Britto?
10 A. Same answer.
11 Q. What role, if any, did Kevin Britto serve
12    with regard to the documents represented in
13    Exhibit 22?
14 A. Same answer.
15 Q. Who prepared the documents contained in
16    Exhibit 22?
17 A. Same answer.
18 Q. What documents, if any, were referred to in
19    preparing Exhibit 22?
20 A. Same answer.
21 Q. With regard to the second -- strike that.
22       What other sources of information
23    were used or referred to in preparing the
24    first page of Exhibit 22?

Page 147

1  A. Same answer.
2  Q. With regard to the second page of Exhibit 22,
3     is that the signature of Jane Dziemit on this
4     reverse side of the check?
5  A. Same answer.
6  Q. Into what bank account did those funds get
7     deposited?
8  A. Same answer.
9  Q. Did you authorize Jane Dziemit to sign that
10    check on behalf of REMCO?
11 A. Same answer.
12 Q. Did you have an understanding as to where
13    those funds were going to go when they were
14    deposited?
15 A. Same answer.
16 Q. Do you know what happened to the
17    approximately $29,000 represented by the
18    check?
19 A. Same answer.
20 Q. The account number that's listed on the
21    reverse side of the check, do you know what
22    account that is? And if so, what account is
23    it?
24 A. Same answer.

Page 148

1  Q. Do you know who -- whether Jane Dziemit, any
2     of her companies, REMCO, Mansfield Rug, or
3     you have any accounts at Citizens or had any
4     accounts at Citizens at any time?
5  A. Same answer.
6  Q. If so, what accounts did you or they have?
7  A. Same answer.
8       MR. GRANT: This is Exhibit 23?
9       MR. KLEHM: Yes, sir.
10 Q. Sir, I'm showing you what's been marked as
11    Exhibit 23 which consists of four pages and
12    ask if you recognize it? And if so, what do
13    you recognize it to be?
14 A. Same answer.
15 Q. What is the first page? What is that?
16 A. Same answer.
17 Q. There's a reference to Mansfield Rug Co. Is
18    that a separate organization, separate and
19    apart from Mansfield Rug?
20 A. Same answer.
21 Q. Are you aware of any incorporated company
22    known as Mansfield Rug Co.?
23 A. Same answer.
24 Q. If you are, what is its principal place of

Page 149

1     business?
2  A. Same answer.
3  Q. Do the four pages that comprise Exhibit 23
4     all relate to the same transaction?
5  A. Same answer.
6  Q. Do the four pages that comprise Exhibit 23
7     relate to a legitimate shipment of goods from
8     Mansfield Rug Co. to International Floor
9     Crafts, Inc.?
10 A. Same answer.
11 Q. Who prepared the invoice which is the second
12    page of Exhibit 23?
13 A. Same answer.
14 Q. What sources were used to obtain the
15    information that's in the second page of
16    Exhibit 23?
17 A. Same answer.
18 Q. Is the third page of Exhibit 23 also known as
19    a key rec?
20 A. Same answer.
21       MR. KLEHM: Two words, k-e-y r-e-c.
22 Q. The last page of Exhibit 23 appears to have
23    the name of Diane Spignosi. Was Diane
24    Spignosi an authorized representative or

38 (Pages 146 to 149)

Page 150

1    contact person for Mansfield Rug?
2    A.  Same answer.
3    Q.  If so, during what period of time was she so
4        authorized?
5    A.  Same answer.
6    Q.  Could you tell me whose handwriting appears
7        on each page of Exhibit 23?
8    A.  Same answer.
9    Q.  On the last page of Exhibit 23, there's a
10       reference to a Kevin, a Steve S., and a
11       Tyrone.  Who are they?
12   A.  Same answer.
13   Q.  Did Mansfield Rug ever sell designer berbers?
14   A.  Same answer.
15   Q.  Did REMCO ever sell designer berbers?
16   A.  Same answer.
17   Q.  On the second page of Exhibit 23, there is a
18       small document at the bottom left-hand
19       corner.  What is it, who prepared it, and
20       what's the purpose of it?
21   A.  Same answer.
22   Q.  What documents went into the preparation of
23       that document?
24   A.  Same answer.

Page 151

1    Q.  Mr. Mitchell, I'm showing you what's been
2        marked as Exhibit 24 which consists of four
3        pages.  I'm going to ask you, do you
4        recognize it?  And if so, what do you
5        recognize it to be?
6    A.  Same answer.
7    Q.  When did you first see this document?
8    A.  Same answer.
9    Q.  Who prepared -- strike that.
10          Whose handwriting appears on all of
11       the four pages of this document?
12   A.  Same answer.
13   Q.  With regard to paragraph No. 2 on the first
14       page, the number of $25,000 which appears on
15       all of the other documents that we've seen
16       known as agreement for sale of goods today
17       has changed to $32,775.16.  What are the
18       circumstances under which that happened?
19   A.  Same answer.
20   Q.  To the right of that, there is a note which
21       has that same number and under it, "Sent to
22       Dave for goods."  What's the significance of
23       that particular notation?
24   A.  Same answer.

Page 152

1    Q.  Were those funds, in fact, sent to David
2        Adams for certain goods?
3    A.  Same answer.
4    Q.  At the top left-hand corner of the document,
5        there's a reference to "No up front $,"
6        dollar sign.  What does that mean?
7    A.  Same answer.
8    Q.  Did you, in fact, advance the $32,775.16 to
9        David Adams in connection with this
10       transaction?
11   A.  Same answer.
12   Q.  Is the signature of David Adams on the bottom
13       of this document authentic?
14   A.  Same answer.
15   Q.  Have you ever seen the original of this
16       particular document?
17   A.  Same answer.
18   Q.  Did you ever sign this particular document?
19   A.  Same answer.
20   Q.  Where is the original of this particular
21       document?
22   A.  Same answer.
23   Q.  Do the documents contained in Exhibit 24
24       refer to a legitimate shipment of goods from

Page 153

1    Building 19 to -- sorry -- from REMCO to
2    Building 19?
3    A.  Same answer.
4    Q.  At the very top of Exhibit 24, there is a fax
5        line.  Can you tell me what documents, if
6        any, were faxed either to Jane Dziemit or
7        from Jane Dziemit?
8    A.  Same answer.
9    Q.  If I ask you to look at Exhibit 15 side by
10       side with Exhibit 24 -- do you have them?
11          Okay.  Can you explain to me why the fax line
12       for Jane Dziemit is dated the same date and
13       time on both of those documents?
14   A.  Same answer.
15   Q.  Can you explain to me how it would come about
16       that the signatures of David Adams on both of
17       those documents is different?
18   A.  Same answer.
19   Q.  Do you have any understanding as to why the
20       other two fax lines that appear on Exhibit 15
21       and other agreement for sale of goods that
22       we've seen today do not appear on the top of
23       Exhibit 24?
24   A.  Same answer.

39  (Pages 150 to 153)

Page 154

1   Q. What caused the preparation of Exhibit 24?
2   A. Same answer.
3   Q. Was Exhibit 24 prepared on July 23, 2001?
4   A. Same answer.
5   Q. The second page of Exhibit 24 appears to be
6      smaller than other invoices from REMCO that
7      we've seen today. Do you know why that is?
8   A. Same answer.
9   Q. At the very top of that page, there is a
10     reference to a facsimile. Do you know to
11     whom this was faxed or from whom it was
12     faxed?
13  A. Same answer.
14  Q. Do you know what other documents, if any,
15     were included with such faxes?
16  A. Same answer.
17  Q. Do you know the purpose for which this
18     document was faxed?
19  A. Same answer.
20  Q. On the third page, there are various
21     cross-outs. Do you know who made those
22     cross-outs?
23  A. Same answer.
24  Q. And one of the cross-outs says, "Let you

Page 155

1      know." Do you know why there's a "let you
2      know" note in the date portion?
3   A. Same answer.
4   Q. And I think I asked you this, but just to
5      make sure. Whose handwriting appears on this
6      particular page?
7   A. Same answer.
8   Q. What documents were used in preparing that
9      third page of Exhibit 24?
10  A. Same answer.
11  Q. On the last page of Exhibit 24, there is what
12     appears to be a signature from Jane Dziemit.
13     Is that, in fact, her signature?
14  A. Same answer.
15  Q. Did you and/or REMCO authorize Jane Dziemit
16     to sign this check?
17  A. Same answer.
18  Q. If so, when did you authorize it, and how did
19     you authorize it?
20  A. Same answer.
21  Q. Did you or REMCO ever revoke an authorization
22     for Jane Dziemit to sign checks on behalf of
23     REMCO?
24  A. Same answer.

Page 156

1   Q. If so, when, how and -- when and how?
2   A. Same answer.
3   Q. And if so, why?
4   A. Same answer.
5   Q. What happened to the proceeds of the check,
6      this particular check?
7   A. Same answer.
8   Q. Did you receive any of the proceeds of this
9      particular check?
10  A. Same answer.
11  Q. Did Jane Dziemit receive any of the proceeds
12     of this check?
13  A. Same answer.
14  Q. Did either David Adams or Kevin Britto
15     receive any of the proceeds of this check?
16  A. Same answer.
17  Q. If so, how much did each of those individuals
18     receive from the proceeds of the check
19     represented in Exhibit 24?
20  A. Same answer.
21  Q. We'll move on to 25. Sir, I'm showing you
22     what's been marked as Exhibit 25 which
23     consists of three pages. I'm going to ask
24     you if you recognize it, and if so --

Page 157

1        MR. GRANT: Excuse me. Three pages
2      or four? Forgive me. My miscount. I
3      apologize.
4   Q. Sir, I'm showing you what's been marked as
5      Exhibit 25 which consists of three pages and
6      ask if you recognize it? And if so, what do
7      you recognize it to be?
8   A. Same answer.
9   Q. At the top of the first page, if you turn it
10     in a landscape format, there's blank space
11     above "Sold To." Do you know why there's a
12     blank space there? And if so, what is the
13     reason?
14  A. Same answer.
15  Q. Does the invoice and the second page of
16     Exhibit 25 relate to an actual transaction of
17     goods from either you, REMCO or Mansfield Rug
18     to International Floor Crafts?
19  A. Same answer.
20  Q. Am I correct that the third page does not
21     relate to the transaction referred to in the
22     first two pages?
23  A. Same answer.
24  Q. Who prepared each of the first two

40 (Pages 154 to 157)

**Page 158**

1    documents --
2    A.  Same answer.
3    Q.  -- contained in Exhibit 25?
4    A.  Same answer.
5    Q.  What sources were used in preparing those
6        particular documents?
7    A.  Same answer.
8    Q.  Were the documents prepared in April of 2004?
9    A.  Same answer.
10   Q.  If not, when were they prepared?
11   A.  Same answer.
12   Q.  At the very, very top, there's -- the first
13       page of Exhibit 25, there's the use of the
14       word "Adams." Does that relate to David
15       Adams, or is it just a product name? Do you
16       know what that's for?
17   A.  Same answer.
18   Q.  On the second page, there's a mention of a
19       Diane Spignosi. What is her role with regard
20       to this particular transaction?
21   A.  Same answer.
22   Q.  What is an ad date as referenced in the
23       middle of the second page there?
24   A.  Same answer.

**Page 159**

1    Q.  Do you know what the third page of Exhibit 25
2        relates to?
3    A.  Same answer.
4    Q.  Exhibit 26.
5            MR. GRANT:  Again, I'm sorry,
6    Exhibit 26 is?
7            MR. KLEHM:  131. I think you're
8    looking at it.
9            MR. GRANT:  Yes.
10   Q.  Mr. Mitchell, I'm showing you what's been
11       marked as Exhibit 26 which consists of one
12       page and ask you if you recognize it? And if
13       so, what do you recognize it to be?
14   A.  Same answer.
15   Q.  Is this a fraudulent bill of lading that you
16       prepared and/or participated in preparing?
17   A.  Same answer.
18   Q.  Who prepared this particular bill of lading?
19   A.  Same answer.
20   Q.  What were the circumstances under which it
21       was prepared?
22   A.  Same answer.
23   Q.  When was it prepared?
24   A.  Same answer.

**Page 160**

1    Q.  There's a signature in the center of the page
2        that appears to be from Tyrone Williams. Who
3        wrote that signature?
4    A.  Same answer.
5    Q.  Did you have any discussions with Tyrone
6        Williams with regard to this bill of lading
7        at any time?
8    A.  Same answer.
9    Q.  To the extent that you did, when did you have
10       it? Was it orally or in writing? Who was
11       present? Where was the conversation, and
12       what was the substance of the conversation?
13   A.  Same answer.
14   Q.  Had you had any conversations with a Bill
15       Gemme with regard to the preparation of this
16       bill of lading at any time?
17   A.  Same answer.
18   Q.  If so, what were those discussions?
19   A.  Same answer.
20   Q.  What documents were used in the preparation
21       of this particular document?
22   A.  Same answer.
23   Q.  What supplier did REMCO use for this
24       particular bill of lading?

**Page 161**

1    A.  Same answer.
2    Q.  Did REMCO ever have any company trucks?
3    A.  Same answer.
4    Q.  Did you have any personal trucks for use in
5        shipping goods to Building 19?
6    A.  Same answer.
7    Q.  Did you personally ever ship any goods to
8        Building 19?
9    A.  Same answer.
10   Q.  Did you use any company trucks from REMCO or
11       Mansfield Rug or yourself to ship goods to
12       Building 19 at any time?
13   A.  Same answer.
14   Q.  If so, when?
15   A.  Same answer.
16   Q.  To the extent that you had any such trucks,
17       what were the license plate numbers of the
18       trucks, the registration numbers of the
19       trucks? What color were the trucks? What
20       was the writing on the side of the trucks?
21       And were they registered under any business
22       name? And if so, what business name?
23   A.  Same answer.
24   Q.  Had you ever represented to anyone that REMCO

41 (Pages 158 to 161)

Page 162

1    had company trucks at a time when it didn't?
2   A. Same answer.
3   Q. To the extent that REMCO did not have any --
4    sorry -- to the extent that you did make such
5    a representation, how many times did you make
6    that representation? To whom, when, and why?
7   A. Same answer.
8   Q. Do you know where the original of this
9    particular document is that's Exhibit 26?
10   A. Same answer.
11   Q. Have you ever seen the original of that
12    particular document?
13   A. Same answer.
14   Q. Do you regret preparing this particular
15    document or causing it to be prepared?
16   A. Same answer.
17   Q. Were you influenced by Kevin Britto or David
18    Adams to prepare this particular bill of
19    lading?
20   A. Same answer.
21   Q. Now, at the bottom of Exhibit 26, there is a
22    fax line. To whom was it faxed and from
23    whom?
24   A. Same answer.

Page 163

1   Q. There's a reference to a page 2. What other
2    pages were faxed along with this particular
3    page?
4   A. Same answer.
5   Q. I may have asked you this, but when was this
6    particular document prepared?
7   A. Same answer.
8   Q. Did you backdate the document or cause it to
9    be backdated?
10   A. Same answer.
11   Q. What does customer order No. 7769 mean?
12   A. Same answer.
13   Q. What does bill of lading No. 3896 mean?
14   A. Same answer.
15   Q. Where did the information come from with
16    regard to the preparation of this particular
17    document?
18   A. Same answer.
19   Q. Were there actually documents shipped as
20    referenced in this bill of lading?
21   A. Same answer.
22   Q. To the extent that there were no such
23    documents shipped, why weren't they shipped?
24   A. Same answer.

Page 164

1   Q. Did REMCO, Mansfield Rug and/or you receive
2    any funds from the alleged shipment of these
3    particular goods?
4   A. Same answer.
5   Q. What did you do with the funds or REMCO do
6    with the funds or Mansfield Rug do with the
7    funds?
8   A. Same answer.
9   Q. What's the size of a shipment of 750 rugs?
10   A. Same answer.
11   Q. Can you give me an estimate of the volume
12    that such a shipment would take?
13   A. Same answer.
14   Q. Can you give me an estimate of the size of
15    the truck that would be needed to ship that
16    kind of a shipment?
17   A. Same answer.
18   Q. If I asked you to look at the particular
19    Exhibit 26, can you tell me what size of a
20    truck would be needed to ship -- in your
21    experience, would be needed to ship those
22    rugs?
23   A. Same answer.
24   Q. Did you actually rent a truck to perform this

Page 165

1    particular shipment? And if so, from what
2    company and what's the address?
3   A. Same answer.
4   Q. Have you ever spoken to anyone from Regional
5    Trucking about this particular shipment?
6   A. Same answer.
7   Q. How much would the 750 rugs referred to on
8    Exhibit 26 weigh?
9   A. Same answer.
10   Q. Would one be able to ship the rugs referred
11    to on Exhibit 26 in one trailer? And if so,
12    what size trailer?
13   A. Same answer.
14      MR. KLEHM: Fred, the next one is
15    this (indicating), and I want to make sure
16    you have it.
17      MR. GRANT: It's actually the next
18    in sequence. It's got Bates stamp 973.
19   Q. With regard to the Exhibit 26 before we get
20    to 27, how long would it take to load that
21    shipment?
22   A. Same answer.
23   Q. How many people would it take to load the
24    shipment?

42 (Pages 162 to 165)

Page 166

1   A.  Same answer.
2   Q.  Did REMCO have employees who loaded trucks?
3   A.  Same answer.
4   Q.  Did REMCO have employees who moved inventory,
5       took care of inventory?
6   A.  Same answer.
7   Q.  Did you ever have to pay anyone to load any
8       trucks for shipments by REMCO or by Mansfield
9       Rug?
10  A.  Same answer.
11  Q.  Did you ever have to pay anyone to ship any
12      goods by REMCO or Mansfield?
13  A.  Same answer.
14  Q.  Did you ever pay any payroll taxes for anyone
15      other than yourself with regard to REMCO --
16      strike that.
17          Did you ever pay any payroll tax
18      whatsoever with regard to any of the
19      operations of REMCO or Mansfield Rug?
20  A.  Same answer.
21  Q.  Sir, I'm going to show you what's been marked
22      as Exhibit 27 and ask you if you recognize
23      it?
24  A.  Same answer.

Page 167

1   Q.  What do you recognize it to be?  And if so --
2           MR. GRANT:  Forgive me, what exhibit
3       number is this?
4           MR. KRASNOO:  Twenty-seven.
5   Q.  What do you recognize it to be?
6   A.  Same answer.
7   Q.  Does Exhibit 27 refer to an actual shipment
8       of goods from Mansfield Rug to Building 19?
9   A.  Same answer.
10  Q.  What documents would you have to refer to in
11      order to determine whether or not there was
12      such a shipment?
13  A.  Same answer.
14  Q.  Who would you speak with if you wanted to
15      determine whether or not there was such a
16      shipment?
17  A.  Same answer.
18  Q.  Have you ever confirmed as to whether or not
19      there was such a shipment as represented in
20      Exhibit 27?
21  A.  Same answer.
22  Q.  Who prepared Exhibit 27?
23  A.  Same answer.
24  Q.  What documents were referred to in preparing

Page 168

1       Exhibit 27?
2   A.  Same answer.
3   Q.  There's a reference to David Adams on
4       Exhibit 27.  Do you know why his name would
5       be on that document?
6   A.  Same answer.
7   Q.  And why that?
8   A.  Same answer.
9   Q.  When did David Adams cease to work on behalf
10      of Building 19?
11  A.  Same answer.
12          (Discussion off the record)
13  Q.  Mr. Mitchell, I'm showing you what's been
14      marked as Exhibit 28 and ask if you recognize
15      it; and if so, what do you recognize it to
16      be?
17  A.  Same answer.
18  Q.  There is what appears to be a stamped
19      signature on the reverse side of the check.
20      Do you know who put that stamp on there?
21  A.  Same answer.
22  Q.  Who made that stamp?
23  A.  Same answer.
24  Q.  Did you authorize anyone to create a stamp on

Page 169

1       behalf of Empire Weavers?
2   A.  Same answer.
3   Q.  What happened to the proceeds of this
4       particular check?
5   A.  Same answer.
6   Q.  Did you ever have any accounts with the First
7       National Bank of Virginia or a bank with a
8       similar name?
9   A.  Same answer.
10  Q.  And do you know whether or not REMCO or
11      Mansfield Rug ever had such an account?
12  A.  Same answer.
13  Q.  Did Jane Dziemit ever have an account at that
14      bank?
15  A.  Same answer.
16  Q.  Did any of her entities ever have an account
17      in that bank?
18  A.  Same answer.
19  Q.  Do you know why the funds were deposited into
20      that bank?
21  A.  Same answer.
22  Q.  Does this particular check represent a
23      legitimate transaction?
24  A.  Same answer.

43  (Pages 166 to 169)

Page 170

1       MR. KLEHM: 1284.
2       MR. GRANT: And this is Exhibit 29
3   now?
4       MR. KLEHM: Yes.
5   Q. Sir, I'm showing you Exhibit 29 and ask if
6     you recognize it? And if so, what do you
7     recognize it to be?
8   A. Same answer.
9   Q. There's a signature on the second page. Do
10    you know whose signature that is? And if so,
11    whose is it?
12  A. Same answer.
13  Q. Did you authorize Jane Dziemit to execute
14    that check on behalf of REMCO?
15  A. Same answer.
16  Q. What were the circumstances under which Jane
17    Dziemit would sign either this check or a
18    check like this on behalf of REMCO?
19  A. Same answer.
20  Q. Do you know what BMPP stands for?
21  A. Same answer.
22  Q. If so, what does it stand for?
23  A. Same answer.
24  Q. Did you ever authorize Jane Dziemit to

Page 171

1     endorse a check paid to BMPP?
2   A. Same answer.
3   Q. There's an account number on that check.
4     What is that account number for?
5   A. Same answer.
6   Q. Is that an account number for REMCO or
7     Mansfield Rug or for you?
8   A. Same answer.
9   Q. What happened to the proceeds of this
10    particular check?
11  A. Same answer.
12  Q. Does this check represent a legitimate
13    transaction between REMCO and International
14    Floor Crafts?
15  A. Same answer.
16  Q. Did you ever tell anyone at International
17    Floor Crafts that you did not examine any of
18    the goods that were being sold to
19    International Floor Crafts?
20  A. Same answer.
21  Q. If so, who did you tell? When did you tell?
22    What did you tell?
23  A. Same answer.
24  Q. Did you ever tell anybody at International

Page 172

1     Floor Crafts that you were serving solely as
2     an intermediary between the seller of the
3     goods and International Floor Crafts?
4   A. Same answer.
5   Q. If so, who did you tell? When did you tell,
6     and what did you tell?
7   A. Same answer.
8   Q. Did you ever tell anybody at International
9     Floor Crafts that REMCO and Mansfield Rug did
10    not exist as independent entities?
11  A. Same answer.
12  Q. If so, who did you tell? When did you tell,
13    and what did you tell?
14  A. Same answer.
15  Q. Were you ever concerned that International
16    Floor Crafts would want to know that REMCO
17    and/or Mansfield Rug did not exist?
18  A. Same answer.
19  Q. Were there ever any legitimate transactions
20    between REMCO and International Floor Crafts?
21  A. Same answer.
22  Q. Were there any legitimate transactions
23    between Mansfield Rug and International Floor
24    Crafts?

Page 173

1   A. Same answer.
2   Q. Were there any legitimate transactions
3     between yourself and International Floor
4     Crafts?
5   A. Same answer.
6   Q. To the extent that there were any such
7     legitimate transactions, when did they take
8     place? How did they take place? What
9     product was sold? And how much was -- how
10    much money was involved in the transaction?
11  A. Same answer.
12  Q. And to the extent that there are any such
13    shipments, could you give me all of the
14    factual details surrounding such?
15  A. Same answer.
16  Q. To the extent that there were any legitimate
17    transactions between either REMCO, Mansfield
18    Rug and/or you and International Floor
19    Crafts, did Jane Dziemit play any role in
20    such transactions?
21  A. Same answer.
22  Q. If so, what role did she play and which
23    transactions are we talking about?
24  A. Same answer.

44 (Pages 170 to 173)

Page 174

1  Q. To the extent that there were any legitimate
2     transactions between REMCO and Mansfield Rug
3     or you and International Floor Crafts, did
4     either David Adams or Kevin Britto play any
5     role in the transaction?
6  A. Same answer.
7  Q. If so, what role did they play and which
8     transactions are we talking about?
9  A. Same answer.
10 Q. When did you create these fictional entities
11    known as REMCO and/or Mansfield Rug?
12 A. Same answer.
13 Q. And why?
14 A. Same answer.
15 Q. Did you ever tell Jane Dziemit that REMCO
16    and/or Mansfield Rug were fictional entities?
17 A. Same answer.
18 Q. Did you ever describe the entities at all to
19    Jane Dziemit?
20 A. Same answer.
21 Q. To the extent that the answer to either of
22    the two previous questions is yes, tell me
23    when you told her, what you told her, and
24    whether it was orally or in writing, and who

Page 175

1     was present.
2  A. Same answer.
3  Q. Did Jane Dziemit ever ask to see any
4     documentation regarding REMCO and/or
5     Mansfield Rug before agreeing to make any
6     loans to you or to them?
7  A. Same answer.
8  Q. If so, what documentation did she insist upon
9     seeing? Did you provide her with that
10    documentation? And when?
11 A. Same answer.
12 Q. Did you ever tell either Britto or Adams or
13    Williams or CCC or any of the Suns or Michael
14    Brown that REMCO and Mansfield Rug were
15    fictional entities?
16 A. Same answer.
17 Q. If so, as to each of those people, when did
18    you tell them? What did you tell them? Who
19    was present? Was it orally or in writing?
20    And what was their reaction when you told
21    them?
22 A. Same answer.
23 Q. Did Jane Dziemit ever ask to see any tax
24    documents or other documents relating to

Page 176

1     either REMCO or Mansfield Rug or you at any
2     time?
3  A. Same answer.
4  Q. If so, what did she ask to see? When did she
5     ask to see it? Did you provide it to her?
6     When did you provide it to her? And what did
7     you provide it to her?
8  A. Same answer.
9        MR. KLEHM: We're going to go to
10    No. 30 now, 1286.
11 Q. Sir, I'm showing you what's been marked
12    Exhibit 30 and ask if you recognize it? And
13    if so, what do you recognize it to be?
14 A. Same answer.
15 Q. There is a stamp on the back of the check.
16    It says, "Empire Weavers." Who applied that
17    stamp?
18 A. Same answer.
19 Q. Did you authorize anyone other than yourself
20    to sign checks on behalf of Empire Weavers?
21 A. Same answer.
22 Q. Did you have anything whatsoever to do with
23    Empire Weavers?
24 A. Same answer.

Page 177

1  Q. If you did, what did you have to do with
2     Empire Weavers?
3  A. Same answer.
4  Q. Did you have anything whatsoever to do with
5     an organization known as Dalton Padding?
6  A. Same answer.
7  Q. And if so, what did you have to do with
8     Dalton Padding?
9  A. Same answer.
10 Q. Did you ever have any understanding that any
11    of the checks from Empire Weavers were going
12    into any accounts for REMCO or for Mansfield
13    Rug?
14 A. Same answer.
15 Q. Did you ever discuss Empire Weavers and/or
16    Dalton Padding with Jane Dziemit?
17 A. Same answer.
18 Q. If so, when did you discuss it? Who was
19    present? Was it orally or in writing? And
20    what was said?
21 A. Same answer.
22 Q. Sir, I'm going to show you 1287. Sir, I'm
23    going to show you what's been marked as
24    Exhibit 31. It consists of one page. And I

45 (Pages 174 to 177)

Page 178

1  ask you if you recognize it? And if so, what
2  do you recognize it to be?
3  A. Same answer.
4      MR. KRASNOO: Just so the record is
5  clear, 1287 is the Bates-stamp number for
6  Exhibit 31.
7  Q. Sir, there appears to be a signature on the
8  back of that check. Do you know whose
9  signature that is?
10  A. Same answer.
11  Q. Did you or anyone on behalf of REMCO
12  authorize Jane Dziemit to sign a check on
13  behalf of REMCO?
14  A. Same answer.
15  Q. If so, when did you do it and how?
16  A. Same answer.
17  Q. Do you know where the funds and the proceeds
18  from this particular check went?
19  A. Same answer.
20  Q. If so, where?
21  A. Same answer.
22      MR. KLEHM: 1288.
23  Q. Sir, I'm showing you what's been marked as
24  Exhibit 32. I'm going to ask you if you

Page 179

1  recognize it?
2  A. Same answer.
3  Q. And if so, what do you recognize it to be?
4  A. Same answer.
5  Q. Sir, there's a signature on the back. Do you
6  know whose handwriting that is?
7  A. Same answer.
8  Q. Did you authorize anyone other than yourself
9  to sign checks on behalf of Mansfield Rug?
10  And if so, who did you authorize?
11  A. Same answer.
12  Q. Do you know what happened to the proceeds of
13  that particular check?
14  A. Same answer.
15  Q. Do you know what goods were sold for that
16  particular check?
17  A. Same answer.
18  Q. Do you know if that check represents a
19  legitimate transaction?
20  A. Same answer.
21  Q. If so, does it?
22  A. Same answer.
23      MR. KLEHM: 1329.
24  Q. Sir, I'm showing you what's been marked as

Page 180

1  Exhibit 33 and ask if you recognize it? And
2  if so, what do you recognize it to be?
3      MR. GRANT: You're a step ahead of
4  me. I apologize. Give me one moment,
5  please. Okay. We're at Exhibit 33?
6      MR. KLEHM: Yes.
7      MR. GRANT: Okay.
8      MR. KLEHM: I don't know if he
9  answered that last question. Did he?
10      THE COURT REPORTER: He didn't, no.
11  A. No answer -- or same answer.
12  Q. We can go back for a second to Exhibit 32
13  just for a second. Do you know who has lived
14  at Suite 146 at 5 Mansfield Grove Road at any
15  time from 1990 to the present? And if so,
16  who has?
17  A. Same answer.
18  Q. Exhibit 33, which I think is in your left
19  hand, do you know who signed the back of that
20  check?
21  A. Same answer.
22  Q. Do you know who prepared the stamp that was
23  used to sign that check?
24  A. Same answer.

Page 181

1  Q. What account did that check go into?
2  A. Same answer.
3  Q. Did you authorize anyone other than yourself
4  to sign checks on behalf of Mansfield Rug Co?
5  A. Same answer.
6  Q. What happened to the proceeds of this check?
7  A. Same answer.
8  Q. I'm going to skip Exhibit 34. But I'll just
9  ask if you recognize it. Do you recognize
10  Exhibit 34? And if so, what do you recognize
11  it to be?
12  A. Same answer.
13      MR. GRANT: Exhibit 34 is
14  Bates-stamped 1334?
15      MR. KLEHM: Yes.
16  Q. Sir, I'm going to show you what's been marked
17  as Exhibit 35 which consists of six pages.
18  I'm going to ask if you recognize any
19  portions of that document. And if so, which
20  portions? And if so, what do you recognize
21  it to be?
22  A. Same answer.
23  Q. Is that a fax cover sheet that you -- are
24  those fax cover sheets that you use in the

Page 182

```
 1    normal course of business or have used in the
 2    normal course of business?
 3  A. Same answer.
 4  Q. As to each of the facsimiles contained in
 5    Exhibit 35, for what purpose were they faxed
 6    and to whom?
 7  A. Same answer.
 8  Q. There's a reference to a phone conversation
 9    that you had with Nick Adler on or about
10    March 15, 2003. As best you can recall, what
11    did you say to Nick Adler and what did he say
12    to you during that conversation?
13  A. Same answer.
14  Q. There are handwritten pages contained within
15    Exhibit 35. Whose handwriting is on each of
16    those pages?
17  A. Same answer.
18  Q. The last page contains a typewritten document
19    from Dave Adams. Who prepared the
20    typewritten portion of that document?
21  A. Same answer.
22  Q. Had you had any conversations with Dave Adams
23    with regard to the typewritten portions of
24    the last page of Exhibit 35 at any time
```

Page 183

```
 1    before it was prepared or after it was
 2    prepared?
 3  A. Same answer.
 4  Q. And if so, what were those conversations?
 5    When did they take place? And what was the
 6    substance of it?
 7  A. Same answer.
 8  Q. Do the documents contained within Exhibit 35
 9    all relate to the same transaction?
10  A. Same answer.
11  Q. The second facsimile which starts on the
12    third page of Exhibit 35 talks about your
13    finally having some product that you know
14    that Nick Adler would like. What product are
15    you referring to?
16  A. Same answer.
17  Q. Was there actually product that you had seen?
18  A. Same answer.
19  Q. How do you know that Nick Adler would like
20    the product?
21  A. Same answer.
22  Q. You also say that you have bought these --
23    quote, you have bought these before. Based
24    on what information did you make that
```

Page 184

```
 1    statement?
 2  A. Same answer.
 3  Q. You also say, quote, this batch is a great
 4    mix. What is the basis of that statement?
 5  A. Same answer.
 6  Q. You also say, "Pricing is the same as it was
 7    in the past. As usual, they are delivered
 8    prices." What is the basis on which you say
 9    that?
10  A. Same answer.
11  Q. At the time that you made these
12    representations to Nick Adler, did you know
13    whether or not there was actually product
14    that was being transferred?
15  A. Same answer.
16  Q. The documents that are contained in 35, do
17    they refer to legitimate transactions or fake
18    transactions?
19  A. Same answer.
20  Q. There are fax cover sheets at the top of each
21    page of Exhibit 35. What's the significance
22    of each of those fax lines?
23  A. Same answer.
24  Q. How much profit, if any, did you, REMCO or
```

Page 185

```
 1    Mansfield Rug receive as a result of the
 2    transactions referred to in Exhibit 35?
 3  A. Same answer.
 4  Q. Did you intend to deceive Nick Adler at the
 5    time that you sent these facsimiles to him?
 6  A. Same answer.
 7  Q. Did you, in fact, deceive him?
 8  A. Same answer.
 9  Q. In what way did you deceive him to the extent
10    that you did?
11  A. Same answer.
12  Q. Thirty-six, which I think is the last
13    exhibit --
14        MR. GRANT: Forgive me. Number 36?
15        MR. KLEHM: Page 573.
16        MR. GRANT: Okay. Is Exhibit 36?
17        MR. KLEHM: Yes.
18  Q. Sir, I'm showing you what's been marked as
19    Exhibit 36 which is Bates-stamped 573. It
20    says "Regional Trucking" in the top
21    right-hand corner. I'm going to ask if you
22    recognize this document? And if so, what do
23    you recognize it to be?
24  A. Same answer.
```

47 (Pages 182 to 185)

Page 186

1  Q. There is handwriting on different portions of
2     this document. Do you know whose handwriting
3     is on this document?
4  A. Same answer.
5  Q. Did Regional Trucking ever ship any materials
6     for REMCO or Mansfield Rug or for you?
7  A. Same answer.
8  Q. Did Regional Trucking ever perform any
9     shipping for Mansfield Rug, REMCO, or for you
10    to International Floor Crafts?
11 A. Same answer.
12 Q. To the extent that they did, what shipments
13    did they make to International Floor Crafts
14    or to any other organization on your behalf
15    or REMCO's behalf or Mansfield Rug's behalf?
16 A. Same answer.
17 Q. Is this particular document represented by
18    Exhibit 36 a fraudulent document?
19 A. Same answer.
20 Q. Is it a fake document?
21 A. Same answer.
22 Q. What circumstances would cause you to leave
23    no freight costs to -- to have no freight
24    costs to International Floor Crafts?

Page 187

1  A. Same answer.
2  Q. Is that the signature of Tyrone Williams in
3     the center of this document?
4  A. Same answer.
5  Q. Sir, I'm showing you Exhibit 26 in connection
6     with Exhibit 36. And I note that both of
7     them are dated from Tyrone Williams on March
8     25th of 2005. What were the circumstances
9     under which Tyrone Williams filled out both
10    of these documents on the same date?
11 A. Same answer.
12 Q. At the top of Exhibit 36, there is a fax
13    line. To whom was it faxed and from whom?
14 A. Same answer.
15 Q. Were there any documents faxed along with
16    these particular documents? And if so, what
17    documents?
18 A. Same answer.
19 Q. At the bottom of Exhibit 36, there's another
20    fax line. What was it that caused that
21    particular fax line to show up?
22 A. Same answer.
23 Q. Now, I notice that it appears that at the
24    bottom of Exhibit 36 there is a page 1 at the

Page 188

1     right-hand corner, and at the bottom of
2     Exhibit 26 there's a page 2. Were these two
3     documents sent as a part of the same fax?
4  A. Same answer.
5  Q. If so, to whom were they faxed? And were
6     there any other documents included?
7  A. Same answer.
8  Q. And to the extent there were other documents
9     included, what were they?
10 A. Same answer.
11 Q. Was Mansfield Rug a shipper as referenced in
12    Exhibit 36?
13 A. Same answer.
14 Q. Was Building 19 a consignee in the shipment
15    referred to in Exhibit 36?
16 A. Same answer.
17 Q. Did you do anything to cause Exhibit 36 to be
18    prepared?
19 A. Same answer.
20 Q. Did you ever contact anyone from Regional
21    Trucking to see whether or not this
22    particular shipping document was legitimate?
23 A. Same answer.
24 Q. Was the purpose in preparing Exhibit 36 to

Page 189

1     deceive International Floor Crafts?
2  A. Same answer.
3  Q. What was the purpose in preparing Exhibit 36?
4  A. Same answer.
5  Q. When was Exhibit 36 prepared?
6  A. Same answer.
7  Q. Did you have any conversations with anyone,
8     including Tyrone Williams or anyone else,
9     regarding the preparation of or the need for
10    a bill of lading at any time?
11 A. Same answer.
12 Q. If so, what were the discussions? With whom?
13    When? Where? Were they orally or in
14    writing? And what was the substance of the
15    discussions?
16 A. Same answer.
17 Q. Did Tyrone Williams ever indicate to you that
18    he did not want to prepare or participate in
19    the preparation of Exhibit 36?
20 A. Same answer.
21 Q. Did you ever fax this document to Tyrone
22    Williams for his signature, meaning
23    Exhibit 36?
24 A. Same answer.

48 (Pages 186 to 189)

Page 190

1  Q. Did you ever tell him to fax it back to you?
2  A. Same answer.
3  Q. Did you have a conversation with anyone in
4     which you told them that there were no
5     freight costs to IFC?
6  A. Same answer.
7  Q. And if so, with whom did you speak? When?
8     Where? Was it orally or in writing? And
9     what was the substance of the conversation?
10 A. Same answer.
11 Q. During the course of your transactions with
12    International Floor Crafts, you would receive
13    payments from International Floor Crafts; is
14    that correct?
15 A. Same answer.
16 Q. To the extent that you were receiving
17    payments from International Floor Crafts, why
18    would you need loans from Jane Dziemit or
19    from any of her entities?
20 A. Same answer.
21 Q. What was the purpose for which you received
22    loans from Jane Dziemit?
23 A. Same answer.
24 Q. What were the terms of your loans with Jane

Page 191

1     Dziemit?
2  A. Same answer.
3  Q. What was the length of the loans, the
4     interest rate on the loans? That's it.
5  A. Same answer.
6  Q. Did you have any partners with you at REMCO?
7  A. Same answer.
8  Q. Who were those partners and what are their
9     last known addresses?
10 A. Same answer.
11 Q. Did you ever tell Nick Adler that you had a
12    partner at REMCO?
13 A. Same answer.
14 Q. If you did, when did you tell him and who was
15    the partner to whom you were referring?
16 A. Same answer.
17 Q. Did you ever go gambling with David Adams?
18 A. Same answer.
19 Q. Have you ever been to Lincoln Park with him?
20 A. Same answer.
21 Q. Have you ever been to Foxwoods or Mohegan Sun
22    with him?
23 A. Same answer.
24 Q. How many times have you been to any of those

Page 192

1     three places with him?
2  A. Same answer.
3  Q. How much did he gamble at any of those times?
4  A. Same answer.
5  Q. Have you ever understood him to lose more
6     than $1,000 in any one day of gambling?
7  A. Same answer.
8  Q. If so, how many times have you known that,
9     and how much did he lose?
10 A. Same answer.
11 Q. Did he ever give you any money to gamble
12    with?
13 A. Same answer.
14 Q. Have you ever gone to any restaurants with
15    David Adams?
16 A. Same answer.
17 Q. If you have gone to restaurants, who paid for
18    the dinner?
19 A. Same answer.
20 Q. Have you ever paid for dinner with David
21    Adams?
22 A. Same answer.
23 Q. Have you and David Adams ever gone drinking
24    together?

Page 193

1  A. Same answer.
2  Q. And if you have, on how many occasions have
3     you gone drinking and who paid for it?
4  A. Same answer.
5  Q. Have you and David Adams engaged in any
6     illegal activities whatsoever?
7  A. Same answer.
8  Q. If so, what illegal activities did you engage
9     in with David Adams?
10 A. Same answer.
11 Q. Did David Adams ever tell you that he was
12    stealing money from International Floor
13    Crafts?
14 A. Same answer.
15 Q. Did Kevin Britto ever tell you he was
16    stealing money from International Floor
17    Crafts?
18 A. Same answer.
19 Q. To the extent that either one of them told
20    you that they were stealing money from
21    International Floor Crafts, when did they
22    tell you? What did they tell you? Where did
23    this happen? Was it orally or in writing?
24    And what was the substance of the

49 (Pages 190 to 193)

Page 194

1    conversation?
2    A. Same answer.
3    Q. Did you ever have any understanding that
4      someone had injured David Adams for failure
5      to pay a debt?
6    A. Same answer.
7    Q. Did you ever have any understanding that
8      someone had broken or attempted to break
9      David Adams' leg for failure to pay a debt?
10   A. Same answer.
11   Q. Did David Adams ever ask for money from you
12     to pay off a debt?
13   A. Same answer.
14   Q. Did you ever give him any?
15   A. Same answer.
16   Q. Who was authorized to sign checks on behalf
17     of REMCO?
18   A. Same answer.
19   Q. Who was authorized to take acts on behalf of
20     REMCO?
21   A. Same answer.
22   Q. Who was authorized to buy into REMCO in any
23     contracts or other deals?
24   A. Same answer.

Page 195

1    Q. For what purpose did REMCO send money to
2      David Adams?
3    A. Same answer.
4    Q. Did you ever personally send money to Dave
5      Adams? If so, how much and why?
6    A. Same answer.
7    Q. At any time did you wire or cause to be wired
8      any funds from your own personal bank
9      accounts to David Adams?
10   A. Same answer.
11   Q. If so, when and why?
12   A. Same answer.
13   Q. In April of 2005, did you provide a fake bill
14     of lading to International Floor Crafts?
15   A. Same answer.
16   Q. Why?
17   A. Same answer.
18   Q. At any time did Kevin Britto direct you to
19     provide a fake bill of lading to
20     International Floor Crafts?
21   A. Same answer.
22   Q. Did you ever ask Kevin Britto or David Adams
23     for any bills of lading?
24   A. Same answer.

Page 196

1    Q. And if you did, when did you ask them? What
2      did you ask them for? And did they provide
3      it?
4    A. Same answer.
5    Q. At one point you had a meeting which involved
6      David Adams, Tony Marasco and perhaps others.
7      Did that meeting take place?
8    A. Same answer.
9    Q. Did you ever meet with Tony Marasco and David
10     Adams?
11   A. Same answer.
12   Q. On how many occasions? Where did you meet?
13     Who was present? What was said by each of
14     you during that meeting?
15   A. Same answer.
16   Q. As a result of that meeting, did you take any
17     actions? If so, what actions did you take?
18   A. Same answer.
19   Q. In or around 2002 or 2003, did Kevin Britto
20     tell you to make further payments to him
21     directly as opposed to sending them to David
22     Adams?
23   A. Same answer.
24   Q. If so, what did Kevin Britto tell you? What

Page 197

1      did you tell Kevin Britto? When were these
2      conversations? Who was present? Was it
3      orally or in writing? And where were they?
4    A. Same answer.
5    Q. Did you insist upon any documentation in
6      order to start sending money to Kevin Britto
7      as opposed to David Adams?
8    A. Same answer.
9    Q. What reason did Kevin Britto give for you to
10     start sending money to Kevin Britto as
11     opposed to David Adams?
12   A. Same answer.
13   Q. What did you do as a result of these
14     conversations that you had with -- this
15     conversation -- strike that.
16         What did you do as a result of any
17     conversation that you had with Kevin Britto
18     regarding switching sending money from --
19     instead of sending money to Adams but sending
20     it to Britto?
21   A. Same answer.
22   Q. What was the arrangement under which you
23     would receive money from certain loans that
24     you made to Kevin Britto and/or David Adams?

50 (Pages 194 to 197)

1    A. Same answer.
2    Q. What percentage did David Adams and Kevin
3       Britto receive from the fraudulent
4       transactions with International Floor Crafts?
5    A. Same answer.
6    Q. How much money did David Adams and Kevin
7       Britto receive from the fraudulent
8       transactions of International Floor Crafts?
9    A. Same answer.
10   Q. How much did Tyrone Williams receive from the
11      fraudulent transactions with International
12      Floor Crafts?
13   A. Same answer.
14   Q. How much did you receive from the fraudulent
15      transactions with International Floor Crafts?
16   A. Same answer.
17   Q. How much did REMCO and/or Mansfield Rug
18      receive from fraudulent transactions with
19      International Floor Crafts?
20   A. Same answer.
21   Q. How would you know what to put on the invoice
22      from REMCO to International Floor Crafts?
23   A. Same answer.
24   Q. At the time that Kevin Britto told you to

1    start paying him directly and not Adams, were
2    you aware that Kevin Britto was no longer
3    working for Building 19?
4    A. Same answer.
5    Q. To the extent that you were aware that Kevin
6       Britto was no longer working for Building 19
7       at the time, why would you send monies to
8       Kevin Britto instead of David Adams?
9    A. Same answer.
10   Q. Did the fact that Kevin Britto was asking you
11      to send money to him and not to David Adams
12      raise your suspicions at all as to whether or
13      not you were engaging in legitimate
14      transactions?
15   A. Same answer.
16   Q. As a result of what Kevin Britto had told you
17      with regard to switching sending money from
18      David Adams to Kevin Britto, did you insist
19      upon any documentation to ensure yourself
20      that this was a legitimate transaction --
21      these were legitimate transactions?
22   A. Same answer.
23   Q. How do you know or how would you know if the
24      amount that you put in the invoices were

1    genuine and fair prices?
2    A. Same answer.
3    Q. Is it correct when Kevin Britto testified
4       that you were suspicious when Kevin Britto
5       told you to start sending him the money and
6       not send it to David Adams?
7    A. Same answer.
8    Q. At any time did Kevin Britto tell you that he
9       and David Adams were paying for goods to be
10      converted that would later be shipped into
11      International Floor Crafts?
12   A. Same answer.
13   Q. If so, when did he tell you that?
14   A. Same answer.
15   Q. At any time did Kevin Britto discuss with you
16      the fact that Bill Elovitz wants
17      International Floor Crafts to have new
18      vendors and that's why they needed the
19      development or creation of REMCO and
20      Mansfield Rug?
21   A. Same answer.
22   Q. At any time did REMCO become Mansfield Rug?
23   A. Same answer.
24   Q. At any point did you cease doing operations

1    as REMCO and start doing operations as
2    Mansfield?
3    A. Same answer.
4    Q. If so, when did that happen?
5    A. Same answer.
6    Q. If so, why did that happen?
7    A. Same answer.
8    Q. Did REMCO ever invoice for actual rugs
9       received by International Floor Crafts?
10   A. Same answer.
11   Q. Did Mansfield Rug ever invoice for actual
12      rugs received by International Floor Crafts?
13   A. Same answer.
14   Q. Did you discuss any tax issues with Kevin
15      Britto at any time?
16   A. Same answer.
17   Q. If so, when did you discuss it? Where were
18      you? Was it oral or in person? As best you
19      can recall, what did you say to him and what
20      did he say to you?
21   A. Same answer.
22   Q. As a result of any of your discussions with
23      Kevin Britto regarding taxes, did you take
24      any steps? And if so, what steps did you

51 (Pages 198 to 201)

Page 202

```
1      take?
2   A. Same answer.
3   Q. Have you included on all of your income tax
4      returns all of the income that you received
5      from REMCO and Mansfield Rug?
6   A. Same answer.
7   Q. Have you included on your income tax returns
8      all of the income that you received as a
9      result of any transactions involving
10     International Floor Crafts, Building 19 and
11     Building 19, Inc.?
12  A. Same answer.
13  Q. To the extent that you have not included any
14     income from these transactions, what income
15     have you not included?
16  A. Same answer.
17  Q. Did you ever at any time have a conversation
18     with Kevin Britto or David Adams in which
19     they told you that you were serving as the
20     middle man in the transactions involving
21     International Floor Crafts?
22  A. Same answer.
23  Q. If so, when did that occur?  And what was the
24     discussion?
```

Page 203

```
1   A. Same answer.
2   Q. Was there a point in or around April or May
3      of 2005 or even before that when Nick Adler
4      told you that he wanted to see your
5      warehouse?
6   A. Same answer.
7   Q. When did that happen?
8   A. Same answer.
9   Q. As best you can recall, what did you say to
10     Nick and what did he say to you with regard
11     to his going to the warehouse?
12  A. Same answer.
13  Q. Did he ever go to the warehouse?
14  A. Same answer.
15  Q. Did you ever tell him that you didn't want
16     him to go to the warehouse because it was
17     messy?
18  A. Same answer.
19  Q. Did you ever have any warehouse at all
20     whether or not it was messy?
21  A. Same answer.
22  Q. Was there any warehouse that Nick Adler could
23     have gone to to see the product that he
24     wanted to see?
```

Page 204

```
1   A. Same answer.
2   Q. Was there ever a discussion amongst you and
3      Adams and/or Britto at which there was a plan
4      developed to say that the warehouse was not
5      located in Connecticut but was located
6      somewhere else?
7   A. Same answer.
8   Q. To the extent that that happened, was the
9      purpose for doing that in order to dissuade
10     Nick Adler from trying to look at the
11     warehouse?
12  A. Same answer.
13  Q. At any point did Kevin Britto and/or David
14     Adams tell you that they did not want you to
15     know where the warehouse was located where
16     the goods were?
17  A. Same answer.
18  Q. If so, what was it that they told you?
19  A. Same answer.
20  Q. At any point did you ask for the names of the
21     vendors that Kevin Britto and/or David Adams
22     were using?
23  A. Same answer.
24  Q. And if so, when did you ask it?  What was the
```

Page 205

```
1      response?
2   A. Same answer.
3   Q. Did you ever seek -- sorry.  Did you ever
4      send direct -- did you ever send --
5         (Cell phone rings)
6         MR. GRANT:  Excuse me.
7         (Pause)
8   Q. Did you ever send checks directly to any
9      vendors?  And if so, to what vendors and
10     when?  And how did you get their names?
11  A. Same answer.
12  Q. According to Kevin Britto, he has spoken with
13     you several times since this case has begun.
14     Is that true?
15  A. Same answer.
16  Q. How many times have you spoken to him?  And I
17     think we went into this earlier, but what was
18     the substance of those conversations?
19  A. Same answer.
20  Q. How did you know the numbers of the rugs that
21     you were selling, the quality of the rugs
22     that you were selling and the values of the
23     rugs that you were selling to International
24     Floor Crafts?
```

52 (Pages 202 to 205)

Page 206

1   A. Same answer.
2   Q. Is it true that you were giving money upfront
3       for an order so that you could prepare an
4       invoice and get more money from International
5       Floor Crafts?
6   A. Same answer.
7   Q. How did you get paid as a result of any
8       transactions involving International Floor
9       Crafts?
10  A. Same answer.
11  Q. Is it true that you were getting your
12      percentage upfront of the funds that you
13      received from International Floor Crafts?
14  A. Same answer.
15  Q. At some point did the nature of the
16      arrangement change such that David Adams
17      wanted money upfront in the course of the
18      transactions?
19  A. Same answer.
20  Q. How did that work?
21  A. Same answer.
22  Q. How did the whole system work under which you
23      would get loans from Jane Dziemit?
24  A. Same answer.

Page 207

1   Q. Describe in detail how it worked that you
2       would get loans from Jane Dziemit and provide
3       funds from that to David Adams.
4   A. Same answer.
5   Q. What documentation, if any, was involved with
6       these loans?
7   A. Same answer.
8   Q. What documentation, if any, did Jane Dziemit
9       request from you in order for her to make
10      these loans?
11  A. Same answer.
12  Q. What documentation, if any, did you provide
13      to Jane Dziemit in return for these loans?
14  A. Same answer.
15  Q. What documentation did you receive from Jane
16      Dziemit for these loans?
17  A. Same answer.
18  Q. Before you got involved in the loans with
19      Jane Dziemit involving David Adams,
20      International Floor Crafts, had you ever
21      borrowed any money from Jane Dziemit before?
22  A. Same answer.
23  Q. To extent that you had borrowed money from
24      her before, on how many occasions did you

Page 208

1       borrow it? How much did you borrow? What
2       were the terms? Did you pay them back? And
3       what was the purpose of the loan?
4   A. Same answer.
5   Q. Were you ever visited by the state police?
6   A. Same answer.
7   Q. To the extent that you were visited by the
8       state police, what did you tell them and what
9       did they tell you?
10  A. Same answer.
11  Q. Did you ever speak with anyone other than
12      your counsel regarding any contact that
13      you've had with the state police?
14  A. Same answer.
15  Q. Did REMCO or Mansfield Rug ever have any
16      liability or other insurance of any kind?
17  A. Same answer.
18  Q. Did you ever have any liability or other
19      insurance of any kind with regard to your
20      business?
21  A. Same answer.
22  Q. To the extent that either you, REMCO or
23      Mansfield Rug ever had any liability or other
24      insurance, with what company did you have?

Page 209

1       What kinds of insurance did you have? And
2       what were the dates of the policy?
3   A. Same answer.
4   Q. Also, what are the limits of the policy?
5   A. Same answer.
6   Q. Is it true that in or around 2003, the amount
7       of the deals that went through REMCO and
8       Mansfield increased?
9   A. Same answer.
10  Q. Why did it increase, if it did?
11  A. Same answer.
12  Q. Over the period from 1990 to the present, can
13      you describe for me the trends of the volume
14      of deals involving Mansfield and REMCO as to
15      whether or not it was increasing or
16      decreasing?
17  A. Same answer.
18  Q. How much money did you earn each year from
19      REMCO and Mansfield Rug?
20  A. Same answer.
21  Q. How much money did you earn each year from
22      Mansfield and REMCO for transactions
23      involving David Adams and/or International
24      Floor Crafts?

53  (Pages 206 to 209)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 210

1   A. Same answer.
2   Q. Did you work with David Adams and/or Kevin
3       Britto on any transactions involving
4       companies other than Building 19 or
5       International Floor Crafts?
6   A. Same answer.
7   Q. If so, what companies and when?
8   A. Same answer.
9   Q. Did you issue any 1099s to David Adams or
10      Kevin Britto or Tyrone Williams for any work
11      that they performed of any kind?
12  A. Same answer.
13  Q. If so, do you have copies of those?
14  A. Same answer.
15  Q. What does it mean to convert carpet?
16  A. Same answer.
17  Q. Are you aware that David Adams and Kevin
18      Britto were arranging for half shipments and
19      non-shipments of materials into International
20      Floor Crafts?
21  A. Same answer.
22  Q. When did you first become aware of that? How
23      did you become aware of it? And what, if
24      anything, did you do in response to becoming

Page 211

1       aware of it?
2   A. Same answer.
3   Q. Did you ever provide any 1099s or W-2s to
4       Jane Dziemit, Tony Marasco, or Diane
5       Spignosi?
6   A. Same answer.
7   Q. If so, when did you provide them?
8   A. Same answer.
9   Q. Am I correct that your role in the deals
10      involving International Floor Crafts was to
11      figure out what the suppliers were going to
12      deliver, figure out when they were going to
13      deliver the items, and to prepare an invoice
14      for International Floor Crafts for those
15      particular rugs?
16  A. Same answer.
17  Q. To the extent that I'm wrong, how am I wrong?
18  A. Same answer.
19  Q. What companies have you worked for other than
20      REMCO and Mansfield Rug over the past 15
21      years?
22  A. Same answer.
23  Q. And what were your duties in those companies?
24  A. Same answer.

Page 212

1       MR. GRANT: Off the record.
2       (Discussion off the record)
3   Q. Have you ever known an individual named
4       Marjorie who works at International Floor
5       Crafts?
6   A. Same answer.
7   Q. To the extent that you have ever known her,
8       how do you know her? When did you first meet
9       her?
10  A. Same answer.
11  Q. If you've ever spoken with her, how many
12      times have you spoken with her? Was it oral
13      or in person? Who was present? Where was
14      the conversation? As best you can recall,
15      what did you say to her, and what did she say
16      to you?
17  A. Same answer.
18      MR. KLEHM: Excuse me one second.
19      (Discussion off the record)
20  Q. Sir, we may have gone through this this
21      morning, and I appreciate your indulgence.
22      In April of 2005, were you requested by Bill
23      Gemme to provide copies of certain proofs of
24      delivery or bills of lading?

Page 213

1   A. Same answer.
2   Q. If so, what were you asked to provide?
3   A. Same answer.
4   Q. At that time did you tell anyone at
5       International Floor Crafts that you were then
6       in South Carolina and there was no one at
7       Mansfield Rug who could pull those records?
8   A. Same answer.
9   Q. And then shortly thereafter, did you tell
10      anyone at International Floor Crafts that an
11      individual named Diane had cleaned up the
12      office and had shredded all of the records?
13  A. Same answer.
14  Q. And did you give that as the reason for why
15      you couldn't give the bills of lading?
16  A. Same answer.
17  Q. And were those conversations with a Bill
18      Gemme of International Floor Crafts?
19  A. Same answer.
20  Q. And when you told Bill Gemme that the items
21      had been shredded, that was a lie, wasn't it?
22  A. Same answer.
23  Q. And when you prepared and sent -- strike
24      that.

54 (Pages 210 to 213)

Page 214

1      And when you provided Building 19
2  with the bill of lading that you did provide
3  that was signed by Tyrone Williams that's
4  Exhibit 36, that was a fraudulent bill of
5  lading, right?
6  A. Same answer.
7  Q. And your intent in both lying to Bill Gemme
8     in that instance and in providing the fake
9     bill of lading was to mislead International
10    Floor Crafts; is that right?
11 A. Same answer.
12 Q. Have there been other instances in which you
13    have lied to anyone from International Floor
14    Crafts over the past ten years?
15 A. Same answer.
16 Q. To the extent that there have been, what have
17    you lied about and to whom did you lie?
18 A. Same answer.
19 Q. Is there anyone else other than the
20    individuals whom we've listed today that you
21    have spoken with regarding either this
22    complaint or the facts alleged in this
23    complaint?
24 A. Same answer.

Page 216

1  A. Same answer.
2  Q. What documents do you have in your possession
3     other than what has been produced through
4     automatic disclosure in this case that relate
5     to REMCO or Mansfield Rug?
6  A. Same answer.
7  Q. Has Kevin Britto taken any steps to try to
8     influence you in your testimony here today or
9     in any action that you've taken with regard
10    to this case?
11 A. Same answer.
12 Q. Has anyone made any promises to you in
13    exchange for your testimony here today or for
14    any actions that you take with regard to this
15    case?
16 A. Same answer.
17      MR. KLEHM: Can we take a break?
18      MR. GRANT: Yes.
19      (Recess taken)
20 BY MR. KLEHM:
21 Q. If so, what promises were made and by whom
22    and when?
23 A. Same answer.
24 Q. Has anyone made any threats to you in

Page 215

1  Q. To the extent that there is anyone else,
2     please tell me who they are, when you spoke
3     with them, and as to each such conversation,
4     what was said, who was present, whether it
5     was orally or in writing, and where it was,
6     excluding your attorneys.
7  A. Same answer.
8  Q. Do you recognize that in exercising your
9     fifth amendment privilege you cannot testify
10    at trial in this matter?
11 A. Same answer.
12 Q. What is the role of a buyer in a rug
13    transaction like the one we've been talking
14    about today?
15 A. Same answer.
16 Q. What's the role of a receiver?
17 A. Same answer.
18 Q. What's the role of a broker?
19 A. Same answer.
20 Q. To the extent that you're familiar with it,
21    how does -- strike that -- how did
22    International Floor Crafts during the period
23    from 2000 to 2004 process transactions
24    involving the sale or purchase of rugs?

Page 217

1  connection with any action you've taken in
2  this case or to try to induce you to take any
3  action in this case?
4  A. Same answer.
5  Q. And to the extent that there is, who made it,
6     when, and what was the substance of it?
7  A. Same answer.
8      MR. KLEHM: At this point, we will
9  suspend the deposition. And we'll put on the
10 record that we anticipate filing a motion to
11 compel at least as to some, if not all, of
12 the questions. So it's your witness.
13      MR. GRANT: I have no questions. I
14 would put on the record with reference to a
15 motion to compel, my recollection is that
16 such things may be required to be or, in any
17 event, it would be good procedure for such
18 things to be conferenced. I think we've
19 worked together enough on this that you know
20 that I'm open to and listen seriously to
21 anything you have to say. And I would just
22 invite some conferencing before something is
23 filed.
24      MR. KLEHM: Sure. It is local rule

55 (Pages 214 to 217)

Page 218

```
 1        7.182 which requires a conference before a
 2   motion is filed.
 3        MR. GRANT:  Of any kind of motion,
 4   my weak recollection.
 5        MR. KLEHM:  I think that's it.  We
 6   suspend.
 7        (Discussion off the record)
 8        (Whereupon, the deposition was
 9        suspended at 3:55 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 220

```
 1   ATTACH TO THE DEPOSITION OF RONALD EDWARD
     MITCHELL
 2   CASE: INTERNATIONAL FLOOR CRAFTS, INC. VS.
     DAVID W. ADAMS, ET AL.
 3        ERRATA SHEET
 4   INSTRUCTIONS: After reading the transcript
     of your deposition, note any change or
 5   correction to your testimony and the reason
     therefor on this sheet.  DO NOT make any
 6   marks or notations on the transcript volume
     itself.  Sign and date this Errata Sheet
 7   (before a Notary Public, if required).  Refer
     to Page 219 of the transcript for Errata
 8   Sheet distribution instructions.
 9   PAGE LINE
              CHANGE: _____
10            REASON: _____
              CHANGE: _____
11            REASON: _____
              CHANGE: _____
12            REASON: _____
              CHANGE: _____
13            REASON: _____
              CHANGE: _____
14            REASON: _____
              CHANGE: _____
15            REASON: _____
              CHANGE: _____
16            REASON: _____
              CHANGE: _____
17            REASON: _____
              CHANGE: _____
18            REASON: _____
19   I have read the foregoing transcript
     of my deposition and except for any
20   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
21   record of the statements made by me.
22
23
24   _____
     RONALD EDWARD MITCHELL   DATE
```

Page 219

```
 1   DEPONENT'S ERRATA SHEET
 2   AND SIGNATURE PAGE INSTRUCTIONS
 3
 4        The original of the Errata Sheet has
 5   been delivered to Paul J. Klehm, Esq.
 6        When the Errata Sheet has been
 7   completed by the deponent and signed, a copy
 8   thereof should be delivered to each party of
 9   record and the ORIGINAL delivered to Paul J.
10   Klehm, Esq., to whom the original deposition
11   transcript was delivered.
12
13        INSTRUCTIONS TO DEPONENT
14
15        After reading this volume of your
     deposition, indicate any corrections or
16   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to you
17   and sign it.  DO NOT make marks or notations
     on the transcript volume itself.
18
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20   COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24
```

Page 221

```
 1   COMMONWEALTH OF MASSACHUSETTS)
 2   SUFFOLK, SS.              )
 3        I, Lisa Abdo, Certified Shorthand
 4   Reporter and Notary Public in and for the
 5   Commonwealth of Massachusetts, do certify
 6   that pursuant to appropriate notice of taking
 7   deposition, there came before me the subject
 8   deponent, who was by me duly sworn; that said
 9   deponent was thereupon examined under oath
10   and said examination reduced to writing by
11   me; and that the deposition is a true record
12   of the testimony given by the deponent.
13        I further certify that I am not a
14   relative or employee of or counsel or
15   attorney for any of the parties, or a
16   relative or employee of such counsel or
17   attorney, nor am I financially or otherwise
18   interested in the outcome of the action.
19        Witness my hand and official seal at
20   Boston, Massachusetts, this 17th day of July,
21   2006.
22
23   _____
     Notary Public
24   My commission expires:  12/11/09
```

56 (Pages 218 to 221)

**EXHIBIT B**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____
INTERNATIONAL FLOOR CRAFTS, INC.  )
     Plaintiff                  )
                                  )
v.                                  )
                                  )
DAVID W. ADAMS, *et al*        )   CIVIL ACTION NO. 05CA11654-NMG
     Defendants          )
_____)

## <u>AFFIDAVIT OF PAUL J. KLEHM, ESQ. PURSUANT TO FED.R.CIV.P. 56(f)</u>

I, Paul J. Klehm, Esq., under oath, depose and state as follows:

1.     I am co-counsel to Plaintiff International Floor Crafts, Inc. ("IFC"). I am an attorney licensed to practice law in the Commonwealth of Massachusetts since 1992, and in the United States District Court for the District of Massachusetts since 1993.

2.     On June 23, 2006, I took the deposition of Defendant Ronald Mitchell, at which he exercised his privilege against self-incrimination as to virtually all questions posed to him, except for his name.

3.     On March 14, 2008, while downloading Defendant Jane Dziemit's summary judgment materials, I learned, for the first time, that Defendant Ronald Mitchell had submitted an affidavit in support of Dziemit's motion.  I was surprised to find Mitchell's affidavit included in the summary judgment materials.

4.     IFC has not had an opportunity to obtain any oral testimony under oath from Defendant Mitchell regarding the facts alleged in the within matter, and IFC has not had an opportunity to cross-examine Defendant Mitchell on the contents of his affidavit.

5.     IFC requires an opportunity to question Defendant Mitchell under oath regarding the facts surrounding the allegations in the case at bar and regarding his affidavit in

order to respond effectively to Defendant Dziemit's summary judgment materials, especially

since Paragraphs 5 and 7 through 17 of the Statement of Undisputed Facts rely upon

Defendant Mitchell's affidavit.

6.    Thus, pursuant to Fed.R.Civ.P. 56(f), IFC cannot present by affidavits facts

essential to justify IFC's opposition absent an opportunity to conduct a deposition of

Defendant Mitchell at which he is deemed to have waived his privilege against self-

incrimination.

Signed under pains and penalties of perjury this 17th day of March, 2008,


*/s/ Paul J. Klehm*_____
Paul J. Klehm

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the
attorney(s) of record or upon each party not represented by an attorney via ECF or via first
class mail, postage pre-paid, on March 17, 2008.

*/s/ Paul J Klehm*_____
Paul J. Klehm