UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____
INTERNATIONAL FLOOR CRAFTS, INC.    )
      Plaintiff    )
          )
v.    )
          )
DAVID W. ADAMS, *et al*    )    CIVIL ACTION NO. 05CA11654-NMG
      Defendants    )
_____)

**PLAINTIFF INTERNATIONAL FLOOR CRAFTS, INC.'S RESPONSE TO
DEFENDANT JANE DZIEMIT'S STATEMENT OF MATERIAL FACTS [DOC. NO.
212] AND PLAINTIFF'S CONCISE STATEMENT OF
FURTHER MATERIAL FACTS**

      Plaintiff International Floor Crafts, Inc. ("IFC") hereby responds as follows to the

"Statement of Undisputed Material Facts" filed by Defendant Jane Dziemit and, further, sets

forth Plaintiff's Concise Statement of Further Material Facts.  For the convenience of the

Court, IFC sets forth each of Defendant Dziemit's alleged facts, along with IFC's

corresponding response thereto.

**IFC's Responses to Defendant Dziemit's Alleged Facts**

**Defendant Dziemit's Alleged Fact No. 1**

      This an action which stems from a long-term scheme involving three (3) IFC former

employees/agents, defendants David Adams, Tyrone Williams and Kevin Britto to defraud

and steal money from plaintiff IFC. Amended Complaint, ¶¶ 38, 40 and 66.[1]

---

[1] (Defendant Dziemit's footnote to Alleged Fact No. 1).  During this litigation Defendant Adams has taken the
5th Amendment concerning answering questions under oath. Defendant Williams has failed to defend the action.
Defendant Britto is deceased, but admitted to his part in the scheme during deposition testimony preceding his
death. Additionally, the Original Complaint in this action was verified by IFC controller William Gemme and
those allegations remained unchanged in the Amended Complaint.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 1**

IFC admits that the within action involves a long-term scheme to defraud and to steal money from IFC, and that David Adams, Tyrone Williams and Kevin Britto, among others, including, without limitation, Defendants Mitchell and Dziemit, were involved in the scheme. Defendants Adams and Williams exercised their Fifth Amendment privilege protections and, in essence, refused to testify at their respective depositions. (*See* **Exhibit A** to Affidavit of Paul J. Klehm, Esq. ("Aff. Klehm"), *see* Deposition of Tyrone Williams (**Exhibit B**[2])). Defendant Britto is apparently deceased. [Doc. No. 192]. To the extent that Defendant Dziemit alleges that Paragraphs 38, 40 and 66 limit the scheme to Defendants Adams, Williams and Britto, IFC denies Alleged Fact No. 1. Further answering, IFC states that, in Paragraph 66 of the First Amended Complaint, IFC alleges that Defendants Jane Dziemit, Ronald Mitchell, Michael Brown, Paul Sun, David Sun and/or CCC International were also involved in the scheme. (*See* also Affidavit of William Gemme in Support of Plaintiff's Motion for Preliminary Injunctions, ¶31, **Exhibit C**). IFC further states that Paragraph 40 of the Amended Complaint also refers to individuals involved in the scheme in addition to Adams, Williams and Britto, including, without limitation, Dziemit. To the extent any further response is required to Alleged Fact No. 1, the paragraph is denied.

Mitchell initially asserted the fifth amendment at his deposition, but, then, after he submitted an affidavit in connection with the within motion, the Court ordered Mitchell to undergo a deposition. That deposition took place on May 16, 2008.

---

[2] References to exhibits shall be to the Affidavit of Paul J. Klehm, Esq.

**Defendant Dziemit's Alleged Fact No. 2**

This long-term scheme involving the insiders and manufacturers' representatives to mainly non-existent companies who conspired to defraud IFC by preparing fabricated purchase orders and fictitious shipping documents in order to cause IFC to make thousands of dollars of payments at a time to illusory companies for non-existent merchandize spanned a period of at least eight years. Amended Complaint ¶1.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 2**

To the extent that Alleged Fact No. 2 limits the scheme to Defendants Adams, Williams and Britto, IFC denies Alleged Fact No. 2. Further answering, to the extent that the meaning of the term "scheme" is expanded to include, without limitation, Defendants Jane Dziemit, Ronald Mitchell, Michael Brown, Paul Sun, David Sun and/or CCC International, then IFC admits Alleged Fact No. 2. To the extent any further response is required to Alleged Fact No. 2, the paragraph is denied.

**Defendant Dziemit's Alleged Fact No. 3**

Defendant Jane Dziemit is a 50 year-old homemaker and mother of two children, ages 15 and 11, who lives in California with the children's father, Tony Maresca. Affidavit of Jane Dziemit, attached hereto as Exhibit 1 and incorporated herein by reference. Exhibit 1, ¶1.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 3**

IFC admits so much of Alleged Fact No. 3 which alleges that Defendant Jane Dziemit is a 50 year-old homemaker and mother of two children, ages 15 and 11, who lives in California**.** As to the phrase "with the children's father, Tony Maresca," IFC denies the assertion, as the citation does not support the allegation.

**Defendant Dziemit's Alleged Fact No. 4**

In or about 1999, Dziemit was approached by family friend and co-defendant Ronald Mitchell for a loan to help him expand his carpet and floor covering business. Exhibit 1, ¶5.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 4**

Admitted, except as to the term loan.  Further answering, see Response No. 12.

**Defendant Dziemit's Alleged Fact No. 5**

Mitchell had been in the carpet cushion business for more than thirty (30) years. Affidavit of Ronald Mitchell, attached hereto as Exhibit 2 and incorporated herein by reference. Exhibit 2, ¶3.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 5**

Denied.  To the extent that Alleged Fact No. 5 is intended to mean that Mitchell had been in the carpet cushion business for more than thirty years as of "in or about 1999," IFC must deny the Alleged Fact because, in his cited affidavit, Ronald Mitchell asserts that, as of March 6, 2008, he had been in the carpet cushion business for more than thirty years.  It is possible that, in or around 1999, he had not yet been in the carpet cushion business for more than thirty years.

**Defendant Dziemit's Alleged Fact No. 6**

Previous to Mitchell approaching Dziemit, Dziemit had been involved in the at home business of making real estate loans, which allowed her to earn money at home while raising her children. Exhibit 1, ¶6.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 6**

Denied.  IFC admits that, in the cited affidavit, Dziemit writes that, at the time she was approached by Mitchell, she processed real estate loans from her house, which allowed her to earn money at home to raise her children.

**Defendant Dziemit's Alleged Fact No. 7**

Mitchell, who previously worked for a company called Crest Foam, became an independent sales agent of padding when Crest Foam was purchased. Mitchell began using the name "Remco" as the name of his sales agency and was working with as many as ten sales representatives. Exhibit 2, ¶4.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 7**

Admitted.  Further answering, REMCO is not, and has not been, incorporated. (**Exhibit C1**, Deposition of Ronald Mitchell ("Dep. Mitchell"), p. 39, ln. 11-13).  REMCO has always been a "d/b/a" company, acting primarily under Mitchell's name.  (Dep. Mitchell, p. 39, ln. 14-20).

**Defendant Dziemit's Alleged Fact No. 8**

In approximately late 1998 one of Mitchell's customers suggested he contact David Adams, who worked as an independent representative for a company called Building 19, which was later determined to be plaintiff, IFC.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 8**

Denied.  Defendant Dzeimit does not cite to any portion of the record for the facts alleged in Alleged Fact No. 8.  IFC does acknowledge that Ronald Mitchell does assert these facts in the first two sentences of Paragraph 5 of his affidavit.

**Defendant Dziemit's Alleged Fact No. 9**

Sometime later Mitchell spoke to Adams who confirmed he was an independent sales representative for IFC. Adams explained that he would find "good deals" on rugs from various suppliers, sell them to IFC and receive commission from the supplier providing the material. Adams also stated that even though he was not an employee for IFC, he could write purchase orders himself. Exhibit 2, ¶5.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 9**

Admitted.

**Defendant Dziemit's Alleged Fact No. 10**

Shortly thereafter, Adams agreed to purchase padding from Mitchell through his supplier, North Carolina Foam, who shipped and billed the material and paid Mitchell the commission, for which he gave a portion to Adams. Exhibit 2, ¶6.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 10**

Admitted.

**Defendant Dziemit's Alleged Fact No. 11**

After several months of this relationship, Adams approached Mitchell and asked if he was interested in expanding his business. Adams told Mitchell that he needed capital to pay suppliers in advance, for merchandise at lower prices, which he could then resell to IFC. Adams stated that if Mitchell was interested, advance funds would be sent to the suppliers, and Mitchell could then bill IFC through his company. Once IFC paid Mitchell on the invoice, the profits could be split. Exhibit 2, ¶7.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 11**

As to the first three sentences of Alleged Fact No. 8, admitted.  As to the fourth (final) sentence of Alleged Fact No. 11, denied, as the citation does not support the alleged facts.  Further answering, this venture concerned the sale of rugs, while up to that point, Mitchell had been dealing with padding (which goes underneath rugs).  (Dep. Mitchell, p. 102, ln. 4-12).  This new venture represented a departure from Mitchell's normal course of business.  (Dep. Mitchell, p. 102, ln. 13-19).

**Defendant Dziemit's Alleged Fact No. 12**

Since Mitchell did not have the capital himself he approached friends of his Dziemit and Maresca. Mitchell knew Dziemit was in the mortgage lending business. Mitchell explained the concept to Dziemit and Maresca, and Dziemit agreed to finance the project with a percentage of the profits going to her. Exhibit 2, ¶8.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 12**

IFC admits that the citation supports the assertions made in Alleged Fact No. 12. Further answering, Dziemit and her related entities did not make loans to REMCO as a part of the scheme.  (*See* Response No. 16, *infra*). Generally, Dziemit was to receive, and did receive, a varying percentage (between 5 and 9 percent) of the amount paid by IFC to REMCO in response to invoices submitted by REMCO to IFC, and not of the amount Dziemit "advanced" to David Adams and/or to CCC.  (*See* Dep. Mitchell, p. 94, ln. 22 to p. 95, ln. 3; p. 97, ln. 9-13;  p. 113, ln. 5-14; p. 114, ln. 1-9, 19;  p. 119, ln. 14 to p. 120, ln. 11). Alternatively, on the first five or six transactions, which involved CCC, Dziemit and Mitchell would split (on a 60/40 or 50/50 basis) the funds remaining from payments made by IFC after the funds advanced were repaid.  (Dep. Mitchell, p. 120, ln. 1-8).

Dziemit's role as the "money lender, the capital person," enabled her to become a partner in REMCO. (Dep. Mitchell, p. 109, ln. 16-17). From 1999 until the end of 2001, Dziemit was a partner in REMCO with Mitchell. (Deposition of Jane Dziemit ("Dep. Dziemit"), **Exhibit D**, p. 55, ln. 8-10; Dep. Mitchell, p. 41, ln. 14 – 23, p. 203, ln. 13-15; **Exhibit E**). In or around 1999, an accountant prepared a tax form pertaining to the partnership. (**Exhibit F**). Dziemit thinks that she had a thirty-three percent interest in the partnership. (Dep. Dziemit, p. 55, ln. 11-18). There was no written partnership agreement. (Dep. Dziemit, p. 55, ln. 24 – p. 56, ln. 2).

Oddly enough, three days before Dziemit resigned as a partner, Mitchell received the sum of $85,000 from Maresca and Dziemit. (Dep. Mitchell, p. 212, ln. 3-6; See also p. 2527 of **Exhibit L1**). On December 28, 2001, Mitchell wrote a check in the amount of $85,000 from his personal account to REMCO. (p. 2527 of **Exhibit L1**, p. 1784 of **Exhibit M**). Mitchell denies that Dziemit was trying to hide any funds. (Dep. Mitchell, 213, ln. 18-21). Mitchell testified that there would be no reason why Dziemit would make any deposits into Mitchell's personal account, and he agreed that it is rather strange that Mitchell does not know what he did with the $85,000. (Dep. Mitchell, p. 213, ln. 6-11, p. 215, ln. 4-7).

Dziemit continued to make advances to, or on behalf of, REMCO after the partnership ended. (Dep. Mitchell, p. 207, ln. 17, p. 208, ln. 8). From a review of Mitchell's records, it appears that Dziemit made at least fifteen advances to, or on behalf of REMCO, after the partnership ended. (**Exhibit G**). Until December 18, 2003, Mitchell continued to send Dziemit funds. (Dep. Mitchell, p. 207, ln. 17-21; **Exhibit G**).

Further answering, Mitchell had not previously taken any loans from Dziemit or from her boyfriend, Anthony Maresca. (Dep. Mitchell, p. 98, ln. 3-9). Mitchell had not

previously had to seek funds from a third party in connection with his work before, and doing so represented a change in Mitchell's usual course of business. (Dep. Mitchell, p. 103, ln. 16-23).

### Defendant Dziemit's Alleged Fact No. 13

Previous to beginning the relationship, Adams met Dziemit, Mitchell and Maresca at a Building 19 outlet in Rhode Island. The purpose of the meeting was to show Dziemit the type of rugs for which she was lending money. At no time during this meeting were there any conversations, agreements or agreements to conspire to defraud IFC amongst the participants. Exhibit 2, ¶9.

### IFC's Response to Defendant Dziemit's Alleged Fact No. 13

Admitted that the citation supports the alleged facts. As to the third sentence of Paragraph 13, denied. The citation in Alleged Fact No. 13 is to the Affidavit of Ronald Mitchell. During the course of his recent deposition, Mitchell testified that he walked around the Building 19 store and let Adams, Mitchell and Maresca talk. (Dep. Mitchell, p. 101, ln. 17-23). Mitchell admits that he was present for only some of the conversation, and that he tried to make himself "a little scarce to let them meet." (Dep. Mitchell, p. 101, ln. 23 to p. 102, ln. 4). Thus, Mitchell cannot assert that there were no conversations, agreements or agreements to conspire to defraud IFC amongst the participants during the meeting, and Dziemit has failed to cite to any portion of the record which supports that allegation.

For clarification, Building 19 operates a group of discount retail stores in New England, and provides administrative services for IFC. IFC operates the rugs, padding and flooring departments in the Building 19 stores. (Affidavit of William Gemme, **Exhibit T**, *infra*).

**Defendant Dziemit's Alleged Fact No. 14**

The first several orders were purchased through CCC International of Lorton, Virginia. Remco checks were forwarded to that company in advance as per IFC purchase orders, Remco then billed IFC and IFC forwarded payments to Remco. Exhibit 2, ¶10.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 14**

Admitted.

**Defendant Dziemit's Alleged Fact No. 15**

In early 2000, Adams approached Mitchell and told him he was using some new suppliers and that instead of advancing funds to the suppliers, Mitchell could send the money directly to Adams. Adams told Mitchell that he did not want Mitchell to know who the new suppliers were, because then Mitchell would not need Adams. Exhibit 2, ¶11.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 15**

Admitted.  In or around 2000, Mitchell began to suspect that Adams had a gambling problem[3].  (Dep. Mitchell, p. 102, ln. 24 – p. 103, ln. 15).  Even so, Mitchell continued to do business with Adams through 2005.  (See Dep. Mitchell, p. 166, ln. 23 – 167, ln. 2).  Mitchell estimates that REMCO sold approximately $2.3 million worth of goods, and that Mansfield Rug sold less than one million dollars worth of goods, to IFC from 1999 to 2005. (Dep. Mitchell, p. 166, ln. 24 – p. 167, ln. 7;  *see* Deposition of William Gemme ("Dep. Gemme"), p. 50, ln. 12-17, **Exhibit I**).  Mitchell estimates that he made $210,000 and that Dziemit made $140,000 from these transactions.  (Dep. Mitchell, p. 167, ln. 11 – p. 168, ln. 8).   IFC has not identified any rugs that REMCO or Mansfield Rug actually delivered to IFC.  (Dep. Gemme, p. 51, ln. 15-20, p. 52, ln. 9-13).

---

[3] Britto estimated that Adams gambled away over a million dollars.  (Deposition of Kevin Britto, March 7, 2006 ("Dep. Britto I") p. 23, ln. 16-20, **Exhibit H**).

**Defendant Dziemit's Alleged Fact No. 16**

Dziemit continue [*sic*] to advance funds to Mitchell for approximately two years, but then informed him she did not want to do it anymore. Dziemit made a few more loans in 2002 and 2003, but by the end of 2003, Dziemit stopped advancing funds to Mitchell/Remco. Exhibit 1, ¶12 and Exhibit 2, ¶12.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 16**

As to the first sentence of Alleged Fact No. 16, admitted.  As to the second sentence of Alleged Fact No. 16, IFC admits that the citation to Mitchell's affidavit supports the alleged fact, but denies the facts alleged in said second sentence.  The second sentence is erroneous for two reasons, each of which shall be dealt with in turn.

1.  Dziemit advanced money to REMCO and Mitchell;  she did not make loans (other than, perhaps, the initial advance to Mitchell).  (*See* Dep. Mitchell, p. 186, ln. 8-18;  Dep. Dziemit, p. 59, ln. 1-5; p. 60, ln. 7-18;  *see* Affidavit of Jane Dziemit ("Aff. Dziemit") [Doc. No. 212-3], ¶7). She initially had Mitchell sign a promissory note.  (Dep. Dziemit, p. 59, ln. 1-5).  She later returned the note to Mitchell when the initial advance was paid.  (Dep. Dziemit, p. 60, ln. 7-18;  see Aff. Dziemit, ¶7).  Dziemit did not require any further writings from Mitchell before she would advance further funds.  (Dep. Dziemit, p. 64, ln. 19 – p. 65, ln. 4).

Dziemit did not receive interest on the amount she alleges that she loaned in return for advancing the funds.  (Dep. Mitchell, p. 190, ln. 4-10).  Instead, after REMCO received payment from IFC for the REMCO invoice, Dziemit would receive back the funds that she had advanced, and then Dziemit, Mitchell and Adams would divide up the remaining funds on a percentage basis.  (Dep. Mitchell, p. 189, ln. 16 to p. 190, ln. 10;  Dep. Dziemit, p. 116,

ln. 21 – p. 117, ln. 3; p. 198, ln. 11 to p. 199, ln. 12;  p. 200, ln. 13 – p. 202, ln. 10).  Dziemit

would receive a percentage of the invoice paid by IFC (after her initial advance was

returned), not of the amount that she advanced[4].  (Dep. Dziemit, p. 199, ln. 13-16;  p. 201, ln.

5-11).   According to Dziemit's affidavit, she received the funds to repay the "loans," "plus

my interest, charges and profit."  (Aff. Dziemit, ¶30).  The amounts of the payments that

Dziemit received was not dependent upon the amount of time that the loan was outstanding.

(Dep. Mitchell, p. 189, ln. 16 to p. 190, ln. 10;  Dep. Dziemit, p. 116, ln. 21 – p. 117, ln. 3; p.

198, ln. 11 to p. 199, ln. 16;  p. 200, ln. 13 – p. 202, ln. 10).  Dziemit would deposit the funds

received from IFC in various accounts.  (Dep. Gemme, p. 53, ln. 8-17).

Dziemit advanced funds to REMCO individually and through various entities with

which she was associated, including, without limitation, Connecticut Commercial Lenders,

Lia's Choice, LLC, potentially Bentley Mortgage Preferred Partners, on approximately 35

occasions.  (Dep. Dziemit, p. 31, ln. 19-21, p. 33, ln. 3-16, p. 62, ln. 14-17; p. 82, ln. 4-20, p.

99, ln. 14 – p. 100, ln. 16, p. 189, ln. 11 – p. 190, ln. 8).  Dziemit would borrow funds from

these entities in order to make the advances.  (Dep. Dziemit, p. 82, ln. 11-12, 20; p. 83, ln.

11-14).  For instance, she would borrow money from Connecticut Commercial  Lenders, a

company with no employees for whom Dziemit performed secretarial work and served as an

officer/secretary, and advance the funds to REMCO, Mitchell and Adams.  (Dep. Dziemit, p.

37, ln. 14-20, p. 38, ln. 1 – p. 39, ln. 18, p. 40, ln. 3-8).

Dziemit, who was uncomfortable lending  money to Mitchell or Remco, admits that

"a lot of times," she "lent" money to Mitchell without having all of the information. (Dep.

Dziemit, p. 168, ln. 17 – p. 169, ln. 3; p. 170, ln. 2-5).

---

[4]   From 2002 on, Dziemit advanced funds through Connecticut Commercial Lending.  (Dep. Dziemit, p. 189,
ln. 20-23).  She did not take any "interest" from those loans personally.  (Dep. Dziemit, p. 189, ln. 11-19).

2.      With regard to Dziemit's claim that she made "a few more loans in 2002 and 2003, but by the end of 2003, Dziemit stopped advancing funds to Mitchell/Remco," the sentence is denied.  Mitchell maintained handwritten records of the various transactions. (**Exhibit G**[5]).  The typewritten chart contained in **Exhibit G** was prepared by Dziemit, but the remainder of the documents are Mitchell's.  (Dep. Mitchell, p. 168, ln. 12 – 169, ln. 12). Mitchell's records and Dziemit's records show that Dziemit made more than twenty advances to Mitchell during 2002 and 2003.  (Dep. Mitchell, p. 168, ln. 18-22;  see "Sent" column on pages Dziemit 0205 through 0207 of **Exhibit G**;  **Exhibit K**).

Disturbingly, Dziemit, who claims only to have loaned funds to Mitchell/REMCO, received payments on transactions involving IFC in which Dziemit did not make advances. (Dep. Mitchell, p. 171, ln. 3-6).  When one reviews **Exhibit G**, one sees that, in several instances, under the term "Sent $," there is a "0," meaning that Mitchell (and therefore, by implication, Dziemit) advanced no funds to Adams[6].  (*See* Dep. Mitchell, p. 181, ln. 7 – 22). In other words, without forwarding any money for, or on behalf of REMCO, Dziemit received several payments ranging from approximately $1,000 to $5,000, yielding a total of more than $43,000.  (See **Exhibit G**).  Mitchell did state that Dziemit may have prepared the invoices for these transactions – a process which would take approximately five minutes to complete.  (Dep. Mitchell, p. 188, ln. 1 – p. 189, ln. 5).  At five minutes per invoice, Dziemit was making a minimum of approximately $12,000.00 ($1,000 x 12) per hour for her work on transactions in which she did not make advances.

---

[5]    At his deposition, Mitchell testified that the first page of his records was missing.  (Dep. Mitchell, p. 181, ln. 24 – p. 182, ln. 3).  Counsel to Mitchell subsequently identified the missing page, which had already been produced.  (See **Exhibit J**).

[6]  Mitchell testified that he did not know the meaning of the "0," but it is a fair inference that the "0" represents instances in which Mitchell, and thereby Dziemit, advanced no funds to Adams.  (Dep. Mitchell, p. 181, ln. 7-11).  After all, Mitchell later states that the term "Sent $" refers to dollars sent to Adams.  (Dep. Mitchell, p. 182, ln. 4-11).

Mitchell's records refer to "T + J." (**Exhibit G**). While the Chart reads "T and J," meaning Tony Maresca and Jane Dziemit, Mitchell does not think that he ever wrote any checks to Maresca or to Dziemit and Maresca jointly. (Dep. Mitchell, p. 173, ln. 7-14). Mitchell did make out checks to Dziemit or to whomever Dziemit directed him to write the check. (Dep. Mitchell, 173, ln. 15-22). In other words, the "T + J" portion of the chart identifies funds received by Dziemit, or on her behalf.

Finally, it is worth noting that, while Dziemit's records show that she received twenty-seven payments from the transactions involving REMCO and Adams, Mitchell's records show at least 53 payments to Dziemit. (*See* **Exhibits G and K**).

To the extent that any further response is required, IFC denies alleged fact no. 16.

**Defendant Dziemit's Alleged Fact No. 17**

At no time between 1999 and 2004 did Mitchell have any agreement with Dziemit or any other person or entity to defraud or conspire to defraud IFC. Between 1999 and 2003 neither Mitchell nor Dziemit had any knowledge of any scheme or plan to defraud IFC in any way. Exhibit 2, ¶14.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 17**

Denied for the reasons set forth herein.

**Defendant Dziemit's Alleged Fact No. 18**

Dziemit only met Adams one other time in order to loan him money which was secured by Adams' property. In both meetings with Adams there were absolutely no conversations or agreements amongst the persons present to agree or conspire to defraud IFC. Exhibit 1, ¶14.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 18**

As to the first sentence, IFC denies that the citation supports the alleged facts. IFC notes that Paragraph 13 of the Affidavit of Jane Dziemit does support the alleged facts set forth in the first sentence of alleged fact no. 18. As to the second sentence of alleged fact no. 18, denied. *See* Response No. 13.

**Defendant Dziemit's Alleged Fact No. 19**

Dziemit has never met, nor ever spoken to co-defendant and IFC employee Tyrone Williams, so she could not have agreed or conspired with him to defraud IFC. Exhibit 1, ¶15.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 19**

Admitted that Dziemit has never met, nor ever spoken to Tyrone Williams. As to the remainder of Alleged Fact No. 19, denied.

**Defendant Dziemit's Alleged Fact No. 20**

Dziemit has never met, nor ever spoken to co-defendant and IFC employee Kevin Britto, so she could not have agreed or conspired with him to defraud IFC. Exhibit 1, ¶16.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 20**

Admitted that Dziemit has never met, nor ever spoken to Kevin Britto. As to the remainder of Alleged Fact No. 19, denied.

**Defendant Dziemit's Alleged Fact No. 21**

Kevin Britto never spoke to Dziemit, and he only knew her through paperwork. All fraudulent acts were done without Remco's knowledge. Deposition of Kevin Britto, attached hereto as Exhibit 3 and incorporated by reference. Exhibit 3, pp. 62, l. 17- p.64, l. 11.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 21**

As to the first sentence of Alleged Fact No. 21, admitted.  As to the second sentence of Alleged Fact No. 21, denied for the reasons set forth herein.

**Defendant Dziemit's Alleged Fact No. 22**

Until the lawsuit was initiated, Dziemit was unaware that co-defendant Ronald Mitchell ever operated another business known as Mansfield Rug, so she could not have conspired with that company to defraud IFC. Exhibit 1, ¶17.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 22**

As to the allegation that "[u]ntil the lawsuit was initiated, Dziemit was unaware that co-defendant Ronald Mitchell ever operated another business known as Mansfield Rug," admitted.  As to the remainder of Alleged Fact No. 22, denied.

**Defendant Dziemit's Alleged Fact No. 23**

Dziemit has never met nor ever spoken to co-defendant Michael Brown, nor did Dziemit ever have any contact with Dalton Padding or Empire Weavers at any time, so she could not have agreed or conspired with Brown or either of those companies to defraud IFC. Exhibit 1, ¶18.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 23**

As to the allegation that "Dziemit has never met nor ever spoken to co-defendant Michael Brown, nor did Dziemit ever have any contact with Dalton Padding or Empire Weavers at any time," admitted.  As to the remainder of Alleged Fact No. 23, denied.

**Defendant Dziemit's Alleged Fact No. 24**

Dziemit has never met or had any conversations with co-defendants John, David or Paul Sun nor did I [*sic*] have any direct contact with CCC International, Inc., except Dziemit

did see five or six invoices from CCC, International. Dziemit also forwarded approximately

four checks to CCC per Mitchell's instructions. Hence, Dziemit could not have agreed or

conspired with the Suns or CCC to defraud IFC. Exhibit 1, ¶19.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 24**

As to the allegation that "Dziemit has never met or had any conversations with co-

defendants John, David or Paul Sun," admitted.  As to the allegation that Dziemit did not

have any direct contact with CCC International, Inc., except Dziemit did see five or six

invoices from CCC, International," denied.  Dziemit wired money to CCC once or twice.

(Dep. Dziemit, p. 126, ln. 12-13).  She sent checks to CCC.  (Dep. Dziemit, p. 126, ln. 1-4).

She obtained money orders for CCC.  (Dep. Dziemit, p. 126, ln. 5-7).  She obtained money

orders or checks for CCC on four to six occasions.  (Dep. Dziemit, p. 126, ln. 10-12). As to

the third sentence of Alleged Fact No. 25, denied.  To the extent any further response is

required, denied.

**Defendant Dziemit's Alleged Fact No. 25**

Dziemit has never signed or generated any purchase orders from IFC for the purpose

of buying goods. Dziemit has never signed or generated a document called a "key req" which

IFC's warehouse people, of which Williams was one, sign to inform accounts payable that

the merchandise was received. Exhibit 1, ¶21. Deposition of William Gemme which is

attached as Exhibit 4 and incorporated herein by reference. Exhibit 4, p. 16, l.7-10 and p. 18,

l. 6- p. 19, l. 14.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 25**

Admitted.  Further answering, Dziemit prepared REMCO invoices on her computer.

(*See* Dep. Dziemit, p. 91, ln. 10-18, p. 104, ln. 19 – 105, ln. 8, p. 107, ln. 13-14;  Dep.

Mitchell, p. 217, ln. 24 – p. 218, ln. 5). Mitchell prepared invoices for Mansfield Rug. (Dep.

Mitchell, p. 219, ln. 15-17). According to Dziemit, Mitchell also generated REMCO

invoices. (Dep. Dziemit, p. 108, ln. 17-18). Dziemit did not generate invoices for any

REMCO customers other than IFC. (Dep. Dziemit, p. 110, ln. 7-10). Dziemit mailed the

invoices to IFC. (Dep. Dziemit, p. 114, ln. 23 – p. 115, ln. 3).

**Defendant Dziemit's Alleged Fact No. 26**

Dziemit had no knowledge that the purchase orders generated by IFC were fraudulent

or fake. Exhibit 4, p. 77, l. 23-p.78, l. 3.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 26**

Denied. The citation refers to the deposition of William Gemme, a Building 19

employee. There was no Rule 30(b)(6) deposition held in this case. The mere fact that Mr.

Gemme had no personal knowledge that Ms. Dziemit had knowledge that the IFC purchase

orders were fraudulent or fake does not mean that Ms. Dziemit had no such knowledge.

Dziemit cites to no portion of the record in which she claims to have no such knowledge.

**Defendant Dziemit's Alleged Fact No. 27**

The scheme to defraud IFC began as early as 1995 and went undetected by the

company for almost ten (10) years. Deposition of William Elovitz which is attached hereto as

Exhibit 5 and incorporated herein by reference. Exhibit 5, p. 52, l.1-7.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 27**

Admitted.

**Defendant Dziemit's Alleged Fact No. 28**

Dziemit did not make the first loan on behalf of Remco until 1999. Exhibit 1, ¶ 23.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 28**

Denied that the citation supports the alleged fact.  As to the term "loan," see

Response to Alleged Fact No.  16, *supra*.

**Defendant Dziemit's Alleged Fact No. 29**

Dziemit had previously maintained a P.O. Box which she used to received checks

from IFC payable to Remco. Exhibit 1, ¶24.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 29**

Admitted.

**Defendant Dziemit's Alleged Fact No. 30**

Dziemit's and/or Maresca's name and/or number appeared on some purchase orders

for Remco. Exhibit 1, ¶24 and Exhibit 4, p. 75, l.14- p. 76, l. 12.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 30**

The citation to Paragraph 24 of Dziemit's affidavit does not support the alleged facts.

To the extent that Alleged Fact No. 30 alleges that Dziemit's name appeared on some

purchase orders, denied.  To the extent that Alleged Fact No. 30 expresses or implies or

refers to Remco purchase orders, it is denied.  IFC admits the remainder of Alleged Fact No.

30.  Maresca, Dziemit's boyfriend, was not an employee of REMCO or IFC.  (Dep. Dziemit,

p. 106, ln. 4-6;  Dep. Mitchell, p. 87, ln. 20-21).  On some IFC purchase orders, Maresca was

listed as the "contact person."  (See e.g. **Exhibit K1**).  Mitchell did not think that having

Maresca's name on the purchase orders, a person who did really nothing with regard to the

purchase orders, was misleading.  (Dep. Mitchell, p. 88, ln. 4 – p. 89, ln. 15).  Dziemit did

not question the presence of Maresca's name on the IFC purchase orders.  (Dziemit, p. 105,

ln. 16 – p. 106, ln. 3).  According to Dziemit, Maresca was not affiliated with REMCO in any way.  (Dep. Dziemit, p.106, ln.7-9).

**Defendant Dziemit's Alleged Fact No. 31**

Dziemit had the authority to endorse checks payable to Remco in order to secure quicker repayment of advances she made on behalf of Remco. Exhibit 1, ¶10.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 31**

Denied, as the citation does not support the alleged facts.

**Defendant Dziemit's Alleged Fact No. 32**

Dziemit received a check from IFC via Federal Express when Mitchell was out of town. Mitchell arranged for IFC to send the check to Dziemit. Exhibit 1, ¶26.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 32**

Admitted.

**Defendant Dziemit's Alleged Fact No. 33**

Dziemit had the authority to sign checks on behalf of Remco and did sign some checks from the Remco account payable to Mitchell. Exhibit 1, ¶27.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 33**

Admitted.  Dziemit had the REMCO checkbook at her home during the partnership, and she wrote approximately ninety percent of the checks during the partnership.  (Dep. Dziemit, p. 207, ln. 14 – 208, ln. 5).

**Defendant Dziemit's Alleged Fact No. 34**

Dziemit had no agreements or conversations with Mitchell wherein they agreed or conspired to defraud IFC. Dziemit thought that because all of the purchase orders were

generated by long-term employees of IFC that the transactions were legitimate. Exhibit 1, ¶28.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 34**

IFC admits that the citation supports the alleged facts. IFC denies that Dziemit had no agreements or conversations with Mitchell wherein they agreed or conspired to defraud IFC based upon the evidence adduced in this case.

**Defendant Dziemit's Alleged Fact No. 35**

For each and every check that Dziemit received from IFC, she believed the check to be legitimate, generated as a result of legitimate IFC internal documents and for legitimate transactions. Dzimeit deposited those checks in good faith and in reliance upon IFC employees that the transactions were, in fact, legitimate. Exhibit 1, ¶29.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 35**

IFC admits that the citation supports the alleged facts. IFC denies that Dziemit believed that each check was legitimate, generated as a result of legitimate IFC internal documents and for legitimate transactions. IFC denies that Dzimeit deposited those checks in good faith and in reliance upon IFC employees that the transactions were, in fact, legitimate, based upon the evidence adduced in this case.

**Defendant Dziemit's Alleged Fact No. 36**

Dziemit never generated, created or signed any IFC purchase orders, invoices, bills of lading or key reqs. The only funds that Dziemit ever received were checks IFC issued to Remco which was used to repay Dziemit's loans and pay her charges, interest and profit. Exhibit 1, ¶ 30.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 36**

As to the first sentence of Alleged Fact No. 36, admitted.  As to the second sentence of Alleged Fact No. 36, denied.  See response to Alleged Fact No. 16, *supra*.

**Defendant Dziemit's Alleged Fact No. 37**

Dziemit has never been in possession at any time of any telephones, facsimile machines, or other equipment that IFC owned.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 37**

Admitted.

**Defendant Dziemit's Alleged Fact No. 38**

IFC has been aware since as early as March 7, 2006 that Dziemit had no knowledge of the underlying scheme to defraud IFC and steal funds. Exhibit 3, p. 38, l. 13-20.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 38.**

Denied.  The citation to the Deposition of Kevin Britto does not support the alleged facts.  Moreover, the mere fact that Britto, who admitted under oath to his participation in the scheme before his apparent death, testified that Mitchell and Dziemit were "innocent," does not demonstrate that Mitchell and Dziemit have no liability in this case.  (See Dep. Britto I, p. 8, ln. 17 – p. 9, ln. 1-14;  38, ln. 13-14;  [Doc. No. 192]).

Britto, who worked as a buyer at IFC from 1993 to November, 1997 and from September, 1998 to September, 2001 testified to the existence of, and his involvement in, the scheme.  (Dep. Britto I).  Britto admitted that there were more than fifty fraudulent shipments.  (Dep. Britto I, p. 9, ln. 1 –14, p. 12, ln. 1 to p. 13, ln. 4).  The scheme encompassed both of Britto's tenures with IFC.  (Dep. Britto I, p. 12, ln. 6-10).  Britto discussed the involvement of Adams and others in the scheme.  (Dep. Britto I, p. 15, ln. 9 –

p. 16, ln. 18).  In some cases, Britto and Adams would cause IFC to be billed for more rugs than the number of rugs which were delivered to IFC.  (Dep. Britto I, p. 10, ln. 8-18).  On other occasions, there would be fictional shipments to IFC.  (Dep. Britto I, p. 68, ln. 18-19).  REMCO, for instance, prepared bills showing product was shipped to IFC, when, in fact, no such product was shipped.  (Dep. Britto I, p. 62, ln. 8-11).

Williams, who worked in the warehouse, participated in the scheme by signing key reqs (shipping documents) to show that certain rugs had been received (when they had not, indeed, been received).  (Dep. Britto I, p. 11, ln. 3-5).  Williams also prepared fake bills of ladings.  (Dep. Britto I, p. 35, ln. 5-8).  Approximately once per month, Britto, who had control over the warehouse even after Britto left his employment with IFC, paid Williams $1,500 per falsified key req.  (Dep. Britto I, p. 18, ln. 9-20, p. 106, ln. 20-22, p. 107, ln. 5-17).  Britto also testified regarding the participation of Michael Brown, who worked for CCC, in the scheme, and the payment of money to Brown.  (Dep. Britto I, p.53, ln.9-17, p.54, ln.13-19, p.108, ln.2-7, p.96, ln.10-14; *see* **Exhibit C**, ¶15).

**Defendant Dziemit's Alleged Fact No. 39**

IFC never sued Diane Spignozzi, Mitchell's girlfriend, who was listed as a contact person on purchase orders for Mansfield Rug. Exhibit 4, p. 124, l. 13- p. 126, l. 24 and p. 130, l. 7.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 39**

Admitted.

**Defendant Dziemit's Alleged Fact No. 40**

Between 1999 and 2004, no one at IFC ever questioned Mitchell or Dziemit about a single shipment for rugs. Exhibit 4, p. 148, l. 10- p.149, l. 11.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 40**

Admitted, to the extent that the cited deponent, William Gemme, who was not a Rule 30(b)(6) deponent, stated that he was not personally aware of anyone at IFC ever questioning Mitchell or Dziemit about a single shipment of rugs between 1999 and 2004.  To the extent any further response is required, IFC denies the remainder of Alleged Fact No. 40.

**Defendant Dziemit's Alleged Fact No. 41**

Between 1999 and 2004, IFC never required bills of lading from trucking companies to be attached or affixed to IFC receiving documents (key reqs) in order to independently verify that merchandize was received. Deposition of John Durant, attached hereto as Exhibit 6 and incorporated by reference. Exhibit 6, p. 18, l. 16-23.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 41**

IFC admits that, between 1999 and 2004, IFC never required bills of lading from trucking companies to be attached or affixed to IFC receiving documents (key reqs).  The remainder of Alleged Fact No. 41 is not supported by the citation, and so IFC denies same.

**Defendant Dziemit's Alleged Fact No. 42**

Previous to 2005 IFC had no policy that bills of lading were necessary in order to pay a suppliers invoice. Exhibit 6, pg. 21, l. 5-12.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 42**

Admitted.

**Defendant Dziemit's Alleged Fact No. 43**

IFC President, William Elovitz, does not know or cannot remember a single fact that supports an allegation that Dziemit had an agreement with any co-defendant to steal money from IFC. Exhibit 5, p. 90, l.1-p. 93, l. 24.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 44**

Denied.  The cited pages do not list all co-defendants.  Moreover, IFC President William Elovitz was not testifying as a Rule 30(b)(6) deponent.  Dziemit did not take a Rule 30(b)(6) deposition of IFC.  In the portion of Elovitz's deposition transcript cited by Dziemit, Elovitz testified that he believed that people in his company had facts to support the allegation that Dziemit had agreements with certain individuals or companies.  (Deposition of William Elovitz ("Dep. Elovitz"), p. 92, ln. 13-19, **Exhibit L**).  Elovitz has relied on his employees.  (Dep. Elovitz, p. 92, ln. 22-23).

**Defendant Dziemit's Alleged Fact No. 44**

IFC President, William Elovitz, is unaware of any facts that support and [*sic*] allegation that Dziemit was involved in the portion of Remco's business where she would receive invoices from suppliers. Exhibit 5, p. 87, l. 10- p. 89, l. 15.

**IFC's Response to Defendant Dziemit's Alleged Fact No. 44**

Admitted that Elovitz testified in the manner cited.  Further answering, see response to Request No. 43, *supra*.  To the extent any further response is required, the alleged facts are denied.

**IFC's Concise Statement of Further Material Facts**

45.    During the normal course of IFC business, a buyer would prepare a purchase order for merchandise that IFC would buy from various suppliers.  When a shipment is delivered to IFC, an IFC receiver prepares a "key rec," which is an internal accounting document which confirms the receipt of the merchandise.  The receiver also obtains bill of lading slips from trucking firms or from the vendor itself (if the vendor uses bill of ladings), and the receiver signs the bill of lading.  The accounting department matches all of the

receiving information to the invoice and to the purchase order.  No invoices are paid until such time as the buyer approves the invoice for payment.  (Exhibit C, ¶16).

46.    Mitchell operated REMCO out of his home.  (Dep. Mitchell, p. 42, ln. 9-17).  Mitchell served as REMCO's representative to IFC.  (Exhibit C, ¶15).  Mitchell admits that, a few years ago, he lied to IFC employee, Nicolas Adler-Duthe ("Adler") by telling Adler that REMCO had a warehouse.  (Dep. Mitchell, p. 42, ln. 18 – p. 46, ln. 11).  REMCO never had a warehouse, and Dziemit never even asked Mitchell whether REMCO had a warehouse.  (Dep. Mitchell, p. 42, ln. 18-19;  Dep. Dziemit, p. 104, ln. 8-10).

47.    In or around March, 2005, IFC terminated Adams and assigned Nicolas Adler-Duthe to serve as the buyer.  (Aff. Gemme, ¶8).  Shortly thereafter, Adler told William Gemme, the person in charge of managing the accounting and financial reporting systems for IFC, that Adler was unable to confirm whether IFC had received ceratin merchandise, all off which Adams had purchased on behalf of IFC and all of which IFC had allegedly received.  (Aff. Gemme, ¶¶2,8).   In response, Gemme requested a bill of lading from Mitchell.  (Aff. Gemme, ¶9).  At that time, Mitchell was attempting to obtain payment on his last two invoices with IFC.  (Dep. Mitchell, p. 69, ln. 8-9).  Mitchell knew that his business with Adams would be over when Adams left IFC.  (Dep. Mitchell, p. 108, ln. 6-13).  Mitchell consulted with Britto and told Britto that Mitchell was stalling IFC.  (Dep. Britto I, p. 70, ln. 1-5).  On April 21, 2005, Britto forwarded a bill of lading to Mitchell, which Mitchell filled out, and then, at Britto's direction, forwarded to Williams  (Dep. Mitchell, p. 70, ln. 20-23, p. 76, ln. 18-20, p. 79, ln. 21-24).  Britto told Mitchell to create a fake bill of lading.  (Dep. Mitchell, p. 82, ln. 1-3).  Mitchell ultimately forwarded a bill of fake bill of lading to IFC, intending to have Gemme accept the bill of lading.  (Dep. Mitchell, p. 75, ln. 23-24, p. 76, ln.

23 – p. 77, ln. 1;  p. 00572).  Mitchell began lying when he realized that there was a problem

involving the shipments.  (Dep. Mitchell, p. 86, ln. 16-20).  In addition to the fake bill of

lading, Mitchell lied to Gemme when Mitchell told Gemme that his former girlfriend

Spignesi had destroyed certain records that Gemme was seeking from REMCO.  (Dep.

Mitchell, p. 61, ln. 4-21).  Mitchell testified that he did not lie to other customers with the

frequency with which he lied to IFC.  (Dep. Mitchell, p. 86, ln. 7-9).

48.    In or around April, 2005, Gemme, at the instruction of John Durant, Vice-

President of Financing for Building 19, Inc., began an investigation of the scheme described

herein, leading to the within lawsuit.  (Aff. Gemme, ¶¶4, 14).

49.    **The Mechanics of the scheme.**  For the first five or six transactions,

REMCO, through Dziemit, would forward funds directly to CCC.  (Dep. Mitchell, p. 113, ln.

18 – p. 115, ln. 4).  Adams would give Mitchell a figure as to how much money to send to

CCC, based upon an invoice, and Dziemit would send the funds.  (Dep. Mitchell, p. 115, ln.

12 – p. 116, ln. 11). When Dziemit issued the advance in a check to CCC, REMCO would

issue an invoice, prepared by Dziemit.  (Dep. Mitchell, p. 116, ln. 20 – p. 117, ln. 7).

Dziemit prepared the invoice, based upon an IFC purchase order that  Adams prepared and

forwarded to REMCO via facsimile.  (Dep. Mitchell, p. 117, ln. 11-17).   Dziemit would then

mail the invoice to IFC.  (Dep. Mitchell, p. 17-19).  IFC would receive a two percent

discount for paying within thirty days, and so, in the normal course, REMCO would receive

payment within thirty days.  (Dep. Mitchell, p. 118, ln. 23 – p. 119, ln. 7).  IFC would send

the check to a P.O. Box owned by Dziemit.  (Dep. Mitchell, p. 119, ln. 8-9; Dep. Dziemit, p.

111, ln. 17 – p. 112, ln. 12).

50.    Mitchell believes that Dziemit would deposit the funds into her own account. (Dep. Mitchell, p. 120, ln. 9-15).  Dziemit would pay herself back for the advance.  (Dep. Mitchell, p. 119, ln. 19-20).  Dziemit would then split the remainder, on either a 60/40 or a 50/50 basis, between herself and Mitchell.  (Dep. Mitchell, p. 120, ln. 1-8).   Mitchell had never handled a deal in the manner in which he handled the first five or six transactions, and it represented a change in his practice or procedure.  (Dep. Mitchell, p. 121, ln. 3-15).

51.    Thereafter, the process changed, after Adams told Mitchell that he had other sources of supply for truckloads of rugs and padding.  (Dep. Mitchell, p. 121, ln. 16-23). Adams sought to receive the funds up front, with which, Adams allegedly represented, Adams would negotiate deals with the suppliers.  (Dep. Mitchell, p. 121, ln. 24 – p. 122, ln. 5).  Mitchell had never conducted business in that matter previously.  (Dep. Mitchell, p. 122, ln. 10-12).  Under this scenario, Adams would send a purchase order and ask for an advance. (Dep. Mitchell, p. 124, ln. 10 – 14).  At some point, Mitchell began sending Adams wire transfers.  (Dep. Mitchell, p. 124, ln. 14-16).  Dziemit would advance money to Mitchell, and Mitchell would forward the money to Adams.  (Dep. Mitchell, p. 124, ln. 16-19).  Two or three weeks would pass, and then Adams would tell Mitchell to send an invoice.  (Dep. Mitchell, p. 124, ln. 19-20).    The amount advanced by Dziemit to Adams differed from the amount that Dziemit put on the invoice.  (Dep. Mitchell, p. 128, ln. 20 – p. 129, ln. 2). Usually, Adams would request $25,000.  (See Dep. Mitchell, p. 129, ln. 8 – 19).  In a moment of candor, Mitchell admitted at his deposition that the fact that Mitchell usually asked for $25,000, and not the amount of the invoices, did not make him suspicious "[b]ecause I'm stupid.  I'm sorry.  I don't mean to – it didn't."  (Dep. Mitchell, p. 129, ln. 20-

24).  At times, the amount of the purchase order exceeded the $25,000 that Adams would request by $10,000.  (Dep. Mitchell, p. 130, ln. 1-10).

52.      Dziemit would issue funds to either REMCO or Mitchell, and then Mitchell would disburse the funds in full to Adams.  (Dep. Mitchell, p. 132, ln. 9-12, p. 133, ln. 3-14). Mitchell acknowledges, though, that the manner of the transaction varied from time to time. (Dep. Mitchell, p. 132, ln. 19).   At times, Mitchell wrote checks to cash.  (Dep. Mitchell, p. 133, ln. 21-23).  He believes he made checks payable to cash for Dziemit.  (Dep. Mitchell, p. 134, ln. 2-4).  Mitchell admits that it is not good business practice to make a check payable to cash from a business account.  (Dep. Mitchell, p. 134, ln. 8-11; see various checks made payable to cash contained in **Exhibit M**).  Dziemit signed a check made payable to cash  in the amount of $15,000 from the REMCO account.  (Dep. Mitchell, p. 137, ln. 9 – p. 139, ln. 16).  On May 10, 2002, Mitchell wrote two checks made payable to cash from the REMCO account – one for $20,000 and another for $10,000.  (*See* p. 1699 of **Exhibit M**).  Mitchell thought the funds may have been used for wire transfers, but he admitted that the checks looked suspicious.  (Dep. Mitchell, p. 142, ln. 11 – p. 143, ln. 2).  Mitchell denied that he was trying to make it more difficult to trace where funds went.  (Dep. Mitchell, p. 143, ln. 2-7). Mitchell acknowledged that he could have arranged for wire transfers without having to write checks to cash.  (Dep. Mitchell, p. 143, ln. 8-13).  Mitchell acknowledge that he had not previously worked with checks made payable to cash in any previous business that he had performed in padding or rugs, and he acknowledged that the checks payable to cash represented a change in his practice.  (Dep. Mitchell, p. 145, ln. 9-14).   In another check made payable to cash – this one in the amount of $6,000 and from Mitchell's personal account, Dziemit indorsed the check.  (See p. 1741 and 1742 of **Exhibit M**;  Dep. Mitchell,

p. 147, ln. 6-11, 14-16).  Mitchell denied knowing the reason for the check.  (Dep. Mitchell, p. 147, ln. 12-13).  Mitchell stated that he did not recall Dziemit ever making any personal loans to him.  (Dep. Mitchell, p. 147, ln. 17-19).   In addition to the checks made payable to cash, Mitchell signed numerous checks in large amounts (in the thousands of dollars), made payable to Citizens Bank, Dziemit and Forbes Property Management, a company associated with Dziemit.  (**Exhibit M**).  Mitchell could not explain why he wrote checks payable to cash.  (Dep. Mitchell, p. 138, ln. 11- p. 148, ln. 23). A brief review of documents produced by Mitchell demonstrate that, from both his personal and REMCO account, Mitchell issued checks payable to "cash" (some of which were indorsed by Dziemit) totaling in excess of $133,282.64.  (**Exhibit N**).

53.    When the funds pursuant to the invoice arrived from IFC, Mitchell would deposit the funds in the REMCO account at Citizens Bank.  (Dep. Mitchell, p. 131, ln. 13-17).  Mitchell would then write checks to Dziemit and Adams from the deposited funds, or Mitchell would wire funds to Adams.  (Dep. Mitchell, p. 131, ln. 18-22).

54.    Mitchell testified that he never borrowed more than $15,000 from his then girlfriend, Dianne Spignesi before this lawsuit began.  (Dep. Mitchell, p. 10, ln. 6 – 12, p. 193, ln. 18-23).  Ignoring checks in the amount of less than $1,000 that Mitchell made payable to Spignesi, Mitchell wrote checks to Spignesi in the amount of approximately $35,000 from 2000 to 2003.  (**Exhibit O**).   Mitchell claims that the checks were for funds that he borrowed from Spignesi, and he denies trying to hide funds from the transactions with her.  (Dep. Mitchell, p. 194, ln 7 – p. 195, ln. 10).

55.    At times, Dziemit would refuse to lend additional money because of the excessive  amount of advances outstanding to Adams.  (Dep. Mitchell, p. 130, ln. 16-20).  As

a result of Dziemit's refusal, Mitchell established Mansfield Rug.  (Dep. Mitchell, p. 130, ln. 21-23).   IFC never received shipments from Mansfield Rug, even though IFC received paperwork indicating that Mansfield Rug had shipped to IFC.  Dep. Britto I, p. 60, ln. 4-20). The shipments were fake.  (Dep. Britto, I, p. 60, ln. 21-22).

56.     At some point, Britto called asking whether REMCO had forwarded funds to Adams.  (Dep. Mitchell, p. 155, ln. 14-17).  Britto, who no longer worked at Building 19 at the time, ordered Mitchell to wire funds in the amount requested by Britto directly to Britto. (Dep. Britto I, p. 99, ln. 19-25, p. 103, ln. 14-17, p. 133, ln. 23 – p. 134, ln. 20).  Britto told Mitchell, "Look, this is what's gonna happen, you don't give [Adams] the money anymore, it comes to me."  (Dep. Britto I, p. 99, ln. 22-23).  Mitchell complied.  (Dep. Britto I, p. 103, ln. 7-17).

57.     Remco presented invoices to IFC for goods that were not shipped.  (Dep. Britto I, p. 62, ln. 8-12).  Empire Weavers and Dalton Padding, both of which were associated with CCC, never made any legitimate shipments to IFC either.  (Dep. Britto I, p.58, ln.21 – p.59, ln.24).

58.     A representative sample of a fraudulent transaction is as follows:  On or about October 29, 2002, Defendant Adams prepared and initialed IFC purchase order No. 6551 ("PO 6551") for Remco, seeking $38,500 of merchandise.    (**Exhibit P**).  On or about October 30, 2002, REMCO, not having shipped anything, issued invoice no. 20021030, which refers to PO 6551.  (**Exhibit Q**).  On or about November 8, 2002, Defendant Williams signed a document, known as a key req, falsely acknowledging receipt of the items.  (**Exhibit R**).  On or about November 14, 2002, IFC issued Check No. 006271 paid to the order of

REMCO in the amount of $37,730.00. The check was indorsed "For Deposit Only," and deposited into a Citizens Bank Account. (**Exhibit S**).

59.    Based upon IFC's investigation, which Gemme describes in an Affidavit dated September 19, 2005 [Doc. No. 75], IFC has determined that IFC has received invoices in the following total amounts from REMCO, Mansfield Rug, Empire Weavers and Dalton Padding for non-existent merchandise:

|   | Years | Company | Amount |
|---|-------|---------|--------|
| a. | 1999-2005 | Remco | approx. $2,300,000.00 |
| b. | 1999-2005 | Mansfield Rug | approx. $980,000.00 |
| c. | 1996-2005 | Empire Weavers | approx. $1,117,000.00[7] |
| d. | 1997-2005 | Dalton Padding | approx. $394,000.00 |

**Total**: $4,791,000.00 (approx.)

Of that total, IFC made payments to the above companies in excess of $4,400,000.00 for non-existent merchandise. Gemme has never located any bills of lading which would show that IFC received any shipments from these entities. (Affidavit of William Gemme, **Exhibit T**).

60.    From 1995 through 2005, IFC made payments to CCC International in the total amount of approximately $5.289 million. To date, IFC remains unable to determine the precise amount of fraudulent transactions involving CCC International, although IFC believes that the figure exceeds $3 million. Gemme bases that conclusion upon a rough calculation of the amounts paid to CCC for shipments for which IFC does not have bills of

---

[7]    In the original and in the amended complaint, IFC erroneously alleged that IFC received $1,170,000 in invoices from Empire Weavers. It appears that that figure was a typographical error. The total figure has been revised accordingly.

lading. **(Exhibit T)**.

61.    IFC's principal place of business is located in Hingham, Massachusetts.  IFC

sent checks to REMCO from its main office in Hingham, Massachusetts.  IFC received

REMCO invoices in Massachusetts.  At all times relevant, Adams, Britto and Williams

worked for IFC mainly at Massachusetts locations.  **(Exhibit T)**.

The Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,

*/s/ Paul J. Klehm*_____
James B. Krasnoo (BBO# 279300)
*jkrasnoo@krasnooklehm.com*
Paul J. Klehm (BBO# 561605)
*pklehm@krasnooklehm.com*
Benjamin Falkner (BBO# 667951)
*bfalkner@krasnooklehm.com*
Krasnoo|Klehm, LLP
23 Main Street, Suite 6
Andover, MA 01810
Dated:  June 6, 2008                              (978) 475-9955

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid, on June 6, 2008.

*/s/ Paul J Klehm*_____
Paul J. Klehm