UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| INTERNATIONAL FLOOR CRAFTS, INC. | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 05-cv-11654-NMG |
| | ) | |
| DAVID W. ADAMS, *et al*, | ) | |
|     Defendants. | ) | |
| | ) | |

**PLAINTIFF INTERNATIONAL FLOOR CRAFTS, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT JANE
DZIEMIT'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 211]**

Plaintiff International Floor Crafts, Inc. ("IFC") hereby files the within

memorandum of law in opposition to Defendant Jane Dziemit's Motion for Summary

Judgment [Doc. No. 211].

## INTRODUCTION

In the case at bar, IFC, the company which handles rugs, padding and flooring

departments for the discount retail stores known as Building 19, asserts various RICO,

G.L. c. 93A and other claims to recover damages against remaining Defendants Jane

Dziemit, Ronald Mitchell, Tyrone Williams and David Adams arising out of a ten year

scheme in which various IFC employees conspired with non-employees to steal at least

five million dollars from IFC by, essentially, falsely representing that IFC had received

various shipments of rugs and padding and then causing IFC to issue payments for said

non-existent (or partial) shipments to various purported entities, including, without

limitation, REMCO.  David Adams, and perhaps Kevin Britto (who apparently died

during the pendency of this case), would receive some funds at the beginning of each

transaction, and then various participants would share in the stolen funds once IFC made

the payment.  Defendant Dziemit, on behalf of REMCO, advanced large sums of money to Adams and prepared REMCO invoices for goods that were never shipped. In return, she received not only a percentage of the difference between the amounts she advanced and the amounts of the IFC invoice, but she also received payments on various transactions in which she did not advance any funds at all.   The evidence, when taken in the light most favorable to IFC, demonstrates that Dziemit was an active participant in the scheme and that she did not merely "loan" funds to Mitchell or REMCO.

Adams and Williams asserted the Fifth Amendment privilege and refused to testify about the scheme at depositions.  Dziemit's partner at REMCO, Defendant Mitchell, who initially asserted the Fifth Amendment privilege, was forced to give testimony at a deposition on May 16, 2008 after providing an affidavit on behalf of Dziemit's motion for summary judgment. That deposition clarified that Defendant Dziemit advanced funds to Adams and sent REMCO invoices, that she prepared, to IFC, enabling Adams to operate a scheme, and that Dziemit received not only various payments from the proceeds of the fraud in exchange for the advances, but she also received payments even when she advanced no funds at all.  Her claim, therefore, that she simply loaned money to the organization is meritless.

Finally, since much of Dziemit's defense centers on a claim that she did not know of the scheme, IFC reminds this Court that "[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind."  *Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 5 (1st Cir. 1984), *quoting Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975).

## **FACTS**

IFC operates the rugs, padding and flooring departments of the discount retail stores known as Building 19.  (Resp. ¶13). Normally, an IFC buyer, like Defendant Adams or Britto, would prepare a purchase order for merchandise that IFC would buy. (Resp. ¶45).  Upon receipt of the shipment, an individual in the receiving department (for our purposes, Williams), would sign a document known as a "key req" confirming that the shipment was received.  *Id.*  The receiver would also collect a bill of lading from the trucking firm or the vendor, and the receiver would sign the bill of lading. *Id.*  The IFC accounting department would match the key reqs and the bill of lading to the invoice (received from the seller) and the purchase order (generated by IFC), and then make payment to the seller.  *Id.*

For approximately ten years, Adams and Britto managed a scheme under which fake or partial shipments would be sent to IFC.  (See Resp. ¶38).  In essence, Britto and Adams would prepare fake purchase orders, and Williams would sign key reqs falsely asserting that the shipments had been received.  *Id.*  IFC would then pay the invoice to certain third parties.

In or around 1999, Mitchell, a family friend of Dziemit, approached Dziemit regarding providing funds for an expansion of Mitchell's carpet business under which Mitchell would provide capital to Adams in advance, and Adams would purportedly use the funds to purchase the items and resell them to IFC. (Resp. ¶¶4,11). At the time, Dziemit was in the mortgage lending business.  (Resp. ¶12).  Dziemit and her boyfriend Anthony Maresca met with Adams at a Building 19 store to discuss the venture, while Mitchell stayed in the background.  (Resp. ¶13).

From 1999 to 2001, Defendant Dziemit, who had been in the business of making real estate loans, served as a partner with Ronald Mitchell in Remco, a d/b/a and one of the companies involved in the scheme.  (Resp. ¶12, Alleged Fact No. 6).  REMCO was run from Mitchell's home, and the company had no warehouse.  (Resp. ¶46).  Mitchell admits to lying to an IFC employee a few years ago by telling the employee that REMCO did have a warehouse.  *Id.*  Dziemit began making large advances of funds to Mitchell. Initially, Dziemit had Mitchell sign a promissory notice, but, once the note was paid, she did not require any further writings from Mitchell.  (Resp. ¶12).

During the first five or six transactions, Dziemit advanced funds for REMCO to send directly to CCC.  (Resp. ¶49).  The notion was that the funds would be used to pay for rug or padding that CCC would send to IFC.  Dziemit would then prepare an REMCO invoice, based upon an IFC purchase order received from Adams, and forward the invoice to IFC.  When the IFC funds would arrive, Dziemit would deduct the amount she advanced, and then Mitchell and Dziemit would split the remainder.  (Resp., ¶49, 59). Dziemit maintains that these advances were loans.  This scenario was not a loan, as Dziemit was not receiving interest on the amount she loaned;  she was merely receiving a percentage of the profits.  (Resp. ¶16).  The amount that Dziemit received was not dependent upon the amount of time that the advance was outstanding.  (Resp. ¶16). Dziemit would deposit the funds received into various accounts.  *Id.*  The depositing of the funds into various accounts, and the fairly haphazard manner in which the transactions were conducted, increase the difficulty of discerning where all of the funds went.  From the record, it is a fair inference that Adams was keeping (or distributing to Britto) the funds advanced from Dziemit, because no rugs or padding were purchased.

(See Resp. ¶38).  Dziemit issued REMCO invoices for product which was never shipped.  *Id.*  She prepared the invoices even though she knew that REMCO had no warehouse.  (Resp. ¶46).

In or around 2000, the scheme changed, after Adams told Mitchell, who had previously only dealt with padding and not rugs, that he had other sources of supply for truckloads of rugs and padding.  (Resp. ¶¶11, 51).  Adams did not want to identify the new sources to Mitchell.  (Alleged Fact No. 15).  At this point, Dziemit began to provide Adams with significant funds (often $25,000) up front, before a purchase order was prepared.  *Id.*  Two or three weeks later, Adams would tell Mitchell to send an invoice to IFC.  *Id.*  When IFC paid the invoice, Adams, Mitchell, Dziemit, and even Britto, would receive funds from REMCO.  (Resp. ¶53; see **Exhibit M**).  Dziemit kept the REMCO checkbook in her home during the partnership, and she wrote ninety percent of the checks.  (Resp. ¶33).

In or around 2000, Mitchell began to suspect that Adams had a gambling problem.  (Resp. ¶15).  Britto estimated that Adams gambled away over $1 million dollars.  (Resp. ¶15).  Nonetheless, Mitchell continued to deal with Adams.  *Id.*

Mitchell began wiring funds to Adams and to write significant checks to cash, some of which were indorsed by Dziemit.  *Id.*  In fact, Mitchell wrote more than $133,000 in checks to cash.  *Id.* Mitchell acknowledged that he had not written checks to cash before in his business. *Id.*  The checks he has produced reveal that Mitchell wrote various checks in large amounts to various banks and to companies associated with Dziemit.  (*See* Resp. ¶51).  Frankly, a review of bank records reveals a confusing web of checks to various entities, and to cash, and a review of his handwritten records pertaining

to the advances is no less confusing.  (**Exhibit L(1)**, **Exhibit G**).  Those records appear to show that Maresca, who was not affiliated with REMCO in any way, made various advances to Mitchell – even the chart shows "T+J," which Mitchell testified meant "Tony and Jane."  (Resp. ¶¶16, 30).   In fact, some of the IFC purchase orders which Dziemit saw listed Maresca, who did not work for IFC or REMCO, as the contact person.  (Resp. ¶30).  Dziemit did not question why Maresca's name appeared on the purchase orders. *Id.*

Later, Britto ordered Mitchell to wire the funds to Britto, and not to Adams. (Resp. ¶56).   Britto told Mitchell, "Look, this is what's gonna happen, you don't give [Adams] the money anymore, it comes to me." *Id*.  Mitchell inexplicably complied. *Id.* At another point, when Dziemit refused to make further advances because of the amount which Adams already had outstanding, Mitchell formed Mansfield Rug and continued the scheme.  (Resp. ¶55).  Even after the partnership ended, Dziemit made at least fifteen additional advances to, or on behalf of REMCO.  (Resp. ¶12).

Dziemit was paid on transactions (in amounts ranging from approximately $1,000 to $5,000) in which she did not advance money.  (Resp. ¶16).  Mitchell testified that Dziemit may have prepared the invoices on these transactions, a process which would have taken five minutes. *Id*.  Thus, Dziemit would receive thousands of dollars for five minutes of work.  Mitchell's records confirm that Dziemit received funds on transactions in which she did not advance funds.  (See **Exhibit G**).

In April, 2005, William Gemme, the acting controller of Building 19, Inc. of IFC began an investigation of its rugs, padding and flooring departments after an employee reported some difficulties with locating certain shipments which Adams, a former IFC

buyer, had ordered.  (*See* Resp. ¶¶47, 48).  At or around that time, Mitchell knowingly

submitted a fake bill of lading to IFC in an effort to deceive IFC into thinking that IFC

had received a certain shipment from REMCO.  (Resp. ¶46).  Mitchell also lied to

William Gemme of IFC by telling Gemme that some REMCO records had been

destroyed.  (Resp. ¶46).

IFC's investigation has revealed that, from 1999 to 2005, IFC received invoices

from REMCO and Mansfield Rug in the amount of approximately $2.3 million and

$980,000, respectively.  (Resp. ¶59).  Also, IFC received invoices from the mid-1990s to

2005 from Empire Weavers and Dalton Padding in the amount of approximately $1.117

million and $394,000, respectively.  *Id*.  IFC made payments on all of those invoices in

excess of $4.4 million but has not been able to confirm shipments through legitimate bills

of lading.  *Id*.  According to Britto, Dalton Padding and Empire Weavers, which were

also involved in the scheme, billed for fake shipments.  (Resp. ¶57).  REMCO and

Mansfield Rug presented invoices for items that were not shipped.  (Resp. ¶¶15, 55, 57).

Mitchell estimates that Dziemit earned $140,000 from the transactions.  (Resp. ¶15)*.*

## STANDARD OF REVIEW

The party moving for summary judgment must meet the initial burden of

demonstrating the absence of a genuine issue of material fact, upon which a reasonable

jury could find for the nonmovant.  Fed.R.Civ.P. 56(c).  All facts must be viewed in the

light most favorable to the nonmovant, giving the nonmovant "the benefit of all

reasonable inferences that can be drawn from these facts."  *Lockhart v. Cedar Rapids*

*Comm. Sch. Dist.,* 963 F. Supp. 805, 814 (N. D. Iowa 1997) *citing Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  "A genuine issue of material

fact is one with a basis in the record." *Id.*, *quoted in Salz v. Stellar Industries,* 2004 WL 439231 (N. D. Iowa). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989), would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds,* 896 F.2d 5, 7 (1st Cir. 1990). "State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind." *Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 5 (1st Cir. 1984), *quoting Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975).

In the case at bar, Defendant Jane Dziemit is not entitled to summary judgment in her favor, and this matter must proceed to trial.

## <u>ARGUMENT</u>

### I.    Summary Judgment Should Be Denied As To Count I, Violations Of The RICO Act (18 U.S.C. §1962(a)-(c)) Because The Record Demonstrates Genuine Issues Of Material Fact As To That Claim.

This Court should deny summary judgment as to Count I of the Amended Complaint, in which IFC alleges violations of the Racketeer-Influenced and Corrupt Organizations Act, specifically, 18 U.S.C. §1962(a)-(c), against all Defendants, including Dziemit, (*See* AC, ¶¶ 65 – 69), because the record demonstrates genuine issues of material fact, *first*, as to whether Dziemit used or invested income received from a pattern of racketeering activity to acquire an interest in or establish an enterprise, in violation of §1962(a), *second*, as to whether Dziemit acquired or maintained an interest in or control of an enterprise through a pattern of racketeering activity, in violation of §1962(b), and

*third*, as to whether Dziemit conducted or participated in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, in violation of §1962(c).

The federal RICO statute, 18 U.S.C. §§1961-1968, prohibits any "person" from "investing in," "acquiring" or "conducting the affairs of" an "enterprise" engaged in or affecting interstate or foreign commerce by means of a "pattern" of "racketeering activity," including, without limitation, mail fraud and wire fraud.  1 David R. McCormack, *Racketeer Influenced Corrupt Organizations, Civil And Criminal*, §1.01, (Knowles Publishing, Inc., 1988, 2004 Supp.).  The statutory definition of a RICO "enterprise" includes "any union or group of individuals associated in fact."  *United States v. Turkette*, 452 U.S. 576, 580 (1981).  The association must be "a group of persons associated together for a common purpose of engaging in a course of conduct."  *Id.*, at 583.  While the association must constitute a unit demonstrated by "systemic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination," *Libertad*, 53 F.3d at 442 – 443, "RICO ... does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants."  *Id.*, at 445, quoting *United States v. Boylan, et al.*, 898 F.2d 230, 242 (1st Cir.), *cert. denied*, 498 U.S. 849 (1990).  Here, the evidence demonstrates a complex enterprise, involving, among others, Adams, Paul Sun, David Sun, CCC International, REMCO, Dziemit, Mitchell and others.  (Resp. ¶38).  Britto and Adams would cause IFC to be billed for more rugs than the number of which were delivered to IFC, or they would cause IFC to be billed for fictional shipments.  (*Id.*).  REMCO, for instance, prepared bills (or invoices) showing product was shipped to IFC, when, in fact no such product was shipped.  (*Id.*).  Williams, who worked in IFC's

warehouse, would sign shipping documents to show rugs had been received (when they had not been), and Williams prepared fake bills of ladings.  (*Id.*).

A pattern of racketeering activity must include "at least two predicate acts of 'racketeering activity,' conduct that includes mail and wire fraud." *North Bridge Associates, Inc. v. Boldt*, 274 F.3d 38, 42 (1st Cir. 2001), *citing Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000).  The acts must be related, and they must "amount to or pose a threat of continued criminal activity." *North Bridge Associates, Inc.*, 274 F.3d at 42.  Here, Defendants repeated their series of mail and wire fraud transactions, all with the same basic pattern, although with slight variations, over a period of more than five years, totaling more than $5,000,000.00 in fraudulent transactions from the various fictitious companies.

The RICO statute provides for a private civil action for "[a]ny person injured in his business or property by reason of a violation of § 1962 ..." *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987), *quoting* 18 U.S.C. §1964(c). Section 1962 provides, in pertinent part:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. ...

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct

of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Here, the record demonstrates violations by Dziemit of §1962(a), (b) and (c). Dziemit does not dispute the existence of an enterprise nor does she dispute the existence of a pattern of racketeering activity. (Defendant's Memorandum [Doc. No. 213], at pp.5-10). Instead, she argues, in essence, that she did not know about, and did not participate in, the fraudulent activity of the enterprise. (*Id.*). Dziemit's arguments fail due to the abundance of evidence demonstrating (1) that Dziemit used or invested income received from the pattern of mail and wire fraud both to acquire an interest in and to establish REMCO, a fictitious organization, (2) that Dziemit acquired or maintained an interest in and control of REMCO, an organization in which she was a partner, through a pattern of mail and wire fraud, including, without limitation, her preparation of and communication of fraudulent invoices to IFC, and (3) that Dziemit conducted or participated in the conduct of the affairs of REMCO, as a partner of Defendant Ronald Mitchell, through a pattern of mail and wire fraud.

### A. Dziemit Used Or Invested Income Received From The Pattern Of Mail And Wire Fraud Both To Acquire An Interest In And To Establish REMCO, A Fictitious Organization.

Dziemit used and invested income received from the mail and wire fraud scheme both to acquire an interest in and to establish REMCO. To recover under 18 U.S.C. §1962(a), IFC must show that it has suffered harm as a result of Dziemit's "use or investment" of racketeering income, *i.e.,* that the investment or use proximately caused injury to IFC. *See Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91-92 (1st Cir. 1995). Here, it is undisputed that Dziemit received racketeering income, when she received, processed, indorsed and deposited

checks from IFC as payment upon REMCO's fraudulent invoices for rugs which were never delivered. Dziemit indorsed the IFC checks, the proceeds of the racketeering, and deposited those checks. She then forwarded the proceeds from the checks to Mitchell and, less frequently, directly to Adams, keeping a percentage of the proceeds as profit. (Resp. ¶¶12, 16). She wrote approximately ninety percent of the REMCO checks during the partnership from 1999 to 2001. (Resp. ¶33). Dziemit's actions were crucial to the scheme, as the IFC insiders, Adams and Britto, needed outside organizations to receive and to process IFC funds. In other words, the scheme does not work unless there is a place to send the money. As such, Dziemit's investment of the ill-gotten gains from IFC, and her redistribution of the funds constituted Dziemit's *designated role* in the overarching enterprise. *See United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003) (finding a discernable structure to the enterprise where the members played "designated roles in keeping the enterprise functioning as a viable unit").

While Dziemit attempts to categorize her investments as mere "loans," Dziemit did not receive periodic interest on her advances, but, rather, she received a percentage of the funds left over after her advanced funds were deducted from the amount received from the funds paid by IFC. (Resp. ¶12). She indorsed large checks made payable to cash from Mitchell or REMCO – something which Mitchell admitted was not good business practice. (Resp. ¶52). Mitchell admitted that the preparation of two checks to cash (one for $20,000 and one for $10,000) on the same day looked suspicious. (Resp. ¶52). REMCO issued more than $133,000 in checks made payable to "cash." (Resp. ¶52).

Most importantly, however, and most indicative of her participation in the scheme, is that Dziemit received payments on transactions in which she did not advance funds. (Resp. ¶16). In exchange for taking five minutes to prepare a REMCO invoice, Dziemit received staggering payments of approximately $1,000 to $5,000. *Id.* Moreover, she wrote REMCO invoices based upon IFC purchase orders, some of which included the name of her boyfriend, Anthony Maresca, as a contact person – a person whom she knew was not an employee of IFC or REMCO – without even questioning the issue. (Resp. ¶30).

In a puzzling maneuver, three days before she resigned as a partner in REMCO, Dziemit and Maresca sent Mitchell funds in the amount of $85,000. (Resp. ¶12). Mitchell, in turn, deposited the funds into his personal account and, on the same day, wrote a check in that amount to REMCO. (Resp. ¶12). Mitchell acknowledged that it was rather strange that he does not recall what he did with the $85,000. (Resp. ¶12). Dziemit made at least fifteen advances to REMCO, and continued to receive funds from REMCO, after the partnership ended. *Id.*

**B.    Dziemit Acquired Or Maintained An Interest In And Control Of REMCO, An Organization In Which She Was A Partner, Through A Pattern Of Mail And Wire Fraud.**

Dziemit used and invested income received from the mail and wire fraud scheme both to acquire an interest in and to establish REMCO. To recover under §1962(c), IFC must show that it was harmed by Dziemit's acquisition or maintenance of control over the enterprise. Here, Dziemit acquired a stake in REMCO, which she operated with Mitchell, and which associated in fact with, among others, Adams, Britto and CCC International. Dziemit held a thirty-three percent interest in REMCO. (Resp. ¶12).

13

Dziemit's acquisition of a stake in REMCO brought the organization much needed capital, and enabled the enterprise to perpetuate the fraud on IFC. *See*, *supra*, §I(A).

### C.    Dziemit Conducted Or Participated In The Conduct Of The Affairs Of REMCO.

To state a RICO claim under 18 U.S.C. §1962(c), "a plaintiff must allege each of the four elements required by the statute:  1) conduct;  2) of an enterprise;  3) through a pattern;  4) of racketeering activity." *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995)(Court finds sufficient evidence of "enterprise" as to some Defendants).  Insiders to the enterprise "who are integral to carrying out the enterprise's racketeering activities-...- come within the definitional sweep of section 1962(c)." *United States v. Houlihan*, 92 F.3d 1271, 1298-1299 (1st Cir. 1996).  In contrast, outsiders to the enterprise, such as an outside accounting firm with only a contractual relationship to the criminal enterprise, must be shown to participate in the "the **operation or management** of the enterprise itself."  Id., at 1298, *quoting Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  Dziemit fits both categories.

In *United States v. Gabriele*, 63 F.3d 61, 68 (1st Cir. 1995), the Court found sufficient insider participation in the conduct of the enterprise to support an instruction that Gabriele need not "direct" the criminal enterprise to incur §1962(c) liability.  In *Gabriele*, an organization known as the Saccoccia enterprise had laundered drug money, in part, by sending gold and precious metals to a company known as RTI, which was operated by Gabriele.  *Id.*, at 64.  After learning that his own companies were under FBI surveillance, Saccoccia began to divert more of his gold to RTI.  *Id.*  Gabriele knew about and participated in counting the cash and gold shipments from Saccoccia.  *Id.*  Gabriele kept coded records of the shipments.  *Id.*  On occasion, Saccoccia instructed Gabriele to

transfer large sums of cash held in the RTI safe. *Id.* At Saccoccia's direction, Gabriele would wire funds to Saccoccia's designated banks or would deliver cash to Saccoccia couriers. *Id.* Saccoccia and Gabriele discussed their ongoing cash transactions in a coded conversation intercepted by the FBI in October 1991. *Id.* Gabriele appealed his §1962(c) conviction on the ground that it was error to instruct the jury that it need not find that he "directed" the Saccoccia enterprise since "an enterprise is operated not just by upper management but also by lower rung participants who act on the direction of upper management." *Gabriele*, 63 F.3d at 68. The Court rejected Gabriele's appeal holding that Gabriele was not an independent "outsider" but a full-fledged "employee" of the Saccoccia enterprise, as evidenced by Saccoccia's anticipated "purchase" of RTI from Gabriele and his instructions to underlings to leave cash for Gabriele. *Id.*

Much like in *Gabriele*, Dziemit claims a lack of knowledge and claims not to have participated in the RICO scheme. However, Dziemit, like Gabriele, was not an independent outsider but rather a full-fledged employee of REMCO. She prepared paperwork. She advanced funds which enabled the scheme to run, even though she was reluctant to advance the funds. (Resp. ¶¶12, 16). She wrote kept the REMCO checkbook at her home during the partnership, wrote ninety percent of the checks, and received REMCO checks at her P.O. Box, (Resp. ¶¶29,33). She forwarded checks to Mitchell and to Adams. She prepared invoices on her computer and mailed those invoices to IFC (Resp. ¶5). Dziemit indorsed checks from IFC to REMCO and deposited those checks, and then Dziemit forwarded the proceeds from the checks to Mitchell and, less frequently, directly to Adams, keeping a percentage of the proceeds as profit. Dziemit's

actions were crucial to the scheme, as the IFC insiders, Adams and Britto, needed outside organizations to receive and process IFC funds. See §I(A), *supra*.

Moreover, further demonstrating Dziemit's participation in the affairs of the wider criminal enterprise, Dziemit wired money to CCC one or twice. (Resp. ¶24). Dziemit sent checks to CCC. (Resp. ¶24). Dziemit obtained money orders for CCC. (Resp. ¶24). She obtained money orders or checks for CCC on four to six occasions. (Resp. ¶24).

Finally, as in *Gabriele*, Dziemit and Mitchell kept simultaneous coded business records (although their records often did not match up). (Resp. ¶16). For instance, Mitchell's records referring to "T + J," code for "Dziemit," identifies 53 payments to Dziemit, while Dziemit's records appear to show that she received only 27 payments. (Resp. ¶16). Additionally, the existence of numerous checks to cash from Mitchell and REMCO suggests that the business was engaged in underhanded dealings. (Resp. ¶52).

Moreover, even if IFC were required to show Dziemit's **operation or management** of the enterprise, *see Reves*, 507 U.S. 170, the record demonstrates that Dziemit participated in the operation or management of the enterprise. Not only did Dziemit become Mitchell's partner in REMCO, but Dziemit traveled to a Building 19 store in Massachusetts for a high level meeting with Adams, the central figure in the scheme to defraud IFC. (Resp. ¶13). Mitchell even made himself "a little scarce" so that Dziemit, Adams and Maresca could talk alone. (Resp. ¶13). Based upon these facts, combined with the massive sums of money acquired by Dziemit personally (Mitchell estimated that he made $210,000 and Dziemit made $140,000 (Resp. ¶15)) during the scheme and her key role in keeping the operation financed, a reasonable finder of fact

could infer that Dziemit had participated in the management or operation of the criminal enterprise.

Dziemit's reliance upon *Bowdoin Const. Corp. v. Rhode Island Hosp. Trust Nat. Bank, N.A.*, 869 F. Supp. 1004, 1009 (D. Mass. 1994), for the contention that lending money absolves one of RICO liability is inapposite. In that case, an outside *bank*, Bank of Boston, made a loan to a hotel, knowing of the hotel's fraud, but the complaint made no allegations that the bank participated in the operation or control of the hotel. *Id.* As to another bank, Rhode Island Hospital Trust National Bank, N.A. ("RIHT"), which made loans to the hotel, the Court did not dismiss the §1962(c) count on that basis, where the plaintiff alleged that RIHT directly controlled the enterprise. *Id.*, at 1009-1010. Thus, even under *Bowdoin Const. Corp.*, the test is not whether Dziemit lent money to the criminal enterprise but whether she participated in the conduct of the enterprise. Moreover, as discussed above, Dziemit was not loaning money to Mitchell d/b/a REMCO. She was receiving profits from funds she advanced, and she was receiving profits even if she did not advance funds.

Finally, Dziemit argues, in essence, that she had no knowledge of the fraud being perpetrated against IFC by Adams and Britto. (Dziemit's Memorandum, pp.5-10). Dziemit's protestations of lack of knowledge are an insufficient ground upon which to grant summary judgment in the within case, as "[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind." *Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 5 (1st Cir. 1984), *quoting Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975). Particularly here,

where the evidence of Dziemit's participation in the criminal enterprise is strong, the

knowledge showing is not strict:

> The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). The RICO statute seeks to encompass those people who are "merely 'associated with'" the enterprise. *Id.*; *see also United States v. Watchmaker*, 761 F.2d 1459, 1476 (11th Cir. 1985). **The defendant need only be "aware of at least the general existence of the enterprise named in the indictment,"** *United States v. Console*, 13 F.3d 641, 653 (3d Cir. 1993) (*quoting United States v. Eufrasio*, 935 F.2d 553, 577 n. 29 (3d Cir.1991)), **and know about its related activities.** *United States v. Martino*, 648 F.2d 367, 394 (5th Cir. 1981); *see also United States v. Starrett*, 55 F.3d 1525, 1551-52 (11th Cir. 1995).

*United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) (emphasis added)(noting at fn.6

that "[t]he standard is the same for both criminal and civil RICO violations"). As such,

material facts as to Dziemit's knowledge remain in genuine dispute, and this Court

should deny summary judgment despite Dziemit's protestations of innocence.

### D.    IFC Adequately Pleaded Its RICO Claim.

In Dziemit's Memorandum at pp. 10-12, Dziemit argues that IFC failed to plead

its fraud claim with the requisite level of particularity required by Fed. R. Civ. P. 9(b).

IFC notes that Dziemit previously unsuccessfully moved to dismiss IFC's RICO claim

against her pursuant to Fed. R. Civ. P. 12(b)(6), and Fed. R. Civ. P. 9(b). IFC

incorporates herein by reference the arguments set forth at pp. 17-20 of Plaintiff

International Floor Crafts, Inc.'s Memorandum In Opposition To Defendant Jane

Dziemit's Motion To Dismiss [Doc. No. 130]. Through discovery, IFC, particularly

through the recent deposition of Ronald Mitchell, IFC has learned that Dziemit prepared

on her computer REMCO invoices, and that she mailed the fraudulent documents to IFC.

(Resp. ¶25). The strong evidence that Dziemit participated actively in the affairs of

REMCO and the wider criminal enterprise renders moot any complaint about the particularity of IFC's pleading.

## II.    Summary Judgment Should Be Denied As To Count II, Conspiracy To Violate The RICO Act, Because The Record Demonstrates Genuine Issues Of Material Fact As To That Claim.

Under 18 U.S.C. §1962(d), it is unlawful for an individual to conspire with another to violate §§1962(a), (b), or (c).  IFC need only show that the defendant agreed with one or more individuals to commit at least two offenses which violate those provisions.  *Aetna*, 43 F.3d at 1562 (1st Cir. 1994), citing *Boylan*, 898 F.2d at 252.  There can be a conspiracy "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Financial Advisors & Consultants, Inc. v. Cooperativa de Seguros de Vida*, 106 F.Supp.2d 244, 260 (D.P.R. 2000)(quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997));  *See Federal Civil Litigation in the First Circuit*, Vol I of II, §13.2 (2004).

In order to state a claim under §1962(d) in the First Circuit, a plaintiff must show: 1) an enterprise affecting interstate commerce;  2) the defendant knowingly joined the conspiracy to participate in the enterprise;  3) the defendant participated in the enterprise; and 4) the defendant did so through a pattern of racketeering activity by agreeing to commit, or by committing, two or more predicate offenses.  *Id.*;  *Aetna*, 43 F.3d at 1561. Each defendant does not need to know all of the details of the conspiracy.  *Id.* at 1562.

Here, by acts, conduct and communications, Dziemit conspired with, among others, Mitchell and Adams, to violate 18 U.S.C. §1962(c).  IFC incorporates by reference Argument §I, *supra*, in which IFC recites Dziemit's participation in the enterprise in more detail.  Defendant Dziemit knowingly joined a conspiracy to

participate in a criminal enterprise aimed at defrauding IFC of millions of dollars by means of, among other things, agreeing to commit or committing two or more predicate acts, including, without limitation, fabricating numerous REMCO invoices on her computer and mailing them to IFC. *See United States v. McDonald*, 576 F.2d 1350, 1359 (9th Cir. 1978) (each mailing in furtherance of the scheme constitutes a separate violation of the mail fraud statute); *Atkinson v. United States*, 344 F.2d 97, 98 (8th Cir. 1965) (same); *Hanrahan v. United States*, 348 F.2d 363, 366 (D.C. Cir. 1965) (same). She also made wire transfers. (Resp. ¶24).

This Court may infer Dziemit agreed to violate the RICO statue from, among other things, (1) Dziemit's conduct, (2) her financing of REMCO, (3) her partnership with Mitchell in REMCO, (4) her meeting at the Building 19 store with Adams, Mitchell and Maresco, (5) her preparation and mailing of fraudulent invoices to IFC, (6) her negotiating and depositing checks from IFC to REMCO for fictitious shipments of rugs, and (7) her sending money indirectly and directly to, among others, Mitchell, Adams and CCC International.

Dziemit argues at p. 15 of her Memorandum, that "it is easy to believe that Adams would keep the true characteristics of his business dealings away from Mitchell and Dziemit ..." Even if a jury were able to make such a leap of faith in the face of such strong evidence of Dziemit's involvement, this Court must draw all reasonable inferences from the record in the light most favorable to IFC, the non-moving party. *Matsushita Elec. Indus. Co., supra*, 475 U.S. at 587. Dziemit's argument must fail because it requires the Court to draw inferences *adverse* to IFC, and to view the evidence in the light most favorable to Dziemit, the moving party.

**III.    Summary Judgment Should Be Denied As To Count III, Conversion, Because The Record Demonstrates Genuine Issues Of Material Fact As To That Claim**

Dziemit argues that she is not liable in conversion for the funds fraudulently obtained from IFC because IFC was the issuer of checks.  In order to sustain a cause of action in conversion, IFC needs only demonstrate that Dziemit "exercised acts of ownership, control or dominion over personal property to which [s]he has no right of possession at the time . . . ." *Abington Natl. Bank v. Ashwood Homes, Inc.*, 19 Mass. App. Ct. 503, 507 (1985).  Where property is obtained from a plaintiff under the form of a sale, but in fact by fraud and misrepresentation, an action for conversion will lie.  *Bates v. Youngerman*, 142 Mass. 120, 124 (1886).  Here, Dziemit obtained funds from IFC by submitting fraudulent invoices which indicated that REMCO had sent rugs to IFC, and, as such, an action for conversion will lie.

Dziemit contends, at p.18 of her Memorandum, that G.L. c. 106, §3-420(a) prevents IFC's recovery.  Dziemit's argument fails because IFC seeks to recover for funds fraudulently obtained by Dziemit and others, rather than to recover for the conversion of the instruments themselves.  Article 3 of the Uniform Commercial Code applies to instruments, including checks, but not to money.  *See* G.L. c. 106, §3-102, providing, in pertinent part, "This Article shall apply to negotiable instruments.  It shall not apply to money, ..."  Section 3-420(a), which prohibits an action for conversion of an **instrument** by the issuer of the instrument, provides a cause of action in conversion when a check:

> is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. ...

Here, the IFC's checks were merely the vehicle by which IFC's money was wrongfully and fraudulently appropriated.  *See, e.g.*, *Bates*, *supra*, 142 Mass. at 124.  IFC does not seek to recover under the Uniform Commercial Code for conversion of the instruments themselves under a theory that someone other than the named payee deposited the check.  Instead, IFC seeks to recover its money that Dziemit fraudulently caused IFC to transfer to Dziemit by *means* of causing IFC to issue checks payable to REMCO.  Dziemit's argument would exonerate conversion claims whenever a check is involved.

For all the foregoing reasons, IFC respectfully requests that this Court deny summary judgment as to Count III, Conversion.

### IV.    Summary Judgment Should Be Denied As To Count IV, Unfair And Deceptive Trade Practices, Because The Record Demonstrates Genuine Issues Of Material Fact As To That Claim.

Conduct is unfair or deceptive if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or "immoral, unethical, oppressive, or unscrupulous."  *Cummings v. HPG Intern., Inc.*, 244 F.3d 16, 25 (1st Cir. 2001), *quoting PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).  The Massachusetts Appeals Court has held that a misrepresentation in the common law sense constitutes a violation of c.93A.  *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979).  Thus, where IFC has demonstrated claims for fraud and RICO (*see, supra,* Argument §I; *infra*, Argument §V), it has also demonstrated 93A claims.  Here, the conduct of Dziemit, participating in a scheme to defraud IFC of millions of dollars clearly attains "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  *See Levings*, at 504.  Dziemit's claims that she did not know of the scheme do not provide a basis for the

granting of summary judgment, where IFC has presented strong evidence of Dziemit's participation in the scheme to defraud IFC.  (*See, supra,* Argument §I; *infra*, Argument §V).

Dziemit suggests that the 93A claim must fail because her business transaction occurred outside the Commonwealth.  In order to defeat a claim under G.L. c.93A, §11 on the grounds that the transactions did not occur primarily and substantially within the Commonwealth, Dziemit bears the burden of proof.  *See* G.L. c. 93A, §11 providing, in pertinent part:

> No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.  For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Under §11, the Court is to "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equipment Corporation*, 438 Mass. 459, 473 (2003).  The determination of whether the "center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth must be made on the basis of factual findings."  *Workgroup Technology Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 118 (D. Mass 2003) *quoting Kuwaiti Danish Computer Co. v. Digital Equipment Corporation*, 438 Mass. 459, 473 (2003).  The determination " can be reduced to any precise formula," but, among other things, the "place of conduct and the 'situs of loss,'" are relevant to the analysis.  *Auto Shine Car Wash Systems, Inc. v. Nice 'N Clean Car Wash, Inc.*, 58 Mass. App. Ct. 685, 689 (2003).

While not determinative, the location of the recipient of a fraudulent communication is relevant, as well as the location of the loss. *Auto Shine Car Wash Systems, Inc.*, 58 Mass. App. Ct. at 689. Here, IFC was located in Massachusetts where it received Dziemit's fraudulent invoices through the mail. *Compare id.*, 58 Mass. App. Ct. at 689 (conduct in Massachusetts where plaintiffs received deceptive communication and suffered loss of business in Massachusetts) *with Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, (1985) (conduct not in Massachusetts where "[t]he alleged unfair or deceptive acts or practices were statements made in Massachusetts but received and acted on in New York. Any loss was incurred in New York"); *see also Evans v. Yegen Assocs.*, 556 F. Supp. 1219, 1228 (D. Mass. 1982) (while unfair and deceptive acts took place both in Florida and in Massachusetts, the communication of the misrepresentation occurred while the defendant's agent was speaking with the plaintiff in Massachusetts). Here, although Dziemit created the fraudulent invoices in Connecticut, IFC received the invoices in Massachusetts, and IFC sent checks to REMCO from its offices in Massachusetts. (Resp. ¶61). The receipt of the REMCO invoices, many of which were created by Dziemit, caused IFC, in Massachusetts, to issue checks to REMCO. IFC's principal place of business is located in Hingham, Massachusetts. *Id.* At all times relevant, Adams, Britto and Williams worked for IFC mainly at Massachusetts locations. (*Id*). There can be little question that the actions and transactions for which it seeks to hold Dziemit liable are primarily and substantially within the Commonwealth. As such, Dziemit has failed to meet her burden of proof, and the Court should deny summary judgment on that basis.

**V.     Summary Judgment Should Be Denied As To Count V, Fraud,
Because The Record Demonstrates Genuine Issues Of Material
Fact As To That Claim.**

**A.     IFC Has Presented Evidence Sufficient To Demonstrate A
Claim For Fraud.**

In order to sustain a claim of fraud or misrepresentation, a plaintiff must show a

false statement of a material fact, which was known or should have been known to be

false, made to induce the plaintiff to act, together with reliance on the false statement by

the plaintiff to the plaintiff's detriment.  *Powell v. Rasmussen*, 355 Mass. 117, 118-119

(1969); *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982); *Acushnet Fed. Credit Union

v. Roderick*, 26 Mass. App. Ct. 604, 605 & n. 1 (1988).  The speaker does not need to

know "that the statement is false if the truth is reasonably susceptible of actual

knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are

available to the speaker." *Acushnet*, *supra* at 605; *Nickerson v. Matco Tools Corp.*, 813

F.2d 529, 530 (1st Cir. 1987) (plaintiff does not need to show that the speaker **knew** that

the statement was false).  Where the plaintiff proves "a statement made, as of the party's

own knowledge, which is false, provided the thing stated is not merely a matter of

opinion, estimate, or judgment, but is susceptible of actual knowledge ... it is not

necessary to make any further proof of an actual intent to deceive."  *Zimmerman v. Kent*,

31 Mass. App. Ct. 72, 77-78 (1991), *quoting Powell*, 355 Mass. at 118.

Dziemit claims that IFC has not met the elements of fraud because Dziemit made

representations only to Mitchell.  Nonetheless, Dziemit billed IFC for rugs which were

never shipped, when she created REMCO invoices on her computer and mailed those

invoices to IFC. The invoices constituted representations that REMCO had, in fact,

delivered the rugs for which it billed, when such was not true. IFC acted in reliance upon

Dziemit's misrepresentations when it executed and delivered to REMCO checks as

payment for the invoiced rugs, which had not, in fact, been delivered. Moreover, by

continually indorsing and depositing IFC checks as payment for rugs which were never

shipped, Dziemit implicitly represented to IFC that the rugs had, in fact, been delivered.

Moreover, while Dziemit claims to have acted in good faith when invoicing IFC, her lack

of good faith is demonstrated by, among other things, (1) the fact that she knew that

Maresca was not a contact person for IFC, (2) the cash transactions and the haphazard

nature of the transactions, and (3) the fact that REMCO had no warehouse.

Dziemit claims that that IFC could not have detrimentally relied upon Dziemit's

representations when IFC was not aware of her existence likewise falls. Dziemit created

and submitted REMCO invoices to IFC, upon which IFC relied in sending checks to

REMCO.

**B.    IFC Adequately Pleaded Its Fraud Claim.**

In Dziemit's Memorandum at pp. 25-28, Dziemit argues that IFC failed to plead

its fraud claim with the requisite level of particularity required by Fed. R. Civ. P. 9(b).

IFC notes that, as with IFC's RICO claim against Dziemit, Dziemit previously

unsuccessfully moved to dismiss IFC's RICO claim against her pursuant to Fed. R. Civ.

P. 12(b)(6), and Fed. R. Civ. P. 9(b). Nonetheless, IFC's fraud claim survived Dziemit's

12(b)(6) and 9(b) claim. IFC incorporates herein by reference the arguments set forth at

pp. 17-20 of Plaintiff International Floor Crafts, Inc.'s Memorandum In Opposition To

Defendant Jane Dziemit's Motion To Dismiss [Doc. No. 130]. Through discovery, IFC,

particularly through the recent deposition of Ronald Mitchell, IFC has learned that

Dziemit prepared on her computer REMCO invoices, and that she mailed the fraudulent

documents to IFC. (Resp. ¶25). The strong evidence that Dziemit participated actively in the affairs of REMCO and the wider criminal enterprise renders moot any complaint about the particularity of IFC's pleading.

## CONCLUSION

Plaintiff International Floor Crafts, Inc. respectfully requests that this Court DENY Defendant Dziemit's motion for summary judgment.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,


/s/ Paul J. Klehm
Paul J. Klehm (BBO# 561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO# 279300)
jkrasnoo@krasnooklehm.com
Benjamin L. Falkner (BBO# 667951)
bfalkner@krasnooklehm.com
Krasnoo | Klehm LLP
23 Main Street, Suite Six
Andover, MA 01810
(978) 475-9955

Dated: June 6, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid, on June 6, 2008.

/s/ Paul J. Klehm
Paul J. Klehm