UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____

INTERNATIONAL FLOOR CRAFTS, INC.    )
      Plaintiff    )
          )
v.    )
          )
DAVID W. ADAMS, *et al*    )    CIVIL ACTION NO. 05CA11654-NMG
      Defendants    )
_____)

### AFFIDAVIT OF PAUL J. KLEHM, ESQ.

I, Paul J. Klehm, Esq., under oath, depose and state as follows:

1.    I am counsel to Plaintiff International Floor Crafts, Inc.  I am an attorney licensed to practice law in the Commonwealth of Massachusetts since 1992, and in the United States District Court for the District of Massachusetts since 1993.

2.    I have caused to be attached hereto true and genuine copies (with portions redacted) of the following documents:

| | |
|---|---|
| **Exhibit A** | Letter dated March 11, 2008 |
| **Exhibit B** | Deposition of Tyronne Willliams on August 30, 2006 |
| **Exhibit C** | Affidavit of William Gemme in Support of Preliminary Injunction |
| **Exhibit C(1)** | Excerpts of Deposition of Ronald Mitchell on May 16, 2008 |
| **Exhibit D** | Excerpts of Deposition of Jane Dziemit on July 11, 2006 |
| **Exhibit E** | Letter dated December 28, 2001 (Exhibit 47, Dep. Mitchell) |
| **Exhibit F** | Tax Form (Exhibit 42, Dep. Mitchell) |
| **Exhibit G** | Mitchell's records (Exhibit 38, Dep. Mitchell) |
| **Exhibit H** | Deposition of Kevin Britto on March 7, 2006 |
| **Exhibit I** | Excerpts of Deposition of William Gemme on February 11, 2008 |

**Exhibit J**       First page of Mitchell Records

**Exhibit K**       Dziemit's Records (Exhibit 39, Deposition of Ronald Mitchell)

The within document was deemed confidential by Defendant Dziemit, and will be filed

separately.

**Exhibit K(1)**   Various documents (Exhibit 1, Deposition of Jane Dziemit)

**Exhibit L**       Excerpts from Deposition of William Elovitz

**Exhibit L(1)**   Mitchell check ledger

**Exhibit M**       Various checks (Exhibit 40, Deposition of Ronald Mitchell)

**Exhibit N**       Copies of various checks

**Exhibit O**       Copies of various checks

**Exhibit P**       IFC Purchase Order 6551

**Exhibit Q**       REMCO Invoice No. 20021030

**Exhibit R**       "Key Req"

**Exhibit S**       IFC Check to REMCO

**Exhibit T**       Affidavit of William Gemme dated June 6, 2008

The filing of the within document was delayed by the need to redact personal information

from various checks submitted.

Signed under the pains and penalties of perjury this 6th day of June, 2008.

/s/ Paul J. Klehm
Paul J. Klehm


**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney(s)
of record or upon each party not represented by an attorney via ECF or via first class mail,
postage pre-paid, on June 6, 2008.

*/s/ Paul J Klehm*
Paul J. Klehm

*Exhibit A*

## LAW OFFICE OF ISAAC H. PERES

92 State Street, 8th Floor
Boston, Massachusetts 02109
Phone (617) 722-0094
Fax (617) 778-0676

March 11, 2008

BY FAX (978) 474-9005

Paul J. Klehm, Esquire
Law Offices of James B. Krasnoo
23 Main Street
Andover, MA 01810

      Re:    International Floor Crafts, Inc. v. David W. Adams, et al.,
            United States District Court, C.A. No. 05-11654-NMG

Dear Paul:

      In response to your inquiry, please be advised that my client, David Adams, will invoke the protections of the Fifth Amendment in response to any questions to be posed by your client at the deposition scheduled for tomorrow.

      Would you kindly confirm for me, by fax or e-mail, that the deposition will not be going forward under this circumstance. Thank you for your attention to this matter.

Sincerely,

Isaac H. Peres

VOLUME I
PAGES 1 TO 83
EXHIBITS 1 TO 21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS,      )
INC.,                            )
            Plaintiff,           )
                                 ) Civil Action
    VS                           ) NO. 05-11654-NMG
                                 )
DAVID W. ADAMS, ET AL.,          )
                                 )
            Defendants.          )


        DEPOSITION OF TYRONE KEITH WILLIAMS, a

witness called on behalf of the Plaintiff, taken

pursuant to the Federal Rules of Civil Procedure,

before Lisa Abdo, Certified Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Krasnoo/Klehm LLP,

23 Main Street, Andover, Massachusetts, on

Wednesday, August 30, 2006, commencing at

10:28 a.m.

Page 2

```
 1   APPEARANCES:
 2
 3   Krasnoo/Klehm LLP
 4     (by Paul J. Klehm, Esq.)
 5     23 Main Street
 6     Terrace Level, Suite One
 7     Andover, Massachusetts 01810-3730
 8     978.475.9955
 9     pklehm@krasnooklehm.com
10     for the Plaintiff.
11
12   Robert M. Xifaras, P.C.
13     (by Robert M. Xifaras, Esq.)
14     5 Dover Street
15     Suite 101
16     New Bedford, Massachusetts  02740
17     508.999.9640
18     for the Defendant Tyrone Keith Williams.
19
20
21
22
23   (Continued on page 3)
24
```

Page 3

```
 1   APPEARANCES (Continued):
 2
 3   Yurko, Salvesen & Remz, P.C.
 4     (by Richard J. Yurko, Esq.)
 5     One Washington Mall, 11th Floor
 6     Boston, Massachusetts 02108-2603
 7     617.723.6900
 8     www.bizlit.com
 9     for the Defendant Jane Dziemit.
10
11   ALSO PRESENT:
12
13   Bill Elovitz
14   Joanne Cameron
15   Bill Gemme
16   Benjamin Falkner, law clerk
17
18
19
20
21
22
23
24
```

Page 4

```
 1            I N D E X
 2   WITNESS:     DIRECT   CROSS   REDIRECT
 3   Tyrone Keith Williams
 4   (by Mr. Klehm)     6           79
 5   (by Mr. Xifaras)          77
 6
 7                * * *
 8
 9           E X H I B I T S
     NO.                    PAGE
10
 1   Affidavit of Tyrone K. Williams      30
11
 2   Tyrone Keith Williams Financial
12     Statement for January, 2006        30
13   3 Tyrone Keith Williams Financial
       Statement for February, 2006       30
14
     4 Pay stubs                          34
15
     5 Tyrone Keith Williams Financial
16     Statement for March, 2006          36
17   6 Documents Bates-stamped 1883 to 1946    38
18   7 Documents Bates-stamped 000017
       to 000036                          39
19
     8 Purchase Order 6590 with related
20     documents                          43
21   9 Documents Bates-stamped 000003
       to 000013                          46
22
    10 Document Bates-stamped 000131      49
23
    11 Document Bates-stamped 000573      50
24
```

Page 5

```
 1           E X H I B I T S
 2   NO.                    PAGE
 3  12 Purchase Order 6590 with related
       documents                          51
 4
    13 Purchase Order 5430 with related
 5     documents                          51
 6  14 Pay stubs                          53
 7  15 Pay stubs                          53
 8  16 Pay stubs of Tyrone K. Williams from
       Labor Ready Northeast, Inc.        53
 9
    17 Documents Bates-stamped 000821
10     to 000823                          55
11  18 Purchase Order 6660 with related
       documents                          56
12
    19 Documents Bates-stamped 000318
13     to 000321                          57
14  20 Documents Bates-stamped 000396
       and 000415                         58
15
    21 Purchase Order 5430 with related
16     documents                          59
17
18
19
20
21
22
23
24
```

Page 6

1  PROCEEDINGS
2  Stipulations
3    It is stipulated by and between counsel for
4  the respective parties that the deposition is to be
5  read and signed under the pains and penalties of
6  perjury; and that all objections, except as to
7  form, and motions to strike are reserved to the
8  time of trial.
9  ———
10  TYRONE KEITH WILLIAMS
11  a witness called for examination by counsel for the
12  Plaintiff, being first satisfactorily identified
13  and duly sworn, was examined and testified as
14  follows:
15  DIRECT EXAMINATION
16  BY MR. KLEHM:
17  Q. Good morning, Mr. Williams. My name is Paul Klehm.
18  I represent International Floor Crafts. I'm going
19  to be asking you some questions today about the
20  case in which you're a defendant.
21    Would you please state your name.
22  A. Tyrone Williams.
23    MR. XIFARAS: Sorry. May I put this on
24  the record before we start?

Page 7

1    MR. KLEHM: Yes.
2    MR. XIFARAS: I would make a general
3  objection to my client testifying here today under
4  the Fifth Amendment of the United States
5  Constitution, his privilege not to incriminate
6  himself. And I do not want it to be deemed a
7  waiver that he will be answering some of the
8  questions in invoking his Fifth Amendment on other
9  questions.
10    MR. KLEHM: Okay. And you understand, as
11  I think I said off the record, that I intend to ask
12  questions today. And as to whether or not you
13  object, that's up to you. From my point of view,
14  to the extent that your client does answer, it is a
15  waiver. And as I've said, we will be suspending
16  this deposition at the close of the deposition for
17  two reasons: One, the issue relating to the
18  automatic disclosures, which I haven't received;
19  and, secondly, relating to any questions on which
20  he asserts or attempts to assert the Fifth
21  Amendment privilege.
22    MR. YURKO: I'd like to put on the record
23  my understanding of the Fifth Amendment privilege,
24  which is that if the witness testifies as to a

Page 8

1  subject, that he waives the privilege as to that
2  entire subject. So you can't start testifying
3  about a subject and then midcourse decide you're
4  going to take the Fifth Amendment privilege. And
5  that's why -- for example, in Mr. Mitchell's
6  deposition, he took the Fifth Amendment privilege
7  on virtually everything that was asked of him.
8    BY MR. KLEHM:
9  Q. Where do you live, Mr. Williams?
10  A. I███████████.
11  Q. Where is that?
12  A. N██████████████
13  Q. Is that a place you own or rent?
14  A. Actually, I don't own it. I did own it but I
15    don't now.
16  Q. Is that a home that was foreclosed upon?
17  A. Yes, sir.
18  Q. And I assume a bank owns it now?
19  A. Yes, sir.
20  Q. When did the foreclosure take place?
21  A. To my recollection, I'm just going to say
22    around March or April, roughly. I don't know
23    off the top of my head. I didn't bring that
24    stuff with me. But I do have the paperwork,

Page 9

1    just not with me.
2  Q. Do you currently intend to move to any other
3    residence?
4  A. Yes, sir.
5  Q. When do you intend to move?
6  A. Probably within the next like week or two. I
7    have some friends getting together with me
8    just to help me get my stuff out of there.
9  Q. Where do you intend to move to?
10  A. I'm just looking to like renting a room for
11    like sixty, eighty bucks a week or whatever.
12  Q. Do have a specific place selected of where you're
13    going to move to?
14  A. No, sir. There's a lot of places around,
15    so...
16  Q. What is your date of birth?
17  A. ████
18  Q. Your Social Security number?
19  A. █████████
20  Q. For how long did you live at ██████████et --
21    sorry. Strike that.
22    For how long have you lived ███████
23  ██████?
24  A. About maybe four years, I think. Three to

3 (Pages 6 to 9)

Page 10

```
 1      four years.
 2   Q. During that three- to four-year period, did anyone
 3      else live there with you?
 4   A. My girlfriend did for -- well, my
 5      ex-girlfriend, I should say.
 6   Q. What's the name of your ex-girlfriend?
 7   A. Stacie Grace.
 8   Q. How do you spell Grace?
 9   A. G-r-a-c-e.
10   Q. Where does Stacie Grace currently reside?
11   A. I know it's Matthew Street. I just don't
12      know the number of the apartment that it is.
13   Q. What town?
14   A. New Bedford, also.
15   Q. Do you have any children?
16   A. Yes. We have two.
17   Q. We? Whose we?
18   A. My -- I'm sorry. I was assuming you meant
19      with Stacie.
20   Q. With Stacie. Okay.
21   A. Yes.
22   Q. How old are those children?
23   A. Two and three.
24   Q. Other than those children, do you have any other
```

Page 11

```
 1      children?
 2   A. Yes. I have two other boys.
 3   Q. What are the names of the mothers of those
 4      children?
 5   A. Tanya -- I don't know what she's going by
 6      last name now.
 7   Q. And where does she live?
 8   A. She actually lives in Germany.
 9   Q. The country Germany?
10   A. Yes.
11   Q. And then the other one, what's her name?
12   A. I'll spell it for you. It's Z-u-l-m-a.
13   Q. First name?
14   A. Yes.
15   Q. What's her last name?
16   A. Thomas. She did remarry.
17   Q. And where does she live?
18   A. Pennsylvania.
19   Q. Before you lived at ███████t, where did you
20      live?
21   A. 60 Dean Street which is also in N██████d.
22   Q. Is that a place you owned or rented?
23   A. No. I just rented there.
24   Q. How long did you live there?
```

Page 12

```
 1   A. Maybe like a year and a half, maybe. Two,
 2      the most.
 3   Q. Who did you live there with?
 4   A. Just myself.
 5   Q. Have you ever been to any Super Bowl games?
 6   A. Yes, sir.
 7   Q. How many?
 8   A. Just two.
 9   Q. Which years?
10   A. I don't -- I can't remember the -- the first
11      year that they went, when they played in New
12      Orleans, I believe. And then the last one
13      that they played.
14   Q. And by they, you're referring to the Patriots?
15   A. Yes. I'm sorry.
16   Q. Who did you go with?
17         MR. XIFARAS: I would object on the Fifth
18      Amendment grounds that this may incriminate my
19      client, and I instruct him not to answer.
20         MR. KLEHM: Okay. Based on my
21      understanding of the Fifth Amendment privilege,
22      your client has already waived it. But are you
23      instructing him not to answer the question?
24         MR. XIFARAS: Yes.
```

Page 13

```
 1   Q. Could you tell me your educational background
 2      beginning with high school.
 3   A. Sure. Graduated from Falmouth High School.
 4   Q. Falmouth, Mass.?
 5   A. Yes.
 6   Q. What year?
 7   A. '83.
 8   Q. Any further formal education?
 9   A. No, just military after that.
10   Q. What branch?
11   A. Army.
12   Q. What years?
13   A. '84 through '87.
14   Q. What was your rank upon discharge?
15   A. It would be E-4.
16   Q. What were your duties?
17   A. The job title was cannon crewman, but I did
18      that for a little while. Then they had me in
19      arms room.
20         MR. YURKO: What was that?
21         THE WITNESS: Arms room. Working in the
22      arms room.
23   Q. What was the nature of your discharge?
24   A. It was honorable.
```

4  (Pages 10 to 13)

Page 14

1  Q. Are you still active in the service in any way?
2  A. No, sir.
3  Q. When you left the Army in '87, did you pursue any
4    further employment -- I'll withdraw it.
5      Where did you work after you left the
6    Army?
7  A. I did various -- I don't even remember the
8    jobs, really. I did various jobs until I
9    moved to Pennsylvania where I met my son's
10    mom.
11  Q. What kinds of jobs did you hold?
12  A. I worked for Loomis Armor for a period of
13    time which is an armor car company. I worked
14    for them for a period of time. But I do
15    remember before that working for a temp
16    agency, because I just moved out there, until
17    I found something.
18  Q. When did you first start working for International
19    Floor Crafts or Building 19?
20      MR. XIFARAS: I would object on the
21    grounds that it may incriminate him pursuant to his
22    Fifth Amendment privilege, and I would instruct him
23    not to answer.
24  Q. When you worked for Loomis Armor, which location

Page 15

1    did you work for?
2  A. I just remember I worked out of York,
3    Pennsylvania.
4  Q. How long did you work there?
5  A. I would go with it's safe to say at least
6    two years.
7  Q. What was the nature of the employment that you had
8    there? What did you do?
9  A. It depends. Sometimes you had to drive.
10    Sometimes you had to do -- which they call
11    was doing the book, which just meant you like
12    marked down when you got to a certain stop,
13    how long it took you to do whatever you had
14    to do and leave. And sometimes you were in
15    the back, depending on if it was a three-man
16    job or a two-man job. It all depends on how
17    big a volume that we had to pick up and
18    deliver.
19  Q. Did you leave there voluntarily?
20  A. Yes, because I moved back to Massachusetts.
21  Q. When did you move back to Mass.?
22  A. I'd say like maybe '91. '90 or '91, roughly.
23  Q. Have you ever had season tickets to the Patriots?
24      MR. XIFARAS: I object on the Fifth

Page 16

1    Amendment grounds that it provide a chain of
2    evidence against my client, and I instruct him not
3    to testify.
4      MR. KLEHM: Maybe at this point it makes
5    sense to have a short-hand version of it. Maybe if
6    you just said, "Fifth Amendment."
7      Is that acceptable to Mr. Yurko?
8      MR. YURKO: It's certainly acceptable to
9    me.
10  Q. Have you ever had any season tickets to any other
11    sports teams?
12      MR. XIFARAS: Fifth Amendment.
13  Q. Have you ever received any season tickets or
14    tickets of any kind to any events from any
15    individuals named Kevin Britto or David Adams?
16      MR. XIFARAS: Fifth Amendment.
17  Q. Do you know an individual named Kevin Britto?
18      MR. XIFARAS: Fifth Amendment.
19  Q. Do you know an individual named David Adams?
20      MR. XIFARAS: Fifth Amendment.
21      MR. YURKO: Can we break just for
22    two seconds?
23      MR. KLEHM: Yes.
24      (Mr. Yurko confers with Mr. Xifaras)

Page 17

1      MR. YURKO: I understand that it's going
2    to be Mr. Williams' intention to take the Fifth
3    Amendment on all substantive questions in this case
4    once we got beyond his biography. So without
5    further ado, I'm going to except myself from the
6    deposition and not continue to charge my client for
7    being here. I thank you for your hospitality.
8  BY MR. KLEHM:
9  Q. When you returned to Massachusetts, where did you
10    work?
11  A. When I returned to Massachusetts, I actually
12    just did part time at a men's clothing store
13    which is called BJ's. But it wasn't spelled
14    like a regular -- it was spelled weird,
15    differently. But that was just part time. I
16    actually was a full-time musician for like
17    years. That's all I did was just music. And
18    we just traveled like the East Coast just
19    doing music.
20  Q. Were you involved in a particular group or groups?
21  A. Just -- I was just in one group.
22      MR. KLEHM: Hold on one second, please.
23      (Discussion off the record)
24      (Mr. Yurko exits conference room)

5 (Pages 14 to 17)

Page 18

1    BY MR. KLEHM:
2    Q. What was the name of the group that you were
3       involved in?
4    A. New Friends was the name of the group.
5    Q. Did you ever generate any income from that
6       organization?
7    A. Yes.
8    Q. Tell me on an annual basis over the last five years
9       how much you've earned from New Friends.
10   A. Well, I'm not with them any longer.
11   Q. Well, let's go that way. When did you cease to be
12      involved with New Friends?
13   A. Maybe '95, '96.
14   Q. Are you involved in any musical ventures now?
15   A. Yes, sir.
16   Q. And what's that called if it has a group name?
17   A. T-Funk is the name of the band. That's T and
18      F-u -- exactly.
19   Q. And how much do you make from that group?
20   A. We're new right now. We've just only gone
21      for like five months or so. So I'd say we
22      play two to three times a month. And usually
23      those gigs only range from like $150 to $200
24      a weekend that we play. So if you want to

Page 19

1    average out between four and five a month
2    doing that.
3    Q. Let's do it this way. Since the time that you left
4       Building 19, International Floor Crafts, what have
5       you done for income?
6    A. I now work for Bay Colony Railroad.
7    Q. What do you do for them?
8    A. I just work on the maintenance crew.
9    Q. And you also do the music job?
10   A. Yes, sir.
11   Q. Any other sources of income?
12   A. No, sir.
13   Q. Do you know an individual named Pam Correia?
14        MR. XIFARAS: I object -- I'm sorry.
15      Fifth Amendment.
16   Q. Did you review any documents in preparing for your
17      deposition today?
18   A. No, sir. I didn't know I had to do that.
19      But I didn't go over any documents at all.
20   Q. Have you read the complaint in this case?
21   A. I read it when I first got -- started
22      getting -- receiving stuff in the mail from
23      it. So just in case that was going on, I
24      read some stuff for it.

Page 20

1    Q. Are the facts set forth in the complaint true?
2        MR. XIFARAS: Fifth Amendment.
3    Q. During what period of time did you work for
4       Building 19?
5        MR. XIFARAS: Fifth Amendment.
6    Q. What were your job titles during the time that you
7       worked for Building 19?
8        MR. XIFARAS: Fifth Amendment.
9    Q. What were your job duties during the time that you
10      work for Building 19?
11        MR. XIFARAS: Fifth Amendment.
12   Q. Have you spoken with any of the defendants in this
13      case from the time you first learned of the suit
14      until the present?
15        MR. XIFARAS: Fifth Amendment.
16   Q. To the extent that you did, who did you speak with?
17      What was discussed? When was it discussed? By
18      what means was the communication?
19        MR. XIFARAS: Fifth Amendment.
20   Q. Did you have any e-mail account?
21   A. No, sir.
22   Q. Have you ever?
23   A. No, never.
24   Q. Do you have a cell phone?

Page 21

1    A. I do.
2    Q. How long have you had the cell phone?
3    A. Maybe a month or two.
4    Q. How long have you had that cell phone number?
5    A. Maybe a month or two.
6    Q. During the time that you worked at Building 19, did
7       you have a cell phone?
8    A. Yes, I did.
9        MR. XIFARAS: Move to strike. Let me
10      make an objection. Fifth Amendment.
11   Q. What company or companies did you have that
12      particular cell phone number with during the time
13      you worked for Building 19?
14        MR. XIFARAS: Fifth Amendment.
15   Q. Do you remember -- strike that.
16        After you worked at the men's clothing
17      store which I think you said was BJ's, where did
18      you work next?
19   A. I want to say it was Colortyme Rentals, I
20      believe, which was like a rent to own type of
21      business.
22   Q. What did you do there?
23   A. I was actually -- I started off as a manager
24      trainee.

6 (Pages 18 to 21)

Page 22

1  Q. How long did you work there?
2  A. I'd say about two and a half -- two, two and
3     a half with them.
4  Q. Years?
5  A. Yes, sir.
6     MR. XIFARAS: I'm sorry. May I just
7     consult with my client for a second?
8     MR. KLEHM: Yes.
9     (Counsel confers with witness)
10 Q. So you worked at Colortyme for two, two and a half
11    years, correct?
12 A. Yes.
13 Q. What was the name of your supervisor there?
14 A. Well, when I was training, I just remember
15    his first name is Paul. That's all I
16    remember. I don't remember his last name.
17    But then after I got promoted to manager,
18    then I just had like district managers which
19    I, for the life of me, couldn't even tell you
20    because I very rarely even dealt with them.
21 Q. Which Colortyme store did you work at?
22 A. I started out in -- I believe it was New
23    Bedford. I think it's considered New
24    Bedford, or maybe it runs into Dartmouth.

Page 23

1     I'm not really sure. I think it's still
2     considered New Bedford, though. Then I
3     started out and once I passed the -- doing
4     the manager trainee thing, a store opened up
5     actually in Lafayette, Louisiana. They asked
6     me if I would transfer down there and I did.
7  Q. Did you work in any other Colortyme stores?
8  A. No, sir.
9  Q. After Colortyme, where did you work next?
10 A. Then I actually -- I believe I started with
11    Furniture City in sales.
12 Q. Okay. What were the circumstances surrounding your
13    leaving Colortyme?
14 A. I just moved back to Massachusetts.
15 Q. Where was the Furniture City located?
16 A. Which is in New Bedford.
17 Q. Did you grow up in New Bedford?
18 A. No, sir, I actually did not.
19 Q. Where did you grow up?
20 A. I basically grew up on the Cape.
21 Q. How long did you work for Furniture City?
22 A. I worked for them for about -- I'll go to say
23    between two and a half to three years.
24 Q. Did you serve as a receiver at any point when you

Page 24

1     worked at Furniture --
2  A. No. I was just in sales.
3  Q. Is Building 19 the only place where you served as a
4     receiver?
5     MR. XIFARAS: Fifth Amendment.
6  Q. What were the circumstances surrounding your
7     leaving Furniture City?
8  A. Just got sick -- got kind of burnt out with
9     sales because that's kind of like what I did
10    basically all my life is sales.
11 Q. Where did you work next?
12    MR. XIFARAS: Fifth Amendment.
13 Q. Is it true that you were hired to work at Building
14    19 on November 16th of '98 and that you worked
15    there until August 11th of 2005?
16    MR. XIFARAS: Fifth Amendment.
17 Q. Any other education, whether formal or informal, of
18    any kind that you had other than what you've
19    testified to?
20 A. No, sir. That would be it.
21 Q. Have you ever had any problems with drugs or
22    alcohol?
23 A. No, sir.
24 Q. Have you ever had any problems with gambling?

Page 25

1  A. No, sir.
2  Q. What was your role in the scheme involving the
3     stealing of money from Building 19 and/or
4     International Floor Crafts?
5     MR. XIFARAS: Fifth Amendment.
6  Q. Did you receive $1,500 per transaction that you
7     engaged in which was a fake transaction as part of
8     the scheme?
9     MR. XIFARAS: Fifth Amendment.
10 Q. How much did you receive from the scheme that's
11    described in the complaint or the amended complaint
12    in this case?
13    MR. XIFARAS: Fifth Amendment.
14 Q. By the way, are you married?
15 A. No, sir.
16 Q. Have you ever been married?
17 A. Yes, sir.
18 Q. I think you mentioned the name of your wife. What
19    was the name of your wife?
20 A. Actually, Tanya was my first wife. I was not
21    married to Zulma, nor Stacie.
22 Q. Okay. So you've been married once?
23 A. No. I actually was married twice. But my
24    second wife, we didn't have any kids or

7 (Pages 22 to 25)

Page 26

1  anything.
2  Q. What was the name of your second wife?
3  A. Anna, but I don't know if she's remarried or
4  anything.
5  Q. What was her name before she got married to you?
6  A. Azavedo.
7  Q. Could you spell that?
8  A. Not really.
9  Q. Okay. During what years were you married to Anna
10  Azavedo?
11  A. Okay. Let me try to figure it out.
12  Q. Well, let me make it easier for you. Were you
13  married to her at any point between 1998 and 2005?
14  MR. XIFARAS: Fifth Amendment.
15  MR. KLEHM: For that? Okay.
16  Q. Before you began working for Building 19, did you
17  have any experience in working in warehouses?
18  MR. XIFARAS: Fifth Amendment and
19  objection to the form.
20  Q. To the extent you did have any experience, what
21  experience did you have and where did you have it?
22  MR. XIFARAS: Fifth Amendment.
23  Q. Were you ever asked to falsify any documents at any
24  time during the time that you worked for

Page 27

1  International Floor Crafts?
2  MR. XIFARAS: Fifth Amendment.
3  Q. When did you last speak with Kevin Britto?
4  MR. XIFARAS: Fifth Amendment.
5  Q. As best you can recall, when did that take place,
6  what was said and who was present?
7  MR. XIFARAS: Fifth Amendment.
8  Q. Have you been convicted of any felonies within the
9  past year or misdemeanors within the past
10  five years?
11  A. No, sir.
12  Q. Have you ever been arrested?
13  A. Yes, sir.
14  Q. On how many occasions have you been arrested?
15  A. Just once, sir.
16  Q. And when was that?
17  A. I don't recall actually the year. I can just
18  tell you why, but I don't remember the --
19  Q. Okay. Why?
20  A. Just driving with a suspended license. I
21  lived in another state and not knowing that
22  my Mass. license was suspended. And I came
23  home to visit. That's when I found out.
24  Q. Okay. Who directed the scheme that's described in

Page 28

1  the amended complaint in this case?
2  MR. XIFARAS: Fifth Amendment.
3  Q. When did you first meet Kevin Britto?
4  MR. XIFARAS: Fifth Amendment.
5  Q. What were the circumstances under which you came to
6  work for International Floor Crafts?
7  MR. XIFARAS: Fifth Amendment.
8  Q. When you first began working for International
9  Floor Crafts, what were your duties?
10  MR. XIFARAS: Fifth Amendment.
11  Q. What were the circumstances under which you first
12  became aware of the scheme described in the amended
13  complaint and/or the possibility of the starting of
14  the scheme described in the amended complaint?
15  MR. XIFARAS: Fifth Amendment.
16  Q. How did you first learn that? From whom? What was
17  said to you? Where was it when it was said to you?
18  And what did you say?
19  MR. XIFARAS: Fifth Amendment.
20  MR. KLEHM: Let's go off for one second.
21  (Discussion off the record)
22  MR. KLEHM: As a result of consultation
23  with counsel off the record, I am going to group
24  many of my questions together, which normally would

Page 29

1  be objectionable as a compound question. But to
2  move this along, given the fact that your client is
3  exercising the Fifth Amendment as to most of the
4  questions I'm asking, I think it makes sense for
5  both the court reporter and for me. Is that
6  acceptable?
7  MR. XIFARAS: Yes, it is.
8  Q. When did you first meet David Adams?
9  MR. XIFARAS: Fifth Amendment.
10  Q. What were the circumstances under which you first
11  met David Adams?
12  MR. XIFARAS: Fifth Amendment.
13  Q. Have you ever gone gambling with David Adams? If
14  you have, when did you go? Who provided the
15  sources or source of funding? Who went with you?
16  And what was the source of the funds that you used
17  while gambling?
18  MR. XIFARAS: Fifth Amendment.
19  MR. KLEHM: By the way -- I'll ask this
20  on the record -- your client also owes me financial
21  statements and bank statements. That's a part of
22  the motion to compel. Do you have those today?
23  MR. XIFARAS: We have an affidavit. He
24  does not have any bank accounts from January '06 to

8  (Pages 26 to 29)

Page 30

1    the present. We are in the process of getting his
2    work records as far as his financial statements.
3    As you can see, even January is -- as of August 28,
4    we had to change what we have. We do not have them
5    done.
6        MR. KLEHM: So you just handed me a
7    financial statement for Tyrone Williams.
8        MR. XIFARAS: It's not final.
9        MR. KLEHM: Not final dated January of
10   2006. Do you have any objection if I mark this?
11       MR. XIFARAS: As long as -- no, no
12   objection. Is the draft marked?
13       MR. KLEHM: It's okay if you write
14   "Draft" on it. That's fine with me. And then
15   you've also handed me a similar draft of a
16   financial statement for February 2006 which also
17   has various markings on it. I'm going to mark this
18   as well.
19       Can we just mark these.
20       (Documents marked as Williams
21       Exhibits 1 to 3 for
22       identification)
23   Q. Mr. Williams, I'm showing you what's been marked as
24   Deposition Exhibit No. 1. It says, "Affidavit of

Page 31

1    Tyrone K. Williams." Do you recognize that?
2    A. (Witness reviews document) Yes, sir.
3    Q. And what do you recognize it to be?
4    A. You know, I don't have accounts, a bank
5    account.
6    Q. You recognize it to be your affidavit?
7    A. Yes, sir.
8    Q. And at the bottom, there's a signature in blue ink.
9        Is that your signature?
10   A. Yes, sir.
11   Q. And when did you sign this document?
12   A. It was either Monday or Tuesday, I guess it
13   was, of this --
14   Q. Of this particular week?
15   A. Yes, sir.
16   Q. Okay. Because it says, "Signed under the pains and
17   penalties of perjury this 28th day," and it doesn't
18   give the month.
19       MR. XIFARAS: Is it okay if he dated it
20   right here?
21   Q. If you want -- and I'll give you a pen. And if you
22   could write in "August" and then put your initials
23   somewhere there, that would be great.
24   A. All right. Is it all right to put "August"

Page 32

1    in parentheses next to that?
2    Q. Yes, just as long as you put your initials above
3    it.
4    A. (Witness complies) Okay.
5    Q. Your middle name is Keith; is that correct?
6    A. Yes, sir.
7    Q. Have you ever been known by any other name other
8    than Tyrone Williams or Tyrone Keith Williams?
9    A. No, sir.
10   Q. Where do you keep your funds currently day to day?
11   A. If you figure I get paid on Friday from my
12   regular job and, like I said, if I happen
13   to -- which we call gig in the band on the
14   weekend, just whatever I get just goes to
15   either paying bills or just surviving.
16   Basically, that's it. So I don't have any
17   money saved or anything like that.
18   Q. Have you kept your monthly expenses below $3,000
19   per month?
20   A. Yes, sir.
21   Q. Do you have documentation that would show that?
22   A. Just my pay stubs that I get from work.
23   Q. Do you have your pay stubs? While he's looking --
24       MR. KLEHM: Is it all right if I keep

Page 33

1    going, Mr. Xifaras?
2        MR. XIFARAS: Sure.
3    Q. How much do you make at the railroad?
4    A. On an hourly --
5    Q. Sure.
6    A. $12 an hour.
7    Q. And how many hours a week do you put in?
8    A. Average, 40 hours a week.
9    Q. And do you get overtime if you go over 40?
10   A. Yes.
11       MR. XIFARAS: Those are incomplete.
12   Q. Your counsel just handed me a set of -- and I don't
13   know how many yet -- what appear to be pay stubs.
14   Are these your pay stubs for where you work at the
15   railroad?
16   A. Yes, sir.
17       MR. KLEHM: Did you say they were or were
18   not complete?
19       MR. XIFARAS: They're incomplete. That's
20   why I'm having problems.
21   Q. These pay stubs appear to go from roughly February
22   to this week?
23       MR. XIFARAS: They're not in order. I'm
24   sorry. January -- we'd say from January of '06 to

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 34

1   this week.
2       MR. KLEHM: So what I'd like to do is to
3   mark this. And then I'll make copies of it, and he
4   can take the originals back. Is that acceptable?
5       MR. XIFARAS: That's fine, sure.
6       MR. KLEHM: Let me read into the record
7   the stub numbers for each of them.
8       The stub numbers are 43235; 43269; 43320;
9   43109; 43175; 43438; 43549; 43609; 43664; 43904;
10  43726; 43801; 43846; 43384; 44036; 44065; 44119;
11  44181; 44210; 44242; 44285; 44353; 44374; 44437;
12  44492; and 44591. So we'll just mark that as --
13  one sticker is fine, since we have the numbers in
14  there.
15      (Pay stubs marked as Williams
16      Exhibit 4 for identification)
17  Q. Mr. Williams, I'm just going to show you Exhibit 4.
18  I read the numbers of the various invoices into the
19  record. Can you just confirm for me that these are
20  the invoices that you do have running from January
21  of '06 to the present?
22  A. Yes.
23  Q. Now I'm going to show you Exhibit 2 which is your
24  financial statement from January of 2006. Once the

Page 35

1   changes that are marked on Exhibit 2 are made, is
2   Exhibit 2 going to be accurate?
3   A. Yes, sir.
4   Q. With regard to Exhibit 3, there are some
5   handwritten changes as well. Once the changes are
6   made to Exhibit 3, will it then be accurate for
7   February of '06?
8   A. Yes, sir.
9   Q. Have you prepared March, April, May or June or July
10  or August yet?
11      MR. XIFARAS: We have drafts but they're
12  not -- I'll show them to you, if you'd like.
13  They're not even -- I told you the file numbers.
14  Sorry. That's what we have. But I don't think
15  they even come close to a draft.
16      MR. KLEHM: Okay. Well, what you've
17  given me appear to be financial statements for each
18  of the months from March to August. They're
19  unsigned. The mortgage amount is crossed out. And
20  in some places, the payment of loan re: attorneys'
21  fees is crossed out.
22  Q. Are these financial statements accurate for the
23  months of March through August 2006 with the
24  changes indicated?

Page 36

1   A. (Witness reviews documents) Yes, sir.
2       MR. KLEHM: Okay. If that's the case,
3   then why don't I just mark this as one exhibit.
4       (Document marked as Williams
5       Exhibit 5 for identification)
6   Q. Sir, I'm going to just show you again Exhibit 5 and
7   confirm -- have you confirm that Exhibit 5
8   represents your financial statements from March
9   through August 2006; is that correct?
10  A. Yes, sir.
11      MR. XIFARAS: I would just note an
12  objection that they're incomplete and probably not
13  even halfway done yet.
14  Q. Well, what is incomplete about them, sir?
15  A. For example, like the band that I am in now,
16  because we are starting to play more now, so
17  just trying to remember the dates that we've
18  done, I have to contact one of the guys to
19  get like accurate dates and not try to guess
20  off the top of my head.
21  Q. Other than adding in your income from the band, any
22  other income?
23  A. It would just be my job and that.
24  Q. Have you filed income tax returns from '98 to the

Page 37

1   present?
2   A. Yes, I have, sir.
3   Q. Did you include income from the scheme which is the
4   subject of the amended complaint?
5       MR. XIFARAS: Fifth Amendment.
6   Q. And how much income did you make from the scheme
7   which is the subject of the complaint?
8       MR. XIFARAS: Fifth Amendment.
9   Q. There's an individual sitting to my left named Bill
10  Elovitz. Have you ever met Bill?
11      MR. XIFARAS: Fifth Amendment.
12  Q. When did you first meet Bill?
13      MR. XIFARAS: Fifth Amendment.
14  Q. And there's also a Joanne Cameron and a Bill Gemme.
15  Have you ever met either of those people?
16      MR. XIFARAS: Fifth Amendment.
17  Q. And if so, when did you first meet them?
18      MR. XIFARAS: Fifth Amendment.
19  Q. Have you ever discussed the scheme which is the
20  subject of the amended complaint with anyone other
21  than your counsel?
22      MR. XIFARAS: Fifth Amendment.
23  Q. To the extent that you have, who have you spoken
24  with? When did you speak to them? What was said?

10 (Pages 34 to 37)

Page 38

1      Who was present? And what were the means of
2    communication?
3         MR. XIFARAS: Fifth Amendment.
4    Q. Let's talk about a couple of documents.
5         (Document marked as Williams
6         Exhibit 6 for identification)
7    Q. Mr. Williams, I'm showing you what's been marked as
8    Exhibit 6 and ask you, do you recognize any of the
9    pages in that?
10        MR. XIFARAS: Fifth Amendment.
11   Q. If so, what do you recognize them to be?
12        MR. XIFARAS: Fifth Amendment.
13   Q. Does your signature appear on any of the pages of
14   Exhibit 6?
15        MR. XIFARAS: Fifth Amendment.
16   Q. What were the circumstances under which you signed
17   and/or prepared any of the documents contained in
18   Exhibit 6?
19        MR. XIFARAS: Fifth Amendment.
20   Q. Tell me all of the persons that you spoke with in
21   regard to the preparation of any of the documents
22   contained in Exhibit 6 and/or signing of any of the
23   documents contained in Exhibit 6 before you signed
24   the document, what was said, what were the means of

Page 39

1    communication, and who else was present.
2         MR. XIFARAS: Fifth Amendment.
3    Q. Also in answer to that, I need to know when those
4    conversations took place.
5         MR. XIFARAS: Fifth Amendment.
6    Q. Have you ever at any time altered any of the
7    documents included in Exhibit 6?
8         MR. XIFARAS: Fifth Amendment.
9    Q. And if so, when?
10        MR. XIFARAS: Fifth Amendment.
11        (Document marked as Williams
12        Exhibit 7 for identification)
13   Q. Mr. Williams, have you ever heard of the name Jane
14   Dziemit?
15        MR. XIFARAS: Fifth Amendment.
16   Q. Who is Jane Dziemit? When did you first meet with
17   her? Tell me all the conversations that you've had
18   with her, if you have, what the substance of those
19   conversations were, when they took place, by what
20   means they took place and who was present.
21        MR. XIFARAS: Fifth Amendment.
22   Q. Same series of questions for an individual named
23   Tony Marasco.
24        MR. XIFARAS: Fifth Amendment.

Page 40

1    Q. Let me show you what's been marked as Exhibit 7.
2    A. (Witness reviews document)
3    Q. Do you recognize any of the pages contained in
4    Exhibit 7 which is also Exhibit 6 to the Mitchell
5    deposition?
6         MR. XIFARAS: Fifth Amendment.
7    Q. Did you prepare or participate in the preparation
8    of any of the documentation contained in Exhibit 7?
9         MR. XIFARAS: Fifth Amendment.
10   Q. The first page is an agreement for sale of goods.
11   What were the circumstances under which that
12   document was prepared?
13        MR. XIFARAS: Fifth Amendment.
14   Q. Were the documents that include the first eight
15   pages of Exhibit 7, were they prepared on the date
16   that's listed at the top of each of those documents
17   in handwriting?
18        MR. XIFARAS: Fifth Amendment.
19   Q. And if so, why? And if not, why?
20        MR. XIFARAS: Again, Fifth Amendment.
21   Q. At the last -- sorry. On the last page of
22   Exhibit 7, there is a note that says, "Please call
23   Tyrone Williams to set up delivery." Do you see
24   that?

Page 41

1    A. (Witness reviews document) Yes, sir.
2    Q. Okay. Whose handwriting is that?
3         MR. XIFARAS: Fifth Amendment.
4    Q. What were the circumstances under which a note
5    would be written, "Call Tyrone Williams to set up
6    delivery"?
7         MR. XIFARAS: Fifth Amendment.
8    Q. Were notes such as that a note to give you an
9    indication that there was a fake shipment to be
10   made?
11        MR. XIFARAS: Fifth Amendment.
12   Q. And was a note such as that set up so that you
13   would be involved in making the fake transaction go
14   forward?
15        MR. XIFARAS: Fifth Amendment.
16   Q. Did you receive a copy of the last page of
17   Exhibit 7 during the time that you worked at
18   Building 19?
19        MR. XIFARAS: Fifth Amendment.
20   Q. Do you have any documents at your home that relate
21   in any way to Building 19?
22   A. No, sir.
23   Q. Any documents at home that relate in any way to
24   International Floor Crafts?

11 (Pages 38 to 41)

Page 42

1  A. No, sir.
2  Q. During the time that you worked for International
3     Floor Crafts, did you bring any of your work home?
4        MR. XIFARAS: Fifth Amendment.
5  Q. If so, what did you bring home and where are those
6     documents today?
7        MR. XIFARAS: The same, Fifth Amendment.
8  Q. Since the time that you left International Floor
9     Crafts, have you had any documents belonging to
10    International Floor Crafts in your possession?
11       MR. XIFARAS: Fifth Amendment.
12 Q. If so, what documents have you had in your
13    possession?
14       MR. XIFARAS: The same, Fifth Amendment.
15 Q. How would you find out that a fake shipment or a
16    partially fake shipment was going to happen?
17       MR. XIFARAS: Fifth Amendment.
18 Q. What would you do upon learning that a fake
19    shipment would take place?
20       MR. XIFARAS: Fifth Amendment.
21 Q. What role did Tony Marasco play in the scheme
22    outlined in the amended complaint?
23       MR. XIFARAS: Fifth Amendment.
24 Q. What role did Jane Dziemit play in that scheme?

Page 43

1        MR. XIFARAS: Fifth Amendment.
2        MR. KLEHM: By the way, if you need to
3     take a break at any time, just let me know.
4        THE WITNESS: Okay.
5        (Document marked as Williams
6        Exhibit 8 for identification)
7  Q. Mr. Williams, I'm going to show you what's been
8     marked as Exhibit 8. I'm going to ask you if you
9     recognize the documents; and if so, what are they?
10       MR. XIFARAS: Fifth Amendment.
11 Q. Could you read for me the note that appears under
12    "Receiving Instructions" and tell me why it is that
13    that note would appear on that particular document.
14 A. Where are we, sir? What page?
15 Q. The first page.
16       MR. XIFARAS: Fifth Amendment.
17 Q. On the third page of Exhibit 8 which at the top
18    says "Exhibit G," there's a signature. Is that
19    your signature?
20       MR. XIFARAS: Fifth Amendment.
21 Q. To the extent it is your signature, when did you
22    write your signature on this? What was the purpose
23    of writing your signature? And what act or acts
24    did you do before writing your signature as a part

Page 44

1     of the scheme?
2        MR. XIFARAS: Fifth Amendment.
3  Q. There's also the initials "TW" to the left -- to
4     the right-hand side of this document under "Order
5     Checked By." Did you enter those initials?
6        MR. XIFARAS: Fifth Amendment.
7  Q. If so, what were the circumstances under which you
8     entered those initials?
9        MR. XIFARAS: Fifth Amendment.
10 Q. Describe for me in a legitimate transaction
11    involving International Floor Crafts what your role
12    would be as a part of the shipping process.
13       MR. XIFARAS: Fifth Amendment.
14 Q. Tell me every person that you would become involved
15    in during your effectuating a normal shipping
16    process as part of your work.
17       MR. XIFARAS: Fifth Amendment.
18 Q. During the course of a shipment or a fake shipment
19    or a partially fake shipment that was not
20    legitimate, tell me the names of every person that
21    you would become involved with and what their
22    individual roles would be.
23       MR. XIFARAS: Fifth Amendment.
24 Q. On the first page of Exhibit 8, where did the

Page 45

1     information come from that was filled in to the
2     purchase order?
3        MR. XIFARAS: Fifth Amendment.
4  Q. Same question with regard to every page of
5     Exhibit 8 with the exception of the check.
6        MR. XIFARAS: Same objection, Fifth
7     Amendment.
8  Q. Did the entity known as Mansfield Rug ever exist?
9        MR. XIFARAS: Fifth Amendment.
10 Q. The same question for Dalton Padding, REMCO, and
11    Empire Weavers?
12       MR. XIFARAS: Fifth Amendment.
13 Q. What did you do with the money that you obtained as
14    a result of the scheme alleged in the amended
15    complaint?
16       MR. XIFARAS: Fifth Amendment.
17 Q. Was there ever a time at which Kevin Britto
18    threatened to or did order you to stop the fake
19    shipments?
20       MR. XIFARAS: Fifth Amendment.
21 Q. If so, describe the circumstances surrounding that.
22       MR. XIFARAS: Fifth Amendment.
23 Q. Did you take orders and/or instructions from Kevin
24    Britto as a part of this scheme as set forth in the

12 (Pages 42 to 45)

Page 46

1    amended complaint?
2        MR. XIFARAS: Fifth Amendment.
3    Q. Describe for me the relationship between you and
4    Kevin Britto from '98 up to '05.
5        MR. XIFARAS: Fifth Amendment.
6    Q. Describe for me the nature of your relationship
7    with David Adams from '98 up to '05.
8        MR. XIFARAS: Fifth Amendment.
9    Q. Is there anyone who is not a named defendant in
10    this case who was involved in the scheme as
11    described in the amended complaint?
12        MR. XIFARAS: Fifth Amendment.
13        MR. KLEHM: Can I get that one marked.
14        (Document marked as Williams
15        Exhibit 9 for identification)
16    Q. Mr. Williams, I'm going to present you with
17    Exhibit 9 which is a number of documents which at
18    the top say, "To Whom It May Concern." Do you
19    recognize these documents? If so, what do you
20    recognize them to be? What are the circumstances
21    under which they were prepared? Who prepared them?
22    Would you see them at all in the course of your
23    duties at International Floor Crafts? And if so,
24    when would you see them? And what, if anything,

Page 47

1    would you do with these documents if you saw them?
2        MR. XIFARAS: Fifth Amendment.
3    Q. Do you recognize the signature of David Adams? And
4    does the signature of David Adams appear on any of
5    the pages of Exhibit 9?
6        MR. XIFARAS: Fifth Amendment.
7    Q. Have you spoken to the state police in this case?
8    A. Yes, I did.
9    Q. On how many occasions?
10    A. I believe it was just twice.
11    Q. And the first time you didn't talk to them, right?
12    A. Yes, sir.
13    Q. And the second time you did talk to them, correct?
14    A. Yes, sir.
15    Q. And when you spoke to them the second time, that
16    was as a result of Kevin Britto telling you you can
17    go ahead and talk to them, right?
18        MR. XIFARAS: Fifth Amendment.
19    Q. And when you spoke to them the second time, was
20    Kevin Britto present either by phone or in person?
21        MR. XIFARAS: Fifth Amendment.
22    Q. As best you can recall, what did the state police
23    say to you and what did you say to them?
24        MR. XIFARAS: Fifth Amendment.

Page 48

1        MR. KLEHM: Let's go off the record for a
2    second.
3        (Discussion off the record)
4        MR. KLEHM: Let's go back on.
5    Q. Who was present at that conversation?
6    A. Just myself and the officer that I was
7    talking to.
8    Q. Do you remember the officer's name?
9    A. (Witness shakes head)
10    Q. Is that a no? You have to say it out loud.
11    A. No, sir. Sorry.
12    Q. Where did it take place?
13    A. They actually came to my home.
14    Q. Do you remember when?
15    A. I just remember the month, sir, which was
16    August. I don't remember the date to be
17    exact.
18    Q. Was it before or after you were let go by Building
19    19?
20        MR. XIFARAS: Fifth Amendment.
21    Q. Was it early August? Mid-August? Late August?
22    A. I guess it would be considered early August,
23    between early and mid-August. I know it
24    wasn't late August, though.

Page 49

1    Q. How long did the second meeting last?
2    A. Maybe just a few hours. It really wasn't
3    that long, actually.
4    Q. A few hours?
5    A. If that. If that.
6    Q. Did you have a lawyer present?
7    A. No, sir.
8    Q. Have you spoken to the state police since?
9    A. No, sir.
10    Q. I think we were on Exhibit 9. Did Ronald Mitchell
11    ever ask you to falsify any documents? And if so,
12    did you? What were the circumstances under which
13    you did? And tell all of the acts that you did
14    with regard to that falsification of the document.
15        MR. XIFARAS: Fifth Amendment.
16        (Document marked as Williams
17        Exhibit 10 for identification)
18    Q. Did you ever date Pam Correia?
19    A. No, sir.
20    Q. Have you talked to her about this case?
21        MR. XIFARAS: Fifth Amendment.
22    Q. I'm going to show you what's been marked as
23    Exhibit 10. Do you recognize it? What do you
24    recognize it to be? Is that your signature in the

13 (Pages 46 to 49)

Page 50

1  center? What were the circumstances under which
2  you signed it? Did you participate in the
3  preparation of the document? Did you participate
4  in obtaining the document? And what did you do
5  with the document once you signed it?
6  　　　　MR. XIFARAS: Fifth Amendment.
7  　　　　(Document marked as Williams
8  　　　　Exhibit 11 for identification)
9  Q. Sir, I'm showing you what's been marked as
10  Exhibit 11.
11  A. (Witness reviews document)
12  Q. First of all, do you recognize the document? What
13  do you recognize it to be? Is that your signature?
14  Is this a fraudulently prepared document? If so,
15  how do you know that? Who asked you to prepare
16  this document? When was it prepared? Did you fax
17  it to anyone? What were the circumstances under
18  which you signed it?
19  　　　　MR. XIFARAS: Fifth Amendment.
20  Q. Have you ever had any discussions with anyone
21  regarding Exhibit 11 at any time?
22  　　　　MR. XIFARAS: Fifth Amendment.
23  Q. To the extent that you did, what did you say to
24  that person or persons? What did they say to you?

Page 51

1  When was the conversation? What were the means of
2  the conversation? What exactly was said?
3  　　　　MR. XIFARAS: Fifth Amendment.
4  Q. Have you ever been to Ronald Mitchell's home?
5  　　　　MR. XIFARAS: Fifth Amendment.
6  　　　　(Document marked as Williams
7  　　　　Exhibit 12 for identification)
8  Q. Have you ever been deposed before?
9  A. No, sir.
10  Q. Have you ever been a party to any lawsuits before?
11  A. No, sir.
12  Q. I'm going to show you what's been marked as
13  Exhibit 12. And as I said, this will be a quick
14  one. So I'll just do the questions now. Actually,
15  hold on one second. Actually, 12 is the same as
16  Exhibit 8 for some reason. So I'm just going to
17  move on from 12. I apologize.
18  　　　　(Document marked as Williams
19  　　　　Exhibit 13 for identification)
20  Q. Sir, I'm showing you what's been marked as
21  Exhibit 13. I'm going to ask you if you recognize
22  it. If so, what do you recognize it to be? What
23  were the circumstance under which it was prepared?
24  How did it come to be that Dave Adams was listed as

Page 52

1  the contact person? Where did the information for
2  the manufacturer's number, description, quantity,
3  cost price, sell price and department come from?
4  How was the rating determined?
5  　　　　Is that your signature on the third page
6  of the document? What were the circumstances under
7  which you signed it? Where did you get the
8  information contained in the make, description and
9  quantity on that third page of the document? Was
10  any document ever delivered as represented in this
11  particular transaction? To the extent it was, what
12  was delivered?
13  　　　　There's also a reference to a "TW" under
14  "Order Checked By." Did you check the order? What
15  did you observe when you checked the order? Above
16  that, it says "Merchandise Checked By" with your
17  initials. What did you do to go about checking the
18  order? There's also a reference to "VR" and a
19  couple of other initials. What do those stand for?
20  How much profit did you make from this particular
21  transaction? What does the note mean at the bottom
22  of the third page?
23  　　　　MR. XIFARAS: Fifth Amendment.
24  　　　　MR. KLEHM: May I see that for a minute,

Page 53

1  please.
2  　　　　MR. XIFARAS: Sure.
3  　　　　MR. KLEHM: Can we take a two-minute
4  break?
5  　　　　MR. XIFARAS: Yes.
6  　　　　(Recess taken)
7  　　　　(Documents marked as Williams
8  　　　　Exhibits 14 to 16 for
9  　　　　identification)
10  Q. Mr. Williams, I'm going to show you what's been
11  marked as Exhibit 14. And I'm just going to read
12  the numbers into the record here. It's 043936,
13  044534. They appear to be additional pay stubs for
14  you. Is that what these are?
15  A. Yes, sir.
16  Q. Okay. I'm also going to show you two additional
17  pay stubs. I'll read their numbers in. 1840327485
18  and 1840327503. These appear to be pay stubs for
19  Labor Ready Northeast, Inc. Is that what these
20  are?
21  A. Yes, sir.
22  Q. And do they — there's two of them. They've been
23  marked as Exhibit 15. Do they show certain pay
24  that you received for working for the temp agency

14 (Pages 50 to 53)

Page 54

1    you talked about earlier?

2  A. Yes, sir.

3  Q. Were there other pay stubs for working at this

4    particular location?

5  A. Those are it right there, sir.

6  Q. And what you're pointing to is what's been marked

7    as Exhibit 16 which consists of five pages of some

8    sort of a pay stub or payroll receipt? Is that

9    what these are?

10 A. Yes, sir.

11 Q. Now, combining 15 and 16, do these represent all of

12   the pay stubs that you received from Labor Ready

13   Northeast, Inc.?

14 A. I'm pretty sure. It's not total. They put

15   you to work when they can. And I never like

16   wrote down like every day that they put me to

17   work.

18 Q. When did you last work for Labor Ready?

19 A. It was in January.

20 Q. Do you know an individual named Tito Perez?

21       MR. XIFARAS: Fifth Amendment.

22 Q. Have you ever shown up -- strike that.

23       Did you ever show up at International

24   Floor Crafts or Building 19 while intoxicated or

Page 55

1    under the influence of any narcotics?

2       MR. XIFARAS: Fifth Amendment.

3  Q. To the extent that you did, when did you show up in

4    that condition? What were the circumstances under

5    which you showed up in that condition? And -- I'll

6    leave it at that.

7       MR. XIFARAS: Fifth Amendment.

8  Q. Did you ever use drugs or alcohol while in the

9    workplace at International Floor Crafts and/or in

10   Building 19?

11      MR. XIFARAS: Fifth Amendment.

12 Q. To the extent that you did, when did you use it?

13   Who did you use it with? What did you use? And

14   where were you when you used it?

15      MR. XIFARAS: Fifth Amendment.

16      (Document marked as Williams

17      Exhibit 17 for identification)

18 Q. Sir, I'm going to show you what's been marked as

19   Exhibit 17. Have you ever heard of CCC

20   International?

21      MR. XIFARAS: Fifth Amendment.

22 Q. If so, when did you first learn of them? And what

23   have you heard about them?

24      MR. KLEHM: Fifth Amendment to that?

Page 56

1       MR. XIFARAS: Oh, yes. Sorry. Fifth

2    Amendment to that one.

3  Q. Was CCC International involved in the scheme set

4    forth involved in the amended complaint? And if

5    so, how? And how did you know that?

6       MR. XIFARAS: Fifth Amendment.

7  Q. Have you ever spoken to a John Sun, a David Sun or

8    a Paul Sun at any time? If so, when did you talk

9    to them? What did you discuss? Did you discuss

10   the scheme that's the subject of the amended

11   complaint? And if you did, what did you discuss

12   about that? What were the means of discussion?

13   And who was present, if anyone?

14      MR. XIFARAS: Fifth Amendment.

15 Q. The second page of Exhibit 17, is that your

16   signature? What were the circumstances under which

17   you signed it? Who are the initials set forth

18   under "Merchandise Checked By"? What were the

19   circumstances under which the names -- the letters

20   "TW" were entered under "Order Checked By"?

21      MR. XIFARAS: Fifth Amendment.

22      (Document marked as Williams

23      Exhibit 18 for identification)

24 Q. Sir, I'm showing you Exhibit 18. Do you recognize

Page 57

1    the document? What were the circumstances under

2    which it was prepared? Who is Mike Brown? What

3    was your role in this transaction? Is this a full

4    shipment, a partial shipment, a fake shipment of

5    any kind? If so, how? Is that your signature on

6    the third page? What were the circumstances under

7    which "TW" was written under "Order Checked By"?

8    What are the initials written under "Merchandise

9    Checked By"? How did you get the information that

10   was filled in on the third page? Whose handwriting

11   is on that third page?

12      MR. XIFARAS: Fifth Amendment.

13      (Document marked as Williams

14      Exhibit 19 for identification)

15 Q. Sir, who is Diane Spignosi?

16      MR. XIFARAS: Fifth Amendment.

17 Q. Have you ever met her? When did you first meet

18   her? Have you spoken to her? If so, what have you

19   spoken to her about and when?

20      MR. XIFARAS: Fifth Amendment.

21 Q. Do you recognize any of the documents contained in

22   Exhibit 19? What do you recognize them to be? Is

23   that your signature on the third page of

24   Exhibit 19? What information was used in preparing

15 (Pages 54 to 57)

Page 58

1 the document? Is your handwriting on the third
2 page of Exhibit 19? Did you participate at all in
3 the preparation of the fourth page of Exhibit 19?
4 Is this -- the transaction represented by these
5 documents in Exhibit 19 a fake transaction or a
6 legitimate transaction? If so, what role did you
7 play in that? And what income did you receive as a
8 result of it?
9        MR. XIFARAS: Fifth Amendment.
10 Q. Is it true that the bulk of the fake shipments
11    involved remnants and not manmades or handmades?
12        MR. XIFARAS: Fifth Amendment.
13 Q. To the extent that it's not true, could you explain
14    why that's not true?
15        MR. XIFARAS: Fifth Amendment.
16        (Document marked as Williams
17        Exhibit 20 for identification)
18 Q. Sir, I'm showing you what's been marked as
19    Exhibit 20. Do you recognize it? What do you
20    recognize it to be? Is that your signature on the
21    first page of Exhibit 20? There's a reference to
22    EW truck. What does that mean? Did Empire Weavers
23    have any trucks? Where did you get the information
24    used in this bill of lading? Did you prepare this

Page 59

1 bill of lading? From whom did you receive this
2 bill of lading if you did not prepare it? Did you
3 have any discussions with anyone regarding the
4 preparation of this document, including Ronald
5 Mitchell? To the extent that you did, what did you
6 say to him and what did he say to you? Or what did
7 you say to any person you had a discussion with
8 about this document, and what did they say to you?
9 The same set of questions as to the second page of
10 Exhibit 20.
11        MR. XIFARAS: Fifth Amendment.
12        MR. KLEHM: I thought we did Dalton
13 Padding, but I guess we didn't. So I will do one
14 now.
15        (Document marked as Williams
16        Exhibit 21 for identification)
17 Q. Sir, I'm going to show you what's been marked as
18    Exhibit 21 and ask you if you recognize it? If so,
19    what do you recognize it to be? Did you
20    participate in the preparation of this document?
21    Who is Tim Breeden? Did you discuss these
22    documents at all with Tim Breeden? If you did,
23    what was discussed? Was Tim Breeden involved in
24    the scheme at all? If so, how? Did you earn any

Page 60

1 income as a result of this transaction? If so,
2 what income did you earn? Is your signature on the
3 fourth page of this document? Is this your
4 handwriting? To the extent that it is, what did
5 you use in preparing this document? What
6 discussions did you have with either Kevin Britto
7 or David Adams with regard to this document? And
8 what income, if any, did they earn from this
9 particular transaction?
10        MR. XIFARAS: Fifth Amendment.
11 Q. During the course of the scheme as set forth in the
12    amended complaint, how were the proceeds of the
13    scheme distributed to the various participants?
14        MR. XIFARAS: Fifth Amendment.
15 Q. How much did Kevin Britto earn from the scheme
16    itself and from each individual transaction as a
17    part of the scheme?
18        MR. XIFARAS: Fifth Amendment.
19 Q. How much did David Adams earn from the scheme
20    itself and from each individual transaction as a
21    part of the scheme?
22        MR. XIFARAS: Fifth Amendment.
23 Q. How much did Ronald Mitchell earn from the scheme?
24        MR. XIFARAS: Fifth Amendment.

Page 61

1 Q. How much did Michael Brown earn from the scheme?
2        MR. XIFARAS: Fifth Amendment.
3 Q. How much did you earn from the scheme?
4        MR. XIFARAS: Fifth Amendment.
5 Q. How were you paid as a part of this scheme, and who
6    paid you and when?
7        MR. XIFARAS: Fifth Amendment.
8 Q. List each and every instance in which you received
9    money as a result of this scheme, the format in
10    which it was received, who gave it to you, and what
11    you did with it.
12        MR. XIFARAS: Fifth Amendment.
13 Q. Is any money owed to you as a part of this scheme
14    today?
15        MR. XIFARAS: Fifth Amendment.
16 Q. When did you last receive any funds from this
17    scheme?
18        MR. XIFARAS: Fifth Amendment.
19 Q. What, if any, was your involvement with the wood
20    flooring purchase that led to the end of the scheme
21    as described in the amended complaint?
22        MR. XIFARAS: Fifth Amendment.
23 Q. When you were making only $1,500 per shipment, did
24    you know how much Kevin Britto and/or David Adams

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 62

1    were getting?
2        MR. XIFARAS: Fifth Amendment.
3    Q. What's the most amount of money that you made in
4      any year as a result of your work in the music
5      industry?
6    A. A year?
7    Q. Yes.
8    A. Honestly, I don't even have a clue because
9      it's just -- it's nothing that's steady.
10   Q. Was it ever more than $10,000?
11   A. No.
12   Q. Have you ever won any lottery game or games of
13     chance?
14   A. No.
15   Q. Have you ever won any significant income from any
16     gambling?
17   A. No.
18   Q. Do you play a certain instrument in the band?
19   A. Yes, sir.
20   Q. What do you play?
21   A. I'm a percussion player.
22   Q. And by that you mean the drums?
23   A. Percussion in general, drums.
24   Q. Do you sing as well?

Page 63

1    A. Yes, sir.
2    Q. Did you have a Web site set up?
3    A. Yes, we do, sir.
4    Q. And what's the name of the Web site?
5    A. It's www.tfunkband.com.
6    Q. So would that be the letter "T" f-u-n-k.com?
7    A. Yes, sir.
8    Q. Do you have any other Web sites set up for that
9      group?
10   A. No, sir.
11   Q. How many members are in the band?
12   A. There are six of us, sir.
13   Q. Did Ronald Mitchell ever call you directly at
14     International Floor Crafts? If he did, when did he
15     call you? What did you discuss with him? Did he
16     ever leave a message for you? If he did, what was
17     the substance of the message?
18       MR. XIFARAS: Fifth Amendment.
19   Q. I'm going to give you a list of names now. And I'm
20     going to ask you the following questions with
21     regard to each of these names:
22         Number one, did they participate at all
23     in the scheme as set forth in the amended
24     complaint?

Page 64

1        Number two, have you ever discussed the
2    scheme with them? If so, what did you discuss with
3    them? When did you discuss it? Who was present?
4    And what were the means of the communication?
5        Thirdly, what act or acts, if any, did
6    each of these particular persons perform in
7    furtherance of the scheme whether or not they knew
8    they were a part of the scheme?
9        And fourth, what deceptions or lies or
10   misstatements did you or any other member of this
11   scheme make to these individuals as a part of the
12   scheme?
13       And then fifth, have you discussed this
14   case and/or the scheme which is the subject of the
15   amended complaint with any of these people? If so,
16   recite all the conversations that you've had with
17   them.
18       And six is the more general catchall.
19   Tell me all the conversations you've had with these
20   individuals at any time from 1998 to the present:
21   William Elovitz; John Durante; William Gemme;
22   Nicholas Adler-Duthe; Russell Boovis; Robert
23   O'Neil; Carol Mauriello, M-a-u-r-i-e-l-l-o; David
24   Adams; Kevin Britto; Ronald Mitchell; Michael E.

Page 65

1    Brown; Jane Dziemit; David Sun; John Sun; Paul Sun;
2    Rick Finley; James Clark; Debra Meyers; Linda
3    Adams; Barbara Adams; Richard Nichols; Stacie
4    Grace; Diane Spignosi; Tony Marasco.
5        MR. XIFARAS: Fifth Amendment.
6        MR. KLEHM: I have a couple more names.
7    Just give me a second.
8    Q. Steve Burroughs; Dave Rooney; Pam Correia?
9        MR. KLEHM: Okay. Now I've completed it.
10       MR. XIFARAS: Fifth Amendment.
11   Q. I'll add one more name to that list. Louis Levine?
12       MR. XIFARAS: Fifth Amendment.
13   Q. Is it true there were at least 55 fraudulent
14     shipments that were made as a part of this scheme?
15       MR. XIFARAS: Fifth Amendment.
16   Q. Is it true that Kevin Britto would tell you what
17     fake shipment came in, when you should bill it, and
18     when you should do a key rec on it?
19       MR. XIFARAS: Fifth Amendment.
20   Q. What is a key rec? And what role did a key rec
21     play in this scheme?
22       MR. XIFARAS: Fifth Amendment.
23   Q. Is it true that Kevin Britto would tell you what to
24     tell buyers and other employees of IFC in

17 (Pages 62 to 65)

Page 66

1   furtherance of the scheme? If so, what would Kevin
2   Britto tell you to say?
3        MR. XIFARAS: Fifth Amendment.
4   Q. How many fake bills of lading did you prepare
5      during the time that you worked for International
6      Floor Crafts?
7        MR. XIFARAS: Fifth Amendment.
8   Q. Is it true that you made somewhere between $10,000
9      to $50,000 as a result of this scheme as
10     represented by Kevin Britto?
11       MR. XIFARAS: Fifth Amendment.
12  Q. Is it true that at the very end of the scheme, you
13     spoke with Kevin Britto regarding having
14     difficulties with the shipments, particularly with
15     David Adams, his handling of the fake shipments?
16       MR. XIFARAS: Fifth Amendment.
17  Q. To the extent that you did have such a
18     conversation, recite the conversation in full as
19     best you can recall.
20       MR. XIFARAS: Fifth Amendment.
21  Q. Is it true that you had an old girlfriend who was a
22     friend of Kevin Britto as he says?
23  A. Yes.
24  Q. Which girlfriend was a friend of Kevin Britto?

Page 67

1   A. Alice was her name.
2   Q. What's her last name?
3   A. Well, at the time it was Blouin, but I don't
4      know if it's changed.
5   Q. How do you spell her last name?
6   A. (No verbal response)
7   Q. B-l-o-u-i-n?
8   A. That sounds good to me, sir. I'm not really
9      sure.
10  Q. Where did she last live that you know of?
11  A. In New Bedford. I know that she lived in New
12     Bedford.
13  Q. Have you spoken with her about this case?
14       MR. XIFARAS: Fifth Amendment.
15  Q. When did you last speak to Alice Blouin?
16       MR. XIFARAS: Fifth Amendment.
17       MR. KLEHM: Okay. I'll just put on the
18     record that there's been a waiver.
19  Q. During what period of time did you date Alice
20     Blouin?
21       MR. XIFARAS: Fifth Amendment.
22  Q. What were the circumstances under which you and
23     Alice Blouin stopped seeing each other or stopped
24     being boyfriend and girlfriend?

Page 68

1        MR. XIFARAS: Fifth Amendment.
2   Q. Kevin Britto testified that he's spoken with you
3      since this case started. Is that true? And if so,
4      how many times have you spoken? What have you
5      spoken about? Who was present?
6        MR. XIFARAS: Fifth Amendment.
7   Q. Kevin Britto testified that at first you wouldn't
8      speak to the state police, and then he called you
9      actually while the state police were present with
10     him and talked to you; and afterwards, you did
11     speak to the state police? Is that true?
12       MR. XIFARAS: Fifth Amendment.
13  Q. Kevin Britto testified that he shared a portion of
14     the funds that he received from this scheme with
15     you; is that true? And if so, what portion did he
16     share with you? How much did he get? How much did
17     you get?
18       MR. XIFARAS: Fifth Amendment.
19  Q. Is it true that you would participate in this
20     scheme approximately -- sorry. I blew that.
21       Is it true that these fake shipments or
22     partially fake shipments would be scheduled
23     approximately once a month?
24       MR. XIFARAS: Fifth Amendment.

Page 69

1   Q. When did the scheme start, and when did the scheme
2      end?
3        MR. XIFARAS: Fifth Amendment.
4   Q. Other than the $1,500 per key rec -- falsified key
5      rec that you received, what other funds, if any,
6      did you get from the scheme?
7        MR. XIFARAS: Fifth Amendment.
8   Q. Did you receive tickets to the Super Bowl from
9      David Adams?
10       MR. XIFARAS: Fifth Amendment.
11  Q. Did you receive a trip to the Super Bowl from David
12     Adams?
13       MR. XIFARAS: Fifth Amendment.
14  Q. Tell me all the things that you received from David
15     Adams or Kevin Britto or any other source as a
16     result of this scheme whether or not they were
17     monetary -- whether or not it was money?
18       MR. XIFARAS: Fifth Amendment.
19  Q. Do you own any property currently? Real property?
20  A. No, sir.
21  Q. Do you have any funds and any investments as a
22     result of this scheme?
23       MR. XIFARAS: Fifth Amendment.
24  Q. Is it true that Kevin Britto called you after his

18 (Pages 66 to 69)

Page 70

1    first day of deposition which would have been, I
2    think, March 7th of 2006?
3        MR. XIFARAS: Fifth Amendment.
4    Q. To the extent that that is true, what did you say
5    to him and what did he say to you?
6        MR. XIFARAS: Fifth Amendment.
7    Q. Is Kevin Britto the godfather of two of your
8    children?
9    A. Yes, sir.
10   Q. Who was it who came up with the scheme which is the
11   subject of the amended complaint?
12       MR. XIFARAS: Fifth Amendment.
13   Q. How did you first learn of the scheme which is the
14   subject of the amended complaint?
15       MR. XIFARAS: Fifth Amendment.
16   Q. Is it true that Kevin Britto was in effect your
17   boss, if you will, during the course of this
18   scheme?
19       MR. XIFARAS: Fifth Amendment.
20   Q. Is it true that during that telephone call with
21   Kevin Britto after the first day of deposition in
22   March of 2006 that Kevin Britto was yelling at you
23   and saying that you should be showing up at the
24   various hearings and motions or depositions in

Page 71

1    relation to this case?
2        MR. XIFARAS: Fifth Amendment.
3    Q. List all the titles that you had at International
4    Floor Crafts during the time that you worked there.
5        MR. XIFARAS: Fifth Amendment.
6    Q. What was the setup of your office at International
7    Floor Crafts?
8        MR. XIFARAS: Fifth Amendment.
9    Q. Where was it located -- I'll stop there. Where was
10   it located?
11       MR. XIFARAS: Fifth Amendment.
12       MR. KLEHM: The location of his office is
13   something that may lead --
14       MR. XIFARAS: The reason for my
15   objection, Mr. Klehm, is I believe it gives -- he
16   would be giving a chain in the link of evidence
17   against himself in a criminal setting just by
18   answering that he worked there and had an office
19   there.
20   Q. Did you have a door on the office? If you did, is
21   it true that there were significant portions of
22   time at which your door would be shut?
23       MR. XIFARAS: Fifth Amendment.
24   Q. Did you conduct any business other than IFC

Page 72

1    business from that office during the time that you
2    worked there?
3        MR. XIFARAS: Fifth Amendment.
4    Q. During the times that your door was shut, were you
5    engaging in or participating in the scheme?
6        MR. XIFARAS: Fifth Amendment.
7    Q. Has Ronald Mitchell telephoned you within the past
8    six months? And if so, what was the discussion?
9        MR. XIFARAS: Fifth Amendment.
10   Q. Did REMCO ever invoice for any actual rugs received
11   by International Floor Crafts?
12       MR. XIFARAS: Fifth Amendment.
13   Q. Same question for Mansfield Rug, Dalton Padding,
14   and Empire Weavers?
15       MR. XIFARAS: Same answer, Fifth
16   Amendment.
17   Q. Did you ever visit any of the warehouses of REMCO,
18   Mansfield Rug, Empire Weavers, and Dalton Padding?
19   And if so, when and where did you go?
20       MR. XIFARAS: Fifth Amendment.
21   Q. Did you ever attend any meetings in which Jane
22   Dziemit was present? If so, when was it? Who was
23   present? What was the purpose of the meeting? And
24   what was discussed?

Page 73

1        MR. XIFARAS: Fifth Amendment.
2    Q. Have you ever spoken with anyone other than your
3    counsel regarding the conversations that you had
4    with the state police?
5        MR. XIFARAS: Fifth Amendment.
6    Q. To the extent that you did, what was it that was
7    said during those conversations?
8        MR. XIFARAS: Fifth Amendment.
9    Q. Who's Ken Mercardo?
10       MR. XIFARAS: Fifth Amendment.
11   Q. Did you participate at all in the conversion of
12   carpeting to area rugs? And if so, what was your
13   participation?
14       MR. XIFARAS: Fifth Amendment.
15   Q. How was the determination made as to whether or not
16   to do a full shipment, a half shipment, or other
17   kind of a partial shipment or a nonshipment?
18       MR. XIFARAS: Fifth Amendment.
19   Q. Have you ever met in person with Ronald Mitchell or
20   Michael Brown? And if so, when? What were the
21   circumstances, and who was present?
22       MR. XIFARAS: Fifth Amendment.
23   Q. Was the sale or the purported sale of foam part of
24   this scheme? If so, what portion of the scheme

19 (Pages 70 to 73)

Page 74

1  involved the sale of fraudulent shipments of foam?
2      MR. XIFARAS: Fifth Amendment.
3  Q. It's a fairly obvious question, but why was it that
4      handmades and manmades were, for the most part, not
5      included in the scheme?
6      MR. XIFARAS: Fifth Amendment.
7  Q. Have you ever borrowed money from or had any
8      interaction with or dealings with the following
9      companies: Wyvern Group, LLC; Equity Mortgage;
10     2575 State Street, LLC; Dimitry Properties, LLC;
11     Lia's Choice; Fifteen Homes Properties, LLC; or 283
12     Forbes Properties, LLC? And, actually, there's one
13     more. Bentley Mortgage?
14         MR. XIFARAS: Fifth Amendment.
15 Q. And if so, what were your dealings?
16         MR. XIFARAS: Fifth Amendment.
17 Q. Have you ever borrowed any money from Jane Dziemit
18     or Ronald Mitchell? If you have, how much have you
19     borrowed? When did you borrow it? Did you repay
20     it? And when was it repaid?
21         MR. XIFARAS: Fifth Amendment.
22 Q. Did IFC -- strike that. Sorry.
23         Did you ever know of anytime that
24     Regional Express provided shipments to any IFC

Page 75

1  warehouse of any goods whatsoever?
2      MR. XIFARAS: Fifth Amendment.
3  Q. If so, what was shipped?
4      MR. XIFARAS: Fifth Amendment.
5  Q. And when?
6      MR. XIFARAS: Fifth Amendment.
7  Q. List for me all of the documents involved in a
8      legitimate transaction involving the sale of
9      carpets or remnants.
10     MR. XIFARAS: Fifth Amendment.
11 Q. And list for me all the documents involved in a
12     fraudulent transaction during the course of the
13     scheme as described in the amended complaint.
14     MR. XIFARAS: Fifth Amendment.
15 Q. Are you able to tell by looking at various shipping
16     documents whether or not they were part of a
17     legitimate shipment or an illegitimate shipment?
18     MR. XIFARAS: Fifth Amendment.
19 Q. To the extent that you can tell the difference,
20     what is the difference to look for?
21     MR. XIFARAS: Fifth Amendment.
22 Q. Have you understood all the questions that I've
23     asked you so far today?
24 A. Yes, I have.

Page 76

1  Q. To the extent that you did answer questions today,
2      have the answers that you've given me been
3      accurate?
4  A. Yes, sir.
5  Q. Are there any questions that you need to revise --
6      sorry -- answers that you need to revise now to
7      make sure that they are accurate?
8  A. No, sir.
9  Q. Are you familiar with the concept of ratios with
10     regard to the buyer's role at IFC?
11         MR. XIFARAS: Fifth Amendment.
12 Q. To the extent that you are, did those ratios affect
13     in any way the way in which the scheme operated as
14     described in the amended complaint?
15         MR. XIFARAS: Fifth Amendment.
16 Q. Did you ever make any phone calls relating to the
17     scheme from your home or from anyplace other than
18     International Floor Crafts?
19         MR. XIFARAS: Fifth Amendment.
20 Q. What's your home phone number?
21         MR. XIFARAS: Fifth Amendment.
22         MR. KLEHM: Let me take a couple minutes
23     with them and I'll be back.
24         (Recess taken)

Page 77

1  BY MR. KLEHM:
2  Q. List for me all of the cell phone numbers that you
3      had from 1998 to the present to the extent you can
4      remember.
5      MR. XIFARAS: Fifth Amendment.
6  Q. I may have asked this, but I'm just going to ask
7      again to make sure. List for me all the providers
8      that you had for cell phone service from 1998 to
9      the present.
10     MR. XIFARAS: Fifth Amendment.
11 Q. My final question is going to be to the extent that
12     you wish to express any remorse or apology for
13     participating in the scheme giving rise to the
14     amended complaint, I will give you that opportunity
15     right now.
16     MR. XIFARAS: Fifth Amendment.
17     MR. KLEHM I have nothing further.
18     MR. XIFARAS: I just have a few
19     questions.
20         CROSS EXAMINATION
21 BY MR. XIFARAS:
22 Q. Mr. Williams, regarding the financial statements
23     that we've entered into evidence here, is it fair
24     to say that even the January and February of 2006

20 (Pages 74 to 77)

Page 78

1  financial statements may need to be revised?

2  A. I would have to say, just to be on the safe

3    side, they may have to be.

4  Q. Would it be fair to say that the child support

5    amounts for those -- for any of these financial

6    statements may have been already included as a

7    deduction from the gross pay?

8  A. (Witness nods head).

9  Q. You have to say yes.

10 A. I'm sorry. Yes, that's true.

11 Q. Sir, as of today, have you received a printout from

12   Bay Colony regarding all of your pay from January

13   until present?

14 A. No, sir.

15 Q. Have you requested that?

16 A. Yes, I have.

17 Q. And how about the same question regarding Labor

18   Ready -- strike that.

19     Would it be fair to say on those

20   financial statements regarding expenses that you do

21   not have a record of every -- a written record of

22   every single expense?

23 A. Yes, it would be. It would be safe to say

24   that.

Page 79

1  Q. And would it be correct to say, sir, that you -- in

2    those areas of expenses where you do not have a

3    written record that you've tried your best to give

4    an honest answer, a complete answer as to what that

5    expense would be?

6  A. Yes.

7     MR. XIFARAS: That's all I have.

8     REDIRECT EXAMINATION

9  BY MR. KLEHM:

10 Q. From '98 to the present, have you prepared all your

11   own tax returns?

12 A. Not my own, no, sir.

13 Q. Okay. Who has prepared your tax returns?

14 A. It could be H&R Block. It could be anyone

15   that I just pick. I never really had a

16   steady place that I went. It kind of

17   depended on who was the cheapest at the time

18   when I went to -- would do it.

19 Q. Are you willing to make your tax returns available

20   from 1998 to the present?

21     MR. XIFARAS: I would say Fifth

22   Amendment.

23     MR. KLEHM: Okay. So I'll ask you

24   directly. Are you willing to make his tax returns

Page 80

1  available from '98 to the present?

2     MR. XIFARAS: No, without prejudice that

3    may be a conditional right now. I'm sorry. I have

4    to say right now no.

5     MR. KLEHM: And the reason for that?

6     MR. XIFARAS: It may be -- it may offer a

7    link in the chain of evidence against himself in a

8    criminal proceeding.

9     MR. KLEHM: Okay. That generally doesn't

10   apply to documents, but we'll deal with that

11   separately.

12 BY MR. KLEHM:

13 Q. Have you ever been accused of stealing by anyone --

14   other than involving this case, have you ever been

15   accused of stealing anything?

16 A. No, sir.

17     MR. KLEHM: At this point, as I said at

18   the beginning of the deposition, I'm going to

19   suspend for two reasons: One, reasons relating to

20   the motion to compel and motion for contempt. And,

21   secondly, with regard to the exercise of the Fifth

22   Amendment here. So we can suspend at this point.

23     (Whereupon, the deposition was

24     suspended at 12:33 p.m.)

Page 81

1  DEPONENT'S ERRATA SHEET

2  AND SIGNATURE PAGE INSTRUCTIONS

3

4    The original of the Errata Sheet has been

5  delivered to Robert M. Xifaras, Esq.

6    When the Errata Sheet has been completed

7  by the deponent and signed, a copy thereof should

8  be delivered to each party of record and the

9  ORIGINAL delivered to Paul J. Klehm, Esq., to whom

10 the original deposition transcript was delivered.

11

12   INSTRUCTIONS TO DEPONENT

13

14    After reading this volume of your

15 deposition, indicate any corrections or changes to

   your testimony and the reasons therefor on the

   Errata Sheet supplied to you and sign it. DO NOT

16 make marks or notations on the transcript volume

   itself.

17

18 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

19 COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

20

21

22

23

24

21 (Pages 78 to 81)

Page 82

```
1   ATTACH TO THE DEPOSITION OF TYRONE KEITH WILLIAMS
    CASE:  INTERNATIONAL FLOOR CRAFTS, INC. VS. DAVID
2   W. ADAMS, ET AL.
3           ERRATA SHEET
4   INSTRUCTIONS: After reading the transcript of your
    deposition, note any change or correction to your
5   testimony and the reason therefor on this sheet.
    DO NOT make any marks or notations on the
6   transcript volume itself.  Sign and date this
    Errata Sheet (before a Notary Public, if required).
7   Refer to Page 81 of the transcript for Errata Sheet
    distribution instructions.
8   PAGE  LINE
            CHANGE: _____
9           REASON: _____
            CHANGE: _____
10          REASON: _____
            CHANGE: _____
11          REASON: _____
            CHANGE: _____
12          REASON: _____
            CHANGE: _____
13          REASON: _____
            CHANGE: _____
14          REASON: _____
            CHANGE: _____
15          REASON: _____
            CHANGE: _____
16          REASON: _____
            CHANGE: _____
17          REASON: _____
18       I have read the foregoing transcript of
    my deposition and except for any corrections or
19  changes noted above, I hereby subscribe to the
    transcript as an accurate record of the statements
20  made by me.
21
22
23
24      _____
        TYRONE KEITH WILLIAMS   DATE
```

Page 83

```
1   COMMONWEALTH OF MASSACHUSETTS)
2   SUFFOLK, SS.          )
3        I, Lisa Abdo, Certified Shorthand
4   Reporter and Notary Public in and for the
5   Commonwealth of Massachusetts, do certify that
6   pursuant to appropriate notice of taking
7   deposition, there came before me the subject
8   deponent, who was by me duly sworn; that said
9   deponent was thereupon examined under oath and said
10  examination reduced to writing by me; and that the
11  deposition is a true record of the testimony given
12  by the deponent.
13       I further certify that I am not a
14  relative or employee of or counsel or attorney for
15  any of the parties, or a relative or employee of
16  such counsel or attorney, nor am I financially or
17  otherwise interested in the outcome of the action.
18       Witness my hand at Boston, Massachusetts,
19  this 21st day of September, 2006.
20
21       _____
         Notary Public
22       My commission expires: 12/11/09
23
24
```

22 (Pages 82 to 83)

*Exhibit C*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC.<br>Plaintiff<br><br>v.<br><br>DAVID W. ADAMS, TYRONE WILLIAMS,<br>KEVIN BRITTO, RONALD E. MITCHELL,<br>Individually and d/b/a MANSFIELD RUG<br>COMPANY a/k/a MANSFIELD RUG<br>DEPARTMENT and REMCO, MICHAEL<br>E. BROWN, Individually and d/b/a DALTON<br>PADDING and EMPIRE WEAVERS, JANE<br>DZIEMIT, AGATHA ESPOSITO, DONALD<br>SHOOP, CCC INTERNATIONAL, INC.,<br>JOHN D. SUN, DAVID D. SUN, and<br>PAUL SUN,<br>Defendants<br><br>v.<br><br>LOWELL FIVE CENT SAVINGS BANK,<br>WACHOVIA BANK, NATIONAL<br>ASSOCIATION, f/k/a FIRST UNION BANK<br>OF VIRGINIA, CITIZENS BANK, BANK OF<br>AMERICA f/k/a BANK OF BOSTON,<br>PEOPLE'S BANK, and FIRST UNION<br>NATIONAL BANK,<br>Trustee Process Defendants | Civil Action No. 05-11654-NMG |

## AFFIDAVIT OF WILLIAM GEMME IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIONS

I, William Gemme, under oath, depose and state as follows:

1.      I am over eighteen years of age, and I reside in the Commonwealth of

Massachusetts.  I submit the within affidavit in support of Plaintiff's Motion for

Preliminary Injunctions.  I incorporate herein by reference the factual averments made in

the Verified Complaint filed in this matter, which I signed in my capacity as an authorized agent of International Floor Crafts, Inc. (hereinafter, "IFC").

2.    Since 1990, I have served as a Vice-President and Controller for Spags Supply, Inc., and, more recently, Spags 19, Inc. In that capacity, I have had the responsibility of managing the accounting and financial reporting systems.

3.    In or around November, 2002, Building 19, Inc. and others purchased the assets of Spags Supply, Inc., which began operating as Spags 19, Inc.

4.    In or around January, 2004, the corporate offices of Building 19, Inc. and Spags 19, Inc. began to merge for efficiency purposes. At that time, John Durant, Vice-President of Finance for Building 19, Inc., assumed control of the accounting function of Spags 19, Inc. At that time, I began to report to Durant.

5.    In or around October, 2004, Building 19, Inc. placed its Accounts Payable Department under my control. The Building 19 Accounts Payable Department responsibilities include, without limitation, the payment of invoices for Building 19 and its affiliates, including, without limitation, IFC.

6.    At the request of Durant, I actively participated in the investigation surrounding the events set forth in the Verified Complaint. I am, and, at all relevant times, have been, an authorized agent of IFC with regard to this matter.

7.    From July 8, 1988 to November 15, 1997, and from September 28, 1998 to September 28, 2001, Defendant Kevin Britto served as a buyer of remnants, broadloom, padding, wood flooring and tile on behalf of IFC. From approximately October 1, 2001 to March 25, 2005, Defendant David Adams served as a buyer of remnants, broadloom, padding, wood flooring and tile on behalf of IFC. In that capacity,

2

Britto, and later Adams, purchased merchandise for distribution to various "Building 19" stores for retail sale.

8.     On or about March 25, 2005, IFC terminated employee David Adams, who served as a buyer, for performance reasons which, at the time, we believed to be unrelated to the within matter. At or around that time, IFC re-assigned an individual named Nicholas Adler to serve as the buyer covering David Adams' departments. *Nicolas Adler-Dorthe w.d.* Shortly thereafter, Adler informed me that he was unable to confirm whether IFC had received certain merchandise in connection with two or three invoices, all of which had allegedly been purchased by Defendant Adams on behalf of IFC and all of which had allegedly been received by IFC.

9.     One of the shipments at issue concerned merchandise allegedly received from a company known as Mansfield Rug. (I now believe that company to be fictitious.) In response, IFC requested documentation from Defendant Ronald Mitchell, an agent to Mansfield Rug, showing proof of delivery of the merchandise. On or about April 21, 2005, IFC received a faint copy of a bill of lading purportedly signed by Defendant Tyrone Williams, IFC's rug department manager. (See Exhibit A). According to the bill of lading, Mansfield Rug shipped the merchandise to IFC via a trucking company known as Regional Trucking.          *false Inventory of w.d.*

10.    Thereafter, Adler informed me that he had visited the Building 19 retail stores and the warehouse, but that he was unable to locate any of the merchandise at issue, including, without limitation, the merchandise from Mansfield Rug.

11.    Adler thereafter informed me that he had contacted Regional Trucking in order to inquire about a Mansfield Rug shipment. Adler told me that a representative of

.3.

Regional Trucking had told Adler that Regional Trucking had no record of the shipment at issue. Adler later received written confirmation that Regional Trucking had no such shipment. (See Exhibit B).

12.   At or around that time, Adler informed me that he had concerns about an invoice from Defendant CCC International, Inc. (hereinafter, "CCC International") relating to merchandise allegedly purchased by Defendant Adams on behalf of IFC which IFC had purportedly received. According to Adler, Adler was unable to locate the wood flooring referred to in the invoice.

13.   Adler informed me that he contacted Defendant Michael Brown, the representative to CCC International, in order to inquire about the type of wood flooring that CCC International had shipped to IFC. Adler informed me that Brown told Adler that Brown was unable to confirm the type of wood flooring contained in the shipment.

14.   Throughout April, 2005, I had several conversations with my supervisor, Durant, regarding the status of Adler's efforts to confirm IFC's receipt of various shipments. In or around the middle or end of April, 2005, Durant instructed me to perform an investigation of invoices paid by IFC for shipments and to collect pertinent documentation.

15.   I thereafter reviewed all of the invoices and all shipments that IFC had processed over a six month period from November 1, 2004 through April 30, 2005 from all companies, including, without limitation, Dalton Padding, Empire Weavers, REMCO, CCC International and Mansfield Rug (hereinafter, the "Five Companies"). Through my investigation, I learned that Defendant Mitchell served as Mansfield Rug Company's and

4

REMCO's representative to IFC, and that Defendant Brown served as Dalton Padding's, Empire Weavers' and CCC International's representative to IFC.

16.    During the normal course of business, the buyer would prepare a purchase order for merchandise that IFC would buy from various suppliers. When a shipment is delivered to IFC, an IFC receiver prepares a "key rec," which is an internal accounting document which confirms receipt of the merchandise. The receiver also obtains bill of lading slips from trucking firms or from the vendor itself (if the vendor uses bill of ladings), and the receiver signs the bill of lading. The accounting department receives an invoice for the merchandise from the supplier. The accounting department matches all of the receiving information to the invoice and to the purchase order. No invoices are paid until such time as the buyer approves the invoice for payment. I was able to locate all but one or two bills of lading for several of the companies (not one of which included the Five Companies) from whom IFC purchased merchandise during the six month period. I found all of the key recs.

17.    I thereafter telephoned all of the companies for which we required bill of ladings or other documentation concerning the six month period I was investigating. As to all of the companies for which we were missing only one or two bills of lading, the companies forwarded me the missing documentation within approximately twenty-four hours. On that basis, I determined that these shipments from the companies for which we were missing only one or two bills of lading were legitimate shipments. Those companies are not named in this Complaint.

18.    During the course of my review of these materials, I determined that, for the six month period, I could locate "key recs," but no bill of ladings for the Five

5

Companies. During this six month period, Defendant Tyrone Williams served as a receiver on behalf of IFC at a location known as Warehouse 3, where all rug inventory, among other things, is kept when it is not in the stores. Despite being one of several receivers assigned to IFC, during the six month period, Defendant Williams prepared all of the key recs pertaining to alleged shipments received from any companies, including, without limitation, the Five Companies. During the six month period at issue, various receivers, including, without limitation, Kathy Whittaker and Carol Bonville, signed the bills of lading relating to shipments received. I was unable to locate a single bill of lading signed by any receiver pertaining to shipments received from the Five Companies.

19.    In or around April, 2005, I requested proof of delivery from the Five Companies. After waiting for a period ranging from four days to one week, I received a set of documents from CCC International, Dalton Padding and Empire Weaver purportedly signed by Defendant Williams in response to my request. The documents did not seem legitimate, as they appeared to have been prepared on a word processor. The documents contained the type of merchandise that was allegedly shipped, but they did not appear to me, based upon my experience, to be bill of ladings. None of these documents had shipper's signatures or dates, which is data commonly included on these documents in our business.

20.    On April 27, 2005, I telephoned Ronald Mitchell and requested two proof of deliveries pertaining to 2004 billings that fell within the six month period I studied. Mitchell told me that he was then in South Carolina, and that no one else at Mansfield Rug could pull the records I requested. He told me that he would return on May 3, 2005, and that he would pull the records for me at that time.

6

21.    On May 2, 2005, I left a telephone message for Mitchell in which I provided him with the invoice numbers, dates, and amounts of the invoices for which I needed proof of delivery. On or about May 3, 2005, Mitchell telephoned me and told me that an individual named Diane, who apparently worked for him, had cleaned up while he was away and she shred his 2004 records. He told me that Diane should not have destroyed the documents, but that, as a result, he would not be able to provide copies of the bill of ladings which I sought.

22.    In May, 2005, I made a review of all 2004 invoices from the Five Companies and found that, during 2004, IFC paid more than $2.3 million dollars to four of the Five Companies. IFC did not make any payments to Dalton Padding during 2004. I determined that IFC had simply paid upon matching the key recs submitted by Defendant Williams to the invoices, without having any bill of ladings attached.

23.    At that time, I determined that I needed to determine whether all of these shipments were fraudulent or, alternatively, whether IFC was receiving some merchandise and paying the invoices based solely on the key recs (in which case we would not be able to determine which shipments were legitimate). At that time, I used the inventory records prepared by RGIS for 2003, as well as for the end of January, 2005, for all of the Building 19 stores.

24.    At that time, I took the 13 month period where I knew we had fairly good inventory counts in the Building 19 stores. During that period at the warehouses we paid extra attention to how well we did the inventory on our own at our warehouses. I determined the total value of the inventory at the beginning of this 13 month period, and the total value of the inventory at the end of the 13 month period. RGIS takes our store

7

inventory at retail value and when we take our inventory in the warehouses, we take that inventory at cost. I converted the warehouse inventory cost to a retail value of the warehouse inventory, and then added it to the retail value of the inventory we had from RGIS in the stores. At that point, I was able to take the beginning inventory as of the end of December 2003, and add to it at retail value, all our purchases for 2004 for the 13-month period that ended January of 2005. I then subtracted all the sales for that same 13-month period in order to arrive at an estimated retail value of inventory by department for IFC for that period of time. I then compared that estimated inventory value to the actual inventory value that we had at that time. I found a shortfall of more than $5.2 million at retail value.

25.    At that time I compiled the total purchases which IFC purportedly made from CCC International, Empire Weavers, Remco and Mansfield Rug during the 13 month period. (IFC did not purchase from Dalton Padding during that 13 month period.) I determined that the total retail dollar value of all the purchases from those four companies during that period was more than $4,555,000. I also concluded that IFC had not received any merchandise from CCC International, Empire Weavers, Remco or Mansfield Rug during that thirteen month period.

26.    I also reviewed the inventory that we had on hand at Warehouse 3, which is where the Five Companies allegedly shipped all of the shipments which we now believe to be fraudulent. As of the end of January, 2005, IFC only had rugs from Georgia Rug and Natco in its inventory. IFC had no rugs in its inventory from CCC International or Empire Weavers, even though a review of purchases in December of 2004 and January of 2005 showed that IFC had purchased at retail, and had received, approximately

8

$313,000 worth of rugs from CCC International, approximately $205,000 worth of rugs from Empire Weavers, approximately $32,000 worth of rugs at retail from Georgia Rug and approximately $17,000 from Natco.

27.    In or around May, 2005, I reviewed records from 1999 to 2005 for IFC. During part of this time, Defendant Britto served as the buyer for IFC. During that period, I found no bill of ladings from Mansfield Rug, Remco, Dalton Padding or Empire Weavers in connection with any alleged shipments. I could locate only five bills of lading for CCC International for that six year period, none of which involved purchases made by David Adams or Kevin Britto. During that same six year period, IFC purportedly purchased more than $7 million of merchandise from these companies at cost -- with a retail value in excess of approximately $13 million or $14 million.

28.    As a part of the investigation, I also caused copies to be made of the front and back of all checks concerning the Five Companies from 1999 to present. From my review of the checks, I noted that even though CCC International is located in Virginia, Empire Weavers is in Maryland, Dalton Padding is in Georgia, all three of the companies deposited at least some checks from IFC into the same account number with the same bank in Virginia. At least one Remco mailing was sent from IFC via overnight mail to Defendant Jane Dziemit, who was apparently an officer, agent, servant or employee of Defendant Mitchell. It appears that Dziemit endorsed several checks and caused them to be deposited into Remco or other accounts.

29.    As a part of my investigation, I also noted that, from 1999 to 2005, all of the Five Companies supposedly delivered their shipments in their own trucks. In fact, the apparently fictitious proof of deliveries from CCC International, Empire Weaver, and

9

Dalton Padding that I received at my request (see Paragraph 19, *supra*) indicate that the deliveries were to be made by the particular company's own truck. Although Remco's invoices represented that they delivered all their shipments by their own trucks, the only bill of lading provided by Remco to IFC listed Regional Express as the trucking company that performed the delivery. On that bill of lading, the items were supposedly shipped from 5 Mansfield Grove Road, East Haven, Connecticut.

30. In or around late April or early May, 2005, I drove to 5 Mansfield Grove Road in East Haven, Connecticut, the address from which the merchandise was supposedly shipped. The address is located in a gated apartment complex, on the water – certainly not an area where one would find 18 wheelers loading or unloading merchandise.

31. As a result of my investigation, I have concluded that Defendants Britto, Adams, Williams, Dziemit, Brown, John Sun, Paul Sun and David Sun and CCC International have all participated in a scheme to defraud IFC of at least $5 million dating back to at least 1999. As a result of my investigation, I also believe that the following entities, to which IFC made significant payments, are fictitious and have never shipped any merchandise to IFC: Dalton Padding, Mansfield Rug, REMCO and Empire Weavers. Defendant Britto, and later Defendant Adams, placed fictitious orders for items from the Five Companies. Defendant Williams would prepare false documentation showing that IFC had received the non-existent merchandise. IFC would send payment for the non-existent merchandise to the appropriate company. IFC's investigation of the extent of the fraud is ongoing. As a result of my investigation, I also believe that the following entities, to which IFC made significant payments, are fictitious and have never

shipped any merchandise to IFC; Dalton Padding, Mansfield Rug, REMCO and Empire

Weavers.

Signed under the pains and penalties of perjury this _19_ day of September, 2005.

William Gemme

William Gemme

## CERTIFICATE OF SERVICE

I, Paul J. Klehm, hereby certify that, on September 19, 2005, the following counsel and *pro se* parties were served either by ECF or by me by facsimile (to counsel only) and first class mail, postage prepaid, where they were not ECF filers:

Isaac Peres, Esq.          Counsel to David Adams
50 Congress Street
Boston, MA 02109

Peter Krupp, Esq.          Counsel to Paul Sun, David Sun and CCC International
Lurie and Krupp, LLP
One McKinley Square
Boston, MA 02109

William A. Brown, Esq.  Counsel to Agatha Esposito
31 Milk Street, Suite 501
Boston, MA 02109

Paul V. Kelly, Esq.    Counsel to Michael Brown
Kelly, Libby & Hoopes, P.C.
175 Federal Street
Boston, MA 02110

Frederic D. Grant, Jr., Esq.    Counsel to Ronald Mitchell
727 Atlantic Avenue, Second Floor
Boston, MA 02111

Robert M. Xifaras, P.C.        Counsel to Tyrone Williams
5 Dover Street, Suite 101
New Bedford, MA 02740

Andrew Good, Esq.    Counsel to John Sun
Good & Cormier
83 Atlantic Avenue
Boston, MA 02110

Ms. Jane Dziemit
48551 Shady View Drive
Palm Desert, CA 92260

Mr. Kevin Britto
300 W 21st Street, Apt. 25
New York, NY 10011

/s/ Paul J. Klehm

*Exhibit C (1)*

ORIGINAL

VOLUME:        II
PAGES:      1-260
EXHIBITS:   37-49

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05CA11654-NMG

INTERNATIONAL FLOOR CRAFTS,      )
INC.,                            )
    Plaintiff,                   )
                                 )
vs.                              )
                                 )
DAVID W. ADAMS, ET AL,           )
    Defendants.                  )

DEPOSITION OF RONALD MITCHELL, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the Federal
Rules of Civil Procedure, before Jill
Shepherd, Registered Professional Reporter,
CSR, CLR and Notary Public, in and for the
Commonwealth of Massachusetts, at the offices
of Krasnoo Klehm, 23 Main Street, Andover,
Massachusetts, on Friday, May 16, 2008,
commencing at 10:05 a.m.

1  A.  The first name is D-I-A-N-N-E.  Last name is

2      S-P-I-G-N-E-S-I.

3  Q.  Is Dianne Spignesi -- how do you pronounce

4      it?

5  A.  Spignesi [pronunciation].

6  Q.  Is Dianne Spignesi currently your girlfriend?

7  A.  No.

8  Q.  Was she ever your girlfriend?

9  A.  Yes.

10 Q.  During what period of time was she your

11     girlfriend?

12 A.  From 1991 until 2006.  Is that 15 years?

13 Q.  Where does Ms. Spignesi live today?

14 A.  I believe she just moved back to Connecticut

15     from Florida.  I have no contact with her.

16 Q.  Where did she live while living in Florida?

17 A.  Apopka.

18 Q.  Can you spell that?

19 A.  A-P-O-P-K-A.

20 Q.  Have you ever lived with Dianne Spignesi?

21 A.  Yes.

22 Q.  During what period of time did you live with

23     Dianne Spignesi?

24 A.  For, I'd say, a six-month period probably in

1    A.  I'm assuming Jane did.

2    Q.  What's the basis of your assumption?

3    A.  She sent it to me.

4    Q.  When did you last speak to Jane Dzeimit?

5    A.  Four or five days ago.

6    Q.  Was that by telephone?

7    A.  Yes.  I need to correct that.

8    Q.  All right.

9    A.  She called me this morning on my way here.  I

10       didn't think of that.

11   Q.  Best you can recall, what did you say to her

12       and what did she say to you during your phone

13       call this morning?

14   A.  She was calling to say good luck, or

15       something along those lines, and I made the

16       remark, "Thank you for causing this."

17   Q.  What did you mean by that statement?

18   A.  When I signed that affidavit, I didn't know

19       what it was going to lead to.

20   Q.  You spoke to Jane Dzeimit four or five days

21       ago.  As best you can recall, what did you

22       say to her and what did she say to you at

23       that point?

24   A.  Well, she knew that I was going to be

1    redeposed and she informed me that she did

2    not know that would happen by me signing the

3    affidavit.

4    Q.  Do you remember anything else from that

5    conversation?

6    A.  I asked if her attorney knew that this would

7    happen.

8    Q.  What did she say?

9    A.  She didn't know; only that she didn't know.

10   Q.  Did you ever speak directly to her attorney?

11   A.  No.

12   Q.  We'll go back to the affidavit.

13                    Are you currently employed?

14   A.  Yes.

15   Q.  Where are you employed?

16   A.  Bilsten's, B-I-L-S-T-E-N-'-S, Appliance

17   Outlet.

18   Q.  What is your title at that job?

19   A.  Sales associate.

20   Q.  How long have you worked there?

21   A.  One year.

22   Q.  What are your duties as a sales associate?

23   A.  I sell appliances.

24   Q.  Before you worked at Bilsten's Appliance

```
 1           Outlet, what was your most recent job?
 2   A.   Self-employed sales representative.
 3   Q.   For what kind of products?
 4   A.   Floor covering.
 5   Q.   Why did you -- strike that.
 6              Are you now out of the floor
 7        covering business?
 8   A.   Basically, yes.
 9   Q.   Okay.  Why are you basically out of the floor
10        business now?
11   A.   Can't sell anything.  Can't make a living
12        doing it.
13   Q.   Why is it that you can't sell it?
14   A.   Due to freight, you know, the current freight
15        charges.  What companies I represented -- did
16        represent, when you add the cost of freight,
17        because most of them are from Georgia, I
18        can't be competitive.
19   Q.   I'd asked you earlier about documents you
20        reviewed and you said you reviewed your
21        affidavit.  Did you review any affidavit
22        prepared by Jane Dzeimit in preparation for
23        your deposition today?
24   A.   Are you talking about the one we already
```

```
 1        division.

 2   Q.   Where did you work next?

 3   A.   That's when I went on my own, so to speak,

 4        created Remco.

 5   Q.   When was Remco created?

 6   A.   Approximately 20 years ago.

 7   Q.   So that would be approximately 1988?

 8   A.   Approximately.

 9   Q.   What is the full name of Remco?

10   A.   That's the full name.

11   Q.   Have you ever incorporated under the name

12        Remco?

13   A.   No.

14   Q.   Has Remco always been what is known as a

15        d/b/a?

16   A.   Yes.

17   Q.   Okay.  Have you always been the sole person

18        who's been acting d/b/a Remco?

19   A.   Primarily, yes.  Other than business cards,

20        it wasn't even a name I used a lot.

21   Q.   I'm sorry.  I'm very confused by the first

22        part.

23   A.   I know.  I'm sorry.

24   Q.   What do you mean when you say "other than
```

1   part of discovery, I believe.

2   Q.   Okay.   Would this be a paper filed with the

3        state government in Connecticut?

4   A.   Yes.

5   Q.   How many such papers are you aware of?

6   A.   Just the one.

7   Q.   Did you play a role in the preparation of

8        that piece of paper?

9   A.   Other than I'm sure signing something, I

10       didn't prepare the paper, no.

11  Q.   Was the piece of paper accurate as of the

12       time it was prepared?

13  A.   Yes.   To my knowledge, yes.

14  Q.   Was Jane Dzeimit ever a partner in Remco?

15  A.   Yes.

16  Q.   During what period of time was Jane Dzeimit a

17       partner in Remco?

18  A.   Probably from the year 2000, 2003.

19  Q.   What do you mean when you use the word

20       "partner" in relation to Jane Dzeimit's

21       partnership in Remco?

22  A.   Give her the ability to deposit checks made

23       out to Remco.

24  Q.   Have you completed your answer?

1    A.    There were some checks -- I don't know if

2          this is relevant to your question.  There

3          were -- some checks would come under Remco,

4          other checks would just come under Ron

5          Mitchell, checks would come under Ron

6          Mitchell Sales.  I don't know that if that's

7          relevant to what you are asking me.

8    Q.    Let's go at this differently.

9                    Did Remco have a place of business?

10   A.    Yes.

11   Q.    Where was that?

12   A.    My home address.

13   Q.    The 5 Mansfield Road?

14   A.    Yes.

15   Q.    Did Remco ever have any other place of

16         business?

17   A.    No.

18   Q.    Did Remco ever have a warehouse?

19   A.    No.

20                    MR. COHEN:  Objection to the form.

21   Q.    Did you ever represent to anyone that Remco

22         did have a warehouse?

23   A.    Possibly.

24   Q.    To the extent -- strike that.

1      him that you presently then had a warehouse?

2  A.  Could you repeat that?

3  Q.  Yeah.  Is it your testimony that as of the

4      time you spoke to Mr. Adler that you did not

5      tell him that you had a warehouse in

6      existence at that time?

7  A.  I don't remember my exact words.

8  Q.  Okay.  Well, let me put it this way:  Did you

9      lie to him about whether or not you had a

10     warehouse for Remco?

11  A.  Yes.

12  Q.  Why did you lie?

13  A.  Just to avoid the conversation of me being a

14     broker.

15  Q.  Is that the sole reason?

16  A.  Yes.

17  Q.  Have you lied to other companies with which

18     you've dealt with about whether or not Remco

19     has a warehouse?

20  A.  Not that I recall.

21  Q.  Not a single time?

22  A.  Not that I recall.

23  Q.  Okay.  Who did Remco sell to?

24  A.  Other than International Floor Crafts?

1      the information.  That, I recall doing,

2      trying to get some of the paperwork that was

3      being asked of me.

4   Q.  Did you ever tell Mr. Gemme that Dianne had

5      destroyed the records?

6   A.  Dianne?

7   Q.  Let me rephrase it.  Did you ever tell

8      Mr. Gemme that Dianne Spignesi had destroyed

9      the records that Mr. Gemme was looking for?

10  A.  Yes.

11  Q.  Okay.  And is this in the conversation that

12     we've just been talking about, or another

13     conversation?

14  A.  I don't recall.

15  Q.  Okay.  Was this in the period immediately

16     prior to the lawsuit being started?

17  A.  I don't recall.

18  Q.  When you told Mr. Gemme that Dianne Spignesi

19     had destroyed the records, were you lying?

20          MR. KLEHM:  Did he answer yet?

21  A.  No.  I would have to say yes.

22          MR. KLEHM:  Why don't we take a

23     ten-minute break?

24          MR. GRANT:  All right.

1      anymore."

2  Q.  Are you still relating to me the phone call

3      that you had with Mr. Britto?

4  A.  Yes.

5  Q.  Okay.  Go ahead.

6  A.  I lost my train of thought.

7  Q.  Well, let's do it again.

8  A.  I was trying to get paid on the last two open

9      invoices.  When Kevin told me, David Adams

10      was no longer working for the company, I

11      mean, I knew that was the end of any business

12      being done and I was just trying to get the

13      last of it over and done with.

14  Q.  I'm asking what was said, not what your

15      thoughts were.  So tell me what was said

16      during that conversation.

17  A.  He didn't -- it was like he wasn't concerned

18      about it.

19  Q.  Okay.  Tell me what was said during that

20      conversation.

21  A.  I don't remember the exact words.

22  Q.  Did he tell you why Mr. Adams had been -- he

23      was no longer working for Building 19?

24  A.  No.

```
 1    Q.  So tell me what your discussion was with him
 2        about the bills of lading.
 3    A.  I said, I need to get some of these proofs of
 4        delivery.  You know, I'm stalling them as
 5        best I can.
 6    Q.  Okay.  What did Mr. Britto say in return?
 7    A.  I don't remember his exact words.  I'm
 8        repeating myself, but he was like he really
 9        wasn't concerned, Don't worry about it.  That
10        kind of --
11    Q.  A moment ago you said that you thought the
12        bills of lading that were ultimately produced
13        were a forgery; have I said that correctly?
14              MR. COHEN:  Objection.
15    A.  Yes.
16    Q.  What's the basis on which you say that you
17        thought those were forgeries?
18    A.  There's only one.
19    Q.  There's only one, okay.
20    A.  I got a fax.  His words were, Just send this
21        to Tyrone, and I took it as this is probably
22        not the real bill of lading, but I just want
23        to get this over with.
24    Q.  Did Kevin Britto ever threaten you at any
```

```
 1        record that we're starting at 37 because I

 2        believe we marked 36 exhibits at your

 3        previous day of deposition.

 4              First of all, sir, I note that it

 5        consists of seven pages.  Have you seen any

 6        of those seven pages before today?

 7   A.   Yes.

 8   Q.   Could you, using the bottom right-hand corner

 9        identifying Bates stamp numbers, list the

10        numbers of the pages that you recognize.

11   A.   Using the bottom --

12   Q.   Bottom right-hand corner, sir.

13   A.   Well, they are all the same.  Oh.  I

14        recognize 00573.  I don't recognize 000131.

15   Q.   What about the remainder of the pages?

16   A.   I don't recognize 00561.  I do recognize

17        000575.  000574, I don't recognize.  000573,

18        I recognize, and 00572, I recognize.

19   Q.   With regard to the first page, which is Bates

20        stamped 572, at the bottom there's a name,

21        Ron Mitchell; do you see that?

22   A.   Yes.

23   Q.   Was this the document that you faxed to IFC?

24   A.   Yes.
```

1   Q.  And was it a one-page fax?

2   A.  I don't recall.

3   Q.  Is this the bill of lading that you believe

4      to be a forgery?

5   A.  Yes.

6   Q.  What is it about this causes you to believe

7      it's a forgery?

8   A.  Because I just assumed it was because I knew

9      we couldn't get the real one.

10  Q.  Now, at the bottom, it looks to be a fax

11     transmittal; do you see that, sir?  I will

12     point it out to you.

13  A.  Yes.

14  Q.  Yes?

15  A.  Yes.

16  Q.  Do you know what that represents?

17  A.  No, I don't.

18  Q.  Did you send this facsimile on April 21,

19     2005?

20  A.  Yes.

21  Q.  Did you intend it to go to Mr. Gemme?

22  A.  Yes.

23  Q.  Did you intend to have Mr. Gemme accept this

24     as a bill of lading for a shipment to IFC?

```
1    A.   Yes.

2    Q.   If we look at the second page, which is

3         page 573, it appears to me that in the top

4         right-hand corner there is Regional Trucking

5         written down; do you see that?

6    A.   Yes.

7    Q.   Did you write that?

8    A.   I believe so.

9    Q.   Now, can you tell me whether at the time it

10        was faxed to Mr. Gemme, whether that Regional

11        Trucking language was written in?

12   A.   Could you repeat that?

13   Q.   Sure.  Were the words that appear at the top

14        right-hand corner of page 573, where it says

15        Regional Trucking, 5 Heart Street,

16        West Haven, Connecticut 06514, were those on

17        the page at the time you faxed it to

18        Mr. Gemme?

19   A.   I would think so.

20   Q.   Did you have any conversations with anyone at

21        IFC in which they said, We can't read the

22        name of the shipping company?

23   A.   I don't recall that.

24   Q.   At the top of page 573, there appears to be a
```

1     Mansfield Rug Co. as d/b/as with East Haven,

2     Connecticut?

3  A.  Yes.

4  Q.  Both?

5  A.  I don't know.  The only reason I know that is

6     because I got a tax bill one time.  I'm just

7     a d/b/a.  I'm a broker.  That's the name I

8     bill it under and they waived the tax.

9  Q.  Which company had the tax?

10  A.  I believe it was Mansfield.  I'm not certain.

11  Q.  Do you know how the name Tyrone Williams was

12     entered on to this particular form, which is

13     572 and 573?

14  A.  I believe he signed it.

15  Q.  Do you recognize his signature?

16  A.  No.

17  Q.  Who prepared the rest of the writing on this

18     particular -- let's go with 572, who prepared

19     the writing on this page, sir?

20  A.  I'm going to say I did.

21  Q.  You've actually prepared this bill of lading?

22  A.  Or co-prepared it with Kevin Britto.  That's

23     my writing, I'm sure.  So, yes, I prepared

24     it.

1          Did Mr. Britto ask you to make this

2     fake bill of lading?

3   A.  Yes.

4   Q.  Okay.  Earlier today you said that you

5     believed that this bill of lading was a

6     forgery; do you remember that?

7   A.  Until I saw -- yes, until I saw it.  I always

8     said I thought it was a forgery.  But until I

9     saw it, I really didn't remember how it came

10    about.

11  Q.  Okay.  And when Mr. Adams wasn't getting back

12    to you and Mr. Britto asked you to create a

13    fake bill of lading, did either of those

14    events cause you to become suspicious?

15  A.  No, I just wanted to end it.

16  Q.  Did you communicate directly with Tyrone

17    Williams at any time during this period?

18  A.  I don't think so.

19  Q.  Did you ever communicate with him?

20  A.  No.

21  Q.  Did you ever try to?

22  A.  No.

23  Q.  If we had a voice mail showing you left a

24    voice mail for Mr. Williams, would that

1    correct?

2    A.   Yes.

3    Q.   And so did you lie -- have you lied to any

4         customers other than IFC in your career?

5                   MR. COHEN:   Objection.   Time frame?

6    A.   I'm sure I have.

7    Q.   Did you lie to your other customers with the

8         frequency with which you lied to IFC?

9    A.   No.

10   Q.   Okay.   So why would you lie more to IFC?

11   A.   The lies were only at the end where I was

12        trying to stall.   I mean, other than that, I

13        wasn't lying to anyone.

14   Q.   Okay.

15   A.   I thought we were doing a good thing.

16   Q.   Is it a more accurate statement to say that

17        the lies were at the end because you realized

18        that there was a problem involving these

19        alleged shipments?

20   A.   Problem, yes.

21   Q.   And the nature of that problem was that they

22        may not have been happening at all; is that

23        correct?

24   A.   I didn't think that.

```
 1   Q.   You never thought that before the case
 2        started?
 3   A.   Never.
 4   Q.   You mentioned a Tony Maresca.  How do you
 5        spell Maresca?
 6   A.   M-A-R-E-S-C-A.
 7   Q.   How do you know Mr. Maresca?
 8   A.   I've known him for 35 years.
 9   Q.   Okay.
10   A.   He used to be a customer of mine, initially.
11   Q.   Were you in Connecticut when you met him?
12   A.   Yes.
13   Q.   Have you lived in Connecticut the bulk of
14        your life?
15   A.   Yes.
16   Q.   Has he?
17   A.   Yes.
18   Q.   Has Mr. Maresca ever worked for Building 19?
19   A.   No.
20   Q.   Has Mr. Maresca ever worked for IFC?
21   A.   No.
22   Q.   Have you ever seen his name on any IFC
23        purchase orders?
24   A.   Yes.
```

1    Q.   At the time, was he a contact person for IFC?

2    A.   He could have been, but that was not the

3         intent.

4    Q.   Okay. Let's break that down. It's your

5         testimony that Mr. Maresca could have been a

6         contact person for IFC with regard to

7         purchase orders --

8    A.   What was the question --

9    Q.   -- with regard to purchase orders; is that

10        correct?

11    A.   Yes.

12    Q.   What role did he play in these purchase

13        orders?

14    A.   Really, nothing. From the very first

15        purchase order -- if not the first, one of

16        the first -- Dave Adams put his name down.

17        Just put it on this and it just stayed.

18    Q.   Did you know he wasn't a true contact person

19        for IFC?

20    A.   If something happened to me, he could have

21        been gotten ahold of and answered someone's

22        question.

23    Q.   Okay.

24    A.   To be honest, I didn't think much of it.

```
 1   Q.  But you knew it was wrong, correct?

 2   A.  I didn't think of it that way.

 3   Q.  Did you ever have any concern arising out of

 4       the fact that you saw the name Tony Maresca

 5       as the contact person on purchase orders from

 6       IFC?

 7   A.  Repeat that, please.

 8   Q.  Did you ever have any concern when you saw

 9       Tony Maresca's name listed as the contact

10       person --

11   A.  No.

12   Q.  -- on the purchase orders?

13   A.  No, I didn't.

14   Q.  Did you think it was misleading?

15   A.  No.

16   Q.  What was his role as the contact person?

17   A.  If something happened to me, they could talk

18       to him.

19   Q.  So were you, in reality, the contact person

20       and he was the backup contact person?

21   A.  Yes.

22   Q.  I see.  So it should have been your name as

23       the contact person on the purchase orders?

24   A.  Yes.
```

```
 1    A.   Yes.

 2    Q.   Was there a partnership agreement?

 3    A.   I don't know what it's -- what it's called.

 4    Q.   Did you have --

 5    A.   There was a piece of paper that was filed.  I

 6         thought it was kind of foolish, to be honest,

 7         but it was to protect her.

 8    Q.   Is that the piece of paper you talked about

 9         that went to the government?

10    A.   Yes.

11    Q.   The one piece that was produced?

12    A.   Yes.

13    Q.   Was there a partnership agreement?

14              MR. COHEN:   Objection.

15    A.   No.

16    Q.   Was there a written partnership agreement?

17    A.   No.

18    Q.   Did she buy into Remco?

19    A.   No.

20    Q.   Did she own a percentage of Remco?

21    A.   No.

22    Q.   How was she paid for her work for Remco?

23    A.   Based on a percentage of the profits.

24    Q.   At the outset, what was her percentage?
```

1    A.    It's hard to answer because it changed all

2          the time; but on the outset, I would say six

3          percent.

4    Q.    Okay.  Let's go back to that in a minute.  We

5          were talking earlier about Mr. Maresca having

6          his name put on as the contact person.  And I

7          had asked you how David Adams knew

8          Mr. Maresca.

9                How did it -- I'm sorry.  I blanked.

10         When did you first -- when did Mr. Adams and

11         Mr. Maresca first meet?

12   A.    When Dave asked me about sending him money to

13         buy carpet and then Remco billing it, I

14         explained to him I didn't have any capital.

15         I said but friends of mine -- meaning, Jane

16         and Tony -- that I would go to them, which I

17         did, and in the very beginning, the three of

18         us took a ride; we met Dave at one of the

19         stores.

20   Q.    Before we get to that meeting --

21   A.    Go ahead.

22   Q.    -- tell me the conversation that you had

23         with -- strike that.

24                When you first approached

1      them feel better, and the thing started.

2  Q.  You haven't told me what they said during the

3      conversation, the initial conversation.

4  A.  I don't recall. Not at all. The exact --

5  Q.  Did they raise any concerns about investing

6      money?

7  A.  Oh, yes.

8  Q.  So what was their role going to be?

9  A.  Their role was to give me the money to send

10     to Dave -- well, initially, it was sending it

11     to CCC. And then when the invoice was paid,

12     they'd get their money back and a percentage

13     of the profits.

14 Q.  What concerns did they raise?

15 A.  Are we going to get paid? Is this whole

16     thing for real? Normal? Normal concerns

17     anyone would have.

18 Q.  As of that time, was Ms. Dzeimit working?

19 A.  Out of her house, yes.

20 Q.  What was she doing?

21 A.  Mortgage broker. I believe she even worked

22     as a paralegal for an attorney out of

23     New York occasionally. I don't know the

24     details of that.

1    Q.   All right.   She was a mortgage broker?

2    A.   For lack of a better word, yes.

3    Q.   As of the time that you approached them about

4         this proposition, did you ever have an

5         occasion to take any loans from Ms. Dzeimit

6         up to that point?

7    A.   No.

8    Q.   Okay.   How about for Mr. Maresca?

9    A.   No.

10   Q.   Now, you said you went to -- let's go off the

11        record for a second.

12                     (Lunch recess.)

13                (Exhibit Nos. 38-39 marked.)

14   Q.   Mr. Mitchell, I just want to ask you another

15        question that relates to Exhibit 37.

16             What would have been unprofessional

17        about telling IFC that Dave Adams had the

18        paperwork that they sought?

19   A.   I don't know how to explain that.   I don't

20        know how to answer that.   I'm sorry.   I don't

21        know how to answer that.

22   Q.   You understand the question?

23   A.   Yes.

24   Q.   You have no information that you can impart

1    around 1999?

2  A.  Yes.

3  Q.  Okay.  As best you -- where did the meeting

4    take place?

5  A.  One of the -- is there more than one store in

6    Rhode Island?  I want to say the Cranston,

7    Rhode Island store.

8  Q.  And who called for the meeting to occur at

9    that place?

10  A.  I think it was mutually agreed upon.

11  Q.  What was the purpose of the meeting?

12  A.  For Jane and Tony to meet Dave Adams.  He

13    showed us some -- you know, the pile of rugs;

14    this is the kind of things we would be

15    buying, just to make them more comfortable

16    about lending more money.

17  Q.  What was said during the meeting?

18  A.  I, actually, for the most part, walked around

19    the store and let -- I didn't want to come

20    across as trying to push people together.  I

21    kind of walked around the store and let the

22    three of them talk.

23  Q.  So you weren't present when they spoke?

24  A.  I was present some of the time.  I don't

```
 1        remember the exact conversations, but I tried

 2        to make myself a little scarce to let them

 3        meet.

 4   Q.   You don't remember any of the conversations?

 5   A.   You know -- other than, you know, we're going

 6        to use your money to buy these rugs or

 7        carpets or whatever they may be and how it's

 8        going to work.  I don't remember exact

 9        detail.

10   Q.   Up to that point, you had been dealing with

11        padding?

12   A.   Yes.

13   Q.   And so this would have been a departure from

14        your normal course of business into rugs; is

15        that correct?

16   A.   Correct, I was actually at that point

17        contemplating taking on a carpet line from a

18        company in Georgia, but I never actually

19        completed that venture.

20   Q.   Okay.

21   A.   My attitude was if I'm out calling on

22        customers to sell them pad, why not have

23        something else to sell too.

24   Q.   David Adams, do you have any knowledge as to
```

 1    whether or not he has a history of gambling?

 2              MR. COHEN:  At what point in time?

 3    A.  I can't say that I know that for sure.  I

 4        thought the possibility existed.

 5    Q.  When did you form the opinion that you

 6        thought the possibility existed?

 7    A.  The day, I couldn't say.  Maybe a year after

 8        we started doing other than pad business.

 9    Q.  So this would be what year?

10    A.  I'd say 2000.  I'm guessing.

11    Q.  Well, when you say you're guessing --

12    A.  I'm estimating.

13    Q.  How long had you been doing business with

14        Mr. Adams as of 2000?

15    A.  Two years.

16    Q.  During those two years, have you ever had --

17        had you ever had to go to a third party to

18        obtain funding?

19    A.  No.

20    Q.  So this particular venture in getting money

21        from a third party would have been a change

22        from your usual course of business?

23    A.  Yes.

24    Q.  What was it that caused you to believe that

1       is always broke, because you know, this for

2       me, he made good money for me.  And it would

3       be, Well, he's probably gambling it away.

4       You know, whether that was true or not, I

5       don't know.

6    Q.  You testified before we broke for lunch that

7       it was your understanding that the business

8       that you were carrying on with Mr. Adams was

9       going to be over after Mr. Adams was

10      separated from his employment with

11      International Floor Crafts; do you remember

12      that?

13   A.  Yes.

14   Q.  Why couldn't you continue to do business with

15      IFC after Mr. Adams separated from his

16      employment?

17   A.  I didn't have the sources of supply.  I

18      actually was hoping -- I didn't know what was

19      happening with Dave.  There was a good

20      two-month period I didn't speak to him, and I

21      even mentioned to Kevin, you know, If you

22      guys want to tell me who to tell to try to

23      keep this going, you know, I'd be happy to do

24      it.

1    Q.   What did Kevin say?

2    A.   I don't recall.

3    Q.   Did you ever approach Kevin Britto with any

4         concerns that David Adams might not be

5         engaging in legitimate deals with IFC?

6    A.   Can you repeat that?

7    Q.   Did you ever tell Kevin Britto that you were

8         suspicious that David Adams might be stealing

9         money from IFC?

10   A.   No.

11   Q.   What happened as a result of this meeting

12        with David Adams, that we were talking about

13        a few minutes ago, with Jane Dzeimit and Tony

14        Maresca?

15   A.   We decided to go forward.

16   Q.   And what was Jane Dzeimit's role going to be?

17   A.   The money lender, the capital person.

18   Q.   Was she going to be responsible for keeping

19        the books and records?

20   A.   It was never really discussed.  We both kept

21        our records.

22   Q.   Did she work out of your condominium?

23   A.   No.

24   Q.   Where did she work out of?

1        purchase order number on it.

2   Q.   And it would have the contact person listed

3        on it?

4   A.   Yes.

5   Q.   You talked a little bit -- earlier today, we

6        started to talk about the percentages, the

7        amount of money, Ms. Dzeimit received from

8        this, and I believe you said that she was

9        initially -- although the number

10       fluctuated -- getting about six percent; is

11       that right?

12  A.   As I recall.

13  Q.   Six percent of what?

14  A.   Of the invoice.

15  Q.   Okay.  If you will, please walk me through

16       how one of these deals would work from

17       beginning to end.

18  A.   The first five or six were different from all

19       the rest.

20  Q.   Okay.

21  A.   The money was sent --

22  Q.   Let me interrupt, so the record is clear.

23       Let's talk about the first five or six for

24       now; tell me how those worked.

1    A.    They were all purchased from CCC.  We sent

2          money to CCC.  I believe -- I'm not positive,

3          I believe then we got the purchase order.  I

4          can't remember if we sent the money and then

5          got the purchase order, or vice versa, but we

6          sent money to CCC.  At some point I was told

7          it's been shipped, go ahead.  Actually, I

8          think I got shipping papers in the beginning

9          from CCC.

10   Q.    Bills of lading?

11   A.    (No audible response.)

12   Q.    You're not sure?

13   A.    Some sort of a shipping paper.

14   Q.    So who is the "we" when you say "We sent

15         money to CCC"?

16   A.    Jane and I.

17   Q.    From what account would it come from, the

18         funds?

19   A.    Initially, Jane sent it directly to CCC.

20   Q.    From where?

21   A.    From her home.

22   Q.    From her what account?

23   A.    I don't recall.  And I might not even know.

24   Q.    So would you see any of the paperwork

1       associated with her sending out a check?

2   A.  Not then, no.

3   Q.  Where would she send the check to?

4   A.  Again, we're talking the first five or six.

5   Q.  Absolutely.

6   A.  To Lorton, Virginia -- I think that was the

7       name of the town -- CCC, wherever they were,

8       she sent the money directly there.  I think

9       there was even a conversation between Jane

10      and one of the people at CCC just to make

11      sure one knew what the other was doing.

12  Q.  Okay.  How would Jane learn how much to send

13      to CCC?

14  A.  We were given a number by Dave Adams.

15  Q.  Was it a round number like 25,000, or was it

16      based on an invoice?

17  A.  Based on an invoice.

18  Q.  Would there be a two percent credit on these

19      invoices on what was sent or not?

20  A.  Are you talking about a discount to IFC?

21  Q.  Yes.

22  A.  I don't recall.  I would guess there was.

23  Q.  So somehow Jane would learn about the amount

24      of an invoice and she would issue a check

```
 1         from an account you are not sure of to CCC;
 2         is that correct?
 3    A.   Correct.
 4              MR. COHEN:   Objection to the
 5         question.
 6    Q.   What was your role during these first five or
 7         six deals?
 8    A.   Dealing with Dave Adams.
 9    Q.   Would you be the intermediary between Dave
10         Adams and Ms. Dzeimit?
11    A.   Yes.
12    Q.   Did they ever speak directly, to your
13         knowledge?
14    A.   Very rarely.
15    Q.   Like, how many times?
16    A.   Less than ten.
17    Q.   Less than ten throughout the entirety of '99
18         to 2007?
19    A.   Yes.
20    Q.   Once Ms. Dzeimit issued a check, what would
21         the next step be?
22    A.   Again, we're referring to the first half a
23         dozen?
24    Q.   Yes.
```

1   A.   We'd bill it.

2   Q.   Okay.  When you say a bill, you mean you --

3   A.   Invoice it.

4   Q.   Would it be a Remco invoice?

5   A.   Yes.

6   Q.   Who would prepare the invoice?

7   A.   Jane.

8   Q.   What would she use to prepare the invoice?

9   A.   Me telling her that Dave said it's been

10       received and you can go ahead and bill it.

11  Q.   How would she know what to put in the invoice

12       in terms of what product?

13  A.   From the purchase order.

14  Q.   This would be an IFC purchase order?

15  A.   Yes.

16  Q.   Okay.  Who prepared the IFC purchase order?

17  A.   Dave Adams.

18  Q.   So would he fax it to Remco?

19  A.   He'd fax it to me, yes.

20  Q.   He would fax it to you and then --

21  A.   Sometimes I would just refax it right to her.

22  Q.   How far apart did you and Ms. Dzeimit live at

23       the time?

24  A.   Five miles.

1  Q.  So you would get a purchase order in and you

2      would in essence refax it to Ms. Dzeimit,

3      correct?

4  A.  Correct.  That would be the case really for

5      all of it.

6  Q.  Okay.  She would then prepare an invoice and

7      send it to IFC?

8  A.  IFC, correct.

9  Q.  Would you review the invoice before it goes?

10 A.  Yes.

11 Q.  How would you obtain it before you reviewed

12     it?

13 A.  She would fax it to me.

14 Q.  And then you would give her the go-ahead to

15     send it to IFC?

16 A.  Yes.

17 Q.  Would she mail it to IFC?

18 A.  Yes.  Primarily, I was proofreading is what I

19     was doing.

20 Q.  Did you proofread each and every one of

21     those?

22 A.  Yes.

23 Q.  And then the invoice, was that invoice such

24     that if they paid within 30 days, they would

```
1        get a two percent discount?
2    A.  Yes.
3    Q.  So in the normal course, in these first five
4        or six we're still talking about, how long
5        would it take to get a payment on the
6        invoice?
7    A.  30 days.
8    Q.  All right.  Where would the check go to?
9    A.  P.O. Box.
10   Q.  And either you or Ms. Dzeimit would pick it
11       up?
12   A.  Yeah.  Initially, she would pick it up, yes.
13   Q.  And then what would happen next?
14   A.  She would take -- to use a number and maybe
15       simplify it a little bit, let's say we sent
16       $10,000.  I'm just using an arbitrary number
17       here --
18   Q.  Sure.
19   A.  -- and we billed it for $14,000, she would
20       then take her 10,000 investment back, and
21       what was left over -- I think on the first
22       six -- we just -- let's say that $4,000 was
23       left over, that was our money at that point.
24   Q.  Okay.  Who's "our money"?
```

```
 1   A.   Jane would get a portion and I would get a
 2        portion.  This is only the first ones I
 3        believe.  I don't think we sent Dave any
 4        money on those.
 5   Q.   So what portion would you get and what
 6        portion would she get?
 7   A.   It started out -- it was either 60/40 or
 8        50/50.
 9   Q.   Now, when the -- to use your example -- the
10        $14,000 had came in, where would those funds
11        be deposited?
12   A.   At that time it would have been whatever bank
13        Jane was using.
14   Q.   She would deposit it into her own account?
15   A.   I believe so.
16   Q.   Did you have the Ronald Mitchell d/b/a Remco
17        account up and running yet?
18   A.   Probably -- I don't think so.
19   Q.   So after she deposited the checks, was she
20        responsible for making the disbursements of
21        the funds?
22   A.   Initially, yes.
23   Q.   So she would issue you a check for whatever
24        it was -- if it was 50/50 for $2,000; is that
```

```
 1        correct?

 2   A.   As I remember, yes.

 3   Q.   Okay.  All right.  Have you now told me the

 4        entirety of the process involved in the first

 5        five or six deals?

 6   A.   I believe so.

 7   Q.   In your 35 years of working in rug and

 8        padding, had you ever handled a deal in the

 9        way that those first or five or six went?

10   A.   No.

11   Q.   So that was a change in the practice and

12        procedure for you, correct?

13   A.   (No audible response.)

14   Q.   Is that a yes?

15   A.   Yes.  Sorry.

16   Q.   After the first five or six, how did the

17        process change?

18   A.   Dave had said to me he had other vendors,

19        sources of supply, that we could get

20        truckloads of rugs primarily.  Sometimes it

21        was even padding involved because I wasn't

22        happy with that because I wanted to continue

23        to sell the other pad.

24             Basically, he said, If you send me
```

```
 1          the money, I'm negotiating a better deal with
 2          whomever the supplier is.  I asked why can't
 3          I send the supplier the money directly?  Why
 4          do I have to send it to you?  Because he
 5          didn't want me to know who the supplier was.
 6    Q.    Did you believe him?
 7    A.    (No audible response.)
 8    Q.    Yes?
 9    A.    Yes.  I'm sorry.
10    Q.    Had you ever dealt in this way before in
11          conducting your business?
12    A.    No.  I understood what he meant.  I mean, the
13          floor covering business could be very
14          cut-throat at times.  If you are a
15          distributor of floor coverings, and you are
16          selling someone product and they like it,
17          your worst nightmare is they find out where
18          it came from and go to the manufacturer
19          directly and bypass the distributor and his
20          profit.
21    Q.    Was Dave Adams still dealing with CCC during
22          this time?
23    A.    I believe so.
24    Q.    Okay.  Did you ever ask him why you couldn't
```

```
 1        go around him.

 2    Q.  Did it concern you at all that David Adams

 3        didn't trust you with the information of who

 4        the sellers were?

 5    A.  No.  No.  Possibly a little.  I remember

 6        saying, Don't you know me by now?  I'm not

 7        going to do that to try to hurt you.  It

 8        would be ridiculous because you are the

 9        buyer.

10    Q.  Okay.  So under this -- I will call it the

11        second scenario, what would happen?  Just put

12        it in your hands.  What would happen?

13    A.  David would send me a purchase order, ask me

14        when I would send the money.  At some point

15        in time we started doing wire transfers to

16        simplify things.  I would get the money from

17        Jane, wire transfer it or send a check, or

18        whatever the case may have been, I would send

19        the money to Dave.  On average, a period of

20        two or three weeks would go by.  Dave would

21        tell me to bill it, which Jane would bill it,

22        and we'd wait for a check.

23                At this point in time, I didn't know

24        if this was going to happen once or go on
```

1    were talking about.

2            You said that you would get money

3    from Jane as a part of this process, correct?

4  A.  Um-hum.

5  Q.  Is that a yes?

6  A.  Yes.

7  Q.  First of all, how would you know that you

8    needed money from Jane?  How would it come

9    about?

10  A.  Dave Adams would send me a purchase order,

11    and probably more often than not, Dave would

12    call me, and say, I'm going to send you a

13    purchase order for a truckload of whatever;

14    do you see a problem in sending me the money

15    for it?

16  Q.  Did the amount that you could send back to

17    David Adams relate to the amount of the

18    purchase order?

19  A.  Say that again.  I'm sorry.

20  Q.  Sure.  Did the amount that you would send to

21    David Adams, did that --

22  A.  Initially, that I sent to him?

23  Q.  Okay.  The amount that you initially sent to

24    David Adams, was that the same or similar to

1      the amount on the invoice?

2  A.  No.

3  Q.  Okay.

4          MR. COHEN:  Objection to the form.

5  Q.  How was the amount that you would send to him

6      determined?

7  A.  Whatever he asked me for.

8  Q.  At some point he would contact you directly

9      and say, I need X dollars; is that correct?

10 A.  Yes.  It was almost --

11 Q.  Go ahead.

12 A.  -- like a standard of 25.  I remember asking,

13     How come it's not 22 or 27?  Why is it

14     always -- and he gave me a reason why.  And

15     it didn't really matter to me.

16 Q.  What was the reason that he gave you?

17 A.  That he -- you know, sometimes he might be

18     sending 23.  Sometimes he might be sending

19     27.  That he would always work it out.

20 Q.  Okay.  Did that make you suspicious?

21 A.  No.

22 Q.  Okay.  Why not?

23 A.  Because I'm stupid.  I'm sorry.  I don't mean

24     to -- it didn't.

1  Q.  Did the amount of a purchase order ever

2      exceed these $25,000 that he would ask for?

3  A.  Oh, yes.

4  Q.  Did it ever exceed it significantly?

5  A.  What's "significantly"?

6  Q.  Can you give me an idea, on a general basis,

7      how much the amount of the purchase order

8      would exceed the amount that he was

9      requesting?

10 A.  $10,000.  Well, we have them right there.

11     Sorry.  I'm sure I'm not supposed to do that.

12 Q.  So then you would contact Jane Dzeimit and

13     say, I need X dollars, correct?

14 A.  Correct.

15 Q.  Okay.

16 A.  There were times when she wouldn't put up the

17     money.  She may have felt there was already

18     too much money out.  And say, you know, I'm

19     not putting any more money out until I get my

20     oldest investment back.

21 Q.  Will you agree with me, that is where

22     Mansfield Rug came from?

23 A.  Absolutely.

24 Q.  So let's just stick with the circumstances

1       that Jane Dzeimit did give you the money,

2       okay?

3   A.  (No audible response.)

4   Q.  You have to say yes.

5   A.  Yes.  I'm sorry.

6   Q.  That's okay.  Which she would issue you a

7       check of some sort?

8   A.  That changed over time.  At some point in

9       time, and it might have been -- I'm

10      estimating -- a year into it, I put the money

11      in the Remco account.

12  Q.  From Jane Dzeimit?

13  A.  From the check that came from IFC.  One of us

14      would get -- usually, she got the check out

15      of the P.O. Box, and then I started

16      depositing it in that Citizens account under

17      Remco.  Yes, I'm sure that's correct.  Then I

18      would write Jane a check and Dave Adams a

19      check, or I would just -- from that same

20      amount of money, I would disburse by wire

21      transfer whatever Dave was supposed to

22      receive.

23  Q.  That's kind of the end of the process, right?

24      I'm talking about the beginning when you

1    initially send funds to David Adams, okay?

2  A.  Okay.

3  Q.  All right.  And at the beginning -- also the

4    beginning of this second scenario, Jane

5    Dzeimit would issue a check; is that correct?

6  A.  Correct.

7  Q.  All right.  Who would it be made payable to?

8  A.  Either Remco or Ron Mitchell.

9  Q.  So in other words, the funds would go to you

10    and then you would disburse them to David

11    Adams; is that correct?

12  A.  Yes.  See.  It was always -- never just one

13    set way.  I mean, there were times when where

14    I believe -- and I don't know this for a

15    fact -- but I'm almost sure that to expedite

16    the matter -- I was on vacation, she sent the

17    money to Dave Adams.  It was never, you know,

18    This is the way we have to do it, kind of

19    thing.  It just varied from time to time.

20  Q.  Why didn't Jane Dzeimit just issue the check

21    for, say, the $25,000, or whatever amount he

22    wanted, directly from Jane Dzeimit to David

23    Adams on every occasion?

24  A.  I don't have an answer for that.

1  Q.  Okay.

2  A.  I should have, but I have to think.

3  Q.  When the funds came to you, would you then

4      deposit them in your Citizens account?

5  A.  Yes.

6  Q.  And then you would make a disbursement to

7      David Adams from that account, correct?

8  A.  Correct.

9  Q.  For the full amount that Jane Dzeimit had

10     given you, correct?

11 A.  Correct.

12 Q.  And sometimes that was done by a wire

13     transfer, correct?

14 A.  Correct.

15 Q.  Other times did you write out checks to cash?

16 A.  To go to who?

17 Q.  Well, that's my next question.

18         Were there times during this process

19     that you would issue checks to cash?

20 A.  Not that I recall.

21 Q.  Do you remember issuing any checks to cash as

22     part of this process?

23 A.  I do, but I don't remember why.  I think if I

24     made a check to cash -- and I'm not

1    completely sure what I'm saying is the

2    truth -- if I made a check to cash, it would

3    have been to Jane.  I don't think I ever did

4    one to Dave Adams.

5  Q.  Why did you make checks payable to cash for

6    Jane?

7  A.  I don't recall.

8  Q.  Would you agree with me that it's not good

9    business practice to make a check payable to

10   cash from an account for a business?

11 A.  Yes.

12 Q.  Were you trying to hide something?

13 A.  No.

14 Q.  Some of these checks that are made payable to

15   cash, I represent to you are for large

16   amounts and several thousands of dollars.

17        Does that refresh your recollection

18   as to issuing some checks to Jane Dzeimit in

19   cash?

20 A.  I said I probably did.  I don't remember

21   amounts.

22 Q.  But do you remember the amounts getting up to

23   the tens of thousands?

24 A.  No.

1    break?

2    A.   No.

3    Q.   Okay.

4             MR. KLEHM:   Fred, while he's looking

5    that over, can I talk to you for a second?

6             We can go off the record for just a

7    second.

8             (Short recess.)

9    Q.   Okay.  Sir, have you had an opportunity to

10   look through exhibit -- I can't read the

11   number -- 40?

12   A.   40.

13   Q.   Have you had an opportunity to look through

14   it?

15   A.   Yes.

16   Q.   And each time when the signature Ron Mitchell

17   appears, is that your signature?

18   A.   Yes.

19   Q.   And each time the signature appears of Jane

20   Dzeimit, does that appear to you to be her

21   signature?

22             MR. COHEN:   Objection.  Lack of

23   foundation.

24             MR. KLEHM:   All right.  I withdraw

```
 1        the question.

 2   Q.   Do you recognize the signature of Jane

 3        Dzeimit?

 4   A.   Yes.

 5   Q.   You've seen it several times before today?

 6   A.   Yes.

 7   Q.   Are you able to tell me whether or not where

 8        her signature appears on these documents,

 9        whether it is indeed hers?

10   A.   I believe it is.

11   Q.   Okay.  So we got into this issue about

12        Exhibit 40 when I asked you about checks to

13        cash.  I want to direct your attention to

14        page 1557.  If you look at the bottom

15        right-hand corner.

16   A.   1557.

17   Q.   Five or -- three or four pages in.

18   A.   Oh, okay.  I have it.

19   Q.   All right.  The first check is a check for

20        $15,000 made payable to cash; do you see

21        that?

22   A.   Yes.

23   Q.   What was that check for?

24   A.   On the preceding page where the backside of
```

1    the check is showing, that check was endorsed

2    by Jane Dzeimit, correct?

3  Q.  Okay.

4              MR. COHEN:  I think it's the

5    subsequent page.

6  Q.  I think you mean 1558 is supposed to be the

7    back side.

8  A.  Okay.  The $15,000 endorsed by Jane --

9    without other records, I don't know what it's

10   for.  I mean, obviously it has to do with the

11   case, but specifically what it's for, I don't

12   know.  I could take the date, put it up

13   against my records and be able to tell you.

14 Q.  Is there any reason why you didn't write in

15   the memo portion what that $15,000 was for?

16 A.  I don't know why I didn't.

17 Q.  Are you able to tell me now, having had an

18   opportunity to look at Exhibit 40, any of the

19   reasons why you would have checks issued

20   payable to cash?

21 A.  Do any of them have like an invoice number

22   or -- let me try to find another cash one.

23 Q.  Sir, let me try to help you along.  My

24   associate has earmarked all of the ones made

```
 1         those funds to make a wire transfer to -- I

 2         will stop talking.  Go ahead, if you thought

 3         of something.

 4    A.   That may be the answer.

 5    Q.   Okay.  So you would use these -- write checks

 6         to cash that would later be used for a wire

 7         transfer?

 8    A.   I'm not saying I know that as a fact.  I'm

 9         saying that's a possibility.  I would have to

10         match it up to something.

11    Q.   Okay.  But why would you write the check

12         payable to cash as opposed to some other

13         entity when making a wire transfer?

14    A.   That's People's Bank, isn't it?  Yeah.

15         Again, I don't know this to be the factual

16         answer, but it would have just been for wire

17         transfers, that I have some memory of a -- I

18         would write the check to cash and they would

19         wire transfer the money to Dave.  I'm not

20         saying that that's definitely what that is

21         for.  I'm sure I could find out.  I'm almost

22         positive I could find out.  It wasn't done to

23         mislead anything.

24    Q.   Would you agree with me it looks rather
```

1       suspicious?

2  A.   Yes.

3  Q.   Were you trying to make it harder for people

4       to trace where the funds went?

5  A.   No.  No.  I really think it has something to

6       do with the wire transfers, but I'm not

7       positive of that.

8  Q.   Okay.  Will you agree with me you could have

9       worked out wire transfers without having to

10      write checks to cash?

11  A.   Yes, but it might have been a way to expedite

12      it at the bank.  I'd be more than happy, if

13      possible, to get back to you on that.

14  Q.   What records would you look at to determine

15      where the funds were going, this cash?

16  A.   Possibly in my checkbook.  Possibly in those

17      records that you have in discovery.

18  Q.   What would you do with these checks made

19      payable to cash?

20  A.   I don't understand -- you know, how to answer

21      that question.  If I don't know what they

22      were for...

23  Q.   If we look at page 1700, you see that you

24      endorsed at least the top two checks,

1    to Dave so he could buy carpet.

2  Q.  So is it your testimony that the checks made

3    payable to cash were so the funds could be

4    deposited in David Adams' Citizens Bank

5    account immediately?

6  A.  No.  That's a possibility.  I would have to

7    look.  I don't want to answer something I'm

8    not sure of.

9  Q.  In any of the previous business that you had

10    done in padding and rugs, had you worked with

11    checks made payable to cash?

12  A.  No.

13  Q.  So this was a change in your practice?

14  A.  Yes.

15  Q.  Do you know why with regard to page 1699 why

16    you would write out two separate checks, one

17    for 20- and one for 10,000?

18  A.  No, not off the top of my head.

19  Q.  Do you know --

20  A.  I don't.  What's strange is I don't even

21    remember having checks with a cat on it.

22    Obviously, that's me.

23  Q.  Down at the bottom, there's a check for

24    $95.80; do you see that?

```
 1        did.  I think it's a possibility, but I don't

 2        remember.

 3   Q.   Let's go to the page 1741.  I believe it's

 4        two pages down.

 5   A.   Okay.

 6   Q.   There's a check made payable to cash for

 7        6,000; do you see that?

 8   A.   Yes.

 9   Q.   And if you look at the next page, that check

10        was endorsed by Jane Dzeimit, correct?

11   A.   Correct.

12   Q.   Do you know what that was for?

13   A.   No.

14   Q.   Okay.  That's out of your personal account;

15        is that correct?

16   A.   Yes.

17   Q.   Did Jane Dzeimit ever make any personal loans

18        to you?

19   A.   Not that I recall.

20   Q.   So why would you be writing her a check from

21        your personal account for $6,000?

22   A.   I don't know.

23   Q.   Now --

24   A.   It's possible -- again, I don't know -- I
```

1    either the first scenario you discussed with

2    CCC or this second scenario that we're going

3    through now?

4        MR. COHEN:  Objection to the form.

5  A.  Kevin Britto had initially no role

6    whatsoever.  As time went on -- I would say

7    the first -- I'm estimating the time.

8    Probably the first two years we were doing

9    this, I never spoke to Kevin Britto.

10 Q.  Okay.

11 A.  At some point, we had occasional

12    conversations.

13 Q.  About what?

14 A.  He may have called and asked -- I mean, this,

15    I do remember one time happening.  He called

16    and asked if I had sent money to Dave for

17    such and such an invoice.

18 Q.  When did he call and ask for that?

19 A.  I don't know the exact date.

20 Q.  Were you surprised when Kevin Britto called

21    you for that information?

22 A.  Mildly.

23 Q.  He had played no role in these dealings,

24    right, at least up to that point?

1   Q.  Did you ever match up the products with any

2       invoices or purchase orders?

3   A.  No.

4   Q.  Did you ever contact Oriental Weavers to try

5       to continue working with them after David

6       Adams left IFC?

7   A.  No.

8   Q.  Why not?

9   A.  That's exactly what -- repeat the question.

10      When you say, after Dave Adams...

11   Q.  We'll go back to that in a minute.

12          You testified a little while ago

13      that Remco sold about $3 million in product

14      to IFC.

15   A.  You know, I never added it up.

16   Q.  Okay.

17   A.  That's probably a reasonable estimate.

18   Q.  All right.  And Mansfield Rug sold another

19      approximately a million, correct?

20   A.  I don't think it would be a million.  I don't

21      think -- again, if I looked at my records, I

22      could tell you to the penny.

23   Q.  Okay.  One second.  Okay.  Is it fair to say,

24      from 1999 to 2005, Remco sold approximately

```
 1        $2.3 million worth of goods to IFC?

 2   A.   Yes.

 3   Q.   And you're not sure about whether or not

 4        Mansfield sold about a million dollars' worth

 5        of goods to IFC?

 6   A.   I'm not sure.  I'm sure it's more than a half

 7        a million.  Probably less than a million.

 8   Q.   Okay.

 9   A.   But, again, if I looked at my records, I

10        could tell you to the penny.

11   Q.   Of that approximately $3 million, how much of

12        that was profit to Remco and Mansfield Rug?

13   A.   200 to -- I'm giving you a net figure.

14        Approximately $210,000.

15   Q.   How do you calculate that number?

16   A.   By adding up all the numbers.

17   Q.   I'm sorry.  Are you giving it a certain

18        percentage based on the total sales?

19   A.   On your discovery work that you have right

20        there, by adding those numbers up --

21   Q.   All right.

22   A.   -- and deducting the money I lost at the end.

23   Q.   How much did you make out of that?

24   A.   $210,000.
```

1    Q.  Okay.  Now I understand.

2            How much did Jane Dzeimit make?

3    A.  The $210,000 that I made, that's Remco and

4        Mansfield Rug.

5    Q.  Um-hum.

6    A.  The numbers, I mean, I do have them and I

7        didn't add them up.  I'm estimating Jane made

8        140.  I'm estimating.

9    Q.  Did Jane Dzeimit advance any funds for the

10       use of Mansfield Rug at any time?

11   A.  No.

12   Q.  Sir, I'm going to show you two maps.  It

13       might make sense if we move this stuff.  If

14       you want, I will take them.

15           Sir, I'm showing you what's been

16       marked as Exhibits 38 and 39.

17   A.  Okay.

18   Q.  I'm going to ask you if you recognize those

19       documents?

20   A.  I recognize 38.

21   Q.  What do you recognize 38 to be?

22   A.  My records.

23   Q.  Sir, I just want to make sure that the record

24       is clear, because Exhibit 38 has several

1    pages.

2                    Are all of those your records?

3    A.   Yes.  Well, wait a second here.  This page

4         [indicating] would have been done by Jane.

5    Q.   So the page you are referring to is the one

6         that's typewritten?

7    A.   Yes, I can't read the number.  It ends in

8         three.

9    Q.   I can't read that either.  But it's the only

10        typewritten page?

11   A.   Right.  Other than that, everything else is

12        my writing.

13   Q.   Let me just refer you just for a moment to

14        the larger one, Exhibit 39.

15                    Can you tell me if you recognize

16        that?

17   A.   Well, I know where it's from, but I don't

18        recognize it, no.  It's not my records.

19   Q.   Where is it from?

20   A.   I'm sure it's Jane's records.

21   Q.   Do you recognize his handwriting?

22   A.   No.

23   Q.   How much did David Adams make from the sales

24        by Remco and Mansfield Rug to IFC?

1          $307,390.71 to Mr. Adams in 2001?

2    A.   Yes.

3    Q.   Were there some deals in which Ms. Dzeimit

4         earned money, but didn't give any upfront

5         money?

6    A.   Yes.

7    Q.   How did that come to pass?

8    A.   Okay.  Page 0208.  These were orders where I

9         was told -- I don't recall the reason why --

10        that Dave didn't have to send the money to

11        the vendor in advance, that we could bill it,

12        and he -- yes, that's why that jumped out at

13        me too -- and then he paid the invoice.

14   Q.   Okay.  Jane Dzeimit has maintained throughout

15        this case that she was just making loans.

16                Is that your understanding of what

17        she was doing?

18   A.   Well, obviously, a case like this, there was

19        no loan involved.

20   Q.   Okay.  So she earned money on some of these

21        deals even though she didn't loan any money,

22        correct?

23   A.   Correct.

24   Q.   Okay.  Let's talk about the columns for a

1  Q.  When you issued -- strike that.

2          Who would issue the checks to you

3      and to Jane and to Dave Adams, ultimately,

4      under the second scenario we've been talking

5      about?

6  A.  Myself.

7  Q.  Okay.  And when you made checks payable to

8      Jane Dzeimit, would it be Jane solely, or

9      would it be to Tony and Jane?

10 A.  I don't think I ever wrote a check out to

11     Tony.

12 Q.  Did you ever make a check out to Tony and

13     Jane?

14 A.  I don't think so.

15 Q.  Did you make checks out to Jane Dzeimit?

16 A.  Yes.

17 Q.  Would you also make checks out to other

18     entities that she was involved with?

19 A.  Forbes Management, yes.  Actually, a lot of

20     the times she would tell me who to write the

21     check out to for whatever reason she had.  To

22     me, it didn't matter.

23 Q.  Well, did it matter for tax purposes?

24 A.  No, because, ultimately, I remember -- this

1        July 26, 2003?

2    A.  I don't know.

3    Q.  Did you ever wire $25,000 to Kevin Britto?

4    A.  I don't know.  They are saying that I did.  I

5        saved every single wire transfer, and if I

6        did, it would be in there.

7    Q.  Okay.  In the next entry down, where it says

8        "Zero" under "Sent," do you see that?

9    A.  Yes.  The next two, yes.

10   Q.  What does that mean?

11   A.  I don't know.

12   Q.  Okay.  Let's go back to the first page.

13   A.  Again, if I had all the detail, I could

14       probably figure that out.  All of it.

15   Q.  Let's go back to the first page of Exhibit 38

16       for a moment.  There are a number of columns

17       and I just want to go through the columns

18       first.

19   A.  Okay.

20   Q.  The first is the date; what does that date

21       signify?

22   A.  The date I sent money.

23   Q.  Okay.

24   A.  You know what's not here?  Are those -- it

1    was on the inside cover of a manila folder.

2    Like the first half dozen invoices.  There

3    may be two or three other ones.  I'm sorry.

4  Q.  Okay.  Then it says, "Sent" with a dollar

5    sign --

6  A.  Right.

7  Q.  -- what does that refer to?

8  A.  Dollars.

9  Q.  Okay.  I didn't mean to be facetious.

10    Where were the funds sent?

11  A.  To Dave Adams.

12  Q.  Are they wire transfers?

13  A.  I wouldn't know off the top of my head.  I

14    just neglected to write it down.  It would

15    either be a wire transfer or a check.

16  Q.  And the next one says, "Amount"; what does

17    that refer to?

18  A.  The amount of the invoice.

19  Q.  And then there's the purchase order number

20    and the invoice number, correct?

21  A.  Correct.

22  Q.  And then there's another date; what's that

23    date?

24  A.  That's the date the invoice was paid.

1      documents relating to David Adams?

2  A.  From me?

3  Q.  Yes.

4  A.  I would have said no, but I -- I don't even

5      know how that started.  That's not a

6      financial document.  I don't know the answer

7      to that.

8  Q.  Did she ever express any reluctance to loan

9      money -- strike that.  Let's actually ask a

10     more basic question.

11             The funds that she gave to Adams,

12     did you call them loans?

13  A.  No.

14  Q.  What did you call them?

15  A.  Upfront money or just money.  After a half a

16     dozen invoices, it became a routine.  I may

17     call and say, Dave needs money.  Are you

18     prepared to do it?

19  Q.  I don't think I asked this one, but, why was

20     it that Jane Dzeimit received funds even when

21     she didn't provide any money?

22  A.  Because in the very beginning, what I said

23     was, if you get me started in this, I would

24     never hurt you.  I would -- in other words,

1    A.    No.

2    Q.    What work did she do to justify obtaining

3          those funds for deals on which she did not

4          provide upfront money?

5    A.    In some cases, she may have actually -- she

6          billed it.

7    Q.    She prepared the invoice?

8    A.    Yes.

9    Q.    For some of these deals, she was getting 3-

10         to $5,000, right?

11   A.    Yes.

12   Q.    So she was getting paid 3- to $5,000 to

13         prepare an invoice?

14   A.    I didn't look at it that way.

15   Q.    But was she doing anything else other than

16         preparing an invoice on these deals?

17   A.    No, but she would have -- she would have

18         money out for other invoices.

19   Q.    Okay.  But she was getting a percentage of

20         the funds from those other invoices, correct?

21   A.    Correct.

22   Q.    Okay.  But with regard to the ones she was

23         not providing upfront money, what services

24         was she providing in addition to preparing an

```
 1        invoice?
 2   A.   None.
 3   Q.   How long would it take her to prepare an
 4        invoice?
 5   A.   Five minutes.
 6   Q.   Did you ever discuss with Ms. Dzeimit any
 7        personal information that you knew regarding
 8        Mr. Britto or Mr. Adams?
 9             MR. COHEN:  Objection to the form.
10   A.   I'm sure there were comments made.  I can't
11        think of any specifically.
12   Q.   How often would you discuss personal
13        information about Mr. Britto and Mr. Adams
14        with Ms. Dzeimit?
15   A.   Not very often.
16   Q.   Am I right, that on the instances in which
17        Ms. Dzeimit advanced money, that she would
18        receive a percentage of the money left over
19        after her initial funds were paid back and
20        after Mr. Adams was paid and after you were
21        paid; is that correct?
22             MR. COHEN:  Objection.
23   A.   Well, all would be done at the same time.
24   Q.   Okay.  But her balance of it would be what
```

1       was left over after all the others had been

2       paid off; is that correct?

3   A.  I guess you could word it that way.

4   Q.  So she wasn't paid, say, something in the

5       line of five percent interest per month for

6       the funds that were outstanding, correct?

7   A.  Correct.

8   Q.  This wasn't like a standard loan like one

9       would have a car loan; is that correct?

10  A.  Correct.

11  Q.  With regard to Exhibit Number 39, you've

12      never reviewed it before today?

13  A.  No.

14  Q.  Go ahead.

15  A.  I've probably seen this in a smaller version,

16      but it wasn't something I spent a lot of time

17      looking at.

18  Q.  All right.  Did you ever set up a bank

19      account for Remco using Ms. Spignesi's Social

20      Security number as a tax ID number?

21  A.  No.

22  Q.  Social Security number as a tax ID number?

23  A.  Could you repeat that question?

24  Q.  Sure.  Did you ever set up a bank account in

```
 1            page 1443 -- I have the actual exhibit -- for

 2            approximately $3,200, to Dianne Spignesi?

 3    A.    There a note --

 4    Q.    Let me finish the thought.  There's no memo

 5            portion.

 6    A.    Okay.

 7    Q.    On the next page, there's a check to her for

 8            $6,000.  There's no memo portion.  On 1582,

 9            there's a check to her for $87.  There's no

10            memo portion.  On page 1645, there's a check

11            to her for $9,500, no memo portion.  And on

12            page 1792, there's a check to her for

13            $12,460.  In the memo of that one, it does

14            say, "Pay back 12,000 of $21,000 plus $4,060

15            in interest."

16                      Now, a moment ago you said you

17            hadn't borrowed more than $15,000 from her

18            over the 17-year period.

19                      What were all those checks for?

20    A.    There were several different reasons.  I

21            needed money.

22    Q.    What does she do for a living?

23    A.    Retired school teacher.

24    Q.    You weren't hiding any of the funds from
```

1    these deals with Dianne Spignesi, were you?

2 A. Hiding?  I had no reason to hide anything.

3    She wasn't part of it.

4 Q. Okay.  But you weren't taking any of the

5    proceeds from these deals that you had that

6    are the subject of this lawsuit and giving

7    them to Ms. Spignesi, were you?

8 A. No.

9 Q. So what were the checks for?

10 A. I borrowed the money from her.

11 Q. Did you have any written agreements with her

12    about that?

13 A. I don't recall any.  There might have been.

14    I don't recall.

15 Q. What's Lincoln Life?

16 A. My retirement plan.

17 Q. In 2003, you made a payment of $9,000 to your

18    retirement plan?

19 A. Wow, good year.  Obviously, yes.

20 Q. Was it a good year?

21 A. For me to give them $9,000, yeah.

22 Q. Okay.  How did you determine how much you

23    sent to Lincoln Life?

24 A. What I could afford to send them.

1    Q.   Did he tell you what he did with the money?

2    A.   No.

3    Q.   Did he tell you what David Adams did with the

4         money?

5    A.   No, not even remotely.

6    Q.   I'm going to show you what's been marked as

7         Exhibit 42 and ask you if you recognize it.

8    A.   Yes, I do.

9    Q.   What do you recognize this exhibit to be?

10   A.   A tax form done by an accountant of Jane

11        Dzeimit for Remco for whatever year that was,

12        '99.

13   Q.   Was Jane Dzeimit a partner in Remco as of

14        1999?

15   A.   Yes.

16   Q.   Okay.  And do you know where this figure of

17        $96,792.50 came from?

18   A.   From Jane.

19   Q.   Do you know how it was calculated?

20   A.   No.  I was actually angry about this.

21   Q.   Why were you angry?

22   A.   I just didn't understand why it was

23        necessary.  It was a very expensive

24        accounting bill, I remember.

1      profit-sharing we already discussed?

2  A.  There's no -- I'm trying to think of the

3      word.  There's no -- we didn't have a

4      building.  We didn't have tables and chairs.

5      This was a partner in name only.

6  Q.  Okay.  Go ahead.

7  A.  If you want me to expand.  Initially, her

8      reasoning for becoming a partner was just to

9      protect her interests.  If I dropped dead --

10     I have had a history of heart problems -- she

11     could finish up whatever needed to be done.

12     I don't even really remember her specific

13     reason for resigning.  I don't recall.  It

14     really meant nothing to me either way.

15  Q.  Were you disappointed that she resigned?

16  A.  No.

17  Q.  Did you continue to send her any funds from

18     any of your dealings with David Adams after

19     she resigned?

20          MR. COHEN:  Objection to form.

21  A.  Yes.

22  Q.  Why?

23  A.  She was still involved.

24  Q.  So what was her relationship to Remco after

1    she resigned?

2  A.   Still a person I got capital from.   If I'm

3       allowed to look at Exhibit 38....

4  Q.   Please do.

5  A.   What I'm doing is, as long as there was money

6       sent to her from me, she was still involved

7       with it.   And I'm up to the last time I sent

8       money to Jane was 12/18/03.

9  Q.   Okay.   So earlier, when you talked about her

10      being a partner from 2000 to '03, and you

11      amended it to 1999 to '03, do you still say

12      she was a partner from 1999 to 2003?

13  A.  I don't know how to answer that.   Obviously,

14      Exhibit 47 says she resigned as a partner,

15      and whatever that means, it means.   But she

16      still earned money up until the date I just

17      gave you.

18  Q.   In '02 and '03, did you give her a 1099?

19  A.   Yes.

20  Q.   Does the name at the bottom of that letter on

21      Exhibit 47, sir, of John Villano -- do you

22      see that?

23  A.   That's the name of her accountant.

24  Q.   Just give me one second.

1      stands for Tony and Jane?

2   A.  Yes.

3   Q.  Okay. Will you agree with me that you

4      received the sum of $85,000 from Tony and

5      Jane in or around December 28, 2001?

6   A.  Yes.

7   Q.  Will you agree with me that you then wrote a

8      check on that same day for $85,000?

9   A.  Yes.

10   Q.  Okay. And will you also agree with me, I'm

11      referring you to page 1785 of Exhibit 40,

12      that you then endorsed the check, "Remco, for

13      deposit only"?

14   A.  Yes.

15   Q.  And what's that account number for?

16   A.  I don't know. This number there

17      [indicating]?

18   Q.  Yes.

19   A.  2202. I don't know.

20   Q.  And the account number we've been talking

21      about is 2202561980; is that correct?

22   A.  I don't know. It almost doesn't make sense.

23   Q.  Have you completed your answer?

24   A.  Yes. I don't know.

1    Q.  Did you have any CDs at People's Bank?

2    A.  I've never had a CD in my life.

3    Q.  Did you recall doing anything with $85,000 at

4        the end of 2001?

5    A.  No.

6    Q.  Do you agree with me that it's rather

7        strange --

8    A.  Yes.

9    Q.  -- that you would not know what you did with

10       $85,000?

11    A.  Yes.

12    Q.  Okay.  You also know -

13    A.  I mean, I showed it coming in and going out.

14       That is not even my writing.

15    Q.  Oh.  Whose writing is that?

16    A.  I don't know.

17    Q.  Okay.

18    A.  It is my not handwriting is what I'm saying.

19    Q.  Is it possible that Jane Dzeimit was seeking

20       to hide some funds with Remco?

21    A.  Hide from -- no.

22    Q.  Okay.  Do you have any idea now looking at

23       these issues about the $85,000 as to why it

24       was that three days later she resigned?

1    Q.    Okay.  And did David Adams sign this form for

2          every time that he received funds from Remco?

3    A.    Probably not.

4    Q.    Isn't it true though, that actually the

5          signature of David Adams is merely a

6          photocopy on each one?

7    A.    Probably.

8    Q.    So did Jane Dzeimit have a pile of

9          photocopies of signed forms already signed by

10         David Adams?

11   A.    I probably did.

12   Q.    What would you do with them?

13   A.    Sign them and tell Dave -- I think, I -- I'm

14         not absolutely sure.  We made a copy instead

15         of faxing them back and forth.  I would say,

16         "Okay.  Dave, I'm filling this one out," and

17         I'd sign it.  I always felt it was a

18         meaningless piece of paper.

19   Q.    You still filled it out?

20   A.    Yes.

21   Q.    Let me ask you to look at page 0032, which I

22         think you're looking at actually.

23   A.    Yes.

24   Q.    Is this a typical Remco invoice?

1    A.   Very typical.

2    Q.   And would these be prepared on a computer?

3    A.   Yes.

4    Q.   Who prepared this particular document?

5    A.   Jane Dzeimit.

6    Q.   What information would she use -- sorry.

7         What documents would she use in order to

8         prepare this document?

9    A.   The purchase order.

10   Q.   That would be the page following?

11   A.   Yes.

12   Q.   Okay.  And it's your testimony that when you

13        would see this purchase order, you would see

14        the entirety of the page, which is page 33?

15   A.   That I would see -- I didn't understand the

16        question.

17   Q.   In other words, what you see depicted in

18        page 33 is what you would receive as a

19        purchase order, correct?

20   A.   Yes.

21   Q.   On this purchase order 33, it says, "Tony

22        Maresca, Remco"; do you see that?

23   A.   Yes.

24   Q.   You will agree with me that Tony Maresca did

1     not work for Remco, correct?

2  A.  Correct.  Actually, it says, "Tony Marosco"

3     [sic].

4  Q.  Who's handwriting is on this document?

5  A.  Dave Adams.

6  Q.  The next one, page 173, sir, would you look

7     at that?

8  A.  173?  Yes.

9  Q.  Is that -- what is that?

10  A.  That's an invoice to IFC.

11  Q.  And who would prepare this document?

12  A.  I did.

13  Q.  How do you know you prepared this one?

14  A.  Because it's Mansfield Rug.

15  Q.  Okay.  Did you prepare all the invoices for

16     Mansfield Rug?

17  A.  Yes.

18  Q.  And does this invoice go with the following

19     page, 174?

20  A.  Yes.

21  Q.  Okay.  And on the previous page, 173, it

22     says, "FOB"; do you see that?

23  A.  (No audible response.)

24  Q.  Underneath, it has the word "delivered" in

Page 1

# ORIGINAL

VOLUME: I
PAGES: 1 - 230
EXHIBITS: Per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-11654-NMG

*******************************************

INTERNATIONAL FLOOR CRAFTS, INC.,　　　　）
　　　　Plaintiff　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　）
vs.　　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　）
DAVID W. ADAMS, TYRONE WILLIAMS,　　　　　）
KEVIN BRITTO, RONALD MITCHELL,　　　　　　）
Individually and d/b/a Mansfield Rug　　　）
DEPARTMENT and REMCO, MICHAEL E. BROWN, ）
Individually and d/b/a DALTON PADDING　　 ）
and EMPIRE WEAVERS, JANE DZIEMIT,　　　　 ）
CHINESE CARPET CENTER, INC.,　　　　　　　）
DAVID D. SUN, and PAUL SUN,　　　　　　　　）
　　　　Defendants　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　　　）
and　　　　　　　　　　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　　　　　）
LOWELL FIVE CENT SAVINGS BANK,　　　　　　）
WACHOVIA BANK, NATIONAL ASSOCIATION,　　　）
f/k/a FIRST UNION BANK OF VIRGINIA,　　　 ）
CITIZENS BANK, BANK OF AMERICA,　　　　　　）
f/k/a BANK OF BOSTON, PEOPLE'S BANK　　　　）
and FIRST UNION NATIONAL BANK,　　　　　　 ）
　　　　Trustee Process Defendants.　　　　 ）
*******************************************

DEPOSITION OF JANE M. DZIEMIT
TUESDAY, JULY 11, 2006
COMMENCING 10:10 a.m.

```
 1    A.   Can you rephrase it?

 2    Q.   Sure.  What were the circumstances under

 3         which you first loaned money in 1994?  Your

 4         own money.

 5    A.   Somebody would have approached me for a

 6         mortgage.

 7    Q.   Have you ever had any ownership in any

 8         corporations?

 9    A.   No I didn't have any ownership in

10         corporations.

11    Q.   Other than nor Equity Mortgage, have you

12         ever been an officer of any corporations?

13    A.   Yes, I've been an officer of corporations.

14    Q.   What corporations?

15    A.   Wait.  Excuse me.  No.  Not corporations.

16    Q.   Have you ever had any ownership interest in

17         any LLC's?

18    A.   Yes.

19    Q.   What LLC's have you had ownership interest

20         in?

21    A.   Lia's Choice.

22    Q.   What is Lia's Choice?

23    A.   It was an LLC.

24    Q.   What did it do?
```

1    than you?

2   A.   No, no one else worked for Lia's Choice.

3   Q.   Did Lia's Choice ever loan any money to

4      Ronald Mitchell?

5   A.   I think it lent money to Ron Mitchell.

6            MR. YURKO:  When you say "Ron

7      Mitchell," are you also including the d/b/a

8      Remco?

9   Q.   Yes.

10            MR. YURKO:  My suggestion is that

11     you include that, actually, in the question,

12     so that it's apparent to the witness,

13     whichever form.

14  Q.   Did Lia's Choice ever lend any money to

15     Remco?

16  A.   Yes.  Lia's Choice lent money to Remco.

17  Q.   I'm not sure how best to ask this, but how

18     much money did Lia's Choice lend to Remco?

19  Q.   It lent money -- I never -- it -- how much

20     money?  It ranged in increments of $7,500 to

21     $15,000, up to $25,000.  I never lent more

22     than $50,000.

23  Q.   What were these loans for?

24  A.   Can you rephrase that question?

1  Q.  But you're not sure?

2              (Witness nods negatively.)

3  Q.  Is that a no?  You have to respond

4      verbally.

5  A.  Oh.  No, I'm not sure.

6  Q.  Other than Lia's Choice LLC, have you ever

7      been an officer of any other LLC?

8  A.  Yes, I've been an officer of --

9  Q.  Okay.  What other LLC's?

10  A.  Connecticut Commercial Lenders, 2575 State

11      Street.

12  Q.  Any others?

13  A.  I don't remember any others.

14  Q.  What title did you hold at Connecticut

15      Commercial Lenders?

16  A.  I would have been a manager or a secretary.

17  Q.  When you say "secretary," do you mean as an

18      officer secretary or do you mean

19      secretarial --

20  A.  Yes, as an officer secretary.

21  Q.  And what did you do for Connecticut

22      Commercial Lenders?

23  A.  I would have done secretarial for

24      Connecticut Commercial Lenders.

1   Q.  During what period of time did you do that

2       secretarial lending?

3   A.  In the late nineties to early 2000's, I

4       would have done secretarial work for

5       Connecticut Commercial Lenders.

6   Q.  What did Connecticut Commercial Lenders do?

7   A.  Connecticut Commercial Lenders helped lend

8       mortgages.

9   Q.  Commercial, residential; what kind of

10      mortgages?

11            MR. YURKO:  Objection to form.

12            MR. KLEHM:  Strike that.

13   Q.  What kind of mortgages?

14   A.  Commercial or residential mortgages.

15   Q.  Did Connecticut Commercial Lenders ever loan

16      any money to Ronald Mitchell or Remco?

17   A.  Connecticut Commercial Lenders lent money to

18      Ron Mitchell and Remco and --

19   Q.  Did Connecticut -- sorry.  I interrupted

20      you.  Go ahead.

21   A.  It lent money through me.  I borrowed the

22      money from Connecticut Commercial and lent

23      it to Ron Mitchell or Remco.

24   Q.  Have you personally ever loaned any money to

1    David Adams?

2  A.  No, I've never personally loaned money to

3    Dave Adams.

4  Q.  Have any of the entities which you've been

5    associated ever lent money to David Adams?

6  A.  Connecticut Commercial Lenders loaned money

7    to Dave Adams.

8  Q.  When?

9  A.  2001 or '2.

10  Q.  Were you the person working for Connecticut

11    Commercial Lenders?

12  A.  I didn't really work for Connecticut

13    Commercial, though.  I only did secretarial

14    work.

15  Q.  Who worked for Connecticut Commercial

16    Lenders?

17  A.  Connecticut Commercial Lenders did not have

18    employees.

19  Q.  Okay.  Was Anthony Maresca involved in any

20    way with Connecticut Commercial Lenders?

21  A.  Anthony Maresca -- Anthony Maresca may have

22    owned Connecticut Commercial Lenders.

23  Q.  Are you sure -- did he own Connecticut

24    Commercial Lenders?

Page 40

1    A.  No, I'm not sure if he owned Connecticut

2        Commercial Lenders.

3    Q.  How much money did Connecticut Commercial

4        Lenders loan to David Adams?

5    A.  Ron Mitchell borrowed money from Connecticut

6        Commercial Lenders.  Ron Mitchell gave the

7        money to Dave Adams.  Dave Adams, in turn,

8        signed a promissory note.

9    Q.  How much money was loaned to David Adams

10       through this arrangement you've just

11       described?

12   A.  I think it was around $30,000.

13   Q.  Was the money ever repaid?

14   A.  Yes.  The money was repaid.

15   Q.  Who paid the money?

16   A.  I believe the money was repaid by Ron

17       Mitchell.

18   Q.  Did Connecticut Commercial Lending ever loan

19       directly to David Adams?  I should say

20       "Lenders."

21   A.  Okay.  The period of 1999 to 2001,

22       approximately, upon Ron Mitchell's

23       direction, there was money that went from,

24       you know, my bank account to Dave Adams for

1   A.   The nature of -- my role in Remco was as a

2        lender because Remco existed as a d/b/a

3        before 1999 and it again existed after 2001

4        as a d/b/a, and it may have also existed as

5        a name in a d/b/a during that time period,

6        but during 1999 to 2001, there was a

7        partnership.

8   Q.   Who was in the partnership?

9   A.   Ron Mitchell and Jane Dziemit were in the

10       partnership.

11  Q.   What was your percentage interest in the

12       partnership?

13  A.   My percentage interest in the partnership --

14       I think it was 33.

15            MR. YURKO:   Percent?

16  A.   Percent.   It was formed that way because I

17       was lending money to Ron Mitchell and I

18       needed to be protected and to be able to get

19       my money back.

20  Q.   And how would forming this partnership

21       protect you?

22  A.   Well, if something ever happened to Ron

23       Mitchell.

24  Q.   Was there a written partnership agreement?

Page 56

1    A.   No, there was not a written partnership

2         agreement.

3    Q.   Were there any writings at all that said

4         that you were a partner in this entity, of

5         which you are aware?

6    A.   There was a bank account and there was

7         the -- the yearly or the quarterly sales

8         tax, the state of Connecticut.

9    Q.   Do your tax returns reflect income from the

10        partnership?

11   A.   They probably would have reflected income

12        from the partnership during '99, 2000, and

13        2001.

14   Q.   You said "probably."  Do your taxes reflect

15        income from the partnership from '99 to

16        2001?

17   A.   I don't remember if they do, because I

18        haven't seen those for years.

19   Q.   In what bank was the bank account that was

20        jointly held?

21            MR. YURKO:  Objection to form.  You

22        may answer.

23   Q.   In what bank account was the bank account

24        that you held as a partnership for Remco?

Page 59

1   Q.  What steps did you go through in making

2       loans to Ron Mitchell or Remco?

3   A.  Well, like I said, in the beginning, there

4       was a promissory note, and then it was based

5       upon his asking.

6   Q.  So he would contact you and tell you he

7       needed X amount as a loan?

8   A.  Yes.

9   Q.  What would you do in response to that?

10   A.  I would ask him, for what?

11   Q.  Okay, and than go ahead.  Then what

12       happened?

13   A.  Upon his direction, I would either give him

14       the money to purchase carpet or I wired it

15       to CCC or I sent it to CCC a few times, and

16       I may have wired it to Dave Adams.

17   Q.  Why did you need to know the reason for the

18       loan?

19   A.  I was lending a lot of money.  I needed to

20       know why I was lending the money.

21   Q.  So is it correct then that you would take

22       Ronald Mitchell's oral statements to you

23       about what he needed the money for and

24       accept that in issuing the loans?

Page 60

1    A.   Yes.

2    Q.   Did you ever insist upon any written

3         documents in connection with the loans,

4         other than the promissory notes you talked

5         about?

6    A.   No.

7    Q.   Okay.  How many times did you make loans to

8         Ronald Mitchell or Remco using promissory

9         notes?

10   A.   There was a promissory note and it was kept

11        open.  So it would have been for $50,000,

12        approximately.

13   Q.   So there's one note for $50,000?

14   A.   Yes.

15   Q.   At some point, he paid off that $50,000?

16   A.   Yes.

17   Q.   Did you return the note to him?

18   A.   Yes.

19   Q.   And when was that; in '99?

20   A.   I don't remember the time period for when I

21        gave him back a note.

22   Q.   Do you have a copy of that note anywhere?

23   A.   No, I do not have a copy.

24   Q.   When did you last see that note?

Page 62

1   Q.   Did you have any assistance -- the

2        assistance of an attorney in drafting that

3        promissory note?

4   A.   No, I did not have the assistance of an

5        attorney in drafting that note.

6   Q.   What were the terms of that promissory note,

7        as best you can recall?

8   A.   It would have been approximately 12 percent

9        interest.

10  Q.   Simple, compound?

11  A.   Simple.

12  Q.   And what was the length, the term?

13  A.   I don't remember.

14  Q.   How many loans did you individually or

15       through various entities make to Ronald

16       Mitchell or Remco from '99 up to '05?

17  A.   Approximately 35.

18  Q.   For those 35 loans, was there a common or

19       normal business practice with regard to how

20       long the term was?

21  A.   No.  The term would -- you know, it would

22       fluctuate, depending on when the carpet was

23       delivered.

24  Q.   Okay.  So we were going through the process

Page 64

```
 1        as to why Ronald Mitchell needed any

 2        particular amount of money?

 3   A.   Yes.

 4   Q.   Okay.  On how many occasions did you do

 5        that?

 6   A.   I don't remember.

 7   Q.   Was it more than half the time?

 8   A.   I would say probably yes.  He --

 9   Q.   Go ahead.

10   A.   I was told he was buying carpet up front, so

11        it would have been like a bulk price, which

12        is why it would have been 25 or 15.

13   Q.   When you say "I was told," who told you

14        that?

15   A.   Ron Mitchell.

16   Q.   So he would tell you he needed, say, $10,000

17        to buy carpet; correct?

18   A.   Yes.

19   Q.   And then you would then disburse those funds

20        without requiring any writings from Ronald

21        Mitchell; is that right?

22   A.   In the beginning, there was a promissory

23        note.

24   Q.   Okay.  Other than that one promissory note,
```

Page 65

1    did you require any writings from Ronald

2    Mitchell or from any source before you would

3    disburse those funds?

4  A.   No.

5  Q.   Did you ever receive any writings from any

6    source in connection with these loans?

7         MR. YURKO:   Could you hold on a

8    second?

9         MR. KLEHM:   Sure.

10         MR. YURKO:   Would you read back

11    that question, please?

12         (The previous question was read

13         back by the court reporter.)

14  A.   I received invoices from CCC.   I received

15    copies of PO's from, I think it's

16    International Floors on the PO's, and I

17    received -- there were checks signed from

18    International Floors.

19  Q.   So when in this process would you receive

20    these items?

21         MR. YURKO:   Objection.   Compound.

22  A.   Can you rephrase that question?

23  Q.   You told me that you didn't --

24         MR. KLEHM:   Strike that.

```
 1        today?

 2   A.   Yes, mark Rosenblitt has represented

 3        entities.

 4   Q.   How did you determine what entity would

 5        make the loans to Ronald Mitchell or

 6        Remco?

 7                  MR. YURKO:  At this point, we're

 8        back to the general loans, as to any one

 9        particular loan?

10   Q.   General loans, yes.

11   A.   Well, I lent the money to Ron Mitchell.  I

12        would borrow from the entity.

13   Q.   Why did you handle the transactions in that

14        manner?

15   A.   What do you mean?

16   Q.   What was the reason why you loaned the

17        money personally to him, rather than just

18        loan him directly from any of these entities

19        we've been talking about today?

20   A.   I borrowed the money from the entity.

21   Q.   Did you pay the entity interest from the

22        money that you borrowed?

23   A.   Yes, I would have paid the entity interest.

24   Q.   At the time, did you have personal funds
```

Page 83

1    available to make the funds loans without

2    having to go through these entities?

3           MR. YURKO:  At what time?

4  Q.  From '99 to '05.

5           MR. YURKO:  Objection.

6  A.  I don't know.  I mean, if I had the money

7    to lend, I would have lent the money.

8  Q.  I guess what I'm trying to get at is, why

9    did you borrow money from an entity in

10   order to make the loans to Ronald Mitchell?

11  A.  I didn't always have the funds available, so

12   I would have borrowed from the entity.  I

13   also borrowed from my home equity line to

14   make loans to Ron Mitchell.

15  Q.  Is it true that each of the 35 loans that

16   you made to Ron Mitchell were made from your

17   personal funds?

18          MR. YURKO:  Objection.

19  A.  No, it is not true that they were made from

20   my personal funds.  You just asked me --

21  Q.  Tell me what's wrong with that.

22  A.  You asked me and I said that I was

23   borrowing money from other entities to lend

24   to Ron Mitchell, so they wouldn't be my

Page 91

1   A.   No, I did not.

2   Q.   What other documents, if any, would you

3        prepare with regard to any loans to Ronald

4        Mitchell or Remco, other than what you've

5        testified to today?

6   A.   For the purpose of the loan?

7   Q.   For any purpose.

8   A.   For any purpose.  Can you please be

9        specific?

10  Q.   When you made loans to Ronald Mitchell, what

11       documents did you generate, other than

12       anything you've testified to today?

13  A.   Ron Mitchell would ask me to prepare the

14       invoices.  I did prepare invoices.

15  Q.   So you would prepare invoices on behalf of

16       Remco?

17  A.   I prepared some of the invoices on behalf of

18       Remco.

19  Q.   We'll go back to that, but what other

20       documents would you prepare or generate in

21       connection with making any loans to Ronald

22       Mitchell or Remco?

23  A.   I did not generate any other documents.

24  Q.   Did you have a ledger sheet for each of the

Page 99

1    loan funds --

2           MR. KLEHM:   Strike that.

3  Q.   How did you determine which entity you would

4     receive funds from in order to loan money to

5     Ronald Mitchell?

6  A.   I don't remember.

7  Q.   There was no process?

8  A.   I would probably have to see if there was

9     money available to lend.

10  Q.   Are there any companies from which you

11    obtained loans, from which you made loans to

12    Ronald Mitchell, other than companies that

13    we have named today?

14  A.   I may have taken -- I may have borrowed

15    money from my kids' accounts.   Bentley

16    Mortgage Preferred Partners.

17          MR. YURKO:   I also want to point

18    out, earlier she testified to a home equity

19    line and you did not ask what bank it was.

20    Its name hasn't come up, though the subject

21    has come up.

22  Q.   With what bank were your kids' accounts that

23    you drew upon?

24  A.   It was probably Citizens.

Page 100

1   Q.  And the home equity line was from what

2       bank?

3   A.  The home equity line was from Citizens.

4   Q.  Now, Bentley Mortgage Preferred Partners,

5       what kind of an entity is that?

6   A.  That was an LLC, I think.

7   Q.  Were you a member of that LLC?

8   A.  No, I was not a member.

9   Q.  Was Anthony Maresca at any time a member of

10      that LLC?

11   A.  I don't remember if he was a member.  He may

12      have been a manager.  I don't remember if he

13      was a member.

14   Q.  What, if anything, did you do for Bentley

15      Mortgage preferred Partners, LLC?

16   A.  I would have done secretarial work.

17   Q.  Where was that entity located?

18   A.  It had an office in Wallingford.  There was

19      somebody else.  I don't remember the

20      person's name who was like a manager, and it

21      was in his house for a while, too.  I don't

22      remember.

23   Q.  Did that entity ever loan funds to David

24      Adams?

Page 104

 1    A.   That was Ron Mitchell's residence.

 2    Q.   Did you ever work from that residence?

 3    A.   No, I did not work from that residence.

 4    Q.   Was there a warehouse of any kind at that

 5         residence?

 6    A.   No, there was not a warehouse at that

 7         residence.

 8    Q.   Did Remco have a warehouse?

 9    A.   Not to my knowledge, Remco did not have a

10         warehouse.

11    Q.   Did you ever ask Ron Mitchell whether it had

12         a warehouse?

13    A.   No, I did not ask Ron Mitchell.

14    Q.   Was it important for you to know whether or

15         not Remco had a warehouse?

16    A.   No, it was not important for me to know.

17    Q.   Did you ever actually --

18              MR. KLEHM:    Strike that.

19    Q.   You testified before we broke that you

20         prepared, I believe, you called them

21         invoices, is that correct, on behalf of

22         Remco?

23    A.   Yes.

24    Q.   What would you do in preparing those

Page 105

1    invoices?  What was the process you

2    followed?

3              MR. YURKO:  Objection.  Asked and

4    answered.  You can answer again.

5  A.  I received a PO, and then I would prepare

6    the invoice.  The PO would come from either

7    IFC or Building 19, whatever it's called,

8    from employees of Building 19 and IFC.

9  Q.  What would you do, if anything, to insure

10    that the information on the purchase orders

11    was accurate?

12  A.  It was signed by Building 19 employees.

13  Q.  What would you do to insure that it was

14    accurate?

15  A.  I didn't do anything to insure.

16  Q.  And did you ever see Tony Maresca's name on

17    any of those purchase orders or invoices

18    that you saw?

19  A.  Yes, Tony Maresca's name was on some of

20    those PO's.

21  Q.  Why was that?

22  A.  I don't know.

23  Q.  Did you ever question it when you saw it?

24  A.  No, I did not question it.  I just thought

Page 106

1    it was a non-issue because Ron Mitchell

2    did the day-to-day business of Remco, for

3    Remco.

4  Q.  Was Tony Maresca ever an employee of

5    Remco?

6  A.  Tony Maresca was not an employee of Remco.

7  Q.  Was he ever affiliated with Remco in any

8    way?

9  A.  No, he was not.

10 Q.  Did the fact that his name appeared on

11    purchase orders as the --

12        MR. KLEHM:  Strike that.

13 Q.  What was the reference to Tony Maresca on

14    the purchase orders that you saw?

15 A.  I don't know.  I would have to see a

16    purchase order.  I don't remember, offhand.

17 Q.  Do you recall whether or not it was as a

18    contact person for Remco?

19 A.  It may have been a contact person.

20        (Five pages beginning with Purchase

21         Order Number 6551 are marked

22         Exhibit Number 1 for

23         Identification.)

24 Q.  Ms. Dziemit, I'm going to show you what has

Page 107

1     been marked as Deposition Exhibit Number 1,

2     which says at the top left-hand corner,

3     "Purchase Order 6551," and attached to it

4     are four pages, for a total of five pages.

5     First of all, do you recognize any of the

6     pages in that particular exhibit?

7     (Indicating.)

8  A.  I recognize the invoice.

9  Q.  You're referring to the second page?

10  A.  Yes.

11  Q.  What is it that you recognize about the

12     second page?

13  A.  It looks like an invoice that would have

14     been generated from my computer.

15  Q.  Do you still have the same computer today

16     that you had back in 2002?

17  A.  No, I don't think so.

18  Q.  Did Ronald Mitchell have access to your

19     computer?

20  A.  No, he did not have access to my computer.

21  Q.  Did Tony Maresca have access to your

22     computer?

23  A.  Yes, Tony Maresca had access to my computer.

24  Q.  Did he, from time to time, use your

Page 108

1        computer?

2   A.   I'm sure he used it, yes.

3   Q.   Did Tony Maresca, to your knowledge, ever

4        create any Remco invoices?

5   A.   No, not to my knowledge.

6   Q.   Did you generate the invoice that's

7        attached here as the second page of

8        Exhibit 1?

9   A.   Do you mean Exhibit B, where it says

10       "Exhibit B" on it?

11  Q.   It says Exhibit B, but it's a part of

12       Exhibit 1, yes.

13  A.   I most likely generated this invoice, yes.

14  Q.   Is there anyone else that you're aware of

15       that would have generated invoices on behalf

16       of Remco?

17  A.   Ron Mitchell would have generated invoices

18       for Remco.

19  Q.   What would he use to generate invoices for

20       Remco?

21  A.   I don't know what Ron Mitchell would use to

22       generate invoices for Remco.

23  Q.   Would they have been in a different format

24       from the one you're looking at now, Exhibit

Page 110

1      partnership and during the partnership,

2      using the Remco name, and I also think that

3      the Remco name is still in existence, so I

4      would think that there still are.

5   Q.  What other customers are you aware of?

6   A.  I don't know any of the names.

7   Q.  Did you ever generate any of the invoices

8      for customers, other than International

9      Floor Crafts or Building 19?

10  A.  No, I did not.

11  Q.  Did Ron Mitchell ever ask to generate any

12     invoices for any customers, other than

13     International Floor Crafts or Building 19?

14  A.  No, he did not.

15  Q.  Did you ever see any invoices for any

16     customers, other than International Floor

17     Crafts or Building 19?

18  A.  I may have seen an invoice.  I mean, I don't

19     remember anything specific because Ron

20     Mitchell did have other customers.

21  Q.  So using Exhibit 1 as an example, would the

22     purchase order that is the first page of

23     Exhibit 1 be the type of purchase order that

24     you would receive from Ronald Mitchell?

Page 111

1   A.   Yes.   This is the type of invoice that was

2        received from Ron Mitchell.

3                  MR. YURKO:   Purchase order.

4   A.   Yes.

5                  MR. YURKO:   You said "invoice."

6   A.   Oh.

7   Q.   Then you would use this purchase order to

8        generate the invoice which is of the type

9        of the one on the second page; is that

10       correct?

11  A.   Yes, that's correct.

12  Q.   Would you ever receive anything of the type

13       of the third page, which is listed as

14       Exhibit C here?

15  A.   No, I don't recall ever seeing anything like

16       this.

17  Q.   On the second page, which is the invoice,

18       there is a PO box listed, 120221, East

19       Haven, Connecticut.   Do you see that?

20  A.   Yes.

21  Q.   Was that a mailing address for Remco?

22  A.   Yes, it was a mailing address for Remco.

23  Q.   Who obtained that mailbox?

24  A.   I obtained the mailbox.

Page 112

1   Q.   When?

2   A.   Oh, God, I don't remember.  Late nineties.

3        I was moving from Branford to New Haven.  I

4        don't remember the exact date.

5   Q.   Why did you obtain the mailbox?

6   A.   I've always had a mailbox in Connecticut.

7   Q.   Why did you obtain a post office box for

8        Remco?

9   A.   This post office box was not obtained for

10       Remco.  It was obtained for all business

11       purposes for me and for any of the other

12       companies.

13  Q.   So what other companies used this PO box?

14  A.   Lia's Choice would have used it.  Probably,

15       Wyvern would have used it.  Any of the other

16       companies that you previously have mentioned

17       may have used it.

18  Q.   So is it fair to say that all of these

19       entities that we discussed earlier today

20       used this PO box as a mailing address?

21            MR. YURKO:   Objection.

22  A.   They could have used that PO as a mailing

23       address, yes.

24  Q.   Why didn't Remco use the Five Mansfield

Page 114

1  A.  I may have received personal mail, yes.

2  Q.  Who paid for the post office box?

3  A.  I don't remember.  It was probably me.  I

4     don't remember.  Ron Mitchell did not pay

5     for it.

6  Q.  Did Ron Mitchell have a key to that post

7     office box?

8  A.  He did have a key to the post office box.

9     I don't remember exactly for what time

10     period.

11  Q.  At some point, did you take back the key?

12  A.  No.  When I moved to California, I left the

13     box open for him to use.

14  Q.  Okay, and did you continue to pay for the

15     box?

16  A.  No, I did not continue to pay for the box.

17  Q.  Now, the invoices of the type Exhibit B to

18     Exhibit 1, once you generated one of those

19     invoices, what would you do next?

20  A.  I generated the invoices based on the PO's;

21     okay, and I also generated invoices -- I'm

22     sorry.  What was the question?

23  Q.  What would you do next after you generated

24     the invoice?

Page 115

1    A.   I would mail out the invoice.

2    Q.   And who would you mail it to?

3    A.   International Floors.

4    Q.   What would be the next step in the process

5         of these loans?

6    A.   What do you mean by "next step"?

7    Q.   I assume, at some point, you would get a

8         check in the PO box?

9    A.   Yes.

10   Q.   How often would you check the PO box?

11   A.   A couple of times a week.

12   Q.   And when a check came in, what would you

13        do?

14   A.   Many times, I cashed the check from the

15        period of 1999 to 2001, and then at other

16        times, the check was left for Ron Mitchell.

17   Q.   How would you determine whether you would

18        cash it or leave it for Ron Mitchell?

19   A.   At the end of 2001, I didn't have the right

20        to cash the checks any more, so they would

21        have been left for Ron Mitchell.

22   Q.   Was your name removed from the accounts at

23        the end of 2001?

24   A.   What do you mean by "accounts"?

Page 116

1   Q.   What do you mean when you say you didn't

2        have the right to cash the checks as of the

3        end of 2001?

4   A.   I was no longer a partner of Remco and the

5        bank account would have been closed.

6   Q.   It was closed?

7   A.   Yes.

8   Q.   Did Ron Mitchell open up a new account?

9   A.   I don't know if Ron Mitchell opened up a

10       new account.   I think I've mentioned to

11       you before that Ron Mitchell has always

12       been a d/b/a, so there may have been

13       another account even during the period

14       of 1999 through 2001.   I do not know.

15  Q.   Was your accountant aware of your

16       partnership with Ron Mitchell?

17  A.   Yes, my accountant was aware of my

18       partnership.

19  Q.   Did you tell him when it ended, as well?

20  A.   Yes, I would have told him when it ended.

21  Q.   Now, you said a few minutes ago that you

22       would cash the checks.   What, actually,

23       would you do with the checks?

24  A.   I would have taken back whatever money I

Page 117

1    lent out.  I would have taken my interest.

2    I would have given the balance back to Ron

3    Mitchell.

4  Q. Would you send Ron Mitchell any kind of a

5    statement showing how much you took out?

6  A. No, I don't think there was a statement.

7  Q. Did you ever send any writings to Ron

8    Mitchell which recited how much you had

9    taken out?

10 A. I probably did maybe like a bring-down of

11    how I arrived at the figure.

12 Q. A bring down?  What is a bring-down?

13 A. I meant, just -- you know, the gross amount

14    of the -- of this --

15         MR. YURKO:  Check.

16 A. Thank you.  -- gross amount of the check --

17    I think in loan terms -- minus the $25,000

18    or the $15,000 or whatever the principal

19    amount that I loaned him, minus the

20    percentage of interest, you know, that was

21    due me on the loan.

22 Q. So was this a writing that you would send to

23    him?

24 A. It wouldn't have been like a formal

Page 126

1   A.   I sent checks to CCC International, yes.

2        Upon Mr. Mitchell's instructions, I believe

3        I may have wired money to Dave Adams on a

4        few occasions.

5   Q.   You mentioned a money order.

6   A.   Yes, to CCC International.  Yes, I would

7        have gotten a money order.

8   Q.   How many money orders did you send to CCC

9        International?

10  A.   It was either money orders or checks.  There

11       was probably anywhere from four to six of

12       them.  I also know that either once or

13       twice, I wired money to CCC International.

14  Q.   How much money in total did you send to CCC

15       International?

16  A.   I don't remember in total how much money I

17       sent.

18  Q.   Is it more than a hundred thousand?

19  A.   No, it was not more than a hundred.

20  Q.   With the 35 loans that you made to Ronald

21       Mitchell, how much money, in total, did you

22       lend to him?

23  A.   I never totalled up the amount of the

24       loans.  As I mentioned previously, they

Page 168

1    A.    I was up in the Massachusetts area for some

2          other business and I would stop in.

3    Q.    You didn't go for the purpose of checking

4          the inventory of Building 19; did you?

5    A.    Nothing, I did not.

6    Q.    You did not have Ron Mitchell come with you

7          to check over the inventory; right?

8    A.    No, I did not.

9    Q.    Now, how many loans did you make to Remco

10         for which you received copies of purchase

11         orders?

12              MR. YURKO:   Objection.   Asked and

13         answered.

14   A.    I made approximately 35 loans to Remco and I

15         believe I received PO's for just about every

16         single one of them.

17   Q.    Do you have any specific memory of any that

18         you made loans on that you didn't get

19         purchase orders for?

20   A.    There may have been a couple.   I don't

21         remember.   I did not type every single

22         invoice.   I think I said that to you before,

23         too.   So a lot of times, I did not have all

24         the information.   I would just be lending

Page 169

1     money to Ron Mitchell.

2   Q.  Without seeing the invoice?

3   A.  Yes.

4   Q.  Would Ron Mitchell send you a copy of the

5     invoice before you made the loan?

6   A.  No, he would not send me a copy before I

7     made the loan.

8   Q.  Would he ever send you a copy of the

9     invoices after you made the loan?

10   A.  Yes.

11   Q.  So is it fair to say then that Ron Mitchell

12     sent you copies of every invoice that he

13     prepared on which you made loans?

14   A.  I believe he sent me an invoice or a copy of

15     an invoice for every loan I made.

16   Q.  You don't have copies of any of those

17     invoices?

18   A.  No, I do not have copies of any of those

19     invoices.

20   Q.  You've testified today about being

21     uncomfortable about loaning the money to Ron

22     Mitchell and Remco; correct?

23         MR. YURKO:  Objection to form.

24   Q.  Is that correct?

Page 170

1  A.  Can you repeat it, please?

2  Q.  Sure.  You've testified today about being

3      uncomfortable about loaning money to Ron

4      Mitchell or Remco; is that correct?

5  A.  Yes.

6  Q.  Did anyone force you to continue to loan to

7      Ron Mitchell or Remco?

8  A.  No, no one forced me to loan to Ron Mitchell

9      or Remco.

10  Q.  Okay, and you also testified that your

11      intent was to only loan to Ron Mitchell for

12      a short period of time; correct?

13  A.  Yes, that is correct, for a short period of

14      time.

15  Q.  So why did you continue loaning to him for a

16      matter of several years?

17  A.  Because, in 2001, I ended the partnership

18      and he kept on saying to me "Just one more

19      order, just one more order.  Do this for me

20      and then I won't ask you again."

21  Q.  And it sounds like he did that more than

22      once; right?

23  A.  Yes, he did that more than once.

24  Q.  How many loans did you issue after Ron

Page 189

1   Q.   Are these portions of your income tax
2        returns for those three years?
3   A.   Yes, they're portions.
4   Q.   Are there other portions of the returns that
5        aren't included here?
6   A.   Yes, there's other portions.
7   Q.   Now, on these returns, do you show any
8        income from any loans to Remco?
9   A.   No, I do not.
10  Q.   Why not?
11  A.   Because I lent Ron Mitchell the money
12       through the other business entities, so I
13       didn't take any interest.
14  Q.   When we talked earlier, I thought you had
15       discussed that you had taken loans from
16       certain entities and then made personal
17       loans to Remco.
18  A.   That was for the period of 1999 through
19       2001.
20  Q.   So from 2002 on, what entities did you use
21       to loan to Ronald Mitchell or Remco?
22  A.   It would have been Connecticut Commercial
23       Lenders.
24  Q.   Was that the only entity from 2002 forward,

Page 190

1          that loan to Ron Mitchell or Remco?

2    A.   I think it's the only entity, yes.

3    Q.   Okay, but you personally didn't make any

4          loans to Remco or to Ron Mitchell; correct?

5    A.   Yes, I did.  I made this one.

6    Q.   "This one," you're referring to Exhibit

7          Number 9; correct?

8    A.   Right.

9    Q.   Did you earn income from the loan referenced

10         in Exhibit Number 9?

11   A.   I don't remember.

12   Q.   Is the income --

13   A.   I may have made maybe $238.  I'm not sure.

14   Q.   You wouldn't have made a loan to him without

15         earning income from it; would you?

16              MR. YURKO:  Objection.  Not

17         everything produces income.

18   Q.   Did you ever make any loans to Ronald

19         Mitchell or Remco that you didn't make any

20         income on?

21   A.   Yes, I did.

22   Q.   Okay.  How many?

23   A.   I don't remember.  There was a few.  I don't

24         remember how many.

Page 198

1   A.   Ron Mitchell.

2   Q.   Okay.  Would Remco make any profit on any of

3        these transactions?

4   A.   Well, Remco made the profit between --

5             MR. YURKO:  During the time of the

6        partnership?

7   Q.   Yes.

8   A.   Yeah, during the time of the partnership,

9        but I had my percentage and he had his

10       percentage of it.

11  Q.   Okay.  So you would get a percentage of the

12       profits for Remco?

13            MR. YURKO:  Objection.

14  A.   No.  I only lent money.  So when the money

15       came back, I got a percentage on it.  That's

16       the only money I made of it, which was a

17       percentage of my invoice, I made on my

18       $25,000 or whatever.  That was it.

19  Q.   What percentage was that?

20  A.   It was anywhere from five to nine percent.

21       When the rest of the money went back to Ron

22       Mitchell to either go to, you know -- I

23       don't know what happened to the balance of

24       the money.  I believe a lot of it went back

1    to Dave Adams and Ron Mitchell kept a

2    percentage of, you know, between five and

3    nine percent, also.

4    Q.   How did you know what the percentage would

5         be in any given transaction?

6    A.   It was -- when I first started lending

7         money, I think it was six or seven, and

8         then -- I think it remained six or seven.

9         When I kept on telling him I wanted to get

10        out, he may have thrown me an extra point or

11        something, to try to keep me in, giving him

12        more money.

13   Q.   So you would get at first six or seven

14        percent of the Remco invoice; is that

15        correct?

16   A.   Yes.

17   Q.   You would get that money when the check

18        would come in from International Floor

19        Crafts; correct?

20   A.   Yes.

21   Q.   Would you also get funds for the loans that

22        you were making to Ronald Mitchell?

23             MR. YURKO:   Objection.

24   Q.   Would you also get any funds from any loans

Page 200

1         that you were making?

2    A.   I'm sorry.  I don't understand what you're

3         asking me.

4    Q.   Okay.  All right.  When you were getting six

5         or seven percent, how much money was Ron

6         Mitchell getting?

7    A.   He was getting maybe a little bit more.

8    Q.   Was there any writing confirming how much he

9         would get or how much you would get?

10   A.   You mean, like a formal writing?

11   Q.   Any writing at all.

12   A.   No, no.

13   Q.   So when the funds came in from International

14        Floor Crafts, how did you know how much of a

15        check to cut for yourself?

16   A.   If they came to me, I would take back my 25,

17        right, and then the balance that was left

18        would be minus two percent, and then it

19        would be, you know, times -- it would be

20        like, for instance, either 14, 15 percent or

21        whatever would be taken out of that amount,

22        and then I would get a certain percentage of

23        that for my interest and he would get the

24        other percentage for the interest, and the

Page 201

1          balance went to Dave Adams.

2     Q.   Was it 25 that you gave each time?

3     A.   No.  I think I said to you before, sometimes

4          it was $7,500, it was 12, it was 15.

5     Q.   All right.  So what I was getting at earlier

6          is, when you were initially putting forward

7          the funds, you wouldn't get interest on that

8          amount; you would only get the six or seven

9          percent or later, a little more, from the

10         transaction; is that correct?

11    A.   Yes.

12    Q.   Okay.  All right.  Do you have an

13         understanding as to what David Adams's cut

14         would be of those funds?  Of the funds that

15         you would receive once you took out your

16         fees and Ron Mitchell's fees; what would

17         David Adams get?

18              MR. YURKO:  Objection.  Asked and

19         answered.

20    A.   He got the balance.

21    Q.   Whatever it was?

22    A.   Yes.

23    Q.   Could you give us an understanding of what

24         the range would be, from transaction to

Page 202

1     transaction?

2  A.  No, I can't do it off the top of my head,

3     but if you look at an invoice and just

4     subtract $25,000 and use that amount times

5     15 percent and subtract that, that's about

6     what the balance that Dave Adams would be

7     getting.

8  Q.  Sometimes it wasn't just $25,000; right?

9  A.  Right.  I was using that as a for instance.

10    Sometimes it was $12,000, $7,500, whatever.

11  Q.  Would there be any relationship between the

12    amount you lent and the amount on the

13    International Floor Crafts's purchase

14    order?

15  A.  I don't know.

16  Q.  Is that ever anything you asked Ron Ronald

17    Mitchell about?

18  A.  I don't know if I specifically asked that,

19    but he was giving money to Dave to buy

20    carpet up front because there's, I guess, a

21    lot of suppliers down south or wherever --

22    if you give them money up front, you can get

23    more goods for less money because you're

24    paying them up front.  That's the way I

Page 207

```
 1    A.   No, I'm sorry.  I never heard of that
 2         person.
 3                   MR. KLEHM:  Let me take a
 4         five-minute break and we're almost done.
 5                   (Recess.)
 6    Q.   Did Ronald Mitchell ever tell you that Diane
 7         Spignosi had destroyed any documents
 8         relating to Remco?
 9    A.   No, he never told me.  I read that in
10         something.  Wasn't it in something?
11    Q.   Something related to this case, since this
12         case was filed?
13    A.   Yes.
14    Q.   Okay.  During the time that you were in a
15         partnership with Ronald Mitchell, who had
16         control of the check books?
17    A.   Well, I had the Remco checkbook.
18    Q.   Did you keep it at your house?
19    A.   Yes.
20    Q.   And after you no longer were a part of a
21         partnership, where was that checkbook?
22    A.   The account was closed, so --
23    Q.   Did you have access to any checkbooks from
24         Remco after the partnership ended?
```

Page 208

1   A.   No, I did not.

2   Q.   What percentage of the Remco checks, during

3        the period of the partnership, did you

4        write?

5   A.   Probably, approximately 90 percent of them.

6   Q.   What made up the other ten percent?

7   A.   I don't know.  Just if maybe I wasn't around

8        and I had given the checkbook to Ron

9        Mitchell, for some reason.  I don't remember

10       why.

11  Q.   Anyone, other than you and Ron, write any

12       Remco checks during the time of the

13       partnership?

14  A.   Not to my knowledge.

15  Q.   When the account was closed, who kept the

16       checkbook?

17  A.   I probably kept the checkbook.  I do not

18       know what happened to it, though.

19  Q.   Where did you keep it?

20  A.   I would have kept it in my house.

21  Q.   Was there a particular place in your house

22       where you would keep your documents

23       relating to your business, your former

24       business?

*Exhibit E*

Jane Dziemit
155 Huntington Road
New Haven, CT 06512
(203) 466-1191
(203) 466-1194

TO:      Ronald Mitchell
FROM:    Jane Dziemit
DATE:    December 31, 2001        *Jane Dziemit*
RE:      REMCO

Effective December 31, 2001, I resign as partner of Remco.  You now have full ownership of Remco.

Cc:    State of Connecticut
       IRS
       John Villano, CPA



EXHIBIT 47
DATE 5/16/08
*Mitchell*
J. SHEPHERD

*Exhibit 230-8 F*

Hartford CT 06102-5030

## General Instructions

| For Department Use Only | 1. A RETURN MUST BE FILED even if no tax is due or no sales were made. | ► | SEPTEMBER 30, 1999 QTR |
|---|---|---|---|
| | 2. DUE DATE: OCTOBER 31, 1999 Return is due one month after period ending. Return must be postmarked on or before the due date. | | Connecticut Tax Registration Number |

3. DEDUCTIONS: Fill out reverse side of this form if you claim deductions.
4. INTEREST: For late payment - 1% of tax due per month from due date.
5. PENALTY: For failure to pay tax when due - 15% of tax due or $50, whichever is greater.
6. NEW OWNERS: Do not use previous owner's form to file your return. Any change in ownership requires a new permit.
7. Make check payable to: COMMISSIONER OF REVENUE SERVICES. (Be sure to include the Tax Registration Number on your check.) FOR COMPLETE INSTRUCTIONS SEE FORM O-88.

*Please enter any changes to your name or address below.*

MITCHELL RONALD & DZIEMIT JANE
REMCO
PO BOX 2274
BRANFORD CT  06405-1374

9710674000110999

New Trade Name:

New Mailing Address:

☐ Please check if change applies to both mailing and physical address.

New Physical Location (P.O. Box Not Acceptable)

| | | | |
|---|---|---|---|
| 1 | Gross receipts from sales of goods | ► 1 | |
| 2 | Gross receipts from leases and rentals | ► 2 | 96,792.50 |
| 3 | Gross receipts from labor and services | ► 3 | |
| 4 | Purchases of goods by your business subject to use tax | ► 4 | |
| 5 | Leases and rentals by your business subject to use tax | ► 5 | |
| 6 | Purchases of services by your business subject to use tax | ► 6 | |
| 7 | Total: Add Lines 1 through 6 | ► 7 | 96,792 50 |
| 8 | Total deductions: Please complete reverse side, enter amount from Total Deductions here. | ► 8 | 96,792 50 |
| 9 | Balance subject to tax: Subtract Line 8 from Line 7, but not less than zero | ► 9 | none |
| 10 | Gross amount of tax due: Multiply Line 9 by 6% (.06) | ► 10 | none |
| 11 | Credits: See Form O-88, Instructions | ► 11 | |
| 12 | Net amount of tax due: Subtract Line 11 from Line 10 | ► 12 | none |
| 13 | For late payment of tax: See General Instructions Interest ► _____ + Penalty ► _____ | 13 | |
| 14 | Total amount due: Add Line 12 and Line 13 | ► 14 | none |

## Please Complete Items Below

If this return is not for a full period, enter dates covered:    From:                          To:

If this business has changed ownership since your last return, enter name and address of new owners and date sold:
Name:                                          Address:                                          Date Sold:

If this is your first return, please enter business starting date:          If you are out of business, please enter last business date:

I declare under the penalty of false statement that I have examined this return and to the best of my knowledge and belief, it is true, complete and correct. The penalty for false statement is imprisonment not to exceed one year or a fine not to exceed two thousand dollars, or both.

| Taxpayer's Signature Jane Dziemit | Title Partner | Date 10/25/99 |
|---|---|---|
| Paid Preparer's Signature | Paid Preparer's Address | Date |

rv. 7/99)

EXHIBIT 42
DATE 5/16/08
Mitchell
J. SHEPHERD

EXHIBIT 3
Mitchell
6/23/06

000163

1

### Deductible Items at 6% Tax Rate
*Missing line numbers reflect changes in sales tax exemptions*

| Line | Description | | # | Amount |
|---|---|---|---|---|
| 15 | Sales for resale - sales of goods | | | |
| 16 | Sales for resale - leases and rentals | ▶ | 15 | 96,792 5? |
| 17 | Sales for resale - labor and services | ▶ | 16 | |
| 18 | All newspapers and subscription sales of magazines and puzzle magazines | ▶ | 17 | |
| 19 | Trucks with gross vehicle weight rating over 26,000 lbs. or used exclusively for carriage of interstate freight | ▶ | 18 | |
| 21 | Food for human consumption, sold through vending machines and any items purchased with food stamps | ▶ | 19 | |
| 23 | Fuel for motor vehicles | ▶ | 21 | |
| 24 | Sales of electricity, gas and heating fuel for residential dwellings | ▶ | 23 | |
| 25 | Sales of electricity - $150 monthly charge per business         FOR UTILITY AND | ▶ | 24 | |
| 26 | Sales of electricity, gas and heating fuel for manufacturing or agricultural production    HEATING FUEL COMPANIES | ▶ | 25 | |
| 27 | Aviation fuel                                              ONLY | ▶ | 26 | |
| 29 | Tangible personal property to persons issued Farmer Tax Exemption Permit | ▶ | 27 | |
| 30 | Machinery, its replacement, repair, component and enhancement parts, materials, tools and fuel for manufacturing | ▶ | 29 | |
| 31 | Machinery, materials, tools and equipment used in commercial printing process or publishing | ▶ | 30 | |
| 32 | Machinery, materials, tools and fuel for commercial fishing | ▶ | 31 | |
| 33 | Out-of-state - sales of goods | ▶ | 32 | |
| 34 | Out-of-state - leases and rentals | ▶ | 33 | |
| 35 | Out-of-state - labor and services | ▶ | 34 | |
| 36 | Motor vehicles or vessels purchased by nonresidents  (Attach CERT-125 to OS-114) | ▶ | 35 | |
| 37 | Prescription medicines - sales of goods | ▶ | 36 | |
| 38 | Nonprescription medicines and diabetic equipment - sales of goods | ▶ | 37 | |
| 39 | Charitable or religious organizations - sales of goods | ▶ | 38 | |
| 40 | Charitable or religious organizations - leases and rentals | ▶ | 39 | |
| 41 | Charitable or religious organizations - labor and services | ▶ | 40 | |
| 42 | Federal, Connecticut or municipal agencies - sales of goods | ▶ | 41 | |
| 43 | Federal, Connecticut or municipal agencies - leases and rentals | ▶ | 42 | |
| 44 | Federal, Connecticut or municipal agencies - labor and services | ▶ | 43 | |
| 45 | Items certified for air or water pollution abatement - sales, leases and rentals of goods | ▶ | 44 | |
| 47 | Nontaxable labor and services | ▶ | 45 | |
| 48 | Services between wholly owned business entities (See Instructions, Form O-88) | ▶ | 47 | |
| 50 | Trade-ins of all like-kind tangible personal property (See Instructions, Form O-88) | ▶ | 48 | |
| 52 | Taxed goods returned within 90 days at 6% (.06) rate | ▶ | 50 | |
| 56 | Oxygen, blood plasma, prostheses, etc. - sales, leases, rentals or repair services of goods | ▶ | 52 | |
| 58 | Printed material for future delivery out of state | ▶ | 56 | |
| 59 | Articles of clothing or footwear under $50 | ▶ | 58 | |
| 60 | Material and components for noncommercial production of clothing | ▶ | 59 | |
| 63 | Funeral expenses | ▶ | 60 | |
| 69 | Repair services, repair and replacement parts for aircraft and certain aircraft (See Instructions, Form O-88) | ▶ | 63 | |
| 71 | Certain machinery under the Manufacturing Recovery Act of 1992 (See Instructions, Form O-88) | ▶ | 69 | |
| 72 | Machinery, equipment, tools, supplies and fuel used in the biotechnology industry | ▶ | 71 | |
| 73 | Repair and maintenance services and fabrication labor to vessels (See Instructions, Form O-88) | ▶ | 72 | |
| 74 | Computer and data processing services (See Instructions, Form O-88) | ▶ | 73 | |
| 75 | Renovation and repair services to residential real property (See Instructions, Form O-88) | ▶ | 74 | |
| 76 | Patient care services by hospitals (See Instructions, Form O-88) | ▶ | 75 | |
| 77 | Sales to direct payment permit holders | ▶ | 76 | |
| A | Other Adjustments - sales of goods (Describe) | ▶ | 77 | |
| B | Other Adjustments - leases and rentals (Describe                ) | ▶ | A | |
| C | Other Adjustments - labor and services (Describe              ) | ▶ | B | |
| | | ▶ | C | |

NOTE: Line 20 is now part of Line 19; Line 22 is now part of Line 21; Line 46 is now part of Line 45; Line 49 is now part of Line 38; Line 57 is now part of Line 56; Line 64 is now part of Line 30.

Computer and data processing services and renovation and repair services to residential real property are being phased out.  (See Instructions, Form O-88)

**TOTAL DEDUCTIONS** *(Enter here and on Line 9 on the front of this return)*                96,792 50



TONY LOAN 26,000.00          6811.20
10/20                         
10/20            10,490.80     831.20
11/29    Bal    6811.20        831.20    2/3/01   Exhibit G

EXHIBIT 28
DATE 5/16/08
Mitchell
J. SHEPHERD

-0-

| Date | Sent $ | Amount | PO# | INV# | Date | RON | T+J | DAVE |
|------|--------|--------|-----|------|------|-----|-----|------|
| 8/7 | 25,000 | | 5743 | D01030 | 10/6 | 3224⁴⁶ | 2865⁹³ | 8698⁵⁴ |
| 9/1 End 2000 | 25,000 | | 5756 | D01107 | 11/9/00 | 3395.61 | 3018³³ | 10,490.8 |
| 10/26 | 25,000 | 38,725 | 5831 | P01010 | 1/4 | 3136.68 | 3833⁷² | 5980: |
| 12/7 | 25,000 | 40,600 | 5834 | D01020-2 | 1/16 | 3288⁶⁰ | 4019⁴⁰ | 7480: |
| 1/23 | 20,000 | 41,300 | 5874 | D011106 | 3/13 | 3345.30 | 4088⁷⁰ | 8040: |
| 1/24 | -0- | 32,415⁹⁴ | 5488 | D010103 | 1/24 | 2625.66 | 3209.14 | 7000⁰⁰ 18,932: |
| 1/25 | -0- | 39,450⁰⁰ | 5818 | D01010-4 | 1/25 | 3195.45 | 3905.55 | 7000⁰⁰ Sent 24,50 |
| 2/2/01 | 20,000 | 40,155⁰⁰ | 5880 | D110051 | 5/1 | 3259.04 | 3983²⁷ | 12,188: |
| 2/12/01 | -0- | 39,148⁰⁰ | 5883 | D011105 | 2/28 | 3170.99 | 3875⁶³ | 7000⁰⁰ Sent 24,31 |
| 3/14/01 | 20,000 | 42,760⁰⁰ | 5990 | D010618 | 6/18 | 3463.56 | 4233²⁴ | 14,808: |
| 3/28/01 | -0- | 29,627⁰⁰ | Kevin | D010137 | 8/28 | 2197²⁶ | 2685⁶⁴ | 3,000 Dav 21,70: |
| 8/29/01 | -0- | 51,230⁰⁰ | 5895 | D010140 | 3/29 | 4149⁶³ | 5071⁷¹ | 5000⁰⁰ 15,984 |
| 5/9/01 | 25,000 | 40,320⁰⁰ | 6001 | D110806 | 8/6 | 3265⁹² | 3991⁶⁸ | 12,256 |
| 5/14/01 | -0- | 45,968⁹⁵ | 5938 | D10550 | 6/4 | 3723.48 | 4550⁹³ | 4000 327 |
| 5/23/01 | 20,000 | 43,650⁰⁰ | 6038 | D110810 | 8/13 | 3536.65 | 4321.35 | 14,42 |
| 7/9/01 | 20,000 | 41,580⁰⁰ | 6116 | D111022 | 10/22 | 3367.98 | 4116⁴² | 13 |
| 7/23/01 | -0- | 48,905⁵⁰ | 5953 | D110723 | 8/10 | 3961.35 | 4841⁶⁴ | Dav |
| 8/30/01 | 23,000 | 39,200 | 6133 | D111020 | 11/19 | 3112.92 | 2767.⁰⁴ | 75 |
| 10/2/01 | -0- | 71,630⁰⁰ | 6073 | D111001 | | 3581⁵⁰ | 3581⁵⁰ | 36,0 |
| 10/15/01 | -0- End 2001 | 17,000⁰⁰ | 6027 | D111016 | | 860⁰⁰ | 850⁰⁰ | 14,9 |
| 11/13/01 | 25,000 | 42,630⁰⁰ | D.A. | 200204 | 6/4 | 3385.52 | 3009¹⁸ | 10,38 |
| 12/11/01 | 26,000 | 42,000 | 6246 | 200222 | 3/22 | 2594¹² | 3705⁸⁸ | 9,86 |
| 1/2/02 | 25,000 | | | ALL PAID | | | | 0052938 |
| 2/28/02 | 25,000 | 36,260 | 6306 | 2002418 | 4/18 | 2879.47 | 2559.53 | 5, |

2/8 9,000 Paid Back over 16,000   6,000 Paid Back 3/22 INV.   10,000 OWED Paid 4/18 INVOICE

✳ NO UP FRONT   2002
Remco

| Ron | T+J | Dave | |
|---|---|---|---|
| 3385.52 | 3009.18 | 10,382.90 | |
| 2594.12 | 3705.88 | 9860.00 | |
| 2879.47 | 2559.53 | 5095.80 | |
| 3474.26 | 3088.24 | 11312.50 | |
| 2227.50 | 2227.50 | 19,800.00 | |
| 3502.06 | 3112.94 | 11603.00 | |
| 2902.00 | 2902.00 | 9480.00 | ⎱ I SENT 15000 |
| 2401.40 | 2401.40 | 8188.00 | ⎰ |
| 526.57 | 526.57 | 4680.56 | |
| 3301.94 | 2935.04 | 19511.40 | |
| 2859.40 | 2859.40 | 26912.00 | |
| 1471.80 | 1308.26 | 1323.92 | |
| 31,526.04 | 30635.94 | 138,150.08 | |

| LAST YEAR | | | |
|---|---|---|---|
| 57,231.00 | 67,926 | 363,245 | |
| 3057.35 | 2717.65 | 11,955 (Less 5000.00) | |
| 1740.31 | 1546.94 | 3189.45 | |
| 1596.29 | 1418.89 | 1683.83 | |
| 1811.05 | 1609.81 | 3928.73 | |
| 39,781.01 | 37,929.03 | 158907.09 | |

$$158907.09 - 16087 = 142820$$
$$142820 - 21866 = 120954$$
$$120954 - 4378 = 116,576$$

002939

Monday, October 10, 2005 12:22 PM

| Date | Sent $ | Amount | P.O.# | Inv.# | Row | T+J | Dave |
|------|--------|--------|-------|-------|-----|-----|------|
| 8/7 | 25,000 | | 5713 | | 3224 | 2565 | 8698 |
| | 25,000 | | 5756 | | 3595 | 3018 | 10,490 |
| 10/24 | 25,000 | 38,725 | 5801 | | 3136.68 | 3833 | 5980 |
| 12/7 | 25,000 | 40,600 | 5834 | D010202 | 3258 | 4019 | 7480 |
| 1/23 | 20,000 | 41,300 | 5874 | D011106 | 3345.30 | 4088 | 8040 |
| 1/24 | —0— | 32,415 | 5488 | D010103 | 26 | | |
| 1/25 | —0— | 39,750 | 5818 | D010104 | 3198.45 | 3905 | |
| 2/2 | 20,000 | 40,236 | 5880 | D110051 | 3259.04 | 3983 | 12,185 |
| 2/12/01 | —0— | 39,148 | 5883 | D011105 | 3170.97 | 3875 | |
| 3/14/01 | 20,000 | 42,760 | 5990 | D010618 | 3463.56 | 4233 | 14,808 |
| 3/28 | —0— | 29,637 | | O010137 | 2197 | | |
| 3/29 | —0— | 51,230 | 5895 | D010140 | 4144.63 | 5071 | |
| 5/9/01 | 25,000 | 40,320 | 6001 | D110806 | 3265 | 3991 | 12,156 |
| 5/14/01 | —0— | 45,468 | 5938 | D10550 | 3723.48 | 4550.93 | |
| 5/23/01 | | 43,650 | 6038 | D110810 | 3536.65 | 4321.35 | |
| 7/9/01 | | 41,580 | 6116 | D111022 | 3367.98 | 4116 | |
| 7/23/01 | —0— | 48,905.50 | 5953 | D110723 | 3961.35 | 4841 | |
| 8/30/01 | 23,000 | 39,200 | 6133 | D111020 | 3112.92 | | |
| 10/2/01 | —0— | 71,630 | 6173 | D11601 | 3581.50 | 3581.50 | |
| 10/15/01 | —0— | 17,000 | 6027 | D111016 | 850 | 850 | |
| 11/15/01 | 25,000 | 42,630 | P.A. | 300264 | 3385.52 | 3607 | |
| 12/11/01 | 25,000 | 42,000 | 6446 | 300222 | 2544 | 3765 | |
| 1/2/02 | 25,000 | | | | ALL PAID | | |
| 2/28/02 | 25,000 | 36,260 | 6386 | 3002418 | 2879.47 | 2569.53 | 5,095 |

| | Wire Date | $ Sent | Amount | P # | Inv # | Bill Date | Rec | T+J | D. rec |
|---|---|---|---|---|---|---|---|---|---|
| 02 | 4/11/02 | 24,800 | 43,750 | 6393 | 2002805 | 8/5 | 3474⁰⁰ | 3088²⁷ | 11,312⁵⁰ |
| 02 | 4/25/02 | —0— | 24,750 | 6308 | 2002435 | 4/5 | 2227⁵⁰ | 2075⁰⁰ | 19,800 |
| 02 | 5/10/02 | 25,000⁰⁰ (24,000⁰⁰) | 44,100 | 6454 | 2002295 | 4/6 | 3505⁸⁸ | 3112⁹⁴ | 11,603 |
| 02 | 5/17/02 | 20,000⁰⁰ | 25,800 | 6314 | 2002524 | 5/30 | 2902⁰⁰ | 2902⁰⁰ | 9,480⁰⁰ |
| 02 | 5/17/02 | for two checks | 23,460 | 6375 | 2002612 | 6/12 | 2401⁴⁰ | 2401⁴⁰ | 8188 |
| 02 | 6/20/02 | —0— for sent 15,000⁰⁰ | 5850²⁹ | 6340 | 2002619 | 6/30 | 526⁵⁸ | 626⁵⁸ | 4680⁰ |
| 02 | 6/25/02 | | 24,780 | 6381 | 2002631 | 6/27 | } 3301⁹⁴ | 2935⁰⁰ | 19,511⁴⁴ |
| 02 | | | 16,800 | 6380 | 2002632 | 6/13 | | | |
| 02 | 6/27/02 | —0— | 33,640 | 6269 | 2002617 | 6/27 | 2859⁴⁶ | 2859⁴⁶ | 26,940 |
| 2002 | 8/26/02 | 25,000 (23,700) | —40.04 | 6650 | 2002 1220 | 12/26 | 3179⁰⁵ | 2800²⁴ | 7800²⁴ |
| 2002 | 9/13/02 | 25,000 | 46,040 | 6634 | 3106 | 1/6/02 | 3174⁵² | 3174⁵² | 7800²⁴ |
| 02 | 9/20/02 | 14,659 I sent That is 365 | 18,533⁶³ | 6462 | 2002426 | 9/30 | 1471⁸⁵ | 1308⁵ | 1333⁵ |
| 02 | 10/15/02 | 20,000 | 38,500 | 6551 | 2002030 | 10/30 | 3057³² | 2717⁵⁵ | 11,955 |
| 02 | 10/21/02 | 18,000 1st sent | 21,415⁰² | 6543 | 2002021 | 1/21 | 1740³¹ | 1546⁴⁴ | 3187⁴ |
| 02 | 11/9/02 | 15,000 I sent 7500 7500 chan | 20,101² | 6556 | 2001111 | 11/4 | 1546⁴ | 1418⁴¹ | 1651⁵ |
| 2002 | 12/9/02 | 7500 chan 15,000 | 22,805⁷⁰ | 6577 | 2002 1204 | 12/9 | 1811⁰⁵ | 1664⁴¹ | 3485⁵ |
| | 12/31/02 | 53,601⁴¹ | 47,460⁰⁰ | 6677 | 63305 | 3/10 | 3768⁸⁸ | 3350⁵² | 10,749⁸⁵ |
| | 1/7/03 | 15,000 1/2 | 24,765¹⁵ | 6635 | 3108 | 1/8/03 | 1728⁶⁵ | 1536⁵² | 7661¹⁵ |
| | 1/24/03 | 15,000 1/2 | 23,851²⁵ | 6659 | 3130 | 1/30 | 1846⁴⁵ | 1658⁵⁹ | 4834¹⁵ |
| | 1/31/03 | 25,000⁰⁰ 42,930 | | 6822 | 3770 | 7/7/03 | 3413¹² | 3033⁸⁸ | 10,673⁴ |
| | 2/10/03 | 15,000 1/2 | 23,491⁰⁰ | D.A. | 3214 | 2/14/03 | 1786⁰⁵ | 1587⁵⁴ | 3607⁵ |
| | 2/28/03 | 255 15,000 1 sent 1500 T+5 | 23,209³⁵ | 6703 | 3082 | 3/13 | 2241⁷⁴ | 1992⁴⁵ | 8,430⁵ |
| | 3/10 | 15,000 T+5 1500 T+5 T+5 1 sent | | | | | | | |
| | 3/21 | 16,580⁰⁰ | 18,148⁰⁰ | 6721 | 3226 | 3/21 | 637⁹⁶ | 567⁰⁸ | —0— |
| | 3/31 | 4,420 I sent 3,000 I sent 7,000 T+5 | 23,300⁰⁰ | 6772 | 3529 | 5/24 | 1850²⁵ | 1644⁷¹ | —0— |
| | 3/28 | —0— T+5 sent | 4,376⁸⁵ | 6716 | 3302 | 3/28 | 1142⁸³ | 1015⁸⁵ | 2033⁵⁸ |
| | 4/9 | 13,650 | 28,737⁵⁰ | 6759 | 3506 | 5/6/03 | 2282⁵ | 2028⁴¹ | 10,101⁴ |

3535A05

| WIRE Date | $ Sent | Amount | Pt # | Inv# | b.11 Date | Ron | T+J | Dave |
|---|---|---|---|---|---|---|---|---|
| 6/5/03 | 7,500 me | 24,590.00 | 6777 | 3617 | 6/17/03 | 1952 74 | 1735 76 | 5,409 70 |
| 7/10/03 | 7,500 T+J | | | | | | | |
| | 7,500 nelson | 21,875 | 7083 | 3104 | 10/9/03 | 1737 13 | 1544 13 | — 0 — |
| 7/26/03 | 7,500 | | | | | | | |
| | 25,000 Ron | | | | | | | |
| 9/15 | — 0 — | 40,140.00 | 6843 | 3815 | 8/6/03 | 3187 53 | 2833 44 | 6709 38/K |
| 11/3 | — 0 — | 23,421 55 | 7066 | 31103 | 11/3/03 | 1366 33 | 1214 41 | — 0 — |
| | | 171,204.25 | | | | | | |

END OF 2003

| | | | | | | (2344 32) | (2642 43) | |
| 12/18/03 | — 0 — | 33,275.00 | 6853 | 31218 | 12/18/03 | 3327 50 | 3327 50 | ? (K) |
| 6/16/04 | Cost of goods 9313 | 15,750 | 7179 | 42356 | 3/16/03 | 3159 | — | 3159 (K) |

END OF 2004

START 2005

| 4/3/05 | 10,000 | 26,475 | 7769 | 52201 | 3/23/05 | 5,295.00 | — | 20,680 55 (K) |

DZIEMIT.0207

Remco 2001                    (Orders Without Up Front $)

| Invoice Date | Inv. # | P.O # | Invoice Amount | Ron Made | T+J Made | Dave Made |
|---|---|---|---|---|---|---|
| 1/24/01 | D010103 | 5488 | 32,415.94 | 2625.66 | 3209.14 | 25,932.75 |
| 1/25/01 | D010104 | 5818 | 39,450.52 | 3195.45 | 3905.55 | 31,560.00 |
| 2/12/01 | D011105 | 5883 | 39,148.00 | 3170.97 | 3875.63 | 31,318.40 |
| 3/28/01 | D010137 | Kevin | 29,627.00 | 2197.26 | 2685.64 | 23,701.60 |
| 3/29/01 | D010140 | 5895 | 51,230.00 | 4149.63 | 5071.77 | 40,984.00 |
| 5/17/01 | D10530 | 5103 | 73,760.92 | 5105.10 | 7550.15 | 54,110.16 |
| 7/23/01 | D110723 | 5953 | 48,905.50 | 3961.35 | 4841.64 | 39,124.40 |
| 10/2/01 | D11001 | 6073 | 71,630.00 | 3581.50 | 3581.50 | 63034.40 |
| 10/15/01 | D111016 | 6027 | 17,000.00 | 850.00 | 850.00 | 14,960.00 |
| | | | 375,375.39 | 27,455.39 | 32,571.86 | 307,390.71 |

DZIEMIT.0208

REMCO 2001    (NOT Including No UpFront Credits)

| AMOUNT SENT | INVOICE AMOUNT | INV. Date | PO# | RON MADE | T+J MADE | DAVE MADE |
|---|---|---|---|---|---|---|
| 10/26/00 25,000 | 38,725 | 1/4/01 | 5831 | 3136.68 | 3833.72 | 5,980.00 |
| 12/7/00 25,000 | 40,600 | 1/16/01 | 5834 | 3288.60 | 4019.40 | 7,480.00 |
| 1/23/01 20,000 | 41,300 | 3/13/01 | 5874 | 3345.30 | 4088.70 | 13,040.00 |
| 2/2/01 20,000 | 40,235 | 5/1/01 | 5880 | 3259.04 | 3983.27 | 12,188.00 |
| 3/14/01 20,000 | 42,760 | 6/18/01 | 5990 | 3463.56 | 4233.24 | 14,208.00 |
| 5/9/01 25,000 | 40,320 | 8/6/01 | 6001 | 3265.92 | 3991.68 | 7,256.00 |
| 5/23/01 20,000 | 43,650 | 8/10/01 | 6038 | 3535.65 | 4321.35 | 14,920.00 |
| 7/9/01 20,000 | 41,580 | 10/22/01 | 6116 | 3367.98 | 4116.42 | 13,264.00 |
| | 329,170 | | | 26,662.73 | 32,587.78 | 88,336.00 |

DZIEMIT.0209

| Wire Date to | Wire Amt | Fee | PO # | Invoice # | Inv Date | Gross Invoice | -2% | Net Invoice | Received | Dave made | | Mitch made | Jane made |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/17/00 Dave | | 8,000.00 per | | | | | | | 10/24/00 | | | | |
| 10/23/00 Dave | 26,000.00 | 26,000.00 per | | | | | | | 27/01 | 6,900.00 | | 3,139.68 | 3,833.72 new 20%4 |
| 10/24/00 Dave | 26,000.00 | | 8831 | D1/0101 | 1/4/01 | 38,728.00 | 774.60 | 37,950.00 | 1/22/01 | 6,900.00 | | | |
| 11/7/00 Dave | | | | | | | | | | | | | |
| 12/6/00 Dave | 20,000.00 | 20,000.00 per | 8834 | D010202 | 1/16/01 | 40,800.00 | 812.00 | 39,788.00 | 11/20/00 | 7,480.00 | 5,000.00 | 3,288.60 | 4,018.40 |
| 12/18/00 Dave | | 20,000.00 per | | | | | | | | | | | |
| 1/3/01 Dave | | 45,000.00 per | | | | | | | | | | | |
| 1/24/01 Dave | 20,000.00 | | 6874 | D1/4108 | 3/19/01 | 41,300.00 | 413.00 | 40,474.00 | 4/2/01 | 13,040.00 | | 3,345.30 | 4,088.70 |
| 2/2/01 Dave | 20,000.00 | 18 | 6880 | D1/10081 | 5/1/01 | 40,235.00 | 804.70 | 39,430.30 | 5/19/01 | 12,188.00 | | 3,260.04 | 3,985.27 |
| 2/9/01 Dave | | | 6488 | D010103 | 4/24/01 | 33,415.64 | 648.32 | 31,767.82 | 2/12/01 | 16,683.76 | 7,000.00 | 2,626.89 | 3,209.14 Invoice up |
| 2/13/01 Dave | | | 6818 | D010104 | 1/25/01 | 39,450.00 | 788.00 | 38,661.00 | 2/12/01 | 24,360.00 | 7,000.00 | 3,165.46 | 3,905.65 Invoice up |
| 2/26/01 Dave | 20,000.00 | | 6383 | D011105 | 2/28/01 | 38,148.00 | 762.96 | 38,385.04 | 2/28/01 | 24,318.40 | 7,000.00 | 3,170.97 | 3,876.65 Invoice up |
| 2/28/01 Dave | | | 6990 | D110618 | 6/18/01 | 42,760.00 | 855.20 | 41,900.80 | 7/8/01 | 14,208.00 | | 3463.58 | 4233.59 |
| 3/1/01 Dave | | | | | | | | | | | | | 4239.24 |
| 3/14/01 Dave | | | | | | | | | | | | | |
| 3/26/01 Dave | | 18.00 W. | 6896 | D010137 | 6/18/01 | 29,627.00 | 592.54 | 28,035.46 | 3/28/01 | 21,685.00 | P 2,000.00 | 2,197.28 | 2,885.54 Inv up/Ac |
| 4/4/01 Dave | 8,000.00 | Kevin | | 0010140 | | 51,290.00 | 1,024.60 | 50,205.40 | 3/29/01 | 35,584.00 | 6,000.00 | 4,449.63 | 6,071.77 Invoice up |
| 5/8/01 Dave | | J vs6/23 | 6838 | D10660 | 5/14/01 | 45,968.85 | 919.38 | 48,048.67 | 6/4/01 | 32,776.18 | 4,000.00 | 3,723.48 | 4,550.83 Invoice up |
| 5/14/01 Dave | 20,000.00 | J vs6/0 | 6901 | D110608 | 8/6/01 | 40,320.00 | 806.40 | 39,613.60 | 8/28/01 | 7,256.00 | | 3,255.82 | 3,991.88 Invoice up |
| 5/23/01 Dave | 10,000.00 | w/7/9 | | | | | | | | | | | |
| 5/23/01 Dave | 10,000.00 | w/6/23 | | | | | | | | | | | |
| 7/6/01 Dave | | | 60386 | D110810 | 8/10/01 | 43,660.00 | 873.00 | 42,777.00 | 8/31/01 | 14,920.00 | | 3,535.66 | 4,321.35 |
| 7/20/01 Dave | 20,000.00 | | 6935 | D10723 | 7/23/01 | 48,908.60 | 978.11 | 47,827.39 | 8/9/01 | 37,124.40 | P 2,000.00 | 3,961.33 | 4,841.64 Invoice up |
| 8/26/01 Dave | 20,000.00 | | 6816 | D11022 | 10/2/01 | 41,580.00 | 831.60 | 40,748.40 | 11/6/01 | 11,264.00 | T 2,000.00 | 3387.98 | 4,116.42 |
| 8/30/01 Dave | 25,000.00 | | 6133 | D11023 | 11/18/01 | 38,200.00 | 764.00 | 38,416.00 | 12/13/01 | 6,536.00 | T 2,000.00 | 3,112.92 | 2,787.04 |
| 10/16/01 Dave | | | 6373 | D1101 | 10/2/01 | 71,650.03 | 1,482.60 | 70,197.40 | 10/23/01 | 61,084.40 | T1 | 3,581.50 | 3,651.50 Invoice up |
| 10/4/01 | | | 6027 | D1016 | 10/15/01 | 17,000.00 | 831.80 | 16,660.00 | 11/6/01 | $14,080.00 | | $650.00 | $850.00 Invoice up |
| 11/8/01 Dave | 26,000.00 | | | | | | | | | | | | |
| 12/13/01 Dave | 25,000.00 | | | | | | | | | | | | |
| 1/2/02 Mitch | 28,000.00 | | | | | | | | | | | | |
| Totals | 270,000.00 | 115,000.00 | | 0 | | 745,745.93 | 14,865.61 | 728,668.80 | | 383,244.71 | 48,000.00 | 57,230.96 | 67,026.82 |

4500⁰⁰

8/10 Sent 18,000 | Inv. Date | Inv. # | PO # | Amount | After Discount | 20,620.00 / 6,000.00

10/26/00 | 8284 | 5758 | 44,000 | 43,130.00 | 14,620.00

- 18,000.00 | - 5,000.00

END OF 2000 | 4500 | 25,120⁰⁰ | 9,620.00
- 4500⁰⁰ | 22,000.00

10/4/00 Sent 25,000⁰⁰ | 1/29/01 | 3365 | 5839 | 42,950⁰⁰ | 20,620.00 / 42,091⁰⁰ | 42,091.00

START 2001 | 4500 | - 29,500.00

12,591⁰⁰
- 4464⁰⁰ PAYED for Dru

25,000⁰⁰ Still owes 4464⁰⁰ | 8127 Sent 7

11/20/00 29,000⁰⁰

Dave Hus after all the stuff on 10/26/00 Invoice Plus Hely

2/8/01 Sent Dave 6,000 From 11,000 LOAN | 2/19/01 | 3412 | Dave Adams | 40,225⁰⁰ | 39,430.30

4500 | 9,124.00 Dave owes

30,306.30 | PAID Dave 800

2/16/01 Sent 25,000⁰⁰ | 4/8/01 | 3521 | 5873 | 40,600 4/20 | 39,788.00 | 10,288 to Dave
- 29,500.00 | - 2000 for LOAN

4500 | 10,288⁻ | 8,288⁻

Sent Ronco 7,000⁰⁰ Dave owes PAID
Kept from - 2370⁰⁰ As of 3/1/01
11,000 LOAN 4660⁰⁰ 9,124⁰⁰

3/8/01 Sent 25,000⁰⁰ | 5/7/01 | 3622 | 5881 | 40,690⁰⁰ 5/25 | After Discount 39,876.20 | 10,376⁰⁰ To Dave

3/27/01 LOAN 8000.00 | 4500

less 1845.00
6155⁰⁰ Balance
2000⁰⁰ From Inv. 3521
4155⁰⁰
- 405⁰⁰ Pd Commission
3750⁰⁰ Balance
OAD 15,00 - 984⁻ From Ronco D.02877
PAID From Ronco 2766 Balance

4/23 Sent 25,000⁰⁰ | 7/3 | 3678 | 5994 | 44,150⁰⁰ 7/20 | 43,267 | 13,767 to Dave
6,800 Ronco owes
6,974
3,65
4500 | 6,602 Sent to Dave

5/30 Sent 25,000⁰⁰ | 9/3 | 3812 | 6101 | 41,720⁰⁰ a/m | 40,865.60 | 11,385.60 Dave

6/20 Sent 22,000⁸⁰ | 10/2 | 3944 | 6109 4500 | 40,600⁰⁰ 10/21 | 39,788⁰⁰ | 10,288 TO Dave

END 2001

7/23 Sent 25,800⁰⁰ | 1/8/02 | 4112 | 6142 | 42,425 1/8 | 41,576.50 4500 | 12,076 to Dave

9/21 Sent 25,000 | 2/9 | 4138 | 6197 | 42,000 3/12 | 41,160.00 4500 | M. 660 to Dave

10/24 Inv # D11001 Extra to Ron 3,000.⁰⁰
11/13 Inv # D11016 Extra " " 680.⁰⁰

| | | | Inv Date | Inv # | PO # | Inv Amount | After Discount | Ron | Dave |
|---|---|---|---|---|---|---|---|---|---|
| 22,000 to Kevin | 10/24 Sent 25,000.⁰⁰ | | 6/3 | 4229 | 6319 | 46,410.⁰⁰ | 45,481.80 | [4500] | 15,981.80 |
| 1/15/03 Sent 10,000 1/08 Sent 15,000 | | | 6/15 | 4240 | 6376 | 43,946.⁰⁰ | 43,067.08 | [4500] | 13,567.⁰⁸ |
| 3/14 Sent 25,000 | | | 8/16 | 4359 | 6444 | 40,600.⁰⁰ | 39,788 | [4500] | 10,288.⁰⁰ |
| 6/21 Sent 25,000  15,000 to Kevin | | | 11/25 | 4462 | 6590 | 43,050.⁰⁰ | 42,189 | [4500] | 12,689 |
| | END 2002 | | | | | | | | |
| 7/9 Sent 25,000 | | | 2/11/03 | 4550 | 6667 | 39,720 | 38,925.⁶⁰ | [4500] | 9,425.⁰⁰ |
| 9/4 Sent 25,000 | | | 4/1/03 | 4628 | 6717 | 40,810.⁰⁰ | 39,993.⁸⁰ | [4500] | 10,493.⁰⁰ |
| 26,000.⁰⁰  11/26 Sent 7,000  12/4 Sent 7,000 to Kevin  12/18 Sent 11,000 to Kev | | | 8/22 | 4779 | 7019 | 39,050 | 28,264 | [4500] | 8,769 |
| Sent 10,000 to Kevin | | | | | | | | | |
| | END 2003 | | | | | | | | |
| 4/28 Sent 25,000 | | | 4/22/04 | 6812 | 6995 | 31,920 | 31,281.⁶⁰ | [4500]  1782 Richards Loan  Tony Paid 25,000 | |
| 9/23 Sent 25,000 | | | 8/9/04 | 6989 | 7371 | 36,960.⁰⁰ | 36,220 | [6283]  25,300 Tony Paid  2,500 Dave | |

002878

| WIRE Date | $ SENT | AMOUNT | PO# | INV# | Bill Date | Ron | T+J | Dave |
|---|---|---|---|---|---|---|---|---|
| 6/5/03 | 7500 me / 7500 T+J | 24,590⁰⁰ | 6777 | 3617 | 6/17/03 | 1952 ⁷⁴ | 1735 ⁷⁶ | 5,409 ⁷⁰ |
| 7/10/03 | 7500 me 15000 / 7500 ~~DVE~~ | 21,875 | 7083 | 3109 | 10/9/03 | 1737 ¹³ | 1544 ¹³ | — 0 — |
| 7/26/03 | 25000 Kevin | | | | | | | |
| 8/15 | — 0 — | 40,140 ⁰⁰ | 6843 | 3815 | 8/15/03 | 3187 ⁵⁷ | 2833 ⁴¹ | 6709 ⁰⁰ (K) |
| 11/3 | — 0 — | ~~23,421 ⁵⁵~~ 17,204.25 | 7066 | 31103 | 11/3/03 | 1366 ⁸² | 1214 ⁴¹ | — 0 — |

(END OF 2003)

| | | | | | | (2348 ⁸²) 3327 ⁵⁰ | (2642 ⁴³) 3327 ⁵⁰ | |
|---|---|---|---|---|---|---|---|---|
| 12/18/03 | — 0 — | 33,275 ⁰⁰ | 6853 | 31218 | 12/18/03 | 3327 ⁵⁰ | 3327 ⁵⁰ ? | (K) |
| 8/16/04 | Cost of Goods 9313 | 15,950 | 7179 | 42326 | 8/16/03 | 3159 | — | 3159 (K) |

(End of 2004)

START 2005

| 4/3/05 | 10,000 | 26,475 | 7769 | 52201 | 3/23/05 | 5,295 ⁰⁰ | — | 20,650 ⁵⁰ (K) |
|---|---|---|---|---|---|---|---|---|
| | | 25945.50 | | | | | | |
| | | 15650 50 | | | | | | |
| | | 275 ⁰⁰ | | | | | | |



| Wire Date | $ Sent | Amount | Po # | Inv. # | BillDate | Ron | T+J | Dave |
|---|---|---|---|---|---|---|---|---|
| '02 | 4/11/02 | 24,860 | 43,750 | 6393 | 2002 8005 | 8/5 | (3474 26) | 3088 24 | 11,313 50 |
| '02 | 4/28/02 | —0— | 24,750 | 6308 | 2002425 | 4/25 | (2227 50) | 2227 50 | 19,800 |
| '02 | 5/10/02 | (20,000) 25,000 00 | 44,100 | 6454 | 2002 295 | 9/6 | 3502.86 | 3112 94 | 11,603 |
| 2 | 5/17/02 | 20,000 00 | 25,800 | 6314 | 2002524 | 5/20 | 2902 00 | 2902 00 | 9,480 00 |
| 2 | For Two Glass Orders | 23,460 | 6375 | 2002612 | 6/12 | 2401 40 | 2401 40 | 8188 00 |
| 2 | 6/20/02 | —0— Ron Sent 15,000 00 | 5850 20 | 6340 | 2002619 | 6/20 | 526 55 | 526 57 | 4680 56 |
| 2 | 6/25/02 | 24,780 | 6381 | 2002631 | 6/27 | 3301 94 | 2935 04 | 19,511 40 |
| 2 | | 16,800 | 6382 | 2002632 | 6/8 |
| 2 | 6/27/02 | —0— | 33,640 | 6267 | 2002627 | 6/27 | 2859 40 | 2859 40 | 26,912 |
| '03 | 8/26/02 | 25,000 (23,700) | 40,040 | 6630 | 2002 1220 | 12/20 | 3179 65 | 2826 35 | 8233 20 |
| '03 | 9/13/02 | 25,000 | 40,040 | 6634 — | 3106 | 1/6/03 | 3179 65 | 2826 35 | 8233 20 |
| 2 | 9/20/02 | 14,059 Ron Sent | 18,533 65 | 6462 | 2002920 | 9/20 | 1471 80 | 1308 06 | 1323 7 |
| '2 | 10/15/02 | Tony 15 me b 20,000 | 38,500 | 6551 | 20021030 | 10/30 | 3057 35 | 2717 65 | 11,955 2 |
| '02 | 10/21/02 | 15,000 | 21,915 00 | 6543 | 20021021 | 10/21 | 1740 31 | 1546 94 | 3189 45 |
| '02 | 11/9/02 | 7500 Tony 15,000 Ron 7500 | 20101 00 | 6556 | 2002 1111 | 11/11 | 1596 36 | 1418 36 | 1683 83 |
| '02 | 12/9/02 | 7500 enc H 15,000 | 22,805.70 | 6597 | 20021209 | 12/9 | 1811.05 | 1609 81 | 3928 73 |
| | 12/31 | 28,642 1/2 | 47,460 00 | 6677 | 03305 | 3/10 | 3768 85 | 3350 12 | 10,749 80 |
| | 1/7/03 | 15,000 1/2 | 21,768 15 | 6635 | 3108 | 1/8/03 | 1728 65 | 1536 58 | 3067 56 |
| | 1/22/03 | 15,000 1/2 | 23,881 20 | 6659 | 3130 | 1/30/03 | 1896 45 | 1685 73 | 4821 70 |
| | 1/31/03 | 25,000 00 43,980 1/2 | 6822 | 3770 | 7/7/03 | 3413 12 | 3033 88 | 10,673 46 |
| | 2/10/03 | 15,000 1/2 | 22,491 00 | D.A. | 3214 | 2/14/03 | 1786 05 | 1587 60 | 3067 33 |
| | 2/28 | 7500 T+S 7500 Ron 15000 | 28,229 30 | 6703 | 30312 | 3/13 | 2241 74 | 1992 66 | 8,430 3 |
| | 3/10 | 25 10,000 I Sent 15,000 T+S | | | | |
| | 3/21 | 16,580 T+S Sent | 18,148 00 | 6721 | 3326 | 3/21 | 637 96 | 567 08 | —0— |
| cross off | 3/31 | 4,420 I Sent | 23,300 00 | 6772 | 3529 | 5/29 | 1850 89 | 1644 71 | —0— |
| | 4/1 | 8,000 I Sent 7,000 T+S | | | | |
| | 3/28 | —0— | 4,276 80 | 6716 | 3328 | 3/28 | 1142 83 | 1015 85 | 2032 2 |
| | 4/9 | T+J Sent 13,650 | 28,737 50 | 6759 | 3506 | 5/6/03 | 2282 10 | 2028 54 | 10,202 |

002937

# In The Matter Of:

## *INTERNATIONAL FLOOR CRAFTS   v.*
## *DAVID ADAMS*

---

## *KEVIN BRITTO*
## *March 7, 2006*

---

## *FINK & CARNEY REPORTING AND VIDEO SERVICES*
## *39 WEST 37TH STREET*
## *NEW YORK, NY  USA  10018*
## *(212) 869-1500   or   (800) 692-3465*

*Original File DD0307Z.TXT, 149 Pages*
*Min-U-Script® File ID: 0700660165*

# Word Index included with this Min-U-Script®

Page 1

[1]
[2]         UNITED STATES DISTRICT COURT FOR THE
[3]           EASTERN DISTRICT OF MASSACHUSETTS
[4]
    INTERNATIONAL FLOOR CRAFTS, INC., :
[5]
        Plaintiff,                    :
[6]
[7]     -against-                   : CIVIL ACTION NO.
                                    : 05CA11654-NMG
[8] DAVID W. ADAMS, et al.,          :
[9]      Defendants.                 :
[10]
[11]
[12]  VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by
[13] Plaintiff at the offices of Fink & Carney Reporting
[14] and Video Services, 39 West 37th Street, 6th Floor,
[15] New York, New York 10018, on Tuesday, March 7, 2006
[16] commencing at 1:30 p.m., before Debra DiBenedetto, a
[17] Shorthand (Stenotype) Reporter and Notary Public
[18] within and for the State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] APPEARANCES:
[3]    KRASNOO KLEHM LLP
            Attorneys for Plaintiff
[4]         Terrace Level Suite One
            Andover, Massachusetts 01810-3730
[5]
        BY: JAMES B. KRASNOO, Esq., of Counsel
[6]         PAUL J. KLEHM, Esq., of Counsel
[7]
        LAW FIRM OF ISAAC H. PERES
[8]         Attorneys for Defendant Adams
            50 Congress Street, Suite 225
[9]         Boston, Massachusetts 02109
[10] BY:  ISAAC H. PERES, Esq., of Counsel
[11]
        YURKO, SALVESEN & REMZ, P.C.
[12]        Attorneys for Defendant Dziemit
            One Washington Mall, 11th Floor
[13]        Boston, Massachusetts 02108-2603
[14] BY:  RICHARD J. YURKO, Esq., of Counsel
[15]
        LAW OFFICES OF FREDERICK D. GRANT, JR.
[16]        Attorneys for Defendant Mitchell
            727 Atlantic avenue, Second Floor
[17]        Boston, Massachusetts 02111
[18] BY:  FREDERIC D. GRANT, JR., Esq.,
            of Counsel
[19]
[20]    TROUT CACHERIS, PLLC
            Attorneys for Defendants David and
[21]        Paul Sun
        1350 Connecticut Avenue, Northwest,
[22]        Suite 300
            Washington, D.C.  20036
[23]
        BY: JOHN THORPE RICHARDS, Esq., of Counsel
[24]
[25]

Page 3

[1]
[2] APPEARANCES: (Cont'd)
[3]
[4]    KELLY, LIBBY, HOOPES
         Attorneys for Defendant Brown
[5]      175 Federal Street
         Boston, Massachusetts 02110
[6]

    BY:  SHARON LAHEY, Esq., of Counsel
[7]
[8]
[9] ALSO PRESENT: John Durant
         William Gemme
[10]    Ronald Mitchell
         William Elovitz
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]
[2]        IT IS HEREBY STIPULATED AND
[3] AGREED that the Parties agree to
[4] hold, and not make at the deposition,
[5] all objections, including as to form,
[6] foundation, evidence, relevance, etc.
[7]    (except for issues of privilege) and
[8] that nonetheless any such potential
[9] objections would be preserved and
[10] could be asserted for the first time
[11] at the time of trial if any party
[12] seeks to offer the videotaped
[13] deposition in evidence.
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 5

[1]                    *Britto*
[2]    THE VIDEOGRAPHER: We're now
[3] going on the record. The time is
[4] 1:30 p.m. on March 7, 2006. This is
[5] the videotaped deposition of Kevin
[6] Britto, in the matter of International
[7] Floor Crafts, Inc. versus David W.
[8] Adams, et al. under the jurisdiction
[9] of the United States District Court
[10] for the Eastern District of
[11] Massachusetts.
[12]    This deposition is being held
[13] at 39 West 37th Street, New York, New
[14] York. My name is Jose Santos and I am
[15] the video specialist. The court
[16] reporter is Debra DiBenedetto and we
[17] both represent Fink & Carney Reporting
[18] with offices located at 39 West 37th
[19] Street New York, New York.
[20]    May I have an introduction
[21] from counsel.
[22]    MR. KRASNOO: Good morning, my
[23] name is James Krasnoo, and with
[24] co-counsel Paul Klehm, we both
[25] represent International Floor Crafts,

Page 6

[1]                    *Britto*
[2] Inc., the plaintiff in this action.
[3]    MR. GRANT: My name is Fred
[4] Grant, I represent Ron Mitchell, a
[5] defendant in this action.
[6]    MR. PERES: Isaac Peres,
[7] representing the defendant, David
[8] Adams.
[9]    MR. RICHARDS: My name is John
[10] Richards and I represent Paul and
[11] David Sun and CCC, Inc.
[12]    MR. YURKO: Richard Yurko I'm
[13] representing Jane Dziemit.
[14]    MS. LAHEY: Sharon Lahey,
[15] representing Michael Brown.
[16]    MR. KRASNOO: Does anyone wish
[17] to discuss the stipulations at all in
[18] this matter?
[19]    MR. YURKO: We're proceeding
[20] on the stipulation that was E-mailed
[21] back and forth.
[22]    MR. KRASNOO: Okay.
[23]    MR. KLEHM: That's fine by me.
[24]    THE WITNESS: Well, I would
[25] like to start off, Jane and Ron are

Page 7

**Britto**

[1]
[2] innocent. The other parties were all
[3] guilty. I have facts to back it up
[4] and I'm trying to make this wrong
[5] right. You know, Bill, Ron, and Jane
[6] are victims.
[7]      As I told Paul yesterday, as a
[8] child I got raped, I was a victim. I
[9] shouldn't be victimizing these people.
[10] And the three of them are going
[11] through shit because of me, and it's
[12] not fair.
[13]      THE VIDEOGRAPHER: Excuse me,
[14] will the court reporter please swear
[15] in the witness.
[16]      REPORTER: Yes, sir I'm just
[17] going to swear you in.
[18]      THE WITNESS: I won't put my
[19] hand on a Bible.
[20]      REPORTER: No. Would you like
[21] to affirm.
[22] KEVIN BRITTO, called as a witness,
[23] having been first duly affirmed before
[24] Debra DiBenedetto, a Notary Public within
[25] and for the State of New York, was examined

Page 8

**Britto**

[1]
[2] and testified as follows:
[3]      THE WITNESS: I don't believe
[4] in God. There isn't a God. If there
[5] is, he's a deadbeat dad.
[6]      **DIRECT EXAMINATION**
[7]      **BY MR. KRASNOO:**
[8]      Q: Mr. Britto, at some point you began
[9] employment with International Floor Crafts?
[10]      A: 1988, July 18th.
[11]      Q: Okay. And at some point you did
[12] something while you were working for International
[13] Floor Crafts that you've earlier, off the record,
[14] just apologized to Mr. Elovitz for, is that
[15] correct?
[16]      A: Yes.
[17]      Q: Okay. What was it that you did when
[18] you worked for International Floor Crafts for
[19] which you've just offered an apology?
[20]      A: Stole money.
[21]      Q: Now, do you recall how it came about
[22] on the first occasion that you stole money?
[23]      A: Dave actually coerced myself into
[24] it, and the Suns and Mike Brown. And there was a
[25] shipment one time that, was short. And I was the

Page 9

**Britto**

[1]
[2] buyer, I became the buyer, June 1993 when Bill
[3] became the president. And, there was a short
[4] shipment and at the time I wasn't close to Bill.
[5] He did something that pissed me off, I can't
[6] recall what it was, and Dave egged me on, so I was
[7] pissed off. The shipment came in short, I called
[8] him up, what's going on, Dave. He said, oh, let
[9] me call you back, I'll fix it. He knew I was mad.
[10] And then he called me back, and said, Well, we can
[11] make some money off this. I'm like, what are you
[12] talking about. So when he did, I thought about
[13] it, I called him back and I said, okay, let's do
[14] it.
[15]      Q: Now, let me ask you some questions
[16] about that first —
[17]      A: Okay.
[18]      Q: You mentioned Dave. What's Dave's
[19] last name?
[20]      A: Adams.
[21]      Q: Okay. Secondly, you mentioned that
[22] there was a short shipment. Do you know who the
[23] supplier of the short shipment was?
[24]      A: DGM.
[25]      Q: Okay. And —

Page 10

**Britto**

[1]
[2]      A: Which the owner is now dead, so.
[3]      Q: Now, you also mentioned that you had
[4] some type of conversation with Dave Adams where he
[5] said, in substance, let's make some money out of
[6] this?
[7]      A: Yep.
[8]      Q: Okay. Did he describe to you in that
[9] conversation how you and he were going to make
[10] money and how the scheme or plan would be
[11] implemented?
[12]      A: There was supposed to be like 600
[13] rugs. 300 came in. We made the money off the 300
[14] rugs.
[15]      Q: Now, how did you — was there
[16] certain paperwork you had to fill out to indicate
[17] that 600 rugs had come in when, in fact, only 300
[18] had?
[19]      A: See, this is where it gets
[20] complicated. I like to cover my tracks. So I
[21] used to have all kind of people do the paperwork
[22] just so it's not one person, you know what I mean.
[23] And, so I don't know who did it at the time.
[24]      Q: Okay. Now, did Mr. Williams, Tyrone
[25] Williams, become known to you at some point?

Page 11

**Britto**

[1]
[2]   A: Yeah.
[3]   Q: And did Mr. Williams at any time
[4] participate in any portion of this scheme?
[5]   A: Yes.
[6]   Q: Okay. Now —
[7]   A: Let me say something on that. I was
[8] his boss. I don't know if I intimidated him,
[9] plus, I do have a reputation — well, I used to
[10] have a reputation of kicking people's ass, so I
[11] don't know if I intimidated him over that and
[12] that's why he did it. Of course, he's a man, he
[13] wanted the money, you know, but I don't know if I
[14] forced him into it.
[15]   Q: Well, first you stated you began
[16] with this scheme, it first started in 1993?
[17]   A: Well, that's when I became the
[18] buyer.
[19]   Q: Okay. When, roughly, from 1993
[20] until how long did you work for International
[21] Crafts?
[22]   A: I left in 1998, September. I came
[23] back September — it's funny because the day I
[24] left is the same date I came back a year later.
[25]   Q: So you came back September 1999?

Page 12

**Britto**

[1]
[2]   A: No, I think that's wrong, I came
[3] back ten months later. I left in November of '97,
[4] came back September 28th of 1998, and then I left
[5] again September 28th, 2001.
[6]   Q: Now, did the scheme to defraud first
[7] happen in your first employment with IFC as well
[8] as your second or only in your second or only in
[9] your first?
[10]   A: Both.
[11]   Q: Okay. And, when did Tyrone Williams
[12] start participating with you in this?
[13]   A: Oh, I came back in '98, I hired him,
[14] so he probably started in '99.
[15]   Q: And when he started with you, can
[16] you estimate for us when the shipment — strike
[17] that — when the stealing actually started, by
[18] that I mean reporting that X number of rugs came
[19] in when only one came in, which was less?
[20]   A: I understand, it was after Dave
[21] Rooney left, which I'm pretty sure IFC has that on
[22] record.
[23]   Q: Now, are you able estimate for us
[24] how many shipments of rugs this involved?
[25]   A: Oh, I don't know.

Page 13

**Britto**

[1]
[2]   Q: Is it more than 50?
[3]   A: It's, it's a high number, I don't
[4] know. It's around 50 at least anyways.
[5]   Q: And, when the stealing began, how
[6] did the parties get the money from it that they
[7] split up, what was the method by which the money
[8] was placed in your pocket anyways?
[9]   A: Went through Dave.
[10]   Q: And did you know how much the theft
[11] represented each time?
[12]   A: No. Actually Dave stole from IFC
[13] and myself.
[14]   Q: Okay. So, did you ever question
[15] Dave Adams —
[16]   A: Oh, yeah, we went at it.
[17]   Q: Okay. So, when you went at it, what
[18] kinds of conversations did you have with Mr. Adams
[19] about the money?
[20]   A: Well, he said Building 19 is not
[21] paying their bills, which they were, and that's
[22] why there's no money there, because he was
[23] gambling the shit away.
[24]   Q: Did you — can you tell us how much
[25] money you made out of the scheme as an estimate?

Page 14

**Britto**

[1]
[2] Is it more than a thousand dollars?
[3]   A: Oh, of course.
[4]   Q: Okay. Is it more than 50,000?
[5]   A: I'm not going to give you any
[6] numbers.
[7]   Q: Is it because you don't have a
[8] memory?
[9]   A: Yeah, I don't know how much, I'm not
[10] gonna give you a number if I don't know — I'm
[11] under oath so I'm not going to.
[12]   Q: Did —
[13]   A: I can tell you one thing, it's over
[14] a hundred thousand, that's for sure.
[15]   Q: Okay.
[16]   A: And, well, he will get every penny
[17] back that I took from him.
[18]   Q: When you say a hundred thousand, is
[19] that money that came just to you?
[20]   A: Oh, yeah.
[21]   Q: Now, over what period of time did
[22] you receive these monies?
[23]   A: That was after Dave really left, I
[24] don't know.
[25]   Q: Did you continue to receive any

Page 15

**Britto**

[1]
[2] money at all after you left IFC for good?
[3]  **A:** Yes.
[4]  **Q:** Okay. And how did you get that
[5] money?
[6]  **A:** Checks.
[7]  **Q:** And who did the checks come from?
[8]  **A:** CCC.
[9]  **Q:** Okay. And, had you ever had any
[10] direct contact with any member of CCC —
[11]  **A:** Yes.
[12]  **Q:** — about any aspect of this scheme?
[13]  **A:** Yes.
[14]  **Q:** Okay. With whom did you have
[15] contact?
[16]  **A:** Paul and David.
[17]  **Q:** Okay. Did you ever have any contact
[18] with another member of CCC named John Sun —
[19]  **A:** Oh, Mike Brown.
[20]  **Q:** Well, John Sun?
[21]  **A:** No, I don't know who that is.
[22]  **Q:** Okay. Now, when you left and you
[23] received checks, did you have communication with
[24] either David Sun or Paul Sun about those specific
[25] checks that came to you after you left

Page 16

**Britto**

[1]
[2] International Floor Craft?
[3]  **A:** Yes.
[4]  **Q:** Which one or both if it was both?
[5]  **A:** Both.
[6]  **Q:** Can you remember, in substance, the
[7] conversations that you had with either one or both
[8] of them?
[9]  **A:** Give me an example.
[10]  **Q:** Well, did you ever discuss with
[11] them, for example, the size of the check and how
[12] much it should be?
[13]  **A:** Yes.
[14]  **Q:** Okay. And did you ever discuss with
[15] them that you thought you were being shortchanged,
[16] for want of a better word, about the size of the
[17] check?
[18]  **A:** No. That would be Dave.
[19]  **Q:** How many checks did you receive
[20] after you left?
[21]  **A:** A bunch.
[22]  **Q:** Okay. And do you know how much money
[23] that represented?
[24]  **A:** (Indicating.)
[25]  **Q:** When did you first — Oh, yeah, you

Page 17

**Britto**

[1]
[2] need —
[3]  **A:** No.
[4]  **Q:** And if you could give us a verbal,
[5] because she can't, the court reporter can't record
[6] whether it means a yes or no with your gesture.
[7]  **A:** Okay.
[8]  **Q:** Now, after you left International
[9] Floor Crafts, what was the purpose of your getting
[10] money from CCC at that point?
[11]  **A:** There's a whole bunch, actually.
[12]  **Q:** Okay. What were they, or the
[13] purposes?
[14]  **A:** Alcoholic, pills, wanting to live in
[15] a gay lifestyle out here in New York. And then my
[16] when mother died, some of that money went to pay
[17] for her funeral, tombstone.
[18]  **Q:** So those are the purposes for which
[19] you used it?
[20]  **A:** I paid — I grew up on welfare in
[21] the projects so all the people I'm close to are
[22] poor. So when I wasn't using the money for the
[23] drugs, the addictions, I was helping people pay
[24] their electric bills, their rent, phone bills,
[25] whatever.

Page 18

**Britto**

[1]
[2]  **Q:** What were the purposes, if you know,
[3] that you got the money from CCC after you left
[4] International Floor Crafts?
[5]  **A:** That was the addiction.
[6]  **Q:** Yes, but I mean what was it that
[7] caused them to give you the money to support your
[8] addiction after you had left?
[9]  **A:** Because I had control of the
[10] warehouse.
[11]  **Q:** So did you continue to have control
[12] of the warehouse even though you physically left
[13] IFC?
[14]  **A:** Yes.
[15]  **Q:** And how did you have physical
[16] control over the warehouse?
[17]  **A:** Because Tyrone was my friend.
[18]  **Q:** So, would you be in communication
[19] with Tyrone Williams after you left IFC?
[20]  **A:** Yes.
[21]  **Q:** And what would be the conversations
[22] that you would have with Tyrone Williams?
[23]  **A:** I would just give him advice how to
[24] do some shit.
[25]  **Q:** And when you gave him advice on how

Page 19

**Britto**

[1]
[2] to do shit, what kind of shit are we talking
[3] about?
[4]    **A:** Legal shit.
[5]    **Q:** So, would he initiate the phone
[6] calls with you or you with him?
[7]    **A:** I probably had to because he's not
[8] too good at communication.
[9]    **Q:** And when you initiated the phone
[10] calls with him or spoke with him, what were some
[11] of the subject matters or all of the subject
[12] matters as you can remember, that you engaged in
[13] between him and Tyrone Williams and yourself?
[14]    **A:** I would tell him what came in, when
[15] to bill it, I mean when to do the key rec. Give
[16] him answers to tell the buyers.
[17]    **Q:** When you would talk to him about
[18] what came in, do you mean by that —
[19]    **A:** I would tell him, look, there's 350
[20] 9-by-10 wells, 350 8-by-10 wells.
[21]    **Q:** So, are you giving him information
[22] that he should be putting down on what you call
[23] the key rec?
[24]    **A:** Yes.
[25]    **Q:** Even though those numbers of rugs in

Page 20

**Britto**

[1]
[2] that quantity actually did not come in?
[3]    **A:** Yes.
[4]    **Q:** So you would be giving him on that
[5] phone call the numbers that he should be placing
[6] in —
[7]    **A:** I was directing him —
[8]    **Q:** That represented phony but not
[9] actual shipments?
[10]    **A:** Yes, I was directing him.
[11]    **Q:** Okay. And when you gave that
[12] quantity, would you first, before you discussed it
[13] with Tyrone Williams, discuss it with anyone at
[14] CCC as to what the quantities should be?
[15]    **A:** Sometimes. Dave, mostly.
[16]    **Q:** Okay. How would CCC know the
[17] quantities of nonexisting rugs to bill IFC for if
[18] they did not discuss it with you?
[19]    **A:** Dave would tell them or I would tell
[20] them.
[21]    **Q:** Would Dave also have — Dave Sun,
[22] you're talking about?
[23]    **A:** No, Dave Adams.
[24]    **Q:** Okay. And would — did David Sun
[25] ever have direct communication with you while you

Page 21

**Britto**

[1]
[2] were at IFC?
[3]    **A:** No.
[4]    **Q:** Okay. Did Paul Sun ever have direct
[5] communication with you while you were at IFC?
[6]    **A:** No.
[7]    **Q:** Did either one of them ever have any
[8] telephone communication with you while you were at
[9] IFC?
[10]    **A:** No, it went through Dave Adams.
[11]    **Q:** Always went through Dave Adams?
[12]    **A:** Yeah.
[13]    **Q:** Now —
[14]    **A:** Or Mike Brown.
[15]    **Q:** After, from the time David Adams
[16] first had the conversation with you where, would
[17] you like to make some money on this or we could
[18] make some money on this, until you left, did David
[19] Adams and you ever discuss whether or not David
[20] Adams had ever implemented this kind of a plan
[21] before he asked you to join him in that endeavor?
[22]    **A:** No.
[23]    **Q:** Okay. When you had this first
[24] conversation with David Adams about, in essence,
[25] we can make some money this way, did you ever

Page 22

**Britto**

[1]
[2] discuss with him whether or not it was a wrong
[3] thing to do?
[4]    **A:** Nope. I told you at the time I was
[5] mad at Bill.
[6]    **Q:** Right. Now, at some time you became
[7] friendly with Bill again, is that correct?
[8]    **A:** Oh, well, that was before I became
[9] close to Bill.
[10]    **Q:** And when you became close to Bill,
[11] did you continue to participate in the scheme to
[12] steal from IFC?
[13]    **A:** Yeah, because that's when I was
[14] addicted. And you can ask Bill, I mean, I used to
[15] have meetings with him, I used to cancel them, I
[16] left because I couldn't face him, I felt like
[17] shit.
[18]    **Q:** Did you ever discuss with Dave Adams
[19] at any point after you became well disposed to
[20] Bill Elovitz, that you had some reluctance to
[21] continue with the scheme?
[22]    **A:** Yes, a few times.
[23]    **Q:** And in the few times can you give us
[24] the substance of any one conversation that you can
[25] remember?

Page 23

**Britto**

[1]

[2] **A:** I'm not going to incriminate myself,

[3] it was nasty.

[4] **Q:** Okay. By nasty, do you mean a lot of

[5] blasphemy being used or swear words?

[6] **A:** Threatening.

[7] **Q:** Were you doing the threatening of

[8] him —

[9] **A:** Yes.

[10] **Q:** Okay. And did your threats to him

[11] involve no longer continuing in this scheme?

[12] **A:** Yes.

[13] **Q:** Did the scheme nevertheless continue

[14] after you made the threats to David Adams?

[15] **A:** Yes.

[16] **Q:** Do you have any idea at all how much

[17] money from anything David Adams told you or what

[18] you personally observed David Adams gambled away?

[19] **A:** It's got to be over a million

[20] dollars.

[21] **Q:** Did you ever accompany Dave Adams to

[22] any place of gambling such as the track or a

[23] gambling club or —

[24] **A:** I did one time, actually.

[25] **Q:** Where did you go on that occasion?

Page 24

**Britto**

[1]

[2] **A:** It was a dog racetrack I think in

[3] Randolph, I'm not sure, I think it's Randolph,

[4] but.

[5] **Q:** Would that be perhaps Raynham?

[6] **A:** Raynham, maybe that's it.

[7] **Q:** And do you recall how much money on

[8] that occasion Mr. Adams placed down on bets?

[9] **A:** I have no idea.

[10] **Q:** Okay. We've discussed —

[11] **A:** I could say one thing, too. One

[12] time — and I do have the receipt — I had to give

[13] him a bank check, because his bookie was gonna

[14] come after him.

[15] **Q:** Okay. Do you remember how much that

[16] was for?

[17] **A:** $18,000.

[18] **Q:** Now, you've told us so far about

[19] Mr. Adams. Was Mr. Adams at some of the time an

[20] IFC employee during the scheme or was he an

[21] independent contractor, if you know?

[22] **A:** No, he was an IFC employee at the

[23] end.

[24] **Q:** And Tyrone Williams was an IFC

[25] employee?

Page 25

**Britto**

[1]

[2] **A:** Yes.

[3] **Q:** Okay. And were there any other

[4] persons during the entire period of time that the

[5] scheme existed, that were employees of IFC

[6] participating in it other than Mr. Adams,

[7] Mr. Williams and yourself?

[8] **A:** Just by — well, no, but doing

[9] paperwork that they didn't know that they were

[10] doing.

[11] **Q:** So were there any employees who knew

[12] what they were doing or knowingly participated in

[13] the scheme —

[14] **A:** No.

[15] **Q:** — other than Mr. Adams,

[16] Mr. Williams and yourself?

[17] **A:** No.

[18] **Q:** Now, when — you mentioned earlier a

[19] document called the key rec. Could you —

[20] **A:** That's a receiving bill.

[21] **Q:** Okay. Could you take us through a

[22] legitimate transaction on the purchase of rugs by

[23] IFC while you were there from start to finish,

[24] identifying for us what documents would be made,

[25] who would be handling the document and what they

Page 26

**Britto**

[1]

[2] would be placing in those documents by way of

[3] information?

[4] **A:** Yes. And one, Bill needs to know

[5] this so it doesn't happen again. One, don't have

[6] stuff delivered free of charge, because it doesn't

[7] go through the company. That's the main thing.

[8] Because it doesn't — I don't know if Steve still

[9] works there, but if it doesn't go through the

[10] traffic manager there's no trace. That's how we

[11] get away with it.

[12] **Q:** You mentioned a name just before and

[13] she doesn't didn't get the full name. Steve?

[14] **A:** Burroughs.

[15] **Q:** And do you know how to spell

[16] Burroughs?

[17] **A:** B-U-R-R-O-U-G-H-S.

[18] **Q:** Now, who was Steve Burroughs?

[19] **A:** He's the traffic manager.

[20] **Q:** What does the traffic manager do at

[21] IFC?

[22] **A:** He sets up all the deliveries, for

[23] the whole company, not just IFC.

[24] **Q:** Okay. And the whole company, by that

[25] you mean Building 19 as well?

**Page 27**

**Britto**

[1]

[2]  **A:** Yeah, but if there's no paper trail,

[3] you can get away with it.

[4]  **Q:** So when free goods come in, there's

[5] no paper trail?

[6]  **A:** Nope.

[7]  **Q:** And what would happen then with the

[8] free goods if there were no paper trail?

[9]  **MR. YURKO:** By that do you

[10] mean free delivery?

[11]  **Q:** Free of charge delivery is what you

[12] mean?

[13]  **A:** Yeah.

[14]  **Q:** Okay, so —

[15]  **A:** The paperwork comes from the

[16] company.

[17]  **Q:** Okay.

[18]  **A:** So if you have somebody receiving

[19] the goods who's a scumbag.

[20]  **Q:** So by that you mean, that if

[21] somebody's a traffic manager and knows that a

[22] shipment of goods is coming for the company but

[23] because they're being delivered without a delivery

[24] charge —

[25]  **A:** He doesn't know about it.

**Page 28**

**Britto**

[1]

[2]  **Q:** There are no shipping papers?

[3]  **A:** Yes.

[4]  **Q:** Those goods come in and then what

[5] happens to them if a person is a scumbag and wants

[6] to, in some way, get some cash or profit or, or

[7] acquisition because of this?

[8]  **A:** Let me make this clear, Steve is not

[9] involved in this.

[10]  **Q:** Right, I understand that.

[11]  **A:** Okay.

[12]  **Q:** But what happens to those goods when

[13] they come out and there is no paperwork

[14] accompanying them?

[15]  **A:** We tell them to go off the truck, we

[16] ship them right out.

[17]  **Q:** And when you ship — so they're

[18] actual goods that come in, is that correct?

[19]  **A:** Sometimes, sometimes not.

[20]  **Q:** Okay. Sometimes they're just

[21] fictional goods?

[22]  **A:** Yes.

[23]  **Q:** Goods don't come in?

[24]  **A:** Yes.

[25]  **Q:** Are there also times when goods

**Page 29**

**Britto**

[1]

[2] would come in —

[3]  **A:** Half shipments —

[4]  **Q:** But then you would add to the goods?

[5]  **A:** Yes.

[6]  **Q:** That portion would be fiction?

[7]  **A:** Yep.

[8]  **Q:** Okay. And as a result you would

[9] claim, for example, 600 rugs came in but only 300

[10] came in?

[11]  **A:** Yes.

[12]  **Q:** Okay. Then there were times when you

[13] would claim 600 rugs came in but absolutely no

[14] rugs came in?

[15]  **A:** Yes.

[16]  **Q:** And then there would be times when

[17] 600 rugs came in and 600 rugs actually did come

[18] in?

[19]  **A:** Yes.

[20]  **Q:** And you would claim that 600 rugs

[21] came in?

[22]  **A:** Yes.

[23]  **Q:** Okay. Now, in all three instances

[24] you say that when they would come in but there

[25] would be no paper work with them, you would ship

**Page 30**

**Britto**

[1]

[2] them immediately out. In the instance where

[3] you're shipping them out but actually no rugs came

[4] in at all, are you creating a document that

[5] suggests these nonexistent 600 rugs actually were

[6] sent out somewhere?

[7]  **A:** We could ship them from another

[8] company.

[9]  **Q:** Okay.

[10]  **A:** So the rugs did go on the trailer,

[11] but it wasn't from the ones.

[12]  **Q:** So, in other words if company A —

[13]  **A:** They didn't ship anything, company B

[14] did.

[15]  **Q:** And you would use company B's rugs

[16] claiming they were company A's —

[17]  **A:** Correct.

[18]  **Q:** And send those out?

[19]  **A:** Correct.

[20]  **Q:** So that it would look like the

[21] receiving Building 19 outlets got 600 rugs but

[22] those 600 rugs that came actually from company B

[23] had already been paid for to company B?

[24]  **A:** Correct.

[25]  **Q:** How did you determine whether to do

Page 31

**Britto**

[1]
[2] a real shipment, a legitimate shipment, as opposed
[3] to treat a shipment as if it were fiction?
[4] **A:** Depends what we had in stock.
[5] **Q:** Okay. So if you actually had 600
[6] rugs, this was a good time to let CCC or another
[7] company know that they should create a fake bill
[8] for 600 rugs because you were going to ship them
[9] out as if they were that company's rugs when they
[10] really weren't?
[11] **A:** Correct.
[12] **Q:** Okay. Did —
[13] **A:** And also, Bill might want to write
[14] this down. The tags shouldn't be universal,
[15] because that's another thing.
[16] **Q:** So when you say the tags now, you
[17] mean that there are tags that are attached with
[18] wires to the rugs, is that correct?
[19] **A:** No, our tags — well, I say ours.
[20] **Q:** Okay.
[21] **A:** The Building 19 tags, there should
[22] be different tags on each vendor, because if you
[23] use a universal tag you could say it's this
[24] person's goods, that person's goods or whatever.
[25] **Q:** So what you're basically telling

Page 32

**Britto**

[1]
[2] Mr. Elovitz by your testimony today is that he
[3] should be able to track the shipments that go out
[4] to the outlets and in order to do that there
[5] should be an individualized tag —
[6] **A:** For each company.
[7] **Q:** That some code identifies the
[8] actually rug shipper or manufacturer?
[9] **A:** For each company. Now, I'm not
[10] talking about a number because you can reuse the
[11] tags, use different colors or something, I mean.
[12] **Q:** Okay. When you would determine
[13] because there were rugs on hand, that a shipment
[14] of 600 rugs came in and there were, in fact, 600
[15] rugs there, no matter what company it came from,
[16] what paperwork would be created to cause those
[17] rugs to first be accepted at the receiving and
[18] then sent out to the various Building 19 outlets,
[19] what paperwork would be created for an entirely
[20] legitimate shipment?
[21] **A:** Just a bill of lading.
[22] **Q:** Okay. Now, would the bill of lading
[23] be created by IFC?
[24] **A:** No.
[25] **Q:** This would be a bill of lading that

Page 33

**Britto**

[1]
[2] came and accompanied the rugs?
[3] **A:** Yes.
[4] **Q:** Because the rugs would be shipped in
[5] by a carrier?
[6] **A:** No, it would be by the company.
[7] **Q:** By the company itself.
[8] **A:** (Witness nods).
[9] **Q:** Now, when the bill of lading comes
[10] with those rugs, to the warehouse —
[11] **A:** Um-hum.
[12] **Q:** — what's the next step, they're
[13] taken off of the trucks and put on a platform at
[14] the warehouse. What paperwork is created, if any,
[15] by an IFC employee to show that they actually were
[16] received?
[17] **A:** Because we have — I keep saying
[18] we — lousy employees. They don't count. They
[19] just go by the paperwork, they just want to punch
[20] in, punch out and go home.
[21] **Q:** So nobody, first you're saying
[22] nobody checks the number of rugs to see what
[23] actually came in?
[24] **A:** Exactly.
[25] **Q:** Okay. Secondly, though, do they do

Page 34

**Britto**

[1]
[2] anything, the warehouseman who's standing on the
[3] dock watching the rugs being unloaded, is he or
[4] she the person who receives the bill of lading?
[5] **A:** Yes, but then it goes to the
[6] supervisor.
[7] **Q:** Okay. Now, does the warehouseman
[8] who first receives the bill of lading write
[9] anything on it, or make any notations on the bill
[10] of lading itself —
[11] **A:** No.
[12] **Q:** To indicate that the rugs were
[13] received?
[14] **A:** No.
[15] **Q:** Does the supervisor who receives
[16] this bill of lading do anything with it?
[17] **A:** Yeah, he's got to sign it, date it
[18] and send it in. But if he's a scumbag —
[19] **Q:** He doesn't send it in?
[20] **A:** No, he sends it in, but he fakes it.
[21] **Q:** You mean he fakes the shipment that
[22] comes in?
[23] **A:** Yeah.
[24] **Q:** Okay. What happens with a legitimate
[25] shipment, though? Did Tyrone Williams ever sign

Page 35

*Britto*

[2] bills of lading to indicate that he actually
[3] received shipments that he did actually receive?
[4] **A:** Oh, definitely, yeah.
[5] **Q:** Okay. And did Tyrone Williams also
[6] sign bills of ladings that faked some or all of
[7] the shipment?
[8] **A:** Yes.
[9] **Q:** Is there a way, from looking at the
[10] bill of ladings to determine now, with hindsight,
[11] which ones were faked and which ones were genuine?
[12] **A:** Yeah, there is actually.
[13] **Q:** Okay.
[14] **A:** The remnant ones were fake.
[15] **Q:** R-E-M-N-A-N-T?
[16] **A:** Yeah.
[17] **Q:** Okay.
[18] **A:** Machine mades weren't. Machine
[19] mades were like half faked.
[20] **Q:** And by half faked, do you mean that
[21] if 300 of those rugs came in it was earmarked as
[22] 600 coming in?
[23] **A:** Yeah, something like that. And
[24] Sometimes it was a full shipment, too.
[25] **Q:** That would be faked?

Page 36

*Britto*

[2] **A:** No, it was a full shipment that did
[3] come in actually.
[4] **Q:** Okay. Now —
[5] **A:** Let me just get to my point. We
[6] would have a full shipment come in and then have a
[7] backup one come in that was half, so we had stock.
[8] **Q:** So you had rugs on hand —
[9] **A:** On hand.
[10] **Q:** To suggest that the half that was
[11] coming in —
[12] **A:** Was added to it, yes.
[13] **Q:** Was really more?
[14] **A:** Yes.
[15] **Q:** Now, after the supervisor passes in
[16] that paperwork to billing, is there a separate
[17] bill that comes from either the rug manufacturer
[18] or supplier?
[19] **A:** A bill-bill, yeah.
[20] **Q:** So, you were participating in the
[21] scheme, would you get word from anyone that the
[22] defrauding company, the company that knew a
[23] shipment of 300 was being sent in, but it was
[24] going to be billed out at 600, would you get any
[25] word at all that that 600 rug bill was on its way

Page 37

*Britto*

[2] to IFC?
[3] **A:** I would tell them.
[4] **Q:** You would tell them when to send it?
[5] **A:** When to bill it.
[6] **Q:** Okay. And was one of the reasons for
[7] waiting that the, you wanted to make sure that
[8] most of those rugs now were out to the various
[9] outlets so that they really couldn't be traced and
[10] counted?
[11] **A:** Always depended on what was in
[12] stock. That's how it worked.
[13] **Q:** Now, what role, if any, did Adams
[14] play in causing the scheme to succeed?
[15] **A:** He set it up.
[16] **Q:** And so he told you that your duties
[17] in this scheme would be as follows and then he
[18] outlined them?
[19] **A:** He set it up. Nobody tells me what
[20] to do.
[21] **Q:** Okay. So tell me what you mean by
[22] the words "set it up." What did David Adams do?
[23] **A:** He got it going.
[24] **Q:** And do you know what steps he took
[25] to get it going?

Page 38

*Britto*

[2] **A:** That's one thing I don't know.
[3] **Q:** Okay.
[4] **A:** I wasn't involved in that.
[5] **Q:** Did David Adams ever tell you in
[6] passing in any conversation with you, any of the
[7] steps he took to get it going?
[8] **A:** Yeah, he said he talked to Mike
[9] Brown.
[10] **Q:** Okay. Now, when you —
[11] **A:** — and he told me —
[12] **Q:** Go on.
[13] **A:** Like with Ron Mitchell and Jane, who
[14] are innocent, by the way, again. He met with Ron
[15] and Tony, or Jane, and, Dave's a good bullshit
[16] artist, he told me we're converting goods and Bill
[17] contested this, he always wants the buyer to get
[18] new vendors, so that's what Dave told them, I need
[19] new vendors, I want to convert goods, so I can get
[20] Bill off my back, and that's what happened.
[21] **Q:** Now, you mentioned the name Tony,
[22] for the first time in your testimony. Who is
[23] Tony?
[24] **A:** I think it's Jane's boyfriend or
[25] some shit.

Page 39

**Britto**

[1]
[2] Q: Okay. Do you know his last name?
[3] A: No, I have no idea.
[4] Q: And when did you find out that
[5] Mr. Adams had had this conversation with either
[6] Ron Mitchell or Jane Dziemit or Tony, whose last
[7] name is unknown?
[8] A: Probably a year afterwards.
[9] Q: And how did you find it out?
[10] A: Because I was pissed off he was —
[11] Dave was actually stealing from both of us.
[12] Q: Dave Adams?
[13] A: At IFC — Dave Adams, and myself.
[14] And so I called up Ron and said look, what the F
[15] is going on, you know.
[16] Q: Now, when you say that Dave Adams
[17] was stealing from both of us, you indicated in
[18] your testimony that one of the persons who he was
[19] stealing from was you.
[20] A: Yes.
[21] Q: Who was the other person?
[22] A: IFC.
[23] Q: IFC, okay. Now, when you called,
[24] when you called Ron Mitchell on that occasion, and
[25] said what the F is going on, what conversation did

Page 40

**Britto**

[1]
[2] you have with Mr. Mitchell?
[3] A: Well, he didn't know I was a big
[4] part of the shit that was going on, okay. I mean
[5] he doesn't know — well, he's finding out now,
[6] but, he didn't know I was a big player in the
[7] conversion company, which means converting carpet,
[8] which means you cut it down, you bind it, mix a
[9] remnant.
[10] Q: Did Mr. Mitchell know that
[11] Mr. Adams, based on the conversation with you, did
[12] he indicate that he knew that Mr. Adams was
[13] causing conversions of the carpets?
[14] A: Can you rephrase that a little bit.
[15] Q: When you called Mr. Mitchell —
[16] A: Yes.
[17] Q: — what was your purpose in calling
[18] him at the time that you did?
[19] A: Because Dave told me Building 19
[20] wasn't paying the bills, so I called Ron up to see
[21] if they were paying them.
[22] Q: And did Mr. Mitchell indicate to you
[23] one way or the other whether —
[24] A: He said yes, they were paying them.
[25] Q: Did Mr. Mitchell inquire of you in

Page 41

**Britto**

[1]
[2] that conversation at all as to why you were
[3] calling him to find out that information?
[4] A: No.
[5] Q: Okay. Did you and Mr. Mitchell have
[6] any discussion with one another about Mr. Adams in
[7] that conversation?
[8] A: Oh, definitely.
[9] Q: What was the conversation that you
[10] had with Mr. Mitchell about it?
[11] A: There's a few of them.
[12] Q: Okay. Could you tell us as best as
[13] you can recall what you said to him and what he
[14] said to you?
[15] A: I don't believe Dave. I said, are
[16] you getting paid? He said, oh, yeah, I'm getting
[17] paid. And because Dave kept saying Building 19's
[18] not paying their bills, not, so I'm not getting my
[19] money, I'm getting pissed off. Now, Ron, in the
[20] meantime, I mean he's naive, he doesn't know what
[21] the hell's going on. But he told me, yeah, I got
[22] paid, I gave the money to Dave because — this is
[23] how it was set up. They were, I guess, call it a
[24] broker, put the money up in advance so we can
[25] convert the goods, buy the rugs, resell them to

Page 42

**Britto**

[1]
[2] IFC and then they get paid.
[3] Q: Now, can you tell us or explain to
[4] us why it was that Mr. Mitchell would put up the
[5] money so that you could convert the goods?
[6] A: Because he made a percentage off it.
[7] Q: And, made a percentage off the
[8] money?
[9] A: Yeah, for loaning it.
[10] Q: So was he financing Dave Adams'
[11] attempt to convert the goods, is that what you
[12] mean by what you just said?
[13] A: Yes.
[14] Q: Okay. Now, what did the conversion
[15] of the goods involve?
[16] A: Buying the goods, paying people to
[17] cut them up, bind them, ship them, cost of
[18] delivery.
[19] Q: What was the purpose of converting
[20] the goods, how would that benefit Mr. Adams so as
[21] to cause the scheme to succeed?
[22] A: Because he wanted money up front so
[23] he can go gamble it.
[24] Q: Okay. So by being paid in advance —
[25] A: He had the money right away.

---

Page 43

***Britto***

[1]
[2]   **Q:** By Mr. Mitchell, is that correct?
[3]   **A:** Or CCC, or —
[4]   **Q:** Okay. And by being paid in advance,
[5] he was supposed to share some of that money with
[6] you, is that correct?
[7]   **A:** Correct.
[8]   **Q:** Now, was there ever any agreement,
[9] oral, between you and Mr. Adams as to what
[10] percentage of the monies received by Mr. Adams you
[11] would receive?
[12]   **A:** 50/50.
[13]   **Q:** And —
[14]   **A:** And did not happen.
[15]   **Q:** Did you give any monies from the 50
[16] that you received to anyone else?
[17]   **A:** Yes.
[18]   **Q:** To whom?
[19]   **A:** Tyrone.
[20]   **Q:** Okay. And was there a percentage
[21] agreed between —
[22]   **A:** Mike Brown, only got a little bit,
[23] but.
[24]   **Q:** Was there a percentage between you
[25] and Tyrone that had ever been discussed?

Page 44

***Britto***

[1]
[2]   **A:** No.
[3]   **Q:** Okay. And was there a percentage
[4] between you and Mike Brown that had ever been
[5] discussed?
[6]   **A:** No.
[7]   **Q:** When did —
[8]   **A:** Well, for the longest time Dave was
[9] supposed to be paying Mike.
[10]   **Q:** Dave Adams was supposed to be paying
[11] Michael —
[12]   **A:** And he didn't.
[13]   **Q:** How do you know that?
[14]   **A:** Because Mike told me.
[15]   **Q:** Okay, and —
[16]   **A:** Can I just grab another water —
[17]   (Brief pause.)
[18]   **Q:** Do you know how much money Tyrone
[19] Williams made from being paid by you?
[20]   **A:** No idea.
[21]   **Q:** Okay, is it more than $10,000?
[22]   **A:** Oh, yeah.
[23]   **Q:** Is it more than $50,000?
[24]   **A:** I'm not sure about that.
[25]   **Q:** And, were there multiple payments or

Page 45

***Britto***

[1]
[2] just a single payment to Tyrone Williams?
[3]   **A:** Multiple, yeah.
[4]   **Q:** Did you ever have any discussions
[5] with Tyrone Williams about what his job was to be
[6] in order to keep on getting this money on the
[7] side?
[8]   **A:** Probably.
[9]   **Q:** Do you remember those conversations
[10] at all?
[11]   **A:** No.
[12]   **Q:** Did Tyrone Williams ever, once he
[13] came aboard in the scheme, discuss with you any
[14] shipments that created problems for him?
[15]   **A:** Yes.
[16]   **Q:** Okay. Do you have any memory of any
[17] particular shipment?
[18]   **A:** Actually, it was the ones that got
[19] us caught, that wood flooring and nonskid.
[20]   **Q:** And tell us about that shipment and
[21] if you could, take us through that shipment from
[22] the start of all you know about it all the way
[23] down to the end of it.
[24]   **A:** Well, Dave —
[25]   **Q:** Dave Adams?

Page 46

***Britto***

[1]
[2]   **A:** Yes, Dave Adams, I keep saying that.
[3]   **Q:** The only reason I constantly add the
[4] last name is because —
[5]   **A:** No, I know, I understand.
[6]   **Q:** We also have a David Sun —
[7]   **A:** Yeah, I understand that —
[8]   **Q:** And I don't want —
[9]   **A:** I understand that —
[10]   **Q:** Any unfairness to result.
[11]   **A:** I understand that.
[12] Dave Adams got dismissed from IFC.
[13] So at the end he wanted to put a couple of orders
[14] in to get more money before he left. And there
[15] was a nonskid, and the wood flooring, which there
[16] was no stock, and that's what happened.
[17]   **Q:** So, who put in those orders for him?
[18]   **A:** No, he did, he just, it was a
[19] purchase order that was already written.
[20]   **Q:** And did he alert you that those
[21] orders were put in?
[22]   **A:** I talked to him about it. He said
[23] there was stock but there wasn't.
[24]   **Q:** And at some point did it appear from
[25] paperwork that the nonskid — nonskid rugs I

---

**Min-U-Script®**

Page 47

*Britto*

[1]
[2] assume they are, is that correct?
[3]    **A:** No, it's under the.
[4]    **Q:** Nonskid material that goes under the
[5] bottom of the rug?
[6]    **A:** So it don't slide, yes.
[7]    **Q:** And was there paperwork that came in
[8] with regard to the nonskid material and to the
[9] wood tiles?
[10]    **A:** See, that I wouldn't know because I
[11] wasn't there.
[12]    **Q:** All right. So this happened while
[13] you were — already had left?
[14]    **A:** Oh, yeah.
[15]    **Q:** Did you at some point then, with
[16] regard to these two transactions, have any
[17] conversation with Williams about it?
[18]    **A:** Oh, yeah.
[19]    **Q:** Can you tell us as best as you can
[20] recall what you said to Tyrone Williams and what
[21] Tyrone Williams said to you?
[22]    **A:** No, I can't.
[23]    **Q:** Okay. Did you ever find out whether
[24] or not, what it was that caused the scheme to be
[25] discovered at this precise point?

Page 48

*Britto*

[1]
[2]    **A:** Those two last orders.
[3]    **Q:** Okay. So how do you know that it was
[4] discovered that there was a fraud involved with
[5] it?
[6]    **A:** There was a new buyer that took over
[7] and he had to do inventory and there was nothing
[8] there.
[9]    **Q:** And who reported this to you,
[10] because you had left the company by this point,
[11] isn't that right?
[12]    **A:** Yes.
[13]    **Q:** Okay. So who reported to you that
[14] the new buyer did the inventory and discovered it
[15] wasn't there?
[16]    **A:** I think it was you guys.
[17]    **Q:** Okay. So you found you that out —
[18]    **A:** — or the State Police, either one,
[19] yes. Actually, it was the State Police, yeah.
[20]    **Q:** So the State Police came to see you
[21] in New York?
[22]    **A:** Yeah, a week after I got out of the
[23] hospital.
[24]    **Q:** And do you recall when that was?
[25]    **A:** I left the hospital on August 2nd,

Page 49

*Britto*

[1]
[2] so a week later.
[3]    **Q:** Okay. And this is of '05?
[4]    **A:** Yes.
[5]    **Q:** Okay. Now —
[6]    **A:** Actually, so you don't think I'm
[7] lying —
[8]    **Q:** And you have shown me, and I'll pass
[9] it to other counsel, a Mount Sinai Hospital, New
[10] York, New York patient discharge plan and referral
[11] form, is that correct?
[12]    **A:** Yes.
[13]    **Q:** And it shows a discharge date of
[14] August 1, 2005.
[15]    **A:** And they came a week later, so.
[16]    **Q:** Okay. And I will pass this, so that
[17] all persons can see it.
[18]    **MR. YURKO:** Will you be
[19] marking that as an exhibit?
[20]    **Q:** Do you want that piece of paper
[21] back?
[22]    **A:** Yes.
[23]    **Q:** Okay. So, is it all right if we make
[24] a copy of it?
[25]    **A:** That's fine.

Page 50

*Britto*

[1]
[2]    **MR. KRASNOO:** And is it all
[3] right with counsel if we mark the copy
[4] as an exhibit?
[5]    **MR. YURKO:** Fine with me.
[6]    **Q:** Did you arrange with Mr. Adams that
[7] with regard to this last shipment that actually
[8] got discovered, that you were to get some money
[9] out of it?
[10]    **A:** Yes.
[11]    **Q:** Okay. Did you get any money out of
[12] it?
[13]    **A:** No.
[14]    **Q:** Okay. Now, was this a shipment where
[15] Mr. Adams got his money up front, as you said he
[16] liked to get his money up front?
[17]    **A:** I believe so.
[18]    **Q:** Okay. Now, do you know who this
[19] shipment came from?
[20]    **A:** CCC. And the nonskid was Dalton
[21] Padding. I think it was Dalton.
[22]    **Q:** D-A-L-T-O-N?
[23]    **A:** Yeah, I think.
[24]    **Q:** Do you know whether Dalton Padding
[25] was an actual or a fictitious company?

Page 51

**Britto**

[1]

[2] A: I think it was actual, at one time.

[3] Q: Okay. Was it at the time that it

[4] sent in this padding?

[5] A: I'm not, I'm not sure.

[6] Q: Okay. Did you ever have any

[7] discussion with Michael Brown about Dalton

[8] Padding?

[9] A: Yes.

[10] Q: Okay. And do you recall how long ago

[11] that was, or an approximate time?

[12] A: Four months ago, maybe, five months.

[13] Q: Okay. And when you had this

[14] discussion with Michael Brown about four months

[15] ago, would make it December of '05 — November or

[16] December of '05?

[17] A: Maybe earlier than that, like

[18] September maybe.

[19] Q: Would it be shortly after you spoke

[20] with the State Police?

[21] A: No.

[22] Q: Okay. Would it be before you spoke

[23] to the State Police?

[24] A: No, it was after, because —

[25] Q: And what was your conversation with

Page 52

**Britto**

[1]

[2] Mike Brown about, what did you say to him and what

[3] did he say to you?

[4] A: In reference to what?

[5] Q: Well, you had a conversation with

[6] him you just told us?

[7] A: Yes.

[8] Q: Where you also discussed Dalton

[9] Padding as one of the subject matters —

[10] A: No, are you talking about the

[11] inventory or the State Police?

[12] Q: Well, did you discuss both with Mike

[13] Brown?

[14] A: After the State police came I called

[15] him.

[16] Q: Okay. So first, are there two

[17] separate conversations with —

[18] A: Yes.

[19] Q: All right. Which one occurred

[20] earlier in time, the one about Dalton Padding?

[21] A: Dalton Padding, yes.

[22] Q: Would you tell us as best as you can

[23] recall the conversation you had with Mike Brown

[24] about the Dalton Padding.

[25] A: I have no idea.

Page 53

**Britto**

[1]

[2] Q: Okay. Did you discuss money in that

[3] conversation?

[4] A: No.

[5] Q: Did Michael Brown discuss with you

[6] whether or not he was getting paid with David

[7] Adams?

[8] A: No.

[9] Q: Was Michael Brown to get paid by

[10] David Adams directly?

[11] A: He was at first, and Dave wasn't

[12] paying him. So then, Dave was telling him that I

[13] was supposed to pay him when Dave was supposed to,

[14] because Dave's, he's —

[15] Q: So did you wind up paying Michael

[16] Brown any money?

[17] A: Yes, but he didn't get too much.

[18] Q: Over what period of time did you pay

[19] Michael Brown?

[20] A: Maybe a year.

[21] Q: Do you recall roughly how much

[22] Mr. Brown got?

[23] A: Probably got like six, 7,000.

[24] Q: And what was Michael Brown's role?

[25] A: Well, he helped set it up with Dave.

Page 54

**Britto**

[1]

[2] Q: And did he ever discuss with you the

[3] steps he had taken to set it up with Dave Adams?

[4] A: No.

[5] Q: Okay. How did you find out the

[6] information that Michael Brown was also one of the

[7] people that set up the scheme with Dave Adams?

[8] A: Because me and Dave discussed it

[9] beforehand.

[10] Q: Okay, what was your discussion with

[11] Dave Adams —

[12] A: Dave Adams.

[13] Q: — about Michael Brown's role in

[14] this matter?

[15] A: Because Michael Brown worked for

[16] CCC, and he was like, I guess the best salesman or

[17] whatever, so he was close to him. So Dave worked

[18] through Michael Brown to get them to do what they

[19] did.

[20] **MR. KRASNOO:** Okay. Off the

[21] record a minute.

[22] **THE VIDEOGRAPHER:** The time is

[23] now 2:23. Off the record.

[24] (Brief recess.)

[25] **THE VIDEOGRAPHER:** Time is now

Page 55

**Britto**

[1]
[2] 2:41. On the record.
[3] BY MR. KRASNOO:
[4]    Q: Mr. Britto, earlier in your
[5] deposition —
[6]    A: Call me Kevin, please.
[7]    Q: Well, it's hard to do it in a
[8] deposition.
[9]    A: Oh, okay. Make me feel old.
[10]    Q: I don't try to do that, please
[11] believe me, I know what age it is.
[12]    You had mentioned that there were
[13] four ways to prevent theft earlier in your
[14] deposition today.
[15]    A: Um-hum.
[16]    Q: And you mentioned one of the ways
[17] was don't use prepaid freight?
[18]    A: Yes.
[19]    Q: A second way was use different tags
[20] for different vendors?
[21]    A: Yes.
[22]    Q: What are the other two ways?
[23]    A: Freight, tags, can't have a
[24] supervisor that's not, scumbag, and the fourth one
[25] I forget.

Page 56

**Britto**

[1]
[2]    Q: Okay, now, when Mr. Adams brought
[3] you aboard in this scheme and discussed it with
[4] you —
[5]    A: Before we get into it, have a buyer
[6] that's honest.
[7]    Q: Okay.
[8]    A: So that's five, I don't know.
[9]    Q: Okay. When Mr. Adams brought you
[10] aboard in this scheme and gave you the outlines of
[11] it, what was it, if anything, about Tyrone
[12] Williams that caused you to connect to Tyrone and
[13] make him a participant in this scheme?
[14]    A: Well, his girlfriend was a friend of
[15] mine.
[16]    Q: Now —
[17]    A: At the time. He's got two or three
[18] since then, but.
[19]    Q: And at that time were you friendly
[20] with Tyrone Williams as a result of knowing his
[21] girlfriend?
[22]    A: Yes.
[23]    Q: Are there other companies other than
[24] CCC and Dalton Padding that were connected to the
[25] scheme of which you're aware?

Page 57

**Britto**

[1]
[2]    A: DGM used to do it, which, the guy
[3] died, so it's not happening anymore.
[4]    Q: Did you ever have any direct
[5] contacts with DGM?
[6]    A: Through Dave Adams.
[7]    Q: Now, you mentioned that the guy
[8] died. Do you mean the company —
[9]    A: Lou Levine died.
[10]    Q: And that was a person. Did you have
[11] direct communication with Lou Levine before he
[12] died about any aspects of this fraud?
[13]    A: Yes.
[14]    Q: Okay. And what were your
[15] conversations with this person about the fraud?
[16]    A: Had lunch.
[17]    Q: When you had lunch did you discuss
[18] fake shipments?
[19]    A: No, always went through Dave Adams.
[20]    Q: Did you discuss any money matters
[21] relating to fake shipments?
[22]    A: Always went through Dave Adams.
[23]    Q: Was Dave present at the lunch?
[24]    A: Yes.
[25]    Q: Do you recall where the lunch was?

Page 58

**Britto**

[1]
[2]    A: It was in Worcester, I don't know
[3] the restaurant.
[4]    Q: And do you recall approximately what
[5] year?
[6]    A: The year after Dave Rooney left, I
[7] don't know what year he left.
[8]    Q: Now, you mentioned Dave Rooney
[9] earlier in your depo and just now. Can you tell
[10] us, did Dave Rooney, acting in his capacity as
[11] warehouseman or receiver —
[12]    A: No, Dave Rooney was the buyer.
[13]    Q: Okay.
[14]    A: I took over his position when he
[15] left.
[16]    Q: Was Dave Rooney an honest buyer?
[17]    A: Yes, definitely.
[18]    Q: Did Dave Rooney ever discuss with
[19] you ways to cheat the company if he wanted to?
[20]    A: Never, no, Dave, honest man.
[21]    Q: Now, have you ever heard of a
[22] company called Empire Weavers?
[23]    A: Yes.
[24]    Q: Were they a company that in any way
[25] participated in this fraud?

Page 59

*Britto*

[1]

[2]    **A:** Yes.

[3]    **Q:** Okay. How did they participate in

[4] the fraud?

[5]    **A:** CCC had CCC, Empire Weavers, Dalton

[6] Padding.

[7]    **Q:** So, this was, for some purposes, an

[8] alter ego of CCC?

[9]    **A:** Yes.

[10]    **Q:** Do you know whether or not it was an

[11] actual ongoing company that sold product or was it

[12] a fictitious entity that was used to pretend to

[13] sell product?

[14]    **A:** It was fictitious for us, I don't

[15] know if it was all around.

[16]    **Q:** As far as you know then, was there

[17] ever a legitimate shipment where the shipper was

[18] Empire Weavers in your association with IFC?

[19]    **A:** No.

[20]    **Q:** Okay. Now, with regard to Dalton

[21] Padding was there any genuine shipments to your

[22] knowledge, from Dalton Padding to IFC while you

[23] were there?

[24]    **A:** I don't believe so.

[25]    **Q:** Now, have you ever heard of a

Page 60

*Britto*

[1]

[2] company named Mansfield Rug?

[3]    **A:** Yes.

[4]    **Q:** Okay. Is Mansfield Rug an actual

[5] company to your knowledge?

[6]    **A:** To my knowledge, yeah.

[7]    **Q:** Okay. Did IFC receive any shipments

[8] from Mansfield Rug while you were there?

[9]    **A:** No.

[10]    **Q:** Did IFC ever receive any paperwork

[11] to indicate that Mansfield Rug had shipped in

[12] items to IFC while you were there?

[13]    **A:** Yes.

[14]    **Q:** So, is it fair to state or unfair to

[15] state that Mansfield Rug, if one were to find any

[16] paperwork indicating shipments had come in, that

[17] all of those shipments to your knowledge would be

[18] fictional, nonexisting shipments — I'm sorry,

[19] shipments of nonexisting rugs?

[20]    **A:** Yes.

[21]    **Q:** And fake shipments?

[22]    **A:** Yes.

[23]    **Q:** Now, have you ever heard of a

[24] company named International Floor, Incs. — Inc.,

[25] sorry?

Page 61

*Britto*

[1]

[2]    **A:** No.

[3]    **Q:** And you don't know it to be

[4] connected to the scheme one way or another, is

[5] that correct?

[6]    **A:** Yeah, I never even heard of that.

[7]    **Q:** Have you ever heard of a company

[8] called Remco?

[9]    **A:** Yes.

[10]    **Q:** Is Remco an actual company?

[11]    **A:** Supposedly.

[12]    **Q:** Did Remco ever send in shipments of

[13] actual rugs or merchandise to IFC while you were

[14] employed there?

[15]    **A:** They thought they did.

[16]    **Q:** Okay.

[17]    **A:** And I'll tell you how. Like with

[18] machine made rugs we would take them and hide them

[19] because Nick was the buyer, or he still is the

[20] buyer, so when he came in, here's the goods.

[21]    **Q:** Now you — Nick is, what's Nick's

[22] last name, do you know?

[23]    **A:** Adler.

[24]    **Q:** To your knowledge, is Nick Adler

[25] someone who was not involved in the fraud?

Page 62

*Britto*

[1]

[2]    **A:** No, he wasn't.

[3]    **Q:** Okay. And you would take then

[4] shipments of actual product and display them to

[5] Nick Adler, telling him that those were the

[6] product that allegedly were shipped in by Remco?

[7]    **A:** Correct.

[8]    **Q:** Okay. Does that mean, therefore,

[9] that Remco presented bills or invoices to show

[10] product was shipped into IFC when, in fact, no

[11] product was shipped in?

[12]    **A:** Without their knowledge, correct.

[13]    **Q:** Okay. Now, could you explain to us

[14] how Remco could create an invoice suggesting that

[15] product was sent in to IFC without its knowledge

[16] their product was never sent in to IFC?

[17]    **A:** Yes. Because we told them, bullshit

[18] them actually, that we didn't want them getting

[19] involved, because we didn't want them to get

[20] involved with the people we were buying the goods

[21] from, so they couldn't steal our business.

[22]    **Q:** So you were telling that to —

[23]    **A:** Ron Mitchell.

[24]    **Q:** Did you ever tell that to Jane

[25] Dziemit?

Page 63

**Britto**

[1]

[2] **A:** I never talked on her.

[3] **Q:** Did you ever tell that to Tony?

[4] **A:** Maybe, I'm not sure.

[5] **Q:** And Tony's last name, Marasca?

[6] **A:** Yep.

[7] **Q:** Does that refresh your recollection?

[8] **A:** Yep.

[9] **Q:** Now, you just stated a moment ago

[10] that you had never talked to Jane Dziemit. How

[11] did you come to know her name and her involvement

[12] with Remco, if at all?

[13] **A:** Paperwork.

[14] **Q:** So that was the first time you

[15] became aware of the —

[16] **A:** Her at all.

[17] **Q:** — of the existence of Jane Dziemit?

[18] **A:** Yeah.

[19] **Q:** Did you ever have any discussion

[20] with Ron Mitchell following receipt about

[21] paperwork down to today about Jane Dziemit?

[22] **A:** Yes.

[23] **Q:** Would you tell us as best you can

[24] recall, what you said to Ron Mitchell and what Ron

[25] Mitchell said to you about Jane Dziemit.

Page 64

**Britto**

[1]

[2] **A:** No, I just said Ron and Jane are

[3] innocent.

[4] **Q:** You said that to Ron?

[5] **A:** Yes.

[6] **Q:** Okay.

[7] **A:** Because they are. I'm trying to

[8] make the wrongs right.

[9] **Q:** What did Ron, if anything, say in

[10] response to your statement?

[11] **A:** I can't remember.

[12] **Q:** Did — do you know from any

[13] conversation at any time with Mr. Mitchell how

[14] much money Remco fronted — if I can put it that

[15] way — paid up front to David Adams?

[16] **A:** (Witness nods).

[17] **Q:** How much money?

[18] **A:** Well, if there was a $40,000

[19] invoice, I guess it would have been like 22,

[20] 25,000.

[21] **Q:** So, so Mr. Mitchell then was to

[22] receive a percentage of the total amount of the

[23] invoice?

[24] **A:** Um-hum.

[25] **Q:** As payment for having produced an

Page 65

**Britto**

[1]

[2] invoice?

[3] **A:** Loaned the money.

[4] **Q:** Okay. Did you ever see any checks or

[5] monies that were purportedly loaned by

[6] Mr. Mitchell to Mr. Adams?

[7] **A:** I don't believe so.

[8] **Q:** How did you know, in a Remco

[9] transaction, that Mr. Mitchell actually paid

[10] Mr. Adams any money up front?

[11] **A:** I don't know.

[12] **Q:** Okay. Was it something that

[13] Mr. Adams ever told you, that I just received

[14] money from Mr. Mitchell?

[15] **A:** Yes.

[16] **Q:** Did you ever see any checks

[17] representing payments from either Remco or

[18] Mr. Mitchell or Ms. Dziemit to Dave Adams?

[19] **A:** No.

[20] **Q:** Did you ever see any monies that

[21] Dave Adams showed you wherein, through

[22] conversation, Mr. Adams indicated that this

[23] represented money flowing from either Remco or

[24] Mr. Mitchell or Ms. Dziemit to him?

[25] **A:** No. To me, yes.

Page 66

**Britto**

[1]

[2] **Q:** So the only time you would know of

[3] it was when Mr. Adams passed some money to you and

[4] made the statement that this was money that came

[5] either from Remco or Mr. Mitchell or Ms. Dziemit?

[6] **A:** Correct.

[7] **Q:** Did you ever try to find any ways to

[8] determine that you were getting your fair share of

[9] the monies that either Mr. Mitchell or Ms. Dziemit

[10] or Remco had paid to Mr. Adams up front?

[11] **A:** Definitely.

[12] **Q:** What steps did you take to get that

[13] information?

[14] **A:** Well, when Dave was giving me this

[15] bullshit act, I called up Ron.

[16] **Q:** Would you do this periodically while

[17] you were still employed at IFC?

[18] **A:** No, this was afterwards.

[19] **Q:** Okay. Before that did Mr. Adams

[20] indicate to you that Remco was fronting him some

[21] monies for shipments that were later going to be

[22] fictitional?

[23] **A:** I can't remember that.

[24] **Q:** When you first — when did you first

[25] become aware of the existence of Ron Mitchell?

Page 67

***Britto***

[1]
[2] **Q:** Was it a name first basis?
[3] **A:** I don't know.
[4] **Q:** Okay. Do you know how you first
[5] learned of his name?
[6] **A:** Yeah, because I did buy padding from
[7] him when I was a buyer.
[8] **Q:** When you bought padding from him
[9] when you were a buyer, was that padding that was
[10] shipped out under Remco's name or another name?
[11] **A:** North Carolina Foam.
[12] **Q:** Okay. And as far as you know what
[13] was Mr. Mitchell's connection, if any, to North
[14] Carolina Foam?
[15] **A:** Salesman.
[16] **Q:** Did you find out — did you have
[17] direct conversations with Mr. Mitchell about any
[18] purchases made from North Carolina Foam?
[19] **A:** Actually, I used to go through Dave.
[20] **Q:** So you would tell Mr. Adams that you
[21] needed to buy some foam, is that correct?
[22] **A:** Yes.
[23] **Q:** And Mr. — how did you find out that
[24] Mr. Adams would buy it from North Carolina Foam?
[25] **A:** Because he had all kind of

Page 68

***Britto***

[1]
[2] connections.
[3] **Q:** But I mean how would you find out —
[4] **A:** He made my job easier.
[5] **Q:** That he bought the foam from North
[6] Carolina Foam as opposed to from another
[7] connection?
[8] **A:** The bill.
[9] **Q:** Okay. So you would actually get to
[10] see the bill?
[11] **A:** Yes.
[12] **Q:** Okay.
[13] **A:** I had to sign off on everything,
[14] every bill that came in, when I was the buyer.
[15] **Q:** So that would involve bills for
[16] genuine shipments?
[17] **A:** Yes.
[18] **Q:** And bills for fictional shipments?
[19] **A:** No.
[20] **Q:** Never?
[21] **A:** Never.
[22] **Q:** Okay. All right. When a bill came
[23] in for a fictional shipment how — let's do it
[24] another way. Would you take us through the steps
[25] that would be accomplished, identifying the

Page 69

***Britto***

[1]
[2] paperwork, for a legitimate shipment first and
[3] then I'll ask you to do the same thing for us for
[4] a fictional shipment so we all can appreciate the
[5] difference in steps.
[6] **A:** Okay.
[7] **Q:** So first, for a legitimate shipment.
[8] **A:** Trailer comes in, count the goods,
[9] this is what they're supposed to do. Count the
[10] goods off the trailer, put it upstairs, count.
[11] Now, the people upstairs who are unloading it
[12] upstairs count the goods in. They got a master
[13] paperwork, turn it in to the supervisor, looks at
[14] the bill of lading, compares the two, if it's a
[15] piece or two off, you know, it could be a wrong
[16] count, do the key rec, sign it, send it in.
[17] **Q:** Now, tell us —
[18] **A:** Now, with the fake ones, you mix it
[19] in with the real ones.
[20] **Q:** Okay.
[21] **A:** Because people are not good at doing
[22] paperwork. So you just give them a whole stack of
[23] shit.
[24] **Q:** So you give them genuine pieces of
[25] paper representing genuine shipments, but you mix

Page 70

***Britto***

[1]
[2] it in with pieces of paper about nonexistent —
[3] **A:** Yes —
[4] **Q:** Shipments at the same time?
[5] **A:** Yes.
[6] **Q:** Now, is the key rec created for the
[7] fictional shipments as well?
[8] **A:** Yes.
[9] **Q:** Okay. And is the supervisor still
[10] required to sign off on the fictional shipments?
[11] **A:** Yeah.
[12] **Q:** Okay. Now, who do you give this
[13] paperwork to where the fictional shipment
[14] paperwork is mixed in with the genuine shipment
[15] paperwork?
[16] **A:** To the supervisor.
[17] **Q:** Okay. Now —
[18] **A:** I'll give you an example. When I
[19] was the buyer, we went through a lot of
[20] supervisors. I used to send them off on shopping
[21] reports, to go a store, do this. While they're
[22] gone, this trailer just happened to come in and we
[23] shipped it out. I'm their boss. They're not
[24] gonna question me. There's the key rec.
[25] **Q:** So you would prepare a key rec for

Page 71

**Britto**

[1]
[2] some of the fictional shipments?
[3] **A:** No, I wouldn't — well, I did some
[4] key recs, but —
[5] **Q:** Who would prepare the key rec for a
[6] fictional shipment?
[7] **A:** The supervisor would, but he didn't
[8] know or she didn't know.
[9] **Q:** That it was fictional shipment?
[10] **A:** Yes.
[11] **Q:** So they would come back from their
[12] shopping merchandise that you sent them on?
[13] **A:** And do the paperwork.
[14] **Q:** They would see the paperwork there,
[15] they would know they had to fill out a key rec?
[16] **A:** Yes.
[17] **Q:** They would fill it out, they would
[18] sign off on it on the basis of the paperwork they
[19] received?
[20] **A:** Correct.
[21] **Q:** Okay. And especially they would be
[22] in part relying upon your statement as a boss that
[23] the shipment came in while you were out?
[24] **A:** Correct.
[25] **Q:** Here's all the paperwork on it?

Page 72

**Britto**

[1]
[2] **A:** Do what the fuck you're told.
[3] **Q:** Okay. Can you tell us the names of
[4] any of the supervisors that were involved?
[5] **A:** Involved in what?
[6] **Q:** Just where you would present these
[7] pieces of paper and they would fill out the key
[8] rec?
[9] **A:** Oh, yeah, yeah, Chris Nolan, Wendy,
[10] I don't know her last name, Mark something, I had
[11] Tito do key recs, Moxume do key recs. I mean, I
[12] had all kinds of people do the key recs. The more
[13] people that did the key recs, the less chance of
[14] getting caught.
[15] **Q:** With the regard to the people that
[16] you've mentioned, is it your testimony that none
[17] of them were participants in the scheme, no one?
[18] **A:** Oh, zero.
[19] **Q:** Okay. Now, could you tell us what
[20] information is contained in a key rec, whether
[21] it's for a fictional shipment or a real shipment
[22] or a half real, half —
[23] **A:** They're both the same.
[24] **Q:** Okay. And what information is
[25] contained in it? A key rec apparently is a

Page 73

**Britto**

[1]
[2] document used by IFC to track receipts of
[3] shipment, is that correct?
[4] **A:** Yes.
[5] **Q:** Okay. So what kind of information is
[6] entered onto the key rec by whoever makes it out?
[7] **A:** The date it came in, who unloaded
[8] it, the shipper, quantities, the supervisor has to
[9] sign it or, whoever signs it, and the date.
[10] **Q:** Now, occasionally in some documents
[11] that are key recs there would be handwritten
[12] notation on it such as I muffed the inventory, it
[13] was really four by six rugs as opposed to eight by
[14] tens, or I put down the wrong quantity for the
[15] four by six rugs. What situations, would those
[16] always be genuine shipments?
[17] **A:** Yeah, I don't have any knowledge of
[18] that.
[19] **Q:** Okay. Did you ever write that kind
[20] of information on any key rec that you filled out?
[21] **A:** Maybe. I don't know.
[22] **Q:** How soon after — strike that.
[23] When the scheme first started,
[24] Mr. Adams was not receiving the money up front
[25] from these companies, was he?

Page 74

**Britto**

[1]
[2] **A:** No.
[3] **Q:** When did that change in the scheme.
[4] You don't know?
[5] **A:** I can't tell you.
[6] **Q:** Was there any conversation with
[7] Mr. Adams and yourself to indicate when it was
[8] going to change and/or why it was going to change?
[9] **A:** With him getting the money up front?
[10] **Q:** Yes.
[11] **A:** No.
[12] **Q:** Before the money came in up front,
[13] how would — would Mr. Adams wait until the
[14] company that shipped the fictional shipment
[15] received payment —
[16] **A:** Yes.
[17] **Q:** From IFC?
[18] **A:** Yes.
[19] **Q:** Okay. How soon, roughly, after the
[20] company received shipment from IFC would Mr. Adams
[21] receive his money?
[22] **A:** Probably a week.
[23] **Q:** Now, would Mr. Adams get it in check
[24] form?
[25] **A:** Well, he, he had an ATM card, got

Page 75

**Britto**

[1]
[2] cash, I mean.
[3]    Q: So there were different ways in
[4] which he would get paid?
[5]    A: Yeah.
[6]    Q: Did you ever see a check made out
[7] from a shipper of fictional merchandise addressed
[8] to Mr. Adams?
[9]    A: I don't think he ever did that.
[10]    Q: Okay. When he paid you, was it in
[11] cash or in any other form?
[12]    A: Cash at first. Then I got checks
[13] from the company.
[14]    Q: Did the checks commence only after
[15] you left the company or was it while you were also
[16] still employed there?
[17]    A: I'm not sure. I'm not going to
[18] answer that. I'm not going to give a wrong
[19] answer.
[20]    Q: And when you got the cash would you
[21] ever deposit it in a bank account?
[22]    A: Sometimes.
[23]    Q: Okay. Now, while you were a buyer —
[24] strike that.
[25]    Were you a buyer at, overlapping the

Page 76

**Britto**

[1]
[2] same time that Dave Adams was a buyer for the
[3] company?
[4]    A: Yes.
[5]    Q: Okay. And when you were both
[6] buyers, did you also have some kind of either
[7] written or oral agreement with IFC through any of
[8] its managers or its president with regard to
[9] reimbursements for disbursements that you would
[10] have made?
[11]    A: Oh, no.
[12]    Q: Okay. Well, did you ever get
[13] reimbursement checks for expenses?
[14]    A: What do you mean by that?
[15]    Q: If you took people out to eat would
[16] you do that in your role as buyer, take them —
[17]    A: Yeah, I had a company credit card.
[18]    Q: Would you ever put in for gas
[19] reimbursement, for driving to various locations,
[20] or things of that nature?
[21]    A: Yeah, that was, everybody does that.
[22]    Q: Okay. With regard to any of those
[23] checks that you received from the company,
[24] reimbursing you for gas and mileage and things of
[25] that nature, would all those checks be legitimate

Page 77

**Britto**

[1]
[2] checks or would those also be fictional expenses
[3] created to be representative of the fictional
[4] shipments of rugs?
[5]    A: Never.
[6]    Q: So they were always legitimate?
[7]    A: Yes.
[8]    Q: Okay. Do you know whether or not, of
[9] your own personal knowledge, Dave Adams' were ever
[10] fake reimbursement expenses?
[11]    A: I think so. Like when he took over
[12] as buyer, Georgia Rug Mills was paying for half of
[13] his Escalade or whatever, Navigator, and he was
[14] claiming, he was getting money from IFC for that.
[15]    Q: Have you ever heard the name of
[16] Peter Burnham?
[17]    A: Yes.
[18]    Q: Who is or was Peter Burnham?
[19]    A: Dave used to work for him. Adams,
[20] used to work for him.
[21]    Q: When David Adams worked for him, do
[22] you know in what capacity David Adams worked for
[23] him?
[24]    A: I guess he was his assistant, I
[25] guess, I'm not sure.

Page 78

**Britto**

[1]
[2]    Q: David Adams was the assistant to
[3] Peter Burnham?
[4]    A: Yes.
[5]    Q: What kind of work that did Burnham
[6] do at the time David Adams worked for him?
[7]    A: They used to go to the store, do
[8] inventories, decide what we needed in stock,
[9] something like that.
[10]    Q: Was Peter Burnham then an employee
[11] of IFC?
[12]    A: Never was.
[13]    Q: Okay.
[14]    A: To my knowledge, anyways.
[15]    Q: Okay. Do you know whether Peter
[16] Burnham ever was involved or knowledgeable about
[17] this particular scheme that you've described for
[18] us today?
[19]    A: I don't think so.
[20]    Q: Okay. Now —
[21]    A: But, however, Peter Burnham was
[22] working with Dave after Dave left IFC to try to
[23] get business.
[24]    Q: Was Peter Burnham trying to get
[25] business for David or was David trying to get

Page 79

**Britto**

[1]
[2] business for Peter Burnham?
[3]   **A:** They were trying to work together to
[4] try to get business together for IFC.
[5]   **Q:** Okay. And that was after David Adams
[6] left?
[7]   **A:** Yes.
[8]   **Q:** How did you know that?
[9]   **A:** Dave told me.
[10]   **Q:** Were you in constant communication
[11] with David Adams once you had left the company?
[12]   **A:** Yes.
[13]   **Q:** Okay. A once a week phone call,
[14] twice a week, daily?
[15]   **A:** Well, sometimes it was a month that
[16] went by. If he knew I was pissed off he wouldn't
[17] call me.
[18]   **Q:** Okay. And was what would piss you
[19] off being that you weren't receiving payment you
[20] thought you were entitled to?
[21]   **A:** Correct.
[22]   **Q:** Now, when you left IFC, did you
[23] locate to New York?
[24]   **A:** The first time, no.
[25]   **Q:** Okay.

Page 80

**Britto**

[1]
[2]   **A:** The second time, yes.
[3]   **Q:** What did you do — when you left IFC
[4] the first time and before the second time, what
[5] kind of work did you do?
[6]   **A:** I was trying to take care of my
[7] addiction.
[8]   **Q:** Okay, so —
[9]   **A:** And I tried to become a state
[10] trooper, actually.
[11]   **Q:** Is this an alcoholic addiction or a
[12] drug addiction?
[13]   **A:** Alcoholic and oxycontins.
[14]   **Q:** Okay. And, did you go in for some
[15] treatment to any hospital?
[16]   **A:** Yes.
[17]   **Q:** Okay. How long a period of time was
[18] that period between the first time employment
[19] ended with IFC —
[20]   **A:** Ten months.
[21]   **Q:** And the second time it began? Ten
[22] months?
[23]   **A:** Ten months.
[24]   **Q:** And where were you located at the
[25] time, was it Massachusetts or —

Page 81

**Britto**

[1]
[2]   **A:** Yes.
[3]   **Q:** Okay. Now, when you left IFC the
[4] second time, did you come to New York?
[5]   **A:** Yes.
[6]   **Q:** And when was that roughly?
[7]   **A:** 2001.
[8]   **Q:** Okay.
[9]   **A:** September 28th.
[10]   **Q:** You had told Mr. Elovitz, had you
[11] not, on some occasion, that you had an uncle in
[12] New York that was lending you an apartment?
[13]   **A:** Yes.
[14]   **Q:** Was that correct?
[15]   **A:** No.
[16]   **Q:** Was that a fake statement?
[17]   **A:** Yes.
[18]   **Q:** Okay. Why, at that point when you
[19] left, did you maintain that fake story to
[20] Mr. Elovitz?
[21]   **A:** Well, New York's expensive. I
[22] didn't want him, let him know what was going on,
[23] you know what I mean.
[24]   **Q:** So, you actually were —
[25]   **A:** Lying.

Page 82

**Britto**

[1]
[2]   **Q:** Lying to obtain money still from —
[3]   **A:** Correct.
[4]   **Q:** Mr. Elovitz.
[5] Now, was this money because of work
[6] you had done or was this like personal loans from
[7] Mr. Elovitz?
[8]   **A:** It was stolen.
[9]   **Q:** Okay. So you told him that you were
[10] living in New York now while you were still trying
[11] to do work for IFC?
[12]   **A:** No.
[13]   **Q:** Okay. I'm confused. When you say
[14] you stole the money, was that money that you stole
[15] from IFC or directly from Mr. Elovitz?
[16]   **A:** IFC.
[17]   **Q:** Okay. And how was it that you were
[18] stealing that money at that point, was it still
[19] the —
[20]   **A:** The fake orders.
[21]   **Q:** Okay. So you were participating
[22] then in fake orders after you left, and you used
[23] as a cover-up to Mr. Elovitz that you had an uncle
[24] in New York that was lending you an apartment as
[25] part of your covering up the scheme?

Page 83

*Britto*

[1]

[2]  **A:** I do have an uncle in New York.

[3]  **Q:** Okay. But not one who had loaned you

[4]  an apartment?

[5]  **A:** Correct.

[6]  **Q:** Now, what was the advantage in lying

[7]  to Mr. Elovitz about that aspect that aided you in

[8]  still getting money from IFC?

[9]  **A:** What do you think?

[10]  **Q:** I don't know, that's why I'm asking.

[11]  **A:** A cover-up.

[12]  **Q:** What was it covering up?

[13]  **A:** Just in case he got a hint of it.

[14]  **Q:** So in case —

[15]  **A:** Could I have a bottle of water,

[16]  please.

[17]  **Q:** In other words, part of what you

[18]  were worried about was that —

[19]  **A:** My tracks.

[20]  **Q:** He might discover your lifestyle?

[21]  **A:** Cover my tracks. Thank you.

[22]  Let's not do a play on words, let's

[23]  be direct. I'm direct, you be direct.

[24]  **Q:** How often did you do fake or short

[25]  shipments, would it average out to once a week,

Page 84

*Britto*

[1]

[2]  once a month?

[3]  **A:** Probably once a month.

[4]  **Q:** Okay. And is there an average

[5]  amount of money that would represent each of the

[6]  fake shipments?

[7]  **A:** When there's remnants, probably like

[8]  40,000. Nonskid, 20-something thousand, I mean.

[9]  Machine mades, 15,000, with half shipments.

[10]  **Q:** Now, did you ever socialize with

[11]  David Adams?

[12]  **A:** No, never. Well, one time I went to

[13]  the dog races. That was it.

[14]  **Q:** Did you ever have any discussion

[15]  with David Adams about any knee injury that

[16]  occurred to him?

[17]  **A:** Foot, when he said he jumped in the

[18]  pool and broke his foot which was like, I think it

[19]  was bullshit, I think the bookie did that to him.

[20]  **Q:** Did you ever see him displaying any

[21]  kind of knee or leg injury?

[22]  **A:** A foot injury.

[23]  **Q:** Okay. And when he had the foot

[24]  injury how did you see that, what was it, was he

[25]  limping or was it in a cast or was it in a brace?

Page 85

*Britto*

[1]

[2]  **A:** Yeah, it was in a cast and he had

[3]  crutches.

[4]  **Q:** Okay. Now, would you — you've

[5]  indicated before that when a fictional shipment

[6]  was being created you would see what was in

[7]  inventory first.

[8]  **A:** Correct.

[9]  **Q:** Would that be your visual inspection

[10]

[11]  **A:** That would be the guideline.

[12]  **Q:** Or would you be relying upon

[13]  previous paperwork to suggest what was in

[14]  inventory?

[15]  **A:** No.

[16]  **Q:** You'd actually go look at the rugs

[17]  that were there?

[18]  **A:** That would be the guideline, yeah.

[19]  **Q:** Now, after the State Police came to

[20]  interview you, who, if anyone, named in the civil

[21]  complaint did you have contact with?

[22]  **A:** Ron Mitchell, Tyrone Williams, Mike

[23]  Brown.

[24]  **Q:** Okay. Did you ever have any contact

[25]  directly with any member of CCC?

Page 86

*Britto*

[1]

[2]  **A:** No.

[3]  **Q:** Okay. When you had contact with

[4]  Tyrone Williams, what did you say to him and what

[5]  did he say to you?

[6]  **A:** Well, when the State Police were

[7]  there, I said tell them the truth, because he was,

[8]  listen, don't say nothing, I'll take care of it.

[9]  But I told him, just tell them the truth. And he

[10]  did.

[11]  **Q:** What is it your understanding that

[12]  Mr. Williams said?

[13]  **A:** I have no idea.

[14]  **Q:** Okay.

[15]  **A:** I wasn't there.

[16]  **Q:** So, how do you, therefore, form the

[17]  conclusion that he did tell the State Police the

[18]  truth?

[19]  **A:** Well, one, the State Police were

[20]  pissed off. Two, when they went back after I told

[21]  him, they seemed like they were happy. Like he

[22]  was, what I told them, he was telling them, so —

[23]  **Q:** But has anybody ever told you

[24]  explicitly what Tyrone Williams said to the State

[25]  Police?

Page 87

**Britto**

[1]
[2] **A:** No.
[3] **Q:** Okay. That's neither Tyrone Williams
[4] nor the State Police?
[5] **A:** No.
[6] **Q:** Okay. And has anyone ever told you
[7] that what Tyrone Williams said to the State Police
[8] was or was not true?
[9] **A:** No.
[10] **Q:** Okay.
[11] **A:** The State Police did tell me though,
[12] he was cooperative the second time. And I
[13] actually called him in front of one of the state
[14] troopers.
[15] **Q:** Okay. And was that when you told him
[16] to go ahead and tell the truth?
[17] **A:** (Witness nods). Because he wasn't
[18] talking at all.
[19] **Q:** Okay. Why don't we stop now, because
[20] it's my understanding that the tape is about to
[21] run out.
[22] **THE VIDEOGRAPHER:** Time is now
[23] 3:16. This marks the ending of tape
[24] number one. Off the record.
[25] (Brief recess.)

Page 88

**Britto**

[1]
[2] **THE VIDEOGRAPHER:** 3:20 p.m.,
[3] this marks the beginning of tape
[4] number two. On the record.
[5] **BY MR. KRASNOO:**
[6] **Q:** Now, you indicated that when the
[7] State Police came you spoke to Tyrone Williams.
[8] Can you tell us, did you have any control over
[9] Tyrone Williams?
[10] **A:** Definitely.
[11] **Q:** Okay. And what was the nature of the
[12] control?
[13] **A:** Well, first, I was his boss.
[14] **Q:** Okay.
[15] **A:** Secondly, he knew that — how can I
[16] put it. It's better to be in my hands than his.
[17] **Q:** Did he in any way rely upon you to
[18] make decisions that affected him in his job?
[19] **A:** Yes.
[20] **Q:** Was that true for legitimate acts he
[21] did on behalf of the employer?
[22] **A:** Yes.
[23] **Q:** Was that also true for —
[24] **A:** Previous employees, too.
[25] **Q:** Okay. Was that also true for

Page 89

**Britto**

[1]
[2] fraudulent acts that he did on behalf of the
[3] employer?
[4] **A:** Um-hum.
[5] **Q:** The answer is —
[6] **A:** Yes.
[7] **Q:** Okay. Now —
[8] **A:** For him, I mean, not the ones I'm...
[9] **Q:** What did you mean when you said a
[10] moment ago that it's better to be in my hands than
[11] his?
[12] **A:** Because I'm smarter than he is.
[13] **Q:** So, did you mean by that that he
[14] should leave decision-making to you —
[15] **A:** Correct.
[16] **Q:** Because you would make wiser
[17] decisions —
[18] **A:** Correct —
[19] **Q:** Than he would?
[20] **A:** Correct.
[21] **Q:** Okay. Is that a fair interpretation
[22] of what that —
[23] **A:** That's correct. And if Dave would
[24] have done it then I wouldn't be sitting here right
[25] now, which I'm glad, because I'm actually glad

Page 90

**Britto**

[1]
[2] this happened, because this has been eatin' me up
[3] for years, so —
[4] **Q:** Did you talk to Dave Adams at all
[5] after the State Police came to see you?
[6] **A:** No. I tried calling him, but he
[7] wouldn't pick up the phone.
[8] **Q:** Did you — you talked to Ron
[9] Mitchell after the State Police came?
[10] **A:** Yes.
[11] **Q:** And you've told us about that?
[12] **A:** Yes.
[13] **Q:** Okay. Now, you spoke to Mike Brown
[14] after the State Police?
[15] **A:** Yes.
[16] **Q:** What was it that you said to Mike
[17] Brown and what was it that he said to you?
[18] **A:** Well, Mike Brown told me that he's
[19] not working for CCC anymore —
[20] **Q:** Okay.
[21] **A:** Because they're downsizing, which I
[22] told Paul. I don't know if they're trying to
[23] hide, I asked, the Chinese tried to skip the
[24] country.
[25] **Q:** When you said you told Paul, do you

---

Page 91

*Britto*

[1]

[2] mean Mr. Klehm?

[3] A: Yes.

[4] Q: Okay. Did you ask Mr. Brown, in the

[5] conversation wherein he reported that he was no

[6] longer employed by CCC, how the circumstances of

[7] his termination of employment occurred?

[8] A: Yeah, I said they're downsizing.

[9] Q: Okay. Did Mr. Brown at all discuss

[10] whether or not he had had any communications with

[11] the State Police?

[12] A: Yes.

[13] Q: Okay. What did he say about that?

[14] A: He didn't say anything, he just said

[15] they came and seen him, that's it.

[16] Q: Okay.

[17] A: Because his lawyer advised him not

[18] to talk to me.

[19] Q: When you spoke to these three

[20] persons, Ron Mitchell, Mr. Brown and Mr. Williams,

[21] was it to inform them that the State Police had

[22] come to see you?

[23] A: Yes.

[24] Q: Okay. Was it to find out whether or

[25] not the State Police had come to see them?

---

Page 92

*Britto*

[1]

[2] A: Yes.

[3] Q: At the time that you spoke to

[4] Mr. Mitchell, had any State Police come to see

[5] him?

[6] A: No.

[7] Q: Okay. Did he specifically tell you

[8] that no State Police had come to see him yet —

[9] A: Yes.

[10] Q: If at all?

[11] A: Yes.

[12] Q: And with regard to Mr. Williams you

[13] already knew, at least at the time when you called

[14] with the State Police in your presence —

[15] A: They were there when the State —

[16] Q: That the State Police had come to

[17] see him?

[18] A: Yeah.

[19] Q: Do you know what, if anything,

[20] Mr. Williams did with the money that you gave to

[21] him that represents the fraud, his share of the

[22] fraudulent shipments?

[23] A: That's his own personal business.

[24] Q: Okay. Did he own a house at the time

[25] this fraudulent shipment scheme began?

---

Page 93

*Britto*

[1]

[2] A: No. He does now.

[3] Q: Did he own a house after?

[4] A: Yes.

[5] Q: Okay. Did you ever find out whether

[6] or not he used any of the monies to acquire that

[7] house?

[8] A: Oh, probably.

[9] Q: But you didn't explicitly discuss it

[10] with him?

[11] A: No.

[12] Q: Did Mr. Williams work at any job

[13] other than working for IFC?

[14] A: Yeah, he has a band, excuse me,

[15] drummer in a band.

[16] Q: Did you ever hear him play?

[17] A: Oh, yeah.

[18] Q: Did Mr. Adams ever work at any jobs

[19] other than as a buyer for IFC?

[20] A: Yeah, DGM. Burton Carpet, I think

[21] NATCO, too.

[22] Q: NATCO?

[23] A: I think so.

[24] Q: What is NATCO?

[25] A: That's who Peter Burnham worked for.

---

Page 94

*Britto*

[1]

[2] Q: Okay, and is that N-A-C-O?

[3] A: N-A-T-C-O and oriental, something.

[4] Bill can tell you.

[5] Q: Do you know whether or not he ever

[6] implemented a similar scheme at any of those

[7] enterprises?

[8] A: No.

[9] Q: Did you — have you ever heard of

[10] the following names: Diane Spignosi,

[11] S-P-I-G-N-O-S-I?

[12] A: Nope.

[13] Q: Okay. Rick Finley.

[14] A: Yes.

[15] Q: Who is Rick Finley?

[16] A: He's a salesman for Liberty Carpet.

[17] Q: Was Liberty Carpet ever one of those

[18] companies that —

[19] A: No.

[20] Q: — created a fraudulent shipment?

[21] A: No.

[22] Q: Okay. Do you know Rick Finley in

[23] any way to be a participant in the scheme that

[24] you've described today?

[25] A: No.

---

Page 95

**Britto**

[2] **Q:** Do you know a — was he asked to be

[3] involved?

[4] **A:** Not on my behalf, I mean.

[5] **Q:** Okay. Did Mr. Adams ever indicate

[6] that he was going to ask Mr. Finley to be

[7] involved?

[8] **A:** Not to my knowledge.

[9] **Q:** Okay. Have you ever heard of a

[10] company called Sinai Wholesalers?

[11] **A:** Yes.

[12] **Q:** Are they involved in any way?

[13] **A:** No.

[14] **Q:** Okay. Are they a real company?

[15] **A:** Yes.

[16] **Q:** Did IFC do business with them?

[17] **A:** Yes.

[18] **Q:** Okay. As far as you know, every

[19] shipment that came in from Sinai Wholesalers was a

[20] real shipment?

[21] **A:** Yes. Even Nick Adler bought from

[22] them, so.

[23] **Q:** Did you ever find out any

[24] information from any participant in the scheme to

[25] indicate whether or not the Suns knowingly

Page 96

**Britto**

[2] participated in creating fraudulent documents

[3] suggesting merchandise had been sent from CCC?

[4] **A:** Yes.

[5] **Q:** To IFC?

[6] **A:** Yes.

[7] **Q:** Okay. Who gave you the substance of

[8] that information first?

[9] **A:** David Sun.

[10] **Q:** David Sun. What was the occasion of

[11] your talking directly to David Sun where your

[12] previous dealings had been either with Mike Brown

[13] or through Dave Adams to Mike Brown?

[14] **A:** Because Dave Adams was robbing.

[15] **Q:** He was robbing you?

[16] **A:** Yes.

[17] **Q:** So when he was robbing you, you took

[18] it into your own hands to contact David Sun?

[19] **A:** Yes, because I controlled the

[20] warehouse, which was the most important part.

[21] **Q:** When you contacted David Sun what

[22] was it in your conversation or conversations with

[23] David Sun, to indicate to you that they were aware

[24] that they were knowingly creating documents to

[25] represent fictional shipments?

Page 97

**Britto**

[2] **A:** I have no idea.

[3] **Q:** But was that something that was

[4] discussed?

[5] **A:** Yes.

[6] **Q:** Okay. Did you ever —

[7] **A:** I was probably drunk at the time,

[8] so —

[9] **Q:** How did you obtain the information

[10] that caused you to conclude that David Adams was

[11] robbing you, as you've just put it?

[12] **A:** Because the money wasn't coming in.

[13] **Q:** And you knew that money should be

[14] coming in because you were aware of the shipments

[15] that came in that were really fictional?

[16] **A:** Correct.

[17] **Q:** Okay. Did you confront David Adams

[18] about the fact that no money was coming in even

[19] though shipments were?

[20] **A:** Over the phone, yes.

[21] **Q:** Now —

[22] **A:** Several times.

[23] **Q:** Okay. And you would do it over the

[24] phone because David Adams wasn't always in on a

[25] daily basis at IFC, is that correct?

Page 98

**Britto**

[2] **A:** Well, I was in New York.

[3] **Q:** Okay.

[4] **A:** He was in Massachusetts.

[5] **Q:** So this occurred after you had

[6] already left IFC?

[7] **A:** Correct.

[8] **Q:** Okay. What was David Adams'

[9] explanation for —

[10] **A:** Building 19's not paying their

[11] bills.

[12] **Q:** Okay.

[13] **A:** Which they were.

[14] **Q:** Okay. Now — and the way you found

[15] that out was by calling David Sun?

[16] **A:** Paul Sun and Ron Mitchell.

[17] **Q:** Okay. When you called and you spoke

[18] to Paul Sun and found out that IFC or Building 19

[19] was, in fact, paying their bills, did you ever

[20] reconfront David Adams?

[21] **A:** Ho, ho, ho, ho.

[22] **Q:** And what basically did you say to

[23] Adams and Adams say to you —

[24] **A:** I'm not gonna say what I said.

[25] **Q:** Okay, is that because it's harsh

Page 99

**Britto**

[1]
[2] language?
[3]    **A:** Yes.
[4]    **Q:** Okay, taking away the colorful
[5] language for the moment, in essence, what did you
[6] say to Dave Adams about the fact that you've now
[7] learned that IFC had, in fact, paid bills that
[8] Dave Adams had claimed IFC had not paid?
[9]    **A:** It was all colorful language.
[10]    **Q:** And what did Adams say upon your
[11] acquainting him with your discovery that he had
[12] lied to you?
[13]    **A:** He hung up.
[14]    **Q:** At that point what did you do?
[15]    **A:** Called him back and he didn't
[16] answer.
[17]    **Q:** So you're still without the money?
[18]    **A:** Yup.
[19]    **Q:** What steps if any do you take to get
[20] the money?
[21]    **A:** Then I called up Ron and the Suns
[22] and said, look, this is what's gonna happen, you
[23] don't give Dave the money anymore, it comes to me.
[24]    **Q:** And did Ron Mitchell send you money?
[25]    **A:** Yes.

Page 100

**Britto**

[1]
[2]    **Q:** Did Ron Mitchell ask you why the
[3] change in circumstances that he no longer sent to
[4] it to Dave?
[5]    **A:** Yes. And I told him because if he
[6] doesn't send it to me, the business stops — I
[7] controlled the warehouse, I could have stopped at
[8] any point and that's what Dave knew.
[9]    **Q:** Okay. So you indicated therefore, to
[10] Ron, that the business would stop if you didn't
[11] get paid. Did Ron understand from the
[12] circumstances in your phone call that the business
[13] that would stop would be the representation that a
[14] shipment came in when, in fact, it was fictional?
[15]    **A:** No.
[16]    **Q:** What was it that Ron thought was
[17] going to stop?
[18]    **A:** My commission.
[19]    **Q:** For actual shipments of rugs?
[20]    **A:** Yes.
[21]    **Q:** Okay. Had you had direct
[22] communication with Ron before this time when you
[23] called him?
[24]    **A:** No.
[25]    **Q:** Okay. How did you know that when you

Page 101

**Britto**

[1]
[2] called Ron, Ron would know that you participated
[3] in working for IFC in this regard in some way?
[4]    **A:** He didn't until I called.
[5]    **Q:** Okay.
[6]    **A:** I got the phone number from Tyrone,
[7] because he had it in my Rolodex from my old
[8] office.
[9]    **Q:** Okay. When you spoke to Ron about
[10] this, did you receive any shipments from Ron
[11] Mitchell, of money, after you spoke to him and
[12] said, hey, you got to send me the money, not Dave
[13] Adams, because I'm not getting paid and it's just
[14] gonna stop?
[15]    **A:** Yes. And let me go a little deeper.
[16] I told him because he's screwing over the vendors.
[17]    **Q:** Who's the he?
[18]    **A:** Dave Adams. He's screwing over the
[19] vendors, I said now they're gonna to stop doing
[20] business with us. I basically bullshitted the
[21] guy.
[22]    **Q:** So you lied to Ron Mitchell —
[23]    **A:** Yes.
[24]    **Q:** When you told him that Dave Adams
[25] was basically screwing over the vendors?

Page 102

**Britto**

[1]
[2]    **A:** Yes.
[3]    **Q:** You had no information to indicate
[4] that Dave Adams was, in fact, screwing over the
[5] vendors?
[6]    **A:** There wasn't any vendors.
[7]    **Q:** Okay. So you knew, in fact, that
[8] what you were saying was a lie?
[9]    **A:** Correct.
[10]    **Q:** Okay. And that lie was designed to
[11] make Mr. Mitchell send you some money —
[12]    **A:** Believe what I was saying.
[13]    **Q:** Okay. Now, you also called either
[14] David or Paul Sun directly with pretty much the
[15] same complaint, is that so?
[16]    **A:** Paul, I talked to Paul.
[17]    **Q:** Had you ever spoken to Paul Sun
[18] before this moment?
[19]    **A:** I seen him one time in a Vegas show.
[20]    **Q:** When you saw him in the Vegas show,
[21] did you ever discuss with him anything that made
[22] Paul Sun aware that you were participating with
[23] David Adams in a fraud in which CCC was also —
[24]    **A:** We weren't doing it then.
[25]    **Q:** Okay. So, how was it — did you

Page 103

**Britto**

[1]
[2] receive monies from CCC after calling Paul Sun?
[3]    A: Yes.
[4]    Q: Okay. And would you receive checks
[5] from CCC?
[6]    A: Yes.
[7]    Q: Did you also receive checks from Ron
[8] Mitchell after you called to tell him that Dave
[9] Adams was screwing over the vendors?
[10]    A: No, it was, actually got wired.
[11]    Q: Now — You mean like trick money was
[12] transferred in a wire transfer?
[13]    A: Um-hum.
[14]    Q: Okay. How would Ron Mitchell know
[15] how much to send you after your conversation with
[16] him?
[17]    A: I would tell him.
[18]    Q: So you would call him again and say
[19] you got to send me X-amount of money?
[20]    A: Let me give you an example.
[21] Because, now the number's not gonna
[22] be correct, but I'm going to give you an example.
[23] Let's say it's a 30,000-dollar shipment, cost
[24] 25,000 to convert the goods and buy them, the
[25] other 5,000 is commission for me and Dave or Dave

Page 104

**Britto**

[1]
[2] and myself, and the money they loaned, they get
[3] their interest.
[4]    Q: Now, so, when that would happen, did
[5] Mr. Mitchell — using the hypothetical for the
[6] moment, I'm not saying those are the real
[7] figures — he would then receive a phone call from
[8] you that you're to send me a check for $5,000 less
[9] the commission?
[10]    A: Wire the money, right.
[11]    Q: Am I right that it would be less the
[12] commission?
[13]    A: Yes.
[14]    Q: So let's assume the commission was
[15] about a fifth of the total amount, you would then
[16] get a wire transfer of $4,000, is that correct?
[17] Yes?
[18]    A: No.
[19]    Q: On the hypothetical?
[20]    A: Once they paid the bill, then I
[21] would get my commission.
[22]    Q: You mean once Building 19 would pay
[23] the bill?
[24]    A: Correct.
[25]    Q: So what happened with regard to the

Page 105

**Britto**

[1]
[2] commissions that you were supposed to get, the
[3] monies you were supposed to get, that Dave Adams
[4] had stiffed you on, that you didn't get?
[5]    A: Never got it.
[6]    Q: Okay. So those were lost until you
[7] picked up the phone and arranged now that you were
[8] to get payment instead of Dave Adams?
[9]    A: Yes.
[10]    Q: And when that happened did you ever
[11] share any of those monies you received with Dave
[12] Adams?
[13]    A: One time I did.
[14]    Q: But other than that you would keep
[15] it and would you share any of those monies with
[16] Tyrone Williams?
[17]    A: Yes.
[18]    Q: Okay. Now, did you ever share any of
[19] those monies with Mike Brown?
[20]    A: A little bit.
[21]    Q: Okay. You would receive the check
[22] from CCC, is that correct, after your conversation
[23] with Paul Sun?
[24]    A: Um-hum.
[25]    Q: How would —

Page 106

**Britto**

[1]
[2]    MR. KLEHM: Is that a yes?
[3]    Q: That's a yes?
[4]    A: Yes.
[5]    Q: Okay. How would Paul Sun know how
[6] much money he was to send you?
[7]    A: Percentage breakdown.
[8]    Q: So that would be on his own invoices
[9] that he sent out?
[10]    A: Um-hum. Yes.
[11]    Q: Okay. How would you know that the
[12] amount of money Paul Sun was sending you after you
[13] had called to complain that Dave Adams was
[14] stiffing you was an accurate amount, that you
[15] weren't being gypped by CCC?
[16]    A: I trusted them.
[17]    Q: Did you ever share any of the monies
[18] you received from CCC with Dave Adams?
[19]    A: I don't think so.
[20]    Q: Did you ever share any of the monies
[21] that you received with Tyrone Williams?
[22]    A: Yes.
[23]    Q: From CCC?
[24]    A: Yes.
[25]    Q: And did you ever share any of those

Page 107

**Britto**

[1]
[2] monies from CCC with, that you received from them
[3] with Michael Brown?
[4] A: Yes.
[5] Q: Okay. Now, how would you determine
[6] how much of the monies that came to you from CCC
[7] should go to Tyrone Williams?
[8] A: He would get so much on a key rec.
[9] Q: Was that a flat sum?
[10] A: Yeah.
[11] Q: How much money was that?
[12] A: 1500.
[13] Q: Per key rec?
[14] A: Yes.
[15] Q: And would that be on average of once
[16] a month?
[17] A: Yes.
[18] Q: Okay. Would it be more often than
[19] once a month?
[20] A: Sometimes.
[21] Q: And —
[22] A: Sometimes it wouldn't — sometimes
[23] they were dry, there wouldn't be anything. Back
[24] to school, there was obviously more, that's our
[25] busy season.

Page 108

**Britto**

[1]
[2] Q: How would you determine what amount
[3] of the money you received from CCC should go to
[4] Michael brown?
[5] A: Whatever I felt like giving him.
[6] For the longest time Dave was supposed to be
[7] paying him, but he stiffed him.
[8] Q: Okay.
[9] A: So when I found that out I started
[10] giving it, you know.
[11] Q: So you found out that David Adams
[12] was not only stiffing you, but he was stiffing
[13] Michael Brown?
[14] A: Correct.
[15] Q: Do you have any knowledge as to
[16] whether or not the period of time that Michael
[17] Brown was being stiffed overlapped or was similar
[18] to the period of time you were being stiffed?
[19] A: No.
[20] Q: Okay. Now, what percentage were you
[21] getting from CCC?
[22] A: 22 percent, I believe it is.
[23] Q: And that was for every shipment that
[24] was fraudulent?
[25] A: And the real ones.

Page 109

**Britto**

[1]
[2] Q: Okay. 22 percent of what?
[3] A: The total invoice.
[4] Q: Okay.
[5] A: On the real ones there wasn't much
[6] to get, but.
[7] Q: Okay. Now, with regard to the other
[8] companies that caused fictional paperwork to come
[9] into IFC on which they paid, was that also the
[10] amount, 22 percent?
[11] A: Yeah all three of them were CCC, I
[12] mean.
[13] Q: Did you ever discuss with David
[14] Adams how he selected CCC to be the company that
[15] should be sending in the bulk of the fictional
[16] shipments?
[17] A: No.
[18] Q: Okay. Did — were you ever at Dave
[19] Adams' home?
[20] A: One time.
[21] Q: Okay. What were the circumstances
[22] over that?—
[23] A: I just happened to be into Building
[24] store, I went by there.
[25] Q: At the time that you complained to

Page 110

**Britto**

[1]
[2] David Adams that you were being stiffed by him —
[3] A: There was a lot of times.
[4] Q: Well, on the various occasions that
[5] you were complaining about it, did you live,
[6] during that period of time, solely in New York?
[7] A: No, Massachusetts.
[8] Q: In Massachusetts was there ever a
[9] time when you were angry enough with the way you
[10] were being treated that you went over to his
[11] house?
[12] A: Oh, no, never.
[13] Q: Never confronted him, okay.
[14] Do you know whether or not in any
[15] completely fraudulent shipment that CCC sent in,
[16] when you or David Adams allegedly got 22 percent
[17] of that, did CCC keep the other 78 percent?
[18] A: Not to my knowledge.
[19] Q: What — do you know what happened to
[20] the 78 percent, some or all of it?
[21] A: I have no idea. I know he stiffed
[22] them, too, Dave Adams.
[23] Q: And in what way did he stiff them?
[24] A: He owed them like 35,000 or some
[25] shit.

Page 111

*Britto*

[1]
[2] **Q:** Okay. So, that was during a period
[3] where CCC would pay David Adams up front, is that
[4] correct?
[5] **A:** I'm not sure what happened — I
[6] think he borrowed the money, actually.
[7] **Q:** He borrowed money from CCC?
[8] **A:** Yeah.
[9] **Q:** And never paid it back?
[10] **A:** Correct.
[11] **Q:** Okay. Do you know the circumstances
[12] of their borrowing, how it occurred?
[13] **A:** Yeah, it was probably his gambling
[14] problem.
[15] **Q:** Do you know roughly when that
[16] occurred?
[17] **A:** 2000 — 2000. Or 2001, one of those
[18] two years.
[19] **Q:** Have you ever had any conversation
[20] with Michael Brown as to why he went along with
[21] the scheme?
[22] **A:** Not really.
[23] **Q:** Have you ever had any conversation
[24] with Tyrone Williams as to why he went along with
[25] the scheme?

Page 112

*Britto*

[1]
[2] **A:** Yeah, I probably forced him into it.
[3] **Q:** Okay.
[4] **A:** I mean, he's a man, he makes his own
[5] decisions, but, I persuaded him.
[6] **Q:** When, when did you first learn that
[7] Mr. David Adams had a gambling problem?
[8] **A:** Oh, I have no idea.
[9] **Q:** Was it before he talked about this
[10] scheme in which you and he could make some money?
[11] **A:** I have no idea.
[12] **Q:** But at some point you did learn that
[13] he had that problem?
[14] **A:** Yeah.
[15] **Q:** Can you explain to us, if you know,
[16] why after your phone call, Ronald Mitchell would
[17] start sending money directly to you?
[18] **A:** Cause I told him the business would
[19] stop.
[20] **Q:** But in the business that would stop,
[21] he was putting up-front money, is that correct?
[22] **A:** Correct.
[23] **Q:** Do you know how much in actual
[24] dollars the stoppage of business meant to
[25] Mr. Mitchell?

Page 113

*Britto*

[1]
[2] **A:** No idea.
[3] **Q:** How much money did Mr. Mitchell send
[4] you after you had this communication with him?
[5] **A:** No idea.
[6] **Q:** Are we talking about thousands?
[7] **A:** Yeah, definitely.
[8] **Q:** Okay. Are we talking about more than
[9] 50,000?
[10] **A:** Probably.
[11] **Q:** Do you think we're talking about
[12] more than a hundred thousand?
[13] **A:** Maybe.
[14] **Q:** And what percentage interest was
[15] Mr. Mitchell getting for having loaned the money
[16] up front to Mr. Adams?
[17] **A:** That's between him and Dave, I have
[18] no idea — Dave Adams.
[19] **Q:** Did you ever — another water?
[20] **A:** Thank you. Should have put a mini
[21] bar up in here.
[22] **Q:** Did you ever, while you were working
[23] for IFC, accompany David Adams on any buying trip?
[24] **A:** One time, yes.
[25] **Q:** Where did you go with David Adams?

Page 114

*Britto*

[1]
[2] **A:** Georgia.
[3] **Q:** And what company or companies did
[4] you visit?
[5] **A:** Burton, Georgia Rug Mills. That was
[6] it, actually.
[7] **Q:** Were those legitimate transactions?
[8] **A:** Yes.
[9] **Q:** Let me ask you, in terms of your
[10] background, how far did you go in education?
[11] **A:** High school.
[12] **Q:** Okay. And what high school was
[13] that?
[14] **A:** New Bedford High School.
[15] **Q:** Okay. Have you ever been a member of
[16] the military?
[17] **A:** No.
[18] **Q:** Okay. And after New Bedford High
[19] School did you get out when you were around 18,
[20] 19?
[21] **A:** 18.
[22] **Q:** And what kind of experience did you
[23] have in the rug buying business before you joined
[24] IFC?
[25] **A:** Nothing.

Page 115

*Britto*

[1]
[2]    **Q:** Okay. How did you obtain the job at
[3] IFC?
[4]    **A:** Part time kid in school.
[5]    **Q:** So you worked for them in New
[6] Bedford while you were going to school?
[7]    **A:** Yes.
[8]    **Q:** Okay. And when you first came
[9] aboard IFC in what capacity were you employed by
[10] them? Meaning what kind of work did you do when
[11] you first came aboard?
[12]    **A:** Unloading trailers, you know,
[13] tagging rugs.
[14]    **Q:** When you graduated did you continue
[15] to work for IFC at that point?
[16]    **A:** Yes.
[17]    **Q:** Okay. And when you continued to
[18] work for them how long was it before you became a
[19] buyer for IFC?
[20]    **A:** June of 1993 when Bill became the
[21] president.
[22]    **Q:** So, by that point you'd been working
[23] for them about how long?
[24]    **A:** Five years.
[25]    **Q:** During the five years what other

Page 116

*Britto*

[1]
[2] positions did you have from unloading?
[3]    **A:** Supervisor of the warehouse —
[4]    **Q:** Okay.
[5]    **A:** When I graduated.
[6]    **Q:** Okay. Now, did anyone teach you how
[7] to evaluate the rugs that you were buying when you
[8] first became a buyer?
[9]    **A:** No.
[10]    **Q:** Okay. Did you simply go out on your
[11] own to buy rugs?
[12]    **A:** Well, Bill showed me a little bit,
[13] but I kind of got thrown out there.
[14]    **Q:** Okay. And when Bill showed you a
[15] little bit, did he ever take you around to
[16] purchase rugs?
[17]    **A:** Excuse me, I didn't —
[18]    **Q:** When Bill showed you a little bit,
[19] did he ever take you around to purchase rugs?
[20]    **A:** Never.
[21]    **Q:** Okay. Did he simply sit down with
[22] you and point out the pluses and the minuses of
[23] buying rugs and —
[24]    **A:** Yes.
[25]    **Q:** — how you should conduct yourself

Page 117

*Britto*

[1]
[2] in that business?
[3]    **A:** Yes.
[4]    **Q:** And did he supervise your buying
[5] techniques and acquisitions when you first went
[6] out and did those?
[7]    **A:** Yes.
[8]    **Q:** How long did it take you before you
[9] felt you were proficient at acquiring rugs for
[10] IFC?
[11]    **A:** I was proficient before I got the
[12] buying job.
[13]    **Q:** And is that partially because you
[14] were able to evaluate the worth of what was being
[15] unloaded from the trucks?
[16]    **A:** Correct.
[17]    **Q:** Did you ever have discussions with
[18] Mr. Elovitz or anyone else at IFC about whether
[19] they were good merchandise they were getting in or
[20] bad merchandise they were getting in?
[21]    **A:** Yes.
[22]    **Q:** Did you ever have any conversations
[23] with Mr. Elovitz about merchandise being bad
[24] enough that you didn't think it was sellable or
[25] salable by any Building 19 outlet or IFC?

Page 118

*Britto*

[1]
[2]    **A:** I'm not sure.
[3]    **Q:** Okay. In any event, did you continue
[4] to get raises?
[5]    **A:** Yes.
[6]    **Q:** And when you left, at the conclusion
[7] of your first stay with IFC, did you make it known
[8] to Mr. Elovitz that one of the reasons you were
[9] leaving was to try to get rid of your addictions?
[10]    **A:** No, I let him know afterwards.
[11]    **Q:** How bad was your addiction at the
[12] time you left to try to get rid of it?
[13]    **A:** Bad enough to leave a job that I
[14] loved.
[15]    **Q:** And were there two different forms
[16] of addiction, both Oxycontins and —
[17]    **A:** No, back then it was Percocets and
[18] blues.
[19]    **Q:** Now, what is the state of your
[20] health today with regard to the addiction that you
[21] have and the alcohol problem that you have?
[22]    **A:** Well, the pills are gone. I'm still
[23] trying to get myself off the alcohol but, I get
[24] anxiety, and I can't take anxiety pills because it
[25] messes with the liver. So I, drinking is the same

Page 119

**Britto**

[1]
[2] thing, but, I'm still drinking, so.
[3]   **Q:** Now, are you addicted to alcohol?
[4]   **A:** Yes.
[5]   **Q:** Has your addiction to alcohol,
[6] Percocets or Oxycontins affected your ability to
[7] think?
[8]   **A:** Most likely.
[9]   **Q:** Are you fully able to understand
[10] what's going on here today?
[11]   **A:** Yes.
[12]   **Q:** Okay. Has it, any of those
[13] addictions affected your ability to tell the truth
[14] here today?
[15]   **A:** No.
[16]   **Q:** Have you had any alcohol in your
[17] system today before you came here today?
[18]   **A:** Yes.
[19]   **Q:** Okay. And do you feel that
[20] throughout your deposition at any time there was a
[21] time when you were not fully sober for purposes of
[22] taking the deposition?
[23]   **A:** Oh, I'm sober right now.
[24]   **Q:** Okay. How much alcohol did you have
[25] today before you came to the deposition?

Page 120

**Britto**

[1]
[2]   **A:** Two drinks.
[3]   **Q:** And what is the nature of what you
[4] drink, is it beer or wine or —
[5]   **A:** Whiskey.
[6]   **Q:** Whiskey. And when you say two
[7] drinks, are we talking about a normal size drink
[8] in a restaurant?
[9]   **A:** Yeah, like a (indicating).
[10]   **Q:** Okay. Have you had — when did you
[11] cease any ingestion of drugs for the purposes of
[12] an addiction to drugs?
[13]   **A:** When I went to the hospital back in
[14] July.
[15]   **Q:** So you haven't had any drugs since?
[16]   **A:** None, nope.
[17]   **Q:** Are you on any medications,
[18] prescriptive medications?
[19]   **A:** Oh, a whole bunch.
[20]   **Q:** Okay. Do any of them affect your
[21] ability to think?
[22]   **A:** Yes.
[23]   **Q:** Okay. Can you tell us which
[24] medicines you're on —
[25]   **A:** No.

Page 121

**Britto**

[1]
[2]   **Q:** — that affect your ability to
[3] think?
[4]   **A:** I...
[5]   **Q:** Okay. Are any of them
[6] antidepressant pills like Prozac or Celexa or
[7] things of that nature?
[8]   **A:** Well, I used to take Ativan.
[9]   **Q:** And do any of those, to your
[10] knowledge, impair your memory?
[11]   **A:** I think so. I'm not sure.
[12]   **Q:** Have you ever discussed it with your
[13] doctor? Just yes or no to that.
[14]   **A:** No.
[15]   **Q:** Okay. Now, were there any writings
[16] between David Adams and yourself at all that
[17] relate to the fraudulent scheme that you've
[18] described today?
[19]   **A:** Most likely.
[20]   **Q:** Do you still have any of those
[21] writings in your possession?
[22]   **A:** Hell, no.
[23]   **Q:** Okay. What were the occasions, if
[24] you could remember, under which the writings were
[25] produced?

Page 122

**Britto**

[1]
[2]   **A:** Well, we would go over orders that
[3] had to be placed.
[4]   **Q:** Okay. And would you keep copies of
[5] the ones that had to be placed?
[6]   **A:** Until it got shipped, correct.
[7]   **Q:** And where did you maintain those
[8] when you kept them, was it at your home, or —
[9]   **A:** Yes.
[10]   **Q:** Okay. Did Mr. Adams also keep copies
[11] of those?
[12]   **A:** I don't think so.
[13]   **Q:** Okay. And at some time did you
[14] cause those to be destroyed or?
[15]   **A:** Oh, definitely. Get rid of the
[16] evidence.
[17]   **Q:** And how would you get rid of them?
[18]   **A:** Garbage.
[19]   **Q:** Just rip them up and throw them
[20] away?
[21]   **A:** When I had my house, I would put
[22] them in the fireplace.
[23]   **Q:** Okay. Now, once the shipments would
[24] be accomplished, meaning that IFC would have
[25] okayed them or paid for them, why, at that point,

Page 123

*Britto*

[1]
[2] would you destroy them?
[3]    **A:** There's no need for it.
[4]    **Q:** Did you find at a certain point that
[5] you needed them to keep track of what Dave Adams
[6] should be paying you?
[7]    **A:** No.
[8]    **Q:** Did — when Ron Mitchell sent you
[9] the monies, did he wire it to a particular bank
[10] account?
[11]    **A:** Citizens.
[12]    **Q:** So did you give Mr. Mitchell a
[13] specific bank number?
[14]    **A:** Well, obviously, if he —
[15]    **Q:** An account number?
[16]    **A:** Obviously, if he wired it, he needed
[17] an account number.
[18]    **Q:** Was that account number in your
[19] name, Kevin Britto?
[20]    **A:** Yes.
[21]    **Q:** Do you know how many wire transfers
[22] were made?
[23]    **A:** I have no idea.
[24]    **Q:** Do you know the period of time over
[25] which it was made?

Page 124

*Britto*

[1]
[2]    **A:** No idea.
[3]    **Q:** Do you still have any bank records
[4] showing the deposits of those sums of money into
[5] your bank account?
[6]    **A:** No, I don't.
[7]    **Q:** Okay. Do you still have the bank
[8] account at Citizens Bank?
[9]    **A:** No, I just closed it.
[10]    **Q:** Would you be willing to give us
[11] permission, on appropriate documents, to secure
[12] copies of the bank statements showing those
[13] deposits in?
[14]    **A:** Yes.
[15]    **Q:** Okay. Would you also be willing to
[16] identify for us, if we sat down with those
[17] documents, which ones you believed to have been
[18] deposits made through wire transfers from
[19] Mr. Mitchell?
[20]    **A:** Yes.
[21]    **Q:** Okay. Now, did you have or ever see
[22] any documents concerning any loans from REM,
[23] Remco, or Ron Mitchell or Jane Dziemit, to David
[24] Adams?
[25]    **A:** I haven't seen anything, no.

Page 125

*Britto*

[1]
[2]    **Q:** Okay. Did Mr. Mitchell —
[3]    **A:** I'm aware of —
[4]    **Q:** You're aware of what?
[5]    **A:** — a loan.
[6]    **Q:** Okay. Through a writing?
[7]    **A:** I haven't seen it, but just.
[8]    **Q:** So somebody told you?
[9]    **A:** Yes.
[10]    **Q:** Okay. Who told you of that loan?
[11]    **A:** Ron Mitchell.
[12]    **Q:** And when did he tell you of it?
[13]    **A:** I don't know.
[14]    **Q:** Was it before or after the State
[15] Police came to visit you?
[16]    **A:** Before.
[17]    **Q:** Okay.
[18]    **A:** Way before.
[19]    **Q:** Was it before or after you called
[20] Mr. Mitchell complaining that —
[21]    **A:** Before.
[22]    **Q:** — Dave Adams stiffed you?
[23]    **A:** Before.
[24]    **Q:** Okay. What was that occasioned
[25] your having contact with Mr. Mitchell about a loan

Page 126

*Britto*

[1]
[2] before you called to complain that Dave Adams was
[3] stiffing you?
[4]    **A:** Because he needed money for a
[5] bookie.
[6]    **Q:** Because Dave Adams needed money for
[7] a bookie?
[8]    **A:** Yes, Dave Adams needed money for a
[9] bookie.
[10]    **Q:** How did you know that Dave Adams
[11] secured the money loan to pay off the gambling
[12] debt from Mr. Mitchell as opposed to from someone
[13] else?
[14]    **A:** Through fraudulent receivings.
[15]    **Q:** Well, you indicated that
[16] Mr. Mitchell and you had discussed this, is that
[17] correct, in a phone call before the State Police
[18] ever called and before — contacted you, and
[19] before you called Mr. Mitchell to complain that
[20] Dave Adams was stiffing you?
[21]    **A:** About the loan.
[22]    **Q:** Yes.
[23]    **A:** Yes.
[24]    **Q:** Okay. Can you tell us, as best as
[25] you can recall, what the conversation was that you

Page 127

**Britto**

[1]
[2] had with Mr. Mitchell, what he said to you and
[3] what you said to him about that loan?
[4]    **A:** I called him up, telling him about
[5] Dave's stiffing, blah, blah, blah, you know,
[6] vendors are calling up because he's not paying
[7] 'em, and then he said, yeah, Dave called up New
[8] Year's Eve or January something, and he was
[9] gamblin' and he asked for a loan, and I said yeah,
[10] well, you're not gonna get that money back.
[11]    **Q:** When you say January, are we talking
[12] about '05?
[13]    **A:** 2000 or 2001.
[14]    **Q:** 2000 to 2001, okay.
[15]    **A:** I believe, I'm not sure, but.
[16]    **Q:** Did you, in that conversation, make
[17] Mr. Mitchell aware of the purpose of his loan,
[18] namely to help David Adams defray his gambling
[19] debt?
[20]    **A:** No.
[21]    **Q:** Okay. What was it that caused you
[22] and Mr. Mitchell to discuss that Mr. Mitchell had
[23] loaned money to David Adams?
[24]    **A:** Because I was pissed off at Dave and
[25] he was too, cause he wasn't getting his money

Page 128

**Britto**

[1]
[2] back.
[3]    **Q:** Okay. You wrote a letter to Bill
[4] Elovitz about a couple of months ago, is that
[5] correct?
[6]    **A:** Correct.
[7]    **Q:** And in that letter you indicated
[8] that your liver was functioning approximately five
[9] percent of capacity, is that correct?
[10]    **A:** Correct.
[11]    **Q:** Can you tell us what the state of
[12] your health is today?
[13]    **A:** Well, once I get this over with, I'm
[14] going to doctor, I'll find out even better then.
[15]    **Q:** Has any doctor and you — just yes
[16] or no to this — discussed any prognosis for you
[17] as to whether or not you can be restored to
[18] completely good health?
[19]    **A:** Yes, a whole bunch of doctors.
[20]    **Q:** Okay. Has any doctor indicated to
[21] you how long you've got to live or estimated your
[22] life span?
[23]    **A:** No, but they want me to get a
[24] transplant which is going to take six months, and
[25] I don't have $100,000 to get a liver, so. Plus, I

Page 129

**Britto**

[1]
[2] don't want to put myself through that anyways.
[3]    **Q:** So have they indicated that if you
[4] do not have a liver transplant you would be
[5] shortening your own life?
[6]    **A:** Yes.
[7]    **Q:** Have they indicated how long without
[8] a liver transplant?
[9]    **A:** Well, they said if I had one more
[10] drink I'd be dead. I've had plenty after that.
[11]    **Q:** Okay. So, in short, you've learned
[12] that doctors are not always accurate?
[13]    **A:** Yes, just like lawyers aren't
[14] either.
[15]    **Q:** Do you know whether or — did Ron
[16] Mitchell ever discuss with you that he thought
[17] that all of the money that he'd sent to Dave Adams
[18] was legitimate?
[19]    **A:** Yes.
[20]    **Q:** Did that include the loan that he
[21] made on or about New Year's Eve?
[22]    **A:** That I have no idea.
[23]    **Q:** But in any event, from 2000, on,
[24] based on your conversation with him, Mr. Mitchell
[25] would have known that Mr. Adams was a gambler who

Page 130

**Britto**

[1]
[2] borrowed money that he was unlikely to repay, is
[3] that correct?
[4]    **A:** Yes.
[5]    **Q:** And you had that conversation with
[6] Mr. Mitchell at a time when Mr. Mitchell was
[7] commenting to —
[8]    **A:** It was 2002.
[9]    **Q:** — commented to you that he hadn't
[10] been paid monies that he was owed by Dave Adams?
[11]    **A:** Correct.
[12]    **Q:** Just as you told Mr. Mitchell you
[13] weren't getting paid by Dave Adams what you were
[14] supposed to be getting paid?
[15]    **A:** Correct.
[16]    **Q:** Okay. Now, when he, Mr. Mitchell,
[17] started sending you wire transfers, did he ask you
[18] to sign any documents at all indicating that you
[19] were getting paid monies?
[20]    **A:** No.
[21]    **Q:** Okay. Do you know from any
[22] conversation you ever had with either Mr. Mitchell
[23] or Mr. Adams that Mr. Mitchell told Mr. Adams that
[24] he was now sending monies he otherwise would have
[25] been sending to Mr. Adams to Mr. Britto, to you?

Page 131

***Britto***

[1]
[2]   **A:** Yes, I believe.

[3]   **Q:** Okay. Did Mr. Mitchell tell you

[4] that he had this conversation with Mr. Adams?

[5]   **A:** Yes, I believe.

[6]   **Q:** Okay. How long after you spoke to

[7] Mr. Mitchell and complained that Dave Adams was

[8] stiffing you, had learned that Dave Adams was not

[9] paying back Mr. Mitchell, how long after that was

[10] it when you had the conversation with Mr. Mitchell

[11] where he informed you that he had told Adams that

[12] he was now sending the money to you, not to

[13] Mr. Adams?

[14]   **A:** I'm not sure. Probably within 30

[15] days.

[16]   **Q:** Did you ever have any conversations

[17] with Dave Adams following that period of time that

[18] you learned from Mr. Mitchell that Mitchell told

[19] Adams, hey, I'm sending the money to Kevin Britto

[20] now, I'm no longer giving it to you?

[21]   **A:** Say that again?

[22]   **Q:** Did you ever have any conversation

[23] with David Adams after —

[24]   **A:** Yes.

[25]   **Q:** — Mr. Mitchell told you that

Page 132

***Britto***

[1]
[2] Mitchell said to Adams, hey, I'm sending the money

[3] to Kevin Britto, I'm no longer sending it to you,

[4] David Adams?

[5]   **A:** Yes.

[6]   **Q:** Okay. When you had that conversation

[7] with David Adams, what was that conversation?

[8]   **A:** I'm not gonna say it on tape.

[9]   **Q:** Okay. So, are we back to terrible

[10] language again?

[11]   **A:** Yep.

[12]   **Q:** Okay. Did Mr. Adams —

[13]   **A:** I feel like I'm taking a fuckin'

[14] test here. Pardon my language, ladies.

[15]   **Q:** Is that what was said?

[16]   **A:** No, I'm saying this now, with all

[17] these questions.

[18]   **Q:** Okay. Did David Adams swear at you?

[19]   **A:** Well, probably.

[20]   **Q:** Okay. Did he indicate that he wanted

[21] his share?

[22]   **A:** Yes.

[23]   **Q:** Okay. What did he say about that?

[24]   **A:** Oh, I cant'.

[25]   **Q:** You don't remember?

Page 133

***Britto***

[1]
[2]   **A:** No.

[3]   **Q:** Did you send him any?

[4]   **A:** Yeah.

[5]   **Q:** Were you at all worried in your

[6] relationship with David Adams at this point that

[7] he might spill the beans and get you in trouble?

[8]   **A:** Never.

[9]   **Q:** Did David Adams ever express any

[10] worry that when he was stiffing you, as you

[11] accused him of, that you would go whistle to the

[12] cops?

[13]   **A:** Yes.

[14]   **Q:** Okay. Was that something you said

[15] to him?

[16]   **A:** Yes.

[17]   **Q:** Okay. And what did he say in

[18] response? Did he threaten you or try to talk you

[19] out of it?

[20]   **A:** Oh, he's not gonna threaten me, but,

[21] what exactly did he say. Oh, if I go down, you're

[22] going down. I said, pardon my language, I don't

[23] give a fuck. Alls it may seem, my loyalty's to

[24] Bill, not these other, people.

[25]   **Q:** Were you at all worried when you

Page 134

***Britto***

[1]
[2] told Ron Mitchell to send you the money instead of

[3] Adams that, Mr. Mitchell, who up to this point

[4] thought that all the moneys that he was laying out

[5] were legitimate, would suddenly think that it was

[6] not legitimate?

[7]   **A:** No. I mean, I bullshitted him, I'll

[8] admit it.

[9]   **Q:** Did Mr. Mitchell ever indicate to

[10] you in this conversation that he thought this was

[11] unusual or strange?

[12]   **A:** Yes.

[13]   **Q:** Okay. And —

[14]   **A:** And that's when the bullshit came

[15] in.

[16]   **Q:** Well, can you explain to us what it

[17] was that you said that eased his suspicions

[18] sufficiently to have Mr. Mitchell send by wire

[19] transfer, monies directly to you?

[20]   **A:** I said it earlier.

[21]   **Q:** Okay. Now, at this time, did

[22] Mr. Mitchell know that you were no longer

[23] associated with IFC?

[24]   **A:** Yes.

[25]   **Q:** Okay. Did Mr. Mitchell — sorry.

Page 135

**Britto**

[1]

[2] Did Mr. Adams ever indicate to you that he was

[3] aware that you had spoken with Mr. Mitchell about

[4] being stiffed by Dave Adams?

[5]   **A:** Yes.

[6]   **Q:** Okay. And was that one of the

[7] unpleasant conversations that you mentioned

[8] earlier?

[9]   **A:** Oh, yeah, there was plenty of 'em.

[10]   **Q:** Now, how soon after you had this

[11] conversation with Mr. Mitchell whereby you tried

[12] to persuade him that it was okay to send you a

[13] wire transfer, did you receive your first wire

[14] transfer?

[15]   **A:** No idea.

[16]   **Q:** Okay, and when you received it, did

[17] you call to let Mr. Mitchell know that you

[18] received it?

[19]   **A:** I believe so.

[20]   **Q:** Now, you indicated in earlier

[21] conversation using a hypothetical, that it would

[22] be roughly out of a 5,000-dollar transaction for

[23] the shipment, it would be about $4,000, is that

[24] correct, because he would be taking his commission

[25] or interest?

Page 136

**Britto**

[1]

[2]   **A:** Oh, okay, yeah.

[3]   **Q:** Is that right?

[4]   **A:** Yes.

[5]   **Q:** Now, do you have any memory of the

[6] first — of the actual sum of money you received

[7] from Mr. Mitchell for wire transfer to you?

[8]   **A:** No, I don't.

[9]   **Q:** Okay. Did Mr. Mitchell ever call you

[10] to find out whether you received it?

[11]   **A:** Yes.

[12]   **Q:** Okay. And had you, by the time he

[13] called you, received it?

[14]   **A:** Sometimes yes, sometimes no.

[15]   **Q:** Did he ask you whether or not you

[16] were going to be paying Dave Adams any money out

[17] of it?

[18]   **A:** Maybe, I'm not sure.

[19]   **Q:** Did you pay Ron Mitchell back any

[20] money for any of the loans?

[21]   **A:** No.

[22]   **Q:** So as far as you knew, Mr. Mitchell

[23] suffered the loss of repayment when David Adams

[24] didn't repay him, is that correct?

[25]   **A:** Correct, yes.

Page 137

**Britto**

[1]

[2]   **Q:** Okay. Did you ever discuss with Dave

[3] Adams whether or not Mr. Mitchell was going to get

[4] paid after he told you that he had, like you, been

[5] stiffed by Dave Adams?

[6]   **A:** Yes.

[7]   **Q:** And what did Adams say about that?

[8]   **A:** He'll get paid.

[9]   **Q:** Did you ask Adams how?

[10]   **A:** No.

[11]   **Q:** Okay. Did Mr. Mitchell ever contact

[12] you seeking repayment of the loans?

[13]   **A:** I don't believe so.

[14]   **Q:** Did he ever in any conversation with

[15] you ask you whether or not you could try to

[16] prevail upon Dave Adams to repay it?

[17]   **A:** Probably, yes.

[18]   **Q:** Do you have a memory of that? You

[19] say probably, but it's important to know whether

[20] you have some memory of it or no memory of it.

[21]   **A:** Most likely, because I'm an

[22] aggressive person, so.

[23]   **Q:** Okay. Do you know a person by the

[24] name of Debbie Meyers?

[25]   **A:** Accounts payable, right?

Page 138

**Britto**

[1]

[2]   **Q:** Yes. Did you have any contact with

[3] her about any of the fraudulent shipments?

[4]   **A:** No.

[5]   **Q:** Okay. Do you know whether or not she

[6] ever had any suspicions that something was wrong?

[7]   **A:** I have no idea.

[8]   **Q:** Did she ever discuss with you or

[9] hint with you that there were suspicions?

[10]   **A:** No.

[11]   **Q:** Did you ever have direct

[12] conversation or communication with Debbie Meyers

[13] in, within your job employment?

[14]   **A:** Yes.

[15]   **Q:** Okay. And what would be the nature

[16] of the communications that you would have with

[17] her?

[18]   **A:** Well, when I had to sign the

[19] invoices, or if there was a key rec late, she

[20] would call.

[21]   **Q:** So, under what —

[22]   **A:** Or if she needed a purchase order,

[23] stuff like that.

[24]   **Q:** Now, on some of the slips that we

[25] have seen there is language written to indicate

Page 139

*Britto*

[2] that in order for her to take advantage of certain

[3] discounts in a timely fashion, she needs the buyer

[4] to sign off on the document.

[5]   **A:** Yes.

[6]   **Q:** Do you recall any such transactions

[7] where she asked you to you sign off on such

[8] documents?

[9]   **A:** Yes.

[10]   **Q:** Okay. And did you do so?

[11]   **A:** Sometimes.

[12]   **Q:** Okay. Were there times when you did

[13] not?

[14]   **A:** Yeah, because I didn't feel like

[15] going to the main office.

[16]   **Q:** Okay. So in order to do that you

[17] would have to come into the main office to sign?

[18]   **A:** Yes.

[19]   **Q:** How frequently would you have

[20] contact with Debbie Meyers?

[21]   **A:** Only when there was a problem or I

[22] had to go sign. When I did advertising I used to

[23] go home and sign all my paperwork.

[24]   **Q:** Did you have any discounts that were

[25] added on to the paperwork relating to fraudulent

Page 140

*Britto*

[2] shipments?

[3]   **A:** Yes.

[4]   **Q:** Okay. So, in order to make a

[5] fraudulent shipment look like a legitimate

[6] shipment you would sometimes tell the shipping

[7] company to add in onto their paperwork 2 percent

[8] discount if paid within ten days or something like

[9] that?

[10]   **A:** Because it gets paid faster.

[11]   **Q:** Okay.

[12]   **MR. KRASNOO:** I notice it's

[13] about —

[14]   **MR. PERES:** Yeah, it's 4:15

[15] right now.

[16]   **MR. KRASNOO:** So why don't we

[17] go off for a minute.

[18]   **THE VIDEOGRAPHER:** Time is now

[19] 4:17. Off the record.

[20]    (Brief recess.)

[21]   **THE VIDEOGRAPHER:** Time is now

[22] 4:19. On the record.

[23]   **MR. KRASNOO:** Mr. Britto, you

[24] have a right to review and sign your

[25] deposition. You have a right to give

Page 141

*Britto*

[2] up that right to review and sign your

[3] deposition. Those rights entirely

[4] belong to you. They don't belong to

[5] anyone else in this room. If you do

[6] agree to review and sign your

[7] deposition, the following procedure

[8] happens. You're sent a copy of the

[9] deposition by us, you would also have

[10] what's called an errata page, an error

[11] page.

[12]   **THE WITNESS:** Um-hum.

[13]   **MR. KRASNOO:** And that has

[14] usually four columns on it. It would

[15] list the page of the deposition in

[16] which the error occurs, the line in

[17] the deposition in which the error

[18] occurs, what the error is and how the

[19] error should be corrected. And that's

[20] the information you would fill out as

[21] you go through the deposition and

[22] write it on the sheet of paper.

[23]   **THE WITNESS:** Okay.

[24]   **MR. KRASNOO:** You would then

[25] sign that sheet of paper at the end

Page 142

*Britto*

[2] which would indicate as well that you

[3] have read and reviewed the entire

[4] deposition and that these are the

[5] changes that you feel are necessary to

[6] make it more accurate.

[7]   **THE WITNESS:** Okay.

[8]   **MR. KRASNOO:** You can give up

[9] that right to review and sign this

[10] and, but you can also go through this

[11] procedure. If you do it, the normal

[12] amount of time to get that

[13] accomplished is sending it to you, you

[14] would have 30 days from the date you

[15] receive it to review it, to prepare

[16] this errata sheet and to send this

[17] errata sheet back to us along with

[18] your signature on it. We would not

[19] need the copy of the deposition that

[20] we've provided to you, we would send

[21] that to you, because obviously it's

[22] New York as opposed to Boston, or

[23] Andover, where we are, and you're not

[24] coming all the way over to Andover to

[25] review and sign it. So we can do

Page 143

[1]                        **Britto**
[2] that. In the normal case, it can be
[3] signed in the presence of a notary,
[4] but if everyone here agrees, it can be
[5] signed under the pains and penalties
[6] of perjury so you don't have to go out
[7] and seek a notary for the errata
[8] sheet, you can merely sign it with
[9] that on it, signed under the pains and
[10] penalties of perjury, this blank day
[11] of, let's say you got it in March,
[12] March 2006, and then a signature line
[13] for you.
[14]    **THE WITNESS:** Okay.
[15]    **MR. KRASNOO:** So I'd ask you
[16] just to think about the way you want
[17] to do it, let us know on Friday and I
[18] would ask these gentlemen here as well
[19] to think about whether or not signing
[20] under the pains and penalties of
[21] perjury is satisfactory to them or
[22] whether or not they would insist upon
[23] your signing before a notary, as they
[24] can. That's their right as well.
[25]    **THE WITNESS:** Um-hum. I

Page 144

[1]                        **Britto**
[2] understand.
[3]    **MR. KRASNOO:** Okay, with that
[4] I think the deposition is concluded
[5] for today, unless anyone wants to
[6] amend what I've said by way of the
[7] explanation on the errata sheet and
[8] signing.
[9]        Hearing no one who wants to,
[10] this deposition is suspended for today
[11] to be resumed on Friday, March 10th,
[12] at 12 noon.
[13]    **THE VIDEOGRAPHER:** Time is now
[14] 4:22. This marks the ending of tape
[15] number two. Off the record.
[16]    (Whereupon, at 4:22 o'clock
[17] p.m., the deposition was suspended.)
[18]    (Mt. Sinai Discharge Plan and
[19] Referral Form was marked as Deposition
[20] Exhibit No. 1 for identification, as
[21] of this date.)
[22]
[23]
[24]
[25]

Page 145

[1]
[2]                    **CAPTION**
[3]
[4] The Deposition of KEVIN BRITTO, taken in the
[5] matter, on the date, and at the time and place set
[6] out on the title page hereof.
[7]
[8]
[9] It was requested that the deposition be taken by
[10] the reporter and that same be reduced to
[11] typewritten form.
[12]
[13]
[14] It was agreed by and between counsel and the
[15] parties that the Deponent will read and sign the
[16] transcript of said deposition.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 146

[1]
[2]        CERTIFICATE
[3]
[4] STATE OF_____ :
[5] COUNTY/CITY OF_____ :
[6]
[7] Before me, this day, personally appeared
[8] KEVIN BRITTO, who, being duly sworn, states
[9] that the foregoing transcript of his/her
[10] Deposition, taken in the matter, on the date, and
[11] at the time and place set out on the title page
[12] hereof, constitutes a true and accurate transcript
[13] of said deposition.
[14]
[15]
[16]
[17]        KEVIN BRITTO
[18]
[19] SUBSCRIBED and SWORN to before me this_____
[20] day of _____, 2006, in the
[21] jurisdiction aforesaid.
[22]
[23]
[24]
[25] My Commission Expires        Notary Public

Page 147

[1]
[2]        DEPOSITION ERRATA SHEET
[3] RE:
    FILE NO.
[4] CASE CAPTION:  IFC  vs.  ADAMS, et al.
[5] DEPONENT: KEVIN BRITTO
    DEPOSITION DATE: 03/07/06
[6]
    To the Reporter:
[7] I have read the entire transcript of my Deposition
    taken in the captioned matter or the same has been
[8] read to me.  I request for the following changes
    be entered upon the record for the reasons
[9] indicated.
    I have signed my name to the Errata Sheet and the
[10] appropriate Certificate and authorize you to
    attach both to the original transcript.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24] SIGNATURE:_____ DATE:_____
[25]    KEVIN BRITTO

Page 148

[1]
[2]            INDEX
[3] Witness:    Direct
[4] Kevin Britto  8
[5]
[6]
[7]        EXHIBITS
[8]
    Britto      Description        Page
[9] For Ident.
[10] 1    Mt. Sinai Discharge Plan and Referral 140
        Form
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 149

[1]
[2]            CERTIFICATE
[3] STATE OF NEW YORK              )
[4]                               ) ss.
[5] COUNTY OF NEW YORK )
[6]        I, Debra DiBenedetto, a
[7]    Shorthand (Stenotype) Reporter and
[8]    Notary Public of the State of New
[9]    York, do hereby certify that the
[10]    foregoing Deposition, of the witness,
[11]    KEVIN BRITTO, taken at the time and
[12]    place aforesaid, is a true and correct
[13]    transcription of my shorthand notes.
[14]        I further certify that I am
[15]    neither counsel for nor related to any
[16]    party to said action, nor in any wise
[17]    interested in the result or outcome
[18]    thereof.
[19]        IN WITNESS WHEREOF, I have
[20]    hereunto set my hand this 14th day of
[21]    March, 2006.
[22]
[23]
[24]        Debra DiBenedetto
[25]

*Exhibit I*

1

Volume I
Pages 1 to 244
Exhibits 1 - 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
INTERNATIONAL FLOOR CRAFTS,         :
INC.,                               :
            Plaintiff,              :
                                    :    Civil Action
        vs.                         :    No. 05-11654-NMG
                                    :
DAVID W. ADAMS, TYRONE              :
WILLIAMS, KEVIN BRITTO,             :
RONALD MITCHELL, Individually       :
and d/b/a MANSFIELD RUG             :
COMPANY a/k/a MANSFIELD RUG         :
DEPARTMENT and REMCO, MICHAEL       :
E. BROWN, Individually and          :
d/b/a DALTON PADDING and            :
EMPIRE WEAVERS, JANE DZIEMIT,       :
AGATHA ESPOSITO, DONALD             :
SHOOP, CCC INTERNATIONAL,           :
INC., JOHN D. SUN, DAVID D.         :
SUN and PAUL SUN,                   :
            Defendants,             :
                                    :
        - and -                     :
                                    :
LOWELL FIVE CENT SAVINGS            :
BANK, WACHOVIA BANK, NATIONAL       :
ASSOCIATION, f/k/a FIRST            :
UNION BANK OF VIRGINIA,             :
CITIZENS BANK, BANK OF              :
AMERICA f/k/a BANK OF BOSTON,       :
PEOPLE'S BANK and FIRST UNION       :
NATIONAL BANK,                      :
            Trustee Process         :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

DEPOSITION OF WILLIAM J. GEMME, a witness called on behalf of the Defendant Jane Dziemit, taken pursuant to the Federal Rules of Civil Procedure before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Neil S. Cohen, P.C., Eleven Beacon Street, Suite 625, Boston, Massachusetts, on Monday, February 11, 2008, commencing at 11:08 a.m.

PRESENT:

    Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
        23 Main Street, Terrace Level, Suite One,
        Andover, MA  01810-3730, for the Plaintiff.

    Isaac H. Peres, Esq.
        92 State Street, Eighth Floor, Boston, MA
        02109, for the Defendant David W. Adams.

    Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
        Eleven Beacon Street, Suite 625, Boston, MA
        02108, for the Defendant Jane Dziemit.

    Also Present:  Jane Dziemit
                  William Elovitz

* * * *

16

1      Q.    We were talking about matching up paper

2  originally, and you started with the purchase order.

3  You match the purchase order, which is a document

4  issued by, we'll talk about, IFC when they make a

5  commitment to buy some merchandise, correct?

6      A.    I'm not sure I understood the question.

7      Q.    We started off talking about a purchase

8  order, which is a document that is generated by IFC,

9  correct?

10     A.    Yes.

11     Q.    And I believe what you testified to, and

12 you can correct me if I'm misstating, that document

13 is generated at the moment in time that IFC makes a

14 commitment to buy some merchandise?

15     A.    Usually it is, yes.

16     Q.    What other paperwork is involved other than

17 these purchase orders, sir?  I saw something about

18 key reqs.  Is that part of the paperwork we're

19 talking about?

20     A.    Paperwork in accounts payable?  Yes.

21     Q.    What are key reqs?  What are those?

22     A.    Key reqs are the document that the points

23 of receiving fill out showing when the merchandise

24 came in, what merchandise was received.

18

1    A.    And possibly if it's delivered at a

2  warehouse as well.

3    Q.    Okay.

4    A.    If there isn't an IFC employee filling out

5  a key req, it could be a Building 19 employee.

6    Q.    In this particular case, sir, with regard

7  to this lawsuit, were there any key reqs filled out

8  by people other than -- the allegations that are

9  made in this complaint that was filed, are you aware

10  of any people other than an IFC employee that filled

11  out a key req?

12    A.    Not pertaining to any of those shipments,

13  no.

14    Q.    That's what I'm talking about, sir.  And I

15  think I saw -- Tyrone Williams is one of the

16  Defendants in this case.  Was he the one who filled

17  out most of the key reqs?

18    A.    Yes.

19    Q.    Who else filled out key reqs other than Mr.

20  Williams?

21    A.    I believe Kevin Britto also filled out key

22  reqs.

23    Q.    Anyone else?

24    A.    Not in any of the key reqs that you're

19

1    referring to in the case.

2        Q.    I'm only referring, sir, right now -- I'm

3    not talking generally -- to this specific lawsuit.

4    There are allegations in this complaint -- in this

5    lawsuit that IFC purchased rugs and/or flooring that

6    were never delivered, correct?

7        A.    Correct.

8        Q.    And the key reqs signed off on those

9    particular orders that IFC claims it never got were

10   signed off on by either Mr. Williams or Mr. Britto,

11   correct?

12       A.    Correct.

13       Q.    No one else?

14       A.    Not to my knowledge.

15       Q.    You were involved in the investigation,

16   sir, were you not?

17       A.    Yes.

18       Q.    And you in fact verified this complaint

19   when it was filed, correct?

20       A.    Yes.

21       Q.    And you know what verification of a

22   complaint means, correct?

23       A.    You could explain.  I'm not completely sure

24   what you mean.

50

1  determined that would be to look at the invoices

2  that were billed to IFC, correct?

3       A.    Correct.

4       Q.    And then match them against what documents,

5  the purchase orders and the key reqs?

6       A.    Correct.  Purchase orders, key reqs and

7  bill of ladings.

8       Q.    And what you're saying is there were no

9  bills of lading that matched up for that time

10 period; is that how you figured it out?

11      A.    Correct.

12      Q.    When you say $2.3 million, sir, is that --

13 what number does that represent?  Does that

14 represent a wholesale figure, a retail figure?  What

15 does it represent?

16      A.    That represents the amount of monies paid

17 to REMCO over that period of time.

18      Q.    That's just flat out what the checks added

19 up to over that period of time?

20      A.    Correct.

21      Q.    And in looking at -- again, this is

22 Paragraph 62.  This is Subsection B on Page 21 of

23 the complaint.  You then also calculated that, with

24 regard to Mansfield Rug, which was the same time

51

1    period, 1999 to 2005, that $980,000 was paid to that

2    entity by IFC for that time period, correct?

3        A.    Correct.  And those are approximate

4    numbers.  I mean, they might be rounded off

5    slightly.

6        Q.    Okay.  And, again, you did the same

7    procedure.  You looked at the bills of lading, if

8    there were any -- but there weren't any, is what

9    you're saying, correct?

10       A.    Correct.

11       Q.    -- the key reqs, the purchase orders, and

12   the invoices, the three documents that you had, and

13   the one that was not there was the bill of lading?

14       A.    Correct.

15       Q.    Between 1999, sir, and 2005, were you able

16   to identify any rugs that were bought by IFC from

17   REMCO that were actually delivered?

18       A.    No.

19       Q.    Not a single one?

20       A.    No.

21       Q.    Did you look back before 1999?

22       A.    Yes.

23       Q.    Were any rugs that IFC bought using REMCO

24   as a broker ever delivered to IFC?

52

1          MR. KLEHM:  Objection.  Go ahead.

2     A.    Not that I'm aware of.  I don't remember

3  offhand whether there were any billings prior to

4  1999.  I would have to go back and take a look,

5  but -- I found no bill of ladings at any time from

6  REMCO.

7     Q.    How about with Mansfield Rug?

8     A.    What was the question?

9     Q.    With regard to Mansfield Rug, any bills of

10 lading dating back either to 1999 or even before

11 which indicated that purchases made through that

12 company were actually delivered?

13    A.    No.  There were none.

14    Q.    Sir, what's your understanding as to my

15 client's relationship with REMCO?

16    A.    My understanding of your client's

17 relationship with REMCO is -- I'll start from the

18 beginning of my investigation.  I mean, at first in

19 the -- do you want me to go through right along --

20    Q.    Sure.

21    A.    -- as my investigation developed --

22    Q.    Sure.

23    A.    -- what I was aware of?

24          In looking at those REMCO paperwork early

53

1    on, we noticed on several occasions that your

2    client, it appeared, had signed the back of those

3    REMCO checks.  We also found that we had sent

4    directly to Ms. Dziemit a couple of REMCO checks

5    that were FedExed to what appeared to be her home

6    address.

7        Q.    Okay.

8        A.    We were also aware that -- I just want to

9    make sure that I have it straight too -- were aware

10   that the PO box that REMCO checks were being sent to

11   was under the name of your client and also under the

12   name of Tony Maresca.

13            Those checks were deposited into various

14   accounts, not all the same accounts.  They were --

15   the ones that were endorsed by your client were

16   deposited into other accounts, not one account in

17   particular, but into various accounts.

18       Q.    What's significant about that, sir?

19       A.    Well, what's significant about that to me

20   is -- one check in particular, if you look at it,

21   there is one that says, "REMCO by Dziemit.  Pay to

22   Dziemit," and it's deposited into a personal account

23   of Dziemit's.

24            What that tells me is that person

Kevin Britto

ME TONY
#1  #25399  6/8  16,000  1120⁰⁰  480⁰⁰
P8  Bank ONE MA400  (16000)

#2  25727  6/28  22,250⁰⁰  1112.⁵⁰  1112.5
PR.  20,005  (2225)
Bank

FAX #508 991 7771
Compass BANK ONE    ABA# 211 370 299  508 984 6000
ONE Compass Place    Acct# 024 510 08552
New Bedford, MA 02740    CCC FAX # 703550 0297

Ex 1280  Jim Clark (payables) Debbie Meyers    (Paul)    @ 1/3    ME
                              (Assistant)
Hill  781 749 6900                    #3  27171  8/25  36,457.50  2430
Campbell also ──→ 3691 FAX#           PP.  32,811⁵⁰  (3,645.75)

Dave Adams          Tyrone      #4  27947  9/27  38,085⁰⁰  2,59⁸
978 973 5997        508 991 7769     PR.  34,276.50  (3,808.50)
Cell Phone          Fax 508 991 7771  Total from start  7202⁰⁰  Total of

                    Hil Campbell         PD.  10/13  35,000
2001 Taxes For Dax             9/8 Sent #5  #4697  11/17  43,129⁰⁰  ME  3411 73  30
35,482.00                                 ↑ TAXED IN 99 ↑
 6,000.00
29,482.00                      #6  4707  1/3/00  42,398⁰⁰  ME  3353.
 2,000.00                                Pd.
27,482.00  3/21 inv.
 7,000                          #7  4719  2/4/00  41,300⁰⁰  ME  3279 69
35,482.00                      Oct 13, 99    Pd.
-96.80  4/6 inv.              Nov 15, 99
35,386.20  4/25 inv.         Dec 1, 99        17,247.06
 2,000.00  5/30 inv.                          TOTAL
33,386.20  11/31 25,000 inv.  5416  3/4/00  36,600  ME
 1,000.00                     5417  3/1/00  33,5    4490
32,386.20  6/13 6:00 inv.     5446  3/15/00  17,04
 3,000                         5503  4/1/00  45,600  3,044
19,386.20  4/10 25000 OUT
 5,000                         5552  6/1/00  40,950  3251 83
14,386.20  4/14 25,000 OUT
                               6/22/00  43,200  3432 15
TAX 2001
8386  11/2
 3000
5386 003J55

**Exhibit K**

Document deemed confidential by Defendant Dziemit.

Plaintiff's counsel will confer with Defendant Dziemit's counsel and file the appropriate motion.

Exhibit A

PURCHASE ORDER    6551

BILL TO:
INTERNATIONAL FLOOR CRAFT, INC.
319 LINCOLN STREET • RTE. 3A
HINGHAM, MA 02043
(781) 749-6900

DATE OF ORDER   10/29
SHIP ON   11/5
ORDER GIVEN BY   DJ

TERMS
2 % DISCOUNT / DAYS
NET   30   DAYS
OTHER

INTERNATIONAL FLOOR CRAFT, INC., INFOR

RECEIVING INSTRUCTIONS

RECEIVED   NOV 01 2002

DISTRIBUTION

DEPOSITION
EXHIBIT


CONDITIONS OF THIS ORDER
ALL COLLECT SHIPMENTS MUST BE ROUTED BY TRAFFIC DEPARTMENT AT 508-690-4890 OR 508-690-5801. FAILURE TO COMPLY
WILL RESULT IN CHARGEBACK OF EXCESSIVE FREIGHT CHARGES INCURRED. ALL BACK ORDERS MUST BE SHIPPED PREPAID.
1. THIS ORDER MUST NOT BE FILLED AT HIGHER PRICES THAN SPECIFIED WITHOUT OUR WRITTEN PERMISSION.
2. THE RIGHT IS RESERVED TO CANCEL IF NOT FILLED IN ACCORDANCE WITH OUR DELIVERY SCHEDULE.
3. THE RIGHTS RESERVED TO RETURN EXCESS OR DEFECTIVE MERCHANDISE AT SHIPPER'S EXPENSE.

*Exhibit "B"*                                                      11-13-02

# REMCO

PO Box 120221
East Haven, CT 06512
(203) 468-9544

NO'

+1 8X10

DISCOUNT!

| Date | Invoice No. | Order No. |
|------|-------------|-----------|
| October 30, 2002 | 20021030 | 6551 |

| Bill to | Ship to |
|---------|---------|
| International Floor Crafts, Inc.<br>319 Lincoln Street<br>Hingham, MA 02043 | Building 19, Warehouse #3<br>One King Street<br>New Bedford, MA 02746 |

| Quantity | Description | Unit Price | Total |
|----------|-------------|------------|-------|
| 280 | 5 x 8 Berber Bound | $15.00 | $4,200.00 |
| 280 | 6 x 9 Berber Bound | $21.00 | $5,880.00 |
| 280 | 8 x 10 Berber Bound | $41.00 | $11,480.00 |
| 280 | 9 x 12 Berber Bound | $53.50 | $14,980.00 |
| 280 | 4 x 6 Berber Bound | $7.00 | $1,960.00 |
|  |  |  |  |
|  | These are delivered prices      Total Due |  | $38,500.00 |

OK TO Pay
Pay as invoiced

Price/Qty ok    11-13-02

CORP.

R350

DOR ACCT #

ICE NO. 20021030          ank you for your order.

E  10-30-02

$ 38,500.00 (770.00)
370700

DATE  11-14-02

RIBUTION  451000

Exhibit C

**ORIGINAL**

NOV 1 3 2002

| | | | | | | | | | KEY-REC NO. | DATE REC |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 406836 | 11-15 |

SHIPPER: Remco

REMARKS, EXCEPTIONS, DAMAGES, CUSTOMERS NAME AND ADDRESS (IF RETURN), ETC.

| MAKE | DESCRIPTION | MODEL NO. | COLOR/FINISH | QUANTITY | COST | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Items | 9x12 Border | | | 250 ✓ | | | | | |
| | 8x10 | | | 281 +1 | | | | | |
| | 6x9 | | | 280 ✓ | | | | | |
| | 5x8 | | | 280 ✓ | | | | | |
| | 4x6 | | | 260 ✓ | | | | | |

SHIPPED FROM   RECEIVED VIA   CARRIER'S NO.   PCS   WT.   CHGS.   DEPT / STORE

1400

RUG 3

SEND AGAIN   RETURN TO STOCK   EVEN EXCHANGE   CREDIT TO ACCT   CASH REFUND   FOR SERVICE   OTHER   INVOICE COST   DISCOUNT

CHARGE BACK

655/

JD W TMRO
ORDER CHG BY
T. W.

T.W.

**NOTE!!** IF CUSTOMER'S RETURN BE SURE TO CHECK (✓)

ENTERED IN UNIT CONTROL

DATE   11-9-02

Tyrone Wilson

Total 1401

Exhibit "D"

INTERNATIONAL FLOOR CRAFTS, INC

319 LINCOLN ST
HINGHAM, MA 02043

Eastern Bank
Massachusetts

51-129
113

No.    006271

*THIRTY-SEVEN THOUSAND SEVEN HUNDRED THIRTY AND XX / 100

Pay to the    REMCO
Order of

P.O. BOX 120221
East Haven, CT 06512

CHECK AMOUNT
****37,730.00*

DATE
11/14/2002

⑈006271⑈ ⑈011301798⑈    8 2 2⑈

⑈00037730001⑈

For Deposit
Only

0449   4 0

CITIZENS
REVERE

0021122  01
00

*FEDERAL RESERVE BOARD OF GOVERNORS REG. CC

The security features listed below, as well as those not listed,
exceed industry standards.

SECURITY FEATURES: Results of document alteration:

MicroPrint Border    Small type in side borders on front of check
                     Appears as dotted line when photocopied

Security Screen      Absence of "PROTECT A CHECK SAFETY PAPER"
                     verbiage on back of check

Color Backgrounds    Chemical or eraser attempts will absorb or
on front of Check    remove color background

*Exhibit L*

1

Volume I
Pages 1 to 121
Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                                  :
INTERNATIONAL FLOOR CRAFTS,       :
INC.,                             :
            Plaintiff,            :
                                  :  Civil Action
        vs.                       :  No. 05-11654-NMG
                                  :
DAVID W. ADAMS, TYRONE            :
WILLIAMS, KEVIN BRITTO,           :
RONALD MITCHELL, Individually     :
and d/b/a MANSFIELD RUG           :
COMPANY a/k/a MANSFIELD RUG       :
DEPARTMENT and REMCO, MICHAEL     :
E. BROWN, Individually and        :
d/b/a DALTON PADDING and          :
EMPIRE WEAVERS, JANE DZIEMIT,     :
AGATHA ESPOSITO, DONALD           :
SHOOP, CCC INTERNATIONAL,         :
INC., JOHN D. SUN, DAVID D.       :
SUN and PAUL SUN,                 :
            Defendants,           :
                                  :
        - and -                   :
                                  :
LOWELL FIVE CENT SAVINGS          :
BANK, WACHOVIA BANK, NATIONAL     :
ASSOCIATION, f/k/a FIRST          :
UNION BANK OF VIRGINIA,           :
CITIZENS BANK, BANK OF            :
AMERICA f/k/a BANK OF BOSTON,     :
PEOPLE'S BANK and FIRST UNION     :
NATIONAL BANK,                    :
            Trustee Process       :
            Defendants.           :
                                  :
- - - - - - - - - - - - - - - - -x

(Continued on Page 2)

2

DEPOSITION OF WILLIAM D. ELOVITZ, a witness called on behalf of the Defendant Jane Dziemit, taken pursuant to the Federal Rules of Civil Procedure before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Neil S. Cohen, P.C., Eleven Beacon Street, Suite 625, Boston, Massachusetts, on Wednesday, February 20, 2008, commencing at 2:07 p.m.

PRESENT:

    Krasnoo/Klehm LLP (by Paul J. Klehm, Esq.)
        23 Main Street, Terrace Level, Suite One,
        Andover, MA  01810-3730, for the Plaintiff.

    Neil S. Cohen, P.C. (by Neil S. Cohen, Esq.)
        Eleven Beacon Street, Suite 625, Boston, MA
        02108, for the Defendant Jane Dziemit.

* * * *

52

1  Q. As you understand, sir, as you sit here

2 today, are you aware of how long this scheme had

3 been occurring prior to August of 2005?

4  A. I can only estimate, based upon that

5 original phone call that tipped me off, which I

6 think was about ten years ago, that it had been

7 going on for a long time.  Ten years.

8   MR. COHEN:  Let's take a break.

9   (Recess)

10 BY MR. COHEN:

11  Q. I think where I left off, sir, I was trying

12 to figure out how this scheme was going on for so

13 many years without, you know, you or anyone else in

14 the company finding out about it.  How is that

15 possible?

16  A. Because they were only stealing a little

17 bit at a time, and turning it up gradually, like

18 boiling a frog.

19  Q. Did either Mr. Gemme or any one of the

20 other people ever do an analysis as to how much they

21 were stealing, say, back in '98 and then how much

22 they were stealing back in 2004?  Did you ever do

23 any kind of comparison?

24  A. I don't know.

92

1    second.

2              (Discussion off the record)

3        Q.    Sir, are you aware of any agreements that

4    Ms. Dziemit had, oral or written, with either David

5    or Paul Sun to steal money from IFC?

6        A.    No, I am not.

7        Q.    And the same question with regard to CCC

8    International, Inc.  Are you aware whether or not

9    there are any facts that support that Ms. Dziemit

10   had an agreement, oral or otherwise, with CCC to

11   steal money from IFC?

12       A.    No, I am not.

13       Q.    Sir, does anyone in your company that works

14   underneath you that you've relied upon, to your

15   knowledge, have any facts that support allegations

16   that Ms. Dziemit had any kind of agreements with any

17   of the individuals or companies I just mentioned to

18   steal money from IFC?

19       A.    I believe they have facts.

20       Q.    Okay, but you haven't had a discussion with

21   them as to what facts they have?

22       A.    No, they have advised me that she is part

23   of the scheme, and I've relied upon that.

24       Q.    But they didn't tell you specifically what

Exhibit L (1)

| 1150 | 3/9 | Cardiac Spec. Bal 350 | 50 00 | Y | | | 1428 |
| | | | | | | | 1348 |
| 1152 | 3/9 | UI | 69 76 | V | | | 1278 |
| | | Cardmember Service bnhbohc | 719 19 | V | | | 559 |
| | | same section | | V | NC 1016 01 | | 1515 |
| | | | | | FP 5 47 | | 1531 |
| 1153 | 3/18 | Alba Santiago | 100 00 | V | | | 1481 |
| 1154 | 3/20 | N.H. GOLF CLUB | 65 00 | V | | | 1416 |
| 1155 | 3/20 | Kevin Kennedy | 30 00 | V | | | 1386 |
| 1156 | 3/26 | SBC | 81 03 | V | | | 1305 |
| 1157 | 3/27 | SCGC | 60 63 | V | | | 1244 |
| 1158 | 3/31 | Verizon Wireless | 77 97 | V | | | 1166 |

| 1159 | 3/31 | Dan Goodison | 1,000 00 | | | | 166 |
| 1160 | | G.D | 50 00 | | | | 116 |
| | 4/4 | Trans From Savings Conf#R94 FDE5 | | V | 1,000 00 | | 1116 |
| | 4/5 | check to cranwell Sr Visa | 307 74 | V | | | 809 |
| 1161 | 4/6 | AAA Fin. Ser. | 77 37 | V | | | 731 |
| 1162 | 4/11 | Comcast | 61 38 | V | | | 670 |
| 1163 | 4/11 | Alba Santiago | 100 00 | V | | | 570 |
| | 4/11 | Trans from Savings#R91286 | | V | 2000 00 | | 2570 |
| | 4/29 | | | V | NC 4515 98 | | 7086 |
| 1164 | 4/15 | US Treasury 1st Qtr Tax | 1610 00 | V | | | 5476 |
| 1165 | 4/15 | Commissioner of Rev. See 2003 | 215 00 | V | | | 5261 |
| 1166 | 4/15 | Comm. of Rev. Ser. Ct. 1st qtr | 319 00 | V | | | 4942 |
| | 4/19 | From John | | V | | 35 00 | 4977 |
| | 4/21 | ATM CASH Carrie | 340 00 | V | | | 4637 |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | PAYMENT/DEBIT (-) | √ T | (IF ANY) (-) | DEPOSIT/CREDIT (+) | BALANCE $ 4637 |
|---|---|---|---|---|---|---|---|
| 1167 | 4/26 | CTI | 47 29 | V | | | 4590 |
| 1168 | 4/26 | The Hartford (Car Ins.) | 810 00 | V | | | 3780 |
| 1169 | 4/26 | UI | 72 76 | V | | | 3707 |
| 1170 | 4/26 | Verizon Wireless | 44 93 | V | | | 3662 |
| 1171 | 4/26 | SCGC | 58 62 | V | | | 3603 |
| 1172 | 4/26 | SBC | 220 06 | V | | | 3383 |
| 1173 | 4/26 | AAA Fin. Ser. | 84 25 | V | | | 3299 |
| 1174 | 4/27 | G.D | 58 00 | V | | | 3241 |
| 1175 | 5/3 | Dan Goodison | 1,000 00 | V | | | 2241 |
| 1176 | 5/11 | CTI | 16 27 | V | | | 2225 |
| 1177 | 5/11 | UI | 85 72 | V | | | 2139 |
| 1178 | 5/11 | VA | 15 00 | V | | | 2124 |

| 1179 | 5/11 | Cardiac Specialists Bal 300 | 50 00 | V | | | 2074 |
| 1180 | 5/11 | Comcast | 34 85 | V | | | 2040 |
| online | 5/11 | Cardmember Services (Visa) Statment Adjust | 458 57 | V | | | 1581 |
| | | | | | 1 50 | | 1555 |
| | 5/13 | From Int Floor | | V | | 31,281 60 | 32,864 |
| 1181 | 5/17 | FPD Payroff transfer | 26,000 00 | V | | | 6864 |
| | 5/15 | ATM CASH Pat | 200 00 | V | | | 7664 |
| | 5/17 | | | V | NC 2374 68 | | 10,039 |
| 1182 | 5/20 | CASH | 200 00 | V | | | 9839 |
| 1183 | 5/22 | G.D | 50 00 | V | | | 9789 |
| 1184 | 5/24 | CASH Michele | 80 00 | V | | | 9709 |
| 1185 | 5/26 | Alba Santiago | 100 00 | V | | | 9609 |
| 1186 | 6/1 | Dan Goodison | 1000 00 | V | | | 8609 |
| 1187 | 6/1 | N.H. Register | 126 67 | V | | | 8483 |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

EXHIBIT 49
DATE 5/16/08
Mitchell
J. SHEPHERD

002518

SUGGESTIONS FOR USE OF THIS REGISTER ARE PRINTED ON INSIDE FRONT COVER.

PLEASE BE SURE TO DEDUCT ANY PER CHECK CHARGES OR SERVICE CHARGES THAT MAY APPLY TO YOUR ACCOUNT

| DATE | CHECK NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | √T | FEE (-) | NEW BALANCE 3854 |
|------|------|------|------|------|------|------|------|
| 9/2 | 694 | D50 Goodison | | 1000 00 | √ | | 2854 |
| 9/5 | 695 | B.O.B. TORRE LOAN STATEMENT OK | | 2000 00 | √ | | 854 |
| 9/6 | 696 | G.D. | | 75 00 | √ | | 779 |
| | | | 3300 00 | | | | 4079 |
| 9/10 | 697 | Jane Driener | | 2806 16 | √ | | 1273 |
| 9/10 | 698 | | | | | | 802 |
| 9/ | | ATM CASH Peoples | | 100 00 | √ | | 702 |
| | | | | 603 00 | √ | | 5100 |
| 9/17 | RIECC40 | Transferred from Savings | 10,000 00 | | √ | | 4299 |
| | | | 780 90 | | | | 7079 |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | AMOUNT (+) | P.B.P. AMOUNT | √T | FEE (-) | 7079 |
|------|------|------|------|------|------|------|------|
| 9/17 | 700 | United States Treas. 3RD QUARTER TAXES | | 5,000 00 | √ | | 2079 |
| 9/17 | | For P.S.Co. Conn | 2175 00 | | √ | | 4257 |
| 9/29 | | Missed This 5+8 shop money | | 58 40 | √ | | 4199 |
| 9/10 | 701 | Niko Seceritas | | 200 00 | √ | | 3999 |
| 9/8 | 702 | Al Hassan (Comish) | 44 85 | 90 00 | √ | | 3909 |
| | | | | | TP | | 3954 |
| 9/21 | 703 | CASH Pauls Auto | | 400 00 | √ | | 3554 |
| 9/21 | 704 | D CHECK CONT OLOZ 10278 TH) | 902 59 | | | | 2591 |
| 9/21 | 704 | MJ | | 50 00 | √ | | 2541 |
| | | | | 100 00 | | | |

| 9/18 | 705 | SCG C | | 21 83 | √ | | 2119 |
| | 706 | | | | | | |
| 9/14 | 707 | SNET | | 68 59 | √ | | 1933 |
| | 708 | | | | | | |
| 9/17 | 709 | Peoples Bank | | 356 51 | √ | | 1513 |
| | 711 | | | 88 | | | 1425 |
| 9/28 | | ATM CASH | | 100 00 | √ | | 1325 |
| | | | | 1000 00 | √ | | 385 |
| 10/1 | | ATM CASH Lost Receipt | | 100 00 | √ | | 225 |
| | | | | 88 | | | |
| 10/2 | 713 | DMV Car Registration | | 80 00 | √ | | 106 |
| 10/10 | 714 | G.D. STATEMENT OK | | 203 82 | | | 1500 |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

8842525

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | AMOUNT (+) | P.B.P. AMOUNT | T | √ | [-] 3762 26 |
|------|------|------|------|------|------|------|------|
| 11/5 | 896 | SNET | | 73 13 | √ | | 3689 13 |
| | | Verizon Wireless | | 35 | | | 3655 |
| 11/5 | 898 | SCGC | | 20 92 | √ | | 3629 29 |
| | | | | 70 33 | | | 3558 |
| 11/5 | 900 | New Haven Register 11/5 | | 119 50 | √ | | 3439 44 |
| | | | | 301 75 | | | 31 |
| 11/7 | 901 | Cardiac Specialists BAL 775 | | 25 00 | √ | | 3112 69 |
| | | | | 5 00 | √ | | 3107 |
| 11/7 | 903 | East Par Pediatrics | | 37 00 | √ | | 3100 69 |
| | | | Statement OK | 300 00 | √ | | 2800 69 |
| | | | | | | | |
| 11/12 | | | 1791 54 | | | √ NC | 4592 23 |
| | | | | 300 00 | | | 4292 |
| 11/18 | 906 | Alba Santiago | | 100 00 | √ | | 4192 23 |
| 11/21 | 907 | SNET | | 73 13 | | | 4119 |
| 11/21 | 908 | DISCOVER CARD | | 20 00 | √ | | 4099 10 |
| | 909 | | | 114 00 | | | 3985 |
| 11/22 | 910 | CTI | | 66 55 | √ | | 39 18 55 |
| | 911 | Peoples Bank M/C | | 149 | | | 3769 |
| 11/22 | 912 | Verizon Wireless  STATEMENT OK | | 38 92 | √ | | 3730 26 |
| 11/20 | 913 | Dan Goodison | | 1000 00 | √ | | 2730 26 |
| 11/29 | 914 | SCGC | | 34 97 | √ | | 2695 29 |
| | 915 | | | | | | |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | T | √ FEE (-) | 2624 94 |
|------|------|------|------|------|------|------|------|
| 12/9 | 916 | CTI | | 60 72 | √ | | 2564 22 |
| | 917 | UI | | 77 87 | √ | | 2486 35 |
| 12/9 | 918 | Discover Card | | 242 93 | √ | | 2243 42 |
| | | | 1005 13 | | | | 3248 |
| 12/10 | 919 | Rick Scachio (Comish) | | 200 00 | √ | | 3048 55 |
| | | | | 300 00 | √ | | 2748 55 |
| 12/13 | 920 | Dentist | | 99 00 | √ | | 2649 55 |
| | | | 5000 | | | | 704 |
| 12/16 | 921 | Dignure Spignes) | 5000 00 | 4625 00 | √ | | 3024 55 |
| | | | | | | | 5337 |
| 12/28 | 922 | Citizens BANK | | 5000 00 | √ | | 3024 55 |
| | | | | 750 00 | | | 7749 |
| 12/3 | 924 | SCGC | | 46 10 | √ | | 2903 45 |
| | | Verizon Wireless | | 38 72 | | | 2864 |
| 12/30 | 926 | Peoples BANK M/C | | 171 62 | √ | | 2692 91 |
| | 927 | East Par Pediatrics | | 50 | | | 2636 |
| 12/30 | 928 | SNET | | 73 94 | √ | | 2562 94 |
| | 929 | Cardiac Specialists Bal 750 | | 25 00 | √ | | 2537 94 |
| 12/30 | 930 | Dan Goodison | 2000 | 1000 00 | √ | | 1537 94 |
| 12/3 | | TRANS From Checking | 5000 00 | | √ | | 1537 94 |
| | | | | | | | |

000532

| DATE | OR P.B.P. | DESCRIPTION OF TRANSACTION | AMOUNT (+) | P.B.P. AMOUNT | T | (-) | BALANCE |
|---|---|---|---|---|---|---|---|
| 12/11 | 742 | Chris Andrell VOID | | 50 00 | √ | | 2118 |
| | | | | | | | 2068 |
| | 743 | | | | | | 1963 |
| 12/11 | 744 | Cheryl Jordan | | 100 00 | √ | | 1868 |
| | | | | | | | 3868 |
| 12/16 | 745 | Diane Spignesi | | 2,460 00 | √ | | 1408 |
| | | OLD ISOTOPY Divorce | | 231 46 | | | 1177 |
| 12/20 | 746 | SCGC | | 35 62 | √ | | 1141 |
| | 747 | Replace book | | 329 36 | | | |
| 12/26 | 748 | SNET MISSING? V/AS Really $50 | | 70 54 | √ | | 744 |
| | 749 | UI | | 69 79 | | | 674 |
| | | | | | | | |
| 12/26 | 750 | CTI | | 56 15 | √ | | 618 |
| | 751 | Cardine Rockett Sal 950 | | 26 00 | | | 593 |
| 12/26 | 752 | Verizon Wireless | | 39 00 | √ | | 554 |
| | | From Disconnected | 63 13 | | | | 617 |
| 12/27 | 753 | SNET | | 70 04 | √ | | 547 |
| | | | 5,000 00 | | | | |
| 12/28 | 754 | Remco | | 85,000 00 | √ | | |
| | | | | | | | 147 |
| 12/31/02 | 755 | George Derosa   Adjust Balance | | 75 00 | √ | | 188 |
| | 756 | From SCGC Orange ChavTink | | 100 00 | | | 88 |
| 1/1/02 | | | 1952 16 | | √ | NC | 2040 |
| | | From Balance | 70 00 | | | | |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

PLEASE BE SURE TO **DEDUCT** ANY PER CHECK CHARGES OR SERVICE CHARGES THAT MAY AFFECT YOUR ACCOUNT.

| DATE | CHECK NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | √ T | FEE (-) | NEW BALANCE |
|---|---|---|---|---|---|---|---|
| 1/4 | 757 | Collector of TAXES  E. Hava car | | 166 96 | √ | | 1943 |
| | 758 | | | | | | 1975 |
| 1/4 | 759 | CTI | | 59 18 | √ | | 1814 |
| | 760 | | | | | | 1772 |
| 1/4 | 761 | AT+T Broadband | | 67 22 | √ | | 1664 |
| | | | | 214 45 | | | |
| 1/15 | | Trans from Savings | 5600 00 | | √ | | 5389 |
| | 762 | | | | | | 5442 |
| 1/15 | 821 | Crogins Bank 4/7th 1/6 | 70 80 | 18 | √ | FP | 5413 |
| | | | | | | | |
| 1/5 | 764 | Diane Spignesi Bal 260 | | 150 00 | √ | | 1263 |
| | 765 | | | | | | 303 |
| 1/25 | 766 | People's Bank m/c | | 70 35 | √ | | 192 |
| | | From | 1000 00 | | | | 292 |
| | | DANA | 2700 00 | | √ | — | |
| | 767 | Cash Deposit | | 2700 00 | √ | | 398 |
| 1/28 | | Trans. From Savings | 1500 00 | | √ | — | 1892 |
| | 768 | Linda Adams | | 300 00 | √ | | 1592 |
| 1/29 | 769 | Dan Goodison Feb rent | | 1,000 00 | √ | | 592 |
| 2/7 | 770 | AT+T Broadband | | 67 22 | √ | | 525 |
| 2/7 | 771 | Paralyzed Vets | | 5 00 | √ | | 520 |

002527

Case 1:05-cv-11654-NMG   Document 230-16   Filed 06/09/2008   Page 4 of 7

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | PAYMENT/DEBIT (-) | T | √IF ANY (-) | DEPOSIT/CREDIT (+) | $ | |
|---|---|---|---|---|---|---|---|---|
| | 4/05 | TAX Refund | | | | $4,450 00 | 4,973 3 |
| | 4/06 | LOAN To DAVE Palermo | 9,900 00 | | | | 5,373 3 |
| | 5/2 | CASH Deposit From Tony LOAN to Dave | 10,000 00 | | | 9,900 00 | 15,273 3 |
| | 5/2 | Wire Trans To Dave LOAN | | | | | 5,273 3 |
| | | Statement OK Interest | | | | 6 49 | 5,279 7 |
| | | Interest | | | | 3 39 | 5,283 1 |
| | 6/8 | CASH Withdrawl | 400 00 | | | | 4,883 1 |
| | | | | | | 45,481 80 | 50,364 9 |
| | 6/21 | Kevin Brito Wire Trans. | 15,000 00 | | | | 35,364 9 |
| | 6/21 | Bank Check CD W/ Palms | 11,980 00 | | | | 23,384 9 |
| | 6/25 | TRANS TO Checking R3909 | 15,000 00 | | | | 8,384 9 |
| | | Interest | | | | 599 00 | 8,390 9 |

| | 7/25 | Cash Withdrawl | 300 00 | | | | 8,090 9 |
| | | Interest Statement | | | | 5 31 | 8,096 9 |
| | 9/11 | From Citizens Acct | | | | 10,000 00 | 18,096 9 |
| | 9/16 | Statement Interest | | | | 5 04 | 8,601 4 |
| | 9/20 | Trans to Citizens | 9,500 00 | | | | 8,601 4 |
| | 9/30 | Trans to Wire Trans Paul | 3,500 00 | | | | 5,101 |
| | | Statement OK 10/16  Interest | | | | 6 75 | 5,108 1 |
| | 11/15 | Interest | | | | 3 33 | 5,111 4 |
| | 12/3 | ATM CASH | 300 00 | √ | | | 4,811 4 |
| | 12/3 | From Ins. Checking | | | √ | 42,151 0 | 47,000 |
| | | Deposit Credit | | | √ | 3 15 | 47,003 5 |
| | | ATM CASH | 400 00 | √ | | | 46,603 |
| R4CA209 | 12/16 | TRANS to Checking | 5000 00 | √ | | | 26,603 5 |
| | 12/16 | TRANS to Citizens Checking | 5000 00 | | | | |

| NUMBER | DATE | DESCRIPTION OF TRANSACTION | PAYMENT/DEBIT (-) | T | √IF ANY (-) | DEPOSIT/CREDIT (+) | $ 26,603 57 | |
|---|---|---|---|---|---|---|---|---|
| | 12/23 | TRANS TO Checking R4 O73D7 | 5000 00 | √ | End of | | 21,603 57 |
| | 12/31 | TRANS TO Checking R41 407E | 5000 00 | | | | 16,603 57 |
| | 1/7 | Trans to Checking R4E2F1F | 8000 00 | | | | 8,603 57 |
| | | STATEMENT OK | | | | 11 46 | 8,614 5 |
| | 1/31 | CASH Withdrawl | 1000 00 | | | | 7,614 9 |
| | 1/31 | Interest Statement | | | | 5 95 | 7,620 95 |
| | 2/28 | TRANS TO CHECKING | 3000 00 | | | | 4,620 9 |
| | 3/4 | Interest From Checking | | | | 2,870 00 | 4,620 95 |
| | 3/10 | TRANS To Checking# R575820 | 10,000 00 | | | | 16,620 95 |
| | | Interest STATEMENT | | | | 3 51 | 16,624 46 |
| | 3/14 | ATM CASH | 400 00 | | | | 16,224 46 |
| R5A2E71 | 3/31 | TRANS TO CHECKING | 9000 00 | | | | 7,224 46 |

| | | STATEMENT Interest | | | | 8 56 | 7,233 00 |
| | 4/29 | CASH Withdrawl | 800 00 | | | | 6,433 0 |
| | | Interest STATMENT | | | | 2 98 | 6,436 00 |
| | | | | | | 2 74 | 6,138 7 |
| | 7/5 | Trans to Checking R649E15 | 1400 00 | | | | 5,038 7 |
| | 7/14 | From T+J | | | | 6500 00 | 11,538 74 |
| | | Statement Interest | | | | 2 37 | 11,541 1 |
| | 7/29 | LOAN to Brian OC | 1000 00 | | | | 10,541 1 |
| | 8/4 | Torre Pay BACK | | | | 1025 00 | 11,566 1 |
| | 8/6 | ATM CASH | 300 | | | | 11,266 1 |
| | | STATMENT Interest | | | | 2 60 | 14,218 7 |
| | 8/9 | Tony Pay Back | | | | 3500 00 | 14,768 7 |
| | 8/28 | TRANSFERED TO CHECKING | 9000 00 | | | | 5,768 7 |
| | 9/5 | | | | | 4500 00 | 10,268 7 |

012533

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | AMOUNT (-) | P.B.P. AMOUNT | √ T | FEE (-) | | |
|------|------|------|------|------|------|------|------|------|
| 3/28 | 179 | Citizens Bank (Kevin) | | 16,580 00 | √ | | 16,641 | 0 |
| | | | | | | | 61 | 0 |
| 3/28 | | FROM First Floor | 16,510 50 | | √ | | 16,571 | 8 |
| 8/29 | 180 | Citizens Bank D | | 10,000 00 | √ | | 36,571 | 0 |
| 3/31 | 181 | Citizens Bank K | | 4,420 00 | √ | | 32,151 | 8 |
| | 182 | FPM Lo# 6677 | | 3350 12 | √ | | 28,801 | 7 |
| | 183 | Save Dziemit | | 7,149 96 | √ | | 21,651 | 8 |
| | 184 | FPM Po# 6703 | | 1992 66 | √ | | 9,659 | 1 |
| | 185 | Jane Dziemit | | 10,424 05 | √ | | 5,765 | 1 |
| 3/31 | | From T+J | 16,580 00 | | √ | | 13,814 | 8 |
| 3/31 | | For INT EC | 27,664 71 | | √ | | 41,479 | 5 |
| | | | | | | | | |
| 4/1 | 186 | Rick Schaefer | | 230 00 | √ | | 41,249 | 5 |
| | | | | | | | 37,743 | 5 |
| 4/1 | 188 | GD # 620 | | 220 00 | √ | | 37,523 | 5 |
| | 189 | Dave Co. 1500 | | | √ | | 36,523 | 5 |
| 4/1 | 190 | S.EGC | | 80 07 | √ | | 36,443 | 5 |
| | | | | | | | | |
| 4/3 | 192 | City of W. Haw Golf | | 600 00 | √ | | 32,693 | 5 |
| | | | | | | | | |
| 4/4 | 194 | Citizens Bank K | | 5000 00 | √ | | 24,693 | 5 |
| | | | | 2 00 | | | | 5 |
| 4/7 | | From T+J    ) same | 7,000 00 | | √ | | 31,691 | 5 |
| | | | | | | | | |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| DATE | CHECK NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | √ T | FEE (-) | | |
|------|------|------|------|------|------|------|------|------|
| | | | | | | | 49,476 | 5 |
| 4/7 | 195 | Citizens Bank K | 5,000 00 | | √ | | 44,476 | 5 |
| | | | | | √ | | 49,476 | 5 |
| 4/7 | 197 | Trans to Peoples Acct | | 10,000 00 | √ | | 32,476 | 5 |
| 4/8 | 198 | Jane Dziemit | | 16,580 00 | √ | | 15,896 | 5 |
| 4/8 | 199 | FPM | | 567 08 | √ | | 15,329 | 4 |
| 4/9 | | From T+J | 13,650 00 | | √ | | | |
| 4/9 | 200 | Citizens Bank | | 13,650 00 | √ | | 15,329 | 4 |
| 4/21 | | From Peoples Acct | 4,191 06 | | √ | | 19,520 | 7 |
| 4/21 | 201 | Citizens Bank D | | 1626 00 | √ | | 17,894 | 7 |
| 4/21 | 202 | FPM | | 10 15 85 | √ | | 16,878 | 5 |
| | | | | | | | | |
| 4/21 | 203 | Jane Dziemit OK Statement | | 406 52 | √ | | 16,472 | 3 |
| 4/24 | 204 | RDS 3901 3970 | | 100 00 | √ | | 16,372 | 3 |
| 4/24 | 205 | TAG Division | | 15 00 | √ | | 16,357 | 3 |
| 4/24 | 206 | Cash | | 63 07 | √ | | 16,294 | 2 |
| 4/24 | 207 | The Hartford Car Ins. | | 771 00 | √ | | 15,523 | 2 |
| 4/26 | | From Peoples | 36,443 20 | | √ | | | |
| | | Kevins Acct | | 27,000 00 | √ | | | |
| | | Dave Acct | | 8,443 00 | √ | | 15,523 | 2 |
| 5 | 208 | VOID | | | √ | | | |
| 5/2 | 209 | GD 2000 Cash | | 1,000 00 | √ | | 14,523 | 2 |
| 5/16 | | ATM CASH | | 200 00 | √ | | 14,323 | 2 |
| 5/16 | 210 | CASH | | 500 00 | √ | | 13,823 | 2 |

082537

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | | FEE T (-) | NEW BALANCE |
|---|---|---|---|---|---|---|---|
| | 242 | FPM | | 8000 | 00 | ✓ | 18377 |
| | | | | | | | 10,379 |
| 10/15 | 243 | Citizens Bank | | 00 | 00 | ✓ | 10,379 |
| 10/15 | 244 | Citizens Bank Kevin | | 5000 | 00 | ✓ | 5279 |
| | | Tna Station | 21,489 50 | | | | |
| 10/28 | 245 | FPM | | 1544 | 12 | ✓ | 25172 |
| | | | | | | | 34,587 |
| 10/28 | 247 | FPM | | 3000 | 00 | ✓ | 21529 |
| | 248 | CASH | | 1500 | 00 | ✓ | 20,029 |
| 11/15 | | ATM CASH | | 300 | 00 | ✓ | 19,729 |
| | 249 | | | 5000 | 00 | ✓ | 14,729 |
| 11/24 | | From INT FLOOR | 16,860 16 | | | ✓ | 31,589 |
| | 250 | | | 540 | 8 | ✓ | |
| | 251 | | | 1214 | 41 | ✓ | 34,849 |
| | | | | 560 | 00 | ✓ | |
| 12/2 | 253 | To Peoples Bank Statemark OK | | 6,000 | 00 | ✓ | 18,387 |
| | 254 | FPM | | 3187 | 00 | ✓ | |
| 12/10 | | | 3187 00 | | | ✓ | 16,387 |
| | 255 | Citizens Bank | | 6,700 | 00 | ✓ | |
| | | START 2004 | | | | ✓ | |
| | | | 33,669 50 | | | | |
| 1/5 | 256 | FPM | | 2348 | 82 | ✓ | 39948 |
| | 257 | CASH | | 7384 | 67 | ✓ | |

REMEMBER TO RECORD AUTOMATIC PAYMENTS / DEPOSITS ON DATE AUTHORIZED.

| DATE | NUMBER OR P.B.P. | DESCRIPTION OF TRANSACTION | DEPOSIT AMOUNT (+) | CHECK OR P.B.P. AMOUNT | | FEE T (-) | NEW BALANCE |
|---|---|---|---|---|---|---|---|
| 1/5 | 258 | Citizens Bank Kw | | 2548 | 00 | ✓ | 32,563 |
| | | | | | | | 20,015 |
| | 259 | CASH | | 10 | 00 | ✓ | 8,943 |
| 1/21 | 260 | CAR TAXES | | 473 | 42 | ✓ | 19472 |
| | | ATM CASH | | 404 | 00 | ✓ | 11,068 |
| 1/24 | | ATM CASH E.H. | | 400 | 00 | ✓ | 18,668 |
| | | ATM | | 403 | 00 | ✓ | 8,103 |
| 2/24 | | ATM " E.H. | | 200 | 00 | ✓ | 18063 |
| | | From D | 354 | | | ✓ | |
| 3/2 | 261 | Rooney Castellon | | 250 | 00 | ✓ | 18,063 |
| 3/27 | 262 | City of New Haven Back Charge | | 600 | 00 | ✓ | 17,463 |
| | | | | 88 | 08 | ✓ | |
| 4/3 | | ATM CASH | | 400 | 00 | ✓ | 17,037 |
| | | Lincoln | | 3200 | 00 | ✓ | |
| 4/26 | | ATM CASH | | 400 | 00 | ✓ | 14,637 |
| | | ATM CASH | | 300 | 00 | ✓ | |
| 5/2 | | ATM CASH | | 200 | 00 | ✓ | 14,137 |
| | | ATM CASH | | 200 | 00 | ✓ | 13,937 |
| 6/3 | | ATM CASH | | 120 | 00 | ✓ | 13,807 |
| | | ATM CASH | | 500 | 00 | ✓ | 13,307 |
| 6/27 | | ATM CASH | | 120 | 00 | ✓ | 13,187 |

Exhibit M-1

**RON MITCHELL**
PH: 800-000-0544
51-7218/2211
1280004706

**645**

4428  DATE 4435/30/0/07-01

PAY TO THE ORDER OF Dan Goodison    $ 1,000 00/xx

One Thousand and 00/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO _____    Ron Mitchell

⑆ 2211721861 ⑆    706" 0645  ⑈0000100000⑈

---

**RON MITCHELL**  231  11  1100  1280004706  05-18-0  **647**

DATE 6/15/01

PAY TO THE ORDER OF Diane Spignesi    $ 3233 00/xx

Three Thousand Two Hundred Thirty Three and 00/100 DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO _____    Ron Mitchell

⑆ 2211721861 ⑆  706" 0647  ⑈0000323300⑈

---

**RON MITCHELL**
51-7218/2211
1280004706

**648**

DATE 6/15/01

PAY TO THE ORDER OF D.M.V.    $ 7 50/xx

Seven and 50/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO Boat Registration    Ron Mitchell

⑆ 2211721861 ⑆  706" 0648  ⑈0000000750⑈

EXHIBIT 40
DATE 5/16/08
Mitchell
J. SHEPHERD



RON MITCHELL

DATE 3/8/01

PAY TO THE ORDER OF FAST                                    $ 60 00/xx

Sixty and 00/100                                            DOLLARS

people's bank
C O N N E C T I C U T

MEMO

⑈221172186⑈      706⑈ 0594 ⑈0000006000⑈



RON MITCHELL
PH. 203-468-9544                    51-7218/2211                    589
                                    1280004706          03-07-01

EAST                                DATE 3/1/00

PAY TO THE ORDER OF Dianne Spignosi                        $ 6,000 00

Six Thousand and 00/100                                    DOLLARS

people's bank
C O N N E C T I C U T

MEMO

⑈221172186⑈      706⑈ 0589 ⑈0000060000⑈

RON MITCHELL
PH. 203-468-9544                    51-7218/2211                    583
                                    1280004706

                    11 3400    DATE 2/28/01

PAY TO THE ORDER OF Dept. of Veterans Affairs              $ 6 00/xx

Six and 00/100                                             DOLLARS

people's bank
C O N N E C T I C U T

MEMO 689 046 36 3841- Mitch

⑈221172186⑈      706⑈ 0583 ⑈0000000600⑈



1 20130253 23 0305   51-7218/2211 7655098    586
RON MITCHELL                        1280004706
PH. 203-468-9544

                    3490 300    DATE 2/28/01

PAY TO THE ORDER OF Cardiac Specialists                    $ 25 00/xx

Twenty Five and 00/100                                     DOLLARS

people's bank
C O N N E C T I C U T

MEMO

⑈221172186⑈      706⑈ 0586 ⑈0000002500⑈

001505

RON MITCHELL
PH. 203-468-9544

51-7218 / 2211
1280004706

560

DATE 1/24/01

PAY TO THE ORDER OF George DeRosA

$ 200.00

Two Hundred and 00/100 DOLLARS

people's bank
CONNECTICUT

Ron Mitchell

MEMO

⑆:221172186⑆: 4706⑈ 0560 ⑈00000020000⑈

---

RON MITCHELL
PH. 203-468-9544

51-7218 / 2211
1280004705

565

DATE 1/30/01

PAY TO THE ORDER OF USA Group Loan Services

$ 50.00

Fifty and 00/100 DOLLARS

people's bank
CONNECTICUT

Ron Mitchell

MEMO

⑆:221172186⑆: 4706⑈ 0565 ⑈0000005000⑈

---

RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

02-05-0561

DATE 1/27/01

PAY TO THE ORDER OF Dave Adams

$ 400.00

Four Hundred and 00/100 DOLLARS

people's bank
CONNECTICUT

PAID 24-3 FEB 2 2001

MEMO Remco Super Bowl Donation

Ron Mitchell

⑆:221172186⑆: 4706⑈ 0561 ⑈0000040000⑈

001529

RONALD E MITCHELL
D/B/A REMCO

Date 12/9/02

51-7011/2111
279

140

Pay to the Order of ___CASH___ $ 15,000 00

Fifteen Thousand and 00/100 ___ Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For _____

⑆211170114⑆  ⬛⬛⬛ 5727⑈  0140 ⑈000 1500000⑈

---

RONALD E MITCHELL
D/B/A REMCO

0146925  18  5400  5416  12-05-02

Date 12/5/02

51-7011/2111
279

137

Pay to the Order of ___CT. Commercial Lenders___ $ 1418 89

One Thousand Four Hundred Eighteen and 89/100 ___ Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For Inv# 2002111

⑆211170114⑆  ⬛⬛ 5727⑈  0137 ⑈0000 141889⑈

---

RONALD E MITCHELL
D/B/A REMCO

0146926  18  5400  5416  12-05-02

Date 12/8/02

51-7011/2111
279

139

Pay to the Order of ___Jane Diemit___ $ 236.50

two hundred thirty six 50/100 ___ Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For ticket

⑆211170114⑆  ⬛⬛⬛ 5727⑈  0139 ⑈00000 23650⑈

001557







RONALD E MITCHELL
D/B/A REMCO                          51-0295520  18  1100  11-31/02  11-25-02                          134
                                                          Date  11/22/02                    51-7011/2111
                                                                                                  279
Pay to the
Order of        Jane Dziemet                                        $ 18,000 00

eighteen thousand no/100                                            Dollars

◆ CITIZENS BANK
   Connecticut

For  return of principal                              Ron Mitchell                    MP

⑈2111701114⑈        5727⑈      0134  ⑈0001800000✱

---

RONALD E MITCHELL
D/B/A REMCO                          51-0295521  18  1100  1121  11-25-02                          133
                                                          Date  11/22/02                    51-7011/2111
                                                                                                  279
Pay to the
Order of    CT Commercial Lenders                                  $ 2717 65

two thousand seven hundred seventeen                               Dollars
                       + 65/100

◆ CITIZENS BANK
   Connecticut

For                                                   Ron Mitchell                    MP

⑈2111701114⑈        5727⑈      0133  ⑈0000271765✱

---

RONALD E MITCHELL
D/B/A REMCO        540038554  18  3400  3406  11-27-02                                            132
                                                          Date  11-20-02                    51-7011/2111
                                                                                                  279
Pay to the
Order of    Diane Spigiesi                                         $ 87.00

Eighty - seven and no/100                                          Dollars

◆ CITIZENS BANK
   Connecticut

For                                                   Ronald E. Mitchell                    MP

⑈2111701114⑈        5727⑈      0132  ⑈0000008700✱



**RONALD E MITCHELL**
**D/B/A REMCO**                                                                    113

Date 9/3/02                              51-7011/2111
                                                                                   279

Pay to the
Order of  Robeet Torre                                    $ 500 00/xx

Five Hundred and 00/00                                    Dollars

**CITIZENS BANK**
Connecticut

For                                              Ron Mitchell

⑆2111701114⑆    5727⑈    0113  ⑈00000500000⑈

GUARDIAN® SAFETY YELLOW WYE

---

**RONALD E MITCHELL**
**D/B/A REMCO**                                                                    114

Date 9/4/02                              51-7011/2111
                                                                                   279

Pay to the
Order of  David Adams                                     $ 29,088 00

Twenty Nine Thousand Two Hundred Eight Eight Dollars
                                           and 00/00

**CITIZENS BANK**
Connecticut

For                                              Ron Mitchell

⑆2111701114⑆    5727⑈    0114  ⑈00029288800⑈

GUARDIAN® SAFETY YELLOW WYE

---

**RONALD E MITCHELL**
**D/B/A REMCO**                                                                    112

Date 8/26/02                             51-7011/2111
                                                                                   279

Pay to the
Order of  Jane Dejemit                                    $ 5300 00

Five Thousand Three Hundred and 00/00  Dollars

**CITIZENS BANK**
Connecticut

For LOAN Payment                                Ron Mitchell

⑆2111701114⑆    2       5727⑈    0112  ⑈00005300000⑈

GUARDIAN® SAFETY YELLOW WYE

00106 22







HH1023

**119**

RONALD E MITCHELL
D/B/A REMCO

Date 9/24/02

51-7011/2111
279

Pay to the Order of: CT Commercial Lenders    $ 12,500 00

Twelve Thousand Five Hundred and 00/100 Dollars

CITIZENS BANK
Connecticut

For Return of Advance for Goods

Ron Mitchell

⑈211170114⑈ 5727⑈ 0119 ⑈000125000⑈

**116**

RONALD E MITCHELL
D/B/A REMCO

Date 9/11/02

51-7011/2111
279

Pay to the Order of: Jane Dziemit    $ 2,000 00

Two Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For LOAN

Ron Mitchell

⑈211170114⑈ 5727⑈ 0116 ⑈00002000⑈

**120**

RONALD E MITCHELL
D/B/A REMCO

Date 9/24/02

51-7011/2111
279

Pay to the Order of: Jane Dziemit    $ 5300 00

Five Thousand Tree Hundred and 00/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑈211170114⑈ 5727⑈ 0120 ⑈0000530000⑈







RONALD E MITCHELL
D/B/A REMCO

118
51-7011/2111
279

Date 9/24/02

Pay to the Order of CT Commercial $ 3112 94

Three Thousand one Hundred Twelve + 94/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆ 727⑈ 0118 ⑆0000311294⑆

RONALD E MITCHELL
D/B/A REMCO

121
51-7011/2111
279

Date 9/24/02

Pay to the Order of Dave Adams $ 6303 00

Six Thousand Three Hundred Three + 0/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆ 727⑈ 0121 ⑆0000630300⑆





U01627

RON MITCHELL
PH: 203-468-9544

51-7218/2211
1280004706

850

DATE 7/10/02

PAY TO THE
ORDER OF David Adams                                    $ 6000 00

Six Thousand and 00/100                        DOLLARS

people's bank
CONNECTICUT

MEMO

Ron Mitchell

⑈221172186⑈        ⑉706⑈ 0850   ⑊0000600000⑊

---

RON MITCHELL
PH: 203-468-9544

51-7218/2211
1280004706

853

DATE 7/15/02

PAY TO THE
ORDER OF Dianne Spignesi                              $ 9,500 00

Nine Thousand Five Hundred and 00/100   DOLLARS

people's bank
CONNECTICUT

MEMO

Ron Mitchell

⑈221172186⑈        ⑉706⑈ 0853   ⑊0000950000⑊

---



RON MITCHELL
PH: 203-468-9544

51-7218/2211
1280004706

843

DATE 7/1/02

PAY TO THE
ORDER OF SNET                                         $ 70 31/xx

Seventy and 31/100                             DOLLARS

people's bank
CONNECTICUT

MEMO

Ron Mitchell

⑈221172186⑈        ⑉706⑈ 0843   ⑊000000703⑊

001045

0111-0048-1
040324888 0111-0048-1
040324888 07-11-02 2604
PEOPLES BANK 2604
010168101 2604 00 07-11-02

CITIZENS 040/91/141/022
RIVERSIDE RI 07102002
0115001204
1360404497

For Deposit Only

6  07/16/02  6
0212-0400-5
Superior Savings Bank
0045500218
07 16 2002
06 16 2002

0111-0048-1
010344667 0111-0048-1
010344667 07-16-02

PEOPLES BANK 4000
010241692 4000 00 07-16-02

SUPERIOR SAVINGS OF
NEW ENGLAND, N.A.
BRANFORD BRANCH

211170363
FLEET CONN PK
TELLER NO. 5012
211170363
JUL 15 '02

FLEET
2269 133 8 94 07022002
460055227

314 2034689544831  NHV 05
>011900571< FLEET BANK
SBC/SNET TELCO # 0000646378

PEOPLES BANK 0902
010050384 0902 00 07-05-02

UU1046

RONALD E MITCHELL
D/B/A REMCO

103

51-7011/2111
279

Date 7/29/02

Pay to the Order of: Jane Dziemit          $ 8300 00

Eight Thousand Three Hundred and 00/00   Dollars

CITIZENS BANK
Connecticut

For LOAN PAYMENT          Ron Mitchell

⑈211170114⑈  5727⑈  0103  ⑈00008300000⑈

---

RONALD E MITCHELL
D/B/A REMCO

109

51-7011/2111
279

Date 8/20/02

Pay to the Order of: David Adams          $ 3,000 00

Three Thousand and 00/00          Dollars

CITIZENS BANK
Connecticut

For          Ron Mitchell

⑈211170114⑈  5727⑈  0109  ⑈0000300000⑈

---

RONALD E MITCHELL
D/B/A REMCO

107

51-7011/2111
279

Date 8/13/02

Pay to the Order of: David Adams          $ 2,000 00

Two Thousand and 00/00          Dollars

CITIZENS BANK
Connecticut

For          Ron Mitchell

⑈211170114⑈  7727⑈  0107  ⑈0000200000⑈

001004







001055

RONALD E MITCHELL
D/B/A REMCO

102

51-7011/2111
279

Date 7/29/02

Pay to the Order of CT. Commercial Lenders        $ 5,794 44/100

Five Thousand Seven Hundred Ninety Four + 44/100 Dollars

CITIZENS BANK
Connecticut

For Commission +        Ron Mitchell        MP

⑈211170114⑈        5727⑈        0102  ⑈0000579444⑈

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

101

51-7011/2111
279

Date 7/27/02

Pay to the Order of David Adams        $ 28,123 00/100

Twenty Eight Thousand One Hundred Twenty Three and 00/100 Dollars

CITIZENS BANK
Connecticut

For_____        Ron Mitchell        MP

⑈211170114⑈        5727⑈        0101 ⑈00028 l 2300⑈

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL  40239655  18  2419  2435  08-06-02
D/B/A REMCO

104

51-7011/2111
279

Date 8/5/02

Pay to the Order of CASH        $ 3,000 00/100

Three Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For_____        Ron Mitchell        MP

⑈211170114⑈        5727⑈        0104  ⑈00000300000⑈

GUARDIAN® SAFETY YELLOW WYE













0111-0048-1
010376286  0111-0048-1
01PEDROES BANK2000

020084864  2601  01  05-24-02

CITIZENS 2776/91/141/022
RIVERSIDE RI 06120002
P011500120

FRB-PHILA.******MIXED
110029309  0310-0004-0
110029309  06-12-02

0111-0048-1
010336172  0111-0048-1
010336PEDROES BANK4000

010185524  4000  CITIZENS
RIVERSIDE RI 06120
P011500120

Connecticut
Commercial

FRB-PHILA.******MIXED
110029310  0310-0004-0
110029310  06-12-02

0111-0048-1
010336173  0111-0048-1
010336PEDROES BANK4000

010185525  4000  CITIZENS
RIVERSIDE RI 06120
P011500120

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

834

DATE 6/4/02

PAY TO THE ORDER OF George Derosa          $ 50 00

Fifty and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

Ron Mitchell

⑆2211721 86⑆          4706⑆ 0834    ⑈000005000⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706    06-05-02    828

DATE 5/31/02

PAY TO THE ORDER OF Dan Goodison          $ 1,000 00

One Thousand and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO June 02 Rent

Ron Mitchell

⑆2211721 86⑆          4706⑆ 0828    ⑈0000100000⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706    05-25-02

837

DATE 6/25/02

PAY TO THE ORDER OF David Adams          $ 15,000 00

Fifteen Thousand and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

Ron Mitchell

⑆2211721 86⑆          4706⑆ 0837    ⑈0001500000⑈

UU1688

PEOPLES BANK1950
020032734 1950 00 06-11-02
WEBSTER BANK
52111701017
06102002
1972 04166 10001529892

0111-0048-1
030237014 0111-0048-1
030237014 06-05-02

PEOPLES BANK2700
020028874 2700 00 05-05-02
015696918 0098 06-04-02 01 8034

0111-0048 BANK2501
020301321 0111-0048-1
020025400 2501 00 06-26-02

CITIZENS 2786/91/141/082
RIVERSIDE RI 04252002
#041589912##
1100002400

For Deposit Only





001099

P.B. BPT, CT 0163
>2221172186<
020216711 0017810299 14 05-10-02

MAY 10 2002

PEOPLE'S BANK
2211722186

01234456-178

P.B. BPT, CT 0163
>2221172186<
020216711 0017810299 14 05-10-02

MAY 10 2002

PEOPLE'S BANK
2211722186

01234456-178

P.B. BPT, CT 0163
>2221172186<
020216711 0017810299 14 05-10-02

MAY 10 2002

PEOPLE'S BANK
2211722186

001709







001728





001741

0111-0048-1
0203 11528  0111-0048-1
0203 11528  03-15-02
PEOPLES BANK2602

010153749 2602 00 03-15-02

CITIZENS BANK

2023120573

40255 0753 020 03                    0753

>011900571<
40255 600097

010082944 0911 00 03-22-02

ASTOR OVAL
4419864 1 4
BROADBAND
8920 76953

PEOPLES BANK0911          03-29-02

010075309 0911  90  03-29-02

PAY TO THE ORDER OF
FLEET BANK
FAIRFIELD, CT 06430-5900
011900571
FOR DEPOSIT ONLY
CARDIAC SPECIALISTS, P.C.

010 00 01384
FLEET MA WOBURN, MA  34

001742

030411354          300    51-7218/2211    2  03-04-0293

2/28/02
Date

PAY to the
ORDER OF   JANE DZICMIT                                    $ 8,009 78/xx

Eight Thousand Nine and 00/100                          DOLLARS

peoples bank

Ronald E Mitchell

MEMO

:2211:                                      ⅄

---

51-7218
2211                                    94

DATE 2/28/02

$ 27,382 00/xx

Peoples BANK
PAY TO THE ORDER OF
Twenty Seven Thousand Three Hundred Eighty Two 00/100  DOLLARS

people's bank
C O N N E C T I C U T
peoples.com

Ronald E Mitchell

MEMO
:221172186:          711  0094  000273829 0

---









001751





001784

PEOPLES B...

010111653...    .00  01-02-02

PEOPLES BANK0906

020016834  0906  00

0111-0048-1
020280750  0111-0048-1
020280750  12-31-01

PEOPLES BANK2300

010102792  2300  00

remco
for deposit only
280



**Check 747**

RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

747

DATE 12/26/0/

PAY TO THE ORDER OF Peoples Bank    $ 327 36/xx

Three Hundred Twenty Seven and 36/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO                        Ron Mitchell

⑈221172186⑈    706⑈ 0747 ⑈000003273⑈

---

**Check 748**

RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

748

DATE 12/26/01

PAY TO THE ORDER OF DepT of Veterans Affairs    $ 4 50/xx

Four and 50/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO SS# 046 36 3841    Ron Mitchell

⑈221172186⑈    706⑈ 0748 ⑈000000045⑈

---

**Check 745**

RON MITCHELL
PH. 203-468-9544 159 11 3400 3400 12-19-01

51-7218/2211
1280004706

745

DATE 12/16/01

PAY TO THE ORDER OF Dianne Spignesi    $ 12460 00/xx

Twelve Thousand Four Hundred Sixty and 00/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO Pay Back 12,000 of 21,000 + 460 Interest    Ron Mitchell

⑈221172186⑈    706⑈ 0745 ⑈0001246000⑈

0222 0446 122701    12253   5545140104844181 CRCD 10004188

P.B. BPT CT 0103
>2211721885<
010184893 0896010218 14 12-27-01

0000000450    1 841MITCH** 1053 003 12312001 VA 023
FLEET
→ 061000052 ←
DEPOSIT TO THE PAYEE'S ACCOUNT IN
ABSENCE OF ENDIGTD.
BANK OF AMERICA
6000 FELDWOOD ROAD
ATLANTA, GEORGIA
PEOPLES BANK0926 651000052 ←
010167828 0926 00 01-02-02

12/18/01
0212-0400-5
QTY
005168242
0111 0048-1
040005159 0151 B 00142500
040005159 12-19-01
010176569 2500 00

TELLER NO. 6007

RONALD E MITCHELL
D/B/A REMCO

254

51-7011/2111
279

Date 12/11/03

Pay to the
Order of _For bes Propeoty Managment_ $ 5187 00

_Five Thousand One Hundred Eighty Seven_ Dollars

+ 00/100

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑈ 5727⑈ 0254 ⑆0000518700⑈

---

RONALD E MITCHELL
D/B/A REMCO

251

51-7011/2111
279

Date 11/25/03

Pay to the
Order of _For bes Property Mgt_ $ 1214 41

_one thousand two fourteen 41_ Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑈ 5727⑈ 0251 ⑆0000121441⑈

---

RONALD E MITCHELL
D/B/A REMCO

253

51-7011/2111
279

Date 12/2/03

Pay to the
Order of _Ron Mitchell_ $ 6,000 00

_Six Thousand and 00/100_ Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑈ 5727⑈ 0253 ⑆0000600000⑈







001829



RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

1065

DATE 9/22/03

PAY TO THE ORDER OF  CASH                                $ 7500

Seven Thousand Five Hundred + 00/100 DOLLARS

people's bank
CONNECTICUT
peoples.com

MEMO

Ron Mitchell

⑆221172186⑆    4706⑈ 1065 ⑈0000750000⑈



RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

1066

DATE 9/23/03

PAY TO THE ORDER OF  CASH                                $ 2057 00

Two Thousand Fifty Seven + 00/100 DOLLARS

people's bank
CONNECTICUT
peoples.com

MEMO

Ron Mitchell

⑆221172186⑆    706⑈ 1066 ⑈0000205700⑈



RON MITCHELL
PH. 203-468-9544

51-7218/2211
1280004706

1059

DATE 9/13/03

PAY TO THE ORDER OF  United States Treasury                     $ 2875 00

                                                      DOLLARS

people's bank
CONNECTICUT
peoples.com

MEMO SS# 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    20031040-ES    Ronald Mitchell

⑆221172186⑆    706⑈ 1059 ⑈0000287500⑈

001852







001853









RONALD E MITCHELL
D/B/A REMCO

244

51-7011/2111
279

Date 10/15/03

Pay to the Order of  Citizens Bank    $ 5,000

Five Thousand and 00/100    Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For

⑆2111701141⑆    5727⑈    0244    ⑆0000500000⑆

---

RONALD E MITCHELL
D/B/A REMCO

242

51-7011/2111
279

Date 9/23/03

Pay to the Order of  Forbes Property Management    $ 8,000 00

Eight Thousand and 00/100    Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For

⑆2111701141⑆    5727⑈    0242    ⑆0000800000⑆

---

RONALD E MITCHELL
D/B/A REMCO

243

51-7011/2111
279

Date 9/30/03

Pay to the Order of  Citizens Bank    $ 100 00

ONE Hundred and 00/100    Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For  New Account

⑆2111701141⑆    5727⑈    0243    ⑆0000010000⑆

001803







RONALD E MITCHELL
D/B/A REMCO

241

51-7011/2111
279

Date 9/18/03

Pay to the Order of ___Citizens Bank___ $ 3,540.00

___Three Thousand Five Hundred Forty + 00/100___ Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑈211170114⑈    5727⑈    0241    0000354000⑈

---

RONALD E MITCHELL
D/B/A REMCO

240

51-7011/2111
279

Date 9/18/03

Pay to the Order of ___Citizens Bank___ $ 15,000.00

___Fifteen Thousand + 00/100___ Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑈211170114⑈    5727⑈    0240    0001500000⑈

---

RONALD E MITCHELL
D/B/A REMCO

236

51-7011/2111
279

Date 9/8/03

Pay to the Order of ___Citizens Bank___ $ 5367.00

___Five Thousand Three Hundred Sixty Seven + 00/100___ Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑈211170114⑈    5727⑈    0236    0000536700⑈







001809



**RONALD E MITCHELL**
**D/B/A REMCO**

233
51-7011/2111
279

Date 9/1/03

Pay to the Order of ___ Judicial Bureau ___ $ 284 00

Two Hundred Eighty Four and 00/100 ___ Dollars

**CITIZENS BANK**
Connecticut

For 1525649

Ron Mitchell

0233 000002840

---

**RONALD E MITCHELL**
**D/B/A REMCO**

237
51-7011/2111
279

Date 9/8/03

Pay to the Order of ___ Citizens Bank ___ $ 24,600 00

Twenty-Four Thousand Six Hundred and 00/100 Dollars

**CITIZENS BANK**
Connecticut

For ___

Ron Mitchell

0237 0002460000

---

**RONALD E MITCHELL**
**D/B/A REMCO**

232
51-7011/2111
279

Date 8/28/03

Pay to the Order of ___ Citizens Bank ___ $ 10,000 00

Ten Thousand and 00/100 ___ Dollars

**CITIZENS BANK**
Connecticut

For ___

Ron Mitchell

0232 0001000000





UU1871

**Check 239**

RONALD E MITCHELL
D/B/A REMCO

51-7011/2111
279

Date 9/11/03

Pay to the Order of: Forbes Property Management   $ 5367 36/100

Five Thousand Three Hundred Sixty Seven + 36/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆   5727⑈   0239   ⑈0000536736⑈

**Check 235**

RONALD E MITCHELL
D/B/A REMCO

51-7011/2111
279

Date 9/4/03

Pay to the Order of: Forbes Property Management   $ 2833 41/100

Two Thousand Eight Hundred Thirty Three + 41/100 Dollars

CITIZENS BANK
Connecticut

For Invoice 3815

Ron Mitchell

⑆211170114⑆   5727⑈   0235   ⑈0000283341⑈

**Check 234**

RONALD E MITCHELL
D/B/A REMCO

51-7011/2111
279

Date 9/3/03

Pay to the Order of: Forbes Property Management   $ 9,000 00/100

Nine Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆   5727⑈   0234   ⑈0000900000⑈

RONALD E MITCHELL
D/B/A REMCO

238

51-7011/2111
279

Date 9/8/03

Pay to the
Order of _Forbes Property Management_    $ 1342.00

_One Thousand Three Hundred Forty Two_    Dollars

CITIZENS BANK
Connecticut

Ron Mitchell

For _____

⑈2111701114⑈    5727⑈    0238 ⑈0000134200⑈





RON MITCHELL
PH. 203 468 0544

51-7218/2211
1280004706

1044

PAY TO THE
ORDER OF  Citizens Bank

DATE  8/28/03

$ 9,000 00

Nine Thousand and 00/100                          DOLLARS

people's bank
CONNECTICUT
peoples.com

MEMO

Ron Mitchell

⑆221172186⑆        4706⑈ 1044 ⑆0000900000⑈

001887

0330622907
08292003
0111-0048-1
ENT=0856 TRC=0878 PK=12

PEOPLES BANK2602

020080446 2602 00 08-29-03

CITIZENS 0301/91/141/022
RIVERSIDE RI 08293003
021500120-4

RONALD E MITCHELL
D/B/A REMCO

231

Date 8/15/03

51-7011/2111
279

Pay to the Order of  Forbes Property Management   $ 8500.00

Eighty-Five Hundred and 00/00   Dollars

CITIZENS BANK
Connecticut

For _____    Ron Mitchell

⑆211170114⑆    5727⑈    0231  ⑈0000850000⑈

---

RONALD E MITCHELL
D/B/A REMCO

228

Date 7/26/03

51-7011/2111
279

Pay to the Order of  Forbes Property Management Corp  $ 8406.78

eight thousand four hundred six 78/100   Dollars

CITIZENS BANK
Connecticut

For PO3770 / Inv 7/7/03    Ron Mitchell

⑆211170114⑆    5727⑈    0228  ⑈0000840678⑈

---

RONALD E MITCHELL
D/B/A REMCO

227

Date 7/26/03

51-7011/2111
279

Pay to the Order of  Citizens Bank   $ 25,000.00

Twenty-Five Thousand and 00/00   Dollars

CITIZENS BANK
Connecticut

For _____    Ron Mitchell

⑆211170114⑆    5727⑈    0227  ⑈0002500000⑈

---

RONALD E MITCHELL
D/B/A REMCO

229

CTDL 1319355551
01/26/06    Date 7/26/03

51-7011/2111
279

Pay to the Order of  CASH   $ 101.00

One hundred one   00/00   Dollars

CITIZENS BANK
Connecticut

For _____    Ron Mitchell

⑆211170114⑆    5727⑈    0229  ⑈0000010100⑈

UU1892





**RONALD E MITCHELL**
**D/B/A REMCO**

224

51-7011/2111
279

Date 7/8/03

Pay to the
Order of    JANE OZIEMIT                    $ 10,738 22

Ten Thousand Seven Hundred Thirty Eight Dollars
+ 22/100

◆ **CITIZENS BANK**
Connecticut

For _____    Ron Mitchell

⑆211170114⑆ _____5727⑈ 0224 ⑈00010738 22⑈

---

**RONALD E MITCHELL**
**D/B/A REMCO**

CTDL#073347885
X 7/19/05    Date 6/27/03

218

51-7011/2111
279

Pay to the
Order of    CASH                    $ 470 00

Four Hundred Seventy and 00/100 Dollars

◆ **CITIZENS BANK**
Connecticut

For _____    Ron Mitchell

⑆211170114⑆ _____727⑈ 0218 ⑈00000 7000⑈

---

**RONALD E MITCHELL**
**D/B/A REMCO**

MC

219

51-7011/2111
279

Date 6/27/03

Pay to the
Order of    Citizens Bank                    $ 3,000 00

Three Thousand and 00/100 Dollars

◆ **CITIZENS BANK**
Connecticut

For _____    Ron Mitchell

⑆211170114⑆ _____6727⑈ 0219 ⑈0000300000⑈

001907







RONALD E MITCHELL
D/B/A REMCO

225

51-7011/2111
279

Date 7/10/03

Pay to the
Order of CITIZENS BANK                    $ 15,000 00

Fifteen Thousand and 00/00                  Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell                     MP

⑆211170114⑆     5727⑈     0225 ⑈0001500000⑈

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

223

51-7011/2111
279

Date 7/8/03

Pay to the
Order of Forbes Property Management           $ 2,817 70/XX

Two Thousand Eight Hundred Seventeen + 70/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell                     MP

⑆211170114⑆     5727⑈     0223 ⑈0000281770⑈

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

226

51-7011/2111
279

Date 7/24/03

Pay to the
Order of Citizens Bank                     $ 5300 00

Five Thousand Three Hundred and 00/00         Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell                     MP

⑆211170114⑆     5727⑈     0226 ⑈0000530000⑈

GUARDIAN® SAFETY YELLOW WYE







215

RONALD E MITCHELL
D/B/A REMCO

Date 6/5/03

51-7011/2111
279

Pay to the
Order of ___CITIZENS BANK___ | $ 7500.00

__Seventy Five Hundred and 00/100__ Dollars

CITIZENS BANK
Connecticut

Ron Mitchell    MP

For_____

⑆211170114⑆ _____5727⑈ 0215 ⑈0000750000⑈

---

212

RONALD E MITCHELL
D/B/A REMCO    510157125 18 3316 3344 05-04-03

Date 6/2/03

51-7011/2111
279

Pay to the
Order of ___Forbes Property Management___ | $ 4,068.97

__Four Thousand Sixty Eight and 97/100__ Dollars

CITIZENS BANK
Connecticut

Ron Mitchell    MP

For_____

⑆211170114⑆ _____5727⑈ 0212 ⑈00004068970⑈

---

213

RONALD E MITCHELL
D/B/A REMCO    510157122 18 3316 3344 06-04-03

Date 6/2/03

51-7011/2111
279

Pay to the
Order of ___Jane Dziemit___ | $ 20,151.44

__Twenty Thousand one Hundred Fifty one__ Dollars
4 44/100

CITIZENS BANK
Connecticut

Ron Mitchell    MP

For_____

⑆211170114⑆ _____5727⑈ 0213 ⑈00020151440⑈







MM1932

RONALD E MITCHELL
D/B/A REMCO

217

51-7011/2111
279

Date 6/24/03

Pay to the
Order of JANE DZIEMIT                    $ 7000 00/XX

Seven Thousand and 00/100                        Dollars

CITIZENS BANK
Connecticut

For _____

Don Mitchell

⑆211170114⑆        5727⑆  0217  ⑆0000700000⑈

RONALD E MITCHELL
D/B/A REMCO

216

51-7011/2111
279

Date 6/24/03

Pay to the
Order of Forbes Property Management        $ 1644 71/XX

Sixteen Hundred Forty Four and 71/100        Dollars

CITIZENS BANK
Connecticut

For _____

Don Mitchell

⑆211170114⑆        727⑆  0216  ⑆0000164471⑈





001934



**RON MITCHELL**
PH. 203-468-9544

DATE 3/20/03

PAY TO THE ORDER OF Kevan Kennedy          $ 25.00

Twenty-Five and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO Happy Birthday          Ron Mitchell

⑆221172186⑈          4706  0971  0000002500

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706          978

DATE 3/31/03

PAY TO THE ORDER OF Lincoln Life          $ 9,000.00

Nine Thousand and and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO 96-9365849          Ron Mitchell

⑆221172186⑈          4706  0978  0000900000

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706          966

DATE 3/10/03

PAY TO THE ORDER OF CASH          $ 5,000.00

Five Thousand and 00/100          DOLLARS

**people's bank**
C O N N E C T I C U T
peoples.com

MEMO          Ron Mitchell

⑆221172186⑈          4706  0966  0000500000

001939

Granite Bank
8396286844
YFITCH00700045-3
0500028862F GE80 040004 01
0500028862 04-05-03
010070832 2201 00 04-03-03

*Kevin Kennedy*

ATM
DEP 1

FLEET
PEOPLES BANK0906
010008842 0906 00 04-03

FOR DEPOSIT ONLY
FIRST ENDORSEMENT
GUARANTEED
DESPITE ITS ABSENCE
NORWEST BANK
INDIANA, N.A.
FOR WAYNE, INDIANA

315

CITIZENS
RIVERSIDE RI

0111-0048-1    0111-0048-1
540327971    540327971    03-11-03

4599

PEOPLES BANK2703
020112435 2703 00 03-11-03

RONALD E MITCHELL
D/B/A REMCO

183

51-7011/2111
279

Date 3/31/03

Pay to the
Order of  Jane Dziemit                                    $ 17,149 96

Seventeen Thousand One Hundred Forty Nine + 96/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆        5727⑈    0183  ⑈000171499 6⑈

---

RONALD E MITCHELL
D/B/A REMCO

185

51-7011/2111
279

Date 4/1/03

Pay to the
Order of  JANE DZIEMIT                                    $ 12,424 28

Twelve Thousand Four Hundred Twenty Four + 28/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆        65727⑈    0185  ⑈000124242 8⑈

---

RONALD E MITCHELL   5301 44404 18 4320 4331 04-10-03  198
D/B/A REMCO

51-7011/2111
279

Date 4/8/03

Pay to the
Order of  JANE Dziemit                                    $ 16,580 00

Sixteen Thousand Five Hundred Eighty + 0/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆        5727⑈    0198  ⑈000165800 0⑈







RONALD E MITCHELL
D/B/A REMCO

179

Date 3/28/03

51-7011/2111
279

Pay to the Order of    Citizens Bank                    $ 16,580 00

Sixteen Thousand Five Hundred Eighty and 00/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆ ████ 65727⑈    0179  ⑈000165800 0⑈

---

RONALD E MITCHELL
D/B/A REMCO

180

Date 3/28/03

51-7011/2111
279

Pay to the Order of    Citizens Bank                    $ 10,000 00

Ten Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆ ████ 5727⑈    0180  ⑈000100000 0⑈

---

RONALD E MITCHELL
D/B/A REMCO

181

Date 3/31/03

51-7011/2111
279

Pay to the Order of    Citizens Bank                    $ 4420 00

Four Thousand Four Hundred Twenty + 00/100 Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆ ████ 5727⑈    0181  ⑈000044200 0⑈









RONALD E MITCHELL
D/B/A REMCO
530205992  18  3300  3304  02-05-03  158
Date 8/3/03
51-7011/2111
279

Pay to the Order of  Forbes Property Managment Group, LLC  $ 6,623 08/xx

Six Thousand Six Hundred Twenty Three + 08/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆  727⑈  0158  ⑈000066230⑈

---

RONALD E MITCHELL
D/B/A REMCO
159
Date 1/31/03
51-7011/2111
279

Pay to the Order of  Jane Duemit  $ 10,800 00/xx

Ten Thousand Eight Hundred and 00/100 Dollars

CITIZENS BANK
Connecticut

For _____

Ron Mitchell

⑆211170114⑆  727⑈  0159  ⑈0001080000⑈

---

RONALD E MITCHELL
D/B/A REMCO
160
Date 1/31/03
51-7011/2111
279

Pay to the Order of  Citizens Bank  $ 25,000 00/xx

Twenty-Five Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For D. A. Act # 113 581 3164

Ron Mitchell

⑆211170114⑆  5727⑈  0160  ⑈0002500000⑈







002048

RONALD E MITCHELL
D/B/A REMCO

161

Date 2/10/03

51-7011/2111
279

Pay to the
Order of Citizens Bank                    $ 15,000 00/xx

Fifteen Thousand and 00/100 _____ Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆    5727⑈    0161 ⑈000150000⑈

---

RONALD E MITCHELL 0213011 18 4423 4446 02-20-03
D/B/A REMCO

165

Date 2/19/03

51-7011/2111
279

Pay to the
Order of Forbes Property Management          $ 2650 01/xx

Two Thousand Six Hundred Fifty and 01/100 ___ Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆    5727⑈    0165 ⑈000026500⑈

---

RONALD E MITCHELL 0213012 18 4423 4446 02-20-03
D/B/A REMCO

166

Date 2/19/03

51-7011/2111
279

Pay to the
Order of Jane Dziemit                    $ 7500 00/xx

Seven Thousand Five Hundred and 00/100 Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆    5727⑈    0166 ⑈0000750000⑈

002049







002050

*Exhibit N-1*



**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

666

DATE 7/9/01

PAY TO THE ORDER OF JACK Esposito    $ 250⁰⁰

Two Hundred Fifty and 00/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

Ron Mitchell

⑈221172186⑈ ... ⑆06⑈ 0666 ⑈0000025000⑈

---

**RON MITCHELL** 630 11 5100 8 07-27-676
PH. 203-468-9544

51-7218/2211
1280004706

DATE 7/24/00

PAY TO THE ORDER OF CASH    $ 1,000⁰⁰

One Thousand and 00/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

Ron Mitchell

⑈221172186⑈ ... ⑆06⑈ 0676 ⑈0000100000⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

674

DATE 7/24/01

PAY TO THE ORDER OF United Illuminating    $ 82²⁷

Eighty-Two and 27/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

Ron Mitchell

⑈221172186⑈ ... 06⑈ 0674 ⑈000000008227⑈

001433

PEOPLES BANK0904

020055945 0904 00 07-25-01

▶0110001384
FLEET-MA MALDEN, MA 34
3926 125 8 98 07242001

0100761755

0111-0048-1
010261630
010261850-055-258042501
010103363 2301 00 07-27-01

CITIZENS BANK
RIVERVIEW RT #/2841
JUL 26 2001

▶011500120

0223 1117
CITIZENS BANK
RIVERVIEW RT #/2841
07-27-01

6183050202

1$1,000.00  13:21 0011 1  26JUL01  10 1040120  022727E240549
22300Z3483 * 868 CASHED CHECK/BOND

PEOPLES BANK0904

010018192 0904 00 07-27-01

*****▶0111010283*****
Webster Bank
P.O.Box
Waterbury, CT
▶0111010283
CENTRAL RETURN
*****0500000020095*****

▶001384
FLEET-MA MALDEN, MA 34
125 8 98 07242001

FOR DEPOSIT ONLY
AMERICAN PAYMENT SYS. 68ENT FOR
United Illuminating Co.
ABA 011900652
ACT 9361492937

CTX0012 07/25/2001 TS-2267 TR=135
882.27 19200147301C0TV
U.S.D.

UUL434

RONALD E MITCHELL
D/B/A REMCO

140

Date 12/9/02

51-7011/2111
279

Pay to the Order of: CASH    $ 15,000 00

Fifteen Thousand and 00/100 Dollars

CITIZENS BANK
Connecticut

For_____

Ron Mitchell

⑆211170114⑆    0140  ⑈0001500000⑈

GUARDIAN SAFETY YELLOW WYE
©Clarke American

---

RONALD E MITCHELL    40146925  18  5400  5416  12-06-02
D/B/A REMCO

137

Date 12/5/02

51-7011/2111
279

Pay to the Order of: CT. Commercial Lenders    $ 1418 89

One Thousand Four Hundred Eighteen and 89/100 Dollars

CITIZENS BANK
Connecticut

For Inv# 2002411

Ron Mitchell

⑆211170114⑆    0137  ⑈000014188⑈

GUARDIAN SAFETY YELLOW WYE
©Clarke American

---

RONALD E MITCHELL    40146926  18  5400  5416  12-06-02
D/B/A REMCO

139

Date 12/8/02

51-7011/2111
279

Pay to the Order of: Jane Dziemit    $ 236 50

two hundred thirty six 50/100 Dollars

CITIZENS BANK
Connecticut

For ticket

Ron Mitchell

⑆211170114⑆    ?⑈    0139  ⑈00000236 50⑈

GUARDIAN SAFETY YELLOW WYE
©Clarke American







001558

**RONALD E MITCHELL**
**D/B/A REMCO**

130

51-7011/2111
279

Date 11/15/02

Pay to the Order of _CASH_    $ 6,955.00

Six Thousand Nine Hundred Fifty Five + 00/xx Dollars

**CITIZENS BANK**
Connecticut

Ron Mitchell

For _____

⑆211170114⑆    0130 ⑆0000695500⑆

---

**RONALD E MITCHELL** 10246465 18 3100 3101 11-13-02   128
**D/B/A REMCO**

51-7011/2111
279

Date 11/8/02

Pay to the Order of _Jane Dziemit_    $ 3300.00

Thirty Three Hundred and 00/60 Dollars

**CITIZENS BANK**
Connecticut

Ron Mitchell

For _____

⑆211170114⑆    0128 ⑆0000330000⑆

---

**RONALD E MITCHELL** 10246467 18 3100 3101 11-13-02   127
**D/B/A REMCO**

51-7011/2111
279

Date 11/8/02

Pay to the Order of _CT Commercial Lenders_    $ 1546.94

Fifteen Hundred Forty Six and 94/100 Dollars

**CITIZENS BANK**
Connecticut

Ron Mitchell

For _____

⑆211170114⑆    0127 ⑆0000154694⑆

RONALD E MITCHELL
D/B/A REMCO

129

Date 11/9/02

51-7011/2111
279

Pay to the
Order of    Citizens Bank                    $ 15,000 00

Fifteen Thousand and 00/100                    Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆    227⑈    0129  ⑆00015000000⑆

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

135

Date 11/26/02

51-7011/2111
279

Pay to the
Order of    CASH                    $ 7,000 00

Seven Thousand and 0/100                    Dollars

CITIZENS BANK
Connecticut

For

Ron Mitchell

⑆211170114⑆    227⑈    0135  ⑆0000700000⑆

GUARDIAN® SAFETY YELLOW WYE





001586







001602

**RONALD E MITCHELL**
**D/B/A REMCO**

102

51-7011/2111
279

Date 7/29/02

Pay to the Order of ___CT. Commercial Lenders___ $ 5,794 44/100

Five Thousand Seven Hundred Twenty Four + 44/100 Dollars

**CITIZENS BANK**
Connecticut

For Commission +

Ron Mitchell    MP

⑆211170114⑆      27⑈  0102  ⑈0000579444⑈

©Clarke American                          GUARDIAN® SAFETY YELLOW WYE

---

**RONALD E MITCHELL**
**D/B/A REMCO**

101

51-7011/2111
279

Date 7/27/02

Pay to the Order of ___David Adams___ $ 28,123 00/100

Twenty Eight Thousand One Hundred Twenty Three and 00/100 Dollars

**CITIZENS BANK**
Connecticut

For _____

Ron Mitchell    MP

⑆211170114⑆      27⑈  0101  ⑈000281230 0⑈

©Clarke American                          GUARDIAN® SAFETY YELLOW WYE

---

**RONALD E MITCHELL** 40239655  18  2419  2435  08-05-02
**D/B/A REMCO**

104

51-7011/2111
279

Date 8/5/02

Pay to the Order of ___CASH___ $ 3,000 00/100

Three Thousand and 00/100 Dollars

**CITIZENS BANK**
Connecticut

For _____

Ron Mitchell    MP

⑆211170114⑆      27⑈  0104  ⑈0000300000⑈

©Clarke American                          GUARDIAN® SAFETY YELLOW WYE







001007

0993

DATE 7/5/02

PAY TO THE
ORDER OF    Jane Dziemit                          $ 16,300.00

Sixteen Thousand Three Hundred and 00/100          DOLLARS

CITIZENS BANK
Connecticut

FOR LOAN Repayment                    Ron Mitchell

0992

DATE 7/5/02

PAY TO THE
ORDER OF    CT Commercial Lenders                  $ 2927.91

Two Thousand Nine Hundred Twenty Seven and 91/00    DOLLARS

CITIZENS BANK
Connecticut

FOR Commissions INV# 2002613/2002619      Ron Mitchell

0991

DATE 7/3/02

PAY TO THE
ORDER OF    CASH                                   $ 5,000.00

Five Thousand and 00/100                           DOLLARS

CITIZENS BANK
Connecticut

FOR                                    Ron Mitchell







Exhibit No. 2





P.B. BPT CT 0163
>221172186<
020216571 0017810299 14 05-10-02
MAY 10 2002
PEOPLE'S BANK
221172186
0123466-178

P.B. BPT CT 0163
>221172186<
020216571 0017810299 14 05-10-02
MAY 10 2002
PEOPLE'S BANK
221172186
0123466-178

P.B. BPT CT 0163
>221172186<
MAY 10 2002
PEOPLE'S BANK
221172186
0123466-178

Visa 2/03







001728



RON MITCHELL 28 11 5200 51-7218/2211 03-15-02 795
PH. 203-468-9544
DATE 3/13/02
PAY TO THE ORDER OF CASH                                    $ 6,000 00
Six Thousand and 0%00                              DOLLARS

people's bank
CONNECTICUT

MEMO                              Ron Mitchell
⑈:221172186⑈        706⑈ 0795  ⑈0000060000⑈

---

RON MITCHELL                    51-7218/2211              793
PH. 203-468-9544                1280004706
5 MANSFIELD GROVE RD., FOUR BEACHES 146
EAST HAVEN, CT 06512            DATE 3/12/02
PAY TO THE ORDER OF AT+T Broadband              $ 67 82/xx
Sixty-Seven and 82/00                          DOLLARS

people's bank
CONNECTICUT

MEMO                              Ron Mitchell
⑈:221172186⑈        706⑈ 0793  ⑈0000006722⑈

---

RON MITCHELL                    51-7218/2211              791
PH. 203-468-9544                1280004706
                                DATE 3/12/02
PAY TO THE ORDER OF Cardiac Specialists P.C.       $ 25 00/xx
Twenty-Five and 0%00                           DOLLARS

people's bank
CONNECTICUT

MEMO                              Ron Mitchell
⑈:221172186⑈        706⑈ 0791  ⑈0000002500⑈

001741

0111-0048-1
020311528  0111-0048-1
020311528  03-15-02
PEOPLES BANK2602
010153749 2602 00 03-15-02

CITIZENS BANK
RIVERSIDE R I 98/18/92
011500120

202312657

46255 0753 020 03 012302F  002                          0753
2309 123  B 90 03222002
16001RA186          >011908571<
46255 600097
84932050801317RE  02702 00 PREMENT 4
010082944 0911 00 03-22-02

ASTOR OVAL
44108641
BROADBAND
892076953

PEOPLES BANK0911
010075309 0911 00 03-20-02

PAY TO THE ORDER OF
FLEET BANK
FAIRFIELD CT 06430-5900
FOR DEPOSIT ONLY
CARD CARE SPECIALISTS, P.C.

011000138
FLEET-NA WALDEN, MA 34
226  155  B 90 03192002

001742

RONALD E MITCHELL
D/B/A REMCO

154

51-7011/2111
279

Date 1/16/03

Pay to the
Order of  CASH

$ 1646 64

Sixteen Hundred Forty Six and 64/100                     Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆          27⑈          0154 ⑈0000164664⑈

---

RONALD E MITCHELL
D/B/A REMCO

157

51-7011/2111
279

Date 1/22/03

Pay to the
Order of  CASH

$ 7500 00

Seven Thousand Five Hundred + 00/100                    Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆          727⑈          0157 ⑈0000750000⑈

---

RONALD E MITCHELL
D/B/A REMCO

148

51-7011/2111
279

Date 12/28/02

Pay to the
Order of  David Adams

$ 2,000 00

Two Thousand and 00/100                    Dollars

CITIZENS BANK
Connecticut

For _____                    Ron Mitchell

⑆211170114⑆          727⑈          0148 ⑈0000200000⑈





**RONALD E MITCHELL**
**D/B/A REMCO**    520322906 18 1200 1215 12-30-02    147

Date 12 28 02                    51-7011/2111
                                      279

Pay to the
Order of JANE Oziemit                    $ 12,886 00/XX

Twelve Thousand Eight Hundred Eighty Six +00/XX Dollars

**CITIZENS BANK**
Connecticut

For _____    Ron Mitchell    MP

⑆211170114⑈    27⑈    0147  ⑈00012886600⑈

---

**RONALD E MITCHELL**
**D/B/A REMCO**    520322907 18 1200 1215 12-30-02    146

Date 12/28/02                    51-7011/2111
                                      279

Pay to the
Order of CT Commercial Lenders                    $ 1609 81/XX

Sixteen Hundred Nine and 81/100 Dollars

**CITIZENS BANK**
Connecticut

For _____    Ron Mitchell    MP

⑆211170114⑈    27⑈    0146  ⑈00016098⑈

---

**RONALD E MITCHELL**
**D/B/A REMCO**                    149

Date 12/31/02                    51-7011/2111
                                      279

Pay to the
Order of CASH                    $ 14,321 00

Fourteen Thousand Three Hundred Twenty One +00/XX Dollars

**CITIZENS BANK**
Connecticut

For _____    Ron Mitchell    MP

⑆211170114⑈    27⑈    0149  ⑈00014321⑈







RONALD E MITCHELL
D/B/A ~~REMCO~~

153

Date 1/16/03

51-7011/2111
279

Pay to the
Order of  David Adams

$ 3,286.00

Three Thousand Two Hundred Eighty Six and 00/100 Dollars

**CITIZENS BANK**
Connecticut

For_____

Ron Mitchell                MP

⑆2111701140⑆ ▬▬▬▬ 727⑈    0153 ⑆0000328600⑆

©Clarke American

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

156

Date 1/17/03

51-7011/2111
279

Pay to the
Order of  CASH

$ 5,000.00

Five Thousand and 00/100                          Dollars

**CITIZENS BANK**
Connecticut

For_ Kevin

Ron Mitchell                MP

⑆2111701140⑆ ▬▬▬▬ 727⑈    0156 ⑆0000500000⑆

©Clarke American

GUARDIAN® SAFETY YELLOW WYE

---

RONALD E MITCHELL
D/B/A REMCO

152

Date 1/7/03

51-7011/2111
279

Pay to the
Order of  Ron Mitchell

$ 7500.00

Seventy-five Hundred and 00/100                   Dollars

**CITIZENS BANK**
Connecticut

For_____

Ron Mitchell                MP

⑆2111701140⑆ ▬▬▬▬ 727⑈    0152 ⑆0000750000⑆

©Clarke American

GUARDIAN® SAFETY YELLOW WYE







Exhibit R

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

645

11 4428 4435/3 DATE 06/07-01

PAY TO THE
ORDER OF  Dan Goodison                                    $ 1,000 00/XX

One Thousand and 00/100                                    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO                                        Ron Mitchell

⑆221172186⑆        706⑈ 0645 ⑈0000100000⑈

---

**RON MITCHELL** 231  11 1100  51-7218/2211  06-18-01  647
PH. 203-468-9544              1280004706

DATE  6/15/01

PAY TO THE
ORDER OF  Diane Spignesi                                    $ 3233 00/XX

Three Thousand Two Hundred Thirty Three and 00/100    DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO                                        Ron Mitchell

⑆221172186⑆        706⑈ 0647 ⑈0000323300⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

648

DATE  6/15/01

PAY TO THE
ORDER OF  D. M. V.                                        $ 7 50/XX

Seven and 50/100                                          DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO  Boat Registration                    Ron Mitchell

⑆221172186⑆        706⑈ 0648 ⑈0000000750⑈

UH:443



**RON MITCHELL**
PH. 203-468-9544

DATE 3/8/01

PAY TO THE ORDER OF _FAST_ $ 60⁰⁰

_Sixty and 00/100_ DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

_Ron Mitchell_

⑆221172186⑆ 06⑈ 0594 ⑉000000600⑉

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

03-07-01   589

DATE 3/ /00

PAY TO THE ORDER OF _Dianne Spignesi_ $ 6,000⁰⁰

_Six Thousand and 00/100_ DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

_Ron Mitchell_

⑆221172186⑆ 06⑈ 0589 ⑉000060000⑉

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

583

11 3400 DATE 2/26/01 07-01

PAY TO THE ORDER OF _Dept. of Veterans Affairs_ $ 6⁰⁰

_Six and 00/100_ DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO 689 046363841-Mitch

_Ron Mitchell_

⑆221172186⑆ 06⑈ 0583 ⑉000000600⑉

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

586

3490 30 2/26/01 07-01

DATE 2/26/01

PAY TO THE ORDER OF _Cardiac Specialists_ $ 25⁰⁰

_Twenty Five and 00/100_ DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO

_Ron Mitchell_

⑆221172186⑆ 06⑈ 0586 ⑉000002500⑉

001505





001601



**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

850

PAY TO THE ORDER OF _David Adams_                    DATE _7/10/02_    $ _6000 00_

_Six Thousand and 00/100_

**people's bank**
C O N N E C T I C U T                                        DOLLARS

MEMO _____                    _Ron Mitchell_

⑈221172186⑈    ⑈ 0850 ⑈0000600000⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

853

DATE _7/15/02_

PAY TO THE ORDER OF _Dianne Spignesi_                    $ _9,500 00_

_Nine Thousand Five Hundred and 00/100_            DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO _____                    _Ron Mitchell_

⑈221172186⑈    ⑈ 0853 ⑈0000950000⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

843

DATE _7/1/02_

PAY TO THE ORDER OF _SNET_                    $ _70 31/__

_Seventy and 31/100_            DOLLARS

**people's bank**
C O N N E C T I C U T

MEMO _____                    _Ron Mitchell_

⑈221172186⑈    ⑈ 0843 ⑈0000007031⑈



**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

747

DATE 12/26/0/

PAY TO THE ORDER OF Peoples Bank                    $ 327 36/xx

Three Hundred Twenty Seven and 36/100    DOLLARS

people's bank
CONNECTICUT

MEMO                              Ron Mitchell

⑆221172186⑆    06⑈ 0747 ⑈000003273⑈

---

**RON MITCHELL**
PH. 203-468-9544

51-7218/2211
1280004706

748

DATE 12/26/01

PAY TO THE ORDER OF DepT of Veterans Affairs    $ 4 50/x

Four and 50/100    DOLLARS

people's bank
CONNECTICUT

MEMO SS# 046 36 3841              Ron Mitchell

⑆221172186⑆    06⑈ 0748 ⑈0000000450⑈

---

**RON MITCHELL**
PH. 203-468-9544  159 11 3400  12-19-01

51-7218/2211
1280004706

745

DATE 12/16/01

PAY TO THE ORDER OF Dianne Spignesi    $ 12,460 00/xx

Twelve Thousand Four Hundred Sixty and 00/100    DOLLARS

people's bank
CONNECTICUT

MEMO PayBack 12,000 of 21,000 + 460 Interest    Ron Mitchell

⑆221172186⑆    06⑈ 0745 ⑈00012460000⑈

*Exhibit P*

PURCHASE ORDER    6551

**BILL TO:**

INTERNATIONAL FLOOR CRAFT, INC.
319 LINCOLN STREET • RTE. 3A
HINGHAM, MA 02043
(781) 749-6900

DATE OF ORDER  10/29
SHIP ON  11/15
ORDER GIVEN BY  DM
DEPT. 7

TERMS  2% DISCOUNT  /  DAYS
NET  30  DAYS

CANCELLATION DATE

OTHER

TELEPHONE NUMBER  203-468-9544
CONTACT PERSON  Terry Murray Co.

**INTERNATIONAL FLOOR CRAFT, INC., INFOR**

RECEIVING INSTRUCTIONS

please ship a per attached

RECEIVED  NOV 01 2002
BY

**DISTRIBUTION**

| MANUFACTURERS NUMBER | DESCRIPTION | PACK | QUANTITY | BUYING UNIT | COST PRICE | SELL PRICE | DEPT | COMPARATIVE RETAIL | QUANTITY RECEIVED | H | B | N | L | K | V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bronco | | | | | | | | | | | | | | | |
| | Bradford CT | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| SX6 Base per Panel | ea | 286 | | 46.00 | 21.13 | 7 | | | | | | | | | |
| 61 per Base | ea | 280 | | 21.00 | 30.13 | 7 | | | | | | | | | |
| 3/4 per Panel | ea | 280 | | 41.00 | 74.13 | 7 | | | | | | | | | |
| 4X6 Corner Base | ea | 280 | ea | 53.50 | 95.00 | 7 | | | | | | | | | |
| | | ea | 7.00 | 13.19 | 7 | | | | | | | | | |
| GE/BE  11-1-02 | | | | | | | | TOTAL RETAIL  707.15 | | | | | | | |
| | | | | | | | | COST OF GOODS  385.00 | | | | | | | |
| | | | | | | | | COST OF FREIGHT  0 | | | | | | | |
| | | | | | | | | TOTAL COST  385.00 | | | | | | | |

CONDITIONS OF THIS ORDER
ALL COLLECT SHIPMENTS MUST BE ROUTED BY THE TRAFFIC DEPARTMENT AT 508-990-8820 OR 508-990-6803. FAILURE TO COMPLY WILL RESULT IN CHARGES BEING MADE. EXCESSIVE FREIGHT CHARGES INCURRED. ALL BACK ORDERS MUST BE SHIPPED PREPAID.
1. THIS ORDER IS NOT TO BE FILLED AT HIGHER PRICES THAN SPECIFIED WITHOUT OUR WRITTEN PERMISSION.
2. THE BUYER RESERVES THE RIGHT TO CANCEL IF NOT FILLED IN ACCORDANCE WITH OUR DELIVERY REQUIREMENTS.
3. THE RIGHTS RESERVED TO RETURN EXCESS OR DEFECTIVE MERCHANDISE AT SHIPPERS EXPENSE.

SHIPPING INSTRUCTIONS Call our Traffic Manager at 508-990-8820 for DELIVERY APPOINTMENTS Call

PLEASE DO NOT SHIP BACK ORDERS OR PARTIAL SHIPMENTS WHERE ADDITIONAL FREIGHT CHARGES WILL RESULT

BUYERS NOTES:  RATING: (1-10)

DEPOSITION EXHIBIT 1
Dziemit E 1
DR 9/11/06



*Exhibit 2*

11-13-02

# REMCO

PO Box 120221
East Haven, CT 06512
(203) 468-9544

NO'

+1 8X10

DISCOUNT!

| Date | Invoice No. | Order No. |
|------|-------------|-----------|
| October 30, 2002 | 20021030 | 6551 |

| Bill to | Ship to |
|---------|---------|
| International Floor Crafts, Inc.<br>319 Lincoln Street<br>Hingham, MA 02043 | Building 19, Warehouse #3<br>One King Street<br>New Bedford, MA 02746 |

| Quantity | Description | Unit Price | Total |
|----------|-------------|-----------|-------|
| 280 | 5 x 8 Berber Bound | $15.00 | $4,200.00 |
| 280 | 6 x 9 Berber Bound | $21.00 | $5,880.00 |
| 280 | 8 x 10 Berber Bound | $41.00 | $11,480.00 |
| 280 | 9 x 12 Berber Bound | $53.50 | $14,980.00 |
| 280 | 4 x 6 Berber Bound | $7.00 | $1,960.00 |
| | These are delivered prices    Total Due | | $38,500.00 |

Ok to pay
Pay as invoiced
Price/qty ok    11-13-c)

CORP. _____

1/4    R350

OR ACCT # _____

ICE NO. 20021030    ank you for your order.

E  10-30-02

$ 38,500.00  (770.00)
            372200

DATE  11-14-02

RIBUTION  451000

11/13/02

Exhibit R



ORIGINAL

Exhibit "C"

*Exhibit S*

INTERNATIONAL FLOOR CRAFTS, INC

319 LINCOLN ST
HINGHAM, MA 02043

Eastern Bank
Massachusetts

51-129
113

No.    006271

*THIRTY-SEVEN THOUSAND SEVEN HUNDRED THIRTY AND XX / 100

CHECK AMOUNT
*****37,730.00*

DATE
11/14/2002

Pay to the
Order of

REMCO

P.O. BOX 120221
East Haven, CT 06512

⑈006271⑈ ⑆011301798⑆       ⑈0003773000⑈

FOR DEPOSIT ONLY



0449   40

FEDERAL RESERVE BOARD OF GOVERNORS REG. CC

The security features listed below, as well as those not listed, exceed industry standards.

SECURITY FEATURES: Results of document alteration:

Microprint Border — Small type in side border on front of check. Appears as dotted line when photocopied

Security Screen — Absence of "PROTECT A CHECK SAFETY PAPER" verbiage on back of check

Color Backer used on Front of Check — Chemical or erasure attempts will attempt to remove color background

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

```
_____
INTERNATIONAL FLOOR CRAFTS, INC.    )
        Plaintiff                   )
                                    )
v.                                  )
                                    )
DAVID W. ADAMS, et al               )   CIVIL ACTION NO. 05CA11654-NMG
        Defendants                  )
_____)
```

## AFFIDAVIT OF WILLIAM GEMME

I, William Gemme, under oath, depose and state as follows:

1.      I am over eighteen years of age, and I reside in the Commonwealth of
Massachusetts.  I submit the within affidavit in support of Plaintiff's Opposition to
Defendant Jane Dziemit's Motion for Summary Judgment.

2.      Since 1990, I have served as a Vice-President for Spags Supply, Inc., and,
more recently, Spags 19, Inc.  I currently act as the controller and real estate manager of
Building 19, Inc. ("Building 19") In that capacity, I have had the responsibility of
managing the accounting and financial reporting systems, including, without limitation,
such systems for International Floor Crafts, Inc. ("IFC").  Building 19, which operates a
group of discount retail stores in New England area, provides administrative
administrative services for IFC.  IFC operates the rugs, padding and flooring departments
in the Building 19 stores.

3.      Based upon IFC's investigation, which I describe in an Affidavit dated
September 19, 2005 [Doc. No. 75], IFC has determined that IFC has received invoices in
the following total amounts from REMCO, Mansfield Rug, Empire Weavers and Dalton
Padding for non-existent merchandise:

|     | Years     | Company         | Amount                          |
| --- | --------- | --------------- | ------------------------------- |
| a.  | 1999-2005 | Remco           | approx. $2,300,000.00           |
| b.  | 1999-2005 | Mansfield Rug   | approx. $980,000.00             |
| c.  | 1996-2005 | Empire Weavers  | approx. $1,117,000.00[1]        |
| d.  | 1997-2005 | Dalton Padding  | approx. $394,000.00             |

**Total**: $4,791,000.00 (approx.)

Of that total, IFC made payments to the above companies in excess of $4,400,000.00 for non-existent merchandise. I have never located any bills of lading which would show that IFC received any shipments from these entities.

4.      From 1995 through 2005, IFC made payments to CCC International in the total amount of approximately $5.289 million. To date, IFC remains unable to determine the precise amount of fraudulent transactions involving CCC International, although IFC believes that the figure exceeds $3 million. I base that conclusion upon a rough calculation of the amounts paid to CCC for shipments for which we do not have bills of lading.

5.      With regard to Paragraph 26 of my September 19, 2005 affidavit, I note that the term "at retail" should be changed to "at cost" in two places.

---

[1] In the original and amended complaint, IFC erroneously alleged that IFC received $1,170,000 in invoices from Empire Weavers. It appears that that figure was a typographical error. The total figure has been revised accordingly.

6.      IFC's principal place of business is located in Hingham, Massachusetts.

IFC sent checks to REMCO from its main office in Hingham,

Massachusetts.  IFC received REMCO invoices in Massachusetts.  At all

times relevant, Adams, Britto and Williams worked for IFC mainly at

Massachusetts locations.

Signed under the pains and penalties of perjury this 6th day of June, 2008.


                              /s/ William Gemme_____
                              William Gemme