UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS, INC. )
     Plaintiffs              )
                             )
v.                          ) CIVIL ACTION NO. 05CA11654-NMG
                             )
DAVID W. ADAMS, *et al*        )
     Defendants          )

## **DEFENDANT, JANE DZIEMIT'S, REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES, Defendant, Jane Dziemit, defendant in the above-styled civil and hereby files this, her Reply to Plaintiff's Opposition to Plaintiff's Motion for Summary Judgment. Defendant incorporates by reference her previously filed Motion for Summary Judgment, Statement of Undisputed of Material Facts, and Memorandum in Support of her Motion.

## **I. BRIEF INTRODUCTION**

As the Court is already aware, the Deposition of Co-defendant, Ronald Mitchell, was recently taken on May 16, 2008 and was abundantly cited in not only Plaintiff's Opposition, but also in its Response to Defendant's Statement of Undisputed Material Facts and its own Statement of Further Material Facts. Defendant takes this opportunity to reply to Plaintiff's Opposition accordingly.

1

**A.   Defendant Ronald Mitchell Provides Absolutely No Testimony Which
Implicates Either He or Jane Dziemit's Management or even Participation
in the Underlying Criminal Scheme involving IFC
insiders Adams, Britto and Williams**

During his Deposition, Ronald Mitchell admitted that he was "stalling" plaintiff IFC

when he knew there was " problem" involving certain shipments, but he never, ever

concluded that the shipments for carpet did not occur. **(Deposition of Ronald Mitchell,**

**attached as Exhibit 1 and incorporated by reference, p. 86, l. 7- p. 87, l. 2).**  At his

deposition, Mr. Mitchell repeatedly testified that not only did he never know that carpet

was not being shipped until after the lawsuit was filed and served, but also that he could

not even square it in his mind after Britto told him it was scam.  **See Exhibit 1, p. 80, l.**

**4-p. 81. l. 7, p. 156, l. 12- p. 158, l. 12, and p. 161, l. 7-14.** As Mitchell testified, it made

no sense to him that rugs were not being delivered because he was not only getting

compliments on the rugs from IFC buyer Nick Alder, but verbal commitments that more

would be purchased. **See Exhibit 1, p. 163, l. 19- p. 165, l. 1.**  Furthermore, Mitchell and

Dziemit were misled by mastermind Adams, who showed Mitchell a pile of rugs at one

of plaintiff's stores on more than one occasion and told him those were the specific rugs

that Adams was buying with the money from Mitchell and Dziemit.  **See Exhibit 1,**

**p.165, l. 2-24.**

Plaintiff has suggested that Dziemit "acquired or maintained an interest in and control

of REMCO, an organization in which she was a partner, through a pattern of mail and

wire fraud, including, without limitation, her preparation of and communication of

fraudulent invoices to IFC".  **See Plaintiff's Memorandum in Opposition to**

**Defendant's Motion for Summary Judgment at p. 11.**  Unfortunately, for plaintiff, it

misses an enormous step in showing that there was, in fact, mail and wire fraud occurring.  That step is the concept of fraud.  As the Court is aware an individual is involved in committing fraud when she makes a false representation of a material fact with knowledge of its falsity.  Eureka Broadband Corp. v. Wentworth Leasing Corp., 400 F. 3d 62 (1st Cir. Mass. 2005).  As defendants Dziemit and Mitchell have contended throughout the course of this litigation, invoices were generated and mailed to plaintiff based upon IFC documents (ie. purchase orders) and the invoices forwarded were for the exact amount of the IFC purchase orders.  **See Exhibit 1, p. p. 112, l. 3-p. 113, l. 4 and p. 117, l. 2-21. See also Exhibit 2, Deposition of Jane Dziemit incorporated herein by reference, p. 93, l. 2-14.**  Plaintiff is unable to produce a shred of credible evidence from any witness that either Mitchell or Dziemit forwarded invoices to IFC which they knew were based upon phony purchase orders.  In fact, the overwhelming evidence is to the contrary.  Hence, despite plaintiff's thick smokescreen of "evidence" which appears to create issues of fact, the simple fact is that Dziemit could **not** have been involved in a pattern of mail or wire fraud if she did not know that the invoices she forwarded were based upon fraudulent purchase orders.[1]

Additionally, plaintiff has argued that "Dziemit used or invested income received from the pattern of mail and wire fraud both to acquire an interest in and to establish REMCO, a fictitious organization".  Such a contention is as misleading as it is preposterous.  First, Mitchell testified at length concerning how and when he began using the trade name REMCO.  Mitchell testified that in the late 1980's he was the vice president of sales for a company called CrestFoam; he further testified that CrestFoam

---

[1] Plaintiff repeatedly refers to the invoices Ms. Dziemit and REMCO forwarded as "fraudulent", when in fact, the invoices were real and the documents on which they were based  (plaintiff's own purchase orders) were.

shut down its carpet cushion division, at which time he began operating REMCO. **See Exhibit 1, p. 38, l. 2- p. 39, l. 16.** According to plaintiff due to the fact that REMCO was not incorporated and was simply a d/b/a, it was therefore a fictitious company. Mitchell testified that he started REMCO as an independent sales company operating as a broker for other companies in Philadelphia and Connecticut and that he did from time to time send invoices to those companies from REMCO. **See Exhibit 1, p. 46, l. 3- p. 48, l. 24.** Hence, inasmuch as plaintiff would like the Court to believe REMCO was as fictitious as Dalton Padding or other defendants, such was simply not the case. Due to the fact that Mitchell had been operating REMCO for more than twenty years before ever speaking to Dziemit contradicts plaintiff's bald statement that she utilized mail and wire fraud "to establish REMCO".

Additionally, the other portion of plaintiff's claim is also misplaced where it argues that Dziemit "used or invested income received from the pattern of mail and wire fraud both to acquire an interest in and establish REMCO". In fact, Dziemit advanced money, first to CCC and then to Adams to purchase rugs, but sought an interest in REMCO and requested other documents from Mitchell and/or Adams to protect her investment. **See Exhibit 1, p. 197, l. 18-p. 198, l. 4 and p. 207, l. 2-14.** It seems obvious that if Dziemit was involved in the underlying scheme, she certainly would not have been worried about having too much money out or losing her investment. **See Exhibit 1, p. 184, l. 18- p. 185, l. 23.** Despite plaintiff's best attempt to argue to the contrary (ie. that Britto, Adams and Williams needed somewhere to send the money), the scheme itself needed no money. Furthermore, Britto, Adams and Williams certainly could have used co-defendant Michael Brown, Dalton Padding or Empire Weavers to invoice IFC.

Clearly, however, the chances of getting caught were reduced by using the names of genuine companies, including co-conspirator CCC as well as the unwitting Mitchell, Dziemit and REMCO.

Moreover, plaintiff argues extensively that because Mitchell lied concerning one bill of lading he was questioned about by IFC in 2005, just prior to filing of the lawsuit, and gave the impression he was more than a broker for suppliers he believed were legitimately sending rugs to IFC, he must have been aware of the underlying scheme. Such an argument, once again, is unsupported by any witness, document or Mitchell's own testimony. During Mitchell's deposition he testified that while he knew there was a problem with the shipment Gemme questioned him about in 2005, he never concluded no shipments had been made. **See Exhibit 1, p. 86, l. 7- p. 87, l. 2.** With regard to his statement that he had rugs in a warehouse, Mitchell confided that he felt it would be unprofessional if IFC was aware that he was just a broker and the lists of rugs were actually coming from David Adams; Mitchell simply wanted to make his operation seem bigger than it was to IFC's buyer Nick Adler. **See Exhibit 1, p. 253, l. 16- p. 254, l. 3 and p. 98, l. 14 p. 99, l. 23.**

Finally, plaintiff contends that Dziemit's participation in the scheme is indicative due to the fact that she received payments on transactions in which she did not advance funds or received payments of between $1,000.00 to $5,000.00 for preparing invoices. Not unexpectedly, plaintiff fails in its Opposition to provide context to its statement. When Mitchell was asked in his deposition, the following exchange occurred:

Q:     I don't think I asked this one, but, why was it that Jane Dziemit received funds even when she didn't provide any money?

A:    Because in the very beginning, what I said was, if you get me started in this, I would never hurt you.  I would--- in other words, there would possibly come a time where I didn't need her money, which ultimately became Mansfield Rug. I lost track of the question.  I'm sorry. Can you repeat the question?

Mr. Klehm:    Do you mind? I forget.

Mr. Cohen:    Why did you get money when no loans were made.

The Witness:  Right.  Because it was the fair thing to do.  She was my whatever you want to call her, partner.  I mean, I couldn't have done this without her, so I didn't think it was fair—I didn't want to hide things from her.

**See Exhibit 1, p. 186, l. 19-p. 187, l. 14.**

Plaintiff seeks to place some improper motive and ignores the obvious: partners, at first glance, may appear to receive more money than they might be entitled to, but their contribution to the partnership and/or good will brought to the table, often justify the money they receive.

Ultimately, plaintiff's attempts to characterize Mitchell, Dziemit and REMCO as insiders like Britto, Adams and Williams fails and as such its reliance on United States v. Gabriele, 63 F.3d. 61, 68 (1st Cir. 1995) is unsupported.  In Gabriele, the defendant made the statement concerning a money laundering scheme for drug money "Steve [Saccoccia] is going to put us all in jail someday".  Further, Gabriele not only knew that the money laundering scheme was occurring, but became an employee of the money launderer and had knowledge about and helped count cash shipments.  Even though Dziemit picked up IFC checks at her post office box, generated invoices and fronted funds, she nor Mitchell for that matter, ever were aware that no rugs were being shipped.  She was not an "employee" of Britto, Adams or Williams, the true insiders and, therefore could not have been participating in "the operation or management" of the enterprise.  She, like plaintiff, was a patsy and unaware that anything unusual was happening.  Defendant respectfully

submits that plaintiff's reliance on Metropolitan Life Ins. Co. v. Ditmore, 729 F.2d. 1, 5 (1st Cir. 1984) for the proposition that "[s]tate of mind is difficult to prove and great circumspection is required where summary judgment is sought…" is equally inapplicable.  In Ditmore, plaintiff alleged a physician submitted false claim forms by way attending physician statements leading to plaintiff's overpayment of claims. Ditmore filed a Motion for Summary Judgment submitting an affidavit calling into question the interpretation of the attending physician's statement.  The Court did not grant summary judgment because a difference in interpretation created a factual issue. Even more importantly, however, no discovery had been conducted prior to the filing of defendant's Motion.  Plaintiff in the case at bar can claim no lack of discovery concerning Mitchell or Dziemit.  Furthermore, neither Mitchell's nor Dziemit's affidavits or deposition testimony leave room for interpretation.

### B.  Because Plaintiff cannot Create an Issue of Fact that Dziemit knew, participated or was Involved in the Operation or Management of the Criminal Enterprise, Its Remaining Counts Must be Dismissed

Plaintiff's Remaining Counts, Conspiracy to Commit RICO (Count II), Conversion (Count III), Unfair and Deceptive Business Practices (Count IV) and Fraud (Count V) must fail because plaintiff cannot demonstrate or show any material fact that Dziemit participated or was involved in the operation or management of the criminal enterprise.

Plaintiff's remaining counts separately and in combination require plaintiff to show that material facts exist that Dziemit had the requisite mindset to commit these

intentional torts or willful acts. [2]

In its interrogation of Mitchell, plaintiff concentrated a great deal of time and effort to suggest that Mitchell and by association Dziemit had questionable business practices, including, but not limited to writing checks to cash, sending money up front for fictitious rug purchases and comingling personal and business funds.  While Mitchell admitted writing checks to cash was a bad business practice, for instance, he stated that he was not trying to hide anything.  **See Exhibit 1, p. 134, l. 5-24.**   Furthermore, when plaintiff's counsel actually questioned Mitchell concerning checks made payable to cash, there were only approximately a dozen or so checks made payable in that fashion compared to the several hundred that were prepared during the relevant time period.  Moreover, Mitchell repeatedly testified that he could not identify what the checks were for without other supporting documentation.  **See Exhibit 1, p. 135, l. 1-19.**

It became clear during Mitchells' deposition that while he was certainly not a terrific businessman and an even poorer record keeper, he (and Dziemit) were naïve to the criminal enterprise and never intended to take money from IFC or anyone else.  **See Exhibit 1, p. 129, l. 5-24 and p. 175, l. 5-9.**

Considering plaintiff's claims II through V rely on its ability to show genuine issues of material facts concerning Defendant Dziemit's participation in the operation and management of the scheme, which plaintiff has failed to do, but for a series of speculative suppositions, its claims under Counts II through V must be dismissed.

---

[2] In addition to lack of intent required for the conversion claim, plaintiff in its opposition incorrectly argues that it is not seeking return of the instrument, but rather the money.  Such a contention does not make a viable conversion claim, but instead would be a claim of theft by taking

## C. Conclusion

Based upon the foregoing, defendant, respectfully requests that this Honorable

Court Grant Defendant's Motion for Summary Judgment on all Counts.

Respectfully Submitted,
Counsel for the Defendant,

/s/ Neil S. Cohen, Esq.
neilcohenlaw@yahoo.com
Neil S. Cohen, Esquire (BBO# 561173)
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108
(617) 367-0070

## Certificate of Conference – Rule 7.1(A)(2) Statement

The undersigned hereby certifies that on or about June 6, 2008, counsel for the

Defendant/Plaintiff in counterclaim conferred with counsel for Plaintiff concerning this

motion.  No agreement as to the Disposition of the case could be reached.

/S/ Neil S. Cohen
Neil S. Cohen, Esq.
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108

<u>**Certificate of Service**</u>

The undersigned hereby certifies that a copy of the above motion was caused to be served on all counsel of record via the ECF filing system and on all parties not represented by counsel by first class mail on June 25, 2008.

<u>/S/ Neil S. Cohen</u>
Neil S. Cohen, Esq.
**NEIL S. COHEN, P.C.**
Eleven Beacon Street, Suite 625
Boston, MA 02108

1

1      VOLUME:      II
                PAGES:    1-260
2                  EXHIBITS:  37-49
3
      UNITED STATES DISTRICT COURT
4      FOR THE DISTRICT OF MASSACHUSETTS
5       Civil Action No. 05CA11654-NMG
6
                                      )
7   INTERNATIONAL FLOOR CRAFTS,        )
   INC.,                              )
8     Plaintiff,                      )
                                      )
9   vs.                               )
                                      )
10   DAVID W. ADAMS, ET AL,            )
      Defendants.                     )
11
12
13
14        DEPOSITION OF RONALD MITCHELL, a
15   witness called on behalf of the Plaintiff,
16   pursuant to the provisions of the Federal
17   Rules of Civil Procedure, before Jill
18   Shepherd, Registered Professional Reporter,
19   CSR, CLR and Notary Public, in and for the
20   Commonwealth of Massachusetts, at the offices
21   of Krasnoo Klehm, 23 Main Street, Andover,
22   Massachusetts, on Friday, May 16, 2008,
23   commencing at 10:05 a.m.
24

2

1   APPEARANCES:
2   LAW OFFICES OF JAMES B. KRASNOO
3   By:  Paul J. Klehm, Esquire
4      -- and --
5      James Krasnoo, Esquire
6      -- and --
7      Benjamin L. Falkner, Esquire
8   23 Main Street
9   Terrace Level
10   Andover, Massachusetts 01810
11   Tel:  978.475.9955
12   E-mail:  Pklehm@krasnoolaw.com

13   Attorney for the Plaintiff.
14
15
16   NEIL S. COHEN, P.C.
17   By:  Neil S. Cohen, Esquire
18   11 Beacon Street
19   Suite 625
20   Boson, Massachusetts 02108
21   Tel:  617.367.0070
22   E-mail:  neilcohenlaw@yahoo.com
23   Attorney for the Defendant,
24   Jane Dzeimit.

                              3
1   APPEARANCES, CONTINUED
2   LAW OFFICE OF FREDERIC D. GRANT, JR.
3   By:  Frederic D. Grant, Jr., Esquire
4   727 Atlantic Avenue
5   Second Floor
6   Boston, Massachusetts  02108
7   Tel:  617.357.6555
8   E-mail:  grant@grantboston.com
9   Attorney for the Witness,
10   Ronald Mitchell.
11
12
13   LAW OFFICE OF ISAAC H. PERES
14   By:  Isaac H. Peres, Esquire
15   92 State Street
16   Eighth Floor
17   Boston, Massachusetts  02109
18   Tel:  617.722.0094
19   On Behalf of the Defendant,
20   David Adams.
21
22   ALSO PRESENT:    Bill Gemme
                Nicolas Adler-Duthe
23                  International Floor Crafts
24

86

7   Q.  Did you lie to your other customers with the
8       frequency with which you lied to IFC?
9   A.  No.
10  Q.  Okay.  So why would you lie more to IFC?
11  A.  The lies were only at the end where I was
12      trying to stall.  I mean, other than that, I
13      wasn't lying to anyone.
14  Q.  Okay.
15  A.  I thought we were doing a good thing.
16  Q.  Is it a more accurate statement to say that
17      the lies were at the end because you realized
18      that there was a problem involving these
19      alleged shipments?
20  A.  Problem, yes.
21  Q.  And the nature of that problem was that they
22      may not have been happening at all; is that
23      correct?
24  A.  I didn't think that.

87

1   Q.  You never thought that before the case
2       started?
3   A.  Never.

80

4  Q.  Were the rugs that are referenced in this
5     bill of lading ever shipped to IFC?
6  A.  To my knowledge, they were.
7  Q.  What's the basis of your knowledge?
8  A.  I had sent money to purchase them.  In my
9     mind, there was no difference between this
10     and any other invoice, whether it be Remco or
11     Mansfield Rug that I billed.
12  Q.  Did you ask for any confirmation from either
13     Mr. Britto or Mr. Adams that the product had
14     been shipped before you created this bill of
15     lading?
16        MR. COHEN:  Objection to the form.
17  A.  Could you repeat it?
18  Q.  Sure.  Did you ask either Mr. Britto or
19     Mr. Adams whether the product reflected on
20     this -- the bill of lading had actually been
21     shipped before you prepared this bill of
22     lading?  And I'm referring to page 572.
23  A.  Probably not.
24  Q.  Why not?

81

1  A.  Just assumed it was.  I never thought, ever,
2     that things weren't shipped.
3  Q.  Even after you prepared 572?
4  A.  (No audible response.)
5  Q.  Is that a yes?
6  A.  Yes, I'm sorry.  I thought that until I
7     received the subpoena.

156

12  Q.  When did you first meet Kevin Britto?
13  A.  About three days after I got the initial
14      subpoena for this case.
15  Q.  What were the circumstances under which you
16      met him?
17  A.  I called him up, and I said, What the hell is
18      going on?  He said, We need to talk.  I drove
19      to New York.  I'm going to assume it was the
20      next day.  Met him at a restaurant.  That was
21      my first physical meeting.  And he proceeded
22      to tell me the truth.
23  Q.  As best you can recall, what did you say to
24      him and what did he say to you?

157

1   A.  I can remember pretty well.  As I said, you
2       know, what is the -- What's going on?  What
3       have you done?  And he said, Well, the whole
4       thing was a fraud, Ron.  And I said, That
5       just can't be.  That doesn't make any sense
6       to me.  How could there never be any rugs?  I
7       mean, it's just, we're talking a lot of
8       money.  And he said, There never was.  He
9       said, Not only with you, with other people
10      too.  And I even brought up, I said, Well,
11      like so and so said to me they liked the
12      rugs.  You know, I will buy more.  He said,
13      There weren't any rugs, Ron.  I mean, I just
14      kept saying, That can't be.  I find that
15      impossible.  I said, I could see if you were
16      fudging on -- you know, we billed somebody
17      for 200 rugs and there was only 150 sent.  I
18      could see that happening.  But to tell me the
19      whole thing was a fraud, just literally made
20      no sense to me.  I drove home there still
21      saying, This is not possible.
22  Q.  Have you now told me everything that Kevin
23      Britto told you at that meeting?
24  A.  I'm sure I missed something.  We talked for a

158

1       good hour and a half.  To be honest, I was
2       just -- when he said that to me, I won't say
3       I was in shock, but I didn't -- I mean, I
4       didn't know what to say or do at that point.

 5  Q.  Did he say anything about Jane Dzeimit?
 6  A.  No.
 7  Q.  Did you have any discussion about how to
 8      defend yourselves in the case?
 9  A.  No, because I don't remember if it was that
10      first meeting or our next conversation, he
11      said that he would, you know, tell whoever
12      that I was not involved in the fraud, that I
13      had no knowledge of it.

161

7  Q.  Did you believe at the time that

8     Kevin Britto had information about the nature

9     of the scheme?

10  A.  Not until -- well, I didn't know there was a

11     scheme until I met with him and he told me.

12  Q.  Did you talk to Jane Dzeimit when you learned

13     there had been a lawsuit filed?

14  A.  Yeah.

163

19  Q.  Earlier you were talking about your
20      conversation with Mr. Britto, and you were
21      saying that Mr. Britto had said that -- that
22      you had said that so and so liked the rugs;
23      do you remember that?
24  A.  Yes.

164

1  Q.  Who told you that they liked the rugs?
2  A.  Nick Adler.
3  Q.  When did he tell you that?
4  A.  '03, '04.  I don't know.
5  Q.  In person?
6  A.  No, it was after a delivery.  I don't know if
7      this is helpful or not.  Most of the items
8      that I would sell to Nick Adler, I got a list
9      of what supposedly was on a truck from Kevin.
10      That was really how I started talking to
11      Kevin more and more.  In the beginning, Kevin
12      was never involved.  I was under the
13      impression that Kevin had a source from
14      Oriental Weavers for these seconds that were
15      a bargain.  And we sent a couple of loads,
16      and at one point I was trying to get another
17      order.  He said to call -- I might have just
18      -- probably just following up a sale and I
19      had called Mr. Adler, and said, you know, Did
20      you get to look at the shipment?  And he
21      said, Yeah, the stuff looks good.  I will
22      take more.  I even called Kevin.  I said --
23      Again, this is where I was a bit misleading.
24      I wasn't going to tell Mr. Adler that I'm

165

1      getting these lists from Kevin Britto.

165

2  Q.  Did you ever see any shipment to IFC that was
3     invoiced by Remco?
4           MR. COHEN:  Objection to the form.
5  A.  Yes.  Well, I actually went -- I met Dave at
6     a store.  Again -- it might have been the
7     New Bedford store.  Either New Bedford or
8     Cranston.  And you know, they pile the rugs
9     on top of each other, and he said, This is
10     the stuff we're buying.  You know, he flipped
11     a few back, and I said, Oh.  That's fine,
12     nice.
13  Q.  When was this?
14  A.  Estimating, '01, and I think it happened more
15     than once.
16  Q.  How many times did it happen?
17  A.  Less than five.
18  Q.  Did Mr. Adams show you the supposed shipments
19     each time?
20  A.  Yes.
21  Q.  And when you saw the goods, did you have an
22     invoice or purchase order with you to match
23     them up?
24  A.  No.

112

3  Q. Did David Adams ever give you any
4     documentation at all to suggest that there
5     were any rugs being shipped to IFC?
6  A. No. I mean, he would send a purchase order.
7  Q. Okay. Other than a purchase order.
8  A. He would then tell me, on the average, maybe
9     three weeks later, Okay. You can bill that
10    purchase order. Usually, it was the exact
11    number of the purchase order. Occasionally,
12    it would be adjusted, you know, in a very
13    minor way. Like, if it said 200 rugs, he
14    might say it's only 196 or something, you
15    know.
16 Q. He would tell you what to bill for?
17 A. Yes.
18 Q. And he would tell you what to ship?
19 A. Yes.
20 Q. Did you see the entirety of the purchase
21    order when you received the IFC purchase
22    order?
23 A. They were always faxed to me. One -- you
24    know, one sheet purchase order with a

113

1     purchase order number on it.
2  Q. And it would have the contact person listed
3     on it?
4  A. Yes.

117

2   Q.  Okay.  When you say a bill, you mean you --

3   A.  Invoice it.

4   Q.  Would it be a Remco invoice?

5   A.  Yes.

6   Q.  Who would prepare the invoice?

7   A.  Jane.

8   Q.  What would she use to prepare the invoice?

9   A.  Me telling her that Dave said it's been

10      received and you can go ahead and bill it.

11  Q.  How would she know what to put in the invoice

12      in terms of what product?

13  A.  From the purchase order.

14  Q.  This would be an IFC purchase order?

15  A.  Yes.

16  Q.  Okay.  Who
prepared the IFC
purchase order?

17  A.  Dave Adams.

18  Q.  So would he fax
it to Remco?

19  A.  He'd fax it to me, yes.

20  Q.  He would fax it to you and then --

21  A.  Sometimes I would just refax it right to her.

38

2  A.  In the middle eighties.  I -- also working --
3     Crest Foam was bought out by a company called
4     Leggett Platt, who also bought a facility in
5     Newburyport, Massachusetts, that I took that
6     division over for approximately two and a
7     half years.
8  Q.  Was that two and a half years part of the
9     ten-year period?
10  A.  In addition to.
11  Q.  What did you do during that
12     two-and-a-half-year period?
13  A.  I ran a division, their carpet cushion
14     division.
15  Q.  Sales?
16  A.  Yes.  I was actually vice president of sales.
17  Q.  What were your duties as VP of sales?
18  A.  Create a product line, hire a sales force.
19  Q.  Anything else?
20  A.  No.
21  Q.  What were the circumstances surrounding your
22     leaving Crest Foam and then its later named
23     company?
24  A.  They shut the -- shut down the carpet cushion

39

1     division.
2  Q.  Where did you work next?
3  A.  That's when I went on my own, so to speak,
4     created Remco.
5  Q.  When was Remco created?
6  A.  Approximately 20 years ago.
7  Q.  So that would be approximately 1988?
8  A.  Approximately.
9  Q.  What is the full name of Remco?
10  A.  That's the full name.
11  Q.  Have you ever incorporated under the name
12     Remco?
13  A.  No.
14  Q.  Has Remco always been what is known as a
15     d/b/a?
16  A.  Yes.

46

3  Q.  Yeah.  Is it your testimony that as of the
4      time you spoke to Mr. Adler that you did not
5      tell him that you had a warehouse in
6      existence at that time?
7  A.  I don't remember my exact words.
8  Q.  Okay.  Well, let me put it this way:  Did you
9      lie to him about whether or not you had a
10      warehouse for Remco?
11  A.  Yes.
12  Q.  Why did you lie?
13  A.  Just to avoid the conversation of me being a
14      broker.
15  Q.  Is that the sole reason?
16  A.  Yes.
17  Q.  Have you lied to other companies with which
18      you've dealt with about whether or not Remco
19      has a warehouse?
20  A.  Not that I recall.
21  Q.  Not a single time?
22  A.  Not that I recall.
23  Q.  Okay.  Who did Remco sell to?
24  A.  Other than International Floor Crafts?

47

1  Q.  Okay.  So International Floor Crafts was one
2      company; what other companies?
3  A.  I would -- Remco, being me, was selling
4      padding through a company called Dalton Foam,
5      not Dalton Padding, which was owned by North
6      Carolina Foam.  Most customers that I sold,
7      including International Floor Crafts, they
8      did the billing.  There were occasions where
9      if they didn't want to establish credit with
10      someone, a customer that I knew and trusted,
11      then I would bill them under Remco.
12  Q.  On how many occasions did that occur?
13  A.  More than ten, less than 40.
14  Q.  Those would be invoices that you would
15      prepare, correct?
16  A.  Right.
17  Q.  Do you have any of those invoices?
18  A.  I'm not sure.
19  Q.  Can you name any of the companies that you
20      sent invoices to?
21  A.  Falcone's Carpet.

22  Q.  Where is that located?
23  A.  Philadelphia.
24  Q.  Is it still in existence?

                              48

1   A.  To my knowledge.
2   Q.  Is there a particular person that you dealt
3        with at Falcone Carpet?
4   A.  Harry Falcone.
5   Q.  Did you ever cause any fake bills of lading
6        to be created in your career?
7   A.  Possibly.
8   Q.  Wouldn't that be something you would
9        remember, whether or not you created a fake
10       bill of lading?
11  A.  I don't know how to answer that.
12  Q.  Okay.  We'll get back to that.
13           What other companies did you create
14       an invoice for Remco?
15  A.  I think the company called American Floor
16       Covering.
17  Q.  Where is that located?
18  A.  West Haven, Connecticut.
19  Q.  Is it still in existence?
20  A.  Yes.
21  Q.  Any others?
22  A.  I'm sure there are, but I just can't think of
23       the names now.  It would have been several
24       years ago.

197

18  Q.  Sir, I'm going to show you what's been marked
19      as Deposition Exhibit 41 and ask if you
20      recognize it.
21  A.  Yes, I do.
22  Q.  What do you recognize it to be?
23  A.  At some point -- let me reread this, please.
24  Q.  Take your time.

198

1  A.  (Witness reviewing document.)  This -- again,
2      I'm going from memory, I believe this -- it
3      was a form that Jane Dzeimit drew up to
4      protect money that was sent to Dave Adams.

207

2  A.  There's no -- I'm trying to think of the
3     word.  There's no -- we didn't have a
4     building.  We didn't have tables and chairs.
5     This was a partner in name only.
6  Q.  Okay.  Go ahead.
7  A.  If you want me to expand.  Initially, her
8     reasoning for becoming a partner was just to
9     protect her interests.  If I dropped dead --
10    I have had a history of heart problems -- she
11    could finish up whatever needed to be done.
12    I don't even really remember her specific
13    reason for resigning.  I don't recall.  It
14    really meant nothing to me either way.

184

18  Q.  Did you and Ms. Dzeimit ever dispute the
19      amounts paid out for any loan or any deal?
20  A.  If there was, it would have been a very minor
21      issue.  There would be times where --
22      whatever profits were earned collectively by
23      Jane and I, there would be times when I'd
24      talk her in to putting out more money and

185

1      say, Okay.  Well, I will give you an extra
2      percent, or whatever the case may be.  So
3      sometimes they would -- their percentages
4      would vary a little.
5   Q.  And how much would they vary?
6   A.  Oh, ten percent, max.
7   Q.  So how many times did it occur that you
8       offered to increase her percentage so that
9       she would loan additional money?
10             (Mr. Krasnoo returns.)
11  A.  Less than ten, more than three.
12  Q.  And on these occasions, did she always agree
13      to loan the money?
14  A.  No.
15  Q.  On how many occasions did she refuse to loan
16      the money even though you offered her more of
17      a percentage?
18  A.  Less than ten, more than three, as best I
19      recall.
20  Q.  What reasons did she give for not loaning the
21      money?
22  A.  Too much money already out.  There was always
23      distrust on her part losing her investment.

86

7  Q.  Did you lie to your other customers with the
8     frequency with which you lied to IFC?
9  A.  No.
10  Q.  Okay.  So why would you lie more to IFC?
11  A.  The lies were only at the end where I was
12     trying to stall.  I mean, other than that, I
13     wasn't lying to anyone.
14  Q.  Okay.
15  A.  I thought we were doing a good thing.
16  Q.  Is it a more accurate statement to say that
17     the lies were at the end because you realized
18     that there was a problem involving these
19     alleged shipments?
20  A.  Problem, yes.
21  Q.  And the nature of that problem was that they
22     may not have been happening at all; is that
23     correct?
24  A.  I didn't think that.

87

1  Q.  You never thought that before the case
2     started?
3  A.  Never.

253

16  Q.  Sir, I think, finally, one of the reasons I
17      think that you stated that you were stalling
18      Mr. Gemme was you didn't want him to know you
19      were just, quote/unquote, a broker, correct?
20  A.  Correct.
21  Q.  Was that sort of to kind of give the illusion
22      that you were a bigger operation than you
23      were?
24  A.  It was probably more that I didn't want to

254

1      have to say, Well, I have to get that
2      information from Dave Adams.  It would also
3      make me look very unprofessional.

98

14  Q.  Mr. Mitchell, I just want to ask you another
15       question that relates to Exhibit 37.
16            What would have been unprofessional
17       about telling IFC that Dave Adams had the
18       paperwork that they sought?
19  A.  I don't know how to explain that.  I don't
20       know how to answer that.  I'm sorry.  I don't
21       know how to answer that.
22  Q.  You understand the question?
23  A.  Yes.
24  Q.  You have no information that you can impart

99

1       in relationship to that question?
2   A.  That maybe it maybe would look like things
3       weren't on the up and up or something, but
4       that's not coming out right either.  To some
5       degree, there was always some degree of --
6       what's the word I'm looking for?  Deception,
7       maybe.  I don't think I wanted anyone, or I
8       assumed that people shouldn't know the
9       relationship between Dave Adams and myself.
10      The less they knew, the better.  You know, I
11      really never -- all's I did was send money
12      for the carpet to be purchased.  I never
13      negotiated a carpet purchase from a
14      manufacturer.  And that's probably what I
15      was -- the illusion I was trying to create;
16      with Mr. Adler, for example, I'd call him up
17      and say, I have these rugs here.  Those lists
18      of rugs were sent to me either by Dave or by
19      Kevin, but I'm not going to say to Mr. Adler
20      that, Oh, Kevin or Dave Adams sent me this
21      list.
22  Q.  Why not?
23  A.  It just seemed unprofessional.

134

5  Q.  Why did you make checks payable to cash for

6     Jane?

7  A.  I don't recall.

8  Q.  Would you agree with me that it's not good

9     business practice to make a check payable to

10     cash from an account for a business?

11  A.  Yes.

12  Q.  Were you trying to hide something?

13  A.  No.

14  Q.  Some of these checks that are made payable to

15     cash, I represent to you are for large

16     amounts and several thousands of dollars.

17         Does that refresh your recollection

18     as to issuing some checks to Jane Dzeimit in

19     cash?

20  A.  I said I probably did.  I don't remember

21     amounts.

22  Q.  But do you remember the amounts getting up to

23     the tens of thousands?

24  A.  No.

135

1  Q.  And as you sit here today, you can't give me
2     a single reason why you would write checks
3     payable to cash to anyone; is that correct?
4  A.  If I had some -- I'm sure when it was done,
5     it was only done to Jane.  And if I had some
6     time to think about it, I probably would be
7     able to tell you why.
8  Q.  Okay.  Did you review any checks before you
9     came in here today?
10 A.  No.
11 Q.  You knew I was going to be asking you about
12     issues relating to your transactions
13     involving Remco, correct?
14 A.  Correct.
15 Q.  Did anyone prevent you from looking over the
16     checks before you came in today?
17         MR. COHEN:  Objection to the form.
18 Q.  You can answer.
19 A.  No, but I have not looked at any.

129

5   Q. How was the amount that you would send to him
6       determined?
7   A. Whatever he asked me for.
8   Q. At some point he would contact you directly
9       and say, I need X dollars; is that correct?
10  A. Yes. It was almost --
11  Q. Go ahead.
12  A. -- like a standard of 25. I remember asking,
13      How come it's not 22 or 27? Why is it
14      always -- and he gave me a reason why. And
15      it didn't really matter to me.
16  Q. What was the reason that he gave you?
17  A. That he -- you know, sometimes he might be
18      sending 23. Sometimes he might be sending
19      27. That he would always work it out.
20  Q. Okay. Did that make you suspicious?
21  A. No.
22  Q. Okay. Why not?
23  A. Because I'm stupid. I'm sorry. I don't mean
24      to -- it didn't.

175

5  Q.  Did you keep track of how much money you sent

6       to Forbes Property Management versus how much

7       you sent to Connecticut Commercial Lenders?

8  A.  No, I kept it in one broad -- as you can see,

9       my recordkeeping leaves a lot to be desired.

Page 93

A. No, I do not shred documents.

1  Q. When you prepared invoices, what documents

2      would you use to prepare them?

3  A. I would prepare the invoices based on signed

4        PO's from Building 19 or IFC, whatever it's

5      called.

6  •    Did you receive a purchase order from Building 19

7      for every one of the 35 loans you made?

8  A. I believe I received a PO

9  • . How would you receive -

10 A. -- from Building 19.

   • . How would you receive them?

   A. It was faxed to me from Ron Mitchell.

   Q. What documents would you prepare to show

      that Ron Mitchell had borrowed money from

      you?

                  MR. YURKO: Objection. Asked and answered.

   Q. You can answer again.

   A. I did not prepare documents for Ron Mitchell

      borrowing money. I mentioned to you before that

      there was a promissory note.

   • . What steps did you take to protect yourself