UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC. | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 05-cv-11654-NMG |
| | ) | |
| DAVID W. ADAMS, *et al*, | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF INTERNATIONAL FLOOR CRAFTS, INC.'S
MOTION *IN LIMINE* FOR LEAVE TO CALL DEFENDANTS DAVID ADAMS
AND TYRONE WILLIAMS TO THE STAND TO ASSERT FIFTH
AMENDMENT PRIVILEGE, AND MOTION *IN LIMINE* FOR PRELIMINARY
INSTRUCTION TO JURY THAT JURY MAY TAKE ADVERSE INFERENCE
FROM DEFENDANTS' EXERCISE OF FIFTH AMENDMENT PRIVILEGE**

Plaintiff International Floor Crafts, Inc. ("IFC") hereby moves this Court *in limine*

for leave to call to the stand at trial Defendants David Adams and Tyrone Williams, both

of whom asserted the protections of the Fifth Amendment and refused to testify at their

respective depositions[1] where (1) IFC has been prejudiced in its efforts to obtain

discovery by their exercise of the privilege, (2) based upon evidence adduced thus far,

Adams and Williams played significant roles in the fraudulent scheme which is the

subject of the within action and (3) their respective invocations are relevant to IFC's

claims that Adams, Williams, Dziemit and others were involved in the scheme.   In the

alternative, IFC moves *in limine* that this Court provide a preliminary instruction to the

jury that it may draw an adverse inference from Adams' and Williams' assertion of the

Fifth Amendment privilege.

IFC relies upon the reasons set forth below:

---

[1]  Defendant Williams did give some limited testimony before asserting the privilege.

1.      On August 30, 2006, Mr. Williams exercised his Fifth Amendment privilege, and refused to testify, as to any issues relating to the subject matter of the within action.  (See copy of Deposition of Tyrone Williams;  **Exhibit A** to Affidavit of Paul J. Klehm;  See **Exhibit 1**).

2.      On March 11, 2008, Mr. Adams, through counsel, gave notice that he would refuse to testify at his deposition because of the Fifth Amendment privilege.  (See **Exhibit B** to Affidavit of Paul J. Klehm, Esq.).  As a result, IFC cancelled the deposition. (See **Exhibit C** to Affidavit of Paul J. Klehm, Esq.).

3.      Through discovery, IFC has determined that Adams and Williams were actively involved in the scheme to defraud IFC of millions of dollars.  In fact, Adams and Williams are currently involved in criminal proceedings arising out of the same set of facts.   Kevin Britto, a former defendant who is now apparently deceased, testified in detail about the mechanics of the scheme and the involvement of Adams and Williams in that scheme.

4.      In civil cases, the jury may draw an adverse inference against a party invoking the Fifth Amendment privilege against self-incrimination.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

5.      In some circumstances, the witness may be called to the stand in order to assert the Fifth Amendment at trial.  *See Rosebud Sioux Tribe v. A & P Steel, Inc*., 733 F.2d 509 (8th Cir. 1984) *cert. denied*, 469 U.S. 1072 (1984);  *RAD Servs, Inc. v. Aetna Casualty & Surety Co*., 808 F.2d 271 (3d Cir. 1986);  *Brink's Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983);  see *Lentz v. Metropolitan Property and Casualty Insurance Company*, 437 Mass. 23 (2002).   Granted, these cases tend to arise in the context of an

employee/employer relationship, but here, where the Defendants were part of a scheme, the same analysis should apply.

6.      Moreover, there will be a fair inference at trial that Adams and Williams will exercise their Fifth Amendment privilege in order to avoid inculpating themselves in a criminal joint venture with the other defendants.  As a result, evidence pertaining to the exercise of the Fifth Amendment is admissible.  See *Lentz*, 437 Mass. at 30 ("The inference that Donovan and Cook invoked the Fifth Amendment privilege to avoid inculpating themselves in a criminal joint venture with Lentz to defraud Metropolitan was reasonable, reliable, relevant, and fair in the circumstances.").

7.      IFC respectfully requests that this Court permit IFC to put Defendants Adams and Williams on the stand for purposes of having them exercise their Fifth Amendment privilege.  In the alternative, IFC respectfully requests a preliminary instruction to the jury that the jury may take an adverse inference from the fact that Williams and Adams have exercised their Fifth Amendment privilege and have refused to testify at trial.

**WHEREFORE**, for the above reasons, IFC respectfully requests that this Court GRANT the within motion and grant IFC leave to call to the stand at trial Defendants David Adams and Tyrone Williams for purposes of exercising the Fifth Amendment privilege.   In the alternative, IFC moves that this Court provide a preliminary instruction to the jury that it may draw an adverse inference from Adams' and Williams' assertion of

the Fifth Amendment privilege.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,


/s/ Paul J. Klehm
Paul J. Klehm (BBO# 561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO# 279300)
jkrasnoo@krasnooklehm.com
Benjamin L. Falkner (BBO# 667951)
bfalkner@krasnooklehm.com
Krasnoo | Klehm LLP
23 Main Street, Suite Six
Andover, MA  01810
(978) 475-9955

Dated:  July 2, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid, on July 2, 2008

/s/ Paul J. Klehm
Paul J. Klehm

**EXHIBIT 1**

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC. | ) |
|      Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID W. ADAMS, *et al* | ) CIVIL ACTION NO. 05CA11654-NMG |
|      Defendants | ) |

_____

### <u>AFFIDAVIT OF PAUL J. KLEHM, ESQ,</u>

I, Paul J. Klehm, Esq., under oath, depose and state as follows:

1.     I am co-counsel to Plaintiff International Floor Crafts, Inc. ("IFC"). I am an attorney licensed to practice law in the Commonwealth of Massachusetts since 1992, and in the United States District Court for the District of Massachusetts since 1993.

2.     I have caused to be attached hereto true and genuine copies of the following documents:

A.     Deposition of Tyrone Williams (minuscript)

B.     Letter dated March 11, 2008 from Isaac Peres, Esq. to Paul J. Klehm, Esq.

C.     Email from Paul J. Klehm, Esq. to Isaac Peres, Esq.

Signed under pains and penalties of perjury this 2nd day of July, 2008,

*/s/ Paul J. Klehm*_____
Paul J. Klehm

## **CERTIFICATE OF SERVICE**

  I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid, on July 2, 2008.

         */s/ Paul J Klehm*      
         Paul J. Klehm

VOLUME I
PAGES 1 TO 83
EXHIBITS 1 TO 21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INTERNATIONAL FLOOR CRAFTS,      )
INC.,                            )
                Plaintiff,       )
                                 ) Civil Action
        VS                       ) NO. 05-11654-NMG
                                 )
DAVID W. ADAMS, ET AL.,          )
                                 )
                Defendants.      )

DEPOSITION OF TYRONE KEITH WILLIAMS, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Lisa Abdo, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Krasnoo/Klehm LLP,
23 Main Street, Andover, Massachusetts, on
Wednesday, August 30, 2006, commencing at
10:28 a.m.

## Page 2

1  APPEARANCES:
2
3  Krasnoo/Klehm LLP
4    (by Paul J. Klehm, Esq.)
5    23 Main Street
6    Terrace Level, Suite One
7    Andover, Massachusetts 01810-3730
8    978.475.9955
9    pklehm@krasnooklehm.com
10   for the Plaintiff.
11
12  Robert M. Xifaras, P.C.
13    (by Robert M. Xifaras, Esq.)
14    5 Dover Street
15    Suite 101
16    New Bedford, Massachusetts  02740
17    508.999.9640
18    for the Defendant Tyrone Keith Williams.
19
20
21
22
23  (Continued on page 3)
24

## Page 3

1  APPEARANCES (Continued):
2
3  Yurko, Salvesen & Remz, P.C.
4    (by Richard J. Yurko, Esq.)
5    One Washington Mall, 11th Floor
6    Boston, Massachusetts 02108-2603
7    617.723.6900
8    www.bizlit.com
9    for the Defendant Jane Dziemit.
10
11  ALSO PRESENT:
12
13  Bill Elovitz
14  Joanne Cameron
15  Bill Gemme
16  Benjamin Falkner, law clerk
17
18
19
20
21
22
23
24

## Page 4

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Tyrone Keith Williams | | | |
| (by Mr. Klehm) | 6 | | 79 |
| (by Mr. Xifaras) | | 77 | |

* * *

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 1 | Affidavit of Tyrone K. Williams | 30 |
| 2 | Tyrone Keith Williams Financial Statement for January, 2006 | 30 |
| 3 | Tyrone Keith Williams Financial Statement for February, 2006 | 30 |
| 4 | Pay stubs | 34 |
| 5 | Tyrone Keith Williams Financial Statement for March, 2006 | 36 |
| 6 | Documents Bates-stamped 1883 to 1946 | 38 |
| 7 | Documents Bates-stamped 000017 to 000036 | 39 |
| 8 | Purchase Order 6590 with related documents | 43 |
| 9 | Documents Bates-stamped 000003 to 000013 | 46 |
| 10 | Document Bates-stamped 000131 | 49 |
| 11 | Document Bates-stamped 000573 | 50 |

## Page 5

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 12 | Purchase Order 6590 with related documents | 51 |
| 13 | Purchase Order 5430 with related documents | 51 |
| 14 | Pay stubs | 53 |
| 15 | Pay stubs | 53 |
| 16 | Pay stubs of Tyrone K. Williams from Labor Ready Northeast, Inc. | 53 |
| 17 | Documents Bates-stamped 000821 to 000823 | 55 |
| 18 | Purchase Order 6660 with related documents | 56 |
| 19 | Documents Bates-stamped 000318 to 000321 | 57 |
| 20 | Documents Bates-stamped 000396 and 000415 | 58 |
| 21 | Purchase Order 5430 with related documents | 59 |

Page 6

1    PROCEEDINGS
2        Stipulations
3        It is stipulated by and between counsel for
4    the respective parties that the deposition is to be
5    read and signed under the pains and penalties of
6    perjury; and that all objections, except as to
7    form, and motions to strike are reserved to the
8    time of trial.
9
10        TYRONE KEITH WILLIAMS
11    a witness called for examination by counsel for the
12    Plaintiff, being first satisfactorily identified
13    and duly sworn, was examined and testified as
14    follows:
15        DIRECT EXAMINATION
16    BY MR. KLEHM:
17    Q. Good morning, Mr. Williams. My name is Paul Klehm.
18    I represent International Floor Crafts. I'm going
19    to be asking you some questions today about the
20    case in which you're a defendant.
21        Would you please state your name.
22    A. Tyrone Williams.
23        MR. XIFARAS: Sorry. May I put this on
24    the record before we start?

Page 7

1        MR. KLEHM: Yes.
2        MR. XIFARAS: I would make a general
3    objection to my client testifying here today under
4    the Fifth Amendment of the United States
5    Constitution, his privilege not to incriminate
6    himself. And I do not want it to be deemed a
7    waiver that he will be answering some of the
8    questions in invoking his Fifth Amendment on other
9    questions.
10        MR. KLEHM: Okay. And you understand, as
11    I think I said off the record, that I intend to ask
12    questions today. And as to whether or not you
13    object, that's up to you. From my point of view,
14    to the extent that your client does answer, it is a
15    waiver. And as I've said, we will be suspending
16    this deposition at the close of the deposition for
17    two reasons: One, the issue relating to the
18    automatic disclosures, which I haven't received;
19    and, secondly, relating to any questions on which
20    he asserts or attempts to assert the Fifth
21    Amendment privilege.
22        MR. YURKO: I'd like to put on the record
23    my understanding of the Fifth Amendment privilege,
24    which is that if the witness testifies as to a

Page 8

1    subject, that he waives the privilege as to that
2    entire subject. So you can't start testifying
3    about a subject and then midcourse decide you're
4    going to take the Fifth Amendment privilege. And
5    that's why -- for example, in Mr. Mitchell's
6    deposition, he took the Fifth Amendment privilege
7    on virtually everything that was asked of him.
8    BY MR. KLEHM:
9    Q. Where do you live, Mr. Williams?
10    A. I██████████.
11    Q. Where is that?
12    A. N████████████████.
13    Q. Is that a place you own or rent?
14    A. Actually, I don't own it. I did own it but I
15    don't now.
16    Q. Is that a home that was foreclosed upon?
17    A. Yes, sir.
18    Q. And I assume a bank owns it now?
19    A. Yes, sir.
20    Q. When did the foreclosure take place?
21    A. To my recollection, I'm just going to say
22    around March or April, roughly. I don't know
23    off the top of my head. I didn't bring that
24    stuff with me. But I do have the paperwork,

Page 9

1    just not with me.
2    Q. Do you currently intend to move to any other
3        residence?
4    A. Yes, sir.
5    Q. When do you intend to move?
6    A. Probably within the next like week or two. I
7        have some friends getting together with me
8        just to help me get my stuff out of there.
9    Q. Where do you intend to move to?
10    A. I'm just looking to like renting a room for
11        like sixty, eighty bucks a week or whatever.
12    Q. Do have a specific place selected of where you're
13        going to move to?
14    A. No, sir. There's a lot of places around,
15        so...
16    Q. What is your date of birth?
17    A. ████████
18    Q. Your Social Security number?
19    A. ████████
20    Q. For how long did you live at ████████et --
21        sorry. Strike that.
22        For how long have you lived ████████
23        ████?
24    A. About maybe four years, I think. Three to

3 (Pages 6 to 9)

## Page 10

1   four years.
2   Q. During that three- to four-year period, did anyone
3   else live there with you?
4   A. My girlfriend did for -- well, my
5   ex-girlfriend, I should say.
6   Q. What's the name of your ex-girlfriend?
7   A. Stacie Grace.
8   Q. How do you spell Grace?
9   A. G-r-a-c-e.
10  Q. Where does Stacie Grace currently reside?
11  A. I know it's Matthew Street. I just don't
12      know the number of the apartment that it is.
13  Q. What town?
14  A. New Bedford, also.
15  Q. Do you have any children?
16  A. Yes. We have two.
17  Q. We? Whose we?
18  A. My -- I'm sorry. I was assuming you meant
19      with Stacie.
20  Q. With Stacie. Okay.
21  A. Yes.
22  Q. How old are those children?
23  A. Two and three.
24  Q. Other than those children, do you have any other

## Page 11

1   children?
2   A. Yes. I have two other boys.
3   Q. What are the names of the mothers of those
4      children?
5   A. Tanya -- I don't know what she's going by
6      last name now.
7   Q. And where does she live?
8   A. She actually lives in Germany.
9   Q. The country Germany?
10  A. Yes.
11  Q. And then the other one, what's her name?
12  A. I'll spell it for you. It's Z-u-l-m-a.
13  Q. First name?
14  A. Yes.
15  Q. What's her last name?
16  A. Thomas. She did remarry.
17  Q. And where does she live?
18  A. Pennsylvania.
19  Q. Before you lived at ████████████, where did you
20      live?
21  A. 60 Dean Street which is also in ██████████.
22  Q. Is that a place you owned or rented?
23  A. No. I just rented there.
24  Q. How long did you live there?

## Page 12

1   A. Maybe like a year and a half, maybe. Two,
2      the most.
3   Q. Who did you live there with?
4   A. Just myself.
5   Q. Have you ever been to any Super Bowl games?
6   A. Yes, sir.
7   Q. How many?
8   A. Just two.
9   Q. Which years?
10  A. I don't -- I can't remember the -- the first
11     year that they went, when they played in New
12     Orleans, I believe. And then the last one
13     that they played.
14  Q. And by they, you're referring to the Patriots?
15  A. Yes. I'm sorry.
16  Q. Who did you go with?
17         MR. XIFARAS: I would object on the Fifth
18  Amendment grounds that this may incriminate my
19  client, and I instruct him not to answer.
20         MR. KLEHM: Okay. Based on my
21  understanding of the Fifth Amendment privilege,
22  your client has already waived it. But are you
23  instructing him not to answer the question?
24         MR. XIFARAS: Yes.

## Page 13

1   Q. Could you tell me your educational background
2      beginning with high school.
3   A. Sure. Graduated from Falmouth High School.
4   Q. Falmouth, Mass.?
5   A. Yes.
6   Q. What year?
7   A. '83.
8   Q. Any further formal education?
9   A. No, just military after that.
10  Q. What branch?
11  A. Army.
12  Q. What years?
13  A. '84 through '87.
14  Q. What was your rank upon discharge?
15  A. It would be E-4.
16  Q. What were your duties?
17  A. The job title was cannon crewman, but I did
18     that for a little while. Then they had me in
19     arms room.
20         MR. YURKO: What was that?
21         THE WITNESS: Arms room. Working in the
22     arms room.
23  Q. What was the nature of your discharge?
24  A. It was honorable.

4  (Pages 10 to 13)

Page 14

1    Q. Are you still active in the service in any way?

2    A. No, sir.

3    Q. When you left the Army in '87, did you pursue any

4       further employment -- I'll withdraw it.

5          Where did you work after you left the

6       Army?

7    A. I did various -- I don't even remember the

8       jobs, really. I did various jobs until I

9       moved to Pennsylvania where I met my son's

10       mom.

11   Q. What kinds of jobs did you hold?

12   A. I worked for Loomis Armor for a period of

13       time which is an armor car company. I worked

14       for them for a period of time. But I do

15       remember before that working for a temp

16       agency, because I just moved out there, until

17       I found something.

18   Q. When did you first start working for International

19       Floor Crafts or Building 19?

20          MR. XIFARAS: I would object on the

21       grounds that it may incriminate him pursuant to his

22       Fifth Amendment privilege, and I would instruct him

23       not to answer.

24   Q. When you worked for Loomis Armor, which location

Page 15

1       did you work for?

2    A. I just remember I worked out of York,

3       Pennsylvania.

4    Q. How long did you work there?

5    A. I would go with it's safe to say at least

6       two years.

7    Q. What was the nature of the employment that you had

8       there? What did you do?

9    A. It depends. Sometimes you had to drive.

10       Sometimes you had to do -- which they call

11       was doing the book, which just meant you like

12       marked down when you got to a certain stop,

13       how long it took you to do whatever you had

14       to do and leave. And sometimes you were in

15       the back, depending on if it was a three-man

16       job or a two-man job. It all depends on how

17       big a volume that we had to pick up and

18       deliver.

19   Q. Did you leave there voluntarily?

20   A. Yes, because I moved back to Massachusetts.

21   Q. When did you move back to Mass.?

22   A. I'd say like maybe '91. '90 or '91, roughly.

23   Q. Have you ever had season tickets to the Patriots?

24          MR. XIFARAS: I object on the Fifth

Page 16

1       Amendment grounds that it provide a chain of

2       evidence against my client, and I instruct him not

3       to testify.

4          MR. KLEHM: Maybe at this point it makes

5       sense to have a short-hand version of it. Maybe if

6       you just said, "Fifth Amendment."

7          Is that acceptable to Mr. Yurko?

8          MR. YURKO: It's certainly acceptable to

9       me.

10   Q. Have you ever had any season tickets to any other

11       sports teams?

12          MR. XIFARAS: Fifth Amendment.

13   Q. Have you ever received any season tickets or

14       tickets of any kind to any events from any

15       individuals named Kevin Britto or David Adams?

16          MR. XIFARAS: Fifth Amendment.

17   Q. Do you know an individual named Kevin Britto?

18          MR. XIFARAS: Fifth Amendment.

19   Q. Do you know an individual named David Adams?

20          MR. XIFARAS: Fifth Amendment.

21          MR. YURKO: Can we break just for

22       two seconds?

23          MR. KLEHM: Yes.

24          (Mr. Yurko confers with Mr. Xifaras)

Page 17

1          MR. YURKO: I understand that it's going

2       to be Mr. Williams' intention to take the Fifth

3       Amendment on all substantive questions in this case

4       once we got beyond his biography. So without

5       further ado, I'm going to except myself from the

6       deposition and not continue to charge my client for

7       being here. I thank you for your hospitality.

8    BY MR. KLEHM:

9    Q. When you returned to Massachusetts, where did you

10       work?

11   A. When I returned to Massachusetts, I actually

12       just did part time at a men's clothing store

13       which is called BJ's. But it wasn't spelled

14       like a regular -- it was spelled weird,

15       differently. But that was just part time. I

16       actually was a full-time musician for like

17       years. That's all I did was just music. And

18       we just traveled like the East Coast just

19       doing music.

20   Q. Were you involved in a particular group or groups?

21   A. Just -- I was just in one group.

22          MR. KLEHM: Hold on one second, please.

23          (Discussion off the record)

24          (Mr. Yurko exits conference room)

Page 18

1    BY MR. KLEHM:
2    Q. What was the name of the group that you were
3       involved in?
4    A. New Friends was the name of the group.
5    Q. Did you ever generate any income from that
6       organization?
7    A. Yes.
8    Q. Tell me on an annual basis over the last five years
9       how much you've earned from New Friends.
10   A. Well, I'm not with them any longer.
11   Q. Well, let's go that way. When did you cease to be
12      involved with New Friends?
13   A. Maybe '95, '96.
14   Q. Are you involved in any musical ventures now?
15   A. Yes, sir.
16   Q. And what's that called if it has a group name?
17   A. T-Funk is the name of the band. That's T and
18      F-u -- exactly.
19   Q. And how much do you make from that group?
20   A. We're new right now. We've just only gone
21      for like five months or so. So I'd say we
22      play two to three times a month. And usually
23      those gigs only range from like $150 to $200
24      a weekend that we play. So if you want to

Page 19

1    average out between four and five a month
2    doing that.
3    Q. Let's do it this way. Since the time that you left
4       Building 19, International Floor Crafts, what have
5       you done for income?
6    A. I now work for Bay Colony Railroad.
7    Q. What do you do for them?
8    A. I just work on the maintenance crew.
9    Q. And you also do the music job?
10   A. Yes, sir.
11   Q. Any other sources of income?
12   A. No, sir.
13   Q. Do you know an individual named Pam Correia?
14       MR. XIFARAS: I object -- I'm sorry.
15   Fifth Amendment.
16   Q. Did you review any documents in preparing for your
17      deposition today?
18   A. No, sir. I didn't know I had to do that.
19      But I didn't go over any documents at all.
20   Q. Have you read the complaint in this case?
21   A. I read it when I first got -- started
22      getting -- receiving stuff in the mail from
23      it. So just in case that was going on, I
24      read some stuff for it.

Page 20

1    Q. Are the facts set forth in the complaint true?
2        MR. XIFARAS: Fifth Amendment.
3    Q. During what period of time did you work for
4       Building 19?
5        MR. XIFARAS: Fifth Amendment.
6    Q. What were your job titles during the time that you
7       worked for Building 19?
8        MR. XIFARAS: Fifth Amendment.
9    Q. What were your job duties during the time that you
10      work for Building 19?
11       MR. XIFARAS: Fifth Amendment.
12   Q. Have you spoken with any of the defendants in this
13      case from the time you first learned of the suit
14      until the present?
15       MR. XIFARAS: Fifth Amendment.
16   Q. To the extent that you did, who did you speak with?
17      What was discussed? When was it discussed? By
18      what means was the communication?
19       MR. XIFARAS: Fifth Amendment.
20   Q. Did you have any e-mail account?
21   A. No, sir.
22   Q. Have you ever?
23   A. No, never.
24   Q. Do you have a cell phone?

Page 21

1    A. I do.
2    Q. How long have you had the cell phone?
3    A. Maybe a month or two.
4    Q. How long have you had that cell phone number?
5    A. Maybe a month or two.
6    Q. During the time that you worked at Building 19, did
7       you have a cell phone?
8    A. Yes, I did.
9        MR. XIFARAS: Move to strike. Let me
10      make an objection. Fifth Amendment.
11   Q. What company or companies did you have that
12      particular cell phone number with during the time
13      you worked for Building 19?
14       MR. XIFARAS: Fifth Amendment.
15   Q. Do you remember -- strike that.
16       After you worked at the men's clothing
17      store which I think you said was BJ's, where did
18      you work next?
19   A. I want to say it was Colortyme Rentals, I
20      believe, which was like a rent to own type of
21      business.
22   Q. What did you do there?
23   A. I was actually -- I started off as a manager
24      trainee.

6 (Pages 18 to 21)

Page 22

1  Q. How long did you work there?
2  A. I'd say about two and a half -- two, two and
3     a half with them.
4  Q. Years?
5  A. Yes, sir.
6        MR. XIFARAS: I'm sorry. May I just
7     consult with my client for a second?
8        MR. KLEHM: Yes.
9        (Counsel confers with witness)
10 Q. So you worked at Colortyme for two, two and a half
11    years, correct?
12 A. Yes.
13 Q. What was the name of your supervisor there?
14 A. Well, when I was training, I just remember
15    his first name is Paul. That's all I
16    remember. I don't remember his last name.
17    But then after I got promoted to manager,
18    then I just had like district managers which
19    I, for the life of me, couldn't even tell you
20    because I very rarely even dealt with them.
21 Q. Which Colortyme store did you work at?
22 A. I started out in -- I believe it was New
23    Bedford. I think it's considered New
24    Bedford, or maybe it runs into Dartmouth.

Page 23

1     I'm not really sure. I think it's still
2     considered New Bedford, though. Then I
3     started out and once I passed the -- doing
4     the manager trainee thing, a store opened up
5     actually in Lafayette, Louisiana. They asked
6     me if I would transfer down there and I did.
7  Q. Did you work in any other Colortyme stores?
8  A. No, sir.
9  Q. After Colortyme, where did you work next?
10 A. Then I actually -- I believe I started with
11    Furniture City in sales.
12 Q. Okay. What were the circumstances surrounding your
13    leaving Colortyme?
14 A. I just moved back to Massachusetts.
15 Q. Where was the Furniture City located?
16 A. Which is in New Bedford.
17 Q. Did you grow up in New Bedford?
18 A. No, sir, I actually did not.
19 Q. Where did you grow up?
20 A. I basically grew up on the Cape.
21 Q. How long did you work for Furniture City?
22 A. I worked for them for about -- I'll go to say
23    between two and a half to three years.
24 Q. Did you serve as a receiver at any point when you

Page 24

1     worked at Furniture --
2  A. No. I was just in sales.
3  Q. Is Building 19 the only place where you served as a
4     receiver?
5        MR. XIFARAS: Fifth Amendment.
6  Q. What were the circumstances surrounding your
7     leaving Furniture City?
8  A. Just got sick -- got kind of burnt out with
9     sales because that's kind of like what I did
10    basically all my life is sales.
11 Q. Where did you work next?
12       MR. XIFARAS: Fifth Amendment.
13 Q. Is it true that you were hired to work at Building
14    19 on November 16th of '98 and that you worked
15    there until August 11th of 2005?
16       MR. XIFARAS: Fifth Amendment.
17 Q. Any other education, whether formal or informal, of
18    any kind that you had other than what you've
19    testified to?
20 A. No, sir. That would be it.
21 Q. Have you ever had any problems with drugs or
22    alcohol?
23 A. No, sir.
24 Q. Have you ever had any problems with gambling?

Page 25

1  A. No, sir.
2  Q. What was your role in the scheme involving the
3     stealing of money from Building 19 and/or
4     International Floor Crafts?
5        MR. XIFARAS: Fifth Amendment.
6  Q. Did you receive $1,500 per transaction that you
7     engaged in which was a fake transaction as part of
8     the scheme?
9        MR. XIFARAS: Fifth Amendment.
10 Q. How much did you receive from the scheme that's
11    described in the complaint or the amended complaint
12    in this case?
13       MR. XIFARAS: Fifth Amendment.
14 Q. By the way, are you married?
15 A. No, sir.
16 Q. Have you ever been married?
17 A. Yes, sir.
18 Q. I think you mentioned the name of your wife. What
19    was the name of your wife?
20 A. Actually, Tanya was my first wife. I was not
21    married to Zulma, nor Stacie.
22 Q. Okay. So you've been married once?
23 A. No. I actually was married twice. But my
24    second wife, we didn't have any kids or

7 (Pages 22 to 25)

Page 26

1  anything.
2  Q. What was the name of your second wife?
3  A. Anna, but I don't know if she's remarried or
4    anything.
5  Q. What was her name before she got married to you?
6  A. Azavedo.
7  Q. Could you spell that?
8  A. Not really.
9  Q. Okay. During what years were you married to Anna
10   Azavedo?
11 A. Okay. Let me try to figure it out.
12 Q. Well, let me make it easier for you. Were you
13   married to her at any point between 1998 and 2005?
14     MR. XIFARAS: Fifth Amendment.
15     MR. KLEHM: For that? Okay.
16 Q. Before you began working for Building 19, did you
17   have any experience in working in warehouses?
18     MR. XIFARAS: Fifth Amendment and
19   objection to the form.
20 Q. To the extent you did have any experience, what
21   experience did you have and where did you have it?
22     MR. XIFARAS: Fifth Amendment.
23 Q. Were you ever asked to falsify any documents at any
24   time during the time that you worked for

Page 27

1    International Floor Crafts?
2      MR. XIFARAS: Fifth Amendment.
3  Q. When did you last speak with Kevin Britto?
4      MR. XIFARAS: Fifth Amendment.
5  Q. As best you can recall, when did that take place,
6    what was said and who was present?
7      MR. XIFARAS: Fifth Amendment.
8  Q. Have you been convicted of any felonies within the
9    past year or misdemeanors within the past
10   five years?
11 A. No, sir.
12 Q. Have you ever been arrested?
13 A. Yes, sir.
14 Q. On how many occasions have you been arrested?
15 A. Just once, sir.
16 Q. And when was that?
17 A. I don't recall actually the year. I can just
18   tell you why, but I don't remember the —
19 Q. Okay. Why?
20 A. Just driving with a suspended license. I
21   lived in another state and not knowing that
22   my Mass. license was suspended. And I came
23   home to visit. That's when I found out.
24 Q. Okay. Who directed the scheme that's described in

Page 28

1  the amended complaint in this case?
2      MR. XIFARAS: Fifth Amendment.
3  Q. When did you first meet Kevin Britto?
4      MR. XIFARAS: Fifth Amendment.
5  Q. What were the circumstances under which you came to
6    work for International Floor Crafts?
7      MR. XIFARAS: Fifth Amendment.
8  Q. When you first began working for International
9    Floor Crafts, what were your duties?
10     MR. XIFARAS: Fifth Amendment.
11 Q. What were the circumstances under which you first
12   became aware of the scheme described in the amended
13   complaint and/or the possibility of the starting of
14   the scheme described in the amended complaint?
15     MR. XIFARAS: Fifth Amendment.
16 Q. How did you first learn that? From whom? What was
17   said to you? Where was it when it was said to you?
18   And what did you say?
19     MR. XIFARAS: Fifth Amendment.
20     MR. KLEHM: Let's go off for one second.
21   (Discussion off the record)
22     MR. KLEHM: As a result of consultation
23   with counsel off the record, I am going to group
24   many of my questions together, which normally would

Page 29

1  be objectionable as a compound question. But to
2  move this along, given the fact that your client is
3  exercising the Fifth Amendment as to most of the
4  questions I'm asking, I think it makes sense for
5  both the court reporter and for me. Is that
6  acceptable?
7      MR. XIFARAS: Yes, it is.
8  Q. When did you first meet David Adams?
9      MR. XIFARAS: Fifth Amendment.
10 Q. What were the circumstances under which you first
11   met David Adams?
12     MR. XIFARAS: Fifth Amendment.
13 Q. Have you ever gone gambling with David Adams? If
14   you have, when did you go? Who provided the
15   sources or source of funding? Who went with you?
16   And what was the source of the funds that you used
17   while gambling?
18     MR. XIFARAS: Fifth Amendment.
19     MR. KLEHM: By the way — I'll ask this
20   on the record — your client also owes me financial
21   statements and bank statements. That's a part of
22   the motion to compel. Do you have those today?
23     MR. XIFARAS: We have an affidavit. He
24   does not have any bank accounts from January '06 to

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 30

1   the present. We are in the process of getting his
2   work records as far as his financial statements.
3   As you can see, even January is -- as of August 28,
4   we had to change what we have. We do not have them
5   done.
6   MR. KLEHM: So you just handed me a
7   financial statement for Tyrone Williams.
8   MR. XIFARAS: It's not final.
9   MR. KLEHM: Not final dated January of
10  2006. Do you have any objection if I mark this?
11  MR. XIFARAS: As long as -- no, no
12  objection. Is the draft marked?
13  MR. KLEHM: It's okay if you write
14  "Draft" on it. That's fine with me. And then
15  you've also handed me a similar draft of a
16  financial statement for February 2006 which also
17  has various markings on it. I'm going to mark this
18  as well.
19  Can we just mark these.
20  (Documents marked as Williams
21  Exhibits 1 to 3 for
22  identification)
23  Q. Mr. Williams, I'm showing you what's been marked as
24  Deposition Exhibit No. 1. It says, "Affidavit of

Page 31

1   Tyrone K. Williams." Do you recognize that?
2   A. (Witness reviews document) Yes, sir.
3   Q. And what do you recognize it to be?
4   A. You know, I don't have accounts, a bank
5   account.
6   Q. You recognize it to be your affidavit?
7   A. Yes, sir.
8   Q. And at the bottom, there's a signature in blue ink.
9   Is that your signature?
10  A. Yes, sir.
11  Q. And when did you sign this document?
12  A. It was either Monday or Tuesday, I guess it
13  was, of this --
14  Q. Of this particular week?
15  A. Yes, sir.
16  Q. Okay. Because it says, "Signed under the pains and
17  penalties of perjury this 28th day," and it doesn't
18  give the month.
19  MR. XIFARAS: Is it okay if he dated it
20  right here?
21  Q. If you want -- and I'll give you a pen. And if you
22  could write in "August" and then put your initials
23  somewhere there, that would be great.
24  A. All right. Is it all right to put "August"

Page 32

1   in parentheses next to that?
2   Q. Yes, just as long as you put your initials above
3   it.
4   A. (Witness complies) Okay.
5   Q. Your middle name is Keith; is that correct?
6   A. Yes, sir.
7   Q. Have you ever been known by any other name other
8   than Tyrone Williams or Tyrone Keith Williams?
9   A. No, sir.
10  Q. Where do you keep your funds currently day to day?
11  A. If you figure I get paid on Friday from my
12  regular job and, like I said, if I happen
13  to -- which we call gig in the band on the
14  weekend, just whatever I get just goes to
15  either paying bills or just surviving.
16  Basically, that's it. So I don't have any
17  money saved or anything like that.
18  Q. Have you kept your monthly expenses below $3,000
19  per month?
20  A. Yes, sir.
21  Q. Do you have documentation that would show that?
22  A. Just my pay stubs that I get from work.
23  Q. Do you have your pay stubs? While he's looking --
24  MR. KLEHM: Is it all right if I keep

Page 33

1   going, Mr. Xifaras?
2   MR. XIFARAS: Sure.
3   Q. How much do you make at the railroad?
4   A. On an hourly --
5   Q. Sure.
6   A. $12 an hour.
7   Q. And how many hours a week do you put in?
8   A. Average, 40 hours a week.
9   Q. And do you get overtime if you go over 40?
10  A. Yes.
11  MR. XIFARAS: Those are incomplete.
12  Q. Your counsel just handed me a set of -- and I don't
13  know how many yet -- what appear to be pay stubs.
14  Are these your pay stubs for where you work at the
15  railroad?
16  A. Yes, sir.
17  MR. KLEHM: Did you say they were or were
18  not complete?
19  MR. XIFARAS: They're incomplete. That's
20  why I'm having problems.
21  Q. These pay stubs appear to go from roughly February
22  to this week?
23  MR. XIFARAS: They're not in order. I'm
24  sorry. January -- we'd say from January of '06 to

9  (Pages 30 to 33)

Page 34

1  this week.
2      MR. KLEHM: So what I'd like to do is to
3  mark this. And then I'll make copies of it, and he
4  can take the originals back. Is that acceptable?
5      MR. XIFARAS: That's fine, sure.
6      MR. KLEHM: Let me read into the record
7  the stub numbers for each of them.
8      The stub numbers are 43235; 43269; 43320;
9  43109; 43175; 43438; 43549; 43609; 43664; 43904;
10 43726; 43801; 43846; 43884; 44036; 44065; 44119;
11 44181; 44210; 44242; 44285; 44353; 44374; 44437;
12 44492; and 44591. So we'll just mark that as --
13 one sticker is fine, since we have the numbers in
14 there.
15     (Pay stubs marked as Williams
16     Exhibit 4 for identification)
17 Q. Mr. Williams, I'm just going to show you Exhibit 4.
18 I read the numbers of the various invoices into the
19 record. Can you just confirm for me that these are
20 the invoices that you do have running from January
21 of '06 to the present?
22 A. Yes.
23 Q. Now I'm going to show you Exhibit 2 which is your
24 financial statement from January of 2006. Once the

Page 35

1  changes that are marked on Exhibit 2 are made, is
2  Exhibit 2 going to be accurate?
3  A. Yes, sir.
4  Q. With regard to Exhibit 3, there are some
5  handwritten changes as well. Once the changes are
6  made to Exhibit 3, will it then be accurate for
7  February of '06?
8  A. Yes, sir.
9  Q. Have you prepared March, April, May or June or July
10 or August yet?
11     MR. XIFARAS: We have drafts but they're
12 not -- I'll show them to you, if you'd like.
13 They're not even -- I told you the file numbers.
14 Sorry. That's what we have. But I don't think
15 they even come close to a draft.
16     MR. KLEHM: Okay. Well, what you've
17 given me appear to be financial statements for each
18 of the months from March to August. They're
19 unsigned. The mortgage amount is crossed out. And
20 in some places, the payment of loan re: attorneys'
21 fees is crossed out.
22 Q. Are these financial statements accurate for the
23 months of March through August 2006 with the
24 changes indicated?

Page 36

1  A. (Witness reviews documents) Yes, sir.
2      MR. KLEHM: Okay. If that's the case,
3  then why don't I just mark this as one exhibit,
4      (Document marked as Williams
5      Exhibit 5 for identification)
6  Q. Sir, I'm going to just show you again Exhibit 5 and
7  confirm -- have you confirm that Exhibit 5
8  represents your financial statements from March
9  through August 2006; is that correct?
10 A. Yes, sir.
11     MR. XIFARAS: I would just note an
12 objection that they're incomplete and probably not
13 even halfway done yet.
14 Q. Well, what is incomplete about them, sir?
15 A. For example, like the band that I am in now,
16 because we are starting to play more now, so
17 just trying to remember the dates that we've
18 done, I have to contact one of the guys to
19 get like accurate dates and not try to guess
20 off the top of my head.
21 Q. Other than adding in your income from the band, any
22 other income?
23 A. It would just be my job and that.
24 Q. Have you filed income tax returns from '98 to the

Page 37

1  present?
2  A. Yes, I have, sir.
3  Q. Did you include income from the scheme which is the
4  subject of the amended complaint?
5      MR. XIFARAS: Fifth Amendment.
6  Q. And how much income did you make from the scheme
7  which is the subject of the complaint?
8      MR. XIFARAS: Fifth Amendment.
9  Q. There's an individual sitting to my left named Bill
10 Elovitz. Have you ever met Bill?
11     MR. XIFARAS: Fifth Amendment.
12 Q. When did you first meet Bill?
13     MR. XIFARAS: Fifth Amendment.
14 Q. And there's also a Joanne Cameron and a Bill Gemme.
15 Have you ever met either of those people?
16     MR. XIFARAS: Fifth Amendment.
17 Q. And if so, when did you first meet them?
18     MR. XIFARAS: Fifth Amendment.
19 Q. Have you ever discussed the scheme which is the
20 subject of the amended complaint with anyone other
21 than your counsel?
22     MR. XIFARAS: Fifth Amendment.
23 Q. To the extent that you have, who have you spoken
24 with? When did you speak to them? What was said?

10 (Pages 34 to 37)

Page 38

1  Who was present? And what were the means of
2  communication?
3      MR. XIFARAS: Fifth Amendment.
4  Q. Let's talk about a couple of documents.
5      (Document marked as Williams
6      Exhibit 6 for identification)
7  Q. Mr. Williams, I'm showing you what's been marked as
8  Exhibit 6 and ask you, do you recognize any of the
9  pages in that?
10      MR. XIFARAS: Fifth Amendment.
11  Q. If so, what do you recognize them to be?
12      MR. XIFARAS: Fifth Amendment.
13  Q. Does your signature appear on any of the pages of
14  Exhibit 6?
15      MR. XIFARAS: Fifth Amendment.
16  Q. What were the circumstances under which you signed
17  and/or prepared any of the documents contained in
18  Exhibit 6?
19      MR. XIFARAS: Fifth Amendment.
20  Q. Tell me all of the persons that you spoke with in
21  regard to the preparation of any of the documents
22  contained in Exhibit 6 and/or signing of any of the
23  documents contained in Exhibit 6 before you signed
24  the document, what was said, what were the means of

Page 39

1  communication, and who else was present.
2      MR. XIFARAS: Fifth Amendment.
3  Q. Also in answer to that, I need to know when those
4  conversations took place.
5      MR. XIFARAS: Fifth Amendment.
6  Q. Have you ever at any time altered any of the
7  documents included in Exhibit 6?
8      MR. XIFARAS: Fifth Amendment.
9  Q. And if so, when?
10      MR. XIFARAS: Fifth Amendment.
11      (Document marked as Williams
12      Exhibit 7 for identification)
13  Q. Mr. Williams, have you ever heard of the name Jane
14  Dziemit?
15      MR. XIFARAS: Fifth Amendment.
16  Q. Who is Jane Dziemit? When did you first meet with
17  her? Tell me all the conversations that you've had
18  with her, if you have, what the substance of those
19  conversations were, when they took place, by what
20  means they took place and who was present.
21      MR. XIFARAS: Fifth Amendment.
22  Q. Same series of questions for an individual named
23  Tony Marasco.
24      MR. XIFARAS: Fifth Amendment.

Page 40

1  Q. Let me show you what's been marked as Exhibit 7.
2  A. (Witness reviews document)
3  Q. Do you recognize any of the pages contained in
4  Exhibit 7 which is also Exhibit 6 to the Mitchell
5  deposition?
6      MR. XIFARAS: Fifth Amendment.
7  Q. Did you prepare or participate in the preparation
8  of any of the documentation contained in Exhibit 7?
9      MR. XIFARAS: Fifth Amendment.
10  Q. The first page is an agreement for sale of goods.
11  What were the circumstances under which that
12  document was prepared?
13      MR. XIFARAS: Fifth Amendment.
14  Q. Were the documents that include the first eight
15  pages of Exhibit 7, were they prepared on the date
16  that's listed at the top of each of those documents
17  in handwriting?
18      MR. XIFARAS: Fifth Amendment.
19  Q. And if so, why? And if not, why?
20      MR. XIFARAS: Again, Fifth Amendment.
21  Q. At the last -- sorry. On the last page of
22  Exhibit 7, there is a note that says, "Please call
23  Tyrone Williams to set up delivery." Do you see
24  that?

Page 41

1  A. (Witness reviews document) Yes, sir.
2  Q. Okay. Whose handwriting is that?
3      MR. XIFARAS: Fifth Amendment.
4  Q. What were the circumstances under which a note
5  would be written, "Call Tyrone Williams to set up
6  delivery"?
7      MR. XIFARAS: Fifth Amendment.
8  Q. Were notes such as that a note to give you an
9  indication that there was a fake shipment to be
10  made?
11      MR. XIFARAS: Fifth Amendment.
12  Q. And was a note such as that set up so that you
13  would be involved in making the fake transaction go
14  forward?
15      MR. XIFARAS: Fifth Amendment.
16  Q. Did you receive a copy of the last page of
17  Exhibit 7 during the time that you worked at
18  Building 19?
19      MR. XIFARAS: Fifth Amendment.
20  Q. Do you have any documents at your home that relate
21  in any way to Building 19?
22  A. No, sir.
23  Q. Any documents at home that relate in any way to
24  International Floor Crafts?

11 (Pages 38 to 41)

Page 42

1  A. No, sir.
2  Q. During the time that you worked for International
3     Floor Crafts, did you bring any of your work home?
4         MR. XIFARAS: Fifth Amendment.
5  Q. If so, what did you bring home and where are those
6     documents today?
7         MR. XIFARAS: The same, Fifth Amendment.
8  Q. Since the time that you left International Floor
9     Crafts, have you had any documents belonging to
10    International Floor Crafts in your possession?
11        MR. XIFARAS: Fifth Amendment.
12 Q. If so, what documents have you had in your
13    possession?
14        MR. XIFARAS: The same, Fifth Amendment.
15 Q. How would you find out that a fake shipment or a
16    partially fake shipment was going to happen?
17        MR. XIFARAS: Fifth Amendment.
18 Q. What would you do upon learning that a fake
19    shipment would take place?
20        MR. XIFARAS: Fifth Amendment.
21 Q. What role did Tony Marasco play in the scheme
22    outlined in the amended complaint?
23        MR. XIFARAS: Fifth Amendment.
24 Q. What role did Jane Dziemit play in that scheme?

Page 43

1         MR. XIFARAS: Fifth Amendment.
2         MR. KLEHM: By the way, if you need to
3     take a break at any time, just let me know.
4         THE WITNESS: Okay.
5         (Document marked as Williams
6         Exhibit 8 for identification)
7  Q. Mr. Williams, I'm going to show you what's been
8     marked as Exhibit 8. I'm going to ask you if you
9     recognize the documents; and if so, what are they?
10        MR. XIFARAS: Fifth Amendment.
11 Q. Could you read for me the note that appears under
12    "Receiving Instructions" and tell me why it is that
13    that note would appear on that particular document.
14 A. Where are we, sir? What page?
15 Q. The first page.
16        MR. XIFARAS: Fifth Amendment.
17 Q. On the third page of Exhibit 8 which at the top
18    says "Exhibit G," there's a signature. Is that
19    your signature?
20        MR. XIFARAS: Fifth Amendment.
21 Q. To the extent it is your signature, when did you
22    write your signature on this? What was the purpose
23    of writing your signature? And what act or acts
24    did you do before writing your signature as a part

Page 44

1     of the scheme?
2         MR. XIFARAS: Fifth Amendment.
3  Q. There's also the initials "TW" to the left -- to
4     the right-hand side of this document under "Order
5     Checked By." Did you enter those initials?
6         MR. XIFARAS: Fifth Amendment.
7  Q. If so, what were the circumstances under which you
8     entered those initials?
9         MR. XIFARAS: Fifth Amendment.
10 Q. Describe for me in a legitimate transaction
11    involving International Floor Crafts what your role
12    would be as a part of the shipping process.
13        MR. XIFARAS: Fifth Amendment.
14 Q. Tell me every person that you would become involved
15    in during your effectuating a normal shipping
16    process as part of your work.
17        MR. XIFARAS: Fifth Amendment.
18 Q. During the course of a shipment or a fake shipment
19    or a partially fake shipment that was not
20    legitimate, tell me the names of every person that
21    you would become involved with and what their
22    individual roles would be.
23        MR. XIFARAS: Fifth Amendment.
24 Q. On the first page of Exhibit 8, where did the

Page 45

1     information come from that was filled in to the
2     purchase order?
3         MR. XIFARAS: Fifth Amendment.
4  Q. Same question with regard to every page of
5     Exhibit 8 with the exception of the check.
6         MR. XIFARAS: Same objection, Fifth
7     Amendment.
8  Q. Did the entity known as Mansfield Rug ever exist?
9         MR. XIFARAS: Fifth Amendment.
10 Q. The same question for Dalton Padding, REMCO, and
11    Empire Weavers?
12        MR. XIFARAS: Fifth Amendment.
13 Q. What did you do with the money that you obtained as
14    a result of the scheme alleged in the amended
15    complaint?
16        MR. XIFARAS: Fifth Amendment.
17 Q. Was there ever a time at which Kevin Britto
18    threatened to or did order you to stop the fake
19    shipments?
20        MR. XIFARAS: Fifth Amendment.
21 Q. If so, describe the circumstances surrounding that.
22        MR. XIFARAS: Fifth Amendment.
23 Q. Did you take orders and/or instructions from Kevin
24    Britto as a part of this scheme as set forth in the

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

Page 46

1    amended complaint?
2        MR. XIFARAS: Fifth Amendment.
3    Q. Describe for me the relationship between you and
4    Kevin Britto from '98 up to '05.
5        MR. XIFARAS: Fifth Amendment.
6    Q. Describe for me the nature of your relationship
7    with David Adams from '98 up to '05.
8        MR. XIFARAS: Fifth Amendment.
9    Q. Is there anyone who is not a named defendant in
10   this case who was involved in the scheme as
11   described in the amended complaint?
12       MR. XIFARAS: Fifth Amendment.
13       MR. KLEHM: Can I get that one marked.
14       (Document marked as Williams
15       Exhibit 9 for identification)
16   Q. Mr. Williams, I'm going to present you with
17   Exhibit 9 which is a number of documents which at
18   the top say, "To Whom It May Concern." Do you
19   recognize these documents? If so, what do you
20   recognize them to be? What are the circumstances
21   under which they were prepared? Who prepared them?
22   Would you see them at all in the course of your
23   duties at International Floor Crafts? And if so,
24   when would you see them? And what, if anything,

Page 47

1    would you do with these documents if you saw them?
2        MR. XIFARAS: Fifth Amendment.
3    Q. Do you recognize the signature of David Adams? And
4    does the signature of David Adams appear on any of
5    the pages of Exhibit 9?
6        MR. XIFARAS: Fifth Amendment.
7    Q. Have you spoken to the state police in this case?
8    A. Yes, I did.
9    Q. On how many occasions?
10   A. I believe it was just twice.
11   Q. And the first time you didn't talk to them, right?
12   A. Yes, sir.
13   Q. And the second time you did talk to them, correct?
14   A. Yes, sir.
15   Q. And when you spoke to them the second time, that
16   was as a result of Kevin Britto telling you you can
17   go ahead and talk to them, right?
18       MR. XIFARAS: Fifth Amendment.
19   Q. And when you spoke to them the second time, was
20   Kevin Britto present either by phone or in person?
21       MR. XIFARAS: Fifth Amendment.
22   Q. As best you can recall, what did the state police
23   say to you and what did you say to them?
24       MR. XIFARAS: Fifth Amendment.

Page 48

1        MR. KLEHM: Let's go off the record for a
2    second.
3        (Discussion off the record)
4        MR. KLEHM: Let's go back on.
5    Q. Who was present at that conversation?
6    A. Just myself and the officer that I was
7    talking to.
8    Q. Do you remember the officer's name?
9    A. (Witness shakes head)
10   Q. Is that a no? You have to say it out loud.
11   A. No, sir. Sorry.
12   Q. Where did it take place?
13   A. They actually came to my home.
14   Q. Do you remember when?
15   A. I just remember the month, sir, which was
16   August. I don't remember the date to be
17   exact.
18   Q. Was it before or after you were let go by Building
19   19?
20       MR. XIFARAS: Fifth Amendment.
21   Q. Was it early August? Mid-August? Late August?
22   A. I guess it would be considered early August,
23   between early and mid-August. I know it
24   wasn't late August, though.

Page 49

1    Q. How long did the second meeting last?
2    A. Maybe just a few hours. It really wasn't
3    that long, actually.
4    Q. A few hours?
5    A. If that. If that.
6    Q. Did you have a lawyer present?
7    A. No, sir.
8    Q. Have you spoken to the state police since?
9    A. No, sir.
10   Q. I think we were on Exhibit 9. Did Ronald Mitchell
11   ever ask you to falsify any documents? And if so,
12   did you? What were the circumstances under which
13   you did? And tell all of the acts that you did
14   with regard to that falsification of the document.
15       MR. XIFARAS: Fifth Amendment.
16       (Document marked as Williams
17       Exhibit 10 for identification)
18   Q. Did you ever date Pam Correia?
19   A. No, sir.
20   Q. Have you talked to her about this case?
21       MR. XIFARAS: Fifth Amendment.
22   Q. I'm going to show you what's been marked as
23   Exhibit 10. Do you recognize it? What do you
24   recognize it to be? Is that your signature in the

13 (Pages 46 to 49)

Page 50

1　center? What were the circumstances under which
2　you signed it? Did you participate in the
3　preparation of the document? Did you participate
4　in obtaining the document? And what did you do
5　with the document once you signed it?
6　　　　MR. XIFARAS: Fifth Amendment.
7　　　　(Document marked as Williams
8　　　　Exhibit 11 for identification)
9　Q. Sir, I'm showing you what's been marked as
10　Exhibit 11.
11　A. (Witness reviews document)
12　Q. First of all, do you recognize the document? What
13　do you recognize it to be? Is that your signature?
14　Is this a fraudulently prepared document? If so,
15　how do you know that? Who asked you to prepare
16　this document? When was it prepared? Did you fax
17　it to anyone? What were the circumstances under
18　which you signed it?
19　　　　MR. XIFARAS: Fifth Amendment.
20　Q. Have you ever had any discussions with anyone
21　regarding Exhibit 11 at any time?
22　　　　MR. XIFARAS: Fifth Amendment.
23　Q. To the extent that you did, what did you say to
24　that person or persons? What did they say to you?

Page 51

1　When was the conversation? What were the means of
2　the conversation? What exactly was said?
3　　　　MR. XIFARAS: Fifth Amendment.
4　Q. Have you ever been to Ronald Mitchell's home?
5　　　　MR. XIFARAS: Fifth Amendment.
6　　　　(Document marked as Williams
7　　　　Exhibit 12 for identification)
8　Q. Have you ever been deposed before?
9　A. No, sir.
10　Q. Have you ever been a party to any lawsuits before?
11　A. No, sir.
12　Q. I'm going to show you what's been marked as
13　Exhibit 12. And as I said, this will be a quick
14　one. So I'll just do the questions now. Actually,
15　hold on one second. Actually, 12 is the same as
16　Exhibit 8 for some reason. So I'm just going to
17　move on from 12. I apologize.
18　　　　(Document marked as Williams
19　　　　Exhibit 13 for identification)
20　Q. Sir, I'm showing you what's been marked as
21　Exhibit 13. I'm going to ask you if you recognize
22　it. If so, what do you recognize it to be? What
23　were the circumstance under which it was prepared?
24　How did it come to be that Dave Adams was listed as

Page 52

1　the contact person? Where did the information for
2　the manufacturer's number, description, quantity,
3　cost price, sell price and department come from?
4　How was the rating determined?
5　　　　Is that your signature on the third page
6　of the document? What were the circumstances under
7　which you signed it? Where did you get the
8　information contained in the make, description and
9　quantity on that third page of the document? Was
10　any document ever delivered as represented in this
11　particular transaction? To the extent it was, what
12　was delivered?
13　　　　There's also a reference to a "TW" under
14　"Order Checked By." Did you check the order? What
15　did you observe when you checked the order? Above
16　that, it says "Merchandise Checked By" with your
17　initials. What did you do to go about checking the
18　order? There's also a reference to "VR" and a
19　couple of other initials. What do those stand for?
20　How much profit did you make from this particular
21　transaction? What does the note mean at the bottom
22　of the third page?
23　　　　MR. XIFARAS: Fifth Amendment.
24　　　　MR. KLEHM: May I see that for a minute,

Page 53

1　please.
2　　　　MR. XIFARAS: Sure.
3　　　　MR. KLEHM: Can we take a two-minute
4　break?
5　　　　MR. XIFARAS: Yes.
6　　　　(Recess taken)
7　　　　(Documents marked as Williams
8　　　　Exhibits 14 to 16 for
9　　　　identification)
10　Q. Mr. Williams, I'm going to show you what's been
11　marked as Exhibit 14. And I'm just going to read
12　the numbers into the record here. It's 043936,
13　044534. They appear to be additional pay stubs for
14　you. Is that what these are?
15　A. Yes, sir.
16　Q. Okay. I'm also going to show you two additional
17　pay stubs. I'll read their numbers in. 1840327485
18　and 1840327503. These appear to be pay stubs for
19　Labor Ready Northeast, Inc. Is that what these
20　are?
21　A. Yes, sir.
22　Q. And do they — there's two of them. They've been
23　marked as Exhibit 15. Do they show certain pay
24　that you received for working for the temp agency

14　(Pages 50 to 53)

Page 54

1    you talked about earlier?

2  A. Yes, sir.

3  Q. Were there other pay stubs for working at this

4    particular location?

5  A. Those are it right there, sir.

6  Q. And what you're pointing to is what's been marked

7    as Exhibit 16 which consists of five pages of some

8    sort of a pay stub or payroll receipt? Is that

9    what these are?

10 A. Yes, sir.

11 Q. Now, combining 15 and 16, do these represent all of

12   the pay stubs that you received from Labor Ready

13   Northeast, Inc.?

14 A. I'm pretty sure. It's not total. They put

15   you to work when they can. And I never like

16   wrote down like every day that they put me to

17   work.

18 Q. When did you last work for Labor Ready?

19 A. It was in January.

20 Q. Do you know an individual named Tito Perez?

21      MR. XIFARAS: Fifth Amendment.

22 Q. Have you ever shown up — strike that.

23      Did you ever show up at International

24   Floor Crafts or Building 19 while intoxicated or

Page 55

1    under the influence of any narcotics?

2      MR. XIFARAS: Fifth Amendment.

3  Q. To the extent that you did, when did you show up in

4    that condition? What were the circumstances under

5    which you showed up in that condition? And — I'll

6    leave it at that.

7      MR. XIFARAS: Fifth Amendment.

8  Q. Did you ever use drugs or alcohol while in the

9    workplace at International Floor Crafts and/or in

10   Building 19?

11     MR. XIFARAS: Fifth Amendment.

12 Q. To the extent that you did, when did you use it?

13   Who did you use it with? What did you use? And

14   where were you when you used it?

15     MR. XIFARAS: Fifth Amendment.

16     (Document marked as Williams

17     Exhibit 17 for identification)

18 Q. Sir, I'm going to show you what's been marked as

19   Exhibit 17. Have you ever heard of CCC

20   International?

21     MR. XIFARAS: Fifth Amendment.

22 Q. If so, when did you first learn of them? And what

23   have you heard about them?

24     MR. KLEHM: Fifth Amendment to that?

Page 56

1      MR. XIFARAS: Oh, yes. Sorry. Fifth

2    Amendment to that one.

3  Q. Was CCC International involved in the scheme set

4    forth involved in the amended complaint? And if

5    so, how? And how did you know that?

6      MR. XIFARAS: Fifth Amendment.

7  Q. Have you ever spoken to a John Sun, a David Sun or

8    a Paul Sun at any time? If so, when did you talk

9    to them? What did you discuss? Did you discuss

10   the scheme that's the subject of the amended

11   complaint? And if you did, what did you discuss

12   about that? What were the means of discussion?

13   And who was present, if anyone?

14     MR. XIFARAS: Fifth Amendment.

15 Q. The second page of Exhibit 17, is that your

16   signature? What were the circumstances under which

17   you signed it? Who are the initials set forth

18   under "Merchandise Checked By"? What were the

19   circumstances under which the names — the letters

20   "TW" were entered under "Order Checked By"?

21     MR. XIFARAS: Fifth Amendment.

22     (Document marked as Williams

23     Exhibit 18 for identification)

24 Q. Sir, I'm showing you Exhibit 18. Do you recognize

Page 57

1    the document? What were the circumstances under

2    which it was prepared? Who is Mike Brown? What

3    was your role in this transaction? Is this a full

4    shipment, a partial shipment, a fake shipment of

5    any kind? If so, how? Is that your signature on

6    the third page? What were the circumstances under

7    which "TW" was written under "Order Checked By"?

8    What are the initials written under "Merchandise

9    Checked By"? How did you get the information that

10   was filled in on the third page? Whose handwriting

11   is on that third page?

12     MR. XIFARAS: Fifth Amendment.

13     (Document marked as Williams

14     Exhibit 19 for identification)

15 Q. Sir, who is Diane Spignosi?

16     MR. XIFARAS: Fifth Amendment.

17 Q. Have you ever met her? When did you first meet

18   her? Have you spoken to her? If so, what have you

19   spoken to her about and when?

20     MR. XIFARAS: Fifth Amendment.

21 Q. Do you recognize any of the documents contained in

22   Exhibit 19? What do you recognize them to be? Is

23   that your signature on the third page of

24   Exhibit 19? What information was used in preparing

15  (Pages 54 to 57)

Page 58

1  the document? Is your handwriting on the third
2  page of Exhibit 19? Did you participate at all in
3  the preparation of the fourth page of Exhibit 19?
4  Is this -- the transaction represented by these
5  documents in Exhibit 19 a fake transaction or a
6  legitimate transaction? If so, what role did you
7  play in that? And what income did you receive as a
8  result of it?
9        MR. XIFARAS: Fifth Amendment.
10  Q. Is it true that the bulk of the fake shipments
11  involved remnants and not manmades or handmades?
12        MR. XIFARAS: Fifth Amendment.
13  Q. To the extent that it's not true, could you explain
14  why that's not true?
15        MR. XIFARAS: Fifth Amendment.
16        (Document marked as Williams
17        Exhibit 20 for identification)
18  Q. Sir, I'm showing you what's been marked as
19  Exhibit 20. Do you recognize it? What do you
20  recognize it to be? Is that your signature on the
21  first page of Exhibit 20? There's a reference to
22  EW truck. What does that mean? Did Empire Weavers
23  have any trucks? Where did you get the information
24  used in this bill of lading? Did you prepare this

Page 59

1  bill of lading? From whom did you receive this
2  bill of lading if you did not prepare it? Did you
3  have any discussions with anyone regarding the
4  preparation of this document, including Ronald
5  Mitchell? To the extent that you did, what did you
6  say to him and what did he say to you? Or what did
7  you say to any person you had a discussion with
8  about this document, and what did they say to you?
9  The same set of questions as to the second page of
10  Exhibit 20.
11        MR. XIFARAS: Fifth Amendment.
12        MR. KLEHM: I thought we did Dalton
13  Padding, but I guess we didn't. So I will do one
14  now.
15        (Document marked as Williams
16        Exhibit 21 for identification)
17  Q. Sir, I'm going to show you what's been marked as
18  Exhibit 21 and ask you if you recognize it? If so,
19  what do you recognize it to be? Did you
20  participate in the preparation of this document?
21  Who is Tim Breeden? Did you discuss these
22  documents at all with Tim Breeden? If you did,
23  what was discussed? Was Tim Breeden involved in
24  the scheme at all? If so, how? Did you earn any

Page 60

1  income as a result of this transaction? If so,
2  what income did you earn? Is your signature on the
3  fourth page of this document? Is this your
4  handwriting? To the extent that it is, what did
5  you use in preparing this document? What
6  discussions did you have with either Kevin Britto
7  or David Adams with regard to this document? And
8  what income, if any, did they earn from this
9  particular transaction?
10        MR. XIFARAS: Fifth Amendment.
11  Q. During the course of the scheme as set forth in the
12  amended complaint, how were the proceeds of the
13  scheme distributed to the various participants?
14        MR. XIFARAS: Fifth Amendment.
15  Q. How much did Kevin Britto earn from the scheme
16  itself and from each individual transaction as a
17  part of the scheme?
18        MR. XIFARAS: Fifth Amendment.
19  Q. How much did David Adams earn from the scheme
20  itself and from each individual transaction as a
21  part of the scheme?
22        MR. XIFARAS: Fifth Amendment.
23  Q. How much did Ronald Mitchell earn from the scheme?
24        MR. XIFARAS: Fifth Amendment.

Page 61

1  Q. How much did Michael Brown earn from the scheme?
2        MR. XIFARAS: Fifth Amendment.
3  Q. How much did you earn from the scheme?
4        MR. XIFARAS: Fifth Amendment.
5  Q. How were you paid as a part of this scheme, and who
6  paid you and when?
7        MR. XIFARAS: Fifth Amendment.
8  Q. List each and every instance in which you received
9  money as a result of this scheme, the format in
10  which it was received, who gave it to you, and what
11  you did with it.
12        MR. XIFARAS: Fifth Amendment.
13  Q. Is any money owed to you as a part of this scheme
14  today?
15        MR. XIFARAS: Fifth Amendment.
16  Q. When did you last receive any funds from this
17  scheme?
18        MR. XIFARAS: Fifth Amendment.
19  Q. What, if any, was your involvement with the wood
20  flooring purchase that led to the end of the scheme
21  as described in the amended complaint?
22        MR. XIFARAS: Fifth Amendment.
23  Q. When you were making only $1,500 per shipment, did
24  you know how much Kevin Britto and/or David Adams

16 (Pages 58 to 61)

Page 62

1  were getting?
2      MR. XIFARAS: Fifth Amendment.
3  Q. What's the most amount of money that you made in
4    any year as a result of your work in the music
5    industry?
6  A. A year?
7  Q. Yes.
8  A. Honestly, I don't even have a clue because
9    it's just -- it's nothing that's steady.
10 Q. Was it ever more than $10,000?
11 A. No.
12 Q. Have you ever won any lottery game or games of
13   chance?
14 A. No.
15 Q. Have you ever won any significant income from any
16   gambling?
17 A. No.
18 Q. Do you play a certain instrument in the band?
19 A. Yes, sir.
20 Q. What do you play?
21 A. I'm a percussion player.
22 Q. And by that you mean the drums?
23 A. Percussion in general, drums.
24 Q. Do you sing as well?

Page 63

1  A. Yes, sir.
2  Q. Did you have a Web site set up?
3  A. Yes, we do, sir.
4  Q. And what's the name of the Web site?
5  A. It's www.tfunkband.com.
6  Q. So would that be the letter "T" f-u-n-k.com?
7  A. Yes, sir.
8  Q. Do you have any other Web sites set up for that
9    group?
10 A. No, sir.
11 Q. How many members are in the band?
12 A. There are six of us, sir.
13 Q. Did Ronald Mitchell ever call you directly at
14   International Floor Crafts? If he did, when did he
15   call you? What did you discuss with him? Did he
16   ever leave a message for you? If he did, what was
17   the substance of the message?
18     MR. XIFARAS: Fifth Amendment.
19 Q. I'm going to give you a list of names now. And I'm
20   going to ask you the following questions with
21   regard to each of these names:
22     Number one, did they participate at all
23   in the scheme as set forth in the amended
24   complaint?

Page 64

1      Number two, have you ever discussed the
2  scheme with them? If so, what did you discuss with
3  them? When did you discuss it? Who was present?
4  And what were the means of the communication?
5      Thirdly, what act or acts, if any, did
6  each of these particular persons perform in
7  furtherance of the scheme whether or not they knew
8  they were a part of the scheme?
9      And fourth, what deceptions or lies or
10 misstatements did you or any other member of this
11 scheme make to these individuals as a part of the
12 scheme?
13     And then fifth, have you discussed this
14 case and/or the scheme which is the subject of the
15 amended complaint with any of these people? If so,
16 recite all the conversations that you've had with
17 them.
18     And six is the more general catchall.
19 Tell me all the conversations you've had with these
20 individuals at any time from 1998 to the present:
21 William Elovitz; John Durante; William Gemme;
22 Nicholas Adler-Duthe; Russell Boovis; Robert
23 O'Neil; Carol Mauriello, M-a-u-r-i-e-l-l-o; David
24 Adams; Kevin Britto; Ronald Mitchell; Michael E.

Page 65

1  Brown; Jane Dziemit; David Sun; John Sun; Paul Sun;
2  Rick Finley; James Clark; Debra Meyers; Linda
3  Adams; Barbara Adams; Richard Nichols; Stacie
4  Grace; Diane Spignosi; Tony Marasco.
5      MR. XIFARAS: Fifth Amendment.
6      MR. KLEHM: I have a couple more names.
7  Just give me a second.
8  Q. Steve Burroughs; Dave Rooney; Pam Correia?
9      MR. KLEHM: Okay. Now I've completed it.
10     MR. XIFARAS: Fifth Amendment.
11 Q. I'll add one more name to that list. Louis Levine?
12     MR. XIFARAS: Fifth Amendment.
13 Q. Is it true there were at least 55 fraudulent
14   shipments that were made as a part of this scheme?
15     MR. XIFARAS: Fifth Amendment.
16 Q. Is it true that Kevin Britto would tell you what
17   fake shipment came in, when you should bill it, and
18   when you should do a key rec on it?
19     MR. XIFARAS: Fifth Amendment.
20 Q. What is a key rec? And what role did a key rec
21   play in this scheme?
22     MR. XIFARAS: Fifth Amendment.
23 Q. Is it true that Kevin Britto would tell you what to
24   tell buyers and other employees of IFC in

17  (Pages 62 to 65)

Page 66

1  furtherance of the scheme? If so, what would Kevin
2  Britto tell you to say?
3      MR. XIFARAS: Fifth Amendment.
4  Q. How many fake bills of lading did you prepare
5  during the time that you worked for International
6  Floor Crafts?
7      MR. XIFARAS: Fifth Amendment.
8  Q. Is it true that you made somewhere between $10,000
9  to $50,000 as a result of this scheme as
10  represented by Kevin Britto?
11      MR. XIFARAS: Fifth Amendment.
12  Q. Is it true that at the very end of the scheme, you
13  spoke with Kevin Britto regarding having
14  difficulties with the shipments, particularly with
15  David Adams, his handling of the fake shipments?
16      MR. XIFARAS: Fifth Amendment.
17  Q. To the extent that you did have such a
18  conversation, recite the conversation in full as
19  best you can recall.
20      MR. XIFARAS: Fifth Amendment.
21  Q. Is it true that you had an old girlfriend who was a
22  friend of Kevin Britto as he says?
23  A. Yes.
24  Q. Which girlfriend was a friend of Kevin Britto?

Page 67

1  A. Alice was her name.
2  Q. What's her last name?
3  A. Well, at the time it was Blouin, but I don't
4  know if it's changed.
5  Q. How do you spell her last name?
6  A. (No verbal response)
7  Q. B-l-o-u-i-n?
8  A. That sounds good to me, sir. I'm not really
9  sure.
10  Q. Where did she last live that you know of?
11  A. In New Bedford. I know that she lived in New
12  Bedford.
13  Q. Have you spoken with her about this case?
14      MR. XIFARAS: Fifth Amendment.
15  Q. When did you last speak to Alice Blouin?
16      MR. XIFARAS: Fifth Amendment.
17      MR. KLEHM: Okay. I'll just put on the
18  record that there's been a waiver.
19  Q. During what period of time did you date Alice
20  Blouin?
21      MR. XIFARAS: Fifth Amendment.
22  Q. What were the circumstances under which you and
23  Alice Blouin stopped seeing each other or stopped
24  being boyfriend and girlfriend?

Page 68

1      MR. XIFARAS: Fifth Amendment.
2  Q. Kevin Britto testified that he's spoken with you
3  since this case started. Is that true? And if so,
4  how many times have you spoken? What have you
5  spoken about? Who was present?
6      MR. XIFARAS: Fifth Amendment.
7  Q. Kevin Britto testified that at first you wouldn't
8  speak to the state police, and then he called you
9  actually while the state police were present with
10  him and talked to you; and afterwards, you did
11  speak to the state police? Is that true?
12      MR. XIFARAS: Fifth Amendment.
13  Q. Kevin Britto testified that he shared a portion of
14  the funds that he received from this scheme with
15  you; is that true? And if so, what portion did he
16  share with you? How much did he get? How much did
17  you get?
18      MR. XIFARAS: Fifth Amendment.
19  Q. Is it true that you would participate in this
20  scheme approximately — sorry. I blew that.
21      Is it true that these fake shipments or
22  partially fake shipments would be scheduled
23  approximately once a month?
24      MR. XIFARAS: Fifth Amendment.

Page 69

1  Q. When did the scheme start, and when did the scheme
2  end?
3      MR. XIFARAS: Fifth Amendment.
4  Q. Other than the $1,500 per key rec -- falsified key
5  rec that you received, what other funds, if any,
6  did you get from the scheme?
7      MR. XIFARAS: Fifth Amendment.
8  Q. Did you receive tickets to the Super Bowl from
9  David Adams?
10      MR. XIFARAS: Fifth Amendment.
11  Q. Did you receive a trip to the Super Bowl from David
12  Adams?
13      MR. XIFARAS: Fifth Amendment.
14  Q. Tell me all the things that you received from David
15  Adams or Kevin Britto or any other source as a
16  result of this scheme whether or not they were
17  monetary — whether or not it was money?
18      MR. XIFARAS: Fifth Amendment.
19  Q. Do you own any property currently? Real property?
20  A. No, sir.
21  Q. Do you have any funds and any investments as a
22  result of this scheme?
23      MR. XIFARAS: Fifth Amendment.
24  Q. Is it true that Kevin Britto called you after his

18 (Pages 66 to 69)

Page 70

1  first day of deposition which would have been, I
2  think, March 7th of 2006?
3      MR. XIFARAS: Fifth Amendment.
4  Q. To the extent that that is true, what did you say
5  to him and what did he say to you?
6      MR. XIFARAS: Fifth Amendment.
7  Q. Is Kevin Britto the godfather of two of your
8  children?
9  A. Yes, sir.
10 Q. Who was it who came up with the scheme which is the
11 subject of the amended complaint?
12     MR. XIFARAS: Fifth Amendment.
13 Q. How did you first learn of the scheme which is the
14 subject of the amended complaint?
15     MR. XIFARAS: Fifth Amendment.
16 Q. Is it true that Kevin Britto was in effect your
17 boss, if you will, during the course of this
18 scheme?
19     MR. XIFARAS: Fifth Amendment.
20 Q. Is it true that during that telephone call with
21 Kevin Britto after the first day of deposition in
22 March of 2006 that Kevin Britto was yelling at you
23 and saying that you should be showing up at the
24 various hearings and motions or depositions in

Page 71

1  relation to this case?
2      MR. XIFARAS: Fifth Amendment.
3  Q. List all the titles that you had at International
4  Floor Crafts during the time that you worked there.
5      MR. XIFARAS: Fifth Amendment.
6  Q. What was the setup of your office at International
7  Floor Crafts?
8      MR. XIFARAS: Fifth Amendment.
9  Q. Where was it located -- I'll stop there. Where was
10 it located?
11     MR. XIFARAS: Fifth Amendment.
12     MR. KLEHM: The location of his office is
13 something that may lead --
14     MR. XIFARAS: The reason for my
15 objection, Mr. Klehm, is I believe it gives -- he
16 would be giving a chain in the link of evidence
17 against himself in a criminal setting just by
18 answering that he worked there and had an office
19 there.
20 Q. Did you have a door on the office? If you did, is
21 it true that there were significant portions of
22 time at which your door would be shut?
23     MR. XIFARAS: Fifth Amendment.
24 Q. Did you conduct any business other than IFC

Page 72

1  business from that office during the time that you
2  worked there?
3      MR. XIFARAS: Fifth Amendment.
4  Q. During the times that your door was shut, were you
5  engaging in or participating in the scheme?
6      MR. XIFARAS: Fifth Amendment.
7  Q. Has Ronald Mitchell telephoned you within the past
8  six months? And if so, what was the discussion?
9      MR. XIFARAS: Fifth Amendment.
10 Q. Did REMCO ever invoice for any actual rugs received
11 by International Floor Crafts?
12     MR. XIFARAS: Fifth Amendment.
13 Q. Same question for Mansfield Rug, Dalton Padding,
14 and Empire Weavers?
15     MR. XIFARAS: Same answer, Fifth
16 Amendment.
17 Q. Did you ever visit any of the warehouses of REMCO,
18 Mansfield Rug, Empire Weavers, and Dalton Padding?
19 And if so, when and where did you go?
20     MR. XIFARAS: Fifth Amendment.
21 Q. Did you ever attend any meetings in which Jane
22 Dziemit was present? If so, when was it? Who was
23 present? What was the purpose of the meeting? And
24 what was discussed?

Page 73

1      MR. XIFARAS: Fifth Amendment.
2  Q. Have you ever spoken with anyone other than your
3  counsel regarding the conversations that you had
4  with the state police?
5      MR. XIFARAS: Fifth Amendment.
6  Q. To the extent that you did, what was it that was
7  said during those conversations?
8      MR. XIFARAS: Fifth Amendment.
9  Q. Who's Ken Mercardo?
10     MR. XIFARAS: Fifth Amendment.
11 Q. Did you participate at all in the conversion of
12 carpeting to area rugs? And if so, what was your
13 participation?
14     MR. XIFARAS: Fifth Amendment.
15 Q. How was the determination made as to whether or not
16 to do a full shipment, a half shipment, or other
17 kind of a partial shipment or a nonshipment?
18     MR. XIFARAS: Fifth Amendment.
19 Q. Have you ever met in person with Ronald Mitchell or
20 Michael Brown? And if so, when? What were the
21 circumstances, and who was present?
22     MR. XIFARAS: Fifth Amendment.
23 Q. Was the sale or the purported sale of foam part of
24 this scheme? If so, what portion of the scheme

19 (Pages 70 to 73)

Page 74

1  involved the sale of fraudulent shipments of foam?
2     MR. XIFARAS:  Fifth Amendment.
3  Q. It's a fairly obvious question, but why was it that
4     handmades and manmades were, for the most part, not
5     included in the scheme?.
6     MR. XIFARAS:  Fifth Amendment.
7  Q. Have you ever borrowed money from or had any
8     interaction with or dealings with the following
9     companies: Wyvern Group, LLC; Equity Mortgage;
10    2575 State Street, LLC; Dimitry Properties, LLC;
11    Lia's Choice; Fifteen Homes Properties, LLC; or 283
12    Forbes Properties, LLC?  And, actually, there's one
13    more. Bentley Mortgage?
14    MR. XIFARAS:  Fifth Amendment.
15 Q. And if so, what were your dealings?
16    MR. XIFARAS:  Fifth Amendment.
17 Q. Have you ever borrowed any money from Jane Dziemit
18    or Ronald Mitchell?  If you have, how much have you
19    borrowed?  When did you borrow it?  Did you repay
20    it?  And when was it repaid?
21    MR. XIFARAS:  Fifth Amendment.
22 Q. Did IFC – strike that.  Sorry.
23       Did you ever know of anytime that
24    Regional Express provided shipments to any IFC

Page 75

1  warehouse of any goods whatsoever?
2     MR. XIFARAS:  Fifth Amendment.
3  Q. If so, what was shipped?
4     MR. XIFARAS:  Fifth Amendment.
5  Q. And when?
6     MR. XIFARAS:  Fifth Amendment.
7  Q. List for me all of the documents involved in a
8     legitimate transaction involving the sale of
9     carpets or remnants.
10    MR. XIFARAS:  Fifth Amendment.
11 Q. And list for me all the documents involved in a
12    fraudulent transaction during the course of the
13    scheme as described in the amended complaint.
14    MR. XIFARAS:  Fifth Amendment.
15 Q. Are you able to tell by looking at various shipping
16    documents whether or not they were part of a
17    legitimate shipment or an illegitimate shipment?
18    MR. XIFARAS:  Fifth Amendment.
19 Q. To the extent that you can tell the difference,
20    what is the difference to look for?
21    MR. XIFARAS:  Fifth Amendment.
22 Q. Have you understood all the questions that I've
23    asked you so far today?
24 A. Yes, I have.

Page 76

1  Q. To the extent that you did answer questions today,
2     have the answers that you've given me been
3     accurate?
4  A. Yes, sir.
5  Q. Are there any questions that you need to revise –
6     sorry -- answers that you need to revise now to
7     make sure that they are accurate?
8  A. No, sir.
9  Q. Are you familiar with the concept of ratios with
10    regard to the buyer's role at IPC?
11    MR. XIFARAS:  Fifth Amendment.
12 Q. To the extent that you are, did those ratios affect
13    in any way the way in which the scheme operated as
14    described in the amended complaint?
15    MR. XIFARAS:  Fifth Amendment.
16 Q. Did you ever make any phone calls relating to the
17    scheme from your home or from anyplace other than
18    International Floor Crafts?
19    MR. XIFARAS:  Fifth Amendment.
20 Q. What's your home phone number?
21    MR. XIFARAS:  Fifth Amendment.
22    MR. KLEHM:  Let me take a couple minutes
23    with them and I'll be back.
24       (Recess taken)

Page 77

1  BY MR. KLEHM:
2  Q. List for me all of the cell phone numbers that you
3     had from 1998 to the present to the extent you can
4     remember.
5     MR. XIFARAS:  Fifth Amendment.
6  Q. I may have asked this, but I'm just going to ask
7     again to make sure. List for me all the providers
8     that you had for cell phone service from 1998 to
9     the present.
10    MR. XIFARAS:  Fifth Amendment.
11 Q. My final question is going to be to the extent that
12    you wish to express any remorse or apology for
13    participating in the scheme giving rise to the
14    amended complaint, I will give you that opportunity
15    right now.
16    MR. XIFARAS:  Fifth Amendment.
17    MR. KLEHM  I have nothing further.
18    MR. XIFARAS:  I just have a few
19    questions.
20       CROSS EXAMINATION
21 BY MR. XIFARAS:
22 Q. Mr. Williams, regarding the financial statements
23    that we've entered into evidence here, is it fair
24    to say that even the January and February of 2006

Page 78

1    financial statements may need to be revised?

2  A. I would have to say, just to be on the safe

3    side, they may have to be.

4  Q. Would it be fair to say that the child support

5    amounts for those -- for any of these financial

6    statements may have been already included as a

7    deduction from the gross pay?

8  A. (Witness nods head).

9  Q. You have to say yes.

10  A. I'm sorry. Yes, that's true.

11  Q. Sir, as of today, have you received a printout from

12    Bay Colony regarding all of your pay from January

13    until present?

14  A. No, sir.

15  Q. Have you requested that?

16  A. Yes, I have.

17  Q. And how about the same question regarding Labor

18    Ready -- strike that.

19        Would it be fair to say on those

20    financial statements regarding expenses that you do

21    not have a record of every -- a written record of

22    every single expense?

23  A. Yes, it would be. It would be safe to say

24    that.

Page 79

1  Q. And would it be correct to say, sir, that you -- in

2    those areas of expenses where you do not have a

3    written record that you've tried your best to give

4    an honest answer, a complete answer as to what that

5    expense would be?

6  A. Yes.

7        MR. XIFARAS: That's all I have.

8        REDIRECT EXAMINATION

9  BY MR. KLEHM:

10  Q. From '98 to the present, have you prepared all your

11    own tax returns?

12  A. Not my own, no, sir.

13  Q. Okay. Who has prepared your tax returns?

14  A. It could be H&R Block. It could be anyone

15    that I just pick. I never really had a

16    steady place that I went. It kind of

17    depended on who was the cheapest at the time

18    when I went to -- would do it.

19  Q. Are you willing to make your tax returns available

20    from 1998 to the present?

21        MR. XIFARAS: I would say Fifth

22    Amendment.

23        MR. KLEHM: Okay. So I'll ask you

24    directly. Are you willing to make his tax returns

Page 80

1    available from '98 to the present?

2        MR. XIFARAS: No, without prejudice that

3    may be a conditional right now. I'm sorry. I have

4    to say right now no.

5        MR. KLEHM: And the reason for that?

6        MR. XIFARAS: It may be -- it may offer a

7    link in the chain of evidence against himself in a

8    criminal proceeding.

9        MR. KLEHM: Okay. That generally doesn't

10    apply to documents, but we'll deal with that

11    separately.

12  BY MR. KLEHM:

13  Q. Have you ever been accused of stealing by anyone --

14    other than involving this case, have you ever been

15    accused of stealing anything?

16  A. No, sir.

17        MR. KLEHM: At this point, as I said at

18    the beginning of the deposition, I'm going to

19    suspend for two reasons: One, reasons relating to

20    the motion to compel and motion for contempt. And,

21    secondly, with regard to the exercise of the Fifth

22    Amendment here. So we can suspend at this point.

23        (Whereupon, the deposition was

24        suspended at 12:33 p.m.)

Page 81

1  DEPONENT'S ERRATA SHEET

2  AND SIGNATURE PAGE INSTRUCTIONS

3

4    The original of the Errata Sheet has been

5  delivered to Robert M. Xifaras, Esq.

6    When the Errata Sheet has been completed

7  by the deponent and signed, a copy thereof should

8  be delivered to each party of record and the

9  ORIGINAL delivered to Paul J. Klehm, Esq., to whom

10  the original deposition transcript was delivered.

11

12  INSTRUCTIONS TO DEPONENT

13

14    After reading this volume of your

15  deposition, indicate any corrections or changes to

    your testimony and the reasons therefor on the

    Errata Sheet supplied to you and sign it. DO NOT

16  make marks or notations on the transcript volume

    itself.

17

18  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

19  COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

20

21

22

23

24

21 (Pages 78 to 81)

Page 82

```
 1    ATTACH TO THE DEPOSITION OF TYRONE KEITH WILLIAMS
      CASE:  INTERNATIONAL FLOOR CRAFTS, INC. VS. DAVID
 2    W. ADAMS, ET AL.
 3            ERRATA SHEET
 4    INSTRUCTIONS:  After reading the transcript of your
      deposition, note any change or correction to your
 5    testimony and the reason therefor on this sheet.
      DO NOT make any marks or notations on the
 6    transcript volume itself.  Sign and date this
      Errata Sheet (before a Notary Public, if required).
 7    Refer to Page 81 of the transcript for Errata Sheet
      distribution instructions.
 8    PAGE  LINE
           CHANGE: _____
 9         REASON: _____
           CHANGE: _____
10         REASON: _____
           CHANGE: _____
11         REASON: _____
           CHANGE: _____
12         REASON: _____
           CHANGE: _____
13         REASON: _____
           CHANGE: _____
14         REASON: _____
           CHANGE: _____
15         REASON: _____
           CHANGE: _____
16         REASON: _____
           CHANGE: _____
17         REASON: _____
18    I have read the foregoing transcript of
      my deposition and except for any corrections or
19    changes noted above, I hereby subscribe to the
      transcript as an accurate record of the statements
20    made by me.
21
22
23
      _____
24    TYRONE KEITH WILLIAMS    DATE
```

Page 83

```
 1    COMMONWEALTH OF MASSACHUSETTS)
 2    SUFFOLK, SS.         )
 3           I, Lisa Abdo, Certified Shorthand
 4    Reporter and Notary Public in and for the
 5    Commonwealth of Massachusetts, do certify that
 6    pursuant to appropriate notice of taking
 7    deposition, there came before me the subject
 8    deponent, who was by me duly sworn; that said
 9    deponent was thereupon examined under oath and said
10    examination reduced to writing by me; and that the
11    deposition is a true record of the testimony given
12    by the deponent.
13           I further certify that I am not a
14    relative or employee of or counsel or attorney for
15    any of the parties, or a relative or employee of
16    such counsel or attorney, nor am I financially or
17    otherwise interested in the outcome of the action.
18           Witness my hand at Boston, Massachusetts,
19    this 21st day of September, 2006.
20
      _____
21    Notary Public
22    My commission expires: 12/11/09
23
24
```

22 (Pages 82 to 83)

*Exhibit B*

# LAW OFFICE OF ISAAC H. PERES

92 State Street, 8th Floor
Boston, Massachusetts 02109
Phone (617) 722-0094
Fax (617) 778-0676

March 11, 2008

BY FAX (978) 474-9005

Paul J. Klehm, Esquire
Law Offices of James B. Krasnoo
23 Main Street
Andover, MA 01810

    Re:    International Floor Crafts, Inc. v. David W. Adams, et al.,
         United States District Court, C.A. No. 05-11654-NMG

Dear Paul:

In response to your inquiry, please be advised that my client, David Adams, will invoke the protections of the Fifth Amendment in response to any questions to be posed by your client at the deposition scheduled for tomorrow.

Would you kindly confirm for me, by fax or e-mail, that the deposition will not be going forward under this circumstance. Thank you for your attention to this matter.

Sincerely,

Isaac H. Peres

From: Paul Klehm <pklehm@krasnooklehm.com>
Subject: **Deposition of David Adams**
Date: March 11, 2008 4:12:26 PM EDT
To: Isaac Peres <isaacperes@comcast.net>, "Fred Grant Jr." <grant@grantboston.com>,
neil cohen <neilcohenlaw@yahoo.com>, xifaraslaw@verizon.net
Cc: James krasnoo <jkrasnoo@krasnooklehm.com>, Ben Falkner <bfalkner@krasnooklehm.com>

Isaac,

Based upon the facsimile which I received from you today, in which you write that your client David Adams will invoke the protections of the Fifth Amendment in response to any questions to be posed at his deposition, which is scheduled for tomorrow, I shall not proceed with the deposition tomorrow. By not proceeding with the deposition, my client does not waive any right to move to compel your client's testimony or to seek any other appropriate relief from the court. Additionally, IFC does not waive any claims that it has, or may have, against Defendant Adams.

Paul

Paul J. Klehm, Esq.
Krasnoo/Klehm LLP
23 Main Street, Suite Six
Andover, MA 01810
(978) 475-9955
facsimile (978) 474-9005

NOTICE: This e-mail transmission is intended only for the use of the person to whom it is addressed and may contain information that is attorney-client privileged, confidential and/or exempt from disclosure under applicable law and/or which constitutes work product. If you are not the person to whom it is addressed, you are hereby notified that any reading, examination, dissemination, disclosure, forwarding, copying or distribution of, or the taking of any action in reliance on, this e-mail transmission, its contents and any attachments thereto, except to deliver such items to the addressee, is strictly prohibited and that such prohibition will be vigorously enforced. If you have received this e-mail in error, please notify us immediately by reply e-mail or by telephone.