UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

—————————————————————
INTERNATIONAL FLOOR CRAFTS, INC.    )
      Plaintiffs    )
          )
v.    )
          )
DAVID W. ADAMS, *et al*    )    CIVIL ACTION NO. 05CA11654-NMG
      Defendants    )
—————————————————————)

## PLAINTIFF'S MOTION *IN LIMINE* REGARDING EXCERPTS OF DEPOSITION OF KEVIN BRITTO TO BE SHOWN TO JURY

Plaintiff International Floor Crafts, Inc. (hereinafter, "IFC") hereby moves *in limine* regarding the portions of the three-day videotaped deposition of decedent Kevin Britto to be shown to the jury at trial.   Kevin Britto, a former IFC employee, was one of the leaders of the scheme which defrauded IFC of millions of dollars, and he admitted to his role in the scheme during his three day deposition. Through this motion, IFC respectfully requests that this Court permit IFC to present to the jury the March 7, 2006 and May 31, 2006 depositions of Kevin Britto, with the excerpts set forth in **Exhibit C** removed. IFC shall discuss the parties' efforts to reach agreement on the contents of the portions of the deposition to be shown to the jury as well as the areas of disagreement. At the Pretrial Conference on July 15, 2008, the Court ordered the parties to reduce the three-day deposition (which includes roughly 6 hours and 45 minutes of total testimony) to three hours.

    1. **The efforts to reach agreement**.  On Monday, July 14, 2008, IFC forwarded a letter via facsimile to counsel to Defendants Dziemit and Adams offering to cut more than three hours from the deposition, and leaving a total deposition of approximately three hours and twenty minutes.  (**Exhibit A**).  On the morning of July 15, 2008, at the request of counsel to Defendant Dziemit, IFC forwarded the letter to counsel to Defendant

Dziemit via email.  On the late afternoon of July 15, 2008, IFC's counsel received an email from counsel to Defendant Dziemit pointing out the changes which Defendant Dziemit seeks to make to IFC's the portions of the deposition to be cut.  (See **Exhibit B**). On that evening, IFC's counsel left a message for Defendant Dziemit's counsel stating that IFC's counsel needed to look over Dziemit's requested changes.  On the morning of July 16, 2008, IFC's counsel sent an email to counsel to Defendant Dziemit outlining the portions of Dziemit's requested changes to which IFC could agree, and the portions to which IFC could not agree.  In a phone call last evening and in two emails today, IFC has requested a further discussion with Dziemit's counsel regarding the deposition excerpts, but IFC has not heard back from counsel to Defendant Dziemit.  Thus, IFC must file the within motion without having had another opportunity to seek to narrow the areas of disagreement[1].

2.      As best IFC can determine, the parties agree to cut the portions of the deposition set forth in **Exhibit C**.   **Exhibit C** takes into account the requested cuts from the deposition made by Defendant Dziemit and to which IFC agrees[2].  Through this motion, IFC respectfully requests that this Court permit IFC to present to the jury the March 7, 2006 and May 31, 2006 depositions of Kevin Britto, with the excerpts set forth in **Exhibit C** removed.  The depositions of Kevin Britto (redacted to remove personal information) are attached hereto as **Exhibit D** (March 7, 2006), **Exhibit E** (March 10, 2006) and **Exhibit F** (May 31, 2006).

3.      The parties disagree on the following six excerpts, each of which will be dealt with in turn:

    a.      **Volume I  (March 7, 2006, Exhibit D)**

        **1.  Dziemit seeks to add Page 67, ln. 8 to p. 68, ln. 12  (Volume 1)**

---

[1]   IFC has not heard from counsel to Defendant Adams regarding the Britto deposition, other than an inquiry regarding whether an agreement had been reached as to the portions to be shown to the jury.

[2]   Those agreed-upon changes only resulted in a net subtraction of less than one minute.

The excerpt concerns dealings between former Defendant Ronald Mitchell and a company known as North Carolina Foam. North Carolina Foam is, to IFC's knowledge, not a part of the scheme, and, as such, the information is entirely irrelevant to the issues raised in the case at bar. Fed.R.Evid. 401, 403.

**b.    Volume II  (March 10, 2006, Exhibit E)**

**1.  Dziemit seeks to include the entirety of Volume II.**

At the outset of the March 10, 2006 deposition, the video of which lasts approximately eleven minutes and forty-seven seconds, Attorney Krasnoo, counsel to IFC states, "Mr. Britto, you indicated shortly before this second day of your deposition was to begin that you wished to make a statement, thereafter leave the building for about 20 minutes, is that correct?"  Response:  "Correct."  Attorney Krasnoo then said, "Why don't you tell us that statement you wanted to make, go ahead and make it."  (See Exhibit

E, p. 154, ln. 23 to p. 155, ln. 8).  Britto proceeded to state, in essence, that he was guilty but that others, including, without limitation, Mitchell (who has already entered into an Agreement for Judgment) and Dziemit were innocent.  (Exhibit E, p. 155, ln. 9 to p. 157, ln. 15).  Britto proceeded to demand that Mitchell, Dziemit and others be dismissed from the case immediately.  (Exhibit E, p. 57, ln. 8-15).  Britto stated that he would give IFC representatives and IFC's counsel twenty minutes to decide, or the deposition would be terminated.  *Id*.  Twenty-seven minutes later, back on record, Attorney Krasnoo informed Mr. Britto that he had no authority to dismiss out any parties and that Attorney Krasnoo would seek a court order compelling Mr. Britto to testify.  (Exhibit E, p. 157, ln. 22 to p. 162, ln. 25).  Britto then refused to testify.  (Exhibit E, p. 163, ln. 24 to p. 164, ln. 15).

The second day of deposition did not include the normal question and answer period contemplated by Fed.R.Civ.P. 30(c)(1).  "The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615."  Fed.R.Civ.P. 30(c)(1).  Through his conduct, Britto sought to control

the proceedings in a manner inconsistent with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.  His conduct, it may be assumed, would not be tolerated by a judge at trial, and, therefore, his speech and demands during the second day of deposition should be excluded.

Additionally, Britto's demands may constitute an offer of compromise, and therefore inadmissible pursuant to Fed.R.Evid. 408.  The statements are also unduly prejudicial to IFC and their prejudicial effect outweighs any probative value (if any).  See Fed.R.Evid. 401, 403.  IFC respectfully requests that this Court bar Volume II, the second day of testimony.

### c.    Volume III  (May 31, 2006)(Exhibit F)

Britto appeared for a third day of deposition on May 31, 2006.  The deposition was held pursuant to a court order.

### 1.  Dziemit seeks to add p. 203 ln. 3-16 and 204 ln. 6-25

Those excerpts concern testimony by Britto regarding alleged conversations with Mitchell (Dziemit's partner at REMCO) after Britto's March 10, 2006 deposition.  Since the conversation took place after the litigation started, it is hearsay and inadmissible.  The conversation does not appear to be in furtherance of the conspiracy.  Additionally, with regard to p. 204, ln. 14-19, Britto provided information that went beyond the scope of the question, which asked for the substance of the conversation between Britto and Mitchell.  Britto went on to state "And it's not fair to him to be going through this.  Now, when he did the invoices is because he was listening to myself or Dave."  That information is not responsive to the question.

### 2.  Dziemit seeks to cut from p. 236 ln. 17 to p. 237 ln. 9

In that excerpt, Britto states that Adams said words to make Britto believe that Adams wanted Britto to change his testimony.  That information constitutes a statement of a party opponent, and, therefore, is admissible.

### 3.  Dziemit seeks to cut p. 249, ln. 17 to p. 254, ln. 1

In that excerpt, Britto discusses an alleged loan between Adams and Tony Maresca, Dziemit's boyfriend.  Maresca's name appears on some of the purchase orders, and he attended a meeting at Building 19 with Dziemit, Mitchell and Adams.  The term "T and J" appears as a column on one of the Defendant's charts, thus suggesting that Maresca and Dziemit received funds from the fraud.  This information helps to tie together the participants in the conspiracy, and, therefore, IFC seeks to include the excerpt in the deposition.

### 4.  Dziemit seeks to cut p. 316, ln. 12 to p. 317, ln. 6

In the excerpt, Britto testifies regarding the amount of funds that he received from the scheme.  (Exhibit F, p. 316, ln. 12-25).   That information is entirely relevant to the issues raised in the case at bar.

**WHEREFORE**, for the above reasons, Plaintiff International Floor Crafts, Inc. respectfully requests that this Court permit IFC to present to the jury the March 7, 2006 and May 31, 2006 depositions of Kevin Britto, with the excerpts set forth in **Exhibit C** removed.  In the alternative,  to the extent that the Court is willing to permit the above-referenced excerpts requested by Dziemit to be added or cut from the portion of the deposition to be shown to the jury, IFC respectfully requests that it be granted leave to show the revised portion of the deposition to the jury.

The Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,

*/s/ Paul J. Klehm*
Paul J. Klehm (BBO#561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO#279300)
jkrasnoo@krasnooklehm.com
Krasnoo|Klehm LLP
23 Main Street, Suite Six
Andover, MA  01810
Dated:  July 16, 2008
(978) 475-9955

**<u>CERTIFICATE OF SERVICE</u>**

I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within document upon all counsel of record and upon all parties not represented by counsel by first class mail, postage pre-paid, on July 16, 2008. I have also forwarded a copy of the within document to the following individuals via first class mail, postage pre-paid:

Robert Xifaras, Esq.
5 Dover Street, Suite 101
New Bedford, MA 02740

*/s/ Paul J. Klehm*_____
Paul J. Klehm

# KRASNOO | KLEHM LLP

*attorneys at law*

Twenty-Three Main Street, Second Floor, Andover, MA 01810-3730
978.475.9955 (phone) • 978.474.9005 (facsimile) • www.krasnooklehm.com
James B. Krasnoo, admitted in MA & CA • Paul J. Klehm, admitted in MA & NH

Benjamin L. Falkner, admitted in MA & NH

July 14, 2008

**VIA FACSIMILE ONLY**
Neil S. Cohen, Esq.
Eleven Beacon Street, Suite 625
Boston, MA  02108

Re: **International Floor Crafts v. Jane Dziemit**, *et al*

Dear Attorney Cohen:

Our office has spent a significant time seeking to cut out portions of the videotaped deposition of Kevin Britto in order to reduce the total deposition time to be shown to the jury to three hours.  I have set forth on the attached page the sections which IFC is willing to strike from the first (March 7, 2006) and third (May 31, 2006) days of Mr. Britto's deposition.  As you will see, we have attempted to do so in a balanced fashion in an effort to resolve this issue as quickly as possible.  We have been able to reduce the deposition to a total of approximately three hours and twenty minutes.

With regard to the second day of deposition (March 10, 2006), which lasts approximately eleven minutes and seventeen seconds, IFC objects to the introduction of any portion of that deposition.  On the second day, Mr. Britto merely made a speech, and there was no formal question and answer period.

Please let me know by tomorrow afternoon whether you agree to the portions that I have omitted.  If you wish to omit other portions, please let me know also.

On Wednesday, I intend to submit a writing to the Court in support of the three hour, twenty minute version which I am identifying here.  I am willing, however, to work with the parties in an effort to reach an agreement as to the portions of the deposition to be shown to the jury.

Very truly yours,

Paul J. Klehm

Enclosure
cc: Isaac Peres, Esq.  (via facsimile only)

```
*****************************
***   MULTI TX/RX REPORT   ***
*****************************
```

| TX/RX NO | 2673 | |
|---|---|---|
| PGS. | 4 | |
| TX/RX INCOMPLETE | (2) | 16173678840p0030 |
| TRANSACTION OK | (1) | 16179739949p0030 |
| ERROR INFORMATION | ----- | |

# KRASNOO | KLEHM LLP

23 MAIN STREET, SUITE SIX
ANDOVER, MA 01810
(978) 475-9955
Facsimile (978) 474-9005

## facsimile transmittal

| To: | Neil S. Cohen, Esq. | Fax: | (617) 973-9949 |
|---|---|---|---|
| To: | Isaac Peres, Esq. | Fax: | (617) 367-8840 |
| From: | Paul J. Klehm, Esq. | Date: | July 14, 2008 |
| Re: | *International Floor Crafts, Inc. v. Dziemit* | Pages: | 4 (including cover) |

⊗ Urgent     For Review     ⊗ Please Comment     ⊗ Please Reply     ⊗ Please Recyde

**Notes:**

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO              2674
CONNECTION TEL               16173678840p0030
CONNECTION ID
ST. TIME             07/14 15:59
USAGE T              00'34
PGS. SENT               4
RESULT               OK
```

## KRASNOO | KLEHM LLP
23 MAIN STREET, SUITE SIX
ANDOVER, MA 01810
(978) 475-9955
Facsimile (978) 474-9005

# facsimile transmittal

| To: | Neil S. Cohen, Esq. | Fax: | (617) 973-9949 |
|---|---|---|---|
| To: | Isaac Peres, Esq. | Fax: | (617) 367-8840 |
| From: | Paul J. Klehm, Esq. | Date: | July 14, 2008 |
| Re: | *International Floor Crafts, Inc. v. Dziemit* | Pages: | 4 (including cover) |

⊗ Urgent     For Review     ⊗ Please Comment     ⊗ Please Reply     ⊗ Please Recycle

Notes:

KRASNOO | KLEHM LLP
23 MAIN STREET, SUITE SIX
ANDOVER, MA 01810
(978) 475-9955
Facsimile (978) 474-9005

# facsimile transmittal

| To: | Neil S. Cohen, Esq. | Fax: | (617) 973-9949 |
|-----|---------------------|------|----------------|
| To: | Isaac Peres, Esq. | Fax: | (617) 367-8840 |
| From: | Paul J. Klehm, Esq. | Date: | July 14, 2008 |
| Re: | *International Floor Crafts, Inc. v. Dziemit* | Pages: | 4 (including cover) |

® Urgent     For Review     ® Please Comment     ® Please Reply     ® Please Recycle

**Notes:**

From: neil cohen <neilcohenlaw@yahoo.com>
Subject: **Re: Britto deposition**
Date: July 15, 2008 4:59:12 PM EDT
To: Paul Klehm <pklehm@krasnooklehm.com>
Reply-To: neilcohenlaw@yahoo.com

Paul, here are my changes/additions:

ad back p. 50,l 6-p.51, l.1

leave in p.67, l.8- p.68, l.12

leave in p. 121, l15- p.123, l.2

are you calling debbie meyers? if yes, no, if no it's o.k.

obviously i want vol. 2

i want p. 203, l.3-16 and 204, l.6-25

i want p. 207, l.11-16 cut

cut line 5-14, p.226 also

paul, i think we should cut everything between, p. 231, l.22-p.240, l.6 as repetitive and not real important

cut p. 244, l.5-20

cut p.249, l. 17-p. 254, l.1 (all hearsay) and Tony's not sued here

cut p. 273, l.23-p. 274, l. 10

cut p. 278, l.12- p. 279, l. 7

cut p,.279, l.7- p. 281, l.1

cut p.314, l.3- p.317, l.9

--- On **Tue, 7/15/08, Paul Klehm <*pklehm@krasnooklehm.com*>** wrote:

> From: Paul Klehm <pklehm@krasnooklehm.com>
> Subject: Britto deposition
> To: "neil cohen" <neilcohenlaw@yahoo.com>
> Date: Tuesday, July 15, 2008, 9:36 AM
>
>
> Paul J. Klehm, Esq.
> Krasnoo/Klehm LLP
> 23 Main Street, Suite Six
> Andover, MA  01810
> (978) 475-9955

facsimile (978) 474-9005

NOTICE: This e-mail transmission is intended only for the use of the person to whom it is addressed and may contain information that is attorney-client privileged, confidential and/or exempt from disclosure under applicable law and/or which constitutes work product. If you are not the person to whom it is addressed, you are hereby notified that any reading, examination, dissemination, disclosure, forwarding, copying or distribution of, or the taking of any action in reliance on, this e-mail transmission, its contents and any attachments thereto, except to deliver such items to the addressee, is strictly prohibited and that such prohibition will be vigorously enforced. If you have received this e-mail in error, please notify us immediately by reply e-mail or by telephone.

<u>**Exhibit C**</u>

<u>**Agreed-Upon Excerpts Cut from Britto Deposition**</u>

<u>**Volume I March 7, 2006**</u>
- P 5 ln 2 to p 8 ln 7
- 48 ln. 10 – 50 ln 5
- 51 ln. 2 – 53 ln. 8
- 54 ln 22 – 58 ln 20
- 75 ln 20 – 79 ln 9
- 85 ln 19 – 92 ln 19
- 93 ln 12 – 95 ln 23
- 102 ln 13 – 103 ln 6
- 113 ln 22 – 118 ln 5
- 123 ln 4 – 123 ln. 7
- 123 ln 24 – 126 ln 23
- 128 ln 2- 129 ln 14
- 137 ln 23- 140 ln 2
- 140 ln 11 – 144 (end of transcript)

<u>**Volume III May 31, 2006**</u>
- 168 ln 1 – 169 ln 25
- 175 ln 6 – 179 ln 21
- 186 ln 19 – 188 ln 22
- 193 ln. 3 to 203 ln. 2
- 203 ln. 17 to 204 ln. 5
- 206 ln 8 – 206 ln 20
- 207 ln 11 – 209 ln 6
- 214 ln 11 – 215 ln 17
- 217 ln 14 – 219 ln 22
- 222 ln 3 – 226 ln 4
- 226 ln 5 – 228 ln 3
- 229 ln 16 – 230 ln 10
- 231 ln 16 – 236 ln 16
- 237 ln 10 – 240 ln 6
- 242 ln 19 – 246 ln 7
- 248 ln 10 – 249 ln 16
- 253 ln 18 – 255 ln 24
- 273 ln 23 –282 ln 11
- 283 ln 1 – 285 ln 20
- 286 ln 18 – 287 ln 15
- 290 ln 14 – 292 ln 4
- 296 ln 6 – 307 ln 10
- 309 ln 4 – 313 ln 2
- 313 ln. 3 – 316 ln 11
- 318 ln 17 – 318 ln 23

- 320 ln 15 – 320 ln 20
- 321 ln 16 – 321 ln 20
- 324 ln 12 – 325 ln 23
- 326 ln 11 – 336 (end)

# In The Matter Of:

*INTERNATIONAL FLOOR CRAFTS   v.*
*DAVID ADAMS*

---

*KEVIN BRITTO*
*March 7, 2006*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

*Original File DD0307Z.TXT, 149 Pages*
*Min-U-Script® File ID: 0700660165*

# Word Index included with this Min-U-Script®

Page 1

[1]
[2]        UNITED STATES DISTRICT COURT FOR THE
[3]          EASTERN DISTRICT OF MASSACHUSETTS
[4]
     INTERNATIONAL FLOOR CRAFTS, INC., :
[5]
         Plaintiff,                    :
[6]
[7]      -against-              : CIVIL ACTION NO.
                                : 05CA11654-NMG
[8] DAVID W. ADAMS, et al.,     :
[9]      Defendants.            :
[10]
[11]
[12]  VIDEOTAPE DEPOSITION of KEVIN BRITTO, taken by
[13]  Plaintiff at the offices of Fink & Carney Reporting
[14]  and Video Services, 39 West 37th Street, 6th Floor,
[15]  New York, New York 10018, on Tuesday, March 7, 2006
[16]  commencing at 1:30 p.m., before Debra DiBenedetto, a
[17]  Shorthand (Stenotype) Reporter and Notary Public
[18]  within and for the State of New York.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 2

[1]
[2] APPEARANCES:
[3]      KRASNOO KLEHM LLP
             Attorneys for Plaintiff
[4]          Terrace Level Suite One
             Andover, Massachusetts 01810-3730
[5]
     BY: JAMES B. KRASNOO, Esq., of Counsel
[6]      PAUL J. KLEHM, Esq., of Counsel
[7]
     LAW FIRM OF ISAAC H. PERES
[8]          Attorneys for Defendant Adams
             50 Congress Street, Suite 225
[9]          Boston, Massachusetts 02109
[10] BY: ISAAC H. PERES, Esq., of Counsel
[11]
     YURKO, SALVESEN & REMZ, P.C.
[12]         Attorneys for Defendant Dziemit
             One Washington Mall, 11th Floor
[13]         Boston, Massachusetts 02108-2603
[14] BY: RICHARD J. YURKO, Esq., of Counsel
[15]
     LAW OFFICES OF FREDERICK D. GRANT, JR.
[16]         Attorneys for Defendant Mitchell
             727 Atlantic avenue, Second Floor
[17]         Boston, Massachusetts 02111
[18] BY: FREDERIC D. GRANT, JR., Esq.,
         of Counsel
[19]
[20] TROUT CACHERIS, PLLC
             Attorneys for Defendants David and
[21]         Paul Sun
         1350 Connecticut Avenue, Northwest,
[22]         Suite 300
             Washington, D.C. 20036
[23]
     BY: JOHN THORPE RICHARDS, Esq., of Counsel
[24]
[25]

Page 3

[2] APPEARANCES: (Cont'd)

[4]   KELLY, LIBBY, HOOPES
         Attorneys for Defendant Brown
[5]      175 Federal Street
         Boston, Massachusetts  02110

[6] BY:  SHARON LAHEY, Esq., of Counsel

[9] ALSO PRESENT:  John Durant
         William Gemme
[10]    Ronald Mitchell
         William Elovitz

---

Page 4

**IT IS HEREBY STIPULATED AND**
[2] **AGREED** that the Parties agree to
[4] hold, and not make at the deposition,
[5] all objections, including as to form,
[6] foundation, evidence, relevance, etc.
[7]   (except for issues of privilege) and
[8] that nonetheless any such potential
[9] objections would be preserved and
[10] could be asserted for the first time
[11] at the time of trial if any party
[12] seeks to offer the videotaped
[13] deposition in evidence.

---

Page 5

*Britto*

[2]   THE VIDEOGRAPHER: We're now
[3] going on the record. The time is
[4] 1:30 p.m. on March 7, 2006. This is
[5] the videotaped deposition of Kevin
[6] Britto, in the matter of International
[7] Floor Crafts, Inc. versus David W.
[8] Adams, et al. under the jurisdiction
[9] of the United States District Court
[10] for the Eastern District of
[11] Massachusetts.
[12]   This deposition is being held
[13] at 39 West 37th Street, New York, New
[14] York. My name is Jose Santos and I am
[15] the video specialist. The court
[16] reporter is Debra DiBenedetto and we
[17] both represent Fink & Carney Reporting
[18] with offices located at 39 West 37th
[19] Street New York, New York.
[20]   May I have an introduction
[21] from counsel.
[22]   MR. KRASNOO: Good morning, my
[23] name is James Krasnoo, and with
[24] co-counsel Paul Klehm, we both
[25] represent International Floor Crafts,

---

Page 6

*Britto*

[2] Inc., the plaintiff in this action.
[3]   MR. GRANT: My name is Fred
[4] Grant, I represent Ron Mitchell, a
[5] defendant in this action.
[6]   MR. PERES: Isaac Peres,
[7] representing the defendant, David
[8] Adams.
[9]   MR. RICHARDS: My name is John
[10] Richards and I represent Paul and
[11] David Sun and CCC, Inc.
[12]   MR. YURKO: Richard Yurko I'm
[13] representing Jane Dziemit.
[14]   MS. LAHEY: Sharon Lahey,
[15] representing Michael Brown.
[16]   MR. KRASNOO: Does anyone wish
[17] to discuss the stipulations at all in
[18] this matter?
[19]   MR. YURKO: We're proceeding
[20] on the stipulation that was E-mailed
[21] back and forth.
[22]   MR. KRASNOO: Okay.
[23]   MR. KLEHM: That's fine by me.
[24]   THE WITNESS: Well, I would
[25] like to start off, Jane and Ron are

---

Page 7

**Britto**

[1]
[2] innocent. The other parties were all
[3] guilty. I have facts to back it up
[4] and I'm trying to make this wrong
[5] right. You know, Bill, Ron, and Jane
[6] are victims.
[7]     As I told Paul yesterday, as a
[8] child I got raped, I was a victim. I
[9] shouldn't be victimizing these people.
[10] And the three of them are going
[11] through shit because of me, and it's
[12] not fair.
[13]     THE VIDEOGRAPHER: Excuse me,
[14] will the court reporter please swear
[15] in the witness.
[16]     REPORTER: Yes, sir I'm just
[17] going to swear you in.
[18]     THE WITNESS: I won't put my
[19] hand on a Bible.
[20]     REPORTER: No. Would you like
[21] to affirm.
[22] KEVIN BRITTO, called as a witness,
[23] having been first duly affirmed before
[24] Debra DiBenedetto, a Notary Public within
[25] and for the State of New York, was examined

Page 8

**Britto**

[1]
[2] and testified as follows:
[3]     THE WITNESS: I don't believe
[4] in God. There isn't a God. If there
[5] is, he's a deadbeat dad.
[6]     **DIRECT EXAMINATION**
[7]     **BY MR. KRASNOO:**
[8]     Q: Mr. Britto, at some point you began
[9] employment with International Floor Crafts?
[10]     A: 1988, July 18th.
[11]     Q: Okay. And at some point you did
[12] something while you were working for International
[13] Floor Crafts that you've earlier, off the record,
[14] just apologized to Mr. Elovitz for, is that
[15] correct?
[16]     A: Yes.
[17]     Q: Okay. What was it that you did when
[18] you worked for International Floor Crafts for
[19] which you've just offered an apology?
[20]     A: Stole money.
[21]     Q: Now, do you recall how it came about
[22] on the first occasion that you stole money?
[23]     A: Dave actually coerced myself into
[24] it, and the Suns and Mike Brown. And there was a
[25] shipment one time that, was short. And I was the

Page 9

**Britto**

[1]
[2] buyer, I became the buyer, June 1993 when Bill
[3] became the president. And, there was a short
[4] shipment and at the time I wasn't close to Bill.
[5] He did something that pissed me off, I can't
[6] recall what it was, and Dave egged me on, so I was
[7] pissed off. The shipment came in short, I called
[8] him up, what's going on, Dave. He said, oh, let
[9] me call you back, I'll fix it. He knew I was mad.
[10] And then he called me back, and said, Well, we can
[11] make some money off this. I'm like, what are you
[12] talking about. So when he did, I thought about
[13] it, I called him back and I said, okay, let's do
[14] it.
[15]     Q: Now, let me ask you some questions
[16] about that first —
[17]     A: Okay.
[18]     Q: You mentioned Dave. What's Dave's
[19] last name?
[20]     A: Adams.
[21]     Q: Okay. Secondly, you mentioned that
[22] there was a short shipment. Do you know who the
[23] supplier of the short shipment was?
[24]     A: DGM.
[25]     Q: Okay. And —

Page 10

**Britto**

[1]
[2]     A: Which the owner is now dead, so.
[3]     Q: Now, you also mentioned that you had
[4] some type of conversation with Dave Adams where he
[5] said, in substance, let's make some money out of
[6] this?
[7]     A: Yep.
[8]     Q: Okay. Did he describe to you in that
[9] conversation how you and he were going to make
[10] money and how the scheme or plan would be
[11] implemented?
[12]     A: There was supposed to be like 600
[13] rugs. 300 came in. We made the money off the 300
[14] rugs.
[15]     Q: Now, how did you — was there
[16] certain paperwork you had to fill out to indicate
[17] that 600 rugs had come in when, in fact, only 300
[18] had?
[19]     A: See, this is where it gets
[20] complicated. I like to cover my tracks. So I
[21] used to have all kind of people do the paperwork
[22] just so it's not one person, you know what I mean.
[23] And, so I don't know who did it at the time.
[24]     Q: Okay. Now, did Mr. Williams, Tyrone
[25] Williams, become known to you at some point?

Page 11

*Britto*

[1]
[2]  **A:** Yeah.

[3]  **Q:** And did Mr. Williams at any time

[4] participate in any portion of this scheme?

[5]  **A:** Yes.

[6]  **Q:** Okay. Now —

[7]  **A:** Let me say something on that. I was

[8] his boss. I don't know if I intimidated him,

[9] plus, I do have a reputation — well, I used to

[10] have a reputation of kicking people's ass, so I

[11] don't know if I intimidated him over that and

[12] that's why he did it. Of course, he's a man, he

[13] wanted the money, you know, but I don't know if I

[14] forced him into it.

[15]  **Q:** Well, first you stated you began

[16] with this scheme, it first started in 1993?

[17]  **A:** Well, that's when I became the

[18] buyer.

[19]  **Q:** Okay. When, roughly, from 1993

[20] until how long did you work for International

[21] Crafts?

[22]  **A:** I left in 1998, September. I came

[23] back September — it's funny because the day I

[24] left is the same date I came back a year later.

[25]  **Q:** So you came back September 1999?

Page 12

*Britto*

[1]
[2]  **A:** No, I think that's wrong, I came

[3] back ten months later. I left in November of '97,

[4] came back September 28th of 1998, and then I left

[5] again September 28th, 2001.

[6]  **Q:** Now, did the scheme to defraud first

[7] happen in your first employment with IFC as well

[8] as your second or only in your second or only in

[9] your first?

[10]  **A:** Both.

[11]  **Q:** Okay. And, when did Tyrone Williams

[12] start participating with you in this?

[13]  **A:** Oh, I came back in '98, I hired him,

[14] so he probably started in '99.

[15]  **Q:** And when he started with you, can

[16] you estimate for us when the shipment — strike

[17] that — when the stealing actually started, by

[18] that I mean reporting that X number of rugs came

[19] in when only one came in, which was less?

[20]  **A:** I understand, it was after Dave

[21] Rooney left, which I'm pretty sure IFC has that on

[22] record.

[23]  **Q:** Now, are you able estimate for us

[24] how many shipments of rugs this involved?

[25]  **A:** Oh, I don't know.

Page 13

*Britto*

[1]
[2]  **Q:** Is it more than 50?

[3]  **A:** It's, it's a high number, I don't

[4] know. It's around 50 at least anyways.

[5]  **Q:** And, when the stealing began, how

[6] did the parties get the money from it that they

[7] split up, what was the method by which the money

[8] was placed in your pocket?

[9]  **A:** Went through Dave.

[10]  **Q:** And did you know how much the theft

[11] represented each time?

[12]  **A:** No. Actually Dave stole from IFC

[13] and myself.

[14]  **Q:** Okay. So, did you ever question

[15] Dave Adams —

[16]  **A:** Oh, yeah, we went at it.

[17]  **Q:** Okay. So, when you went at it, what

[18] kinds of conversations did you have with Mr. Adams

[19] about the money?

[20]  **A:** Well, he said Building 19 is not

[21] paying their bills, which they were, and that's

[22] why there's no money there, because he was

[23] gambling the shit away.

[24]  **Q:** Did you — can you tell us how much

[25] money you made out of the scheme as an estimate?

Page 14

*Britto*

[1]
[2] Is it more than a thousand dollars?

[3]  **A:** Oh, of course.

[4]  **Q:** Okay. Is it more than 50,000?

[5]  **A:** I'm not going to give you any

[6] numbers.

[7]  **Q:** Is it because you don't have a

[8] memory?

[9]  **A:** Yeah, I don't know how much, I'm not

[10] gonna give you a number if I don't know — I'm

[11] under oath so I'm not going to.

[12]  **Q:** Did —

[13]  **A:** I can tell you one thing, it's over

[14] a hundred thousand, that's for sure.

[15]  **Q:** Okay.

[16]  **A:** And, well, he will get every penny

[17] back that I took from him.

[18]  **Q:** When you say a hundred thousand, is

[19] that money that came just to you?

[20]  **A:** Oh, yeah.

[21]  **Q:** Now, over what period of time did

[22] you receive these monies?

[23]  **A:** That was after Dave really left, I

[24] don't know.

[25]  **Q:** Did you continue to receive any

Page 15

[1]                              **Britto**
[2] money at all after you left IFC for good?
[3]    A: Yes.
[4]    Q: Okay. And how did you get that
[5] money?
[6]    A: Checks.
[7]    Q: And who did the checks come from?
[8]    A: CCC.
[9]    Q: Okay. And, had you ever had any
[10] direct contact with any member of CCC —
[11]    A: Yes.
[12]    Q: — about any aspect of this scheme?
[13]    A: Yes.
[14]    Q: Okay. With whom did you have
[15] contact?
[16]    A: Paul and David.
[17]    Q: Okay. Did you ever have any contact
[18] with another member of CCC named John Sun —
[19]    A: Oh, Mike Brown.
[20]    Q: Well, John Sun?
[21]    A: No, I don't know who that is.
[22]    Q: Okay. Now, when you left and you
[23] received checks, did you have communication with
[24] either David Sun or Paul Sun about those specific
[25] checks that came to you after you left

Page 16

[1]                              **Britto**
[2] International Floor Craft?
[3]    A: Yes.
[4]    Q: Which one or both if it was both?
[5]    A: Both.
[6]    Q: Can you remember, in substance, the
[7] conversations that you had with either one or both
[8] of them?
[9]    A: Give me an example.
[10]    Q: Well, did you ever discuss with
[11] them, for example, the size of the check and how
[12] much it should be?
[13]    A: Yes.
[14]    Q: Okay. And did you ever discuss with
[15] them that you thought you were being shortchanged,
[16] for want of a better word, about the size of the
[17] check?
[18]    A: No. That would be Dave.
[19]    Q: How many checks did you receive
[20] after you left?
[21]    A: A bunch.
[22]    Q: Okay. And do you know how much money
[23] that represented?
[24]    A: (Indicating.)
[25]    Q: When did you first — Oh, yeah, you

Page 17

[1]                              **Britto**
[2] need —
[3]    A: No.
[4]    Q: And if you could give us a verbal,
[5] because she can't, the court reporter can't record
[6] whether it means a yes or no with your gesture.
[7]    A: Okay.
[8]    Q: Now, after you left International
[9] Floor Crafts, what was the purpose of your getting
[10] money from CCC at that point?
[11]    A: There's a whole bunch, actually.
[12]    Q: Okay. What were they, or the
[13] purposes?
[14]    A: Alcoholic, pills, wanting to live in
[15] a gay lifestyle out here in New York. And then my
[16] when mother died, some of that money went to pay
[17] for her funeral, tombstone.
[18]    Q: So those are the purposes for which
[19] you used it?
[20]    A: I paid — I grew up on welfare in
[21] the projects so all the people I'm close to are
[22] poor. So when I wasn't using the money for the
[23] drugs, the addictions, I was helping people pay
[24] their electric bills, their rent, phone bills,
[25] whatever.

Page 18

[1]                              **Britto**
[2]    Q: What were the purposes, if you know,
[3] that you got the money from CCC after you left
[4] International Floor Crafts?
[5]    A: That was the addiction.
[6]    Q: Yes, but I mean what was it that
[7] caused them to give you the money to support your
[8] addiction after you had left?
[9]    A: Because I had control of the
[10] warehouse.
[11]    Q: So did you continue to have control
[12] of the warehouse even though you physically left
[13] IFC?
[14]    A: Yes.
[15]    Q: And how did you have physical
[16] control over the warehouse?
[17]    A: Because Tyrone was my friend.
[18]    Q: So, would you be in communication
[19] with Tyrone Williams after you left IFC?
[20]    A: Yes.
[21]    Q: And what would be the conversations
[22] that you would have with Tyrone Williams?
[23]    A: I would just give him advice how to
[24] do some shit.
[25]    Q: And when you gave him advice on how

Page 19

***Britto***

[2] to do shit, what kind of shit are we talking
[3] about?
[4] **A:** Legal shit.
[5] **Q:** So, would he initiate the phone
[6] calls with you or you with him?
[7] **A:** I probably had to because he's not
[8] too good at communication.
[9] **Q:** And when you initiated the phone
[10] calls with him or spoke with him, what were some
[11] of the subject matters or all of the subject
[12] matters as you can remember, that you engaged in
[13] between him and Tyrone Williams and yourself?
[14] **A:** I would tell him what came in, when
[15] to bill it, I mean when to do the key rec. Give
[16] him answers to tell the buyers.
[17] **Q:** When you would talk to him about
[18] what came in, do you mean by that —
[19] **A:** I would tell him, look, there's 350
[20] 9-by-10 wells, 350 8-by-10 wells.
[21] **Q:** So, are you giving him information
[22] that he should be putting down on what you call
[23] the key rec?
[24] **A:** Yes.
[25] **Q:** Even though those numbers of rugs in

Page 20

***Britto***

[2] that quantity actually did not come in?
[3] **A:** Yes.
[4] **Q:** So you would be giving him on that
[5] phone call the numbers that he should be placing
[6] in —
[7] **A:** I was directing him —
[8] **Q:** That represented phony but not
[9] actual shipments?
[10] **A:** Yes, I was directing him.
[11] **Q:** Okay. And when you gave that
[12] quantity, would you first, before you discussed it
[13] with Tyrone Williams, discuss it with anyone at
[14] CCC as to what the quantities should be?
[15] **A:** Sometimes. Dave, mostly.
[16] **Q:** Okay. How would CCC know the
[17] quantities of nonexisting rugs to bill IFC for if
[18] they did not discuss it with you?
[19] **A:** Dave would tell them or I would tell
[20] them.
[21] **Q:** Would Dave also have — Dave Sun,
[22] you're talking about?
[23] **A:** No, Dave Adams.
[24] **Q:** Okay. And would — did David Sun
[25] ever have direct communication with you while you

Page 21

***Britto***

[2] were at IFC?
[3] **A:** No.
[4] **Q:** Okay. Did Paul Sun ever have direct
[5] communication with you while you were at IFC?
[6] **A:** No.
[7] **Q:** Did either one of them ever have any
[8] telephone communication with you while you were at
[9] IFC?
[10] **A:** No, it went through Dave Adams.
[11] **Q:** Always went through Dave Adams?
[12] **A:** Yeah.
[13] **Q:** Now —
[14] **A:** Or Mike Brown.
[15] **Q:** After, from the time David Adams
[16] first had the conversation with you where, would
[17] you like to make some money on this or we could
[18] make some money on this, until you left, did David
[19] Adams and you ever discuss whether or not David
[20] Adams had ever implemented this kind of a plan
[21] before he asked you to join him in that endeavor?
[22] **A:** No.
[23] **Q:** Okay. When you had this first
[24] conversation with David Adams about, in essence,
[25] we can make some money this way, did you ever

Page 22

***Britto***

[2] discuss with him whether or not it was a wrong
[3] thing to do?
[4] **A:** Nope. I told you at the time I was
[5] mad at Bill.
[6] **Q:** Right. Now, at some time you became
[7] friendly with Bill again, is that correct?
[8] **A:** Oh, well, that was before I became
[9] close to Bill.
[10] **Q:** And when you became close to Bill,
[11] did you continue to participate in the scheme to
[12] steal from IFC?
[13] **A:** Yeah, because that's when I was
[14] addicted. And you can ask Bill, I mean, I used to
[15] have meetings with him, I used to cancel them, I
[16] left because I couldn't face him, I felt like
[17] shit.
[18] **Q:** Did you ever discuss with Dave Adams
[19] at any point after you became well disposed to
[20] Bill Elovitz, that you had some reluctance to
[21] continue with the scheme?
[22] **A:** Yes, a few times.
[23] **Q:** And in the few times can you give us
[24] the substance of any one conversation that you can
[25] remember?

Page 23

***Britto***

[1]
[2]   **A:** I'm not going to incriminate myself,
[3]  it was nasty.
[4]   **Q:** Okay. By nasty, do you mean a lot of
[5]  blasphemy being used or swear words?
[6]   **A:** Threatening.
[7]   **Q:** Were you doing the threatening of
[8]  him —
[9]   **A:** Yes.
[10]  **Q:** Okay. And did your threats to him
[11] involve no longer continuing in this scheme?
[12]  **A:** Yes.
[13]  **Q:** Did the scheme nevertheless continue
[14] after you made the threats to David Adams?
[15]  **A:** Yes.
[16]  **Q:** Do you have any idea at all how much
[17] money from anything David Adams told you or what
[18] you personally observed David Adams gambled away?
[19]  **A:** It's got to be over a million
[20] dollars.
[21]  **Q:** Did you ever accompany Dave Adams to
[22] any place of gambling such as the track or a
[23] gambling club or —
[24]  **A:** I did one time, actually.
[25]  **Q:** Where did you go on that occasion?

Page 24

***Britto***

[1]
[2]   **A:** It was a dog racetrack I think in
[3]  Randolph, I'm not sure, I think it's Randolph,
[4]  but.
[5]   **Q:** Would that be perhaps Raynham?
[6]   **A:** Raynham, maybe that's it.
[7]   **Q:** And do you recall how much money on
[8]  that occasion Mr. Adams placed down on bets?
[9]   **A:** I have no idea.
[10]  **Q:** Okay. We've discussed —
[11]  **A:** I could say one thing, too. One
[12] time — and I do have the receipt — I had to give
[13] him a bank check, because his bookie was gonna
[14] come after him.
[15]  **Q:** Okay. Do you remember how much that
[16] was for?
[17]  **A:** $18,000.
[18]  **Q:** Now, you've told us so far about
[19] Mr. Adams. Was Mr. Adams at some of the time an
[20] IFC employee during the scheme or was he an
[21] independent contractor, if you know?
[22]  **A:** No, he was an IFC employee at the
[23] end.
[24]  **Q:** And Tyrone Williams was an IFC
[25] employee?

Page 25

***Britto***

[1]
[2]   **A:** Yes.
[3]   **Q:** Okay. And were there any other
[4]  persons during the entire period of time that the
[5]  scheme existed, that were employees of IFC
[6]  participating in it other than Mr. Adams,
[7]  Mr. Williams and yourself?
[8]   **A:** Just by — well, no, but doing
[9]  paperwork that they didn't know that they were
[10] doing.
[11]  **Q:** So were there any employees who knew
[12] what they were doing or knowingly participated in
[13] the scheme —
[14]  **A:** No.
[15]  **Q:** — other than Mr. Adams,
[16] Mr. Williams and yourself?
[17]  **A:** No.
[18]  **Q:** Now, when — you mentioned earlier a
[19] document called the key rec. Could you —
[20]  **A:** That's a receiving bill.
[21]  **Q:** Okay. Could you take us through a
[22] legitimate transaction on the purchase of rugs by
[23] IFC while you were there from start to finish,
[24] identifying for us what documents would be made,
[25] who would be handling the document and what they

Page 26

***Britto***

[1]
[2]  would be placing in those documents by way of
[3]  information?
[4]   **A:** Yes. And one, Bill needs to know
[5]  this so it doesn't happen again. One, don't have
[6]  stuff delivered free of charge, because it doesn't
[7]  go through the company. That's the main thing.
[8]  Because it doesn't — I don't know if Steve still
[9]  works there, but if it doesn't go through the
[10] traffic manager there's no trace. That's how we
[11] get away with it.
[12]  **Q:** You mentioned a name just before and
[13] she doesn't didn't get the full name. Steve?
[14]  **A:** Burroughs.
[15]  **Q:** And do you know how to spell
[16] Burroughs?
[17]  **A:** B-U-R-R-O-U-G-H-S.
[18]  **Q:** Now, who was Steve Burroughs?
[19]  **A:** He's the traffic manager.
[20]  **Q:** What does the traffic manager do at
[21] IFC?
[22]  **A:** He sets up all the deliveries, for
[23] the whole company, not just IFC.
[24]  **Q:** Okay. And the whole company, by that
[25] you mean Building 19 as well?

Page 27

*Britto*

[1] **A:** Yeah, but if there's no paper trail,
[3] you can get away with it.
[4] **Q:** So when free goods come in, there's
[5] no paper trail?
[6] **A:** Nope.
[7] **Q:** And what would happen then with the
[8] free goods if there were no paper trail?
[9] **MR. YURKO:** By that do you
[10] mean free delivery?
[11] **Q:** Free of charge delivery is what you
[12] mean?
[13] **A:** Yeah.
[14] **Q:** Okay, so —
[15] **A:** The paperwork comes from the
[16] company.
[17] **Q:** Okay.
[18] **A:** So if you have somebody receiving
[19] the goods who's a scumbag.
[20] **Q:** So by that you mean, that if
[21] somebody's a traffic manager and knows that a
[22] shipment of goods is coming for the company but
[23] because they're being delivered without a delivery
[24] charge —
[25] **A:** He doesn't know about it.

Page 28

*Britto*

[1] **Q:** There are no shipping papers?
[3] **A:** Yes.
[4] **Q:** Those goods come in and then what
[5] happens to them if a person is a scumbag and wants
[6] to, in some way, get some cash or profit or, or
[7] acquisition because of this?
[8] **A:** Let me make this clear, Steve is not
[9] involved in this.
[10] **Q:** Right, I understand that.
[11] **A:** Okay.
[12] **Q:** But what happens to those goods when
[13] they come out and there is no paperwork
[14] accompanying them?
[15] **A:** We tell them to go off the truck, we
[16] ship them right out.
[17] **Q:** And when you ship — so they're
[18] actual goods that come in, is that correct?
[19] **A:** Sometimes, sometimes not.
[20] **Q:** Okay. Sometimes they're just
[21] fictional goods?
[22] **A:** Yes.
[23] **Q:** Goods don't come in?
[24] **A:** Yes.
[25] **Q:** Are there also times when goods

Page 29

*Britto*

[2] would come in —
[3] **A:** Half shipments —
[4] **Q:** But then you would add to the goods?
[5] **A:** Yes.
[6] **Q:** That portion would be fiction?
[7] **A:** Yep.
[8] **Q:** Okay. And as a result you would
[9] claim, for example, 600 rugs came in but only 300
[10] came in?
[11] **A:** Yes.
[12] **Q:** Okay. Then there were times when you
[13] would claim 600 rugs came in but absolutely no
[14] rugs came in?
[15] **A:** Yes.
[16] **Q:** And then there would be times when
[17] 600 rugs came in and 600 rugs actually did come
[18] in?
[19] **A:** Yes.
[20] **Q:** And you would claim that 600 rugs
[21] came in?
[22] **A:** Yes.
[23] **Q:** Okay. Now, in all three instances
[24] you say that when they would come in but there
[25] would be no paper work with them, you would ship

Page 30

*Britto*

[2] them immediately out. In the instance where
[3] you're shipping them out but actually no rugs came
[4] in at all, are you creating a document that
[5] suggests these nonexistent 600 rugs actually were
[6] sent out somewhere?
[7] **A:** We could ship them from another
[8] company.
[9] **Q:** Okay.
[10] **A:** So the rugs did go on the trailer,
[11] but it wasn't from the ones.
[12] **Q:** So, in other words if company A —
[13] **A:** They didn't ship anything, company B
[14] did.
[15] **Q:** And you would use company B's rugs
[16] claiming they were company A's —
[17] **A:** Correct.
[18] **Q:** And send those out?
[19] **A:** Correct.
[20] **Q:** So that it would look like the
[21] receiving Building 19 outlets got 600 rugs but
[22] those 600 rugs that came actually from company B
[23] had already been paid for to company B?
[24] **A:** Correct.
[25] **Q:** How did you determine whether to do

Page 31

**Britto**

[1]
[2] a real shipment, a legitimate shipment, as opposed
[3] to treat a shipment as if it were fiction?
[4] **A:** Depends what we had in stock.
[5] **Q:** Okay. So if you actually had 600
[6] rugs, this was a good time to let CCC or another
[7] company know that they should create a fake bill
[8] for 600 rugs because you were going to ship them
[9] out as if they were that company's rugs when they
[10] really weren't?
[11] **A:** Correct.
[12] **Q:** Okay. Did —
[13] **A:** And also, Bill might want to write
[14] this down. The tags shouldn't be universal,
[15] because that's another thing.
[16] **Q:** So when you say the tags now, you
[17] mean that there are tags that are attached with
[18] wires to the rugs, is that correct?
[19] **A:** No, our tags — well, I say ours.
[20] **Q:** Okay.
[21] **A:** The Building 19 tags, there should
[22] be different tags on each vendor, because if you
[23] use a universal tag you could say it's this
[24] person's goods, that person's goods or whatever.
[25] **Q:** So what you're basically telling

Page 32

**Britto**

[1]
[2] Mr. Elovitz by your testimony today is that he
[3] should be able to track the shipments that go out
[4] to the outlets and in order to do that there
[5] should be an individualized tag —
[6] **A:** For each company.
[7] **Q:** That some code identifies the
[8] actually rug shipper or manufacturer?
[9] **A:** For each company. Now, I'm not
[10] talking about a number because you can reuse the
[11] tags, use different colors or something, I mean.
[12] **Q:** Okay. When you would determine
[13] because there were rugs on hand, that a shipment
[14] of 600 rugs came in and there were, in fact, 600
[15] rugs there, no matter what company it came from,
[16] what paperwork would be created to cause those
[17] rugs to first be accepted at the receiving and
[18] then sent out to the various Building 19 outlets,
[19] what paperwork would be created for an entirely
[20] legitimate shipment?
[21] **A:** Just a bill of lading.
[22] **Q:** Okay. Now, would the bill of lading
[23] be created by IFC?
[24] **A:** No.
[25] **Q:** This would be a bill of lading that

Page 33

**Britto**

[1]
[2] came and accompanied the rugs?
[3] **A:** Yes.
[4] **Q:** Because the rugs would be shipped in
[5] by a carrier?
[6] **A:** No, it would be by the company.
[7] **Q:** By the company itself.
[8] **A:** (Witness nods).
[9] **Q:** Now, when the bill of lading comes
[10] with those rugs, to the warehouse —
[11] **A:** Um-hum.
[12] **Q:** — what's the next step, they're
[13] taken off of the trucks and put on a platform at
[14] the warehouse. What paperwork is created, if any,
[15] by an IFC employee to show that they actually were
[16] received?
[17] **A:** Because we have — I keep saying
[18] we — lousy employees. They don't count. They
[19] just go by the paperwork, they just want to punch
[20] in, punch out and go home.
[21] **Q:** So nobody, first you're saying
[22] nobody checks the number of rugs to see what
[23] actually came in?
[24] **A:** Exactly.
[25] **Q:** Okay. Secondly, though, do they do

Page 34

**Britto**

[1]
[2] anything, the warehouseman who's standing on the
[3] dock watching the rugs being unloaded, is he or
[4] she the person who receives the bill of lading?
[5] **A:** Yes, but then it goes to the
[6] supervisor.
[7] **Q:** Okay. Now, does the warehouseman
[8] who first receives the bill of lading write
[9] anything on it, or make any notations on the bill
[10] of lading itself —
[11] **A:** No.
[12] **Q:** To indicate that the rugs were
[13] received?
[14] **A:** No.
[15] **Q:** Does the supervisor who receives
[16] this bill of lading do anything with it?
[17] **A:** Yeah, he's got to sign it, date it
[18] and send it in. But if he's a scumbag —
[19] **Q:** He doesn't send it in?
[20] **A:** No, he sends it in, but he fakes it.
[21] **Q:** You mean he fakes the shipment that
[22] comes in?
[23] **A:** Yeah.
[24] **Q:** Okay. What happens with a legitimate
[25] shipment, though? Did Tyrone Williams ever sign

Page 35

*Britto*

[1]
[2] bills of lading to indicate that he actually
[3] received shipments that he did actually receive?
[4]   A: Oh, definitely, yeah.
[5]   Q: Okay. And did Tyrone Williams also
[6] sign bills of ladings that faked some or all of
[7] the shipment?
[8]   A: Yes.
[9]   Q: Is there a way, from looking at the
[10] bill of ladings to determine now, with hindsight,
[11] which ones were faked and which ones were genuine?
[12]   A: Yeah, there is actually.
[13]   Q: Okay.
[14]   A: The remnant ones were fake.
[15]   Q: R-E-M-N-A-N-T?
[16]   A: Yeah.
[17]   Q: Okay.
[18]   A: Machine mades weren't. Machine
[19] mades were like half faked.
[20]   Q: And by half faked, do you mean that
[21] if 300 of those rugs came in it was earmarked as
[22] 600 coming in?
[23]   A: Yeah, something like that. And
[24] Sometimes it was a full shipment, too.
[25]   Q: That would be faked?

Page 36

*Britto*

[1]
[2]   A: No, it was a full shipment that did
[3] come in actually.
[4]   Q: Okay. Now —
[5]   A: Let me just get to my point. We
[6] would have a full shipment come in and then have a
[7] backup one come in that was half, so we had stock.
[8]   Q: So you had rugs on hand —
[9]   A: On hand.
[10]   Q: To suggest that the half that was
[11] coming in —
[12]   A: Was added to it, yes.
[13]   Q: Was really more?
[14]   A: Yes.
[15]   Q: Now, after the supervisor passes in
[16] that paperwork to billing, is there a separate
[17] bill that comes from either the rug manufacturer
[18] or supplier?
[19]   A: A bill-bill, yeah.
[20]   Q: So, you were participating in the
[21] scheme, would you get word from anyone that the
[22] defrauding company, the company that knew a
[23] shipment of 300 was being sent in, but it was
[24] going to be billed out at 600, would you get any
[25] word at all that that 600 rug bill was on its way

Page 37

*Britto*

[1]
[2] to IFC?
[3]   A: I would tell them.
[4]   Q: You would tell them when to send it?
[5]   A: When to bill it.
[6]   Q: Okay. And was one of the reasons for
[7] waiting that the, you wanted to make sure that
[8] most of those rugs now were out to the various
[9] outlets so that they really couldn't be traced and
[10] counted?
[11]   A: Always depended on what was in
[12] stock. That's how it worked.
[13]   Q: Now, what role, if any, did Adams
[14] play in causing the scheme to succeed?
[15]   A: He set it up.
[16]   Q: And so he told you that your duties
[17] in this scheme would be as follows and then he
[18] outlined them?
[19]   A: He set it up. Nobody tells me what
[20] to do.
[21]   Q: Okay. So tell me what you mean by
[22] the words "set it up." What did David Adams do?
[23]   A: He got it going.
[24]   Q: And do you know what steps he took
[25] to get it going?

Page 38

*Britto*

[1]
[2]   A: That's one thing I don't know.
[3]   Q: Okay.
[4]   A: I wasn't involved in that.
[5]   Q: Did David Adams ever tell you in
[6] passing in any conversation with you, any of the
[7] steps he took to get it going?
[8]   A: Yeah, he said he talked to Mike
[9] Brown.
[10]   Q: Okay. Now, when you —
[11]   A: — and he told me —
[12]   Q: Go on.
[13]   A: Like with Ron Mitchell and Jane, who
[14] are innocent, by the way, again. He met with Ron
[15] and Tony, or Jane, and, Dave's a good bullshit
[16] artist, he told me we're converting goods and Bill
[17] contested this, he always wants the buyer to get
[18] new vendors, so that's what Dave told them, I need
[19] new vendors, I want to convert goods, so I can get
[20] Bill off my back, and that's what happened.
[21]   Q: Now, you mentioned the name Tony,
[22] for the first time in your testimony. Who is
[23] Tony?
[24]   A: I think it's Jane's boyfriend or
[25] some shit.

---

Page 39

**Britto**

[1]

[2] Q: Okay. Do you know his last name?

[3] A: No, I have no idea.

[4] Q: And when did you find out that

[5] Mr. Adams had had this conversation with either

[6] Ron Mitchell or Jane Dziemit or Tony, whose last

[7] name is unknown?

[8] A: Probably a year afterwards.

[9] Q: And how did you find it out?

[10] A: Because I was pissed off he was —

[11] Dave was actually stealing from both of us.

[12] Q: Dave Adams?

[13] A: At IFC — Dave Adams, and myself.

[14] And so I called up Ron and said look, what the F

[15] is going on, you know.

[16] Q: Now, when you say that Dave Adams

[17] was stealing from both of us, you indicated in

[18] your testimony that one of the persons who he was

[19] stealing from was you.

[20] A: Yes.

[21] Q: Who was the other person?

[22] A: IFC.

[23] Q: IFC, okay. Now, when you called,

[24] when you called Ron Mitchell on that occasion, and

[25] said what the F is going on, what conversation did

---

Page 40

**Britto**

[1]

[2] you have with Mr. Mitchell?

[3] A: Well, he didn't know I was a big

[4] part of the shit that was going on, okay. I mean

[5] he doesn't know — well, he's finding out now,

[6] but, he didn't know I was a big player in the

[7] conversion company, which means converting carpet,

[8] which means you cut it down, you bind it, mix a

[9] remnant.

[10] Q: Did Mr. Mitchell know that

[11] Mr. Adams, based on the conversation with you, did

[12] he indicate that he knew that Mr. Adams was

[13] causing conversions of the carpets?

[14] A: Can you rephrase that a little bit.

[15] Q: When you called Mr. Mitchell —

[16] A: Yes.

[17] Q: — what was your purpose in calling

[18] him at the time that you did?

[19] A: Because Dave told me Building 19

[20] wasn't paying the bills, so I called Ron up to see

[21] if they were paying them.

[22] Q: And did Mr. Mitchell indicate to you

[23] one way or the other whether —

[24] A: He said yes, they were paying them.

[25] Q: Did Mr. Mitchell inquire of you in

---

Page 41

**Britto**

[1]

[2] that conversation at all as to why you were

[3] calling him to find out that information?

[4] A: No.

[5] Q: Okay. Did you and Mr. Mitchell have

[6] any discussion with one another about Mr. Adams in

[7] that conversation?

[8] A: Oh, definitely.

[9] Q: What was the conversation that you

[10] had with Mr. Mitchell about it?

[11] A: There's a few of them.

[12] Q: Okay. Could you tell us as best as

[13] you can recall what you said to him and what he

[14] said to you?

[15] A: I don't believe Dave. I said, are

[16] you getting paid? He said, oh, yeah, I'm getting

[17] paid. And because Dave kept saying Building 19's

[18] not paying their bills, not, so I'm not getting my

[19] money, I'm getting pissed off. Now, Ron, in the

[20] meantime, I mean he's naive, he doesn't know what

[21] the hell's going on. But he told me, yeah, I got

[22] paid, I gave the money to Dave because — this is

[23] how it was set up. They were, I guess, call it a

[24] broker, put the money up in advance so we can

[25] convert the goods, buy the rugs, resell them to

---

Page 42

**Britto**

[1]

[2] IFC and then they get paid.

[3] Q: Now, can you tell us or explain to

[4] us why it was that Mr. Mitchell would put up the

[5] money so that you could convert the goods?

[6] A: Because he made a percentage off it.

[7] Q: And, made a percentage off the

[8] money?

[9] A: Yeah, for loaning it.

[10] Q: So was he financing Dave Adams'

[11] attempt to convert the goods, is that what you

[12] mean by what you just said?

[13] A: Yes.

[14] Q: Okay. Now, what did the conversion

[15] of the goods involve?

[16] A: Buying the goods, paying people to

[17] cut them up, bind them, ship them, cost of

[18] delivery.

[19] Q: What was the purpose of converting

[20] the goods, how would that benefit Mr. Adams so as

[21] to cause the scheme to succeed?

[22] A: Because he wanted money up front so

[23] he can go gamble it.

[24] Q: Okay. So by being paid in advance —

[25] A: He had the money right away.

---

Page 43

***Britto***

[1]

[2]    **Q:** By Mr. Mitchell, is that correct?

[3]    **A:** Or CCC, or —

[4]    **Q:** Okay. And by being paid in advance,

[5] he was supposed to share some of that money with

[6] you, is that correct?

[7]    **A:** Correct.

[8]    **Q:** Now, was there ever any agreement,

[9] oral, between you and Mr. Adams as to what

[10] percentage of the monies received by Mr. Adams you

[11] would receive?

[12]    **A:** 50/50.

[13]    **Q:** And —

[14]    **A:** And did not happen.

[15]    **Q:** Did you give any monies from the 50

[16] that you received to anyone else?

[17]    **A:** Yes.

[18]    **Q:** To whom?

[19]    **A:** Tyrone.

[20]    **Q:** Okay. And was there a percentage

[21] agreed between —

[22]    **A:** Mike Brown, only got a little bit,

[23] but.

[24]    **Q:** Was there a percentage between you

[25] and Tyrone that had ever been discussed?

Page 44

***Britto***

[1]

[2]    **A:** No.

[3]    **Q:** Okay. And was there a percentage

[4] between you and Mike Brown that had ever been

[5] discussed?

[6]    **A:** No.

[7]    **Q:** When did —

[8]    **A:** Well, for the longest time Dave was

[9] supposed to be paying Mike.

[10]    **Q:** Dave Adams was supposed to be paying

[11] Michael —

[12]    **A:** And he didn't.

[13]    **Q:** How do you know that?

[14]    **A:** Because Mike told me.

[15]    **Q:** Okay, and —

[16]    **A:** Can I just grab another water —

[17]    (Brief pause.)

[18]    **Q:** Do you know how much money Tyrone

[19] Williams made from being paid by you?

[20]    **A:** No idea.

[21]    **Q:** Okay, is it more than $10,000?

[22]    **A:** Oh, yeah.

[23]    **Q:** Is it more than $50,000?

[24]    **A:** I'm not sure about that.

[25]    **Q:** And, were there multiple payments or

Page 45

***Britto***

[1]

[2] just a single payment to Tyrone Williams?

[3]    **A:** Multiple, yeah.

[4]    **Q:** Did you ever have any discussions

[5] with Tyrone Williams about what his job was to be

[6] in order to keep on getting this money on the

[7] side?

[8]    **A:** Probably.

[9]    **Q:** Do you remember those conversations

[10] at all?

[11]    **A:** No.

[12]    **Q:** Did Tyrone Williams ever, once he

[13] came aboard in the scheme, discuss with you any

[14] shipments that created problems for him?

[15]    **A:** Yes.

[16]    **Q:** Okay. Do you have any memory of any

[17] particular shipment?

[18]    **A:** Actually, it was the ones that got

[19] us caught, that wood flooring and nonskid.

[20]    **Q:** And tell us about that shipment and

[21] if you could, take us through that shipment from

[22] the start of all you know about it all the way

[23] down to the end of it.

[24]    **A:** Well, Dave —

[25]    **Q:** Dave Adams?

Page 46

***Britto***

[1]

[2]    **A:** Yes, Dave Adams, I keep saying that.

[3]    **Q:** The only reason I constantly add the

[4] last name is because —

[5]    **A:** No, I know, I understand.

[6]    **Q:** We also have a David Sun —

[7]    **A:** Yeah, I understand that —

[8]    **Q:** And I don't want —

[9]    **A:** I understand that —

[10]    **Q:** Any unfairness to result.

[11]    **A:** I understand that.

[12] Dave Adams got dismissed from IFC.

[13] So at the end he wanted to put a couple of orders

[14] in to get more money before he left. And there

[15] was a nonskid, and the wood flooring, which there

[16] was no stock, and that's what happened.

[17]    **Q:** So, who put in those orders for him?

[18]    **A:** No, he did, he just, it was a

[19] purchase order that was already written.

[20]    **Q:** And did he alert you that those

[21] orders were put in?

[22]    **A:** I talked to him about it. He said

[23] there was stock but there wasn't.

[24]    **Q:** And at some point did it appear from

[25] paperwork that the nonskid — nonskid rugs I

Page 47

**Britto**

[2] assume they are, is that correct?

[3] **A:** No, it's under the.

[4] **Q:** Nonskid material that goes under the

[5] bottom of the rug?

[6] **A:** So it don't slide, yes.

[7] **Q:** And was there paperwork that came in

[8] with regard to the nonskid material and to the

[9] wood tiles?

[10] **A:** See, that I wouldn't know because I

[11] wasn't there.

[12] **Q:** All right. So this happened while

[13] you were — already had left?

[14] **A:** Oh, yeah.

[15] **Q:** Did you at some point then, with

[16] regard to these two transactions, have any

[17] conversation with Williams about it?

[18] **A:** Oh, yeah.

[19] **Q:** Can you tell us as best as you can

[20] recall what you said to Tyrone Williams and what

[21] Tyrone Williams said to you?

[22] **A:** No, I can't.

[23] **Q:** Okay. Did you ever find out whether

[24] or not, what it was that caused the scheme to be

[25] discovered at this precise point?

Page 48

**Britto**

[2] **A:** Those two last orders.

[3] **Q:** Okay. So how do you know that it was

[4] discovered that there was a fraud involved with

[5] it?

[6] **A:** There was a new buyer that took over

[7] and he had to do inventory and there was nothing

[8] there.

[9] **Q:** And who reported this to you,

[10] because you had left the company by this point,

[11] isn't that right?

[12] **A:** Yes.

[13] **Q:** Okay. So who reported to you that

[14] the new buyer did the inventory and discovered it

[15] wasn't there?

[16] **A:** I think it was you guys.

[17] **Q:** Okay. So you found you that out —

[18] **A:** — or the State Police, either one,

[19] yes. Actually, it was the State Police, yeah.

[20] **Q:** So the State Police came to see you

[21] in New York?

[22] **A:** Yeah, a week after I got out of the

[23] hospital.

[24] **Q:** And do you recall when that was?

[25] **A:** I left the hospital on August 2nd,

Page 49

**Britto**

[2] so a week later.

[3] **Q:** Okay. And this is of '05?

[4] **A:** Yes.

[5] **Q:** Okay. Now —

[6] **A:** Actually, so you don't think I'm

[7] lying —

[8] **Q:** And you have shown me, and I'll pass

[9] it to other counsel, a Mount Sinai Hospital, New

[10] York, New York patient discharge plan and referral

[11] form, is that correct?

[12] **A:** Yes.

[13] **Q:** And it shows a discharge date of

[14] August 1, 2005.

[15] **A:** And they came a week later, so.

[16] **Q:** Okay. And I will pass this, so that

[17] all persons can see it.

[18] **MR. YURKO:** Will you be

[19] marking that as an exhibit?

[20] **Q:** Do you want that piece of paper

[21] back?

[22] **A:** Yes.

[23] **Q:** Okay. So, is it all right if we make

[24] a copy of it?

[25] **A:** That's fine.

Page 50

**Britto**

[2] **MR. KRASNOO:** And is it all

[3] right with counsel if we mark the copy

[4] as an exhibit?

[5] **MR. YURKO:** Fine with me.

[6] **Q:** Did you arrange with Mr. Adams that

[7] with regard to this last shipment that actually

[8] got discovered, that you were to get some money

[9] out of it?

[10] **A:** Yes.

[11] **Q:** Okay. Did you get any money out of

[12] it?

[13] **A:** No.

[14] **Q:** Okay. Now, was this a shipment where

[15] Mr. Adams got his money up front, as you said he

[16] liked to get his money up front?

[17] **A:** I believe so.

[18] **Q:** Okay. Now, do you know who this

[19] shipment came from?

[20] **A:** CCC. And the nonskid was Dalton

[21] Padding. I think it was Dalton.

[22] **Q:** D-A-L-T-O-N?

[23] **A:** Yeah, I think.

[24] **Q:** Do you know whether Dalton Padding

[25] was an actual or a fictitious company?

Page 51

**Britto**

[1]
[2]  A: I think it was actual, at one time.

[3]  Q: Okay. Was it at the time that it

[4] sent in this padding?

[5]  A: I'm not, I'm not sure.

[6]  Q: Okay. Did you ever have any

[7] discussion with Michael Brown about Dalton

[8] Padding?

[9]  A: Yes.

[10]  Q: Okay. And do you recall how long ago

[11] that was, or an approximate time?

[12]  A: Four months ago, maybe, five months.

[13]  Q: Okay. And when you had this

[14] discussion with Michael Brown about four months

[15] ago, would make it December of '05 — November or

[16] December of '05?

[17]  A: Maybe earlier than that, like

[18] September maybe.

[19]  Q: Would it be shortly after you spoke

[20] with the State Police?

[21]  A: No.

[22]  Q: Okay. Would it be before you spoke

[23] to the State Police?

[24]  A: No, it was after, because —

[25]  Q: And what was your conversation with

Page 52

**Britto**

[1]
[2] Mike Brown about, what did you say to him and what

[3] did he say to you?

[4]  A: In reference to what?

[5]  Q: Well, you had a conversation with

[6] him you just told us?

[7]  A: Yes.

[8]  Q: Where you also discussed Dalton

[9] Padding as one of the subject matters —

[10]  A: No, are you talking about the

[11] inventory or the State Police?

[12]  Q: Well, did you discuss both with Mike

[13] Brown?

[14]  A: After the State police came I called

[15] him.

[16]  Q: Okay. So first, are there two

[17] separate conversations with —

[18]  A: Yes.

[19]  Q: All right. Which one occurred

[20] earlier in time, the one about Dalton Padding?

[21]  A: Dalton Padding, yes.

[22]  Q: Would you tell us as best as you can

[23] recall the conversation you had with Mike Brown

[24] about the Dalton Padding.

[25]  A: I have no idea.

Page 53

**Britto**

[1]
[2]  Q: Okay. Did you discuss money in that

[3] conversation?

[4]  A: No.

[5]  Q: Did Michael Brown discuss with you

[6] whether or not he was getting paid with David

[7] Adams?

[8]  A: No.

[9]  Q: Was Michael Brown to get paid by

[10] David Adams directly?

[11]  A: He was at first, and Dave wasn't

[12] paying him. So then, Dave was telling him that I

[13] was supposed to pay him when Dave was supposed to,

[14] because Dave's, he's —

[15]  Q: So did you wind up paying Michael

[16] Brown any money?

[17]  A: Yes, but he didn't get too much.

[18]  Q: Over what period of time did you pay

[19] Michael Brown?

[20]  A: Maybe a year.

[21]  Q: Do you recall roughly how much

[22] Mr. Brown got?

[23]  A: Probably got like six, 7,000.

[24]  Q: And what was Michael Brown's role?

[25]  A: Well, he helped set it up with Dave.

Page 54

**Britto**

[1]
[2]  Q: And did he ever discuss with you the

[3] steps he had taken to set it up with Dave Adams?

[4]  A: No.

[5]  Q: Okay. How did you find out the

[6] information that Michael Brown was also one of the

[7] people that set up the scheme with Dave Adams?

[8]  A: Because me and Dave discussed it

[9] beforehand.

[10]  Q: Okay, what was your discussion with

[11] Dave Adams —

[12]  A: Dave Adams.

[13]  Q: — about Michael Brown's role in

[14] this matter?

[15]  A: Because Michael Brown worked for

[16] CCC, and he was like, I guess the best salesman or

[17] whatever, so he was close to him. So Dave worked

[18] through Michael Brown to get them to do what they

[19] did.

[20]  MR. KRASNOO: Okay. Off the

[21] record a minute.

[22]  THE VIDEOGRAPHER: The time is

[23] now 2:23. Off the record.

[24]  (Brief recess.)

[25]  THE VIDEOGRAPHER: Time is now

Page 55

**Britto**

[1]
[2] 2:41. On the record.
[3]         BY MR. KRASNOO:
[4]     Q: Mr. Britto, earlier in your
[5] deposition —
[6]     A: Call me Kevin, please.
[7]     Q: Well, it's hard to do it in a
[8] deposition.
[9]     A: Oh, okay. Make me feel old.
[10]     Q: I don't try to do that, please
[11] believe me, I know what age is.
[12]     You had mentioned that there were
[13] four ways to prevent theft earlier in your
[14] deposition today.
[15]     A: Um-hum.
[16]     Q: And you mentioned one of the ways
[17] was don't use prepaid freight?
[18]     A: Yes.
[19]     Q: A second way was use different tags
[20] for different vendors?
[21]     A: Yes.
[22]     Q: What are the other two ways?
[23]     A: Freight, tags, can't have a
[24] supervisor that's not, scumbag, and the fourth one
[25] I forget.

Page 56

**Britto**

[1]
[2]     Q: Okay, now, when Mr. Adams brought
[3] you aboard in this scheme and discussed it with
[4] you —
[5]     A: Before we get into it, have a buyer
[6] that's honest.
[7]     Q: Okay.
[8]     A: So that's five, I don't know.
[9]     Q: Okay. When Mr. Adams brought you
[10] aboard in this scheme and gave you the outlines of
[11] it, what was it, if anything, about Tyrone
[12] Williams that caused you to connect to Tyrone and
[13] make him a participant in this scheme?
[14]     A: Well, his girlfriend was a friend of
[15] mine.
[16]     Q: Now —
[17]     A: At the time. He's got two or three
[18] since then, but.
[19]     Q: And at that time were you friendly
[20] with Tyrone Williams as a result of knowing his
[21] girlfriend?
[22]     A: Yes.
[23]     Q: Are there other companies other than
[24] CCC and Dalton Padding that were connected to the
[25] scheme of which you're aware?

Page 57

**Britto**

[1]
[2]     A: DGM used to do it, which, the guy
[3] died, so it's not happening anymore.
[4]     Q: Did you ever have any direct
[5] contacts with DGM?
[6]     A: Through Dave Adams.
[7]     Q: Now, you mentioned that the guy
[8] died. Do you mean the company —
[9]     A: Lou Levine died.
[10]     Q: And that was a person. Did you have
[11] direct communication with Lou Levine before he
[12] died about any aspects of this fraud?
[13]     A: Yes.
[14]     Q: Okay. And what were your
[15] conversations with this person about the fraud?
[16]     A: Had lunch.
[17]     Q: When you had lunch did you discuss
[18] fake shipments?
[19]     A: No, always went through Dave Adams.
[20]     Q: Did you discuss any money matters
[21] relating to fake shipments?
[22]     A: Always went through Dave Adams.
[23]     Q: Was Dave present at the lunch?
[24]     A: Yes.
[25]     Q: Do you recall where the lunch was?

Page 58

**Britto**

[1]
[2]     A: It was in Worcester, I don't know
[3] the restaurant.
[4]     Q: And do you recall approximately what
[5] year?
[6]     A: The year after Dave Rooney left, I
[7] don't know what year he left.
[8]     Q: Now, you mentioned Dave Rooney
[9] earlier in your depo and just now. Can you tell
[10] us, did Dave Rooney, acting in his capacity as
[11] warehouseman or receiver —
[12]     A: No, Dave Rooney was the buyer.
[13]     Q: Okay.
[14]     A: I took over his position when he
[15] left.
[16]     Q: Was Dave Rooney an honest buyer?
[17]     A: Yes, definitely.
[18]     Q: Did Dave Rooney ever discuss with
[19] you ways to cheat the company if he wanted to?
[20]     A: Never, no, Dave, honest man.
[21]     Q: Now, have you ever heard of a
[22] company called Empire Weavers?
[23]     A: Yes.
[24]     Q: Were they a company that in any way
[25] participated in this fraud?

Page 59

*Britto*

[1]

[2]    **A:** Yes.

[3]    **Q:** Okay. How did they participate in

[4] the fraud?

[5]    **A:** CCC had CCC, Empire Weavers, Dalton

[6] Padding.

[7]    **Q:** So, this was, for some purposes, an

[8] alter ego of CCC?

[9]    **A:** Yes.

[10]    **Q:** Do you know whether or not it was an

[11] actual ongoing company that sold product or was it

[12] a fictitious entity that was used to pretend to

[13] sell product?

[14]    **A:** It was fictitious for us, I don't

[15] know if it was all around.

[16]    **Q:** As far as you know then, was there

[17] ever a legitimate shipment where the shipper was

[18] Empire Weavers in your association with IFC?

[19]    **A:** No.

[20]    **Q:** Okay. Now, with regard to Dalton

[21] Padding was there any genuine shipments to your

[22] knowledge, from Dalton Padding to IFC while you

[23] were there?

[24]    **A:** I don't believe so.

[25]    **Q:** Now, have you ever heard of a

Page 60

*Britto*

[1]

[2] company named Mansfield Rug?

[3]    **A:** Yes.

[4]    **Q:** Okay. Is Mansfield Rug an actual

[5] company to your knowledge?

[6]    **A:** To my knowledge, yeah.

[7]    **Q:** Okay. Did IFC receive any shipments

[8] from Mansfield Rug while you were there?

[9]    **A:** No.

[10]    **Q:** Did IFC ever receive any paperwork

[11] to indicate that Mansfield Rug had shipped in

[12] items to IFC while you were there?

[13]    **A:** Yes.

[14]    **Q:** So, is it fair to state or unfair to

[15] state that Mansfield Rug, if one were to find any

[16] paperwork indicating shipments had come in, that

[17] all of those shipments to your knowledge would be

[18] fictional, nonexisting shipments — I'm sorry,

[19] shipments of nonexisting rugs?

[20]    **A:** Yes.

[21]    **Q:** And fake shipments?

[22]    **A:** Yes.

[23]    **Q:** Now, have you ever heard of a

[24] company named International Floor, Incs. — Inc.,

[25] sorry?

Page 61

*Britto*

[1]

[2]    **A:** No.

[3]    **Q:** And you don't know it to be

[4] connected to the scheme one way or another, is

[5] that correct?

[6]    **A:** Yeah, I never even heard of that.

[7]    **Q:** Have you ever heard of a company

[8] called Remco?

[9]    **A:** Yes.

[10]    **Q:** Is Remco an actual company?

[11]    **A:** Supposedly.

[12]    **Q:** Did Remco ever send in shipments of

[13] actual rugs or merchandise to IFC while you were

[14] employed there?

[15]    **A:** They thought they did.

[16]    **Q:** Okay.

[17]    **A:** And I'll tell you how. Like with

[18] machine made rugs we would take them and hide them

[19] because Nick was the buyer, or he still is the

[20] buyer, so when he came in, here's the goods.

[21]    **Q:** Now you — Nick is, what's Nick's

[22] last name, do you know?

[23]    **A:** Adler.

[24]    **Q:** To your knowledge, is Nick Adler

[25] someone who was not involved in the fraud?

Page 62

*Britto*

[1]

[2]    **A:** No, he wasn't.

[3]    **Q:** Okay. And you would take then

[4] shipments of actual product and display them to

[5] Nick Adler, telling him that those were the

[6] product that allegedly were shipped in by Remco?

[7]    **A:** Correct.

[8]    **Q:** Okay. Does that mean, therefore,

[9] that Remco presented bills or invoices to show

[10] product was shipped into IFC when, in fact, no

[11] product was shipped in?

[12]    **A:** Without their knowledge, correct.

[13]    **Q:** Okay. Now, could you explain to us

[14] how Remco could create an invoice suggesting that

[15] product was sent in to IFC without its knowledge

[16] their product was never sent in to IFC?

[17]    **A:** Yes. Because we told them, bullshit

[18] them actually, that we didn't want them getting

[19] involved, because we didn't want them to get

[20] involved with the people we were buying the goods

[21] from, so they couldn't steal our business.

[22]    **Q:** So you were telling that to —

[23]    **A:** Ron Mitchell.

[24]    **Q:** Did you ever tell that to Jane

[25] Dziemit?

Page 63

**Britto**

[1]
[2] A: I never talked on her.
[3] Q: Did you ever tell that to Tony?
[4] A: Maybe, I'm not sure.
[5] Q: And Tony's last name, Marasca?
[6] A: Yep.
[7] Q: Does that refresh your recollection?
[8] A: Yep.
[9] Q: Now, you just stated a moment ago
[10] that you had never talked to Jane Dziemit. How
[11] did you come to know her name and her involvement
[12] with Remco, if at all?
[13] A: Paperwork.
[14] Q: So that was the first time you
[15] became aware of the —
[16] A: Her at all.
[17] Q: — of the existence of Jane Dziemit?
[18] A: Yeah.
[19] Q: Did you ever have any discussion
[20] with Ron Mitchell following receipt about
[21] paperwork down to today about Jane Dziemit?
[22] A: Yes.
[23] Q: Would you tell us as best you can
[24] recall, what you said to Ron Mitchell and what Ron
[25] Mitchell said to you about Jane Dziemit.

Page 64

**Britto**

[1]
[2] A: No, I just said Ron and Jane are
[3] innocent.
[4] Q: You said that to Ron?
[5] A: Yes.
[6] Q: Okay.
[7] A: Because they are. I'm trying to
[8] make the wrongs right.
[9] Q: What did Ron, if anything, say in
[10] response to your statement?
[11] A: I can't remember.
[12] Q: Did — do you know from any
[13] conversation at any time with Mr. Mitchell how
[14] much money Remco fronted — if I can put it that
[15] way — paid up front to David Adams?
[16] A: (Witness nods).
[17] Q: How much money?
[18] A: Well, if there was a $40,000
[19] invoice, I guess it would have been like 22,
[20] 25,000.
[21] Q: So, so Mr. Mitchell then was to
[22] receive a percentage of the total amount of the
[23] invoice?
[24] A: Um-hum.
[25] Q: As payment for having produced an

Page 65

**Britto**

[1]
[2] invoice?
[3] A: Loaned the money.
[4] Q: Okay. Did you ever see any checks or
[5] monies that were purportedly loaned by
[6] Mr. Mitchell to Mr. Adams?
[7] A: I don't believe so.
[8] Q: How did you know, in a Remco
[9] transaction, that Mr. Mitchell actually paid
[10] Mr. Adams any money up front?
[11] A: I don't know.
[12] Q: Okay. Was it something that
[13] Mr. Adams ever told you, that I just received
[14] money from Mr. Mitchell?
[15] A: Yes.
[16] Q: Did you ever see any checks
[17] representing payments from either Remco or
[18] Mr. Mitchell or Ms. Dziemit to Dave Adams?
[19] A: No.
[20] Q: Did you ever see any monies that
[21] Dave Adams showed you wherein, through
[22] conversation, Mr. Adams indicated that this
[23] represented money flowing from either Remco or
[24] Mr. Mitchell or Ms. Dziemit to him?
[25] A: No. To me, yes.

Page 66

**Britto**

[1]
[2] Q: So the only time you would know of
[3] it was when Mr. Adams passed some money to you and
[4] made the statement that this was money that came
[5] either from Remco or Mr. Mitchell or Ms. Dziemit?
[6] A: Correct.
[7] Q: Did you ever try to find any ways to
[8] determine that you were getting your fair share of
[9] the monies that either Mr. Mitchell or Ms. Dziemit
[10] or Remco had paid to Mr. Adams up front?
[11] A: Definitely.
[12] Q: What steps did you take to get that
[13] information?
[14] A: Well, when Dave was giving me this
[15] bullshit act, I called up Ron.
[16] Q: Would you do this periodically while
[17] you were still employed at IFC?
[18] A: No, this was afterwards.
[19] Q: Okay. Before that did Mr. Adams
[20] indicate to you that Remco was fronting him some
[21] monies for shipments that were later going to be
[22] fictitious?
[23] A: I can't remember that.
[24] Q: When you first — when did you first
[25] become aware of the existence of Ron Mitchell?

Page 67

**Britto**

[1]
[2]    **Q:** Was it a name first basis?

[3]    **A:** I don't know.

[4]    **Q:** Okay. Do you know how you first

[5] learned of his name?

[6]    **A:** Yeah, because I did buy padding from

[7] him when I was a buyer.

[8]    **Q:** When you bought padding from him

[9] when you were a buyer, was that padding that was

[10] shipped out under Remco's name or another name?

[11]    **A:** North Carolina Foam.

[12]    **Q:** Okay. And as far as you know what

[13] was Mr. Mitchell's connection, if any, to North

[14] Carolina Foam?

[15]    **A:** Salesman.

[16]    **Q:** Did you find out — did you have

[17] direct conversations with Mr. Mitchell about any

[18] purchases made from North Carolina Foam?

[19]    **A:** Actually, I used to go through Dave.

[20]    **Q:** So you would tell Mr. Adams that you

[21] needed to buy some foam, is that correct?

[22]    **A:** Yes.

[23]    **Q:** And Mr. — how did you find out that

[24] Mr. Adams would buy it from North Carolina Foam?

[25]    **A:** Because he had all kind of

Page 68

**Britto**

[1]
[2] connections.

[3]    **Q:** But I mean how would you find out —

[4]    **A:** He made my job easier.

[5]    **Q:** That he bought the foam from North

[6] Carolina Foam as opposed to from another

[7] connection?

[8]    **A:** The bill.

[9]    **Q:** Okay. So you would actually get to

[10] see the bill?

[11]    **A:** Yes.

[12]    **Q:** Okay.

[13]    **A:** I had to sign off on everything,

[14] every bill that came in, when I was the buyer.

[15]    **Q:** So that would involve bills for

[16] genuine shipments?

[17]    **A:** Yes.

[18]    **Q:** And bills for fictional shipments?

[19]    **A:** No.

[20]    **Q:** Never?

[21]    **A:** Never.

[22]    **Q:** Okay. All right. When a bill came

[23] in for a fictional shipment how — let's do it

[24] another way. Would you take us through the steps

[25] that would be accomplished, identifying the

Page 69

**Britto**

[1]
[2] paperwork, for a legitimate shipment first and

[3] then I'll ask you to do the same thing for us for

[4] a fictional shipment so we all can appreciate the

[5] difference in steps.

[6]    **A:** Okay.

[7]    **Q:** So first, for a legitimate shipment.

[8]    **A:** Trailer comes in, count the goods,

[9] this is what they're supposed to do. Count the

[10] goods off the trailer, put it upstairs, count.

[11] Now, the people upstairs who are unloading it

[12] upstairs count the goods in. They got a master

[13] paperwork, turn it in to the supervisor, looks at

[14] the bill of lading, compares the two, if it's a

[15] piece or two off, you know, it could be a wrong

[16] count, do the key rec, sign it, send it in.

[17]    **Q:** Now, tell us —

[18]    **A:** Now, with the fake ones, you mix it

[19] in with the real ones.

[20]    **Q:** Okay.

[21]    **A:** Because people are not good at doing

[22] paperwork. So you just give them a whole stack of

[23] shit.

[24]    **Q:** So you give them genuine pieces of

[25] paper representing genuine shipments, but you mix

Page 70

**Britto**

[1]
[2] it in with pieces of paper about nonexistent —

[3]    **A:** Yes —

[4]    **Q:** Shipments at the same time?

[5]    **A:** Yes.

[6]    **Q:** Now, is the key rec created for the

[7] fictional shipments as well?

[8]    **A:** Yes.

[9]    **Q:** Okay. And is the supervisor still

[10] required to sign off on the fictional shipments?

[11]    **A:** Yeah.

[12]    **Q:** Okay. Now, who do you give this

[13] paperwork to where the fictional shipment

[14] paperwork is mixed in with the genuine shipment

[15] paperwork?

[16]    **A:** To the supervisor.

[17]    **Q:** Okay. Now —

[18]    **A:** I'll give you an example. When I

[19] was the buyer, we went through a lot of

[20] supervisors. I used to send them off on shopping

[21] reports, to go a store, do this. While they're

[22] gone, this trailer just happened to come in and we

[23] shipped it out. I'm their boss. They're not

[24] gonna question me. There's the key rec.

[25]    **Q:** So you would prepare a key rec for

Page 71

*Britto*

[1]
[2] some of the fictional shipments?
[3] **A:** No, I wouldn't — well, I did some
[4] key recs, but —
[5] **Q:** Who would prepare the key rec for a
[6] fictional shipment?
[7] **A:** The supervisor would, but he didn't
[8] know or she didn't know.
[9] **Q:** That it was fictional shipment?
[10] **A:** Yes.
[11] **Q:** So they would come back from their
[12] shopping merchandise that you sent them on?
[13] **A:** And do the paperwork.
[14] **Q:** They would see the paperwork there,
[15] they would know they had to fill out a key rec?
[16] **A:** Yes.
[17] **Q:** They would fill it out, they would
[18] sign off on it on the basis of the paperwork they
[19] received?
[20] **A:** Correct.
[21] **Q:** Okay. And especially they would be
[22] in part relying upon your statement as a boss that
[23] the shipment came in while you were out?
[24] **A:** Correct.
[25] **Q:** Here's all the paperwork on it?

Page 72

*Britto*

[1]
[2] **A:** Do what the fuck you're told.
[3] **Q:** Okay. Can you tell us the names of
[4] any of the supervisors that were involved?
[5] **A:** Involved in what?
[6] **Q:** Just where you would present these
[7] pieces of paper and they would fill out the key
[8] rec?
[9] **A:** Oh, yeah, yeah, Chris Nolan, Wendy,
[10] I don't know her last name, Mark something, I had
[11] Tito do key recs, Moxume do key recs. I mean, I
[12] had all kinds of people do the key recs. The more
[13] people that did the key recs, the less chance of
[14] getting caught.
[15] **Q:** With the regard to the people that
[16] you've mentioned, is it your testimony that none
[17] of them were participants in the scheme, no one?
[18] **A:** Oh, zero.
[19] **Q:** Okay. Now, could you tell us what
[20] information is contained in a key rec, whether
[21] it's for a fictional shipment or a real shipment
[22] or a half real, half —
[23] **A:** They're both the same.
[24] **Q:** Okay. And what information is
[25] contained in it? A key rec apparently is a

Page 73

*Britto*

[1]
[2] document used by IFC to track receipts of
[3] shipment, is that correct?
[4] **A:** Yes.
[5] **Q:** Okay. So what kind of information is
[6] entered onto the key rec by whoever makes it out?
[7] **A:** The date it came in, who unloaded
[8] it, the shipper, quantities, the supervisor has to
[9] sign it or, whoever signs it, and the date.
[10] **Q:** Now, occasionally in some documents
[11] that are key recs there would be handwritten
[12] notation on it such as I muffed the inventory, it
[13] was really four by six rugs as opposed to eight by
[14] tens, or I put down the wrong quantity for the
[15] four by six rugs. What situations, would those
[16] always be genuine shipments?
[17] **A:** Yeah, I don't have any knowledge of
[18] that.
[19] **Q:** Okay. Did you ever write that kind
[20] of information on any key rec that you filled out?
[21] **A:** Maybe. I don't know.
[22] **Q:** How soon after — strike that.
[23] When the scheme first started,
[24] Mr. Adams was not receiving the money up front
[25] from these companies, was he?

Page 74

*Britto*

[1]
[2] **A:** No.
[3] **Q:** When did that change in the scheme.
[4] You don't know?
[5] **A:** I can't tell you.
[6] **Q:** Was there any conversation with
[7] Mr. Adams and yourself to indicate when it was
[8] going to change and/or why it was going to change?
[9] **A:** With him getting the money up front.
[10] **Q:** Yes.
[11] **A:** No.
[12] **Q:** Before the money came in up front,
[13] how would — would Mr. Adams wait until the
[14] company that shipped the fictional shipment
[15] received payment —
[16] **A:** Yes.
[17] **Q:** From IFC?
[18] **A:** Yes.
[19] **Q:** Okay. How soon, roughly, after the
[20] company received shipment from IFC would Mr. Adams
[21] receive his money?
[22] **A:** Probably a week.
[23] **Q:** Now, would Mr. Adams get it in check
[24] form?
[25] **A:** Well, he, he had an ATM card, got

Page 75

[1] *Britto*

[2] cash, I mean.

[3] **Q:** So there were different ways in

[4] which he would get paid?

[5] **A:** Yeah.

[6] **Q:** Did you ever see a check made out

[7] from a shipper of fictional merchandise addressed

[8] to Mr. Adams?

[9] **A:** I don't think he ever did that.

[10] **Q:** Okay. When he paid you, was it in

[11] cash or in any other form?

[12] **A:** Cash at first. Then I got checks

[13] from the company.

[14] **Q:** Did the checks commence only after

[15] you left the company or was it while you were also

[16] still employed there?

[17] **A:** I'm not sure. I'm not going to

[18] answer that. I'm not going to give a wrong

[19] answer.

[20] **Q:** And when you got the cash would you

[21] ever deposit it in a bank account?

[22] **A:** Sometimes.

[23] **Q:** Okay. Now, while you were a buyer —

[24] strike that.

[25] Were you a buyer at, overlapping the

Page 76

[1] *Britto*

[2] same time that Dave Adams was a buyer for the

[3] company?

[4] **A:** Yes.

[5] **Q:** Okay. And when you were both

[6] buyers, did you also have some kind of either

[7] written or oral agreement with IFC through any of

[8] its managers or its president with regard to

[9] reimbursements for disbursements that you would

[10] have made?

[11] **A:** Oh, no.

[12] **Q:** Okay. Well, did you ever get

[13] reimbursement checks for expenses?

[14] **A:** What do you mean by that?

[15] **Q:** If you took people out to eat would

[16] you do that in your role as buyer, take them —

[17] **A:** Yeah, I had a company credit card.

[18] **Q:** Would you ever put in for gas

[19] reimbursement, for driving to various locations,

[20] or things of that nature?

[21] **A:** Yeah, that was, everybody does that.

[22] **Q:** Okay. With regard to any of those

[23] checks that you received from the company,

[24] reimbursing you for gas and mileage and things of

[25] that nature, would all those checks be legitimate

Page 77

[1] *Britto*

[2] checks or would those also be fictional expenses

[3] created to be representative of the fictional

[4] shipments of rugs?

[5] **A:** Never.

[6] **Q:** So they were always legitimate?

[7] **A:** Yes.

[8] **Q:** Okay. Do you know whether or not, of

[9] your own personal knowledge, Dave Adams' were ever

[10] fake reimbursement expenses?

[11] **A:** I think so. Like when he took over

[12] as buyer, Georgia Rug Mills was paying for half of

[13] his Escalade or whatever, Navigator, and he was

[14] claiming, he was getting money from IFC for that.

[15] **Q:** Have you ever heard the name of

[16] Peter Burnham?

[17] **A:** Yes.

[18] **Q:** Who is or was Peter Burnham?

[19] **A:** Dave used to work for him. Adams,

[20] used to work for him.

[21] **Q:** When David Adams worked for him, do

[22] you know in what capacity David Adams worked for

[23] him?

[24] **A:** I guess he was his assistant, I

[25] guess, I'm not sure.

Page 78

[1] *Britto*

[2] **Q:** David Adams was the assistant to

[3] Peter Burnham?

[4] **A:** Yes.

[5] **Q:** What kind of work that did Burnham

[6] do at the time David Adams worked for him?

[7] **A:** They used to go to the store, do

[8] inventories, decide what we needed in stock,

[9] something like that.

[10] **Q:** Was Peter Burnham then an employee

[11] of IFC?

[12] **A:** Never was.

[13] **Q:** Okay.

[14] **A:** To my knowledge, anyways.

[15] **Q:** Okay. Do you know whether Peter

[16] Burnham ever was involved or knowledgeable about

[17] this particular scheme that you've described for

[18] us today?

[19] **A:** I don't think so.

[20] **Q:** Okay. Now —

[21] **A:** But, however, Peter Burnham was

[22] working with Dave after Dave left IFC to try to

[23] get business.

[24] **Q:** Was Peter Burnham trying to get

[25] business for David or was David trying to get

INTERNATIONAL FLOOR CRAFTS  v.
DAVID ADAMS   Case 1:05-cv-11654-NMG    Document 264-5    Filed 07/16/2008    Page 22 of 23    KEVIN BRITTO

March 7, 2006

Page 79

**Britto**

[1]
[2] business for Peter Burnham?
[3]   **A:** They were trying to work together to
[4] try to get business together for IFC.
[5]   **Q:** Okay. And that was after David Adams
[6] left?
[7]   **A:** Yes.
[8]   **Q:** How did you know that?
[9]   **A:** Dave told me.
[10]   **Q:** Were you in constant communication
[11] with David Adams once you had left the company?
[12]   **A:** Yes.
[13]   **Q:** Okay. A once a week phone call,
[14] twice a week, daily?
[15]   **A:** Well, sometimes it was a month that
[16] went by. If he knew I was pissed off he wouldn't
[17] call me.
[18]   **Q:** Okay. And was what would piss you
[19] off being that you weren't receiving payment you
[20] thought you were entitled to?
[21]   **A:** Correct.
[22]   **Q:** Now, when you left IFC, did you
[23] locate to New York?
[24]   **A:** The first time, no.
[25]   **Q:** Okay.

Page 80

**Britto**

[1]
[2]   **A:** The second time, yes.
[3]   **Q:** What did you do — when you left IFC
[4] the first time and before the second time, what
[5] kind of work did you do?
[6]   **A:** I was trying to take care of my
[7] addiction.
[8]   **Q:** Okay, so —
[9]   **A:** And I tried to become a state
[10] trooper, actually.
[11]   **Q:** Is this an alcoholic addiction or a
[12] drug addiction?
[13]   **A:** Alcoholic and oxycontins.
[14]   **Q:** Okay. And, did you go in for some
[15] treatment to any hospital?
[16]   **A:** Yes.
[17]   **Q:** Okay. How long a period of time was
[18] that period between the first time employment
[19] ended with IFC —
[20]   **A:** Ten months.
[21]   **Q:** And the second time it began? Ten
[22] months?
[23]   **A:** Ten months.
[24]   **Q:** And where were you located at the
[25] time, was it Massachusetts or —

Page 81

**Britto**

[1]
[2]   **A:** Yes.
[3]   **Q:** Okay. Now, when you left IFC the
[4] second time, did you come to New York?
[5]   **A:** Yes.
[6]   **Q:** And when was that roughly?
[7]   **A:** 2001.
[8]   **Q:** Okay.
[9]   **A:** September 28th.
[10]   **Q:** You had told Mr. Elovitz, had you
[11] not, on some occasion, that you had an uncle in
[12] New York that was lending you an apartment?
[13]   **A:** Yes.
[14]   **Q:** Was that correct?
[15]   **A:** No.
[16]   **Q:** Was that a fake statement?
[17]   **A:** Yes.
[18]   **Q:** Okay. Why, at that point when you
[19] left, did you maintain that fake story to
[20] Mr. Elovitz?
[21]   **A:** Well, New York's expensive. I
[22] didn't want him, let him know what was going on,
[23] you know what I mean.
[24]   **Q:** So, you actually were —
[25]   **A:** Lying.

Page 82

**Britto**

[1]
[2]   **Q:** Lying to obtain money still from —
[3]   **A:** Correct.
[4]   **Q:** Mr. Elovitz.
[5] Now, was this money because of work
[6] you had done or was this like personal loans from
[7] Mr. Elovitz?
[8]   **A:** It was stolen.
[9]   **Q:** Okay. So you told him that you were
[10] living in New York now while you were still trying
[11] to do work for IFC?
[12]   **A:** No.
[13]   **Q:** Okay. I'm confused. When you say
[14] you stole the money, was that money that you stole
[15] from IFC or directly from Mr. Elovitz?
[16]   **A:** IFC.
[17]   **Q:** Okay. And how was it that you were
[18] stealing that money at that point, was it still
[19] the —
[20]   **A:** The fake orders.
[21]   **Q:** Okay. So you were participating
[22] then in fake orders after you left, and you used
[23] as a cover-up to Mr. Elovitz that you had an uncle
[24] in New York that was lending you an apartment as
[25] part of your covering up the scheme?

Page 83

*Britto*

[1] **A:** I do have an uncle in New York.

[3] **Q:** Okay. But not one who had loaned you

[4] an apartment?

[5] **A:** Correct.

[6] **Q:** Now, what was the advantage in lying

[7] to Mr. Elovitz about that aspect that aided you in

[8] still getting money from IFC?

[9] **A:** What do you think?

[10] **Q:** I don't know, that's why I'm asking.

[11] **A:** A cover-up.

[12] **Q:** What was it covering up?

[13] **A:** Just in case he got a hint of it.

[14] **Q:** So in case —

[15] **A:** Could I have a bottle of water,

[16] please.

[17] **Q:** In other words, part of what you

[18] were worried about was that —

[19] **A:** My tracks.

[20] **Q:** He might discover your lifestyle?

[21] **A:** Cover my tracks. Thank you.

[22] Let's not do a play on words, let's

[23] be direct. I'm direct, you be direct.

[24] **Q:** How often did you do fake or short

[25] shipments, would it average out to once a week,

Page 84

*Britto*

[1] once a month?

[3] **A:** Probably once a month.

[4] **Q:** Okay. And is there an average

[5] amount of money that would represent each of the

[6] fake shipments?

[7] **A:** When there's remnants, probably like

[8] 40,000. Nonskid, 20-something thousand, I mean.

[9] Machine mades, 15,000, with half shipments.

[10] **Q:** Now, did you ever socialize with

[11] David Adams?

[12] **A:** No, never. Well, one time I went to

[13] the dog races. That was it.

[14] **Q:** Did you ever have any discussion

[15] with David Adams about any knee injury that

[16] occurred to him?

[17] **A:** Foot, when he said he jumped in the

[18] pool and broke his foot which was like, I think it

[19] was bullshit, I think the bookie did that to him.

[20] **Q:** Did you ever see him displaying any

[21] kind of knee or leg injury?

[22] **A:** A foot injury.

[23] **Q:** Okay. And when he had the foot

[24] injury how did you see that, what was it, was he

[25] limping or was it in a cast or was it in a brace?

Page 85

*Britto*

[1] **A:** Yeah, it was in a cast and he had

[3] crutches.

[4] **Q:** Okay. Now, would you — you've

[5] indicated before that when a fictional shipment

[6] was being created you would see what was in

[7] inventory first.

[8] **A:** Correct.

[9] **Q:** Would that be your visual inspection

[10]

[11] **A:** That would be the guideline.

[12] **Q:** Or would you be relying upon

[13] previous paperwork to suggest what was in

[14] inventory?

[15] **A:** No.

[16] **Q:** You'd actually go look at the rugs

[17] that were there?

[18] **A:** That would be the guideline, yeah.

[19] **Q:** Now, after the State Police came to

[20] interview you, who, if anyone, named in the civil

[21] complaint did you have contact with?

[22] **A:** Ron Mitchell, Tyrone Williams, Mike

[23] Brown.

[24] **Q:** Okay. Did you ever have any contact

[25] directly with any member of CCC?

Page 86

*Britto*

[1] **A:** No.

[3] **Q:** Okay. When you had contact with

[4] Tyrone Williams, what did you say to him and what

[5] did he say to you?

[6] **A:** Well, when the State Police were

[7] there, I said tell them the truth, because he was,

[8] listen, don't say nothing, I'll take care of it.

[9] But I told him, just tell them the truth. And he

[10] did.

[11] **Q:** What is it your understanding that

[12] Mr. Williams said?

[13] **A:** I have no idea.

[14] **Q:** Okay.

[15] **A:** I wasn't there.

[16] **Q:** So, how do you, therefore, form the

[17] conclusion that he did tell the State Police the

[18] truth?

[19] **A:** Well, one, the State Police were

[20] pissed off. Two, when they went back after I told

[21] him, they seemed like they were happy. Like he

[22] was, what I told them, he was telling them, so —

[23] **Q:** But has anybody ever told you

[24] explicitly what Tyrone Williams said to the State

[25] Police?

# In The Matter Of:

*INTERNATIONAL FLOOR CRAFTS   v.*
*DAVID ADAMS*

---

## KEVIN BRITTO
*March 7, 2006*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

*Original File DD0307Z.TXT, 149 Pages*
*Min-U-Script® File ID: 0700660165*

# Word Index included with this Min-U-Script®

Page 87

*Britto*

[1]
[2]　**A:** No.

[3]　**Q:** Okay. That's neither Tyrone Williams

[4] nor the State Police?

[5]　**A:** No.

[6]　**Q:** Okay. And has anyone ever told you

[7] that what Tyrone Williams said to the State Police

[8] was or was not true?

[9]　**A:** No.

[10]　**Q:** Okay.

[11]　**A:** The State Police did tell me though,

[12] he was cooperative the second time. And I

[13] actually called him in front of one of the state

[14] troopers.

[15]　**Q:** Okay. And was that when you told him

[16] to go ahead and tell the truth?

[17]　**A:** (Witness nods). Because he wasn't

[18] talking at all.

[19]　**Q:** Okay. Why don't we stop now, because

[20] it's my understanding that the tape is about to

[21] run out.

[22]　**THE VIDEOGRAPHER:** Time is now

[23] 3:16. This marks the ending of tape

[24] number one. Off the record.

[25]　　(Brief recess.)

Page 88

*Britto*

[1]
[2]　**THE VIDEOGRAPHER:** 3:20 p.m.,

[3] this marks the beginning of tape

[4] number two. On the record.

[5]　　　**BY MR. KRASNOO:**

[6]　**Q:** Now, you indicated that when the

[7] State Police came you spoke to Tyrone Williams.

[8] Can you tell us, did you have any control over

[9] Tyrone Williams?

[10]　**A:** Definitely.

[11]　**Q:** Okay. And what was the nature of the

[12] control?

[13]　**A:** Well, first, I was his boss.

[14]　**Q:** Okay.

[15]　**A:** Secondly, he knew that — how can I

[16] put it. It's better to be in my hands than his.

[17]　**Q:** Did he in any way rely upon you to

[18] make decisions that affected him in his job?

[19]　**A:** Yes.

[20]　**Q:** Was that true for legitimate acts he

[21] did on behalf of the employer?

[22]　**A:** Yes.

[23]　**Q:** Was that also true for —

[24]　**A:** Previous employees, too.

[25]　**Q:** Okay. Was that also true for

Page 89

*Britto*

[1]
[2] fraudulent acts that he did on behalf of the

[3] employer?

[4]　**A:** Um-hum.

[5]　**Q:** The answer is —

[6]　**A:** Yes.

[7]　**Q:** Okay. Now —

[8]　**A:** For him, I mean, not the ones I'm...

[9]　**Q:** What did you mean when you said a

[10] moment ago that it's better to be in my hands than

[11] his?

[12]　**A:** Because I'm smarter than he is.

[13]　**Q:** So, did you mean by that that he

[14] should leave decision-making to you —

[15]　**A:** Correct.

[16]　**Q:** Because you would make wiser

[17] decisions —

[18]　**A:** Correct —

[19]　**Q:** Than he would?

[20]　**A:** Correct.

[21]　**Q:** Okay. Is that a fair interpretation

[22] of what that —

[23]　**A:** That's correct. And if Dave would

[24] have done it then I wouldn't be sitting here right

[25] now, which I'm glad, because I'm actually glad

Page 90

*Britto*

[1]
[2] this happened, because this has been eatin' me up

[3] for years, so —

[4]　**Q:** Did you talk to Dave Adams at all

[5] after the State Police came to see you?

[6]　**A:** No. I tried calling him, but he

[7] wouldn't pick up the phone.

[8]　**Q:** Did you — you talked to Ron

[9] Mitchell after the State Police came?

[10]　**A:** Yes.

[11]　**Q:** And you've told us about that?

[12]　**A:** Yes.

[13]　**Q:** Okay. Now, you spoke to Mike Brown

[14] after the State Police?

[15]　**A:** Yes.

[16]　**Q:** What was it that you said to Mike

[17] Brown and what was it that he said to you?

[18]　**A:** Well, Mike Brown told me that he's

[19] not working for CCC anymore —

[20]　**Q:** Okay.

[21]　**A:** Because they're downsizing, which I

[22] told Paul. I don't know if they're trying to

[23] hide, I asked, the Chinese tried to skip the

[24] country.

[25]　**Q:** When you said you told Paul, do you

Page 91

*Britto*

[1] mean Mr. Klehm?

[2] **A:** Yes.

[3] **Q:** Okay. Did you ask Mr. Brown, in the

[4] conversation wherein he reported that he was no

[5] longer employed by CCC, how the circumstances of

[6] his termination of employment occurred?

[7] **A:** Yeah, I said they're downsizing.

[8] **Q:** Okay. Did Mr. Brown at all discuss

[9] whether or not he had had any communications with

[10] the State Police?

[11] **A:** Yes.

[12] **Q:** Okay. What did he say about that?

[13] **A:** He didn't say anything, he just said

[14] they came and seen him, that's it.

[15] **Q:** Okay.

[16] **A:** Because his lawyer advised him not

[17] to talk to me.

[18] **Q:** When you spoke to these three

[19] persons, Ron Mitchell, Mr. Brown and Mr. Williams,

[20] was it to inform them that the State Police had

[21] come to see you?

[22] **A:** Yes.

[23] **Q:** Okay. Was it to find out whether or

[24] not the State Police had come to see them?

Page 92

*Britto*

[1] **A:** Yes.

[2] **Q:** At the time that you spoke to

[3] Mr. Mitchell, had any State Police come to see

[4] him?

[5] **A:** No.

[6] **Q:** Okay. Did he specifically tell you

[7] that no State Police had come to see him yet —

[8] **A:** Yes.

[9] **Q:** If at all?

[10] **A:** Yes.

[11] **Q:** And with regard to Mr. Williams you

[12] already knew, at least at the time when you called

[13] with the State Police in your presence —

[14] **A:** They were there when the State —

[15] **Q:** That the State Police had come to

[16] see him?

[17] **A:** Yeah.

[18] **Q:** Do you know what, if anything,

[19] Mr. Williams did with the money that you gave to

[20] him that represents the fraud, his share of the

[21] fraudulent shipments?

[22] **A:** That's his own personal business.

[23] **Q:** Okay. Did he own a house at the time

[24] this fraudulent shipment scheme began?

Page 93

*Britto*

[1] **A:** No. He does now.

[2] **Q:** Did he own a house after?

[3] **A:** Yes.

[4] **Q:** Okay. Did you ever find out whether

[5] or not he used any of the monies to acquire that

[6] house?

[7] **A:** Oh, probably.

[8] **Q:** But you didn't explicitly discuss it

[9] with him?

[10] **A:** No.

[11] **Q:** Did Mr. Williams work at any job

[12] other than working for IFC?

[13] **A:** Yeah, he has a band, excuse me,

[14] drummer in a band.

[15] **Q:** Did you ever hear him play?

[16] **A:** Oh, yeah.

[17] **Q:** Did Mr. Adams ever work at any jobs

[18] other than as a buyer for IFC?

[19] **A:** Yeah, DGM. Burton Carpet, I think

[20] NATCO, too.

[21] **Q:** NATCO?

[22] **A:** I think so.

[23] **Q:** What is NATCO?

[24] **A:** That's who Peter Burnham worked for.

Page 94

*Britto*

[1] **Q:** Okay, and is that N-A-C-O?

[2] **A:** N-A-T-C-O and oriental, something.

[3] Bill can tell you.

[4] **Q:** Do you know whether or not he ever

[5] implemented a similar scheme at any of those

[6] enterprises?

[7] **A:** No.

[8] **Q:** Did you — have you ever heard of

[9] the following names: Diane Spignosi,

[10] S-P-I-G-N-O-S-I?

[11] **A:** Nope.

[12] **Q:** Okay. Rick Finley.

[13] **A:** Yes.

[14] **Q:** Who is Rick Finley?

[15] **A:** He's a salesman for Liberty Carpet.

[16] **Q:** Was Liberty Carpet ever one of those

[17] companies that —

[18] **A:** No.

[19] **Q:** — created a fraudulent shipment?

[20] **A:** No.

[21] **Q:** Okay. Do you know Rick Finley in

[22] any way to be a participant in the scheme that

[23] you've described today?

[24] **A:** No.

---

Page 95

**Britto**

[1]
[2] Q: Do you know a — was he asked to be
[3] involved?
[4] A: Not on my behalf, I mean.
[5] Q: Okay. Did Mr. Adams ever indicate
[6] that he was going to ask Mr. Finley to be
[7] involved?
[8] A: Not to my knowledge.
[9] Q: Okay. Have you ever heard of a
[10] company called Sinai Wholesalers?
[11] A: Yes.
[12] Q: Are they involved in any way?
[13] A: No.
[14] Q: Okay. Are they a real company?
[15] A: Yes.
[16] Q: Did IFC do business with them?
[17] A: Yes.
[18] Q: Okay. As far as you know, every
[19] shipment that came in from Sinai Wholesalers was a
[20] real shipment?
[21] A: Yes. Even Nick Adler bought from
[22] them, so.
[23] Q: Did you ever find out any
[24] information from any participant in the scheme to
[25] indicate whether or not the Suns knowingly

---

Page 96

**Britto**

[1]
[2] participated in creating fraudulent documents
[3] suggesting merchandise had been sent from CCC?
[4] A: Yes.
[5] Q: To IFC?
[6] A: Yes.
[7] Q: Okay. Who gave you the substance of
[8] that information first?
[9] A: David Sun.
[10] Q: David Sun. What was the occasion of
[11] your talking directly to David Sun where your
[12] previous dealings had been either with Mike Brown
[13] or through Dave Adams to Mike Brown?
[14] A: Because Dave Adams was robbing.
[15] Q: He was robbing you?
[16] A: Yes.
[17] Q: So when he was robbing you, you took
[18] it into your own hands to contact David Sun?
[19] A: Yes, because I controlled the
[20] warehouse, which was the most important part.
[21] Q: When you contacted David Sun what
[22] was it in your conversation or conversations with
[23] David Sun, to indicate to you that they were aware
[24] that they were knowingly creating documents to
[25] represent fictional shipments?

---

Page 97

**Britto**

[1]
[2] A: I have no idea.
[3] Q: But was that something that was
[4] discussed?
[5] A: Yes.
[6] Q: Okay. Did you ever —
[7] A: I was probably drunk at the time,
[8] so —
[9] Q: How did you obtain the information
[10] that caused you to conclude that David Adams was
[11] robbing you, as you've just put it?
[12] A: Because the money wasn't coming in.
[13] Q: And you knew that money should be
[14] coming in because you were aware of the shipments
[15] that came in that were really fictional?
[16] A: Correct.
[17] Q: Okay. Did you confront David Adams
[18] about the fact that no money was coming in even
[19] though shipments were?
[20] A: Over the phone, yes.
[21] Q: Now —
[22] A: Several times.
[23] Q: Okay. And you would do it over the
[24] phone because David Adams wasn't always in on a
[25] daily basis at IFC, is that correct?

---

Page 98

**Britto**

[1]
[2] A: Well, I was in New York.
[3] Q: Okay.
[4] A: He was in Massachusetts.
[5] Q: So this occurred after you had
[6] already left IFC?
[7] A: Correct.
[8] Q: Okay. What was David Adams'
[9] explanation for —
[10] A: Building 19's not paying their
[11] bills.
[12] Q: Okay.
[13] A: Which they were.
[14] Q: Okay. Now — and the way you found
[15] that out was by calling David Sun?
[16] A: Paul Sun and Ron Mitchell.
[17] Q: Okay. When you called and you spoke
[18] to Paul Sun and found out that IFC or Building 19
[19] was, in fact, paying their bills, did you ever
[20] reconfront David Adams?
[21] A: Ho, ho, ho.
[22] Q: And what basically did you say to
[23] Adams and Adams say to you —
[24] A: I'm not gonna say what I said.
[25] Q: Okay, is that because it's harsh

---

---

Page 99

*Britto*

[1]
[2] language?
[3]   **A:** Yes.
[4]   **Q:** Okay, taking away the colorful
[5] language for the moment, in essence, what did you
[6] say to Dave Adams about the fact that you've now
[7] learned that IFC had, in fact, paid bills that
[8] Dave Adams had claimed IFC had not paid?
[9]   **A:** It was all colorful language.
[10]   **Q:** And what did Adams say upon your
[11] acquainting him with your discovery that he had
[12] lied to you?
[13]   **A:** He hung up.
[14]   **Q:** At that point what did you do?
[15]   **A:** Called him back and he didn't
[16] answer.
[17]   **Q:** So you're still without the money?
[18]   **A:** Yup.
[19]   **Q:** What steps if any do you take to get
[20] the money?
[21]   **A:** Then I called up Ron and the Suns
[22] and said, look, this is what's gonna happen, you
[23] don't give Dave the money anymore, it comes to me.
[24]   **Q:** And did Ron Mitchell send you money?
[25]   **A:** Yes.

---

Page 100

*Britto*

[1]
[2]   **Q:** Did Ron Mitchell ask you why the
[3] change in circumstances that he no longer sent to
[4] it to Dave?
[5]   **A:** Yes. And I told him because if he
[6] doesn't send it to me, the business stops — I
[7] controlled the warehouse, I could have stopped at
[8] any point and that's what Dave knew.
[9]   **Q:** Okay. So you indicated therefore, to
[10] Ron, that the business would stop if you didn't
[11] get paid. Did Ron understand from the
[12] circumstances in your phone call that the business
[13] that would stop would be the representation that a
[14] shipment came in when, in fact, it was fictional?
[15]   **A:** No.
[16]   **Q:** What was it that Ron thought was
[17] going to stop?
[18]   **A:** My commission.
[19]   **Q:** For actual shipments of rugs?
[20]   **A:** Yes.
[21]   **Q:** Okay. Had you had direct
[22] communication with Ron before this time when you
[23] called him?
[24]   **A:** No.
[25]   **Q:** Okay. How did you know that when you

---

Page 101

*Britto*

[1]
[2] called Ron, Ron would know that you participated
[3] in working for IFC in this regard in some way?
[4]   **A:** He didn't until I called.
[5]   **Q:** Okay.
[6]   **A:** I got the phone number from Tyrone,
[7] because he had it in my Rolodex from my old
[8] office.
[9]   **Q:** Okay. When you spoke to Ron about
[10] this, did you receive any shipments from Ron
[11] Mitchell, of money, after you spoke to him and
[12] said, hey, you got to send me the money, not Dave
[13] Adams, because I'm not getting paid and it's just
[14] gonna stop?
[15]   **A:** Yes. And let me go a little deeper.
[16] I told him because he's screwing over the vendors.
[17]   **Q:** Who's the he?
[18]   **A:** Dave Adams. He's screwing over the
[19] vendors, I said now they're gonna to stop doing
[20] business with us. I basically bullshitted the
[21] guy.
[22]   **Q:** So you lied to Ron Mitchell —
[23]   **A:** Yes.
[24]   **Q:** When you told him that Dave Adams
[25] was basically screwing over the vendors?

---

Page 102

*Britto*

[1]
[2]   **A:** Yes.
[3]   **Q:** You had no information to indicate
[4] that Dave Adams was, in fact, screwing over the
[5] vendors?
[6]   **A:** There wasn't any vendors.
[7]   **Q:** Okay. So you knew, in fact, that
[8] what you were saying was a lie?
[9]   **A:** Correct.
[10]   **Q:** Okay. And that lie was designed to
[11] make Mr. Mitchell send you some money —
[12]   **A:** Believe what I was saying.
[13]   **Q:** Okay. Now, you also called either
[14] David or Paul Sun directly with pretty much the
[15] same complaint, is that so?
[16]   **A:** Paul, I talked to Paul.
[17]   **Q:** Had you ever spoken to Paul Sun
[18] before this moment?
[19]   **A:** I seen him one time in a Vegas show.
[20]   **Q:** When you saw him in the Vegas show,
[21] did you ever discuss with him anything that made
[22] Paul Sun aware that you were participating with
[23] David Adams in a fraud in which CCC was also —
[24]   **A:** We weren't doing it then.
[25]   **Q:** Okay. So, how was it — did you

---

**Britto**

[2] receive monies from CCC after calling Paul Sun?

[3] **A:** Yes.

[4] **Q:** Okay. And would you receive checks

[5] from CCC?

[6] **A:** Yes.

[7] **Q:** Did you also receive checks from Ron

[8] Mitchell after you called to tell him that Dave

[9] Adams was screwing over the vendors?

[10] **A:** No, it was, actually got wired.

[11] **Q:** Now — You mean like trick money was

[12] transferred in a wire transfer?

[13] **A:** Um-hum.

[14] **Q:** Okay. How would Ron Mitchell know

[15] how much to send you after your conversation with

[16] him?

[17] **A:** I would tell him.

[18] **Q:** So you would call him again and say

[19] you got to send me X-amount of money?

[20] **A:** Let me give you an example.

[21] Because, now the number's not gonna

[22] be correct, but I'm going to give you an example.

[23] Let's say it's a 30,000-dollar shipment, cost

[24] 25,000 to convert the goods and buy them, the

[25] other 5,000 is commission for me and Dave or Dave

**Britto**

[2] and myself, and the money they loaned, they get

[3] their interest.

[4] **Q:** Now, so, when that would happen, did

[5] Mr. Mitchell — using the hypothetical for the

[6] moment, I'm not saying those are the real

[7] figures — he would then receive a phone call from

[8] you that you're to send me a check for $5,000 less

[9] the commission?

[10] **A:** Wire the money, right.

[11] **Q:** Am I right that it would be less the

[12] commission?

[13] **A:** Yes.

[14] **Q:** So let's assume the commission was

[15] about a fifth of the total amount, you would then

[16] get a wire transfer of $4,000, is that correct?

[17] Yes?

[18] **A:** No.

[19] **Q:** On the hypothetical?

[20] **A:** Once they paid the bill, then I

[21] would get my commission.

[22] **Q:** You mean once Building 19 would pay

[23] the bill?

[24] **A:** Correct.

[25] **Q:** So what happened with regard to the

**Britto**

[2] commissions that you were supposed to get, the

[3] monies you were supposed to get, that Dave Adams

[4] had stiffed you on, that you didn't get?

[5] **A:** Never got it.

[6] **Q:** Okay. So those were lost until you

[7] picked up the phone and arranged now that you were

[8] to get payment instead of Dave Adams?

[9] **A:** Yes.

[10] **Q:** And when that happened did you ever

[11] share any of those monies you received with Dave

[12] Adams?

[13] **A:** One time I did.

[14] **Q:** But other than that you would keep

[15] it and would you share any of those monies with

[16] Tyrone Williams?

[17] **A:** Yes.

[18] **Q:** Okay. Now, did you ever share any of

[19] those monies with Mike Brown?

[20] **A:** A little bit.

[21] **Q:** Okay. You would receive the check

[22] from CCC, is that correct, after your conversation

[23] with Paul Sun?

[24] **A:** Um-hum.

[25] **Q:** How would —

**Britto**

[2] **MR. KLEHM:** Is that a yes?

[3] **Q:** That's a yes?

[4] **A:** Yes.

[5] **Q:** Okay. How would Paul Sun know how

[6] much money he was to send you?

[7] **A:** Percentage breakdown.

[8] **Q:** So that would be on his own invoices

[9] that he sent out?

[10] **A:** Um-hum. Yes.

[11] **Q:** Okay. How would you know that the

[12] amount of money Paul Sun was sending you after you

[13] had called to complain that Dave Adams was

[14] stiffing you was an accurate amount, that you

[15] weren't being gypped by CCC?

[16] **A:** I trusted them.

[17] **Q:** Did you ever share any of the monies

[18] you received from CCC with Dave Adams?

[19] **A:** I don't think so.

[20] **Q:** Did you ever share any of the monies

[21] that you received with Tyrone Williams?

[22] **A:** Yes.

[23] **Q:** From CCC?

[24] **A:** Yes.

[25] **Q:** And did you ever share any of those

Page 107

*Britto*

[1]
[2] monies from CCC with, that you received from them
[3] with Michael Brown?
[4]   **A:** Yes.
[5]   **Q:** Okay. Now, how would you determine
[6] how much of the monies that came to you from CCC
[7] should go to Tyrone Williams?
[8]   **A:** He would get so much on a key rec.
[9]   **Q:** Was that a flat sum?
[10]   **A:** Yeah.
[11]   **Q:** How much money was that?
[12]   **A:** 1500.
[13]   **Q:** Per key rec?
[14]   **A:** Yes.
[15]   **Q:** And would that be on average of once
[16] a month?
[17]   **A:** Yes.
[18]   **Q:** Okay. Would it be more often than
[19] once a month?
[20]   **A:** Sometimes.
[21]   **Q:** And —
[22]   **A:** Sometimes it wouldn't — sometimes
[23] they were dry, there wouldn't be anything. Back
[24] to school, there was obviously more, that's our
[25] busy season.

Page 108

*Britto*

[1]
[2]   **Q:** How would you determine what amount
[3] of the money you received from CCC should go to
[4] Michael brown?
[5]   **A:** Whatever I felt like giving him.
[6] For the longest time Dave was supposed to be
[7] paying him, but he stiffed him.
[8]   **Q:** Okay.
[9]   **A:** So when I found that out I started
[10] giving it, you know.
[11]   **Q:** So you found out that David Adams
[12] was not only stiffing you, but he was stiffing
[13] Michael Brown?
[14]   **A:** Correct.
[15]   **Q:** Do you have any knowledge as to
[16] whether or not the period of time that Michael
[17] Brown was stiffed overlapped or was similar
[18] to the period of time you were being stiffed?
[19]   **A:** No.
[20]   **Q:** Okay. Now, what percentage were you
[21] getting from CCC?
[22]   **A:** 22 percent, I believe it is.
[23]   **Q:** And that was for every shipment that
[24] was fraudulent?
[25]   **A:** And the real ones.

Page 109

*Britto*

[1]
[2]   **Q:** Okay. 22 percent of what?
[3]   **A:** The total invoice.
[4]   **Q:** Okay.
[5]   **A:** On the real ones there wasn't much
[6] to get, but.
[7]   **Q:** Okay. Now, with regard to the other
[8] companies that caused fictional paperwork to come
[9] into IFC on which they paid, was that also the
[10] amount, 22 percent?
[11]   **A:** Yeah all three of them were CCC, I
[12] mean.
[13]   **Q:** Did you ever discuss with David
[14] Adams how he selected CCC to be the company that
[15] should be sending in the bulk of the fictional
[16] shipments?
[17]   **A:** No.
[18]   **Q:** Okay. Did — were you ever at Dave
[19] Adams' home?
[20]   **A:** One time.
[21]   **Q:** Okay. What were the circumstances
[22] over that?—
[23]   **A:** I just happened to be into Building
[24] store, I went by there.
[25]   **Q:** At the time that you complained to

Page 110

*Britto*

[1]
[2] David Adams that you were being stiffed by him —
[3]   **A:** There was a lot of times.
[4]   **Q:** Well, on the various occasions that
[5] you were complaining about it, did you live,
[6] during that period of time, solely in New York?
[7]   **A:** No, Massachusetts.
[8]   **Q:** In Massachusetts was there ever a
[9] time when you were angry enough with the way you
[10] were being treated that you went over to his
[11] house?
[12]   **A:** Oh, no, never.
[13]   **Q:** Never confronted him, okay.
[14] Do you know whether or not in any
[15] completely fraudulent shipment that CCC sent in,
[16] when you or David Adams allegedly got 22 percent
[17] of that, did CCC keep the other 78 percent?
[18]   **A:** Not to my knowledge.
[19]   **Q:** What — do you know what happened to
[20] the 78 percent, some or all of it?
[21]   **A:** I have no idea. I know he stiffed
[22] them, too, Dave Adams.
[23]   **Q:** And in what way did he stiff them?
[24]   **A:** He owed them like 35,000 or some
[25] shit.

**Britto**

Page 111

[1]
[2] **Q:** Okay. So, that was during a period
[3] where CCC would pay David Adams up front, is that
[4] correct?
[5] **A:** I'm not sure what happened — I
[6] think he borrowed the money, actually.
[7] **Q:** He borrowed money from CCC?
[8] **A:** Yeah.
[9] **Q:** And never paid it back?
[10] **A:** Correct.
[11] **Q:** Okay. Do you know the circumstances
[12] of their borrowing, how it occurred?
[13] **A:** Yeah, it was probably his gambling
[14] problem.
[15] **Q:** Do you know roughly when that
[16] occurred?
[17] **A:** 2000 — 2000. Or 2001, one of those
[18] two years.
[19] **Q:** Have you ever had any conversation
[20] with Michael Brown as to why he went along with
[21] the scheme?
[22] **A:** Not really.
[23] **Q:** Have you ever had any conversation
[24] with Tyrone Williams as to why he went along with
[25] the scheme?

**Britto**

Page 112

[1]
[2] **A:** Yeah, I probably forced him into it.
[3] **Q:** Okay.
[4] **A:** I mean, he's a man, he makes his own
[5] decisions, but, I persuaded him.
[6] **Q:** When, when did you first learn that
[7] Mr. David Adams had a gambling problem?
[8] **A:** Oh, I have no idea.
[9] **Q:** Was it before he talked about this
[10] scheme in which you and he could make some money?
[11] **A:** I have no idea.
[12] **Q:** But at some point you did learn that
[13] he had that problem?
[14] **A:** Yeah.
[15] **Q:** Can you explain to us, if you know,
[16] why after your phone call, Ronald Mitchell would
[17] start sending money directly to you?
[18] **A:** Cause I told him the business would
[19] stop.
[20] **Q:** But in the business that would stop,
[21] he was putting up-front money, is that correct?
[22] **A:** Correct.
[23] **Q:** Do you know how much in actual
[24] dollars the stoppage of business meant to
[25] Mr. Mitchell?

**Britto**

Page 113

[1]
[2] **A:** No idea.
[3] **Q:** How much money did Mr. Mitchell send
[4] you after you had this communication with him?
[5] **A:** No idea.
[6] **Q:** Are we talking about thousands?
[7] **A:** Yeah, definitely.
[8] **Q:** Okay. Are we talking about more than
[9] 50,000?
[10] **A:** Probably.
[11] **Q:** Do you think we're talking about
[12] more than a hundred thousand?
[13] **A:** Maybe.
[14] **Q:** And what percentage interest was
[15] Mr. Mitchell getting for having loaned the money
[16] up front to Mr. Adams?
[17] **A:** That's between him and Dave, I have
[18] no idea — Dave Adams.
[19] **Q:** Did you ever — another water?
[20] **A:** Thank you. Should have put a mini
[21] bar up in here.
[22] **Q:** Did you ever, while you were working
[23] for IFC, accompany David Adams on any buying trip?
[24] **A:** One time, yes.
[25] **Q:** Where did you go with David Adams?

**Britto**

Page 114

[1]
[2] **A:** Georgia.
[3] **Q:** And what company or companies did
[4] you visit?
[5] **A:** Burton, Georgia Rug Mills. That was
[6] it, actually.
[7] **Q:** Were those legitimate transactions?
[8] **A:** Yes.
[9] **Q:** Let me ask you, in terms of your
[10] background, how far did you go in education?
[11] **A:** High school.
[12] **Q:** Okay. And what high school was
[13] that?
[14] **A:** New Bedford High School.
[15] **Q:** Okay. Have you ever been a member of
[16] the military?
[17] **A:** No.
[18] **Q:** Okay. And after New Bedford High
[19] School did you get out when you were around 18,
[20] 19?
[21] **A:** 18.
[22] **Q:** And what kind of experience did you
[23] have in the rug buying business before you joined
[24] IFC?
[25] **A:** Nothing.

Page 115

*Britto*

[1]
[2]   Q: Okay. How did you obtain the job at
[3] IFC?
[4]   A: Part time kid in school.
[5]   Q: So you worked for them in New
[6] Bedford while you were going to school?
[7]   A: Yes.
[8]   Q: Okay. And when you first came
[9] aboard IFC in what capacity were you employed by
[10] them? Meaning what kind of work did you do when
[11] you first came aboard?
[12]   A: Unloading trailers, you know,
[13] tagging rugs.
[14]   Q: When you graduated did you continue
[15] to work for IFC at that point?
[16]   A: Yes.
[17]   Q: Okay. And when you continued to
[18] work for them how long was it before you became a
[19] buyer for IFC?
[20]   A: June of 1993 when Bill became the
[21] president.
[22]   Q: So, by that point you'd been working
[23] for them about how long?
[24]   A: Five years.
[25]   Q: During the five years what other

Page 116

*Britto*

[1]
[2] positions did you have from unloading?
[3]   A: Supervisor of the warehouse —
[4]   Q: Okay.
[5]   A: When I graduated.
[6]   Q: Okay. Now, did anyone teach you how
[7] to evaluate the rugs that you were buying when you
[8] first became a buyer?
[9]   A: No.
[10]   Q: Okay. Did you simply go out on your
[11] own to buy rugs?
[12]   A: Well, Bill showed me a little bit,
[13] but I kind of got thrown out there.
[14]   Q: Okay. And when Bill showed you a
[15] little bit, did he ever take you around to
[16] purchase rugs?
[17]   A: Excuse me, I didn't —
[18]   Q: When Bill showed you a little bit,
[19] did he ever take you around to purchase rugs?
[20]   A: Never.
[21]   Q: Okay. Did he simply sit down with
[22] you and point out the pluses and the minuses of
[23] buying rugs and —
[24]   A: Yes.
[25]   Q: — how you should conduct yourself

Page 117

*Britto*

[1]
[2] in that business?
[3]   A: Yes.
[4]   Q: And did he supervise your buying
[5] techniques and acquisitions when you first went
[6] out and did those?
[7]   A: Yes.
[8]   Q: How long did it take you before you
[9] felt you were proficient at acquiring rugs for
[10] IFC?
[11]   A: I was proficient before I got the
[12] buying job.
[13]   Q: And is that partially because you
[14] were able to evaluate the worth of what was being
[15] unloaded from the trucks?
[16]   A: Correct.
[17]   Q: Did you ever have discussions with
[18] Mr. Elovitz or anyone else at IFC about whether
[19] they were good merchandise they were getting in or
[20] bad merchandise they were getting in?
[21]   A: Yes.
[22]   Q: Did you ever have any conversations
[23] with Mr. Elovitz about merchandise being bad
[24] enough that you didn't think it was sellable or
[25] salable by any Building 19 outlet or IFC?

Page 118

*Britto*

[1]
[2]   A: I'm not sure.
[3]   Q: Okay. In any event, did you continue
[4] to get raises?
[5]   A: Yes.
[6]   Q: And when you left, at the conclusion
[7] of your first stay with IFC, did you make it known
[8] to Mr. Elovitz that one of the reasons you were
[9] leaving was to try to get rid of your addictions?
[10]   A: No, I let him know afterwards.
[11]   Q: How bad was your addiction at the
[12] time you left to try to get rid of it?
[13]   A: Bad enough to leave a job that I
[14] loved.
[15]   Q: And were there two different forms
[16] of addiction, both Oxycontins and —
[17]   A: No, back then it was Percocets and
[18] blues.
[19]   Q: Now, what is the state of your
[20] health today with regard to the addiction that you
[21] have and the alcohol problem that you have?
[22]   A: Well, the pills are gone. I'm still
[23] trying to get myself off the alcohol but, I get
[24] anxiety and I can't take anxiety pills because it
[25] messes with the liver. So I, drinking is the same

Page 119

**Britto**

[1]
[2] thing, but, I'm still drinking, so.

[3] **Q:** Now, are you addicted to alcohol?

[4] **A:** Yes..

[5] **Q:** Has your addiction to alcohol,

[6] Percocets or Oxycontins affected your ability to

[7] think?

[8] **A:** Most likely.

[9] **Q:** Are you fully able to understand

[10] what's going on here today?

[11] **A:** Yes.

[12] **Q:** Okay. Has it, any of those

[13] addictions affected your ability to tell the truth

[14] here today?

[15] **A:** No.

[16] **Q:** Have you had any alcohol in your

[17] system today before you came here today?

[18] **A:** Yes.

[19] **Q:** Okay. And do you feel that

[20] throughout your deposition at any time there was a

[21] time when you were not fully sober for purposes of

[22] taking the deposition?

[23] **A:** Oh, I'm sober right now.

[24] **Q:** Okay. How much alcohol did you have

[25] today before you came to the deposition?

Page 120

**Britto**

[1]
[2] **A:** Two drinks.

[3] **Q:** And what is the nature of what you

[4] drink, is it beer or wine or —

[5] **A:** Whiskey.

[6] **Q:** Whiskey. And when you say two

[7] drinks, are we talking about a normal size drink

[8] in a restaurant?

[9] **A:** Yeah, like a (indicating).

[10] **Q:** Okay. Have you had — when did you

[11] cease any ingestion of drugs for the purposes of

[12] an addiction to drugs?

[13] **A:** When I went to the hospital back in

[14] July.

[15] **Q:** So you haven't had any drugs since?

[16] **A:** None, nope.

[17] **Q:** Are you on any medications,

[18] prescriptive medications?

[19] **A:** Oh, a whole bunch.

[20] **Q:** Okay. Do any of them affect your

[21] ability to think?

[22] **A:** Yes.

[23] **Q:** Okay. Can you tell us which

[24] medicines you're on —

[25] **A:** No.

Page 121

**Britto**

[1]
[2] **Q:** — that affect your ability to

[3] think?

[4] **A:** I...

[5] **Q:** Okay. Are any of them

[6] antidepressant pills like Prozac or Celexa or

[7] things of that nature?

[8] **A:** Well, I used to take Ativan.

[9] **Q:** And do any of those, to your

[10] knowledge, impair your memory?

[11] **A:** I think so. I'm not sure.

[12] **Q:** Have you ever discussed it with your

[13] doctor? Just yes or no to that.

[14] **A:** No.

[15] **Q:** Okay. Now, were there any writings

[16] between David Adams and yourself at all that

[17] relate to the fraudulent scheme that you've

[18] described today?

[19] **A:** Most likely.

[20] **Q:** Do you still have any of those

[21] writings in your possession?

[22] **A:** Hell, no.

[23] **Q:** Okay. What were the occasions, if

[24] you could remember, under which the writings were

[25] produced?

Page 122

**Britto**

[1]
[2] **A:** Well, we would go over orders that

[3] had to be placed.

[4] **Q:** Okay. And would you keep copies of

[5] the ones that had to be placed?

[6] **A:** Until it got shipped, correct.

[7] **Q:** And where did you maintain those

[8] when you kept them, was it at your home, or —

[9] **A:** Yes.

[10] **Q:** Okay. Did Mr. Adams also keep copies

[11] of those?

[12] **A:** I don't think so.

[13] **Q:** Okay. And at some time did you

[14] cause those to be destroyed or?

[15] **A:** Oh, definitely. Get rid of the

[16] evidence.

[17] **Q:** And how would you get rid of them?

[18] **A:** Garbage.

[19] **Q:** Just rip them up and throw them

[20] away?

[21] **A:** When I had my house, I would put

[22] them in the fireplace.

[23] **Q:** Okay. Now, once the shipments would

[24] be accomplished, meaning that IFC would have

[25] okayed them or paid for them, why, at that point,

Page 123

*Britto*

[1]
[2] would you destroy them?

[3]    **A:** There's no need for it.

[4]    **Q:** Did you find at a certain point that

[5] you needed them to keep track of what Dave Adams

[6] should be paying you?

[7]    **A:** No.

[8]    **Q:** Did — when Ron Mitchell sent you

[9] the monies, did he wire it to a particular bank

[10] account?

[11]    **A:** Citizens.

[12]    **Q:** So did you give Mr. Mitchell a

[13] specific bank number?

[14]    **A:** Well, obviously, if he —

[15]    **Q:** An account number?

[16]    **A:** Obviously, if he wired it, he needed

[17] an account number.

[18]    **Q:** Was that account number in your

[19] name, Kevin Britto?

[20]    **A:** Yes.

[21]    **Q:** Do you know how many wire transfers

[22] were made?

[23]    **A:** I have no idea.

[24]    **Q:** Do you know the period of time over

[25] which it was made?

Page 124

*Britto*

[1]
[2]    **A:** No idea.

[3]    **Q:** Do you still have any bank records

[4] showing the deposits of those sums of money into

[5] your bank account?

[6]    **A:** No, I don't.

[7]    **Q:** Okay. Do you still have the bank

[8] account at Citizens Bank?

[9]    **A:** No, I just closed it.

[10]    **Q:** Would you be willing to give us

[11] permission, on appropriate documents, to secure

[12] copies of the bank statements showing those

[13] deposits in?

[14]    **A:** Yes.

[15]    **Q:** Okay. Would you also be willing to

[16] identify for us, if we sat down with those

[17] documents, which ones you believed to have been

[18] deposits made through wire transfers from

[19] Mr. Mitchell?

[20]    **A:** Yes.

[21]    **Q:** Okay. Now, did you have or ever see

[22] any documents concerning any loans from REM,

[23] Remco, or Ron Mitchell or Jane Dziemit, to David

[24] Adams?

[25]    **A:** I haven't seen anything, no.

Page 125

*Britto*

[1]
[2]    **Q:** Okay. Did Mr. Mitchell —

[3]    **A:** I'm aware of —

[4]    **Q:** You're aware of what?

[5]    **A:** — a loan.

[6]    **Q:** Okay. Through a writing?

[7]    **A:** I haven't seen it, but just.

[8]    **Q:** So somebody told you?

[9]    **A:** Yes.

[10]    **Q:** Okay. Who told you of that loan?

[11]    **A:** Ron Mitchell.

[12]    **Q:** And when did he tell you of it?

[13]    **A:** I don't know.

[14]    **Q:** Was it before or after the State

[15] Police came to visit you?

[16]    **A:** Before.

[17]    **Q:** Okay.

[18]    **A:** Way before.

[19]    **Q:** Was it before or after you called

[20] Mr. Mitchell complaining that —

[21]    **A:** Before.

[22]    **Q:** — Dave Adams stiffed you?

[23]    **A:** Before.

[24]    **Q:** Okay. What was it that occasioned

[25] your having contact with Mr. Mitchell about a loan

Page 126

*Britto*

[1]
[2] before you called to complain that Dave Adams was

[3] stiffing you?

[4]    **A:** Because he needed money for a

[5] bookie.

[6]    **Q:** Because Dave Adams needed money for

[7] a bookie?

[8]    **A:** Yes, Dave Adams needed money for a

[9] bookie.

[10]    **Q:** How did you know that Dave Adams

[11] secured the money loan to pay off the gambling

[12] debt from Mr. Mitchell as opposed to from someone

[13] else?

[14]    **A:** Through fraudulent receivings.

[15]    **Q:** Well, you indicated that

[16] Mr. Mitchell and you had discussed this, is that

[17] correct, in a phone call before the State Police

[18] ever called and before — contacted you, and

[19] before you called Mr. Mitchell to complain that

[20] Dave Adams was stiffing you?

[21]    **A:** About the loan.

[22]    **Q:** Yes.

[23]    **A:** Yes.

[24]    **Q:** Okay. Can you tell us, as best as

[25] you can recall, what the conversation was that you

**Britto**

Page 127

[1]

[2] had with Mr. Mitchell, what he said to you and

[3] what you said to him about that loan?

[4]    A: I called him up, telling him about

[5] Dave's stiffing, blah, blah, blah, you know,

[6] vendors are calling up because he's not paying

[7] 'em, and then he said, yeah, Dave called up New

[8] Year's Eve or January something, and he was

[9] gamblin' and he asked for a loan, and I said yeah,

[10] well, you're not gonna get that money back.

[11]    Q: When you say January, are we talking

[12] about '05?

[13]    A: 2000 or 2001.

[14]    Q: 2000 to 2001, okay.

[15]    A: I believe, I'm not sure, but.

[16]    Q: Did you, in that conversation, make

[17] Mr. Mitchell aware of the purpose of his loan,

[18] namely to help David Adams defray his gambling

[19] debt?

[20]    A: No.

[21]    Q: Okay. What was it that caused you

[22] and Mr. Mitchell to discuss that Mr. Mitchell had

[23] loaned money to David Adams?

[24]    A: Because I was pissed off at Dave and

[25] he was too, cause he wasn't getting his money

**Britto**

Page 128

[1]

[2] back.

[3]    Q: Okay. You wrote a letter to Bill

[4] Elovitz about a couple of months ago, is that

[5] correct?

[6]    A: Correct.

[7]    Q: And in that letter you indicated

[8] that your liver was functioning approximately five

[9] percent of capacity, is that correct?

[10]    A: Correct.

[11]    Q: Can you tell us what the state of

[12] your health is today?

[13]    A: Well, once I get this over with, I'm

[14] going to doctor, I'll find out even better then.

[15]    Q: Has any doctor and you — just yes

[16] or no to this — discussed any prognosis for you

[17] as to whether or not you can be restored to

[18] completely good health?

[19]    A: Yes, a whole bunch of doctors.

[20]    Q: Okay. Has any doctor indicated to

[21] you how long you've got to live or estimated your

[22] life span?

[23]    A: No, but they want me to get a

[24] transplant which is going to take six months, and

[25] I don't have $100,000 to get a liver, so. Plus, I

**Britto**

Page 129

[1]

[2] don't want to put myself through that anyways.

[3]    Q: So have they indicated that if you

[4] do not have a liver transplant you would be

[5] shortening your own life?

[6]    A: Yes.

[7]    Q: Have they indicated how long without

[8] a liver transplant?

[9]    A: Well, they said if I had one more

[10] drink I'd be dead. I've had plenty after that.

[11]    Q: Okay. So, in short, you've learned

[12] that doctors are not always accurate?

[13]    A: Yes, just like lawyers aren't

[14] either.

[15]    Q: Do you know whether or — did Ron

[16] Mitchell ever discuss with you that he thought

[17] that all of the money that he'd sent to Dave Adams

[18] was legitimate?

[19]    A: Yes.

[20]    Q: Did that include the loan that he

[21] made on or about New Year's Eve?

[22]    A: That I have no idea.

[23]    Q: But in any event, from 2000, on,

[24] based on your conversation with him, Mr. Mitchell

[25] would have known that Mr. Adams was a gambler who

**Britto**

Page 130

[1]

[2] borrowed money that he was unlikely to repay, is

[3] that correct?

[4]    A: Yes.

[5]    Q: And you had that conversation with

[6] Mr. Mitchell at a time when Mr. Mitchell was

[7] commenting to —

[8]    A: It was 2002.

[9]    Q: — commented to you that he hadn't

[10] been paid monies that he was owed by Dave Adams?

[11]    A: Correct.

[12]    Q: Just as you told Mr. Mitchell you

[13] weren't getting paid by Dave Adams what you were

[14] supposed to be getting paid?

[15]    A: Correct.

[16]    Q: Okay. Now, when he, Mr. Mitchell,

[17] started sending you wire transfers, did he ask you

[18] to sign any documents at all indicating that you

[19] were getting paid monies?

[20]    A: No.

[21]    Q: Okay. Do you know from any

[22] conversation you ever had with either Mr. Mitchell

[23] or Mr. Adams that Mr. Mitchell told Mr. Adams that

[24] he was now sending monies he otherwise would have

[25] been sending to Mr. Adams to Mr. Britto, to you?

---

Page 131

*Britto*

[1]

[2]    **A:** Yes, I believe.

[3]    **Q:** Okay. Did Mr. Mitchell tell you

[4] that he had this conversation with Mr. Adams?

[5]    **A:** Yes, I believe.

[6]    **Q:** Okay. How long after you spoke to

[7] Mr. Mitchell and complained that Dave Adams was

[8] stiffing you, had learned that Dave Adams was not

[9] paying back Mr. Mitchell, how long after that was

[10] it when you had the conversation with Mr. Mitchell

[11] where he informed you that he had told Adams that

[12] he was now sending the money to you, not to

[13] Mr. Adams?

[14]    **A:** I'm not sure. Probably within 30

[15] days.

[16]    **Q:** Did you ever have any conversations

[17] with Dave Adams following that period of time that

[18] you learned from Mr. Mitchell that Mitchell told

[19] Adams, hey, I'm sending the money to Kevin Britto

[20] now, I'm no longer giving it to you?

[21]    **A:** Say that again?

[22]    **Q:** Did you ever have any conversation

[23] with David Adams after —

[24]    **A:** Yes.

[25]    **Q:** — Mr. Mitchell told you that

---

Page 132

*Britto*

[1]

[2] Mitchell said to Adams, hey, I'm sending the money

[3] to Kevin Britto, I'm no longer sending it to you,

[4] David Adams?

[5]    **A:** Yes.

[6]    **Q:** Okay. When you had that conversation

[7] with David Adams, what was that conversation?

[8]    **A:** I'm not gonna say it on tape.

[9]    **Q:** Okay. So, are we back to terrible

[10] language again?

[11]    **A:** Yep.

[12]    **Q:** Okay. Did Mr. Adams —

[13]    **A:** I feel like I'm taking a fuckin'

[14] test here. Pardon my language, ladies.

[15]    **Q:** Is that what was said?

[16]    **A:** No, I'm saying this now, with all

[17] these questions.

[18]    **Q:** Okay. Did David Adams swear at you?

[19]    **A:** Well, probably.

[20]    **Q:** Okay. Did he indicate that he wanted

[21] his share?

[22]    **A:** Yes.

[23]    **Q:** Okay. What did he say about that?

[24]    **A:** Oh, I cant'.

[25]    **Q:** You don't remember?

---

Page 133

*Britto*

[1]

[2]    **A:** No.

[3]    **Q:** Did you send him any?

[4]    **A:** Yeah.

[5]    **Q:** Were you at all worried in your

[6] relationship with David Adams at this point that

[7] he might spill the beans and get you in trouble?

[8]    **A:** Never.

[9]    **Q:** Did David Adams ever express any

[10] worry that when he was stiffing you, as you

[11] accused him of, that you would go whistle to the

[12] cops?

[13]    **A:** Yes.

[14]    **Q:** Okay. Was that something you said

[15] to him?

[16]    **A:** Yes.

[17]    **Q:** Okay. And what did he say in

[18] response? Did he threaten you or try to talk you

[19] out of it?

[20]    **A:** Oh, he's not gonna threaten me, but,

[21] what exactly did he say. Oh, if I go down, you're

[22] going down. I said, pardon my language, I don't

[23] give a fuck. Alls it may seem, my loyalty's to

[24] Bill, not these other, people.

[25]    **Q:** Were you at all worried when you

---

Page 134

*Britto*

[1]

[2] told Ron Mitchell to send you the money instead of

[3] Adams that, Mr. Mitchell, who up to this point

[4] thought that all the moneys that he was laying out

[5] were legitimate, would suddenly think that it was

[6] not legitimate?

[7]    **A:** No. I mean, I bullshitted him, I'll

[8] admit it.

[9]    **Q:** Did Mr. Mitchell ever indicate to

[10] you in this conversation that he thought this was

[11] unusual or strange?

[12]    **A:** Yes.

[13]    **Q:** Okay. And —

[14]    **A:** And that's when the bullshit came

[15] in.

[16]    **Q:** Well, can you explain to us what it

[17] was that you said that eased his suspicions

[18] sufficiently to have Mr. Mitchell send by wire

[19] transfer, monies directly to you?

[20]    **A:** I said it earlier.

[21]    **Q:** Okay. Now, at this time, did

[22] Mr. Mitchell know that you were no longer

[23] associated with IFC?

[24]    **A:** Yes.

[25]    **Q:** Okay. Did Mr. Mitchell — sorry.

---

INTERNATIONAL FLOOR CRAFTS v. Document 264-6 Filed 07/16/2008 Page 14 of 2?

Case 1:05-cv-11654-NMG

KEVIN BRITTO
DAVID ADAMS                                              March 7, 2006

Page 135

**Britto**

[1]
[2] Did Mr. Adams ever indicate to you that he was
[3] aware that you had spoken with Mr. Mitchell about
[4] being stiffed by Dave Adams?
[5]    **A:** Yes.
[6]    **Q:** Okay. And was that one of the
[7] unpleasant conversations that you mentioned
[8] earlier?
[9]    **A:** Oh, yeah, there was plenty of 'em.
[10]   **Q:** Now, how soon after you had this
[11] conversation with Mr. Mitchell whereby you tried
[12] to persuade him that it was okay to send you a
[13] wire transfer, did you receive your first wire
[14] transfer?
[15]   **A:** No idea.
[16]   **Q:** Okay, and when you received it, did
[17] you call to let Mr. Mitchell know that you
[18] received it?
[19]   **A:** I believe so.
[20]   **Q:** Now, you indicated in earlier
[21] conversation using a hypothetical, that it would
[22] be roughly out of a 5,000-dollar transaction for
[23] the shipment, it would be about $4,000, is that
[24] correct, because he would be taking his commission
[25] or interest?

Page 136

**Britto**

[1]
[2]    **A:** Oh, okay, yeah.
[3]    **Q:** Is that right?
[4]    **A:** Yes.
[5]    **Q:** Now, do you have any memory of the
[6] first — of the actual sum of money you received
[7] from Mr. Mitchell for wire transfer to you?
[8]    **A:** No, I don't.
[9]    **Q:** Okay. Did Mr. Mitchell ever call you
[10] to find out whether you received it?
[11]   **A:** Yes.
[12]   **Q:** Okay. And had you, by the time he
[13] called you, received it?
[14]   **A:** Sometimes yes, sometimes no.
[15]   **Q:** Did he ask you whether or not you
[16] were going to be paying Dave Adams any money out
[17] of it?
[18]   **A:** Maybe, I'm not sure.
[19]   **Q:** Did you pay Ron Mitchell back any
[20] money for any of the loans?
[21]   **A:** No.
[22]   **Q:** So as far as you knew, Mr. Mitchell
[23] suffered the loss of repayment when David Adams
[24] didn't repay him, is that correct?
[25]   **A:** Correct, yes.

Page 137

**Britto**

[1]
[2]    **Q:** Okay. Did you ever discuss with Dave
[3] Adams whether or not Mr. Mitchell was going to get
[4] paid after he told you that he had, like you, been
[5] stiffed by Dave Adams?
[6]    **A:** Yes.
[7]    **Q:** And what did Adams say about that?
[8]    **A:** He'll get paid.
[9]    **Q:** Did you ask Adams how?
[10]   **A:** No.
[11]   **Q:** Okay. Did Mr. Mitchell ever contact
[12] you seeking repayment of the loans?
[13]   **A:** I don't believe so.
[14]   **Q:** Did he ever in any conversation with
[15] you ask you whether or not you could try to
[16] prevail upon Dave Adams to repay it?
[17]   **A:** Probably, yes.
[18]   **Q:** Do you have a memory of that? You
[19] say probably, but it's important to know whether
[20] you have some memory of it or no memory of it.
[21]   **A:** Most likely, because I'm an
[22] aggressive person, so.
[23]   **Q:** Okay. Do you know a person by the
[24] name of Debbie Meyers?
[25]   **A:** Accounts payable, right?

Page 138

**Britto**

[1]
[2]    **Q:** Yes. Did you have any contact with
[3] her about any of the fraudulent shipments?
[4]    **A:** No.
[5]    **Q:** Okay. Do you know whether or not she
[6] ever had any suspicions that something was wrong?
[7]    **A:** I have no idea.
[8]    **Q:** Did she ever discuss with you or
[9] hint with you that there were suspicions?
[10]   **A:** No.
[11]   **Q:** Did you ever have direct
[12] conversation or communication with Debbie Meyers
[13] in, within your job employment?
[14]   **A:** Yes.
[15]   **Q:** Okay. And what would be the nature
[16] of the communications that you would have with
[17] her?
[18]   **A:** Well, when I had to sign the
[19] invoices, or if there was a key rec late, she
[20] would call.
[21]   **Q:** So, under what —
[22]   **A:** Or if she needed a purchase order,
[23] stuff like that.
[24]   **Q:** Now, on some of the slips that we
[25] have seen there is language written to indicate

Page 139

*Britto*

[2] that in order for her to take advantage of certain
[3] discounts in a timely fashion, she needs the buyer
[4] to sign off on the document.
[5]   **A:** Yes.
[6]   **Q:** Do you recall any such transactions
[7] where she asked you to you sign off on such
[8] documents?
[9]   **A:** Yes.
[10]   **Q:** Okay. And did you do so?
[11]   **A:** Sometimes.
[12]   **Q:** Okay. Were there times when you did
[13] not?
[14]   **A:** Yeah, because I didn't feel like
[15] going to the main office.
[16]   **Q:** Okay. So in order to do that you
[17] would have to come into the main office to sign?
[18]   **A:** Yes.
[19]   **Q:** How frequently would you have
[20] contact with Debbie Meyers?
[21]   **A:** Only when there was a problem or I
[22] had to go sign. When I did advertising I used to
[23] go home and sign all my paperwork.
[24]   **Q:** Did you have any discounts that were
[25] added on to the paperwork relating to fraudulent

Page 140

*Britto*

[2] shipments?
[3]   **A:** Yes.
[4]   **Q:** Okay. So, in order to make a
[5] fraudulent shipment look like a legitimate
[6] shipment you would sometimes tell the shipping
[7] company to add in onto their paperwork 2 percent
[8] discount if paid within ten days or something like
[9] that?
[10]   **A:** Because it gets paid faster.
[11]   **Q:** Okay.
[12]   **MR. KRASNOO:** I notice it's
[13] about —
[14]   **MR. PERES:** Yeah, it's 4:15
[15] right now.
[16]   **MR. KRASNOO:** So why don't we
[17] go off for a minute.
[18]   **THE VIDEOGRAPHER:** Time is now
[19] 4:17. Off the record.
[20]   (Brief recess.)
[21]   **THE VIDEOGRAPHER:** Time is now
[22] 4:19. On the record.
[23]   **MR. KRASNOO:** Mr. Britto, you
[24] have a right to review and sign your
[25] deposition. You have a right to give

Page 141

*Britto*

[2] up that right to review and sign your
[3] deposition. Those rights entirely
[4] belong to you. They don't belong to
[5] anyone else in this room. If you do
[6] agree to review and sign your
[7] deposition, the following procedure
[8] happens. You're sent a copy of the
[9] deposition by us, you would also have
[10] what's called an errata page, an error
[11] page.
[12]   **THE WITNESS:** Um-hum.
[13]   **MR. KRASNOO:** And that has
[14] usually four columns on it. It would
[15] list the page of the deposition in
[16] which the error occurs, the line in
[17] the deposition in which the error
[18] occurs, what the error is and how the
[19] error should be corrected. And that's
[20] the information you would fill out as
[21] you go through the deposition and
[22] write it on the sheet of paper.
[23]   **THE WITNESS:** Okay.
[24]   **MR. KRASNOO:** You would then
[25] sign that sheet of paper at the end

Page 142

*Britto*

[2] which would indicate as well that you
[3] have read and reviewed the entire
[4] deposition and that these are the
[5] changes that you feel are necessary to
[6] make it more accurate.
[7]   **THE WITNESS:** Okay.
[8]   **MR. KRASNOO:** You can give up
[9] that right to review and sign this
[10] and, but you can also go through this
[11] procedure. If you do it, the normal
[12] amount of time to get that
[13] accomplished is sending it to you, you
[14] would have 30 days from the date you
[15] receive it to review it, to prepare
[16] this errata sheet and to send this
[17] errata sheet back to us along with
[18] your signature on it. We would not
[19] need the copy of the deposition that
[20] we've provided to you, we would send
[21] that to you, because obviously it's
[22] New York as opposed to Boston, or
[23] Andover, where we are, and you're not
[24] coming all the way over to Andover to
[25] review and sign it. So we can do

INTERNATIONAL FLOOR CRAFTS v.    KEVIN BRITTO
DAVID ADAMS
Case 1:05-cv-11654-NMG   Document 264-6    Filed 07/16/2008    Page 16 of 27
March 7, 2006

Page 143

**Britto**

[1]
[2] that. In the normal case, it can be
[3] signed in the presence of a notary,
[4] but if everyone here agrees, it can be
[5] signed under the pains and penalties
[6] of perjury so you don't have to go out
[7] and seek a notary for the errata
[8] sheet, you can merely sign it with
[9] that on it, signed under the pains and
[10] penalties of perjury, this blank day
[11] of, let's say you got it in March,
[12] March 2006, and then a signature line
[13] for you.
[14]    THE WITNESS: Okay.
[15]    MR. KRASNOO: So I'd ask you
[16] just to think about the way you want
[17] to do it, let us know on Friday and I
[18] would ask these gentlemen here as well
[19] to think about whether or not signing
[20] under the pains and penalties of
[21] perjury is satisfactory to them or
[22] whether or not they would insist upon
[23] your signing before a notary, as they
[24] can. That's their right as well.
[25]    THE WITNESS: Um-hum. I

Page 144

**Britto**

[1]
[2] understand.
[3]    MR. KRASNOO: Okay, with that
[4] I think the deposition is concluded
[5] for today, unless anyone wants to
[6] amend what I've said by way of the
[7] explanation on the errata sheet and
[8] signing.
[9]    Hearing no one who wants to,
[10] this deposition is suspended for today
[11] to be resumed on Friday, March 10th,
[12] at 12 noon.
[13]    THE VIDEOGRAPHER: Time is now
[14] 4:22. This marks the ending of tape
[15] number two. Off the record.
[16]    (Whereupon, at 4:22 o'clock
[17] p.m., the deposition was suspended.)
[18]    (Mt. Sinai Discharge Plan and
[19] Referral Form was marked as Deposition
[20] Exhibit No. 1 for identification, as
[21] of this date.)
[22]
[23]
[24]
[25]

Page 145

[1]
[2]            **CAPTION**
[3]
[4] The Deposition of KEVIN BRITTO, taken in the
[5] matter, on the date, and at the time and place set
[6] out on the title page hereof.
[7]
[8]
[9] It was requested that the deposition be taken by
[10] the reporter and that same be reduced to
[11] typewritten form.
[12]
[13]
[14] It was agreed by and between counsel and the
[15] parties that the Deponent will read and sign the
[16] transcript of said deposition.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 146

[1]
[2]        CERTIFICATE
[3]
[4] STATE OF_____ :
[5] COUNTY/CITY OF_____ :
[6]
[7] Before me, this day, personally appeared
[8] KEVIN BRITTO, who, being duly sworn, states
[9] that the foregoing transcript of his/her
[10] Deposition, taken in the matter, on the date, and
[11] at the time and place set out on the title page
[12] hereof, constitutes a true and accurate transcript
[13] of said deposition.
[14]
[15]
[16]
            KEVIN BRITTO
[17]
[18]
[19] SUBSCRIBED and SWORN to before me this_____
[20] day of _____, 2006, in the
[21] jurisdiction aforesaid.
[22]
[23]
[24]
[25] My Commission Expires      Notary Public

Page 147

[1]
[2]        DEPOSITION ERRATA SHEET
[3] RE:
    FILE NO.
[4] CASE CAPTION:   IFC  vs.  ADAMS, et al.
[5] DEPONENT: KEVIN BRITTO
    DEPOSITION DATE: 03/07/06
[6]
    To the Reporter:
[7] I have read the entire transcript of my Deposition
    taken in the captioned matter or the same has been
[8] read to me.  I request for the following changes
    be entered upon the record for the reasons
[9] indicated.
    I have signed my name to the Errata Sheet and the
[10] appropriate Certificate and authorize you to
    attach both to the original transcript.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24] SIGNATURE:_____  DATE:_____
[25]    KEVIN BRITTO

Page 148

[1]
[2]        INDEX
[3] Witness:    Direct
[4] Kevin Britto 8
[5]
[6]
[7]        EXHIBITS
[8]
    Britto        Description        Page
[9] For Ident.
[10] 1    Mt. Sinai Discharge Plan and Referral 140
       Form
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 149

[1]
[2]        CERTIFICATE
[3] STATE OF NEW YORK          )
[4]                            ) ss.
[5] COUNTY OF NEW YORK )
[6]        I, Debra DiBenedetto, a
[7]    Shorthand (Stenotype) Reporter and
[8]    Notary Public of the State of New
[9]    York, do hereby certify that the
[10]    foregoing Deposition, of the witness,
[11]    KEVIN BRITTO, taken at the time and
[12]    place aforesaid, is a true and correct
[13]    transcription of my shorthand notes.
[14]        I further certify that I am
[15]    neither counsel for nor related to any
[16]    party to said action, nor in any wise
[17]    interested in the result or outcome
[18]    thereof.
[19]        IN WITNESS WHEREOF, I have
[20]    hereunto set my hand this 14th day of
[21]    March, 2006.
[22]
[23]
[24]        Debra DiBenedetto
[25]

**Lawyer's Notes**

**$**

$10,000 44:21
$100,000 128:25
$18,000 24:17
$4,000 104:16; 135:23
$40,000 64:18
$5,000 104:8
$50,000 44:23

**0**

05 49:3; 51:15, 16; 127:12

**1**

1 49:14; 144:20
10th 144:11
12 144:12
15,000 84:9
1500 107:12
18 114:19, 21
18th 8:10
19 13:20; 26:25; 30:21;
31:21; 32:18; 40:19;
98:18; 104:22; 114:20;
117:25
19's 41:17; 98:10
1988 8:10
1993 9:2; 11:16, 19;
115:20
1998 11:22; 12:4
1999 11:25
1:30 5:4

**2**

2 140:7
20-something 84:8
2000 111:17, 17; 127:13,
14; 129:23
2001 12:5; 81:7; 111:17;
127:13, 14
2002 130:8
2005 49:14
2006 5:4; 143:12
22 64:19; 108:22; 109:2,
10; 110:16
25,000 64:20; 103:24
28th 12:4, 5; 81:9
2:23 54:23
2:41 55:2
2nd 48:25

**3**

30 131:14; 142:14
30,000-dollar 103:23
300 10:13, 13, 17; 29:9;

35:21; 36:23
35,000 110:24
350 19:19, 20
37th 5:13, 18
39 5:13, 18
3:16 87:23
3:20 88:2

**4**

40,000 84:8
4:15 140:14
4:17 140:19
4:19 140:22
4:22 144:14, 16

**5**

5,000 103:25
5,000-dollar 135:22
50 13:2, 4; 43:15
50,000 14:4; 113:9
50/50 43:12

**6**

600 10:12, 17; 29:9, 13,
17, 17, 20; 30:5, 21, 22;
31:5, 8; 32:14, 14; 35:22;
36:24, 25

**7**

7 5:4
7,000 53:23
78 110:17, 20

**8**

8-by-10 19:20

**9**

9-by-10 19:20
97 12:3
98 12:13
99 12:14

**A**

A's 30:16
ability 119:6, 13; 120:21;
121:2
able 12:23; 32:3; 117:14;
119:9
aboard 45:13; 56:3, 10;
115:9, 11
absolutely 29:13
accepted 32:17

accompanied 33:2
accompany 23:21;
113:23
accompanying 28:14
accomplished 68:25;
122:24; 142:13
account 75:21; 123:10,
15, 17, 18; 124:5, 8
Accounts 137:25
accurate 106:14; 129:12;
142:6
accused 133:11
acquainting 99:11
acquire 93:6
acquiring 117:9
acquisition 28:7
acquisitions 117:5
act 66:15
acting 58:10
action 6:2, 5
acts 88:20; 89:2
actual 20:9; 28:18; 50:25;
51:2; 59:11; 60:4; 61:10,
13; 62:4; 100:19; 112:23;
136:6
actually 8:23; 12:17;
13:12; 17:11; 20:2; 23:24;
29:17; 30:3, 5, 22; 31:5;
32:8; 33:15, 23; 35:2, 3,
12; 36:3; 39:11; 45:18;
48:19; 49:6; 50:7; 62:18;
65:9; 67:19; 68:9; 80:10;
81:24; 85:16; 87:13;
89:25; 103:10; 111:6;
114:6
Adams 5:8; 6:8; 9:20;
10:4; 13:15, 18; 20:23;
21:10, 11, 15, 19, 20, 24;
22:18; 23:14, 17, 18, 21;
24:8, 19, 19; 25:6, 15;
37:13, 22; 38:5; 39:5, 12,
13, 16; 40:11, 12; 41:6;
42:10, 20; 43:9, 10; 44:10;
45:25; 46:2, 12; 50:6, 15;
53:7, 10; 54:3, 7, 11, 12;
56:2, 9; 57:6, 19, 22;
64:15; 65:6, 10, 13, 18, 21,
22; 66:3, 10, 19; 67:20, 24;
73:24; 74:7, 13, 20, 23;
75:8; 76:2; 77:9, 19, 21,
22; 78:2, 6; 79:5, 11;
84:11, 15; 90:4; 93:18;
95:5; 96:13, 14; 97:10, 17,
24; 98:8, 20, 23, 23; 99:6,
8, 10; 101:13, 18, 24;
102:4, 23; 103:9; 105:3, 8,
12; 106:13, 18; 108:11;
109:14, 19; 110:2, 16, 22;
111:3; 112:7; 113:16, 18,
23, 25; 121:16; 122:10;
123:5; 124:24; 125:22;
126:2, 6, 8, 10, 20; 127:18,
23; 129:17, 25; 130:10, 13,
23, 23, 25; 131:4, 7, 8, 11,
13, 17, 19, 23; 132:2, 4, 7,
12, 18; 133:6, 9; 134:3;
135:2, 4; 136:16, 23;
137:3, 5, 7, 9, 16

add 29:4; 46:3; 140:7
added 36:12; 139:25
addicted 22:14; 119:3
addiction 18:5, 8; 80:7,
11, 12; 118:11, 16, 20;
119:5; 120:12
addictions 17:23; 118:9;
119:13
addressed 75:7
Adler 61:23, 24; 62:5;
95:21
admit 134:8
advance 41:24; 42:24;
43:4
advantage 83:6; 139:2
advertising 139:22
advice 23:8, 25
advised 91:17
affect 120:20; 121:2
affected 88:18; 119:6, 13
affirm 7:21
affirmed 7:23
afterwards 39:8; 66:18;
118:10
again 12:5; 22:7; 26:5;
38:14; 103:18; 131:21;
132:10
age 55:11
aggressive 137:22
ago 51:10, 12, 15; 63:9;
89:10; 128:4
agree 4:3; 141:6
AGREED 4:3; 43:21;
145:14
agreement 43:8; 76:7
agrees 143:4
ahead 87:16
aided 83:7
al 5:8
alcohol 118:21, 23;
119:3, 5, 16, 24
Alcoholic 17:14; 80:11,
13
alert 46:20
allegedly 62:6; 110:16
Alls 133:23
along 111:20, 24; 142:17
alter 59:8
Always 21:11; 37:11;
38:17; 57:19, 22; 73:16;
77:6; 97:24; 129:12
amend 144:6
amount 64:22; 84:5;
104:15; 106:12, 14; 108:2;
109:10; 142:12
and/or 74:8
Andover 142:23, 24
angry 110:9
antidepressant 121:6
anxiety 118:24, 24
anymore 57:3; 90:19;
99:23
anyways 13:4; 78:14;

129:2
apartment 81:12; 82:24;
83:4
apologized 8:14
apology 8:19
apparently 72:25
appear 46:24
appreciate 69:4
appropriate 124:11
approximate 51:11
approximately 58:4;
128:8
around 13:4; 59:15;
114:19; 116:15, 19
arrange 50:6
arranged 105:7
artist 38:16
aspect 15:12; 83:7
aspects 57:12
ass 11:10
asserted 4:10
assistant 77:24; 78:2
associated 134:23
association 59:18
assume 47:2; 104:14
Ativan 121:8
ATM 74:25
attached 31:17
attempt 42:11
August 48:25; 49:14
average 83:25; 84:4;
107:15
aware 56:25; 63:15;
66:25; 96:23; 97:14;
102:22; 125:3, 4; 127:17;
135:3
away 13:23; 23:18; 26:11;
27:3; 42:25; 99:4; 122:20

**B**

B 30:13, 22, 23
B's 30:15
B-U-R-R-O-U-G-H-S
26:17
back 6:21; 7:3; 9:9, 10,
13; 11:23, 24, 25; 12:3, 4,
13; 14:17; 38:20; 49:21;
71:11; 86:20; 99:15;
107:23; 111:9; 118:17;
120:13; 127:10; 128:2;
131:9; 132:9; 136:19;
142:17
background 114:10
backup 36:7
bad 117:20, 23; 118:11,
13
band 93:14, 15
bank 24:13; 75:21; 123:9,
13; 124:3, 5, 7, 8, 12
bar 113:21
based 40:11; 129:24
basically 31:25; 98:22;

101:20, 25
**basis** 67:2; 71:18; 97:25
**beans** 133:7
**became** 9:2, 3; 11:17; 22:6, 8, 10, 19; 63:15; 115:18, 20; 116:8
**become** 10:25; 66:25; 80:9
**Bedford** 114:14, 18; 115:6
**beer** 120:4
**beforehand** 54:9
**began** 8:8; 11:15; 13:5; 80:21; 92:25
**beginning** 88:3
**behalf** 88:21; 89:2; 95:4
**belong** 141:4, 4
**benefit** 42:20
**best** 41:12; 47:19; 52:22; 54:16; 63:23; 126:24
**bets** 24:8
**better** 16:16; 88:16; 89:10; 128:14
**Bible** 7:19
**big** 40:3, 6
**Bill** 7:5; 9:2, 4; 19:15; 20:17; 22:5, 7, 9, 10, 14, 20; 25:20; 26:4; 31:7, 13; 32:21, 22, 25; 33:9; 34:4, 8, 9, 16; 35:10; 36:17, 25; 37:5; 38:16, 20; 68:8, 10, 14, 22; 69:14; 94:4; 104:20, 23; 105:20; 116:12, 14, 18; 128:3; 133:24
**bill-bill** 36:19
**billed** 36:24
**billing** 36:16
**bills** 13:21; 17:24, 24; 35:2, 6; 40:20; 41:18; 62:9; 68:15, 18; 98:11, 19; 99:7
**bind** 40:8; 42:17
**bit** 40:14; 43:22; 105:20; 116:12, 15, 18
**blah** 127:5, 5, 5
**blank** 143:10
**blasphemy** 23:5
**blues** 118:18
**bookie** 24:13; 84:19; 126:5, 7, 9
**borrowed** 111:6, 7; 130:2
**borrowing** 111:12
**boss** 11:8; 70:23; 71:22; 88:13
**Boston** 142:22
**both** 5:17, 24; 12:10; 16:4, 4, 5, 7; 39:11, 17; 52:12; 72:23; 76:5; 118:16
**bottle** 83:15
**bottom** 47:5
**bought** 67:8; 68:5; 95:21
**boyfriend** 38:24
**brace** 84:25
**breakdown** 106:7

**Brief** 44:17; 54:24; 87:25; 140:20
**Britto** 5:6; 7:22; 8:8; 55:4; 123:19; 130:25; 131:19; 132:3; 140:23; 145:4
**broke** 84:18
**broker** 41:24
**brought** 56:2, 9
**Brown** 6:15; 8:24; 15:19; 21:14; 38:9; 43:22; 44:4; 51:7, 14; 52:2, 13, 23; 53:5, 9, 16, 19, 22; 54:6, 15, 18; 85:23; 90:13, 17, 18; 91:4, 9, 20; 96:12, 13; 105:19; 107:3; 108:4, 13, 17; 111:20
**Brown's** 53:24; 54:13
**Building** 13:20; 26:25; 30:21; 31:21; 32:18; 40:19; 41:17; 98:10, 18; 104:22; 109:23; 117:25
**bulk** 109:15
**bullshit** 38:15; 62:17; 66:15; 84:19; 134:14
**bullshitted** 101:20; 134:7
**bunch** 16:21; 17:11; 120:19; 128:19
**Burnham** 77:16, 18; 78:3, 5, 10, 16, 21, 24; 79:2; 93:25
**Burroughs** 26:14, 16, 18
**Burton** 93:20; 145:2
**business** 62:21; 78:23, 25; 79:2, 4; 92:23; 95:16; 100:6, 10, 12; 101:20; 112:18, 20, 24; 114:23; 117:2
**busy** 107:25
**buy** 41:25; 67:6, 21, 24; 103:24; 116:11
**buyer** 9:2, 2; 11:18; 38:17; 48:6, 14; 56:5; 58:12, 16; 61:19, 20; 67:7, 9; 68:14; 70:19; 75:23, 25; 76:2, 16; 77:12; 93:19; 115:19; 116:8; 139:3
**buyers** 19:16; 76:6
**Buying** 42:16; 62:20; 113:23; 114:23; 116:7, 23; 117:4, 12

**C**

**call** 9:9; 19:22; 20:5; 41:23; 55:6; 79:13, 17; 100:12; 103:18; 104:7; 112:16; 126:17; 135:17; 136:9; 138:20
**called** 7:22; 9:7, 10, 13; 25:19; 39:14, 23, 24; 40:15, 20; 52:14; 58:22; 61:8; 66:15; 87:13; 92:13; 95:10; 98:17; 99:15, 21; 100:23; 101:2, 4; 102:13; 103:8; 106:13; 125:19; 126:2, 18, 19; 127:4, 7,

136:13; 141:10
**calling** 40:17; 41:3; 90:6; 98:15; 103:2; 127:6
**calls** 19:6, 10
**came** 8:21; 9:7; 10:13; 11:22, 24, 25; 12:2, 4, 13, 18, 19; 14:19; 15:25; 19:14, 18; 29:9, 10, 13, 14, 17, 21; 30:3, 22; 32:14, 15; 33:2, 23; 35:21; 45:13; 47:7; 48:20; 49:15; 50:19; 52:14; 61:20; 66:4; 68:14, 22; 71:23; 73:7; 74:12; 85:19; 88:7; 90:5, 9; 91:15; 95:19; 97:15; 100:14; 107:6; 115:8, 11; 119:17, 25; 125:15; 134:14
**can** 9:10; 12:15; 13:24; 14:13; 16:6; 19:12; 21:25; 22:14, 23, 24; 27:3; 32:10; 38:19; 40:14; 41:3, 24; 42:3, 23; 44:16; 47:19, 19; 49:17; 52:22; 58:9; 63:23; 64:14; 69:4; 72:3; 88:8, 15; 94:4; 112:15; 120:23; 126:24, 25; 128:11, 17; 134:16; 142:8, 10, 25; 143:2, 4, 8, 24
**cancel** 22:15
**cant** 132:24
**capacity** 58:10; 77:22; 115:9; 128:9
**CAPTION** 145:2
**card** 74:25; 76:17
**care** 80:6; 86:8
**Carney** 5:17
**Carolina** 67:11, 14, 18, 24; 68:6
**carpet** 40:7; 93:20; 94:16, 17
**carpets** 40:13
**carrier** 33:5
**case** 83:13, 14; 143:2
**cash** 28:6; 75:2, 11, 12, 20
**cast** 84:25; 85:2
**caught** 45:19; 72:14
**cause** 32:16; 42:21; 112:18; 122:14; 127:25
**caused** 18:7; 47:24; 56:12; 97:10; 109:8; 127:21
**causing** 37:14; 40:13
**CCC** 6:11; 15:8, 10, 18; 17:10; 18:3; 20:14, 16; 31:6; 43:3; 50:20; 54:16; 56:24; 59:5, 5, 8; 85:25; 90:19; 91:6; 96:3; 102:23; 103:2, 5; 105:22; 106:15, 18, 23; 107:2, 6; 108:3, 21; 109:11, 14; 110:15, 17; 111:3, 7
**cease** 120:11
**Celexa** 121:6
**certain** 10:16; 123:4; 139:2

**chance** 72:13
**change** 74:3, 8, 8; 100:3
**changes** 12:5
**charge** 26:6; 27:11, 24
**cheat** 58:19
**check** 16:11, 17; 24:13; 74:23; 75:6; 104:8; 105:21
**Checks** 15:6, 7, 23, 25; 16:19; 33:22; 65:4, 16; 75:12, 14; 76:13, 23, 25; 77:2; 103:4, 7
**child** 7:8
**Chinese** 90:23
**Chris** 72:9
**circumstances** 91:6; 100:3, 12; 109:21; 111:11
**Citizens** 123:11; 124:8
**civil** 85:20
**claim** 29:9, 13, 20
**claimed** 99:8
**claiming** 30:16; 77:14
**clear** 28:8
**close** 9:4; 17:21; 22:9, 10; 54:17
**closed** 124:9
**club** 23:23
**co-counsel** 5:24
**code** 32:7
**coerced** 8:23
**colorful** 99:4, 9
**colors** 32:11
**columns** 141:14
**coming** 27:22; 35:22; 36:11; 97:12, 14, 18; 142:24
**commence** 75:14
**commented** 130:9
**commenting** 130:7
**commission** 100:18; 103:25; 104:9, 12, 14, 21; 135:24
**commissions** 105:2
**communication** 15:23; 18:18; 19:8; 20:25; 21:5, 8; 57:11; 79:10; 100:22; 113:4; 138:12
**communications** 91:10; 138:16
**companies** 56:23; 73:25; 94:18; 109:8; 114:3
**company** 26:7, 23, 24; 27:16, 22; 30:8, 12, 13, 15, 16, 22, 23; 31:7; 32:6, 9, 15; 33:6, 7; 36:22, 22; 40:7; 48:10; 50:25; 57:8; 58:19, 22, 24; 59:11; 60:2, 5, 24; 61:7, 10; 74:14, 20; 75:13, 15; 76:3, 17, 23; 79:11; 95:10, 14; 109:14; 114:3; 140:7
**company's** 31:9
**compares** 69:14
**complain** 106:13; 126:2, 19

**complained** 109:25; 131:7
**complaining** 110:5; 125:20
**complaint** 85:21; 102:15
**completely** 110:15; 128:18
**complicated** 10:20
**concerning** 124:22
**conclude** 97:10
**concluded** 144:4
**conclusion** 86:17; 118:6
**conduct** 116:25
**confront** 97:17
**confronted** 110:13
**confused** 82:13
**connect** 56:12
**connected** 56:24; 61:4
**connection** 67:13; 68:7
**connections** 68:2
**constant** 79:10
**constantly** 46:3
**contact** 15:10, 15, 17; 85:21, 24; 86:3; 96:18; 125:25; 137:11; 138:2; 139:20
**contacted** 96:21; 126:18
**contacts** 57:5
**contained** 72:20, 25
**contested** 38:17
**continue** 14:25; 18:11; 22:11, 21; 23:13; 115:14; 118:3
**continued** 115:17
**continuing** 23:11
**contractor** 24:21
**control** 18:9, 11, 16; 88:8, 12
**controlled** 96:19; 100:7
**conversation** 10:4, 9; 21:16, 24; 22:24; 38:6; 39:5, 25; 40:11; 41:2, 7, 9; 47:17; 51:25; 52:5, 23; 53:3; 64:13; 65:22; 74:6; 91:5; 96:22; 103:15; 105:22; 111:19, 23; 126:25; 127:16; 129:24; 130:5, 22; 131:4, 10, 22; 132:6, 7; 134:10; 135:11, 21; 137:14; 138:12
**conversations** 13:18; 16:7; 18:21; 45:9; 52:17; 57:15; 67:17; 96:22; 117:22; 131:16; 135:7
**conversion** 40:7; 42:14
**conversions** 40:13
**convert** 38:19; 41:25; 42:5, 11; 103:24
**converting** 38:16; 40:7; 42:19
**cooperative** 87:12
**copies** 122:4, 10; 124:12
**cops** 133:12
**copy** 49:24; 50:3; 141:8;

142:19
**corrected** 141:19
**cost** 42:17; 103:23
**counsel** 5:21; 49:9; 50:3; 145:14
**count** 33:18; 69:8, 9, 10, 12, 16
**counted** 37:10
**country** 90:24
**couple** 46:13; 128:4
**course** 11:12; 14:3
**Court** 5:9, 15; 7:14; 17:5
**cover** 10:20; 83:21
**cover-up** 82:23; 83:11
**covering** 82:25; 83:12
**Craft** 16:2
**Crafts** 5:7, 25; 8:9, 13, 18; 11:21; 17:9; 18:4
**create** 31:7; 62:14
**created** 32:16, 19, 23; 33:14; 45:14; 70:6; 77:3; 85:6; 94:20
**creating** 30:4; 96:2, 24
**credit** 76:17
**crutches** 85:3
**cut** 40:8; 42:17

**D**

**D-A-L-T-O-N** 50:22
**dad** 8:5
**daily** 79:14; 97:25
**Dalton** 50:20, 21, 24; 51:7; 52:8, 20, 21, 24; 56:24; 59:5, 20, 22
**date** 11:24; 34:17; 49:13; 73:7, 9; 142:14; 144:21; 145:5
**Dave** 8:23; 9:6, 8, 18; 10:4; 12:20; 13:9, 12, 15; 14:23; 16:18; 20:15, 19, 21, 21, 23; 21:10, 11; 22:18; 23:21; 38:18; 39:11, 12, 13, 16; 40:19; 41:15, 17, 22; 42:10; 44:8, 10; 45:24, 25; 46:2, 12; 53:11, 12, 13, 25; 54:3, 7, 8, 11, 12, 17; 57:6, 19, 22, 23; 58:6, 8, 10, 12, 16, 18, 20; 65:18, 21; 66:14; 67:19; 76:2; 77:9, 19; 78:22, 22; 79:9; 89:23; 90:4; 96:13, 14; 99:6, 8, 23; 100:4, 8; 101:12, 18, 24; 102:4; 103:8, 25, 25; 105:3, 8, 11; 106:13, 18; 108:6; 109:18; 110:22; 113:17, 18; 123:5; 125:22; 126:2, 6, 8, 10, 20; 127:7, 24; 129:17; 130:10, 13; 131:7, 8, 17; 135:4; 136:16; 137:2, 5, 16
**Dave's** 9:18; 38:15; 53:14; 127:5
**David** 5:7; 6:7, 11; 15:16,

24; 20:24; 21:15, 18, 19, 24; 23:14, 17, 18; 37:22; 38:5; 46:6; 53:6, 10; 64:15; 77:21, 22; 78:2, 6, 25, 25; 79:5, 11; 84:11, 15; 96:9, 10, 11, 18, 21, 23; 97:10, 17, 24; 98:8, 15, 20; 102:14, 23; 108:11; 109:13; 110:2, 16; 111:3; 112:7; 113:23, 25; 121:16; 124:23; 127:18, 23; 131:23; 132:4, 7, 18; 133:6, 9; 136:23
**day** 11:23; 143:10
**days** 131:15; 140:8; 142:14
**dead** 10:2; 129:10
**deadbeat** 8:5
**dealings** 96:12
**Debbie** 137:24; 138:12; 139:20
**Debra** 5:16; 7:24
**debt** 126:12; 127:19
**December** 51:15, 16
**decide** 78:8
**decision-making** 89:14
**decisions** 88:18; 89:17; 112:5
**deeper** 101:15
**defendant** 6:5, 7
**definitely** 35:4; 41:8; 58:17; 66:11; 88:10; 113:7; 122:15
**defraud** 12:6
**defrauding** 36:22
**defray** 127:18
**delivered** 26:6; 27:23
**deliveries** 26:2
**delivery** 27:10, 11, 23; 42:18
**depended** 37:11
**Depends** 31:4
**depo** 58:9
**Deponent** 145:15
**deposit** 75:21
**deposition** 4:4, 13; 5:5, 12; 55:5, 8, 14; 119:20, 22, 25; 140:25; 141:3, 7, 9, 15, 17, 21; 142:4, 19; 144:4, 10, 17, 19; 145:4, 9, 16
**deposits** 124:4, 13, 18
**describe** 10:8
**described** 78:17; 94:24; 121:18
**designed** 102:10
**destroy** 123:2
**destroyed** 122:14
**determine** 30:25; 32:12; 35:10; 66:8; 107:5; 108:2
**DGM** 9:24; 57:2, 5; 93:20
**Diane** 94:10
**DiBenedetto** 5:16; 7:24
**died** 16:7; 57:3, 8, 9, 12
**difference** 69:5

**different** 31:22; 32:11; 55:19, 20; 75:3; 118:15
**DIRECT** 8:6; 15:10; 20:25; 21:4; 57:4, 11; 67:17; 83:23, 23, 23; 100:21; 138:11
**directing** 20:7, 10
**directly** 53:10; 82:15; 85:25; 96:11; 102:14; 112:17; 134:19
**disbursements** 76:9
**discharge** 49:10, 13; 144:18
**discount** 140:8
**discounts** 139:3, 24
**discover** 83:20
**discovered** 47:25; 48:4, 14; 50:8
**discovery** 99:11
**discuss** 6:17; 16:10, 14; 20:13, 18; 21:19; 22:2, 18; 45:13; 52:12; 53:2, 5; 54:2; 57:17, 20; 58:18; 91:9; 93:9; 102:21; 109:13; 127:22; 129:16; 137:2; 138:8
**discussed** 20:12; 24:10; 43:25; 44:5; 52:8; 54:8; 56:3; 97:4; 121:12; 126:16; 128:16
**discussion** 41:6; 51:7, 14; 54:10; 63:19; 84:14
**discussions** 45:4; 117:17
**dismissed** 46:12
**display** 62:4
**displaying** 84:20
**disposed** 22:19
**District** 5:9, 10
**dock** 34:3
**doctor** 121:13; 128:14, 15, 20
**doctors** 128:19; 129:12
**document** 25:19, 25; 30:4; 73:2; 139:4
**documents** 25:24; 26:2; 73:10; 96:2, 24; 124:11, 17, 22; 130:18; 139:8
**dog** 24:2; 84:13
**dollars** 14:2; 23:20; 112:24
**done** 82:6; 89:24
**down** 19:22; 24:8; 31:14; 40:8; 45:23; 63:21; 73:14; 116:21; 124:16; 133:21, 22
**downsizing** 90:21; 91:8
**drink** 120:4, 7; 129:10
**drinking** 118:25; 119:2
**drinks** 120:2, 7
**driving** 76:19
**drug** 80:12
**drugs** 17:23; 120:11, 12, 15
**drummer** 93:15

**drunk** 97:7
**dry** 107:23
**duly** 7:23
**during** 24:20; 25:4; 110:6; 111:2; 115:25
**duties** 37:16
**Dziemit** 6:13; 39:6; 62:25; 63:10, 17, 21, 25; 65:18, 24; 66:5, 9; 124:23

**E**

**E-mailed** 6:20
**earlier** 8:13; 25:18; 51:17; 52:20; 55:4, 13; 58:9; 134:20; 135:8, 20
**earmarked** 35:21
**eased** 134:17
**easier** 68:4
**Eastern** 5:10
**eat** 76:15
**eatin** 90:2
**education** 114:10
**egged** 9:6
**ego** 59:8
**eight** 73:13
**either** 15:24; 16:7; 21:7; 36:17; 39:5; 48:18; 65:17, 23; 66:5, 9; 76:6; 96:12; 102:13; 129:14; 130:22
**electric** 17:24
**Elovitz** 8:14; 22:20; 32:2; 81:10, 20; 82:4, 7, 15, 23; 83:7; 117:18, 23; 118:8; 128:4
**else** 43:16; 117:18; 126:13; 141:5
**em** 127:7; 135:9
**Empire** 58:22; 59:5, 18
**employed** 61:14; 66:17; 75:16; 91:6; 115:9
**employee** 24:20, 22, 25; 33:15; 78:10
**employees** 25:5, 11; 33:18; 88:24
**employer** 88:21; 89:3
**employment** 8:9; 12:7; 80:18; 91:7; 138:13
**end** 24:23; 45:23; 46:13; 141:25
**endeavor** 21:21
**ended** 80:19
**ending** 87:23; 144:14
**engaged** 19:12
**enough** 110:9; 117:24; 118:13
**entered** 73:6
**enterprises** 94:7
**entire** 25:4; 142:3
**entirely** 32:19; 141:3
**entitled** 79:20
**entity** 59:12
**errata** 141:10; 142:16,

17; 143:7; 144:7
**error** 141:10, 16, 17, 18, 19
**Escalade** 77:13
**especially** 71:21
**essence** 21:24; 99:5
**estimate** 12:16, 23; 13:25
**estimated** 128:21
**et** 5:8
**etc** 4:6
**evaluate** 116:7; 117:14
**Eve** 127:8; 129:21
**even** 18:12; 19:25; 61:6; 95:21; 97:18; 128:14
**event** 118:3; 129:23
**everybody** 76:21
**everyone** 143:4
**evidence** 4:6, 13; 122:16
**Exactly** 33:24; 133:21
**EXAMINATION** 8:6
**examined** 7:25
**example** 16:9, 11; 29:9; 70:18; 103:20, 22
**except** 4:7
**Excuse** 7:13; 93:14; 116:17
**exhibit** 49:19; 50:4; 144:20
**existed** 25:5
**existence** 63:17; 66:25
**expenses** 76:13; 77:2, 10
**expensive** 81:21
**experience** 114:22
**explain** 42:3; 62:13; 112:15; 134:16
**explanation** 98:9; 144:7
**explicitly** 86:24; 93:9
**express** 133:9

**F**

**F** 39:14, 25
**face** 22:16
**fact** 10:17; 32:14; 62:10; 97:18; 98:19; 99:6, 7; 100:14; 102:4, 7
**facts** 7:3
**fair** 7:12; 60:14; 66:8; 89:21
**fake** 31:7; 35:14; 57:18, 21; 60:21; 69:18; 77:10; 81:16, 19; 82:20, 22; 83:24; 84:6
**faked** 35:6, 11, 19, 20, 25
**fakes** 34:20, 21
**far** 24:18; 59:16; 67:12; 95:18; 114:10; 136:22
**fashion** 139:3
**faster** 140:10
**feel** 55:9; 119:19; 132:13; 139:14; 142:5
**felt** 22:16; 108:5; 117:9

few 22:22, 23; 41:11
fiction 29:6; 31:3
fictional 28:21; 60:18;
68:18, 23; 69:4; 70:7, 10,
13; 71:2, 6, 9; 72:21;
74:14; 75:7; 77:1, 3; 85:5;
96:25; 97:15; 100:14;
109:8, 15
fictitious 66:22
fictitious 50:25; 59:12,
14
fifth 104:15
figures 104:7
fill 10:16; 71:15, 17; 72:7;
141:20
filled 73:20
financing 42:10
find 39:4, 9; 41:3; 47:23;
54:5; 60:15; 66:7; 67:16,
23; 68:3; 91:24; 93:5;
95:23; 123:4; 128:14;
136:10
finding 40:5
fine 6:23; 49:25; 50:5
finish 25:23
Fink 5:17
Finley 94:13, 15, 22; 95:6
fireplace 122:22
first 4:10; 7:23; 8:22;
9:16; 11:15, 16; 12:6, 7, 9;
16:25; 20:12; 21:16, 23;
32:17; 33:21; 34:8; 38:22;
52:16; 53:11; 63:14;
66:24, 24; 67:2, 4; 69:2, 7;
73:23; 75:12; 79:24; 80:4,
18; 85:7; 88:13; 96:8;
112:6; 115:8, 11; 116:8;
117:5; 118:7; 135:13;
136:6
five 51:12; 56:8; 115:24,
25; 128:8
fix 9:9
flat 107:9
Floor 5:7, 25; 8:9, 13, 18;
16:2; 17:9; 18:4; 60:24
flooring 45:19; 46:15
flowing 65:23
Foam 67:11, 14, 18, 21,
24; 68:5, 6
following 63:20; 94:10;
131:17; 141:7
follows 8:2; 37:17
Foot 84:17, 18, 22, 23
forced 11:14; 112:2
forget 55:25
form 4:5; 49:11; 74:24;
75:11; 86:16; 144:19;
145:11
forms 118:15
forth 6:21
found 48:17; 98:14, 18;
108:9, 11
foundation 4:6
Four 51:12, 14; 55:13;
73:13, 15; 141:14

fourth 55:24
fraud 48:4; 57:12, 15;
58:25; 59:4; 61:25; 92:21;
102:23
fraudulent 89:2; 92:22,
25; 94:20; 96:2; 108:24;
110:15; 121:17; 126:14;
138:3; 139:25; 140:5
Fred 6:3
free 26:6; 27:4, 8, 10, 11
freight 55:17, 23
frequently 139:19
Friday 143:17; 144:11
friend 18:17; 56:14
friendly 22:7; 56:19
front 42:22; 50:15, 16;
64:15; 65:10; 66:10;
73:24; 74:9, 12; 87:13;
111:3; 113:16
fronted 64:14
fronting 66:20
fuck 72:2; 133:23
fuckin 132:13
full 26:13; 35:24; 36:2, 6
fully 119:9, 21
functioning 128:8
funeral 17:17
funny 11:23

## G

gamble 42:23
gambled 23:18
gambler 129:25
gamblin 127:9
gambling 13:23; 23:22,
23; 111:13; 112:7; 126:11;
127:18
Garbage 122:18
gas 76:18, 24
gave 18:25; 20:11; 41:22;
56:10; 92:20; 96:7
gay 17:15
gentlemen 143:18
genuine 35:11; 59:21;
68:16; 69:24, 25; 70:14;
73:16
Georgia 77:12; 114:2, 5
gesture 17:6
gets 10:19; 140:10
girlfriend 56:14, 21
giving 19:21; 20:4; 66:14;
108:5, 10; 131:20
glad 89:25, 25
God 8:4, 4
goes 34:5; 47:4
gonna 14:10; 24:13;
70:24; 98:24; 99:22;
101:14, 19; 103:21;
127:10; 132:8; 133:20
Good 5:22; 15:2; 19:8;
31:6; 38:15; 69:21;
117:19; 128:18

goods 27:4, 8, 19, 22;
28:4, 12, 18, 21, 23, 25;
29:4; 31:24, 24; 38:16, 19;
41:25; 42:5, 11, 15, 16, 20;
61:20; 62:20; 69:8, 10, 12;
103:24
grab 44:16
graduated 115:14; 116:5
GRANT 6:3, 4
grew 17:20
guess 41:23; 54:16;
64:19; 77:24, 25
guideline 85:11, 18
guilty 7:3
guy 57:2, 7; 101:21
guys 48:16
gypped 106:15

## H

Half 29:3; 35:19, 20; 36:7,
10; 72:22, 22; 77:12; 84:9
hand 7:19; 32:13; 36:8, 9
handling 25:25
hands 88:16; 89:10;
96:18
handwritten 73:11
happen 1:7; 26:5; 27:7;
43:14; 99:22; 104:4
happened 38:20; 46:16;
47:12; 70:22; 90:2;
104:25; 105:10; 109:23;
110:19; 111:5
happening 57:3
happens 28:5, 12; 34:24;
141:8
happy 86:21
hard 55:7
harsh 98:25
health 118:20; 128:12, 18
hear 93:16
heard 58:21; 59:25;
60:23; 61:6, 7; 77:15; 94:9;
95:9
Hearing 144:9
held 5:12
Hell 121:22
hell's 41:21
help 127:18
helped 53:25
helping 17:23
here's 61:20; 71:25
HEREBY 4:2
hereof 145:6
hey 101:12; 131:19;
132:2
hide 61:18; 90:23
high 13:3; 114:11, 12, 14,
18
hindsight 35:10
hint 83:13; 118:9
Indicating 16:24; 60:16;
120:9; 130:18
Ho 98:21, 21, 21, 21

hold 4:4
home 33:20; 109:19;
122:8; 139:23
honest 56:6; 58:16, 20
hospital 48:23, 25; 49:9;
80:15; 120:13
house 92:24; 93:3, 7;
110:11; 122:21
hundred 14:14, 18;
113:12
hung 99:13
hypothetical 104:5, 19;
135:21

## I

idea 23:16; 24:9; 39:3;
44:20; 52:25; 86:13; 97:2;
110:21; 112:8, 11; 113:2,
5, 18; 123:23; 124:2;
129:22; 135:15; 138:7
identification 144:20
identifies 32:7
identify 124:16
identifying 25:24; 68:25
IFC 12:7, 21; 13:12; 15:2;
18:13, 19; 20:17; 21:2, 5,
9; 22:12; 24:20, 22, 24;
25:5, 23; 26:21, 23; 32:23;
33:15; 37:2; 39:13, 22, 23;
42:2; 46:12; 59:18, 22;
60:7, 10, 12; 61:13; 62:10,
15, 16; 66:17; 73:2; 74:17,
20; 76:7; 77:14; 78:11, 22;
79:4, 22; 80:3, 19; 81:3;
82:11, 15, 16; 83:8; 93:13,
19; 95:16; 96:5; 97:25;
98:6, 18; 99:7, 8; 101:3;
109:9; 113:23; 114:24;
115:3, 9, 15, 19; 117:10,
18, 25; 118:7; 122:24;
134:23
immediately 30:2
impair 121:10
implemented 10:11;
21:20; 94:6
important 96:20; 137:19
Inc 5:7; 6:2, 11; 60:24
include 129:20
including 4:5
incriminate 23:2
Incs 60:24
independent 24:21
indicate 10:16; 34:12;
35:2; 40:12, 22; 60:11;
66:20; 74:7; 95:5, 25;
96:23; 102:3; 132:20;
134:9; 135:2; 138:25;
142:2
indicated 39:17; 65:22;
85:5; 88:6; 100:9; 126:15;
128:7, 20; 129:3, 7; 135:20
individualized 32:5

inform 91:21
information 19:21; 26:3;
41:3; 54:6; 66:13; 72:20,
24; 73:5, 20; 95:24; 96:8;
97:9; 102:3; 141:20
informed 131:11
ingestion 120:11
initiate 19:5
initiated 19:9
injury 84:15, 21, 22, 24
innocent 7:2; 38:14; 64:3
inquire 40:25
insist 143:22
inspection 85:9
instance 30:2
instances 29:23
instead 105:8; 134:2
interest 104:3; 113:14;
135:25
International 5:6, 25;
8:9, 12, 18; 11:20; 16:2;
17:8; 18:4; 60:24
interpretation 89:21
interview 85:20
intimidated 11:8, 11
into 8:23; 11:14; 56:5;
62:10; 96:18; 109:9, 23;
112:2; 124:4; 139:17
introduction 5:20
inventories 78:8
inventory 48:7, 14;
52:11; 73:12; 85:7, 14
invoice 62:14; 64:19, 23;
65:2; 109:3
invoices 62:9; 106:8;
138:19
involve 23:11; 42:15;
68:15
involved 12:24; 28:9;
38:4; 48:4; 61:25; 62:19,
20; 72:4, 5; 78:16; 95:3, 7,
12
involvement 63:11
Isaac 6:6
issues 4:7
items 60:12

## J

James 5:23
Jane 6:13, 25; 7:5; 38:13,
15; 39:6; 62:24; 63:10, 17,
21, 25; 64:2; 124:23
Jane's 38:24
January 127:8, 11
job 45:5; 68:14; 88:18;
93:12; 115:2; 117:12;
118:13; 138:13
jobs 93:18
John 6:9; 15:18, 20
join 21:21
joined 114:23
Jose 5:14

July 8:10; 120:14
jumped 84:17
June 9:2; 115:20
jurisdiction 5:8

**K**

keep 33:17; 45:6; 46:2; 105:14; 110:17; 122:4, 10; 123:5
kept 41:17; 122:8
Kevin 5:5; 7:22; 55:6; 123:19; 131:19; 132:3; 145:4
key 19:15, 23; 25:19; 69:16; 70:6, 24, 25; 71:4, 5, 15; 72:7, 11, 11, 12, 13, 20, 25; 73:6, 11, 20; 107:8, 13; 138:19
kicking 11:10
kid 115:4
kind 10:21; 19:2; 21:20; 67:25; 73:5, 19; 76:6; 78:5; 80:5; 84:21; 114:22; 115:10; 116:13
kinds 13:18; 72:12
Klehm 5:24; 6:23; 91:2; 106:2
knee 84:15, 21
knew 9:9; 25:11; 36:22; 40:12; 79:16; 88:15; 92:13; 97:13; 100:8; 102:7; 136:22
knowing 56:20
knowingly 25:12; 95:25; 96:24
knowledge 59:22; 60:5, 6, 17; 61:24; 62:12, 15; 73:17; 77:9; 78:14; 95:8; 108:15; 110:18; 121:10
knowledgeable 78:16
known 10:25; 118:7; 129:25
knows 27:21
KRASNOO 5:22, 23; 6:16, 22; 8:7; 50:2; 54:20; 55:3; 88:5; 140:12, 16, 23; 141:13, 24; 142:8; 143:15; 144:3

**L**

ladies 132:14
lading 32:21, 22, 25; 33:9; 34:4, 8, 10, 16; 35:2; 69:14
ladings 35:6, 10
LAHEY 6:14, 14
language 99:2, 5, 9; 132:10, 14; 133:22; 138:25
last 9:19; 39:2, 6; 46:4; 48:2; 50:7; 61:22; 63:5; 72:10

late 138:19
later 11:24; 12:3; 49:2, 15; 66:21
lawyer 91:17
lawyers 129:13
laying 134:4
learn 112:6, 12
learned 67:5; 99:7; 129:11; 131:8, 18
least 13:4; 92:13
leave 89:14; 118:13
leaving 118:9
left 11:22, 24; 12:3, 4, 21; 14:23; 15:2, 22, 25; 16:20; 17:8; 18:3, 8, 12, 19; 21:18; 22:10; 46:14; 47:13; 48:10, 25; 58:6, 7, 15; 75:15; 78:22; 79:6, 11, 22; 80:3; 81:3, 19; 82:22; 98:6; 118:6, 12
leg 84:21
Legal 19:4
legitimate 25:22; 31:2; 32:20; 34:24; 59:17; 69:2, 7; 76:25; 77:6; 88:20; 114:7; 129:18; 134:5, 6; 140:5
lending 81:12; 82:24
less 12:19; 72:13; 104:8, 11
letter 128:3, 7
Levine 57:9, 11
Liberty 94:16, 17
lie 102:8, 10
lied 99:12; 101:22
life 128:22; 129:5
lifestyle 17:15; 83:20
liked 50:16
likely 119:8; 121:19; 137:21
limping 84:25
line 141:16; 143:12
list 141:15
listen 86:8
little 40:14; 43:22; 101:15; 105:20; 116:12, 15, 18
live 17:14; 110:5; 128:21
liver 118:25; 128:8, 25; 129:4, 8
living 82:10
loan 125:5, 10, 25; 126:11, 21; 127:3, 9, 17; 129:20
Loaned 65:3, 5; 83:3; 104:2; 113:15; 127:23
loaning 42:9
loans 82:6; 124:22; 136:20; 137:12
locate 79:23
located 5:18; 80:24
locations 76:19
long 11:20; 51:10; 80:17; 115:18, 23; 117:8; 128:21;

129:7; 131:6, 9
longer 23:11; 91:6; 100:3; 131:20; 132:3; 134:22
longest 44:8; 108:6
look 19:19; 30:20; 39:14; 85:16; 99:22; 140:5
looking 35:9
looks 69:13
loss 136:23
lost 105:6
lot 23:4; 70:19; 110:3
Lou 57:9, 11
lousy 33:18
loved 118:14
loyalty's 133:23
lunch 57:16, 17, 23, 25
lying 49:7; 81:25; 82:2; 83:6

**M**

Machine 35:18, 18; 61:18; 84:9
mad 9:9; 22:5
mades 35:18, 19; 84:9
main 26:7; 139:15, 17
maintain 81:19; 122:7
makes 73:6; 112:4
man 11:12; 58:20; 112:4
manager 26:10, 19, 20; 27:21
managers 76:8
Mansfield 60:2, 4, 8, 11, 15
manufacturer 32:8; 36:17
many 12:24; 16:19; 123:21
Marasca 63:5
March 5:4; 143:11, 12; 144:11
mark 50:3; 72:10
marked 144:19
marking 49:19
marks 87:23; 88:3; 144:14
Massachusetts 5:11; 80:25; 98:4; 110:7, 8
master 69:12
material 47:4, 8
matter 5:6; 6:18; 32:15; 54:14; 145:5
matters 19:11, 12; 52:9; 57:20
May 5:20; 133:23
maybe 24:6; 51:12, 17, 18; 53:20; 63:4; 73:21; 113:13; 136:18
mean 10:22; 12:18; 18:6; 19:15, 18; 22:14; 23:4; 26:25; 27:10, 12, 20; 31:17; 32:11; 34:21;

35:20; 37:21; 40:4; 41:20; 42:12; 57:8; 62:8; 68:3; 72:11; 75:2; 76:14; 81:23; 84:8; 89:8, 9, 13; 91:2; 95:4; 103:11; 104:22; 109:12; 112:4; 134:7
Meaning 115:10; 122:24
means 17:6; 40:7, 8
meant 112:24
meantime 41:20
medications 120:17, 18
medicines 120:24
meetings 22:15
member 15:10, 18; 85:25; 114:15
memory 14:8; 45:16; 121:10; 136:5; 137:18, 20, 20
mentioned 9:18, 21; 10:3; 25:18; 26:12; 38:21; 55:12, 16; 57:7; 58:8; 72:16; 135:7
merchandise 61:13; 71:12; 75:7; 96:3; 117:19, 20, 23
merely 143:8
messes 118:25
met 38:14
method 13:7
Meyers 137:24; 138:12; 139:20
Michael 6:15; 44:11; 51:7, 14; 53:5, 9, 15, 19, 24; 54:6, 13, 15, 18; 107:3; 108:4, 13, 16; 111:20
might 31:13; 83:20; 133:7
Mike 8:24; 15:19; 21:14; 38:8; 43:22; 44:4, 9, 14; 52:2, 12, 23; 85:22; 90:13, 16, 18; 96:12, 13; 105:19
mileage 76:24
military 114:16
million 23:19
Mills 77:12; 114:5
mine 56:15
mini 113:20
minuses 116:22
minute 54:21; 140:17
Mitchell 6:4; 38:13; 39:6, 24; 40:2, 10, 15, 22, 25; 41:5, 10; 42:4; 43:2; 62:23; 63:20, 24, 25; 64:13, 21; 65:6, 9, 14, 18, 24; 66:5, 9, 25; 67:17; 85:22; 90:9; 91:20; 92:4; 98:16; 99:24; 100:2; 101:11, 22; 102:11; 103:8, 14; 104:5; 112:16, 25; 113:3, 15; 123:8, 12; 124:19, 23; 125:2, 11, 20, 25; 126:12, 16, 19; 127:2, 17, 22, 22; 129:16, 24; 130:6, 6, 12, 16, 22, 23; 131:3, 7, 9, 10, 18, 18, 25; 132:2; 134:2, 3, 9, 18, 22, 25; 135:3, 11, 17; 136:7, 9, 19, 22; 137:3, 11

Mitchell's 67:13
mix 40:8; 69:18, 25
mixed 70:14
moment 63:9; 89:10; 99:5; 102:18; 104:6
money 8:20, 22; 9:11; 10:5, 10, 13; 11:13; 13:6, 7, 19, 22, 25; 14:19; 15:2, 5; 16:22; 17:10, 16, 22; 18:3, 7; 21:17, 18, 25; 23:17; 24:7; 41:19, 22, 24; 42:5, 8, 22, 25; 43:5; 44:18; 45:6; 46:14; 50:8, 11, 15, 16; 53:2, 16; 57:20; 64:14, 17; 65:3, 10, 14, 23; 66:3, 4; 73:24; 74:9, 12, 21; 77:14; 82:2, 5, 14, 14, 18; 83:8; 84:5; 92:20; 97:12, 13, 18; 99:17, 20, 23, 24; 101:11, 12; 102:11; 103:11, 19; 104:2, 10; 106:6, 12; 107:11; 108:3; 111:6, 7; 112:10, 17, 21; 113:3, 15; 124:4; 126:4, 6, 8, 11; 127:10, 23, 25; 129:17; 130:2; 131:12, 19; 132:2; 134:2; 136:6, 16, 20
moneys 134:4
monies 14:22; 43:10, 15; 65:5, 20; 66:9, 21; 93:6; 103:2; 105:3, 11, 15, 19; 106:17, 20; 107:2, 6; 123:9; 130:10, 19, 24; 134:19
month 79:15; 84:2, 3; 107:16, 19
months 12:3; 51:12, 12, 14; 80:20, 22, 23; 128:4, 24
more 13:2; 14:2, 4; 36:13; 44:21, 23; 46:14; 72:12; 107:18, 24; 113:8, 12; 129:9; 142:6
morning 5:22
most 37:8; 96:20; 119:8; 121:19; 137:21
mostly 20:15
mother 17:16
Mount 49:9
Moxume 72:11
Mt 144:18
much 13:10, 24; 14:9; 16:12, 22; 23:16; 24:7, 15; 44:18; 53:17, 21; 64:14, 17; 102:14; 103:15; 106:6; 107:6, 8, 11; 109:5; 112:23; 113:3; 119:24
muffed 73:12
multiple 44:25; 45:3
myself 8:23; 13:13; 23:2; 39:13; 104:2; 118:23; 129:2

**N**

N-A-C-O 94:2

N-A-T-C-O 94:3
naive 41:20
name 5:14, 23; 6:3, 9; 9:19; 26:12, 13; 38:21; 39:2, 7; 46:4; 61:22; 63:5, 11; 67:2, 5, 10, 72:10; 77:15; 123:19; 137:24
named 15:18; 60:2, 24; 85:20
namely 127:18
names 72:3; 94:10
nasty 23:3, 4
NATCO 93:21, 22, 24
nature 76:20, 25; 88:11; 120:3; 121:7; 138:15
Navigator 77:13
necessary 142:5
need 17:2; 38:18; 123:3; 142:19
needed 67:21; 78:8; 123:5, 16; 126:4, 6, 8; 138:22
needs 26:4; 139:3
neither 87:3
nevertheless 23:13
New 5:13, 13, 19, 19; 7:25; 17:15; 38:18, 19; 48:6, 14, 21; 49:9, 10; 79:23; 81:4, 12, 21; 82:10, 24; 83:2; 98:2; 110:6; 114:14, 18; 115:5; 127:7; 129:21; 142:22
next 33:12
Nick 61:19, 21, 24; 62:5; 95:21
Nick's 61:21
nobody 33:21, 22; 37:19
nods 33:8; 64:16; 87:17
Nolan 72:9
none 72:16; 120:16
nonetheless 4:8
nonexistent 30:5; 70:2
nonexisting 20:17; 60:18, 19
nonskid 45:19; 46:15, 25, 25; 47:4, 8; 50:20; 84:8
noon 144:12
Nope 22:4; 27:6; 94:12; 120:16
nor 87:4
normal 120:7; 142:11; 143:2
North 67:11, 13, 18, 24; 68:5
Notary 7:24; 143:3, 7, 23
notation 73:12
notations 34:9
notice 140:12
November 12:3; 51:15
number 12:18; 13:3; 14:10; 32:10; 33:22; 42:24; 88:4; 101:6; 123:13, 15, 17, 18; 144:15
number's 103:21

numbers 14:6; 19:25; 20:5

O

o'clock 144:16
oath 14:11
objections 4:5, 9
observed 23:18
obtain 82:2; 97:9; 115:2
obviously 107:24; 123:14, 16; 142:21
occasion 8:22; 23:25; 24:8; 39:24; 81:11; 96:10
occasionally 73:10
occasioned 125:24
occasions 110:4; 121:23
occurred 52:19; 84:16; 91:7; 98:5; 111:12, 16
occurs 141:16, 18
off 6:25; 8:13; 9:5, 7, 11; 10:13; 28:15; 33:13; 38:20; 39:10; 41:19; 42:6, 7; 54:20, 23; 68:13; 69:10, 15; 70:10, 20; 71:18; 79:16, 19; 86:20; 87:24; 118:23; 126:11; 127:24; 139:4, 7; 140:17, 19; 144:15
offer 4:12
offered 8:19
office 101:8; 139:15, 17
offices 5:18
often 83:24; 107:18
okayed 122:25
old 55:9; 101:7
once 45:12; 79:11, 13; 83:25; 84:2, 3; 104:20, 22; 107:15, 19; 122:23; 128:13
one 8:25; 10:22; 12:19; 14:13; 16:4, 7; 21:7; 22:24; 23:24; 24:11, 11; 26:4, 5; 36:7; 37:6; 38:2; 39:18; 40:23; 41:6; 48:18; 51:2; 52:9, 19, 20; 54:6; 55:16, 24; 60:15; 61:4; 72:17; 83:3; 84:12; 86:19; 87:13, 24; 94:17; 102:19; 105:13; 109:20; 111:17; 113:24; 118:8; 129:9; 135:6; 144:9
ones 30:11; 35:11, 11, 14; 45:18; 69:18, 19; 89:8; 108:25; 109:5; 122:5; 124:17
ongoing 59:11
only 10:17; 12:8, 8, 19; 29:9; 43:22; 46:3; 66:2; 75:14; 108:12; 139:21
onto 73:6; 140:7
opposed 31:2; 68:6; 73:13; 126:12; 142:22
oral 43:9; 76:17
order 32:4; 45:6; 46:19; 138:22; 139:2, 16; 140:4

orders 46:13, 17, 21; 48:2; 82:20, 22; 122:2
oriental 94:3
otherwise 130:24
ours 31:19
out 10:5, 16; 13:25; 17:15; 28:13, 16; 30:2, 3, 6, 18; 31:9; 32:3, 18; 33:20; 36:24; 37:8; 39:4, 9; 40:5; 41:3; 47:23; 48:17, 22; 50:9, 11; 54:5; 67:10, 16, 23; 68:3; 70:23; 71:15, 17, 23; 72:7; 73:6, 20; 75:6; 76:15; 83:25; 87:21; 91:24; 93:5; 95:23; 98:15, 18; 106:9; 108:9, 11; 114:19; 116:10, 13, 22; 117:6; 128:14; 133:19; 134:4; 135:22; 136:10, 16; 141:20; 143:6; 145:6
outlet 117:25
outlets 30:21; 32:4, 18; 37:9
outlined 37:18
outlines 56:10
over 11:11; 14:13, 21; 18:16; 23:19; 48:6; 53:18; 58:14; 77:11; 88:8; 97:20, 23; 101:16, 18, 25; 102:4; 103:9; 109:22; 110:10; 122:2; 123:24; 128:13; 142:24
overlapped 108:17
overlapping 75:25
owed 110:24; 130:10
own 77:9; 92:23, 24; 93:3; 96:18; 106:8; 112:4; 116:11; 129:5
owner 10:2
oxycontins 80:13; 118:16; 119:6

P

p.m 5:4; 88:2; 144:17
Padding 50:21, 24; 51:4, 8; 52:9, 20, 21, 24; 56:24; 59:6, 21, 22; 67:6, 8, 9
page 141:10, 11, 15; 145:6
paid 17:20; 30:23; 41:16, 17, 22; 42:2, 24; 43:4; 44:19; 53:6, 9; 64:15; 65:9; 66:10; 75:4, 10; 99:7, 8; 100:11; 101:13; 104:20; 109:9; 111:9; 122:25; 130:10, 13, 14, 19; 137:4, 8; 140:8, 10
pains 143:5, 9, 20
paper 27:2, 5, 8; 29:25; 49:20; 69:25; 70:2; 72:7; 141:22, 25
papers 28:2
paperwork 10:16, 21; 25:9; 27:15; 28:13; 32:16, 19; 33:14, 19; 36:16;

46:25; 47:7; 60:10, 16; 63:13, 21; 69:2, 13, 22; 70:13, 14, 15; 71:13, 14, 18, 25; 85:13; 109:8; 139:23, 25; 140:7
Pardon 132:14; 133:22
part 40:4; 71:22; 82:25; 83:17; 96:20; 115:4
partially 117:13
participant 56:13; 94:23; 95:24
participants 72:17
participate 11:4; 12:11; 59:3
participated 25:12; 58:25; 96:2; 101:2
participating 12:12; 25:6; 36:20; 82:21; 102:22
particular 45:17; 78:17; 123:9
Parties 4:3; 7:2; 13:6; 145:15
party 4:11
pass 49:8, 16
passed 66:3
passes 36:15
passing 38:6
patient 49:10
Paul 5:24; 6:10; 7:7; 15:16, 24; 21:4; 90:22, 25; 98:16, 18; 102:14, 16, 16, 17, 22; 103:2; 105:23; 106:5, 12
pause 44:17
pay 17:16, 23; 53:13, 18; 104:22; 111:3; 126:11; 136:19
payable 137:25
paying 13:21; 40:20, 21, 24; 41:18; 42:16; 44:9, 10; 53:12, 15; 77:12; 98:10, 19; 108:7; 123:6; 127:6; 131:9; 136:16
payment 45:2; 64:25; 74:15; 79:19; 105:8
payments 44:25; 65:17
penalties 143:5, 10, 20
penny 14:16
people 7:9; 10:21; 17:21, 23; 42:16; 54:7; 62:20; 69:11, 21; 72:12, 13, 15; 76:15; 133:24
people's 11:10
Per 107:13
percent 108:22; 109:2, 10; 110:16, 17, 20; 128:9; 140:7
percentage 42:6, 7; 43:10, 20, 24; 44:3; 64:22; 106:7; 108:20; 113:14
Percocets 118:17; 119:6
PERES 6:6, 6; 140:14
perhaps 24:7
period 14:21; 25:4; 53:18; 80:17, 18; 108:16,

18; 110:6; 111:2; 123:24; 131:17
periodically 66:16
perjury 143:6, 10, 21
permission 124:11
person 10:22; 28:5; 34:4; 39:21; 57:10, 16; 137:22, 23
person's 31:24, 24
personal 77:9; 82:6; 92:23
personally 23:18
persons 25:4; 39:18; 49:17; 91:20
persuade 135:12
persuaded 112:5
Peter 77:16, 18; 78:3, 10, 15, 21, 24; 79:2; 93:25
phone 17:24; 19:5, 9; 20:5; 79:13; 90:7; 97:20, 24; 100:12; 101:6; 104:7; 105:7; 112:16; 126:17
phony 20:8
physical 18:15
physically 18:12
pick 90:7
picked 105:7
piece 49:20; 69:15
pieces 69:24; 70:2; 72:7
pills 17:14; 118:22, 24; 121:6
piss 79:18
pissed 9:5, 7; 39:10; 41:19; 79:16; 86:20; 127:24
place 23:22; 145:5
placed 13:8; 24:8; 122:3, 5
placing 20:5; 26:2
plaintiff 6:2
plan 10:10; 21:20; 49:10; 144:18
platform 33:13
play 37:14; 83:22; 93:16
player 40:6
please 7:14; 55:6, 10; 83:16
plenty 129:10; 135:9
plus 11:9; 128:25
pluses 116:22
pocket 13:8
point 8:8, 11; 10:25; 17:10; 22:19; 36:5; 46:24; 47:15, 25; 48:10; 81:18; 82:18; 99:14; 100:8; 112:12; 115:15, 22; 116:22; 122:25; 123:4; 133:6; 134:3
Police 48:18, 19, 20; 51:20, 23; 52:11, 14; 85:19; 86:6, 17, 19, 25; 87:4, 7, 11; 88:7; 90:5, 9, 14; 91:11, 21, 25; 92:4, 8, 14, 16; 125:15; 126:17

pool 84:18
poor 17:22
portion 11:4; 29:6
position 58:14
positions 116:2
possession 121:21
potential 4:8
precise 47:25
prepaid 55:17
prepare 70:25; 71:5; 142:15
prescriptive 120:18
presence 92:14; 143:3
present 57:23; 72:6
presented 62:9
preserved 4:9
president 9:3; 76:8; 115:21
pretend 59:12
pretty 12:21; 102:14
prevail 137:16
prevent 55:13
previous 85:13; 88:24; 96:12
privilege 4:7
probably 12:14; 19:7; 39:8; 45:8; 53:23; 74:22; 84:3, 7; 93:8; 97:7; 111:13; 112:2; 113:10; 131:14; 132:19; 137:17, 19
problem 111:14; 112:7, 13; 118:21; 139:21
problems 45:14
procedure 141:7; 142:11
proceeding 6:19
produced 64:25; 121:25
product 59:11, 13; 62:4, 6, 10, 11, 15, 16
proficient 117:9, 11
profit 28:6
prognosis 128:16
projects 17:21
provided 142:20
Prozac 121:6
Public 7:24
punch 33:19, 20
purchase 25:22; 46:19; 116:16, 19; 138:22
purchases 67:18
purportedly 65:5
purpose 17:9; 40:17; 42:19; 127:17
purposes 17:13, 18; 18:2; 59:7; 119:21; 120:11
put 7:18; 33:13; 41:24; 42:4; 46:13, 17, 21; 64:14; 69:10; 73:4; 76:18; 88:16; 97:11; 113:20; 122:21; 129:2
putting 19:22; 112:21

## Q

quantities 20:14, 17; 73:8
quantity 20:2, 12; 73:14

## R

R-E-M-N-A-N-T 35:15
races 84:13
racetrack 24:2
raises 118:4
Randolph 24:3, 3
raped 7:8
Raynham 24:5, 6
read 142:3; 145:15
real 31:2; 69:19; 72:21, 22; 95:14, 20; 104:6; 108:25; 109:5
really 14:23; 31:10; 36:13; 37:9; 73:13; 97:15; 111:22
reason 46:3
reasons 37:6; 118:8
rec 19:15, 23; 25:19; 69:16; 70:6, 24, 25; 71:5, 15; 72:8, 20, 25; 73:6, 20; 107:8, 13; 138:19
recall 8:21; 9:6; 24:7; 41:13; 47:20; 48:24; 51:10; 52:23; 53:21; 57:25; 58:4; 63:24; 126:25; 139:6
receipt 24:12; 63:20
receipts 73:2
receive 14:22, 25; 16:19; 35:3; 43:11; 60:7, 10; 64:22; 74:21; 101:10; 103:2, 4, 7; 104:7; 105:21; 135:13; 142:15
received 15:23; 33:16; 34:13; 35:3; 43:10, 16; 65:13; 71:19; 74:15, 20; 76:23; 105:11; 106:18, 21; 107:2; 108:3; 135:16, 18; 136:6, 10, 13
receiver 58:11
receives 34:4, 8, 15
receiving 25:20; 27:18; 30:21; 32:17; 73:24; 79:19
receivings 126:14
recess 54:24; 87:25; 140:20
recollection 63:7
reconfront 98:20
record 5:3; 8:13; 12:22; 17:5; 54:21, 23; 55:2; 87:24; 88:4; 140:19, 22; 144:15
records 124:3
recs 71:4; 72:11, 11, 12, 13; 73:11
reduced 145:10

reference 52:4
referral 49:10; 144:19
refresh 63:7
regard 47:8, 16; 50:7; 59:20; 72:15; 76:8, 22; 92:12; 101:3; 104:25; 109:7; 118:20
reimbursement 76:13, 19; 77:10
reimbursements 76:9
reimbursing 76:24
relate 121:17
relating 57:21; 139:25
relationship 133:6
relevance 4:6
reluctance 22:20
rely 88:17
relying 71:22; 85:12
REM 124:22
Remco 61:8, 10, 12; 62:6, 9, 14; 63:12; 64:14; 65:8, 17, 23; 66:5, 10, 20; 124:23
Remco's 67:10
remember 16:19; 22:25; 24:15; 45:9; 64:11; 66:23; 121:24; 132:25
remnant 35:14; 40:9
remnants 84:7
rent 17:24
repay 130:2; 136:24; 137:16
repayment 136:23; 137:12
rephrase 40:14
reported 48:9, 13; 91:5
reporter 5:16; 7:14, 16, 20; 17:5; 145:10
Reporting 5:17; 12:18
reports 70:21
represent 5:17, 25; 6:4, 10; 84:5; 96:25
representation 100:13
representative 77:3
represented 13:11; 16:23; 20:8; 65:23
representing 6:7, 13, 15; 65:17; 69:25
represents 92:21
reputation 11:9, 10
requested 145:9
required 70:10
resell 41:25
response 64:10; 133:18
restaurant 58:3; 120:8
restored 128:17
result 29:8; 46:10; 56:20
resumed 144:11
reuse 32:10
review 140:24; 141:2, 6; 142:9, 15, 25
reviewed 142:3
Richard 6:12

RICHARDS 6:9, 10
Rick 94:13, 15, 22
rid 118:9, 12; 122:15, 17
right 7:5; 22:6; 28:10, 16; 42:25; 47:12; 48:11; 49:23; 50:3; 52:19; 64:8; 68:22; 89:24; 104:10, 11; 119:23; 136:3; 137:25; 140:15, 24, 25; 141:2; 142:9; 143:24
rights 141:3
rip 122:19
robbing 96:14, 15, 17; 97:11
role 37:13; 53:24; 54:13; 76:16
Rolodex 101:7
Ron 6:4, 25; 7:5; 38:13, 14; 39:6, 14, 24; 40:20; 41:19; 62:23; 63:20, 24, 24; 64:2, 4, 9; 66:15, 25; 85:22; 90:8; 91:20; 98:16; 99:21, 24; 100:2, 10, 11, 16, 22; 101:2, 2, 9, 10, 22; 103:7, 14; 123:8; 124:23; 125:11; 129:15; 134:2; 136:19
Ronald 112:16
room 141:5
Rooney 12:21; 58:6, 8, 10, 12, 16, 18
roughly 11:19; 53:21; 74:19; 81:6; 111:15; 135:22
rug 32:8; 36:17, 25; 47:5; 60:2, 4, 8, 11, 15; 77:12; 114:5, 23
rugs 10:13, 14, 17; 12:18, 24; 19:25; 20:17; 25:22; 29:9, 13, 14, 17, 17, 20; 30:3, 5, 10, 15, 21, 22; 31:6, 8, 9, 18; 32:13, 14, 15, 17; 33:2, 4, 10, 22; 34:3, 12; 35:21; 36:8; 37:8; 41:25; 46:25; 60:19; 61:13, 18; 73:13, 15; 77:4; 85:16; 100:19; 115:13; 116:7, 11, 16, 19, 23; 117:9
run 87:21

## S

S-P-I-G-N-O-S-I 94:11
salable 117:25
salesman 54:16; 67:15; 94:16
same 11:24; 69:3; 70:4; 72:23; 76:2; 102:15; 118:25; 145:10
Santos 5:14
sat 124:16
satisfactory 143:21
saw 102:20
saying 33:17, 21; 41:17; 46:2; 102:8, 12; 104:6;

132:16
scheme 10:10; 11:4, 16; 12:6; 13:25; 15:12; 22:11, 21; 23:11, 13; 24:20; 25:5, 13; 36:21; 37:14, 17; 42:21; 45:13; 47:24; 54:7; 56:3, 10, 13, 25; 61:4; 72:17; 73:23; 74:3; 78:17; 82:25; 92:25; 94:6, 23; 95:24; 111:21, 25; 112:10; 121:17
school 107:24; 114:11, 12, 14, 19; 115:4, 6
screwing 101:16, 18, 25; 102:4; 103:9
scumbag 27:19; 28:5; 34:18; 55:24
season 107:25
second 12:8, 8; 55:19; 80:2, 4, 21; 84:4; 87:12
Secondly 9:21; 33:25; 88:15
secure 124:11
secured 126:11
seek 143:7
seeking 137:12
seeks 4:12
seem 133:23
seemed 86:21
selected 109:14
sell 59:13
sellable 117:24
send 30:18; 34:18, 19; 37:4; 61:12; 69:16; 70:20; 99:24; 100:6; 101:12; 102:11; 103:15, 19; 104:8; 106:6; 113:3; 133:3; 134:2, 18; 135:12; 142:16, 20
sending 106:12; 109:15; 112:17; 130:17, 24, 25; 131:12, 19; 132:2, 3; 142:13
sends 34:20
sent 30:6; 32:18; 36:23; 51:4; 62:15, 16; 71:12; 96:3; 100:3; 106:9; 110:15; 123:8; 129:17; 141:8
separate 36:16; 52:17
September 11:22, 23, 25; 12:4, 5; 51:18; 81:9
set 37:15, 19, 22; 41:23; 53:25; 54:3, 7; 145:5
sets 26:22
Several 97:22
share 43:5; 66:8; 92:21; 105:11, 15, 18; 106:17, 20, 25; 132:21
Sharon 6:14
sheet 141:22, 25; 142:16, 17; 143:8; 144:7
ship 28:16, 17; 29:25; 30:7, 13; 31:8; 42:17
shipment 35:9; 4, 7, 22; 23; 12:16; 27:22; 31:2, 2,

3; 32:13, 20; 34:21, 25;
35:7, 24; 36:2, 6, 23;
45:17, 20, 21; 50:7, 14, 19;
59:17; 68:23; 69:2, 4, 7;
70:13, 14; 71:9, 6, 23;
72:21, 21; 73:3; 74:14, 20;
85:5; 92:25; 94:20; 95:19,
20; 100:14; 103:23;
108:23; 110:15; 135:23;
140:5, 6

**shipments** 12:24; 20:9;
29:3; 32:3; 35:3; 45:14;
57:18, 21; 59:21; 60:7, 16,
17, 18, 19, 21; 61:12; 62:4;
66:21; 68:16, 18; 69:25;
70:4, 7, 10; 71:2; 73:16;
77:4; 83:25; 84:6, 9; 92:22;
96:25; 97:14, 19; 100:19;
101:10; 109:16; 122:23;
138:3; 140:2

**shipped** 33:4; 60:11;
62:6, 10, 11; 67:10; 70:23;
74:14; 122:6

**shipper** 32:8; 59:17;
73:8; 75:7

**shipping** 28:2; 30:3;
140:6

**shit** 7:11; 13:23; 18:24;
19:2, 2, 4; 22:17; 38:25;
40:4; 69:23; 110:25

**shopping** 70:20; 71:12

**short** 8:25; 9:3, 7, 22, 23;
83:24; 129:11

**shortchanged** 16:15

**shortening** 129:5

**shortly** 51:19

**show** 33:15; 62:9;
102:19, 20

showed 65:21; 116:12,
14, 18

**showing** 124:4, 12

**shown** 49:8

shows 49:13

**side** 45:7

**sign** 34:17, 25; 35:6;
68:13; 69:16; 70:10;
71:18; 73:9; 130:18;
138:18; 139:4, 7, 17, 22,
23; 140:24; 141:2, 6, 25;
142:9, 25; 143:8; 145:15

**signature** 142:18; 143:12

**signed** 143:3, 5, 9

**signing** 143:19, 23; 144:8

**signs** 73:9

**similar** 94:6; 108:17

**simply** 116:10, 21

**Sinai** 49:9; 95:10, 19;
144:18

**single** 45:2

**sit** 116:21

**sitting** 89:24

**situations** 73:15

**six** 53:23; 73:13, 15;
128:24

**size** 16:11, 16; 120:7

**skip** 90:23

---

slide 47:6

**slips** 138:24

**smarter** 89:12

**sober** 119:21, 23

**socialize** 84:10

**sold** 59:11

**solely** 110:6

**somebody** 27:18; 125:8

**somebody's** 27:21

**someone** 61:25; 126:12

**Sometimes** 20:15; 28:19,
19, 20; 35:24; 75:22;
79:15; 107:20, 22, 22;
136:14, 14; 139:11; 140:6

**somewhere** 30:6

**soon** 73:22; 74:19;
135:10

**sorry** 60:18, 25; 134:25

**span** 128:22

**specialist** 5:15

**specific** 15:24; 123:13

**specifically** 92:7

**spell** 26:15

**Spignosi** 94:10

**spill** 133:7

**split** 13:7

**spoke** 19:10; 51:19, 22;
88:7; 90:13; 91:19; 92:3;
98:17; 101:9, 11; 131:6

**spoken** 102:17; 135:3

**stack** 69:22

**standing** 34:2

**start** 6:25; 12:12; 25:23;
45:22; 112:17

**started** 11:16; 12:14, 15,
17; 73:23; 108:9; 130:17

**State** 7:25; 48:18, 19, 20;
51:20, 23; 52:11, 14;
60:14, 15; 80:9; 85:19;
86:6, 17, 19, 24; 87:4, 7,
11, 13; 88:7; 90:5, 9, 14;
91:11, 21, 25; 92:4, 8, 14,
15, 16; 118:19; 125:14;
126:17; 128:11

**stated** 11:15; 63:9

**statement** 64:10; 66:4;
71:22; 81:16

**statements** 124:12

**States** 5:9

**stay** 118:7

**steal** 22:12; 62:21

**stealing** 12:17; 13:5;
39:11, 17, 19; 82:18

**step** 33:12

**steps** 37:24; 38:7; 54:3;
66:12; 68:24; 69:5; 99:19

**Steve** 26:8, 13, 18; 28:8

**stiff** 110:23

**stiffed** 105:4; 108:7, 17,
18; 110:2, 21; 125:22;
135:4; 137:5

**stiffing** 106:14; 108:12,
12; 126:3, 20; 127:5;
131:8; 133:10

---

still 26:8; 61:19; 66:17;
70:9; 75:16; 82:2, 10, 18;
83:8; 99:17; 118:22;
119:2; 121:20; 124:3, 7

**STIPULATED** 4:2

**stipulation** 6:20

**stipulations** 6:17

**stock** 31:4; 36:7; 37:12;
46:16, 23; 78:8

**Stole** 8:20, 22; 13:12;
82:14, 14

**stolen** 82:8

**stop** 87:19; 100:10, 13,
17; 101:14, 19; 112:19, 20

**stoppage** 112:24

**stopped** 100:7

**stops** 100:6

**store** 70:21; 78:7; 109:24

**story** 81:19

**strange** 134:11

**Street** 5:13, 19

**strike** 12:16; 73:22; 75:24

**stuff** 26:6; 138:23

**subject** 19:11, 11; 52:9

**substance** 10:5; 16:6;
22:24; 96:7

**succeed** 37:14; 42:21

**suddenly** 134:5

**suffered** 136:23

**sufficiently** 134:18

**suggest** 36:10; 85:13

**suggesting** 62:14; 96:3

**suggests** 30:5

**sum** 107:9; 136:6

**sums** 124:4

**Sun** 6:11; 15:18, 20, 24,
24; 20:21, 24; 21:4; 46:6;
96:9, 10, 11, 18, 21, 23;
98:15, 16, 18; 102:14, 17,
22; 103:2; 105:23; 106:5,
12

**Suns** 8:24; 95:25; 99:21

**supervise** 117:4

**supervisor** 34:6, 15;
36:15; 55:24; 69:13; 70:9,
16; 71:7; 73:8; 116:3

**supervisors** 70:20; 72:4

**supplier** 9:23; 36:18

**support** 18:7

**supposed** 10:12; 43:5;
44:9, 10; 53:13, 13; 69:9;
105:2, 3; 108:6; 130:14

**Supposedly** 61:11

**sure** 12:21; 14:14; 24:3;
37:7; 44:24; 51:5; 63:4;
75:17; 77:25; 111:5;
118:2; 121:11; 127:15;
131:14; 136:18

**suspended** 144:10, 17

**suspicions** 134:17;
138:6, 9

**swear** 7:14, 17; 23:5;
132:18

**system** 119:17

---

**T**

**tag** 31:23; 32:5

**tagging** 115:13

**talk** 19:17; 90:4; 91:18;
133:18

**talked** 38:8; 46:22; 63:2,
10; 90:8; 102:16; 112:9

**talking** 9:12; 19:2; 20:22;
32:10; 52:10; 87:18;
96:11; 113:6, 8, 11; 120:7;
127:11

**tape** 87:20, 23; 88:3;
132:8; 144:14

**teach** 116:6

**techniques** 117:5

**telephone** 21:8

**telling** 31:25; 53:12; 62:5,
22; 86:22; 127:4

**tells** 37:19

**ten** 12:3; 80:20, 21, 23;
140:8

**tens** 73:14

**termination** 91:7

**terms** 114:9

**terrible** 132:9

**test** 132:14

**testified** 8:2

**testimony** 32:2; 38:22;
39:18; 72:16

**theft** 13:10; 55:13

**therefore** 62:8; 86:16;
100:9

**though** 18:12; 19:25;
33:25; 34:25; 87:11; 97:19

**thought** 9:12; 16:15;
61:15; 79:20; 100:16;
129:16; 134:4, 10

**thousand** 14:2, 14, 18;
84:8; 113:12

**thousands** 113:6

**threaten** 133:18, 20

**Threatening** 23:6, 7

**threats** 23:10, 14

**three** 7:10; 29:23; 56:17;
91:19; 109:11

**throughout** 119:20

**throw** 122:19

**thrown** 116:13

**tiles** 47:9

**timely** 139:3

**times** 22:22, 23; 28:25;
29:12, 16; 97:22; 110:3;
139:12

**title** 145:6

**Tito** 72:11

**today** 32:2; 55:14; 63:21;
78:18; 94:24; 118:20;
119:10, 14, 17, 17, 25;
121:18; 128:12; 144:5, 10

**together** 79:3, 4

---

**told** 7:7; 22:4; 23:17;
24:18; 37:16; 38:11, 16,
18; 40:19; 41:21; 44:14;
52:6; 62:17; 65:13; 72:2;
79:9; 81:10; 82:9; 86:9, 20,
22, 23; 87:6, 15; 90:11, 18,
22, 25; 100:5; 101:16, 24;
112:18; 125:8, 10; 130:12,
23; 131:11, 18, 25; 134:2;
137:4

**tombstone** 17:17

**Tony** 38:15, 21, 23; 39:6;
63:3

**Tony's** 63:5

**took** 14:17; 37:24; 38:7;
48:6; 58:14; 76:15; 77:11;
96:17

**total** 64:22; 104:15; 109:3

**trace** 26:10

**traced** 37:9

**track** 23:22; 32:3; 73:2;
123:5

**tracks** 10:20; 83:19, 21

**traffic** 26:10, 19, 20;
27:21

**trail** 27:2, 5, 8

**trailer** 30:10; 69:8, 10;
70:22

**trailers** 115:12

**transaction** 25:22; 65:9;
135:22

**transactions** 47:16;
114:7; 139:6

**transcript** 145:16

**transfer** 103:12; 104:16;
134:19; 135:13, 14; 136:7

**transferred** 103:12

**transfers** 123:21;
124:18; 130:17

**transplant** 128:24;
129:4, 8

**treat** 31:3

**treated** 110:10

**treatment** 80:15

**trial** 4:11

**trick** 103:11

**tried** 80:9; 90:6, 23;
135:11

**trip** 113:23

**trooper** 80:10

**troopers** 87:14

**trouble** 133:7

**truck** 28:15

**trucks** 33:13; 117:15

**true** 87:8; 88:20, 23, 25

**trusted** 106:16

**truth** 86:7, 9, 18; 87:16;
119:13

**try** 55:10; 66:7; 78:22;
79:4; 118:9, 12; 133:18;
137:15

**trying** 7:4; 64:7; 78:24,
25; 79:3; 80:6; 82:10;
90:22; 118:23

turn 69:13
twice 79:14
two 47:16; 48:2; 52:16;
55:22; 56:17; 69:14, 15;
86:20; 88:4; 111:18;
118:15; 120:2, 6; 144:15
type 10:4
typewritten 145:11
Tyrone 10:24; 12:11;
18:17, 19, 22; 19:13;
20:13; 24:24; 34:25; 35:5;
43:19, 25; 44:18; 45:2, 5,
12; 47:20, 21; 56:11, 12,
20; 85:22; 86:4, 24; 87:3,
7; 88:7, 9; 101:6; 105:16;
106:21; 107:7; 111:24

**U**

Um-hum 33:11; 55:15;
64:24; 89:4; 103:13;
105:24; 106:10; 141:12;
143:25
uncle 81:11; 82:23; 83:2
under 5:8; 14:11; 47:3, 4;
67:10; 121:24; 138:21;
143:5, 9, 20
unfair 60:14
unfairness 46:10
United 5:9
universal 31:14, 23
unknown 39:7
unless 144:5
unlikely 130:2
unloaded 34:3; 73:7;
117:15
unloading 69:11; 115:12;
116:2
unpleasant 135:7
unusual 134:11
up 7:3; 9:8; 13:7; 17:20;
26:22; 37:15, 19, 22;
39:14; 40:20; 41:23, 24;
42:4, 17, 22; 50:15, 16;
53:15, 25; 54:3, 7; 64:15;
65:10; 66:10, 15; 73:24;
74:9, 12; 82:25; 83:12;
90:2, 7; 99:13, 21; 105:7;
111:3; 113:16, 21; 122:19;
127:4, 6, 7; 134:3; 141:2;
142:8
up-front 112:21
upon 71:22; 85:12; 88:17;
99:10; 137:16; 143:22
upstairs 69:10, 11, 12
use 30:15; 31:23; 32:11;
55:17, 19
used 10:21; 11:9; 17:19;
22:14, 15; 23:5; 57:2;
59:12; 67:19; 70:20; 73:2;
77:19, 20; 78:7; 82:22;
93:6; 121:8; 139:22
using 17:22; 104:5;
135:21
usually 141:14

**V**

various 32:18; 37:8;
76:19; 110:4
Vegas 102:19, 20
vendor 31:22
vendors 38:18, 19;
55:20; 101:16, 19, 25;
102:5, 6; 103:9; 127:6
verbal 17:4
versus 5:7
victim 7:8
victimizing 7:9
victims 7:6
video 5:15
VIDEOGRAPHER 5:2;
7:13; 54:22, 25; 87:22;
88:2; 140:18, 21; 144:13
videotaped 4:12; 5:5
visit 114:4; 125:15
visual 85:9

**W**

W 5:7
wait 74:13
waiting 37:7
wants 28:5; 38:17; 144:5,
9
warehouse 18:10, 12,
16; 33:10, 14; 96:20;
100:7; 116:3
warehouseman 34:2, 7;
58:11
watching 34:3
water 44:16; 83:15;
113:19
way 21:25; 26:2; 28:6;
35:9; 36:25; 38:14; 40:23;
45:22; 55:19; 58:24; 61:4;
64:15; 68:24; 88:17;
94:23; 95:12; 98:14;
101:3; 110:9, 23; 125:18;
142:24; 143:16; 144:6
ways 55:13, 16, 22;
58:19; 66:7; 75:3
Weavers 58:22; 59:5, 18
week 48:22; 49:2, 15;
74:22; 79:13, 14; 83:25
welfare 17:20
wells 19:20, 20
Wendy 72:9
weren't 31:10; 35:18;
79:19; 102:24; 106:15;
130:13
West 5:13, 18
what's 9:8, 18; 33:12;
61:21; 99:22; 119:10;
141:10
whereby 135:11
wherein 65:21; 91:5
Whereupon 144:16
Whiskey 120:5, 6

whistle 133:11
who's 27:19; 34:2;
101:17
whole 17:11; 26:23, 24;
69:22; 120:19; 128:19
Wholesalers 95:10, 19
whose 39:6
Williams 10:24, 25; 11:3;
12:11; 18:19, 22; 19:13;
20:13; 24:24; 25:7, 16;
34:25; 35:5; 44:19; 45:2, 5,
12; 47:17, 20, 21; 56:12,
20; 85:22; 86:4, 12, 24;
87:3, 7; 88:7, 9; 91:20;
92:12, 20; 93:12; 105:16;
106:21; 107:7; 111:24
willing 124:10, 15
wind 53:15
wine 120:4
wire 103:12; 104:10, 16;
123:9, 21; 124:18; 130:17;
134:18; 135:13, 13; 136:7
wired 103:10; 123:16
wires 31:18
wiser 89:16
wish 6:16
within 7:24; 131:14;
138:13; 140:8
without 27:23; 62:12, 15;
99:17; 129:7
WITNESS 6:24; 7:15, 18,
22; 8:3; 33:8; 64:16; 87:17;
141:12, 23; 142:7; 143:14,
25
wood 45:19; 46:15; 47:9
Worcester 58:2
word 16:16; 36:21, 25
words 23:5; 30:12; 37:22;
83:17, 22
work 11:20; 29:25; 77:19,
20; 78:5; 79:3; 80:5; 82:5,
11; 93:12, 18; 115:10, 15,
18
worked 8:18; 37:12;
54:15, 17; 77:21, 22; 78:6;
93:25; 115:5
working 8:12; 78:22;
90:19; 93:13; 101:3;
113:22; 115:22
works 26:9
worried 83:18; 133:5, 25
worry 133:10
worth 117:14
write 31:13; 34:8; 73:19;
141:22
writing 125:6
writings 121:15, 21, 24
written 46:19; 76:7;
138:25
wrong 7:4; 12:2; 22:2;
69:15; 73:14; 75:18; 138:6
wrongs 64:8
wrote 128:3

**X**

X 12:18
X-amount 103:19

**Y**

year 11:24; 39:8; 53:20;
58:5, 6, 7
Year's 127:8; 129:21
years 90:3; 111:18;
115:24, 25
Yep 10:7; 29:7; 63:6, 8;
132:11
yesterday 7:7
York 5:13, 14, 19, 19;
7:25; 17:15; 48:21; 49:10,
10; 79:23; 81:4, 12; 82:10,
24; 83:2; 98:2; 110:6;
142:22
York's 81:21
Yup 99:18
YURKO 6:12, 12, 19;
27:9; 49:18; 50:5

**Z**

zero 72:18

150

1

2                    UNITED STATES DISTRICT COURT FOR THE

3                    EASTERN DISTRICT OF MASSACHUSETTS

4        - - - - - - - - - - - - - - - - - x
         INTERNATIONAL FLOOR CRAFTS, INC.,  :
5
                        Plaintiff,          :
6                                           :
                                            :
7                   -against-               :   CIVIL ACTION NO.
                                            :   05CA11654-NMG
8        DAVID W. ADAMS, et al.,            :
                                            :
9                       Defendants.         :
                                            :
10       - - - - - - - - - - - - - - - - - x

11

12                    CONTINUED VIDEOTAPED PROCEEDINGS in the

13       above-captioned matter, held at the offices of Fink &

14       Carney Reporting and Video Services, 39 West 37th

15       Street, 6th Floor, New York, New York 10018, on

16       Friday, March 10, 2006 commencing at 12:20 p.m.,

17       before Debra DiBenedetto, a Shorthand (Stenotype)

18       Reporter and Notary Public within and for the State of

19       New York.

20

21

22

23

24

25

151

A P P E A R A N C E S:

KRASNOO KLEHM LLP
            Attorneys for Plaintiff
            Terrace Level Suite One
            Andover, Massachusetts  01810-3730

BY:  JAMES B. KRASNOO, Esq., of Counsel
     PAUL J. KLEHM, Esq., of Counsel


LAW FIRM OF ISAAC H. PERES
            Attorneys for Defendant Adams
            50 Congress Street, Suite 225
            Boston, Massachusetts  02109

BY:  ISAAC H. PERES, Esq., of Counsel



YURKO, SALVESEN & REMZ, P.C.
            Attorneys for Defendant Dziemit
            One Washington Mall, 11th Floor
            Boston, Massachusetts  02108-2603

BY:  RICHARD J. YURKO, Esq., of Counsel



LAW OFFICES OF FREDERICK D. GRANT, JR.
            Attorneys for Defendant Mitchell
            727 Atlantic avenue, Second Floor
            Boston, Massachusetts  02111

BY:  ROBERT A. FALK, Esq., of Counsel

152

1

2     A P P E A R A N C E S(Cont'd):

3

4              TROUT CACHERIS, PLLC
                    Attorneys for Defendants David and
5                   Paul Sun
                    1350 Connecticut Avenue, Northwest,
6                   Suite 300
                    Washington, D.C.  20036
7
               BY:   JOHN THORPE RICHARDS, Esq., of  Counsel
8

9

10

11    ALSO PRESENT:  John Durant
                     William Gemme
12                   Ronald Mitchell
                     William Elovitz

13

14

15

16

17

18

19

20

21

22

23

24

25

153

1

2          THE VIDEOGRAPHER:  We're now

3      going on the record.  The time is

4      12:20 p.m. on March 10th, 2006.  This

5      is the videotape deposition of Kevin

6      Britto, in the matter of International

7      Floor Crafts, Inc. versus David W.

8      Adams, et al., under the jurisdiction

9      of the United States District Court

10     for the Eastern District of

11     Massachusetts.

12          This deposition is being held

13     at 39 West 37th Street, New York, New

14     York.  My name is Jose Santos and I am

15     the video specialist.  The court

16     reporter is Debra DiBenedetto and we

17     both represent Fink & Carney Reporting

18     with offices located at 39 West 37th

19     Street, New York, New York.

20          May I have an introduction

21     from counsel.

22          MR. KRASNOO:  My name is James

23     Krasnoo.  With me is my associate,

24     Paul Klehm.  We both represent the

25     plaintiff in this matter,

154

1

2      International Floor Craft, Inc.

3              MR. FALK:  My name is Robert

4      Falk.  I'm here with the witness, Ron

5      Mitchell, substituting for Frederic

6      Grant, Law Office of Frederic Grant.

7              MR. PERES:  Isaac Peres,

8      representing the defendant, David

9      Adams.

10             MR. YURKO:  Richard Yurko,

11     representing the defendant, Jane

12     Dziemit.

13             MR. RICHARDS:  John Richards,

14     representing CCC International and

15     Paul and David Sun.

16             THE VIDEOGRAPHER:  Will the

17     reporter please swear in the witness.

18  K E V I N   B R I T T O, called as a witness,

19         having been first duly affirmed by Debra

20         DiBenedetto, a Notary Public within and for

21         the State of New York, was examined and

22         testified as follows:

23             MR. KRASNOO:  Mr. Britto, you

24         indicated shortly before this second

25         day of your deposition was to begin

155

1
2      that you wished to make a statement,
3      thereafter leave the building for
4      about 20 minutes, is that correct?
5            THE WITNESS:  Correct.
6            MR. KRASNOO:  Why don't you
7      tell us what statement you wanted to
8      make, go ahead and make it.
9            THE WITNESS:  One, I want to
10     say, you indicated last time that
11     there was a problem because I had a
12     few drinks beforehand, and my
13     medication, as I showed you the
14     paperwork can make me confused.
15     Haven't had anything to drink, haven't
16     taking taken my medication, which I'm
17     sure is not a good thing but my system
18     is clean.  I haven't been coerced,
19     paid off, bribed or threatened by
20     anyone on IFCs behalf including the
21     attorneys.  I want to make that clear.
22     I'm doing this of my own free will.
23     Enough people have been victimized
24     over what I did.  I'm guilty, I can
25     admit it.  I stand up for what I did.

156

1
2  But it seems like there are more
3  people getting victimized now because
4  of me.  Jane, Ron and the last time
5  you brought up Peter Burnham, Debbie
6  Meyers, Sinai Wholesale and Rick
7  Finley.  They are all innocent. I
8  can't have any more people getting
9  victimized over what I did.  It's just
10  not right.  I'll stand up for what I
11  did, but it's not fair to them.
12        I've been victimized, as I
13  said the first time I got here on
14  Tuesday, March the 7th, 2006.  Today
15  is Friday, March the 10, 2006.  Bill's
16  birthday is ███████████.  His
17  father's birthday's ███████████████.
18  My birthday is ███████████.  My mother
19  and father were born, my mother was
20  born on ████████████████, my father was
21  born ██████████████.  My grandmother on
22  my mother's side was born █████████,
23  ████, right around the time that the
24  Titanic went down which was the
25  14th into the 15th which is the

157

1

2      15th we all know is tax day.  I'm

3      saying that just so everybody knows I

4      know what's going on.  I'm coherent.

5           I gotta right the wrongs.  If

6      I can't right them all, then I'm not

7      going to right anything.

8           The names I just previously

9      mentioned need to be released,

10     dismissed from this case or this

11     deposition is over today, right now.

12     Bill, Durant, and your counsel have 20

13     minutes to make a decision and I'll be

14     back.  It's not right.  There's enough

15     victims in this case already.

16          MR. YURKO:  Off the record.

17          THE VIDEOGRAPHER:  Time is now

18     12:25, off the record.

19          (Brief recess.)

20          THE VIDEOGRAPHER:  Time is now

21     12:52, on the record.

22          MR. KRASNOO:  Okay,

23     Mr. Britto, I've heard your statement,

24     as have some of the others.  Now you

25     can hear mine.  First, a person who is

158

1

2      noticed to have a deposition taken is

3      to appear at the deposition and to

4      answer questions put to him.

5            THE WITNESS:  I already have

6      done that.

7            MR. KRASNOO:  You have not

8      completed your deposition, sir, either

9      with questions of me or questions from

10     any of the other people in the room

11     who choose to avail themselves of

12     their right under the case law and

13     under the federal rules to ask you any

14     questions at all.

15           THE WITNESS:  First of all, I

16     volunteered for this.

17           MR. KRASNOO:  If you see your

18     job --

19           THE WITNESS:  Do you have

20     anything with my signature on it

21     saying --

22           MR. KRASNOO:  Are you going to

23     let me finish and give me the

24     politeness you told me --

25           THE WITNESS:  Yes, yes.

159

1

2          MR. KRASNOO:   That I was to

3      treat to you --

4          THE WITNESS:   Yes.

5          MR. KRASNOO:   With politeness?

6          As I say, you're a party to

7      the proceedings, you were a party

8      named in the complaint.   Parties can

9      be noticed by way of taking

10     deposition, they need sign nothing,

11     but they must appear at a deposition,

12     if the deposition is ordered.   The

13     deposition was ordered, you have

14     appeared at day one.   Your deposition

15     is not complete.   Under Rule 30 of the

16     Federal Rules of Civil Procedure, not

17     only are we entitled to ask questions

18     that we feel are necessary and germane

19     to our case even if you disagree with

20     their necessity, but the attorneys who

21     represent all other parties are to be

22     afforded the opportunity to ask

23     questions upon the completion of our

24     asking the initial round of questions.

25     After they ask their questions, we're

160

1

2          entitled to ask further questions

3          based on anything that they illuminate

4          or bring out, and they, thereafter,

5          are entitled to ask questions based on

6          what we ask.  At some point, of

7          course, the deposition is concluded.

8                  You have said last time and

9          this time that Ron and Jane are

10         innocent.  That may be true, but that

11         does not mean that you are entitled to

12         determine that solely because you know

13         what you know, because you can't

14         possibly know necessarily all that

15         other people know and may be able to

16         contribute to this, so your request is

17         at best, premature, perhaps a request

18         that cannot be honored, perhaps a

19         request that can be honored.  With

20         your testimony all of us may be able

21         to dig better and obtain the truth.

22         Without your testimony all of us will

23         nevertheless still attempt to dig

24         better to get the truth.

25

161

1

2          If your testimony abrogates

3     now, the following things have to

4     happen. We will go back to Judge

5     Gordon, who's the judge in these

6     proceedings and seek to have a court

7     order compelling you to complete your

8     deposition.  If your deposition is not

9     complete, it leaves up in the air

10    whether or not any of your testimony

11    can be used in this case at all.

12    There are people who may say that they

13    did not have the opportunity to

14    examine you and therefore, your

15    testimony cannot be used.  If your

16    testimony cannot be used, it's not

17    that your testimony can be split into

18    what is useful for one side or the

19    other, it means all of your testimony

20    cannot be used.  So any of your

21    statements that you feel aid one party

22    or the other, aren't going to be able

23    to be used.  On the other hand, the

24    court may allow, may allow -- and the

25    stress is may, because I don't know

162

1

2          the answer to this yet -- all of your

3          deposition to be used, none of your

4          deposition to be used.  I can't

5          picture him, but I can't tell you what

6          a judge necessarily will do.  I think

7          it would be highly unlikely that he

8          would allow some of your deposition to

9          be used but not others.  So that

10         that's where we're at.

11                If you choose not to answer

12         questions today, I have no choice but

13         to go back to Judge Gordon and ask

14         that your deposition be completed.

15                Do I have the authority to do

16         as you wish, to dismiss people where

17         the evidence is not all in, to find

18         any determination as to their guilt or

19         innocence as you put it -- and those

20         are the wrong terms, it's whether or

21         not they're civilly liable or

22         responsible or not -- the answer is

23         no.  So that's my response to your

24         statement.

25

163

1

2          THE WITNESS:  My response is

3  go back to Judge Gordon.

4          MR. KRASNOO:  Okay.

5          THE WITNESS:  I'm tired of

6  getting up in the morning, throwing up

7  bleeding ulcers over this shit.  I'll

8  take --

9          MR. KRASNOO:  Let me ask

10  you --

11          THE WITNESS:  What I did and

12  other people as well as Bill, victims,

13  it's not right.

14          MR. KRASNOO:  It's --

15          THE WITNESS:  Trying to make

16  things right.

17          MR. KRASNOO:  It's up to you,

18  not me; but as long as the other

19  people are here, since you're not

20  going to answer any of my questions,

21  the question is whether or not you're

22  going to answer any of theirs at the

23  present time?

24          THE WITNESS:  I'm not

25  answering anybody's questions.

164

1

2          MR. KRASNOO:  Okay.

3          THE WITNESS:  I guess this is

4     going to turn ugly.  I'm sorry, Bill,

5     I didn't want this to happen, but I'm

6     not getting any cooperation here.

7          MR. YURKO:  I suggest we go

8     off the record, I'm not -- there's no

9     deponent, there's no reason to have a

10    record.

11         MR. KRASNOO:  Okay.

12         THE VIDEOGRAPHER:  Time is now

13    12:58, off the record.

14         (Time noted: 12:58 o'clock

15    p.m.)

16

17

18

19

20

21

22

23

24

25

165

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK   )

4                        ) ss.

5    COUNTY OF NEW YORK )

6                    I, DEBRA DIBENEDETTO, a

7            Shorthand (Stenotype) Reporter and

8            Notary Public of the State of New

9            York, do hereby certify that the

10           foregoing Proceedings, taken at the

11           time and place aforesaid, is a true

12           and correct transcription of my

13           shorthand notes.

14                    I further certify that I am

15           neither counsel for nor related to any

16           party to said action, nor in any wise

17           interested in the result or outcome

18           thereof.

19                    IN WITNESS WHEREOF, I have

20           hereunto set my hand this 15th day of

21           March, 2006.

22

23                    _____

24                    DEBRA DIBENEDETTO

25

Case 1:05-cv-11654-NMG    Document 264-9    Filed 07/16/2008    Page 1 of 20

# In The Matter Of:

*INTERNATIONAL FLOOR CRAFTS   v.*
*DAVID ADAMS*

---

*KEVIN BRITTO*
*May 31, 2006*

---

*FINK & CARNEY REPORTING AND VIDEO SERVICES*
*39 WEST 37TH STREET*
*NEW YORK, NY  USA  10018*
*(212) 869-1500   or   (800) 692-3465*

*Original File DD0531Z.TXT, 176 Pages*
*Min-U-Script® File ID: 0142682450*

# Word Index included with this Min-U-Script®



[1]
[2]     UNITED STATES DISTRICT COURT FOR THE
[3]     EASTERN DISTRICT OF MASSACHUSETTS
[4]
        INTERNATIONAL FLOOR CRAFTS, INC., :
[5]
            Plaintiff,                          :
[6]
[7]     -against-                    : CIVIL ACTION NO.
                                     : 05CA11654-NMG
[8] DAVID W. ADAMS, et al.,          :
[9]     Defendants.                  :
[10]
[11]
[12]
[13]          VOLUME III
[14]     CONTINUED VIDEOTAPE DEPOSITION OF KEVIN
[15] BRITTO, held at the offices of Fink & Carney Reporting
[16] and Video Services, 39 West 37th Street, 6th Floor,
[17] New York, New York 10018, on Tuesday, May 31, 2006
[18] commencing at 10:37 a.m., before Debra DiBenedetto, a
[19] Shorthand (Stenotype) Reporter and Notary Public
[20] within and for the State of New York.
[21]
[22]
[23]
[24]
[25]

[1]
[2] APPEARANCES:
[3]     KRASNOO KLEHM LLP
            Attorneys for Plaintiff
[4]         Terrace Level Suite One
            Andover, Massachusetts 01810-3730
[5]
        BY: JAMES B. KRASNOO, Esq., of Counsel
[6]         PAUL J. KLEHM, Esq., of Counsel
[7]
        KARIM H. KAMAL
[8]     Counselor at Law
            Attorney for Plaintiff(NY)
[9]         630 Fifth Avenue, Suite 3183
            New York, New York 10111
[10]
[11] YURKO, SALVESEN & REMZ, P.C.
            Attorneys for Defendant Dziemit
[12]        One Washington Mall, 11th Floor
            Boston, Massachusetts 02108-2603
[13]
        BY: RICHARD J. YURKO, Esq., of Counsel
[14]
[15]
[16]
    ALSO PRESENT: John Durant
[17]            William Gemme
                Ronald Mitchell (p.m.)
[18]            William Elovitz
[19]            Kevin Brooks, Videographer
[20]
[21]
[22]
[23]
[24]
[25]

**Britto**

[2] THE VIDEOGRAPHER: We're now
[3] going on the record. The time is
[4] 10:37 a.m. on May 31st, 2006. This is
[5] the continued videotape deposition of
[6] Kevin Britto, in the matter of
[7] International Floor Crafts,
[8] Incorporated versus David W. Adams,
[9] et al., under the jurisdiction of the
[10] United States District Court for the
[11] Eastern District of Massachusetts.
[12]   This deposition is being held
[13] at 39 West 37th Street, New York, New
[14] York. My name is Kevin Brooks, and I
[15] am the video specialist. The court
[16] reporter is Debra DiBenedetto, and we
[17] both represent Fink & Carney Reporting
[18] with offices located at 39 West 37th
[19] Street, New York, New York.
[20]   May I have an introduction
[21] from counsel.
[22]   MR. KRASNOO: My name is James
[23] Krasnoo, and I represent the
[24] plaintiff, International Floor Crafts
[25] in this matter.

**Britto**

[2] Q: Good morning, Mr. Britto.
[3] A: Good morning.
[4] Q: Sir, are you here in response to a
[5] subpoena?
[6] A: Yes.
[7] Q: Okay. And you are aware that you're
[8] also here in response to a court order directing
[9] you to attend and complete your deposition?
[10] A: Yes.
[11] Q: Okay. Now, have you read either or
[12] both of the already transcribed portions of your
[13] depositions?
[14] A: Some.
[15] Q: Okay. And I'm going to ask you
[16] first, sir, is there anything at all that you
[17] stated either in the first day of deposition or
[18] your second day of deposition that you want to
[19] change or correct in any way?
[20] A: Change, no; correct, yes.
[21] Q: Okay. Why don't you tell us what it
[22] is you'd like to correct.
[23] A: Well, there were things just off the
[24] bat. I wasn't hired July 18th, I was hired
[25] July 8th. This scheme didn't start June of 1993,

**Britto**

[2] MR. KLEHM: My name is Paul
[3] Klehm, that's K-L-E-H-M, I also
[4] represent International Floor Crafts.
[5]   MR. ELOVITZ: William Elovitz,
[6] International Floor Crafts.
[7]   MR. GEMME: Bill Gemme,
[8] International Floor Crafts.
[9]   MR. YURKO: Richard Yurko,
[10] Y-U-R-K-O, representing Jane Dziemit.
[11]   MR. DURANT: John Durant, of
[12] International Floor Crafts.
[13]   MR. KAMAL: Karim Kamal,
[14] representing International Floor
[15] Crafts.
[16]   THE VIDEOGRAPHER: Will the
[17] court reporter please swear in the
[18] witness.
[19] KEVIN BRITTO, called as a witness,
[20] having first duly affirmed before Debra
[21] DiBenedetto, a Notary Public within and for
[22] the State of New York, was examined and
[23] testified further as follows:
[24]       DIRECT EXAMINATION
[25]       BY MR. KRASNOO (Cont'd):

**Britto**

[2] that's when I became a buyer, June of 1993, when
[3] Mr. Elovitz became president. Happened
[4] approximately six months after Dave Rooney left.
[5] That's when it started. I mean I don't know when
[6] he left. I know it was somewheres in February or
[7] March, could have been '94, or '95, I'm not sure.
[8] But that's — so that was incorrect.
[9] Q: Are there any other aspects of your
[10] testimony you wish to correct or change?
[11] A: Possibly, I haven't read the whole
[12] thing, so.
[13] Q: Okay. To the best of your knowledge,
[14] but for what you corrected, was everything else,
[15] to the best of your present knowledge, truthful in
[16] response to the questions?
[17]   MR. YURKO: Objection.
[18] A: Yes.
[19]   MR. YURKO: The witness said
[20] he hadn't read the whole deposition.
[21] Q: To the best of your memory, as to
[22] what you said on either the first or second day of
[23] your deposition, was everything you said truthful?
[24] A: Yes.
[25] Q: Now, you handed to me today a, what

**Britto**

[2] looks like a printout of a bill with regard to
[3] your various stays, admissions or medical
[4] treatments at the Mount Sinai Hospital in New
[5] York, is that correct?

[6]    **A:** Yes.

[7]    **Q:** Okay. And can you tell us the reason
[8] you brought that with you today and gave it to me?

[9]    **A:** Yes. Because you gave me a paper
[10] when I left the last time, stating you wanted some
[11] records.

[12]    **Q:** Okay.

[13]    **A:** Now, under Federal Rules of Civil
[14] Protection, 26 C, states that I don't have to
[15] share that, but I wanted to share that just so you
[16] know I'm not full of shit. I am telling the
[17] truth.

[18]    **Q:** Okay. Now, you also brought with us
[19] various printouts that come from, I guess,
[20] Rite Aid Drugstore because up above it says Rite
[21] Advice, and what they do is they describe the
[22] uses, warnings and side effects, if any, from
[23] various kinds of medication.

[24]    **A:** Correct.

[25]    **Q:** And I assumed, but I'm going to ask

**Britto**

[2] you specifically instead of assuming, that with
[3] regard to these medications, are these medications
[4] that you are currently taking?

[5]    **A:** Yes.

[6]    **Q:** Okay. Do any of these medications
[7] affect your ability to answer truthfully to any
[8] questions?

[9]    **A:** I don't believe so.

[10]    **Q:** Okay. Do any of these medications,
[11] to the best of your knowledge and belief, cause
[12] you to encounter difficulty in remembering things?

[13]    **A:** Probably.

[14]    **Q:** Which?

[15]    **A:** Short term, not long term.

[16]    **Q:** Okay. Do you know which medication
[17] might have the effect on your ability to remember?

[18]    **A:** No.

[19]    **Q:** Okay. I'm going to try to pronounce
[20] these.

[21]    **A:** Yeah, they're ridiculous, aren't
[22] they.

[23]    **Q:** One is hydroxyzine and that's
[24] H-Y-D-R-O-X-Y-Z-I-N-E, H-C-L, 25 milligrams
[25] tablet. One is lorazepam, L-O-R-A-Z-E-P-A-M.

**Britto**

[2]    **MR. YURKO:** If I could just
[3] interrupt you for a second. Are you
[4] going to mark these? That may be the
[5] easiest, simplest way of —

[6]    **MR. KRASNOO:** I have no
[7] objection to marking them. I don't
[8] know, do you need these back?

[9]    **A:** Yeah, I want them back.

[10]    **Q:** We can make Xeroxes of them at a
[11] suitable time. Is that all right with you?

[12]    **A:** Yeah, today.

[13]    **Q:** Yes. Okay, with regard to these
[14] five medications, one is atenolol, protonics,
[15] quinine sulfate, lorazepam and the other one that
[16] I pronounced. In addition to these, are there any
[17] other medications that you take where you have not
[18] brought Rite Advice forms?

[19]    **A:** No. There were, but there are not
[20] now. Now, atenolol is for high blood pressure.

[21]    **Q:** Now —

[22]    **A:** And the Campral, Capril, whatever,
[23] that's to help you get off alcohol. The Ativan is
[24] for anxiety and alcohol withdrawals.

[25]    **Q:** Okay.

**Britto**

[2]    **A:** The other two are —

[3]    **Q:** Were you taking any of these on your
[4] earlier depositions March 7th and March 10?

[5]    **A:** I was taking it all, yes.

[6]    **MR. YURKO:** Mr. Britto, just
[7] on a going-forward basis, you have to
[8] wait till the questioner finishes the
[9] question before you answer or —

[10]    **THE WITNESS:** Admonition, I
[11] know.

[12]    **MR. YURKO:** — or I don't have
[13] a chance to object.

[14]    **THE WITNESS:** Admonition, I
[15] know.

[16]    **MR. YURKO:** Thank you.

[17]    **MR. KRASNOO:** Let's go back
[18] for a minute, because I should have
[19] put this explicitly. I'm assuming
[20] that all objections that we preserved,
[21] whatever we did last time still
[22] governs this deposition, even though
[23] it's been some time between the second
[24] one and today which is the third
[25] portion of it.

Page 176

**Britto**

[1]
[2]     MR. YURKO: I think we have to
[3] operate on that stipulation since that
[4] was the stipulation in effect
[5] previously, and many of the counsel
[6] aren't here anymore, though, that
[7] doesn't mean I won't object.
[8]     MR. KRASNOO: No, no, no, and
[9] I wasn't intending it to foreclose you
[10] in any way, I was merely putting it on
[11] the record again that that should
[12] still be the operative strictures of
[13] the deposition.
[14]     MR. YURKO: That's fine by me.
[15]     MR. KRASNOO: Okay.
[16]     THE WITNESS: So that's
[17] saying, just so I understand?
[18]     MR. YURKO: The stipulation we
[19] entered into before was that one does
[20] not have to actually state an
[21] objection and that any objections to
[22] the testimony are preserved and can be
[23] made later for any reason. But that
[24] doesn't mean that one can't object.
[25] If, for example, there was a question

Page 177

**Britto**

[1]
[2] that was asked, that I thought
[3] Mr. Krasnoo could easily cure the
[4] objection right now, I might well make
[5] the objection so that it could be
[6] cured or that everyone here could
[7] understand that the question is
[8] objectionable.
[9]     MR. KRASNOO: Right.
[10]     THE WITNESS: Now, does that
[11] mean that the first deposition was
[12] valid or not?
[13]     MR. KRASNOO: What happens is,
[14] when an objection is lodged at trial
[15] to portions of your deposition, even
[16] if the objection were not made here in
[17] your first day or your second day or
[18] today, a judge can rule on it and
[19] determine whether or not, on the basis
[20] of the objection, the information that
[21] was obtained from your deposition
[22] should be excluded or continue to be
[23] included as evidence at the trial
[24] before him.
[25]     THE WITNESS: No, I understand

Page 178

**Britto**

[1]
[2] that, but I'm talking about the first
[3] deposition.
[4]     MR. KRASNOO: No, I'm talking
[5] about the first one as well, same way.
[6]     THE WITNESS: Oh, okay.
[7]     MR. KRASNOO: Even though it's
[8] three days where you're concerned,
[9] this is treated all of a piece, as
[10] though it were the continuation of one
[11] single deposition.
[12]     THE WITNESS: Okay.
[13]     MR. KRASNOO: So that the
[14] rules will be consistent to all three
[15] days.
[16]     THE WITNESS: Okay.
[17]     MR. KRASNOO: So we're going
[18] to ask that these be marked for
[19] identification in the deposition along
[20] with a copy of the Mount Sinai bill.
[21] And I might add, I don't think,
[22] Mr. Britto, the first Mount Sinai
[23] document that you gave us at an
[24] earlier date in your deposition, the
[25] patient discharge plan and referral

Page 179

**Britto**

[1]
[2] form had ever been marked and so I
[3] think we'll have that marked as well.
[4]     MR. YURKO: That was going to
[5] be Exhibit 1, as I recall.
[6]     MR. KRASNOO: Right, and I
[7] don't think we ever had it marked and
[8] that was our error.
[9]     (Mt. Sinai documents was
[10] marked as Deposition Exhibit No. 1 for
[11] identification, as of this date.)
[12]     THE WITNESS: By the way,
[13] thank you, for asking for the medical
[14] records, because they were piling up
[15] and I looked at them, because they've
[16] been calling me and they want more
[17] money, this and that, and as you
[18] notice on my front page I spotted
[19] something.
[20]     MR. KRASNOO: Well, I saw
[21] that.
[22]                 BY MR. KRASNOO:
[23]     Q: Mr. Britto, at one point during the
[24] first day of your deposition, you made a statement
[25] to indicate that Mr. Elovitz would be paid back

**Britto**

[1]
[2] all the money I stole from him.
[3]   A: Correct.
[4]   Q: Okay. Did you mean by that that you
[5] intended to pay it back to him?
[6]   A: Yes, my share.
[7]   Q: Now, do you have any funds to pay
[8] back?
[9]   A: No, I don't have it —
[10]   Q: Okay. And you indicated that the
[11] amount that you believed you personally gained
[12] from the theft and the scheme was somewhere around
[13] $100,000?
[14]   A: No, it was more than that.
[15]   Q: It was more than that, okay. Now,
[16] do you have any estimate at all for us as to how
[17] much money was involved in the total scheme, no
[18] matter who got which portions of it?
[19]   A: If you gave me records, the bill of
[20] ladings or invoices and I went through it, then I
[21] could tell you.
[22]   Q: Okay.
[23]   A: I can give you an exact figure.
[24]   Q: Now, one of the things you brought
[25] up last time was that at a certain point you were

**Britto**

[1]
[2] not being paid by Mr. Adams money that he was to
[3] have given to you which were illegal gains through
[4] the scheme, is that correct?
[5]   A: Correct.
[6]   Q: And that you acted on that by
[7] calling Mr. Mitchell, and told him that you should
[8] get paid directly, not send the money to Adams —
[9]   A: Yes.
[10]   Q: — do you recall that? Can you tell
[11] us how far into the scheme that occurred? Was it
[12] two years, three years, four years? Do you have
[13] any estimate?
[14]   A: 2002.
[15]   Q: 2002. Now, at that time Adams was
[16] still fully employed by IFC as buyer, is that
[17] correct?
[18]   A: Correct.
[19]   Q: And you were still — were you still
[20] fully employed by IFC?
[21]   A: No.
[22]   Q: You had left before that?
[23]   A: September 28th, 2001.
[24]   Q: Okay. Now, according to what you
[25] said last time, you had not spoken directly to

**Britto**

[1]
[2] Mr. Mitchell about any aspect of the scheme before
[3] you made the call and looked for payment to be
[4] directed to you as opposed to Mr. Adams, is that
[5] correct?
[6]   **MR. YURKO:** Objection to form.
[7]   A: Correct.
[8]   **THE WITNESS:** What does that
[9] mean?
[10]   **MR. YURKO:** Means I don't like
[11] the way he phrased it. I don't think
[12] it accurately reflects your prior
[13] testimony.
[14]   Q: When you called Mr. Mitchell on that
[15] occasion where you said, direct money to me, don't
[16] direct it to Mr. Adams, what was your
[17] understanding of what Mr. Mitchell knew with
[18] regard to the scheme?
[19]   A: He was just loaning the money and
[20] making a percentage off of it.
[21]   Q: Now, was it Mr. Adams or someone
[22] else who contacted Mr. Mitchell and let him know
[23] when to bill or send an invoice to IFC?
[24]   A: Mr. Adams.
[25]   Q: Okay. Did you ever see those

**Britto**

[1]
[2] invoices?
[3]   A: Maybe when I was working there, but
[4] not when I wasn't.
[5]   Q: Do you know whether or not,
[6] personally know now, that means that you would
[7] have seen it, did you ever see any writings signed
[8] by Mr. Mitchell and Mr. Adams indicating that
[9] Mr. Adams was going to cause rugs to be sent to
[10] IFC and Mr. Mitchell was paying up front for those
[11] rugs?
[12]   A: Go a little deeper. You mean
[13] purchase order or?
[14]   Q: No. Did you ever see any documents
[15] where Mr. Adams and Mr. Mitchell both signed the
[16] same document?
[17]   A: No.
[18]   Q: Okay. When you called Mr. Mitchell,
[19] as best as you can recall, and I know at certain
[20] times in your earlier depo you wanted to leave out
[21] the colorful language that was used, leaving that
[22] out for the moment, can you tell us as best as you
[23] can recall your conversation with Mr. Mitchell
[24] wherein, as part of the conversation or all of it,
[25] you said to him send the money to me, don't send

**Britto**

[1]
[2] it to Mr. Adams, he's not been paying me?
[3]    **MR. YURKO:** Objection, asked
[4] and answered.
[5]    You may go ahead.
[6]    **THE WITNESS:** Oh, okay.
[7]    **MR. YURKO:** The objections are
[8] just like little footnotes as to — go
[9] ahead and answer.
[10]    **A:** Okay, yeah, because as I told Ron,
[11] the vendors are calling me up now, because me and
[12] Dave were partners, so they're not getting paid
[13] because Dave is taking the money, so now they're
[14] calling me. So I told him from now on send the
[15] money to me or this business is going to stop
[16] because the vendors are getting pissed off.
[17]    **Q:** Now, was that true, that the money
[18] was going to the vendors?
[19]    **A:** Oh, no.
[20]    **Q:** Okay. And did Mr. Mitchell, at the
[21] time you called him, know that you were no longer
[22] working for IFC?
[23]    **A:** Yes.
[24]    **Q:** Did Mr. Mitchell at all have any
[25] questions of you as to why he would be sending

**Britto**

[1]
[2] money to a nonemployee of IFC for rugs that were
[3] going to be sent to IFC which he was going to
[4] invoice IFC for?
[5]    **A:** Yes.
[6]    **MR. YURKO:** Objection.
[7]    **Q:** Okay. Would you tell us as best as
[8] you can recall what, if anything, Mr. Mitchell
[9] said along those lines, or asked?
[10]    **A:** I could say what I told him. I
[11] can't remember what he asked, but.
[12]    **Q:** Okay.
[13]    **A:** He — he was suspicious, but then I
[14] did what Dave did, I bullshitted him. I told him
[15] look, we're paying for goods to be converted and
[16] then we ship it in to IFC. And then I told him, I
[17] said, because Bill always wants new vendors. So
[18] that's why Remco became Mansfield, Mansfield
[19] became a — it's two of them, to make Dave's job
[20] easier to have another vendor, as Bill would call
[21] it, hunting.
[22]    **Q:** Did Remco, to your knowledge, ever
[23] invoice for actual rugs received by IFC?
[24]    **A:** I don't believe so.
[25]    **Q:** Did Mansfield ever, to your

**Britto**

[1]
[2] knowledge?
[3]    **A:** I don't believe so.
[4]    **Q:** Okay. Now, did Mr. Mitchell ever
[5] discuss with you in this conversation why he would
[6] be invoicing for rugs that he never shipped?
[7]    **A:** Yes.
[8]    **Q:** Okay. And can you tell us what he
[9] said to you about that and what you said to him
[10] about that?
[11]    **A:** Well, he would say — let me get
[12] this correctly, I don't want to. We talked about
[13] the IRS — excuse me — taxes and stuff, he needs
[14] to have some proof and one time Nick was going to
[15] go look at the warehouse, but we told him it's a
[16] middleman, that was what he did. So he was
[17] nervous, but then I would tell him some shit, Dave
[18] would tell him some shit, and then it went away.
[19]    **Q:** Well, you indicated the first time
[20] you spoke to Mr. Mitchell about any aspect of the
[21] scheme was when you called and said send the money
[22] to me, don't send it to Mr. Adams. So, did you
[23] have further conversations after that time with
[24] Mr. Mitchell where he indicated he was nervous and
[25] where you talked to him about the IRS or did all

**Britto**

[1]
[2] of that occur in this one conversation?
[3]    **A:** No, it happened afterwards.
[4]    **Q:** It happened afterwards. Okay.
[5] So can you tell us roughly how many
[6] conversations you had with Mr. Mitchell that
[7] involved different aspects of the scheme such as
[8] Nick going to the warehouse or that he needed
[9] documentation or the IRS aspect?
[10]    **MR. YURKO:** Objection to the
[11] form of the question. The testimony
[12] so far is that Mr. Mitchell didn't
[13] know there was a scheme.
[14]    **A:** If Nick — I found it out through
[15] Dave. Ron didn't tell me. And then I talked to
[16] Ron about it.
[17]    **Q:** So you found out from Dave Adams —
[18]    **A:** Yeah.
[19]    **Q:** That Nick was going into the
[20] warehouse?
[21]    **A:** Because Bob Walsh wanted him to go
[22] look at the goods, who was the vice president of
[23] International Floor Crafts.
[24]    **Q:** Okay. And do you recall roughly
[25] when that occurred, when Adams told you this?

**Britto**

[1]

[2]    A: I have no idea.

[3]    Q: Okay. Was it while you were still

[4] employed there?

[5]    A: No.

[6]    Q: Okay. And as far as you can tell us,

[7] it was after this conversation where you had

[8] monies diverted to you instead of Mr. Adams?

[9]    A: I'm not sure about that.

[10]    Q: Okay. And you had this conversation

[11] with Ron and you told him, Ron Mitchell, and you

[12] told him that Nick was going to the warehouse, was

[13] that after this conversation you had with Ron and

[14] where you told him to divert the money away from

[15] Adams and instead send it to you?

[16]    MR. YURKO: Objection to form.

[17]    A: I'm not sure.

[18]    Q: Okay.

[19]    A: I mean, I don't want to answer and

[20] it looks like I'm lying.

[21]    Q: No, that's fine. We work with what

[22] you remember.

[23]      Tell us as best as you can recall,

[24] what the conversation was that you had with Ron,

[25] what you said to him and what he said to you when

**Britto**

[1]

[2] you told him that Nick was going to the warehouse.

[3]    A: Well, I talked to Dave first. So we

[4] discussed the game plan. It could have been Dave

[5] that informed Ron or myself, one of the two.

[6]    Q: What was the game plan?

[7]    A: The game plan was to say that the

[8] warehouse wasn't in Connecticut, it was someplace

[9] else. So Ron was thinking from what we told him,

[10] because we didn't want him knowing who the vendors

[11] were that we were dealing with. That's what we

[12] told him. We didn't want him trying to take our

[13] business away from us.

[14]    Q: So you told Ron that Nick was going

[15] to a warehouse but you were going to divert Nick

[16] to a warehouse other than in Connecticut, right?

[17]    A: Yes.

[18]    Q: And that's because Mr. Mitchell,

[19] with whatever rugs he sold for Remco, if he sold

[20] any, would have a warehouse in Connecticut?

[21]    A: Correct.

[22]    Q: And that's in part because

[23] Mr. Mitchell's invoices for Remco would have borne

[24] a Connecticut address, is that correct?

[25]    A: I would think so.

**Britto**

[1]

[2]    Q: So that's where Mr. Adler would have

[3] thought to have to go to see the shipments, is

[4] that correct?

[5]    A: Yes.

[6]    Q: Now, at the time you had this

[7] conversation with Mr. Mitchell, you told him that

[8] you didn't want him to know where the warehouses

[9] were because you didn't want him to directly be

[10] able to buy from those people; is that correct?

[11]    A: Correct.

[12]    Q: Was this conversation after you had

[13] already started to receive monies from Mitchell

[14] that previously had gone to Mr. Adams?

[15]    A: Yes.

[16]    Q: Okay. Now —

[17]    A: Just for the record, I start talking

[18] to Ron when, I don't want to be too colorful, but

[19] when the shit started with Dave and I had to take

[20] over my part.

[21]    Q: Are you able to tell us even a year

[22] when this conversation occurred?

[23]    A: 2002.

[24]    Q: 2002, okay.

[25] When you said I'm not gonna tell you

**Britto**

[1]

[2] the location of where we get the rugs from, did

[3] Mr. Mitchell say anything to indicate that that

[4] made him suspicious?

[5]    A: Actually, I'm wrong, it's 2003.

[6]    Q: Okay.

[7]    A: That was the year my mother died, so

[8] I know that. And it was like February or March of

[9] 2003.

[10]    MR. YURKO: Could you repeat

[11] the question then.

[12]    MR. KRASNOO: Yes.

[13]    Q: When you told Mr. Mitchell we're not

[14] going to tell you where the locations of the

[15] vendors are, did Mr. Mitchell say anything to you

[16] in response that indicated that he was suspicious

[17] or concerned about that?

[18]    A: No, he just said I can't understand

[19] why you guys wouldn't want me to know, because he

[20] wanted to send the checks to the vendors.

[21]    Q: Instead of sending it to you —

[22]    A: And Dave, yeah.

[23]    Q: Okay. Now in reality, there were no

[24] warehouses because rugs really were not being

[25] shipped in, is that correct?

**Britto**

[1]
[2]    **A:** Correct.
[3]    **Q:** That being the situation, when Nick
[4] indicated that he was going to a warehouse to see
[5] the rugs, how did you tackle that problem, either
[6] you and/or Mr. Adams?
[7]    **A:** It's like shooting at the hip,
[8] whatever it is, deal with it as it comes, I mean,
[9] depends on the situation.
[10]    **Q:** So did Nick ever go to a warehouse
[11] where he saw rugs that he thought were rugs that
[12] Remco was causing to be shipped?
[13]    **A:** I have no idea.
[14]    **Q:** Okay. Did Nick ever go to a
[15] warehouse where Mr. Adams reported back to you
[16] that Nick had gone to a warehouse?
[17]    **A:** No.
[18]    **Q:** Now, on the date of your first
[19] deposition you indicated that you were working as
[20] a bartender, is that correct?
[21]    **A:** Yes.
[22]    **Q:** And do you receive a weekly salary?
[23]    **A:** No.
[24]    **Q:** Okay. Do you receive just tips from
[25] your?

Page 193

**Britto**

[1]
[2]    **A:** No, I never was a bartender.
[3]    **Q:** Oh, you weren't? Do you work at
[4] all?
[5]    **A:** No, not right now, my health.
[6]    **Q:** Okay. Do you collect any Social
[7] Security disability or unemployment?
[8]    **A:** No.
[9]    **Q:** Okay. How do you support yourself?
[10] You live in an apartment house, don't you?
[11]    **A:** Yes.
[12]    **Q:** So you pay rent for the apartment
[13] that you rent?
[14]    **A:** Yes.
[15]    **Q:** How do you support yourself and make
[16] ends meet?
[17]    **A:** I paid a lot of things ahead, in
[18] advance, because —
[19]    (Discussion off the record.)
[20]    **Q:** Can you recite your answer again,
[21] please.
[22]    **A:** Yeah, I'm big on security, so I paid
[23] stuff in advance. Come July 1st, I'm screwed.
[24]    **Q:** So, how are you supporting your food
[25] intake, things of that nature, your daily

Page

**Britto**

[1]
[2] expenses?
[3]    **A:** I have a little cash on hand.
[4]    **Q:** Is — the money that you paid for
[5] the security deposit let's say, was that paid for
[6] with the proceeds from this scheme?
[7]    **A:** Yes.
[8]    **Q:** Do you have any of the scheme money
[9] left?
[10]    **A:** Probably, I mean.
[11]    **Q:** Where do you keep it, is it in banks
[12] or is it in your house or?
[13]    **A:** I don't want to answer that.
[14]    **Q:** Okay. When did you last work?
[15]    **A:** Couple of years ago, I have no idea.
[16]    **Q:** Okay. And the apartment for which
[17] you pay rent, what is the name of the landlord?
[18]    **A:** See, I don't want to get into that,
[19] because then you're going to drag him in here?
[20]    **Q:** No, not necessarily.
[21] Does the landlord physically live at
[22] the same premises at which you live?
[23]    **A:** No.
[24]    **Q:** Okay. And are there multiple
[25] apartments at the premises at which you live of

Page

**Britto**

[1]
[2] which you occupy one?
[3]    **A:** Yes.
[4]    **Q:** What is the landlord's name? I
[5] don't intend to bring him in.
[6]    **A:** Feldstein, F-E-L-D-S-T-E-I-N.
[7]    **Q:** And is that a company or just an
[8] individual?
[9]    **A:** I'm not sure, to tell you the truth.
[10]    **Q:** Okay. To where do you send — do you
[11] pay in cash or check or —
[12]    **A:** Check.
[13]    **Q:** When you made out a security deposit
[14] check did you make it out to a Mr. Feldstein or a
[15] company?
[16]    **A:** No, it was a company.
[17]    **Q:** Okay. Do you remember the name of
[18] the company?
[19]    **A:** Well, I — yes, I do, but I'm not
[20] going to answer that.
[21]    **Q:** Okay. What — how much is your rent?
[22]    **A:** I'm not gonna answer that either.
[23]    **Q:** And how much money?
[24]    **A:** Isn't this case about what's going
[25] on, not my personal business?

Page 196

**Britto**

[1]
[2] **Q:** It is in one sense, it isn't in
[3] another. One of the reasons that we can ask these
[4] questions is that you're currently in default in
[5] this case in that you failed to file an answer.
[6] **A:** Which was denied by Gordon.
[7] **Q:** Pardon?
[8] **A:** Didn't that default get denied by
[9] Gordon?
[10] **Q:** When you failed to file an answer,
[11] the — it means that you don't contest any of the
[12] issues in the complaint.
[13] **A:** Did the judge default that?
[14] **Q:** The judge —
[15] **A:** Denied it.
[16] **Q:** Did not enter a default judgment.
[17] **A:** He denied it and it sealed, right?
[18] **Q:** No, just so you are aware, a default
[19] was entered because you filed no answer. But a
[20] default has to proceed to default judgment before
[21] a judgement can be lodged against you.
[22]     You have filed no answer to the
[23] complaint. What that means is that you have given
[24] up your right to contest any of the allegations in
[25] the complaint and claim that they're not true. We

Page 197

**Britto**

[1]
[2] have moved for a default judgment and the judge
[3] did not grant it at that time. We can move for a
[4] default judgment again at any other time and if a
[5] judgement is entered it means potentially you're
[6] exposed to the entire sum of money along with
[7] every other co-defendant, to the sum that we want.
[8]     The way that works is that we're
[9] entitled to get as much money as we can from each
[10] defendant no matter who we get it from first,
[11] until it reaches the amount that a judge finds
[12] we're entitled to under the complaint, that maybe
[13] as much as the $5 million that we've alleged we're
[14] out.
[15]     That being the situation, we're
[16] entitled in someone who's in the position where
[17] you're at at the default and not contesting that
[18] he or she participated in the scheme and stole
[19] money, we're entitled to ask questions that would
[20] give us a lead on where monies from the scheme
[21] might be and where assets might be that are
[22] seizable to be able to pay off the debt that is
[23] owed.
[24]     So, as a result, this is one of the
[25] reasons I'm asking the questions. And while it,

Page 198

**Britto**

[1]
[2] yes, it does get to personal business, it gets to
[3] personal business with an eye towards seeing
[4] whether or not there are assets out there that are
[5] obtainable by my clients to reduce the damage that
[6] has been done to them.
[7] **A:** I don't have any assets, I can tell
[8] you that.
[9] **Q:** Do you have any bank accounts?
[10] **A:** Yeah.
[11] **Q:** Okay. Do you have any of the monies
[12] from the scheme in any bank accounts?
[13] **A:** There's $92 in one, $16 in another
[14] one.
[15] **Q:** Did you, when you were making the
[16] hundred thousand dollars from the scheme —
[17] **A:** It was more than that.
[18] **Q:** But let's use that as a figure
[19] because you've said that you had made at least
[20] that much from the scheme.
[21] **MR. YURKO:** Let's use the
[22] figure more than a hundred thousand
[23] since that's what the witness has said
[24] several times.
[25] **Q:** Okay, when you've made more than a

Page 199

**Britto**

[1]
[2] hundred thousand, did you put any of that in bank
[3] accounts?
[4] **A:** I believe so.
[5] **Q:** Okay. And do you still have those
[6] banks with whom you do business?
[7] **A:** Two of them, yeah.
[8] **Q:** Okay. Can you tell us the names of
[9] the banks?
[10] **A:** You already have it.
[11] **Q:** Okay. Did you give it to us last
[12] time in either of your two depositions?
[13] **A:** The State Police have it.
[14] **Q:** Okay. We're not the State Police, I
[15] assure you. So can you tell us —
[16] **A:** So you're telling me they haven't
[17] shared any of the information with you guys?
[18] **Q:** They would be prohibited by law from
[19] sharing information in a criminal case with us
[20] that is not public and is obtained directly from
[21] suspects. So once again I ask, not being privy to
[22] that information if you can tell us what bank
[23] accounts you —
[24] **A:** Yeah, Wachovia, Bank of America.
[25] **Q:** Now, are there specific branches you

## Page 200

**Britto**

[2] deal with in those banks?

[3]    **A:** Yeah. Closest ones to where I live.

[4]    **Q:** Okay. And are you able to give us

[5] the address of the Wachovia one?

[6]    **A:** 15th Street and 9th Ave, I believe.

[7]    **Q:** And are you able to give us the one

[8] for the Bank of America?

[9]    **A:** 17th and 5th.

[10]    **Q:** Okay. Now, let me jump to another

[11] subject for the moment. With regard to the

[12] apartment in which you live, does anyone else

[13] share that apartment with you?

[14]    **A:** There is gonna be somebody on

[15] Saturday.

[16]    **Q:** Okay. And is that person a relative

[17] or a friend or just a perfect stranger?

[18]    **A:** Just a, stranger.

[19]    **Q:** From the date of your last

[20] deposition date which was March, to today, have

[21] you spoken with any of the named defendants either

[22] in person or by phone?

[23]    **A:** Yes.

[24]    **Q:** Okay. With whom have you spoken?

[25]    **A:** Ron, Tyrone, Dave Adams.

## Page 201

**Britto**

[2]    **Q:** Now, Ron is Ron Mitchell and Tyrone

[3] is Tyrone Williams, is that correct?

[4]    **A:** Yes.

[5]    **Q:** Okay. Can you tell us which one of

[6] the three you spoke with first?

[7]    **A:** I don't know.

[8]    **Q:** And was the conversation — well -

[9]    **A:** I don't know.

[10]    **Q:** Okay. And was one of the

[11] conversations or any of the conversations in

[12] person?

[13]    **A:** No.

[14]    **Q:** So were all of them by telephone?

[15]    **A:** Yes.

[16]    **Q:** Now, how many times have you spoken

[17] with Ron Mitchell by telephone since the date of

[18] your last deposition down to today?

[19]    **A:** A lot.

[20]    **Q:** Okay.

[21]    **A:** I'm not gonna stop talking to

[22] somebody because we're going through this, as just

[23] to make a point here. Tyrone Williams, his two

[24] youngest children, I'm their godfather. I'm not

[25] gonna stop talking to him because we're going to

## Page 202

**Britto**

[2] through this.

[3]    **Q:** Have you spoken to Mr. Mitchell at

[4] all about any aspect of this case?

[5]    **A:** Oh, definitely.

[6]    **Q:** Okay. Would you tell us as best as

[7] you can what you said to Mr. Mitchell and what he

[8] said to you from that time, your last depo was

[9] March 10th —

[10]    **A:** Yeah.

[11]    **Q:** Down to today, May 31st.

[12]    **A:** Oh, geez —

[13]    **MR. YURKO:** Objection to form,

[14] I believe it calls for an incredible

[15] narrative, it seems like.

[16]    **Q:** You're still free to answer the

[17] question.

[18]    **A:** Oh, okay.

[19]    **Q:** What happens is the objection

[20] preserves his rights to pursue certain issues, but

[21] in no way do they form a limitation on your

[22] ability to answer at all.

[23]    **A:** Oh, okay.

[24]    **Q:** Okay.

[25]    **A:** Yeah, we talked about the case, I

## Page 203

**Britto**

[2] mean, every aspect of it, I mean, I don't —

[3]    **Q:** Well, why don't you tell us as best

[4] as you can what aspects you discussed with Ron,

[5] what he said, what you said about any an aspects

[6] that you can now remember.

[7]    **A:** One is I told him, I apologized to

[8] him because he's going through this shit for

[9] something I did. I mean, he's paying for

[10] attorneys. Dave still owes him all kind of money.

[11] And he's just paying out for no reason.

[12]    **Q:** Did you discuss with Mr. Mitchell at

[13] all the fact that he caused invoices to be sent to

[14] IFC wherein those invoices he portrayed as being

[15] the rug seller, but he never sold the rugs?

[16]    **A:** Yes.

[17]    **MR. YURKO:** Objection. You

[18] got to give me a chance to object.

[19]    **THE WITNESS:** Oh, okay.

[20]    **Q:** What did you say to him and he say

[21] to you about that subject matter?

[22]    **A:** Threw me off balance here.

[23]    **MR. KRASNOO:** You want to read

[24] back my earlier question, his answer

[25] and then my present question, that

Page 204

[1]                     *Britto*
[2] might help you to focus.
[3]     (Requested portion of record
[4] read by the reporter.)
[5]     **A:** About the invoices?
[6]     **Q:** Yes. About the fact that the
[7] invoices showed that he sold rugs to IFC when in
[8] fact, he did not.
[9]     **A:** Well, he didn't know he did.
[10]     **Q:** Okay. But first tell us what he
[11] said to you and you said to him about it and then
[12] I'll ask some follow-up questions based on what
[13] you just said.
[14]     **A:** No, I told him, point blank like I'm
[15] telling everybody here, the people involved, not
[16] everyone, but the names I mentioned, were guilty.
[17] And it's not fair to him to be going through this.
[18] Now, when he did the invoices is because he was
[19] listening to myself or Dave.
[20]     **Q:** The invoices that he sent, did they
[21] list quantities of specific kinds of rugs?
[22]     **A:** Yes.
[23]     **Q:** That was information given to him
[24] either by you or by Mr. Adams, is that correct?
[25]     **A:** Yes.

Page 205

[1]                     *Britto*
[2]     **Q:** And before you called Mr. Mitchell
[3] and said send the money to me, not to Mr. Adams
[4] anymore, that information was given by Mr. Adams,
[5] is that correct?
[6]     **A:** Correct.
[7]     **Q:** But for the information given to
[8] Mr. Mitchell by the IFC employee at that time,
[9] David Adams, Mr. Mitchell had no way to know
[10] whether or not there were rugs in those numbers,
[11] isn't that correct?
[12]     **A:** Yeah, he didn't know what was going
[13] on.
[14]     **Q:** And he had no way to know what the
[15] quality of those rugs were, did he?
[16]     **A:** No.
[17]     **Q:** And he had no way to know,
[18] therefore, what a fair value was for those rugs,
[19] did he?
[20]     **A:** No. He went by what we told him.
[21]     **Q:** And therefore, what he did was, he
[22] simply gave some money up front for an order so
[23] that he could prepare an invoice and get more
[24] money back from IFC, isn't that correct?
[25]     **MR. YURKO:** Objection.

Page 206

[1]                     *Britto*
[2]     **A:** He was making his percentage of
[3] putting the money up front.
[4]     **Q:** And, but what he didn't know was
[5] whether or not there were ever actual shipments,
[6] did he?
[7]     **A:** No, he never saw the goods.
[8]     **Q:** But he not only never saw the goods,
[9] he never ever received any writings from either
[10] you or Mr. Adams showing that there were actula
[11] goods, did he?
[12]     **MR. YURKO:** Objection, you
[13] know that's not the case. You're
[14] misleading this witness.
[15]             **BY MR. KRASNOO:**
[16]     **Q:** He never received a single writing
[17] showing there was vendor of rugs, did he?
[18]     **MR. YURKO:** Objection.
[19]     **A:** Not from me, he could have from Dave
[20] Adams.
[21]     **Q:** Okay. Now, he indicated to you at
[22] one point you've said, that he wanted to send the
[23] checks instead of to you and as he had to
[24] Mr. Adams before you, he wanted to send them
[25] directly to vendors, isn't that correct?

Page 207

[1]                     *Britto*
[2]     **A:** Yes.
[3]     **Q:** Did he ever refuse to go along with
[4] the way you and Dave Adams were having him do
[5] business because you didn't let him send the
[6] checks directly to the vendors?
[7]     **A:** If you're doing business with
[8] someone and they tell you this is how it has to be
[9] and you're making a percentage off it, are you
[10] really going to push them too hard?
[11]     **Q:** But you're making a percentage of
[12] loaning money, aren't you, advancing it?
[13]     **MR. YURKO:** Objection.
[14]     **A:** Yes.
[15]     **Q:** In this case he's not really making
[16] percentage of money off of selling rugs, because
[17] he's not selling rugs, right?
[18]     **MR. YURKO:** Objection. He's a
[19] broker.
[20]     **MR. KRASNOO:** Well, that's
[21] your explanation for it.
[22]     **MR. YURKO:** That's the
[23] explanation in the documents.
[24]     **MR. KRASNOO:** But I also have
[25] a right to test and see whether or not

Page 208

***Britto***

[1]
[2] that explanation could be correct or
[3] not and I have a right to do it with
[4] witnesses other than Mr. Mitchell.
[5]    **MR. YURKO:** Yeah, but you're
[6] misleading the witness and posing the
[7] question to the witness to the extent
[8] that there's only one option, that
[9] he's either the seller or he's the
[10] lender and you know that —
[11]    **MR. KRASNOO:** I think under
[12] Rule 29 you're entitled to object, but
[13] you're not entitled necessarily to,
[14] nor are you required at this stage,
[15] based on our rules, to state the
[16] reason for your objection. If you
[17] think I'm misleading the witness
[18] that's something you can certainly
[19] correct during your period of time.
[20] If the witness thinks I'm misleading
[21] him, we both have experience with
[22] Mr. Britto where he wouldn't hesitate
[23] to let me know he thinks I'm
[24] misleading him. And he would do it
[25] both orally and ultimately in print,

Page 209

***Britto***

[1]
[2] if he so chose.
[3]        **BY MR. KRASNOO:**
[4]    **Q:** So having that as caveats, I still
[5] put my question to you. But let me go back and
[6] ask still another way.
[7]        What writings, if any, did you
[8] personally supply to Mr. Mitchell concerning rugs
[9] that were allegedly coming to IFC that were
[10] fictional shipments as it turns out?
[11]    **A:** If I did, it would be a purchase
[12] order from Dave Adams.
[13]    **Q:** Okay. Now, did you ever see a
[14] purchase order from Dave Adams where you knew that
[15] purchase order either you were sending to
[16] Mr. Mitchell or Dave Adams had told you he was
[17] sending to Mr. Mitchell or you saw Dave Adams in
[18] the act of sending it to Mr. Mitchell?
[19]    **MR. YURKO:** Objection to form.
[20]    **A:** Yes.
[21]    **Q:** Okay. How many times did you see a
[22] writing that constituted a purchase order that
[23] went to Mr. Mitchell?
[24]    **A:** Fifteen, maybe.
[25]    **Q:** Now, did all of those purchase

Page 210

***Britto***

[1]
[2] orders take on a certain format? In other words,
[3] did each purchase order resemble the other, but
[4] without specific numbers or specific descriptions?
[5]    **MR. YURKO:** Objection to form.
[6]    **A:** No, they all had numbers.
[7]    **Q:** Okay. Did each purchase order have a
[8] specific purchase order number to it?
[9]    **A:** Yeah, they all do.
[10]    **Q:** Okay. Who prepared the purchase
[11] orders?
[12]    **A:** The buyer.
[13]    **Q:** Okay. Now, the buyer of the
[14] nonexistent rugs in this case would be whom?
[15]    **A:** Dave or myself.
[16]    **Q:** Okay. And when you prepared the
[17] purchase orders, did you show the purchase orders
[18] that you prepared to Dave after you prepared them?
[19]    **A:** Well, let me back up a little bit.
[20] Nick also did some purchase orders.
[21]    **Q:** Were those the fraudulent ones?
[22]    **A:** Yes.
[23]    **Q:** Okay. Did Nick know them to be
[24] fraudulent?
[25]    **A:** No.

Page 211

***Britto***

[1]
[2]    **Q:** So, when Nick prepared purchase
[3] orders, it was because he wanted to by a certain
[4] number of rugs of a certain quality and he
[5] prepared an order to buy those from a particular
[6] seller of rugs, is that correct?
[7]    **A:** Correct.
[8]    **Q:** And the seller of rugs sometimes
[9] would be Remco Company?
[10]    **MR. YURKO:** Objection.
[11]    **Q:** Is that correct?
[12]    **A:** (Witness nods).
[13]    **Q:** Would you see those legitimate
[14] purchase orders from Nick?
[15]    **MR. YURKO:** Objection.
[16]    **A:** Yes.
[17]    **Q:** What happened to those purchase
[18] orders, if you have personal knowledge?
[19]    **A:** Not all of them, but —
[20]    **Q:** Okay. What would happen to them?
[21]    **A:** What do you mean?
[22]    **Q:** Well, would they be sent to Remco?
[23]    **A:** The purchase orders?
[24]    **Q:** Yeah?
[25]    **A:** I would believe so, I'm not sure.

Page 212

**Britto**

[2] Q: Well, if they're sent to Remco, did
[3] Remco actually have any rugs to fulfill those
[4] orders?
[5] A: They thought they did.
[6] Q: But that doesn't quite answer my
[7] question. Did Mr. Mitchell, when he received a
[8] purchase order, looking for rugs, actually fill
[9] that purchase order from rugs that he had?
[10] MR. YURKO: Objection.
[11] A: No, Nick does the purchase order.
[12] Q: I understand, but that gets sent,
[13] you said that gets sent to Mr. Mitchell, is that
[14] correct?
[15] A: I was the buyer for I don't know how
[16] many years, I never sent a purchase order to
[17] anyone.
[18] Q: Okay. Well, let's go back. I asked
[19] you whether or not you ever saw any writings that
[20] were sent to Mr. Mitchell and you indicated that
[21] you saw roughly 15 purchase orders —
[22] A: Correct.
[23] Q: That went to Mr. Mitchell.
[24] A: (Witness nods).
[25] Q: Then you discussed that you made up

Page 213

**Britto**

[2] some of them, Dave Adams made up some of them, and
[3] Nick made up some of them. Now, when you made
[4] them up, those were purchase orders for
[5] nonexistent rugs, isn't that true?
[6] A: Yes.
[7] Q: And would you send that purchase
[8] order to Mr. Mitchell?
[9] A: I — I didn't send purchase orders
[10] to anybody.
[11] Q: Okay, now, but when a purchase order
[12] is normally made up, if they are for a genuine
[13] purchase of rugs, is that sent to a seller of
[14] rugs?
[15] A: Some buyers do, some buyers don't.
[16] Q: Okay. Did Nick ever send any
[17] directly to either Mr. Mitchell or to Remco?
[18] MR. YURKO: Objection,
[19] foundation.
[20] A: You have to ask Nick that. I
[21] believe so, but he'd know better than me.
[22] Q: Did Mr. Mitchell ever have a
[23] conversation with you wherein he discussed I got
[24] this purchase order from Nick Adler at IFC looking
[25] for rugs, what am I supposed to do with it?

Page 214

**Britto**

[2] A: Yes.
[3] MR. YURKO: Objection.
[4] A: But I didn't see it.
[5] Q: Okay. How often did he have such a
[6] conversation with you? That's Mr. Mitchell and
[7] you.
[8] A: No idea.
[9] Q: More than twice?
[10] A: Yeah.
[11] Q: What would you say to him when he
[12] said what am I supposed to do with this order from
[13] Nick Adler?
[14] MR. YURKO: Objection to form.
[15] Q: You can answer.
[16] A: I want to know what that means.
[17] MR. YURKO: The question is
[18] asked wrong. He says what would you
[19] do. The only thing that's relevant is
[20] what did you do, not what would you
[21] do. Also, that the question purports
[22] to reflect a conversation which you
[23] haven't actually testified to. You
[24] haven't actually testified that, that
[25] Mr. Mitchell said what the heck do I

Page 215

**Britto**

[2] do with this. I mean, so that's why I
[3] object to the way the question is
[4] asked. There are ways of getting at
[5] that information which are more
[6] appropriate and proper.
[7] THE WITNESS: I have a
[8] question. Is Dave Adams' lawyer here
[9] today?
[10] MR. KRASNOO: No, Mr. Yurko is
[11] the sole attorney representing one
[12] defendant. No other attorney is
[13] present.
[14] MR. YURKO: Mr. Adams has
[15] filed for bankruptcy.
[16] THE WITNESS: Yeah, I got
[17] that. He's a...
[18] Q: When Mr. Mitchell told you I
[19] received a purchase order from Mr. Adams — from
[20] Mr. Adler, I misspoke I'm sorry, for rugs, what am
[21] I supposed to do with it, did you have a
[22] conversation with Mr. Mitchell about that subject
[23] matter?
[24] MR. YURKO: Object form.
[25] A: No. He wouldn't say what am I

Page 216

**Britto**

[1]
[2] supposed to do with it.

[3]    **Q:** What did he say?

[4]    **A:** He would ask if the goods were

[5] available.

[6]    **Q:** And that would be because he didn't

[7] have any goods available to fill that order, he

[8] was asking you whether or not you had goods

[9] available to fill that order, is that correct?

[10]    **MR. YURKO:** Objection to form.

[11]    **A:** Because I contacted the vendors, as

[12] he believed.

[13]    **Q:** Throughout your entire association

[14] with Mr. Mitchell, when he was acting in some

[15] capacity on behalf of Remco, do you know of any

[16] time when Mr. Mitchell actually possessed rugs for

[17] sale for Remco?

[18]    **MR. YURKO:** You're asking for

[19] physical possession?

[20]    **MR. KRASNOO:** Yes.

[21]    **A:** I have no idea.

[22]    **Q:** Did you ever at any time see

[23] Mr. Mitchell down in Connecticut?

[24]    **A:** Never.

[25]    **Q:** Did you ever have any conversation

---

Page 217

**Britto**

[1]
[2] with Mr. Mitchell where you would inform him that

[3] a purchase order had been created for some rugs

[4] and that he would be sending an invoice in a few

[5] weeks for it?

[6]    **A:** Clarify that.

[7]    **Q:** Okay. You've indicated that from

[8] your vantage point Mr. Mitchell did not know that

[9] there were nonexistent shipments, that no rugs

[10] came through Remco as a seller of rugs, is that

[11] correct?

[12]    **MR. YURKO:** Objection to form.

[13]    **A:** He did not know.

[14]    **Q:** Okay. Now, did you let Mr. Mitchell

[15] know at any time in your dealings with him that a

[16] purchase order had been made up for rugs where he

[17] was ultimately going to be billing for those rugs?

[18]    **MR. YURKO:** Objection to form,

[19] made up.

[20]    **MR. KRASNOO:** I mean

[21] physically made up.

[22]    **MR. YURKO:** Prepared.

[23]    **A:** Would he invoice it? Yes.

[24]    **Q:** Did you ever let Mr. Mitchell know

[25] when he was to bill for — when he was to submit a

---

Page 218

**Britto**

[1]
[2] fake invoice? And by fake I mean where the

[3] invoice was made up representing rugs that Remco

[4] had sent where you knew those rugs to be

[5] nonexistent.

[6]    **MR. YURKO:** Objection to form.

[7]    **A:** I knew, but he did not, yes.

[8]    **Q:** When Mr. Mitchell sent those

[9] invoices they would be unaccompanied by any bills

[10] of lading, isn't that correct?

[11]    **A:** Some may, some may not, I'm not

[12] sure.

[13]    **Q:** Well, would Mr. Mitchell create

[14] phony bills of lading?

[15]    **MR. YURKO:** Objection to form.

[16]    **A:** Most likely.

[17]    **Q:** Did you ever see any?

[18]    **A:** Yeah, from the paperwork I got from

[19] you.

[20]    **Q:** Now, how do you know that those were

[21] created by Mr. Mitchell or by somebody through

[22] Remco?

[23]    **A:** How would I know?

[24]    **Q:** Well, that's what I'm asking you.

[25]    **A:** Yeah, I mean, I wasn't there when it

---

Page 219

**Britto**

[1]
[2] got made up.

[3]    **Q:** Did Mr. Mitchell ever tell you that

[4] he was creating bills of lading to send with the

[5] invoices?

[6]    **A:** Yes, but you asked me if I ever seen

[7] them.

[8]    **Q:** You had a conversation with

[9] Mr. Mitchell wherein in substance he said to you

[10] that he was creating —

[11]    **A:** No, I told him to.

[12]    **Q:** You told Mr. Mitchell to create

[13] bills of ladings?

[14]    **A:** When he started asking.

[15]    **Q:** Now, Mr. Mitchell knew at the time

[16] that —

[17]    (Discussion off the record.)

[18]    **A:** I didn't finish by the way.

[19]    **Q:** By all means, finish your answer.

[20]    **A:** Ask the question again, bill of

[21] ladings.

[22]    **Q:** Okay. You indicated just a moment

[23] ago that you had a conversation with Mr. Mitchell

[24] where you told him to create a false bill of

[25] lading indicating that rugs had been shipped to —

---

***Britto***

[1]
[2] from Remco to International Floor Crafts, is that
[3] correct?
[4]    **A:** Correct. The reason being it had to
[5] come from his company, because he was the broker,
[6] so it had to come from him. We didn't want him to
[7] know who the vendors were, the false vendors. So
[8] let me take you through this real quick. Ron
[9] billed this through a bill of lading for this
[10] amount, sent it in on this date, that's it.
[11]    **Q:** Now, did Ron ever question you as to
[12] why he had to create a bill of lading, when there
[13] would be a bill of lading, wouldn't there — let
[14] me do it another way.
[15]    You've indicated that Ron believed
[16] there were actually rugs shipped, is that correct?
[17]    **A:** Correct.
[18]    **Q:** Well, if there were actual rugs
[19] shipped, there would be a bill of lading for
[20] actual rugs shipped, no matter who in fact really
[21] shipped it, isn't that so?
[22]    **A:** Yes.
[23]    **Q:** Did Ron ever ask you, weren't you
[24] concerned that there would be two bills of lading
[25] for the one shipment, one coming from the actual

***Britto***

[1]
[2] person who sent it in and one coming from Ron
[3] Mitchell pretending to send it in?
[4]    **A:** The one who sent it in went to Dave
[5] Adams, that's what he believed.
[6]    **Q:** Did he believe Dave Adams was
[7] stopping them, meaning that they were never
[8] getting to IFC?
[9]    **A:** I have no idea.
[10]    **Q:** Did he ever ask you what's happening
[11] to one of the two bills of ladings, the one other
[12] than the one I'm sending in?
[13]    **A:** Yeah he asked me questions and all
[14] the paperwork went through Dave.
[15]    **Q:** Did he ever ask to see these bills
[16] of lading?
[17]    **A:** Numerous times. Dave said he got
[18] rid of them.
[19]    **Q:** Did Mr. Mitchell ever say to Dave
[20] Adams I don't want you to get rid of the next bill
[21] of lading. The next time we do this I want you to
[22] send it to me, or words to that effect?
[23]    **MR. YURKO:** Objection.
[24]    **A:** I'm not sure.
[25]    **Q:** Did he ever say that to you?

***Britto***

[1]
[2]    **A:** No.
[3]    **Q:** In the rug industry as it were, when
[4] a shipper of rugs sells rugs, does he ever insure
[5] the shipment or have insurance on it?
[6]    **A:** I don't know. I would think so, but
[7] I'm not sure.
[8]    **Q:** Did Mr. Mitchell, when he created
[9] fake bills of lading, did he ever use a specific
[10] shipper as a name?
[11]    **MR. YURKO:** Objection to form.
[12]    **A:** And I want to say something,
[13] unknowingly fake bill of lading.
[14]    **Q:** What was unknown about it?
[15]    **A:** He didn't know.
[16]    **Q:** Well, he knew that the bill of
[17] lading did not cover actual rugs that he shipped,
[18] didn't he?
[19]    **MR. YURKO:** Objection.
[20]    **A:** Let me put it to you this way. How
[21] can I say this —
[22]    **Q:** Let me ask it another way. Is it
[23] fair to state that a bill of lading accompanies
[24] the shipment of actual goods?
[25]    **MR. YURKO:** Objection the

***Britto***

[1]
[2] witness has answered that in his first
[3] day of deposition and what he said in
[4] his first day of deposition was
[5] there's no bill of lading when the
[6] person that brings the goods brings
[7] them in their own trucks.
[8]    **MR. KRASNOO:** There's no
[9] establishment here as to whether or
[10] not they were in Remco trucks or not.
[11] The question is, does a bill of lading
[12] accompany the actual shipment of goods
[13] when a bill of lading is created.
[14]    **MR. YURKO:** You're questioning
[15] this witness about a bill of lading
[16] and it's obvious to anyone looking at
[17] this deposition that the witness is
[18] answering you with respect to
[19] invoices. And the two of you are like
[20] ships going in the night passing each
[21] other. Let me object to the whole
[22] line of questioning.
[23]    **A:** I wasn't finished. Can you go back
[24] to what I was saying earlier? I had a good point
[25] but now I forgot.

---

Page 224

**Britto**

[1]

[2]   **Q:** Let's back up and make sure that

[3] we're tackling the right point. There's no

[4] question that Mr. Mitchell submitted invoices to

[5] IFC claiming that he shipped rugs, is that

[6] correct?

[7]   **MR. YURKO:** Objection, form.

[8]   **Q:** And wanting payment for it?

[9]   **A:** Stop trying to coerce me. Because

[10] that's what you're doing.

[11]   **Q:** Mr. Britto, I'm trying to put up

[12] with what I believe is obstreperous conduct on the

[13] part of adversary counsel and at the same time —

[14]   **A:** You're trying to walk me into a

[15] fucking wall.

[16]   **Q:** I'm trying to find out whether

[17] there's a difference between bills of lading and

[18] invoices.

[19]   **A:** U.S. marshals threatening me, insult

[20] my intelligence, go after my sister who's

[21] pregnant, default of court, et cetera, et cetera,

[22] et cetera, and you want me to fucking respect you?

[23]   **MR. YURKO:** Let me suggest,

[24] we've been going at the deposition for

[25] about an hour and 15 minutes or maybe

---

Page 225

**Britto**

[1]

[2] an hour and ten minutes, it might make

[3] sense to have a break. I could use a

[4] bathroom break.

[5]   **THE WITNESS:** Good idea.

[6]   **MR. KRASNOO:** I'd like to

[7] finish this point.

[8]   **MR. YURKO:** It's your

[9] deposition.

[10]   **THE WITNESS:** It's my

[11] deposition, I'm the deponent, I'm the

[12] star of the show.

[13]   **MR. KRASNOO:** You're a

[14] witness.

[15]   **THE WITNESS:** And I'm not

[16] going to leave the building, I'm going

[17] to pace the hallway, because I'm

[18] getting fucking aggravated now,

[19] because once again inadvertently

[20] you're insulting my intelligence.

[21]   **MR. KRASNOO:** Note that the

[22] break is over my objection.

[23]   **THE VIDEOGRAPHER:** The time is

[24] 11:44, we are off the record.

[25]   (Brief recess.)

---

Page 226

**Britto**

[1]

[2]   **THE VIDEOGRAPHER:** Time is now

[3] 11:56, we are back on the record.

[4]   **BY MR. KRASNOO:**

[5]   **Q:** Mr. Britto, you've already told us

[6] that Mr. Mitchell prepared fake invoices, is that

[7] correct?

[8]   **MR. YURKO:** Objection, form.

[9]   **A:** Unknowingly, yes.

[10]   **Q:** Did Mr. Mitchell also prepare fake

[11] bills of lading?

[12]   **MR. YURKO:** Objection to form.

[13]   **A:** Unknowingly, yes. I believe,

[14] anyways.

[15]   **MR. KRASNOO:** Could you repeat

[16] that answer.

[17]   (Record read by the reporter.)

[18]   **Q:** Do you know how soon after Mr. Adams

[19] and/or you arranged with Mr. Mitchell to create

[20] fake invoices, how soon after that did he begin to

[21] create fake bills of lading?

[22]   **MR. YURKO:** Objection.

[23]   **A:** No idea.

[24]   **Q:** Did you ever see such a bill of

[25] lading that he created?

---

Page 227

**Britto**

[1]

[2]   **A:** Probably at the end.

[3]   **Q:** Do you happen to remember at all

[4] what name of shipper he used in the fake bill of

[5] lading?

[6]   **A:** No idea.

[7]   **Q:** You indicated earlier in the morning

[8] section of your deposition today that he had a

[9] concern about reporting something to the IRS, is

[10] that correct?

[11]   **A:** Dave did.

[12]   **Q:** Did Dave discuss — okay. Dave

[13] Adams had a concern about Mr. Mitchell's reporting

[14] something to the IRS or Dave Adams reporting

[15] something to the IRS?

[16]   **A:** Well, Dave didn't pay taxes on the

[17] money he received, so —

[18]   **Q:** Okay. Did Dave ever discuss with

[19] Mr. Mitchell any aspect of IRS reporting, either

[20] concerning Mr. Mitchell, Remco, or Dave Adams?

[21]   **MR. YURKO:** Objection to form.

[22]   **A:** Could have been that or could have

[23] been Tony who he spoke to.

[24]   **Q:** Now, do you know from any of the

[25] sources in the conversation, what the conversation

---

*Britto*

[1]

[2] was?

[3]  A: No.

[4]  Q: When did you first meet, through

[5] either the phone or become aware of Tony — this

[6] is Tony Marasco, right?

[7]  A: Yes.

[8]  Q: Okay.

[9]  A: That's when Dave, Dave borrowed like

[10] 50,000 from him for a bookie.

[11]  Q: From Tony directly?

[12]  A: Tony or his company, I mean I don't

[13] know, that was between them, but —

[14]  Q: When you say "or his company," do

[15] you mean Remco, now, or another company?

[16]  A: I have no idea who it was.

[17]  Q: Okay.

[18]  A: But he called me up because Dave was

[19] supposed to be my partner and he needed his money.

[20]  Q: That is Tony called you up?

[21]  A: Yeah.

[22]  Q: And wanted the money because Dave

[23] was your partner?

[24]  A: Yes.

[25]  Q: Okay.

*Britto*

[1]

[2]  A: And — you got to stop cutting me

[3] off, I forgot.

[4]  Q: When you've used the word he and

[5] there's more than two males in it I always have to

[6] identify which male you're talking about as the

[7] he.

[8]  A: Tony called me up, oh, because —

[9] and then Dave called me up, Adams, he put, Tony I

[10] guess put a lien on his house, because he signed

[11] some paperwork.

[12]  Q: Do you recall approximately when?

[13] What year?

[14]  A: Well, I was living in New York so

[15] had to be, I think it was 2005, actually.

[16]  Q: Okay. Apart from a bill of lading

[17] and apart from an invoice, did Mr. Mitchell ever

[18] create any other documents, written documents?

[19]  MR. YURKO: Objection.

[20]  A: What do you mean by that, like, give

[21] me an example.

[22]  Q: Well, were there ever any letters

[23] addressed to IFC about specific shipments?

[24]  A: You mean like what was available for

[25] goods?

*Britto*

[1]

[2]  Q: That's fine.

[3]  A: Yes.

[4]  Q: Okay. Were those letters about fake

[5] rugs as it were?

[6]  MR. YURKO: Objection to form.

[7]  A: Unknowingly to him, yes.

[8]  Q: So were those letters suggested

[9] either by you or by Dave Adams to Mr. Mitchell?

[10]  A: Yes.

[11]  Q: Okay. Let me can ask you, could you

[12] and/or Mr. Adams, to cause the scheme to come to

[13] pass, simply gone out and created your own fake

[14] companies, claiming that they were shippers of

[15] goods?

[16]  A: Probably.

[17]  Q: Okay. Did you ever discuss that

[18] with Mr. Adams, why you didn't do that and simply

[19] cut out Ron?

[20]  A: Yes.

[21]  Q: Okay. And when you discussed that

[22] with him, what did Mr. Adams say about it and what

[23] did you say about it?

[24]  A: Well, I brought it up.

[25]  Q: Okay.

*Britto*

[1]

[2]  A: And he just basically blew me off.

[3]  Q: Okay, did you point out to him that

[4] if you did that, Ron wouldn't be taking interest

[5] on the loan?

[6]  A: Yes, more for us.

[7]  Q: Mr. Adams wasn't interested in that?

[8]  A: No, because he was gambling it all

[9] away, you know.

[10]  Q: Did he ever give you any reason why

[11] what you had suggested wasn't a good idea?

[12]  MR. YURKO: Objection; asked

[13] and answered.

[14]  A: I don't believe so.

[15]  Q: Okay.

[16]  A: But he does have a company right

[17] now.

[18]  Q: The he is Dave Adams?

[19]  A: Um-hum.

[20]  Q: Okay, now —

[21]  A: It's with Peter Burnham.

[22]  Q: That brings me back to for a moment

[23] a question I asked you before the break which was

[24] who have you talked to of any of the named

[25] individual defendants since the time of your last

Page 232

**Britto**

[1]
[2] deposition March 10th to today. You indicated
[3] three people, Mr. Williams, Mr. Adams and
[4] Mr. Mitchell. We started with those conversations
[5] with Mr. Mitchell. Can you tell us any
[6] conversations you've had with Mr. Mitchell that
[7] you haven't already addressed earlier in your
[8] deposition today, that is for that period,
[9] March 10th down to today?
[10]   **A:** No, it's basically the same stuff.
[11]   **Q:** Okay. With regard to Mr. Adams,
[12] what conversations, if any, have you had directly
[13] with Mr. Adams from March 10th, 2006 down to
[14] today?
[15]   **A:** Yeah, I talked to him for about two
[16] weeks. And, because he gives you that same old
[17] bullshit routine, trying to act like he's
[18] innocent, just going to throw his hands up in the
[19] air, you got to get me out of this, because I'm up
[20] here telling the truth — but, then he's trying to
[21] make money off of this.
[22]   **Q:** Did he indicate to you how he was
[23] trying to make money off of this?
[24]   **A:** Well, he said a few things. One was
[25] if I got him out of it, meaning if I came here

Page 233

**Britto**

[1]
[2] today and said oh, I don't know what I was talking
[3] about, blah, blah, blah, I can get him out of it,
[4] and, what a — that's another story, but. So he
[5] said, which, he's so stupid, my attorney said if
[6] you get me off this he'll give you free legal
[7] advice, which we all know there is no attorney on
[8] this planet that's going to give free legal
[9] advice.
[10]   Secondly, he said he's gonna
[11] countersue Building 19 for a million dollars, for
[12] ruining his business, deprivation of character,
[13] what the hell he's saying is.
[14]   **Q:** Defamation?
[15]   **A:** Defamation of character, yes.
[16]   **Q:** Did you and Mr. Adams discuss at all
[17] any of the wrongs that you claim Mr. Adams to have
[18] done in your testimony?
[19]   **A:** Yes, but it was like read in between
[20] the lines kind of stuff, just in case his phone
[21] was tapped.
[22]   **Q:** Did Mr. Adams offer you any money at
[23] all to get you to change your testimony?
[24]   **A:** No.
[25]   **Q:** Now, you indicated just a moment ago

Page 234

**Britto**

[1]
[2] that he tried to blow you off, you said. What
[3] does that phrase really mean, how did he — how
[4] could he attempt to blow you off? What did he
[5] mean by it? You just said in conversation with
[6] him that he tried to blow you off, that's what you
[7] just —
[8]   **MR. YURKO:** Objection I think
[9] he said he did his usual bullshit
[10] routine, so, that's the phrase of what
[11] I can understand your reticence to use
[12] it.
[13]   **A:** There's a lot of different ways you
[14] can blow somebody off.
[15]   **Q:** Is that what you meant by it, that
[16] he was just giving you a ration of untruths?
[17]   **A:** Oh, yeah.
[18]   **Q:** How soon after the deposition was
[19] that two week period when you spoke to Mr. Adams?
[20]   **A:** Seven to ten days probably.
[21]   **Q:** Okay.
[22]   **A:** I mean there's phone records, so —
[23]   **Q:** So that would take us somewhere
[24] towards the end of March, beginning of April, that
[25] period of time, is that correct?

Page 235

**Britto**

[1]
[2]   **A:** In the middle of the April,
[3] actually.
[4]   **Q:** Okay. What happened with, what
[5] happened in your last conversation with Mr. Adams?
[6] In other words, why did they end at the end of the
[7] two weeks?
[8]   **A:** Because his lawyer advised him not
[9] to talk to me.
[10]   **Q:** Okay. Did you ever discuss with him
[11] how much money he made out of the scheme?
[12]   **A:** No.
[13]   **Q:** Did you ever discuss with him how
[14] much money you made out of the scheme?
[15]   **A:** No.
[16]   **Q:** Okay. Did you ever discuss with him
[17] the pending criminal case with the State Attorney
[18] General's Office?
[19]   **A:** I believe so.
[20]   **Q:** Can you tell us what you said about
[21] that and he said about that subject matter?
[22]   **A:** I can't remember.
[23]   **Q:** Now, did David Adams —
[24]   **A:** Hold on, let me back up.
[25] He did say that when the state

Page 236

**Britto**

[2] troopers came and visit me, 15 went to his house,
[3] went through his stuff and Dennis Kelly said they
[4] found $200,000 or some stuff.
[5]   **Q:** Who's Dennis Kelly?
[6]   **A:** He was a store manager at
[7] Building 19.
[8]   **Q:** And that's what — did Dennis Kelly
[9] say that directly to you or was Dave Adams saying
[10] that that's what Dennis Kelly had said?
[11]   **A:** That's what Dave said.
[12]   **Q:** So Dave Adams told you that Dennis
[13] Kelly said to someone that they had found
[14] $200,000?
[15]   **A:** Which you can't believe what Dave
[16] says, so — but he did say that.
[17]   **Q:** Now, did David Adams at any time
[18] suggest to you or use words that caused you to
[19] believe he was asking you to change your
[20] testimony?
[21]   **A:** Oh, definitely.
[22]   **Q:** Did he say it specifically?
[23]   **A:** Oh, definitely.
[24]   **Q:** Okay. Can you tell us, did he ask
[25] you to lie for him?

Page 237

**Britto**

[2]   **A:** No, he did not. He just said, he
[3] said I don't want you to lie, just get me off the
[4] hook. Said it like ten times, I said will you
[5] shut the —
[6]   **Q:** You told him to shut up?
[7]   **A:** Yes.
[8]   **MR. YURKO:** In the vernacular.
[9]   **MR. KRASNOO:** Yes.
[10]   **Q:** When you suggested to Dave Adams
[11] that instead of using Ron, and you recommended
[12] setting up our own company to do this, there would
[13] be more money for us, you indicated there, you
[14] used the phrase, that Dave blew you off. Can you
[15] recall at all what he said that you interpreted as
[16] blowing you off?
[17]   **A:** Yeah, he just, he just never
[18] followed up with it.
[19]   **Q:** What else did you and David Adams
[20] talk about over the two-week period of time other
[21] than what you've already just told us?
[22]   **A:** Dennis Kelly, state troopers,
[23] 200,000.
[24]   Another thing, he lies so much he
[25] gets caught up in his own lies. The first time I

Page 238

**Britto**

[2] talked to him, just got out of the doctors, he had
[3] five slipped disks in his back. Talked to him a
[4] week later, just got out of the doctors, he got
[5] four. Now, it wasn't like he went to the doctors
[6] for a follow-up and they found out it was four,
[7] not five. He just went to the doctors. He just,
[8] oh, it's ridiculous.
[9]   **Q:** Did he discuss any aspect of the
[10] scheme at all other than what you've already told
[11] us in that two week conversation?
[12]   **A:** No.
[13]   **Q:** Now, you also indicated that you
[14] spoke with Tyrone Williams?
[15]   **A:** Yes.
[16]   **Q:** And that was from the date of your
[17] last depo, March 10th down to today, is that
[18] correct?
[19]   **A:** Yes.
[20]   **Q:** And you indicated from your prior
[21] testimony that some of it involved just social
[22] stuff, meaning that you inquired about your
[23] godchildren and things of that nature and his
[24] familial circumstances. Beyond that, did you have
[25] any conversations with Tyrone Williams in that

Page 239

**Britto**

[2] period of time from March 10th down to today where
[3] you discussed any aspect of the case at all or the
[4] scheme?
[5]   **A:** I'm pretty sure.
[6]   **Q:** Okay. Can you tell us as best as
[7] you can recall what you said to Tyrone Williams
[8] and what he said to you about the scheme or any
[9] aspect of it?
[10]   **A:** About the case, not the scheme.
[11]   **Q:** Yes, fine.
[12]   **A:** Well, once I told him, said, look,
[13] why aren't you showing up, this isn't a game here
[14] we're playing, this is some serious shit.
[15] Actually, it wasn't a conversation, it was more
[16] like me yelling at him. Who's here? You would
[17] think they would want to be here.
[18]   **Q:** So when you said why aren't you
[19] showing up, you meant why isn't Mr. Williams
[20] coming down to attend your depositions?
[21]   **A:** Yeah.
[22]   **Q:** Okay. Did he say anything in
[23] response to that?
[24]   **A:** Oh, I gotta work and this and that.
[25] You know what, you could be working behind bars.

### Britto

[1]
[2] And he's spending all this time, working on a new
[3] band, spending all this time on that. This is ten
[4] times more important. But like I said earlier,
[5] the gay guy's standing up, all the straight guys
[6] are running scared.
[7]     Q: Did, did you discuss with
[8] Mr. Mitchell at all from March 10th down to the
[9] present, the, any aspect of the fake invoices that
[10] he made out?
[11]     A: I've talked to Ron so much,
[12] possibly, I mean.
[13]     Q: Did you discuss with him at all any
[14] of the fake bills of lading —
[15]     MR. YURKO: Objection.
[16]     Q: — that he made out?
[17]     A: Can we use a different, can we say
[18] unknowingly fake?
[19]     Q: Okay. Let's leave out whether
[20] they're fake or unknowing, and did you have any
[21] discussion with him about bills of lading that he
[22] caused to be put into print?
[23]     MR. YURKO: You're focusing on
[24] the time period March 10th to today?
[25]     MR. KRASNOO: Yes.

### Britto

[1]
[2]     A: Possibly. Like I said, we talked.
[3]     Q: Did Mr. Mitchell ever — did
[4] Mr. Mitchell ever indicate to you in any
[5] conversation — I'm not in the time limit now —
[6] any conversation from the time this case began,
[7] that he was angry with you that you got him
[8] involved in the scheme where no rugs were
[9] involved?
[10]     A: No.
[11]     Q: Did he ever indicate any anger to
[12] you that you had suggested to him that he create
[13] invoices that are now being called fake, bills of
[14] lading that are now being called fake?
[15]     A: No. He did with Dave, however.
[16]     Q: Did Dave recite what Ron said to you
[17] in that conversation or did Ron recite to you what
[18] Ron said in that conversation?
[19]     A: Ron.
[20]     Q: Ron told you what he said to Dave?
[21]     A: Yeah.
[22]     Q: What did Ron say to you in
[23] conversation with you about what he had said to
[24] Dave?
[25]     A: Well, first Dave still owes him all

### Britto

[1]
[2] kind of money, and like, how did Ron put it, if
[3] Dave's lips are moving, he's lying, which is
[4] pretty funny, because it's the truth.
[5]     Q: Did you at any point tell Ron that
[6] there were no rugs involved?
[7]     A: No.
[8]     Q: Okay. Did Ron already know that at
[9] some point when he spoke to you from anything that
[10] he had said?
[11]     A: No. He found out once the case
[12] started and I told him.
[13]     Q: So did you tell him then, once the
[14] case started, that there were no rugs involved?
[15]     A: At some point.
[16]     Q: What was his reaction?
[17]     A: He was nervous, he was like, oh,
[18] shit.
[19]     Q: Did he accuse you of being a thief
[20] or Mr. Adams at all?
[21]     A: No.
[22]     Q: Did he indicate any dismay or
[23] concern about that?
[24]     A: Oh, yes.
[25]     Q: Did he ever talk to you about that

### Britto

[1]
[2] he was worried about the tax issue?
[3]     A: No, I think I brought that up to
[4] him.
[5]     Q: Do you know whether or not in a
[6] normal transaction of rugs, that means that some
[7] vendor sends out rugs to IFC, real rugs, is there
[8] a sales tax aspect to that? Does IFC have to pay
[9] sales tax on the rugs that he it receives to the
[10] vendor?
[11]     A: Oh, I have no idea.
[12]     Q: Did you ever see that on any
[13] legitimate invoices, invoices that came in from
[14] people that actually represented genuine shipments
[15] that IFC got?
[16]     A: No.
[17]     MR. YURKO: Objection.
[18]     A: I never seen it.
[19]     THE VIDEOGRAPHER: 12:18, this
[20] marks the end of Tape 1. We are now
[21] off the record.
[22]     (Brief recess.)
[23]     THE VIDEOGRAPHER: Time is now
[24] 12:25. This marks the beginning of
[25] Tape 2. We are back on the record.

**Britto**

[1]
[2]    THE WITNESS: I accept this
[3] Academy Award.
[4]    BY MR. KRASNOO:
[5]    Q: Mr. Britto, in any conversation that
[6] you've had at any time since the complaint was
[7] filed with either Mr. Mitchell or Mr. Adams or
[8] Mr. Williams, did you have any discussion with any
[9] one of the three of them or any two or all three
[10] as to what, if anything, they told the State
[11] Police when the State Police came to see them?
[12]    A: Yes.
[13]    Q: First of all, with which of the
[14] three did you do so; all of them, some of them,
[15] one of them?
[16]    A: I believe the State Police never
[17] went and visited Ron.
[18]    Q: Okay.
[19]    A: Talked to Tyrone and Dave which they
[20] didn't tell me anything.
[21]    Q: Okay. Did you at all discuss with
[22] them what, if anything, you said to the State
[23] Police when the State Police came to see you?
[24]    A: Most likely.
[25]    Q: Okay. Do you recall which of the two

**Britto**

[1]
[2] you discussed that with?
[3]    A: Probably both.
[4]    Q: Okay. Did you also discuss it with
[5] Mr. Williams?
[6]    A: That's what I mean.
[7]    Q: I'm sorry, Mr. Mitchell. Did you
[8] tell Mr. Mitchell what you had said to the State
[9] Police?
[10]    A: Probably.
[11]    Q: Okay. Have you, since March 10th
[12] down to the present, spoken with any of the
[13] attorneys who represent any of the named
[14] defendants in this case?
[15]    A: No. Never have at all.
[16]    Q: Okay. Now, do you intend presently
[17] to remain at your present address after July 1?
[18]    A: Hopefully.
[19]    Q: Do you have any other addresses in
[20] mind? The reason I ask that is we're still duty
[21] bound, pursuant to the rules we set up, to send
[22] you a copy of your deposition so that you can
[23] review it and make any corrections to it in
[24] writing and submit it back to us within 30 days.
[25] That being the situation, we would need to have an

**Britto**

[1]
[2] address.
[3]    Are you willing, in the event you
[4] change from your current address, to inform us as
[5] to whatever new address you take on as a
[6] residence?
[7]    A: Oh, definitely.
[8]    Q: Now, did you ever have any
[9] conversations with Mr. Mitchell wherein he asked
[10] you for any documents at all that confirmed or
[11] showed that rugs had actually been shipped?
[12]    A: Documents, no.
[13]    Q: Okay. Did he ever ask you for
[14] anything other than oral assurances that rugs had
[15] been shipped?
[16]    A: Oral, yes. But Dave was the one
[17] that was supposed to take care of all the
[18] paperwork and all that.
[19]    Q: Okay. And, correct me if I'm wrong,
[20] did you indicate that you had a discussion with
[21] Mr. Mitchell regarding tax issues of some kind?
[22]    A: Yes.
[23]    Q: Okay. Can you, as best as you can
[24] recall it, tell us what you said to him and what
[25] he said to you?

**Britto**

[1]
[2]    A: Well, I paid taxes on the money I
[3] received.
[4]    Q: Okay.
[5]    A: And Dave never paid any taxes.
[6]    Q: Okay. And do you know whether or not
[7] Mr. Mitchell paid any taxes on the monies that he
[8] received?
[9]    A: He said he did.
[10]    Q: He said?
[11]    A: He said he did.
[12]    Q: He said he did, okay. Now, do you
[13] know how much you paid in taxes?
[14]    A: I have it at home.
[15]    Q: Okay. Do you have the tax returns?
[16]    A: Yes.
[17]    Q: Okay. Would a review of the tax
[18] returns be helpful to indicate how much more than
[19] a hundred thousand dollars you received as a
[20] result of this scheme?
[21]    A: Most likely.
[22]    Q: Okay. And why did you pay taxes on
[23] money that you believed to be the result of a
[24] theft or a fraudulent scheme?
[25]    A: Well, one, I need to have some

**Britto**

[1]

[2] income coming in, just for credit reasons. And

[3] secondly, I don't need the IRS coming after me.

[4]    Q: Did you put down on your tax returns

[5] figures that represented the total sums of money

[6] that you actually stole as a result of the scheme

[7] or did you understate that illegally obtained

[8] income?

[9]    A: That was accurate.

[10]    Q: Did you have any aid in tax

[11] preparation for your return?

[12]    A: Yes, I did. I had an accountant.

[13] H & R Block, whatever.

[14]    Q: And does the accountant maintain

[15] your records for the tax returns, or did he simply

[16] make them out and then give you back all of your

[17] supporting documentation?

[18]    A: I have no idea.

[19]    Q: Could you —

[20]    A: I have everything. Whether he does,

[21] I don't know.

[22]    Q: Can you tell us the name of your

[23] accountant?

[24]    A: Used to be Kenneth Machado.

[25]    Q: That's M-A-C-H-A-D-O?

**Britto**

[1]

[2]    A: Yes.

[3]    Q: Okay.

[4]    A: Which is in Massachusets. And this

[5] year I went to H&R Block which is on 23rd Street.

[6]    Q: Now, do you know at all who —

[7] strike that.

[8]    Do you know at all what kind of

[9] legal entity Remco is, if indeed it's a legal

[10] entity?

[11]    A: I know they have a federal tax ID

[12] number.

[13]    Q: Do you know whether or not it's a

[14] corporation or a partnership or a sole

[15] proprietorship?

[16]    A: I have no idea.

[17]    Q: Do you know of the names of the

[18] other workers who worked at Remco other than Tony

[19] Marasco?

[20]    MR. YURKO: Objection.

[21]    Q: You mentioned Tony before, right?

[22]    A: Yeah.

[23]    Q: And the last name I think you told

[24] us in the first day of the deposition?

[25]    A: Marasco, or Meresco or something.

**Britto**

[1]

[2]    Q: Other than that person who you

[3] mentioned as having worked with Remco in some

[4] capacity, do you know the names of any other

[5] person?

[6]    MR. YURKO: Are you referring

[7] to testimony today?

[8]    MR. KRASNOO: No, that was —

[9] I was referring to testimony from day

[10] one.

[11]    MR. YURKO: Note my objection.

[12]    Q: Did you have conversations with Tony

[13] at all about Remco or any of Remco's business?

[14]    A: With Remco I talked to him about the

[15] money that Dave owed — owed him.

[16]    Q: Owed him?

[17]    A: Yeah. From gambling.

[18]    Q: Okay. When — did Tony ever indicate

[19] to you in any conversation at all the

[20] circumstances under which he loaned money to David

[21] Adams?

[22]    A: Yes.

[23]    Q: Okay. Would you tell us, as best as

[24] you can recall, what he said about that?

[25]    A: Yeah, he wanted his money back,

**Britto**

[1]

[2] which was like $50,000. And once again, this came

[3] from Dave, supposedly he put a lien on Dave's

[4] house. Whether he did or not, I mean —

[5]    Q: Did you talk to Dave at all after

[6] Tony spoke to you about the debt that he was owed

[7] by David, did you talk to David Adams at all about

[8] that debt?

[9]    A: Yes.

[10]    Q: Okay.

[11]    A: That's why Tony called me.

[12]    Q: How soon after Tony called you was

[13] it that you spoke about that debt?

[14]    A: It was like three weeks.

[15]    Q: Now, when Tony called you did you

[16] already know Tony by having spoken to him by phone

[17] before?

[18]    A: No.

[19]    Q: Did Tony, in this conversation to

[20] you, indicate how it was that he loaned David

[21] Adams money? In other words, who he was so as to

[22] be in a situation to loan David money?

[23]    A: No, I learned that from Ron

[24] Mitchell.

[25]    Q: Okay. And when you learned it from

Page 252

[1]                    *Britto*
[2] Ron Mitchell, did you learn that before or after
[3] Tony called you looking for his money?
[4]    A: Before, I believe.
[5]    Q: Okay. So, when Tony called you —
[6]    A: Yeah, it was before.
[7]    Q: Looking for the money that David
[8] Adams owed him, you already knew who he was?
[9]    A: Yeah, it was before that, yes.
[10]    Q: Did Tony at all indicate any, or
[11] communicate any threats as to what he would do to
[12] Dave if he didn't get paid?
[13]    A: Yeah, lien on his house.
[14]    Q: He told you that he would put a lien
[15] on his house?
[16]    A: No, I believe it was already on it.
[17]    Q: He told you that he had put a lien
[18] on the house, Tony, or was it David who told you
[19] that?
[20]    A: Dave told me for sure.
[21]    Q: Okay.
[22]    A: I discussed it with Tony. Did he
[23] tell me — yes, he did, he said he would take it
[24] off if Dave gave him the money.
[25]    Q: When Mr. Mitchell first told you

Page 253

[1]                    *Britto*
[2] about Tony, what was it that he said about him?
[3]    A: He was a loan shark.
[4]    Q: Okay.
[5]    A: You guys are keeping Post-its in
[6] business, ha.
[7]    Q: Did Tony have any position, as far
[8] as you knew, at Remco?
[9]    A: No just a lender.
[10]    Q: And other than the money Dave Adams
[11] owed Tony, did you ever discuss any other business
[12] deals or Remco with Tony?
[13]    A: No.
[14]    Q: Did Tony ever mention Jane Dziemit?
[15]    A: I don't believe so. The first I knew
[16] of Jane is the paperwork I got from you guys,
[17] which is I understand is his girlfriend.
[18]    Q: Do you know whether or not Tony lent
[19] any money to David Adams at any time after either
[20] the case began or the State Police came to meet
[21] with the various people connected to this case?
[22]    A: No idea. Since the State Police
[23] went — came, that's the first, recently is the
[24] first time I talked to Dave.
[25]    Q: When —

Page 254

[1]                    *Britto*
[2]    A: Which was sometime in April, late
[3] March.
[4]    Q: You indicated earlier today in your
[5] deposition that David Adams had a new business and
[6] he had it with a Peter?
[7]    A: Burnham.
[8]    Q: Burnham. Do you know the name of
[9] that business?
[10]    A: I have it at home.
[11]    Q: Okay.
[12]    A: I had him fax me a copy of a PO,
[13] they're doing business with Ocean State Job Lot.
[14]    Q: Ocean State?
[15]    A: Job Lot.
[16]    Q: Job Lot, okay. And how long ago did
[17] you find out that Mr. Adams was in this business?
[18]    A: Probably the day I got the fax,
[19] which would have it on the heading.
[20]    Q: Okay. Is that sometime after
[21] March 10th?
[22]    A: Yes.
[23]    Q: Okay. And if you had to estimate
[24] how long ago; a week, two weeks, three weeks, four
[25] weeks?

Page 255

[1]                    *Britto*
[2]    A: Middle of April.
[3]    Q: Okay. Did you receive that fax from
[4] David Adams?
[5]    A: Yes.
[6]    Q: And did you receive it before — did
[7] you receive it before, during or after that
[8] two-week period of time where you were talking to
[9] him constantly?
[10]    A: During.
[11]    Q: Do you know why Mr. Adams sent you
[12] that purchase order by fax?
[13]    A: Because I told him to, because I
[14] didn't believe him.
[15]    Q: Do you know Peter Burnham?
[16]    A: Yes.
[17]    Q: Did you ever discuss with Peter
[18] Burnham whether or not David Adams was in business
[19] with him?
[20]    A: I haven't talked to Peter Burnham in
[21] eight, ten years, I mean.
[22]    Q: Okay.
[23]    A: And they also have the same
[24] birthday, which is funny.
[25]    Q: Now, with regard to various purchase

Page 256

**Britto**

[1]
[2] orders of Remco that you have seen, have you ever
[3] seen Tony's name on a Remco purchase order?
[4] **A:** I think so.
[5] **Q:** And do you know — did you ever
[6] learn the circumstances under which the name Tony
[7] was placed on a Remco purchase order?
[8] **A:** Just a contact person.
[9] **Q:** Okay. And did you ever have contact
[10] with Tony in his capacity as a contact person?
[11] **A:** Never.
[12] **Q:** Okay. There was also a woman Diane
[13] and I may be mispronouncing, Spignosi. Do you
[14] recall the name of Diane ever being on a Remco
[15] pursuant order?
[16] **A:** No, I don't but I found out who it
[17] was.
[18] **Q:** And who was it?
[19] **A:** Ron's girlfriend. Because after,
[20] the first times deposition, I'm like who the
[21] hell's Diane, and he told me.
[22] **Q:** Was Tony a contact person for Remco?
[23] **A:** Could have been Remco or Mansfield,
[24] it's still the same thing.
[25] **Q:** I'm going to show you a document —

Page 257

**Britto**

[1]
[2] **MR. YURKO:** Did you make a
[3] copy for me?
[4] **Q:** — and ask you whether or not you
[5] can identify it in any way?
[6] **MR. YURKO:** Are you going to
[7] mark this?
[8] **MR. KRASNOO:** Yeah.
[9] **MR. YURKO:** Do you know what
[10] number it's going to be?
[11] **MR. KRASNOO:** I think it's
[12] going to be 4.
[13] **MR. YURKO:** My copy of what
[14] you're going to mark as Exhibit 4 has
[15] two Exhibit Ds. Is that a mistake or
[16] is that intentional?
[17] **MR. KRASNOO:** I think that
[18] it's front and back because
[19] Exhibit D —
[20] **MR. YURKO:** I just have two
[21] copies of the front.
[22] **MR. KRASNOO:** Oh, well, you
[23] should have a copy of the back. Do
[24] you have a copy of the back — yes,
[25] okay. Here we go, and I'll take that

Page 258

**Britto**

[1]
[2] one back from you.
[3] **Q:** Now, are you able to identify any
[4] pages of this multi-page exhibit consisting of
[5] five pages?
[6] **A:** When you say identify, what exactly
[7] do you mean?
[8] **Q:** I mean, are you able to — can you
[9] recognize any of the forms?
[10] **A:** Oh, of course.
[11] **Q:** Okay. Which form or forms can you
[12] recognize out of the five pages?
[13] **A:** All of them.
[14] **Q:** Okay.
[15] **MR. KRASNOO:** Now, with regard
[16] to all of them, why don't we have that
[17] marked for identification now as
[18] Exhibit 4, which you can do at the
[19] lunch break or at any time it's
[20] convenient for you.
[21]     (Five pages of forms was
[22] marked as Deposition Exhibit No. 4 for
[23] identification, as of this date.)
[24]     **BY MR. KRASNOO:**
[25] **Q:** Looking first at page one of that,

Page 259

**Britto**

[1]
[2] what is that form?
[3] **A:** Purchase order.
[4] **Q:** Okay. Is that a form that would be
[5] made up at International Floor Crafts?
[6] **A:** Yes, by the buyer.
[7] **Q:** Okay. Are you able to identify who
[8] made up this specific one in front of you?
[9] **A:** Dave Adams.
[10] **Q:** Okay. And how do you identify that
[11] it is one made up by Dave Adams?
[12] **A:** His handwriting.
[13] **Q:** Okay.
[14] **A:** And his signature.
[15] **Q:** Okay.
[16] **A:** And Jerry Sokol signed off on it as
[17] well.
[18] **MR. YURKO:** Could you ask him
[19] what he's referring to as the
[20] signature? I don't —
[21] **BY MR. KRASNOO:**
[22] **Q:** Is that on the lower right, part of
[23] which is not there?
[24] **A:** On the conditions of this order.
[25] **MR. YURKO:** Can I see your

Page 260

*Britto*

[2] copy? Okay, thank you.

[3] **Q:** So you can recognize from the swirls

[4] there that that was a portion of Mr. Adams'

[5] signature?

[6] **A:** Yeah, I know his signature.

[7] **Q:** And you also see the JMS and you

[8] know that to be Mr. Sokol's initials?

[9] **A:** Yes.

[10] **Q:** Okay. Now, in addition, if you look

[11] up above there's a small column on the right-hand

[12] side of the purchase order form, says order given

[13] by, and it has DA in there.

[14] **A:** Yep.

[15] **Q:** And would that stand for David

[16] Adams?

[17] **A:** Dead on arrival --- no.

[18] **Q:** That would be DOA.

[19] So, but is that ---

[20] **A:** Yes, Dave Adams.

[21] **Q:** Now, you'll notice on the upper

[22] right-hand side of page one, it says contact

[23] person, and it lists a Tony, is that correct?

[24] **A:** Yes.

[25] **Q:** Is that Tony Marasco?

Page 261

*Britto*

[2] **A:** Yes.

[3] **Q:** Okay. And you'll notice that the

[4] vendor is Remco, is that correct?

[5] **A:** Yes.

[6] **Q:** All right. Now, the date of this

[7] order was October 29th. Are we able to tell what

[8] year this was?

[9] **A:** Well, this receiving stamp says

[10] 2002.

[11] **Q:** Okay. And when you say the receiving

[12] stamp, that's on the right-hand side where it says

[13] received Nov. 01, 2002?

[14] **A:** Correct.

[15] **Q:** Okay. Also down below on the

[16] left-hand side but above the words condition of

[17] this order are hand writings GE/BE 11-1-02. Do

[18] you see that?

[19] **A:** Yes.

[20] **Q:** Do you know what GE and BE stands

[21] for?

[22] **A:** Gerry Elovitz, Bill Elovitz.

[23] **Q:** And that's the same date as the date

[24] of the received stamp, is that correct?

[25] **A:** Correct.

Page 262

*Britto*

[2] **Q:** Now, what is the purpose, if you

[3] know, from your experience having worked for

[4] International Floor Craft of having a contact

[5] person on a purchase order?

[6] **A:** Just in case there's a problem.

[7] **Q:** And you'll notice that there's a

[8] number there of ████ a █ and then I can't tell

[9] whether that's a █ or a █?

[10] **A:** ████

[11] **Q:** Okay. Do you know that telephone

[12] number?

[13] **A:** I believe it's Ron's number.

[14] **Q:** And are you able to determine why

[15] Tony Marasco would be put down as a contact person

[16] for a Remco order that represents nonexisting

[17] rugs?

[18] **MR. YURKO:** Objection, no

[19] foundation.

[20] **A:** You have to ask Dave that.

[21] **Q:** Okay. Now, there is, in fact, a

[22] description of certain rugs with the quantity and

[23] the cost price and the sale price and the

[24] department number, is that correct, on this page

[25] one?

Page 263

*Britto*

[2] **A:** Yup.

[3] **Q:** Okay.

[4] **A:** Yes.

[5] **Q:** And whose handwriting in that?

[6] **A:** That's Dave Adams.

[7] **Q:** Okay. And then there's a total

[8] retail amount of 70,715.20?

[9] **A:** Yes.

[10] **Q:** Okay. And in point of fact is that

[11] a fake amount for nonexistent rugs?

[12] **MR. YURKO:** Objection; where

[13] are you pointing to?

[14] **MR. KRASNOO:** Total retail,

[15] down on the lower right.

[16] **Q:** Is that correct?

[17] **A:** Yes.

[18] **Q:** Okay. Now, there also is put in

[19] there a cost of goods of 38,500. Is --- was that

[20] money advanced under the scheme by Remco directly

[21] to purchase rugs?

[22] **MR. YURKO:** Objection.

[23] **A:** November 1st, 2002 --- could have

[24] been, I'm not sure, but at first it didn't start

[25] that way.

Page 264

**Britto**

[2] **Q:** No. Did Remco ever advance for

[3] funds more than $20,000 at any one time?

[4] **A:** Yes.

[5] **Q:** Okay. Now, the cost of freight was

[6] zero. Do you notice that?

[7] **A:** Yes.

[8] **Q:** Did Remco, to your knowledge,

[9] actually have trucks?

[10] **A:** No.

[11] **Q:** Do you have any recollection of ever

[12] seeing a Remco truck deliver anything to any IFC

[13] physical location?

[14] **A:** No.

[15] **Q:** And then there's the total cost

[16] recited again of 38,500. And then under that it's

[17] a percentage something with a figure that is

[18] somewhat cut off. Do you know what that

[19] percentage?

[20] **A:** Percentage of markup.

[21] **Q:** Markup. And are you able to

[22] determine — it looks like there's a 4181

[23] something. Would that represent —

[24] **A:** No, that's actually 41 percent.

[25] **Q:** 41 percent, okay.

Page 265

**Britto**

[2] Now, are you able to determine how

[3] many square yards of carpet this approximates?

[4] **A:** If I had a calculator I could figure

[5] it out.

[6] **Q:** Okay. If the quantity is 280, what

[7] does that mean, the numbers of rugs that exist?

[8] **A:** Yes.

[9] **Q:** Okay. So this then would involve

[10] about 1200 rugs, is that correct, because 280

[11] times five?

[12] **A:** Yep.

[13] **Q:** Would an order of this size need a

[14] fairly large trailer if it were delivered?

[15] **A:** Depends on the size of the rugs.

[16] **Q:** Well, the size are listed there,

[17] aren't they?

[18] **A:** Yeah, but you have to figure out

[19] square yardage.

[20] **Q:** Okay. If I were to suggest to you

[21] that the order approximated 5,280 square yards,

[22] what size trailer would be needed for such a

[23] delivery?

[24] **A:** Probably a 53-footer.

[25] **Q:** Okay. And is that a — that's a

Page 266

**Britto**

[2] fairly large trailer, isn't it?

[3] **A:** Yes. I believe you can fit 6,000

[4] square yards on a trailer.

[5] **Q:** Now, the second page gives a

[6] typewritten description of the rugs, is that

[7] correct?

[8] **A:** Yes.

[9] **Q:** Okay. Are you able identify any or

[10] all of the handwritings on the second page, the

[11] Remco form, other than the words Exhibit B, up at

[12] the very top?

[13] **A:** Bob Walsh.

[14] **Q:** And can you tell us which portions

[15] of handwriting were written on by Mr. Walsh?

[16] **A:** The signature at the bottom,

[17] 11/13/02.

[18] **Q:** Okay.

[19] **A:** The other one looks like Dave Adams.

[20] **Q:** And where are you referring to when

[21] you see Dave Adams?

[22] **A:** Pay as invoiced.

[23] **Q:** Pay as invoiced, okay.

[24] **A:** Price and quantity okay.

[25] **Q:** Okay. Now, are you able to identify

Page 267

**Britto**

[2] any of the writing on the lower left-hand portion

[3] that begins with the word Corp., C-O-R-P and ends

[4] with what looks like distribution but only the

[5] R-I-B-U-T-I-O-N is on there?

[6] **A:** No, I don't know who that —

[7] **Q:** All right. There are check marks

[8] against the description of the rugs in the

[9] quantity box, the check mark starts, as to each

[10] one of the five lines. Are you able to tell who

[11] made those check marks?

[12] **A:** I don't think anybody can tell who

[13] made a check mark.

[14] **Q:** Okay. Now, are you able to tell who

[15] wrote the word up above, discount, which is

[16] underlined twice with an exclamation point?

[17] **A:** No.

[18] **Q:** Okay. And this says ship to

[19] Building 19, Warehouse 3 at One King Street in New

[20] Bedford. Was there any discussion with you and

[21] Dave Adams with regard to what, where the shipment

[22] should be sent to in the various Remco invoices?

[23] **A:** They all went to Warehouse 3.

[24] **Q:** They all went to the New Bedford

[25] warehouse?

Page 268

**Britto**

[1]

[2] **A:** Yes.

[3] **Q:** What would your role be in this

[4] particular shipment at all?

[5] **MR. YURKO:** Objection; why

[6] don't you ask him what his role was?

[7] **MR. KRASNOO:** Sorry?

[8] **MR. YURKO:** Why don't you ask

[9] him what his role was as opposed to

[10] what it would be.

[11] **Q:** What was your role specifically with

[12] regard to this shipment that was received

[13] November 1, 2002?

[14] **A:** I mean, I can't tell you what my

[15] role was for every shipment, but I would basically

[16] be the middleman giving the information between

[17] the warehouse and the buyer.

[18] **Q:** Okay. Take a look at the next page,

[19] and the next page has in the cost column a plus

[20] one. What does that mean, if you know?

[21] **A:** Supposed to receive 280 rugs, they

[22] received 281.

[23] **Q:** Okay. Was that part of the scheme

[24] to claim an overshipment so as to dupe or deceive

[25] any reader of this document?

Page 269

**Britto**

[1]

[2] **A:** Yes.

[3] **Q:** Who developed the idea to

[4] periodically put on shipment forms, an

[5] overshipment?

[6] **A:** I did.

[7] **Q:** And what is the purpose to putting

[8] an overshipment on the form?

[9] **A:** Because in any vendor that we deal

[10] with there's always under or overs, so that's why

[11] you would do it.

[12] **Q:** Now, going back to page two, as it

[13] were, for the moment, is that what the plus one

[14] 8-by-10 up above in the upper right-hand corner

[15] also refers to?

[16] **A:** Yes.

[17] **Q:** Okay. Now, you're not able to read

[18] whose writing that is, the plus one 8-by-10, are

[19] you?

[20] **A:** What page are we on?

[21] **Q:** On page two, can you identify whose

[22] writing that is?

[23] **A:** No, I have no idea.

[24] **Q:** Okay. And are you able to identify

[25] the plus one on the third page in the cost column?

Page 270

**Britto**

[1]

[2] **A:** Well, the key rec's made out by

[3] Tyrone, so must be him.

[4] **Q:** And one of the ways you can tell

[5] that is that it's got TW above the, in the order

[6] block order checked by, is that correct?

[7] **A:** No, because it's signed at the

[8] bottom.

[9] **Q:** Okay. But in addition, Tyrone

[10] Williams' initials are in the order check box on

[11] the right hand column?

[12] **A:** Correct.

[13] **Q:** Okay. Are those the way Tyrone

[14] Williams makes his initials, do you know?

[15] **A:** I'm not sure.

[16] **Q:** Okay. But are you able to identify

[17] Tyrone Williams' handwriting down below?

[18] **A:** Signature, yes.

[19] **Q:** Okay. And it says merchandise

[20] checked by JD, WT, M something, and then SA. Do

[21] you see that?

[22] **A:** Um-hum.

[23] **Q:** Okay. Do you know any of those

[24] initials of who those people are that checked it?

[25] **A:** I have no idea.

Page 271

**Britto**

[1]

[2] **Q:** Okay. And are you able to identify

[3] whose handwriting it is that attributes that the

[4] merchandise was checked by those people?

[5] **A:** Looks different actually.

[6] **Q:** Was that part of the scheme to put

[7] in that merchandise was checked?

[8] **A:** No.

[9] **Q:** Okay. But, in point of fact, are you

[10] able to tell us whether or not with regard to this

[11] particular shipment there was any merchandise that

[12] was received?

[13] **A:** No, there wasn't.

[14] **Q:** Okay.

[15] **A:** But I'm just trying to figure out

[16] how, there's two different handwritings, it looks

[17] like.

[18] **Q:** Would Mr. Williams as part of the

[19] scheme, on his own, determine the overshipment or

[20] would he take direction either from you or Dave

[21] Adams?

[22] **A:** From myself or Dave Adams.

[23] **Q:** Okay. So, do you remember having

[24] conversations with Mr. Williams where you

[25] indicated to him that he should list some things

# In The Matter Of:

## INTERNATIONAL FLOOR CRAFTS   v.
## DAVID ADAMS

---

## KEVIN BRITTO
## May 31, 2006

---

## FINK & CARNEY REPORTING AND VIDEO SERVICES
## 39 WEST 37TH STREET
## NEW YORK, NY  USA  10018
## (212) 869-1500   or   (800) 692-3465

Original File DD0531Z.TXT, 176 Pages
Min-U-Script® File ID: 0142682450

# Word Index included with this Min-U-Script®

May 31, 2000

DAVID ADAMS

**Britto**

[1]

[2] as overshipment, list some things as

[3] undershipments from time to time?

[4] **A:** Yes.

[5] **Q:** Okay. Did you ever see the paperwork

[6] related to those shipments to show that

[7] Mr. Williams had followed your advice?

[8] **A:** Sometimes.

[9] **Q:** Would you see the checks that

[10] International Floor Crafts made out to Remco?

[11] **A:** When I was a buyer, I would.

[12] **Q:** Okay. So you would see them at some

[13] point before they left the premises to be mailed

[14] to Remco, is that correct?

[15] **A:** Probably five percent of the time.

[16] I didn't see them all the time.

[17] **Q:** How would you find out, if you

[18] would, that Remco either cashed or deposited a

[19] check that was sent to it from IFC?

[20] **A:** Well, later on I might find out when

[21] I asked Ron.

[22] **Q:** And — but before you would simply

[23] receive some monies from Dave Adams, is that

[24] correct?

[25] **A:** Correct.

**Britto**

[1]

[2] **Q:** Now, was there any way for you to

[3] know what percentage share you were getting as

[4] opposed to Dave Adams when Dave Adams was taking

[5] in the money and then giving it to you?

[6] **A:** No.

[7] **Q:** At that point, Dave Adams would be

[8] giving you cash, wouldn't he?

[9] **A:** At first maybe the first ten orders.

[10] **Q:** But after the first ten orders, how

[11] did you get paid by Dave Adams or did the payment

[12] stop?

[13] **A:** Well, they stopped, and then CCC

[14] would send me a check.

[15] **Q:** So CCC sent you a check directly?

[16] **A:** Yes.

[17] **Q:** Was it made out to you in your name?

[18] **A:** Yes.

[19] **Q:** Okay. And what would Remco do?

[20] **A:** Wire the money.

[21] **Q:** Okay. And wired it directly into

[22] your bank account?

[23] **A:** Yes. Can I take a recess? This

[24] waters going through me.

[25] **Q:** Absolutely, and it's ten past one,

**Britto**

[1]

[2] so might be a good time to see whether or not

[3] there is lunch yet.

[4] **THE VIDEOGRAPHER:** The time is

[5] now 1:02. We are off the record.

[6]      (Whereupon, at 1:02 o'clock p.m. a

[7] luncheon recess was taken.)

[8] **THE VIDEOGRAPHER:** Time is now

[9] 1:54, we're back on the record.

[10]      **BY MR. KRASNOO:**

[11] **Q:** Mr. Britto, I'm showing you what

[12] appears to be a purchase order 26027 of

[13] International Floor Crafts, Inc. and I would ask

[14] you if you would look at all three pages of it,

[15] and see whether or not you can identify any of the

[16] pages.

[17] **A:** Yeah, the first page which is the

[18] purchase order filled out by myself. Second page

[19] is an invoice signed by Robert Walsh, I believe.

[20] And the third page is a key rec signed by Tyrone

[21] Williams.

[22] **Q:** Okay. Now, with regard to the first

[23] page that you filled out, is it your handwriting

[24] bearing the telephone number in the upper

[25] right-hand corner, it's ▓▓▓▓▓▓▓▓?

**Britto**

[1]

[2] **A:** Yes, it is.

[3] **Q:** And do you know whose telephone

[4] number that is?

[5] **A:** I got that number from Dave. I have

[6] no idea.

[7] **Q:** Okay.

[8] **A:** Says Tony, but.

[9] **Q:** And did you know that name as of the

[10] date of the order which appears to be from the

[11] form September 25th, '01?

[12] **A:** We just put names on anything, so.

[13] Did I know the person? No, I never met him.

[14] **Q:** Okay. Had you spoken to Tony by

[15] this point?

[16] **A:** No.

[17] **Q:** Okay. Did you know whether or not,

[18] at the time you put the name down on the form,

[19] there had been a Tony in some way connected to

[20] Remco?

[21] **A:** I have no idea.

[22] **Q:** Okay. Were you concerned at all

[23] that someone who wasn't part of the scheme or the

[24] process, was listed as the contact person?

[25] **A:** Not at all.

**Min-U-Script®**       FINK & CARNEY (800) NYC-FINK

---

**Page 276**

*Britto*

[1]

[2]    **Q:** Now, that's your signature in the

[3] lower left-hand corner?

[4]    **A:** Yes, it is.

[5]    **Q:** And is that Mr. Sokol's initials?

[6]    **A:** Yes.

[7]    **Q:** Written in his own handwriting?

[8]    **A:** I believe so. And then next to my

[9] name it looks like Bob Walsh.

[10]    **Q:** Okay. Can you tell me why you

[11] weren't concerned that someone where you didn't

[12] know whether he was or wasn't part of the scheme

[13] was listed as the contact person?

[14]    **A:** Yeah, because like I stated earlier,

[15] Bill wanted new vendors, so we would make up new

[16] vendors. It made our job easier.

[17]    **Q:** Now, is page one related to a

[18] fictional shipment? In other words —

[19]    **A:** I know what you mean.

[20]    **Q:** Okay.

[21]    **A:** Most likely.

[22]    **Q:** Okay. Now, this was actually made

[23] out while you were still at the employ of

[24] International Floor Crafts, isn't that correct,

[25] September '01?

---

**Page 277**

*Britto*

[1]

[2]    **A:** The purchase order was.

[3]    **Q:** Yes.

[4]    **A:** However, the receiving wasn't

[5] because I left on September 28th, 19 — I mean

[6] 2001.

[7]    **Q:** All right. So this was, this perhaps

[8] may have been the last purchase order that you

[9] made out?

[10]    **A:** Maybe, yeah.

[11]    **Q:** When you put down the contact person

[12] you indicated before the lunch break that the

[13] purpose of the contact person was if anything went

[14] wrong with the order that person could be called,

[15] is that correct?

[16]    **A:** Yes.

[17]    **Q:** If something went wrong with this

[18] order and they contacted Tony Marasco, there would

[19] be no way for you to know whether or not he would

[20] know anything appropriate to say about the order,

[21] isn't that correct?

[22]    **A:** I would think so.

[23]    **Q:** So, but that didn't concern you at

[24] the time you put down his name?

[25]    **A:** No.

---

**Page 278**

*Britto*

[1]

[2]    **Q:** Did David Adams at all tell you that

[3] this person whose name you put down was aware of

[4] the fact that Remco would be billing for rugs that

[5] they in fact had not shipped?

[6]    **MR. YOUNG:** Objection to form.

[7]    **A:** Let me back up a little bit. When

[8] it came to Ron and Tony at this point, Dave dealt

[9] with them. So when I put a name on a purchase

[10] order, if there was a problem, I would contact

[11] Dave, he would contact them.

[12]    **Q:** Okay. Now, you indicated before the

[13] break that the Tony who loaned Dave $50,000, you

[14] called him a loan shark. Do you recall?

[15]    **A:** Yeah.

[16]    **Q:** Do you simply mean that he loaned

[17] money on that one occasion or did you know him to

[18] be in the business of lending money?

[19]    **A:** I know him to be in the business of

[20] lending money.

[21]    **Q:** Had he loaned David Adams before

[22] this one occasion, to your knowledge?

[23]    **A:** I only know about that one time.

[24]    **Q:** Okay. Did David Adams and you ever

[25] discuss that Tony was in the business of loaning

---

**Page 279**

*Britto*

[1]

[2] money?

[3]    **A:** Yes.

[4]    **Q:** Did Dave Adams ever indicate to you

[5] that Tony had loaned him any money on prior

[6] occasions to this particular one?

[7]    **A:** No.

[8]    **Q:** Now, I think in your first day of

[9] deposition you mentioned an incident where

[10] Mr. Adams was in a cast or had some damage done to

[11] his legs?

[12]    **A:** Yes.

[13]    **Q:** And that I think you said that

[14] although he explained it as having a swimming pool

[15] accident —

[16]    **A:** Yeah.

[17]    **Q:** — that you really believed that

[18] somebody was trying to collect a debt from him —

[19]    **A:** Yes.

[20]    **Q:** — and banged him up?

[21]    **A:** Yeah.

[22]    **Q:** Did you ever find out from him

[23] whether or not there was a person who banged him

[24] up?

[25]    **A:** No. But, can I add something to

---

Page 280

*Britto*

[1]
[2] that?
[3]    Q: All right.
[4]    A: Said he jumped into a pool, broke
[5] both of his feet, but he had to put one cast on
[6] and then once that comes off the cast goes on
[7] another one. That's — that second cast never
[8] showed up, and I believe.
[9]    Q: Go on.
[10]    A: And I could be wrong, because Dave,
[11] he told me this, but it sounds like something Bill
[12] would do, Mr. Elovitz, offered to give him money
[13] to pay off a loan, a bookie.
[14]    Q: Let's look at page two of the
[15] exhibit in front of you. If you'll notice under
[16] the unit price there's an item there marked $3 and
[17] it doesn't have a check mark and there's a total
[18] there of 900 and it doesn't have a check mark.
[19]    A: Um-hum.
[20]    Q: Does that mean anything to you where
[21] all the other unit prices do have check marks but
[22] that does not?
[23]    MR. YURKO: Objection,
[24] foundation. He wasn't there.
[25]    A: Accounts payable would know better

Page 281

*Britto*

[1]
[2] than I would.
[3]    Q: Okay. Now, on this particular
[4] document, both 6027, the front page of it, and
[5] this Remco invoice that was received according to
[6] the stamp, October 22, '01, there's no
[7] overshipment or undershipment indicated. Would
[8] that mean, therefore, on a fair reading, that this
[9] was theoretically a shipment that came in just as
[10] it was ordered?
[11]    MR. YURKO: Objection. Are
[12] you going to have the witness look at
[13] the third page, which is the key rec?
[14]    A: I don't understand how that $3 thing
[15] is not checked off and it says pay as invoiced,
[16] when it shouldn't to my knowledge from doing bills
[17] of ladings and working in accounts payable, as a
[18] buyer, they shouldn't have paid that without
[19] checking into that.
[20]    Q: Okay. Notice also on the second
[21] page of it, where it has this stamp or something
[22] attached to another document it clearly looks like
[23] and it begins with the word Corp. and ends with —
[24]    A: Corp., yup.
[25]    Q: — and ends with "ribution" again,

Page 282

*Britto*

[1]
[2] notice on the line that's marked with 17,000 it
[3] has a bracket to the right of it of $340 and below
[4] that $16,660. Did those numbers, based on your
[5] practice and experience with invoices, mean
[6] anything?
[7]    A: The brackets would mean minus.
[8]    Q: Okay. Okay, so that $340 being
[9] taken off the total of 17,000 to arrive at the
[10] 16,660?
[11]    A: Yes.
[12]    Q: All right. Now, the last page of
[13] this, this is a key rec you indicated that is
[14] signed with the name Tyrone Williams, is that
[15] correct?
[16]    A: Correct.
[17]    Q: Can you identify that as
[18] Mr. Williams' signature?
[19]    A: Yes.
[20]    Q: Okay. And before it is a date.
[21] Does that mean that that would be the date on
[22] which he checked over the goods and made out a key
[23] rec?
[24]    A: That's the date he just signed the
[25] key rec.

Page 283

*Britto*

[1]
[2]    Q: Okay. Now, under the column marked
[3] color and finish is three entries, a plus 50, a
[4] plus 50 and a plus a hundred?
[5]    A: Um-hum.
[6]    Q: Does that mean that there were more
[7] rugs of a particular kind than ordered?
[8]    A: Well, that's nonskid padding which,
[9] yeah.
[10]    Q: Okay. And again, are you able to
[11] identify whose handwriting is on the portion of
[12] the key rec that says merchandise checked by with
[13] JJ and DG?
[14]    A: I don't even know whose those
[15] initials are.
[16]    Q: Okay. And you're not able to tell
[17] whether the initials TW in order checked by were
[18] Tyrone's initials, is that correct?
[19]    A: Yeah, but it would —
[20]    Q: Okay.
[21]    A: — seem to be his, but. But the
[22] purchase order number, what purchase order number
[23] is that?
[24]    Q: Did you ever find out from any
[25] conversation you ever had with anyone about

**Britto**

[1]
[2] Remco's preparation of documents to be sent to IFC
[3] whether or not Tony was aware that Remco was
[4] billing for rugs which Remco actually never
[5] shipped?
[6]     **A:** No.
[7]     **Q:** Now, not only did Remco participate
[8] in this scheme, but CRC also did, too, as well,
[9] right?
[10]     **MR. YURKO:** Objection to
[11] the —
[12]     **THE WITNESS:** Excuse me —
[13]     **MR. YURKO:** Can I state my
[14] objection, then you get to answer.
[15]     **THE WITNESS:** I object to the
[16] first part of the question about
[17] Remco.
[18]     **Q:** CCC —
[19]     **A:** Yes. Yes CCC knew knowingly, Remco
[20] did not know knowingly.
[21]     **Q:** So, what communications did you have
[22] with anyone at Remco — at CCC about the shipments
[23] where they knew the shipments were fake?
[24]     **A:** Went through Dave.
[25]     **Q:** Okay. Dave Adams?

**Britto**

[1]
[2]     **A:** Yes. And then later on Mike Brown.
[3]     **Q:** Okay.
[4]     **A:** And then David Sun.
[5]     **Q:** Now, when it was a CCC shipment, did
[6] CCC also at some point advance funds just like
[7] Remco did?
[8]     **A:** To Dave, yes.
[9]     **Q:** Okay. And did you have any mechanism
[10] in place so that you knew that Dave was giving you
[11] your fair share from whatever he was receiving
[12] either from CCC or from Remco?
[13]     **A:** No, I learned that later on.
[14]     **Q:** Okay. So, did you learn at some
[15] point that you were in some way stiffed by David?
[16] I mean, I'm not talking about when he gave you
[17] nothing, but, I mean, did you also learn that when
[18] he was sharing monies with you that you were
[19] getting less than what he was getting?
[20]     **A:** Probably at some point.
[21]     **Q:** Okay. In the first day of your
[22] deposition you mentioned two different percentages
[23] at different places in your testimony, one was
[24] 22 percent, and one was 50 percent. What was the
[25] 22 percent figure for, that percentage?

**Britto**

[1]
[2]     **A:** 22 percent was from CCC.
[3]     **Q:** So you were getting 22 percent of
[4] whatever monies were sent by IFC to CCC for
[5] nonexistent shipment of rugs, is that correct?
[6]     **A:** I was supposed to be getting
[7] 22 percent.
[8]     **Q:** Okay. And when, when the 22 percent
[9] was coming, was that 22 percent just for Kevin
[10] Britto or was that 22 percent for Kevin Britto and
[11] David Adams?
[12]     **A:** It was for Kevin Britto and Tyrone
[13] Williams.
[14]     **Q:** Okay. And did you know how much
[15] David Adams was supposed to be getting? No?
[16]     **A:** No. I mean he did a lot of things
[17] behind my back that I have no knowledge of.
[18]     **Q:** So when you got money from CCC, that
[19] was separate and apart from money that you
[20] understood was to go to David Adams from CCC as
[21] well, is that correct?
[22]     **A:** Rephrase that.
[23]     **Q:** Yeah. When CCC sent you money for
[24] your participation in these nonexistent shipments,
[25] they were sending you 22 percent of what, the

**Britto**

[1]
[2] total check that IFC gave to them or something
[3] less?
[4]     **A:** Something less.
[5]     **Q:** Okay. And how did you and CCC
[6] arrive at the figure of 22 percent?
[7]     **A:** Well, that's what, Dave set it up so
[8] that's how.
[9]     **Q:** When you say it was 22 percent of
[10] something less than the total amount of monies
[11] from IFC to CCC, what was it — what was that
[12] something less, do you know?
[13]     **A:** Depends on what I received, until I,
[14] as I stated earlier, took more of a proactive
[15] demeanor or whatever you want to call it.
[16]     **Q:** So when you and David Adams
[17] initially arranged that CCC was going to knowingly
[18] participate in a scheme where no rugs were coming
[19] to IFC but IFC was going to be paying CCC as if
[20] rugs had been sent, how did you, what discussion,
[21] if any, did you have with David Adams at that
[22] point about monies, how much you were to get, and
[23] what it really meant in terms of real dollars in
[24] your pocket?
[25]     **A:** It's a long time ago. It was

---

DAVID ADAMS

Page 288

[1]                    *Britto*
[2] supposed to be 50/50, but it never turned out to
[3] be that way.
[4]     **Q:** Okay.
[5]     **A:** And the share that I got, Tyrone's
[6] pay would come out of it.
[7]     **Q:** And that was about 1500 per key rec
[8] you said last time, is that right?
[9]     **A:** Yes, yep.
[10]     **MR. YURKO:** It, you meant
[11] Mr. Williams' share.
[12]     **MR. KRASNOO:** Yes.
[13]     **Q:** So was it arranged then of a total
[14] invoice that would be sent to CCC, if they got a
[15] hundred percent of that total invoice sent to them
[16] by IFC, at least initially you were to get
[17] 22 percent of that and then out of that came
[18] Tyrone's share, or were you to get more and what
[19] happened was you ultimately wound up getting
[20] 22 percent because you paid some money to Tyrone?
[21]     **A:** 22 percent was the total I would
[22] get. Now, Dave would get the money up front.
[23]     **Q:** Okay. From CCC?
[24]     **A:** From CCC.
[25]     **Q:** Okay.

Page 289

[1]                    *Britto*
[2]     **A:** A lot of times he would come and say
[3] Building 19's not paying their bills, I wouldn't
[4] see anything. When I did, I would pay Tyrone out
[5] of my share.
[6]     **Q:** Did you ever learn that in fact when
[7] we said IFC isn't paying its bills, that he
[8] received money from CCC and just never split any
[9] of it with you?
[10]     **A:** Yes, I found out later on.
[11]     **Q:** Okay. Did you also find that he did
[12] the same thing with Remco in the sense that Remco
[13] sent him money and he would say that I didn't
[14] receive anything and therefore I've got nothing to
[15] give you?
[16]     **A:** Yes.
[17]     **Q:** Okay. Now, how did you find out
[18] that David Adams wasn't paying you monies that he
[19] had actually received — out of monies that he had
[20] actually received?
[21]     **MR. YURKO:** Asked and answered
[22] in day one.
[23]     **A:** Because I would call Tyrone up and
[24] he would call accounts payable to see if they were
[25] getting paid.

Page 290

[1]                    *Britto*
[2]     **Q:** So it was only after David Adams
[3] told you that IFC wasn't paying its bills that you
[4] found out that you were getting stiffed by David
[5] Adams?
[6]     **A:** Yes.
[7]     **Q:** Okay. Did you ever find out the
[8] amounts of money you were getting stiffed by David
[9] Adams?
[10]     **A:** I don't think so.
[11]     **Q:** Okay.
[12]     **A:** Could have been, if it was, I'm
[13] pretty sure I would remember that, you know.
[14]     **Q:** Did you ever ask Mr. Mitchell how
[15] much money he had ever paid David Adams over a
[16] certain period of time?
[17]     **A:** Maybe.
[18]     **Q:** Okay. You told us earlier today
[19] that at a point where you weren't getting
[20] paid and you knew you were getting stiffed, you
[21] called down to both CCC or Mike Brown, one of the
[22] two, and also to Mr. Mitchell and said direct the
[23] monies to me, don't direct them to David Adams
[24] anymore; isn't that correct?
[25]     **A:** Yep.

Page 291

[1]                    *Britto*
[2]     **Q:** At that point did you ask either
[3] anyone at CCC or Michael Brown or Mr. Mitchell how
[4] much money have you been paying David Adams from X
[5] date to Y date so you knew how much you had been
[6] stiffed out of?
[7]     **A:** No.
[8]     **Q:** Okay. How did you and David Adams
[9] arrive at a percentage of 22 percent for you?
[10]     **MR. YURKO:** You're talking
[11] about the CCC at this point.
[12]     **MR. KRASNOO:** Yeah.
[13]     **A:** CCC got their percentage, Dave got
[14] his and I was supposed to get mine.
[15]     **Q:** Okay, but how did you arrive at the
[16] figure of 22 percent?
[17]     **A:** Well, because the trucking costs,
[18] you got to take that off. Like when machine
[19] mades, you got to buy goods, so it varied.
[20]     **Q:** So did you work out in advance with
[21] Mr. Adams, then, depending upon certain shipments,
[22] how much you were to get and why?
[23]     **A:** Most likely.
[24]     **Q:** Okay. Now, did you get a different
[25] percentage amount on the Remco shipments than what

**Britto**

[1]
[2] you got from CCC?

[3]     A: Once again, I was supposed to, but
[4] it never happened.

[5]     Q: Okay. Did, when you started the
[6] fictional shipments, did Remco start earlier in
[7] time to CCC or did CCC start earlier in time to
[8] Remco?

[9]     A: CCC was the first.

[10]     Q: Okay. When you sort of added Remco
[11] in as an alternate supplier of fictional
[12] shipments, did you have a separate meeting with
[13] Dave Adams about arriving at what percentage you
[14] should get there or did you simply borrow the
[15] thinking you had had at CCC and automatically
[16] apply it?

[17]     A: Yeah, it was supposed to be the
[18] same.

[19]     Q: Okay. Now, was Dalton Padding also
[20] a fictional supplier?

[21]     A: I believe so.

[22]     Q: And —

[23]     A: It was at some point, but I'm not
[24] sure if it was the whole time.

[25]     Q: Okay, but at the point where it was,

**Britto**

[1]
[2] was there the same percentage you were to get or a
[3] different percentage?

[4]     MR. YURKO: Objection, the
[5] same percentage as what?

[6]     Q: As the 22 percent that you were
[7] getting from CCC.

[8]     A: They were all under CCC, so it was
[9] the same across the board.

[10]     Q: And that would be true for Empire
[11] Weavers as well then?

[12]     A: Yes.

[13]     Q: What about with Mansfield, was it
[14] the same as Remco's?

[15]     A: Yes, which was basically nothing.

[16]     Q: In 2005, you would be, you were long
[17] gone from IFC at that point?

[18]     A: Oh, yeah, I left September 28th,
[19] 2001.

[20]     Q: How would you find out, if you did,
[21] as to whether or not there was product at the
[22] warehouse such as wood flooring or padding
[23] invoices?

[24]     A: Through Dave or Tyrone.

[25]     Q: Okay. What steps would Tyrone have

**Britto**

[1]
[2] to take to know whether or not there was like
[3] padding or floor covering or rugs or wood
[4] flooring?

[5]     A: Well, he does an inventory for
[6] everything every Monday.

[7]     Q: Okay.

[8]     A: What they do is they do an
[9] inventory, they fax it to the stores, see what the
[10] stores want, stores fax them back, and then they
[11] ship it out.

[12]     Q: Now, you left IFC, you've indicated
[13] in, sometime in 2001, is that correct?

[14]     A: September 28th.

[15]     Q: Okay. And at some point in 2001 CCC
[16] and Dalton stopped invoicing IFC, and Empire's
[17] bill, last bill, came in October 2001 for about a
[18] two-year period of time.

[19]     Do you know at all why activity with
[20] CCC, Dalton, and Empire stopped before it resumed?

[21]     A: Yeah, I do, actually.

[22]     Q: What were the reasons?

[23]     A: Because Dave owed them money and he
[24] stopped doing business with them, so that's why
[25] probably in that same period of time Remco and

**Britto**

[1]
[2] Mansfield started getting more business.

[3]     Q: Do you know how much money Dave
[4] Adams owed them at that point?

[5]     A: I think it was 35,000.

[6]     Q: At some point CCC resumed billing
[7] IFC in early 2003 and Dalton began again in 2005.
[8] Were you aware when they started billing again?

[9]     A: In 2003.

[10]     Q: When they started billing again had
[11] there been any resolution of the 35,000 that David
[12] Adams owed or did CCC just eat the debt as it
[13] were?

[14]     A: I think they ate it, because he
[15] promised them a lot of business so they figured
[16] they could make more money than the 35,000. I
[17] think it was 35,000.

[18]     Q: Now, CCC, during the period of the
[19] fraudulent scheme, began to bill a lot more to IFC
[20] than it had in 2001, it increased a great deal,
[21] didn't it?

[22]     A: Yeah.

[23]     Q: Okay. And some of those shipments
[24] were genuine shipments of actual rugs, weren't
[25] they, from CCC?

**Britto**

[1]
[2]   **A:** Yes.

[3]   **Q:** But many of them were completely
[4] fraudulent shipments?

[5]   **A:** Yes.

[6]   **Q:** Is there a way to tell from looking
[7] at any of the documents, either the purchase
[8] orders or the invoices or the key recs, as to
[9] whether or not the shipment was genuine or
[10] fraudulent?

[11]   **A:** I would have to look at them.

[12]   **Q:** Okay. What is it that you would be
[13] looking for that would be able to tell you that it
[14] was a genuine one or a fraudulent one?

[15]   **A:** It depends what product it is. I
[16] mean there's certain things that I can look at
[17] that other people can't.

[18]   **Q:** Okay.

[19]   **A:** Who signed off on it. I mean, just
[20] certain things. But the product is the biggest
[21] thing.

[22]   **Q:** From April 21st, 2005, through
[23] May 12th, 2005, you and Mr. Mitchell spoke nine
[24] times. Do you have any idea as to why?

[25]   **A:** Yeah, just talking about the case.

**Britto**

[1]
[2]   **Q:** Okay. Well —

[3]   **A:** Oh, you said 2005?

[4]   **Q:** 2005. Let me give you the dates
[5] again. April 21st, 2005, through May 12th, 2005,
[6] according to the information we've got,
[7] Mr. Mitchell and you had nine conversations.

[8]   **A:** That's probably with the loan thing
[9] with Dave Adams.

[10]   **Q:** Okay.

[11]   **A:** Because I didn't want to talk to
[12] Tony, so.

[13]   **Q:** Okay.

[14]   **A:** That sounds about right, I think.
[15] I'm pretty sure that's what it was.

[16]   **Q:** Give me just a moment.

[17]   **THE WITNESS:** (Inaudible)

[18]   **MR. KLEHM:** It's not your
[19] deposition.

[20]   **THE WITNESS:** I'm the star of
[21] the show. I've got to be a star
[22] somehow, ha.

[23]   **Q:** You've indicated that —

[24]   **A:** Did you guys all color coordinate?

[25]   **Q:** Did —

**Britto**

[1]
[2]   **A:** Light blue on this side, dark blue
[3] on that side.

[4]   **Q:** You've indicated that you got
[5] payment, David Adams got payment, and Tyrone
[6] Williams got payment for all the fraudulent
[7] shipments in some amounts, when the scheme
[8] actually worked, and David Adams wasn't stiffing
[9] you. Was there any other human being that got
[10] paid other than those three individuals that you
[11] know of for the fraudulent shipments?

[12]   **A:** Well, when Lou Levine was alive, it
[13] wasn't fraudulent, it was just built-in cost.

[14]   **Q:** It wasn't fraudulent and then I
[15] didn't hear what you said.

[16]   **A:** Built-in cost, meaning like it was
[17] really 50 cents but it might have been 65 cents
[18] that got billed.

[19]   **Q:** Okay. Now, you indicated you intend
[20] to pay Mr. Elovitz back. Do you have any idea how
[21] you're going to do that?

[22]   **A:** Yes, I do.

[23]   **Q:** Could you tell us how?

[24]   **A:** Nope.

[25]   **Q:** Okay.

**Britto**

[1]
[2]   **A:** The reason being, I'm working on
[3] something right now which has nothing to do with
[4] rugs. Every time I tell somebody I get bad luck
[5] for some reason, I don't know what it is. Once it
[6] gets up and running, I have no problem divulging
[7] that information whatsoever.

[8]   **Q:** Do you anticipate how soon in the
[9] near future it would be?

[10]   **A:** It's going to start in June.

[11]   **Q:** And do you know how much — well,
[12] let's back up. In terms of do you intend payments
[13] to be monthly or a lump sum?

[14]   **A:** Oh, it can't be a lump sum, no.

[15]   **Q:** And do you intend it to be monthly
[16] or just periodic? Do you have any idea as to
[17] that?

[18]   **A:** Whatever you guys tell me.

[19]   **Q:** Okay. Do you have any idea as to
[20] the sum that you're going to be able to pay back?

[21]   **A:** I'm going to pay all of it back.

[22]   **Q:** And by all of it, do you mean simply
[23] all that you took or all for the entire scheme?

[24]   **A:** Oh, I'm not gonna pay for the rest
[25] of the people.

**Britto**

[1]

[2]  **Q:** Okay. So how much do you determine

[3] is what you have to take pay back?

[4]  **A:** That's your job.

[5]  **Q:** Okay.

[6]  **A:** I mean, I have no idea.

[7]  **Q:** Okay. Now —

[8]  **THE WITNESS:** Paul, learn how

[9] to whisper.

[10]  **Q:** Do you know, outside of

[11] Mr. Mitchell, do you know anyone else connected to

[12] either Remco or Mansfield Rug that would be in a

[13] similar ownership position, as it were?

[14]  **A:** Well, according to your paperwork

[15] it's Jane and Tony.

[16]  **Q:** But only from the paperwork?

[17]  **A:** Yeah.

[18]  **Q:** Okay. You don't have any knowledge

[19] on your own?

[20]  **A:** No. I know Tony was a lender, but

[21] whether they're in company, I don't know.

[22] Partnership, company.

[23]  **Q:** Okay.

[24]  **A:** As I stated in my first deposition,

[25] Dave's the one who met with them. I mean, I have

[1]

**Britto**

[2] no idea what happened at that meeting.

[3]  **Q:** Did David tell you that he met with

[4] them?

[5]  **A:** Yes.

[6]  **MR. YURKO:** Objection, who's

[7] the them?

[8]  **Q:** David Adams and — you can answer

[9] Mr. Yurko's questions, who's the them with whom

[10] David Adams met?

[11]  **A:** Tony and Ron Mitchell, Marasco or

[12] Mr. Marasco's — what is that last name?

[13]  **Q:** Well, according to what you wrote on

[14] the one in front of you, it's Marisco, is that

[15] right, M-A-R-I-S-C-O?

[16]  **A:** No, I just want the pronunciation.

[17]  **Q:** We've always had it pronounced to us

[18] as "Marisco," but I'm no authority on how one

[19] pronounces his last name; okay?

[20]  **A:** All right.

[21]  **Q:** Do you own any real estate?

[22]  **A:** No.

[23]  **Q:** Okay. Do you know whether or not,

[24] now, do you know whether or not Tony's married to

[25] Jane Dziemit?

[1]

**Britto**

[2]  **A:** I have no idea.

[3]  **Q:** Okay. And when did you last speak to

[4] Tony?

[5]  **A:** Probably when during the nine phone

[6] calls.

[7]  **Q:** Okay. So that would be back in the?

[8]  **A:** About a year ago, right.

[9]  **Q:** April 21st through May 12th, 2005

[10] period is your best memory?

[11]  **A:** Okay. Yes.

[12]  **Q:** At the time you listed a contact

[13] person there were several different people who

[14] might have called the contact person as orders

[15] were received at IFC, isn't that so?

[16]  **A:** Yes.

[17]  **Q:** Among them it could have been either

[18] Mr. Elovitz, for any reason at all?

[19]  **A:** Yep.

[20]  **Q:** It could have been Jerry Ellis?

[21]  **A:** Yes.

[22]  **Q:** It could have been a traffic manager

[23] at IFC?

[24]  **A:** Yes.

[25]  **Q:** A merchandise manager at IFC? No?

[1]

**Britto**

[2]  **A:** That would be the buyer.

[3]  **Q:** Okay. But the buyer could have

[4] called either you or Dave Adams, right?

[5]  **A:** Yeah.

[6]  **Q:** Okay. A controller could have

[7] called?

[8]  **A:** Yes, Jim Clark. I think he's the

[9] controller.

[10]  **Q:** It could have been the accounts

[11] payable manager?

[12]  **A:** Yes.

[13]  **Q:** And it could have been an accounts

[14] payable clerk?

[15]  **A:** Yes. And it could also have been

[16] Bob Walsh, who is the vice president.

[17]  **Q:** So a number of different people

[18] might have a different reason to contact the

[19] contact person about any particular shipment,

[20] whether that shipment was a legitimate shipment

[21] and an actual shipment of rugs, or a fictional

[22] shipment, isn't that so?

[23]  **A:** Yes. Even a warehouse supervisor

[24] could have.

[25]  **Q:** Okay. Did you ever, at any time,

Page 304

**Britto**

[2] discuss the scheme of fictional rug shipments with
[3] Tony Marasco?
[4] **A:** No.
[5] **MR. YURKO:** It's been asked
[6] now three times. This is the fourth.
[7] Asked and answered.
[8] You may answer it again.
[9] **A:** No.
[10] **MR. KRASNOO:** He just did. He
[11] said no. Okay.
[12] Give us just one minute to
[13] make sure that I haven't left out
[14] anything and I think the floor is
[15] yours.
[16] **THE VIDEOGRAPHER:** Time is
[17] 2:35. This marks the end of Tape 2,
[18] we are now off the record.
[19] (Brief recess.)
[20] (Document was marked as
[21] Deposition Exhibit No. 5 for
[22] identification, as of this date.)
[23] **THE VIDEOGRAPHER:** We are back
[24] on the record. The time is 2:45.
[25] This marks the beginning of Tape 3.

Page 305

**Britto**

[2] **BY MR. KRASNOO:**
[3] **Q:** Mr. Britto, did you ever receive any
[4] 1099s from Remco?
[5] **A:** Yes.
[6] **Q:** Did you receive 1099s from Mansfield
[7] Rug?
[8] **A:** Possibly.
[9] **Q:** Did you receive 1099s from CCC?
[10] **A:** Yes.
[11] **Q:** And did you receive them from Dalton
[12] Padding?
[13] **A:** No.
[14] **Q:** Did you receive them from Empire
[15] Weavers?
[16] **A:** No. The three were grouped in,
[17] Empire Weavers, Dalton Padding, and CCC.
[18] **Q:** Okay. Did the 1099s you received
[19] reflect all of the funds that you received from
[20] those companies, as far as you know?
[21] **A:** Besides the cash I received before,
[22] no — or yes — did I answer that correctly?
[23] **Q:** Okay. How much cash did you receive
[24] roughly?
[25] **A:** I have no idea.

Page 306

**Britto**

[2] **Q:** The cash came at the beginning,
[3] right, of the scheme?
[4] **A:** Yeah.
[5] **Q:** And did it last for longer than a
[6] one year period of time?
[7] **A:** No.
[8] **Q:** Okay. So that you received checks
[9] thereafter once the cash ended or wire transfers
[10] or a combination of both?
[11] **A:** A combination of both.
[12] **Q:** And with regard two the tax returns
[13] do you have your tax returns for the period of
[14] time covering when the scheme was implemented?
[15] **A:** I probably have the last three or
[16] four years.
[17] **Q:** Okay. How did it come about that
[18] you got the 1099s? Did you ask for them? Did
[19] someone tell you they were sending them?
[20] **MR. YURKO:** Objection to form.
[21] **A:** I asked for them.
[22] **Q:** You asked for them, okay.
[23] Did you ask for them in each
[24] instance, namely, from Remco?
[25] **A:** Yes, from both companies.

Page 307

**Britto**

[2] **Q:** From CCC?
[3] **A:** Yes.
[4] **Q:** Okay. Who did you speak with at
[5] Remco when you asked for them?
[6] **A:** Well, it was Dave. I went through
[7] Dave.
[8] **Q:** Mr. Adams?
[9] **A:** Yeah. I don't know if you want to
[10] call him Mr., but.
[11] **Q:** Did David Adams ever tell you who he
[12] asked down at either of the two companies, Remco
[13] or CCC, for the 1099s?
[14] **A:** No, I just told him what I wanted.
[15] **Q:** Do you know whether or not David
[16] Adams received any 1099s?
[17] **A:** I believe not.
[18] **Q:** Okay. Did you ever have a discussion
[19] with David Adams about your wanting 1099s?
[20] **A:** Yes.
[21] **Q:** Did Mr. Adams ever discuss with you
[22] whether or not it was a bad idea or good idea,
[23] something you shouldn't do, something you should
[24] do?
[25] **A:** Yes.

### Britto

[1]

[2]    Q: Okay. What was the conversation

[3] that you had with Mr. Adams about the 1099s?

[4]    A: That's why I said I believe he

[5] didn't do it, because he said we could always just

[6] throw our hands up and say we don't know what

[7] happened. So that's why I would think that's why

[8] he didn't do it.

[9]    Q: Would you be willing to provide to

[10] us copies of so many of the tax returns that

[11] you've got that cover the scheme period of time?

[12]    A: The ones I have, yes.

[13]    Q: Okay. Was David Adams at all upset

[14] that you were going to get 1099s or that you asked

[15] for them?

[16]    A: I don't believe so.

[17]    Q: Okay. When did you first ask for

[18] 1099s?

[19]    A: I have no idea.

[20]    Q: Did you have to ask for them through

[21] Mr. Adams more than once? In other words, you

[22] asked David Adams to get them, he said he'd work

[23] on it but then you didn't get anything and you had

[24] to ask again, or did you get them shortly after

[25] the very first time you asked for them?

### Britto

[1]

[2]    MR. YURKO: Objection to form.

[3]    A: I got them right away.

[4]    Q: Now, I may have asked you on the

[5] date of your first deposition and I'm not sure.

[6] If I did I apologize repeating. But, can we have

[7] your Social Security number which will be on your

[8] tax returns anyway?

[9]    A: What do you need that for?

[10]    Q: Well, the Social Security number

[11] allows us to send for the tax returns with your

[12] permission as to the ones.

[13]    (Discussion off the record.)

[14]    THE WITNESS: You guys got

[15] something going on over here?

[16]    Q: Did you get 1099s from CCC as well

[17] as Remco?

[18]    A: Yes.

[19]    Q: And you have no present idea how

[20] many tax returns you have that cover the years of

[21] the scheme versus how many you don't have, do you?

[22]    A: I got about three or four.

[23]    Q: Okay. And how long did the scheme

[24] last?

[25]    A: It started six months,

### Britto

[1]

[2] approximately, when Dave Rooney left. Now, I

[3] don't know if he left in '94 or '95, but —

[4]    Q: Okay. And it continued all the way

[5] up through to at least 2005, isn't that correct?

[6]    A: Yes.

[7]    Q: Okay. So for that ten-year period of

[8] time, can you estimate for us how many tax returns

[9] you would have?

[10]    A: It should be one for each year.

[11]    Q: So you think you've got them all?

[12]    A: I don't have them all, but I can get

[13] them, I mean.

[14]    Q: Okay. And you're willing to provide

[15] them to us?

[16]    A: Oh, yeah.

[17]    Q: Okay. And do you have an objection

[18] to our having your Social Security number?

[19]    A: Well —

[20]    Q: It's going to be on the tax returns.

[21]    A: They have it on my application or

[22] paperwork at work.

[23]    Q: Okay. So do you want to give it to

[24] me?

[25]    A: I'm not going to give it in front of

### Britto

[1]

[2] everybody.

[3]    Q: Okay.

[4]    A: That's personal information, I mean.

[5]    Q: No question. Tell me if you can,

[6] what is the state of your health today, because

[7] you've discussed health problems before with us.

[8] What's the state of your health?

[9]    A: As you can see, I'm taking a step

[10] backwards, so we'll find out when I go to the

[11] doctors again.

[12]    Q: And when do you go?

[13]    A: Well, I was waiting to get this

[14] first.

[15]    Q: Okay. So you haven't got a scheduled

[16] appointment yet with the doctor?

[17]    A: No, because I didn't know if this

[18] was going to be two days...

[19]    Q: All right. Have you ever owned any

[20] companies in your own name, any businesses?

[21]    A: Nope.

[22]    Q: Okay. And do you have any trusts at

[23] all or did you have any trusts?

[24]    A: No.

[25]    Q: With regard to the business where

Page 312

*Britto*

[2] you said that you think you'd be able to start
[3] paying back Mr. Elovitz for the amounts of money
[4] that you stole, you mentioned June you thought
[5] that things might be successful in that regard to
[6] be able to make an initial payment of some kind?
[7]   **A:** Yeah, it's going to start up.
[8]   **Q:** Did you mean this coming month,
[9] June?
[10]   **A:** Yeah, tomorrow.
[11]   **Q:** Okay. And do you mean, does it
[12] involve your becoming an owner of any business or
[13] company?
[14]   **A:** Yes.
[15]   **Q:** Okay. So, is that company yet formed
[16] as it were?
[17]   **A:** Well, I do have the LLC but it's not
[18] up and running yet.
[19]   **Q:** Okay. Is the LLC recorded with the
[20] Department of Corporations in New York?
[21]   **A:** Yes.
[22]   **Q:** And do you want to give us the name
[23] of it?
[24]   **A:** No.
[25]   **Q:** Okay.

Page 313

*Britto*

[2]   **A:** I will once it gets going.
[3]   **Q:** Has anyone at all had a conversation
[4] with you whereby they have promised you anything
[5] of value for your testimony in this case?
[6]   **A:** No.
[7]   **Q:** Okay. Has anyone threatened you to
[8] get you to testify in this case?
[9]   **A:** No.
[10]   **Q:** Okay. And has anyone promised that
[11] they would provide anything of value to a family
[12] member for your testimony in this case?
[13]   **A:** No.
[14]   **Q:** Is there anything else you would
[15] like to tell us about the scheme and your
[16] involvement in it, other than what I've already
[17] asked you?
[18]   **A:** I don't think so. Well, I mentioned
[19] about the free deliveries. Don't do that. Have
[20] somebody checking on the checker. I mean, I can
[21] make a list and fax it to you, but —
[22]   **Q:** But those were steps that you began
[23] in your first day of deposition, telling IFC ways
[24] in which to prevent this from ever happening
[25] again, is that correct?

Page 314

*Britto*

[2]   **A:** Exactly.
[3]   **Q:** Have there been certain subject
[4] matters that we've not asked you about that you
[5] think are relevant to the scheme or your
[6] participation in it?
[7]   **A:** Most likely.
[8]   **Q:** Anything you can tell us?
[9]   **A:** I got it all at home.
[10]   **Q:** Okay. And is there anything you
[11] specifically want to say to Bill Elovitz
[12] concerning the scheme?
[13]   **A:** No.
[14]   **Q:** Okay.
[15]   **A:** This is tough enough.
[16]   **Q:** What do you have at home? Do you
[17] mean a list of something?
[18]   **A:** Oh, I got a whole bunch of stuff.
[19]   **Q:** Okay. Do you want to make that
[20] available to us?
[21]   **A:** Yeah, I will.
[22]   **Q:** Okay. When do you think we might be
[23] able to receive it?
[24]   **A:** I don't want to share it with the
[25] other parties.

Page 315

*Britto*

[2]   **Q:** Oh, that makes it difficult, to be
[3] sure.
[4]   **A:** That's why I didn't bring it in the
[5] door, because if I did, I would have to share it.
[6] That's their personal business.
[7]   **Q:** Okay. When do you think you'd be
[8] able to make available to us, however, the copies
[9] of your tax returns?
[10]   **A:** Well, the ones I have are at home,
[11] so —
[12]   **Q:** Would you be able to cause copies to
[13] be made so that we could get copies of them? You
[14] should retain copies for yourself obviously?
[15]   **A:** Oh, yes.
[16]   **Q:** And do those tax returns have
[17] attached to them 1099s?
[18]   **A:** Yes.
[19]   **Q:** Would you make copies of those
[20] separately? I know they usually get stapled onto
[21] the first page?
[22]   **A:** Stapled, yes.
[23]   **Q:** But if you could make copies
[24] separately of the 1099s in addition to the tax
[25] return that would be helpful.

Page 316

*Britto*

[1]
[2] **A:** Okay.
[3] **Q:** Do you think we could get those
[4] within two weeks, three weeks?
[5] **A:** Yeah, I mean I can.
[6] **Q:** Okay. That would be great if you
[7] would send them to us. And —
[8] **A:** I think I should have invested in
[9] stocks in Post-its.
[10] **Q:** Well, it's not a bad investment. It
[11] made somebody a millionaire, that's for sure.
[12] Do you know whether or not the
[13] amount of cash that you received as initial
[14] payments in the scheme is less or more than
[15] $10,000?
[16] **MR. YURKO:** Asked and
[17] answered.
[18] **A:** What was that?
[19] **Q:** He said it's asked and answered.
[20] You said that you really had no idea as to the
[21] total amount, but what I'm asking is a slightly
[22] different question, which is, do you know whether
[23] or not that total amount of cash was less or more
[24] than $10,000?
[25] **A:** It was more than 10,000.

Page 317

*Britto*

[1]
[2] **Q:** Okay.
[3] **A:** But I don't have any idea how much
[4] it was.
[5] **Q:** Was it less than a hundred thousand?
[6] **A:** Oh, yeah.
[7] **MR. KRASNOO:** I have nothing
[8] further of this witness.
[9] **THE WITNESS:** Your turn?
[10] **CROSS-EXAMINATION**
[11] **BY MR. YURKO:**
[12] **Q:** Yes. Mr. Britto, are you feeling
[13] well enough to answer a few of my questions?
[14] **A:** You can talk.
[15] **Q:** I have only a few questions, this is
[16] cross-examination, so —
[17] **A:** Yeah, I know.
[18] **Q:** — the rules are a little bit
[19] different.
[20] I just want to check a number of
[21] things that I think I understand from your
[22] testimony, but may have been either lost or what
[23] have you over the course of the last three days.
[24] When you originally began this
[25] scheme, as Mr. Krasnoo has called it, in the mid

Page 318

*Britto*

[1]
[2] '90s, it didn't involve Ron Mitchell whatsoever,
[3] correct?
[4] **A:** Correct.
[5] **Q:** Okay. And when you began the
[6] scheme, CCC was one of the primary participants in
[7] it with you, is that correct?
[8] **A:** Correct.
[9] **Q:** And in that case you received money
[10] whenever CCC got itself paid from IFC, is that
[11] correct?
[12] **A:** Correct.
[13] **Q:** Now, and as I understood you, your
[14] cut before what you paid Mr. Williams was
[15] 22 percent on the CCC payments?
[16] **A:** Yes.
[17] **Q:** Okay. The — and so you had to wait
[18] for IFC to get paid — for IFC to make the
[19] payments, and you had to wait for Mr. Adams to get
[20] paid by CCC and then you had to hope that he was
[21] going to give you your 22 percent?
[22] **A:** Yes.
[23] **MR. KRASNOO:** Objection.
[24] **Q:** Okay. Now, I believe you testified
[25] that Mr. Adams has a gambling problem?

Page 319

*Britto*

[1]
[2] **A:** Yes.
[3] **Q:** And he wanted the money faster and
[4] sooner?
[5] **A:** Yes.
[6] **Q:** The — now, you were familiar with
[7] Ron Mitchell before you started buying rugs from
[8] Remco in the scheme, correct?
[9] **A:** Yes.
[10] **Q:** You knew that he was a broker of
[11] rugs and sometimes a sales representative?
[12] **A:** Sales representative, yes.
[13] **Q:** Now, do you know what a broker does
[14] in this industry?
[15] **A:** Yeah, he's a middleman.
[16] **Q:** Exactly. The, so, a broker will buy
[17] rugs from person A and sell them to person B, is
[18] that correct?
[19] **A:** Yes.
[20] **Q:** Does the broker actually have to see
[21] the rugs to make the sale?
[22] **A:** I would not think so.
[23] **Q:** The, now, as the scheme worked with
[24] Mr. Mitchell, now, I understand you've
[25] testified —

**Britto**

[1]
[2]   **A:** A thousand times.

[3]   **Q:** — a thousand times that

[4] Mr. Mitchell didn't know that there were no rugs,

[5] is that correct?

[6]   **A:** Yes.

[7]   **Q:** And, and when you had direct contact

[8] with him, I believe you testified that you, to use

[9] your phrase, bullshitted him, is that correct?

[10]   **A:** Yes.

[11]   **Q:** And you got him to go along in a

[12] transition between Adams to you as to who was to

[13] get payments?

[14]   **A:** Yes.

[15]   **Q:** And what you told Mr. Mitchell was
that you and Adams had a couple of sources for
carpet that could then be converted to rugs and
then sold to IFC, is that correct?
   **A:** Yes.
   **MR. KRASNOO:** Objection.
   **Q:** And as I understood it, on several
occasions you told Mr. Mitchell that you didn't
want him to know who the suppliers were, because
then he could go direct, is that correct?
   **A:** Yes. Well, that actually came from

**Britto**

[1]
[2] Dave, too.

[3]   **Q:** So both of you took that position

[4] with Mr. Mitchell?

[5]   **A:** Yes.

[6]   **Q:** Okay. Now, the conversion of carpet

[7] into area rugs, that's a process, correct?

[8]   **A:** Yes.

[9]   **Q:** And it doesn't have anything to do

[10] with what we lawyers call conversion, which is a

[11] bad thing. Conversion, as you were using the

[12] term, meant taking the broadloom carpet, cutting

[13] it up, binding it and selling it as an area rug,

[14] is that correct?

   **A:** Correct.
   **Q:** And Remco's role in this was to buy
the rugs that would be converted by your
suppliers, pay them, and then sell them to IFC at
a markup, is that correct?
   **MR. KRASNOO:** Objection.
   **A:** Correct.
   **Q:** Now, in your scheme, it involved you
and other insiders at IFC preparing a number of
false documents, correct?
[25]   **A:** Correct.

**Britto**

[1]
[2]   **Q:** And so, now, in some of the orders

[3] that were involved, there were only half the

[4] amount of goods that supposedly were delivered

[5] were delivered and others, no goods were

[6] delivered, is that correct?

[7]   **A:** Yes.

[8]   **Q:** Now, so, when you prepared the

[9] purchase orders for Remco, you and Mr. Adams knew

[10] that those purchase orders were false, correct?

[11]   **A:** Correct.

[12]   **Q:** You knew —

[13]   **A:** Let me back up for a minute though,

[14] some of the shipments that did come in from CCC or

[15] who, were full.

[16]   **Q:** I'm not asking about CCC. I'm

[17] talking about Remco.

[18]   **A:** I just want to make sure it's on the

[19] record.

[20]   **Q:** Okay, and I appreciate that. When

[21] you prepared a purchase order for Remco, as an

[22] employee of IFC, you knew that purchase order was

[23] false, there weren't going to be any rugs

[24] delivered?

[25]   **A:** Yes.

**Britto**

[1]
[2]   **Q:** But you tried to make those purchase

[3] orders look as authentic as you could because you

[4] didn't want to get caught, right?

[5]   **A:** Exactly.

[6]   **Q:** And you had them signed by a variety

[7] of people at IFC so they would look authentic?

[8]   **A:** Yes.

[9]   **Q:** And part of your scheme also

[10] required the preparation of false key recs, is

[11] that correct? A key rec saying that something had

[12] been delivered when nothing had, in fact, been

[13] delivered?

[14]   **A:** Yeah, it's not preparation, it

[15] happens at the time.

[16]   **Q:** Okay. So Mr. Williams would prepare

[17] a key rec that said something was delivered when

[18] in fact, nothing had been delivered?

[19]   **A:** No, we wouldn't prepare for

[20] anything, we'd do it at the time.

[21]   **Q:** At the time that the rugs that were

[22] not delivered were supposably delivered you'd

[23] prepare, I guess the word is — you would complete

[24] a key rec that was inaccurate?

[25]   **A:** Yes.

**Britto**

[1]

[2]    Q: And the key rec would say something

[3] had been delivered when nothing was delivered?

[4]    A: Correct.

[5]    Q: And you tried to make those key recs

[6] look as authentic as possible so that no one at

[7] IFC or otherwise would know?

[8]    A: Yes, but just so you know, key recs,

[9] purchase orders, everything has to be done a

[10] certain way, so you do them all the same way. So

[11] they all look the same.

[12]    Q: Now, Mr. Mitchell's role and Remco's

[13] role here, was, when you told him that your

[14] suppliers were going to be — strike that.

[15]    Mr. Mitchell's role and Remco's role

[16] was to hear from you what your suppliers were

[17] going to deliver, when they were going to deliver

[18] it and prepare an invoice to IFC for those rugs

[19] that he thought were going to be delivered, is

[20] that correct?

[21]    MR. KRASNOO: Objection.

[22]    Q: You have to say yes or no.

[23]    A: Yes.

[24]    Q: And from everything that you know,

[25] Mr. Mitchell believed that those rugs were, in

**Britto**

[1]

[2] fact, being delivered, is that correct?

[3]    MR. KRASNOO: Objection.

[4]    A: Yes.

[5]    Q: And you — that's what you told him,

[6] right?

[7]    A: Yes.

[8]    MR. KRASNOO: Objection.

[9]    Q: Now, you began this deposition by

[10] apologizing to certain people; do you recall that?

[11]    A: Yes.

[12]    Q: And you recall apologizing to

[13] Mr. Elovitz; do you recall that?

[14]    A: Yes.

[15]    Q: You also apologized to two other

[16] people. Do you recall that they were Ron Mitchell

[17] and Jane Dziemit?

[18]    A: Yes.

[19]    Q: And why was that?

[20]    A: Because they're innocent.

[21]    Q: Because you'd lied to them, too?

[22]    A: Yes.

[23]    MR. KRASNOO: Objection.

[24]    A: All three of them are victims.

[25]    Q: Okay. Can you tell me about your

**Britto**

[1]

[2] relationship with Bill Elovitz.

[3]    A: What do you mean by that?

[4]    Q: Are you friends or were you friends?

[5]    A: Yeah, we were friends.

[6]    Q: Close?

[7]    A: I would hope so.

[8]    Q: Have you been to his house?

[9]    A: No. He's never been to my house.

[10] But he's been a role model in my life.

[11]    Q: Now, I will confess to being struck

[12] by this scheme and how it worked and from your

[13] point of view how well it worked for, looks like,

[14] about ten years.

[15]    MR. KRASNOO: Objection; move

[16] to strike.

[17]    Q: Did the idea of using an

[18] intermediary, like a broker who bought carpet that

[19] got converted into rugs and then selling it to

[20] Building 19, is that something that you and Dave

[21] Adams dreamed up?

[22]    MR. KRASNOO: Objection.

[23]    A: I have no idea.

[24]    Q: Do you know of anyone else at

[25] Building 19 that has a company that they use to

**Britto**

[1]

[2] buy and sell to Building 19?

[3]    A: Rugs?

[4]    Q: Yeah, rugs.

[5]    A: Yeah.

[6]    Q: And who would that be?

[7]    A: Well, I don't know if they're still

[8] doing it, but it used to be Imperfections.

[9]    Q: And what is Imperfections?

[10]    A: It's a company who converts carpet.

[11]    Q: Okay. And who owns Imperfections?

[12]    A: It's either Bill Elovitz or Robert

[13] Weller.

[14]    Q: And when you were at Building 19 or

[15] IFC, did you buy from Imperfections?

[16]    A: I used to buy the goods to get

[17] converted that went to Robert Weller and then buy

[18] the goods from Robert Weller under IFC and then

[19] ship to the stores. Can you follow that?

[20]    Q: Okay, let me see, let me break it

[21] down. You, as a buyer at IFC, would buy from the

[22] carpet manufacturers remnants, is that?

[23]    A: No, broadloom.

[24]    Q: Broadloom, okay. And then, and then

[25] you would have that delivered to Mr., is it

Page 328

**Britto**

[1]
[2] Weller?
[3]     A: Robert Weller, yes.
[4]     Q: Robert Weller. And then you would
[5] then, and then he would have it made into area
[6] rugs?
[7]     A: Remnants, yes.
[8]     Q: And then he would sell it to IFC?
[9]     A: Yes.
[10]     Q: Okay.
[11]     A: It's a converter.
[12]     Q: And you did this all the while you
[13] were at Building 19, buying from Imperfections and
    lling to Weller and then buying from?
    A: Not the whole time. Like I said,
    ice Dave Rooney left.
    Q: Did you ever ask why IFC wasn't
    iying the stuff direct and using this middleman
    : Inperfections or Weller?
    MR. KRASNOO: Objection.
    A: It made my job easier.
    Q: And how did it make your job easier?
    A: Because I didn't have to deal with
[—, ... I just was the bought and sold, I didn't have
[25] to worry about converting the shit, you know. I

Page 329

**Britto**

[1]
[2] had enough to do.
[3]     Q: And do you know whether the owner of
[4] Imperfections — never mind, never mind, strike
[5] that.
[6]     During day two of your deposition,
[7] which was relatively brief, prior to that did you
[8] have a conversation with anyone at the law firm of
[9] Krasnoo and Klehm and tell them in words or
[10] substance that you were thinking about maybe not
[11] appearing at your deposition?
[12]     A: No.
[13]     MR. YURKO: Thanks, that's all
[14] the questions I have.
[15]     THE WITNESS: Thank God.
[16]     MR. YURKO: I knew it was
[17] going to be much more painless than
[18] the last few days.
[19]     THE WITNESS: Mr. Krasnoo, are
[20] you going to reboot?
[21]     MR. KRASNOO: Not the whole
[22] thing.
[23]     I have no questions. The depo
[24] is over.
[25]     THE VIDEOGRAPHER: The time is

Page 330

**Britto**

[1]
[2] now 3:14. This marks the end of
[3] Tape 3, we are now off the record.
[4]     (Brief recess.)
[5]     THE VIDEOGRAPHER: Time is
[6] 3:15, Tape 3 is continuing. You're
[7] back on the record.
[8]     MR. KRASNOO: Okay.
[9] There were certain questions,
[10] Mr. Britto earlier today that you
[11] refused to answer. We're going to
[12] suspend on the depo. My partner and I
[13] will determine whether or not we
[14] should seek to compel answers to those
[15] questions through court proceedings
[16] and so we'll suspend for today. If we
[17] determine not to go back into court
[18] then for all practical purposes your
[19] deposition is completed.
[20]     If by over, over, you meant
[21] this finishes all of your
[22] participation with all court
[23] proceedings in this case, that is not
[24] necessarily true. If you recall, I
[25] told you earlier today that we have

Page 331

**Britto**

[1]
[2] not, we've got a motion for default
[3] filed against you, and we have pending
[4] where the judge refused it initially,
[5] a motion for default judgment, that a
[6] default judgment be entered against
[7] you, but there may still be further
[8] proceedings in court involving you.
[9]     THE WITNESS: Yeah, I
[10] understand that. I just meant like do
[11] I have to come back tomorrow?
[12]     MR. KRASNOO: No, for those
[13] purposes your deposition is completed.
[14] We would want to review the transcript
[15] and see question by question the ones
[16] that you didn't answer to make the
[17] determination as to whether or not we
[18] should go into court, so that would
[19] take some time.
[20]     I'm pretty sure that at the
[21] beginning of this we stated in the
[22] first day of deposition that you would
[23] read and sign. The way that works is
[24] that we provide a copy of each day of
[25] deposition to you.

Page 332

**Britto**

[1]
[2] THE WITNESS: Yeah, I
[3] understand that.
[4] MR. KRASNOO: You then must
[5] review it within 30 days under the
[6] rule. You need to have it signed
[7] before a notary in our state,
[8] Massachusetts. Unless the parties
[9] agree, that notary has to be the
[10] person who took the deposition. I'm
[11] not aware of the rules of New York,
[12] which requires it or not.
[13] I'm getting a negative shaking
[14] of the head of the court reporter,
[15] which means you could probably have it
[16] notarized before anyone who's
[17] available to notarize it.
[18] MR. YURKO: Why don't we have
[19] a stipulation that he can sign before
[20] any Notary.
[21] MR. KRASNOO: You can sign
[22] before a Notary —
[23] THE WITNESS: In New York.
[24] MR. KRASNOO: And I'm happy to
[25] have you sign, if Mr. Yurko is, under

Page 333

**Britto**

[1]
[2] pains and penalties of perjury. All
[3] you have to do is have that phrase
[4] added on by the court reporter to the
[5] last page of your deposition for all
[6] three depos, and you can sign it and
[7] that obviates your necessity to find a
[8] Notary, you've just signed it under
[9] the pains and penalties of perjury
[10] which is an oath. But where you have
[11] affirmations, you may not be willing
[12] to take an oath. I don't know the
[13] answer to that. But I'm happy to have
[14] that as an alternative resource for
[15] you if you wish it.
[16] THE WITNESS: Okay.
[17] MR. KRASNOO: In any event
[18] that has to be sent back to us, the
[19] correction pages have to be sent back
[20] to us, with any corrections that you
[21] make on it and I believe that the
[22] court reporter sends you forms, a
[23] correction page, which is pretty
[24] self-explanatory, it shows if there's
[25] to be any correction at all it usually

Page 334

**Britto**

[1]
[2] lists the page, the line on which the
[3] correction is to be made, the nature
[4] of the correction you wish to be made
[5] and what is being corrected, meaning,
[6] what appears in the deposition.
[7] THE WITNESS: Now, does that
[8] involve the first one?
[9] MR. KRASNOO: It involves the
[10] first, the second, if there were
[11] anything there, and the third.
[12] THE WITNESS: Okay.
[13] MR. KRASNOO: And you'll be
[14] sent those. There'll be three
[15] separate pages of corrections for each
[16] volume and then you simply send those
[17] originals back to us, the corrections
[18] pages, along with the page indicating
[19] you've either had it notarized or
[20] signed under pains and penalties of
[21] perjury, and then we do the rest of
[22] providing a copy of all of those pages
[23] to each adversary attorney.
[24] If you do not sign it within
[25] 30 days and return it to us, your

Page 335

**Britto**

[1]
[2] depositions are deemed as accurate and
[3] taken as accurate, so that the 30 days
[4] is the window of opportunity to
[5] correct anything in case you feel it
[6] needs correction. If you feel that
[7] nothing need be corrected, you can
[8] either just sign the corrections page
[9] and mail it back to us with blank as
[10] to corrections or just not send
[11] anything back in a timely way and it
[12] would be treated as if the depositions
[13] were correct for all purposes.
[14] THE WITNESS: Okay.
[15] MR. KRASNOO: Any questions
[16] about what I've just explained to you?
[17] THE WITNESS: Not at all.
[18] MR. KRASNOO: Okay, that's
[19] where we're at.
[20] THE VIDEOGRAPHER: The time is
[21] now 3:20, this marks the end of
[22] Tape 3. We are now off the record.
[23] (Medication information sheets
[24] was marked as Deposition Exhibit No.
[25] 2A - 2F for identification, as of this

Page 336

*Britto*

[1]
[2] date.)
[3]    (Hospital bill showing dates
[4] of treatment was marked as Deposition
[5] Exhibit No. 3 for identification, as
[6] of this date.)
[7]    (Whereupon, at 3:20 o'clock
[8] p.m., the deposition was concluded.)
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 337

CAPTION

[1]
[2]
[3]
[4] The Deposition of KEVIN BRITTO, taken in the
[5] matter, on the date, and at the time and place set
[6] out on the title page hereof.
[7]
[8]
[9] It was requested that the deposition be taken by
[10] the reporter and that same be reduced to
[11] typewritten form.
[12]
[13]
[14] It was agreed by and between counsel and the
[15] parties that the Deponent will read and sign the
[16] transcript of said deposition.
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 338

[1]
[2]    CERTIFICATE
[3]
[4] STATE OF_____:
[5] COUNTY/CITY OF_____:
[6]
[7] Before me, this day, personally appeared
[8] KEVIN BRITTO, who, being duly sworn, states
[9] that the foregoing transcript of his/her
[10] Deposition, taken in the matter, on the date, and
[11] at the time and place set out on the title page
[12] hereof, constitutes a true and accurate transcript
[13] of said deposition.
[14]
[15]
[16]
           KEVIN BRITTO
[17]
[18]
[19] SUBSCRIBED and SWORN to before me this_____
[20] day of _____, 2006, in the
[21] jurisdiction aforesaid.
[22]
[23]
[24]
[25] My Commission Expires        Notary Public

Page 339

[1]
[2]    DEPOSITION ERRATA SHEET
[3] RE:
     FILE NO.
[4] CASE CAPTION:  IFC  vs.  ADAMS, et al.
[5] DEPONENT: KEVIN BRITTO
     DEPOSITION DATE: 05/31/06
[6]
     To the Reporter:
[7] I have read the entire transcript of my Deposition
     taken in the captioned matter or the same has been
[8] read to me.  I request for the following changes
     be entered upon the record for the reasons
[9] Indicated.
     I have signed my name to the Errata Sheet and the
[10] appropriate Certificate and authorize you to
     attach both to the original transcript.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24] SIGNATURE:_____  DATE:_____
[25]    KEVIN BRITTO

[1]

[2]          INDEX

[3] Witness:    Direct  Cross

[4] Kevin Britto   169   317

[5]

[6]

[7]          EXHIBITS

[8] Britto      Description      Page

For Ident.

[9]

[10] 1   Mt. Sinai documents        179

[11] 4   Five pages of forms        258

[12] 5   Document                304

[13] 2A - 2F Medication information sheets    336

[14] 3   Hospital bill showing dates of    336

[15]     treatment

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

[1]

[2]          CERTIFICATE

[3] STATE OF NEW YORK           )

[4]                              ) ss.

[5] COUNTY OF NEW YORK )

[6]        I, Debra DiBenedetto, a

[7]     Shorthand (Stenotype) Reporter and

[8]     Notary Public of the State of New

[9]     York, do hereby certify that the

[10]    foregoing Deposition, of the witness,

[11]    KEVIN BRITTO, taken at the time and

[12]    place aforesaid, is a true and correct

[13]    transcription of my shorthand notes.

[14]        I further certify that I am

[15]    neither counsel for nor related to any

[16]    party to said action, nor in any wise

[17]    interested in the result or outcome

[18]    thereof.

[19]        IN WITNESS WHEREOF, I have

[20]    hereunto set my hand this 6th day of

[21]    June, 2006.

[22]

[23]

[24]        Debra DiBenedetto

[25]

## $

**$10,000** 316:15, 24
**$100,000** 180:13
**$16** 198:13
**$16,660** 282:4
**$20,000** 264:3
**$200,000** 236:4, 14
**$3** 280:16; 281:14
**$340** 282:3, 8
**$5 million** 197:13
**$50,000** 251:2; 278:13
**$92** 198:13

## 0

**01** 261:13; 275:11;
276:25; 281:6

## 1

**1** 179:5, 10; 243:20;
245:17; 268:13
**1-203-466-1191** 274:25
**10** 175:4
**10,000** 316:25
**1099s** 305:4, 6, 9, 18;
306:18; 307:13, 16, 19;
308:3, 14, 18; 309:16;
315:17, 24
**10:37** 168:4
**10th** 202:9; 232:2, 9, 13;
238:17; 239:2; 240:8, 24;
245:11; 254:21
**11-1-02** 261:17
**11/13/02** 266:17
**11:44** 225:24
**11:56** 226:3
**1200** 265:10
**12:18** 243:19
**12:25** 243:24
**12th** 296:23; 297:5; 302:9
**15** 212:21; 224:25; 236:2
**1500** 288:7
**15th** 200:6
**16,660** 282:10
**17,000** 282:2, 9
**17th** 200:9
**18th** 170:24
**19** 233:11; 236:7; 267:19;
**277:**5; 326:20, 25; 327:2,
14; 328:13
**19's** 289:3
**1993** 170:25; 171:2
**1:02** 274:5, 6
**1:54** 274:9
**1st** 193:23; 263:23

## 2

**2** 243:25; 304:17
**200,000** 237:23
**2001** 181:23; 277:6;
293:19; 294:13, 15, 17;
295:20
**2002** 181:14, 15; 190:23,
24; 261:10, 13; 263:23;
268:13
**2003** 191:5, 9; 295:7, 9
**2005** 229:15; 293:16;
295:7; 296:22, 23; 297:3,
4, 5, 5; 302:9; 310:5
**2006** 168:4; 232:13
**203468** 262:8
**21st** 296:22; 297:5; 302:9
**22** 281:6; 285:24, 25;
286:2, 3, 7, 8, 9, 10, 25;
287:6, 9; 288:17, 20, 21;
291:9, 16; 293:6; 318:15,
21
**23rd** 249:5
**25** 173:24
**25th** 275:11
**26** 172:14
**26027** 274:12
**280** 265:6, 10; 268:21
**281** 268:22
**28th** 181:23; 277:5;
293:18; 294:14
**29** 208:12
**29th** 261:7
**2:35** 304:17
**2:45** 304:24
**2A** 335:25
**2F** 335:25

## 3

**3** 262:9; 267:19, 23;
304:25; 330:3, 6; 335:22;
336:5
**30** 245:24; 332:5; 334:25;
335:3
**31st** 168:4; 202:11
**35,000** 295:5, 11, 16, 17
**37th** 168:13, 18
**38,500** 263:19; 264:16
**39** 168:13, 18
**3:14** 330:2
**3:15** 330:6
**3:20** 335:21; 336:7

## 4

**4** 257:12, 14; 258:18, 21
**41** 264:24, 25
**4181** 264:22

## 5

**5** 262:9; 304:21
**5,280** 265:21
**50** 283:3, 4; 285:24;
298:17
**50,000** 228:10
**50/50** 288:2
**53-footer** 265:24
**544** 262:10
**5th** 200:9

## 6

**6,000** 266:3
**6027** 281:4
**65** 298:17

## 7

**70,715.20** 263:8
**7th** 175:4

## 8

**8-by-10** 269:14, 18
**8th** 170:25

## 9

**9** 262:8
**900** 280:18
**90s** 318:2
**94** 171:7; 310:3
**95** 171:7; 310:3
**9th** 200:6

## A

**a.m** 168:4
**ability** 173:7, 17; 202:22
**able** 190:10, 21; 197:22;
200:4, 7; 258:3, 8; 259:7;
261:7; 262:14; 264:21;
265:2; 266:9, 25; 267:10,
14; 269:17, 24; 270:16;
271:2, 10; 283:10, 16;
296:13; 299:20; 312:2, 6;
314:23; 315:8, 12
**above** 172:20; 260:11;
261:16; 267:15; 269:14;
270:5
**Absolutely** 273:25
**Academy** 244:3
**accept** 244:2
**accident** 279:15
**accompanies** 222:23
**accompany** 223:12
**according** 181:24;
281:5; 297:6; 300:14;

**account** 273:22
**accountant** 248:12, 14,
23
**accounts** 198:9, 12;
199:3, 23; 280:25; 281:17;
289:24; 303:10, 13
**accurate** 248:9; 335:2, 3
**accurately** 182:12
**accuse** 242:19
**across** 293:9
**act** 209:18; 232:17
**acted** 181:6
**acting** 216:14
**activity** 294:19
**actual** 185:23; 206:5;
220:18, 20, 25; 222:17, 24;
223:12; 295:24; 303:21
**actually** 176:20; 191:5;
212:3, 8; 214:23, 24;
216:16; 220:16; 229:15;
235:3; 239:15; 243:14;
246:11; 248:6; 264:9, 24;
271:5; 276:22; 284:4;
289:19, 20; 294:21; 298:8;
319:20; 320:25
**actula** 206:10
**Adams** 168:8; 181:2, 8,
15; 182:4, 16, 21, 24;
183:8, 9, 15; 184:2;
186:22; 187:17, 25; 188:8,
15; 190:14; 192:6, 15;
200:25; 204:24; 205:3, 4,
9; 206:10, 20, 24; 207:4;
209:12, 14, 16, 17; 213:2;
215:8, 14, 19; 221:5, 6, 20;
226:18; 227:13, 14, 20;
229:9; 230:9, 12, 18, 22;
231:7, 18; 232:3, 11, 13;
233:16, 17, 22; 234:19;
235:5, 23; 236:9, 12, 17;
237:10, 19; 242:20; 244:7;
250:21; 251:7, 21; 252:8;
253:10, 19; 254:5, 17;
255:4, 11, 18; 259:9, 11;
260:4, 16, 20; 263:6;
266:19, 21; 267:21;
271:21, 22; 272:23; 273:4,
4, 7, 11; 278:2, 21, 24;
279:4, 10; 284:25; 286:11,
15, 20; 287:16, 21; 289:18;
290:2, 5, 9, 15, 23; 291:4,
8, 21; 292:13; 295:4, 12;
297:9; 298:5, 8; 301:8, 10;
303:4; 307:8, 11, 16, 19,
21; 308:3, 13, 21, 22;
318:19, 25; 320:12, 16;
322:9; 326:21
**add** 178:21; 279:25
**added** 292:10; 333:4
**addition** 174:16; 260:10;
270:9; 315:24
**address** 189:24; 200:5;
245:17; 246:2, 4, 5
**addressed** 229:23; 232:7
**addresses** 245:19
**Adler** 190:2; 213:24;

**301:13**

**admissions** 172:3
**Admonition** 175:10, 14
**advance** 193:18, 23;
264:2; 285:6; 291:20
**advanced** 263:20
**advancing** 207:12
**adversary** 224:13;
334:23
**Advice** 172:21; 174:18;
233:7, 9; 272:7
**advised** 235:8
**affect** 173:7
**affirmations** 333:11
**affirmed** 169:20
**afterwards** 187:3, 4
**again** 176:11; 193:20;
197:4; 199:21; 219:20;
225:19; 251:2; 264:16;
281:25; 283:10; 292:3;
295:7, 8, 10; 297:5; 304:8;
308:24; 311:11; 313:25
**against** 196:21; 267:8;
331:3, 6
**aggravated** 225:18
**ago** 194:15; 219:23;
233:25; 254:16, 24;
287:25; 302:8
**agree** 332:9
**agreed** 337:14
**ahead** 184:5, 9; 193:17
**Aid** 172:20; 248:10
**air** 232:19
**al** 168:9
**alcohol** 174:23, 24
**alive** 298:12
**allegations** 196:24
**alleged** 197:13
**allegedly** 209:9
**allows** 309:11
**along** 178:19; 185:9;
197:6; 207:3; 320:11;
334:18
**alternate** 292:11
**alternative** 333:14
**although** 279:14
**always** 185:17; 229:5;
269:10; 301:17; 308:5
**America** 199:24; 200:8
**Among** 302:17
**amount** 180:11; 197:11;
220:10; 263:8, 11; 291:25;
316:13, 21, 23; 322:4
**amounts** 290:8; 298:7;
312:3
**and/or** 192:6; 226:19;
230:12
**anger** 241:11
**angry** 241:7
**answered** 184:4; 223:2;
231:13; 289:21; 304:7;
316:17, 19
**anticipate** 299:8

anxiety 174:24
anymore 176:6; 205:4; 290:24
anyways 226:14
Apart 229:16, 17; 286:19
apartment 193:10, 12; 194:16; 200:12, 13
apartments 194:25
apologize 309:6
apologized 203:7; 325:15
apologizing 325:10, 12
appearing 329:11
appears 274:12; 275:10; 334:6
application 310:21
apply 292:16
appointment 311:16
appreciate 322:20
appropriate 215:6; 277:20
approximated 265:21
approximately 171:4; 229:12; 310:2
approximates 265:3
April 234:24; 235:2; 254:2; 255:2; 296:22; 297:5; 302:9
area 321:7, 13; 328:5
around 180:12
arranged 226:19; 287:17; 288:13
arrival 260:17
arrive 282:9; 287:6; 291:9, 15
arriving 292:13
aspect 182:2; 186:20; 187:9; 202:4; 203:2; 227:19; 238:9; 239:3, 9; 240:9; 243:8
aspects 171:9; 187:7; 203:4, 5
assets 197:21; 198:4, 7
association 216:13
assumed 172:25
assuming 173:2; 175:19
assurances 246:14
assure 199:15
ate 295:14
atenolol 174:14, 20
Ativan 174:23
attached 281:22; 315:17
attempt 234:4
attend 170:9; 239:20
attorney 215:11, 12; 233:5, 7; 235:17; 334:23
attorneys 203:10; 245:13
attributes 271:3
authentic 323:3, 7; 324:6
authority 301:18
automatically 292:15
available 216:5, 7, 9; 229:24; 314:20; 315:8;

332:17
Ave 200:6
Award 244:3
aware 170:7; 196:18; 228:5; 278:3; 284:3; 295:8; 332:11
away 186:18; 188:14; 189:13; 231:9; 309:3

# B

B 266:11; 319:17
back 174:8, 9; 175:17; 179:25; 180:5, 8; 192:15; 203:24; 205:24; 209:5; 210:19; 212:18; 223:23; 224:2; 226:3; 231:22; 235:24; 238:3; 243:25; 245:24; 248:16; 250:25; 257:18, 23, 24; 258:2; 269:12; 274:9; 278:7; 286:17; 294:10; 298:20; 299:12, 20, 21; 300:3; 302:7; 304:23; 312:3; 322:13; 330:7, 17; 331:11; 333:18, 19; 334:17; 335:9, 11
backwards 311:10
bad 299:4; 307:22; 316:10; 321:11
balance 203:22
band 240:3
banged 279:20, 23
bank 198:9, 12; 199:2, 22, 24; 200:8; 273:22
bankruptcy 215:15
banks 194:11; 199:6, 9; 200:2
bars 239:25
bartender 192:20; 193:2
based 204:12; 208:15; 282:4
basically 231:2; 232:10; 268:15; 293:15
basis 175:7; 177:19
bat 170:24
bathroom 225:4
bearing 274:24
became 171:2, 3; 185:18, 19
become 228:5
becoming 312:12
Bedford 267:20, 24
began 241:6; 253:20; 295:7, 19; 313:22; 317:24; 318:5; 325:9
begin 226:20
beginning 234:24; 243:24; 304:25; 306:2; 331:21
begins 267:3; 281:23
behalf 216:15
behind 239:25; 286:17
belief 173:11

below 261:15; 270:17; 282:12
Besides 305:21
best 171:13, 15, 21; 173:11; 183:19, 22; 185:7; 188:23; 202:6; 203:3; 239:6; 246:23; 250:23; 302:10
better 213:21; 280:25
Beyond 238:24
big 193:22
biggest 296:20
Bill 169:7; 172:2; 178:20; 180:19; 182:23; 185:17, 20; 217:25; 219:20, 24; 220:9, 12, 13, 19; 221:20; 222:13, 16, 23; 223:5, 11, 13, 15; 226:24; 227:4; 229:16; 261:22; 276:15; 280:11; 294:17, 17; 295:19; 314:11; 326:2; 327:12; 336:3
billed 220:9; 298:18
billing 217:17; 278:4; 284:4; 295:6, 8, 10
bills 218:9, 14; 219:4, 13; 220:24; 221:11, 15; 222:9; 224:17; 226:11, 21; 240:14, 21; 241:13; 281:16; 289:3, 7; 290:3
binding 281:13
birthday 255:24
bit 210:19; 278:7; 317:18
blah 233:3, 3, 3
blank 204:14; 335:9
blew 231:2; 237:14
Block 248:13; 249:5; 270:6
blood 171:20
blow 234:2, 4, 6, 14
blowing 237:16
blue 298:2, 2
board 293:9
Bob 187:21; 266:13; 276:9; 303:16
bookie 228:10; 280:13
borne 189:23
borrow 292:14
borrowed 228:9
both 168:17; 170:12; 183:15; 208:21, 25; 245:3; 280:5; 281:4; 290:21; 306:10, 11, 15; 321:3
bottom 266:16; 270:8
bought 326:18; 328:24
bound 245:21
box 267:9; 270:10
bracket 282:3
brackets 282:7
branches 199:25
break 225:3, 4, 22; 231:23; 258:19; 277:12; 278:13; 327:20
Brief 225:25; 243:22; 304:19; 329:7; 330:4

bring 195:5; 315:4
brings 223:6, 6; 231:22
Britto 168:6; 169:19; 170:2; 175:6; 178:22; 179:23; 208:22; 224:11; 226:5; 244:5; 274:11; 286:10, 10, 12; 305:3; 317:12; 330:10; 337:4
broadloom 321:12; 327:23, 24
broke 280:4
broker 207:19; 220:5; 319:10, 13, 16, 20; 326:18
Brooks 168:14
brought 172:8, 18; 174:18; 180:24; 230:24; 243:3
Brown 285:2; 290:21; 291:3
building 225:16; 233:11; 236:7; 267:19; 289:3; 326:20, 25; 327:2, 14; 328:13
built-in 298:13, 16
bullshit 232:17; 234:9
bullshitted 185:14; 320:9
bunch 314:18
Burnham 231:21; 254:7, 8; 255:15, 18, 20
business 184:15; 189:13; 195:25; 198:2, 3; 199:6; 207:5, 7; 233:12; 250:13; 253:6, 11; 254:5, 9, 13, 17; 255:18; 278:18, 19, 25; 294:24; 295:2, 15; 311:25; 312:12; 315:6
businesses 311:20
buy 190:10; 211:5; 291:19; 319:16; 321:16; 327:2, 15, 16, 17, 21
buyer 171:2; 181:16; 210:12, 13; 212:15; 259:6; 268:17; 272:11; 281:18; 303:2, 3; 327:21
buyers 213:15, 15
buying 319:7; 328:13, 14, 18

# C

C 172:14
C-O-R-P 267:3
calculator 265:4
call 182:3; 185:20; 287:15; 289:23, 24; 307:10; 321:10
called 169:19; 182:14; 183:18; 184:21; 186:21; 205:2; 228:18, 20; 229:8, 9; 241:13, 14; 251:11, 12, 15; 252:3, 5; 277:14; 278:14; 290:21; 302:14; 303:4, 7; 317:25
calling 179:16; 181:7; 184:11, 14

calls 202:14; 302:6
came 217:10; 232:25; 236:2; 243:13; 244:11, 23; 251:2; 253:20, 23; 278:8; 281:9; 288:17; 294:17; 306:2; 320:25
Campral 174:22
can 172:7; 174:10; 176:22; 177:18; 180:23; 181:10; 183:19, 23; 185:8; 186:8; 187:5; 188:6, 23; 193:20; 196:3, 21; 197:3, 9; 198:7; 199:8, 15, 22; 201:5; 202:7; 203:4, 6; 208:18; 214:15; 222:21; 223:23; 230:11; 232:5; 233:3; 234:11, 14; 235:20; 236:24; 237:14; 239:6, 7; 240:17, 17; 245:22; 246:23, 23; 248:22; 250:24; 257:5; 258:8, 11, 18; 259:25; 260:3; 266:3, 14; 267:12; 269:21; 270:4; 273:23; 274:15; 276:10; 279:25; 282:17; 284:13; 296:16; 301:8; 309:6; 310:8, 12; 311:5, 9; 313:20; 314:8; 316:5; 317:14; 325:25; 327:19; 332:19, 21; 333:6; 335:7
capacity 216:15; 250:4; 256:10
Capril 174:22
CAPTION 337:2
care 246:17
Carney 168:17
carpet 265:3; 320:17; 321:6, 12; 326:18; 327:10, 22
case 195:24; 196:5; 199:19; 202:4, 25; 206:13; 207:15; 210:14; 233:20; 235:17; 239:3, 10; 241:6; 242:11, 14; 245:14; 253:20, 21; 262:6; 296:25; 313:5, 8, 12; 318:9; 330:23; 335:5
cash 194:3; 195:11; 273:8; 305:21, 23; 306:2, 9; 316:13, 23
cashed 272:18
cast 279:10; 280:5, 6, 7
caught 237:25; 323:4
cause 173:11; 183:9; 230:12; 315:12
caused 203:13; 236:18; 240:22
causing 192:12
caveats 209:4
CCC 273:13, 15; 284:18, 19, 22; 285:5, 6, 12; 286:2, 4, 18, 20, 23; 287:5, 11, 17, 19; 288:14, 23, 24; 289:8; 290:21; 291:3, 11, 13; 292:2, 7, 7, 9, 15; 293:7, 8; 294:15, 20; 295:6, 12, 18, 25; 305:9;

17; 307:2, 13; 309:16;
318:6, 10, 15, 20; 322:14,
16
cents 298:17, 17
certain 180:25; 183:19;
202:20; 210:2; 211:3, 4;
262:22; 290:16; 291:21;
296:16, 20; 314:3; 324:10;
325:10; 330:9
certainly 208:18
cetera 224:21, 21, 22
chance 175:13; 203:18
change 170:19, 20;
171:10; 233:23; 236:19;
246:4
character 233:12, 15
check 195:11, 12, 14;
267:7, 9, 11, 13; 270:10;
272:19; 273:14, 15;
280:17, 18, 21; 287:2;
317:20
checked 270:6, 20, 24;
271:4, 7; 281:15; 282:22;
283:12, 17
checker 313:20
checking 281:19; 313:20
checks 191:20; 206:23;
207:6; 272:9; 306:8
children 201:24
chose 209:2
circumstances 238:24;
250:20; 256:6
Civil 172:13
claim 196:25; 233:17;
268:24
claiming 224:5; 230:14
Clarify 217:6
Clark 303:8
clearly 281:22
clerk 303:14
clients 198:5
Close 326:6
Closest 200:3
co-defendant 197:7
coerce 224:9
collect 193:6; 279:18
color 283:3; 297:24
colorful 183:21; 190:18
column 260:11; 268:19;
269:25; 270:11; 283:2
combination 306:10, 11
coming 209:9; 220:25;
221:2; 239:20; 248:2, 3;
286:9; 287:18; 312:8
communicate 252:11
communications
284:21
companies 230:14;
305:20; 306:25; 307:12;
311:20
company 195:7, 15, 16,
18; 211:9; 220:5; 228:12,
14, 15; 231:16; 237:12;
300:21, 22; 312:13, 15;
326:25; 327:10

compel 330:14
complaint 196:12, 23,
25; 197:12; 244:6
complete 170:9; 323:23
completed 330:19;
331:13
completely 296:3
concern 227:9, 13;
242:23; 277:23
concerned 178:8;
191:17; 220:24; 275:22;
276:11
concerning 209:8;
227:20; 314:12
concluded 336:8
condition 261:16
conditions 259:24
conduct 224:12
confess 326:11
confirmed 246:10
connected 253:21;
275:19; 300:11
Connecticut 189:8, 16,
20, 24; 216:23
consistent 178:14
consisting 258:4
constantly 255:9
constituted 209:22
Cont'd 169:25
contact 256:8, 9, 10, 22;
260:22; 262:4, 15; 275:24;
276:13; 277:11, 13;
278:10, 11; 302:12, 14;
303:18, 19; 320:7
contacted 182:22;
216:11; 277:18
contest 196:11, 24
contesting 197:17
continuation 178:10
continue 177:22
continued 168:5; 310:4
continuing 330:6
controller 303:6, 9
convenient 258:20
conversation 183:23,
24; 186:5; 187:2; 188:7,
10, 13, 24; 190:7, 12, 22;
201:8; 213:23; 214:6, 22;
215:22; 216:25; 219:8, 23;
227:25, 25; 234:5; 235:5;
238:11; 239:15; 241:5, 6,
17, 18, 23; 244:5; 250:19;
251:19; 283:25; 308:2;
313:3; 329:8
conversations 186:23;
187:6; 201:11, 11; 232:4,
6, 12; 238:25; 246:9;
250:12; 271:24; 297:7
conversion 321:6, 10, 11
converted 185:15;
320:17; 321:17; 326:19;
327:17
converter 328:11
converting 328:25
converts 327:10

coordinate 297:24
copies 257:21; 308:10;
315:8, 12, 13, 14, 19, 23
copy 178:20; 245:22;
254:12; 257:3, 13, 23, 24;
260:2; 331:24; 334:22
corner 269:14; 274:25;
276:3
Corp 267:3; 281:23, 24
corporation 249:14
Corporations 312:20
corrected 171:14; 334:5;
335:7
correction 333:19, 23,
25; 334:3, 4; 335:6
corrections 245:23;
333:20; 334:15, 17; 335:8,
10
correctly 186:12; 305:22
cost 262:23; 263:19;
264:5, 15; 268:19; 269:25;
298:13, 16
costs 291:17
counsel 168:21; 176:5;
224:13; 337:14
countersue 233:11
Couple 194:15; 320:16
course 258:10; 317:23
Court 168:10, 15; 169:17;
170:8; 224:21; 330:15, 17,
22; 331:8, 18; 332:14;
333:4, 22
cover 222:17; 308:11;
309:20
covering 294:3; 306:14
Craft 262:4
Crafts 168:7, 24; 169:4,
6, 8, 12, 15; 187:23; 220:2;
259:5; 272:10; 274:13;
276:24
CRC 284:8
create 218:13; 219:12,
24; 220:12; 226:19, 21;
229:18; 241:12
created 217:3; 218:21;
222:8; 223:13; 226:25;
230:13
creating 219:4, 10
credit 248:2
criminal 199:19; 235:17
CROSS-EXAMINATION
317:10, 16
cure 177:3
cured 177:6
current 246:4
currently 173:4; 196:4
cut 230:19; 264:18;
318:14
cutting 229:2; 321:12

D

D 257:19
DA 260:13

daily 193:25
Dalton 292:19; 294:16,
20; 295:7; 305:11, 17
damage 198:5; 279:10
dark 298:2
date 178:24; 179:11;
192:18; 200:19, 20;
201:17; 220:10; 238:16;
258:23; 261:6, 23, 23;
275:10; 282:20, 21, 24;
291:5, 5; 304:22; 309:5;
336:2, 6; 337:5
dates 297:4; 336:3
Dave 171:4; 184:12, 13;
185:14; 186:17; 187:15,
17; 189:3, 4; 190:19;
191:22; 200:25; 203:10;
204:19; 206:19; 207:4;
209:12, 14, 16, 17; 210:15,
18; 213:2; 215:8; 221:4, 6,
14, 17, 19; 227:11, 12, 12,
14, 16, 18, 20; 228:9, 9,
18, 22; 229:9; 230:9;
231:18; 236:9, 11, 12, 15;
237:10, 14; 241:15, 16, 20,
24, 25; 244:19; 246:16;
247:5; 250:15; 251:3, 5;
252:12, 20, 24; 253:10, 24;
259:9, 11; 260:20; 262:20;
263:6; 266:19, 21; 267:21;
271:20, 22; 272:23; 273:4,
4, 7, 11; 275:5; 278:8, 11,
13; 279:4; 280:10; 284:24,
25; 285:8, 10; 287:7;
288:22; 291:13; 292:13;
293:24; 294:23; 295:3;
297:9; 303:4; 307:6, 7;
310:2; 321:2; 326:20;
328:16
Dave's 185:19; 242:3;
251:3; 300:25
David 168:8; 205:9;
235:23; 236:17; 237:19;
250:20; 251:7, 7, 20, 22;
252:7, 18; 253:19; 254:5;
255:4, 18; 260:15; 278:2,
21, 24; 285:4, 15; 286:11,
15, 20; 287:16, 21; 289:18;
290:2, 4, 8, 15, 23; 291:4,
8; 295:11; 298:5, 8; 301:3,
8, 10; 307:11, 15, 19;
308:13, 22
day 170:17, 18; 171:22;
177:17, 17; 179:24; 223:3,
4; 249:24; 250:9; 254:18;
279:8; 285:21; 289:22;
313:23; 329:6; 331:22, 24
days 178:8, 15; 234:20;
245:24; 311:18; 317:23;
329:18; 332:5; 334:25;
335:3
Dead 260:17
deal 192:8; 200:2; 269:9;
295:20; 328:23
dealing 189:11
dealings 217:15
deals 253:12
dealt 278:8

Debra 168:16; 169:20
debt 197:22; 251:6, 8, 13;
279:18; 295:12
deceive 268:24
deemed 335:2
deeper 183:12
Defamation 233:14, 15
default 196:4, 8, 13, 16,
18, 20, 20; 197:2, 4, 17;
224:21; 331:2, 5, 6
defendant 197:10;
215:12
defendants 200:21;
231:25; 245:14
definitely 202:5; 236:21,
23; 246:7
deliver 264:12; 324:17,
17
delivered 265:14; 322:4,
5, 6, 24; 323:12, 13, 17,
18, 22, 22; 324:3, 3, 19;
325:2; 327:25
deliveries 313:19
delivery 265:23
demeanor 287:15
denied 196:6, 8, 15, 17
Dennis 236:3, 5, 8, 10,
12; 237:22
department 262:24;
312:20
depending 291:21
depends 192:9; 265:15;
287:13; 296:15
depo 183:20; 202:8;
238:17; 329:23; 330:12
deponent 225:11; 337:15
depos 333:6
deposit 194:5; 195:13
deposited 272:18
deposition 168:5, 12;
170:9, 17, 18; 171:20, 23;
175:22; 176:13; 177:11,
15, 21; 178:3, 11, 19, 24;
179:10, 24; 192:19;
200:20; 201:18; 223:3, 4,
17; 224:24; 225:9, 11;
227:8; 232:2, 8; 234:18;
245:22; 249:24; 254:5;
256:20; 258:22; 279:9;
285:22; 297:19; 300:24;
304:21; 309:5; 313:23;
325:9; 329:6, 11; 330:19;
331:13, 22, 25; 332:10;
333:5; 334:6; 335:24;
336:4, 8; 337:4, 9, 16
depositions 170:13;
175:4; 199:12; 239:20;
335:2, 12
deprivation 233:12
describe 172:21
description 262:22;
266:6; 267:8
descriptions 210:4
determination 331:17
determine 177:19;

262:14; 263:25, 17;
271:19; 300:2; 330:13, 17

developed 269:3

DG 283:13

Diane 256:12, 14, 21

DiBenedetto 168:16;
169:21

died 191:7

difference 224:17

different 187:7; 234:13;
240:17; 271:5, 16; 285:22,
23; 291:24; 293:3; 302:13;
303:17, 18; 316:22;
317:19

difficult 315:2

difficulty 173:12

DIRECT 169:24; 182:15,
16; 290:22, 23; 320:7, 24;
328:18

directed 182:4

directing 170:8

direction 271:20

directly 181:8, 25; 190:9;
199:20; 206:25; 207:6;
213:17; 228:11; 232:12;
236:9; 263:20; 273:15, 21

disability 193:7

discharge 178:25

discount 267:15

discuss 186:5; 203:12;
227:12, 18; 230:17;
233:16; 235:10, 13, 16;
238:9; 240:7, 13; 244:21;
245:4; 253:11; 255:17;
278:25; 304:2; 307:21

discussed 189:4; 203:4;
212:25; 213:23; 230:21;
239:3; 245:2; 252:22;
311:7

Discussion 193:19;
219:17; 240:21; 244:8;
246:20; 267:20; 287:20;
307:18; 309:13

disks 238:3

dismay 242:22

distribution 267:4

District 168:10, 11

divert 188:14; 189:15

diverted 188:8

divulging 299:6

DOA 260:18

doctor 311:16

doctors 238:2, 4, 5, 7;
311:11

document 178:23;
183:16; 256:25; 268:25;
281:4, 22; 304:20

documentation 187:9;
248:17

documents 179:9;
183:14; 207:23; 229:18,
18; 246:10, 12; 284:2;
296:7; 321:24

dollars 198:16; 233:11;
247:19; 287:23

door 315:5

down 201:18; 202:11;
216:23; 232:9, 13; 238:17;
239:2, 20; 240:8; 245:12;
248:4; 261:15; 262:15;
263:15; 270:17; 275:18;
277:11, 24; 278:3; 290:21;
307:12; 327:21

drag 194:19

dreamed 326:21

Drugstore 172:20

Ds 257:15

duly 169:20

dupe 268:24

DURANT 169:11, 11

during 179:23; 208:19;
255:7, 10; 295:18; 302:5;
329:6

duty 245:20

Dziemit 169:10; 253:14;
301:25; 325:17

**E**

earlier 175:4; 178:24;
183:20; 203:24; 223:24;
227:7; 232:7; 240:4;
254:4; 276:14; 287:14;
290:18; 292:6, 7; 330:10,
25

early 295:7

easier 185:20; 276:16;
328:21, 22

easiest 174:5

easily 177:3

Eastern 168:11

eat 295:12

effect 173:17; 176:4;
221:22

effects 172:22

eight 255:21

either 170:11, 17; 171:22;
192:5; 195:22; 199:12;
200:21; 204:24; 206:9;
208:9; 209:15; 213:17;
227:19; 228:5; 230:9;
244:7; 253:19; 271:20;
272:18; 285:12; 291:2;
296:7; 300:12; 302:17;
303:4; 307:12; 317:22;
327:12; 334:19; 335:8

Ellis 302:20

ELOVITZ 169:5, 5; 171:3;
179:25; 261:22, 22;
280:12; 298:20; 302:18;
312:3; 314:11; 325:13;
326:2; 327:12

else 171:14; 182:22;
189:9; 200:12; 237:19;
300:11; 313:14; 326:4

Empire 293:10; 294:20;
305:14, 17

Empire's 294:16

employed 181:16, 20;
188:4

employee 205:8; 322:22

encounter 173:12

end 227:2; 234:24; 235:6,
6; 243:20; 304:17; 330:2;
335:21

ended 306:9

ends 193:16; 267:3;
281:23, 25

enough 314:15; 317:13;
329:2

enter 196:16

entered 176:19; 196:19;
197:5; 331:6

entire 197:6; 216:13;
299:23

entitled 197:9, 12, 16, 19;
208:12, 13

entity 249:9, 10

entries 283:3

error 179:8

establishment 223:9

estate 301:21

estimate 180:16; 181:13;
254:23; 310:8

et 168:9; 224:21, 21, 22

even 175:22; 177:15;
178:7; 190:21; 283:14;
303:23

event 246:3; 333:17

everybody 204:15; 311:2

everyone 177:6; 204:16

evidence 177:23

exact 180:23

exactly 258:6; 314:2;
319:16; 323:5

EXAMINATION 169:24

examined 169:22

example 176:25; 229:21

exclamation 267:16

excluded 177:22

excuse 186:13; 284:12

Exhibit 179:5, 10;
257:14, 15, 19; 258:4, 18,
22; 266:11; 280:15;
304:21; 335:24; 336:5

exist 265:7

expenses 194:2

experience 208:21;
262:3; 282:5

explained 279:14;
335:16

explanation 207:21, 23;
208:2

explicitly 175:19

exposed 197:6

extent 208:7

eye 198:3

**F**

F-E-L-D-S-T-E-I-N 195:6

fact 203:13; 204:6, 8;
220:20; 262:21; 263:10;
271:9; 278:4, 5; 289:6;
323:12, 18; 325:2

failed 196:5, 10

fair 204:17; 205:18;
222:23; 281:8; 285:11

fairly 254:16; 266:2

fake 218:2, 2; 222:9, 13;
226:6, 10, 20, 21; 227:4;
230:4, 13; 240:9, 14, 18,
20; 241:13, 14; 263:11;
284:23

false 219:24; 220:7;
321:24; 322:10, 23;
323:10

familial 238:24

familiar 319:6

family 313:11

far 181:11; 187:12; 188:6;
253:7; 305:20

faster 193:3

fax 254:12, 18; 255:3, 12;
294:9, 10; 313:21

February 171:6; 191:8

Federal 172:13; 249:11

feel 335:5, 6

feeling 317:12

feet 280:5

Feldstein 195:6, 14

few 217:4; 232:24;
317:13, 15; 329:18

fictional 200:10; 276:18;
292:6, 11, 20; 303:21;
304:2

Fifteen 209:24

figure 180:23; 198:18,
22; 264:17; 265:4, 18;
271:15; 285:25; 287:6;
291:16

figured 295:15

figures 248:5

file 196:5, 10

filed 196:19, 22; 215:15;
244:7; 331:3

fill 212:8; 216:7, 9

filled 274:18, 23

find 224:16; 254:17;
272:17, 20; 279:22;
283:24; 289:11, 17; 290:7;
293:20; 311:10; 333:7

finds 197:11

fine 176:14; 188:21;
230:2; 239:11

finish 219:18, 19; 225:7;
283:3

finished 223:23

finishes 175:8; 330:21

Fink 168:17

firm 329:8

F

fill 169:22; 170:16, 17;
171:22; 177:11, 17; 178:2,
5, 22; 179:24; 186:19;
189:3; 192:18; 197:10;
201:6; 204:10; 223:2, 4;
228:4; 237:25; 241:25;
244:13; 249:24; 252:25;
253:15, 23, 24; 256:20;
258:25; 263:24; 273:9, 9,
10; 274:17, 22; 279:8;
284:16; 285:21; 292:9;
300:24; 308:17, 25; 309:5;
311:14; 313:23; 315:21;
331:22; 334:8, 10

fit 266:3

five 174:14; 238:3, 7;
258:5, 12, 21; 265:11;
267:10; 272:15

Floor 168:7, 24; 169:4, 6,
8, 12, 14; 187:23; 220:2;
259:5; 262:4; 272:10;
274:13; 276:24; 294:3;
304:14

flooring 293:22; 294:4

focus 204:2

focusing 240:23

follow 327:19

follow-up 204:12; 238:6

followed 231:18; 272:7

follows 169:23

food 193:24

footnotes 184:8

foreclose 176:9

forgot 223:25; 229:3

form 179:2; 182:6;
187:11; 188:16; 202:13,
21; 209:19; 210:5; 214:14;
215:24; 216:10; 217:12,
18; 218:6, 15; 222:11;
224:7; 226:8, 12; 227:21;
230:6; 258:11; 259:2, 4;
260:12; 266:11; 269:8;
275:11, 18; 278:6; 306:20;
309:2; 337:11

format 210:2

formed 312:15

forms 174:18; 258:9, 11,
21; 269:4; 333:22

found 187:14, 17; 236:4,
13; 238:6; 242:11; 256:16;
289:10; 290:4

foundation 213:19;
262:19; 280:24

four 181:12; 238:5, 6;
254:24; 306:16; 309:22

fourth 304:6

fraudulent 210:21, 24;
247:24; 295:19; 296:4, 10,
14; 298:6, 11, 13, 14

free 202:16; 233:6, 8;
313:19

freight 264:5

friend 200:17

friends 326:4, 4, 5

front 179:18; 183:10;
205:22; 206:3; 257:18, 21;

259:8; 280:15; 281:4;
288:22; 301:14; 310:25
**fucking** 224:15, 22;
225:18
**fulfill** 212:3
**full** 172:16; 322:15
**fully** 181:16, 20
**funds** 180:7; 264:3;
285:6; 305:19
**funny** 242:4; 255:24
**further** 169:23; 186:23;
317:8; 331:7
**future** 299:9

# G

**gained** 180:11
**gains** 181:3
**gambling** 231:8; 250:17;
318:25
**game** 189:4, 6, 7; 239:13
**gave** 172:8, 9; 178:23;
180:19; 205:22; 252:24;
285:16; 287:2
**gay** 240:5
**GE** 261:20
**GE/BE** 261:17
**geez** 202:12
**GEMME** 169:7, 7
**General's** 235:18
**genuine** 213:12; 243:14;
295:24; 296:9, 14
**Gerry** 261:22
**gets** 198:2; 212:12, 13;
237:25; 299:6; 313:2
**girlfriend** 253:17; 256:19
**given** 181:3; 196:23;
204:23; 205:4, 7; 260:12
**gives** 232:16; 266:5
**giving** 234:16; 268:16;
273:5, 8; 285:10
**God** 329:15
**godchildren** 238:23
**godfather** 201:24
**goes** 280:6
**going-forward** 175:7
**gonna** 190:25; 195:22;
200:14; 201:21, 25;
233:10; 299:24
**Good** 170:2, 3; 223:24;
225:5; 231:11; 274:2;
307:22
**goods** 185:15; 187:22;
206:7, 8, 11; 216:4, 7, 8;
222:24; 223:6, 12; 229:25;
230:15; 263:19; 282:22;
291:19; 322:4, 5; 327:16,
18
**Gordon** 196:6, 9
**gotta** 239:24
**governs** 175:22
**grant** 197:3
**great** 295:20; 316:6

**grouped** 305:16
**guess** 172:19; 229:10;
323:23
**guilty** 204:16
**guy's** 240:5
**guys** 191:19; 199:17;
240:5; 253:5, 16; 297:24;
299:18; 309:14

# H

**H** 248:13
**H&R** 249:5
**H-C-L** 173:24
**H-Y-D-R-O-X-Y-Z-I-N-E**
173:24
**ha** 253:6; 297:22
**half** 322:3
**hallway** 225:17
**hand** 194:3; 261:17;
270:11
**handed** 171:25
**hands** 232:18; 308:6
**handwriting** 259:12;
263:5; 266:15; 270:17;
271:3; 274:23; 276:7;
283:11
**handwritings** 266:10;
271:16
**happen** 211:20; 227:3
**Happened** 171:3; 187:3,
4; 211:17; 235:4, 5;
288:19; 292:4; 301:2;
308:7
**happening** 221:10;
313:24
**happens** 177:13; 202:19;
323:15
**happy** 332:24; 333:13
**hard** 207:10
**head** 332:14
**heading** 254:19
**health** 193:5; 311:6, 7, 8
**hear** 298:15; 324:16
**heck** 214:25
**held** 168:12
**hell** 233:13
**hell's** 256:21
**help** 174:23; 204:2
**helpful** 247:18; 315:25
**hereof** 337:6
**hesitate** 208:22
**high** 174:20
**hip** 192:7
**hired** 170:24, 24
**Hold** 235:24
**home** 247:14; 254:10;
314:9, 16; 315:10
**hook** 237:4
**hope** 318:20; 326:7
**Hopefully** 245:18
**Hospital** 172:4; 336:3

**hour** 224:25; 225:2
**house** 193:10; 194:12;
229:10; 236:2; 251:4;
252:13, 15, 18; 326:8, 9
**human** 298:9
**hundred** 198:16, 22;
199:2; 247:19; 283:4;
288:15; 317:5
**hunting** 185:21
**hydroxyzine** 173:23

# I

**ID** 249:11
**idea** 188:2; 192:13;
194:15; 214:8; 216:21;
221:9; 225:5; 226:23;
227:6; 228:16; 231:11;
243:11; 248:18; 249:16;
253:22; 269:3, 23; 270:25;
275:6, 21; 296:24; 298:20;
299:16, 19; 300:6; 301:2;
302:2; 305:25; 307:22, 22;
308:19; 309:19; 316:20;
317:3; 326:17, 23
**identification** 178:19;
179:11; 258:17, 23;
304:22; 335:25; 336:5
**identify** 229:6; 257:5;
258:3, 6; 259:7, 10; 266:9,
25; 269:21, 24; 270:16;
271:2; 274:15; 282:17;
283:11
**IFC** 181:16, 20; 182:23;
183:10; 184:22; 185:2, 3,
4, 16, 23; 203:14; 204:7;
205:8, 24; 209:9; 213:24;
224:5; 225:4; 229:23;
243:7, 8, 15; 264:12;
272:19; 284:2; 286:4;
287:2, 11, 19, 19; 288:16;
289:7; 290:3; 293:17;
294:12, 16; 295:7, 19;
302:15, 23, 25; 313:23;
318:10, 18, 18; 320:18;
321:18, 23; 322:22; 323:7;
324:7, 18; 327:15, 18, 21;
328:8, 17
**illegal** 181:3
**illegally** 248:7
**Imperfections** 327:8, 9,
11, 15; 328:13; 329:4
**implemented** 306:14
**important** 240:4
**inaccurate** 323:24
**inadvertently** 225:19
**Inaudible** 297:17
**Inc** 274:13
**incident** 279:9
**included** 177:23
**income** 248:2, 8
**Incorporated** 168:8
**incorrect** 171:8
**increased** 295:20
**incredible** 202:14

**indeed** 249:9
**indicate** 179:25; 191:3;
232:22; 241:4, 11; 242:22;
246:20; 247:18; 250:18;
251:20; 252:10; 279:4
**indicated** 180:10;
186:19, 24; 191:16; 192:4,
19; 206:21; 212:20; 217:7;
219:22; 220:15; 227:7;
232:2; 233:25; 237:13;
238:13, 20; 254:4; 271:25;
277:12; 278:12; 281:7;
282:13; 294:12; 297:23;
298:4, 19
**indicating** 183:8; 219:25;
334:18
**individual** 195:8; 231:25
**individuals** 298:10
**industry** 222:3; 319:14
**inform** 217:2; 246:4
**information** 177:20;
199:17, 19, 22; 204:23;
205:4, 7; 215:5; 268:16;
297:6; 299:7; 311:4;
335:23
**informed** 189:5
**initial** 312:6; 316:13
**initially** 287:17; 288:16;
331:4
**initials** 260:8; 270:10, 14,
24; 276:5; 283:15, 17, 18
**innocent** 232:18; 325:20
**Inperfections** 328:19
**inquired** 238:22
**insiders** 321:23
**instance** 306:24
**instead** 173:2; 188:8, 15;
191:21; 206:23; 237:11
**insult** 224:19
**insulting** 225:20
**insurance** 222:5
**insure** 222:4
**intake** 193:25
**intelligence** 224:20;
225:20
**intend** 195:5; 245:16;
298:19; 299:12, 15
**intended** 180:5
**intending** 176:9
**intentional** 257:16
**interest** 231:4
**interested** 231:7
**intermediary** 326:18
**International** 168:7, 24;
169:4, 6, 8, 12, 14; 187:23;
220:2; 259:5; 262:4;
272:10; 274:13; 276:24
**interpreted** 237:15
**interrupt** 174:3
**into** 176:19; 181:11;
187:19; 194:18; 224:14;
240:22; 273:21; 280:4;
281:19; 321:7; 326:19;
328:5; 330:17; 331:18
**introduction** 168:20

**inventory** 294:5, 9
**invested** 316:8
**investment** 316:10
**invoice** 182:23; 185:4,
23; 205:23; 217:4, 23;
218:2, 3; 229:17; 274:19;
281:5; 288:14, 15; 324:18
**invoiced** 266:22, 23;
281:15
**invoices** 180:20; 183:2;
189:23; 203:13, 14; 204:5,
7, 18, 20; 218:9; 219:5;
223:19; 224:4, 18; 226:6,
20; 240:9; 241:13; 243:13,
13; 267:22; 282:5; 293:23;
296:8
**invoicing** 186:6; 294:16
**involve** 265:9; 312:12;
318:2; 334:8
**involved** 180:17; 187:7;
204:15; 238:21; 241:8, 9;
242:6, 14; 321:22; 322:3
**involvement** 313:16
**involves** 334:9
**involving** 331:8
**IRS** 186:13, 25; 187:9;
227:9, 14, 15, 19; 248:3
**issue** 243:2
**issues** 196:12; 202:20;
246:21
**item** 280:16

# J

**James** 168:22
**Jane** 169:10; 253:14, 16;
300:15; 301:25; 325:17
**JD** 270:20
**Jerry** 259:16; 302:20
**Jim** 303:8
**JJ** 283:21
**JMS** 260:7
**job** 185:19; 254:13, 15,
16; 276:16; 300:4; 328:21,
22
**John** 169:11
**judge** 177:18; 196:13, 14;
197:2, 11; 331:4
**judgement** 196:21; 197:5
**judgment** 196:16, 20;
197:2, 4; 331:5, 6
**July** 170:24, 25; 193:23;
245:17
**jump** 200:10
**jumped** 280:4
**June** 170:25; 171:2;
299:10; 312:4, 9
**jurisdiction** 168:9

# K

**K-L-E-H-M** 169:3
**KAMAL** 169:13, 13

Karim 169:13
keep 194:11
keeping 253:5
Kelly 236:3, 5, 8, 10, 13; 237:22
Kenneth 248:24
Kevin 168:6, 14; 169:19; 286:9, 10, 12; 337:4
key 270:2; 274:20; 281:13; 282:13, 22, 25; 283:12; 288:7; 296:8; 323:10, 11, 17, 24; 324:2, 5, 8
kind 203:10; 233:20; 242:2; 246:21; 249:8; 283:7; 312:6
kinds 172:23; 204:21
King 267:19
KLEHM 169:2, 3; 297:18; 329:9
knew 182:17; 209:14; 218:4, 7; 219:15; 222:16; 252:8; 253:8, 15; 284:19, 23; 285:10; 290:20; 291:5; 319:10; 322:9, 12, 22; 329:16
knowing 189:10
knowingly 284:19, 20; 287:17
knowledge 171:13, 15; 173:11; 185:22; 186:2; 211:18; 264:8; 278:22; 281:16; 286:17; 300:18
KRASNOO 168:22, 23; 169:25; 174:6; 175:17; 176:8, 15; 177:3, 9, 13; 178:4, 7, 13, 17; 179:6, 20, 22; 191:12; 203:23; 206:15; 207:20, 24; 208:11; 209:3; 215:10; 216:20; 217:20; 223:8; 225:6, 13, 21; 226:4, 15; 237:9; 240:25; 244:4; 250:8; 257:8, 11, 17, 22; 258:15, 24; 259:21; 263:14; 268:7; 274:10; 288:12; 291:12; 304:10; 305:2; 317:7, 25; 318:23; 320:20; 321:20; 324:21; 325:3, 8, 23; 326:15, 22; 328:20; 329:9, 19, 21; 330:8; 331:12; 332:4, 21, 24; 333:17; 334:9, 13; 335:15, 18

**L**

L-O-R-A-Z-E-P-A-M 173:25
lading 218:10, 14; 219:4, 25; 220:9, 12, 13, 19, 24; 221:16, 21; 222:9, 13, 17, 23; 223:5, 11, 13, 15; 224:17; 226:11, 21, 25; 227:5; 229:16; 240:14, 21; 241:14
ladings 180:20; 219:13,

21; 221:11; 281:17
landlord 194:17, 21
landlord's 195:4
language 183:21
large 265:14; 266:2
last 172:10; 175:21; 180:25; 181:25; 194:14; 199:11; 200:19; 201:18; 202:8; 231:25; 235:5; 238:17; 249:23; 277:8; 282:12; 288:8; 294:17; 301:12, 19; 302:3; 306:5, 15; 309:24; 317:23; 329:18; 333:5
late 254:2
later 176:23; 238:4; 272:20; 285:2, 13; 289:10
law 199:18; 329:8
lawyer 215:8; 235:8
lawyers 321:10
lead 197:20
learn 252:2; 256:6; 285:14, 17; 289:6; 300:8
learned 251:23, 25; 285:13
least 198:19; 288:16; 310:5
leave 183:20; 225:16; 240:19
leaving 183:21
left 171:4, 6; 172:10; 181:22; 194:9; 272:13; 277:5; 293:18; 294:12; 304:13; 310:2, 3; 328:16
left-hand 261:16; 267:2; 276:3
legal 233:6, 8; 249:9, 9
legitimate 211:13; 243:13; 303:20
legs 279:11
lender 208:10; 253:9; 300:20
lending 278:18, 20
lent 253:18
less 285:19; 287:3, 4, 10, 12; 316:14, 23; 317:5
letters 229:12; 230:4, 8
Levine 298:12
lie 236:25; 237:3
lied 325:21
lien 229:10; 251:3; 252:13, 14, 15
lies 237:24, 25
life 326:10
Light 298:2
likely 218:16; 244:24; 247:21; 276:21; 291:23; 314:7
limit 241:5
limitation 202:21
line 223:22; 282:1; 334:2
lines 185:9; 233:20; 267:10
lips 242:3

list 204:21; 271:25; 272:2; 313:21; 314:17
listed 265:16; 275:24; 276:13; 302:12
listening 204:19
lists 260:23; 334:2
little 183:12; 184:8; 194:3; 210:19; 278:7; 317:18
live 193:10; 194:21, 22, 25; 200:3, 12
living 229:14
LLC 312:17, 19
loan 231:5; 251:22; 253:3; 278:14; 280:13; 297:8
loaned 250:20; 251:20; 278:13, 16, 21; 279:5
loaning 182:19; 207:12; 278:25
located 168:18
location 191:2; 264:13
locations 191:14
lodged 177:14; 196:21
long 173:15; 254:16, 24; 287:25; 293:16; 309:23
longer 184:21; 306:5
look 185:15; 186:15; 187:22; 239:12; 260:10; 268:18; 274:14; 280:14; 281:12; 296:11, 16; 323:3, 7; 324:6, 11
looked 179:15; 182:3
looking 212:8; 213:24; 223:16; 252:3, 7; 258:25; 296:6, 13
looks 172:2; 188:20; 264:22; 266:19; 267:4; 271:5, 16; 276:9; 281:22; 326:13
lorazepam 173:25; 174:15
lost 317:22
lot 193:17; 201:19; 234:13; 254:13, 15, 16; 286:16; 289:2; 295:15, 19
Lou 298:12
lower 259:22; 263:15; 267:2; 276:3
luck 299:4
lump 299:13, 14
lunch 258:19; 274:3; 277:12
luncheon 274:7
lying 188:20; 242:3

**M**

M 270:20
M-A-C-H-A-D-O 248:25
M-A-R-I-S-C-O 301:15
Machado 248:24
machine 291:18
mades 291:19

mail 335:9
mailed 272:13
maintain 248:14
makes 270:14; 315:2
making 182:20; 198:15; 206:2; 207:9, 11, 15
male 229:6
males 229:5
manager 236:6; 302:22, 25; 303:11
Mansfield 185:18, 18, 25; 256:23; 293:13; 295:2; 300:12; 305:6
manufacturers 327:22
many 176:5; 187:5; 201:16; 209:21; 212:16; 265:3; 296:3; 308:10; 309:20, 21; 310:8
Marasco 228:6; 249:19, 25; 260:25; 262:15; 277:18; 301:11; 304:3
Marasco's 301:12
March 171:7; 175:4, 4; 191:8; 200:20; 202:9; 232:2, 9, 13; 234:24; 238:17; 239:2; 240:8, 24; 245:11; 254:3, 21
Marisco 301:14, 18
mark 174:4; 257:7, 14; 267:9, 13; 280:17, 18
marked 178:18; 179:2, 3, 7, 10; 258:17, 22; 280:16; 282:2; 283:2; 304:20; 335:24; 336:4
marking 174:7
marks 243:20, 24; 267:7, 11; 280:21; 304:17, 25; 330:2; 335:21
markup 264:20, 21; 321:19
married 301:24
marshals 224:19
Massachusets 249:4
Massachusetts 168:11; 332:8
matter 168:6, 25; 180:18; 197:10; 203:21; 215:23; 220:20; 235:21; 337:5
matters 314:4
May 168:4, 20; 174:4; 184:5; 202:11; 218:11, 11; 256:13; 277:8; 296:23; 297:5; 302:9; 304:8; 309:4; 317:22; 331:7; 333:11
Maybe 183:3; 197:12; 209:24; 224:25; 273:9; 277:10; 290:17; 329:10
mean 171:5; 176:7, 24; 177:11; 180:4; 182:9; 183:12; 188:19; 192:8; 194:10; 203:2, 2, 9; 211:21; 215:2; 217:20; 218:2, 25; 228:12, 15; 229:20, 24; 234:3, 5, 22; 240:12; 245:6; 251:4;

255:21; 258:7, 8; 265:7; 268:14, 20; 276:19; 277:5; 278:16; 280:20; 281:8; 282:5, 7, 21; 283:6; 285:16, 17; 286:16; 296:16, 19; 299:22; 300:6, 25; 310:13; 311:4; 312:8, 11; 313:20; 314:17; 316:5; 326:3
meaning 221:7; 232:25; 238:22; 298:16; 334:5
Means 182:10; 183:6; 196:11, 23; 197:5; 214:16; 219:19; 243:6; 332:15
meant 234:15; 239:19; 287:23; 288:10; 321:12; 330:20; 331:10
mechanism 285:9
medical 172:3; 179:13
medication 172:23; 173:16; 335:23
medications 173:3, 6, 10; 174:14, 17
meet 193:16; 228:4; 253:20
meeting 292:12; 301:2
member 313:12
memory 171:21; 302:10
mention 253:14
mentioned 204:16; 249:21; 250:3; 279:9; 285:22; 312:4; 313:18
merchandise 270:19; 271:4, 7, 11; 283:12; 302:25
merely 176:10
Meresco 249:25
met 275:13; 300:25; 301:3, 10
Michael 291:3
mid 317:25
middle 235:2; 255:2
middleman 186:16; 268:16; 319:15; 328:18
might 173:17; 177:4; 178:21; 197:21, 21; 204:2; 225:2; 272:20; 274:2; 298:17; 302:14; 303:18; 312:5; 314:22
Mike 285:2; 290:21
milligrams 173:24
million 233:11
millionaire 316:11
mind 245:20; 329:4, 4
mine 291:14
minus 282:7
minute 175:18; 304:12; 322:13
minutes 224:25; 225:2
misleading 206:14; 208:6, 17, 20, 24
mispronouncing 256:13
misspoke 215:20
mistake 257:15
Mitchell 181:7; 182:2, 14,

17, 22; 183:8, 10, 15, 18, 23; 184:20, 24; 185:8; 186:4, 20, 24; 187:6, 12; 188:11; 189:18; 190:7, 13; 191:3, 13, 15; 201:2, 17; 202:3, 7; 203:12; 205:2, 8, 9; 208:4; 209:8, 16, 17, 18, 23; 212:7, 13, 20, 23; 213:8, 17, 22; 214:6, 25; 215:18, 22; 216:14, 16, 23; 217:2, 8, 14, 24; 218:8, 13, 21; 219:3, 9, 12, 15, 23; 221:3, 19; 222:8; 224:4; 226:6, 10, 19; 227:19, 20; 229:17; 230:9; 232:4, 5, 6; 240:8; 241:3, 4; 244:7; 245:7, 8; 246:9, 21; 247:7; 251:24; 252:2, 25; 290:14, 22; 291:3; 296:23; 297:7; 300:11; 301:11; 318:2; 319:7, 24; 320:4, 15, 22; 321:4; 324:25; 325:16

**Mitchell's** 189:23; 227:13; 324:12, 15

**model** 326:10

**moment** 183:22; 200:11; 219:22; 231:22; 233:25; 269:13; 297:16

**Monday** 294:6

**money** 179:17; 180:2, 17; 181:2, 8; 182:15, 19; 183:25; 184:13, 15, 17; 185:2; 186:21; 188:14; 194:4, 8; 195:23; 197:6, 9, 19; 203:10; 205:3, 22, 24; 206:3; 207:12, 16; 227:17; 228:19, 22; 232:21, 23; 233:22; 235:11, 14; 237:13; 242:2; 247:2, 23; 248:5; 250:15, 20, 25; 251:21, 22; 252:3, 7, 24; 253:10, 19; 263:20; 273:5, 20; 278:17, 18, 20; 279:2, 5; 280:12; 286:18, 19, 23; 288:20, 22; 289:8, 13; 290:8, 15; 294:1; 294:23; 295:3, 16; 312:3; 318:9; 319:3

**monies** 188:8; 190:13; 197:20; 198:11; 247:7; 272:23; 285:18; 286:4; 287:10, 22; 289:18, 19; 290:23

**month** 312:8

**monthly** 299:13, 15

**months** 171:4; 309:25

**more** 179:16; 180:14, 15; 198:17, 22, 25; 205:23; 214:9; 215:5; 229:5; 231:6; 237:13; 239:15; 240:4; 247:18; 264:3; 283:6; 287:14; 288:18; 295:2, 16, 19; 308:21; 316:14, 23, 25; 329:17

**morning** 170:2, 3; 227:7

**Most** 218:16; 244:24; 247:21; 276:21; 291:23; 314:7

**mother** 191:7

**motion** 331:2, 5

**Mount** 172:4; 178:20, 22

**move** 197:3; 326:15

**moved** 197:2

**moving** 242:3

**Mt** 179:9

**much** 180:17; 195:21, 23; 197:9, 13; 198:20; 235:11, 14; 237:24; 240:11; 247:13, 18; 286:14; 287:22; 290:15; 291:4, 5, 22; 295:3; 299:11; 300:2; 305:23; 317:3; 329:17

**multi-page** 258:4

**multiple** 194:24

**must** 270:3; 332:4

**myself** 189:5; 204:19; 210:15; 271:22; 274:18

## N

**name** 168:14, 22; 169:2; 194:17; 195:4, 17; 222:10; 227:4; 248:22; 249:23; 254:8; 256:3, 6, 14; 273:17; 275:9, 18; 276:9; 277:24; 278:3, 9; 282:14; 301:12, 19; 311:20; 312:22

**named** 200:21; 231:24; 306:24

**namely** 306:24

**names** 199:8; 204:16; 249:17; 250:4; 275:12

**narrative** 202:15

**nature** 193:25; 238:23; 334:3

**near** 299:9

**necessarily** 194:20; 208:13; 330:24

**necessity** 333:7

**need** 174:8; 245:25; 247:25; 248:3; 265:13; 309:9; 332:6; 335:7

**needed** 187:8; 228:19; 265:22

**needs** 186:13; 335:6

**negative** 332:13

**nervous** 186:17, 24; 242:17

**New** 168:13, 13, 19; 169:22; 172:4; 185:17; 229:14; 240:2; 246:5; 254:5; 267:19, 24; 276:15, 15; 312:20; 332:11, 23

**next** 221:20, 21; 268:18, 19; 276:8

**Nick** 186:14; 187:8, 14, 19; 188:12; 189:2, 14, 15; 192:3, 10, 14, 16; 210:20, 23; 211:2, 14; 212:11; 213:3, 16, 20, 24; 214:13

**night** 223:20

**nine** 296:23; 297:7; 302:5

**nods** 211:12; 212:24

**nonemployee** 185:2

**nonexistent** 210:14; 213:5; 217:9; 218:5; 263:11; 286:5, 24

**nonexisting** 262:16

**nonskid** 283:8

**Nope** 298:24; 311:21

**nor** 208:14

**normal** 243:6

**normally** 213:12

**notarize** 332:17

**notarized** 332:16; 334:19

**Notary** 169:21; 332:7, 9, 20, 22; 333:8

**Note** 225:21; 250:11

**notice** 179:18; 260:21; 261:3; 262:7; 264:6; 280:15; 281:20; 282:2

**Nov** 261:13

**November** 263:23; 268:13

**number** 210:8; 211:4; 249:12; 257:10; 262:8, 12, 13, 24; 274:24; 275:4, 5; 283:22, 22; 303:17; 309:7, 10; 310:18; 317:20; 321:23

**numbers** 205:10; 210:4, 6; 265:7; 282:4

**Numerous** 221:17

## O

**o'clock** 274:6; 336:7

**oath** 333:10, 12

**object** 175:13; 176:7, 24; 203:18; 208:12; 215:3, 24; 223:21; 284:15

**Objection** 171:17; 174:7; 176:21; 177:4, 5, 14, 16, 20; 182:6; 184:3; 185:6; 187:10; 188:16; 202:13, 19; 203:17; 205:25; 206:12, 18; 207:13, 18; 208:16; 209:19; 210:5; 211:10, 15; 212:10; 213:18; 214:3, 14; 216:10; 217:12, 18; 218:6, 15; 221:23; 222:11, 19, 25; 224:7; 225:22; 226:8, 12, 22; 227:21; 229:19; 230:6; 231:12; 234:8; 240:15; 243:17; 249:20; 250:11; 262:18; 263:12, 22; 268:5; 278:6; 280:23; 281:11; 284:10, 14; 293:4; 301:6; 306:20; 309:2; 310:17; 318:23; 320:20; 321:20; 324:21; 325:3, 8, 23; 326:15, 22; 328:20

**objectionable** 177:8

**objections** 175:20; 176:21; 184:7

**obstreperous** 224:12

**obtainable** 198:5

**obtained** 177:21; 199:20;

248:7

**obviates** 333:7

**obvious** 315:7

**obviously** 315:14

**occasion** 182:15; 278:17, 22

**occasions** 279:6; 320:22

**occupy** 195:2

**occur** 187:2

**occurred** 181:11; 187:25; 190:22

**Ocean** 254:13, 14

**October** 261:7; 281:6; 294:17

**off** 170:23; 174:23; 182:20; 184:16; 193:19; 197:22; 203:22; 207:9, 16; 219:17; 225:24; 229:3; 231:2; 232:21, 23; 233:6; 234:2, 4, 6, 14; 237:3, 14, 16; 243:21; 252:24; 259:16; 264:18; 274:5; 280:6, 13; 281:15; 282:9; 291:18; 296:19; 304:18; 309:13; 330:3; 335:22

**offer** 233:22

**offered** 280:12

**Office** 235:18

**offices** 168:18

**often** 214:5

**old** 232:16

**once** 199:21; 225:19; 239:12; 242:11, 13; 251:2; 280:6; 292:3; 299:5; 306:9; 308:21; 313:2; 328:16

**One** 173:23, 25; 174:14, 15; 175:24; 176:19, 24; 178:5, 10; 179:23; 180:24; 186:14; 187:2; 189:5; 195:2; 196:2, 3; 197:24; 198:13, 14; 200:5, 7; 201:5, 10; 203:7; 206:22; 208:8; 215:11; 220:25, 25; 221:2, 4, 11, 11, 12; 232:24; 244:9, 15; 246:16; 247:25; 250:10; 258:2, 25; 259:8, 11; 260:22; 262:25; 264:3; 266:19; 267:10, 19; 268:20; 269:13, 18, 25; 270:4; 273:25; 276:17; 278:17, 22, 23; 279:6; 280:5, 7; 285:23, 24; 289:22; 290:21; 296:14, 14; 300:25; 301:14, 18; 304:12; 306:6; 310:10; 318:6; 324:6; 334:8

**ones** 200:3; 210:21; 308:12; 309:12; 315:10; 331:15

**only** 206:8; 208:8; 214:19; 267:4; 278:23; 284:7; 290:2; 300:16; 317:15; 322:3

**onto** 315:20

**operate** 176:3

**operative** 176:12

**opportunity** 335:4

**opposed** 182:4; 268:9; 273:4

**option** 208:8

**oral** 246:14, 16

**orally** 208:25

**order** 170:8; 183:13; 205:22; 209:12, 14, 15, 22; 210:3, 7, 8; 211:5; 212:8, 9, 11, 16; 213:8, 11, 24; 214:12; 215:19; 216:7, 9; 217:3, 16; 255:12; 256:3, 7, 15; 259:3, 24; 260:12, 12; 261:7, 17; 262:5, 16; 265:13, 21; 270:5, 6, 10; 274:12, 18; 275:10; 277:2, 8, 14, 18, 20; 278:10; 283:17, 22, 22; 322:21, 22

**ordered** 281:10; 283:7

**orders** 210:2, 11, 17, 17, 20; 211:3, 14, 18, 23; 212:4, 21; 213:4, 9; 256:2; 273:9, 10; 296:8; 302:14; 322:2, 9, 10; 323:3; 324:9

**originally** 317:24

**originals** 334:17

**others** 322:5

**otherwise** 324:7

**out** 183:20, 22; 187:14, 17; 195:13, 14; 197:14; 198:4; 203:11; 209:10; 224:16; 230:13, 19; 231:3; 232:19, 25; 233:3; 235:11, 14; 238:2, 4, 6; 240:10, 16, 19; 242:11; 243:7; 248:16; 254:17; 256:16; 258:12; 265:5, 18; 270:2; 271:15; 272:10, 17, 20; 273:17; 274:18, 23; 276:23; 277:9; 279:22; 282:22; 283:24; 288:2, 6, 17; 289:4, 10, 17, 19; 290:4, 7; 291:6, 20; 293:20; 294:11; 304:13; 311:10; 337:6

**outside** 300:10

**over** 190:20; 225:22; 237:20; 282:22; 290:15; 309:15; 317:23; 329:24; 330:20, 20

**overs** 269:10

**overshipment** 268:24; 269:5, 8; 271:19; 272:2; 281:7

**owed** 197:23; 250:15, 15, 16; 251:6; 252:8; 253:11; 294:23; 295:4, 12

**owes** 203:10; 241:25

**own** 223:7; 230:13; 237:12, 25; 271:19; 276:7; 300:19; 301:21; 311:20

**owned** 311:19

**owner** 312:12; 329:3

**ownership** 300:13

**owns** 327:11

# P

p.m 274:6; 336:8

pace 225:17

padding 283:8; 292:19; 293:22; 294:3; 305:12, 17

page 179:18; 258:25; 260:22; 262:24; 266:5, 10; 268:18, 19; 269:12, 20, 21, 25; 274:17, 18, 20, 23; 276:17; 280:14; 281:4, 13, 21; 282:12; 315:21; 333:5, 23; 334:2, 18; 335:8; 337:6

pages 258:4, 5, 12, 21; 274:14, 16; 333:19; 334:15, 18, 22

paid 179:25; 181:2, 8; 184:12; 193:17, 22; 194:4, 5; 247:2, 5, 7, 13; 252:12; 273:11; 281:18; 288:20; 289:25; 290:15, 20; 298:10; 318:10, 14, 18, 20

painless 329:17

pains 333:2, 9; 334:20

paper 172:9

paperwork 218:18; 221:14; 229:11; 246:18; 253:16; 272:5; 300:14, 16; 310:22

Pardon 196:7

part 183:24; 189:22; 190:20; 224:13; 259:22; 268:23; 271:6, 18; 275:23; 276:12; 284:16; 323:9

participants 318:6

participate 284:7; 287:18

participated 197:18

participation 286:24; 314:6; 330:22

particular 211:5; 268:4; 271:11; 279:6; 281:3; 283:7; 303:19

parties 314:25; 332:8; 337:15

partner 228:19, 23; 330:12

partners 184:12

partnership 249:14; 300:22

pass 230:13

passing 223:20

past 273:25

patient 178:25

Paul 169:2; 300:8

pay 180:5, 7; 193:12; 194:17; 195:11; 197:22; 227:16; 243:8; 247:22; 266:22, 23; 280:13; 281:15; 288:6; 289:4; 298:20; 299:20, 21, 24; 300:3; 321:18

payable 280:25; 281:17; 289:24; 303:11, 14

paying 183:10; 184:2;

185:15; 203:9, 11; 287:19; 289:3, 7, 18; 290:3; 291:4; 312:3

payment 182:3; 224:8; 273:11; 298:5, 5, 6; 312:6

payments 299:12; 316:14; 318:15, 19; 320:13

penalties 333:2, 9; 334:20

pending 235:17; 331:3

people 190:10; 204:15; 232:3; 243:14; 253:21; 270:24; 271:4; 296:17; 299:25; 302:13; 303:17; 323:7; 325:10, 16

per 288:7

percent 264:24, 25; 272:15; 285:24, 24, 25; 286:2, 3, 7, 8, 9, 10, 25; 287:6, 9; 288:15, 17, 20, 21; 291:9, 16; 293:6; 318:15, 21

percentage 182:20; 206:2; 207:9, 11, 16; 264:17, 19, 20; 273:3; 285:25; 291:9, 13, 25; 292:13; 293:2, 3, 5

percentages 285:22

perfect 200:17

perhaps 277:7

period 208:19; 232:8; 234:19, 25; 237:20; 239:2; 240:24; 255:8; 290:16; 294:18, 25; 295:18; 302:10; 306:6, 13; 308:11; 310:7

periodic 299:16

periodically 269:4

perjury 333:2, 9; 334:21

permission 309:12

person 200:16, 22; 201:12; 221:2; 223:6; 250:2, 5; 256:8, 10, 22; 260:23; 262:5, 15; 275:13, 24; 276:13; 277:11, 13, 14; 278:3; 279:23; 302:13, 14; 303:19; 319:17, 17; 332:10

personal 195:25; 198:2, 3; 211:18; 311:4; 315:6

personally 180:11; 183:6; 209:8

Peter 231:21; 254:6; 255:15, 17, 20

phone 200:22; 228:5; 233:20; 234:22; 251:16; 302:5

phony 218:14

phrase 234:3, 10; 237:14; 320:9; 333:3

phrased 182:11

physical 216:19; 264:13

physically 194:21; 217:21

piece 178:9

piling 179:14

pissed 184:16

place 285:10; 337:5

placed 256:7

places 285:23

plaintiff 168:24

plan 178:25; 189:4, 6, 7

planet 233:8

playing 239:14

please 169:17; 193:21

plus 268:19; 269:13, 18, 25; 283:3, 4, 4

PO 254:12

pocket 287:24

point 179:23; 180:25; 201:23; 204:14; 206:22; 217:8; 223:24; 224:3; 225:7; 231:3; 242:5, 9, 15; 263:10; 267:16; 271:9; 272:13; 273:7; 275:15; 278:8; 285:6, 15, 20; 287:22; 290:19; 291:2, 11; 292:23, 25; 293:17; 294:15; 295:4, 6; 326:13

pointing 263:13

Police 199:13, 14; 244:11, 11, 16, 23, 23; 245:9; 253:20, 22

pool 279:14; 280:4

portion 175:25; 204:3; 260:4; 267:2; 283:11

portions 170:12; 177:15; 180:18; 266:14

portrayed 203:14

posing 208:6

position 197:16; 253:7; 300:13; 321:3

possessed 216:16

possession 216:19

possible 324:6

Possibly 171:11; 240:12; 241:2; 305:8

Post-its 253:5; 316:9

potentially 197:5

practical 330:18

practice 282:5

pregnant 224:21

premises 194:22, 25; 272:13

preparation 248:11; 284:2; 323:10, 14

prepare 205:23; 226:10; 323:16, 19, 23; 324:18

prepared 210:10, 16, 18, 18; 211:2, 5; 217:22; 226:6; 322:8, 21

preparing 201:22

present 171:15; 203:25; 215:13; 240:9; 245:12, 17; 309:19

presently 245:16

preserved 175:20; 176:22

preserves 202:20

president 171:3; 187:22; 303:16

pressure 174:20

pretending 221:3

pretty 239:5; 242:4; 290:13; 297:15; 331:20; 333:23

prevent 313:24

previously 176:5; 190:14

price 262:23, 23; 266:24; 280:16

prices 280:21

primary 318:6

print 208:25; 240:22

printout 172:2

printouts 172:19

prior 182:12; 238:20; 279:5; 329:7

privy 199:21

proactive 287:14

Probably 173:13; 194:10; 222:2; 230:16; 234:20; 245:3, 10; 254:18; 265:24; 272:15; 285:20; 294:25; 297:8; 302:5; 306:15; 332:15

problem 192:5; 262:6; 278:10; 299:6; 318:25

problems 311:7

proceed 196:20

proceedings 330:15, 23; 331:8

proceeds 194:6

process 275:24; 321:7

product 293:21; 296:15, 20

prohibited 218:4

promised 295:15; 313:4, 10

pronounce 173:19

pronounced 174:16; 301:17

pronounces 301:19

pronunciation 301:16

proof 186:14

proper 215:6

proprietorship 249:15

Protection 172:14

protonics 174:14

provide 308:9; 310:14; 313:11; 331:24

providing 334:22

Public 169:21; 199:20

purpose 183:13; 209:11, 14, 15, 22, 25; 210:3, 7, 8, 10, 17, 17, 20; 211:2, 14, 17, 23; 212:8, 9, 11, 16, 21; 213:4, 7, 9, 11, 13, 24; 215:19; 217:3, 16; 255:12, 25; 256:3, 7; 259:3; 260:12; 262:5; 263:21; 274:12, 18; 277:2, 8; 278:9; 283:22, 22; 296:7; 322:9, 10, 21, 22; 323:2; 324:9

purports 214:21

purpose 262:2; 269:7; 277:13

purposes 330:18; 331:13; 335:13

pursuant 245:21; 256:15

pursue 202:20

push 207:10

put 175:19; 199:2; 209:5; 222:20; 224:11; 229:9, 10; 240:22; 242:2; 248:4; 251:3; 252:14, 17; 262:15; 263:18; 269:4; 271:6; 275:12, 18; 277:11, 24; 278:3, 9; 280:5

putting 176:10; 206:3; 269:7

# Q

quality 205:15; 211:4

quantities 204:21

quantity 262:22; 265:6; 266:24; 267:9

questioner 175:8

quick 220:8

quinine 174:15

quite 212:6

# R

R 248:13

R-I-B-U-T-I-O-N 267:5

ration 234:16

reaches 197:11

reaction 242:16

read 170:11; 171:11, 20; 203:23; 204:4; 226:17; 233:19; 269:17; 331:23; 337:15

reader 268:25

reading 281:8

real 220:8; 243:7; 287:23; 301:21

reality 191:23

really 191:24; 207:10, 15; 220:20; 234:3; 279:17; 287:23; 298:17; 316:20

reason 172:7; 176:23; 203:11; 208:16; 220:4; 231:10; 245:20; 299:2, 5; 302:18; 303:18

reasons 196:3; 197:25; 248:2; 294:22

reboot 329:20

rec 274:20; 281:13; 282:13, 23, 25; 283:12; 288:7; 323:11, 17, 24; 324:2

rec's 270:2

recall 179:5; 181:10; 183:19, 23; 185:8; 187:24; 188:23; 229:12; 237:15; 239:7; 244:25; 246:24;

250:24; 256:14; 278:14;
325:10, 12, 13, 16; 330:24

**receive** 190:13; 192:22,
24; 255:3, 6, 7; 268:21;
272:23; 289:14; 305:3, 6,
9, 11, 14, 23; 314:23

**received** 185:23; 206:9,
16; 212:7; 215:19; 227:17;
247:3, 8, 19; 261:13, 24;
268:12, 22; 271:12; 281:5;
287:13; 289:8, 19, 20;
302:15; 305:18, 19, 21;
306:8; 307:16; 316:13;
318:9

**receives** 243:9

**receiving** 261:9, 11;
277:4; 285:11

**recently** 253:23

**recess** 225:25; 243:22;
273:23; 274:7; 304:19;
330:4

recite 193:20; 241:16, 17

recited 264:16

**recognize** 258:9, 12;
260:3

**recollection** 264:11

**recommended** 237:11

**record** 168:3; 176:11;
190:17; 193:19; 204:3;
219:17; 225:24; 226:3, 17;
243:21, 25; 274:5, 9;
304:18, 24; 309:13;
322:19; 330:3, 7; 335:22

**recorded** 312:19

**records** 172:11; 179:14;
180:19; 234:22; 248:15

**recs** 296:8; 323:10;
321:5, 8

**reduce** 198:5

**reduced** 337:10

**referral** 178:25

**referring** 250:6, 9;
259:19; 266:20

**refers** 269:15

**reflect** 214:22; 305:19

**reflects** 182:12

**refuse** 207:3

**refused** 330:11; 331:4

**regard** 172:2; 173:3;
174:13; 182:18; 200:11;
232:11; 255:25; 258:15;
267:21; 268:12; 271:10;
274:22; 306:12; 311:25;
312:5

**regarding** 246:21

**related** 272:6; 276:17

**relationship** 326:2

**relative** 200:16

**relatively** 329:7

**relevant** 214:19; 314:5

remain 245:17

**Remco** 185:18, 22;
189:19, 23; 192:12; 211:9,
22; 212:2, 3; 213:17;
216:15, 17; 217:10; 218:3,

22; 220:2; 223:10; 227:20;
228:15; 249:9, 18; 250:3,
13, 14; 253:8, 12; 256:2, 3,
7, 14, 22, 23; 261:4;
262:16; 263:20; 264:2, 8,
12; 266:11; 267:22;
272:10, 14, 18; 273:19;
275:20; 278:4; 281:5;
284:3, 4, 7, 17, 19, 22;
285:7, 12; 289:12, 12;
291:25; 292:6, 8, 10;
294:25; 300:12; 305:4;
306:24; 307:5, 12; 309:17;
319:8; 322:9, 17, 21

**Remco's** 250:13; 284:2;
293:14; 321:16; 324:12,
15

**remember** 173:17;
185:11; 188:22; 195:17;
203:6; 227:3; 235:22;
271:23; 290:13

**remembering** 173:12

**remnants** 327:22; 328:7

**rent** 193:12, 13; 194:17;
195:21

**repeat** 191:10; 226:15

**repeating** 309:6

**Rephrase** 286:22

**reported** 192:15

**reporter** 168:16; 169:17;
204:4; 226:17; 332:14;
333:4, 22; 337:10

**Reporting** 168:17; 227:9,
13, 14, 19

**represent** 168:17, 23;
169:4; 245:13; 264:23

**representative** 319:11,
12

**represented** 243:14;
248:5

**representing** 169:10, 14;
215:11; 218:3

**represents** 262:16

**Requested** 204:3; 337:9

**required** 208:14; 323:10

**requires** 332:12

**resemble** 210:3

**residence** 246:6

**resolution** 295:11

**resource** 333:14

**respect** 223:18; 224:22

**response** 170:4, 8;
171:16; 191:16; 239:23

**rest** 299:24; 334:21

**result** 197:24; 247:20, 23;
248:6

**resumed** 294:20; 295:6

**retail** 263:8, 14

**retain** 315:14

**reticence** 234:11

**return** 248:11; 315:25;
334:25

**returns** 247:15, 18;
248:4, 15; 306:12, 13;
308:10; 309:8, 11, 20;

310:8, 20; 315:9, 16

**review** 245:23; 247:17;
331:14; 332:5

**ribution** 281:25

**Richard** 169:9

**rid** 221:18, 20

**ridiculous** 173:21; 238:8

**right** 174:11; 177:4, 9;
179:6; 189:16; 193:5;
196:17, 24; 207:17, 25;
208:3; 224:3; 228:6;
231:16; 249:21; 259:22;
261:6; 263:15; 267:7;
270:11; 277:7; 280:3;
282:3, 12; 284:9; 288:8;
297:14; 299:3; 301:15, 20;
302:8; 303:4; 306:3;
309:3; 311:19; 323:4;
325:6

**right-hand** 260:11, 22;
261:12; 269:14; 274:25

**rights** 202:20

Rite 172:20, 20; 174:18

**Robert** 274:19; 327:12,
17, 18; 328:3, 4

**role** 268:3, 6, 9, 11, 15;
321:16; 324:12, 13, 15, 15;
326:10

**Ron** 184:10; 187:15, 16;
188:11, 11, 13, 24; 189:5,
9, 14; 190:18; 200:25;
201:2, 2, 17; 203:4; 220:8,
11, 15, 23; 221:2; 230:19;
231:4; 237:11; 240:11;
241:16, 17, 18, 19, 20, 22;
242:2, 5, 8; 244:17;
251:23; 252:2; 272:21;
278:8; 301:11; 318:2;
319:7; 325:16

**Ron's** 256:19; 262:13

**Rooney** 171:4; 310:2;
328:16

**roughly** 187:5, 24;
212:21; 305:24

**routine** 232:17; 234:10

**rug** 203:15; 222:3;
300:12; 304:2; 305:7;
321:13

**rugs** 183:9, 11; 185:2, 23;
186:6; 189:19; 191:2, 24;
192:5, 11, 11; 203:15;
204:7, 21; 205:10, 15, 18;
206:17; 207:16, 17; 209:8;
210:14; 211:4, 6, 8; 212:3,
8, 9; 213:5, 13, 14, 25;
215:20; 216:16; 217:3, 9,
10, 16, 17; 218:3, 4;
219:25; 220:16, 18, 20;
222:4, 4, 17; 224:5; 230:5;
241:8; 242:6, 14; 243:6, 7,
7, 9; 246:14, 14; 262:17,
22; 263:11, 21; 265:7, 10,
15; 266:6; 267:8; 268:21;
278:4; 285:7; 284:4;
286:5; 287:18, 20; 294:3;
295:24; 299:4; 303:21;
319:7, 11, 17, 21; 320:4,
17; 321:7, 17; 322:23;

325:21; 326:18, 25;
326:19; 327:3, 4; 328:6

**ruining** 233:12

**rule** 177:18; 208:12;
332:6

**Rules** 172:13; 178:14;
208:15; 245:21; 317:18;
332:11

**running** 240:6; 299:6;
312:18


# S

**SA** 270:20

**salary** 192:22

**sale** 216:17; 262:23;
319:21

**sales** 243:8, 9; 319:11, 12

**same** 178:5; 183:16;
194:22; 224:13; 232:10,
16; 255:23; 256:24;
261:23; 289:12; 292:18;
293:2, 5, 9, 14; 294:25;
324:10, 11; 337:10

**Saturday** 200:15

**saw** 179:20; 192:11;
206:7, 8; 209:17; 212:19,
21

**saying** 176:17; 223:24;
233:13; 236:9; 323:11

**scared** 240:6

**scheduled** 311:15

**scheme** 170:25; 180:12,
17; 181:4, 11; 182:2, 18;
186:21; 187:7, 13; 194:6,
8; 197:18, 20; 198:12, 16,
20; 230:12; 235:11, 14;
238:10; 239:4, 8, 10;
241:8; 247:20, 24; 248:6;
263:20; 268:23; 271:6, 19;
275:23; 276:12; 284:8;
287:18; 295:19; 298:7;
299:23; 304:2; 306:3, 14;
308:11; 309:21, 23;
313:15; 314:5, 12; 316:14;
317:25; 318:6; 319:8, 23;
321:22; 323:9; 326:12

**screwed** 193:23

**sealed** 196:17

**second** 170:18; 171:22;
174:3; 175:23; 177:17;
266:5, 10; 274:18; 280:7;
281:20; 334:10

**Secondly** 233:10; 248:3

**section** 227:8

**Security** 193:7, 22;
194:5; 195:13; 309:7, 10;
310:18

**seeing** 198:3; 264:12

**seek** 330:14

**seem** 283:21

**seems** 202:15

**seizable** 197:22

**self-explanatory** 333:24

**sell** 319:17; 321:18;

327:2; 328:8

**seller** 203:15; 208:9;
211:6, 8; 213:13; 217:10

**selling** 207:16, 17;
321:13; 326:19; 328:14

**sells** 222:4

**send** 181:8; 182:23;
183:25, 25; 184:14;
186:21, 22; 188:15;
191:20; 195:10; 205:3;
206:22, 24; 207:5; 213:7,
9, 16; 219:4; 221:3, 22;
245:21; 273:14; 309:11;
316:7; 334:16; 335:10

**sending** 184:25; 191:21;
209:15, 17, 18; 217:4;
221:12; 286:25; 306:19

**sends** 243:7; 333:22

**sense** 196:2; 225:3;
289:12

**sent** 183:9; 185:3;
203:13; 204:20; 211:22;
212:2, 12, 13, 16, 20;
213:13; 218:4, 8; 220:10;
221:2, 4; 255:11; 267:22;
272:19; 273:15; 284:2;
286:4, 23; 287:20; 288:14,
15; 289:13; 333:18, 19;
334:14

**separate** 286:19; 292:12;
334:15

**separately** 315:20, 24

**September** 181:23;
275:11; 276:25; 277:5;
293:18; 294:14

**serious** 239:14

**set** 245:21; 287:7; 337:5

**setting** 237:12

**Seven** 234:20

**several** 198:24; 302:13;
320:21

**shaking** 332:13

**share** 172:15, 15; 180:6;
200:13; 273:3; 285:11;
288:5, 11, 18; 289:5;
314:24; 315:5

**shared** 199:17

**sharing** 199:19; 285:18

**shark** 253:3; 278:14

**sheets** 335:23

**ship** 185:16; 267:18;
294:11; 327:19

**shipment** 220:25; 222:5,
24; 223:12; 267:21; 268:4,
12, 15; 269:4; 271:11;
276:18; 281:9; 285:5;
286:5; 287:10; 296:9;
303:19, 20, 20, 21, 22

**shipments** 190:3; 206:5;
209:10; 217:9; 229:23;
243:14; 272:6; 284:22, 23;
286:24; 291:21, 25; 292:6,
12; 295:23, 24; 296:4;
298:7, 11; 304:2; 322:14

**shipped** 186:6; 191:25;
192:12; 219:25; 220:16,
19, 20, 21; 222:17; 224:5;

246:11, 15; 278:5; 284:5

**shipper** 222:4, 10; 227:4

**shippers** 230:14

**ships** 223:20

**shit** 172:16; 186:17, 18; 190:19; 203:8; 239:14; 242:18; 328:25

**shooting** 192:7

**Short** 173:15

**shortly** 308:24

**show** 210:17; 225:12; 256:25; 272:6; 297:21

**showed** 204:7; 246:11; 280:8

**showing** 206:10, 17; 239:13, 19; 274:11; 336:3

**shows** 333:24

**shut** 237:5, 6

**side** 172:22; 260:12, 22; 261:12, 16; 298:2, 3

**sign** 331:23; 332:19, 21, 25; 333:6; 334:24; 335:8; 337:15

**signature** 259:14, 20; 260:5, 6; 266:16; 270:18; 276:2; 282:18

**signed** 183:7, 15; 229:10; 259:16; 270:7; 274:19, 20; 282:14, 24; 296:19; 323:6; 332:6; 333:8; 334:20

**similar** 300:13

**simplest** 174:5

**simply** 205:22; 230:13, 18; 248:15; 272:22; 278:16; 292:14; 299:22; 334:16

**Sinai** 172:4; 178:20, 22; 179:9

**single** 178:11; 206:16

**sister** 224:20

**situation** 192:3, 9; 197:15; 245:25; 251:22

**six** 171:4; 309:25

**size** 265:13, 15, 16, 22

**slightly** 316:21

**slipped** 238:3

**small** 260:11

**Social** 193:6; 238:21; 309:7, 10; 310:18

**Sokol** 259:16

**Sokol's** 260:8; 276:5

**sold** 189:19, 19; 203:15; 204:7; 320:18; 328:24

**sole** 215:11; 249:14

**somebody** 200:14; 201:22; 218:21; 234:14; 279:18; 299:4; 313:20; 316:11

**somehow** 297:22

**someone** 182:21; 197:16; 207:8; 236:13; 275:23; 276:11; 306:19

**someplace** 189:8

**sometime** 254:2, 20;

294:13

**sometimes** 211:8; 272:8; 319:11

**somewhat** 264:18

**somewhere** 180:12; 234:23

**somewheres** 171:6

**soon** 226:18, 20; 234:18; 251:12; 299:8

**sooner** 319:4

**sorry** 215:20; 245:7; 268:7

**sort** 292:10

**sounds** 280:11; 297:14

**sources** 227:25; 320:16

**speak** 302:3; 307:4

**specialist** 168:15

**specific** 199:25; 204:21; 210:4, 4, 8; 222:9; 229:23; 259:8

**specifically** 173:2; 236:22; 268:11; 314:11

**spending** 240:2, 3

**Spignosi** 256:13

**split** 289:8

**spoke** 186:20; 201:6; 227:23; 234:19; 238:14; 242:9; 251:6, 13; 296:23

**spoken** 181:25; 200:21, 24; 201:16; 202:3; 245:12; 251:16; 275:14

**spotted** 179:18

**square** 265:3, 19, 21; 266:4

**stage** 208:14

**stamp** 261:9, 12, 24; 281:6, 21

**stand** 260:15

**standing** 240:5

**stands** 261:20

**stapled** 315:20, 22

**star** 225:12; 297:20, 21

**start** 170:25; 190:17; 263:24; 292:6, 7; 299:10; 312:2, 7

**started** 171:5; 190:13, 19; 219:14; 232:4; 242:12, 14; 292:5; 295:2, 8, 10; 309:25; 319:7

**starts** 267:9

**State** 169:22; 176:20; 199:13, 14; 208:15; 222:23; 235:17, 25; 237:22; 244:10, 11, 16, 22, 23; 245:8; 253:20, 22; 254:13, 14; 284:13; 311:6, 8; 332:7

**stated** 170:17; 276:14; 287:14; 300:24; 331:21

**statement** 179:24

**States** 168:10; 172:14

**stating** 172:10

**stays** 172:3

**step** 311:9

steps 253:25; 315:22

**stiffed** 285:15; 290:4, 8, 20; 291:6

**stiffing** 298:8

**still** 175:21; 176:12; 181:16, 19, 19; 188:3; 199:5; 202:16; 203:10; 209:4, 6; 241:25; 245:20; 256:24; 276:23; 327:7; 331:7

**stipulation** 176:3, 4, 18; 332:19

**stocks** 316:9

**stole** 180:2; 197:18; 248:6; 312:4

**stop** 184:15; 201:21, 25; 224:9; 229:2; 273:12

**stopped** 273:13; 294:16, 20, 24

**stopping** 221:7

**store** 236:6

**stores** 294:9, 10, 10; 327:19

**story** 233:4

**straight** 240:5

**stranger** 200:17, 18

**Street** 168:13, 19; 200:6; 249:5; 267:19

**strictures** 176:12

**strike** 249:7; 324:14; 326:16; 329:4

**struck** 326:11

**stuff** 186:13; 193:23; 232:10; 233:20; 236:3, 4; 238:22; 314:18; 328:18

**stupid** 233:5

**subject** 200:11; 203:21; 215:22; 235:21; 314:3

**submit** 217:25; 245:24

**submitted** 224:4

**subpoena** 170:5

**substance** 319:9; 329:10

**successful** 312:5

**suggest** 224:23; 236:18; 265:20

**suggested** 230:8; 231:11; 237:10; 241:12

**suitable** 174:11

**sulfate** 174:15

**sum** 197:6, 7; 299:13, 14, 20

**sums** 248:5

**Sun** 285:4

**supervisor** 303:23

**supplier** 292:11, 20

**suppliers** 320:23; 321:18; 324:14, 16

**supply** 209:8

**support** 193:9, 15

**supporting** 193:24; 248:17

**supposably** 323:22

**supposed** 213:25; 214:12; 215:21; 216:2;

228:19; 246:17; 268:21; 286:6, 15; 288:2; 291:14; 292:3, 17

**supposedly** 251:3; 322:4

**sure** 171:7; 188:9, 17; 195:9; 211:25; 218:12; 221:24; 222:7; 224:2; 239:5; 252:20; 263:24; 270:15; 290:13; 292:24; 297:15; 304:13; 309:5; 315:3; 316:11; 322:18; 331:20

**suspects** 199:21

**suspend** 330:12, 16

**suspicious** 185:13; 191:4, 16

**swear** 169:17

**swimming** 279:14

**swirls** 260:3


**T**


**tablet** 173:25

**tackle** 192:5

**tackling** 224:3

**talk** 235:9; 237:20; 242:25; 251:5, 7; 297:11; 317:14

**talked** 186:12, 25; 187:15; 189:3; 202:25; 231:24; 232:15; 238:2, 3; 240:11; 241:2; 244:19; 250:14; 253:24; 255:20

**talking** 178:2, 4; 190:17; 201:21, 25; 229:6; 233:2; 255:8; 285:16; 291:10; 296:25; 322:17

**Tape** 243:20, 25; 304:17, 25; 330:3, 6; 335:22

**tapped** 233:21

**tax** 243:2, 8, 9; 246:21; 247:15, 17; 248:4, 10, 15; 249:11; 306:12, 13; 308:10; 309:8, 11, 20; 310:8, 20; 315:9, 16, 24

**taxes** 183:6; 227:16; 247:2, 5, 7, 13, 22

**telephone** 201:14, 17; 262:11; 274:24; 275:3

**telling** 172:16; 199:16; 204:15; 232:20; 313:23

**ten** 225:2; 234:20; 237:4; 240:3; 255:21; 273:9, 10, 25; 326:14

**ten-year** 310:7

**term** 173:15, 15; 321:12

**terms** 287:23; 299:12

**test** 207:25

**testified** 169:23; 214:23, 24; 318:24; 319:25; 320:8

**testify** 313:8

**testimony** 171:10; 176:22; 182:13; 187:11; 233:18, 23; 236:20; 238:21; 250:7, 9; 285:23;

**Thanks** 329:13

**theft** 180:12; 247:24

**theoretically** 281:9

**There'll** 334:14

**thereafter** 306:9

**therefore** 205:18, 21; 281:8; 289:14

**thief** 242:19

**thinking** 189:9; 292:15; 329:10

**third** 175:24; 269:25; 274:20; 281:13; 334:11

**though** 175:22; 176:6; 178:7, 10; 322:13

**thought** 177:2; 190:3; 192:11; 212:5; 312:4; 324:19

**thousand** 198:16, 22; 199:2; 247:19; 317:5; 320:2, 3

**threatened** 313:7

**threatening** 224:19

**threats** 252:11

**three** 178:8, 14; 181:12; 201:6; 232:3; 244:9, 9, 14; 251:14; 254:24; 274:14; 283:3; 298:10; 304:6; 305:16; 306:15; 309:22; 316:4; 317:23; 325:24; 333:6; 334:14

**Threw** 203:22

**Throughout** 216:13

**throw** 232:18; 308:6

**till** 175:8

**timely** 335:11

**times** 183:20; 198:24; 201:16; 209:21; 221:17; 237:4; 240:4; 256:20; 265:11; 289:2; 296:24; 304:6; 320:2, 3

**tips** 192:24

**title** 337:6

**today** 171:25; 172:8; 174:12; 175:24; 177:18; 200:20; 201:18; 202:11; 215:9; 227:8; 232:2, 8, 9, 14; 233:2; 238:17; 239:2; 240:24; 250:7; 254:4; 290:18; 311:6; 330:10, 16, 25

**told** 181:7; 184:10, 14; 185:10, 14, 16; 186:15; 187:25; 188:11, 12, 14; 189:2, 9, 12, 14; 190:7; 191:13; 203:7; 204:14; 205:20; 209:16; 215:18; 219:11, 12, 24; 226:5; 236:12; 237:6, 21; 238:10; 239:12; 241:20; 242:12; 244:10; 249:23; 252:14, 17, 18, 20, 25; 255:13; 256:21; 280:11; 290:3, 18; 307:14; 320:15, 22; 324:13; 325:5; 330:25

**tomorrow** 312:10;

331:11

Tony 227:23; 228:5, 6, 11, 12, 20; 229:8, 9; 249:18, 21; 250:12, 18; 251:6, 11, 12, 15, 16, 19; 252:3, 5, 10, 18, 22; 253:2, 7, 11, 12, 14, 18; 256:6, 10, 22; 260:23, 25; 262:15; 275:8, 14, 19; 277:18; 278:8, 13, 25; 279:5; 284:3; 297:12; 300:15, 20; 301:11; 302:4; 304:3

Tony's 256:3; 301:24

took 287:14; 299:23; 321:3; 332:10

top 266:12

total 180:17; 248:5; 263:7, 14; 264:15; 280:17; 282:9; 287:2, 10; 288:13, 15, 21; 316:21, 23

tough 314:15

towards 198:3; 234:24

traffic 302:22

trailer 265:14, 22; 266:2, 4

transaction 243:6

transcribed 170:12

transcript 331:14; 337:16

transfers 306:9

transition 320:12

treated 178:9; 335:12

treatment 336:4

treatments 172:2

trial 177:14, 23

tried 234:2, 6; 323:2; 324:5

troopers 236:2; 237:22

truck 264:12

trucking 291:17

trucks 223:7, 10; 264:9

true 184:17; 196:25; 213:5; 293:10; 330:24

trusts 311:22, 23

truth 172:17; 195:9; 232:20; 242:4

truthful 171:15, 23

truthfully 173:7

try 173:19

trying 189:12; 224:9, 11, 14, 16; 232:17, 20, 23; 271:15; 279:18

turn 317:9

turned 288:2

turns 209:10

TW 270:5; 283:17

twice 214:9; 267:16

two 175:2; 181:12; 185:19; 189:5; 199:7, 12; 201:25; 220:24; 221:11; 223:19; 229:5; 232:15; 234:19; 235:7; 238:11; 241:9, 25; 254:24; 257:15, 20; 269:12, 21; 271:16; 280:14; 285:22; 290:22;

306:12; 307:12; 311:18; 316:4; 325:15; 329:6

upset 508:13

use 198:18, 21; 222:9; 225:3; 234:11; 236:18; 240:17; 320:8; 326:25

used 183:21; 227:4; 229:4; 237:14; 248:24; 327:8, 16

uses 172:22

using 237:11; 321:11; 326:17; 328:18

usual 234:9

usually 315:20; 333:25

two-week 237:20; 255:8

two-year 294:18

typewritten 266:6; 337:11

Tyrone 200:25; 201:2, 3, 23; 238:14, 25; 239:7; 244:19; 270:3, 9, 13, 17; 274:20; 282:14; 286:12; 288:20; 289:4, 23; 293:24, 25; 298:5

Tyrone's 283:18; 288:5, 18

## U

U.S 224:19

ultimately 208:25; 217:17; 288:19

Um-hum 231:19; 270:22; 280:19; 283:5

unaccompanied 218:9

under 168:9; 172:13; 197:12; 208:11; 250:20; 256:6; 263:20; 264:16; 269:10; 280:15; 283:2; 293:8; 327:18; 332:5, 25; 333:8; 334:20

underlined 267:16

undershipment 281:7

undershipments 272:3

understate 248:7

understood 286:20; 318:13; 320:21

unemployment 193:7

unit 280:16, 21

United 168:10

unknowing 240:20

unknowingly 222:13; 226:9, 13; 230:7; 240:18

unknown 222:14

Unless 332:8

untruths 234:16

up 172:20; 179:14; 180:25; 183:10; 184:11; 196:24; 205:22; 206:3; 210:19; 212:25; 213:2, 3, 4, 12; 217:16, 19, 21; 218:3; 219:2; 224:2, 11; 228:18, 20; 229:8, 9; 230:24; 232:18, 19; 235:24; 237:6, 12, 18, 25; 239:13, 19; 240:5; 243:3; 245:21; 259:5, 8, 11; 260:11; 266:11; 267:15; 269:14; 276:15; 278:7; 279:20, 24; 280:8; 287:7; 288:19, 22; 289:23; 299:6, 12; 308:6; 310:5; 312:7, 18; 321:13; 322:13; 326:21

upon 291:21

upper 260:21; 269:14; 274:24

waters 273:24

way 170:19; 174:5; 176:10; 178:5; 179:12; 182:11; 197:8; 202:21; 205:9, 14, 17; 207:4; 209:6; 215:3; 219:18; 220:14; 222:20, 22; 257:5; 263:25; 270:13; 273:2; 275:19; 277:19; 285:15; 288:3; 296:6; 310:4; 324:10, 10; 331:23; 335:11

ways 215:4; 234:13; 270:4; 313:23

Weavers 293:11; 305:15, 17

week 234:19; 238:4, 11; 254:24

weekly 192:22

weeks 217:5; 232:16; 235:7; 251:14; 254:24, 24, 25; 316:4, 4

Weller 327:13, 17, 18; 328:2, 3, 4, 14, 19

weren't 193:3; 220:23; 276:11; 290:19; 295:24; 322:23

West 168:13, 18

what's 195:24; 221:10; 311:8

whatsoever 299:7; 318:2

whenever 318:10

whereby 313:4

wherein 183:24; 203:14; 213:23; 219:9; 246:9

Whereupon 274:6; 336:7

whisper 300:9

who's 197:16; 224:20; 236:5; 239:16; 301:6, 9; 332:16

whole 171:11, 20; 223:21; 292:24; 314:18; 328:15; 329:21

whose 263:5; 269:18, 21; 271:3; 275:3; 278:3; 283:11, 14

William 169:5

Williams 201:3, 23; 232:3; 238:14, 25; 239:7, 19; 244:8; 245:5; 270:10, 14, 17; 271:18, 24; 272:7; 274:21; 282:14, 18; 286:13; 288:11; 298:6; 318:14; 323:16

willing 246:3; 308:9; 310:14; 333:11

window 335:4

Wire 273:20; 306:9

wired 273:21

wish 171:10; 333:15; 334:4

withdrawals 174:24

within 169:21; 245:24; 316:4; 332:5; 334:24

without 210:4; 281:18

witness 169:18, 19;

## V

valid 177:12

value 205:18; 313:5, 11

vantage 217:8

varied 291:19

variety 323:6

various 172:3, 19, 23; 253:21; 255:25; 267:22

vendor 185:20; 206:17; 243:7, 10; 261:4; 269:9

vendors 184:11, 16, 18; 185:17; 189:10; 191:15, 20; 206:25; 207:6; 216:11; 220:7, 7; 276:15, 16

vernacular 237:8

versus 168:8; 309:21

vice 187:22; 303:16

victims 325:24

video 168:15

VIDEOGRAPHER 168:2; 169:16; 225:23; 226:2; 243:19, 23; 274:4, 8; 304:16, 23; 329:25; 330:5; 335:20

videotape 168:5

view 326:13

visit 236:2

visited 244:17

volume 334:16

## W

W 168:8

Wachovia 199:24; 200:5

wait 175:8; 318:17, 19

waiting 311:13

walk 224:14

wall 224:15

Walsh 187:21; 266:13, 15; 274:19; 276:9; 303:16

wants 185:17

warehouse 186:15; 187:8, 20; 188:12; 189:2, 8, 15, 16, 20; 192:4, 10, 15, 16; 267:19, 23, 25; 268:17; 293:22; 303:23

warehouses 190:8; 191:24

warnings 172:22

11:19; 175:10, 14; 176:16; 177:10, 25; 178:6, 12, 16; 179:12; 182:8; 184:6; 198:23; 203:19; 206:14; 208:6, 7, 17, 20; 211:12; 212:24; 215:7, 16; 223:2, 15, 17; 225:5, 10, 14, 15; 244:2; 281:12; 284:12, 15; 297:17, 20; 300:8; 309:14; 317:8, 9; 329:15, 19; 331:9; 332:2, 23; 333:16; 334:7, 12; 335:14, 17

witnesses 208:4

woman 256:12

wood 293:22; 294:3

word 224:4; 267:3, 15; 281:23; 323:23

words 210:2; 221:22; 235:6; 236:18; 251:21; 261:16; 266:11; 276:18; 308:21; 329:9

work 188:21; 193:3; 194:14; 239:24; 291:20; 308:22; 310:22

worked 249:18; 250:3; 262:3; 298:8; 319:23; 326:12, 13

workers 249:18

working 183:3; 184:22; 192:19; 239:25; 240:2; 281:17; 299:2

works 197:8; 331:23

worried 243:2

worry 328:25

wound 288:19

writing 206:16; 209:22; 245:24; 267:2; 269:18, 22

writings 183:7; 206:9; 209:7; 212:19; 261:17

written 229:18; 266:15; 276:7

wrong 191:5; 214:18; 246:19; 277:14, 17; 280:10

wrongs 233:17

wrote 267:15; 301:13

WT 270:20

## X

X 291:4

Xeroxes 174:10

## Y

Y 291:5

Y-U-R-K-O 169:10

yardage 265:19

yards 265:3, 21; 266:4

year 190:21; 191:7; 229:13; 249:5; 261:8; 302:8; 306:6; 310:10

years 181:12, 12, 12;

194:15; 212:16; 255:21;
306:16; 309:20; 326:14
**yelling** 239:16
**Yep** 260:14; 265:12;
288:9; 290:25; 302:19
**York** 168:13, 14, 19, 19;
169:22; 172:5; 229:14;
312:20; 332:11, 23
**YOUNG** 278:6
**youngest** 201:24
**YOURKO** 212:10; 214:17
**Yup** 263:2; 281:24
**YURKO** 169:9, 9; 171:17,
19; 174:2; 175:6, 12, 16;
176:2, 14, 18; 179:4;
182:6, 10; 184:3, 7; 185:6;
187:10; 188:16; 191:10;
198:21; 202:13; 203:17;
205:25; 206:12, 18;
207:13, 18, 22; 208:5;
209:19; 210:5; 211:10, 15;
213:18; 214:3, 14; 215:10,
14, 24; 216:10, 18; 217:12,
18, 22; 218:6, 15; 221:23;
222:11, 19, 25; 223:14;
224:7, 23; 225:8; 226:8,
12, 22; 227:21; 229:19;
230:6; 231:12; 234:8;
237:8; 240:15, 23; 243:17;
249:20; 250:6, 11; 257:2,
6, 9, 13, 20; 259:18, 25;
262:18; 263:12, 22; 268:5,
8; 280:23; 281:11; 284:10,
13; 288:10; 289:21;
291:10; 293:4; 301:6;
304:5; 306:20; 309:2;
316:16; 317:11; 329:13,
16; 332:18, 25
**Yurko's** 301:9

---

# Z

**zero** 264:6

**Lawyer's Notes**