UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INTERNATIONAL FLOOR CRAFTS, INC. )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>DAVID W. ADAMS, *et al*, )<br>    Defendants. )<br>) | CIVIL ACTION NO.<br>05-cv-11654-NMG |

**PLAINTIFF INTERNATIONAL FLOOR CRAFTS, INC.'S TRIAL BRIEF**

Plaintiff International Floor Crafts, Inc. hereby submits its trial brief in the within matter pursuant to Local Rule 16.5(F):

**I.     Introduction**

Through this action, IFC seeks to recover damages and attorneys' fees from remaining defendants, Jane Dziemit, Tyrone Williams and David Adams for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), common law conspiracy to violate RICO, unfair and deceptive business practices and common law fraud arising out of a multi-year scheme under which former employees of IFC (which handles the rugs, padding and flooring departments of retail stores known as Building 19) conspired with non-employees to steal at least five million dollars from IFC by, essentially, falsely representing that IFC had received various shipments of rugs and padding and then causing IFC to make payments on the partial or phantom shipments.  The Amended Complaint also alleges claims against Williams and Adams for breach of fiduciary duty[1].  IFC expects that Williams and Adams will exercise their Fifth Amendment rights at trial.  IFC also expects that former defendant Ronald Mitchell, who entered into an Agreement for Judgment recently, will testify at trial.  While Adams sought bankruptcy

---

[1]     While technically, claims for conversion against Williams and Adams are still viable, in light of the Court's ruling on Defendant Dziemit's motion for summary judgment (in which the Court granted summary judgment in favor of Dziemit on the conversion claim), IFC does not press the conversion claim against Williams and Adams.

protection earlier this month, on July 15, 2008, the Bankruptcy Court granted IFC a relief from stay.

## II.     Facts[2]

IFC operates the rugs, padding and flooring departments of the discount retail stores known as Building 19. Normally, an IFC buyer, like Defendant Adams or Britto, would prepare a purchase order for merchandise that IFC would buy. Upon receipt of the shipment, an individual in the receiving department (for our purposes, Williams), would sign a document known as a "key req" confirming that the shipment was received. The receiver would also collect a bill of lading from the trucking firm or the vendor, and the receiver would sign the bill of lading. The IFC accounting department would match the key reqs and the bill of lading to the invoice (received from the seller) and the purchase order (generated by IFC), and then make payment to the seller.

For approximately ten years, Adams and Britto managed a scheme under which fake or partial shipments would be sent to IFC from various entities, including, without limitation, CCC International, Dalton Padding, Empire Weavers, Mansfield Rug and Remco. In essence, Britto and Adams would prepare fake purchase orders, and Williams would sign key reqs falsely asserting that the shipments had been received. The various entities, such as Remco and Mansfield Rug, would then issue invoices which IFC would pay. The proceeds from the frauds would then be distributed, with Adams and Britto apparently receiving the bulk of the funds. According to Britto, he and Adams were to receive 22 percent of the invoice. Williams received approximately $1,500 per falsified key req.

---

[2]  The following facts are mainly drawn from IFC's memorandum in opposition to Dziemit's motion for summary judgment.

2

In or around 1999, Mitchell, a family friend of Dziemit, approached Dziemit regarding providing funds for an expansion of Mitchell's carpet business under which Mitchell would provide capital to Adams in advance, and Adams would purportedly use the funds to purchase the items and resell them to IFC. At the time, Dziemit was in the mortgage lending business. Dziemit and her boyfriend Anthony Maresca met with Adams at a Building 19 store to discuss the venture, while Mitchell stayed in the background.

From 1999 to 2001, Defendant Dziemit, who had been in the business of making real estate loans, served as a partner with Ronald Mitchell in Remco, a d/b/a and one of the companies involved in the scheme. Remco was run from Mitchell's home, and the company had no warehouse. Mitchell admits to lying to an IFC employee a few years ago by telling the employee that Remco did have a warehouse. Dziemit began making large advances of funds to Mitchell. Initially, Dziemit had Mitchell sign a promissory notice, but, once the note was paid, she did not require any further writings from Mitchell.

During the first five or six transactions, Dziemit advanced funds for Remco to send directly to CCC. The notion was that the funds would be used to pay for rug or padding that CCC would send to IFC. Dziemit would then prepare a Remco invoice, based upon an IFC purchase order received from Adams, and forward the invoice to IFC. When the IFC funds would arrive, Dziemit would deduct the amount she advanced, and then Mitchell and Dziemit would split the remainder. Dziemit maintains that these advances were loans. This scenario was not a loan, as Dziemit was not receiving interest on the amount she loaned; she was merely receiving a percentage of the profits. The amount that Dziemit received was not dependent upon the amount of time that the advance was outstanding. Dziemit would deposit the funds

3

received into various accounts. The depositing of the funds into various accounts, and the fairly haphazard manner in which the transactions were conducted, increase the difficulty of discerning where all of the funds went. From the record, it is a fair inference that Adams was keeping (or distributing to Britto) the funds advanced from Dziemit, because no rugs or padding were purchased. Dziemit issued Remco invoices for product which was never shipped. She prepared the invoices even though she knew that Remco had no warehouse.

In or around 2000, the scheme changed, after Adams told Mitchell, who had previously only dealt with padding and not rugs, that he had other sources of supply for truckloads of rugs and padding. Adams did not want to identify the new sources to Mitchell. At this point, Dziemit began to provide Adams with significant funds (often $25,000) up front, before a purchase order was prepared. Two or three weeks later, Adams would tell Mitchell to send an invoice to IFC. When IFC paid the invoice, Adams, Mitchell, Dziemit, and even Britto, would receive funds from Remco. Dziemit kept the Remco checkbook in her home during the partnership, and she wrote ninety percent of the checks.

In or around 2000, Mitchell began to suspect that Adams had a gambling problem. Britto estimated that Adams gambled away over $1 million dollars. Nonetheless, Mitchell continued to deal with Adams.

Mitchell began wiring funds to Adams and to write significant checks to cash, some of which were indorsed by Dziemit. In fact, Mitchell wrote more than $133,000 in checks to cash. Mitchell acknowledged that he had not written checks to cash before in his business. The checks he has produced reveal that Mitchell wrote various checks in large amounts to various banks and to companies associated with Dziemit. Frankly, a review of bank records reveals a confusing

4

web of checks to various entities, and to cash, and a review of his handwritten records pertaining to the advances is no less confusing. Those records appear to show that Maresca, who was not affiliated with Remco in any way, made various advances to Mitchell – even the chart shows "T+J," which Mitchell testified meant "Tony and Jane." In fact, some of the IFC purchase orders which Dziemit saw listed Maresca, who did not work for IFC or Remco, as the contact person. Dziemit did not question why Maresca's name appeared on the purchase orders.

Later, Britto ordered Mitchell to wire the funds to Britto, and not to Adams. Britto told Mitchell, "Look, this is what's gonna happen, you don't give [Adams] the money anymore, it comes to me." Mitchell inexplicably complied.

At another point, when Dziemit refused to make further advances because of the amount which Adams already had outstanding, Mitchell formed Mansfield Rug and continued the scheme. Even after the partnership ended, Dziemit made at least fifteen additional advances to, or on behalf of Remco.

Dziemit was paid on transactions (in amounts ranging from approximately $1,000 to $5,000) in which she did not advance money. Mitchell testified that Dziemit may have prepared the invoices on these transactions, a process which would have taken five minutes. Thus, Dziemit would receive thousands of dollars for five minutes of work. Mitchell's records confirm that Dziemit received funds on transactions in which she did not advance funds.

In April, 2005, William Gemme, the acting controller of IFC, began an investigation of its rugs, padding and flooring departments after an employee reported some difficulties with locating certain shipments which Adams, a former IFC buyer, had ordered. At or around that time, Mitchell knowingly submitted a fake bill of lading to IFC in an effort to deceive IFC into

5

thinking that IFC had received a certain shipment from Remco. Mitchell also lied to William Gemme of IFC by telling Gemme that some Remco records had been destroyed.

IFC's investigation has revealed that, from 1999 to 2005, IFC received invoices from Remco and Mansfield Rug in the amount of approximately $2.3 million and $980,000, respectively. Also, IFC received invoices from the mid-1990s to 2005 from Empire Weavers and Dalton Padding in the amount of approximately $1.117 million and $394,000, respectively. IFC made payments on all of those invoices in excess of $4.4 million but has not been able to confirm shipments through legitimate bills of lading. According to Britto, Dalton Padding and Empire Weavers, which were also involved in the scheme, billed for fake shipments. Remco and Mansfield Rug presented invoices for items that were not shipped. Mitchell estimates that Dziemit earned $140,000 from the transactions.

### III. IFC's claims against Defendants Dziemit, Williams and Adams

The main claims in this case are the RICO and fraud claims against all of the Defendants. While the RICO claim lists all four subparts of §1962(a-d), the primary focus is upon §1962(c)(participating in the conduct of a business engaged in interstate commerce through a pattern of racketeering activity) and §1962(d)(conspiracy to violate §§1962(a-c)). We shall deal with all four sections in turn.

#### A. Defendants' Violation of Section 1962(c)

As set forth in IFC's Proposed Jury Instruction No. 53, in order to prove that the defendant violated § 1962(c), IFC must establish by a preponderance of the evidence each one of the following five elements:

1. That an enterprise existed;
2. That the enterprise affected interstate or foreign commerce;
3. That the defendant was associated with or employed by the enterprise;

    4.       That the defendant engaged in a pattern of racketeering activity (or the collection of an unlawful debt); and

    5.       That the defendant conducted or participated in the conduct of the enterprise through the pattern of racketeering activity.

    1.       **"Enterprise"**  As to the first element, IFC has alleged four different enterprises, all or some which may co-exist, in this case:

    a.       **Remco**.  Former defendant Mitchell and Defendant Dziemit were partners in Remco from 1999 until the end of 2001, although Dziemit continued to participate in the business of Remco (through alleged loans) after that time.  While Mitchell maintained that the business had a warehouse, there was no such warehouse.  The business was operated out of his house and prepared invoices pertaining to goods that no one at Remco ever saw.

    b.       An enterprise consisting of at least **Jane Dziemit, Ronald Mitchell, David Adams, Tyrone Williams, David Sun, Paul Sun, Kevin Britto, CCC International, Inc., Remco, Mansfield Rug, Empire Weavers, and/or Dalton Padding**.  These people (and the entities) had a common purpose, an informal organization and they functioned as a unit for approximately ten years.  (Of course, Dziemit was not involved for all ten years.)  The participants worked together to arrange for the partial and phantom shipments.

    c.       **International Floor Crafts, Inc., an innocent enterprise**.  Under *Aetna Cas. Sur. Co., v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994), International Floor Crafts, Inc. may be considered an "innocent enterprise."  As noted in *Aetna*, "an enterprise may include a legitimate legal entity like Aetna as the victim of the racketeering activity." *Id.* at 1557.

    d.       The fourth enterprise includes, without limitation, **Jane Dziemit, Ronald Mitchell, David Adams, Tyrone Williams, David Sun, Paul Sun, Kevin Britto, CCC International, Inc., Remco, Mansfield Rug, Empire Weavers, Dalton Padding and/or International Floor Crafts (an innocent participant)**.

    2.       **Interstate commerce**.   Evidence at trial will demonstrate that funds and documents were forwarded across state lines, and that the business activity of the various enterprises, which encompassed millions of dollars, affected interstate commerce.

    3.       As to the third element, IFC must show that the Defendants were associated with, or employed by, the enterprise.  (See Proposed Instruction No. 54).  IFC must show that Dziemit,

Mitchell and Adams were connected to the enterprise in some meaningful way, and that the Defendants knew of the existence of the enterprise and the general nature of its activities. *Id*. Here, Adams and Williams were the buyer and the receiver who orchestrated the false shipments. Dziemit met directly with Adams. She was responsible for preparing Remco invoices for goods which did not exist. She received a percentage of the profits – not interest on any alleged loans – from the fraudulent gains. She received payments even in instances when she did not make any alleged loans. Dziemit had dealings with Mitchell, Adams and CCC. She sent out various payments from funds received from IFC. She was involved in the day-to-day operations of Remco.

      4.      As to the fourth element, IFC must show that Defendants committed at least two racketeering acts, sufficiently related to constitute a pattern, within ten years of each other. IFC intends to show that Defendant Dziemit arranged for specific wire transfers to David Adams in connection with the sale (including, without limitation, on November 18, 1999, December 1, 1999 and December 8, 1999), and to show that Dziemit mailed Remco invoices (for non-existent goods) to IFC during the 1999 to 2001 period. IFC intends to seek to demonstrate that Adams forwarded Purchase Orders via mail or facsimile to Remco for the preparation of false invoices.

      5.      Finally, IFC must show that the Defendants conducted or participated in the conduct of the enterprise through that pattern of racketeering activity. Dziemit sent out invoices and funds to various participants in the scheme. By sending the Remco invoices (which she prepared), she enabled the participants to receive funds from the scheme. Adams and Williams prepared the purchase orders and key reqs, respectively.

Insiders to the enterprise "who are integral to carrying out the enterprise's racketeering

activities-...-come within the definitional sweep of section 1962(c)." *United States v. Houlihan*, 92 F.3d 1271, 1298-1299 (1st Cir. 1996).  In contrast, outsiders to the enterprise, such as an outside accounting firm with only a contractual relationship to the criminal enterprise, must be shown to participate in the "the operation or management of the enterprise itself." Id., at 1298, *quoting Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

In *United States v. Gabriele*, 63 F.3d 61, 68 (1st Cir. 1995), the Court found sufficient insider participation in the conduct of the enterprise to support an instruction that Gabriele need not "direct" the criminal enterprise to incur §1962(c) liability.  In *Gabriele*, an organization known as the Saccoccia enterprise had laundered drug money, in part, by sending gold and precious metals to a company known as RTI, which was operated by Gabriele.  *Id.*, at 64.  After learning that his own companies were under FBI surveillance, Saccoccia began to divert more of his gold to RTI.  *Id.*  Gabriele knew about and participated in counting the cash and gold shipments from Saccoccia.  *Id.*  Gabriele kept coded records of the shipments.  *Id.*  On occasion, Saccoccia instructed Gabriele to transfer large sums of cash held in the RTI safe.  *Id.*  At Saccoccia's direction, Gabriele would wire funds to Saccoccia's designated banks or would deliver cash to Saccoccia couriers.  *Id.*  Saccoccia and Gabriele discussed their ongoing cash transactions in a coded conversation intercepted by the FBI in October 1991.  *Id.*  Gabriele appealed his §1962(c) conviction on the ground that it was error to instruct the jury that it need not find that he "directed" the Saccoccia enterprise since "an enterprise is operated not just by upper management but also by lower rung participants who act on the direction of upper management." *Gabriele*, 63 F.3d at 68.  The Court rejected Gabriele's appeal holding that Gabriele was not an independent "outsider" but a full-fledged "employee" of the Saccoccia

enterprise, as evidenced by Saccoccia's anticipated "purchase" of RTI from Gabriele and his instructions to underlings to leave cash for Gabriele. *Id.*

Much like in *Gabriele*, Dziemit claims a lack of knowledge and claims not to have participated in the RICO scheme. Even so, Dziemit, like Gabriele, was not an independent outsider but rather a full-fledged employee of Remco. She prepared paperwork. She advanced funds which enabled the scheme to run, even though she was reluctant to advance the funds. She kept the Remco checkbook at her home during the partnership, wrote ninety percent of the checks, and received Remco checks at her post office box. She forwarded checks to Mitchell and to Adams. She prepared invoices on her computer and mailed those invoices to IFC. Dziemit indorsed checks from IFC to Remco and deposited those checks, and then Dziemit forwarded the proceeds from the checks to Mitchell and, less frequently, directly to Adams, keeping a percentage of the proceeds as profit. Dziemit's actions were crucial to the scheme, as the IFC insiders, Adams, Britto and Williams, needed outside organizations to receive and process IFC funds.

Moreover, further demonstrating Dziemit's participation in the affairs of the wider criminal enterprise, Dziemit wired money to CCC one or twice. Dziemit sent checks to CCC. Dziemit obtained money orders for CCC. She obtained money orders or checks for CCC on four to six occasions.

Finally, as in *Gabriele*, Dziemit and Mitchell kept simultaneous coded business records. For instance, Mitchell's records referring to "T + J," code for "Dziemit," identifies 53 payments to Dziemit, while Dziemit's records appear to show that she received only 27 payments. Additionally, the existence of numerous checks to cash from Mitchell and Remco suggests that

n

the business was engaged in underhanded dealings.

Moreover, even if IFC were required to show Dziemit's operation or management of the enterprise, *see Reves*, 507 U.S. 170, the record demonstrates that Dziemit participated in the operation or management of the enterprise. Not only did Dziemit become Mitchell's partner in Remco, but Dziemit traveled to a Building 19 store in Massachusetts for a high level meeting with Adams, the central figure in the scheme to defraud IFC. Mitchell even made himself "a little scarce" so that Dziemit, Adams and Maresca could talk alone. Based upon these facts, combined with the massive sums of money acquired by Dziemit personally (Mitchell estimated that he made $210,000 and Dziemit made $140,000 during the scheme) and her key role in keeping the operation financed, a reasonable finder of fact could infer that Dziemit had participated in the management or operation of the criminal enterprise.

### B.     Defendants' Violation of §1962(d) and Common Law Conspiracy

IFC has also brought a conspiracy to violate RICO claim pursuant to §1962(d). As shown above Dziemit engaged in more than two acts of mail and wire fraud by forwarding false invoices to Remco and by wiring funds from the fraud to Adams. IFC will be able to prove that Dziemit met with Adams and that, thereafter, she began advancing funds to Adams, thus demonstrating her agreement to enter into the conspiracy. IFC will also be able to prove that Dziemit was a partner in Remco with Mitchell, a company that sold non-existent rugs to IFC. Adams forwarded false purchase orders to Remco in furtherance of the scheme[3].

IFC has also asserted a common law conspiracy to violate §1962 claim. The pertinent type of civil conspiracy here is akin to common law joint tort liability. "In order to prove such a claim, a plaintiff must show (1) a common design or an agreement, express or implied, between

---

[3] IFC has moved to amend the complaint to include David Adams in the 1962(d) claim (now that the automatic stay has been lifted).

two or more persons to do a wrongful act, and (2) proof of some tortious act in furtherance of the agreement." *Allendale Farm, Inc. v. Koch*, 1997 WL 1229248, *3 (Mass. Super. 1997); *Aetna Casualty Sur. Co. v. P&B Autobody,* 43F.3d 1546, 1564 (1st Cir. 1994). Here, there was an implied or express agreement on the part of all of the co-conspirators, including, without limitation, the remaining Defendants, to defraud IFC, each of whom performed various acts in an effort to accomplish that goal.

     **C.**    **Defendants' Violation of 1962(a)**

To recover under 18 U.S.C. §1962(a), IFC must show that it has suffered harm as a result of Dziemit's "use or investment" of racketeering income, *i.e.,* that the investment or use proximately caused injury to IFC. *See Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91-92 (1st Cir. 1995). Here, Dziemit received racketeering income when she received, processed, indorsed and deposited checks from IFC as payment upon Remco's fraudulent invoices for rugs which were never delivered. Dziemit indorsed the IFC checks, the proceeds of the racketeering, and deposited those checks. She then forwarded the proceeds from the checks to Mitchell and, less frequently, directly to Adams, keeping a percentage of the proceeds as profit. She wrote approximately ninety percent of the Remco checks during the partnership from 1999 to 2001. Dziemit's actions were crucial to the scheme, as the IFC insiders, Adams, Williams and Britto, needed outside organizations to receive and to process IFC funds. In other words, the scheme does not work unless there is a place to send the money. As such, Dziemit's investment of the ill-gotten gains from IFC, and her redistribution of the funds constituted Dziemit's *designated role* in the overarching enterprise. *See United States v. Connolly*, 341 F.3d 16, 28 (1st Cir. 2003) (finding a discernable structure to

12

the enterprise where the members played "designated roles in keeping the enterprise functioning as a viable unit").

While Dziemit attempts to categorize her investments as mere "loans," Dziemit did not receive periodic interest on her advances, but, rather, she received a percentage of the funds left over after her advanced funds were deducted from the amount received from the funds paid by IFC. She indorsed large checks made payable to cash from Mitchell or Remco – something which Mitchell admitted was not good business practice. Mitchell admitted that the preparation of two checks to cash (one for $20,000 and one for $10,000) on the same day looked suspicious. Remco issued more than $133,000 in checks made payable to "cash."

Most importantly, however, and most indicative of her participation in the scheme, is that Dziemit received payments on transactions in which she did not advance funds.  In exchange for taking five minutes to prepare a Remco invoice, Dziemit received staggering payments of approximately $1,000 to $5,000. Moreover, she wrote Remco invoices based upon IFC purchase orders, some of which included the name of her boyfriend, Anthony Maresca, as a contact person – a person whom she knew was not an employee of IFC or Remco – without even questioning the issue.

### D.  Violations of §1962(b)

IFC also brings a claim under §1962(b), claiming, in essence, that the Defendants acquired control of, or an interest in, a business engaged in interstate commerce through a pattern of racketeering activity.  There is little question that Adams, along with at least Britto, controlled the overall scheme.  Of course, the overall scheme encompassed dealings with Dalton Padding, Emprire Weavers, Mansfield Rug, CCC and Remco.  Dziemit, with Mitchell, controlled and had

an interest in Remco. Thus, to the extent that the enterprise is Remco itself, Dziemit has satisfied the requirements of §1962(b). Since Dziemit was receiving a percentage of the proceeds of the fraud (insofar as it involved Remco), she also had an interest in the overall scheme itself sufficient to satisfy §1962(b)).

### E.  Fraud claims

IFC has also asserted fraud claims against the defendants. In order to sustain a claim of fraud or misrepresentation, a plaintiff must show a false statement of a material fact, which was known or should have been known to be false, made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment. *Powell v. Rasmussen*, 355 Mass. 117, 118-119 (1969); *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982); *Acushnet Fed. Credit Union v. Roderick*, 26 Mass. App. Ct. 604, 605 & n. 1 (1988). The speaker does not need to know "that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker." *Acushnet*, *supra* at 605; *Nickerson v. Matco Tools Corp.*, 813 F.2d 529, 530 (1st Cir. 1987) (plaintiff does not need to show that the speaker **knew** that the statement was false). Where the plaintiff proves "a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge ... it is not necessary to make any further proof of an actual intent to deceive." *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77-78 (1991), *quoting Powell*, 355 Mass. at 118.

Dziemit billed IFC for rugs which were never shipped, when she created Remco invoices on her computer and mailed those invoices to IFC. The invoices constituted representations that

14

Remco had, in fact, delivered the rugs for which it billed, when such was not true.  IFC acted in reliance upon Dziemit's misrepresentations when it executed and delivered to Remco checks as payment for the invoiced rugs, which had not, in fact, been delivered.  Moreover, by continually indorsing and depositing IFC checks as payment for rugs which were never shipped, Dziemit implicitly represented to IFC that the rugs had, in fact, been delivered.  Moreover, while Dziemit claims to have acted in good faith when invoicing IFC, her lack of good faith is demonstrated by, among other things, (1) the fact that she knew that Maresca was not a contact person for IFC, (2) the cash transactions and the haphazard nature of the transactions, and (3) the fact that Remco had no warehouse.

**Damages:**

IFC intends to introduce evidence to show that IFC paid the following sums to the following companies from 1995 to 2005 for goods which it did not receive, or, at the very least, cannot confirm receiving:

| | |
|---|---|
| CCC International | $5.1 million (approx.) |
| Dalton Padding | $330,000 (approx.) |
| Empire Weavers | $1 million (approx.) |
| Mansfield Rug | $940,000 (approx.) |
| Remco | <u>$2.3 million (approx.)</u> |
| **Total** | **9.6 million (approx.)** |

IFC also seeks to recover treble damages, costs and attorneys' fees.

Plaintiff
International Floor Crafts, Inc.
By Its Attorneys,

*/s/ Paul J. Klehm*
Paul J. Klehm (BBO# 561605)
pklehm@krasnooklehm.com
James B. Krasnoo (BBO# 279300)
jkrasnoo@krasnooklehm.com
Benjamin L. Falkner (BBO# 667951)
bfalkner@krasnooklehm.com
Krasnoo | Klehm LLP
23 Main Street, Suite Six
Andover, MA 01810
(978) 475-9955

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney(s) of record or upon each party not represented by an attorney via ECF or via first class mail, postage pre-paid on July 16, 2008.

*/s/ Paul J. Klehm*
Paul J. Klehm